[If you need additional space for ANY section, please attach an additional sheet and reference that section.]



RECEIVED

7/29/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Azis Kochiu

_____ )
_____ )

Plaintiff(s),

v.

_____

Secretary Doug A. Collins
Department of Vet. Affairs

Defendant(s).

Case Number: _____

**1:25-cv-09065**
**Judge LaShonda A. Hunt**
**Magistrate Judge Gabriel A. Fuentes**
**RANDOM / Cat 1**

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. This is an action for employment discrimination.

2. The plaintiff is Azis Kochiu of the county of Milwaukee in the state of Wisconisn.

3. The defendant is Secretary Doug A. Collins, whose street address is 810 Vermont Avenue N.W.,

(city) Washington D.C. (county) District of Columbia (state) (ZIP) 20420

(Defendant's telephone number) (815) – 698-2411

4. The plaintiff sought employment or was employed by the defendant at (street address)

Captian James A Lovell Federal Health Care - VA (city) North Chicago

(county) Lake (state) Illinois (ZIP code) 60064

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

5.      The plaintiff [*check one box*]

(a)     ☐       was denied employment by the defendant.

(b)     ☒       was hired and is still employed by the defendant.

(c)     ☐       was employed but is no longer employed by the defendant.

6.      The defendant discriminated against the plaintiff on or about, or beginning on or about,
(month) May, (day) 8th, (year) 2023.

7.1     (*Choose paragraph 7.1 or 7.2, do not complete both*.)

(a)     The defendant is not a federal governmental agency, and the plaintiff
        [*check one box*] ☐*has*  ☐*has not* filed a charge or charges against the defendant

        asserting the acts of discrimination indicated in this complaint with any of the

        following government agencies:

        (i)     ☐ the United States Equal Employment Opportunity Commission, on or about

                (month)_____ (day)_____ (year)_____.

        (ii)    ☐ the Illinois Department of Human Rights, on or about

                (month)_____ (day)_____ (year)_____.

(b)     If charges *were* filed with an agency indicated above, a copy of the charge is

        attached. ☐ Yes, ☐ No, **but plaintiff will file a copy of the charge within 14 days**.


        It is the policy of both the Equal Employment Opportunity Commission and the Illinois

        Department of Human Rights to cross-file with the other agency all charges received. The

        plaintiff has no reason to believe that this policy was not followed in this case.


7.2     The defendant is a federal governmental agency, and

        (a)     the plaintiff previously filed a Complaint of Employment Discrimination with the

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

defendant asserting the acts of discrimination indicated in this court complaint.

☑ Yes (month) May_____ (day) 3_____ (year) 2023_____

☐ No, did not file Complaint of Employment Discrimination

(b)   The plaintiff received a Final Agency Decision on (month) May_____

(day) 19_____ (year) 2025_____.

(c)   Attached is a copy of the

(i)   Complaint of Employment Discrimination,

☑ Yes   ☐ No, but a copy will be filed within 14 days.

(ii) Final Agency Decision

☑ Yes   ☐ N0, but a copy will be filed within 14 days.

8.   *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

(a) ☐   the United States Equal Employment Opportunity Commission has not

issued a *Notice of Right to Sue.*

(b) ☐ the United States Equal Employment Opportunity Commission has issued

a *Notice of Right to Sue*, which was received by the plaintiff on

(month)_____ (day)_____ (year)_____ a copy of which

*Notice* is attached to this complaint.

9.   The defendant discriminated against the plaintiff because of the plaintiff's [***check only***

***those that apply***]:

(a) ☐   Age (Age Discrimination Employment Act).

(b) ☐   Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

    (c)  ☐   Disability (Americans with Disabilities Act or Rehabilitation Act)

    (d)  ☐   National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

    (e)  ☑   Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

    (f)  ☐   Religion (Title VII of the Civil Rights Act of 1964)

    (g)  ☑   Sex (Title VII of the Civil Rights Act of 1964)

10.    If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983).

11.    Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the ADA by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791; and for the ADEA, 29 U.S.C. § 626(c).

12.    The defendant [***check only those that apply***]

    (a) ☐ failed to hire the plaintiff.

    (b) ☐ terminated the plaintiff's employment.

    (c) ☐ failed to promote the plaintiff.

    (d) ☐ failed to reasonably accommodate the plaintiff's religion.

    (e) ☐ failed to reasonably accommodate the plaintiff's disabilities.

    (f) ☐ failed to stop harassment;

    (g) ☑ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

    (h) ☑ other (specify):  Falsely detailed plaintiff, intentionally and falsely ran a chart review

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

in order to justify the detail while knowingly deceiving the quality management dept in terms

of Plaintiff's responsibilities, decieved the board peer review with false data, higher leadership

intentionally dismissed department witnesses that corroborated Plaintiff responsibilities and duties,

slandered plaintiff's name with a vicious proposed suspension letter, suspended plaintiff etc.

13.    The facts supporting the plaintiff's claim of discrimination are as follows:

Defendent charged Plaintiff with,"Delay of Care."Plaintiff has hundreds of consults as direct evidence

submitted into the record of every dept member in delay of care status, and nothing happend to them.

Direct evidence in the record indicating how a me being a male, non Filipino

_____

_____

14.    **[*AGE DISCRIMINATION ONLY*]** Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15.    The plaintiff demands that the case be tried by a jury. ☑  Yes ☐  No

16.    THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

    (a)    ☐  Direct the defendant to hire the plaintiff.

    (b)    ☐  Direct the defendant to re-employ the plaintiff.

    (c)    ☐  Direct the defendant to promote the plaintiff.

    (d)    ☐  Direct the defendant to reasonably accommodate the plaintiff's religion.

    (e)    ☐  Direct the defendant to reasonably accommodate the plaintiff's disabilities.

    (f)    ☐  Direct the defendant to (specify): _____

_____

_____

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

_____

_____

_____

(g)  ☐  If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double  damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h)  ☑  Grant such other relief as the Court may find appropriate.

_____
(Plaintiff's signature)

Azis Kochiu
_____
(Plaintiff's name)

Azis Kochiu
_____
(Plaintiff's street address)

(City) South Milwaukee      (State) WI      (ZIP) 53172

(Plaintiff's telephone number) ( 414 ) – Ph: 414-617-9879 cell

Date:  7/30/2025

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

Addendum to Complaint form.

7.2 (b)

The EEOC final decision was riddled with holes. For example, Donnabelle defendent states she doesn't know the patients in question due to the evidence which was redacted, yet commented on them with perjured statements and the Judge took her word for the truth and forgone a hearing where my witnesses could prove the truth and Donnabelle's perjury.

The judge did not take the direct evidence into consideration, i.e. a video recording of Donnabelle giving the department direction contrary to her testimony and that I followed orders exactly as she stated.

The Judge didn't take into consideration the direct evidence that I charted everything that was needed as my responsibilities.

The Judge hadn't taken into account the hundreds of consults entered into the record as evidence which were in the status of "delay of care" of which the entire dept was guilty of but nothing happened to any of them. Delay of care was what I was charged with.

Extremely important, the Judge did not take into consideration that Donnabelle and Cindy Reyula an RN Filipino was assigned the consult in question after me and neither Cindy nor Donnabelle did proper follow up resulting in delay of care, and nothing happened to Cindy (female) (Filipino). Note, Donnabelle is female and Filipino.


Most importantly, direct evidence shows Wendy Superable, female, Filipino was assigned a consult which was psychiatry in which an active suicide patient called indicating the desperate need for inpatient psych due to suicide ideation. Despite the chart being flagged as suicide, Wendy negligently ignored it and assigned it to an LPN (LPNs are administrative staff). ALL suicide patients are the responsibility of Registered Nurses, to be done immediately by RNs, flat cold. What was the outcome? The administrative staff called the veteran a week later, (delay of care) and was informed the this 35 year old female veteran who had been begging for help, who needed the help immediately, was not called by a trained staff member (Registered Nurse) but by an administrative staff member and was told the 35 year old female veteran had hung herself.

When I brought up and filed discrimination based on sex and race as to why Wendy was not subject to the same intense detail and suspension and chart review that I was, Donnabelle give the below answer.

Donnabelle testified that this patient was not an equal comparison to the one I was involved because Wendy assigned the consult to an administrative staff (LPN) and did proper follow up. The Judge took what Donnabelle stated and agreed that my situation and Wendy's were not comparable. That has to be the most contradictory and flawed decision I have ever heard on face value.

First off Donnabelle lied and stated Wendy did the correct follow up. That's not true, Wendy assigned the consult to an administrative staff member against Donnabelle's own words on recording when she states Registered Nurses do all the moderate and complex consults, it's on recording as direct evidence. Moreover, Wendy's actions the Board of Nursing considers way below the proper level of care for a Registered Nurse to perform at.

This passed prima facia. On face value we have 2 RN's, one the plaintiff, white, male, followed protocol EXACTLY as he was told, and proved by evidence in the record, as well as witness testimony in emails, and the other a female Filipino RN, who fell way below the standard of care, caused delay in care, resulting in the veteran to commit suicide.

Now if Donnabelle states Wendy did follow up care then we have a major problem as Wendy and the VA would be in violation of falsifying documentation to show proper follow up, or the more likely scenario, Donnabelle lied in testimony. The latter is what happened, she knowingly, knows that an RN takes care of suicide patients and not administrative staff. She has her own words on recording stating to that. One does not need an advanced literary degree to understand this. The Judge took Donnabelle's word on this, despite the mountains of direct evidence and witnesses willing to testify on plaintiff's behalf. Plaintiff wasn't allowed to cross-examine Donnabelle, wasn't allowed to have a hearing to which 10 plus witnesses wanted to testify.

The above is textbook discrimination no matter how you look at it. 2 RNs, one a white male, the other a female Filipino. The manager Donnabelle who is of Filipino race. The white male was suspended and punished, whereas the female Filipino got to slide.

Obviously, the Judge wanted to punt and not make the tough decision. It's all in the record presented as direct evidence.


7.2 (9). Race, Sex, and Retaliation.

7.2 (12) (h).

Falsely detailed plaintiff based on deceptive data entered by Donnabelle to Dr Ravipati and the Quality Management (QM) department.

Intentionally and falsely had QM run a chart review on plaintiff based on false data which was done to justify the detail all while knowingly deceiving QM and subsequently deceiving Dr. Ravipati in terms of the Registered Nurses responsibilities.

Donnabelle deceived and tampered with evidence when this came up in a peer review board meeting.

Higher leadership, Dr Ravipati intentionally dismissed plaintiff's witnesses that corroborated plaintiff's responsibilities and duties.

Ravipati slandered the plaintiff's name based on her own assumptions viciously in her proposed suspension letter. This is slander.

None of what happened to me was done to Wendy female Filipino, or Cindy Reyula, female Filipino, given the Manager Donnabelle is a female Filipino. More over none of what happened to me happened to anyone else in the department for their "Delay of Care" given my charge by the agency was "Delay of Care." Again, the record depicts hundreds of consults in the Delay of Care status and there are A LOT more.

This was harassment, belittled plaintiff, caused unnecessary stress and anxiety, humiliation, the entire hospital knew what happened to plaintiff. No matter what the truth is, the damage is done. Putting one through the process is worse than the punishment. I denied several positions that I applied for, despite being more than qualified for the positions due to the slander around the hospital.


7.2 (h) (13).


Plaintiff charged with Delay of Care, despite the consultation in question, is proven by documents in the record that plaintiff followed protocol exactly as directed. Whereas the two, female, Filipino's cited above had nothing happen to them when they were guilty of Delay of Care and improper follow up resulting in a death.


Plaintiff has the direct evidence entered as exhibits.

Witness testimony

Witnesses wanting to testify

Recording

Perjured testimony by the defendants


Why the plaintiff was denied Due Process to present the evidence is a travesty and is a denial of Due Process of the 5th and 14th Amendments to the U.S. Constitution.


7.2 (h) (15).

I want a Jury trial and not a motion for summary judgment as I know if it goes to MSJ my case will be dismissed just because I am going pro se. The only fair outcome will be if the case is presented in front of a Jury of my peers.

Addendum to Complaint form.


7.2 (b)

The EEOC final decision was riddled with holes.  For example, Donnabelle defendent states she doesn't know the patients in question due to the evidence which was redacted, yet commented on them with perjured statements and the Judge took her word for the truth and forgone a hearing where my witnesses could prove the truth and Donnabelle's perjury.

The judge did not take the direct evidence into consideration, i.e. a video recording of Donnabelle giving the department direction contrary to her testimony and that I followed orders exactly as she stated.

The Judge didn't take into consideration the direct evidence that I charted everything that was needed as my responsibilities.

The Judge hadn't taken into account the hundreds of consults entered into the record as evidence which were in the status of "delay of care" of which the entire dept was guilty of but nothing happened to any of them.  Delay of care was what I was charged with.

Extremely important, the Judge did not take into consideration that Donnabelle and Cindy Reyula an RN Filipino was assigned the consult in question after me and neither Cindy nor Donnabelle did proper follow up resulting in delay of care, and nothing happened to Cindy (female) (Filipino).  Note, Donnabelle is female and Filipino.


Most importantly, direct evidence shows Wendy Superable, female, Filipino was assigned a consult which was psychiatry in which an active suicide patient called indicating the desperate need for inpatient psych due to suicide ideation.  Despite the chart being flagged as suicide, Wendy negligently ignored it and assigned it to an LPN (LPNs are administrative staff).  ALL suicide patients are the responsibility of Registered Nurses, to be done immediately by RNs, flat cold.  What was the outcome?  The administrative staff called the veteran a week later, (delay of care) and was informed the this 35 year old female veteran who had been begging for help, who needed the help immediately, was not called by a trained staff member (Registered Nurse) but by an administrative staff member and was told the 35 year old  female veteran had hung herself.

When I brought up and filed discrimination based on sex and race as to why Wendy was not subject to the same intense detail and suspension and chart review that I was, Donnabelle give the below answer.

Donnabelle testified that this patient was not an equal comparison to the one I was involved because Wendy assigned the consult to an administrative staff (LPN) and did proper follow up. The Judge took what Donnabelle stated and agreed that my situation and Wendy's were not comparable. That has to be the most contradictory and flawed decision I have ever heard on face value.

First off Donnabelle lied and stated Wendy did the correct follow up. That's not true, Wendy assigned the consult to an administrative staff member against Donnabelle's own words on recording when she states Registered Nurses do all the moderate and complex consults, it's on recording as direct evidence. Moreover, Wendy's actions the Board of Nursing considers way below the proper level of care for a Registered Nurse to perform at.

This passed prima facia. On face value we have 2 RN's, one the plaintiff, white, male, followed protocol EXACTLY as he was told, and proved by evidence in the record, as well as witness testimony in emails, and the other a female Filipino RN, who fell way below the standard of care, caused delay in care, resulting in the veteran to commit suicide.

Now if Donnabelle states Wendy did follow up care then we have a major problem as Wendy and the VA would be in violation of falsifying documentation to show proper follow up, or the more likely scenario, Donnabelle lied in testimony. The latter is what happened, she knowingly, knows that an RN takes care of suicide patients and not administrative staff. She has her own words on recording stating to that. One does not need an advanced literary degree to understand this. The Judge took Donnabelle's word on this, despite the mountains of direct evidence and witnesses willing to testify on plaintiff's behalf. Plaintiff wasn't allowed to cross-examine Donnabelle, wasn't allowed to have a hearing to which 10 plus witnesses wanted to testify.

The above is textbook discrimination no matter how you look at it. 2 RNs, one a white male, the other a female Filipino. The manager Donnabelle who is of Filipino race. The white male was suspended and punished, whereas the female Filipino got to slide.

Obviously, the Judge wanted to punt and not make the tough decision. It's all in the record presented as direct evidence.


7.2 (9). Race, Sex, and Retaliation.

7.2 (12) (h).

Falsely detailed plaintiff based on deceptive data entered by Donnabelle to Dr Ravipati and the Quality Management (QM) department.

Intentionally and falsely had QM run a chart review on plaintiff based on false data which was done to justify the detail all while knowingly deceiving QM and subsequently deceiving Dr. Ravipati in terms of the Registered Nurses responsibilities.

Donnabelle deceived and tampered with evidence when this came up in a peer review board meeting.

Higher leadership, Dr Ravipati intentionally dismissed plaintiff's witnesses that corroborated plaintiff's responsibilities and duties.

Ravipati slandered the plaintiff's name based on her own assumptions viciously in her proposed suspension letter. This is slander.

None of what happened to me was done to Wendy female Filipino, or Cindy Reyula, female Filipino, given the Manager Donnabelle is a female Filipino. More over none of what happened to me happened to anyone else in the department for their "Delay of Care" given my charge by the agency was "Delay of Care." Again, the record depicts hundreds of consults in the Delay of Care status and there are A LOT more.

This was harassment, belittled plaintiff, caused unnecessary stress and anxiety, humiliation, the entire hospital knew what happened to plaintiff. No matter what the truth is, the damage is done. Putting one through the process is worse than the punishment. I denied several positions that I applied for, despite being more than qualified for the positions due to the slander around the hospital.


7.2 (h) (13).


Plaintiff charged with Delay of Care, despite the consultation in question, is proven by documents in the record that plaintiff followed protocol exactly as directed. Whereas the two, female, Filipino's cited above had nothing happen to them when they were guilty of Delay of Care and improper follow up resulting in a death.


Plaintiff has the direct evidence entered as exhibits.

Witness testimony

Witnesses wanting to testify

Recording

Perjured testimony by the defendants


Why the plaintiff was denied Due Process to present the evidence is a travesty and is a denial of Due Process of the 5th and 14th Amendments to the U.S. Constitution.


7.2 (h) (15).

I want a Jury trial and not a motion for summary judgment as I know if it goes to MSJ my case will be dismissed just because I am going pro se. The only fair outcome will be if the case is presented in front of a Jury of my peers.



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## Chicago District Office

JCK Federal Building
230 S. Dearborn, Suite 1866
(Enforcement, State and Local & Hearings)
Chicago, IL 60604
Chicago Direct Dial: (312) 872-9777
Federal Sector Fax: (312) 588-1265 or
CHIC-HEARINGSFAX@EEOC.GOV
Website: www.eeoc.gov

|  |  |
|---|---|
| AZIS KOCHIU, | EEOC No.: 440-2024-00142X |
| Complainant, | Agency No.: 200J556A-2023-152770 |
| v. |  |
|  | Administrative Judge |
| DENIS MCDONOUGH, SECRETARY, | Catherine Hunter |
| DEPARTMENT OF VETERANS AFFAIRS, |  |
| Agency. | Date: May 19, 2025 |

## ORDER ENTERING JUDGMENT

For the reasons set forth in the enclosed decision dated May 19, 2025, judgment in the above-captioned matter is hereby entered. A Notice to the Parties explaining their appeal rights and/or responsibilities is attached to the Decision. The hearing record is uploaded to the relevant online repository (Complainant may access the record via the EEOC's Public Portal and the Agency may access via FEDSEP).

IT IS SO ORDERED, on May 19, 2025.

FOR THE COMMISSION: *Catherine Hunter*

Catherine Hunter
Administrative Judge
Catherine.Hunter@eeoc.gov

1



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

JCK Federal Building
230 S. Dearborn, Suite 1866
(Enforcement, State and Local & Hearings)
Chicago, IL 60604
Chicago Direct Dial: (312) 872-9777
Federal Sector Fax: (312) 588-1265 or
Website: www.eeoc.gov

| | |
|---|---|
| AZIS KOCHIU,          ) | EEOC No.: 440-2024-00142X |
|     Complainant,   ) | Agency No.: 200J556A-2023-152770 |
|                    ) | |
|      v.                   ) | |
|                    ) | Administrative Judge |
| DENIS MCDONOUGH, SECRETARY,  ) | Catherine Hunter |
| DEPARTMENT OF VETERANS AFFAIRS, ) | |
|     Agency.              ) | Date: May 19, 2025 |
|                    ) | |

## DECISION OF ADMINISTRATIVE JUDGE ON
## AGENCY'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This decision is issued pursuant to 29 C.F.R. § 1614.109(g). Complainant made initial contact on June 22, 2023, and he filed a formal complaint on July 24, 2023. The Agency investigated and forwarded the Investigative File to Complainant with a Post Investigation Option Letter. On or about March 15, 2024, Complainant requested a hearing. On May 6, 2024, the Commission issued an Acknowledgement Order. On June 12, 2024, the undersigned held an Initial Conference and issued an Order After Initial Conference. On June 18, 2024, the Agency filed a Motion to Dismiss Claim and Basis. On June 18, 2024, Complainant filed a response. No Agency Reply was permitted. On June 26, 2024, the Agency's motion was granted in part, denied in part.[1]

On June 18, 2024, Complainant submitted two documents[2] and "Teams recordings". Upon the undersigned's inquiry, the Agency had no objection to adding the affidavit to the record but objected to adding any additional documents and "Teams recordings". On June 18, 2024, Monica Coleman's affidavit was marked and uploaded, as part of the record.[3] Upon the undersigned granting leave, Complainant filed a Motion to Add the 7 Day Letter and Teams Recording of the Department Workflow to be Entered Into Evidence on June 21, 2024. On June 27, 2024, the

---

[1] As Ordered on June 26, 2024, the undersigned granted the dismissal of the basis for reprisal for this complaint and denied the dismissal of Claim 1.

[2] 7-day letter and Monica Coleman's affidavit.

[3] Supp. ROI, 001-003.

Agency filed a response. No Complainant reply was permitted. On June 28, 2024, Complainant's motion was denied.[4] On September 10, 2024, the Agency filed a Motion for Summary Judgment ("Agency Motion"). On September 22, 2024, Complainant filed a response ("Compl. Resp.").[5] On September 27, 2024, Agency filed a reply ("Agency Reply").

On December 11, 2024, Complainant essentially filed a Motion to Delay a Decision for a possible Motion to Amend for matters, which he already contacted an EEO Counselor on or about December 10, 2024. Complainant's motion was denied without any Agency response.[6] On January 31, 2025, Complainant filed a Motion to Consolidate/Amend this complaint.[7] On February 5, 2025, the Agency filed a response. In granting the Agency's Motion for Summary Judgment in this complaint, Complainant's Motion to Consolidate/Amend this complaint is DENIED.[8]

Herein, I issue findings of fact and conclusions of law on the record having determined there are no genuine issue of material fact or issues of credibility to be resolved by a hearing. Therefore, the Agency's Motion for Summary Judgment is hereby GRANTED.

## II. ISSUES

Whether Complainant was subjected to a hostile work environment based on Sex (Male) and race (White) when:[9] a) since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed him and management has done nothing to stop it; b) in 2022, he was rated Satisfactory in his Proficiency Report; c) from November 8, 2022, to May 3, 2023, his was assigned a bigger workload than his co-workers; d) on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022; e) on June 15, 2023, DLV gave deceptive information to a Peer Review Committee: f) on June 19, 2023, he became aware DLV was asking co-workers to submit negative reports of contacts regarding him; and includes the following timely raised independently actionable claims:

---

4 At the same time, the undersigned advised Complainant he may cite to additional documents and Teams recordings and include as an exhibit in any response to a dispositive motion while also detailing the relevancy to this complaint.
5 On September 12, 2024, Complainant advised the undersigned that he was unable to upload to the EEOC portal a "recording" because it was encrypted. For review and consideration, the undersigned granted Complainant leave to send to the Agency and undersigned ta USB flash drive with an index listing the contents of the flash drive with the recording. Upon the undersigned's review of the USB flash drive, it contained a single recording with a video recording with audio that lasted 1 minute and 27 seconds and an index in Word and PDF format. The USB flash drive included no other recordings beyond the single recording, which was identified on provided index. *See* Ex. A.
6 At the same time, the undersigned advised Complainant that if he believed the Agency subjected him to discrimination beyond this complaint, he may contact an EEO counselor. Complainant was reminded that EEO counselor contact must be timely under 29 C.F.R. § 1614.105(a)(1).
7 Complainant requested to add/combine new events related to the Privacy Act of 1974 and Office of Inspector General (OIG) investigation, which have been identified in a separate complaint, Agency No. 200J-556A-2025-162505.
8 *See* EEOC EEO Management Directive 110 (MD-110), August 5, 2015, Chap. 5 § III.B. *et seq*.
9 The basis of sex relates to Claims a-f, and Claims 1 and 2, and the basis of race relates to only Claims b and d. *See* Order on Agency's Motion to Dismiss Claim and Basis dated June 26, 2024, fn. 2; ROI, 83-84, 109, 160-161.

3

(1) On May 8, 2023, he was removed from patient care.

(2) As of July 19, 2023, he has not been issued his Proficiency Rating that was due in February 2023.

### III. FINDINGS OF FACTS

The following facts are undisputed, or if disputed, viewed in the light most favorable to Complainant:

Background:

1. Azis Kochiu ("Complainant") is a Registered Nurse (RN) Grade 2, Step 2 previously with the Department of Community Care ("DCC") at the James A. Lovell Federal Health Care Center (FHCC). ROI, 130.

2. Complainant has been a VA ("Agency") employee since February 2019. ROI, 130.

3. Complainant identifies his sex as male. ROI, 131.

4. Complainant identifies his race as white. ROI, 161.

5. Complainant's first-line supervisor was Christianah Arowora ("Arowora") (Female/Black), Registered Nurse Manager. ROI, 130-131.

6. Complainant's second-line supervisor was Donnabelle Lorenzo-Villarino ("Villarino") (Female/Asian), Registered Nurse Manager. ROI, 131.

7. Complainant's third-line supervisor was Dr. Mamata Ravipati ("Ravipati") (Female), Assistant Chief Medical Executive Ambulatory Care. ROI, 200.

8. Villarino perceived Complainant's sex as male. ROI Vol. 1 at 183.

Claim a – Management did nothing to stop subjection to HWE:

9. Complainant's team was short staffed and was swamped with work for six months because he was given more work when someone left his department. ROI, 136, 184; Compl. Resp., 11-12.

10. When the department has staff turnover or staff shortages, staff members are expected to provide coverage for their absent co-workers. ROI, 184; Compl. Resp., 11-12.

11. Complainant notified Villarino other employees were working overtime without pay. ROI, 137.

12. Villarino did a review of hours worked and told staff not to work outside of their tour of duty or approved overtime hours. ROI, 184.

4

13. On May 8, 2023, Complainant was detailed pending an investigation about a patient care issue stemming from a Quality Assurance/Management report. ROI, 156, 188.

14. Complainant was detailed because there may have been a risk to patient safety. ROI, 190.

Claim b – Satisfactory Rating on Proficiency Report

15. For February 2021 through February 2022, Complainant received a Satisfactory proficiency rating on February 15, 2022. ROI, 490.

16. Arowora was the rating official. ROI, 490.

17. Villarino was the approving official ROI, 490.

18. On January 21, 2022, Arowora emailed Villarino she will rate Complainant as High Satisfactory. ROI, 172; ROI, 831.

19. On February 11, 2022, Villarino emailed Arowora stating she disagrees with her High Satisfactory rating of Complainant because there was no new input from the employee or manager. ROI, 196; ROI, 830.

20. Charlene Miller ("Miller") (Female/Black) was treated the same as Complainant for this claim. ROI Vol. 1 at 143.

21. Arowora (Female/Black) was treated the same as Complainant for this claim. ROI Vol. 1 at 143.

Claim c – Assigned Bigger Workload

22. Complainant's work unit was divided into multiple groups. ROI, 187.

23. Work assignments were divided based on the patient's name in the alphabet. ROI, 187.

24. The alphabet split was determined based on historical data. ROI, 187.

25. Complainant's workgroup had two (2) Registered Nurses, one (1) Licensed Practical Nurse, and one (1) Program Support Assistant. ROI, 187, 229.

26. Complainant's co-worker, Adrienne Harris ("Harris") (Female/Black), was also given a bigger caseload. ROI, 144.

27. Complainant states his team was short staffed and was swamped with work for six months because he was given more work when someone left his department. ROI, 136.

28. When the department has turnover or staff shortages, staff members are expected to provide coverage for their absent co-workers. ROI Vol. 1 at 184.

Claim D – Not Allowed Union Representation, Subjected to Fact-Finding Investigation, Lacks Documentation in Emails, and Accused of Not Properly Scheduling Deceased Patient's Consult and Claim 1 – Removed from Patient Care

29. A patient death generated a patient safety report indicating there was a lack of care coordination, which resulted in a patient not being scheduled or referred by the Department of Community Care. ROI, 188.

30. A Registered Nurse ("RN") Care Coordinator has a higher responsibility in care coordination. ROI, 203.

31. On May 8, 2023 Complainant was detailed pending an investigation about the patient care issue stemming from Quality Assurance/Management's report. ROI, 156.

32. Complainant was detailed for approximately three months. Compl. Resp., 60.

33. Complainant was detailed because there may have been a risk to patient safety. ROI, 190.

34. Per Human Resource guidance, Villarino issued the temporary re-assignment. ROI, 204.

35. On March 23, 2023, Alex Morse ("Morse"), Human Resources Specialist, was contacted by Villarino regarding delay in care possibly resulting in death of a patient. ROI, 216.

36. Morse recommend Villarino to perform a Weingarten meeting of Complainant to gather all the information surrounding event. ROI, 216.

37. On March 24, 2023, Villarino emailed Complainant advising he can have a Union present at a fact-finding interview about a Joint Patient Safety Reporting System ("JPSR") related to delay in patient care delivery. ROI, 188, 497.

38. Complainant cites two Oncology Department nurses advised him that they submitted JPSRs for two nurses in Office of Community Care ("OCC"), which did not receive write ups or subjected to a fact-finding for cancelling a consult and a veteran expired. ROI, 145-146.

39. The Oncology Department does not fall within Villarino's supervision. ROI, 196.

40. Complainant cites RN Wendy Superable ("Superable") (Female/Filipino) as a comparator because she was assigned a suicide patient, and the patient committed suicide. ROI, 146, 161, 197, 203.

Claim e – Deceptive Information to Peer Review Committee

41. Villarino assisted Quality Management in assigning another peer RN to review the consult and relaying messages between Quality Management, Complainant, and the peer RN. ROI, 189.

42. Villarino was not the point of contact for Quality Management. ROI, 189.

Claim f – Asking Co-workers to Submit Negative Reports of Contacts

43. Villarino asked Monica Coleman ("Coleman"), RN Care Coordinator to write up a Report of Contract ("ROC") regarding negative comment about Complainant. ROI, 148-149, Supp. ROI, 2.

Claim 2 – Not Issued Proficiency Rating

44. Arowora, Complainant's first-line supervisor and rating official, had several Proficiency Ratings assigned for her to complete for FY 2022 appraisal period. ROI, 172, 191, 490

45. Arowora was on extended leave from November 2022 through June 2023. ROI, 173.

46. On March 21, 2023 Villarino emailed Complainant about his Proficiency Report and requested any voluntary input to consider for his rating. ROI, 488.

47. On March 21, 2023 Complainant declined to provide input on his Proficiency Report. ROI, 488.

48. Complainant received his rating proficiency on August 25, 2023. ROI, 486.

49. Complainant provided a rebuttal to the Proficiency Report. ROI, 483.

50. Arowora issued the Proficiency Reports for FY 2022 approximately one month after returning from extended leave. ROI, 174.

51. Other female RNs received delayed Proficiency Reports – Wendy Superable, Cynthia Reluya (Reluya"), Ruby Dizon, and Adrienne Harris. ROI, 174, 228.

## IV. PRINCIPLES OF LAW

### A. Summary Judgment

Summary judgment is appropriate if the pleadings, answers to interrogatories, admissions, affidavits and other evidence establish no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* 29 C.F.R. § 1614.109(g); *see also Murphy v. Department of the Army*, EEOC Appeal No. 01A04099 (July 11, 2003) (noting that the

regulation governing decisions without a hearing is modeled after the Federal Rules of Civil Procedure, Rule 56.) The U.S. Supreme Court has held that summary judgment is appropriate where a court determines that, given the substantive legal and evidentiary standards that apply to the case, there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In ruling on a motion for summary judgment, a court's function is not to weigh the evidence but rather to determine whether there are genuine issues for trial. *Id.* at 249. The evidence of the non-moving party must be believed at the summary judgment stage and all justifiable inferences must be drawn in the non-moving party's favor. *Id.* at 255. An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. *Celotex v. Catrett,* 477 U.S. 317, 322-23 (1986); *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 105 (1st Cir. 1988). A fact is "material" if it has the potential to affect the outcome of the case. If a case can only be resolved by weighing conflicting evidence, issuing a decision without holding a hearing is not appropriate.

In the context of an administrative proceeding, an administrative judge may properly consider issuing a decision without holding a hearing only upon a determination that the record has been adequately developed for summary disposition. *See Petty v. Department of Defense,* EEOC Appeal No. 01A24206 (July 11, 2003). Finally, an Administrative Judge should not rule in favor of one party without holding a hearing unless he or she ensures that the party opposing the ruling is given (1) ample notice of the proposal to issue a decision without a hearing, (2) a comprehensive statement of the allegedly undisputed material facts, (3) the opportunity to respond to such a statement, and (4) the chance to engage in discovery before responding, if necessary. According to the Supreme Court, Rule 56 itself precludes summary judgment "where the [party opposing summary judgment] has not had the opportunity to discover information that is essential to his opposition." *Anderson*, 477 U.S. at 250. In the hearing context, this means that the administrative judge must enable the parties to engage in the amount of discovery necessary to properly respond to any motion for a decision without a hearing. *Cf.* 29 C.F.R. § 1614.109(g) (2) (suggesting that an administrative judge could order discovery, if necessary, after receiving an opposition to a motion for a decision without a hearing).

## B. Title VII Standard

The law governing this case is Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.* To prevail in a disparate treatment claim such as this, complainant must satisfy the three-part evidentiary scheme fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In disparate treatment cases, where there is an absence of direct evidence of discrimination, the allocation of burdens and order of presentation of proof is a three-step process. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). Under this analytic framework, complainant must first establish a *prima facie* case of unlawful discrimination--that complainant was a member of a protected class of individuals under Title VII; that s/he was subject to differing terms and conditions of employment; and another similarly situated employee not in the Complainant's protected class was treated more favorably regarding those same terms and conditions of employment. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253, and n. 6; *Nevin v. Tennessee Valley Authority*, Appeal No. 01992795 (February 14,

2002).

The Commission has long held that to be similarly situated, all relevant aspects of a Complainant's employment must be nearly identical to those of the comparative employee. *See Anderson v. Dep't of Treasury*, EEOC Appeal No. 01A22092 (Mar. 13, 2003). The Commission considers the following factors in making the determination: whether Complainant and the comparators come under the same manager's supervision; whether Complainant and the comparators perform the same job function; and whether Complainant and the comparators are on the same tour of duty. *Yang v. USPS,* EEOC Appeal No. 0120080544 (July 30, 2010) *citing Darbouze v. Department of Justice,* EEOC Appeal No. 01954013 (June 25, 1997).

The burden of production then shifts to the employer or Agency to "articulate" a legitimate, non-discriminatory reason for taking the challenged action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In a *McDonnell Douglas* analysis, the Supreme Court has long recognized that after the employer establishes a legitimate nondiscriminatory motive, the plaintiff "must be afforded 'an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 144 (2000).

If an Agency has asserted a legitimate, non-discriminatory reason, there is only "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Thus, the *prima facie* case need not be assessed in these circumstances. Instead, the examination focuses upon whether there is evidence of pretext. For example, is there a "convincing mosaic" of circumstantial evidence that would support the inference of discriminatory animus. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013). Thiswould include suspicious timing, verbal or written statements, comparative evidence that a similarly situated employee was treated differently, falsity of the employer's proffered reason for the adverse action, or any other "bits and pieces" from which an inference of discriminatory or retaliatory intent might be drawn. *Id.* Other indicators of pretext include, but are not limited to, discriminatory statements or past personal treatment attributable to those responsible for the personnel action that led to the filing of the complaint, comparative or statistical data revealing differences in treatment across various protected-group lines, unequal application of Agency policy, deviations from standard procedures without explanation or justification, or inadequately explained inconsistencies in the evidentiary record. *Mellissa F. v. U.S. Postal Service*, EEOC Appeal No. 0120141697 (Nov. 12, 2015).

### D. Harassment/Hostile Work Environment

Complainant alleged that he was subjected to harassment based on his protected classes. Harassment of an employee that would not occur but for the employee's race, color, sex, national origin, age, disability, religion, or prior EEO activity is unlawful. *Wilson v. Dept. of Veterans Affairs,* Appeal No. 01A309907 (Feb. 23, 2004), *citing McKinney v. Dole*, 765 F.2d 1129, 1138-1139 (D.C. Cir. 1985). To establish a claim of harassment Complainant must show that: (1)

he/she is a member of the statutorily protected class; (2) he/she was subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on the statutorily protected class; and (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment. *Fisher v. USPS,* EEOC Appeal No. 0120080536 (July 10, 2009); *citing Humphrey v. United States Postal Service,* EEOC Appeal No. 01965238 (October 16, 1998); 29 C.F.R. § 1604.11.

The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. *Enforcement Guidance on Harris v. Forklift Systems, Inc.*, EEOC Notice No. 915.002 (March 8, 1994). For most claims of harassment, the incidents must have been "sufficiently severe and pervasive to alter the conditions of Complainant's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); *see also Oncale v. Sundowner Offshore Services, Inc.*, 23 U.S. 75 (1998). A single incident or group of isolated incidents will not be regarded as discriminatory harassment unless the conduct is severe. *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1358 (11th Cir. 1982). Whether the harassment is sufficiently severe to trigger a violation of Title VII must be determined by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems*, 510 U.S. 17 (1993).

To warrant a hearing on a claim of discriminatory harassment, Complainant would have to present enough evidence to raise a genuine issue of material fact as to whether the responsible management officials were motivated by unlawful considerations in connection with the incidents described in the complaint. *See* 29 C.F.R. 1614.109(g); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000); *Harris, 510 U.S. at 22.* Complainant can satisfy this burden by presenting evidence of discriminatory statements or past personal treatment attributable to the responsible Agency officials, comparative or statistical data showing differences in treatment across gender lines, unequal application of Agency policy, deviations from standard procedures without explanation or justification, or inadequately explained inconsistencies in the evidentiary record. *Nicki D. v. Dep't of Veterans Affairs,* EEOC Appeal No. 0120133247 (Oct. 15, 2015). If Complainant fails to raise a genuine issue of material fact as to the existence of discriminatory/retaliatory intent on the part of the responsible management official, no further inquiry would be necessary as to whether the incidents complained of are severe or pervasive to rise to the level of harassment or constitute separate actions of discrimination/retaliation. *Nicki D. v. Dep't of Veterans Affairs,* EEOC Appeal No. 0120133247 (Oct. 15, 2015).

## V. ANALYSIS

In this case, both parties have had the opportunity to engage in discovery. The record, which has been adequately developed for this decision, consists of the Investigative File[10] and the parties' submissions.

---

10 *See Supra* Sec. I.

### A. Implied Motion to Amend

As a preliminary matter, Complainant's response identifies the basis of race beyond Claims b and d.[11] However, race is not an accepted basis in this complaint except for Claims b and d.[12] Similarly, Complainant alleges retaliation.[13] As previously addressed herein, the basis for reprisal was dismissed on June 26, 2024.[14] Therefore, the basis of race except for Claims b and d and reprisal for all claims are treated as a motion to amend. Filing a motion to amend after the Agency has already moved for a Summary Judgment is a basis for denying the motion. Accordingly, Complainant's motion to amend the complaint is hereby DENIED. Therefore, this decision will address the issues as identified in the Order on Agency's Motion to Dismiss Claim and Basis dated June 26, 2024.

### B. Possible Discovery Disputes

Complainant's response alluded to being unable to ask questions of Villarino and Ravipati about other nurses that were detailed and other topics.[15] However, Complainant had the opportunity to conduct depositions during discovery. Specifically, Complainant was approved for one deposition, and he made no inquires with the undersigned for any additional depositions.[16] He also did not alert the undersigned that he requested from the Agency additional depositions beyond one, and the Agency denied the request. Moreover, on July 1, 2024, the undersigned received a Motion to Compel, which was not related to depositions. On July 1, 2024, Complainant's motion was denied. Accordingly, all previously raised discovery disputes were appropriately addressed and will not be addressed further herein.

### C. Proposed 14-day Suspension and 3-day Suspension

Complainant's response also discusses a proposed 14-day suspension based on gender and retaliation.[17] Ultimately, on August 31, 2023, the proposed 14-day suspension was reduced to a 3-day suspension.[18] However, the proposed 14-day suspension or 3-day suspension are not accepted issues in this complaint. Prior to Complainant's response, he also did not request to amend this complaint to include these events. In fact, despite Complainant essentially filing to Motions to Amend on December 11, 2024 and January 31, 2025,[19] the motions did not include events related to the proposed 14-day suspension or 3-day suspension. As the proposed 14-day suspension or 3-day suspension are not accepted claims in this complaint, and Complainant never sought to amend this complaint to include these events, the events will not be addressed herein.

---

11 Compl. Resp., 27.
12 *See Supra* Sec. II; ROI, 1, 26-28, 109, 160-161.
13 Compl. Resp., 21, 44, 64.
14 *See* Order on Agency's Motion to Dismiss Claim and Basis dated June 26, 2024.
15 Compl. Resp., 13, 18, 31, 44-45.
16 *See* Order After Initial Conference dated June 12, 2024, Sec. III.1.d.
17 Compl. Resp., 17, 43, 45, 50-51, 54; *See* ROI, 473.
18 ROI, 570-574.
19 *See Supra* Sec. I, V.A.

### D. Disparate Treatment

Complainant fails to establish a *prima facie* case of discrimination on any basis including, but not limited to sex and race.[20] Beyond mere allegations and conclusory statements, he provides minimal evidence to support the allegations. Even if Complainant established a *prima facie* case, and he does not, the Agency has demonstrated legitimate, nondiscriminatory reasons for all actions taken related to this complaint. It is Complainant's burden to establish the Agency's provided legitimate, nondiscriminatory reasons are false or pretextual. Complainant has also failed to establish the Agency's reasons are a pretext for discrimination. For the reasons explained below, Complainant fails to meet his burden to establish a *prima facie* case or create a genuine issue as it relates to pretext.[21] Thus, his claims fail.

### 1. Satisfactory Rating on Proficiency Report (Claim b) and Not Issued Proficiency Rating (Claim 2)

Regarding Claim b, there appears to be confusion or misunderstanding regarding if Claim b pertains to FY 2021 (period covered: 02/19/2021-02/01/2022)[22] or FY 2022 (period covered: 02/28/2022 – 02/27/2023)[23] appraisal period. Therefore, this decision will address both FY 2021 and FY 2022 appraisal period. Initially for Claim b, Complainant testified he never received a Proficiency Report until after returning from detail for FY 2022, which is also related to Claim 2.[24] Noteworthy, for Claim b, at no time does Complainant mention any change of Proficiency Report rating in his initial affidavit dated November 18, 2023.[25]

With regards to the delay with issuing FY 2022 Proficiency Report, the Agency has articulated a legitimate, nondiscriminatory reason for the delay (Claim 2). The record shows Arowora was on extended leave while the FY 2022 Proficiency Report ratings were due in February 2023.[26] Arowora was rating official for Complainant and multiple other staff, which included female RNs.[27] While Arowora was on extended leave from November 2022 until June 2023, Villarino worked with Human Resources to reassign several outstanding Proficiency Report ratings. Villarino was reassigned as rating official for Complainant and other staff. Thereafter, she sent an email to the employees requesting any self-assignments.[28] On May 5, 2023, Villarino released the employees' plan to the reviewing/approving official. Arowora testified that after returning from extended leave in June 2023, she issued Proficiency Ratings to multiple employees approximately one month after her return.[29] Complainant does not rebut this testimony.[30] It

---

20 *See Supra* fn. 7.
21 *See Sims v. USPS*, EEOC Appeal No. 0120070183 (July 2008) ("[A] complainant's own statements of belief that discrimination occurred, no matter how genuinely held, are not proof and cannot withstand legal scrutiny."); *see also Elise S. v. Dept. of Army*, EEOC Appeal No. 0120151668 (June 16, 2017) ("[B]are assertion of motive, without evidentiary support," will not defeat Summary Judgment.).
22 ROI, 491.
23 *Id.*, 484.
24 ROI, 141, 484-487; *See Infra* Sec. D.6.
25 ROI, 141-143, 159, 830-834.
26 *Id.*, 173, 191.
27 *Id.*, 191, 174.
28 *Id.*, 191, 488-489.
29 *Id.*, 173-174, 484-487.
30 Compl. Resp., 60; ROI, 228.

appears Complainant is the only male that did not receive the Proficiency Report. All other employees that received a delayed Proficiency Report from Arowora were female and at least two were not of the same race as Complainant (*e.g.*, Harris and Superable).[31] Although the evidence supports there was a significant delay with issuing the Proficiency Report ratings for FY 2022, the evidence does not support discriminatory animus related to the delay. Instead, various RNs both male and female and white and non-white received a delayed FY 2022 Proficiency Report.

Additionally, Complainant testified he deserved a higher rating than Satisfactory for FY 2022 (Claim b).[32] The evidence establishes Complainant elected not to provide any input for the FY 2022 appraisal prior to issuance of the rating.[33] However, he did provide a rebuttal.[34] The FY 2022 provides detailed narratives to support the Satisfactory rating. While Complainant may disagree with the rating and believes some accomplishments were not included in the narratives,[35] he provides no evidence or argument to establish discriminatory animus or pretext related to the FY 2022 Proficiency Report rating.[36] Even if the rebuttal is accurate, beyond mere speculation, Complainant provides no evidence the oversight or inaccuracies were intentional or motivated by a protected class or pretextual.[37] Moreover, the ratings for other RNs that received a higher rating for FY 2022 include detailed narrative to support a higher rating.[38] Complainant did not argue the other RNs' ratings were not accurate. It is not overlooked Complainant's Proficiency Report rating was completed prior to Arowora's issuing them.[39] However, this is reasonable considering Arowora was on leave for November 2022 through June 2023. Thus, the Agency has articulated a legitimate nondiscriminatory reason for the delay and Satisfactory rating for FY 2022. Complainant has failed to meet his burden of proof to establish a *prima facie* case or pretext. Therefore, the Agency is entitled to summary judgment on this claim related to FY 2022.

If Complainant intended for Claim b to be related to FY 2021,[40] Complainant alleges he was rated Satisfactory on his Proficiency Report. Specifically, Complainant takes issue with Villarino not agreeing with Arowora's proposed High Satisfactory rating and instead, rating him Satisfactory for FY 2021.[41] On January 26, 2022, Arowora indicated that she would rate Complainant "High Satisfactory" in Category I and II with an overall rating of "High Satisfactory". In response, Villarino stated, "I requested input again from employees but was only provided with same info from last year. No new input from employee or manager therefore

---

31 ROI, 144, 174, 161; Agency Reply, Ex. 1 at 8-20.
32 ROI, 141-142, 484-487.
33 *Id.*, 488-489.
34 *Id.*, 483.
35 *Id.*, 141-142, 483.
36 *Ransohoff v. Dept. of the Army*, EEOC Request No. 05880627 ("Neither the ADEA nor Title VII was intended to be a vehicle for second-guessing an agency's business decisions. The Commission's duty is not to review the propriety of the agency's business decision, but rather to determine whether such a decision was a mere pretext for discrimination on a prohibited basis).
37 *See Terisa B. v. Dep't of Def.*, EEOC No. 0120180570 (Sept. 4, 2019)("a mistake made by an agency is not evidence of pretext unless there is evidence that the mistake was based on a complainant's protected class."
38 Agency Reply, Ex. 1.
39 ROI, 228.
40 *See* Agency Motion, 3-4, 11-12; Compl. Resp., 78-80.
41 ROI, 490-492, 830-834.

I would disagree with a High Satisfactory rating. I would rate Satisfactory."[42] Arowora testified, while she had always rated Complainant High Satisfactory, it was lowered by Villarino because Arowora was on detail.[43] Again, Complainant elected not to provide any input prior to issuance of the Proficiency Report for FY 2021[44] and there is no evidence Complainant submitted a rebuttal.

Complainant fails to establish a *prima facie* case related to FY 2021 Proficiency Report rating because he provides no evidence another similarly situated employee not in the Complainant's protected class was treated more favorably. While Complainant does identify Ruby Dizon and Cindy Reyula, both females of "Filipino descent", he provides no details or evidence related to their FY 2021 Proficiency Report or even their specific ratings.[45] Beyond unsupported speculation and conclusory statements, Complainant provides no evidence of discriminatory animus related to Villarino not agreeing with Arowora's initial rating. Thus, Complainant fails to meet his burden of proof to establish a *prima facie* case or pretextual motive. Accordingly, these claims fail.

2. Assigned Bigger Workload (Claim c)

For Claim c, Complainant alleges he was assigned a bigger workload than his co-workers based on his sex (Male). Villarino testified that when the department has staff turnover or staff shortage, the other staff are expected to provide coverage.[46] Complainant even recognized the department was short staffed.[47] Complainant also testified that Adrienne Harris (Female) was also given a bigger caseload.[48] The evidence supports that Complainant's unit is divided into groups. Complainant group consists of a total of four employees. Ultimately, the work assignments across all the teams were assigned by alpha split.[49] While race it not an accepted basis for Claim c, Complainant argues, "I find it suspect that two black women were on my team and not on team with Filipinos. Boy, I wonder why that happened." Complainant also testified, "…the Filipino's groups were stacked. And by the way I was given the weakest employees in my group."[50] While it is unknown what Complainant is implying being teamed up with "the two black women," and he was "given the weakest employees," Complainant presented no evidence he was assigned to a specific team based on his sex (or race). Beyond pure speculation and conjecture,[51] he fails to provide any evidence the assignment of a bigger workload was motivated by discriminatory animus or pretextual. Again, Harris (female) was also assigned a bigger caseload. Instead, the evidence supports for business reasons, workload had to be divided due staff shortage.[52] Thus, Complainant fails to establish a *prima facie* case.

---

42 *Id.*, 830-831.
43 *Id.*, 172.
44 *Id.*, 491.
45 *Id.*, 143; Compl. Resp., 20-25.
46 ROI, 184.
47 *Id.*, 458.
48 ROI, 144; Compl. Resp., 25-26.
49 ROI, 187.
50 Compl. Resp., 26.
51 *See Sims v. USPS*, EEOC Appeal No. 0120070183 (July 2008); s*ee also Elise S. v. Dept. of Army*, EEOC Appeal No. 0120151668 (June 16, 2017).
52 *Ransohoff*, EEOC Request No. 05880627.

### 3. Deceptive Information to Peer Review Committee (Claim e)

Regarding Claim e, Complainant alleges Villarino provided deceptive information to a Peer Review Committee. Villarino testified that she did not provide any additional information to Peer Review Committee.[53] Complainant's response also makes some extreme unsupported allegations based on pure speculation regarding if Harris or Villarino wrote the "deceptive information".[54] However, beyond pure speculation, Complainant provides no evidence Villarino or Harris provided "deceptive information". Regardless of who provided the additional information, while Complainant may disagree with any statements Harris or Villarino provided to the Peer Review Committee, he fails to provide any evidence to support discriminatory animus related to the information provided to the Peer Review Committee.[55] Thus, Complainant fails to establish a *prima facie* case or pretextual motives.

### 4. Asking Co-workers to Submit Negative Reports of Contacts (Claim f)

Regarding Claim f, Complainant alleges Villarino asked Coleman (female) to submit a negative ROC about him.[56] While Villarino testified that she had no written communications with Coleman, the preponderance of evidence supports she did request Coleman to submit a ROC about Complainant allegedly being "disrespectful".[57, 58] Coleman further testified, "anytime that an employee does not agree with Donnabelle Lorenzo-Villarin [sic], she targets that individual. I have been a victim of her target as well."[59] Reluya testified that Villarino did not request her to write negative reports about Complainant.[60] Beyond his own belief, Complainant does not provide any evidence the request was motivated by his sex or pretextual.[61] Again, Coleman (female) also testified that she was a "target" of Villarino. It is not overlooked, Coleman alleged Villarino provided a "lesser discipline action" for a similar Complainant action.[62] However, Coleman nor Complainant provided any further details related to the "lesser discipline action".[63] Assuming Coleman is referencing the events related to Claims d and 1, this decision addresses the allegation separately.[64] Instead, the evidence supports Villarino's request of Coleman is at the very least poor judgment. However, there is no evidence the request was motivated by discriminatory animus. Even Complainant and Coleman concede the request was made after Complainant questioned Villarino about a business decision and Villarino perceived Complainant's questioning as disrespectful.[65] Therefore, Complainant fails to establish pretextual motive. Thus, this claim fails.[66]

---

[53] ROI, 189.
[54] Compl. Resp., 54-55, 76.
[55] *Id*., 54-57; ROI, 146-148, 189.
[56] ROI, 148.
[57] Supp. ROI, 2.
[58] ROI, 197.
[59] Supp ROI, 3.
[60] *Id.*, 828.
[61] *See Sims v. USPS*, EEOC Appeal No. 0120070183 (July 2008); s*ee also Elise S. v. Dept. of Army*, EEOC Appeal No. 0120151668 (June 16, 2017).
[62] Supp. ROI, 3.
[63] *See* Compl. Resp.
[64] *See Infra* Sec. V.D.5.
[65] ROI, 148; Supp ROI, 2-3.
[66] *Ransohoff*, EEOC Request No. 05880627.

5. Not Allowed Union Representation, Subjected to Fact-Finding Investigation, Lacks Documentation in Emails, and Accused of Not Properly Scheduling Deceased Patient's Consult (Claim d) Removed from Patient Care (Claim 1)

Regarding Claims d and 1, Complainant alleges he was not allowed union representation and subjected to a fact-finding investigation related to a deceased patient (Claim d). Also, while he was under investigation, he was removed from patient care (Claim1).[67] For Claim d regarding not being allowed union representation, the evidence supports he was advised of his rights to have union representation on March 24, 2023.[68] Complainant does not rebut this evidence.[69] Regarding Complainant's allegations of not receiving union representation when issued the temporary assignment on May 8, 2023,[70] Villarino testified Human Resources advised her union representation was not required for issuance of the letter.[71] The union was notified following the issuance of the reassignment letter. Complainant does not rebut this testimony.[72]

Regarding the fact-finding investigation (Claim d) and removal from patient care (Claim 1), the Agency articulates a legitimate, nondiscriminatory reason for initiating the fact-finding investigation and removal from patient care. A fact-finding investigation was initiated because a patient death generated a JPSR that indicated there was a lack of care coordination.[73] Thereafter, Complainant was temporarily reassigned pending the fact-finding investigation.[74] Villarino testified Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment, and the patient expired with an open community care consult.[75] Similarly, Ravipati testified a review of the case showed there were gaps in care coordination.[76] Moreover, Ravipati testified, a "30 chart reviews has been done by RN external to the department in which multiple gaps were identified. Alleged [Complainant] did not show any responsibility and accountability during one-on-one meeting and in his emails."[77] Beyond unsupported allegations and conjecture, Complainant has provided no evidentiary support to rebut Ravipati's testimony.[78]

To establish pretextual motive, Complainant alleges other RNs which were also identified on a JPSR were not subjected to a fact-finding investigation or reassigned.[79] Specifically, Complainant discusses "7 cases" which involved a JPSR and related "narratives".[80] However, he does not provide any argument how each case is similar to Complainant's delay of care incident,

---

67 ROI, 506.
68 *Id.*, 497.
69 Compl. Resp., 35.
70 *See* Comp. Resp., 74; ROI, 145.
71 ROI, 188.
72 *Id.*, 241-242.
73 *Id.*, 188.
74 *Id.*, 156, 188, 506; Agency Reply, Ex. 2.
75 *Id.*
76 ROI, 203.
77 *Id.*
78 ROI, 290.
79 Compl. Resp., 27-28, 35-36; ROI, 145-146, 196.
80 ROI, 242-243; Compl. Resp., 36-39.

which the other RN was not subjected to a fact-finding investigation and reassignment.[81] Moreover, Complainant fails to provide any evidence the "narratives" were retrieved from a controlled database or even accurately reflects the processing of the specific case. In fact, the database that this information was retrieved is not identified by Complainant. While Theresa Minniear sent multiple emails regarding the "7 cases", Complainant fails to provide any supporting evidence (*i.e.*, affidavit) the information in the emails accurately reflects the information "copied" for the unknown database.[82]

Specifically regarding "Case 7", Complainant alleges Superable received a JPSR related to a death of a "suicide" patient but "nothing happened" to "Wendy" because she was Villarino's "best friend" and of the same race as Villarino.[83] First, Complainant provides no evidentiary support Villarino and Superable are "best friends". Even if Villarino and Superable were "best friends", beyond outright speculation, Complainant fails to provide even a scintilla of evidence Villarino would not properly discipline Superable. Secondly, Complainant concedes Superable was issued a JPSR.[84] Also, Villarino did alert Ravipati regarding the deceased veteran in March 2023.[85] Ravipati also testified that OCC leadership was working with HR regarding the incident.[86] Villarino further testified she believed a fact-finding investigation was conducted for the incident.[87] Complainant does not provide any evidentiary support to refute Villarino or Ravipati's testimony.[88] Unlike in Complainant's incident, Villarino testified there was documented care coordination occurring for Superable's incident (*e.g.*, "Case 7").[89] Thus, "Case 7" was not a similar situation as Complainant's incident.

Based on the preponderance of evidence, the Agency had legitimate, nondiscriminatory reasons for conducting a fact-finding investigation compared to the "7 cases".[90] Complainant has failed to provided evidence of discriminatory animus related to the fact-finding investigation and removal from patient care during the investigation. Complainant has also failed to establish pretext; therefore, the Agency is entitled to summary judgment on these claims.

When a party moves for summary judgment, the non-moving party's opposition must consist of more than bare assertions, general denials, conclusory allegations or mere suspicion and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for hearing.[91] Subjective belief or speculation as to motive, intent, or pretext are not sufficient to satisfy the Complainant's burden of proof in a Title VII case.[92] Here, Complainant's allegations are unsupported by any evidence other than Complainant's opinion and bare assertions. Thus, Complainant has failed to meet his burden of proof, and these claims

---

81 ROI, 259-271; Agency Reply, Ex. 2, A.
82 *See Id.*
83 Compl. Resp., 38-39; ROI, 146.
84 ROI, 161.
85 Agency Reply, Ex. 2B.
86 *Id.*, 197, 203.
87 *Id.*; *See* Agency Reply, Ex. 2, B.
88 Compl. Resp., 38, 41-43; ROI, 161, 197, 271.
89 Agency Reply, Ex. 2A at 271, 2B.
90 Agency Reply, Ex. 2A, 2B.
91 *Elizabeth Fernandes v. USPS,* EEOC Appeal No. 0120113904 (July 25, 2013) *citing Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).
92 *See Matsushita Elec. Indus. Co.,* 475 U.S. 574 (1986).

fail.

### E. Harassment/Hostile Work Environment (Claims a-f and 1 and 2)

Complainant failed to warrant a hearing on his claims because he did not raise a genuine issue of material fact as to the existence of discriminatory intent on the part of any Agency employee who allegedly subjected him to a hostile work environment (Claim a). Specifically, Complainant has not pointed to any evidence that a protected class was a motivating factor for any management officials' actions related to this complaint. Therefore, no further inquiry is necessary as to whether the incidents complained of are severe or pervasive to rise to the level of harassment or constitute separate actions of discrimination under the disparate treatment theory.[93]

Besides his unfounded assertions and conclusory statements, Complainant presents no evidence that any identified alleged offensive conduct or requests were based on any protected class.[94] For example, while Villarino requested a ROC about Complainant allegedly being disrespectful (Claim f), he provides no evidence the request was motivated by discriminatory animus. Although Villarino's may have used poor judgment requesting the ROC from Coleman, Complainant even concedes the request was made after he questioned Villarino during a meeting.[95] Similarly, while Complainant disagreed with the Proficiency Reports for FY 2021 and 2022 (Claims b), he provides no evidentiary support the ratings were based on more than managements' observation and discretion. Likewise for Claim 1, the evidence supports it was because of extended leave that multiple employees were delayed with receiving the FY 2022 Proficiency Report. Another example, the evidence supports Complainant was subjected to a fact-finding investigation and removed from patient care because of the pending investigation related to death of a patient which he failed to schedule an appointment and properly follow-up (Claims d and 1). For each instance alleged by Complainant not particularly discussed herein, Complainant has failed to create a genuine of material fact to show the Agency's actions were motivated by sex or race. A finding of a hostile work environment is precluded by the determination that Complainant failed to establish any of the actions taken by the Agency were motivated by discriminatory animus.

### VI. CONCLUSION

In summary, based upon a careful review of the entire record, including arguments and evidence not specifically addressed herein, this matter is appropriate for summary disposition. The Agency's Motion for Summary Judgment is GRANTED. The record reflects that there exists no

---

93 *Nicki D. v. Dep't of Veterans Affairs,* EEOC Appeal No. 0120133247 (Oct. 15, 2015).
94 *Sims,* EEOC Appeal No. 0120070183 (July 2008); s*ee also Elise S.*, EEOC Appeal No. 0120151668 (June 16, 2017).
95 ROI, 148.

genuine issue of material fact or issues of credibility. The hearing record is uploaded to the IMS, FedSEP and the Public Portal for the complaint.

IT IS SO ORDERED, May 19, 2025.

FOR THE COMMISSION: *Catherine Hunter*

Catherine Hunter
Administrative Judge
Catherine.Hunter@eeoc.gov

## **NOTICE TO THE PARTIES**

This is a decision by an Equal Employment Opportunity Commission Administrative Judge issued pursuant to 29 C.F.R. §§ 1614.109(b), 109(g) or 109(i). **With the exception detailed below, Complainant may not appeal to the Commission directly from this decision.** EEOC regulations require the Agency to take final action on the complaint by issuing a final order notifying Complainant whether or not the Agency will fully implement this decision within forty (40) calendar days of receipt of the hearing file and this decision.

Complainant may appeal to the Commission within thirty (30) calendar days of receipt of the Agency's final order. Complainant may file an appeal whether the Agency decides to fully implement this decision or not.

The Agency's final order shall also contain notice of Complainant's right to appeal to the Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit, and the applicable time limits for such appeal or lawsuit. If the final order does not fully implement this decision, the Agency must also simultaneously file an appeal to the Commission in accordance with 29 C.F.R. § 1614.403 and append a copy of the appeal to the final order. A copy of EEOC Form 573 must be attached. A copy of the final order shall also be provided by the Agency to the Administrative Judge.

If the Agency has <u>not</u> issued its final order within forty (40) calendar days of its receipt of the hearing file and this decision, Complainant may file an appeal to the Commission directly from this decision. In this event, a copy of the Administrative Judge's decision should be attached to the appeal. Complainant should furnish a copy of the appeal to the Agency at the same time it is filed with the Commission and should certify to the Commission the date and method by which such service was made on the Agency.

You may file an appeal with the Commission's Office of Federal Operations **when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision**. 29 C.F.R. § 1614.110(a). You will have **thirty (30) days** to file an appeal from the time you receive the agency's final order. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

**Do not send your appeal to the Administrative Judge**. Your appeal must be filed with the Office of Federal Operations at the address set forth below. If you do <u>not</u> use the EEOC Public Portal to file your appeal, you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations, and you must certify the date and method by which you sent a copy of your appeal to the agency.

20

## <u>HOW TO FILE AN APPEAL</u>

**RECOMMENDED METHOD** – The EEOC highly recommends that you file your appeal online using the EEOC Public Portal at https://publicportal.eeoc.gov/, and clicking on the "Filing with the EEOC" link. If you have not already registered in the Public Portal, you will be asked to register by entering your contact information and confirming your email address. Once you are registered you can request an appeal, upload relevant documents (e.g., a statement or brief in support of your appeal), and manage your personal and representative information. During the adjudication of your appeal, you can also use the Public Portal to view and download the appellate record. **If you use the Public Portal to file your appeal, you do not have to send a copy to the agency.** A complainant with an account with the EEOC's Public Portal may waive receipt of the appellate decision via U.S. mail and receive the decision via the EEOC Public Portal. Federal agencies will receive the appellate decision via the FedSEP digital platform.

<u>BY MAIL</u> – You may mail your written appeal to:

> Director, Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 77960
> Washington, D.C. 20013-8960

<u>BY HAND DELIVERY OR COURIER</u> – You can also hand-deliver or send your appeal by courier service to:

> Director, Office of Federal Operations
> Equal Employment Opportunity Commission
> 131 M St., NE
> Washington, D.C. 20507

<u>BY FAX</u> – Finally, you may send it by facsimile to (202) 663-7022.

If you elect to mail, deliver, or fax your appeal you should use EEOC Form 573, Notice of Appeal/Petition, and should indicate what you are appealing. Additionally, you must serve the agency with a copy of your appeal, and include a statement certifying the date and method by which service to the agency was made.

Facsimile transmissions over 10 pages will not be accepted.

## COMPLIANCE WITH AN AGENCY FINAL ACTION

An Agency's final action that has not been the subject of an appeal to the Commission or civil action is binding on the Agency.  *See* 29 C.F.R. § 1614.504.  If Complainant believes that the Agency has failed to comply with the terms of its final action, Complainant shall notify the Agency's EEO Director, in writing, of the alleged noncompliance within thirty (30) calendar days of when the complainant knew or should have known of the alleged noncompliance.  The Agency shall resolve the matter and respond to the complainant in writing.  If Complainant is not satisfied with the Agency's attempt to resolve the matter, he or she may appeal to the Commission for a determination of whether the Agency has complied with the terms of its final action.  Complainant may file such an appeal within thirty (30) calendar days of receipt of the Agency's determination or, in the event that the Agency fails to respond, at least thirty-five (35) calendar days after Complainant has served the Agency with the allegations of noncompliance. A copy of the appeal must be served on the Agency, and the Agency may submit a response to the Commission within thirty (30) calendar days of receiving the notice of appeal.

## CERTIFICATE OF SERVICE

For timeliness purposes, I certify that on May 19, 2025, this Order and Decision was uploaded and sent via e-mail to the following recipients:

Complainant:
Azis Kochiu
azis.kochiu@va.gov


Complainant Legal Representative:
N/A


Agency Representative:
Justine Fernandez
justine.fernandez@va.gov

Anthony Amore
Anthony.Amore@va.gov


*Catherine Hunter*
Catherine Hunter
Administrative Judge
Catherine.Hunter@eeoc.gov

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

**TRANSMITTAL OF FINAL ORDER**

**TO:**      The Parties
              Representatives of the Parties
              ORM Field Office
              EEOC Administrative Judge

**SUBJ:**   Final Order

              Complainant's Name:        Azis Kochiu
              Agency Case No.:             200J-556A-2023-152770
              EEOC Case No.:              440-2024-00142X

Enclosed is the Department's Final Order concerning the above-referenced complaint of employment discrimination. The Final Order includes a statement explaining Complainant's right of appeal and right to file a civil action.

This transmittal to Complainant includes EEOC Form 573 should Complainant wish to file an appeal.

Because Complainant requested a hearing before an EEOC administrative judge, the transmittal to the ORM field office also encloses the EEOC administrative judge's decision, and/or other miscellaneous correspondence/documents provided to this office by the administrative judge.

Enclosures

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

_____

| | |
|---|---|
| **Azis Kochiu,** | ) |
| | ) |
| **Complainant,** | ) |
| | ) |
| **v.** | ) **VA Case No. 200J-556A-2023-152770** |
| | ) |
| **Secretary,** | ) **EEOC Case No. 440-2024-00142X** |
| **Department of Veterans Affairs,** | ) |
| | ) |
| **Agency.** | ) |

_____

## FINAL ORDER

It is the final action of this Department in the above-referenced matter to accept and fully implement the attached decision of the EEOC administrative judge. If dissatisfied with this final action, Complainant may appeal or file a civil action as set forth below.

## RIGHT OF APPEAL

Complainant may appeal this final order within 30 calendar days of receipt to: **Equal Employment Opportunity Commission, Office of Federal Operations (EEOC-OFO)**. The appeal may be filed via the EEOC's Public Portal, U.S. Mail, or Hand-Delivery.

1. **EEOC-OFO recommends that all submissions and communications from complainants be electronic.**

   a. **Appeals submitted electronically should be completed via the EEOC Public Portal at https://publicportal.eeoc.gov/Portal/Login.aspx.** See warning below and detailed instructions attached.

   **WARNING!**

   **Attorneys and non-legal representatives MUST NOT use the EEOC Public Portal to file appeals on behalf of their clients as the portal will incorrectly list the representative as the complainant. Therefore, COMPLAINANTS MUST file electronic appeals themselves through the EEOC Public Portal regardless of whether they are represented.**

1

**b. Appeals submitted by mail should be completed by using EEOC Form 573.** A copy of EEOC Form 573 is attached. Appeals submitted by mail should be sent to:

> Director
> Equal Employment Opportunity Commission
> Office of Federal Operations
> P.O. Box 77960
> Washington, D.C. 20013

**c. As an alternative to mailing the appeal, the appeal may be hand-delivered to**:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> 131 M St., N.E., Ste. 5SW12G
> Washington, D.C. 20507

**2. If mailing or hand-delivering the appeal to the EEOC-OFO, a copy of the appeal must also be sent to the VA Office of General Counsel at the following address:**

> Department of Veterans Affairs
> Office of General Counsel (024)
> 810 Vermont Avenue, N.W.
> Washington, D.C. 20420

3. Statements or briefs in support of the appeal must be submitted to the EEOC-OFO within 30 calendar days of the filing of the appeal. The EEOC-OFO will accept statements or briefs in support of an appeal, which are ten (10) pages or less, by facsimile transmittal at (202) 663-7022. <u>If statements or briefs are submitted by mail or hand delivery, a copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement," must also be sent to the VA's Office of General Counsel at the above address</u>.

4. If an appeal is filed with the EEOC-OFO by mail or hand delivery, the appeal, and any subsequently filed statement or brief, must contain a statement certifying the date and method by which copies of these documents were served on the VA's Office of General Counsel.

5. If Complainant files an appeal with the EEOC-OFO beyond the above-noted time limit, Complainant should provide the EEOC-OFO with an explanation as to why the appeal should be accepted despite its untimeliness. If Complainant cannot explain why timeliness should be excused, the EEOC-OFO may dismiss the appeal as untimely.

## RIGHT TO FILE A CIVIL ACTION

Complainant also has the right to file a civil action in an appropriate United States District Court. Complainant may file a civil action as follows:

(1) Within 90 days of receipt of this final decision if no appeal to the EEOC-OFO has been filed; OR,

(2) Within 90 days after receipt of the EEOC-OFO's final decision on appeal; OR,

(3) After 180 days from the date of filing an appeal with the EEOC-OFO if there has been no final decision by the Commission.

Complainant must name the official head of the Department of Veterans Affairs, **Douglas A. Collins**, as the Defendant. Complainant may not name just the Department. Complainant must also state the official title of the Department head, which is the **Secretary of Veterans Affairs**. Failure to provide the name or official title of the head of the Department may result in dismissal of the case.

If Complainant decides to file a civil action under Title VII of the Civil Rights Act of 1964 (for discrimination due to race, color, religion, sex, national origin, or reprisal) or under the Rehabilitation Act of 1973, as amended (for discrimination due to disability), and if Complainant does not have or cannot afford the services of an attorney, Complainant may request that the Court appoint an attorney to represent Complainant and that the Court permit Complainant to file the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court**. Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS of the date that Complainant receives the final order from the Department or the Commission.


_Kathleen Oddo_                    5/21/2025
Kathleen K. Oddo                   Date
Executive Director
Office of Employment Discrimination
Complaint Adjudication

Enclosures:   EEOC Public Portal Instructions
              EEOC Form 573

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**


**CERTIFICATE OF SERVICE**


| | |
|---|---|
| Complainant's Name: | Azis Kochiu |
| Agency Case No.: | 200J-556A-2023-152770 |
| EEOC Case No.: | 440-2024-00142X |


I certify that on this date, the foregoing Final Order was sent via electronic mail to the individuals and parties shown below.


**Complainant:**
Azis Kochiu
Azis.Kochiu@va.gov
kochiu106@gmail.com

**Medical Center Director:**
Robert G. Buckley
Robert.G.Buckley@va.gov

**ORM District Office:**
Office of Resolution Management (08O)
ORMMDFrontOffice@va.gov

**Agency Representative:**
Justine Fernandez
Justine.Fernandez@va.gov

**EEOC Administrative Judge:**
Honorable Catherine Hunter
Catherine.Hunter@eeoc.gov


*Christina M. Ladd*
_____
Signature of Dispatcher

5/21/2025
_____
Date of Dispatch

**Exhibit 1**

**Agency's Reply Motion for Summary Judgement.**

**Agency argued why the EEO case should go to Summary Judgement, and not a Trial/Hearing.**

<div align="center">

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**CHICAGO DISTRICT OFFICE**

</div>

| | | |
|---|---|---|
| AZIS KOCHIU, | ) | |
| | ) | EEOC No.     440-2024-00142X |
| Complainant, | ) | |
| v. | ) | Agency No.    200J-556A-2023-152770 |
| | ) | |
| DENIS MCDONOUGH, Secretary, | ) | |
| Department of Veterans Affairs, | ) | ADMINISTRATIVE JUDGE |
| | ) | CATHERINE HUNTER |
| Agency. | ) | |
| | ) | DATED: September 27, 2024 |

---

<div align="center">

**AGENCY'S REPLY MOTION FOR SUMMARY JUDGMENT**

</div>

---

    **NOW COMES** The United States Department of Veterans Affairs (hereinafter referred to as "VA" or "Agency"), by and through its undersigned counsel, and files its Reply Motion for Summary Judgment in response to Complainant's Response Motion for Summary Judgment submitted on September 22, 2024.

<div align="center">

**A.      ARGUMENT**

</div>

**Claim A: He was subjected to a HWE and management did nothing to stop it;**

    In his Response Complainant states, "This entire process was done to humiliate me in such a way for DB to relish in some sort of weird flex in an attempt to virtue signal to our new leader, Ravipati. And Ravipati virtue signaled back to DB after I filed my EEO."

    The Agency defers to the Commissions' order regarding reprisal for prior EEO activity and therefore does not address this basis. The Agency stands on its argument outlined in its Motion for Summary Judgment for this claim.

**Claim B: In 2022, he was rated satisfactory on his proficiency report.**

    Complainant concedes he was treated the same as co-workers of a different race and sex who were similarly situated. Nonetheless, his performance appraisal does not have examples, specifics, or a

<div align="center">

Page **1** of 7

</div>

narrative supporting a higher rating. ROI Vol. 1 at p. 484-87. Contrast this with the performance appraisals of other employees under Chrstianah Arowora, where there are specific dates, accomplishments for the fiscal year, and reasons for a higher rating. Exhibit 1. The Agency rests on its argument in its Motion for Summary Judgment.

**Claim C: He was assigned a bigger workload than his co-workers.**

In the relevant sections of Complainant's Response to this claim, he states RN Wendy Superable team had an extra person on her team compared to his own, which created a greater work load and as such this created a hostile work environment. To prevail on a claim of hostile work environment, Complainant must explain how his protected class is connected to management's severe or pervasive conduct that a *reasonable person* in his or her position would have considered it hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Management's alleged harassing conduct should be evaluated based on objective viewpoint of a reasonable person in the victim's circumstances. EEOC, Enforcement Guidance on *Harris v. Forklift Sys., Inc.* (Mar. 8, 1994).

It is reasonable to believe that if there is an odd number of people in a work unit, the work teams will have an uneven amount of people. As the Agency argued in its Motion for Summary Judgment, although this is an unfortunate reality, it's reasonable for management to split the teams as evenly as possible due to the staffing obstacles it was facing at the time. Had the Agency put Complainant on a team without any assistants or other RNs, that would be another story. Complainant would be able to argue management stacked the deck against Complainant with a heavier workload and subjected him to harassment. However, that is not the case at the bar; there was only a difference of *one* person between each team. The Agency can justify its actions as previous argued in its Motion for Summary Judgment and rests on its arguments therein.

**Claim D: He was not allowed union representation, he was told he was subject to a [fact-finding] investigation, he lacks documentation in his emails, he was accused of not properly scheduling a deceased patient's consult.**

In his Response, Complainant points out RN Wendy [Superable] had seven specific cases, where there was a delay in patient care, and she was not detailed or subjected to an investigation. The Agency assumes the seven cases Complainant references is on ROI Vol. 1 p. 259-71. The Agency stands on its argument that RN Wendy is not an appropriate comparator because she does not report

to RMO Lorenzo-Villarino and is in a different work group than Complainant; RN Wendy is responsible for Women's Consults while Complainant with Community Care. Nonetheless, the RMO Lorenzo-Villarino addresses the seven cases Complainant mentions and differentiates the cases in her affidavit. See Exhibit 1.

In summary, the seven cases Complainant cites to support his contention RN Wendy is an appropriate comparator are not like the case that led to Complainant's fact-finding investigation, reassignment, and discipline. See Exhibit 2. Complainant even admits he is not sure if he documented everything. ROI Vol. 2 at p. 18. In all seven of the cases, the Community Care Coordinator either scheduled the patient's appointment in the community or followed up on care, neither of which Complainant did. ROI Vol. 2 at p. 1-62. Complainant cannot liken these cases to his own circumstance and therefore lacks indirect evidence to support his allegation of illegal discrimination.

For an employee to be a proper comparator to lead to an inference of discrimination, the comparative employee(s) must have reported to the same manager as complainant, must have been subject to the same standards performance and discipline, and must have engaged in conduct like complainant's without mitigating circumstances that would distinguish their conduct or the appropriate discipline for it. *Allen v. Dep't of the Navy*, EEOC Request No. 05900539 (June 14, 1990). With each of the seven cases above, not only did RN Wendy have a different chain of command other than RMO Lorenzo-Villarino, but her actions in those seven cases are distinguishable from Complainant's actions, making them not similarly situated.

**Claim E: His supervisor gave deceptive information to a peer review committee.**

In his Response, Complainant states, "Either [RMO Lorenzo-Villarino] wrote it, told Adrienne to write it the way she did, or she seen it and let it get turned in knowing it was false info." See page Complainant Response to Motion for Summary Judgment at page 76. Additionally, he reasons, "First off the entire syntax in that paragraph sounds exactly as DB writes with the exception of the very last sentence. Read her writing than read Adrienne's writing you will see the contrasts are huge in the verbiage between the two. I honestly believe DB wrote that, gave it to Adrienne and had Adrienne sign off on it. I am also willing to wager a years pay that Adrienne had that paragraph given to her and DB called her and told her to add the last sentence in that it was an expedite. The phrasing in the last sentence sounds like Adrienne, the rest of it is DB. I can tell you all right now no one in the department would know to look at and cite chapters 3.2 and 6.3 as reference." *Id.* at page 54.

Complainant does not cite to any other material, other than his own belief, to prove RMO Lorenzo-Villarino provided deceptive information as Claim E alleges. For example, to support his belief, he cites to an email he wrote wherein he stated his beliefs. See Complainant Response to Motion for Summary Judgment at page 56, question 40 ("I said and it's in the email in the record ROI Vol 1 at pg 479 that if this warranted a detail, lets have a root cause analysis, this was sent to several of the leaders as seen by email").

Complainant's cyclical reasoning and explanations on pages 54-85 do not provide a "convincing mosaic" of circumstantial evidence that would support the inference of discriminatory animus. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013).

Complainant further states RMO Lorenzo-Villarino should have to testify to prove she did not submit that. Complainant Response to Motion for Summary Judgment at 74. That is not the proper standard of proof at this juncture. Complainant's mere statements do not make a prima facie case of discrimination. The Agency stands on its argument in its Motion for Summary Judgment for the remainder of its reply for this Claim.


**Claim F: He became aware his supervisor was asking co-workers to submit negative reports of contacts regarding him.**

Complainant alleges RMO Lorenzo-Villarino asked other co-workers, specifically RN Monica Coleman, to write negative comments about him. RN Coleman states this occurred a few months before or after May 8, 2023 during a discussion about billing and workload, where Complainant disagreed with RMO Lorenzo-Villarino's changes. ROI Supp. at 002. RN Coleman states RMO Lorenzo-Villarino asked her to write a report of contact stating Complainant was disrespectful.

Even assuming this is true and, in the light most favorable to Complainant, he cannot meet prongs two and three of the hostile work environment analysis because management's actions were not sufficiently severe or pervasive that a reasonable person would find this, by itself, as a form of harassment. In respect to prong two, there is no information that Complainant suffered from any adverse action, such as discipline, because RN Coleman did not submit the report of contact. There is no information RMO Lorenzo-Villarino asked RN Coleman to write a report of contact during the meeting in front of others to embarrass Complainant.

In respect to prong three, Complainant cannot connect this alleged act to his protected classes. RN Coleman admits, "Anytime that an employee does not agree with Donnabelle Lorenzo-Villarino, she targets that individual." ROI Supp. at 003. On the face of this allegation, it appears RMO Lorenzo-Villarino did not ask RN Coleman to write a report of contact about Complainant because of his race or sex, which is what the Commission has jurisdiction over in this case, but because of his disagreement with the changes she wanted to make. Again, any allegations of retaliation unrelated to the Title VII, ADEA, and Rehabilitation Act are outside of the scope of the matter at hand and therefore should be dismissed. Complainant's objection RMO Lorenzo-Villarino's management decisions do not provide him Title VII protections and therefore judgment for the Agency is appropriate.

**Claim 1: On May 8, 2023 he was removed from patient care.**

The Agency reiterates its arguments under Claim D of the instant motion.

In his Response, Complainant states RMO Lorenzo-Villarino did not allow him to have union representation at the fact-finding investigation. The fact-finding investigation led to him being detailed, which is a form of harassment. Even in the light most favorable to Complainant and assuming RMO Lorenzo-Villarino did not allow Complainant to have union representation at the fact-finding investigation, despite what the record shows, he cannot prove this was a violation of the EEOC protections, but rather a violation of the NNU collective bargaining unit, which is outside the scope of this proceeding. Although Complainant attempts to show a pattern of circumventing the system, it is irrelevant to the matter at hand because the negotiated grievance procedure is separate and very distinct from the EEOC universe we are currently in. The Complainant's argument does not hold water and his claim must fail.

**Claim 2: As of July 19, 2023 he was not issued his proficiency rating that was due in February 2023.**

In his Response Complainant states, "And yes my proficiency rating was based on sex and race. Compare my ratings to the Filipinos. Heck even compare it to Adrienne Harris, who Christianah states got a higher review than me from DB. Despite Adrienne being named in two of the 7 JPRS on of which resulted in a death. But Adrienne is female and got the higher review. My issue is with the

patten of bias towards me for not being a Filipino." Complainant Response to Motion for Summary Judgment at page 83.

Claim 2 addresses the timeliness of the proficiency ratings, not the substance. The substance and merits of Complainant's rating is discussed in Claim B on this motion. The Agency relies on its arguments in its Motion for Summary Judgment for the remainder of its reply.

## CONCLUSION

**WHEREFORE**, the Agency respectfully requests that the Commission grants summary judgment in favor of the Agency.

Respectfully submitted,

/s/

Justine Fernandez
Agency Counsel
Office of General Counsel – Midwest District
United States Department of Veterans Affairs
p: 202-894-0695
Justine.Fernandez@va.gov

Attachments:

Exhibit 1 – Comparator Proficiency Evals Redacted

Exhibit 2 – RMO Lorenzo-Villarino Affidavit; Exhibits A and B therein

## <u>CERTIFICATE OF SERVICE</u>

I, Justine Fernandez, hereby certify the foregoing **Agency's Reply Motion for Summary Judgment** was uploaded onto FEDSEP and sent as indicated below on September 27, 2024:

via e-mail only:

**<u>EEOC</u>**
Judge Catherine Hunter
Catherine.Hunter@eeoc.gov

**<u>Complainant</u>**
Azis Kochiu
Azis.Kochiu@va.gov

/s/

Justine Fernandez
Agency Counsel
Office of General Counsel – Midwest District
United States Department of Veterans Affairs
p: 202-894-0695
Justine.Fernandez@va.gov

Exhibit 2

**KOCHIU'S RESPONSE TO AGENCY'S MOTION FOR SUMMARY JUDGEMENT.**

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**CHICAGO DISTRICT OFFICE**

|  |  |  |
|---|---|---|
| AZIS KOCHIU, | ) | |
| | ) | EEOC No.    440-2024-00142X |
| Complainant, | ) | |
| v. | ) | Agency No.   200J-556A-2023-152770 |
| | ) | |
| DENIS MCDONOUGH, Secretary, | ) | |
| Department of Veterans Affairs, | ) | ADMINISTRATIVE JUDGE |
| | ) | CATHERINE HUNTER |
| Agency. | ) | |
| | ) | DATED: September 22, 2024 |

_____

**KOCHIU'S RESPONSE TO AGENCY'S MOTION FOR SUMMARY JUDGMENT**
_____

<span style="color:green">For clarity purposes, and hopefully I made it easier for everyone to follow, I did my best to interject my answers to the points the Agency brings up.</span>

    **NOW COMES** The United States Department of Veterans Affairs (hereinafter referred to as "VA" or "Agency"), by and through its undersigned counsel, and denies management's actions were based on illegal factors and bases its Motion for Summary Judgment on Complainant's inability to prove a *prima facie* case of hostile work environment and illegal discrimination. The undisputed facts entitle the Agency to judgment as a matter of law.

## A.     ACCEPTED CLAIMS[1]

**Whether complainant was subjected to a hostile work environment (HWE) based on Sex (Male) when:**

    a)  He was subjected to a HWE and management did nothing to stop it;

    b)  He was rated satisfactory on his proficiency report;

    c)  He was assigned a bigger workload than his co-workers;

    d)  He was not allowed union representation, he was told he was subject to a FF investigation, he lacks documentation in his emails, he was accused of not properly scheduling a deceased patient's consult;

    e)  His supervisor gave deceptive information to a peer review committee; and

    f)  He became aware his supervisor was asking co-workers to submit negative reports of contacts regarding him

**And the following actionable claims:**

    1.  On May 8, 2023 he was removed from patient care

    2.  As of July 19, 2023 he was not issued his proficiency rating that was due in February 2023.

**Whether complainant was subjected to a hostile work environment (HWE) based Race (White) when:**

**ROI Vol 1 pg 160 Race**

b) He was rated satisfactory on his proficiency report;

**ROI VOL 1 pg 238 and ROI Vol 1 pg 186**

**DB states in** question 39 when asked any employees under her supervision in the same position and grade as complainant, who received higher ratings on his/her proficiency Report?

---

[1] These accepted claims come from the Commission's Order on Agency's Motion to Dismiss Claim and Basis dated June 26, 2024. See footnote 18 at p. 4.

**ROI VOL1 pg 186 is first affidavit of DB dated 12/5/2022.**

**Answer 36 she states she did not discuss complainants' performance rating she states no individual discussion with the reviewing official about a specific rating.**

**Question 39 asks DB if anyone got a higher rating than me**

**Answer is No.**

I cut and pasted **Christianah's question** the investigator asked in terms of employees in same position grade as complainant, same performance received a higher rating on his/her Proficiency Report?

ANSWER: No

**ROI VOL 1 pg 239**

Below is Christianah's response's in italicized.

*32. Were there any other employees, under your supervision and in the same position and grade as the Complainant, with performance similar to the Complainant's who received a higher rating on his/her Proficiency Report? a. Identify each person by name and position title.*

*ANSWER: Ms. Adriene Harris-- I do have other RN staff, actually on the same team that was given **High Satisfactory by My immediate supervisor during the same period** I was out. Staff proficiency attached. b. Identify each person's sex.—*

*ANSWER: **Female** c. Why was each person not treated similarly to the Complainant with respect to this matter?*

*ANSWER: I cannot speak to this. I was not the person who rated the complainant and other staff indicated above.*

*d. **Please explain why each individual was given a higher rating with similar performance.***

*ANSWER: N/A*

*My interpretation.* *Adrienne Harris got a higher rating than I did even though I am more productive than she is and we are on the same team. And by the way Adriene Harris had two JPRS filed against her and one of which resulted in a death. Adriene got no detail pending investigation, no suspension, no harassment etc etc. I will attach those JPRS in another section. Yet she got a higher review than I did. And as Christianah indicates DB was the one that did the ratings. Very telling with regard to DB's credibility and as it pertains to her lies.*

*40. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant with regard to issuing "Satisfactory" Proficiency Report ratings in the past year?*

*a. Not to my knowledge.*

*If so,*

*Right here DB on page 238 perjured herself in a sworn Affidavit, when asked by the investigator as it contradicts what Christianah is saying at page 39.*

DB should be on trial to answer to this and she should produce the reviews or argue against what Christianah stated in which Christianah per DB handed the reviews out to Adrienne Harris after, and that DB rated Adrienne and others higher. I'd like to hear her justification as to why the others got a higher review, despite having JPRS filed against them relating to deaths.

ROI Vol1 pg 186    On December 5th, 2022 sworn affidavit of DB

**Question 36.** DB is asked if she discussed with Christianah my performance the rating she believed I should receive.

Answer: there was no discussion with Christianah.

**Question 39.** Investigator asks DB if there were any other employees within the same grade as me who received a higher rating.

Answer: No

According to Christianah's testimony this is not true, as Adrienne Harris got a higher review than I did.

**Question 50. Have other employees been subject to a fact-finding investigation in the same grade as complainant within the past year under similar circumstances?**

Answer: No

Here we go, DB does nothing with regards to **the 7 JPRS** which included **3 deaths**, and other **adverse outcomes for Delay of Care to other employees of equal comparison to me.** Nothing happened to the hundreds and hundreds of consults which I have provided in the record, as well as will be cited within this response motion.

 **DB did not contact HR as Alex HR states in ROI VOL1 pg 216**. Only mine, is this not discrimination? Why did no Female or Filipino employees get detailed during a fact-finding investigation, or have a Weingarten meeting, or get suspended and so on? Why didn't DB **contact HR** about these hundreds of consults and the 7 JPRS as per Alex Morris, DB contacted him and he advised a Weingarten as she did to me, but she contacted HR about me? There were **deaths**, **significant adverse effects do to the Delay in Care** by the other **Registered Nurses who are comparisons to me.**

My answer is this is discrimination because I am not Female, and I am not Filipino.

**Question 60**. Investigator asks who was responsible for removing me from patient care.

Answer: she states she did as directed by HR. HR only testified to advising DB to do a Weingarten not removal see below testimony of Alex Morris HR.

**ROI Vol1 page 216**

**Question 7.** Alex Morris states DB **contacted** him on 3/3/2023

**Question 8.** Investigator asks what information was provided…

Answer: Alex was given to him by DB, Delay in Care resulting in death of a pt. I advised to perform a **Weingarten** meeting to question the employee and gather info.

<mark>Back to DB testimony on 12/5/2023</mark>

ROI Vol 1 pg 185

**Question 29.** Were you responsible for rating the complainant "Satisfactory" on his Proficiency Report?

**Answer**: No.

If you were not responsible, then please identify the name and title of who was responsible?

**Answer:** Christianah Arowora, OCC Nurse Manager.

This is contradictory to Christianah's answer above which is in the record at **ROI VOL 1 pg 239**

**Odds and ends on the DBs testimony 12/5/23**

**ROI Vol1 pg 196,**

**issue C**

DB obfuscates, doesn't answer the question.

**Question 10.** Investigator asks according to complainant, RN Harris and the entire cc department were treated more favorable because they are female; specifically, they were detailed or suspended when they delay care of patients. How do you respond?

**Answer:** DB doesn't answer the question of why others weren't disciplined for delay of care. She rambles around the question because she only did this to me. Despite 2 of the cases listed in this response where Adrienne Harris had two JPRS filed against her one for a death and the other for a pulmonary nodule spreading. Again, Christianah testifies Adrienne got a higher review than I did.

Throughout DBs testimony all you get is semantics, mental gymnastics, and proof of discrimination.

**The investigators follow questions on 1/30/2024 sworn Supplemental Affidavit of DB and her testimony.**

**ROI Vol 1 pg 195**

**Question 1 almost two months after the initial interview with the investigator.**

Investigator asks, "According to complainant RMO Arorowa rated Complainant as High Satisfactory (HS), but you lowered Complainants rating to satisfacrtory, to which RMO Arowora complied. Is this true?

Almost two months later she now states she discussed with Christianah, but on 12/5/2023 her testimony was she did not discuss with Christianah.  In this testimony she states she recommends a satisfactory rather than High Satisfactory, when on 12/5/22 she said Christianah gave me the satisfactory…if she (Christianah deemed me HS) she should have turned in supporting documentation to justify the higher rating.

First off, she perjured her testimony from 12/5/22 when she was pinched by the investigator on 1/30/24 when investigator stated. Kochiu and Arowora proclaimed Arowora gave High Satisfactory (HS).   DB pivots from her previous answer of not giving me the Satisfactory to now she admits to giving me a satisfactory due to unsupported data to justify it.

I am not required to fill out a self-assessment, my direct manager knows exactly how I work and my abilities as was shown in her reviews of me. In addition, why am I stuck in the middle because Christianah doesn't add supporting documentation?  If my direct manager deems me High Satisfactory based on what she has seen me do over the past year, during meetings and so on, why would DB question Christianah's judgement?

DB lied two times in this scenario. 1.  She stated she never discussed my review with Christianah on 12/5/22, and that she didn't give me the rating of satisfactory on 12/5/22; however, during the follow up questions on 1/30/24 when she's caught in a predicament she pivots and states the excuse Kochiu or Arowora never added new data to warrant a higher review.  Why didn't she say this on 12/5/22 but only when she was pinched?

On 1/30/23 DB goes on to say all ratings were discussed with Arowora prior to her approval, conversely on 12/5/22 she stated nothing was discussed.  Why the lie?  People lie when they can't keep their story straight.  DB now admits she gave me the satisfactory, but in the same breath says it was Christianah that did because Christianah signed the review, or checked off the box, in other words Christianah complied with what her boss DB told he to do.  Yeah, Christianah had the gun to her head because DB who's constant mantra in the Dept is to bully Chrisitanah the point that Christianah got sick and has had to take a leave of absence, why would Christianah stick her neck out for me?  It would only cause her more grief at the hands of DB, had she went with her gut feeling and gave me what I deserved which was a HS.

Why is this important?  Because it proves a pattern of lies and deceit by DB and this is some of the pretext and prelude to her finally having the opportunity discriminate against me based on Sex and Race.  All of DB's charades as I will point out here and is already included in the record, crescendos to the strongest points I have to make, which is I was treated differently than my equals for actually doing my job, and the others that in fact did make mistakes i.e. Wendy had nothing happen to them by the Agency.

 

d) He was not allowed union representation, he was told he was subject to a FF investigation, he lacks documentation in his emails, he was accused of not properly scheduling a deceased patient's consult;

 

Every one of the Statement of Facts the Agency lists below, I have already filed a rebuttal to the witness's testimony and is already in the record.  Nonetheless for clarity I will do my best to respond to the issues surrounding this case.  Issues overlap and since the record is not listed in chronological order of events, my answers, and when citing the record, will sporadically be spread throughout this response motion.

**ROI Vol 1** Affidavits and testimony of, **Adrienne Harris pg 164, Christianah Aurora pg 168, Donnabelle (DB) pg 181 dated 12/5/23, then follow up questions at pg 196 dated 1/29/2024 the answers change, Dr Ravipati at pg 204, Dr Buckley at pg 208, Alex Morris (HR) at pg 215**

**Kochiu's Rebuttal to the Affidavits are at:**

**ROI Vol 1 for Adrienne Harris pg 221-223**

**ROI Vol 1 Christianah pg 224-228**

**ROI Vol 1 for DB pgs 229 – 255**

**ROI Vol 1 for Ravipati pgs 279 - 300**

**ROI Vol 1 for Dr Buckley pgs 438 – 444,** note at **ROI Vol 1 pg 446** I asked Dr Buckley in the email if Agency can specifically let me know what it was I exactly that I did wrong. What Policy, time frame, etc etc etc. As you can see I never got a response from him or anyone in the Agency. That's telling in my opinion, that I would be punished and not told specifically what I did wrong other than vague statements Ravipati makes indicating, "gaps" and "failure to follow procedure" ROI **VOL 1 pg 284** indicate the transcripts of the procedure as does the recording at 13 minutes on USB.

**ROI Vol 1 pg 457** Alex Morris HR rep.

7. On what date were you contacted by Management with regard to this action? **Who contacted you**?

> A: 3/23/23. **Donnabelle Lorenzo-Villarino**

> What information was provided to you by management and what advice did you give to management regarding this action?

> A: That there was a **delay in care** possibly resulting in the death of a patient. I **advised** them that they would need to perform a Weingarten meeting to question the employee and gather all the information surrounding the case.

DB and Ravipati in their testimony say that HR recommended the detail. HR advised them did not recommend anything. Another instance of the Agency deflecting to cover themselves.

We see DB contacted HR.  HR had no idea of the consult in question until DB contacted them.  Question: Why didn't DB reach out to contact HR when the 7 JPRS Cases against several RNs of equal comparison to me, in which I have listed in the record, which resulted in deaths and adverse outcomes to veterans?  See JPRS filed, **ROI Vol 1 pgs 259 – 270.**

 Why didn't DB contact HR and investigate all the Delay of Care that I outline in the record that pertains to all the RNs?  See Delay of Care of the **hundreds** of consults, second column from the right are the number of days care has been delayed and counting per consult. **ROI Vol 1 pgs 324 – 437.**

Why was I the only one she contacted HR about?

Why didn't the Agency look into the direct evidence presented as far as all "Delay of Care" and "Failure to follow procedure" of other staff, particularly RNs at **ROI Vol 1 259 - 270, and 324 - 437 ?**

As it pertains to the Teams recording of DB specifically going over the protocol she wants the department to follow, HR/Agency stated I can add into evidence.  See email chain at **ROI Vol 1 pgs 447 – 451**


**To answer DB's question during the Weingarten meeting**

**ROI vol 2 pg 18** Weingarten meeting.

Question 10.   "… did you contact the patient?"

11. where is that in the consult?

"I call every patien/provider let then know referral is there"

**ROI Vol1 pg 464, 448, 301**  shows the CCP template which is part of the chart.  See the Section stating "Care coordination was determined from:" chart review, phone call to veteran/family/caregiver.  This is where my direct manager directed us the department to document.

**ROI VOL 1 pg 301** indicates the CCP note which is part of the chart where I document all my calls to the veteran.

"Level of Care Coordination

    Moderate

    Care Coordination was determined from:

        Chart Review, Phone call to Veteran/Family/Caregiver"

This is what happens when the Agency fails to do a full and fair investigation, which was purposely done to discriminate against me.

## B. STATEMENT OF FACTS

1. Complainant is a Registered Nurse (RN) Grade 2, Step 2 previously with the Department of Community Care at the James A. Lovell Federal Health Care Center (FHCC). ROI Vol 1 at 3, 130.

2. Complainant has been a VA employee since February 2019. ROI Vol. 1 at 130.

3. Complainant identifies his sex as male. ROI Vol. 1 at 131.

4. Complainant identifies his race as white. ROI Vol. 1 at 161.

5. Complainant's first-line supervisor was Christianah Arowora (Female/Black). ROI Vol. 1 at 110, 131.

6. Complainant's second-line supervisor was Donnabelle Lorenzo-Villarino (Female/Asian). ROI Vol. 1 at 110, 131.

7. Complainant's third-line supervisor was Dr. Mamata Ravipati (Female). ROI Vol. 1 at 200.

8. RMO Lorenzo-Villarino perceived Complainant's sex as male. ROI Vol. 1 at 183.

**Claim A: He was subjected to a HWE and management did nothing to stop it.**

9. Complainant's team was short staffed and was swamped with work for six months because he was given more work when someone left his department. ROI Vol. 1 at 136.

10. When the department has staff turnover or staff shortages, staff members are expected to provide coverage for their absent co-workers. ROI Vol. 1 at 184.

Still doesn't answer the question of why my group was shorted. If someone is out sick, or leaves the dept for whatever reason, the fact that the other groups still had more members of the team to pick up the extra work compared to my group which was shorted. So, when it came to my group having to pick up the extra work with less members than the other groups, we still have more work. This was done intentionally. Donnabelle (DB) doesn't answer the heart of the question directly, but rather pivots to giving an answer with regards to when staff aren't there, they are expected to cover.

11. Complainant notified RMO Lorenzo-Villarino other employees were working overtime without pay. ROI Vol. 1 at 137.

Already discussed this will be an OIG issue, but it does merge into DB leading to my discrimination.

12. RMO Lorenzo-Villarino did a review of hours worked and told staff not to work outside of their tour of duty or approved overtime hours. ROI Vol. 1 at 184.

Another pivot by DB, and this was some of her motive to come after me. I complained because staff were working on their own time until 10pm, Saturdays and Sundays, staff were receiving emails from other staff at 3 am. DB having the timekeeper do a review of the hours will not show anything when staff are not claiming those hours. Not too difficult for IT to run a report on the staff to see when they logged into the me and discriminating against me. Had a Filipino or female brought this to her attention, they would never have been detailed, despite the fact that they were in violation of the claim, "Delay of Care."

I would love to ask DB and Ravipati, how many consults they are currently behind at the present time and follow up with did any of those RN's get detailed or are they going to be detailed for Delay of Care? I can't ask these questions without a trial. I can't ask these question unless on direct or cross examination which would do me a disservice if we did not have a trial.

system and for how long, then see if the staff claimed those hours to be paid. The reason staff was working on their own time was the volume of work as everyone was falling behind, constituting, "**Delay of Care**" since that's buzzword the agency proclaimed in my case. Question circles back to why weren't those staff members detailed for, "Delay of Care"? The record indicates just some of the **Delay of Care** at **ROI Vol 1 pg 273 – 274 and ROI Vol 1 pgs 324 – 437**. Truth is DB did nothing about staff slaving on their own time, unpaid, because it benefitted her. I mean, she didn't want to answer to VISN 12 for the reason Lovell Community Care Department was dead last or always on the bottom of the statistical daily metric's scale. So many labor and union laws were violated by this practice of which I won't cite as they have nothing to do with EEO; however, by me bringing it to her and the VAs attention was one of the preludes to her detailing

13. On May 8, 2023 Complainant was detailed pending an investigation about a patient care issue stemming from a Quality Assurance/Management report. ROI Vol. 1 at 156.

14. Complainant was detailed for six months. ROI Vol. 1 at 140.

3 months I believe the 6 months the Attorney is referring to is to an example I never filed this EEO, DB and Ravipati could have kept me detailed/shamed 6 months or indefinitely. I was at there mercy to beg and yet they took enjoyment in seeing me go through the humiliation. The detail was somewhere around 3 months or so, I was immediately taken off detail and brought back to the department when I filed this EEO, which is suspect after Ravipati said she couldn't get me back. I will point this out later in my response.

I think this would be a good area to add a few other facts in terms of how the Agency discriminated against me.

Peer Review Committee

**ROI Vol 1 pg 243 – 245** is my response to the deceptive information given to the Peer Review Committee.

### Deceptive Chart Review.

**ROI Vol 1 pg 21 and pg 22**

The false deceptive information DB sent to Quality Management in running my chart review.

1. 30% of consults not processed in 48 hours.

So deceptive, no one in the entire world could process a consult in 48 hours unless it is an inpatient consult that comes from an Emergency Department from an outside community hospital as in those cases the services already occurred, and we know where to send the authorization as it is listed on the consult.  This is so deceptive the department witnesses will shoot this down so fast. Was only included as criteria by DB to make me look bad.  **She knows very well this isn't true.**

2. 46.6 % of consults lacked capturing preferred preferences.

It's not required if you call the vet and he/she already has a preference, OR, if the preferred provider is listed as the vet already gave that info to the requesting provider before the consult is even sent to the community care department.  This is stated in the guidebook.   Moreover, the department never got clarity on the 3 preferences as about a year before my consult was falsely put into question, we had a group that was working on revamping the process to make the flow work better.  We were working on this for several months.  One day DB and Ken Dizon were arm wrestling on this issue to which Ken told DB that is not what the guidebook states, the guidebook does not state we need to list 3 preferred providers on the consult if one is listed or the Veteran tells us where he/she wants to go.  DB was becoming more and more opiniated on this issue, got frustrated to the point where she abruptly left the group.  She took her ball and left the playground and took the analyst Cliff with her.  She abandoned the department and never showed up to another meeting about this re vamp again.  Christianah the lower manager, had to step in and we had a new workflow set within 24 hours, we didn't need to spend months trying to figure this out, but DB never signed off on it.  So, the dept went back to what never worked in the first place.  I want my witnesses to testify to this.

This was dishonest information she gave QM when they ran my chart review. DB gave QM information contrary to what the department guidebook indicates.

3. 86.6% show no contact attempt.

This is where the Agency did not do it's diligence in running a fair chart review. All of my contact attempts are documented on a CCP note or community care progress note, which Christianah my direct manager gave the department directive to document there. It was not a requirement to use the consult toolbox. All QM had to do was look at the CCP notes where I indicated in the box that I called the veteran. Then it is documented at what facility the veteran will be seen. Besides this would show up on my phone log. Furthermore, how would any of the thousands and thousands of veterans I sent out over the 4.5 years I was in that department, know where to go?

Another fraudulent claim DB made to QM. All QM had to do was run the ccp notes and it would show 100%. DB knew this but didn't care, as long as she could discriminate against me that was good enough for her.

4. 66% no documentation showing veteran were informed of their scheduled appts.

First off this is a PSA duty and DB knows that. She even indicates this on the Teams recording. Second the dept including the PSAs were never told these had to be sent out. ==See the email== attached I sent Justine as part of discovery which is titled, Rhonda Paulson, the manager who sent out the email stating this is starting to be audited. Meaning it was never required before, but DB had QM audit me on it. Rhonda sent this after me and Dori met with Ravipati on or around 5/11/2024 when we told Ravipati we don't do it unless a veteran asks for it, and that a PSA would be the one that sends this out.

Complete dishonesty by DB to submit this, knowing it was never a requirement.

5. 40 % of charts showed referring provider failed to get records.

This is a PSA duty. Another crafty and untruthful thing to have QM run on a Registered Nurse. This is a PSA responsibility for the entire time I was in the department, and DB knows that and it's crazy that she would turn this in. I don't think DB thought I would see this chart review, but when I went to question my detail to Dr Ravipati and I was in her office, Ravipati's showed me this information, but Ravpati said "I'm not suppose to show you this." So I stated this entire audit is fraudulent. As stated above I went to Ravipati's office with Dori Matusz to clarify this as the department was shocked that this was happening to me.

6. 96.6% no authorization sent to veteran.

Complete dishonesty, first off this is a PSA duty as they are the ones that schedule the consult, and after the consult is scheduled the authorization is completed with a date of service. Moreover, this is only sent out by the **PSA if the veteran asks for it.**

Those Six criteria DB had QM run my chart review on was the most underhanded, shifty, slimy thing she could do. She knows all of that is bogus and not true. My witnesses will easily testify to this and shoot it down within seconds of asking them. This was done to make me look bad, and Ravipati who seen this chart review obviously was taken back as she never knew Registered Nurses did not do the criteria DB had QM run on me. I mean, Ravipati was only the lead of the department for 2 months prior to the time I was detailed. When Dori Matusz and I went to Ravipati's office to point these falsehoods out, she was dismissive and wasn't sure how to answer this.

So Dori and I tell Ravipati the truth, she ignores it and doesn't look into it, tells me this is going to be a slap on the wrist (which btw was insulting to me) and several weeks later when I ask to get me off the detail, she tells me she doesn't know how to get me off this detail. However, when I filed the EEO, she got me back immediately and stated a host of scornful, belittle remarks about me in the mitigating 14-day proposed sentence contrary to what my yearly reviews show. Why? Because this was retaliation for me filing the EEO.

**If the Agency wants to run a chart review on me, then they should run the exact same chart review on the RNs of equal comparison to me in the department, with the exact criteria, on the same dates and time frames they ran my chart review. They won't because the review would indicate everyone's charts would be like mine.**

I filed the EEO, Ravipati retaliated.

Consequently, Ravipati enters a punishment without indicating what procedure and what the time frame this consult in question was supposed to be completed. She disregarded the latest directive dated 11/10/2022 that DB wanted the dept to follow. This was only done because I filed an EEO and her anger clouded her judgment to which she randomly stated whatever she deemed appropriate, backing it up by nothing. As will be shown in this motion and throughout the record I have sent emails to her and Buckley, and HR, asking them what procedure did I not follow and at what time frame. Crickets, nothing, not one of them responded to me, so my only option was to get out of that department asap, even though I liked working from home, I couldn't risk them accusing me of something again when they never told me what I did wrong the first time.

Now this gets sent to Dr Buckley. I go in the meeting with him, I have my two Union reps with me, and we explain that the chart review is deceiving. We presented the recording.

About a week later he suspends me stating the exact same things that Ravipati state.

Charge: Failure to Follow Policy

Specification: On December 15, 2022, you initiated a consult for a Veteran. You failed to complete the consult within the required timeframe which resulted in a delay in care.

2. In reaching this decision, your oral and written replies were carefully **considered along with all the evidence developed.**

3. This decision also takes into consideration the **aggravating factors cited in your notice of proposed suspension**. **These factors were considered in determining the appropriate level of discipline.**

So Buckley makes his decision based off the evidence that developed.  What evidence?  The deceitful chart review, the deceitful claim that it was my responsibility to schedule the consult, completely ignoring DB or Cindy's part in the consult. Completely falls in lock step with Dr Ravipati because they both work in the Command Suite.  Ravipati fell in lock step with her friend DB, and DB discriminated against me because I am not Filipino, hence proven by no one in Agency leadership did anything to Wendy Filipino, any female, the 7 JPRS filed, the hundreds of consults in the record that are within the Delay of Care status.

Buckley had his mind made up before the Union and I even walked into his office.  He used the false info DB presented to QM, which was then sent to Ravipati, to which she sent to Buckley.  DB set this entire thing in motion, and after Ravipati got to it and me, Dori and the Union explained the truth, her anger because I filed the EEO through all rationale thinking out, because she was offended by my filing this EEO to the point she sent the false info to Dr Buckley.

**Summary**

DB initiates this entire case into motion by contacting HR for my alleged actions, but she never contacts HR about anyone else which is discrimination.   She then submits deceptive information in terms of criteria to QM when they run my chart review again only on me and none of the other equals that had consults for what Agency is alleging I did. (discrimination).  Ravipati gets this false information, assumes it's true, despite me and Dori telling her via workflow this is a false.  I file an EEO, Ravipati levels me with a proposed suspension and adds a bunch of false allegations about me contrary to my reviews, by the way of which she signed.  All this bogus info gets sent to Buckley, and in his statement, he mentions he looked at all the evidence.  Well, the evidence Buckley looked at was deceptive from the beginning.  This entire case is based on

discrimination based on Sex and Race as I unequivocally proven throughout the record. The case is based on a lie initiated by DB and everyone in the Agency fell in lock step with each other.

**Side note:**

**At the VA you only get 3 Peer Reviews in front of a committee before being fired.**

This was intentionally done by DB, to discriminate against me based on my Sex and because I am not a Filipino like her. She intentionally put a strike against me and this was an evil thing to do.

15. Complainant was detailed because there may have been a risk to patient safety. ROI Vol. 1 at 190.

Question I have is weren't all the patients at risk for safety when every single person in the department was in violation of Delay of Care? **ROI VOL 1 273 - 274** Why was I in particular singled out? How did HR get the information on me, but not everyone else in the department that were assigned to veterans that in several cases veterans have died during the course of their being in the Community Care Department, or veteran's that had adverse events occur to them due to Delay of Care or what nots by other staff? Please see the JPRS filed from other departments onto the Community Care Department. **ROI Vol 1 pg 259, 262, 264, 265, 268, 269, 270** Whether HR singled me out, or DB, or Ravipati, or Christianah, or whoever, they are all part of the Agency, and they can point fingers to whoever they want, and shift people around to circumvent DB from having to address Wendy's major negligence and so on, the fact remains the same, Kochiu was discriminated against by the Agency from the initial Weingarten all the way up to Buckley, they are all part of the Agency, they are all guilty and party to what I would call a crime, so the Attorney can refrain from stating and protecting DB, by insisting Kochiu has made this case against DB. No, everyone in

leadership at FHCC is guilty of discrimination as they all failed to do a full and fair investigation and punished and humiliated me under false pretenses.

**Let's look at how the consult was handled.**

ROI VOL 2 pg 12 and 13 indicate the consult and how it was handled.

12/8/2022 consult entered I believe it was a Friday.

Sat/Sunday off

Monday the consult was not on the analyst Cliff's list he sends out to the department when work is distributed daily.

Did not show up on my list until the following Tuesday.

Wednesday I had off for my birthday.

Thursday it was received.

Friday, I had the day off.

Saturday off

Sunday off

Monday 12/19/22 I called vet (see CCP note), sent out the documents and alerted Kelly the same day to schedule.

If DB wanted this out earlier, she sees the daily worklist, she could have had someone send it out on Friday when I had the day off.

Furthermore, as the manager she should have followed up with Kelly Heckel to see where she is as far as the scheduling of this consult. But she failed to do so.

Documentation 12/19/23 "awaiting appt details from veteran or community provider" was mentioned by the Attorney at one time. That quote is what we are supposed to put down as our last statement when we send out the consult, per DBs directive. The reason is so when cliff pulls the report and daily list and distributes it to the department it shows "…awaiting appt…" queuing the PSA to call and schedule the appt as the department is awaiting someone to schedule it.

1/10/23 DB assigns the consult to Cindy RN Filipino during over time at 1750 she's unable to secure appt fails to send the 7 day letter.

2/1/23 DB assigns the consult again to Cindy RN she's unable to secure appt. does not send a 7-day required letter. She alerts Kell Heckel as she is supposed to, Kelly ignores the alert even though Kelly is supposed to schedule all the consults. .

3/1/23 DB assigns the consult again to Cindy RN, fails to secure an appt. does not send a 7-day required letter

Vet expired on 2/25/23

Kelly finally touched the consult in late March about 3 months later. Nothing happened to Kelly, who's duty it was to schedule the appt. Kelly is female, so nothing happened, Cindy and DB are both Filipino, so nothing happened to them. This is discrimination.

**After you hear the witness testimony, and listen to the recording, I want the Agency to point out to the Court and finally tell me what Ravipati and Buckley both ignored to tell me, despite me asking them, what procedure did I fail to follow, and what is the timeframe for my part of the consult? Both of which they used as justification for this witch hunt.**

**Claim B: In 2022, he was rated satisfactory on his proficiency report.**

16. Complainant received a Satisfactory proficiency rating on February 15, 2022. ROI Vol. 1 at 490.

17. Arowora was the rating official. ROI Vol. 1 at 490.

18. RMO Lorenzo-Villarino was the approving official ROI Vol. 1 at 490.

19. On January 21, 2022 Arowora emailed RMO Lorenzo-Villarino she will rate Complainant as High Satisfactory. ROI Vol. 1 at 172; ROI Vol. 2 at 831.

**ROI Vol 1 pg 235** my rebuttal to DB when she states the following:

*Back to the questions being asked of Donnabelle below.*

*Investigator asks*

*32. Please explain, in detail, the reason you issued the Complainant a "Satisfactory" Proficiency report. a***. I am unable to address this question as I am the approving official and not the rating official.**

*Another lie by Donnabelle. As Christianah my direct manager states in her answers above, she rated me High Satisfactory, and it was Donnabelle that lowered the rating. This is clear bias, clearly makes my point, clearly shows discrimination and retaliation by Donnabelle onto me. If Donnabelle is willing to lie about this and some of the other instances, why would anyone believe any of her credibility? It should be automatic; she has been proven to lie and deceive.*

*000235*

**At page 252**

**Incident 2: As of July 19, 2023, Complainant has not been issued his Proficiency Rating that was due in February 2023**.

*72. Were you responsible for issuing the Complainant's proficiency rating?*

*a. No.*

*If you were not responsible, then please identify the name and title of who was responsible.*

   *a. Christianah Arowora, Office of Community Care Nurse Manager*

*b. If you were not responsible, did you have a role in this matter? If so, please explain it.*

*a. I am the reviewing/approving official.*

20. On February 11, 2022 RMO Lorenzo-Villarino emailed Arowora stating she disagrees with her High Satisfactory rating of Complainant because there was no new input from the employee or manager. ROI Vol. 1 at 196.; ROI Vol. 2 at 830

What's the difference she contradicts herself in her affidavits from December 5, 2023  then again on follow up on 1/30/2024. Moreover, if my direct manager who knows me directly deems me worthy of High Satisfactory it makes one skeptical that she would lower my rating considering all the circumstances in this case cumulatively.

21. Charlene Miller (Female/Black) was treated the same as Complainant for this claim. ROI Vol. 1 at 143.

Charlene is a PSA, not an RN to make a comparison to me. What I was indicating in the answer about Charlene and Christianah is that they are Black Females and Charlene mentioned to me several times as did Christanah that each one of them believes they are being discriminated against each other due to the color of their skin.  In Christianah's case the entire department knows of the harassment she has received at the hands of DB and Wendy Superable and several other female Filipino employees in the department.  Case in point: DB and some of the staff orchestrated together to sabotage Christanah wherein the entire department had to meet with some higher ups I believe out of Chicago to discuss issues about Christianah.  I don't know why we were called as witnesses, not sure if it was an EEO filing, or what kind of case it was.  I just knew I was asked to explain questions about Christianah.   Again, has nothing to do with my EEO case other than it indicates a pattern of favoritisms to the Filipino race as they piled onto Christianah in order for DB to get her best friend Wendy into Christianah's management position.  Don't misinterpret what I'm saying here, I get along with all my Filipino collogues, they are dedicated, incredibly smart, nice, outstanding workers and a pleasure to be around; however, with that said it still doesn't exclude the fact that the Agency discriminated against me based on Race for not being a Filipino, as well as my Sex.

22. Christianah Arowora (Female/Black) was treated the same as Complainant for this claim. ROI Vol. 1 at 143.

Again, same comparison as we are both RN, but not the same comparison since Christianah is a manager.  Now Christianah and DB have had their differences to the point where the former director of the department, Todd Adkins, apparently had to write up DB and

told DB not to talk to Christianah after Christianah made a claim that while she sat in her office, DB walked in and accosted her, yelled and harassed her in her office in which the police had to intervene.  Not sure if DB was pounding on Christianah's desk (I want to say with a spoon, but I could be wrong) yelling at Christianah for apparently doctoring or changing the numbers to make the metics look better…?  Again Hearsay, chatter around the hospital.  Getting back to topic, there are some slight comparisons

Christianah is an RN just like Donnabelle is an RN and when the consult in question that I'm being accused of "not scheduling" wasn't scheduled, why didn't Donnabelle schedule it when she saw it and assigned it to Cindy Reyula RN?  Nurses Practice Act deems an RN is an RN is an RN no matter if you are a student nurse or a nurse with 50 years' experience, whether you are a manager or not, either way you are held to the same standard.  Therefore, DB and Cindy had access to the consult in question 3 times after me and failed to schedule or do proper follow up via a **7-day letter** and so on. ROI **Vol 1 at page 257**  Every nurse knows this, I believe it's even a question on boards.

Agency conveniently details me for an 89 year old that died, of whom I have never met, nor am I the veteran's provider, I only knew of the veteran the same way I know most of the veteran's when I was working in that department and that was by the name on a computer screen and telephone number.  But somehow for 89 years of the veteran's life, Agency blatantly points to me to know the veteran's complete health history through an H&P and accuses me of the 89 year old dying of renal failure or whatever other comorbidities he had along the way; however DB and Cindy get to skate on by, with no blame after touching the consult 3 times, contrary to what the Nurses Practice Act states,  and Kelly Heckle who's job it was to schedule that consult in which nothing happened, to the resident and attending who oversees the resident and entered the consult of which nothing happed, to the veteran's primary care physician, his renal doctor and who knows how many physician consultations this veteran has had throughout his life, they all skate with nothing happening to them,  but the person to blame is Kochiu, who by the way followed complete protocol exactly as he was told.   Talk about playing the blame game.  And btw, how do they even know the veteran died of Renal Failure.  Did they do an autopsy?  If so I want to see it.

This is such a frame up you'd have to go to a museum to see it.   The agency wants to make this convenient for them in so far as blaming me but no one else, despite the fact that I did everything as I was told, of which I will prove and it will be backed up by direct evidence as well as proved by my 8 or 10 department witnesses that want to testify on my behalf.  These witnesses have nothing to gain by testifying on my behalf, in fact these witnesses are only acquaintances through work, but they want to testify because they see the injustice and discrimination that took place and continues to and they should have a right to testify with their own words particularity when they want to make their voices heard with regard to fairness and discrimination.

When Melvin Tolbert EEO official at FHCC asked me how this was going, I stated they (Agency) are all pointing fingers at one another, to which he stated, that's no surprise that's what they'll do.

A pragmatic example would be for instance, Kochiu is on his lunch break, RN manager is covering his patients while Kochiu is on break, one of Kochiu's patient's is coding, and the RN manager DB is covering but does nothing because it was Kochiu's patient. Sorry counselor, it doesn't work that way in medicine.  DB in that example would be held liable for not treating said patient, according to the Nurses Practice Act (NPA), not to be confused with the good Samaritan law which does not apply in DB or Cindy Reyula's case here when they had the consult in their possession 3 times after I did.  We all know a lawyer would have a field day with the Agency particularly DB and Cindy Reyula for negligence in that type of scenario.  Therefore, what's the difference between DB and Cindy Reyula, touching the consult in question, 3 times after I touched it and they didn't complete it?  That's the pot calling the kettle black.


**ROI Vol 1 pg 257 and at 286.**  The 7-day letter is important and supposed to be sent out after attempting to reach the veteran.  Why? One it gives the veteran a chance as a reminder to schedule the appt or call the Community Care Dept that he/she is still interested or what circumstances may be hindering scheduling, and two if the VA doesn't get a response, then the Consult is closed regardless of if it is scheduled or not.  If this letter was not sent out by Cindy RN who had 3 opportunities to do so and if no follow up by the veteran consult would be closed regardless of outcome. It's also negligent for DB not to follow up on Cindy to make sure this was scheduled

and see if she sent out the 7-day letter or vet could have called back asking staff to schedule for him, or if he's having other issues that need to be addressed. This 7-day letter you can look at as sort of a safety net for the VA in terms of liability, as well as a second form and way to remind the vet through another form of communication. The consults cannot stay opened indefinitely, they either have to be scheduled or closed. Please listen to the recoding dated 11-10-2023. **ROI Vol 1 pg 284** are the transcripts of the recording which would be the equivalent of being at 13 minutes into the recording.

**Claim C: He was assigned a bigger workload than his co-workers.**

23. Complainant's work unit was divided into two groups. ROI Vol. 1 at 187.

Not sure what the two groups you are referring to are, there **were 4 groups** and everyone one of those groups had more staff than the group I was assigned to. Moreover, the female group was assigned 1 full time position to do all the work but had 2 RNs and 1 then bumped to 2 psa's the break down of groups **ROI Vol 1 pgs 229 - 230**

24. Work assignments were divided based on the patient's name in the alphabet. ROI Vol. 1 at 187.

25. The alphabet split was determined based on historical data. ROI Vol. 1 at 187.

 Not sure what the historical data is or the meaning of wording it that way, but seems to be of no relevance, other than it's not too hard to divide the number of consults evenly by how many staff are in the department, rather than have staff divided into groups where one group is shorted staff. But I'm not the manager, and this is the way they choose to run the department.

26. Complainant's workgroup had two RNs and one Program Support Assistant.

 **Work groups** ROI Vol. 2 at 229.  ROI Vol 1 229 – 230

27. Complainant's co-worker, Adrienne Harris (Female/Black), was also given a bigger caseload. ROI Vol. 1 at 144.

And what's the point? Everyone on my team was shorted, including Kelly Heckel who was falling behind and I even indicate this as part of the record where on a Teams message with DB I told her before this incident in question that Kelly is falling behind and needs help. Furthermore, Roger was supposed to be on my team six months earlier, but DB kept him on Cindy's team because Cindy is Filipino, despite me asking her to give me Roger. I would have liked to say Roger would have been able to assist Kelly and maybe none of this would have happened, but I truly believe this was done out of Racism and DB would have found another reason eventually to put me through this. DB loaded the Filipino's groups but not my team. And yes, Adrienne Harris as in my group and just because she doesn't want to speak up out of fear because she's a black woman that's on her. I find it suspect that the two black women were on my team and not on a team with Filipinos. Boy, I wonder why that happened. Agency seems to want to use it against me for speaking up. Besides, Adrienne Harris was never detailed for her, "Delay in Care" or the JPRS that was filed on her in one of the cases submitted a patient died, and the other a pulmonary nodule spread. Why? Because Adrienne is a female and DB had the motive to come after me for being male, speaking up, non-Filipino. Don't get me wrong, she likes Adrienne because she's female, but she's still not part of the Filipino clique.

28. Complainant states his team was short staffed and was swamped with work for six months because he was given more work when someone left his department. ROI Vol. 1 at 136. Yes, I had to pick up the slack as did some of the others, **not all**, some, the only difference is I had to soak more of the punches by virtue of having less staff to assist. And having one or two employees on a team makes a world of difference each way. If you have one more person on your team in that department it alleviates so much more stress and work, as compared to having one less employee on your team. It makes a BIG difference. I was shorted at least two workers. You don't need an advanced literary degree to understand that.

29. When the department has turnover or staff shortages, staff members are expected to provide coverage for their absent co-workers. ROI Vol. 1 at 184. Doesn't change the fact I had less help in my group and the Filipino's groups were stacked. And by the

way I was given the weakest employees in my group. The best PSAs were assigned to the groups that had the Filipinos., ie DM, KM etc etc. Irrelevant as far as EEO but signifies a pattern in terms of Race.

**Claim D: He was not allowed union representation, he was told he was subject to a [fact-finding] investigation, he lacks documentation in his emails, he was accused of not properly scheduling a deceased patient's consult.**

30. A patient death generated a patient safety report indicating there was a lack of care coordination, which resulted in a patient not being scheduled or referred by the Department of Community Care. ROI Vol. 1 at 188. A patient safety report is a JPRS so how can DB say she didn't see the JPRS from the Oncology department who submitted them on the Community Care Department employees of equal comparison to me. Several of those JPRS Oncology submitted were regarding deaths, as a result of Registered Nurses from within the Community Care Department; so, you mean to tell me in my case that a death occurred, "a patient death generated a patient safety report", however, when the other staff members had a JPRS filed on them some resulting in death of patient(s) plural, that no "patient safety report" was generated, informing the manager of our department? Does that even make sense?

 Yet BAM when someone submitted a JPRS on the consult in question that I touched, why did DB miraculously see that one, and only that one, but not the others?

**When someone files a JPRS they can list their name on JPRS or keep the filing anonymous; however, all JPRS get sent to the department leaders of the employee that had the JPRS filed against them. Any sidestepping DB makes indicating she never saw the 7 cases/JPRS I have listed in this motion and record is a total and complete lie. She knew of them, but did nothing to the others, but pursued my consult, alleging I was the cause of the 89-year-old dying. Is DB, HR, Christiniah, Ravipat, and Buckley going to pursue the other staff members with the same exact intensity as they did mine? The answer is simple, no they did not then, no they will not now, and what I have just proven through direct**

**evidence via the record of my case, and the direct evidence presented via the JPRS/7 cases proving the evidence I have submitted, the testimony of the 8 employees who are my witnesses from my former department who are listed in the record, along with the medical records indicating exactly what occurred as it is documented in a CCP note as well as on the consult itself, is far beyond the Sun, extremely in favor of me making my point, that the Preponderance of evidence is so convincingly in my favor by 100% that I have proven my case, with just these points that I outlined alone, proving this is nothing less than discrimination as per the standard of the EEO, and that the decision be rendered in my favor and the Court/Commission should find the Agency guilty and liable in violation of the EEO discrimination standard. The higher authorities of DB, Christianah, HR, Buckley, Ravipati, and their higher rankings in FHCC, by proxy, their actions speak for the employer/Agency and in this case makes the Agency automatically liable for the hostile work environment I have had to endure as far as discrimination based on Sex and Race.**

Redundant but needs to be said. Lets talk about lack of coordination. DB and Cindy Reyula touched the consult 3 times after I did. All three of us are RNs. Why didn't Cindy or DB complete the coordination or lack thereof? According to the nurses practice act all RN's are held to the same standard no matter how long you have been a nurse. Besides, if you listen to the directive on recording you will see I followed exact protocol and did my part of the coordination. The only reason nothing happened to Cindy is because she's female and Filipino just like DB is. These are the comparisons when you look at RN to RN, but how about Kelly Heckel the PSA who's job it was to schedule the consult according to DB's directive in transcript and on recording, but she did not?

as DB specifically stated so on recording, and add to it she herself knows Cindy Reyula and herself touched the consult 3 times after me, **YET**, the Agency which includes, DB, HR, Ravipati, Christianah, Buckley all came after me for this. She called me on a Friday while I was working from home and had a nervous laugh to the conversation, and she asked if I could come in on Monday and work in the office that day, to which I did. I mean the most astonishing part of this whole thing was when she brought me into work, then called me into her office to tell me I was being detailed for the Weingarten we had around I want to say 6 weeks earlier, had left me so perplexed

at the moment, in that she thought I was so dumb as to think I didn't know this was Kelly Heckle's job to schedule, and that her and Cindy touched the consult 3 times after me, and that I even asked DB to get Roger on our team to even things out between teams, and in addition get Kelly some help, because my team was short staffed, and that she still had the determination to literally gaslight me right to my face, into thinking I did something wrong, that she would move forward with this as if I was too stupid not to realize what was happening, and that me knowing that none of this was my fault, was probably one of the top 10 most awkward bizarre moments in my life occurring right before my eyes, as these types of

What really amazes me, and is and will be permanently ingrained in my mind is, that DB set these rules up, they are in transcript, **ROI Vol 1 pg 284,** they are on the recording dated 11/10/22, I specifically asked DB on the recording to re state what she stated at 13 minutes into the recording to which DB did, and she used my name "For example Ozzie. . ." as the example when reiterating how she wants the work to be done in the department.  The stunning most bizarre part that I still can't wrap my mind around this entire thing is that DB came up with the rules, she knows the rules, she seen I followed the rules, she knew it was Kelly's job as a PSA to schedule the consult, these type of things only happen in dreams.  I mean DB is not a dumb person by any stretch, in fact she's quite smart, one might even say she's clever, has a silver tongue,  she knew exactly what she was doing, but to think that I or anyone with a functioning brain cell, would ignorantly not see through this, was so unusual for the actions of an intelligent person like DB, that the metaphor Justine points out to as an "explicit" was the only way I can describe the situation as it unfolded on DBs behalf.

I wish I could describe her face right before she told me I was being detailed, it had guilt and uncertainty written all over it with a mix of trying to be confident and stoic at the same time which completely signaled insecurity in my mind.  She was seated at her desk, I was seated in front of her slightly to her left towards the end of her desk, not directly in front of her, she didn't look me in the eye, the uncertainty in her nervousness was quite obvious, as she was shaking her head side to side, taking a breath in,  looking around at the papers she was shuffling on her desk, almost afraid to say what was about to come out of her mouth, in her mind just praying what she was about to do to me, would go smooth and  that I'd fall for it, like a puppy dog and not question her attempts to gaslight me right there and then, that when she finally mustered up the courage and broke out the words that I was being detailed for the Weingarten we had

maybe 6-7 weeks earlier, without looking at me, then me saying "what?" and telling her, "Kelly was supposed to schedule that consult, and you know it!" We then exchanged a few words as I stood up, I don't remember exactly what was said, but I was looking at her she had her head posturing her right shoulder desperately trying to avoid eye contact with me as she continued looking at her desk, after she couldn't respond to me, I turned and walked out of her office without signing the detail or having the paper in my hand, then her **literally** screaming at me something like, "you're going to disrespect me!" her demeaner turned from complete uncertainty from the moment I stepped into her office at the beginning of the situation, and all her hopes of me smoothly buying into what she was trying to sell me failed, to within seconds going from 0 to 10 and getting angry that I wasn't falling for the gibberish (I'm using that verb as not to offend the Agency Attorney with the acronym I'm more accustomed to using within my verbiage). I turned and entered into her room, didn't sign the detail, took the detail paperwork that indicated where I was to report, went up to talk to Ravipati, who I believe was off that day and ended up talking to her secretary Cathy S. and after a brief conversation with Cathy I reported to where the detail directed me to report to who was a woman named Amy and a guy named Allen. I found it strangely odd that she never looked me in the eye and she had a nervous vibe about her from the moment I walked in her office, walked out, then back in to grab the paperwork after she yelled. I believe she gambled with me because in the past I would let certain things slide, even though I knew I was being taken advantage of I wouldn't say anything. I honestly wonder if she mistakenly took my kindness for weakness and thought she could bully me the way she constantly did to Christianah.

The Agency by proxy of its leaders came after me, the guy that did exactly as he was told, and DB the person that came up with the rules, completely disregarded her own rules and did nothing to Kelly PSA or Cindy RN, or herself for the matter, but intentionally targeted me and not them or the others in the department as I have stated throughout the record and this response. Again, not sure what in the world she and Agency were thinking, and they should have to come and explain to the Commission, in their own words, with all the confidence they came after me with and explain why they thought it was appropriate to come after me but not Wendy or the others for delay of care.

DB detailed me without the Union even being aware I was called to come to work on Monday only to be ambushed. Union wasn't aware until I called them to inform them. Along with making DB as my witness, I also am making Ravipati and HR my witnesses on direct, as well as the staff members that asked me if they can testify on my behalf.

In terms of finger pointing by the Agency, stating "HR didn't recommend" as far as Wendy or "HR advised" as it pertains to me is the Agency yet again eluding the question when they're caught in a jam and play semantics with the wording as to blame HR. Everyone knows it's leadership who has the final answer and not HR. HR can "recommend" or "advise" whatever they want, the manager is the final say to discipline and fairness when you compare me and the equals in the dept and how I was treated compared to them. In ROI **Vol 1 pg 506** the detail letter states, I will be brought back when DB or a "higher authority, cancels it." Me being detailed had nothing to do with HR recommending or advising the way Ravipati and DB answer in their Affidavits. One of my witnesses was a manager in leadership role at FHCC who will testify to this. Just like it wasn't up to HR to recommend Wendy be detailed. It's always up to the manager and in Wendy's case, along with all the other literally hundreds of consults in delay of care status, in addition to the 7 cases cited that had drastic outcomes, it is up to the leadership to make the final determination and not HR who is supposed to be neutral. Leadership/Agency who has the final call on details, choose not to detail Wendy RN because she is Filipino.

I for the life of me can't figure out what was going on in her mind, and I don't mean that facetiously, I mean that in a critical way. Maybe she was trying to score points in an attempt to ladder climb in front of Ravipati as some sort of weird flex since Ravipati was just aligned within our department and that was DB's way to get an angle in to proving to Ravipati that she's rugged and demanding? I'm not sure, only she herself can speak to what her intentions were. I indicated to the Agency during the discovery phase that DB would be my witness so I can question her on direct, that way the court make its determination to who's telling the truth and who is being deceitful and Racist. The only conclusion when you commutatively add up all the direct evidence in conjunction with all the circumstances is the conclusion of discrimination based on Sex and Race. If the Agency was so confident to swiftly detail and suspend me, without a full and fair investigation, and Ravipati issues a host of derogatory comments on the 14-day proposed sentence only after I filed this EEO, then I see it only fitting that they come in with that same confidence and present their case to a Judge.

DB and Ravipati always had the ability to bring me back but didn't and put the blame on HR. Ravipati has been with the VA for probably 20 years or so, for her to indicate she doesn't know how to bring me back was a lie. She immediately brought me back after the Agency was informed I filed this EEO. Wendy Superable RN wasn't detailed and made to go through the walk of shame. Regardless, of who the Agency wants to blame for not detailing Wendy, the Agency discriminated against me for being male and non-Filipino.

31. An RN Care Coordinator has a higher responsibility in care coordination. ROI Vol. 1 at 20

**ROI Vol 2 pg 62** 14 day proposed

Do the same rules of "higher responsibility" apply to the other RNs in the department? Does this "higher responsibility" apply to DB and Cindy Reyula both RNs that touched the consult 3 times after me? Does this "higher responsibility" apply to the doctor that entered this consult? We can play semantics all day long if she wants to go that route.

Does this responsibility as far as Delay of Care include the following 7 cases and hundreds of late consults entered as direct evidence into the record at **ROI Vol 1 pg 259 – 270** in terms of JPRS filed? How about the Delay in Care at **ROI Vol 1 pgs 324 – 437** which indicates consults delayed up to 300 days?

ROI VOL1 pg 289  false chart review

**37. Complainant alleges when his chart review was conducted it was based on duties that were the responsibility of the Patient Services Assistant and not Registered Nurses. Is this true? Please explain your account of what occurred.**

**No, as a RN care coordinator, RN 's has higher responsibility in care coordination.**

What does that answer even mean in regard to charting? She doesn't indicate in her answer if my chart review was based on what PSAs are supposed to chart but gives some generic answer that RN's have higher responsibility in care coordination. The question asked was, was my chart review based on PSA duties and she doesn't answer it.

This has been explained above, I followed the rules leadership gave us. I do not document what PSAs are supposed to document that would be falsifying documents had I done so. Just like her as a doctor does not document what RN's are to document. That was a feeble answer and just another deflection.

 The fact that they ran a biased chart review on me which included what the PSAs are supposed to chart was purposely done only to make me look bad so they can justify their attacks and harassment on me. For this to hold water DB and Ravipati would have had to run all the RNs under the exact same criteria meaning time frame and complexity of each consult to come to a fair conclusion that I am charting inadequately or differently than any other Registered Nurse in the Department. They never did that, even at my request, as the investigation was fraudulent and biased. Ravipati knows this, she is concealing the truth by not answering a simple question, because as stated above Dori Matusz and I went up to her office and explained this to her before she scoffed and made a contorted face and motioned to the door for us to leave her office.

The flow chart provides evidence otherwise as did the Union when they brought this up to Dr Buckley. Everyone in leadership knows and knew this but choose to ignore it. Besides we're clinicians at different levels we all know this.

 If we follow Ravipati's logic to her answer, then the doctor that initiated the consult has a greater responsibility than I do as I am only a nurse. Did the doctor follow up on his patient? Did the doctor document in the chart his follow up? Why didn't the doctor follow up on his patient that he knows? The nurses in our department only know the veterans by name and social security number we don't see the patients. Why did Nephrology wait a year before seeing the patient? That's Bizarre in and of itself.  Why is the entire blame on me the RN that touched the consult first and not the doctor, or DB leadership who disseminates the work to staff. Again, why would Cindy RN not be held to the same standard as I was when she had the patient after I did? This logic can even apply to Ravipati as a clinician, why did she not chart anything on the consult. At what point do you stop pointing fingers and hold the system failure akin to a Swiss Cheese Event accountable, but instead Agency found a reason to come directly after me and personally treat me differently and anyone else because I am not Filipino.

The investigator was asking why when the Agency ran my chart review did they marble duties of PSAs or duties neither PSAs or RNs have been asked to do. See the email attachment by Rhonda Paulson, which I turned over to the Agency during the discovery phase.

Look at the date on the email, this email was sent out only after I questioned the chart review. So why would you run a chart review on me on things we are not required to do, then after I question the chart review, suddenly leadership sends out an email stating this is being audited now only after I questioned it? DB or Ravipati knew we didn't have to send out these particular letters yet ran my report on as if we did have to send them out, and made my numbers look as if I'm not doing my job. This was a slimy thing to do.

But since Agency cites Ravipati in this issue, let's take this a tad bit further and look at it from the real issue at hand which is who holds the responsibility when it comes to Delay of Care, especially as it pertains to discrimination based on Sex and Race. The only conclusion I can make is that Dr Ravipati was negligent in not seeking an investigation into DB and Cindy who are comparisons as they are both RN's and she did not hold them to the "higher responsibility" she cites while holding me to a higher responsibility, contrary to what the Nurses Practice Act states. This argument holds no water and as a Medical Doctor she knows better, but her ego was likely offended just because the investigator questioned her.

Ravipati short quick answer she gives with such certainty, would be great to ask her in trial, under her leadership currently as the department head, how many consults are in the Delay of Care status, and if any, have any of those RNs been detailed and suspended? The answer is no, and I know that because the folks that work in that department told me. So why weren't DB or Cindy both RNs both female, both Filipino, not detailed or suspended the same way I was? When you combine that with Wendy Superable, female, Filipino, who's 35-year-old female veteran who committed suicide by hanging herself, despite her pleas for wanting to be admitted to inpatient psych. The only conclusion anyone can come up with is I am a male and being discriminated against because I am not Filipino, that I know for sure no matter how often the Agency Attorney states otherwise.

On a side note, department witnesses/employees indicated to me that there have been a few more suicide deaths in the Community Care Department after I left, I'd like to know if anyone from Ravipati, HR, Buckley , Christianah, DB, or anyone else on the Agencies behalf have detailed anyone for the deaths. If not, why not?  Currently, Ravipati is already fighting a separate court case in which, Pine Law Offices is prosecuting her on an EEO case on behalf of the union that represents Doctor's and Gs employees. I cite that because yet again we see a patten here which seems to be happening at The Captain James A Lovell Medical Center, throughout the agency.

32. On May 8, 2023 Complainant was detailed pending an investigation about the patient care issue stemming from Quality Assurance/Management's report. ROI Vol. 1 at 156.

33. On March 24, 2024, RMO Lorenzo-Villarino emailed Complainant advising he can have a Union present at a fact-finding interview about a Joint Patient Safety Report (JPSR) related to delay in patient care delivery. ROI Vol. 1 at 497.

34. Complainant cites Oncology Department nurses in Community Care did not receive write ups for cancelling a consult and a veteran expired. They were not subjected to a fact-finding. ROI Vol. 1 at 196.

**ROI VOL 2 pg 313**

Me emailing ORMDI asking why the investigator isn't asking the appropriate questions pertinent.

The investigator asked and misinterpreted the questioning. Not sure if it was intentionally done by the investigator to solicit a certain response to try and purposely trip the person in question, or if it was an honest mistake.  Nonetheless, what the question should have stated was, there were two nurses that work in the Oncology Department Not Community Care Department, that filed JPRS against some of the RNs in the Community Care Department.  Those JPRS are then sent to the Director of Nursing

in the facility then forwarded to whatever department it is that had the JPRS filed against them. Of course, DB isn't the leader above the Oncology nurses that filed the JPRS, but she is the leader of the RNs of whom the JPRS were filed against. DB knows this and since it was asked wrong DB took advantage of the question being asked incorrectly and ran with it that way by answering the obvious.

**I did not say the Oncology nurses did not get a write up or detail, that wouldn't even make sense in my situation. In fact they volunteered to help me and gave me the JPRS information as they were appalled as much as I was for this witch hunt the Agency pulled on me. I said none of OUR nurses in the Office of Community Care that had the JPRS filed against them were detailed or suspended. Some of the JPRS were filed for Deaths, some for diagnosis becoming worse due to delay in care or cancelling of consults or receiving records etc etc. This is some more direct evidence of discrimination as the JPRS were filed against all females, some Filipino one male Filipino who are all RNs and no one got detailed, that's clear-cut discrimination when you look at that and compare it to what happened to me. ROI vol 1 JPRS filed. None of this has to do with the Oncology Nurses.**

If you read these cases in the record, they are thoughtfully detailed in stellar fashion.

**JPRS filed:**

**These are cases of RNs of equal comparison to me and nothing happened to them that I got from the Oncology Nurses.**

**Case 1  ROI Vol 1 pg 259 – 261** this was a female RN in DBs/Christianah's department **– nothing happened**.  Look at the amount of Delay of Care pointed out by the Oncology Nurse who filed this, it's very detailed and orderly fashion.  Lesion grew as a result of the Delay of Care.

At pg 261 look at the Summary of elapsed times:

"to realization that pt never had 2nd CT appt (**140 days)** Time for Community Care to request/upload records**: 7.5 months" Seven and a half months delay in asking for cancer records is a major you know what word I wish I could say!!**

Dr Ravipati may even have been the primary care physician with regards to this consult. I would love to ask her about this on direct.

Did anything happen to this nurse of equal comparison to me? No. Nothing. Zilch. Walked away like nothing happened.

**Case 2 ROI Vol 1 pg 262-263** Veteran **death,** This was a failure to **f/u by a female staff employee** on one that a male Filipino RN sent out "**Pt EXPIRED 9/28/22**" **Nothing happened to the Filipino RN**

**Case 3 ROI Vol 1 pg 264** Female RN – **nothing happened** "The evaluation was scheduled for 5 months down the road. One month after this consult was placed (but still before he was scheduled) the pt called the Triage Line with worsening sx, and was advised to go to the ER. I don't see any charting after this, **but even this didn't "flag" the urgency of this consult,"**

**Case 4 ROI Vol 1 pg 265-267 Female RN nothing happened. "Pt (now deceased)** was a 66 yo chronic smoker."

"Key points: Lack of timely follow-through by CC: Initial pulmonary consult, placed in April, was eventually discontinued. **There did not seem to be nursing judgement used, regarding importance of this**, as evidenced by charted statements of manager. Lack of initiation by VA: As the elderly vet outright verbalized transportation issues—especially with regard to **an important pulmonary evaluation for cancer**—perhaps it would have been more prudent of the VA to take initiative and call pt with options, rather than placing the onus on the pt to call himself and seek options. Historically some pts can be dismissive and feel burdened if tasks are placed on them. At this time the VA was on "bypass" for onsite pulmonology, due to being short a physician—it took the daughter calling back to see if her father could be seen at the VA, rather than this option being outright offered to the pt, from FHCC, due to urgency of evaluation. Unclear pulmonary follow-through: writing unclear of pulmonary follow-through after initial (7/15) bx at FHCC. 000266 Sending discs: Community Care to be educated to automatically send imaging discs, for a biopsy. In these cases, recommend to overnight discs so precious time is not lost."

**Case 5 ROI Vol 1 pg 268 "**Submitting this event because 8 months have elapsed since consult was first placed" "…Consult approved and eventually scheduled for 3/16/22. Records requested by person #1 on 7/2/22, but never received. Records requested by person #2 on 8/10/22, but never received. On 9/20/22 person #3 called outside provider and learned that pt never attended appt, prompting CC Managed Care Director to contact Cancer Care Coordinator (CCC) RN and CC RN on 9/27 to ask that someone f/u with patient. CCC RN responded affirmatively and called pt on 9/27:" **Nothing happened to the RN in the Community Care Dept,**

**Case 6 ROI Vol 1 pg 269** Case 6 here had to do with two females both RNs in Community Care. One of which who closed the consult is a manager – **nothing happened**

"Good morning CC Leadership, Can you kindly provide education on your policy for record request/upload, including **the permissible timeframe?** Above pt has a current consult to be seen in the FHCC hem-onc, but Dr. Pant-Purohit lacks outside records from his previous CC consult. This consult was closed (marked "C") on 3/6/23, without any records uploaded. If I'm reading this correctly, there was only 1 documented attempt made, and 2 additional ones were to follow. **It's now 6 months later, and still there are no records.** No more attempts were documented."

 **Is this the Delay of Care that the Agency is referring to?**

**Case 7  ROI Vol 1 pg 270** has to do with Wendy Suberable RN and the death of a veteran.  **Nothing happened** other than a review into the matter.  Wendy was never detailed pending the review, never suspended, never humiliated, etc etc etc. I was detailed pending investigation but Wendy was not.  Doesn't matter who it was that decided not to detail Wendy pending investigation, leadership by proxy is the Agency.  Here Agency discriminated against me flat cold.  Why?  Because Wendy is a female and more so she is Filipino.  **This is Racism.**

There was so many things that Wendy could have done other than passively pass this onto a newly hired administrative staff member. When Ravipati speaks of Kochiu is held to a "higher responsibility" how can she explain not detailing wendy?

**ROI Vol 1 470 – 472** is a way on how to handle a suicide patient.  You do whatever it takes, not pass the buck.  Complete negligence and Wendy got a pass by the Agency.

**I think it would be appropriate to add this here ROI Vol 1 pg 475, here DB moved a consult from pending to active status but assigned it to a PSA when it needed to be assigned to an RN.  She did not clinically triage the consult and made it a basic.  Why is it that if DB doesn't follow her own procedure, skips steps, inappropriately assigns the consult, and nothing happens to her as an RN?  Is she not held to a "higher responsibility" as Agency/Ravipati pointed out with regards to me, but not DB.  As you can see this email was sent up the chain of command and nothing happened.  Why?  Because when it comes to leadership, the Agency protects its own, and that's discrimination.  This is the Federal Government and like any other business should be held to the same standards when it comes to the EEO laws.  But instead we have rules for thee not for me apparently.**

**These are only the ones that I know of who knows how many have been turned in during my time in the dept.  Now DB and Agency can bob and weave all they want but how do they explain that none of the RNs in the 7 cases I present as direct evidence were ever investigated, detailed pending outcome of investigation, suspended, made to do the walk of shame the way I was.  I'm glad to see my name was not on any of those disastrous outcomes listed above.  I mean Dr Buckley talks about the gravity of my case, (which I am not guilty of) but completely ignores these 7 cases?  Where's Ravipati, Donnabelle, and Christianah, HR, and the rest of the Agency that came after me?  They never investigated these. Are they not going to investigate these? If not, why not?  What they did to me is clear cut discrimination, and case is closed I've proved discrimination based on Sex and Race.**

The Oncology Department does not fall within RMO Lorenzo-Villarino's supervision and therefore she is unaware of any cancelled oncology consults leading to a veteran expiration. ROI Vol. 1 at 196.

Not true, every manager attends the 0730 morning huddle by the Director of Nursing in which the previous days data is gone over. All the JPRS in the hospital are discussed and the JPRS are forwarded to each department manager of which the JPRS was filed on. DB is flat cold lying about this. In my new role I'm part of this 0730 daily huddle currently run by Dr Shaw every morning. I even saw DB invited to this Teams 0730 morning huddle. When a JPRS is written it can come from anywhere in the hospital, DB's dodge that Oncology is a separate dept means nothing as far as her department receiving the JPRS from another department, because they are all forwarded to the managers. JPRS are written by various depts onto other departments which includes for example, doctors in surgery submitting on Drs in med surg, or a nurse in the ER filing against an issue in Radiology, and so on. In the above scenario is was the Oncology Dept filing on the Community Care Dept. Either way it doesn't matter each dept head gets the JPRS. This is another one of DB flipping the script in answering the question truthfully, for obvious reasons, it signals discrimination and lack of follow through.

Justine in her defense is only going off what is written in te record. I'm not sure if she interviewed her witnesses and they told her differently that I wouldn't know. It's my job to try and make this as clear and transparent as possible with the least amount of distortion in-between and to somehow articulate this in writing. I'm not a lawyer and can't form arguments and articulate my points in writing the likes of an attorney, particularly when I'm up against witnesses that are intentionally twisting the facts, and that's why the best way to get the truth out and uncover this discrimination is via trial. It's these kinds of statements which require a trial so these people making these senseless allegations can answer in front of the Judge or Jury. Agency is trying to play ignorant sporadically throughout their affidavits and are searching for loopholes of who to blame this on as far as detailing me and not detailing others as indicated in the 7 JPRS cases.

All VA's do JPRS from one department to the other.   Any manager saying one dept is not part of the other therefore they never saw the JPRS is a laugh.  I mean how would hospital departments work in conjunction with one another if they can't keep in touch when issues arise between departments.  OIG and State would come in so fast and cite so many violations if that were the case it would make national news.  If this is the hill DB wants to die on that oncology is not her dept and therefore she doesn't know about the JPRS when they are filed against her employees in the Community Care Department is the biggest dodge out there, it either shows gross incompetence for not knowing her job and following through, (which I don't believe is true), but what I do know is true she's lying so that she can play ignorant because she knows she detailed me based on Race and didn't detail her best friend Wendy Superable, female, Filipino or anyone else written in the JPRS, or anyone else in the dept in violation of, "Delay of Care."

35. Complainant cites RN Superable (Female/Filipino) as a comparator because she was assigned a suicide patient and the patient committed suicide. RN Superable was not subjected to a fact-finding. ROI Vol. 1 at 161, 197. This is where DB covers herself. When I filed my EEO, the incident with Wendy happened sometime after.  DB knew she would have to do something to her best friend Wendy otherwise case closed if she didn't detail and suspend Wendy I proved my case of discrimination.  So, what she did was make a lateral move so she can pretend she is no longer the boss of Community Care and therefore wouldn't be stuck between a rock and a hard place to either put Wendy through the walk of shame like they did to me, or not detail Wendy and I proved my case of discrimination against the Veterans Administration.  So, DB with Ravipati calculated this move temporarily, only until I drop my EEO or it gets shot down by a court, or it just drags out forever, then Ravipati would slide DB back to her original position where she was boss over Wendy and they all skate on by.

So, DB punts on this so the hot potato doesn't fall in her lap, and Wendy's situation gets dumped on to Christianah.  Why Christianah? Easy, first it puts the onus on Christianah to make the decision and DB slips past it, and secondly, DB knew Christianah would let this slither away because the blow back Christianah would receive by DB, Wendy, and the rest of the Filipinos would be too much to handle. I have already mentioned above how the Filipinos dog piled on Christianah for years, and there was an investigation and all, well

Christianah knows this and knows if she were to cross Wendy she will have the most miserable life in that hospital. That's why Christianah did not put Wendy through everything I went through.

That said, it was on Christianah who is part of the Agency by proxy to treat me and Wendy as equals, despite the outcomes she was afraid of, it was part of Ravipati the top leader of the Community Care Dept on the Agency's behalf to treat Wendy no different than the she and the Agency treated me, it was up to HR and Buckley to treat Wendy and me the same way, but the Agency didn't, and this is unequivocally, positively, non-ambiguous, so transparent, clear cut, or whatever adjective I can think of as discrimination based on Race and Sex against me, flat cold and nothing anyone can say to me will ever make me think differently.

The Agency attorney seems to think if DB didn't detail Wendy than Kochiu has no case. But she's wrong, the managers are proxies of the Agency, and the Agency as a whole treated me differently, than it did Wendy. Whether it was Christianah or whoever in leadership the fact that I was discriminated against can't be denied. Particularly when Ravipati had a part in my case, and Wendy's as well as she is and was the leader during my detail and above Wendy in the department. Ravipati had authority in detailing and bringing me back as did HR, similarly, HR and Ravipati had authority in detailing Wendy and bringing her back but did nothing. That's racism.

36. The incident in paragraph 35 occurred in July or August 2023 when RMO Lorenzo-Villarino was not RN Superable's direct supervisor. ROI Vol. 1 at 197. 35 isn't correct paragraph that was about the Onc Nurses, but I know you are referring to paragraph 36. See my reply to 36 for this. Moreover, it was the Agency as a whole that did nothing to Wendy which includes, Ravipati, HR, Buckley, DB, Christianah. Whether it was DBs responsibility or someone from the Agency in leadership position you can't dispute I was discriminated against and Wendy was not. If the system at FHCC can't get it together and treat everyone fairly without discrimination via racism, that's not my fault and it should not be held against me. The fact remains the same I was

discriminated against by FHCC Agency if you compare me to Wendy, and even the 7 JPRS and hundreds of consults that are in the delay of care status.

37. RN Superable's direct supervisor at the time conducted a fact-finding for the incident in paragraph 35. ROI Vol. 1 at 197. Why wasn't Wendy detailed during this fact-finding investigation? The fact that Wendy was not detailed or suspended was discrimination. It's not my job to figure out which person that is proxy on the Agency's behalf had the responsibility to keep things fair and free of discrimination. The fact that the Agency treated me like a dog, made me do the walk of shame, humiliated me, put in a bunch of derogatory comments that aren't true about me in a 14-day proposed sentence, that I now have to refute when or if I even get my interview with the Central Intelligence Agency in Washington DC is bad enough. I mean, you guys were willing to make me whole last fall if I were to drop this EEO case. Why? If the Agency was so certain that I messed up why would you want to make me whole when we were going to proceed through the DAB meeting? The Agency Attorney is acting as though this case is frivolous and worthy of disqualification or indicating Kochiu is overzealous in seeking justice.

Do you really think when or if I get the interview at the CIA they aren't going to look into this? This is no security clearance the likes of getting hired at some VA hospital. They're going to look under every rock, run out every ground ball, pull up things from my past, every click of the mouse, etc etc etc. Do you honestly think they will not look at the false remarks Ravipati made about me in the 14-day suspension? Even if this is dropped no matter what they will ask me questions and ask if it was dropped as some sort of plea or whatever. The damage is done, no matter the outcome of this I will have to answer to this when and if they interview me. I will never know if I don't get a different job in government that I apply for (particularly the CIA) if this detail or these false allegations levied against me will be the reason I may be turned down. A potential employer won't tell me that. And if I'm lucky enough to even get the interview with the CIA, I will have to refute every bogus accusation she made of me, just because her fragile little ego was hurt because I filed this EEO and the investigator questioned her.

My question is how did Ravipati come to those conclusions in the 14 day when she was only the department head for 2 months and doesn't know my work ethic?  Ravipati states I don't work with others, and a host of derogatory comments, for her justification.  Where did she get that info, DB?  Or did she do it out of retaliation because I filed an EEO? Please refer to my reviews at **ROI Vol 1 at 484** where DB states I collaborate with staff, etc etc.  Please refer to **ROI Vol 1 at pg 493** where Christianah states and DB signed off on which state positives about me, that I'm an astute employee etc etc. Even Ravipati signed off on the last review that states nothing of what she indicates in her sentence to be considered by Buckley.  BTW of which Buckley took into consideration when suspending me. If Ravipati really wasn't offended by my filing an EEO to the point that she retaliated against me then why did she put those statements that I now have to refute into the permanent record.  The statements she made about me are completely contradictory to what all the positives the manager(s) are saying about me in my reviews.  How can she come up with those responses when she was only the boss for 2 months at the time?  Furthermore, if this was true, why did it take 4.5 years to bring this to my attention?  I think the answer is quite simple, Ravipati retaliated against me for filing this EEO, and her feelings of being insulted because a low-level nurse like me, beneath her thrown, dare question my being detailed unjustly.  She took this so personal to the point it clouded her thinking and out of anger and spite she had a knee jerk reaction and wrote those statements about me that now I will have to refute.

In my opinion the damage is already done, whether she recants those or not. I will forever have to refute why they were recanted or made about me in the first place. It's about reputation and integrity to me.   I don't think the Agency understands how bad the statements she made about me actually are.

38. At the time of the instant EEO investigation, Dr. Ravipati confirms there was a pending fact-finding for the incident in paragraph 35. ROI Vol. 1 at 203. This is where I want to question Ravipati in front of the Judge or a Jury. She states, "**multiple gaps** were identified. **Alleged did not show any responsibility and accountability** during one-on-one meeting and in his emails. **ROI Vol 1 at 203** what gaps? Responsibility or accountability? For what? For doing my job the correct way and her and the agency discriminating against me?

**Ravipati, DB, Buckley, HR, Christianah, the entire Agency, completely ignores the Delay of Care the entire staff is guilty of see ROI Vol 1 pgs 324 – 437. The second column from the right indicates how many days the consults, (plural) are in the Delay of Care status. Not a single employee, RNs in particular that are my equal in comparison were held to a "higher responsibility", "multiple gaps" etc etc etc . the way I was.  This is only a snapshot in time. Can the Agency please explain to me the difference between me and the other RNs in the department?  They can't.  And this is discrimination particularly when nothing happens to the females or any of the Filipino's.**

**ROI VOL2 pg 62**

**Buckley charged me with what Ravipati stated**

**Citing time frame, What's the time frame? They never stated.**

**Ravipati states in the 14-day suspension cites**

**Charge: Failure to follow Policy. Ravipati and Buckley never state which policy I failed to follow.**

**Buckley at ROI VOL 2 pg 64**

Charge: Failure to Follow Policy and suspended me for 3 days.

None of them stated what policy I failed to follow.

None of them told me what the time frame was.

**Teams message to Ravipati of asking her when I can come back, this was after the peer review committee was completed.**

**Date 6/5/23**

Kochiu: any word on the detail?

Ravipati: just spoke to Amy, as per her it's not locked . No update from HR side.

Kochiu: Is it up to HR or Donnabelle?  the union tells me it's Donnabell

Ravipati: HR

Kochiu:  what are they waiting for

Kochiu:  or what's taking so long

Rav: please reach out to Alex Morse in HR.

Kochiu: ok

**6/6/23**

Kochiu: any word on the detail?

Ravipati: Aziz, suggest you please reach out to HR.

Kochiu: yesterday i called Alex and he said they were in the back end of it.  i called him today and he said my mngr would reach out to me.  Don't know why Donnavbelle is slow walking this the dept is suffering everyday she keeps me out of there.  Can't you do something about it since our dept is aligned with you guys now and you're higher than her in the chain of command?

Rav:  we are working towards it.

Kochiu:  if it's up to DB she'll take her time

**6/15/23**

Regarding the peer review meeting

Kochiu:  sorry Dr Ravipati i have been under a lot of stress about this and was nervous during the call

Rav: no worries. you explained your version

**6/28/2023**

Kochiu: who is this up to to lift the detail

Rav: i have no idea

Kochiu: Can't you lift it?

Rav:  No

Kochiu: yeah but you're higher in the chain of command than donnabelle i don't get it

Kochiu: **any reason why I'm being singled out?**

Shortly after this I filed the EEO.

**Teams message between me and Alex Morse (HR)**

6/5/2023

Gm Alex, can i talk to you with regards to a detail?

On this day Alex told me on the phone this investigation was done weeks back and that he wanted to get this out of the way so he can get onto other things.

6/6/2023

Hey there Alex, any word on the detail wrapping up?

Alex:  Hello, there are no further updates at this time. Your supervisor will keep you updated as things move along

6/28/2023

Alex any word?  Last time i talked to you, you mentioned we were at the back end of this

Alex: Good afternoon, you will be notified by your leadership of any updates.

Yeah but isn't HR suppose to be on both sides?

HR is on neither side. As I told you before, I am not at liberty to discuss your case. Any information you receive will come from your leadership.

gotcha.  i just remember you saying several weeks back that we were on the back end of things, that's why i asked

Alex i sent you an email, would you be so kind to look at it?  it would be greatly appreciated

 is there a DAB meeting today?

**ROI VOL 2 pg 305**

Email sent stating cops are called in the dept

**Goes to the chaos that Ravipati says there is none on the 14 day.**

 From: Kochiu, Azis FHCC Lovell Sent: Thursday, January 11, 2024 11:06 AM To: Spilsbury, Daniel (ORMDI) ; Little Elvis Is Combat Ready Cc: Wollmann, Rena (ORMDI) ; Lisa Wabinga Subject: RE: [EXTERNAL] Re: Affidavit of Christiana Arowora

 Okay, I guess all I can do is submit my rebuttal and all the information I have at this time and hope ORMDI asks for more information because I'm not sure I can explain/articulate in verbiage on paper the facts of the case and the process we follow in the Community Care Department as the dept is run as chaos at best. You'd need a highly sophisticated psychologist to decipher the human behavior in that department. I mean you got managers calling the police on other managers in the dept. Managers calling the police on staff etc etc etc. Trying to explain in words on paper the disfunction and all the changes that take place in that department is the equivalent of trying to explain the existential crisis in life. Anyway, thanks for taking the time to explain this to me, Dan. Likewise, thankyou Lisa for your effort into investigating this matter. I truly do appreciate all you've done. All I can say is I'll do my best

 When Ravipati mentions in the 14 day that there are no stressful events or something like that, I think she should look back at what had transpired throughout the time I was in that department.

**Work load stressors.**

We have had two teams bulding sessions in the time I was there to help with all the chaos and dysfunction department.

The first one was held by a guy named Mark.  Lasted a few months or so.

The second one was held by a Dave, and Stephanie, which lasted a few months.  This one apparently was told to be done by the Executive Buckley apparently after outside Agencies in the Federal Gov't were receiving complaints with regards to the dysfunction of the department.

**ROI VOL 2 pg 5**

**This is Ravipati's derogatory answers she states about my work.  This was done in retaliation right after I filed the EEO.**

**Remember on 6/28/23 on the teams messages with her when Ravipati states she has no idea who lifts this detail and further states, "No" she can't lift it.**

**However, the moment I filed, and the Agency was notified, she lifts my detail, hit's me with a 14 day proposed suspension, and made a lot of derogatory comments towards me.**

Me - who is this up to to lift the detail

 Rav - i have no idea

Me - Can't you lift it?

 Rav - No

Me - yeah but you're higher in the chain of command than donnabelle i don't get it

 Me - any reason why I'm being singled out?

Shortly after this which was after the Peer Review Meeting, I filed the EEO.  **ROI VOL 1 pg 3 and 4 and pg 24**. The date on the initial contact just shows June, 2023 and it appears I presented to the EEO office on June 22, 2023

**ROI Vol 1 Pg 24** indicates that the initial interview was on 6/28/2023 the day I got no answer from Ravipati as indicated on the Teams messages we had.

**ROI Vol 1 pg 24** Facility Director was notified on 7/12/2023

**ROI Vol 1 pg 30** on 7/24/2023 Donnabelle was initially interviewed by Michelle Reed.

**ROI VOL 2 pg 62** Ravaipati brought me back August 1, 2023

This if funny that Ravipati went from she can't get me back, and told me to call HR on 6/28/2023 per our Teams conversation, then I file with the EEO, Donnabelle gets interviews on 7/24, I'm on vacation that week and Ravipati calls me into her office when I got back and on 8/1/2023 she brings me back to my regular job. Magically, she found out how to get me back only after I filed this EEO. Only it was no longer a slap on the wrist. She retaliated at me for filing and hit me with a proposed 14-day suspension, in addition she added a bunch of derogatory comments in her reasons as to why. Which by the way were false and I will proceed in this section to show you how they were false. This is retaliation. Why?


First off she states "Failure to Follow Procedure" …"within the time frame required"

She never told me what procedure I did not follow. If you listen to the recording, and the testimony of my colleagues they indicate I did what I was supposed to do on the consult as a Registered Nurse.

Second, she doesn't indicate the time frame I was supposed to complete my share of responsibilities on said consult as a Registered Nurse.


**ROI Vol 2 pg 5, 6, 7, 8, 9**

**Ravipati gives these answers in regards to my work ethic which show retaliation.**

She states the death was the cause of negligence . My question is on who's part? DB and Cindy that had the consult in there hands 3 times after I did and failed to schedule or make contact with the veteran, or even bother to send out the 7-day letter as another form of contact. Or was it Kelly Heckle's negligence for not scheduling the consult when DB states in no uncertain terms on the recorded directive the PSAs do all the scheduling? Is DB negligent as a manager for not getting Kelly help after I sent a Teams message to her indicating Kelly is falling behind and needs help. Is it the requesting provider who never followed up on his consult, or the primary care physician, or Ravipati since she was the lead. I mean, this can go on and on and on. I did as I was told and DB used this intentionally and discriminated against me.

**Ravipati states I am not dependable with workload, consult management process, and resistant to supervision feedback.**

How would Ravipati know that since she testifies, she has been our manager since 3/3/23 which was 2 months prior to my detail. Furthermore, did she not look at my reviews which indicate quite the opposite of her comments?

She later states I am **not receptive to peer feedback.**


She refers that this would **look bad if it went to the Media.** My answer to that is that's exactly where this will be going, the media needs to see how the vets are treated and how that department discriminates against me as a male and non-Filipino.

She goes on to state **I am not committed to veteran care.** Funny as I am awaiting congressional approvement on a proposal I have submitted that will greatly improve veteran care. I imagine congress is waiting until after the election.

She states I **lack dignity.**

She states I am **not accountable for my actions nor willing to admit mistakes**. And she knows this how? What mistakes did I make? I don't admit mistakes that I didn't make just to appease Dr Ravipati.

She goes on and **states there are no workload stressors**. In the 4.5 years in that department, we had 2 teams building sessions that were months long do to the complaints by employees, management that doesn't get along or talk to one another. How can a department function when one manager pits all the employees against another manager?

Finally, she admits only one positive thing about me and that is that employee with other staff brought to attention workload.


**Now let's compare the negatives Ravipati throws at me to what my reviews indicate.**

**ROI VOL1 pg 484**

Per DB on my review in 22/2023 states,


" **Mr Kochiu collaboratively** with patient/providers/outside providers in care coordination. "

"**He collaborated with an interdisciplinary team to include primary care, and specialty care, leadership and** with veteran discuss the course of action to take in order to acquire emergent approval. "

"Mr Kochiu reviews consults assigned to him. He makes sure all pertinent information needed in the consult are present prior to processing and routing to community provider to avoid rejection."

"…continues to self-assess on monthly basis with UBC to discuss new areas of improvement."

"…collaborating with unit-based council to identify areas of improvement and present to leadership."

…"Kochiu reviews the guidebook and looks for opportunity to improve the process."

Does any of what DB states sound like what Dr Ravipati is stating about me in her 14-day proposal? No, it doesn't quite the opposite. In fact, as I previously stated, Ravipati who was only our lead in the dept from 3/23 to 5/8/23 when I was detailed**. Ravipati even signed the above yearly review on 5/4/2023 which indicates I do collaborate in addition to other positives about me contrary to what she wrote in the 14-day proposed sentence. Why August 1, 2023 was she being so hypocritical with an angry tone to her answers? Did something change from 5/4/23 to 8/1/23?** I mean I was detailed at that time not even in the dept working at the time she states, I lack dignity, don't collaborate with others, feedback and so on. The answer is simple. **Ravipati retaliated against** me for filing an EEO which she was notified on somewhere around 7/24/23 when the facility was given notice to my filing and DB was interviewed by EEO Michelle Reed.

**ROI VOL1 pg 491, my review 21/2022**

States the following by Christianah and signed by Donnabell.

"Works collaboratively with all levels of muti-specialty interdisciplinary health care provider, physician, pharmacist, social workers, dietitians, behavioral heal specialist, outpt/inpt depts, ancillary serviced community resources. A strong advocate for his patients …works diligently. "

"Serves as a role model in educating others…knowledge of policies and procedures, laws and regulations, preceptor to the new LPN hire"

…Kochiu uses his astute clinical knowledge to valuate practice of self and others…heightened awareness, educates patients and family…collaborates with members of his interdisciplinary tea to deliver continuum of care…"

"Ongoing communication/collaboration with leadership and provider to ensure…goes above and beyond for his patients and families, has significant input."

Again, does that review sound anything like the negative comments Ravipati answers about me? Obviously, no. She only filed a 14-day despite knowing it was Kelly Heckle's duty to schedule the consult, and she completely ignored when Dori Matusz and I explained in detail the chart review was completely wrong (in which DB intentionally sent deceptive info to QM, knowing this wasn't an honest chart review), just because her fragile little ego was hurt because I filed under my Federal rights an EEO case. So, what does she do? Plain as the sky is blue, she retaliated at me for filing and in doing so pushed for a 14-day suspension and entered very demeaning remarks about me that I now and in the future will have to refute.

**Claim E: His supervisor gave deceptive information to a peer review committee.**

39. RMO Lorenzo-Villarino only assisted Quality Management in assigning another peer RN to review the consult and relaying messages between Quality Management, Complainant, and the peer RN. ROI Vol. 1 at 189.

ROI Vol 1 pg 221

This case involved an 89 y/o male with order placed for community care nephrology consult on 12/08/2022. Order was received on 12/15/2022. On 12/19/2022, referral was processed. Subsequent follow-up for referral was on 01/10/2023. On 02/27/2023, notification was received that patient was admitted in community hospital on 02/23/2023 for acute kidney failure. The initial reviewer identified the aspects of care on inadequately monitoring patient's condition and, lack of recognition of signs and symptoms of deterioration on patient's condition. The initial reviewer cited Community Care Field guidebook chapters 3.2 and 6.3 as reference. The initial reviewer also mentioned **that the RN coordinator did not consider the consult as complex by processing and scheduling ASAP even though it was an expedited request.**

**First off the entire syntax in that paragraph sounds exactly as DB writes with the exception of the very last sentence. Read her writing than read Adrienne's writing you will see the contrasts are huge in the verbiage between the two. I honestly believe DB wrote that, gave it to Adrienne and had Adrienne sign off on it. I am also willing to wager a years pay that Adrienne had that paragraph given to her and DB called her and told her to add the last sentence in that it was an expedite. The phrasing in the last sentence sounds like Adrienne, the rest of it is DB. I can tell you all right now no one in the department would know to look at and cite chapters 3.2 and 6.3 as reference. Those chapter references came from leadership. There story changed when I blew it up in front of the Peer Review Committee in which Adrienne Harris was there and so was Ravipati.**

**Why didn't Ravipati but more specifically Adrienne Harris not speak up when I said this wasn't an expedite? I said it several times and Adrienne had several opportunities to correct, "what she and DB proclaim Adrienne wrote" You're going to just sit there**

when the guy is calling you out saying to the entire committee this is false.  I believe I even said DB is tampering with evidence.  Why would you not defend what you wrote instead just sit there silently as if you're in shock?  There's a reason DB never showed up to the Peer Review Committee.  DB literally called me and asked if I was going to participate in it, to which I was so enthusiastic in my answer to her that I was going for sure.  That was the moment I would finally get to tell the truth in front of 20 or so people on the committee, all the higher ups and so on.  DB never showed because when she called me to see if I was going to be there and I said yes, she knew I'd come out firing with double barrels and she would have been called out right there and then in front of leadership.  So she skipped and had Adrienne proxy for her.

Therefore, it didn't need to be processed and scheduled ASAP the way whoever wrote that stated, because it was NOT and expedite.  In fact, it wasn't even a complex consult, after I ran the CAN score it pulled up as a moderate.  Moreover, one could consider this a basic consult in that the provider was already listed on the consult, all it would have taken for an ancillary staff member to do was call the veteran and tell him the consult was sent and an appointment was captured.

Again, does the last sentence sound like Adrienne is referring to the provider that entered the referral.  last sentence she states, " RN Coordinator" specifically calls the RN out…consider it a complex…even though it was an expedited request. " I mean you can't parse the wording as it is what it is.  I honestly believe since that last sentence Adrienne is now attempting to back pedal her wording to blame the requesting provider and not me that came from DB calling Adrienne.

Take the semantics out and realize this is what it states it is.  It is accusing the RN Coordinator (Kochiu) even though it was an expedited request.  It doesn't say the provider, it says the RN coordinator.   Adrienne is not saying it should have been entered as an expedite, she's blatantly saying that the verb "expedited request" is the past tense indicating the doctor entered it in as an expedited request.  Only thing is is that it was NOT and expedited request.  Now Adrienne has a masters degree I doubt she meant something else.  And the only way she would know to write this up as an expedite is if DB fed that to her.

And after I blew this entire thing up in front of the higher ups, DB and Adrienne had to come up with another dodge in order to prevent DB from looking like she entered or told Adrienne to tamper with evidence.

Why would Adrienne call me up on a Sunday evening telling me how bad she feels and so on.

Okay let's just say even if DB didn't write this, and it was Adrienne that wrote it.  Why did DB allow this to be turned into the committee stating it was an expedite?  Her excuse will be, I didn't read it, Adrienne submitted it.  My answer to that is that would be negligence on her part.  I mean if this scenario required me being detailed, put through a massive investigation, don't you think it would be prudent to read the summary being turned into the higher ups?  I mean it would take 15 – 20 seconds at most to

read. If you're going to eagle eye my work and proclaim all this bad information about me, why wouldn't you as a manager read this before it's turned in? That's if she uses the excuse of incompetence. Worse yet, even if Adrienne did write it, why did DB allow it to be turned in that way?

Maybe it was already turned in and that's when DB called me to see if I was going to attend the review and when she found out I was, she bailed and skipped it entirely because she knows what was written in the summary.

There's no excuse for this to have been turned in the way it was written.

Either way DB is guilty of tampering with evidence either directly, indirectly, or by looking the other way.

40. RMO Lorenzo-Villarino was not part of the root cause analysis conducted by Quality Management Department. ROI Vol. 2 at 189. The question was asked wrong by the investigator. I said and it's in the email in the record **ROI Vol 1 at pg 479** that if this warranted a detail, lets have a root cause analysis, this was sent to several of the leaders as seen by email. They never had a RCA. Why? Because then I would be able to speak up in front of a another committee who's job it is to implement ways to prevent and make sure changes are made so that sentinel events or other adverse affects to patients don't happen. RCAs are not a form of punishment they are a way to get the hospital together and find pathways to prevent negative outcomes. This was completely bypassed by the Agency. Why? Because the last thing the Agency wanted was for me to detail the specifics of how everything went down, including the recording which I could play off my laptop and the details would only implicate leadership in Lovell for ignoring adverse events. 90% of the employees in the VA act like they care about the veterans, but they don't. Again if Buckley states the "gravity"… of this situation and this warranted an investigation and me being detailed, why not have an RCA to prevent this from ever happening again. Simple answer, they wanted to sweep this under the rug and move on thinking, hopefully, Kochiu drops this or it gets dismissed. They know they messed up or they wouldn't have tried to cut a deal with me during the DAB if I were to drop this EEO case.

41. Complainant stated, "I'm not sure how to explain her thinking other than in simple terms (please pardon my French here) I think she fell in a pile of shit and somehow wanted to come out smelling like roses." ROI Vol. 2 at 148. Okay Justine, and the purpose

of this is what? It has nothing to do with the last question regarding an RCA or peer review etc. Metaphorically speaking it's true, however not the best choice of words and no disrespect to the court. You pointing this out, I doubt is going to score you points with the Judge. Anyway, the truth is DB created an event of discrimination, and when I filed the EEO she scrambled for every excuse for every scenario that involves her, from my claim of tampering with evidence stating Adrienne Harris wrote it, to not suspending Wendy by sliding over to another dept deflecting blame to Christianah, and Ravipati deflecting it on HR, from not detailing the folks with the JPRS DB proclaiming she didn't see them, to detailing me and not Kelly Heckel as it was based on HRs advise or recommendations, to lowering my review in January she had a different answer then when she had follow up questions 8 weeks later by the investigator, to stating she never asked Monica to submit negative comments about me because she can't find the emails that indicate that, when Monica states in a sworn affidavit DB called her and asked her, and I can go on and on and on, but the truth is all the footprints lead to DBs door. And in my opinion, I think she may have thought this was something I would just let go, the way some of the others she picked on let things go (Like Christianah). Perhaps she didn't think it would get this far and after realizing discrimination is a bigger issue than she anticipated which prompted her to the cascade of lies and deception to protect herself and deflect blame on everyone else but her, which is so clearly proven throughout the record. But whether it be DB, Christianah, Ravipati, Buckley, HR, none of that matters because they are all proxies of the Agency as a whole, and the Agency failed to spot discrimination, and when I pointed it out, the Agency continued to ignore it and suspended me for filing an EEO.

I mean is someone like DB who has her fingerprints all over this is willing to lie or deceive that should be an automatic guilt. Her credibility speaks for itself throughout the record.

**Claim F: He became aware his supervisor was asking co-workers to submit negative reports of contacts regarding him**

Yes, see Sworn Affidavit of Monica Coleman cited throughout this motion.

Complainant alleges RMO Lorenzo-Villarino asked union representative, Monica Coleman, and co-worker Isabelle Cantu to write negative comments about "Cliff" not doing work. ROI Vol. 1 at 148. Have no idea what Isabelle Cantu (Izzy) has to do with my EEO.

ROI VOL 2 pg 299 the investigator states she hasn't done one of these in a while, perhaps this is why some of the questions were asked wrong.

ROI VOL 2 pg 313

Me emailing ORMDI asking why the investigator isn't asking the appropriate questions pertinent.

42. I never said Isabelle was asked by DB to write negative comments about Cliff? Where in the heck did that come from? From my recollection the point I was making was the same as what other staff members asked in the past, which was, Izzy was the analyst prior to Cliff that Christianah hired, and one of her duties was taking care of the bills. If I remember correctly during a morning huddle the issue of billing must have come up, as this topic was always on the forefront. Sounds like the point I was making in this statement was that DB took Izzy away from Christianah for whatever reason and RNs were stuck doing the bills. It's nowhere written in the guidebook that Registered Nurses are required to process and troubleshoot bills. Anyway during the huddle, I may have brought up why are we doing bills or maybe someone else brought it up first, I can't remember exactly it was brought up so many times. Anyway, when Izzy was in the department she did them, and when Cliff took her place DB told him not to do them and the nurses had this burden of bills on their plates, which was taking up a lot of time doing bills and it was taking nurses away from patient care. That's what that answer is about. Just a side note: Billing is such a big issue and took so much time from patient care that I submitted a proposal to Congress in the form of a billing card and HMO plan to prevent the veterans from being sent into collections to no fault of their own. I mean, we can't take care of the vets for whatever reason at the VA, so we send them out to private hospitals in the Community, then these vets that we send out because we can't take care of them are getting billed anywhere from a few hundred dollars to hundreds of thousands of dollars for treatment of Agent Orange etc. Although I believe me circumventing Lovell and going straight to Congress may have struck a nerve in DB, who knows?

But I digress and **Izzy and Cliff have nothing to do with my EEO**. I'm guessing it was a mistake in interpretation. Judge, this is why a trial is needed, there is so much confusion throughout.

As far as Monica Coleman, she submitted an affidavit which is part of the record indicating DB asked her to submit negative comments about me. **See affidavit of Monica Coleman at, Supp. ROI 001-003.** The other coworkers choose not to step forward, and one changed her story for obvious reasons, so they were not included. Ask yourself this, why would Monica lie? She's the Union rep for Lovell, what does she have to gain by lying? Seriously, there is no upside for her to lie or any of my witnesses. The only ones that need to lie are the Agency representatives.

43. RMO Lorenzo-Villarino reviewed her communications with Coleman on the date int question. Complainant was not mentioned in her emails to Coleman on that date. ROI Vol. 1 at 197. Of course DB will say that, Monica stated in her Affidavit DB called her and asked her, Monica does not state it was done through email. DB dodging, playing the if you can't prove it, then it didn't happen angle. This is reason enough for the Judge to hear it directly from Monica and DB and you yourself can determine the credibility of the truth. **See affidavit of Monica Coleman at, Supp. ROI 001-003.**

44. RMO Lorenzo-Villarino did not ask RN Cynthia Reluya to write negative reports about Complainant. ROI Vol. 2 at 828. Cindy is DB friend they go on vacations together until they had a fall out. Just my opinion that Cindy keeps her friends close but her enemies closer (DB). Cindy will not testify to what she told me as she doesn't want to stir the pot and get involved. Not a hard inference to come to. If Cindy isn't willing to tell the investigator what she hinted to me, there's nothing I can do about that. I go out on the field with the players I have and the direct evidence I have.

**Claim 1: On May 8, 2023 he was removed from patient care**

45. On May 8, 2023 Complainant was detailed pending an investigation about patient care issue stemming from Quality Management's report. ROI Vol. 1 at 156.

46. Complainant was detailed for six months. ROI Vol. 1 at 140. It was on or around 3 months not 6 months this was misinterpreted by whoever wrote this motion, Justine or her paralegal, just an overlook.  I was brought back the moment I filed this EEO, which I filed after the Peer Review Committee when I explained the situation to said committee of how the consult was processed and the statement that it was an expedited consult was not true.  After the Peer Committee, I was sure I would be brought back after that, but I was wrong and not brought back, to which I asked Ravipati ROI Vol Teams on a Teams message and her response was she couldn't get me back or she didn't know how etc.  I knew the only way out from under this discrimination was to file an EEO because I knew this was discrimination.  When I filed Ravipati found a quick way to get me back, but in doing so she retaliated against me as I state throughout the record.

47. Complainant was detailed because there may have been a risk to patient safety. ROI Vol. 1 at 190. I was detailed for something I didn't do wrong, but no one else was detailed when the JPRS or for  Delay of Care resulting in deaths and adverse outcomes which is discrimination.

48. The Agency reiterates paragraphs 29-38 above.

**Claim 2: As of July 19, 2023 he was not issued his proficiency rating that was due in February 2023.**

49. Complainant's first-line supervisor, Christianah Arowora, had several performance appraisals and proficiency ratings assigned for her to complete. ROI Vol. 1 at 191.

50. Arowora was on extended leave starting on February 21, 2023. ROI Vol. 1 at 191.

51. In May 2023, Arowora returned to duty. ROI Vol. 1 at 191

52. Other female RNs were given proficiencies later – Wendy Superable, Cynthia Reluya, Ruby Dizon, and Adrienne Harris. ROI Vol. 1 at 228. None of the others had their reviews lowered by DB per Chrisitanah's testimony.

53. On March 21, 2023 RMO Lorenzo-Villarino emailed Complainant about his proficiency appraisal about providing input for his rating. ROI Vol. 1 at 488. I'm not required to enter my input. My direct manager Christianah who met with me knows my work ethic and critical thinking and stated good comments about me. DB lowering my rating was an act of vindictiveness. I mean you really have to look at that part of her affidavit and the questions she was initially asked and the way she responded and compare them to the way she responded when the investigator asked her follow up questions on a later date. DB perjured herself. That entire section of her testimony is confusing and hard to decipher. It takes on many interpretations turns in terms of her stating Christianah is the one that does the ratings as my direct manager to all she does is review/approve and sign to later statement indicating I didn't warrant a raise. I thought she testified earlier it was up to Christianah? It's a complete obfuscate. BTW in the 5 and something years I have only turned I believe one self assessment. I don't think it's my job to do the managers job of writing my review, that's why Christianah is my manager she must have saw something in me that warranted High Satisfactory whether she copied and pasted the exact same thing as the previous year or not, she knows my ability and the guide book does not state I have to turn in a self-assessment. Christinah's testimony in her sworn affidavit is she gave me a Highly Satisfactory rate, and she testifies that DB lowered it. Noteworthy I don't believe DB testified to this in her first affidavit, it wasn't until the investigator asked her at a later date with the leading question that Christianah stated you DB lowered the rating, and it was at that time when DB was pinched that she inverts the answer to Kochiu never submitted any input, and Christianah turned in the exact notes as the previous year. Wouldn't that be up to my direct managers determination if I am worthy of a raise, particularly when DB states she doesn't do the ratings, my direct manager Christianah does? Makes me wonder if Christianah got punished somehow by DB or Ravipati for telling the truth.

54. On March 21, 2023 Complainant responded, "Just do it without my input." ROI Vol. 1 at 488. Yes, and the point is what? It's not a requirement nor does it mean by not submitting one that that gives the manager the right to lower my rating that a previous manager gave me who has direct contact with me and deemed me worthy of a High Satisfactory. I answer this question above.

55. Christiana Arowora was the rating official. ROI Vol. 1 at 172; 490. Yes she was, and DB lowered it and only admitted to lowering it 2 months later during the follow up questions by the investigator when she was cornered.  This goes to the pattern of abuse and hostility I had to deal with at this Agency.  Why would DB be believed at this point?  Seriously, her fingerprints are on everything, but she pulls out her best of Harry Houdini when answering questions.

56. Complainant received his rating proficiency on August 25, 2023. ROI Vol. 1 at 486.

**DBs testimony is perjured when she testifies in her Affidavit  dated 12/5/22 compared to her follow up Affidavit on 1/30/2024.**

 **ROI Vol 1 pg 186**

36 A "no discussion with reviewing official about a specific rating"

**ROI Vol 2 page 323** email between DB and Chrisitanah

Good afternoon Donnabelle,

I do not have any added information. I will rate this employee as indicated below.

CATEGORY I Category II NURSING PRACTICE ---HIGH SATISFACTORY

interpersonal relationships----HIGH SATISFACTORY

 OVERALL RATING------- HIGH SATISFACTORY

ENTRIES ON THIS FORM ARE BASED ON:

 *FREQUENT OR DAILY CONTACT and FREQUENT OBSERVATIONS OF WORK RESULTS*

Thank you. V/r Christianah Arowora MSN. MHA. BSN. BS. RN. CCRN-K. CCM.

## Let's look at that evidence DB and Ravipati entered and some background information.

**ROI VOL 1 pg 202** Affidavit of Ravipatis.  Office of community care was aligned under my supervision in 3/23,

ROI Vol 1 pg 204 Ravipati states

On May 8, 2023, the Complainant was removed from patient care.

43.Were you responsible for removing the Complainant from patient care? If you were not responsible, then please identify the name and title of who was responsible.

No, **Donnabelle Lorenzo-Villarino** issued the temporary re-assignment as per HR's guidance

48.According to the Complainant, Wendy Superable, Nurse was not treated similarly to the Complainant and removed from patient care following the death of a patient? How do you respond?

After fact finding and review of 30 consults evidence was presented to HR, HR did not advise OCC leadership to remove RN Wendy Superable from patient care.

First off why would medical leadership turn documents over to HR to hand down a punishment?  HR is not clinicians, what criteria would make them qualify on what happens in medicine.  This is so phony because this is now on Ravipati for not detailing Wendy pending investigation outcome like they did to me.  This is racism.

If what Ravipati is saying is true, then HR discriminated against me.  This is a dodge, but it doesn't matter, HR, DB, Ravipati, Christianh, Buckley, they are all leadership and the Agency. For some reason the Attorney keeps indicating it's me vs DB, no it's me vs the AGENCY and it's system

failure in protecting its employees against discrimination, and in my case that discrimination is based on Sex, race, and retaliation. It's not my fault the cabal can't keep it together to make it fair for all Federal employees. If they miscommunicate or managers can't get along with one another that's not my concern, and I shouldn't be discriminated against. What is my concern is that I was treated different than Wendy RN who is Filipino, and the Agency needs to answer as to why.

**ROI Vol 1 pg 215 regarding HR**

6. According to the record, you were the Human Resources Specialist that advised

management regarding this action? Is this correct? If not, please provide the name of the HR specialist that handled this action (Name and contact information). A: Yes

7**. On what date were you contacted by Management with regard to this action? Who contacted you? A: 3/23/23. Donnabelle Lorenzo-Villarino**

Why didn't DB notify the hundreds of late consults that resulted in Delay of Care that is referenced in this motion and record? Why didn't DB contact HR with regards to the 7 cases I have included in the record as well as this motion?

Why? Because she based my case on Sex and Race as the other cases involve females and Filipinos.

I will repeat this until the day I die, I know from deep within every cell of my body, down to the mitochondria, that had I been a Filipino, we wouldn't be having these conversations right now and I would still be in that department working from home, flat cold.

### Odds and Ends

I did everything as I was told to and the process which is spoken in no uncertain terms by Donnabelle on the recording at 13 minutes on the date of 11-10-22. I even asked her to repeat what she had said of which she did and she used me as an example. The recording is also part of the record in transcript form. ROI Vol 1 pg 284. ROI Vol 1 307 algorithm of work flow.

I called the veteran ROI Vol 1 pg 301

I sent out the documents ROI Vol 1 pg 301

I alerted Kelly Heckel to schedule the consult at ROI Vol 1 pg 302

It was that simple, I move on to the next consult.

I will list some of the department employees and their titles as they corroborate the workflow protocol and how I followed protocol that I listed above. They indicate in email that RNs send the documents out, and the administrative staff schedule all the consults.  Administrative staff are considered LPNs, and PSAs.  In my case Kelly Heckel was the PSA I alerted to schedule the consult.

ROI Vol 1 pg 308, Roger, LPN

ROI Vol 1 pg 310 Dori, PSA

ROI Vol 1 pg 312, Carolyn, LPN

ROI Vol 1 pg 314, Charlene, PSA

ROI Vol 1 pg 316, Ken D, RN

ROI Vol 1 pg 318, Ken S, LPN

ROI Vol 1 pg 320, Kim, LPN

ROI Vol 1 pg 322, Monica, RN

As you can see there are various levels of staff from RNs, LPNs, and PSAs, and we all know the protocol to follow.  This was a simple case that should have never been brought against me.

Can Agency show specifically what "gaps" and, where I failed to "follow procedure" when they put me through this? They never did tell me and ignored my email when I asked for specifics ROI Vol 1 pg 446.

Agency intentionally targeted me, failed to do a full and fair investigation, ignored the recording, ignored the statements by staff corroborating me, ignored RNs in violation of Delay of Care which I indicated, ignored the JPRS filed on the RNs, **and the only** conclusion is is that I discriminated against based on Sex and Race.

The fact that two nurses touched the consult after me on three different occasions, (DB RN and Cindy Reyula RN) both of which did not complete the consult, and nothing happened to them speaks to the Agency's lack of a full and fair investigation.

In addition, I have told DB Kelly Heckel is falling behind and she needs help of which she never got, since our group was short staffed. See ROI Vol 1 at pg 503 where I'm corresponding with DB with regards to being short staffed and Kelly is falling behind. Maybe Kelly would have scheduled the consult if DB had gotten her some help. This implicates DB as she ignored getting Kelly help, knowing that Kelly is required to schedule the consults not me.

## D. APPLICABLE LAW

Despite the Agency's buck shot approach in its cut and paste case law template below which I'm sure is sent to all EEO cases they move to dismiss; I proved throughout this response and throughout the record as to why this should be heard through a trial and

why they have the facts wrong. The judge should be able to listen to all the witnesses and decide who is telling the truth and who is not.

Although I can find tons of case law similar in defense of my position, I am not going to do that for two reasons: First, me not being an attorney citing case law would be insulting to the Judge who I'm sure knows the law in terms of EEO cases inside and out; therefore, me adding a plethora of case law wouldn't matter. Second, every case is different, and the record speaks for itself in that it is a clear-cut case of discrimination based on Sex and Race.

### 1. Summary Judgment

The Commission's regulations allow an Administrative Judge to issue a decision without a hearing when he or she finds that there is no genuine issue of material fact. 29 C.F.R. § 1614.109(g). This regulation is patterned after the summary judgment procedure set forth in Rule 56 of the Federal Rules of Civil Procedure. The U.S. Supreme Court has held that summary judgment is appropriate where a court determines that, given the substantive legal and evidentiary standards that apply to the case, there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In ruling on a motion for summary judgment, a court's function is not to weigh the evidence but rather to determine whether there are genuine issues for trial. Id. at 249.

The reason for a trial is the confusion within the record as well as the answers by the Agency witnesses. For example, the investigator asked question that I am not even making nor did I ever state. I never said anything about Izzy and Monica being asked by DB to write negatives about Cliff. I never said the Oncology nurses should be detailed or weren't treated the same as me. No need for me to re-explain those points as I already have above. The confusion in terms of answers given throughout the Affidavits by the Agency witnesses investigated. The record is blended between VOL 1 and VOL 2, mixed with duplicates, transcripts of the recording not transcribed correctly, etc etc. For clarity a trial is needed. To ask a Judge to decide based on all the confusion surrounding the record, I wouldn't

think is an easy task. You're asking the Judge to go back and forth, flip pages, try to interpret protocol from a dysfunctional department, understand medical lingo, it would be so labor intensive on her part to keep it all in order when a trial would go smoother and a lot quicker, get straight to the point. I mean how long would a trial take? One day, maybe two at most? The only people that don't want a trial are people that have something to hide.

The evidence of the non-moving party must be believed at the summary judgment stage and all justifiable inferences must be drawn in the non-moving party's favor. Id. at 255. An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). A fact is "material" if it has the potential to affect the outcome of the case. If a case can only be resolved by weighing conflicting evidence, summary judgment is not appropriate.

Summary judgment is appropriate where, given the substantive legal and evidentiary standards that apply to the specific case, the evidence is not sufficient to support complainant's position. *Anderson*, at 255. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Id.* at 252. A decision without a hearing is appropriate absent sufficient evidence to support a finding for the complainant because, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).

The evidence presented in the case is so overwhelming in favor of my case. Between my witness's testimony in email. The 7 cases presented and detailed with specifics, which includes Wendy's case. The hundreds and hundreds of consults in the delay of care status I wouldn't consider that evidence a "scintilla of evidence". The fact that nothing happened to anyone but me should give one some serious pause. All my claims are supported by facts and direct evidence.

## 2. Hostile Work Environment

Complainant can prove their allegations of discrimination based on sex, age, race, national origin, and disability utilizing the direct evidence or indirect evidence burden shifting structure in McDonnell Douglas v. Green, 411 U.S. 792 (1972). A complainant must first prove a prima facie case of discrimination, the agency must then articulate a legitimate and nondiscriminatory reason for its actions, and the final step requires complainant to prove the reasons is a pretext for discrimination.

I have already proven discrimination based on Sex and Race via direct evidence. For example, Ravipati is asked by the investigator why wasn't Wendy who is an equal comparison to me detailed pending investigation, and her answer was "HR didn't recommend" it. It's Ravipati's call to detail Wendy just as her and DB detailed me, but they didn't. That in and of itself proved my case of discrimination by direct evidence at first sight. Wendy is female and Filipino. Ravipati is probably one of the top 3 or 4 highest leaders at FHCC, she had the power and influence to do the right thing, but she hides behind and points the finger to the HR rep saying Alex didn't recommend it. Ravipati is the clinician, she didn't hold Wendy to "a higher responsibility" as she states about me. HR didn't say Koichiu is held to a "higher responsibility" Ravipati said that, and that was her justification to detail me. HR didn't say Kochiu should be detailed because he didn't complete the consult "within the time frame" and Kochiu should be detailed for "failure to follow procedure", Ravipati stated that. So why didn't Ravipati apply that same criteria to Wendy's case?

In addition to the hundreds of delays of care consults, as well as the JPRS cases are all facts the prove nothing happened to any of the Filipino's or female employees, including Kelly Heckel. This is outlined above no need to go point by point again. Anyone can see "at first sight" this is discrimination, that's why the employees in the department as well as the Oncology department volunteered to come to my defense and prove the discrimination.

To have a "hostile work environment" there must be a showing that harassment of an employee would not have occurred but for the employee's race, color, sex, national origin, age, disability, or religion. Such harassment is unlawful if it is sufficiently patterned or pervasive. *McKinney v. Doyle*, 765 F.2d 1129, 1138-39 (D.C. Cir. 1985); *John A. Frye v. Department of Labor*, EEOC Request No. 05950152 (February 8, 1996). The complainant must show that he (1) belongs to a protected group; (2) was subjected to harassment sufficiently pervasive to alter the conditions of employment and create an abusive or hostile working environment; and (3) the harassment was based on an impermissible factor. *Ethel Ware v. Justice*, 01963427 (Oct. 30, 1998); *Rose G. Vargas v. Department of Defense*, EEOC Appeals No. 05931047 (Oct. 7, 1993).

An abusive or hostile working environment is one that is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe. *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). Whether an environment is hostile or abusive can be determined only by looking at all the circumstances of the case, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating; or a mere offensive utterance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

Whether an objectively hostile or abusive work environment exists is based on whether a reasonable person in the complainant's circumstances would have found the alleged behavior to be hostile or abusive. The incidents must have been "sufficiently severe or pervasive to alter the conditions of complainant's employment and create an abusive working environment." Meritor Savings Bank v. Vinson, 86 FEOR 9002 , 477 U.S. 57 (1986); Harris v. Forklift Systems, Inc., 93 FEOR 9003 , 510 U.S. 17 (1993).

Hostility comes in many forms, indirect, direct, through a third party, by passive aggressiveness. When DB intentionally shorted my team, lowered my review, asked Monica Coleman to submit negative comments about me. When your manager asks fellow employees to write negative comments about you that's creating a hostile work environment. Being detailed, entering deceptive information to a Peer Review Committee, deceiving QM on the chart review. She made me come back and work in the office while the others got the luxury of working from home as punishment and it was demeaning. You think she would have done that to one of her own within the Filipino race? She never did this to any Filipino's. To me it was abusive and made to embarrass me and intentionally

to put me down and shut me up, to humiliate me.  No one should be subject to this type of harassment because she used her position and authority to detail me and no one else.  The prelude to what happened to me up until the detail and then after the detail was discriminatory.

### 3.  Failure to State a Claim

According to 29 C.F.R. § 1614.109(b), "Administrative judges may dismiss complaints pursuant to § 1614.107, on their own initiative, after notice to the parties, or upon an agency's motion to dismiss a complaint."

The agency is moving for the case to be dismissed only because she's not ready for a trial.  Justine indicated in email to me that she is not prepared for a hearing during the discovery phase.

**Dated August 22, 2024**

**"AGENCY'S SECOND SUPPLEMENTAL RESPONSE TO DISCOVERY**

**NOW COMES**, the Agency by and through its undersigned counsel and responds to Complainant's First Set of Discovery Requests to the Agency. The Agency's initial response to discovery was sent to Complainant on July 25, 2024. The Agency reserves the right to supplement and amend its responses as necessary.

**AGENCY'S GENERAL OBJECTIONS**
1. Respondent has not completed its investigation and discovery in this action nor its preparation for hearing."

Not my problem the Agency isn't prepared.  This case shouldn't be dismissed because the Agency is not prepared.

29 C.F.R. § 1614.107(a)(9)(iii) reads states, "Where the agency, strictly applying the criteria set forth in Commission decisions, finds that the complaint is part of a clear pattern of misuse of the EEO process for a purpose other than the prevention and elimination of employment discrimination. A clear pattern of misuse of the EEO process requires…(iii) Evidence of circumventing other

administrative processes, retaliating against the agency's in-house administrative processes or overburdening the EEO complaint system." Id. (emphasis added).

The Agency needs to explain what part of my claim is a misuse of the EEO process?

Look at the record and what I've stated above throughout this response. The Agency is clearly in violation of the EEO laws. When Agency discriminates against me for being a male and non-Filipino I met two of the five criteria alone.

What happened to me is discrimination and I outlined it throughout this response as well as the record.

Justine states I'm retaliating against the in-house administrative process. What administrative processes am I retaliating against? You must mean that I'm stating what happened to me was an unfair investigation, through deceptive information by Ravipati and DB. The fact that Buckley fell in lock step with leadership, despite hearing the evidence presented by me and the two Union representatives. Let the Judge hear the recording and look at the evidence and decide through a trial.

To indicate that I am overburdening the EEO system. Perhaps you should direct that response to your witnesses who discriminated against me. What Justine is saying now is blaming the victim akin to telling a woman that was raped, we wouldn't be here if you didn't complain. The Judge/Commission is here for checks and balances and you want to blame the victim for "overburdening the system" when I have detailed mountains of evidence depicting Racism by the agency. And just because the Agency isn't prepared for a hearing, I shouldn't be denied my due process under the 5th and 14th Amendment in presenting my case.

Further, "an employee cannot use the EEO complaint process to lodge a collateral attack on another proceeding. Also, a complaint is subject to dismissal for failure to state a claim where the complainant cannot demonstrate he was personally aggrieved by the action." *Mitchell v. U.S. Postal Service*, 109 LRP 42651, EEOC No. 0120091611 (EEOC OFO 2009). "The commission's federal sector case precedent has long defined an "aggrieved employee" as one who suffers a present harm or loss with respect to a term, condition, or privilege of employment for which there is a remedy." *Sanders v. U.S. Postal Service*, 108 LRP 34030, EEOC No. 0120082054 (EEOC OFO 2008).

I am not sure what the Agency is indicating as far as lodging collateral attacks on another proceeding. What other proceeding? Specify it because this case is about what happened to me by the Agency's leaders abuse of power to me and only me and none of the other equal comparisons as far as colleagues.

As far as stating "personally aggrieved" you don't get to decide what I'm personally going through, you don't get to decide how this affected me. Are you going to interview for me with the Central Intelligence Agency and have to rebut all these false accusations? No. That mess is left up to me. I now realize what a rape victim goes through when they want to speak up against an unjust system.

## B.     ARGUMENT[2]

For purposes of this motion only, the Agency concedes Complainant can meet prong one of the hostile work environment test. The Agency argues the rest of the merits as follows:

---

[2] The Agency divides the accepted claims into related segments for its argument section.

**Claim A: He was subjected to a HWE and management did nothing to stop it;** This entire process was done to humiliate me in such a way for DB to relish in some sort of weird flex in an attempt to virtue signal to our new leader, Ravipati. And Ravipati virtue signaled back to DB after I filed my EEO.

**Claim D: He was not allowed union representation, he was told he was subject to a [fact-finding] investigation, he lacks documentation in his emails, he was accused of not properly scheduling a deceased patient's consult;** the not properly scheduling a deceased patient's consult is explained in this response, it's in the record, it's on transcripts, and you will hear it in no uncertain terms on the recording that the burden of scheduling the consult was not on me, and DB knows this but proceeded with this and set this EEO case into motion. Again victim blaming.

**Claim E: His supervisor gave deceptive information to a peer review committee;** Yes, she did and it's explained in this response as well as the record and she should have to testify to prove she didn't submit that, in addition to the phony deceptive information DB gave to the QM department in terms of the chart review.

**Claim 1: On May 8, 2023 he was removed from patient care.** This is where I'm indicating I was not allowed union representation.

In respect to Complainant's claims that he was not permitted to have union representation, the evidence shows RMO Lorenzo-Villarino emailed Complainant stating he is permitted to have union representation during a fact-finding meeting with management. If Complainant alleges RMO Lorenzo-Villarino did not notify the Union ("NNU") when it temporarily detailed Complainant pursuant to the fact-finding, there is no evidence this was based on the protected classes of race or gender. My point in making this argument is it shows a pattern of DB circumventing the rules, and is pretext that led to me being detailed. Another form of harassment. It's easy to harass someone without a witness like the union in my presence. Complainant provides no comparator evidence that other similarly situated employees of a different gender or race were treated better and thus would fail his burden of production at a hearing. Further, it appears Complainant alleges RMO Lorenzo-Villarino violated the collective bargaining agreement by not notifying the union of his detail. Notwithstanding, the EEOC does not have jurisdiction over labor disputes or matters and therefore should not make a ruling on any labor issues or alleged

violations. Complainant fails to meet prongs two and three of the hostile work environment analysis. I am showing a pattern of circumventing the system which lead to me being discriminated and no one else in the department was.

In respect to the fact-finding investigation involving Complainant's actions related to patient care, he cannot show illegal discrimination was a factor in management's decision to detail him and conduct the fact-finding investigation. You must not have read the record. The fact that I was detailed pending investigation but Wendy and the hundreds of consults in violation of delay of care were not, as well as the 7 cases submitted, is in and of itself discrimination. Because Complainant has a higher responsibility in care coordination, the VA appropriately detailed him when it was discovered that one of his patients expired without being seen in the community. You're regurgitating Ravipati's weak semantics here. We can go on all day long and speak to who has "higher responsibility" which would include all the doctors, including Ravipati, DB and Cindy, and don't forget the hundreds of consults, cases and so on… but I already stated that in this response as well as the record. Complainant states another nurse, RN Superable, is a comparator however RN Superable is not similarly situated because RMO Lorenzo-Villarino was not in RN Superable's chain of command. Doesn't matter, Ravipati and Christianah are her chain of command. And if Ravipati states, Kochiu is held to a, "Higher Responsibility" then Wendy should as well. Christianah and Ravipati are proxies to the Agency. Doesn't matter if DB circumvented this scenario to protect her best friend. That fact that Ravipati had a hand in my detail and punishment but when it comes to Wendy she now shifts the blame on HR makes your argument weak and ineffective. I'll bet if this was told to a Jury they'd 99% go in my favor of the guilt on the Agency's part, in that Ravipati as the leader is guilty of letting Wendy skate. Doesn't matter if it was Ravipati, Christianah, HR, DB, Buckley the fact that they are all Clinicians with the exception of HR, it was their duty to act upon such a horrendous outcome when the RN allowed a 35 year old female veteran to hang herself despite the veterans pleas for help. I can't stress enough what a weak argument that is and why the Agency just let it slide. They let it slide because Wendy is female and Filipino. Is that really the hill the Agency wants to die on? The argument that DB was no longer her boss means nothing to the veteran and her loved ones. The fact that no one did anything to help this veteran is unspeakable and warranted a serious investigation. Let me ask you this. Do you know what the number one priority in the VA system is and has been since 2017? Veteran suicide. Yet you feel because DB didn't directly detail Wendy this should be swept under the rug? It was Christianah and

more so Ravipati's obligation to do a deep dive into this. This type of scenario definitely warrants an RCA. We're not talking an 89 year old, we're talking about a 35 year old, with her entire life ahead of her. If the media got a hold of this, I wouldn't want to be sitting in Ravipati's or Christiana's shoes. Complainant also vaguely argues other nurses in the Oncology Department in Community Care did not receive write-ups or were not subjected to fact-finding when they cancelled a consult and a veteran expired. These other nurses, of which there is no information on race or gender, also do not report to RMO Lorenzo-Villarino and therefore are not appropriate comparators. Because of the gaps in discriminatory evidence, Complainant is unable to meet his requirements under the hostile work environment test or his burden under the independently actionable claim – Claim 1. This claim I never made. This was the investigator who likely got mixed up with all the details that she asked the question wrong. I explained this above in the response.

In respect to Claim E (RMO Lorenzo-Villarino providing false information to the Quality Assurance/Management and peer review committee), Complainant does not provide any evidence other than his own assumption that RMO Lorenzo-Villarino, in fact, did this. There is no evidence in the ROI to show what information RMO Lorenzo-Villarino submitted or how the information was false. Rather, Complainant provides a narrative, in so far as using expletives, with conclusory statements that RMO Lorenzo-Villarino tampered with evidence. No reasonable factfinder could find for Complainant in the case at bar because there is a lack of a convincing mosaic of discriminatory animus. As such, he fails to meet prongs two and three of the hostile work environment scheme.

I detailed my response to the Peer Review Committee above in this motion. Either DB wrote it, told Adrienne to write it the way she did, or she seen it and let it get turned in knowing it was false info. If she claims she never saw it when it was turned in, well that's negligence on DBs part, because if a detail was warranted for me she has no excuse to read what QM wanted and more importantly all the higher ups were going to look at this. And when I brought this up to her and the Peer Review Committee, neither her or Adrienne refuted it. It was only when the investigator asked both of them and they were pinched that they did they conjure up an excuse. BTW I never got the outcome of the Peer Review Committee.

A far as "expletives" the Agency point out. Judge this is the same attorney that during the discovery phase I asked her to give me a list of all the people DB hired and the races of each hire. Attorney gave it to me, which was nice of her, and in one sentence I used the acronym

B.S. when DB stated she hired a white female (which btw wasn't true) she hired all Filipinos. Anyway, because I used said acronym when referring to DBs answer, not sure if the attorney took it personal but she sends me back email stating something like, "I'm going to tell the Judge." Seriously? Lawyers are scrappers, they're tough, unbreakable. So, I reply back and apologize to her and so on.

In the event Complainant can shift the burden to the Agency to provide a non-discriminatory reason for its actions, the record shows management had reason to initiate a fact-finding, detail Complainant pending that fact-finding, and interview Complainant based on Quality Assurance/Management's report. Once RMO Lorenzo-Villarino was notified there may have been a patient care issue, she provided information to Quality Assurance/Management and conducted a fact-finding to investigate whether Complainant compromised patient care. DB gets notified via a JPRS. Even if QM notified DB or vice versa is irrelevant. The question becomes, why didn't she or anyone in the Agency, do anything about the deaths in the cases I provide? Those were JPRS filed and DB gets notification of them. None of those RNs were detailed pending investigation etc etc. Another incredibly weak argument by the Agency. She seems to think there are one set of rules for Kochiu and another set of rules for my comparative equals. Doesn't make sense and my witnesses if we get a trial will shoot this down so fast. Although Complainant argues there is a system failure in how this patient's care was coordinated within the Department of Community Care, the VA is responsible for ensuring the patient was seen in the community and the VA was within its management right to investigate this delay or lack of care. This is a legitimate, non-discriminatory act for which Complainant cannot prove pretext. I hope you're referring to a system failure in terms of investigating EEO activity fairly. Not only is it a system failure in patient care, but it's a system failure in holding everyone to an equal standard as far as RNs. The system failure was that Kochiu was detailed pending investigation, and the hundreds and hundreds of consults in delay of care status, deaths, adverse outcomes never got treated the way I did. This is discrimination and yes is a system/leadership/Agency failure.

Complainant has no evidence any of the Agency's actions were motivated by his race or gender because he does not provide direct or indirect evidence that such occurred. The Commission and "the federal courts are not self-appointed personnel managers, and they may not second-guess the fairness or the wisdom of an employer's non-discriminatory employment decisions." *Day v. Johnson*, 119 F.3d 650,

657 (8th Cir. 1997). See also, *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004) citing *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). If an employer has legitimate reasons for treating employees differently, it is not a violation of Title VII. *Ibarra v. Martin*, 143 F.3d 286, 292-93 (7th Cir. 1998). "Employers may act for many reasons, good and bad; unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter." *Kuhn v. Ball State University*, 78 F.3d 330, 332 (7th Cir. 1996). Here, the Agency decided to detail an employee while an investigation was pending and therefore should not be penalized for its aim to ensure patient safety. You can't be serious, can you? The evidence is so overwhelming in my favor that I proved discrimination for not being Filipino. The fact that you keep saying that doesn't make it true. Look at the direct evidence of what happened to me, then look at what happened to Wendy and the other cases outlined. Case closed, I proved discrimination based on race, and the Agency is liable.

Complainant's failure to connect this event to his protected classes is detrimental to his case and he does not survive summary judgment. My case is easy, and clearly shows nothing happened to Wendy female Filipino, but did happen to me. As discussed throughout the record as well as this response. The connection is so solid, you can't prove the disconnect. This is why Agency does not want a trial, my witnesses from the department will speak otherwise.

**Claim B: In 2022, he was rated satisfactory on his proficiency report.**

Complainant takes issue with his February 15, 2022 proficiency rating given by his first-line supervisor Christianah Arowora. ROI Vol. 1 at 490. Complainant believes his rating should have been higher because he worked overtime, which prevented delays in patient care, and he notified his Senator about veteran billing issues. Not sure where I stated I worked overtime? I never worked overtime, I worked my tour of duty. You may be mistaken via an email I sent to Buckley to get us help we're falling behind and compromising patient care. You may be referring to when I asked him to get us the Active Duty Military to assist, but Buckley offered overtime to anyone in the hospital that could assist. Essentially the dept was in a tailspin and DB didn't have the courage to reach out and talk to the CEO so I took the initiative. We're talking patient lives here, we're not putting lawn mowers together she should have done something as the leader.

Someone had to do something so I did. The argument I made was Christianah my direct manager at the time who knows exactly what I am worthy of gave me a higher review, even when DB told her to re rate me Christianah still rated me higher, and DB lowered it. Signals a pattern of abuse, and hostility towards me that none of the Filipinos went through. In fact all the Filipinos got top level reviews. See above in the response where DB asks Christianah to submit new info and then rate me, where Christianah rated me and based the rating off her rationale on pg 62 above FREQUENT OR DAILY CONTACT and FREQUENT OBSERVATIONS OF WORK RESULTS. ROI Vol. 1 at 141. Complainant does not indicate how the lower rating is related to his race. In fact, he admits Charlene Miller (Female/Black) and Christianah Arowora (Female/Black), both under RMO Lorenzo-Villarino, were similarly situated and treated the same as he was. ROI Vol. 1 at 143. Wrong connection you're making here. I stated the Black employees are treated with discrimination as well. But that's a battle they can take up on their own. This was even discussed in our discovery phase when I wanted the race of all the employees hired by DB. Then compare it to how she treats the black employees. In discovery I indicated she fired Kay (African) on the last day of her orientation which was one year, DB called the police on Lenola Black employee who had to use a face shield instead of a face mask as she was a bigger person and was claustrophobic, she never hired back stellar employees like Vicki (Black) or Antionette who was black, she constantly bullies Christianah to the point Christiana has to take leave of absence. She never hired those employees back despite that they already knew the job, but instead hired all Filipinos. This is easy to prove. What am I pointing out here? The pattern of racism against not only blacks but even me a white male as compared to the Filipinos. I already proved how I was discriminated on the basis of Race and Sex. On its face, it appears RMO Lorenzo-Villarino is treating employees the same regardless of their race and gender. She is treating us the same in that she's being racist towards me and the black employees. Look at the pattern hiring pattern and treatment between me and the black folks and then compare it to the treatment of the Filipinos. But you keep making it about DB, when the issue is about me being discriminated against by the Agency in terms of my detail and none of the Filipinos were detailed for being guilty of what the Agency is alleging I did.

Assuming arguendo Complainant can shift the burden to the Agency to explain why he was only given a Satisfactory rating, RMO Lorenzo-Villarino explained Complainant did not provide input for the rating period, and the reasons for his Satisfactory rating were based on the comments in his proficiency rating at ROI Vol. 1 at 491. I am not required to submit input on my rating, that's my direct managers

responsibility. And if you look at the comments in the proficiency ratings you point out, they make me look great. The EEOC process is not the venue for one to challenge this rating (see ROI Vol. 1 at 483) because there is no evidence of Title VII implications. If Complainant was unhappy with this 2022 rating, he could have asked for a reconsideration or provide a self-assessment. Complainant cannot prove he was given a Satisfactory rater because of his sex or race or soundly reason the Agency's non-discriminatory reason is pretext, and thus his Title VII arguments must fail. You're not following the pattern. You can see there is clearly a pattern of treating me differently than the Filipinos by ratings, by not detailing them for adverse outcomes up to death, but when it came to me, I was put through the ringer. And I'll say it again, you don't get to decide how I should or should not be feeling. You think I care about some rating? No not in the slightest. The point is this is a pattern depicting a hostile work environment and racism towards me.

**Claim C: He was assigned a bigger workload than his co-workers.**

Complainant cannot meet prongs two and three of the hostile work environment test for this claim. Complainant claims he received the same number of consults as another team who had one more nurse on board than his own team. Not only did they have one more nurse on board than me but also one or two more PSAs on their teams. Again, look at the pattern. The Filipino teams were stacked and mine wasn't. In fact, as explained above when Roger Lohr was hired he was supposed to be on my team assisting Kelly Heckel, but DB put him on Cindy female Filipino's team, which was completely stacked. She brought Roger to my group I think a short time before she was going to detail me. She knew she was going to detail me so she put Roger on my team so they aren't completely buried in work because she planned on launching me on 5/8/23. If I was a danger to patient care why didn't she detail me earlier? Why did she wait until Christianah was coming back from leave of absence to fill in for me, before detailing me? If what I did was so bad why keep me there until the others get shifted into the group. Why? It was all based on Race. It's all so obvious. Her and Ravipati are so calculated a first grader can see through it.

It is reasonable, as with any workplace, that when a team is short-staffed following an employee's departure, the team is still tasked with completing the work and providing coverage. Although this is an unfortunate and inconvenient reality, Complainant's workload was not

based on a protected class and a reasonable factfinder could not find for Complainant for this claim of illegal discrimination. Complainant concedes the other nurse on his team was also responsible for the same number of consults. This is further supported by Complainant's concession that his co-worker of a different sex and gender, Adrienne Harris, was also given a bigger caseload. Complainant's lack of comparator evidence is detrimental to his case and thus he should not survive summary judgment. But you failed to look at the groups that had the Filipinos. They were all stacked. Let's take for example Wendy's team. Wendy was responsible for the women's consults. She got approximately 1500 consults and since she had less consults than the rest of the groups she was supposed to do all the consults from beginning to end, and that means even scheduling and getting records. The rest of the teams the RNs send out the packets and the PSAs schedule the appts and get records. But despite the agreement in the union contract Wendy who was supposed to do it all by herself, instead got an extra RN, and two PSAs, yet my team remained shorted. Not a coincidence that Wendy female Filipino gets extra help and my team does not. Had I been Filipino I would have been on a full team. And yes one extra person on a team makes a big difference.

Again this is an example of the Racism and favoritism and shows a pattern of benefiting the Filipino's and against me and the Blacks.

Assuming Complainant can shift the burden to require the VA to provide a non-discriminatory reason for acting, RMO Lorenzo-Villarino is able to do so. The Department of Community Care's work assignments were divided between two teams based on the patient's name in the alphabet. The alphabet was divided based on historical data. Therefore, Complainant cannot prove his increased workload were based on his protected classes and the Agency is entitled to summary judgment at this juncture. Whatever the historical data gibberish DB states means I can't answer to that. This is the first time I ever heard her mention her rational in terms of historical data, it still doesn't explain as to why my group was intentionally shorted. The fact remains the Filipinos had stacked groups and I did not, and this goes to the pattern of hostility towards me which is also seen by the way I was detailed and Wendy and the others weren't.

**Claim F: He became aware his supervisor was asking co-workers to submit negative reports of contacts regarding him**

Complainant alleges RMO Lorenzo-Villarino asked Coleman and Cantu to write negative reports about Cliff not doing work. ROI Vol. 1 at 148. I have no idea what this even means. I never said that. You're barking up the wrong tree because the investigator asked a question incorrectly or got confused in something. I never made this part of my EEO. Based on Complainant's affidavit, this does not pertain to him but rather employee, Cliff. Although Complainant takes issue with RMO Lorenzo-Villarino's behavior towards Cliff, Complainant cannot use the EEOC process on behalf of Cliff in this manner because Complainant does not have standing to do so. Ergo, Complainant is not an aggrieved person under the EEOC rules because his own employment was not affected, and this claim must be dismissed for failure to state a claim. *See Mitchell v. U.S. Postal Service,* 109 LRP 42651, EEOC No. 0120091611 (EEOC OFO 2009); *Mayfield v. Department of Agriculture*, 111 LRP 57233, EEOC No. 0120100735 (EEOC OFO 2011) ("The complainant had no standing to pursue a claim concerning the alleged harassment of her subordinates because "she did not suffer a harm or loss with respect to a term, condition, or privilege of employment as a result of the alleged conduct."). This entire section was due to the investigator asking the question. I have nothing to do with this. I would like to say it's because of confusion like this that a trial should be warranted.

What I did say was that DB was soliciting staff to write up negative comments about me. See Affidavit of Monica Coleman in **Supp ROI 001-003 dated 6/18/2024**

**Claim 2: As of July 19, 2023 he was not issued his proficiency rating that was due in February 2023.**

Complainant takes issue with his proficiency rating not being issued by the end of the rating deadline – February 2023. Complainant's failure to meet his burden of production continues to this claim. Complainant wants the Commission to believe his delayed proficiency rating is based on his protected class. "A discrete act occurs on the particular day it happens. These acts include termination, failure to promote, denial of transfer, and refusal to hire, and must be raised within 45 days of the date they occur." See *National R.R. Passenger Corp. v. Morgan*, 102 LRP 13910 , 536 U.S. 101 (U.S. 2002).

Here, Complainant is unable to prove the delay in his proficiency rating is based on sex because other female nurses' proficiency ratings were also delayed – Wendy Superable (Female), Cynthia Reluya (Female), Ruby Dizon (Female), and Adrienne Harris (Female). ROI Vol. 1 at 228. The proficiency ratings were delayed because the rating official, Christianah Arowora was on extended leave in February. Because there is no direct evidence and Complainant fails to cite to an appropriate comparator, Complainant's discrete act of discrimination in Claim 2 fails and there is nothing in the record to support an argument of pretext. My issue with the proficiency ratings had to do with depicting a pattern in terms of lowering my rating. I could care less about the rating itself, it's the pattern that I am indicating which in conjunction with all of the other aspects of my case leads to the conclusion of discrimination. And yes my proficiency rating was based on sex and race. Compare my ratings to the Filipinos. Heck even compare it to Adrienne Harris, who Christianah states got a higher review than me from DB. Despite Adrienne being named in two of the 7 JPRS on of which resulted in a death. But Adrienne is female and got the higher review. My issue is with the patten of bias towards me for not being a Filipino.

A reasonable fact-finder could not find for Complainant in this instance and therefore summary judgment in favor of the VA is warranted.

## CONCLUSION

**WHEREFORE**, the Agency respectfully requests that the Commission grants summary judgment in favor of the Agency.

Respectfully submitted,

/s/

Justine Fernandez
Agency Counsel
Office of General Counsel – Midwest District
United States Department of Veterans Affairs
p: 202-894-0695
Justine.Fernandez@va.gov

## Kochiu's Conclusion

This is a simple case of discrimination based on Sex and Race. I have proven it in the record and throughout this response. In addition, if this makes it to trial my witnesses will corroborate me. The Agency can't get past the fact that I was detailed for allegedly Failure to Follow Procedure, and Failure to complete the consult in a timely manner causing a delay in care. The Agency never indicated what procedure I failed to follow, nor did they indicate the time frame.

However, the record clearly depicts, hundreds and hundreds of consults in the delay of care status, 7 JPRS of which there have been deaths reported, and adverse outcomes, add to this Wendy's case female Filipino and not a single one of those equal comparisons was detailed by the Agency, but I was. I was discriminated based on Sex and Race and the Agency can't get past the fact, I was detailed, and my comparisons were not.

Therefore, I am asking for a trial to clear up any confusion that would hinder an appropriate decision. I am also asking the Commission to render a decision in my favor and find the Agency guilty of discrimination based on Sex and Race.

## <u>CERTIFICATE OF SERVICE</u>

I, Azis Kochiu, hereby certify that this response to the **Agency's Motion for Summary Judgment** was uploaded onto FEDSEP and sent as indicated below on September 22, 2024:

via e-mail only:

**<u>EEOC</u>**
Judge Catherine Hunter
Catherine.Hunter@eeoc.gov

**<u>Complainant</u>**
Azis Kochiu
Azis.Kochiu@va.gov

Agency Counsel
Justine Fernandez
Justine.Fernandez@va.gov

**Exhibit 3**

**Privacy Office notifying me to testify to an alleged HIPPA violation that Donnabelle turned into them.  Despite Donnabelle's testimony in sworn affidavit, knowing and admitting that the 7 cases she turned me in for that she was unable to know who they were about given there were no names or identifiable data in them.**



Dear RN Kochiu:

My Office is in the process of conducting a Privacy Investigation into a matter that was reported to my office on October 10, 2024, regarding sensitive information that was disclosed to you by another FHCC staff member and disclosed outside the VHA.

Under VA Handbook 5021, Part I, Chapter 1, all employees are required to provide full and truthful answers during any inquiry or investigation. Failure to do so may be grounds for disciplinary or adverse action. This is an active investigation, and you are prohibited from discussing any portion of this investigation outside your supervisory chain of command, union/personal representative, or Human Resources.

**Based on that report received by my office, I must conduct a Privacy interview with you.**

- We can meet via teams or face-to-face (please specify)
- Email me with times that you are available – the week of Dec 2nd .
- Provide the name of your supervisor.
- Specify if you are a bargaining unit employee.

If you are a bargaining unit employee, prior to this meeting and during the interview you have a right to seek and have representation in accordance with the Union contract.  Please specify if you want Union representation.

If you have additional questions, I may be reached at 224-610-3383.

Thank you,

Jermaine / Privacy Officer

*Jermaine K. Williams | Privacy Officer / Freedom of Information Act (FOIA) Officer*
*Government Information Specialist*
*Office of the Director*
*Captain James A. Lovell Federal Health Care Center(FHCC)|North Chicago, IL*
*Office : 224-610-3383 | Cell: 224-503-6291*

**Exhibit 4**

**Donnabelle perjured herself by falsely testifying to 7 cases presented as evidence.**

**This evidence is backed up by a Registered Nurse, Theresa Minier, who was privy to the cases.**

**Donnabelle used this as reprisal by turning what she acknowledges the cases are redacted and yet filed this data to the Privacy Office in retaliation to, Theresa and Kochiu.  Donnabelle is intimidating Theresa who is one of my witnesses.**

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**CHICAGO DISTRICT OFFICE**

|  |  |  |
|---|---|---|
| AZIS KOCHIU, | ) | |
| | ) | EEOC No. 440-2024-00142X |
| Complainant, | ) | |
| v. | ) | Agency No. 200J-556A-2023-152770 |
| | ) | |
| DENIS MCDONOUGH, Secretary, | ) | |
| Department of Veterans Affairs, | ) | ADMINISTRATIVE JUDGE |
| | ) | CATHERINE HUNTER |
| Agency. | ) | |
| | ) | DATED: September 27, 2024 |

---

### AFFIDAVIT OF DONNABELLE LORENZO-VILLARINO

---

I, Donnabelle Lorenzo-Villarino, make the following declaration as permitted by 28 USC § 1746. I am aware this declaration will be filed with the United States Equal Employment Opportunity Commission, and it is the legal equivalent of a statement under oath.

1. I was the Managed Care Clinical Coordinator Department Head at the Captain James A. Lovell Federal Health Care Center (FHCC) at the Department of Veterans Affairs (VA).

2. I was Complainant's second-line supervisor.

3. I held this position from December 2018 to March 2024.

4. I am now Referral Program Nurse Manager.

5. I have been with the VA since August 2016.

6. Dr. Mamata Ravipati is my first-line supervisor.

7. As a RN Care Clinical Coordinator, Complainant was responsible for organizing and coordinating the clinical components for the authorization of non-VA services in response to individual healthcare needs along the illness and care continuum and in multiple settings. The goals are to center services around the patient, to foster patient self-managed care, and maximize efficient and cost-effective use of health care resources. They support the Veterans referred for evaluation and coordinates between the FHCC providers and

community referral physicians; ensures appropriate follow-up consults as required. Coordinates patient appointments and procedural instructions, follow-up, and reports test results to the appropriate providers, and obtains records and test results from outside facilities. Ensures all consults are acted on and completed in a timely manner.

8. I've reviewed the emails in Exhibit A to this affidavit.

9. The cases in Exhibit A are not patient charts, but rather narratives from the one of the care coordinators on what occurred in a particular case. The patients' names are not included in Exhibit A.

10. I do not certify the narratives are accurate.

11. Despite not knowing the patient's name and not reviewing the chart, I can ascertain the following:

12. In respect to Case 1, the Community Care Coordinator scheduled an appointment for the patient on January 4, 2022. Exhibit A at p. 260.

13. Because the patient in Case 1 was scheduled for an appointment, it is reasonable to believe the proper documentation was provided to the community provider to schedule the appointment.

14. The Community Care Coordinator attempted to obtain records from an appointment in June and July 2022. Exhibit A at p. 260.

15. Case 1 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 1, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment, and the patient in Case 1 did not expire with an open community care consult because the patient was seen on January 11, 2022. Exhibit A at p. 260; Exhibit B.

16. In respect to Case 2, the Community Care Coordinator scheduled an appointment for the patient on June 9, 2021. Exhibit A at p. 263.

17. Because the patient in Case 2 was scheduled for an appointment, it is reasonable to believe the proper documentation was provided to the community provider to schedule an appointment.

18. Case 2 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 2, Complainant did not perform the necessary care

coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment and the patient in Case 2 was scheduled and seen by community provider before patient expired. Exhibit A at p. 263; Exhibit B.

19. In respect to Case 3, the document is about how a consult is classified. There is no mention of the Community Care Coordinator's patient care. Exhibit A at 264.

20. In respect to Case 4, the Community Care Coordinator processed the consult in a month after the consult was placed. Exhibit A at 265.

21. The Community Care Coordinator routed the consult back to FHCC and the manager canceled the consult. Exhibit A at 265.

22. After the consult was cancelled, the patient received subsequent care.

23. Although the patient expired, Community Care was involved.

24. Case 4 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 4, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment and although the patient in Case 4 expired, they did not do so with an open Community Care consult. Exhibit A at p. 265-67; Exhibit B.

25. In respect to Case 5, the Community Care Coordinator conducted care coordination in that they scheduled the patient for an appointment on March 16, 2022, there was documentation in the chart, and they attempted to contact the patient and provider. Exhibit A at p. 268.

26. Case 5 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 5, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment and did not follow-up on the patient's care. Exhibit A at p. 268; Exhibit B.

27. In respect to case 6, the patient was scheduled for an appointment and seen by a community provider. Exhibit A at p. 269.

28. Case 6 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 6, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community,

document follow-up with the community provider or his patient about scheduling an appointment, he did not attempt to obtain documentation from the community provider, and he did not follow-up on the patient's care. Exhibit A at p. 269; Exhibit B.

29. In respect to Case 7, the document is about how a consult is classified. The Community Care Coordinator was a Licensed Practical Nurse (LPN) who was in contact with the patient. Exhibit A at p. 271.

30. Case 7 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 7, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment, and did not follow-up on the patient's care. Although the patient in Case 7 expired there were documented care coordination that occurred. Exhibit A at p. 271; Exhibit B

I have read this and the above pages, and I declare under penalty of perjury that the information stated there is true and correct to the best of my knowledge, information, and belief.

Dated this 27th day of September, 2024

DONNABELL LORENZO-VILLARINO
Digitally signed by DONNABELL LORENZO-VILLARINO
Date: 2024.09.27 11:17:53 -05'00'

Donnabelle Lorenzo-Villarino
Referral Program Nurse Manager
Captain James A. Lovell Federal Health Care Center
United States Department of Veterans Affairs

EXHIBIT A

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:30 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: Case #1

This next bunch I will add to my afficavit and the memorandum where Ravipatti states this never happened in the dept before

this was a female RN – nothing happened

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 2:59 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Case #1

# Case #1

<u>Preface:</u> 76 yo male; NH resident. Had CT in Sept '21, which led to a PET and then Cardiothoracic evaluation. Fell off after that (No surgery/bx). Repeat CT ordered in Sept '22 (1 year later): lesion grew.

On 9/30/21 pt had CT thorax, which showed stable RUL lung nodule (0.8x1cm) and new subpleural density. On 10/12/21 consults placed for pulmonary outpatient and Community Care (CC)-PET. PET scheduled for 11/2/21 at Froedtert. Pulm appt was 11/30/21, at which time consults were placed for CC-Cardiothoracic and PFTs. Pt saw Cardiothoracic (CTH) surgeon on 1/11/22, but records were not formally requested by CC until 6/23/22 (1st attempt), 7/30/22 (2nd), and finally uploaded on 8/30/22. In the meantime, on 1/27/22 pt's PCP requested CTH records, but PCP's RN instead received GI records. In the actual CTH records, it reads that CTH surgeon needs the disc of the Sept CT scan, presumably in order for them to proceed with a biopsy. (Writer since verified directly with CTH office that they never got the disc and pt never returned to see them and was lost to f/u). On 3/1/22 pt, a NH resident, presented to PCP for routine f/u visit. PCP noted that CTH records were still absent and made note that these were still needed and that NH should obtain them. On 3/10/22 pt presented to pulm for f/u, at which time they also noted absence of CTH records and sought them directly, themselves. Upon receipt they noted that CTH needed the disc, and documented that they called the NH with instruction to obtain it. Pt went back to pulm on 9/1/22, for f/u, at which time it was realized pt STILL had no f/u with CTH surgeon. As <u>one year</u> had elapsed, STAT CT thorax was ordered: RUL

nodules had now grown into 1 lesion: 1.4x1.2cm. NEW consults for CC-cardiothoracic and PET therefore placed.

| | |
|---|---|
| **3/25/21** | **CT thorax:** New subpleural nodule in RUL (0.8 x 1cm) |
| **9/30/21** | **CT thorax:** Stable subpleural nodule in RUL (0.8 x 1cm); New subpleural density in RUL (0.7 x 0.4cm) |
| **10/12/21** | **CT signed off; Consults placed** for pulm outpt and CC-PET. MD called NH and relayed need for f/u with both areas. |
| **10/22/21** | CC RN received PET consult; **PET scheduled** for 11/2/21 @ Froedtert South |
| **11/2/21** | **PET-CT @ Froedtert South** |
| **11/30/21** | **Pulmonary consult** with fellow. **Consults placed** for Cardiothoracic (CTh) and PFTs. |
| **1/4/22** | **CC scheduled CT appt** for 1/11/22 |
| **1/11/22** | **Pt saw CT surgeon** (Dr. Raikar)...note says that they need CT images from the VA |
| **1/27/22** | **PCP requested CT records** |
| **1/28/22** | PCP RN requested records –*Rec'd GI records instead*—made vague note about "unable to view CTh records" |
| **2/1/22** | **CT RN** requested CT scan from PCP's RN (never sent) |
| **3/1/22** | Pt presented to **PCP for routine f/u** |
| | • Noted that CT records were still absent |
| | • PCP unsure if pt had CTh surgery |
| | • Informed NH to call for records |
| | • Made note for FHCC to obtain records |
| **3/10/22** | Pt presented to **pulm for f/u** |
| | • Noted no records from CTh appt. |
| | • Contacted CTh office for records; fax received. |
| | • Noted that Imaging was needed |
| | • Called NH and instructed to obtain disc. |
| **6/23/22** | CC documents **1ˢᵗ attempt** to obtain records from CTh appt. |
| **7/30/22** | CC documents **2ⁿᵈ attempt** to obtain records from CTh appt. |
| **8/30/22** | **CC uploads CTh records** |
| **9/1/22** | Pt presented to **pulm for f/u** |
| | • Realized that pt still did not have f/u with CTh |
| | • STAT CT ordered. |
| **9/15/22** | **CT thorax:** RUL nodules are now merged as one lesion (1.4 x 1.2cm) |

Summary of elapsed times:

| | |
|---|---|
| CT scan to PET | (33 days) |
| to pulm consult | (28 days) |
| to cardiothoracic appt | (42 days) |
| to 1ˢᵗ request by PCP for records | (16 days) |
| to receipt of records by pulm | (43 days) |

to realization that pt never had 2<sup>nd</sup> CT appt (140 days)

Time for Community Care to request/upload records: **7.5 months**

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:31 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #2

This was a failure to f/u by a female staff employee on one that a male Filipinos sent out

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 3:00 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** case #2

# Case #2

**Preface:** 73 yo male. PSA steadily increasing since 2010 (4.11 to 12.7, by 2018). PSA 411 (2021), PSA 622 (2022).

**On 5/28/21 pt saw PCP for routine visit. Elevated PSA with sx noted; PCP ordered CT CAP and placed consult for CC-Urology. 6/7/21 CT CAP at FHCC showed bone mets-report sent to CC-Urology. Pt had CC-urology appt on 6/9/21. Per conversation with outside clinic, they dx pt with prostate CA and pt's last visit with them was on 9/8/21--they said a CT and bone scan were scheduled for Dec but pt cancelled appts, never returned and there was no f/u. Writer notes that CT CAP was instead performed at FHCC on 7/30/21, with CT lumbar in Aug '21 d/t pt inability to tolerate bone scan. Writer unsure of what transpired at the end of 2021/beginning of 2022 that causes seeming lapse in pt following up with CC urologist. In Feb '22 pt went to the ER with altered mental status and unsteady gait--he was admitted approx 1 month with ESRD/ARF, and thereafter d/ch to NH. Pt eventually returned to FHCC to see PCP on 7/27/22, at which time PCP requested urology records. Note charted 8/11/22 that PCP's RN did request urology records. Unsure if these were ever received, as no notes follow. On 8/3/22 Cancer Care Coordinator (CCC) RN first became aware of pt via autogenerated report from lab, where PSA was elevated at 622. CCC RN reached out directly to Uropartners, where pt went for CC consult, and learned pt never f/u with treatment. Asked for faxed records--received and faxed to PCP's nurse, with Teams message to her that pt never f/u and his PSA is now 622. CCC RN also documented note with PCP sign-off. On 9/8/22 pt was admitted to FHCC with SOB. PSA again drawn: >500. Hem/Onc inpatient consult was placed; Hem-onc fellow Dr. Paduri saw pt and through chart review discovered he was worked up for prostate CA but was never treated. Dr. Paduri asked CCC RN to request records from recent admission - did so and provided records to her. Pt expired 9/28/22 without ever having been treated.**

| | |
|---|---|
| 5/28/21 | Saw PCP for routine visit |
| | • Elevated PSA noted; hematuria, bladder lesion |
| | • Ordered CT CAP |
| | • Referred to CC- urology |
| 6/7/21 | CT CAP at FHCC |
| | • Bone mets |
| | • Report sent to CC-urology |

| | |
|---|---|
| **6/9/21** | CC-urology appt |
| | • Bx 6/25/21 (4+3=7); pt diagnosed |
| | • Pt's last visit was 9/8/21 |
| | • CT and bone scan scheduled for Dec |
| | • Pt cx appts and never returned |
| **7/30/21** | CT CAP at FHCC |
| | • Bone mets |
| | • Spinal compression |
| | • Nodal spread |
| **Aug '21** | CT lumbar at FHCC |
| | • Unable to tolerate bone scan |
| | • Pain management referral |
| **Feb '22** | Went to ER |
| | • Altered mental status, unsteady gait and falls. |
| | • ICU; ESRD/ARF |
| | • Admitted 1 month, then to NH for rehab |
| **5/27/22** | Sees Dr. Sias for pre-op physical with |
| **7/27/22** | Pt sees PCP at FHCC |
| | • PCP requests urology records |
| **8/11/22** | PCP RN requests CC-urology records |
| | • Never received |
| **8/3/22** | Cancer Care Coordinator receives PSA list |
| | • Called Uropartners; learned pt never f/u with treatment |
| | • Rec'd records; Faxed to PCP RN |
| | • Documented note; requested PCP sign-off |
| **9/8/22** | Pt admitted for SOB |
| | • PSA > 500 |
| | • Hem/Onc inpatient consult |

**Pt EXPIRED 9/28/22**

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 3:03 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Case #3

## Case #3

In this consult, the physician indicated <u>weight loss</u> and clearly listed in the description that a <u>mass in the pancreas</u> was visible on CT. This was categorized as "moderate." Wondering why this wasn't categorized as "complex," with an RN processing?

The evaluation was scheduled for 5 months down the road. One month after this consult was placed (but still before he was scheduled) the pt called the Triage Line with worsening sx, and was advised to go to the ER. I don't see any charting after this, but even this didn't "flag" the urgency of this consult.

Would like to please understand what the acceptable timelines/processes are in community care, so I can help to prevent these lapses.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:32 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #4

Female RN – nothing happened

## Case #4

Pt (now deceased) was a 66 yo chronic smoker.

On 4/14/22 pt had a CT chest, which showed evidence of likely lung cancer in his right middle lobe. This was new since his 2019 imaging. The PCP placed a CC-pulmonary consult, which wasn't "worked on" by CC until 1 month later, at which time an LPN charted that the vet verbalized transportation issues. LPN gave pt numbers to call, with the onus on him to get back to CC. One month later this same LPN returned a call to the pt's daughter, who explained it would be far easier for vet to be seen at FHCC. Almost 3 weeks later, on 6/28, the then manager of CC cancelled the consult and charted a vague note about it being forwarded back to the pulmonary clinic *if needed*. (??)  Later this consult was automatically discontinued.

Shortly thereafter the PCP, on 7/1, submitted another pulmonary consult--this time electronic. On 7/5 the pulmonary dept recommended a bronchoscopy with biopsy, which was performed at FHCC on 7/15. The resultant pathology report showed "atypical cells" and was negative for cancer in some samples. It was sent out for an expert opinion. Unclear of pulmonary follow-up.

On 8/10 vet presented to FHCC ER with complaints of abdominal pain, chest burning and shortness of breath. During the evaluation process he had a CT angio to evaluate for pulmonary embolism (PE), which, although negative for PE, again demonstrated likely lung cancer as well as bone metastasis. A CT abdomen-pelvis additionally showed liver lesions which were concerning for cancer, as well as the prostate…the latter which was of concern because pt's PSA was concurrently uptrending. On 8/11 the ER doctor charted that he believed the pt's symptoms were all related to cancer, as likely malignancy was again visible on imaging (lung, liver, adrenal, bone and questionable prostate). He therefore admitted the pt and placed inpatient consults for both pulmonary and oncology.

On 8/11 the oncology fellow MD saw the pt in-house. She requested for his case to be discussed at Tumor Board on 8/15, citing the need for a 2nd pathology review, and to get recommendations on whether or not a liver biopsy was now warranted, to be considered as a secondary site of analysis. Due to questionable prostate cancer with rising PSA, she also placed a urology consult. The 8/15 Tumor Board panel agreed that more tissue was needed for definitive diagnosis and staging, so on 8/19 the hem-onc fellow placed a consult for CC-Invasive radiology for a liver biopsy. Cancer Care Coordinator (CCC) RN was made aware of pt, to track.

In the meantime, on 8/15 a repeat bronchoscopy with biopsy was performed at FHCC. The resultant pathology report was "suspicious for malignancy" in some areas. It was sent out externally to Milwaukee, for additional review.

On 8/16 the urologist saw the pt while admitted.  Given the PSA level she did not suspect prostate CA, but decided to wait on a 2nd lung biopsy, to confirm. Pt's f/u with urology was scheduled for 9/9.

On Mon 8/22 CCC RN called pt to f/u on Fri 8/19 order for a liver biopsy. Pt initially declined, citing 2 previous lung biopsies which "showed nothing," in his perception. Pt agreed to speak to the CCC RN while on site the next day, for a 1:1 discussion. CCC RN physically met with the pt and explained rationale and importance for the liver biopsy, citing that his imaging and past biopsies are all concerning, we're just not clear on a definitive diagnosis. Pt agreed to get the liver biopsy, so CCC RN informed CC to proceed with scheduling at CTCA, pt's choice, as it was local. When personally following up with CTCA to check on status, CCC RN eventually learned it was on "hold" for scheduling due to lack of imaging discs. CCC RN alerted CC, and discs were mailed. These took > 1 week to arrive, at which time pt was finally scheduled for a biopsy on 9/8/22.

On 9/8 pt had a liver biopsy at CTCA. The report was finalized on 9/13, and showed "poorly differentiated carcinoma" now suggesting possible pancreaticobiliary origin. CCC RN ordered genomic testing on his tissue specimen, as requested by oncologists, to shed light on origin site and treatment options. Testing through Tempus takes approximately 2 weeks. Note that Tempus testing was not requested of previous lung biopsies, as it was determined that those sample were insufficient for further testing.

On 9/14 pt was admitted to FHCC for weakness and a fall. Repeat CT imaging again showed a lung mass with metastatic sites, including the spine, so oncology was again consulted in-house. On 9/15/22 the hem-onc fellow saw the pt. Plan was for pt to come to the oncology clinic after discharge, to start treatment, as he had since been admitted. It was hoped that his genomic report would be back by then. On request of Tempus, writer secured additional blood sample from pt, while admitted in ICU, so that this (along with the tissue) could help determine histology. This was mailed out Fed-Ex next day.

On 9/20/22 pt had a CT chest which showed pneumonia (possible infection, lung collapse, aspiration and pleural effusions). Pt expired in the ICU on 9/21/22, having never been treated for cancer. Five months had elapsed from when the presumed cancer was first visible on CT.

**Key points:**
- Lack of timely follow-through by CC: Initial pulmonary consult, placed in April, was eventually discontinued. There did not seem to be nursing judgement used, regarding importance of this, as evidenced by charted statements of manager.
- Lack of initiation by VA: As the elderly vet outright verbalized transportation issues—especially with regard to an important pulmonary evaluation for cancer—perhaps it would have been more prudent of the VA to take initiative and call pt with options, rather than placing the onus on the pt to call himself and seek options. Historically some pts can be dismissive and feel burdened if tasks are placed on them. At this time the VA was on "bypass" for onsite pulmonology, due to being short a physician—it took the daughter calling back to see if her father could be seen at the VA, rather than this option being outright offered to the pt, from FHCC, due to urgency of evaluation.
- Unclear pulmonary follow-through: writing unclear of pulmonary follow-through after initial (7/15) bx at FHCC.

- Sending discs: Community Care to be educated to automatically send imaging discs, for a biopsy. In these cases, recommend to overnight discs so precious time is not lost.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:32 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #5

Female follow up on this  - nothing happened

## Case #5

On 2/4/22 MD entered Community Care (CC) oncology/tumor consult for pt to f/u for testicular cancer (FHCC was on bypass due to solo provider). Consult approved and eventually scheduled for 3/16/22. Records requested by person #1 on 7/2/22, but never received. Records requested by person #2 on 8/10/22, but never received. On 9/20/22 person #3 called outside provider and learned that pt never attended appt, prompting CC Managed Care Director to contact Cancer Care Coordinator (CCC) RN and CC RN on 9/27 to ask that someone f/u with patient. CCC RN responded affirmatively and called pt on 9/27: LM on phone, asking for call back. Pt returned call on 9/28 and expressed desire to attend appt at FHCC. As FHCC oncology is now fully staffed, pt granted permission to be seen at Lovell. CC Managed Care Director therefore forwarded appt back to FHCC Hem/Onc outpatient. Submitting this event because 8 months have elapsed since consult was first placed.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:41 AM
**To:** lisa.wabinga@ceseeo.com

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:43 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: Absence of records for CC consult that is 1 year old
**Importance:** High

Case 6 here had to do with two females.

One of which who closed the consult is a manager – nothing happened

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Tuesday, December 12, 2023 9:53 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** FW: Absence of records for CC consult that is 1 year old
**Importance:** High

**Case #6**

Good morning CC Leadership,

Can you kindly provide education on your policy for record request/upload, including the permissible timeframe?
Above pt has a current consult to be seen in the FHCC hem-onc, but Dr. Pant-Purohit lacks outside records from his previous CC consult.
This consult was closed (marked "C") on 3/6/23, without any records uploaded. If I'm reading this correctly, there was only 1 documented attempt made, and 2 additional ones were to follow.
It's now 6 months later, and still there are no records. No more attempts were documented.

```
COMPLETE/UPDATE          03/06/23 16:44     PAULSON, RHONDA RN     PAULSON, RHONDA RN
ACM-Administratively closed without records
   Administratively complete with records follow-up: Facility community
care staff have received confirmation that the Veteran has attended the
initial visit. One attempt has been made to obtain medical records without
timely response from the community provider. This consult is being
administratively completed. Two additional documented attempts must be
made to obtain the medical records per the guidance in the Office of
Community Care Field Guidebook.
RET-Referral Coordination Team Member
CUR-CTB User Role: Provider
```

Thank you,

Theresa

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:45 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** ozzie - case 7

Case 7

A female Wendy – downgraded and sent an actuve suicide patient who had been asking for inpatient help and the RN who should have taken IMMEDIATE action sent it to have an orientee or just off orientation PSA to process it. A week later, the 35 year old veteran hung herself.

Nothing happened

V/R,
Ozzie Kochiu CLC RN Admissions Coordinator
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law,

**EXHIBIT B**

| | |
|---|---|
| **From:** | Lorenzo-Villarino, Donnabelle L. |
| **To:** | Ravipati, Mamata FHCC Lovell; Paulson, Rhonda FHCC Lovell |
| **Subject:** | DECEASED VETERAN |
| **Date:** | Thursday, March 23, 2023 10:13:00 AM |
| **Attachments:** | image001.png |

Morning,

Reviewing Deceased patient list on the FHCC Dashboard, I came across patient that needs review.

███████████████ was admitted on 2/23/2023 Aurora medical Center ER for acute kidney failure and expired on 2/25/2023.
Consult for COM CARE NEPHROLOGY entered on 12/8/2022 still in ACTIVE - having OCC PSA check with community provider if patient was actually seen prior to ER admission.  No follow up from assigned coordinator - only from OT staff trying to verify if appt was attended.

ADDED COMMENT          12/19/22 14:33     KOCHIU,AZIS V       KOCHIU,AZIS V
PRQ-Provider requires records to review prior to scheduling.
DU-Documents uploaded to HSRM.
RSP-Records faxed/sent to Community Care Provider.
CUR-CTB User Role: RN
COM-Additional Comments:
documents faxed to provider

referral
order
general note 212-8-22
Renal 5-25-22
privacy letter
Optum billing address

Referral Number: VA0025145057

FROEDTERT SOUTH MEDICAL GROUP
9555 76TH STREET FLOOR 2
PLEASANT PRIIRIE WI 53158
NPI 1891729950
TEL 262.577.8300
FAX 262.671.7153
COM----------

ADDED COMMENT          12/19/22 14:34     KOCHIU,AZIS V       KOCHIU,AZIS V
alerted Kelly

ADDED COMMENT          12/19/22 14:34     KOCHIU,AZIS V       KOCHIU,AZIS V
awaiting appt details from veteran or community provider

ADDED COMMENT          01/10/23 17:50     RELUYA,CYNTHIA P     RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Voicemail left to veteran at 1746  requesting a call back re: if he has an
appt. set up already w/ Froedtert Nephrologist.
COM----------

ADDED COMMENT          02/01/23 16:41     RELUYA,CYNTHIA P     RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Voicemail left to veteran at 1619, requesting him to call Assigned staff
if he already set up an appt. w/ Froedtert South Medical Grp.
Nephrologist.
COM----------

ADDED COMMENT          02/01/23 16:46     RELUYA,CYNTHIA P     RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Follow-up call made to provider/vendor to check on status.

Spoke w/ Corrie @ Dr. Wade Milosevic's office w/  Froedtert Scuth Medical
Grp.
Nephrology Dept. at 1621 and informed writer that they didn't receive the
referral that was faxed on 12/19/2023, to refax the referral to the same
fax # 262 671 7153, and scheduler will call the patient.
COM----------

```
ADDED COMMENT          02/01/23 16:49     RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
RSP-Records faxed/sent to Community Care Provider.
CUR-CTB User Role: RN
COM-Additional Comments:
Referral refaxed to Dr. Rade Milosevic w/ Froedtert South Medical
Grp. Nephrology Dept. at 262 671 7153.

Alert sent to Admin staff to follow up.
COM----------


ADDED COMMENT          03/01/23 17:45     RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
CV2-COVID-19 Priority 2: Schedule after clinical review
CUR-CTB User Role: RN
COM-Additional Comments:
Follow-up call made to provider/vendor to check on status.

Contacted Dr. Wade Milosevic's office w/ Froedtert South Medical
Grp. Nephrology Dept. at 1731 but office is closed already.
COM----------
```

*Respectfully,*

**Donnabelle Lorenzo-Villarino, RN**
*Managed Care Department Head*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
3001 Green Bay Road North Chicago, IL 60064
Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: <u>donnabelle.lorenzo-villarino@va.gov</u>



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**Exhibit 5**

**Kochiu files a retaliation claim based on the 7 cases Donnabelle turned him in for.**

**Agency states it should not be included in the current EEO case and should be done as a separate EEO case.**

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**CHICAGO AREA OFFICE**

| | | |
|---|---|---|
| AZIS KOCHIU, | ) | |
| | ) | |
| | ) | EEOC No.    440-2023-00142X |
| Complainant, | ) | |
| v. | ) | Agency No.    200J-576A-2023-152770 |
| | ) | |
| TODD HUNTER, Acting Secretary, | ) | |
| Department of Veterans Affairs, | ) | ADMINISTRATIVE JUDGE |
| | ) | CATHERINE HUNTER |
| Agency. | ) | |
| | ) | DATED: February 5, 2025 |

_____

**AGENCY'S RESPONSE TO MOTION TO COMBINE**
_____

NOW COMES the Agency (VA), by and through its undersigned counsel, Justine Fernandez, and files its Response to Complainant's Motion to Combine. The Agency respectfully requests the Commission deny Complainant's motion based on 29 C.F.R. § 1614.106(d) and MD-110 Chapter 5(III)(B)(3). In support of its motion, the Agency states as follows:

**A.      ACCETPED CLAIMS**

Whether Complainant was subjected to a hostile work environment based on sex (male) and reprisal (prior EEO activity) when:

    a.  He was subjected to a HWE and management did nothing to stop it;

    b.  He was rated satisfactory on his proficiency report;

    c.  He was assigned a bigger workload than his co-workers;

    d.  He was not allowed union representation, he was told he was subject to a FF investigation, he lacks documentation in his emails, he was accused of not properly scheduling a deceased patient's consult;

    e.  His supervisor gave deceptive information to a peer review committee; and

    f.  He became aware his supervisor was asking co-workers to submit negative reports of contacts regarding him

And the following actionable claims:

    1.  On May 8, 2023 he was removed from patient care

2. As of July 19, 2023 he was not issued his proficiency rating that was due in February 2023.

## B. STATEMENT OF NEW EEO CLAIMS

"On 12/04/2024, Responsible Management Official (RMO) Donellebelle Lorenz-Villarino, Nurse Manager, allegedly accused the Aggrieved Party (AP) of a Privacy Act of 1974 violation when she reported to privacy officer Jermaine Williams that the AP disclosed information, he received from a colleague to the Equal Employment Opportunity (EEO) investigator during his EEO investigation on his prior EEO.

On or about November 2024, RMO Lorenz-Villarino intimidated AP's witnesses by calling the Office Inspector General (OIG) on co-worker Christianah Arowora who was named as a witness in AP's prior EEO case.

On or about November 2024, RMO Lorenz-Villarino intimidated Theresa Meneer by having her investigated by privacy officer Jermaine Williams who was named as a witness in AP's prior EEO case." [1]

## C. APPLICABLE LAW

### 1. MD-110 Chapter 5(III)(B)(3)

MD-110 Chapter 5(III)(B)(3) reads in part as follows - In cases where subsequent acts of alleged discrimination do not add to or clarify the original claim, and/or could not have been **reasonably expected to grow out of the investigation of the original claim, the later incident should be the subject of a separate EEO complaint**. In such cases, fragmented processing of an EEO complaint is not at issue because there are two distinct and unrelated legal claims being alleged…Example 8 An agency employee sought EEO counseling and filed a formal complaint concerning his allegation that the agency discriminated against him in the terms and conditions of his employment by requiring that he adhere to a specific work schedule while not imposing a similar requirement on a comparative employee. During the investigation into this complaint, the

---

[1] This is copied from the EEO Counselor Report in Complainant's January 31, 2025 email. Agency counsel does not have the formal complaint as of this filing.

complainant tells the investigator that he was recently not selected for a position in another facility and believes this occurred as a result of discrimination. In this case, the discriminatory non-selection claim is not like or related to the adherence to the work schedule claim, as it is factually distinct and cannot reasonably be said to add to or clarify the original claim." (emphasis added).

## D. ARGUMENT

Complainant's new EEO claims are not like or related to the instant complaint as required by MD-110 Chapter 5(III)(B)(3). Although the Responsible Management Officials (RMO) appear to be the same, that is the extent of likeness between the two cases. The new EEO claim from Complainant's Motion to Combine involves a Privacy Act violation, while the instant EEO complaint involves proficiency reports, workloads, a fact-finding investigation related to documentation, a peer review committee, being detailed from patient care, and a 2023 proficiency rating.

MD-110 Chapter 5(III)(B)(2) provides guidance on when a new claim is like or related to a pending claim – "In deciding if a subsequent claim is "like or related" to the original claim, a determination must be made as to **whether the later incident adds to or clarifies the original claim, and/or could have reasonably been expected to grow out of the investigation of the original claim**. See *Complainant v. Dep't. of the Army*, EEOC Appeal No. 0120142480 (Nov. 25, 2014; Scher v. U.S. Postal Service, EEOC Request No. 05940702 (May 30, 1995); *Webber v. Dep't. of Health and Human Services*, EEOC Appeal No. 01900902 (Feb. 28, 1990)" (emphasis added).

Example 5 reads, "An agency employee files a race discrimination complaint alleging he was not selected for a particular supervisory position, despite his belief that he was the best qualified candidate for the job. During the investigation into his complaint, the same selecting official does not select the complainant for another supervisory position. Complainant again asserts he was not selected because of his race. This new claim of a discriminatory non-selection is sufficiently like or related to the original non-selection claim that the agency should amend the original complaint to include the subsequent non-selection." MD-110 Chapter 5(III)(B)(2) Example 5.

Complainant's new case does not coincide with Example 5 above. In Example 5, there is a common denominator between the old and new claims – non-selection. In the instant motion, there is no common denominator between the claims. The later incident in the new EEO case (Privacy

Act violation) could not have been reasonably expected to grow out of the investigation of the original claim (proficiency reports, workloads, a fact-finding investigation related to documentation, a peer review committee, being detailed from patient care, and a 2023 proficiency rating). The Privacy Act violation is not only a separate area of law that would require a different argument under the theory of illegal discrimination, but it also took place approximately one year after the claims in the original complaint. Had Complainant's new EEO claims allege, for example, an adverse action related to the 2023 proficiency rating like a demotion, the instant motion would be more appropriate. However, that is not the case.

**WHEREFORE**, the Agency respectfully requests that the Commission deny Complainant's Motion to Combine.

Respectfully submitted,

/s/

Justine Fernandez
Agency Counsel
Office of General Counsel – Midwest District
United States Department of Veterans Affairs
p: 202-894-0695
Justine.Fernandez@va.gov

## **CERTIFICATE OF SERVICE**

I, Justine Fernandez, hereby certify the foregoing **Agency's Response to Motion to Combine** was uploaded onto FEDSEP and sent as indicated below on February 5, 2025:

via e-mail only:

**EEOC**
Judge Catherine Hunter
Catherine.Hunter@eeoc.gov

**Complainant**
Azis Kochiu
Azis.Kochiu@va.gov

/s/

Justine Fernandez
Agency Counsel
Office of General Counsel – Midwest District
United States Department of Veterans Affairs
p: 202-894-0695
Justine.Fernandez@va.gov

Exhibit 6

Teams recording location by time on usb

Focus on the Highlighted below.

0:00:00 : Donnabelle is explaining the protocol

0:00:35: Kochiu asks Donnabelle to repeat what she  just stated

0:00:40: Donnabelle repeats the process again

0:01:05: Donnabelle ends answering Kochiu's question.

0:01:07: Ken Dizon asks about preferred providers and DB

0:0 1:26 recording ends

**Exhibit 7**

**I filed an EEO based on Reprisal which led to intimidation of my witness by Donnabelle.**



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT, DIVERSITY & INCLUSION**
**MID-WEST DISTRICT**
**Westchester, IL**

In reply refer to: 08O

December 16, 2024

VIA: kochiu106@gmail.com

Azis Kochiu
1831 Monroe Ave
South Milwaukee, WI 53172

**SUBJECT: Notice of Rights and Responsibilities in your EEO Complaint, Case No. 200J-556A-2025-162505**

Dear Azis Kochiu:

I will serve as the EEO counselor in the matter you reported to the Office of Resolution Management, Diversity & Inclusion (ORMDI) on December 09, 2024, Case Number 200J-556A-2025-162505 as follows:

| Basis | Claim | Date of Occurrence |
|-------|-------|--------------------|
| Reprisal | Harassment/Hostile Work Environment (Non-Sexual) | |
| | RMO Lorenz-Villarino accused AP of HIPPA violation when she reported information to Privacy Officer Jermaine Williams that was disclosed in his VA EEO investigation for his complaint. | December 04, 2024 |
| | RMO Lorenz-Villarino is tampering and intimidating AP's witnesses in his current EEO case due to calling OIG on his witness Christianah Arowora. | 2024? |
| | RMO Lorenz-Villarino is tampering with and intimidating witness Theresa Meneer due to her being investigated by COF. | 2024? |

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Page 2
Notice of Rights and Responsibilities
Name of Aggrieved Party: Azis Kochiu
Case Number: 200J-556A-2025-162505

If this information is incorrect, please advise me within five days of receipt of this letter.

I am enclosing the Notice of Rights and Responsibilities and a document entitled "Role & Responsibilities of the EEO Counselor."  Please read these documents carefully, sign where indicated, and return a copy, preferably via e-mail to Eboney.Tolliver@va.gov or via fax at  or to the address above.


If you have any questions or need additional information, call me at (888)566-3982 ext. 102391.

Sincerely,

*Eboney Tolliver*

Eboney Tolliver
EEO Counselor

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT, DIVERSITY & INCLUSION**
**MID-WEST DISTRICT**
**Westchester, IL**

**Aggrieved Party: Azis Kochiu**
**Case Number: 200J-556A-2025-162505**

Under 29 C.F.R. §1614.105(a) & (a)(1), aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, reprisal or genetic information must consult an EEO counselor prior to filing a complaint in order to try to informally resolve the matter.

An aggrieved person must initiate contact with an EEO counselor within 45 calendar days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 calendar days of the effective date of the action.

If the alleged matter(s) are beyond the 45 calendar day time limit for contacting an EEO counselor, you will be given an opportunity to provide an explanation of your untimely contact to the EEO counselor.

ORMDI is required to advise you that you have certain rights and responsibilities regarding the EEO matter that you raised. They are:

    a. The right to remain anonymous during EEO Counseling. Your name will be divulged to others only upon your authorization for ORMDI to do so. You should know, however, that it might be very difficult to resolve your complaint informally if you choose to remain anonymous. Please indicate your choice by initialing below:

        ☐  **I want to remain anonymous**

        ☒  **I do NOT want to remain anonymous**

    b. The right to a representative during the EEO complaint process including during EEO counseling. You may select anyone to represent you, as long as their position with VA would not represent a conflict of interest. **The EEO counselor cannot be your representative**. Please initial next to your selection below:

        ☒  **I do NOT want a representative at this time.** I understand I may select a representative later (or at any stage of the EEO process).

        ☐  **I have a representative. My representative is:**

        Name:                         Attorney: ☐Yes ☐ No
        Address:                   Phone: (     )

**Confidential Document**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Page 2
Azis Kochiu,  200J-556A-2025-162505

Email:                                      Fax: (      )

c. The right to have your claim(s) addressed through the agency Alternative Dispute Resolution (ADR) program or EEO counseling, **but not both.** Participation in the ADR program is voluntary on your part and ADR may be entered into in lieu of traditional EEO counseling. If ADR is elected during the pre-complaint process, the counseling period may be extended up to but not more than 90 calendar days. Your agreement to participate in ADR must be in writing. When ADR is elected, the EEO counselor will only gather enough information on your basis (es) and claim(s) to assist the agency in making a procedural determination in the event resolution through ADR is not reached.

   The EEO counselor will have no further involvement in the matter until the counselor is advised of the completion of the ADR process or the end of the 90-day counseling period, whichever comes first. At that time, if a resolution is not reached through ADR or the 90-day counseling period has ended, a final interview will be conducted, and you will be issued a Notice of Right to File a Discrimination Complaint.

d. The right to request a reasonable accommodation during the EEO complaint process. Section 501 of the Rehabilitation Act requires agencies to provide reasonable accommodations to qualified applicants and employees with disabilities. To make a request and find your local reasonable accommodation coordinator, visit the Office of Diversity and Inclusion website at: http://www.diversity.va.gov/programs/pwd.aspx

e. Under 29 C.F.R. §1614.301, Relationship to Negotiated Grievance Procedure, if you are employed by an agency subject to 5 U.S.C. 7121(d), and is covered by a bargaining unit agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure, and you wish to file a complaint or a grievance of alleged employment discrimination, you must elect to raise the matter under either Part 1614 OR the negotiated grievance procedure, **but not both**. You may file the grievance before, during or after EEO counseling, but not after you file a formal discrimination complaint through EEO. An election to proceed under a negotiated grievance procedure is indicated by the filing of a timely grievance. Whichever you file first, a formal EEO complaint or a union grievance will be considered an election to proceed in that forum, and it must be presented in writing. At the formal level, any complaint filed after a grievance has been filed on the same matter, shall be dismissed without prejudice to the complainant's right to proceed through the negotiated grievance procedure. The dismissal of such a complaint shall advise the complainant of the obligation to raise discrimination in the grievance process and of the right to appeal the final grievance decision to the Commission.

**Confidential Document**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Page 3
Azis Kochiu, 200J-556A-2025-162505

https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

f.  If you are disputing a matter that can be appealed to the Merit Systems Protection Board (MSPB), you may file an EEO complaint or an MSPB appeal, **but not both**. Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

g.  Within thirty (30) days of your first contact with an EEO counselor, you have the right to receive a written notice terminating counseling and informing you of the right to file a formal complaint (unless the period has been extended by prior written consent). You also have the right, at the conclusion of counseling, to file a formal complaint within **15 calendar days** of receipt of the Notice of Right to File a Discrimination Complaint. When you are represented by an attorney, the Commission's service regulations require that all notices be served on the attorney, with a copy to you. Time frames are computed from the date of receipt by the attorney, not the date of receipt by the aggrieved person.

h.  If you allege age discrimination, you have the right to file a lawsuit in Federal District Court, without filing a formal EEO complaint. A Notice of Intent to Sue must be filed within 180 calendar days of the date of the alleged discriminatory act. However, you must first notify the Equal Employment Opportunity Commission (EEOC), 131 M Street, NE Fourth Floor, Suite 4NWO2F Washington, DC 20507-0100 of your intent to do so, at least thirty (30) calendar days in advance of the filing your Notice of Intent to Sue. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

i.  If you are complaining about sex-based wage discrimination (being paid less than a person of the opposite sex, even though they are doing equal work), you may file a formal EEO complaint, or lawsuit in Federal District Court, pursuant to the Equal Pay Act. In addition to other remedies available through the EEO complaint process, liquidated damages are available for willful violation of the Equal Pay Act. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

j.  If you file a formal EEO complaint and it is accepted, you have the right to request an immediate Final Agency Decision from the Department of Veterans Affairs, or a hearing before an administrative judge of the EEOC after 180 days from the date you file the formal complaint, or after completion of the investigation, whichever comes first. If you request a Final Agency Decision, the request should be addressed to O'neal, Ida, District Office (200J), Office of Resolution Management, Diversity & Inclusion, MID-WEST DISTRICT, 2255 Enterprise Drive, Suite 5506, Westchester, IL, 60154. If you request an EEOC hearing, the request should be addressed to the EEOC District office under your geographical jurisdiction with a copy to the above-named District Manager. The list of offices can be found at

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

http://www.eeoc.gov/federal/directives/md-110_appendix_n.cfm.

k.  Except for complaints of age discrimination, you have the right to file a lawsuit in Federal District court at any time 180 calendar days after filing a formal complaint or up to 90 calendar days after receipt of a Final Agency Decision from VA. You may also appeal a Final Agency Decision to EEOC within 30 calendar days of receipt of the decision. If you choose to appeal a Final Agency Decision to EEOC, you have the right to file a lawsuit in Federal District Court at any time after 180 calendar days from the filing of such an appeal, or up to 90 calendar days after receiving an appellate decision from EEOC.

l.  If you believe that other individuals, similarly situated to you, have suffered from the same kind of discrimination, you may have the right to file a class action complaint. A class action complaint must allege that you have been individually harmed by a VA personnel management policy or practice that has similarly harmed numerous other class members. You must also allege that there are questions of fact that are common to, and typical of, the claims of the class, and that you or your representative will fairly and adequately protect the interests of the class. EEOC also requires that a class agent be represented by a qualified attorney. https://www.eeoc.gov/federal/directives/md-110_chapter_8.cfm

m.  You have the responsibility to cooperate with VA during the processing of your complaint. You must keep the VA informed of your current address; you must claim any mail sent to you, and you must cooperate with any individual assigned to the complaint. If you eventually file an appeal with EEOC about the complaint, you must serve copies of the appeal papers on VA.

n.  If your complaint involves back pay, you have a duty to mitigate damages by actively seeking and/or retaining employment. Interim earnings or amounts, which could be earned by a complainant with reasonable diligence, generally must be deducted from back pay.

o.  If you have filed two or more complaints, the agency will consolidate them after appropriate notice to you. When a complaint has been consolidated with one or more earlier complaints, the agency shall complete its investigation within the earlier of 180 days after the filing of the last complaint or 360 days of the filing of the first complaint. In addition, the Administrative Judge may consolidate multiple complaints at the EEOC hearing stage.

p.  Finally, you must limit any formal EEO complaint you may file to those matters discussed with ORMDI, or to like or related matters (that is, matters which are directly related to those matters or which are unmistakably derived from those matters). Additionally, if you wish to amend a previously filed complaint, only matters that are like or related to the claim(s) in the pending complaint may be

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Page 5
Azis Kochiu,  200J-556A-2025-162505

added. To protect your rights, discuss all claims with ORMDI before you file a formal complaint.

q. If you reject an agency offer of resolution made pursuant to 29 C.F.R. §1614.109(c), it may result in the limitation of the Agency's payment of attorney's fees or costs.

r. Extension of Counseling for Resolution Efforts. When the aggrieved individual and an EEO Counselor engage in resolution efforts, they may decide that they need additional time to reach an agreement. If the aggrieved person consents, the EEO office may extend the counseling period an additional period up to but not exceeding 60 days. See 29 C.F.R. § 1614.105(e). Prior to the end of the 30-day period, the aggrieved person may agree in writing with the agency to postpone the final interview and extend the counseling period for an additional period of no more than 60 days. If the matter has not been resolved before the conclusion of the agreed extension, the notice described in paragraph (g) of this section shall be issued.

s. Unless you inform us otherwise, all EEO correspondence transmitted by ORM will be sent to you and your designated representative, if applicable, via email. If your representative chooses not to participate in the email receipt of documents, he/she must notify ORMDI in writing. In instances where documents may be too large to email, ORMDI will physically mail any such correspondence to your address of record.

If you should file a formal complaint, and it is accepted for investigation, you will receive a copy of the investigative file via encrypted email or via another means approved by the agency. With this election, you will not receive a printed copy of the investigative file unless you notify ORMDI in writing of your request to receive a printed file.

ORMDI will use the date you or your attorney, if applicable, received the correspondence via email for purposes of calculating timeliness. Therefore, if the email address to which EEO correspondence is sent is a VA account, you must use the Read Receipt Option in Outlook to provide proof of delivery to ORMDI. If you or your representative is not using a VA email account to receive EEO correspondence, you must provide ORMDI with email confirmation immediately upon receipt of documents and notices. For timeliness purposes if read receipt or email confirmation is not provided, it shall be presumed that the parties received the Agency's correspondence within five days after the date it was sent via email.

t. You may be asked to provide documentation to ORMDI to support your case. The Department of Veterans Affairs National Rules of Behavior (§2.hh) state that you "will protect sensitive information from unauthorized disclosure, use, modification, or destruction,…" You are asked to redact any unnecessary personally identifiable

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Page 6
Azis Kochiu,  200J-556A-2025-162505

information (names, patient records, addresses, phone number, etc..) from any documents that you provide to ORMDI. If you believe that the sensitive information in the documents is essential to your case, contact your ORMDI counselor/investigator and advise him/her of your concern BEFORE sending the information.

If you wish to discuss your rights and responsibilities further, or if you have questions or need additional information you may contact me preferably by e-mail, Eboney.Tolliver@va.gov or via telephone at 888-566-3982 (work phone: (708) 236-2800) or at the above address.


*azis kochiu*
_____          12/18/2024
Azis Kochiu, Aggrieved Party            Date            _____


_____          _____
, Representative                  Date

**Confidential Document**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT, DIVERSITY & INCLUSION**
**MID-WEST DISTRICT**
**Westchester, IL**

## ROLE AND RESPONSIBILITIES OF THE EEO COUNSELOR

- I am an information gatherer.

- My counseling activities are intentionally informal in order to contribute to a climate within which facts may be given freely and resolutions explored by both parties with minimum tension.

- I talk with the principles in the dispute in a casual and non-intimidating manner.

- As an EEO counselor, my job is to assist the parties of the complaint in their efforts to reach an amicable agreement.

- I am not a representative or an advocate of the aggrieved person. I do not, for example, advise the aggrieved person whether to file a formal complaint.

- I do not offer opinions about the merits of the case, but I do advise on what EEO laws and regulations require to prevail in a case.

- I provide all parties with technical information about how the process works and about their rights and responsibilities during the process.

- I am not management's representative. I am a neutral of the Office of Resolution Management, Diversity & Inclusion (ORMDI).

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Exhibit 8

EEO Judge allowing for the Teams' recording into evidence.

**CATHERINE HUNTER**

| | |
|---|---|
| **From:** | CATHERINE HUNTER |
| **Sent:** | Thursday, September 12, 2024 10:34 AM |
| **To:** | Kochiu, Azis FHCC Lovell; Fernandez, Justine A. (OGC) |
| **Subject:** | RE: Kochiu v. VA 440-2024-00142X | Agency MSJ |

Mr. Kochiu:

I am unable to open the link.

If you wish to reference any recording in your response, I will allow you to send the referenced recording via overnight courier (*i.e.*, Fed Ex, UPS, etc.) on a USB flash drive to the Agency and me. However, the USB flash drive with any recording **must be mailed on or before the same day you file your response AND received no later than three (3) days after filing of your response to be considered timely**. The USB flash drive must also include an index of what is included on the flash drive. No other documents/items sent via overnight courier beyond the USB flash drive containing only the actual recording and index will be reviewed or considered. It is very important that you ensure that any recording and document on the USB flash drive can be opened and accessed by the Agency and me. On the same day of mailing, you must also provide the separate overnight courier tracking nos. to the Agency and me, so we can monitor the arrival of any flash drive. Upon receipt of the overnight courier package, the Agency will have five (5) days to file any reply to your response. For your convenience, I have included my duty station address below for any overnight courier package. Ms. Fernandez, please provide the same information to Mr. Kochiu.

Also, you can present your response to the Agency's motion as you deem fit.

Best regards,

Judge Hunter


U.S. Equal Employment Opportunity Commission
Chicago District Office
230 S. Dearborn, Suite 1800
Chicago, IL 60604

---

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Thursday, September 12, 2024 10:04 AM
**To:** CATHERINE HUNTER <CATHERINE.HUNTER@EEOC.GOV>
**Cc:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Fernandez, Justine A. (OGC) <Justine.Fernandez@va.gov>
**Subject:** Kochiu v. VA 440-2024-00142X | Agency MSJ

> **CAUTION:** The sender of this message is external to the EEOC network. Please use care when clicking on links and responding with sensitive information. Forward suspicious emails to phishing@eeoc.gov.

📄 OCC Workflow and Worklist Assignment-20221110_150029-Meeting Recording.mp4

**Judge Hunter,**

I will be responding to the Agency's Motion for Summary Judgment (MSJ) as I want a hearing then move to a trial. I'll submit the response within the 15 day time line.

**I just have a couple of questions:**

1. **Can you hover over the link above, hit control and left click with your mouse and let me know if you can hear the narration?** If you can or can't hear it, can you let me know either way as I want to add this into my response, particularly at 13 minutes of the recording. If you can't hear it, I will have to get the recording to you either by mail or some other way. I want you to have access to this as it sets up my case of discrimination.

2. **In the Agency's MSJ is it okay for me to respond to Justine's answers on the same page she submitted in a different color?** I ask because it would be too confusing for you to read the Agency's motion, then have to go to my response and compare them. It would be too much back and forth for you and the Agency and her witnesses are obfuscating and, in my opinion, trying to create confusion as her witnesses did in there affidavits. I honestly think it would be straighter to the point without confusion by me directly answering her questions right where she states them.

    I will put an overall summary in the motion asking for my reasons for a hearing, but my goal is to make this as transparent as I can so you can go off the facts without all the confusion.

Sent via email only to
Justine Fernandez
VA Attorney

Sent via email only to
Judge Catherine Hunter

V/R,
Ozzie Kochiu CLC
I.G.S.
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov

**Exhibit 9**

**Kochiu's proficiencies.**

| **VA** Department of Veterans Affairs | **PROFICIENCY REPORT** |
|---|---|

| SECTION A - INDIVIDUAL REPORTED ON | | | |
|---|---|---|---|

| 1. NAME *(Last, First, Middle)* | | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY | 4. FACILITY NO. |
|---|---|---|---|---|
| Comparator 1 Comparator | | | Nursing, GEC 556 | |

| 5. GRADE/STEP | 6. POSITION TITLE | 7. PROBATIONARY REVIEW | | 8. PERIOD COVERED BY REPORT | |
|---|---|---|---|---|---|
| VN-02 | RN/CASE MGR/CARE, NURSING, GEC | DUE | COMPLETED 09/13/2022 | FROM 01/25/2022 | TO 01/24/2023 |

| 9. SERVICE | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE |
|---|---|---|
| GERIATRICS - EXTENDED CAR | | |

| SECTION B - NARRATIVE EVALUATION BY RATING OFFICIAL |
|---|

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

MANTO, ALLISON  10/06/2022

Dimension: Practice

Practice

I concur with the following employee provided narrative.

"

**PRACTICE:**

**Problem: Department of veteran's affairs VISN 12 virtual mock community survey report.**

The right to be free from any physical or chemical restraints imposed for purposes of discipline or convenience, and not required to treat the resident's medical symptoms, consistent with the resident has the right to be free from abuse, neglect, misappropriation of resident property, and exploitation as defined in this subpart. This includes but is not limited to freedom from corporal punishment, involuntary seclusion and any physical or chemical restraint not required to treat the resident's medical symptoms. When the use of restraints is indicated, the facility must ensure that the resident is free from physical or chemical restraints imposed for purposes of discipline or convenience and that are not required to treat the resident's medical symptoms. When the use of restraints is indicated, the facility must use the least restrictive alternative for the least amount of time and document ongoing re-evaluation of the need for restraints. CLC was written up for overuse of bed and chair alarms causing restriction to movement of veterans.  Unnecessary use of side rails that may contribute to entrapment.

Action:

Ms. Comparator 1 acted as lead in this mock survey team, implemented interventions, and evaluation of all veterans in CLC that use bed and chair alarms. Reviewed on reducing the use of unnecessary alarms in CLC with the interdisciplinary team. Trained staff members regarding use of alarm as a restraint using evidence base practice. Ms. Comparator 1 function as effective change agent assisting colleagues in moving through the change in process of reducing alarms in CLC. Ms. Comparator 1 and her mock survey team trained all staff members regarding the use of bed rails including following the elements in assessing residents' risk of entrapment from bed rails, reviewing risk and benefits of bed rails with the resident and resident representative, and obtaining informed consent. Mock survey team constantly monitors through rounding the unnecessary use of siderails. Constantly educate staffs and communicate with Nurse Managers on findings.

Outcome: reduction of bed chair alarms by 62% in CLC from 52 to 20 in the CLC.

Sustainability: Continued discussion weekly on bed and chair alarm reduction and side rail reduction

"

Ethics

I concur with the following employee provided narrative.

"**Problem:** Veteran had 5 falls within a span of 6 weeks.  Veteran placed on 1:1 observation due to falls and unsteady gait.  Veteran refused 1:1 observation due to privacy issues but safety comes first before preference.

**Action:** Ms. Comparator 1 lead an ethical discussion with interdisciplinary team including the provider, psychiatrist, psychologist, charge nurse, social worker, certified nursing assistant and therapist regarding Veterans right to refuse 1:1 observation at the same time still keeping him safe and decrease risk of falls.  Team discussed the situation and explored other alternatives to keep the Veteran safe. Resident was evaluated by the physical therapist and referred to provider to do more laboratory blood work to ensure resident was medically stable. Noted to have unstable labs and fluid retention resulting in the accumulation of excess fluids on abdomen leading to poor balance. Provider then increased his diuretic and eventually was able to decrease 1:1 from 24 hours a day to 16 hours and then to 8 hours until totally discontinued.  Veteran was happy that we were able to decrease and accommodate his wishes.

**Sustainability and outcome:** 1:1 observation monitored and discussed weekly on appropriateness and other alternatives prior to ordering them. "

Resource Utilization

| VA FORM MAR 2018 | 10-2623 | VATANGEPERF | PAGE 1 of 7 |
|---|---|---|---|

I concur with the following employee provided narrative.

"

**Problem:** FHCC CLC has the highest number of veterans on 1:1 observation

**Action:** In this rating period, Ms. [Comparator 1] assisted with identifying measures to reduce unnecessary spending on items that can be automated to improve efficiency in our workplace. She actively suggests and participates in weekly treatment team meeting in reducing 1:1 observation with residents in CLC. Suggest decreasing in 2 hours inclement to keep veterans safe as well as decreasing unnecessary 1:1 observation. Assist with assessment and implementation of programs to reduce 1:1 observation.

**Population:** CLC veterans

**Outcome:** Decrease number of hours that 1:1 observation for veterans from 24/7 to 12 hours or hours per day or discontinued 1:1 observation.

**Dimension: Professional Development**

Performance

I concur with the following employee provided narrative.

"

**Problem:** VHA guideline mandates all CLC staff members participate in the skills fair annually which supports our mission of utilizing evidence-based practice.

Ms. [Comparator 1] was able to fulfill a Mission Essential duty to coordinate staff education and competencies to the LPN/RNs in the Long -Term Care area, Home Care/Primary Care and Restorative Care nurses.

The learning formats used:

- Digital technology-computers
- Power Point-Slide shows
- Didactic instruction
- Interactive discussion and Q&A
- Presenter hands on demonstrations

The learning model of Malcolm Knowles, "Andragogy" was used to meet the learner needs, based on their level knowledge and experience.

Staff Needs based on:

- Self-requested staff needs
- Observed, patient morning assessments
- Interdisciplinary requests
- OPI/Safety requests
- Managers input
- Vendors request for assist

**Problem Identified**

1.  New Policies/Procedures needed to be reviewed and education & competencies provided to nursing staff

a.  PPE, Hand washing and infection control

b.  5 P'S, purposeful rounding, fall prevention

c.  Hospice palliative care/ Aroma therapy

d.  Sage oral care/CHG wipes and documentation

e.  Caribou documentation

f.  patient Care observer

g.  Vascular access

h.  Rapid Response

i.  CPAP & Respiratory Devices used in CLC- care and Management

j.  Restraints

k.  SBAR/Hand Off communication/Watchlist Huddle

l.  Tracheostomy care and suctioning

m.  Nursing documentation

**ACTION/S**

Ms. [Comparator], on [redacted] ..... Infection Control Specialist, Palliative and Hospice, Dietitian, High Reliability Organization Specialist, Barcode Coordinator, Physical Therapist, Bedside Nurses, Clinical Managers to assess, scrutinize, evaluated all required LTCI skills and requested Skills from the CLC nursing staff. Ms. [Comparator] conducted needs assessments and identified gaps with the current FHCC practices when providing annual skills fair to our nursing staff in all of the CLC households. Ms. [Comparator] developed an educational plan for the annual skills fair for CLC and invited speakers to handle the skills stations for the fair. Ms. [Comparator] coordinated, compiled attendance, correlated with Nurse Managers, assisted with assembling props/equipment, collected supplies, helped set up "assimilated skills lab", and tested the ease of staff flow.

**Population-** FHCC RNs/LPNs in long term care and Home Care/Primary Care, Restorative care areas

**Outcome/Result-** Due to Ms. [Comparator] teaching skills and assistance, the nursing staff throughout the facility has become more competent in providing meaningful and patient-centered education for nursing staff. Each nurse working within the CLC now has a better understanding of all the skills provided leading to an increase in quality patient care. The nurses appreciated all the skills that they received. These nurses also learned some of the vital resources for the nursing team to help safely care for the CLC veterans.

**Sustainability- A**nnual training as identified by needs assessments. This is an ongoing initiative


"

Education/Career Development

I concur with the following employee provided narrative.


"

**EDUCATION/CAREER DEVELOPMENT**

Ms. [Comparator] has completed all required Talent Management System (TMS) trainings, as well as completing optional modules to enhance and maintain her skills. Ms. [Comparator] is highly motivated and completes CLC specific as well as facility training and competencies in a timely manner.

**Problem:** Lack of educational opportunities due to Pandemic

**ACTION:** Ms. [Comparator] was able to find educational programs that are free such as Post catheter removal after acute care by WOCN. . Monthly Greenhouse Guide/Educator /nurse networking. Weekly LTCI continuous survey readiness and compliance education. Attended Greenhouse team topic: Cultural transformation , Role of nurse in Greenhouse 3/29/22. Webinar on different appearances of ostomy mucosa, looking for evidence of infection, inflammation and neoplasia. Webinar on hands on workshops addressing ostomy clinical challenges and yoga for pelvic health 6/6/22 and 6/07/22. She maintains knowledge of current techniques, trends, and professional issues based on current published or communicated information through reading, attending conferences, and shares her clinical expertise with her colleagues.

**Outcome and sustainability:** Ms. [Comparator] has an increased knowledge and teaching abilities. Continue to identify CLC areas of strength and areas needing support to sustain pressure injury prevention as part of Joint Commission National Patient Safety Goal. All Greenhouse staffs needs annual food and safety training course.

"

Dimension: Collaboration

Collegiality

I concur with the following employee provided narrative.


**"Problem:** RCA, Lack of awareness among CLC employees regarding the standard process for the assessment and management of a patient at risk for wandering may have allowed the interdisciplinary team members to grant privileges' to an at risk patient with known history of elopement attempts, to freely roam the facility grounds which led to elopement.

**Action:** Ms. [Comparator] took lead and educated all CLC employees on the policy of missing patients and the code silver procedures. Code silver drills were held monthly on all households. Monitored that each CLC household did code silver drills monthly for 6 months. Interdisciplinary teams reassess all residents that were given privileges' to go out on pass in CLC on their risk assessment. Each household has clear designation of responsibility to a single individual or dedicated service line who will lead the process to ensure that the local policy for management of wandering and missing patient is updated timely. Monitored that code silver drills were done right – ensuring that facility has a missing patient team who actively leads all missing patient drills according to VHA Directive.

**Outcome and sustainment:** All CLC households were complaint with code silver drills for 6 months and continue to do code silver drills following CLC policy on missing person. All Staffs educated with code silver missing parson policy and response time as well as reporting time. "

Collaboration

I concur with the following employee provided narrative.


"

**COLLABORATION**

**Problem:** Department of veteran's affairs has annual long term care survey and need to prepare staff members for upcoming survey.

Staffs need ongoing practice and reminders on FHCC policy and procedures as well as need for competency on all areas of practice in their field.

**Action:** Ms. ▮Comparator 1▮ ... has advocated and ensured ... ... followed ... her ... ... ... ... ... keep which includes infection control, privacy and respect, proper donning on and off of PPE, Dignity , environmental rounds, following policy and procedures, following medication administration, pressure ulcer care, evaluating staff knowledge of current policies. Ms. ▮Comparator 1▮ also completed chart audits on documentation.  Team came in at 5AM to follow med pass and do on the spot training as well as stayed after hours to follow medication administration and rounding.

**OUTCOME:** CLC recently received a 5 star rating from Centers of Medicare and Medicaid Services. CMS uses a rating system that utilize information from health care surveys including quality measures and staffing, Unannounced survey from 2022 found no deficiency. Surveyors complimented CLC On

1. Enjoying their interactions with our Veterans & Staff
2. How happy our Veterans are in their homes
3. How beautiful our CLC households are
4. Zero medication administration errors
5. Facilities is very organized
6. Facilities had Zero concerns
7. How well each Liaison carrying a lap top and camera ensure excellent views & more
8. They had NO concerns
9.

**Sustainability:** Continued preparation of staffs for survey readiness

"

Dimension: Scientific Inquiry

Quality of Care

I concur with the following employee provided narrative.

"

**QUALITY OF CARE**

**Problem:** Need to maintain overall wound care program support and the lack of dedicated educational support staff bringing subject matter expertise in developing, implementing, and supporting proactive pressure injury prevention program may have contributed to patient pressure injury development.

**Action:** During this rating period, Ms. ▮Comparator 1▮ implemented a change in CLC based on evidence base practice, reviewed current evidence base literature on prevention of pressure injuries. Educated staff on the continued use of VHA template in CLC VAAES Skin inspection/Assessment. She reminds all Skin champions on all household and provides ongoing training on this inpatient nursing  assessment and pressure ulcer prevention and management. She collaborated with Wound care specialist and FHCC educators as well as Informatics requested to add some wound documentation to the template. that would assist staffs in prevention of pressure injury of susceptible residents who are at risk for skin breakdown looking at residents holistically from their diagnosis, mobility status, nutrition, continence, and cognitive status. Then prompt implementation of preventive measures according to the needs of the residents.

**Outcome and sustainability:** Weekly audits for all household held on CLC pressure ulcer prevention and management SOP. Weekly skin inspection and monthly Braden as well as significant change and care plan audits.

"

Research

I concur with the following employee provided narrative.

"

**Problem:** The pressure injury prevalence study's mission is to aid in patient safety and quality improvement efforts by providing research-based national comparative data on nursing care and the relationship to patient outcomes. Hill-Rom Prevalence study is a national nursing quality measurement program which provides hospitals with unit-level performance comparison reports to state, national, and regional percentile distributions. All indicator data are reported at the nursing unit level. Prevalence study is nursing-sensitive indicators reflect the structure, process, and outcomes of nursing care.

**Action:** Ms. ▮Comparator 1▮ has been a member of this pressure injury prevalence study for the past 7 years.She participates in the quarterly prevalence study that has been ongoing in FHCC. This committee is formed to establish a standardized scientific review process for proposals submitted and data with the overall goal of advancing the evidence-base on nursing quality.

Multiple studies of the prevalence and incidence of pressure ulcers have been done. Prevalence studies involve a snapshot of current pressure ulcers in each unit on a given day. Typically, the skin champions assess all patients' skin to determine if each patient exhibits the physical signs of a pressure ulcer, and if so, the pressure ulcer is staged. The incidence of pressure ulcers indicates the number of patients in whom pressure ulcers develop in a given health care setting. Results show in the intensive care unit (ICU), patients have multiple factors that increase the risk of pressure ulcers developing. Typically, the patient has respiratory equipment, urinary catheters, sequential compression devices, multiple intravenous catheters, and the infusion of vasoactive agents for hypotension that may contribute to inability to turn patients and increase the risk of pressure ulcer development. This article discusses the multiple risk factors present in critical care for the development of pressure ulcers, current practices, and evidence for interventions aimed at preventing pressure ulcers. Other studies of risk factors have examined comorbid conditions such as diabetes and peripheral vascular disease, score on the Acute Physiology and Chronic Health Evaluation, ICU length of stay, presence of mechanical ventilation, use of sedatives, and the use of instruments to measure the pressure at the interface between skin and patient. Unfortunately, the independent and dependent variables in these studies do not point to a single predictor for pressure ulcers in the intensive care and medical surgical environment. Researchers have also studied patients' mobility and risk for pressure ulcer development. Progressive mobility protocols decrease the risk of pressure ulcers developing, but do not address the inability of patients to follow a progressive mobility protocol owing to hemodynamic instability or other physical restraints.  Prolonged stays in the ICU

are related to increased latency in pressure ulcer development. Participated in trials which may be due to the patient's acuity or lack of bed availability in an appropriate lower level of care. Duration of mechanical ventilation is also associated with increased risk of pressure ulcer development. Utilization of evidence-informed practice to inform the development, implementation and evaluation of the plan of care of each patient.

**OUTCOME: C**ontinue to maintain no/minimal hospital acquired pressure injury in CLC.

**Population:** FHCC patients from ICU, Medical surgical unit, CLC households, Mental Health

**Sustainability:** Continue to participate with quarterly Hill-Rom prevalence study to compare FHCC with other VA hospital and other private hospital and private nursing homes. Quarterly prevalence study audits care plans/PIER Notes/ Head to toe inspection of skin on all patients/ checking of beds for excess layers/Braden score last 24 hours/preventive measure in place for all acute care units.

"

**SECTION C - RATING BY RATING OFFICIAL**

| INSTRUCTIONS | LEGEND |
|---|---|
| An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement. | UNSATISFACTORY - Has not met all criteria.<br><br>LOW SATISFACTORY - Has met all criteria, but at times performance marginal.<br><br>SATISFACTORY - Has met all criteria, at times exceeds expectations.<br><br>HIGH SATISFACTORY - Has met all criteria, usually exceeds expectations by a substantial margin.<br><br>OUTSTANDING - Has met all criteria, consistently exceeds expectations to an exceptional degree. |

12. CATEGORY I - NURSING PRACTICE *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

13. CATEGORY II - INTERPERSONAL RELATIONSHIPS *(Works effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

**SECTION D - OVERALL EVALUATION**

14. OVERALL RATING - *(An objective appraisal of overall competency based on rating in Section C. See VA Handbook 5013, Part II)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

| 15. ENTRIES ON THIS FORM ARE BASED ON: | | NO. OF MONTHS UNDER MY SUPERVISION THIS RATING PERIOD |
|---|---|---|
| ☑ FREQUENT OR DAILY CONTACT<br>☐ INFREQUENT CONTACT<br>☐ INFREQUENT OBSERVATIONS OF WORK RESULTS | ☐ FREQUENT OBSERVATIONS OF WORK RESULTS<br>☐ JOINT REVIEW WITH: | 4 |

16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTS IN WRITING? *(See VA Handbook 5013, Part II.)*

☐ YES ☐ NO ☑ NOT APPLICABLE

| 17a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| Electronically signed by: Allison Manto, CNM | RN-ASST MGR, NURSING, GEC | 10/07/2022 |

SECTION E - COMMENTS OF APPROVING OFFICIAL

IF IN DISAGREEMENT WITH RATING, REFER TO VA HANDBOOK 5013, PART II

| 18a. SIGNATURE OF APPROVING OFFICIAL | 18b. POSITION | 18c. DATE |
|---|---|---|
| Electronically signed by: Ifeanyi Nwokocha | SUPERVISORY RN, SENIOR LEADERSHP, GERIATRICS AND EXTENDED CARE | 10/07/2022 |

| SECTION F- SIGNATURE OF REVIEW BY ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES(if required) | |
|---|---|
| 19a. SIGNATURE OF THE ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES | 19b. DATE |

| SECTION G - RATED EMPLOYEE | |
|---|---|
| 20a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)* | 20b. DATE |
| Electronically signed by: ███████ Comparator 1 | 10/07/2022 |

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

| **VA** Department of Veterans Affairs | **PROFICIENCY REPORT** |

### SECTION A - INDIVIDUAL REPORTED ON

| 1. NAME (Last, First, Middle) ▮▮ ▮▮ | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY Chief of Staff 556 | 4. FACILITY NO. |
|---|---|---|---|

| 5. GRADE/STEP VN-03 | 6. POSITION TITLE RN/CASE MGR/CARE, CHIEF OF STAFF | 7. PROBATIONARY REVIEW DUE / COMPLETED | 8. PERIOD COVERED BY REPORT FROM 03/13/2022 / TO 03/12/2023 |
|---|---|---|---|

| 9. SERVICE CHIEF OF STAFF | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE |
|---|---|---|

### SECTION B - NARRATIVE EVALUATION BY RATING OFFICIAL

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

LORENZO-VILLARINO, DONNABELLE  05/04/2023

**Dimension: Practice**

**Practice**

▮▮ as a  new RN staff in the Office of Community care demonstrates competency early on during her orientation by processing consults with minimal supervision. She understands the importance of efficient delivery of care by contributing to have more consults processed timely. As soon as she finished her orientation, she immediately serves as resource person to other new employees, to the staff working overtime; and to the clinic provider and nurses who always reach out to her. She guides them on daily encounters with Veterans, answering and trouble shooting concerns which made them more confident and productive on performing their task/workload. ▮▮ took the initiative to train the newest PSA by patiently teaching/training him on the basic processing of consults from creating the  medical records packet or refdoc creating authorization in HSRM and updating HSRM when the appointment has been made. After training him, he was able to process basic consults which he thank ▮▮ as the only one patiently training him. ▮▮ worked work above and beyond by taking under her wing one of the orientee RN and guide her daily on any issues that arises when dealing with consults and or Veterans concerns. This made the new RN more confident and reliable in dealing with challenging consults and or Veterans that come her way.

**Ethics**

▮▮ performs service recovery to patient advocate concerns, covers nurses that are on leave, she helped with  the ACD line in the past numerous times even when she was still on orientation, she addresses the Myhealthyvet emails promptly as well as the VISN 12 Phone Message Manager. When there was no help with issues with billing previously, ▮▮ was quick to help all the Veterans that sent their bill concerns. When OCC staff were still  on the first floor, ▮▮ always answers the door for the Veterans and listen and addresses to the Veterans concerns whether it is for their referral or billing issues and she provided action as needed.

**Resource Utilization**

▮▮ Triages consults that comes her way. She sends to the leadership team any referral date change of consults promptly to avoid any billing issues with the Veteran. She helps other fellow nurses, overtime staff, hospital staff such as providers, clinic nurses, case managers as their resource and elevate the situation if unable to trouble shoot. She forward consults, cancel consults and edit consults appropriately that significantly helped the delay of patient care.

**Dimension: Professional Development**

## Performance

████ took the initiative to provide an overview teaching of the Office of Community care program to other departments such as the surgical clinic nurses on January 27, 2023, Medical clinic nurses on February 22, 2023 and Evanston CBOC clinic on February 24, 2023. Her agenda also included  educating the Providers and nurses that as of early Fall of last year 2022, Community provider does not accept consults entered by Medical Residents; OCC cannot process consults that are incomplete  such as no ICD code in the Provisional diagnosis; unable to process consults that are not eligible for  Community care services such as Tricare patients, ChampVA and Humanitarian patients. ████ also provided information to email all fast-track consults to FHCCLovellOfficeofCommunityCareExpediteGroup@va.gov to prevent unnecessary call to OCC staff.

## Education/Career Development

████ continues to educate and update herself by completing TMS, attending TEAMS meetings, and attending TEAMS class. ████ also is always willing to share her knowledge. ████ provided in-service to OCC staff regarding SEOC or Standard episode of care.

**Dimension: Collaboration**

## Collegiality

████ took the initiative to provide an overview teaching of the Office of Community care program to other departments such as the surgical clinic nurses on January 27, 2023, Medical clinic nurses on February 22, 2023 and Evanston CBOC clinic on February 24, 2023. Her agenda also included  educating the Providers and nurses that as of early Fall of last year 2022, Community provider does not accept consults entered by Medical Residents; OCC cannot process consults that are incomplete  such as no ICD code in the Provisional diagnosis; unable to process consults that are not eligible for  Community care services such as Tricare patients, Champs VA and Humanitarian patients. ████ also provided information to email all fast-track consults to FHCCLovellOfficeofCommunityCareExpediteGroup@va.gov to prevent unnecessary call to OCC staff.

## Collaboration

████ together with another OCC staff are tracking expedite consults to ensure that they are processed timely. ████ communicates to Providers to follow-up any RFS ensuring no delay of care even though some Providers are not receptive of ordering DME's. ████ collaborated with surgery nurses and the PACT team and provided them with up to date information and expectations for community care consults.

**Dimension: Scientific Inquiry**

## Quality of Care

████ took the initiative to provide an overview teaching of the Office of Community care program to other departments such as the surgical clinic nurses on January 27, 2023, Medical clinic nurses on February 22, 2023 and Evanston CBOC clinic on February 24, 2023. Her agenda also included  educating the Providers and nurses that as of early Fall of last year 2022, Community provider does not accept consults entered by Medical Residents; OCC cannot process consults that are incomplete  such as no ICD code in the Provisional diagnosis; unable to process consults that are not eligible for  Community care services such as Tricare patients, ChampVA and Humanitarian patients. ████ also provided information to email all fast-track consults to

**Research**

 uses the OCC guidebook as resource to ensure that she is processing consults correctly,

SECTION C - RATING BY RATING OFFICIAL

| INSTRUCTIONS | LEGEND |
|---|---|
| An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement. | UNSATISFACTORY - Has not met all criteria.<br><br>LOW SATISFACTORY - Has met all criteria, but at times performance marginal.<br><br>SATISFACTORY - Has met all criteria, at times exceeds expectations.<br><br>HIGH SATISFACTORY - Has met all criteria, usually exceeds expectations by a substantial margin.<br><br>OUTSTANDING - Has met all criteria, consistently exceeds expectations to an exceptional degree. |

**12. CATEGORY I - NURSING PRACTICE** *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

**13. CATEGORY II - INTERPERSONAL RELATIONSHIPS** *(Works effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

**SECTION D - OVERALL EVALUATION**

**14. OVERALL RATING** – *(An objective appraisal of overall competency based on rating in Section C. See VA Handbook 5013, Part II)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

| 15. ENTRIES ON THIS FORM ARE BASED ON: | NO. OF MONTHS UNDER MY SUPERVISION THIS RATING PERIOD |
|---|---|
| ☑ FREQUENT OR DAILY CONTACT ☐ FREQUENT OBSERVATIONS OF WORK RESULTS<br>☐ INFREQUENT CONTACT ☐ JOINT REVIEW WITH:<br>☑ INFREQUENT OBSERVATIONS OF WORK RESULTS | 12 |

**16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTS IN WRITING?** *(See VA Handbook 5013, Part II.)*

☐ YES ☐ NO ☑ NOT APPLICABLE

| 17a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| Electronically signed by: Christianah Arowora | RN/CASE MGR/CARE, CHIEF OF STAFF | 06/23/2023 |

IF IN DISAGREEMENT WITH RATING, REFER TO VA HANDBOOK 5013, PART II

RAVIPATI, MAMATA  05/04/2023
  Concur

| 18a. SIGNATURE OF APPROVING OFFICIAL | 18b. POSITION | 18c. DATE |
|---|---|---|
| Electronically signed by: Mamata Ravipati MD | ASSOC COS RES & DEV | 05/04/2023 |

| **SECTION F- SIGNATURE OF REVIEW BY ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES** *(if required.)* | | |
|---|---|---|
| 19a. SIGNATURE OF THE ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES | | 19b. DATE |

| **SECTION G - RATED EMPLOYEE** | |
|---|---|
| 20a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)* | 20b. DATE |
| Electronically signed by: ███████ ███ | 06/28/2023 |

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

| **VA** Department of Veterans Affairs | **PROFICIENCY REPORT** |

### SECTION A – INDIVIDUAL REPORTED ON

| 1. NAME (Last, First, Middle) | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY | 4. FACILITY NO. |
|---|---|---|---|
| ███████ ███████ | | Health Administration 556 | |

| 5. GRADE/STEP | 6. POSITION TITLE | 7. PROBATIONARY REVIEW | | 8. PERIOD COVERED BY REPORT | |
|---|---|---|---|---|---|
| VN-03 | RN/CASE MGR/CARE, HEALTH ADMINISTRATION | DUE 04/28/2021 | COMPLETED 04/28/2022 | FROM 01/24/2022 | TO 01/23/2023 |

| 9. SERVICE | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE |
|---|---|---|
| MANAGED CARE | | |

### SECTION B – NARRATIVE EVALUATION BY RATING OFFICIAL

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

LORENZO-VILLARINO, DONNABELLE  05/04/2023

**Dimension: Practice**

**Practice**

P: Ms. ███████ uses the nursing process to apply changes to the OCC program. She tracts issues, analyzes problems thoroughly and takes appropriate action.  OCC processes about one thousand consults per month from primary care, and specialty clinics to include but not limited to cardiology, pulmonary, dermatology, ophthalmology. Ms. ███████ continues to come across multiple inappropriate referrals without justification or lack of rationale of consult resulting in cancellation of consults.  As a result, a delay in care occurred where the OCC staff had to coordinate multiple times with the referring provider to obtain clarification on the order placed which took an extra two to three days.  She works with her peers to identify issues they encounter and then to track and trend these issues.  She collaborates with the clinic that forwards the referral for clarification.  She ensures that she works well with other employees to ensure quality in their work.

A: She works in collaboration with other OCC staff, program analyst, chief medical executive (CME), nurse manager, and division officer to implement a quality management process in the program. This practice aims to improve consult process and increase compliance with clinical and administrative standards for OCC in a timely manner resulting in decrease of cancelled consults. She voluntarily recommends resourceful, alternative and an original idea for work environment by leading and creating the Quality Assurance (QA) Checklist for processing and reviewing consults.  She led the re-education of consult process wherein she presented the recurrent barriers, consult expectations to CBOC nurses and providers. Ms. ███████ can identify problems within her area; she can  develop resourceful solutions; she can  make recommendations for corrective actions, as well as use good judgement and information in solving problems.

O: Ms. ███████ educated 100% of all three CBOC staff in consult processing and multiple providers from different clinic areas which improves average days of consult processing minimizing delays.

S: Monthly review of consult processing and updates.

**Ethics**

P: Ms. ███████ serves as a role model in educating others to make them aware of ethical issues to include unethical practices. Ms. ███████ is very focused, knowledgeable, and dedicated to her work especially in analyzing consults. Ms.

identified a consult on a 68-year-old Veteran with multiple co-morbidities. This Veteran was newly diagnosed with cancer and active pneumonia with recent transfer to ICU unit. He was was referred to be seen by a community provider for evaluation and treatment while he was still inpatient at FHCC ICU unit.

A: Ms. ▇ referred this case to leadership and CME for further evaluation. She serves as a role model to make other professionals be aware of this unethical practice as per the ANA Code of Ethics provision 3.5, "where the nurse promotes, advocates for and protects the rights, health and safety of the patient; acting on questionable practice." After coordinating with the requesting provider, she explained patient's care needs, family concerns that were raised and educated the specialty clinic on consult processing according to the VHA Directive 1232(2) Consult Processes and Procedures.

O: Consult was forwarded back to the in-house specialty clinic to evaluate and treat patient in-house thereby minimizing patient's exposure to cold weather during transfers especially those with active pneumonia.

S: Daily review of consults to check for appropriateness of care needs.

**Resource Utilization**

P: Ms. ▇ identifies negative patient care delivery and utilizes appropriate resources to improve patient outcomes. Ms. ▇ is very focused, knowledgeable, and dedicated to her work in analyzing consults. Ms. ▇ identified a consult for an inpatient Veteran with multiple co-morbidities; he was newly diagnosed with cancer and active pneumonia with recent transfer to ICU unit; he was referred to be seen by a community provider for evaluation and treatment while still inpatient at FHCC ICU unit.

A: Ms. ▇ referred this case to leadership and CME for further evaluation. After coordinating with the requesting provider, she explained patient's care needs, family concerns that were raised and educated the specialty clinic on consult processing according to the VHA Directive 1232(2) Consult Processes and Procedures. She emphasized the importance for an in-house provider to treat the patient to minimize patient's exposure to cold weather and other viruses as well as to minimize the need for resource and transportation.

O: Consult was forwarded back to the in-house specialty clinic to evaluate and treat patient in-house minimizing patient's exposure to cold weather or other viruses during transfers while with active pneumonia and minimize the need to transport patient to a community provider.

S: Daily review of consults to check for appropriateness of care needs

I concur with the following employee provided narrative.

"

P: Ms. ▇ identifies negative patient care delivery and utilizes appropriate resources to improve patient outcomes. Ms. ▇ is very focused, knowledgeable, and dedicated to her work in analyzing consults. Ms. ▇ identified a consult for an inpatient Veteran with multiple co-morbidities; he was newly diagnosed with cancer and active pneumonia with recent transfer to ICU unit; he was referred to be seen by a community provider for evaluation and treatment while still inpatient at FHCC ICU unit.

A: Ms. ▇ referred this case to leadership and CME for further evaluation. After coordinating with the requesting provider, she explained patient's care needs, family concerns that were raised and educated the specialty clinic on

emphasized the importance for an in-house provider to treat the patient to minimize patient's exposure to cold weather and other viruses as well as to minimize the need for resource and transportation.

O: Consult was forwarded back to the in-house specialty clinic to evaluate and treat patient in-house minimizing patient's exposure to cold weather or other viruses during transfers while with active pneumonia and minimize the need to transport patient to a community provider.

S: Daily review of consults to check for appropriateness of care needs

"

**Dimension: Professional Development**

### Performance

P: Ms. ███ uses the nursing professional standards to apply changes to the OCC program. She tracts issues, analyses problems thoroughly and takes appropriate action. OCC processes about one thousand consults per month from primary care, and specialty clinics to include but not limited to cardiology, pulmonary, dermatology, ophthalmology. Ms. ███ continues to come across multiple inappropriate referrals without justification or lack of rationale of consult resulting in cancellation of consults. As a result, a delay in care occurrs where the OCC staff had to coordinate multiple times with the referring provider to obtain clarification on the order placed which took an extra two to three days. She works with her peers to identify issues they encounter and then to track and trend these issues. She collaborates with the clinic that forwards the referral for clarification.

A: She works in collaboration with other OCC staff, program analyst, CME, nurse manager, and division officer to implement a review and revise current quality management process in the program. This practice aims to improve consult process and increase compliance with clinical and administrative standards for OCC in a timely manner resulting in decrease of cancelled consults. She voluntarily recommends resourceful, alternative and an original idea for work environment by leading and creating the QA Checklist for processing and reviewing consults. She led the re-education of consult process wherein she presented the recurrent barriers, consult expectations to CBOC nurses and providers. Ms. ███ can identify problems within her area, develop resourceful solutions, make recommendations for corrective actions, as well as using good judgement and information in solving problems.

O: Ms. ███ educated 100% of all three CBOC staff in consult processing and multiple providers from different clinic areas which improves average days of consult processing minimizing delays.

S: Monthly review of consult processing and updates.

### Education/Career Development

P: Ms. ███ uses the nursing process to apply changes to the OCC program. She tracts issues, analyses problems thoroughly and takes appropriate action. OCC processes about one thousand consults per month from primary care, and specialty clinics to include but not limited to cardiology, pulmonary, dermatology, ophthalmology. Ms. ███ continues to come across multiple inappropriate referrals without justification or lack of rationale of consult resulting in cancellation of consults. As a result, a delay in care occurred where the OCC staff had to coordinate multiple times with the referring provider to obtain clarification on the order placed which took an extra two to three days. She works with her peers to identify issues they encounter and then to track and trend these issues. She collaborates with the clinic that forwards the referral for clarification. She ensures that she works well with other employees to ensure quality in their work.

A: Ms. ███ uses current evidence-based research techniques to develop educational plan. She works in collaboration with other OCC staff, program analyst, CME, nurse manager, and division officer to implement a quality management process in the program. This practice aims to improve consult process and increase compliance with clinical and administrative standards for OCC in a timely manner resulting in decrease of cancelled consults. She voluntarily recommends resourceful, alternative and an original idea for work environment by leading and creating QA Checklist for processing and reviewing consults. She led the re-education of consult process wherein she presented the recurrent barriers, consult expectations to CBOC nurses and providers. Ms. ███ can identify problems within her area, can develop resourceful solutions, make recommendations for corrective actions, as well as use good judgement and information in solving problems.

O: Ms. ███ educated 100% of all three CBOC staff in consult processing and multiple providers from different clinic areas which improves average days of consult processing minimizing delays.

S: Monthly review of consult processing and updates.

**Dimension: Collaboration**

### Collegiality

P: Ms. ███ uses the nursing process to apply changes to the OCC program. She tracts issues, analyses problems thoroughly and takes appropriate action. OCC processes about one thousand consults per month from primary care, and specialty clinics to include but not limited to cardiology, pulmonary, dermatology, ophthalmology. Ms. ███ continues to come across multiple inappropriate referrals without justification or lack of rationale of consult resulting in cancellation of consults. As a result, a delay in care occurs where the OCC staff had to coordinate multiple times with the referring provider to obtain clarification on the order placed which takes an extra two to three days. She works with her peers to identify issues they encounter and then to track and trend these issues. She collaborates with the clinic that forwards the referral for clarification. She ensures that she works well with other employees to ensure quality in their work.

A: She works in collaboration with other OCC staff, program analyst, CME, nurse manager, and division officer to implement a quality management process in the program. This practice aims to improve consult process and increase compliance with clinical and administrative standards for OCC in a timely manner resulting in decrease of cancelled consults. She voluntarily recommends resourceful, alternative and an original idea for work environment by leading and creating the QA Checklist for processing and reviewing consults. She led the re-education of consult process wherein she presented the recurrent barriers, consult expectations to CBOC nurses and providers. Ms. ███ can identify problems within her area, develop resourceful solutions, make recommendations for corrective actions, as well as use good judgement and information in solving problems.

O: Ms. ███ educated 100% of all three CBOC staff in consult processing and multiple providers from different clinic areas which improves average days of consult processing minimizing delays.

S: Monthly review of consult processing and updates.

### Collaboration

P: Ms. ███ uses the nursing process to apply changes to the OCC program. She tracts issues, analyses problems thoroughly and takes appropriate action. OCC processes about one thousand consults per month from primary care, and specialty clinics to include but not limited to cardiology, pulmonary, dermatology, ophthalmology. Ms. ███ continues to come across multiple inappropriate referrals without justification or lack of rationale of consult resulting

in cancellation of consults. Due to delay in care she educes to contact the referring provider multiple times with the referring provider to obtain clarification on the order placed which takes an extra two to three days. She works with her peers to identify issues they encounter and then to track and trend these issues. She collaborates with the clinic that forwards the referral for clarification. She ensures that she works well with other employees to ensure quality in their work.

A: She works in collaboration with other OCC staff, program analyst, CME, nurse manager, and division officer to implement a quality management process in the program. This practice aims to improve consult process and increase compliance with clinical and administrative standards for OCC in a timely manner resulting in decrease of cancelled consults. She voluntarily recommends resourceful, alternative and an original idea for work environment by leading and creating the QA Checklist for processing and reviewing consults. She led the re-education of consult process wherein she presented the recurrent barriers, consult expectations to CBOC nurses and providers. Ms. [comparator] can identify problems within her area, develop resourceful solutions, make recommendations for corrective actions, as well as use good judgement and information in solving problems.

O: Ms. [comparator] educated 100% of all three CBOC staff in consult processing and multiple providers from different clinic areas which improves average days of consult processing minimizing delays.

S: Monthly review of consult processing and updates.

**Dimension: Scientific Inquiry**

### Quality of Care

P: Ms. [comparator] evaluates current practice environment and quality of care related to a patient referred to community care. She identifies and initiates quality improvement for an inpatient Veteran with multiple co-morbidities. The Veteran was newly diagnosed with cancer and active pneumonia with recent transfer to ICU unit; he was referred to be seen by a community provider for evaluation and treatment while he was still inpatient at FHCC ICU unit.

A: Ms. [comparator] referred this case to leadership and CME for further evaluation. After coordinating with the requesting provider, she explained patient's care needs, family concerns that were raised and educated the specialty clinic on consult processing according to the VHA Directive 1232(2) Consult Processes and Procedures. She emphasizes the importance to have the in-house provider treat the patient to minimize patient's exposure to cold weather and other viruses and also minimize the need for resource needed for transportation.

O: Consult was forwarded back to the in-house specialty clinic to evaluate and treat patient in-house minimizing patient's exposure to cold weather or other viruses during transfers while with active pneumonia and minimize the need to transport patient to a community provider thereby improving healthcare delivery.

S: Daily review of consults to check for appropriateness of care needs.

### Research

P: Ms. [comparator] collaborates with others within the services to validate and improve nursing practice and patient care delivery. One of her patients required a community care consult to be processed and provider entered community care lab for a specific test with an out of network facility.

A: She researched current evidence-based practices of laboratory procedures. She communicated to the leadership, CME, and the provider evidence-based recommendations after research-applied delivery of care. She identified that the requested lab is performed outside the state. She spoke with multiple interdisciplinary teams and found out that

a VA provider can perform the aspiration and send the specimen to their facility to process. Ms. ███ verified with the facility's finance team and FHCC's fiscal to determine contract arrangements. She shared her research activities with other staff members processing and coordinating other consults with other specialty clinics in FHCC to improve care delivery.

O: Patient's consult for community care lab was drawn by an FHCC provider and specimen sent to the contracted facility for processing. FHCC providers were educated on proper usage of community care consult which can improve healthcare delivery.

S: Daily review of consults to check for appropriateness of care needs.

I concur with the following employee provided narrative.

"

P: Ms. ███ collaborates with others within the services to validate and improve nursing practice and patient care delivery. One of her patients required a community care consult to be processed and provider entered community care lab for a specific test with an out of network facility.

A: She researched current evidence-based practices of laboratory procedures. She communicated to the leadership, CME, and the provider evidence-based recommendations after research-applied delivery of care. She identified that the requested lab is performed outside the state. She spoke with multiple interdisciplinary teams and found out that a VA provider can perform the aspiration and send the specimen to their facility to process. Ms. ███ verified with the facility's finance team and FHCC's fiscal to determine contract arrangements. She shared her research activities with other staff members processing and coordinating other consults with other specialty clinics in FHCC to improve care delivery.

O: Patient's consult for community care lab was drawn by an FHCC provider and specimen sent to the contracted facility for processing. FHCC providers were educated on proper usage of community care consult which can improve healthcare delivery.

S: Daily review of consults to check for appropriateness of care needs.

"

SECTION C - RATING BY RATING OFFICIAL

| INSTRUCTIONS | LEGEND |
|---|---|
| An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement. | UNSATISFACTORY - Has not met all criteria.<br><br>LOW SATISFACTORY - Has met all criteria, but at times performance marginal.<br><br>SATISFACTORY - Has met all criteria, at times exceeds expectations.<br><br>HIGH SATISFACTORY - Has met all criteria, usually exceeds expectations by a substantial margin.<br><br>OUTSTANDING - Has met all criteria, consistently exceeds expectations to an exceptional degree. |

**12. CATEGORY I - NURSING PRACTICE** *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

**13. CATEGORY II - INTERPERSONAL RELATIONSHIPS** *(Works effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

**SECTION D - OVERALL EVALUATION**

**14. OVERALL RATING** - *(An objective appraisal of overall competency based on rating in Section C. See VA Handbook 5013, Part II)*

☐ UNSATISFACTORY ☐ LOW SATISFACTORY ☐ SATISFACTORY ☑ HIGH SATISFACTORY ☐ OUTSTANDING

| 15. ENTRIES ON THIS FORM ARE BASED ON: | NO. OF MONTHS UNDER MY SUPERVISION THIS RATING PERIOD |
|---|---|
| ☑ FREQUENT OR DAILY CONTACT ☑ FREQUENT OBSERVATIONS OF WORK RESULTS<br>☐ INFREQUENT CONTACT ☐ JOINT REVIEW WITH:<br>☐ INFREQUENT OBSERVATIONS OF WORK RESULTS | 12 |

**16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTS IN WRITING?** *(See VA Handbook 5013, Part II.)*

☐ YES ☐ NO ☑ NOT APPLICABLE

| 17a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| Electronically signed by: Christianah Arowora | RN/CASE MGR/CARE, CHIEF OF STAFF | 06/16/2023 |

IF IN DISAGREEMENT WITH RATING, REFER TO VA HANDBOOK 5013, PART II

SPILLNER, CATHERINE  05/04/2023
  concur

| 18a. SIGNATURE OF APPROVING OFFICIAL | 18b. POSITION | 18c. DATE |
|---|---|---|
| Electronically signed by: Cathy Spillner | SUPERVISORY STAFF ASSISTANT, CHIEF OF STAFF | 05/04/2023 |

| SECTION F- SIGNATURE OF REVIEW BY ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES *(if required.)* | |
|---|---|
| 19a. SIGNATURE OF THE ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES | 19b. DATE |

| SECTION G - RATED EMPLOYEE | |
|---|---|
| 20a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)* | 20b. DATE |
| Electronically signed by: Comparator 3 | 06/22/2023 |

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

| ![VA] Department of Veterans Affairs | **PROFICIENCY REPORT** |
|---|---|

### SECTION A - INDIVIDUAL REPORTED ON

| 1. NAME (Last, First, Middle) Comparator 4 Comparator 4 | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY Chief of Staff 556 | 4. FACILITY NO. |
|---|---|---|---|

| 5. GRADE/STEP VN-03 | 6. POSITION TITLE RN/CASE MGR/CARE, CHIEF OF STAFF | 7. PROBATIONARY REVIEW | | 8. PERIOD COVERED BY REPORT | |
|---|---|---|---|---|---|
| | | DUE | COMPLETED | FROM 10/29/2022 | TO 10/28/2023 |

| 9. SERVICE CHIEF OF STAFF | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE |
|---|---|---|

### SECTION B - NARRATIVE EVALUATION BY RATING OFFICIAL

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

AROWORA, CHRISTIANAH  12/20/2023

**Dimension: Practice**

**Practice**

Ms. Comparator 4 Comparator 4 currently serves as one of the Registered Nurse Clinical Coordinators for Women's health in the Office of Community Care (OCC). In his current role, she is responsible as an RN Clinical Coordinator in the Office of Community Care (OCC) program, responsible for organizing and coordinating the clinical components for the authorization of non-VA services. Ms. Comparator 4 provides adequate response to veteran's individual health care needs, along with the illness and care continuum in multiple settings In a timely manner. She also provides direct staff support In planning, designing, integrating, implementing, modifying, and-evaluating the effectiveness of the components In the program. She works collaboratively with all levels of multi-specialty interdisciplinary healthcare providers, including primary care physicians, pharmacists, social workers, dietitians, behavioral health specialist, outpatient and inpatient departments, ancillary services, and community resources.

**Ethics**

Ms. Comparator 4 adhered to strict guidelines of confidentiality regarding patients, the families, and VA staff. Ms. Comparator 4 provided oversight and education with co-workers on the importance of reporting and addressing any issue that went outside the guidelines. Ms. Comparator 4 ensured the confidentiality of clinical reviews and documented information regarding patients and providers. According to the American Nurses Association (Imperative 8.4), "Nurses must always stress human rights protection with Particular attention to preserving the human rights of vulnerable groups, such as the poor, the homeless, the elderly, the mentally ill, prisoners, refugees, women, children, and socially stigmatized groups". And (Imperative 8.2)7 Ethics, human rights, and nursing converge as a formidable instrument for social justice and human rights must be diligently protected and promoted." Ms. Comparator 4 worked diligently during COVID-19 ensuring every patient had medical attention either through tele health, alternative appointment or even finding another provider. This insured veteran's health care was cover to the best ability of the situation at hand.

**Resource Utilization**

Ms. Comparator 4 has thorough knowledge of all basic clinical policies and procedures dealing with outpatient scheduling and other clinical topics. Ms. Comparator 4 possess a working knowledge of clinic processes and services to

function in/interact with various forms throughout the hospital. Makes independent judgment required in many situations and care concerns when there are no written guidelines to cover every situation in the process. As an incumbent RN makes determinations on intent of laws, regulations, and applies guidelines as necessary. Ms. Comparator 4 depending on nature of inquiry, urgency of need for medical attention, or workload, exercised judgment in interpreting guides without deviating from routine procedures.

**Dimension: Professional Development**

### Performance

Ms. Comparator 4 uses her astute clinical knowledge to valuate practice of self and others using professional standards, relevant statutes, and regulations. Ms. Comparator 4 takes actions to improve performance. Ms. Ruscheinsky identifies patterns, and trends in the constant changes of office of Community care (OCC) processing standard handed down from National office of Community care (OCC). Ms. Comparator 4 ensures the identification of issues to modify and improve the program and to facilitate accomplishment of quality management goals and objectives in compliance with laid down Standard of Operation.

### Education/Career Development

Ms. Comparator 4 is a Master of Nursing prepared RN. She takes time to fulfill all CEUs. And a super user for the CERNER EHRM system going live March of 2024. She has amass knowledge for herself in learning this new software and help other super users to navigate the new sand box. Ms. Comparator 4 took the initiative to educate the new incoming RNs on all OCC process and how to navigate the constant challenges of timely consult processing.

**Dimension: Collaboration**

### Collegiality

Ms. Comparator 4 supports professionally and aims to achieve a common objective, which is the best patient care possible. Ms. Comparator 4 aims to work with other staff maintaining to support. Ms. Comparator 4 shared vital community information with her peers that is invaluable to veterans, co-workers, and families. While COVID-19 testing is expensive and family members are concerned if they have been exposed. Ms. Comparator 4 shared that Walgreens and CVS will do free COVID-19 testing without insurance or prescription for anyone in need by registering on their web site. This information was invaluable in preventing spread by allowing people immediate access to testing in their direct area without delay.

### Collaboration

Ms. Comparator 4 works as a mentor to other nurses in work area in the office of Community Care. Ms. Comparator 4 works diligently helping putting Veterans first. Ms. Comparator 4 collaborate with Nurse Manager for daily tracking of consult management to review consults by specific clinics. Tracking to include but not limited to the identification of medical necessity for community care consult vs. in house consult, identifying the capability and capacity of the organization which impacts on the program. She is currently collaborating with other super users to put together a learning folder for OCC end user staff for CERNER.

**Dimension: Scientific Inquiry**

### Quality of Care

Ms. Comparator 4 implements and maintains the elements of specific Case Management & Utilization Management

programs to evaluate the quality of patient care and the appropriateness of service provided e.g., Care Assessment Need (CAN) score utilization to differentiate moderate to complex consults. Ms. ███████ continually goes above and beyond for her patients, making sure that customer care is a top priority for Veterans and their families. She is very diligent with expedite consults.

**Research**

Ms. ███████ leads the women's health team making sure the consults are processed timely by her team members. She engages in daily clinical review of consults processed in community care and providing leadership daily for trending in consult forwarding to be communicated in the FHCC consult oversight meeting.

**SECTION C - RATING BY RATING OFFICIAL** *(Continued)*

| INSTRUCTIONS | LEGEND |
|---|---|
| An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement. | <u>UNSATISFACTORY -</u> Has not met all criteria.<br><br><u>LOW SATISFACTORY -</u> Has met all criteria, but at times performance marginal.<br><br><u>SATISFACTORY -</u> Has met all criteria, at times exceeds expectations.<br><br><u>HIGH SATISFACTORY -</u> Has met all criteria, usually exceeds expectations by a substantial margin.<br><br><u>OUTSTANDING -</u> Has met all criteria, consistently exceeds expectations to an exceptional degree. |

**12. CATEGORY I - NURSING PRACTICE** *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☐ SATISFACTORY   ☑ HIGH SATISFACTORY   ☐ OUTSTANDING

**13. CATEGORY II - INTERPERSONAL RELATIONSHIPS** *(Works effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☐ SATISFACTORY   ☐ HIGH SATISFACTORY   ☑ OUTSTANDING

**SECTION D - OVERALL EVALUATION**

**14. OVERALL RATING** – *(An objective appraisal of overall competency based on rating in Section C. See VA Handbook 5013, Part II)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☐ SATISFACTORY   ☑ HIGH SATISFACTORY   ☐ OUTSTANDING

| 15. ENTRIES ON THIS FORM ARE BASED ON: | | NO. OF MONTHS UNDER MY SUPERVISION THIS RATING PERIOD |
|---|---|---|
| ☐ FREQUENT OR DAILY CONTACT<br>☐ INFREQUENT CONTACT<br>☐ INFREQUENT OBSERVATIONS OF WORK RESULTS | ☑ FREQUENT OBSERVATIONS OF WORK RESULTS<br>☐ JOINT REVIEW WITH: | 9 |

**16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTS IN WRITING?** *(See VA Handbook 5013, Part II.)*

☐ YES   ☐ NO   ☑ NOT APPLICABLE

| 17a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| Electronically signed by: Christianah Arowora | RN/CASE MGR/CARE, CHIEF OF STAFF | 01/05/2024 |

SECTION E - COMMENTS OF APPROVING OFFICIAL

IF IN DISAGREEMENT WITH RATING, REFER TO VA HANDBOOK 5013, PART II

| 18a. SIGNATURE OF APPROVING OFFICIAL | 18b. POSITION | 18c. DATE |
|---|---|---|
| Electronically signed by: Mamata Ravipati MD | ASSOC COS RES & DEV | 01/04/2024 |

| SECTION F- SIGNATURE OF REVIEW BY ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES *(if required.)* | |
|---|---|
| 19a. SIGNATURE OF THE ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES | 19b. DATE |

| SECTION G - RATED EMPLOYEE | |
|---|---|
| 20a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)* | 20b. DATE |
| Electronically signed by: comparator Comparator | 01/05/2024 |

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

**Exhibit 10**

**Cases and at the bottom is the case in question.  This indicates that Donnabelle assigned this case to another Registered Nurse, Cindy Reyula, who is a Filipino, female, and what I will prove is:**

1.  **Cindy did not follow protocol and submit a 7 day letter when unable to reach a veteran.  This is another form of contacting veterans via mail.**
2. **Cindy was not held accountable as she was caring for the veteran at that time after Donnabelle assigned the consult to her.  Note, the veteran did not pass when Cindy tried to make contact with the veteran the first two times.**
3. **Donnabelle as a Registered Nurse is not absolved of her obligation as an RN and not follow up with the veteran per American Nurses rules of conduct.  She was held accountable as much as I was and as much as Cindy was.**
4. **Nothing happened to Donnabelle, by her manager (Agency), and Donnabelle did not hold Cindy Reyula to the Nursing Standard.  Cindy was not detailed, nor investigated.  This is one form of discrimination based on gender, and race, given Kochiu is a White Male, non-Filipino, and Cindy is a female, of Filipino decent.   Note that Donnabelle is a female, Filipino.**

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
CHICAGO DISTRICT OFFICE

|  |  |  |
|---|---|---|
| AZIS KOCHIU, | ) | |
| | ) | EEOC No.    440-2024-00142X |
| Complainant, | ) | |
| v. | ) | Agency No.    200J-556A-2023-152770 |
| | ) | |
| DENIS MCDONOUGH, Secretary, | ) | |
| Department of Veterans Affairs, | ) | ADMINISTRATIVE JUDGE |
| | ) | CATHERINE HUNTER |
| Agency. | ) | |
| | ) | DATED: September 27, 2024 |

---

## AFFIDAVIT OF DONNABELLE LORENZO-VILLARINO

---

I, Donnabelle Lorenzo-Villarino, make the following declaration as permitted by 28 USC § 1746. I am aware this declaration will be filed with the United States Equal Employment Opportunity Commission, and it is the legal equivalent of a statement under oath.

1. I was the Managed Care Clinical Coordinator Department Head at the Captain James A. Lovell Federal Health Care Center (FHCC) at the Department of Veterans Affairs (VA).

2. I was Complainant's second-line supervisor.

3. I held this position from December 2018 to March 2024.

4. I am now Referral Program Nurse Manager.

5. I have been with the VA since August 2016.

6. Dr. Mamata Ravipati is my first-line supervisor.

7. As a RN Care Clinical Coordinator, Complainant was responsible for organizing and coordinating the clinical components for the authorization of non-VA services in response to individual healthcare needs along the illness and care continuum and in multiple settings. The goals are to center services around the patient, to foster patient self-managed care, and maximize efficient and cost-effective use of health care resources. They support the Veterans referred for evaluation and coordinates between the FHCC providers and

community referral physicians; ensures appropriate follow-up consults as required. Coordinates patient appointments and procedural instructions, follow-up, and reports test results to the appropriate providers, and obtains records and test results from outside facilities. Ensures all consults are acted on and completed in a timely manner.

8. I've reviewed the emails in Exhibit A to this affidavit.

9. The cases in Exhibit A are not patient charts, but rather narratives from the one of the care coordinators on what occurred in a particular case. The patients' names are not included in Exhibit A.

10. I do not certify the narratives are accurate.

11. Despite not knowing the patient's name and not reviewing the chart, I can ascertain the following:

12. In respect to Case 1, the Community Care Coordinator scheduled an appointment for the patient on January 4, 2022. Exhibit A at p. 260.

13. Because the patient in Case 1 was scheduled for an appointment, it is reasonable to believe the proper documentation was provided to the community provider to schedule the appointment.

14. The Community Care Coordinator attempted to obtain records from an appointment in June and July 2022. Exhibit A at p. 260.

15. Case 1 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 1, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment, and the patient in Case 1 did not expire with an open community care consult because the patient was seen on January 11, 2022. Exhibit A at p. 260; Exhibit B.

16. In respect to Case 2, the Community Care Coordinator scheduled an appointment for the patient on June 9, 2021. Exhibit A at p. 263.

17. Because the patient in Case 2 was scheduled for an appointment, it is reasonable to believe the proper documentation was provided to the community provider to schedule an appointment.

18. Case 2 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 2, Complainant did not perform the necessary care

coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment and the patient in Case 2 was scheduled and seen by community provider before patient expired. Exhibit A at p. 263; Exhibit B.

19. In respect to Case 3, the document is about how a consult is classified. There is no mention of the Community Care Coordinator's patient care. Exhibit A at 264.

20. In respect to Case 4, the Community Care Coordinator processed the consult in a month after the consult was placed. Exhibit A at 265.

21. The Community Care Coordinator routed the consult back to FHCC and the manager canceled the consult. Exhibit A at 265.

22. After the consult was cancelled, the patient received subsequent care.

23. Although the patient expired, Community Care was involved.

24. Case 4 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 4, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment and although the patient in Case 4 expired, they did not do so with an open Community Care consult. Exhibit A at p. 265-67; Exhibit B.

25. In respect to Case 5, the Community Care Coordinator conducted care coordination in that they scheduled the patient for an appointment on March 16, 2022, there was documentation in the chart, and they attempted to contact the patient and provider. Exhibit A at p. 268.

26. Case 5 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 5, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment and did not follow-up on the patient's care. Exhibit A at p. 268; Exhibit B.

27. In respect to case 6, the patient was scheduled for an appointment and seen by a community provider. Exhibit A at p. 269.

28. Case 6 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 6, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community,

document follow-up with the community provider or his patient about scheduling an appointment, he did not attempt to obtain documentation from the community provider, and he did not follow-up on the patient's care. Exhibit A at p. 269; Exhibit B.

29. In respect to Case 7, the document is about how a consult is classified. The Community Care Coordinator was a Licensed Practical Nurse (LPN) who was in contact with the patient. Exhibit A at p. 271.

30. Case 7 is different from the case that led to Complainant's discipline because unlike the Community Care Coordinator in Case 7, Complainant did not perform the necessary care coordination to ensure the patient was scheduled for an appointment in the community, document follow-up with the community provider or his patient about scheduling an appointment, and did not follow-up on the patient's care. Although the patient in Case 7 expired there were documented care coordination that occurred. Exhibit A at p. 271; Exhibit B

I have read this and the above pages, and I declare under penalty of perjury that the information stated there is true and correct to the best of my knowledge, information, and belief.

Dated this 27th day of September, 2024

DONNABELL LORENZO-VILLARINO
Digitally signed by DONNABELL LORENZO-VILLARINO
Date: 2024.09.27 11:17:53 -05'00'

Donnabelle Lorenzo-Villarino
Referral Program Nurse Manager
Captain James A. Lovell Federal Health Care Center
United States Department of Veterans Affairs

**EXHIBIT A**

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:30 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: Case #1

This next bunch I will add to my afficavit and the memorandum where Ravipatti states this never happened in the dept before

this was a female RN – nothing happened

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 2:59 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Case #1

# Case #1

Preface: 76 yo male; NH resident. Had CT in Sept '21, which led to a PET and then Cardiothoracic evaluation. Fell off after that (No surgery/bx). Repeat CT ordered in Sept '22 (1 year later): lesion grew.

On 9/30/21 pt had CT thorax, which showed stable RUL lung nodule (0.8x1cm) and new subpleural density. On 10/12/21 consults placed for pulmonary outpatient and Community Care (CC)-PET. PET scheduled for 11/2/21 at Froedtert. Pulm appt was 11/30/21, at which time consults were placed for CC-Cardiothoracic and PFTs. Pt saw Cardiothoracic (CTH) surgeon on 1/11/22, but records were not formally requested by CC until 6/23/22 (1st attempt), 7/30/22 (2nd), and finally uploaded on 8/30/22. In the meantime, on 1/27/22 pt's PCP requested CTH records, but PCP's RN instead received GI records. In the actual CTH records, it reads that CTH surgeon needs the disc of the Sept CT scan, presumably in order for them to proceed with a biopsy. (Writer since verified directly with CTH office that they never got the disc and pt never returned to see them and was lost to f/u). On 3/1/22 pt, a NH resident, presented to PCP for routine f/u visit. PCP noted that CTH records were still absent and made note that these were still needed and that NH should obtain them. On 3/10/22 pt presented to pulm for f/u, at which time they also noted absence of CTH records and sought them directly, themselves. Upon receipt they noted that CTH needed the disc, and documented that they called the NH with instruction to obtain it. Pt went back to pulm on 9/1/22, for f/u, at which time it was realized pt STILL had no f/u with CTH surgeon. As one year had elapsed, STAT CT thorax was ordered: RUL

nodules had now grown into 1 lesion: 1.4x1.2cm. NEW consults for CC-cardiothoracic and PET therefore placed.

| | |
|---|---|
| **3/25/21** | **CT thorax:** New subpleural nodule in RUL (0.8 x 1cm) |
| **9/30/21** | **CT thorax:** Stable subpleural nodule in RUL (0.8 x 1cm); New subpleural density in RUL (0.7 x 0.4cm) |
| **10/12/21** | **CT signed off; Consults placed** for pulm outpt and CC-PET. MD called NH and relayed need for f/u with both areas. |
| **10/22/21** | CC RN received PET consult; **PET scheduled** for 11/2/21 @ Froedtert South |
| **11/2/21** | **PET-CT @ Froedtert South** |
| **11/30/21** | **Pulmonary consult** with fellow. **Consults placed** for Cardiothoracic (CTh) and PFTs. |
| **1/4/22** | **CC scheduled CT appt** for 1/11/22 |
| **1/11/22** | **Pt saw CT surgeon** (Dr. Raikar)...note says that they need CT images from the VA |
| **1/27/22** | **PCP requested CT records** |
| **1/28/22** | PCP RN requested records –*Rec'd GI records instead*—made vague note about "unable to view CTh records" |
| **2/1/22** | **CT RN** requested CT scan from PCP's RN (never sent) |
| **3/1/22** | Pt presented to **PCP for routine f/u** |
| | • Noted that CT records were still absent |
| | • PCP unsure if pt had CTh surgery |
| | • Informed NH to call for records |
| | • Made note for FHCC to obtain records |
| **3/10/22** | Pt presented to **pulm for f/u** |
| | • Noted no records from CTh appt. |
| | • Contacted CTh office for records; fax received. |
| | • Noted that Imaging was needed |
| | • Called NH and instructed to obtain disc. |
| **6/23/22** | CC documents **1st attempt** to obtain records from CTh appt. |
| **7/30/22** | CC documents **2nd attempt** to obtain records from CTh appt. |
| **8/30/22** | **CC uploads CTh records** |
| **9/1/22** | Pt presented to **pulm for f/u** |
| | • Realized that pt still did not have f/u with CTh |
| | • STAT CT ordered. |
| **9/15/22** | **CT thorax:** RUL nodules are now merged as one lesion (1.4 x 1.2cm) |

<u>Summary of elapsed times</u>:

| | |
|---|---|
| CT scan to PET | (33 days) |
| to pulm consult | (28 days) |
| to cardiothoracic appt | (42 days) |
| to 1st request by PCP for records | (16 days) |
| to receipt of records by pulm | (43 days) |

to realization that pt never had 2<sup>nd</sup> CT appt (140 days)

Time for Community Care to request/upload records: **7.5 months**

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
*theresa.minniear@va.gov*



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:31 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #2

This was a failure to f/u by a female staff employee on one that a male Filipinos sent out

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 3:00 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** case #2

# Case #2

<u>Preface:</u> 73 yo male. PSA steadily increasing since 2010 (4.11 to 12.7, by 2018). PSA 411 (2021), PSA 622 (2022).

On 5/28/21 pt saw PCP for routine visit. Elevated PSA with sx noted; PCP ordered CT CAP and placed consult for CC-Urology. 6/7/21 CT CAP at FHCC showed bone mets-report sent to CC-Urology. Pt had CC-urology appt on 6/9/21. Per conversation with outside clinic, they dx pt with prostate CA and pt's last visit with them was on 9/8/21--they said a CT and bone scan were scheduled for Dec but pt cancelled appts, never returned and there was no f/u. Writer notes that CT CAP was instead performed at FHCC on 7/30/21, with CT lumbar in Aug '21 d/t pt inability to tolerate bone scan. Writer unsure of what transpired at the end of 2021/beginning of 2022 that causes seeming lapse in pt following up with CC urologist. In Feb '22 pt went to the ER with altered mental status and unsteady gait--he was admitted approx 1 month with ESRD/ARF, and thereafter d/ch to NH. Pt eventually returned to FHCC to see PCP on 7/27/22, at which time PCP requested urology records. Note charted 8/11/22 that PCP's RN did request urology records. Unsure if these were ever received, as no notes follow. On 8/3/22 Cancer Care Coordinator (CCC) RN first became aware of pt via autogenerated report from lab, where PSA was elevated at 622. CCC RN reached out directly to Uropartners, where pt went for CC consult, and learned pt never f/u with treatment. Asked for faxed records--received and faxed to PCP's nurse, with Teams message to her that pt never f/u and his PSA is now 622. CCC RN also documented note with PCP sign-off. On 9/8/22 pt was admitted to FHCC with SOB. PSA again drawn: >500. Hem/Onc inpatient consult was placed; Hem-onc fellow Dr. Paduri saw pt and through chart review discovered he was worked up for prostate CA but was never treated. Dr. Paduri asked CCC RN to request records from recent admission - did so and provided records to her. Pt expired 9/28/22 without ever having been treated.

| | |
|---|---|
| 5/28/21 | Saw PCP for routine visit |
| | • Elevated PSA noted; hematuria, bladder lesion |
| | • Ordered CT CAP |
| | • Referred to CC- urology |
| 6/7/21 | CT CAP at FHCC |
| | • Bone mets |
| | • Report sent to CC-urology |

| | |
|---|---|
| **6/9/21** | CC-urology appt |
| | • Bx 6/25/21 (4+3=7); pt diagnosed |
| | • Pt's last visit was 9/8/21 |
| | • CT and bone scan scheduled for Dec |
| | • Pt cx appts and never returned |
| **7/30/21** | CT CAP at FHCC |
| | • Bone mets |
| | • Spinal compression |
| | • Nodal spread |
| **Aug '21** | CT lumbar at FHCC |
| | • Unable to tolerate bone scan |
| | • Pain management referral |
| **Feb '22** | Went to ER |
| | • Altered mental status, unsteady gait and falls. |
| | • ICU; ESRD/ARF |
| | • Admitted 1 month, then to NH for rehab |
| **5/27/22** | Sees Dr. Sias for pre-op physical with |
| **7/27/22** | Pt sees PCP at FHCC |
| | • PCP requests urology records |
| **8/11/22** | PCP RN requests CC-urology records |
| | • Never received |
| **8/3/22** | Cancer Care Coordinator receives PSA list |
| | • Called Uropartners; learned pt never f/u with treatment |
| | • Rec'd records; Faxed to PCP RN |
| | • Documented note; requested PCP sign-off |
| **9/8/22** | Pt admitted for SOB |
| | • PSA > 500 |
| | • Hem/Onc inpatient consult |

**Pt EXPIRED 9/28/22**

Theresa Minniear, MSN RN OCN
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 3:03 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Case #3

## Case #3

In this consult, the physician indicated <u>weight loss</u> and clearly listed in the description that a <u>mass in the pancreas</u> was visible on CT. This was categorized as "moderate." Wondering why this wasn't categorized as "complex," with an RN processing?

The evaluation was scheduled for 5 months down the road. One month after this consult was placed (but still before he was scheduled) the pt called the Triage Line with worsening sx, and was advised to go to the ER. I don't see any charting after this, but even this didn't "flag" the urgency of this consult.

Would like to please understand what the acceptable timelines/processes are in community care, so I can help to prevent these lapses.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:32 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #4

Female RN – nothing happened

## Case #4

Pt (now deceased) was a 66 yo chronic smoker.

On 4/14/22 pt had a CT chest, which showed evidence of likely lung cancer in his right middle lobe. This was new since his 2019 imaging. The PCP placed a CC-pulmonary consult, which wasn't "worked on" by CC until 1 month later, at which time an LPN charted that the vet verbalized transportation issues. LPN gave pt numbers to call, with the onus on him to get back to CC. One month later this same LPN returned a call to the pt's daughter, who explained it would be far easier for vet to be seen at FHCC. Almost 3 weeks later, on 6/28, the then manager of CC cancelled the consult and charted a vague note about it being forwarded back to the pulmonary clinic *if needed*. (??)  Later this consult was automatically discontinued.

Shortly thereafter the PCP, on 7/1, submitted another pulmonary consult--this time electronic. On 7/5 the pulmonary dept recommended a bronchoscopy with biopsy, which was performed at FHCC on 7/15. The resultant pathology report showed "atypical cells" and was negative for cancer in some samples. It was sent out for an expert opinion. Unclear of pulmonary follow-up.

On 8/10 vet presented to FHCC ER with complaints of abdominal pain, chest burning and shortness of breath. During the evaluation process he had a CT angio to evaluate for pulmonary embolism (PE), which, although negative for PE, again demonstrated likely lung cancer as well as bone metastasis. A CT abdomen-pelvis additionally showed liver lesions which were concerning for cancer, as well as the prostate…the latter which was of concern because pt's PSA was concurrently uptrending. On 8/11 the ER doctor charted that he believed the pt's symptoms were all related to cancer, as likely malignancy was again visible on imaging (lung, liver, adrenal, bone and questionable prostate). He therefore admitted the pt and placed inpatient consults for both pulmonary and oncology.

On 8/11 the oncology fellow MD saw the pt in-house. She requested for his case to be discussed at Tumor Board on 8/15, citing the need for a 2nd pathology review, and to get recommendations on whether or not a liver biopsy was now warranted, to be considered as a secondary site of analysis. Due to questionable prostate cancer with rising PSA, she also placed a urology consult. The 8/15 Tumor Board panel agreed that more tissue was needed for definitive diagnosis and staging, so on 8/19 the hem-onc fellow placed a consult for CC-Invasive radiology for a liver biopsy. Cancer Care Coordinator (CCC) RN was made aware of pt, to track.

In the meantime, on 8/15 a repeat bronchoscopy with biopsy was performed at FHCC. The resultant pathology report was "suspicious for malignancy" in some areas. It was sent out externally to Milwaukee, for additional review.

On 8/16 the urologist saw the pt while admitted.  Given the PSA level she did not suspect prostate CA, but decided to wait on a 2nd lung biopsy, to confirm. Pt's f/u with urology was scheduled for 9/9.

On Mon 8/22 CCC RN called pt to f/u on Fri 8/19 order for a liver biopsy. Pt initially declined, citing 2 previous lung biopsies which "showed nothing," in his perception. Pt agreed to speak to the CCC RN while on site the next day, for a 1:1 discussion. CCC RN physically met with the pt and explained rationale and importance for the liver biopsy, citing that his imaging and past biopsies are all concerning, we're just not clear on a definitive diagnosis. Pt agreed to get the liver biopsy, so CCC RN informed CC to proceed with scheduling at CTCA, pt's choice, as it was local. When personally following up with CTCA to check on status, CCC RN eventually learned it was on "hold" for scheduling due to lack of imaging discs. CCC RN alerted CC, and discs were mailed. These took > 1 week to arrive, at which time pt was finally scheduled for a biopsy on 9/8/22.

On 9/8 pt had a liver biopsy at CTCA. The report was finalized on 9/13, and showed "poorly differentiated carcinoma" now suggesting possible pancreaticobiliary origin. CCC RN ordered genomic testing on his tissue specimen, as requested by oncologists, to shed light on origin site and treatment options. Testing through Tempus takes approximately 2 weeks. Note that Tempus testing was not requested of previous lung biopsies, as it was determined that those sample were insufficient for further testing.

On 9/14 pt was admitted to FHCC for weakness and a fall. Repeat CT imaging again showed a lung mass with metastatic sites, including the spine, so oncology was again consulted in-house. On 9/15/22 the hem-onc fellow saw the pt. Plan was for pt to come to the oncology clinic after discharge, to start treatment, as he had since been admitted. It was hoped that his genomic report would be back by then. On request of Tempus, writer secured additional blood sample from pt, while admitted in ICU, so that this (along with the tissue) could help determine histology. This was mailed out Fed-Ex next day.

On 9/20/22 pt had a CT chest which showed pneumonia (possible infection, lung collapse, aspiration and pleural effusions). Pt expired in the ICU on 9/21/22, having never been treated for cancer. Five months had elapsed from when the presumed cancer was first visible on CT.

**Key points:**
- Lack of timely follow-through by CC: Initial pulmonary consult, placed in April, was eventually discontinued. There did not seem to be nursing judgement used, regarding importance of this, as evidenced by charted statements of manager.
- Lack of initiation by VA: As the elderly vet outright verbalized transportation issues—especially with regard to an important pulmonary evaluation for cancer—perhaps it would have been more prudent of the VA to take initiative and call pt with options, rather than placing the onus on the pt to call himself and seek options. Historically some pts can be dismissive and feel burdened if tasks are placed on them. At this time the VA was on "bypass" for onsite pulmonology, due to being short a physician—it took the daughter calling back to see if her father could be seen at the VA, rather than this option being outright offered to the pt, from FHCC, due to urgency of evaluation.
- Unclear pulmonary follow-through: writing unclear of pulmonary follow-through after initial (7/15) bx at FHCC.

- Sending discs: Community Care to be educated to automatically send imaging discs, for a biopsy. In these cases, recommend to overnight discs so precious time is not lost.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:32 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #5

Female follow up on this  - nothing happened

## Case #5

On 2/4/22 MD entered Community Care (CC) oncology/tumor consult for pt to f/u for testicular cancer (FHCC was on bypass due to solo provider). Consult approved and eventually scheduled for 3/16/22. Records requested by person #1 on 7/2/22, but never received. Records requested by person #2 on 8/10/22, but never received. On 9/20/22 person #3 called outside provider and learned that pt never attended appt, prompting CC Managed Care Director to contact Cancer Care Coordinator (CCC) RN and CC RN on 9/27 to ask that someone f/u with patient. CCC RN responded affirmatively and called pt on 9/27: LM on phone, asking for call back. Pt returned call on 9/28 and expressed desire to attend appt at FHCC. As FHCC oncology is now fully staffed, pt granted permission to be seen at Lovell. CC Managed Care Director therefore forwarded appt back to FHCC Hem/Onc outpatient. Submitting this event because 8 months have elapsed since consult was first placed.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:41 AM
**To:** lisa.wabinga@ceseeo.com

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:43 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: Absence of records for CC consult that is 1 year old
**Importance:** High

Case 6 here had to do with two females.

One of which who closed the consult is a manager – nothing happened

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Tuesday, December 12, 2023 9:53 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** FW: Absence of records for CC consult that is 1 year old
**Importance:** High

**Case #6**

Good morning CC Leadership,

Can you kindly provide education on your policy for record request/upload, including the permissible timeframe?
Above pt has a current consult to be seen in the FHCC hem-onc, but Dr. Pant-Purohit lacks outside records from his previous CC consult.
This consult was closed (marked "C") on 3/6/23, without any records uploaded. If I'm reading this correctly, there was only 1 documented attempt made, and 2 additional ones were to follow.
It's now 6 months later, and still there are no records. No more attempts were documented.

```
   COMPLETE/UPDATE        03/06/23 16:44     PAULSON, RHONDA RN    PAULSON, RHONDA RN
ACN-Administratively closed without records
     Administratively complete with records follow-up: Facility community
  care staff have received confirmation that the Veteran has attended the
  initial visit. One attempt has been made to obtain medical records without
  timely response from the community provider. This consult is being
  administratively completed. Two additional documented attempts must be
  made to obtain the medical records per the guidance in the Office of
  Community Care Field Guidebook.
RCT-Referral Coordination Team Member
CUR-CTB User Role: Provider
```

Thank you,

Theresa

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:45 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** ozzie - case 7

Case 7

A female Wendy – downgraded and sent an actuve suicide patient who had been asking for inpatient help and the RN who should have taken IMMEDIATE action sent it to have an orientee or just off orientation PSA to process it. A week later, the 35 year old veteran hung herself.

Nothing happened

V/R,
Ozzie Kochiu CLC RN Admissions Coordinator
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law,

**EXHIBIT B**

| From: | Lorenzo-Villarino, Donnabelle L. |
|---|---|
| To: | Ravipati, Mamata FHCC Lovell; Paulson, Rhonda FHCC Lovell |
| Subject: | DECEASED VETERAN |
| Date: | Thursday, March 23, 2023 10:13:00 AM |
| Attachments: | image001.png |

Morning,

Reviewing Deceased patient list on the FHCC Dashboard, I came
across patient that needs review.

████████████████ was admitted on 2/23/2023 Aurora
medical Center ER for acute kidney failure and expired on
2/25/2023.
Consult for COM CARE NEPHROLOGY entered on 12/8/2022 still in
ACTIVE - having OCC PSA check with community provider if
patient was actually seen prior to ER admission. No follow up
from assigned coordinator - only from OT staff trying to verify
if appt was attended.

ADDED COMMENT          12/19/22 14:33    KOCHIU,AZIS V      KOCHIU,AZIS V
PRQ-Provider requires records to review prior to scheduling.
DU-Documents uploaded to HSRM.
RSP-Records faxed/sent to Community Care Provider.
CUR-CTB User Role: RN
COM-Additional Comments:
documents faxed to provider

referral
order
general note 212-8-22
Renal 5-25-22
privacy letter
Optum billing address

Referral Number: VA0025145057

FROEDTERT SOUTH MEDICAL GROUP
9555 76TH STREET FLOOR 2
PLEASANT PRIIRIE WI 53158
NPI 1891729950
TEL 262.577.8300
FAX 262.671.7153
COM----------

ADDED COMMENT          12/19/22 14:34    KOCHIU,AZIS V      KOCHIU,AZIS V
alerted Kelly

ADDED COMMENT          12/19/22 14:34    KOCHIU,AZIS V      KOCHIU,AZIS V
awaiting appt details from veteran or community provider

ADDED COMMENT          01/10/23 17:50    RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Voicemail left to veteran at 1746  requesting a call back re: if he has an
appt. set up already w/ Froedtert Nephrologist.
COM----------

ADDED COMMENT          02/01/23 16:41    RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Voicemail left to veteran at 1619, requesting him to call Assigned staff
if he already set up an appt. w/ Froedtert South Medical Grp.
Nephrologist.
COM----------

ADDED COMMENT          02/01/23 16:46    RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Follow-up call made to provider/vendor to check on status.

Spoke w/ Corrie @ Dr. Wade Milosevic's office w/  Froedtert Scuth Medical
Grp.
Nephrology Dept. at 1621 and informed writer that they didn't receive the
referral that was faxed on 12/19/2023, to refax the referral to the same
fax # 262 671 7153, and scheduler will call the patient.
COM----------

```
ADDED COMMENT          02/01/23 16:49     RELUYA,CYNTHIA P     RELUYA,CYNTHIA P
RSP-Records faxed/sent to Community Care Provider.
CUR-CTB User Role: RN
COM-Additional Comments:
Referral refaxed to Dr. Rade Milosevic w/  Froedtert South Medical
Grp. Nephrology Dept. at 262 671 7153.

Alert sent to Admin staff to follow up.
COM----------


ADDED COMMENT          03/01/23 17:45     RELUYA,CYNTHIA P     RELUYA,CYNTHIA P
CV2-COVID-19 Priority 2: Schedule after clinical review
CUR-CTB User Role: RN
COM-Additional Comments:
Follow-up call made to provider/vendor to check on status.

Contacted Dr. Wade Milosevic's office w/  Froedtert South Medical
Grp. Nephrology Dept. at 1731 but office is closed already.
COM----------
```

*Respectfully,*

**Donnabelle Lorenzo-Villarino, RN**
*Managed Care Department Head*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
3001 Green Bay Road North Chicago, IL 60064
Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: donnabelle.lorenzo-villarino@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a),  and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction.  If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**Exhibit 11**

**Kochiu and Agency arguing the following:**

**Recording**

**7 day letter**

**Entered are the recording transcripts on how the workflow is supposed to be done given to the department by Donnabelle.**

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**CHICAGO AREA OFFICE**

| | |
|---|---|
| AZIS KOCHIU, | ) |
| | ) |
| | ) EEOC No.    440-2023-00142X |
| Complainant, | ) |
| v. | ) Agency No.    200J-576A-2023-152770 |
| | ) |
| DENIS MCDONOUGH, Secretary, | ) |
| Department of Veterans Affairs, | ) ADMINISTRATIVE JUDGE |
| | ) CATHERINE HUNTER |
| Agency. | ) |
| | ) DATED: June 27, 2024 |

_____

**Motion For Rehearing**

_____

I am asking the Commission for a rehearing, to have entered into evidence, the relevancy of a Teams recording and a 7-day letter which is pertinent to this case, in which both I and the Agency currently have in our possession.

I want to also state that I am not familiar with legal format when writing briefs or motions, so I want to make sure that I am not intending aggressive statements that I have bolded, or highlighted, it's my attempt at mentioning key points.

**Teams recording:**

**Link**

**https://dvagov-my.sharepoint.com/:v:/r/personal/donnabellelorenzo-villarino va gov /Documents/Recordings/OCC workflow and Worklist Assignment-20221110**150029-Meeting Recording.mp4

Agency makes the argument that I was detailed, investigated, and suspended for "Failing to Follow Procedure" without telling me what the exact procedure I failed to follow. That's the vaguest statement backed up by nothing in writing/or in words that I have ever encountered and its coming from highly educated people.

Agency's motion to deny 7-day letter citing her bullet **point (A)** on relevancy as she describes, is so weak and there are so many things wrong with it, it screams of the Dunning-Kruger effect. That response is indicative of not knowing the procedure in the department and the Recording is of maximum importance to be included for clarity, otherwise all we will have is chaos, confusion and hearsay. Agency attorney has absolutely no clue of what she is talking about. When the department staff have a chance to testify, she may regret that statement.

**It was not my job to schedule the appointment, that is the job of the PSA and my PSA at the time was Kelly Heckel. Case closed. Enough playing games. And if Agency wants to proclaim follow up was on my part, then the recording needs to be heard because the protocol is Kelly was supposed to follow up "in a few days." Had she done her part of the job we wouldn't be here right now debating. If we go by Agency's argument at (A), then I can go further, why after Donnabelle RN Chief, saw the consult three times and assigned it to Cindy RN; why didn't Donnabelle RN follow up? She's a nurse and the American Nurses Association, Board of Nursing, and Nurses Practice Act state that and every RN in the country would look at that statement as being foolishness. You can't pass the buck in Medicine. Why didn't Cindy RN follow up? Why didn't Dr Ravipati, Buckley, or the primary care doctor that entered the consult follow up? Those semantics and**

**game playing are so weak the Recording will be needed. With those types of responses, the Agency is going to have a rough time explaining her statements to every employee in the department that testifies. In this motion I will be citing guidebook and state statutes to prove how the 7-day notice and Teams recording will be needed to prove I was discriminated against.**

**The steps Cindy took were given to her under PSA duties during overtime. She was responsible for sending out the 7-day notice. Sorry Counselor, you don't work in the department to be even able to speak on it. And since Cindy took the assignment it was her responsibility to follow through fully,** see Nurses Practice Act SS chapter 6, N6.01(2) *The intent of the board of nursing in adopting this chapter is to specify minimum practice standards for which R.N.'s and LPNs are responsible, and to clarity the scope of practice for RNs and LPNs." Continuing, N 6.03(2)(a)(b) Accept only those delegated acts for which there are protocols or written or verbal orders. Accept only those delegated acts for which the RN is competent to perform based on his or her nursing education, training, or experience."*

Donnabelle was responsible per SS chapter 6 N6.03 (3)(a) "Delegate tasks commensurate with educational preparation and demonstrated abilities of the person supervised. Continuing with (c) "observe and monitor the activities of those supervised."(d) evaluate the effectiveness of acts performed under supervision."

**Is Donnabelle RN going to be held to the same standards as I am as an RN? If not, why?**

**Did Agency ask Donnabelle if she followed through with her duties as an RN delegating work per State Statutes and Bord of Nursing standards as far as observing, supervising, evaluate the performance to mitigate said consult from falling through the cracks? Maybe leadership's directive she had the department follow on the Teams recording was the cause of said, timely, delay of care?**

**I won't even go into when me and a few other Nurses along with Donnabelle were meeting every few weeks working on a better way that is more productive and smoother transition for patient care, but that group was dissolved when Donnabelle and another nurse were arguing over patient preferences, in which DB took her ball and walked off the**

playground and never came back to the meetings, essentially abandoning the department.   The group marched on and came to a conclusion that we all agreed on but Donnabelle never signed off on it.

Donnabelle didn't follow her duties when delegating.  This is a system failure and I was the scapegoat who was discriminated against because I am a white male, non-Filipino of Asian race.

Agency's issue at (B) states "*Complainant appears to argue this Teams Recording is the smoking gun to prove the VA acted with discriminatory animus when it removed him from patient care to investigate allegations he did not complete the consult within the required timeframe, which resulted in a delay in care. In the video Complainant alleges RMO Lorenzo-Villarino states registered nurses (RNs) are not responsible for administrative tasks of scheduling consults. Even taking Complainant's contention as true, it does not prove the VA engaged in sex or race discrimination.1 This recording does not prove other similarly situated employees who are of a different race or sex were treated differently than Complainant was.*"

What's the required timeframe you address in your statement?  Can you cite that from the guidebook?

Does that time frame you point to apply to the rest of the employees in the department?  I clearly have entered in the record consults which shows consults up to 350 days old which were never followed up on (timely) and resulted in delay of care?  ==Agency just made my point of discrimination.==  The recording is needed to prove I followed the rules and was discriminated against because if she is contending, I failed to follow up and there was a delay of care on my part, then you can't treat me any different than the other employees and you need to explain the hundreds (no hyperbole here) of only a fraction I introduced of the consults I have entered into evidence, with no follow up resulting in delay of care by every staff member in that department.  ==Thank you, you made my point, Agency discriminated against me, flat cold.==

The question I have for the Agency, and I'll ask it again, so the Judge is privy to the statement without any confusion, what procedure exactly did I fail to follow?  Can you cite something from the guidebook or the Nurses Practice Act that

**applies to only me and not any of the other RNs in the department?** I have asked Donnabelle, Chief Manager of Managed Care, I asked Dr Ravipati, Medical Chief, I asked Dr Buckley, Medical Director of the entire Facility, I have asked Alex Morse of HR, and **NO ONE EVER, not one of them, told me or explained to me, what procedure I did not follow, not in person when asked, not in writing** when I asked as you can verify this by the record, which shows the emails I sent asking this very question. But somehow, the Agency attorney, knows the ins and outs of how medicine is practiced.

Now the Agency needs to stop the game playing and tell me and the Judge, right here, right now, EXACTLY what procedure I failed to follow that makes me any different than the other Registered Nurses in the department in which I have entered as part of the record 7 JPRS and the hundreds of consults that failed to timely follow procedure resulting in delay of care. A lot of those consults I entered resulted in deaths, cancer spreading and more. By Agency attorney's standard then why am I being accused of and put through this type of discrimination and harassment and no one else in the department is, especially the female RNs who are of Asian race.

What Agency explained in their response made my point completely. Agency should know the answer to the above without any hesitation and should be able to respond to this question immediately without having to run and consult with the leaders and ask them what procedure it was that I failed to follow. If you cannot respond immediately to what the timeframe you refer to and the follow up you refer to, that means you don't know and you're going to go ask your witnesses, Donnabelle or Ravipati who by the way perjured there testimony throughout their sworn affidavits that I countered and pointed out, who are going to scramble to come up with another lie as they have been nothing but eluding this question from when I initially was asking this on May, 8, 2023 the day I was detailed and the story changed so many times they landed on. failed to follow procedure, timely, delay of care.

**Continuing at (B) Agency's response**

*For example, Complainant cites to Nurse Reluya as a comparator because she is a female Filipinio and she was not disciplined. However, Nurse Reluya is not similarly situated because she called the patient to see if an appointment needed to be scheduled, called the community provider, faxed the referral, and followed up with the provider one month later. Because Complainant and Nurse Reluya handled the processing of the patient's consult differently, despite whatever the Teams recording portrays, it has no bearing on whether Complainant was treated disparately when he was removed from patient care and thus adds no probative value to the record.*

Cindy is responsible she took on PSA duties in overtime see (Nurses Practice Act), I also cite the VHA guidebook1232 minimal scheduling efforts as well as state statutes throughout this motion that speak otherwise.  And by the way how does Cindy calling the Veteran and resending the records absolve her from her duties under VHA1232 minimal scheduling efforts?  I called on 12/19/2024 is there a difference in Registered Nurses?  I'm confused?  I'm not understanding the difference between when the Nurses Practice Act states that an RN is an RN is an RN from student nurses all the way up to a 40 years of experience nurse in the field, we are all held to the same standard.  It also states if you accept an assignment, you are responsible for it and cannot pass the buck.  If you cannot do assigned tasked to you, you must tell the charge nurse or leader. Moving on, I called the veteran, on Dec 19, 2024 and it's documented in the Community Care Progress Note (CCP) which is conveniently left out of the record which I will motion for at a later time.  I called the veteran, sent the fax to the provider with all pertinent records as documented clearly in the consult you missed to see, AND I alerted Kelly who's job it was to call the provider in "a few days to make sure the appointment is scheduled" all per Donnabelle's directive on the recording.  And if you're trying to insinuate I never sent the records then we can pull up the RICO fax data and look back and see if I never faxed the records, that stuff doesn't disappear.  If I documented it, it was done.  Or are the differences you responded to that I am male, white and Cindy is female and Filipino race?  Because other than that state statutes which federal gov't follow as far as nursing and VHA guidebook and the Teams Recording state everything is similar.  **Point where what Cindy did was different than what I did?**  I did what I was supposed to do per Teams Recording and Cindy and Kelly did not do their due diligence under VHA 1232 Guidebook, minimal scheduling efforts as well as Donnabelle's recording on Teams.  If what you're indicating in your response with so much confidence then everyone else in the department is guilty of failing to follow procedure, with all the timely, and delay of care consults I submitted.

## OCC Workflow and Worklist Assignment

**The transcripts of the recording below highlighted in yellow are acronyms you will not know what they mean unless you hear the recording and I or someone else explains what they mean. The stuff in green are some key points I want to bring your attention to.**

**Dizon, Ken FHCC Lovell**
11 minutes 23 seconds11:23

Dizon, Ken FHCC Lovell 11 minutes 23 seconds
I'm so sorry. Just to go back to clarify, did you just say moderates and complex will be RN, is that correct?

**Lorenzo-Villarino, Donnabelle L.**
11 minutes 30 seconds11:30

Lorenzo-Villarino, Donnabelle L. 11 minutes 30 seconds
That is correct.
Lorenzo-Villarino, Donnabelle L. 11 minutes 34 seconds
Umm.
Lorenzo-Villarino, Donnabelle L. 11 minutes 37 seconds
CCP notes on the moderate and complex. That is what it is and the guidebook moderate our complex. Our work on by our ends. Then you go through the flow. Veteran's preferences have been captured. If not then.
Lorenzo-Villarino, Donnabelle L. 11 minutes 52 seconds
You captured a veteran's preferences, then you work through this workflow. If they have been captured, then you go on to the next one. As far as creating the console.
Lorenzo-Villarino, Donnabelle L. 12 minutes 1 second

Are the referral documents and processing them sending them to the providers making sure that when we are creating those ref docs we are sharing them with the team and that share with the team we need to upload that into the CSRM the reason why we wanna upload it to HRM is that it is somebody submitted the refdoc already affects over to the provider somebody else comes behind them and the provider says that they have not received the ref doc. It would be easier if we could just go to you just run.

Lorenzo-Villarino, Donnabelle L. 12 minutes 31 seconds

And download it of the roughed up again rather than creating a new ref top. So make sure that we are once we create those ref doc there's another extra step to just click it and save it to HSRP so that it is available for everybody.

Lorenzo-Villarino, Donnabelle L. 12 minutes 46 seconds

Once you do that one, the clinical staff, uh alerts their administrative staff. Once that that has been sent to the provider administrative staff, you followed through with your process and getting your console scheduled at the same time. You also follow us through the if the scheduled appointment has been made once it's been sent to the provider.

Lorenzo-Villarino, Donnabelle L. 13 minutes 12 seconds

And so far.

**K**

Kochiu, Azis FHCC Lovell

13 minutes 13 seconds13:13

Kochiu, Azis FHCC Lovell 13 minutes 13 seconds

But can you just explain that that last part of it again I?

Kochiu, Azis FHCC Lovell 13 minutes 17 seconds

So.

I am adding here - Here is where I asked Donnbelle to repeat what she just stated but it wasn't picked up by voice recognition.

Lorenzo-Villarino, Donnabelle L.

13 minutes 17 seconds13:17

Lorenzo-Villarino, Donnabelle L. 13 minutes 17 seconds

**Once you, the clinical staff have, for example, Ozzy has submitted the raft up, uploaded it to HS arm, then you alert your administrative staff that has been sent to PSRM already, even if it's a complex or moderate consult. Administrative staff, make sure you follow up behind the clinical staff and call the provider a few days later to make sure if the console has been scheduled.**

| K |
|---|

Kochiu, Azis FHCC Lovell
13 minutes 22 seconds13:22

Kochiu, Azis FHCC Lovell 13 minutes 22 seconds
Uh-huh.
Kochiu, Azis FHCC Lovell 13 minutes 43 seconds
OK.

| D |
|---|

Dizon, Ken FHCC Lovell

**Agency attorney needs to articulate and answer the question, what is the time frame and procedure, answer what constitutes timely and delay of care.**

Agency is going to have a hard time in the hearing or Jury trial challenging the 10 or so department witnesses that already sent emails defending me, which are in the record regarding who schedules the appointments after the nurses send out the referrals and who's responsibility it is. The witnesses will also be testifying as to the discrimination as this has only happened to me and not the person or persons, who are female, and one is of Asian race, that were responsible for scheduling the consult and nothing happened to them. The department witnesses are just as shocked with this as I was, and I still am as they will detail all the delay of care and how the rules change daily if not weekly in that department.

I suspect, in the Agency attorney's defense, I'm sure she responded that way in her motion because I would imagine that's what Donnabelle or Ravipati told her, because the latter two have no answers to the discrimination they put me through, which is a very very weak response, particularly in the field of medicine.

**That said, the teams recording is relevant and should be heard by the Commission for the following:**

1. It states exactly what procedure/protocol the staff in the department are supposed to follow.
2. It will prove I followed the procedure exactly as it states.

3. It will prove the chart review that was run on me, was run under deceptive information as the recording states my job duties verse the PSA's job duties.

4. To the above point, I will prove that the information sent to Quality Management was false and my chart review which was run under PSA duties was 100% misleading and intentionally done to discriminate against me.

5. It will prove the manager Donnabelle and Agency clearly knew the criteria as Donnabelle and Agency approved of the procedure stated on the recording, yet willfully and intentionally sent deceptive information to QM knowing it was false and discriminated against me.

6. Donnabelle and the entire Agency will be given the opportunity to explain to the commission or Jury if it goes that route, why the Agency that came up with the said procedure, knew this was deceptive information yet sent it, and discriminated against me and only me, which led to the cascade of deception that followed thereafter.

7. The recording will prove that (Kelly Heckel) PSA was supposed to schedule the consult and not me as the RN, and this is so clearly stated in the recording.

8. The recording will show since I followed procedure there was no "Delay in Care" on my part, but rather the "Delay in Care" was on the part of Kelly Heckel whose job it was to schedule the consult but hadn't touched it for 3 months after being alerted by me, in addition to Cindy Reyula RN who was assigned PSA duties by Donnabelle 3 times to schedule

said consult and failed to send out the 7-day letter as a second form of contact per VHA 1232 Guidebook, Minimal Scheduling Efforts.

9. Agency HR, Alex Morse, who heard the recording during my meeting with Buckley, and with two Union representatives present, sent me an email which is already in the record, On the date of August 10, 2023 at 1:54 PM, I received the following email from Alex stating, "**Good afternoon, Yesterday during your response, you played a recording of Donnabelle going over the process. If you would like it to be considered as a part of the evidence you submitted, please reply to this email with a copy of the recording.**" I cannot get Alex the recording the same way I cannot get it to the Commission and that is because Donnabelle has a lock on it so that only the people that were part of the meeting on 11/10/2022 can hear it and have access to it.

I indicated to Alex, I wanted this part of the evidence, the Union tried to get it and stated to Alex on the same email thread the following:

August 10, 2023 at 4:40 PM, Monica Coleman, emailed Alex the following, **"Hello Alex, Being that the recording is the property of the hospital, we ask that you give permission for its release from Donnabelle who was the "host" of the team's meeting held on 11/10/22 "workflow/work assignment.""**

Alex responds on the same thread, August 11, 2023 at 7:43 AM, stating, **"Good morning, Thank you for the update, I will reach out to Donnabelle and ask for the link and access."**

This should have already been part of the record since Agency had already requested it and asked me if I wanted it part of the record. Now the Lawyer comes in not knowing all the facts and proclaims, "relevancy" and now I have to fight for something that the Agency agreed to already.

Furthermore, I stated to the investigator to make this part of the evidence to submit, and her answer to me whenever I explained it to her was always, "I believe you, I believe you..." Well her believing me or not doesn't help me out if she

never added it into evidence for the Commission to hear. I asked my Case Manager, Patricia Martinez for another investigator to get the relevant information into the record and she had me talk to a Daniel (last name escapes me) out of Pennsylvania. I do have this email in the record.

Question. Does HR have this and is intentionally leaving it out of the record? Alex in his email stated he would reach out to Donnabelle to get the link and access. I don't know, only the Agency can answer that. The Agency has the evidence and is sitting on it preventing the discovery process. The one thing I do know is the Union and I already presented it as evidence, so I'm baffled at why if I already presented it, it's not part of the record? One could sense an intentional coverup by the Agency.

The agency is acting as if this is top secret covert information when the entire Community Care Department has access to it already. There's no patient information on the recording so no HIPPA violation.

10. Agency has the evidence, Agency asked if I wanted this entered into evidence, and now Agency does not want this part of the evidence.

11. The transcripts of the recording are already part of the record as evidence; however, they are presented through the voice recognition software Teams uses and it came out garbled. For example, we use the acronym HSRM but the translation came out as something like "PSRM" or something to that effect etc. There are words and acronyms we use in the department that are presented wrong through Teams translation, and for clarity the Commission should have this recording rather than a contorted transcript. I did notice however that some of the transcripts are missing, the most important part mind you where Donnabelle explains the procedure and I ask her to repeat it. Not sure how that got missed but at this juncture with the Agency fighting so hard to keep it out one can only speculate.

I also noticed parts of the documentation on the consult in question are missing, as well as my CCP note. Again, it's really starting to make me wonder, why key elements that I will be referring to are missing. I will motion for those to be

included as it could have been a scanning issue during uploading, but the fact that they both are what I need to refer to, at this point, yes it raises my suspicions.

**The 7-day letter is relevant for the following:**

The 7-day letter is important as it is another form of contact, VHA Guidebook 1232 requires in the "MINIMAL SCHEDULING EFFORTS" section last updated July 28, 2022, Standard Operating Procedure (SOP) 9(B) (1a)(2)(i)(ii). In addition to the Guidebook Donnabelle has this written on the flowchart already part of the record.

Guidebook states, at the sections listed above, "...the scheduler must make a minimum of two documented attempts using different contact modalities." (i) "Both contact attempts may be completed on the same day" (a) "For example, if the scheduler attempts to contact the Veteran via telephone and is unsuccessful, then he/she may also send a secure message or letter that same day, requesting the Veteran to contact the medical center to schedule an appointment." (2) Disposition of Request. A schedular is permitted to:

(i) Discontinue contact attempts and disposition the appointment request if the patient fails to respond within 14 calendar days of the second contact effort.

(ii) Cancel the consult...after a failed scheduling effort..."

VHA DIRECTIVE 1232(5)(3)(3) "Scheduled (S). This indicates that an appointment has been made and linked to the consult request. Schedular status automatically sends an alert to the sending provider..." this was Kelly Heckel the PSA who's job it was to schedule the consult per the Teams' recording. This is key and comes into play when the Agency ran my chart review under PSA duties and the review came back as showing I do not schedule my consults. It was deceptive on Agency's part knowingly and willfully to submit this and use it as criteria indicating I am not following procedure.

Federal guidelines for RN's follows the state statutes. Citing Wisconsin State Statute from the Board of nursing, Chapter 7, Rules of Conduct, N 7.03 Grounds for disciplinary action, N 7.03(1) Noncompliance with federal, jurisdiction or reporting any of the following: N 7.03(5) Fraud, deception or misrepresentation, including any of the

following: Falsifying or inappropriately altering reports, patient documentation, agency records, or other health documents . (b) Intentionally making incorrect entries in a patient's medication record or other related documents. (d) submitting false claims. " Donnabelle and Ravipati in later in the process who knowing and willfully engaged in the above mentioned activities are in violation of said state statutes which apply under Federal jurisdiction similarly. Continuing citing N 7.03 (5)(m) discriminating on the basis of age, marital status, gender, sexual preference, race, religion, diagnosis, ...etc"

The Teams recording will prove I followed the rules and in doing so my job was not to schedule the consult, therefore, the chart review was falsified to discriminate against me citing the above statutes in conjunction with the Teams policy and procedures as well as the VHA 1232 (5) department Guidebook.

1.  It is already part of the record under the flow chart, but for clarity purposes I want it entered so the Commission can see and understand what it means that way there is no confusion and it will show how it is relevant to the case which led to discrimination against me and not the other staff.

2.  Cindy Reyula RN was assigned PSA duties by Donnabelle RN manager three times, on this consult in question, during overtime hours to schedule the consult, and on three separate occasions she failed to secure an appointment and failed to send out the required 7-day notice per policy and procedure Donnabelle has written on the flow chart as well as the 1232 Guidebook referenced above.

    On 1/10/2024, Cindy was assigned the consult to schedule in which she documents "Voicemail left to veteran at 1746 requesting a callback re: if he has an appt. set up already w/Froedtert Nephrologist." No follow up with a 7 day letter per policy, and she did not alert Kelly Heckel to schedule either.

    On 2/1/2024 Cindy was assigned to schedule the consult per Donnabelle's directive on overtime in which in her comments documents, "Voicemail left to veteran at 1619, requesting him to call Assigned staff if he already set up

an appt. w/Froedtert South Medical Grp." Again no follow up with the 7 day letter per policy. Cindy did however alert Kelly Heckel who's job it was to schedule this consult per policy and procedures, in which Kelly did not.

On 3/1/2024 Donnabelle assigned this consult to Cindy Reyula again to follow up with scheduling, On March 1st, 2024 Cindy documents, "Contacted veteran at 1732, automated machine states the person you are calling block your phone number"
Then at 1733 Cindy documents. "Voicemail left to veteran's wife at 1733, requesting vet. To call assigned staff if he already set up an appt. w/Froedtert South Medical Grp." "Alert sent to Assigned staff and Requesting Providerfor awareness."

On 3/23/2024 at 1047 Kelly Heckel finally made her first attempt to reach the veteran three months later from when I alerted first alerted her on 12/19/2024 in which it was her responsibility to schedule per Donnabelle's policy and procedures she so clearly states on the Teams' Recording. I am paraphrasing, "PSAs after the RN alerts you, you follow up in a "few days" to see if appointment is scheduled." Kelly was alerted a second time by Cindy RN on 2/1/2024 and again she did not follow up on scheduling efforts. Kelly documents for the first time, "Spoke with Lori (patient access specialist) at Providers office who stated Veteran never scheduled an appointment."

The Teams recording depicting the workflow is relevant and shows the responsibilities of each of the staff members in which I took all the bullets for Cindy and Kelly who failed to follow procedure, and that is blatant discrimination, especially when the Agency knew the policies and procedures and knew it was the two females that touched the consult and nothing happened to them.

2/1/2024, Cindy RN failed to schedule the consult and per policy failed to send out the 7-day letter as another form of contact per VHA Guidebook 1232 as well as the Teams' recording which is the Workflow algorithm already entered into evidence.

3. Ravipati stated in her affidavit that I am the nurse and is holding me to a different standard than Cindy RN and clearly Ravipati is missing the policies and procedures from this **recording** which entails the **7-day** letter, both of which are part of VHA 1232 Guidebook Directive. This is clear cut discrimination that I as an RN who followed the rules on the Teams recording and am held to a different standard than Cindy RN who didn't follow the rules, and I can add every other RN in the department by the record showing Delay of Care on the consults past 300 days and further out. All those dates ranging from anywhere 10 days up to 350 days are all "Delay of Care" consults for one reason or another.  The recording indicates the policy to follow and in doing so that means everyone in the department are guilty of Agency's decision to investigate me which was, "Failure to Follow Procedure."    It's for points like this and many more that the 7- day and Teams recording are relevant to prove I followed procedure and have been discriminated against.

Let's take Ravipati's statement in her affidavit when questioned by the investigator that I'm the nurse and I have more responsibility or something like that, if we play those semantics, and she and Agency are holding me to that standard of being a nurse, but no other nurse is held to that same standard particularly the female, Asian race,  this is clear cut discrimination when we see they and other RN's have JPRS filed for deaths, and cancer spreading,etc due to Delay of Care and "Failed to Follow Procedure." Why aren't the female employees held to the same standard as I am as a nurse, and why are the female Filipinos, Asian race held to the same standard as I am?  Is this not discrimination?  Yes it is. It fits the definition of discrimination.

"Discrimination is the unfair or prejudicial treatment  of people or groups based on their perceived or actual membership in certain categories or groups...Discrimination can be intentional or unintentional, and can take many forms..." "to make a distinction in favor or against a person or thing on the basis of group, class, or category..."

Ravipati MD medical chief, Buckly MD Director of facility and Donnabelle RN chief manager of managed care, per VHA 1232 (4)(f)(1) did not follow said Directive which states, "<u>Facility Chief of Staff.</u>  The Facility Chief of Staff is responsible for:  Regular reviewing and improving facility consult performance and outcomes. (4) Ensuring appropriate no show follow-up" as indicated by Kelly Heckle's documentation above she writes on the consult

stating "Spoke with Lori (patient access specialist) at Providers office who stated Veteran never scheduled an appointment."

We can go on even farther up the chain of command per VHA 1232 (4)(c)(d)(3)(e)(1)(2) states the following: (c) Assistant Under Secretary for Health for Integrated Veteran Care is responsible for consult policy and process education, improvement, and **oversight**. (d) "Veterans Integrated Service Network Director. (VISN) is responsible for oversight of policy implementation and performance management within VISN including: (e) VA Medical Facility Director,,, is responsible for: (1) oversight of facility consult policy, process, and outcomes, (2) Regular monitoring and improvement of facility consult performance and results. This should occur monthly and more frequently if outcomes are not being met. (3) Allocating sufficient resources to enable management of consults and timely delivery of care. (10) Ensuring adherence to national timeliness and completion requirements as outlined in the Consult Timeliness SOP." **This is not the case otherwise we wouldn't see as the record indicates all the late consults of which some are over 300 days old. What we have is everyone in the department has "Failed to follow procedure" resulting in a " Delay of Care."**

**In addition, the requesting provider that entered the consult in question, "Failed to Follow Procedure" Failed to follow up on his patient's scheduling status.** citing VHA Directive 1232 (5)(9)(i) (6)which states, "Consult Sending Service ... is responsible for: Reviewing the status of ordered consults to make sure that the patient receives timely care.** This is on the doctor that entered the consult failure to follow said directive cited.

VHA Directive 1232 (5) (j) states, "Consult Receiving Service. The consult receiving service is responsible for ensuring:
(1) Adherence to the relevant Care Coordination Agreements." This would include the Teams recording as agreement in terms of policy and procedures and care coordination.

Questions for the Agency: Did anyone who was responsible for scheduling the consult per Teams' recording and VHA 1232, get disciplined and detailed the same way I did. Did anyone in leadership above me all the way up the

chain of command get investigated for "Failure to Follow Procedure" Did they have monthly meetings and look into why a plethora of consults that are in the "Delay Of Care." status? All of which is outlined in VHA 1232?

The answer is quite simple, **NO.** No one was held accountable but me for what is a massive system failure and all leadership above me at Lovell, up through VISN, to the Assistant Under Secretary for Health for Integrated Veteran Care are not held liable for the system failure.

It was convenient to discipline me by some lower level Lovell managers who are more interested in ladder climbing than seeking the truth to the departments failure in which they used me as a scapegoat and in doing so, there is categorically no denying what happened to me is DISCRIMINATION on the highest levels. **It was intentionally done to me and none of the females. The Teams' recording is the prelude to pointing out the process of which leadership is accusing me of not following**.

Furthermore, under VHA 1232(5) APPENDIX A. "RECOMMENDED CONTENT FOR CARE COORDINATION AGREEMENTS" in which it states under paragraph 1, "The Care Coordination Agreement is a written agreement made between any two or more parties, where one party sends work to the other, outlining the workflow rules" The workflow rules are on the Teams' recording. Continuing," the agreements may exist within or between facilities. They are developed by a consensus; **signed by service chiefs from involved services**, reviewed or updated as changes are needed, at a minimum annually, and audited." **Donnabelle chief of Managed Care** explained the rules on the Teams' recording and either her or Ravipati signed off on them. **The recording is pertinent.**

4. Cindy and Kelly's failure to schedule this consult and failure to send out the 7 day notice per policy indicates they didn't follow procedure; however, both females and one who is Filipino of Asian race were never investigated, never detailed, never suspended, never slandered as opposed to me who was and this is discrimination.

5. To Agency's comment as far as documenting stating, Kochiu documented, "Awaiting appt details from veteran or community provider" on the consult in question. Every RN was directed to enter that verbiage after we send the consults/records out to the community provider, while we are waiting for the PSA's to schedule the appointment, at the same time we as RN's keep moving on to the next consult we are assigned to work on. This is why the Teams recording is so important it details the job functions between staff members for productivity and to have the best possible outcomes. Now the Agency attorney attacked me on this topic, which is fine, she's doing her job, but I wouldn't expect her to know that's standard operating procedure in the department because obviously she did not know that nor would she have a way to know that since she does not work in the dept. No fault on her part but to my point of the Teams recording and wanting it to be heard by the commission is needed for clarity because there are a lot of moving parts in the department that would never be clear to a Judge or Agency attorney who was handed this case with regards to a department that is in complete disarray and is tail spinning out of control. It's as simple as doing a Google search, or Youtube search on the VA's Community Care Department to understand the dysfunction and chaos. That's why I am doing my best to keep this orderly so everyone can understand, rather than a bunch of chaos and confusion.

6. Lastly I would like to point out, Wendy Superable RN had a consult that had a very grim ending to it. Citing: Minimum Scheduling Efforts For Outpatient Appointments Standard Operating Procedures (SOP), updated July 28, 2022 part of the VHA 1232 Guidebook under section (3)(2) which states," <u>High-Risk Flag (HRF) for Suicide Exemption.</u> Atte**mpts to contact** patients with EHR category 1 HRF for suicide cancel or no-show **must be made by qualified staff who possess a scope of practice including evaluation and triage of high-risk behaviors."**

The above patient was assigned to Wendy RN Female, Filipino, Asian race, in which she completely disregarded the complexity of this consult as it was flagged by a banner and the veteran a 35 year old female called indicating she needed inpatient psychiatric help desperately to which Wendy did not **clinically Triage according to the Teams' recording** but instead of handling it as an RN would handle a complex consult, she by negligence gave it to a PSA who by the way was Female Filipino of Asian race, and who was currently in training, or just out of training, to call this veteran, send out the records of which is required of an RN to do, and the PSA's make an appointment.

The above mentioned 35-year-old female veteran was called by the PSA a week after Wendy RN gave her the consult to work on and what happened was the veteran hung herself.

Now I was investigated for doing my job according to the **Teams recording,** whereas Wendy RN "Failed to Follow Procedure" **per Teams recording**, according to Donnabelle's directive on the Teams recording and what we had was a horrendous outcome. And Ravipati as a medical doctor wants us to believe this would be up to HR to decide on a Temporary Reassignment pending investigation. That statement is one of the greatest insults to humanity.

Nothing happened to Wendy RN as far as being detailed pending investigation for "Failure to follow Policy" She was never suspended or humiliated or slandered throughout the hospital and so on. Dr Ravipati's answer in her affidavit to the investigator when asked why Wendy wasn't detailed was, "HR didn't recommend it."

Let's take Ravipati's sworn affidavit and compare it to the Temporary Reassignment notice Donnabelle gave me on May 8, 2023 which is part of the record, in which it states under number (4) **"This order will remain in effect until such time as I, or a higher authority, cancels it**." Does that sound like Human Resources has anything to do with deciding if I or anyone else like Wendy gets "Temporarily Reassigned"? Absolutely not. It also explains why Donnabelle and Ravipati slow walked my detail when HR told me the investigation was done within two weeks of the start of it, and it was up to the manager to bring me back not HR.

It was only when I filed this EEO in July 2023 that leadership brought me back in late August 2023 and hit me with a 14 day suspension when this was told to me by QM this was "non punitive", and Ravipati told me this is a "slap on the wrist." Which I still believe constitutes retaliation based on EEO criteria, I did file retaliation prematurely and to the wrong department, but if was also filed under sex and the fact that it was filed and I was brought back and suspended almost immediately after I filed, constitutes retaliation by the definition of retaliation via EEO. But that point is mute at this juncture. However, as the statement in bold in this paragraph states, **"This order will remain in effect until such time as I, or a higher authority, cancels it."**

Therefore, it's up to leadership to determine discipline not HR. It is a deception on the Agency to state or blame HR for what leadership/Agency should have done to Wendy. It's discrimination that I had to suffer and went through all the slander and humiliation on my part, and now Agency is pointing fingers at HR, which is only Agency's attempt at distorting facts and not take responsibility for their own actions to cover themselves, in hopes that the Commission gets confused and the real issues are lost in a cloud of dust, and the case gets denied or thrown out. This entire foundation of the case starts with the Teams recording as it details the procedure to follow, and states how the department leadership wants the workflow to be done and it's coming directly from leaderships own words, not mine. Moreover, it will prove I followed procedure contrary to Ravipati stating in her 14-day proposed suspension, "Failure to Follow Procedure."

I'm coming in this wanting the Teams recording to prevent any confusion so it's clear to the Commission when it comes to a decision that's based on facts and not speculation. The recording will corroborate the 10 or so emails from staff stating RNs process the consults and PSAs do all the scheduling.

The facts clearly show as entered into evidence the overabundance of late consults for staff "Failing to Follow Procedure", the sworn affidavits by Agency which contradict some key questions being asked of them by the investigator, the fact that only I was put through the walk of shame and no one else was.

I'm not a lawyer and am finding my way through the legalities as far as procedure, but the one thing I have on my side is the truth, as compared to the Agency coming in with attempts to confuse things as is depicted in their answers throughout their sworn testimony. I only want to present the truth and it starts with that Teams recording and I can build off that and we can have an understanding of the process, that way the Commission and Agency attorney (who I don't expect to know the procedures) understand the procedure from the Teams recording as we move forward. This way we can let the Commission decide, not the Agency or Agency's attorney or anyone else for that matter. I want to make this easy to understand for all of us and we need the recording for clarity.

Judge, only you can decide the truth as the fact finder, and I want you to listen to the recording before you come to a conclusion.

Back to Wendy's Consult of a suicide patient.

Citing Wisconsin state statute, Board of Nursing, Chapter 7 Rules of Conduct. N 7.03 Grounds for denying or taking disciplinary action.  Under section (1) **Noncompliance with federal, jurisdictional,** or reporting requirements..."
Citing: N 7.03 (5) (n) states, "Executing an order which the licensee knew or should have know would harm or present the likelihood of harm to a patient.  Citing: N 7.03 (7) "Improper supervision or allowing unlicensed practice, including any of the following: (a) delegating a nursing function or a prescribed health function when the delegation could reasonably be expected to result in unsafe or ineffective patient care." Continuing under same section (c) "Inappropriate or inadequate supervision or delegation." Wendy RN failed in terms of what the Board of Nursing expects, and the Agency did nothing about it.

This is blatant discrimination because I am male of the white race and nothing happened to any of the employees that are female, particularly if they are of Asian race.  It's wrong, and the Agency is guilty of discrimination by the Federal EEO laws.

If HR recommended, I be investigated and detailed, and Wendy not be investigated under the same criteria and intensity as I was, then HR engaged in discrimination against me.  Similarly, if it was Agency leadership that did not investigate Wendy or put her through the detail process and walk of shame, under the same scrutiny I was put through, then this is discrimination by Agency Leadership as well.   No matter who Ravipati and Donnabelle or HR, they represent the Agency and they discriminated against me.

**Conclusion:**

Both the Agency and I have the 7-day letter and Teams' recording in our procession and it would be a great injustice if I am not afforded the opportunity to present this crucial, relevant information to the Commission. Since our hearings are done through Teams, the Commission will not be able to hear the evidence that both I and the Agency already have if we play it over Teams. I want the Commission to have this and be the decider if it is relevant or not. Not sure why the Agency is willfully objecting to the Commission this evidence? Isn't the truth being out in the open better than hiding behind a veil of secrecy that only creates confusion of facts for the Trier to hear? This is the evidence the Agency used to discriminate against me, and now they don't want it part of the evidence to be heard. The recording should be heard by a 3rd party neutral person who is deciding the case.

Discrimination is discrimination no matter how big or small it may seem to the Agency when they proclaimed, I'm paraphrasing, Kochiu didn't like the outcome of being investigated and a "3-day suspension." The question becomes, how far are we willing to tolerate this type of discrimination or any form of discrimination if you will? Where do you draw the line on discrimination? How much discrimination is okay?

I am so certain, 100%, and nothing anyone can say will ever change my mind, within every cell of my body, down to the mitochondria, that had I been a, female, Filipino of the Asian race, we would not be having this conversation. This is a blatant case of discrimination, and I will prove it as long as the Agency does not distort the issues and intentionally keeps relevant evidence out of the record.

Furthermore, for a Federal Agency proclaiming "relevancy" to evidence already out there that Agency and Plaintiff both have is doing a disservice to anyone else that may be subject to discrimination. It's this type of behavior by the Agency as to why a lot of people who have been discriminated against, would rather take the high road and move on, rather than deal with all the red tape just because one side can just claim "relevancy." Agency is entering into the area of blame for the victim in the wake of a discrimination case. Agency does not want this into evidence not because of "relevancy" but strategically Agency wants to cause confusion, and muddy things up, in addition to purposely overload a person with more work when they want to present their case in a clear manner.

Question for the Agency, you have the recording and I have the recording, why are you objecting to "relevancy" for the Judge not to hear it?

Agency is engaging in censorship at the highest levels as I would be silenced from presenting my case to the Trier, who should hear all the pertinent facts, the evidence and the relevancy in deciding the outcome.

I am requesting a hearing to prove to the Commission the relevancy of entering both items into the record as I will be bringing this up during testimony and my direct questions to my witnesses and whatever witnesses Agency presents will revert to this recording which is the protocol that was given by leadership to the department to follow. In doing so, you will see I followed all the rules and the excuse of Ravipati and Buckley who state, "failure to follow procedure" will be shot down. They never cited what rules I failed to follow. It would be easier for the Commission to follow along with clear concrete data instead of distorted facts the Agency witnesses will present as they will try to create confusion and obfuscate the facts and blame everyone else but themselves, in order to protect themselves from all the lies and deceit they have engaged in which lead to me being discriminated against.

**Scheduling that consults had nothing to do with me, and this couldn't be made more clearly than the Teams recording.** I still can't for the love of God wrap my mind around Donnabelle knowing this as she explained the rules herself in no uncertain terms, so clearly on the recording, in which I even asked her to re-explain the rules to which she did, yet Agency states, "Failure to Follow Procedure." I hate to be redundant, but Agency NEVER told me what exact procedure I failed to follow no matter how many emails I sent (which are in the record by the way) or no matter how many times I've asked them, even in the presence of witnesses, they never told me what rules I failed to follow but went ahead with the discrimination.

**Just on this motion alone, with all the evidence already present in the record, which includes sworn affidavits with inconsistencies throughout from leadership's answers to the investigator, in conjunction with the intentional omission by Agency leadership to give me the answer as to what procedure it was I failed to follow, my case of discrimination has already been proven and Agency should seek some sort of solution or settlement to remedy this situation.**

For the foregoing reasons I ask to move the Commission to have a hearing on the 7-day letter, and most importantly for the Teams' recording to be entered into the record as evidence.

Respectfully,

Kochiu

**Exhibit 12**

**Importance of 7 day letter and Teams Recording.**

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
CHICAGO AREA OFFICE

| | | | |
|---|---|---|---|
| AZIS KOCHIU, | ) | | |
| | ) | EEOC No. | 440-2023-00142X |
| Complainant, | ) | | |
| v. | ) | Agency No. | 200J-576A-2023-152770 |
| | ) | | |
| DENIS MCDONOUGH, Secretary, | ) | | |
| Department of Veterans Affairs, | ) | ADMINISTRATIVE JUDGE | |
| | ) | CATHERINE HUNTER | |
| Agency. | ) | | |
| | ) | DATED: June 21, 2024 | |

_____

**COMPLAINANT KOCHIU'S, MOTION TO ADD THE 7 DAY LETTER AND
TEAMS RECORDING OF THE DEPARTMENT WORKFLOW TO BE ENTERED
INTO EVIDENCE.**
_____

### 1. 7 Day letter

The 7-day letter is relevant because it's a tool staff uses when they call a veteran to check and see if he/she has scheduled the appointment with the community provider they (vet) agreed to see.   See the OCC workflow Flowchart entered into evidence.

Why is it important?  Because after I complainant, captured veteran's preferences and faxed relevant medical records to provider the next person's duty was (Kelly Heckel) PSA who was supposed to call the vet "in a few days" to check with veteran to see if he/she scheduled the appointment.  If Kelly or anyone else calls the veteran and cannot reach them, the next step is to send out a 7-day letter stating for the veteran to call the Community Care Department within 7 days, or the consult will be cancelled and sent back to the requesting provider.   The 7-day letter is another tool to reach the veteran by mail if you can't reach vet by phone.

Now Kelly Heckel, missed this opportunity (which again was her duty according to the workflow process and the Teams recording in which manager Donnabelle clearly states the PSA is supposed) to call the veteran within a few days to check on the appointment.  Kelly did not check with the veteran until 3 months after complainant sent out the medical records and alerted her (Kelly) that the documents have been faxed and she takes over the rest of the process, which is administrative, not clinical.  See Teams Recording and algorithm.

Here's the Caveat.  Donnabelle assigned the consult in question to a Registered Nurse, Cindy Reyula, three times after I had touched the consult to call and check if the appointment was

scheduled. Cindy was unable to reach the veteran by phone, therefore it was her duty to send out the 7-day letter, which she did not do. She had three opportunities, and she skipped that step every time. See the record for the dates Cindy called the veteran. Now Cindy did alert Kelly Heckle PSA again to follow up with the veteran to see if the appointment was scheduled. Again Kelly missed it or ignored the alert.

In addition, Cindy has to follow through as she was the last RN to handle the consult, it was her responsibility, it was in her hands. Cindy not following up via a 7-day or checking with Kelly or bringing this up to me or someone else, is the equivalent of a nurse or doctor getting report on a patient one day, but another nurse or doctor takes over on a different day, either way as a medical provider or nurse clinician you are held to the responsibility while in your possession of patient. Nursing board states, "no passing the buck." Meaning Cindy RN who was working with the patient if she knew something was wrong, she had to do something about it, and not disregard it or pass the buck to me complainant just because said veterans first initial of last name fell under my group. Donnabelle took the approach to put the blame me which goes against medical liability when someone else was working with the patient. That's the equivalent of someone coding (having a heart attack for instance) in the hallway and you as a nurse or provider just walk past without helping because it's not your patient. That's elementary medicine and you don't need to work in medicine to understand that you have to do something or you are just as liable.

So, what we have is complainant taking all the bullets for what was the PSA's responsibility to call and schedule which is an administrative task not clinical, (see workflow, Teams Recording, emails by dept staff, VHA handbook) and when the consult was assigned to Cindy RN she didn't follow through with the 7-day letter as another avenue to reach the veteran. As we proceed, I will show how nothing happened to Kelly Heckel, or Cindy Reyula, only me, and that was done for retaliation purposes. Even Dr Ravipati was baffled that Cindy wasn't held accountable for this just as much as they were blaming me for not capturing the appointment. Why? Because Cindy is Filipino and female and was immune to punishment, similarly Kelly Heckel is a female and was not held to the standard of what her duties which were clearly made and stated throughout the Teams recording and workflow chart. See emails from ten or so department employees that testify on my behalf of the workflow and what the requirements of the RN's are and the requirements of the PSA's.

Finally, Cindy is an RN and should be held to the same standard as I was. Rudimentary nursing states that an RN is an RN is an RN whether you are a student nurse or a nurse with 30 years' experience you are all held to the same standards. And Dr Ravipati's argument in her affidavit that I am a nurse, and I had more responsibility is just semantics. If that's the case then Cindy RN, Donnabelle the RN manager that seen and had access to the consult, the doctor that entered the consult for his client to see the community provider should all be held to the same standard as I am for an 89-year-old veteran that expired.

The letter is important as it gives clarity for everyone to see what I'm referring to when I go through the Teams Recording and the workflow algorithm.

## 2. Teams Recording dated November 10, 2022, titled, OCC Workflow and Worklist Assignment, directed by Lorenzo-Villarino, Donnabelle L.

This is important and should be entered into evidence for the same reasons stated in number one. It depicts the workflow by voice recording rather than through written testimony or looking at an algorithm which can be confusing to someone that doesn't work in the department. Hearing it from the proverbial horse's mouth holds a lot more weight than an argument made in writing or through pictures. The recording is of Donnabelle giving directive of how she wants the workflow to be done. There's no denying it, it's clear and at 13 minutes in the recording I even ask Donnabelle to repeat the workflow process which she did and is a must hear. You're hearing it from Donnabelle and not me. It proves that I wasn't the responsible one that was given directive to do the administrative task of scheduling consults. The VISN made it clear many times, in which they **do not** want RN's paid to schedule consults, and get caught up in administrative work rather than do the clinical work. Donnabelle knows this, she even made the rules and emphasized them in her Teams recording yet sent false information to Quality Management regarding the difference between what the expectations of RNs is verses what the PSAs duties are. When Donnabelle sent Quality Management my chart requesting it be reviewed for investigation, (yes she solicited QM to do a chart review on me, it wasn't QM asking for a chart review as I did the deep dive into this issue) but anyway, in doing so Donnabelle marbled RN work and PSA work to use as criteria for Quality Management when they run my charts, **knowing** it was presented under false pretenses, and it was done in retaliation before I filed my EEO. Again, she came up with the rules, what did she suddenly forget them when she sent my chart for review...?

The Teams recording in my opinion is the most important part of my claim of discrimination in terms of reprisal, gender, and race because it will give everyone better clarity of duties and responsibilities between RN's LPN's and PSAs.

## CONCLUSION

These issues I bring forth and many other similar requests to make things part of the record were brought up to the investigator, for her to enter as evidence but were not. I had been emailing back and forth with the Chicago EEO dept who directed me to a dept out of Pennsylvania, in which they stated to bring this up during disclosure as I was at the time requesting a new investigator.  See record for my emails referring to this.   I also noticed the investigator left out the documentation throughout the consult in question, but I'll cross that bridge when we get to it as I have everything in paper form already.  I don't believe that was intentional at all, probably just got lost in the uploading process.

You must understand that the Community Care Department is in such disarray that entering the above, especially the Teams Recording into evidence is vital to keep in order the dynamics of the department for clarity purposes.

The letter is important as it gives clarity for everyone to see what I'm referring to when I go through the Teams Recording and the workflow algorithm and certain aspects of the record.

Judge, I am asking you to at least listen to the recording for clarity purposes so as we move forward, you, me, and the agency are aware of all aspects, openly and honestly, with clarity, without anything clouding or mudding up the issues.  If I bring up issues in a hearing and have witnesses from the department testify, whether written or in person, everyone in the dept that testifies will understand what each other are talking about, but you and the agency will not be able to follow as the department dysfunctional at best. It would be in the best interest for all of us to have the evidence available in case we need it for open on honest clarification purposes.

## CERTIFICATE OF SERVICE

I, Azis Kochiu have uploaded the motion to enter evidence the 7-day letter and Teams Recording into the EEO portal and sent this motion to all parties through email.

**EEOC**
Judge Catherine Hunter
Catherine.Hunter@eeoc.gov

**Justine Fernandez**
Agency Counsel
Office of General Counsel – Midwest District
United States Department of Veterans Affairs
p: 202-894-0695
Justine.Fernandez@va.gov

Azis Kochiu (Complainant)

Azis.Kochiu@VA.gov

**Exhibit 13**

**Kochiu's witness list.**

# Interrogatories

1. **Ken Schingeck**

LPN, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Building 9

Ph: 224-610-8761

**Qualifications/Relevancy/ Summary:** Works in OCC. He has first-hand knowledge of the department protocol and how the work is divided among staff. He will testify to Donnabelle's (DB) directive she gave to staff which includes her teams recording to staff and will testify that I did everything I was supposed to do exactly like DB's directive. In addition will testify as the chart review QM did on me was false the way Agency ran my review of RN duties based on duties that ancillary staff is assigned to, and that certain things leadership ran in my review for example letters sent to patients regarding their appt date, no one in the dept does unless it's asked for by the veteran. Will also testify as to why the female person who's job was supposed to schedule the consult but she did not and was not disciplined the same way I was. Will testify to the 7 day letter. The plethora of Delay in Care from the daily worklist already presented into evidence. How the women's group was supposed to be staffed with one RN for the entire workload as that group has less consults, but DB gave Wendy (female Filipino) and extra RN part time and a full time PSA. This was approved by the Union for FTE of 1 RN only. Wendy's group is staffed past what Union and leadership agreed on but my group remained short staffed.



Ken Schengeck - workflow directive.ms    Ken's email regarding workflow responsibilities

**Compensation:** None

2. **Ken Dizon**

Registered Nurse, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Building 9

PH:  224-610-8626

**Qualifications/Relevancy/ Summary:** Works in OCC. He has first-hand knowledge of the department protocol and how the work is divided among staff. He will testify to Donnabelle's (DB) directive she gave to staff which includes her teams recording to staff and will testify that I did everything I was supposed to do exactly like DB's directive.  In addition will testify as the chart review QM did on me was false the way Agency ran my review of RN duties based on duties that ancillary staff is assigned to, and that certain things leadership ran in my review for example letters sent to patients regarding their appt date, no one in the dept does unless it's asked for by the veteran. Will also testify as to why the female person who's job was supposed to schedule the consult but she did not and was not disciplined the same way I was.  Will testify to the 7 day letter.  The Delay in Care worklist presented. Current delay in care worklists.  How the women's group was supposed to be staffed with one RN for the entire workload as that group has less consults, but DB gave Wendy (female Filipino) and extra RN part time and a full time PSA.  This was approved by the Union for FTE of 1 RN only.  Wendy's group is staffed past what Union and leadership agreed on but my group remained short staffed.

He will also testify that on or around 6 months prior to the new workflow (recording), the department was brainstorming on a weekly basis for months on a better workflow that benefits the veterans and department and that him and DB were arguing in regards to "preferred providers" (which is one of the criteria Agency ran my chart review on)  to the point that DB left the discussion and took, Cliff Olsen, the depart analyst with her and never came back the following weeks and in doing so the department NEVER got direction on preferred providers.   DB essentially abandoned the department and never answered the question of preferred providers.



Ken Dizon - workflow directive.ms   Ken's email regarding workflow responsibilities

**Compensation:** none

3. **Roger Lohr**

LPN, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Building 9

Ph:  224-610-8759

**Qualifications/Relevancy/ Summary:** Works in OCC. He has first-hand knowledge of the department protocol and how the work is divided among staff. He will corroborate Donnabelle's (DB) directive to staff which includes her teams recording to staff and will testify that I did everything I was supposed to do exactly like DB's directive.  In addition will testify as the chart review QM did on me was false the way Agency ran my review of RN duties based on duties that ancillary staff is assigned to, and that certain things leadership ran in my review for example letters sent to patients regarding their appt date, no one in the dept does unless it's asked for by the veteran. Will also testify as to why the female person who's job was supposed to schedule the consult but she did not and was not disciplined the same way I was.  Will testify to the 7 day letter.  The Delay in care worklist I will be presenting.  How the women's group was supposed to be staffed with one RN for the entire workload as that group has less consults, but DB gave Wendy (female Filipino) and extra RN part time and a full time PSA.  This was approved by the Union for FTE of 1 RN only.  Here Wendy's group is staffed past what Union and leadership agreed on but my group remained short staffed.

He will also testify of his start date sometime in October or November 2022 and even though he was supposed to be in my group he was not and was working under Cindy's (female, Filipino) group and did not get assigned to my group until somewhere around 3/30/2024 this is about 6 months after being hired only after I kept asking for more help.  This will show how I was intentionally left

short handed as Cindy's group was a lot more staffed for the same amount of consults split between each group, not including Women's health which is a separate issue.



Roger Lohr - workflow Directive.ms  Roger's email regarding workflow responsibilities

**Compensation:** None

4. **Charlene Miller**

PSA, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Building 9

Ph: 224-610-8632

**Qualifications/Relevancy/ Summary:** Works in OCC. He has first-hand knowledge of the department protocol and how the work is divided among staff. She will testify Donnabelle's (DB) directive she gave to staff which includes her teams recording to staff and will testify that I did everything I was supposed to do exactly like DB's directive. In addition will testify as to the chart review QM did on me was false the way Agency ran my review of RN duties based on duties that ancillary staff is assigned to, and that certain things leadership ran in my review for example letters sent to patients regarding their appt date, no one in the dept does unless it's asked for by the veteran. Will also testify as to why the female person who's job was supposed to schedule the consult but she did not and was not disciplined the same way I was. Will testify to the 7 day letter. The Delay in Care worklist I will be presenting. How the women's group was supposed to be staffed with one RN for the entire workload as that group has less consults, but DB gave Wendy (female Filipino) and extra RN part time and a full time PSA. This was approved by the Union for FTE of 1 RN only. Here Wendy's group is staffed past what Union and leadership agreed on but my group remained short staffed.

She will also discuss the racism and favoritism she sees in the department in which DB engages in. As well as the dysfunction and confusion throughout the years in the department and the constant change in workflow and directive.



Charlene - workflow
directive.msg          Charlene's email regarding workflow responsibility

**Compensation:** none

5. **Dori Matusz**

PSA, James Lovell PSA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Building 9

Ph: 224-610-8632

**Qualifications/Relevancy/ Summary:** Works in OCC. He has first-hand knowledge of the department protocol and how the work is divided among staff. She will testify to Donnabelle's (DB) directive she gave to staff which includes her teams recording to staff and will testify that I did everything I was supposed to do exactly like DB's directive.  In addition will testify as to the chart review QM did on me was false the way Agency ran my review of RN duties based on duties that ancillary staff is assigned to, and that certain things leadership ran in my review for example letters sent to patients regarding their appt date, no one in the dept does unless it's asked for by the veteran. Will also testify as to why the female person who's job was supposed to schedule the consult but she did not and was not disciplined the same way I was.  Will testify to the 7 day letter.  The Delay in Care worklist I will be presenting.  How the women's group was supposed to be staffed with one RN for the entire workload as that group has less consults, but DB gave Wendy (female Filipino) and extra RN part time and a full time PSA.  This was approved by the Union for FTE of 1 RN only. Here Wendy's group is staffed past what Union and leadership agreed on but my group remained short staffed.

She will also testify that her and I went to Dr Ravipati's office at the beginning of my detail to discuss my chart review and how it was flawed and that I am not supposed to be charting on the items the Agency falsely stated I was supposed to.  In addition, that it was Kelly that was supposed to schedule the consult and that Cindy should have sent out the 7 day notice, but essentially we were

ignored and we were dismissed out of her office.  She will also testify to the meetings the dept was working on and that DB left and never showed up due to an argument with another staff member.

 She will testify to the JPRS filed on Wendy for a patient that Wendy Superable had negligently passed it onto a PSA either who was currently in training or just off of training, in which the 35 year old female veteran who committed suicide by hanging herself after she was calling requesting inpatient care desperately.  Dori will also testify that when opening this veteran's chart  it was flagged by a pop up box which indicated this was a High-Risk Suicide patient.


Dori Matusz -
workflow directive.ms  Dori's email regarding workflow responsibilities.

**Compensation:**  None

   6.  **Kim Martil**

LPN, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Building 9

Ph:  224-610-8632

**Qualifications/Relevancy/ Summary:** Works in OCC. He has first-hand knowledge of the department protocol and how the work is divided among staff. He will testify on Donnabelle's (DB) directive she gave to staff which includes her teams recording to staff and will testify that I did everything I was supposed to do exactly like DB's directive.  In addition will testify as the chart review QM did on me was false the way Agency ran my review of RN duties based on duties that ancillary staff is assigned to, and that certain things leadership ran in my review for example letters sent to patients regarding their appt date, no one in the dept does unless it's asked for by the veteran. Will also testify as to why the female person who's job was supposed to schedule the consult but she did not and was not disciplined the same way I was.  Will testify to the 7 day letter.  The Delay in Care worklist I will be presenting.



Kim Matil - workflow
directive.msg        Kim's email regarding workflow responsibilities.

**Compensation:** None


   **7. Monica Coleman**

Registered Nurse, James Lovel VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Building 9

Ph: 224-610-8619

**Qualifications/Relevancy/ Summary:** Works in OCC. He has first-hand knowledge of the department protocol and how the work is divided among staff. She will testify on Donnabelle's (DB) directive she gave to staff which includes her teams recording to staff and will testify that I did everything I was supposed to do exactly like DB's directive. In addition will testify as the chart review QM did on me was false the way Agency ran my review of RN duties based on duties that ancillary staff is assigned to, and that certain things leadership ran in my review for example letters sent to patients regarding their appt date, no one in the dept does unless it's asked for by the veteran. Will also testify as to why the female person who's job was supposed to schedule the consult but she did not and was not disciplined the same way I was. Will testify to the 7 day letter. The Delay in Care worklist I will be presenting. The confusion throughout the department, racism she has experienced or seen.

She will also testify to DB soliciting her to state false information about me. Testify to her observations of racism, favoritism and bullying of certain staff members.



Monica Coleman -
workflow directive.ms        Monica's email regarding workflow responsibilities.

**Compensation:** None

8. **Alex Morse**

HR Representative, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

HR Department

Ph: 224-610-3040

**Qualifications/Relevancy/ Summary:** Alex was the HR rep that was involved in the case. Whose job was it to bring me back to my original workplace. What was the date the investigation was completed and to provide the proof of all the documentation. Was it his responsibility to detail Wendy Superable that negligently allowed a patient to commit suicide as Dr Ravipati states in her affidavit.

I will also ask him if it is his responsibility to detail all the employees that are guilty of Delay of Care. I will ask him what constitutes Delay of Care.

Why Ravipati stated she could not bring me back and told me to call Alex Morse who indicated to me the investigation was completed on or around within two weeks of the start of my detail and HR stated it was up to my leadership to bring me back.

If Alex refutes the call, we had in which he told me the following, I'm paraphrasing, that "the investigation was completed within a few weeks, it was up to my managers to bring me back and he wanted to get on to other things." Also, If he can't remember, I will adjourn any proceeding and go through the protocol to have our telephone call or teams call entered into evidence, even if it means going through the appeals court to get that in the record.

**Compensation:** None

9. **Dr Mamata Ravipati**

Chief Medical Executive, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Command Suite

Ph: 224-610-1177

**Qualifications/Relevancy/ Summary:** She was one of the leaders up the chain of command that proposed the 14-day suspension. I will be asking some questions to statements she made in the affidavits, the 14-day proposed suspension, and some teams messages we sent to one another that are contradicting. Relevancy shows discrimination against me but no one else that had Delay of Care in the department. I will be asking questions in regards to the JPRS submitted and Wendy Superable who was never detailed for a 35 year old patient she was assigned to who had been calling OCC in dire need of inpatient mental health but Wendy ignored the call and the CPRS which flagged everyone of a high risk suicide patient who then committing suicide by hanging herself. Most importantly what constitutes "Delay of care." How many of her staff including consults currently are in the Delay of Care status and is anyone going to be detailed for said "Delay of Care?"

In addition, how much discrimination based on sex and race is acceptable at the VA.

Why she stated she could not bring me back and told me to call Alex Morse who indicated to me the investigation was completed on or around within two weeks of the start of my detail and HR stated it was up to my leadership to bring me back.

If Alex refutes the call, we had in which he told me the following, I'm paraphrasing, that "the investigation was completed within a few weeks and it was up to my managers to bring me back and he wanted to get on to other things." Also If he can't remember, I will adjourn any proceeding and go through the protocol to have our telephone call or teams call entered into evidence, even if it means going through the appeals court to get that in the record.

Why was I brought back only after I filed an EEO and said Agency leaders were notified.

Why when I explained during the Peer Review committee that she was in attendance of did she not take action when I stated the facts of the workflow and that Cindy Reyula touched the consult 3 times after me and never sent the 7 day letter per protocol. Why after I stated it was Kelly Heckle's job to schedule. And why when I stated this was not an expedited consult the way it was written,

she didn't take initiative as a leader and correct all those issues with the appropriate people like HR and DB, or look and re investigate this with the correctly using the correct criteria based off of how the department was supposed to run per DB and all leaderships directive that signed off on the new directive.

Why after I asked several times did she or anyone in leadership state specifically what it was I did wrong. They essentially ignored me see the emails.

Can she point in the guidebook what it was I did wrong.

**Compensation:** None


Suicide. From
Veterans Affairs Medi  suicide is the VA's top priority since 2017 and for not detailing Wendy S on such a massive mistake proves my case of discrimination on this issue alone.


Teams conversation
with Ravipati.docx  teams conversation between Ravipati and me she indicates she does not know how to get me back and in another exchange I ask her why I'm being singled out and she did nothing about this, is this not letting her know I'm being singled out in terms of harassment?

**10. Donnabelle Lorenzo**

Registered Nurse Leader/Manager, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Building 9

Ph: 224-610-8454

**Qualifications/Relevancy/ Summary:** Why she investigated me and none of the other JPRS that have ever come across her desk. What constitutes Delay of Care. Why wasn't everyone else in the department ever detailed for Delay of Care. I will present the worklist. Why she never gave us directive on preferred providers. Why she or someone who gave Quality Management (QM) the deceptive criteria to run my chart review was it never corrected as the things they ran the review on with regards to things RNs do not chart on. Why didn't she explain this to Ravipati but allowed the false review to be reviewed by Ravipati and Buckley all while she knew it was false and deceiving.

Why did she tamper with evidence directly or indirectly by submitting the summary to QM to which I had to defend myself against in front of the Peer Review Committee. Why if she claims she didn't write it did she not correct it after reading it. I could never imagine a leader who stated she would be in the Peer Review Committee not read what was written to check it for facts about one of her employees that either she wrote or who she assigned it to. Any excuse to say you never saw it prior to being submitted is suspicious and constitutes negligence. Even if she proclaims she never saw it, I made it clear to her, the committee, Ravipati, and Buckley this information was false, and none of them did anything about it. They all fell in lock step with one another and backed criminal Donnabelle which in reality makes them all party to the crime.

Her contradicting statements in the affidavits between her and Christianah regarding my review.

Her submitting said false information either intentionally or looking the other way when she knew the truth, and after I told her this was false and she never corrected it but let it go up the chain of command, makes her guilty and these actions could be reported to the Board Of Nursing in which said board will very likely do a completely separate investigation per State Statutes.

Her treatment of black employees, the bullying of Christianah (black woman) to the point where Christianah had to take leave of absence due to the stress from DB, the calling the police on Lenola Corker (black Woman) and having her escorted off the VA property, I believe there may still be an ongoing investigation into this matter. Tamara (black woman) who stated to me the racism in the department before leaving, DB firing Kay (African American) just a few days before the end of her probationary period, Antionette (Black woman) that worked and had experience was never hired back when DB interviewed her, Vicki McGee (black woman) former employee of OCC who interviewed with DB but was never hired back. However, there have been at least a half a dozen Filipino's hired by DB during her time as acting manager for Christianah during the latter's absence. There is a pattern no one can deny here. Why she transferred into a different position.



DB changed directive to admin scheduling a    here are the transcripts of DB's directive 11/10/2022



PR #15Q2FY23 - Kochiu signed (002).p    this attachment shows that DB knew of the Peer Review meeting.  As you can see she wanted Christianah to show up but then crossed it out likely because Christianah had just come back from leave and told DB she can't be there she knows nothing about it.  This is also proof that DB either tampered with evidence when she had Adriene Harris enter the consult as an expedite or she should have read it before it got submitted especially since I was detailed.  She cannot play ignorant on this as if she never knew it was submitted that way.  Furthermore, when she found out when I stated to her and ALL leadership that was false she could have corrected the mistake but she did not.



RE_ PRC meeting invitation - please rou    this shows that DB knew about the peer review committee



RE Recap on meeting .msg    DB indicating, she knows I am short staffed compared to the other groups



Qand A from National.docx    this attachment is when National VA came in to check on the dysfunction in the department and asked why we are not following the guidebook to which Christianah answered we are trying to but can't because we have been short staffed.

 transcripts of DB recording 11/10/2022 giving the dept new directive to follow

 This indicates that it wasn't until after I was detailed that we were asked to send out scheduled letters to veterans.  Notice this only happened after I complained that one of the issues they ran my criteria on in the chart review was regarding the sending letters.  Again DB knew and deceived everyone, never told Ravipati, Peer Committee, Buckley.  She knew it was a lie and never said anything.

 here is an attachment of me requesting more help as the dept was falling behind in a tail spin.

 Roger finally gets added to my group but I was still one RN short.

**Compensation:** None

# The Below are possible witnesses not solidified yet.

1. **Stephanie Latham**

Registered Nurse, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Command Suite


Ph:

**Qualifications/Relevancy/ Summary:** She was part of the teams steps/building set up by upper leadership due to the constant dysfunction in the department.  It's relevant for various reasons.  For example, Ravipati stated in her 14-day proposal there is no dysfunction in the dept.  and this will go to the confusion all staff have in terms of workflow and the process constantly changing.

**Compensation:**  None



2.  **David Keating**

Registered Nurse, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Command Suite

Ph:

**Qualifications/Relevancy/ Summary:** He was part of the teams steps/building set up by upper leadership due to the constant dysfunction in the department.  It's relevant for various reasons.  For example, Ravipati stated in her 14-day proposal there is no dysfunction in the dept.  and this will go to the confusion all staff have in terms of workflow and the process which constantly changes at times daily or weekly.

**Compensation:**  None



3.  **Vicki McGee**

PSA, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Legacy Homes


Ph:

**Qualifications/Relevancy/ Summary:** Worked in OCC went to another dept within James Lovell, and re applied to OCC but was never hired back.

**Compensation:** None

4. **Antionette**

LPN, James Lovell VA

Address:

Ph:

**Qualifications/Relevancy/ Summary:** Worked in OCC went to another dept and re applied but was never hired back.

**Compensation:** None

5. **Lenola**
   New Federal Position

Address:

Ph:

**Qualifications/Relevancy/ Summary:** Worked in OCC went to another Federal position outside of the VA, but was involved with a police escort off the property.  If she does or does not have an investigation into her matter.

**Compensation:** None

**6. Kay**

LPN, Former employee of James Lovell VA

Address:

Ph:  630-930-3536

**Qualifications/Relevancy/ Summary:** Worked in OCC and was fired by DB just days prior to her completion of probationary period. She hired an attorney to look into the harassment she was getting from DB.  This raises suspicion.

**Compensation:**  None

**7. Tamara**

Registered Nurse


Ph:

**Qualifications/Relevancy/ Summary:** Worked in OCC went to another VA to work due to what she told me was "the Racism" and dysfunction at James Lovell OCC department.

**Compensation:**  None

**8. Christianah Arowora**

   Registered Nurse direct manager

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

   Building 9
   Ph: 224-610-8639

**Qualifications/Relevancy/ Summary:** My review in which she contradicts DB. The harassment she told me she experiences from DB due to the color of her skin. Donnabelle accosting her to the point that Christianah had to call security, for which Donnabelle got written up for and was no longer to speak to Christianah per leadership. Questions regarding the Peer Review Committee (signature).

**Compensation:** None

9. **Joy Castelli**
   Registered Nurse, Quality Management Department, James Lovell VA

**Address:** Captain James A Lovell Federal Health Care Center Patient Service Administration, North Chicago, IL 60064

Quality Management Department

**Ph**: 224-610-3024

**Qualifications/Relevancy/ Summary:** Do they (QM) know what each person or department does as far as protocol when doing a chart review on employees. If not, who gives them the information on how and what to check for when running a chart review. In my case who gave them the criteria to which they (QM) ran my chart review to come up with the numbers as far as a percentage of what I did or did not do as far as charting in which they summarized on the review that Ravipati entered into evidence. Relevancy shows the review was taken under false pretenses by the Agency, which led to the slandering of my name and reputation as a worker to upper leadership, HR, and everyone at Lovell or any other VA I would apply to.



letters sent - RE
Veterans Appt's.msg   this email indicates by date that no one new to send out the letter indicating appointment until after I was detailed May 8th. Because I said we don't do this and they ran my chart review based on it DB started scrambling to cover her ass and has Rhonda send this email out on May 30, 2023 while I was detailed. Agency only claims this is currently being audited only after I objected to the

false chart review they ran on me.  If this isn't an obvious of a cover up then a jury definitely needs to hear this case.  The corruption and cover up is bone deep.

## **DECLARATION**

I, AZIS KOCHIU, declare under penalty of perjury, that the factual information included in the foregoing Answers to Agency's Interrogatories are true and correct to the best of my knowledge and belief. The factual information is based on personal knowledge.


_____                        _____
AZIS KOCHIU                                                                     DATE
Complainant

Exhibit 14

Kochiu wanted to combine initial claims with the reprisal claim.

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**CHICAGO DISTRICT OFFICE**

|  |  |  |
|---|---|---|
| AZIS KOCHIU, | ) | |
| | ) | EEOC No.    440-2024-00142X |
| Complainant, | ) | |
| v. | ) | |
| | ) | |
| United States, Department of Veterans Affairs, | ) | ADMINISTRATIVE JUDGE |
| | ) | CATHERINE HUNTER |
| | ) | |
| | ) | DATED: January 31. 2025 |

## Motion to Consolidate/Amend the above case.

Judge Hunter, I am asking to move the Commission to add the attached new information to the current case above based on the following:

1. Hostile work environment.
2. Retaliation.
3. Intimidating my witnesses.

This new information attached in the email is collateral to the above case in which it is information that proves in conjunction with the current case I am being subject to a Hostile work environment, Retaliation, and intimidation of my witnesses.

As you can see by the attachments, For Donnabelle, to call The Office of Inspector General, (OIG) to investigate Christianah Arowra, OCC Manager, right after DB attempts to rebut Christianah's sworn testimony in the ROI, which favors me, is intimidation of a witness. OIG found no issues with Christianah. This was done to intimidate and prevent Christianah from testifying on my behalf.

Theresa Minier, RN Oncology, another witness that gave me 6 redacted cases who is another one of my witnesses was questioned by the Privacy Office here at Lovell. The outcome of her investigation revealed she did not disclose confidential information to me. Again, DB filed this complaint to the Privacy office, right after she attempted to rebut the 6 cases Theresa gave me and the EEO investigator included into the ROI. This is DB intimidating, Theresa, considering she gave me information that favors me and my case.

I was investigated by the Privacy Office with regards to receiving the information I had already known of from, Theresa, and giving it to the EEO investigator who by the way asked for it and made it part of the ROI. Moreover, the ROI depicts that in the initial stages of my EEO case Patricia Martinez stated to let my investigator know of these cases. My investigation by the Lovell Privacy Office was dismissed. This is retaliation to my filing the current EEO case and DB's actions create a Hostile work environment.

I want to be able to prosecute my case to the best of my ability without DB engaging in intimidation tactics towards me and my witnesses. These are key witnesses to my case as are the others (in the attachment) and in view of DB intimidating them it is likely they may not testify on my behalf if needed.

Attached I have the witness list the Agency asked me to provide during the discovery part of the case. I have also included the results of the new EEO investigators initial notes. DB does not dispute that she submitted this information to the Privacy office. The new investigation is not completed, however, this information is suffice without needing a full blown investigation as all it would lead to is DB's denial in terms of her intimidating witnesses and retaliating against me. I would rather cross-examine her myself in trial.

## **CERTIFICATE OF SERVICE**

I, Azis "Ozzie" Kochiu, hereby certify this Motion to Combine and add addendum was uploaded onto the EEOC Portal and sent as indicated below on January 31, 2025:

via e-mail only:


**<u>EEOC</u>**
Judge Catherine Hunter
Catherine.Hunter@eeoc.gov

**<u>Complainant</u>**
Azis Kochiu
Azis.Kochiu@va.gov

<div align="right">

Justine Fernandez
Agency Counsel
Office of General Counsel – Midwest District
United States Department of Veterans Affairs
p: 202-894-0695
Justine.Fernandez@va.gov

</div>

**Exhibit 15**

**Kochiu initially made a claim of reprisal to EEO to which EEOC stated the reprisal had to have occurred prior to the filing.**

**This is a separate claim of reprisal that occurred after the EEOC case was towards the tail end.**

**What we have is two issues of reprisal and this was the first one.**

**Citing questions from:**

**www.eeoc.gov/laws/guidance/questions**

**preface:**

**Everything in black is what I got from the above website, everything in red is my response.**

## Questions and Answers: Enforcement Guidance on Retaliation and Related Issues

*Each of the Equal Employment Opportunity (EEO) laws prohibits retaliation and related conduct: Title VII of the Civil Rights Act of 1964 (Title VII), the Age Discrimination in Employment Act (ADEA), Title V of the Americans with Disabilities Act (ADA), Section 501 of the Rehabilitation Act (Rehabilitation Act), the Equal Pay Act (EPA), and Title II of the Genetic Information Nondiscrimination Act (GINA).*

*On August 29, 2016, the EEOC issued its Enforcement Guidance on Retaliation and Related Issues, https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues, a sub-regulatory document that provides the EEOC's interpretation of the law on this topic. The Enforcement Guidance replaces the Compliance Manual Section 8: Retaliation (1998).*

*The following questions and answers address major points from the guidance. A short Small Business Fact Sheet on this topic is available at https://www.eeoc.gov/laws/guidance/small-business-fact-sheet-retaliation-and-related-issues.*

**Rebuttal to the dismissal of my raised issue regarding reprisal.**

The EEO laws prohibit punishing job applicants or employees for asserting their rights to be free from employment discrimination including harassment.  Asserting these EEO rights is called "protected activity," *and it can take many forms.*  For example, it is unlawful to retaliate against applicants or employees for:

 For example, depending on the facts, it could be retaliation if an employer acts because of the employee's EEO activity to:

- reprimand the employee or give a performance evaluation that is lower than it should be;

*See my direct manager at the time, Christianah's affidavit, who is directly aware of my work as an RN, where she indicates she gave me a higher review which means a bonus.  Paraphrasing Christianah's testimony, she states although she gave me a higher review, it was Donnabelle (DB) who gave her orders to lower my review, thus no bonus.  I'd like to point out a few things, one, DB stated in her affidavit she only signs the reviews and does not rate the review as that is up to the employee's direct manager. Second, the lowering of my review came before I filed an EEO.  This is just one example of reprisal that had been crescendoing to the point of my filing this EEO and it continued after I filed.*

- make the person's work more difficult (for example, punishing an employee for an EEO complaint by purposefully changing his work schedule to conflict with family responsibilities).

*Let's look at the workload in the department.  DB disseminated the amount of consults/work equally between teams; however, she shorted my team in terms of workers, which means by default I had more of a workload than the other team leads.  This was purposely done, and no matter how often I would state this in department huddles and in emails to her it was all to no avail nothing was ever done to make it fair.  I won't even go into when I had to cover my team as well as others when they left the department, I*

*have that written either in my rebuttal to affidavits or written in a 6000-word brief which was never turned in by the investigator. I'm debating on whether or not to enter the brief into the record as it may bog down the court and a lot of it is just repeating what I'm saying but at different angles.*

## 2. What must someone show to prove a legal claim of retaliation?

In a case alleging that an employer took a materially adverse action because of protected activity, legal proof of retaliation requires evidence that:

Generally, "protected activity" is either participating in an EEO process <mark>or reasonably opposing conduct made unlawful by an EEO law</mark>

*I Whistle blew that staff was working overtime (extra hours on their own time) against the tele work contract we all signed, and labor laws as they were not getting paid to work on their own time of which DB was aware of, I brought this issue up to her many times, to which she admitted it when I pressed her during a department meeting with everyone present, including the union.  When the union questioned her about that, DB stated, "it was brought up to me, but I can't help what people do on their own time."  To which I stated "yeah,  I was the one that brought it up to you. " I'd like to point out that DB initially stated before the meeting started that it was being recorded, however, the next day several staff members looked for it as proof, but could not find the recording.  Not sure if it was intentionally deleted or intentionally not recorded.  However, the staff all witnessed/heard her admit she knew staff were working a lot of hours without pay.*

*I also continued to bring up the issue of veteran's being charged for bills and sent into collections to know fault of their own.  The Government gave their word to the veterans that they would have VA services when they enlisted after they finished their active duty service, and when the vets were no longer active duty and need the care, to which we at the VA cannot provide those services, the vets are sent out into the community for care, and if there is any mistake in the VA sending out paperwork, or a community provider not billing correctly, etc,, the veterans are on the hook for the bill and most that are responsible for the bill are sent to collections, to*

*which I have so many examples where the VA disregards the veteran's concerns. Agency shows no concern for the veteran's credit rating, etc etc etc.*

*In seeing this injustice thrown upon our Veterans, I came up with a proposal to solve/attempt to solve this billing issue and brought it to the attention of Lovell leadership, Senator Ron Johnson's office, and sent the proposal to the Veterans House Committee in Washington DC and currently awaiting a response if this should go up for vote or not. I believe this was too much for DB and was just another reason for her to retaliate towards me. I mean after all, when I came up with the billing card, and submitted a way to run this as an HMO, with providers listed and so on, she tried to boost my idea as far as the billing card goes, until I went up the chain.*

## making false reports to government authorities or in the media;

*DB made several false reports to my upper leadership about me. Starting with her initiation of a chart review on me. She deceived the Quality Management department in which she had them run my chart review under several Patient Service Administration (PSA) duties of which I or no Registered Nurses chart under what PSA duties are. Therefore, when the review was completed it was done under false pretenses and was sent up the chain of command to Dr Raviopati which eventually went all the way up to Dr Buckley the CEO, as well as the Peer Review Committee to which I had to defend myself at every level.*

*If DB wanted to make my chart review fair, then she should have run all the RN's under the exact same criteria within the exact same time frame under the same intensity as she did to me, then we can compare my charting to the other RN in the dept. But she didn't do that and used this deception because she had nothing to get me on for speaking up, and this was her way to retaliate against me. DB can come and rebut any of my statements to the court if she's so certain about this chart review or any part of this detail and suspension. This was done prior to me filing the EEO.*

*When I brought this up to Dr Ravipati with a witness Dori Matusz, from the dept., Ravipati dismissed us and took DB side despite clear facts that I did nothing wrong, and my chart review was done in retaliation under dishonest accusations.*

*DB continued her deception to the Peer Review Committee by stating the consult in question was an expedite which it was not, another thing I had to defend myself against. Even in the review committee they seemed to dismiss my defense. Furthermore, I was suppose to get an outcome by the committee which I never got.*

*I'm going to shift slightly with my next point here. A few years back, DB had Christianah my direct manager who works under her in terms of the chain of command investigated by staff. I made it clear I was not going to lie, and I wasn't going to assist in the demise of any employee as I am not the judge of that. Now, by no means am I friends with Christianah other than she was my supervisor and it was left at that. Her and I have had I had our differences back and forth, some heated debates more so by me than her, but nonetheless I was not going to say something about her during an investigation that is not true even though I disagreed with Christianah often. Furthermore, even though I am not bosom buddies with Christianah, I wasn't going to stand around and watch DB and others bully her and try to get her fired just so DB can have her best friend Wendy put in management position. I can't prove that DB used this as part of her retaliation towards me, but when you look at all the circumstances in conjunction with one another it certainly is plausible.*

**Employers must not retaliate against an individual for "opposing" a perceived unlawful EEO practice.** This means that an employer must not punish an applicant or employee for *communicating opposition to a perceived EEO violation.* For example, it is unlawful to retaliate against an applicant or employee for:

- complaining to management about EEO-related compensation disparities; or

*As stated above I whistle blew that staff working overtime after tour of duty without pay – rate busting. Tour of Duty ends at 1600 or 1630 in that department and employees were working until 10pm, Saturdays and Sundays to keep up, I received emails from staff at 3 am. As stated above DB admitted this to the entire staff during a department meeting.*

**9. What are some other examples of employer actions that may be actionable as retaliation?**

 negative or lowered evaluations;

*DB lowered my review as stated above. I point this out in my rebuttal to the affidavits.*

After I Filed the retaliation became worse.

- **transfers to less prestigious or desirable work or work locations;**

*Being detailed and suspended under false allegations was bad enough, but after I served my time for whatever it was the agency proclaims I did wrong, I had to continue coming to work when everyone else was able to tele work.*

*I was made to sign an action plan that in essence stated that (leadership) was training me on whatever they claim I did wrong as the charge changed multiple times. I did not need any action plan I was the only nurse in the department that had Critical Care experience one of the stronger nurses probably in the entire hospital. Making me come to work as if I was a first grader being punished for spilling his milk and putting me under some bogus "action plan" was just a way to continue to humiliate me after all the damage was done. This was continued harassment, discrimination, retaliation, whatever you want to call it I was treated differently than my colleagues.*

## 10. Can an action be materially adverse even if it *does not stop* the employee from asserting her EEO rights?

Yes. If the employer's action would be reasonably likely to deter protected activity, it can be challenged as retaliation even if it does not actually stop the employee in a particular case from asserting her EEO rights. An employer can also be liable for retaliation if the materially adverse action does not harm the employee; the extent of the harm only affects the amount of relief the individual might be awarded as compensation.

*DB/Agency kept trying to deter me even after said sentence/discipline was fulfilled as explained above. DB and Ravipati still could not get me to forfeit my rights or set a precedence to deter anyone else that may be in the same situation as I was in from speaking up against something that may or may not be wrong by silencing them via threats of being detailed using me as an example that what happened to me could happen to them. I continued to ask leadership all the way up the chain of command to let me know what it was that I did wrong to which none of them gave me an answer. It was at that point I asked for a change in work position as a way of reasonable accommodation. I mean they never told me exactly what I did wrong. Agency never cited anything from the guidebook indicating what I did wrong. It was flat cold retaliation.*

*As far as "Harm" goes, no one gets to decide how I should be feeling or the mental anguish and humiliation I was put through, even though I may not show signs of it. We all go through the stages of grief differently, Kubler Ross.*

## 11. Are employees protected against retaliation when they complain about conduct that affects others but does not affect themselves?

Yes. It is unlawful to take an action against employees because they have complained about discrimination that affects other people. It does not matter whether the person is a witness regarding an EEO complaint brought by others, or whether the person is complaining of conduct that directly affects himself.

*Regarding labor laws as explained above.*

## 14. Who must prove retaliation?

In order for the employee to prevail in demonstrating a violation, the evidence must show that it is more likely than not that retaliation has occurred. It is not the employer's burden to disprove the claim.

*As outlined throughout the brief/affidavits it clearly depicts how I have been retaliated against. When agency treats me different than the other employees in the same position, when I am the only one who was detailed, suspended, lied about. When I have 8, 10, or 12 witnesses from the department willing to testify on my behalf as to doing nothing wrong and I am being targeted for speaking up. This is clearly retaliation, what else would you call it?*

## 16. What types of evidence may *support* a claim of retaliation?

In some cases, the employer's own statements may acknowledge or betray its intention to deter an applicant or employee from engaging in protected activity. However, in many cases, there are different pieces of evidence, either

==alone or together, that may support an inference that retaliation caused a materially adverse action.== Examples include:

- suspiciously close timing between the EEO activity and the materially adverse action;

- *Case in point when I asked Ravipati to get me back to my original position I was taken away from, she stated on a Teams message to me that she doesn't know how to get me back to my position. But after I filed this EEO she figured out quickly how to get me back to work, as she got me back within days, but this time it was not a slap on the wrist she moved for a 14-day suspension. Why? Because how dare a low-level nurse like me challenge a doctor (by filing an EEO) who acts as if she owns Lovell or owns the Federal Government. Ravipati is an employee of the Federal Government no more no less than I am, and because I filled an EEO and she felt offended by that she pushed for the 14 day suspension when previously she said nothing was going to happen to me. Nothing should have happened to me as I did nothing wrong.*

- verbal or written statements demonstrating a retaliatory motive, comparative evidence (e.g., the individual was disciplined for an infraction that regularly goes undisciplined in that workplace, or that another employee who did not engage in EEO activity committed and was not disciplined as severely);

  *They have never disciplined anyone in the dept for "Delay of care" Charting "in emails" or whatever else they conjured up to come after me. The charge changed so many times and I believe if finally landed on "Delay of care." If that's the case everyone in the dept, at the hospital, at every VA in the nation would be guilty of, "Delay of Care." That's what they say when they have nothing on you because it's the easiest default to land on.*

*DB and Ravipati only targeted me and none of the other employees that were behind in work as shown throughout the brief the late delay of care by every employee in the dept. That's why staff was working on their own time without pay just to keep their heads above water. In addition, the proof of Theresa Minear's JPRS she submitted in which nothing happened to the employees mentioned in them in which she depicts cancer spreading, patient deaths and so on due to delay of care by other RN's in the department.*

*Nothing happened to Wendy Superable (Donnabelle's best friend at one time) when she sent a consult regarding a suicide patient who called seeking inpatient help desperately to a PSA who was in training or just off training, in which the 35 year old female veteran hung herself a week later. No chart review, no detail, no suspension, not stripped of her tele work duties, not stripped of her ability to practice as an RN as was all that happened to me.*

*When asked by the investigator, DB skated by this by proclaiming she was not Wendy's direct manager, which is all BS she's in leadership, and Ravipati who was asked and stated HR didn't recommend anything for Wendy. Okay, then Agency HR discriminated against me and not Wendy or the other's with Delay of Care. Ravipati stated I'm a Nurse and it was my obligation to oversee my consult, but Wendy who is a Nurse the equivalent as me was not held to the same standard as Ravipati/agency held me to. I go into this in more detail in my rebuttals to their conflicting testimony throughout the affidavits.*

*Furthermore, the department was behind due to mismanagement by leadership all the way up.*

*In summary, this was retaliation for being the one that speaks up.*

- demonstrated falsity of the employer's proffered reason for the adverse action; or
- any other pieces of evidence which, viewed alone or in combination with other facts, may support an inference of retaliatory intent.

*DB falsely sent the quality management misleading information during my chart review which when ran it showed that I wasn't charting PSA work when that was not my responsibility. She only did that to make a case and create a strawman for her failures in the dept and me speaking up on behalf of veterans and labor laws and workload distribution.*

***Summary:***

The affidavits clearly show reprisal under the above criteria and more and should not be dismissed. I could probably cite thousands of case law in my defense, but my brief and witnesses will be my proof and will show I did nothing wrong, and this was done in retaliation. It will also show no one ever has been put through this harassment for "delay of care", my documentation in "emails" "lack of documentation" or whatever mud they threw against the wall to muster up some claim that I did something wrong.

If this had been only one or two things, we could chalk that up as coincidence, but there has been subtle patterns and direct blatant signs of retaliation. I mean, DB isn't going to come out and tell me or anyone else she is retaliating against me for speaking up and challenging the status quo. The metaphorical Chinese proverbial saying for this is, "The nail that sticks up the farthest gets hit with the hammer."

-Ozzie Kochiu

**Exhibit 16**

**Evidence from Teams messages and rebuttal to Agency.**

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**CHICAGO AREA OFFICE**

|  |  |  |
|---|---|---|
| AZIS KOCHIU, | ) | |
| | ) | EEOC No.      440-2023-00142X |
| Complainant, | ) | |
| v. | ) | Agency No.    200J-576A-2023-152770 |
| | ) | |
| DENIS MCDONOUGH, Secretary, | ) | |
| Department of Veterans Affairs, | ) | ADMINISTRATIVE JUDGE |
| | ) | CATHERINE HUNTER |
| Agency. | ) | |
| | ) | DATED: June 24, 2024 |

_____

**Rebuttal to Agency's Motion to dismiss claim of Reprisal.**

_____

**Preface**

The Community Care Department is a mess, it's in constant turmoil, run in a tremendously dysfunctional ad hoc manner in which leadership constantly changes the rules and protocol by the week if not daily at times, and I don't mean this in any sense to be hyperbolic. Therefore, I'll try to make this make sense as best I can for the people that don't work in the department.

**Background**

I'd like to start off by stating my claim that I bring forth in front of the EEOC is not based soley on retaliation for Whistleblowing. Retaliation comes in many forms, some subtle and sometimes blatant. Obviously, the people in leadership that the Agency is protecting will not directly come out and tell me they are going to retaliate against me. My claim of whistleblowing is only a subsidiary of or tentacle if you will of all the evidence cumulatively in which said evidence show that the footprints all lead up to Donnabelle's doorsteps. The motion to dismiss is an attempt by the Agency to pigeonhole me and sway or attempt to convince the commission that my entire case was brought forth based on a whistleblower retaliation claim, and in doing so, the agency's next motion to the commission will be a motion to dismiss the claims of discrimination based on sex and discrimination based on race in an attempt to tie those two issues to the whistleblower claim.

For clarity, I never filed an EEO claim and I'm not sure how or why it was written in the following way "prior EEO activity." When I was initially talking with Nicole Reed who was the person taking my statements I remember her stating she was getting confused and told me she doesn't know anything with regards to medical terms and such, similarly I was just as unfamiliar and confused with how this EEO procedure works and the legalities as I am not versed in this, nor am I by any means trying to have my Perry Mason moment. I vaguely remember Nicole bringing up the topic of race and in my mind, I was thinking of race in terms of Black and White races and didn't even consider the Asian race other than mentioning that it feels that I'm being treated differently than the Filipino's and females in the department, but I wasn't articulating my point and in my ignorance was unaware that being Asian is considered a separate race. Nicole stated that the other issues I bring up will be to the investigator. However, prior to the investigator reaching out to me, I was assigned a case manager, Patricia Martinez, in which I corresponded with her via phone and email. I mentioned the facts surrounding the case and so forth and she too stated I should keep a record of these things and bring the issues up to the investigator.

Okay now we're at the point of me being detailed for about 6 or 8 weeks or so and I was asked if I wanted to participate in a Peer Review Committee. This committee is set by QM and is in no way supposed to be punitive. I thought great, I finally get to explain my side of the story for everyone to hear which I attempted to explain the issues at hand but the conductor of the committee wasn't concerned about anything other than he wanted me to take him through the process of my thinking in terms of making the consult a moderate. I thought okay great, this is the end, I showed up to the Peer Review now I can come back, after all QM and Peer Committee kept telling me this is nonpunitive. I reached out to Dr Ravipati via Teams messages and asked the following, "when can I come back to my original position?" (this detail was humiliating to me) to which she responded, "I don't know." To which I responded, "you're higher in the chain of command than Donnabelle, can't you get me back?" to which she responded "No" and she told me to reach out to HR Alex Morse, which I did. I talked to Alex via phone and through Teams messages and asked him when I come back to my original position and Alex told me it's up to my manager not him. He added that my issue as far as HR was concerned was done, and had been done (I want to say) within two weeks

of the start of the investigation, he then insinuated in as far as I can remember the verbiage he used, that he wanted to get this past him because he had other things to do.

I realized if Ravipati can't help me, and HR says it's not up to him (btw this issue comes up to haunt Ravipati later) at that point it was all in the hands of DB, and her vindictiveness would keep me detailed indefinitely and the only way I would get back to some sort of normalcy in my life was to act on my own and in doing so I talked with, Melvin Tolbert, EEO counselor at Lovell, then shortly thereafter I filed this EEO.

My claim of retaliation in my statement to EEO was that I speak up against the status quo, billing issues in which veterans are sent into collections, employees working overtime without pay in which DB was comparing my work to the employees who were working on their own time until 10pm, all day Saturdays and Sundays etc. She was trying to say I am doing less than them (see record) That's when I brought up the whistleblower claim to DB. There was a whole host of things I would bring up. That whistleblower claim is by no means the reason why I brought up the claims of Sex and Race which both fall under protective activity of Title VII. DB retaliated against me because I am independent person, speak up and speak the truth, don't accept her bullying of other staff members, and when I say bullying I am not saying that lightly, and most importantly in my opinion, I won't fall in lock step with her and I don't worship the ground her and Ravipati walk on.

I claimed my issues of speaking up had DB retaliate against me in the following ways: She detailed me under deceptive allegations to the Quality Management Department (QM) by having them run a chart review of my job duties under false pretenses, as well as excluding Asians and females in the department who handled the consult in question and were treated differently for the same allegations she was accusing me of for similar activities, to add to that, then I saw that she tampered with evidence in a statement presented to a Peer Review Committee that I was part of. That is what I considered retaliation to Nicole who was taking my initial statements at the beginning of this EEO.

Again, It was at that point that I filed the EEO and I made my claim of this all being retaliation for speaking up, not just with regards to whistleblowing but to many things which are outlined throughout the affidavits. Moreover I made a separate claim separate from retaliation on the basis of "sex" as I am a white male heterosexual and the two female employees whose fingerprints are on the consult had not been detailed or investigated or run through the exact same chart review with the same intensity as I had been put through. When it came to my claim of race, that didn't occur to me until during the investigation when I noticed a pattern or the element or component of race in this matter. I was held to a completely different standard as a white heterosexual male than my Asian colleagues for being accused of what the Filipino's had actually done and nothing happened to them, i.e. Wendy Superable, or Cindy Reyula. I was held to a different standard than them.

That said, I realize the Agency is only going off what is written on the filing; however, it appears the Agency is attempting to mislead the commission by trying to take us down this rabbit hole by indicating in her Motion of accepted claims listed from A – F and 1 and 2 that all those issues I bring forth have to do with whistleblowing.  That way she can claim since Kochiu brought his case forward via a whistleblower claim which doesn't fall within protected activity his entire EEO claim must be dismissed.  Preemptively I'm stating that's not true and since the agency opened the door to several statements throughout her brief, I will make comments to those, and will show the Commission the case is about discrimination based on protective activity of VII and the retaliation was the prelude to said claims of Sex and Race.

**First I will address the whistleblower claim since that is the claim the Agency brings forth in this motion.**

**Then I will address some other issues the agency brings up.**

I don't want to focus too much on the whistleblower claim as that is just one element of the whole that shows a pattern of abuse that led to my other two claims of Protected Activity based on Sex and Race.  I understand what the Agency is saying in which whistleblower in terms of retaliation should not be brought up to the EEOC, and is arguing and pointing out that I'm barking up the wrong tree as this should be filed to OIG or OSC etc.  However, although my whistleblower claim is only a small fracture of the claim(s) I bring forth, holistically it is marbled into the discrimination based on Sex and Race under the NO FEAR ACT.   If you look at this holistically in terms of another piece of evidence it makes sense to keep it in here or use it as another tool in deciding the real issues which are discrimination.  The commission can always take the claim out at any part of the process if it feels this is the wrong venue to make this claim, no need to do it now, let all the evidence unfold first.

"On May 15, 2002, Congress enacted the "National and Federal Employee Antidiscrimination and Retaliation Act of 2002," known as the NO FEAR ACT. One purpose of the Act is to "require that Federal agencies be accountable for violations of antidiscrimination and whistleblower protection laws." Public Law 107-174.  Summary. In support of this purpose, Congress found that "agencies cannot be run effectively if those agencies practice or tolerate discrimination." Public Law 107-174, Title I, General Provisions, Section 101(1).

Under the Notification & Federal Employee Antidiscrimination and Retaliation, or NO FEAR ACT.  Public Law 107-174, all Federal agencies are accountable for violations of:

Antidiscrimination Laws and Whistleblower protection laws.

"The United States Department of Veterans Affairs (VA) is a Cabinet-level executive branch department of the federal government charged with providing lifelong healthcare services to eligible military veterans at the 170 VA medical centers and outpatient clinics located throughout the country. "

"Executive branch employees of the Department of Veterans Affairs (VA) can file a whistleblower claim with the VA's EEO office. The Whistleblower Protection Act (WPA) is the primary whistleblower law for executive branch employees, including most VA medical and non-medical professionals."

Every case is different and in this case the whistleblowing claim I make is a small subsidiary of the larger issues of discrimination based on Sex and Race. It's one of many examples of speaking up which led to the Agency to discriminate against me, it's not the only issue and not the only issue I bring forth driving my discrimination claims. Notwithstanding, EEO and WHISTLEBLOWING PROTECTIONS Executive branch employees are covered by federal EEO and other unique anti-discrimination laws and executive orders prohibiting discrimination. Given this overlap, employees may also seek to enforce their whistleblowing rights when they face reprisal for speaking out. (See 5 U,S,C & 2302(b)(1)(2)(IV). Covered employees are also protected under the related anti-retaliation provisions of applicable EEO laws. As in this case it went to EEO, went under an investigation and a hearing can be held.

"NO FEAR ACT. If you believe you have been discriminated against based on the NO FEAR ACT, you may report allegations of discrimination to the Office of Resolution Management, Diversity & Inclusion (ORMDI)."

" if you feel that your complaint falls in this category, then contact the ORMDI to initiate the EEO complain process."

"For example, Title VII of the Civil Rights Act of 1964, as amended, allows covered employees to seek relief from workplace retaliation they may face after speaking out."

**Statement of material facts the agency references.**

2. Christianah was not on station at the time of this incident.

4. it should be noted that Dr Ravipati was only in the department maybe 2 months at the time of the incident in question and knew nothing of the department intricacies yet made bad judgment calls on me during her 14 day proposal and the allegations she states which are not true in said proposal. Question: How would Ravipati know of these things she claims I'm doing wrong if she knew nothing of the department, workflow, or protocol? I mean, department staff is barley aware considering all the changes that have taken place so often in conjunction that leadership in the department doesn't follow the VA field guidebook. The only way she could get that information she cites about me would have been from DB through lies and a fraudulent chart review.

Nonetheless, since Ravipati signed the 14 day and made such false statements, she is party to the crime.

The moment Ravipati came after me with a lot of malevolent accusations in her 14-day proposal about me, in conjunction with brining me back to my position immediately after I filed this EEO, when she initially told me she didn't know how to get me back. The suspicion of this happening to me right after I filed the EEO, in conjunction with the fact that QM stated this was nonpunitive, and Ravipati told me in no uncertain terms, "this is a slap on the wrist" she sure made it punitive. Ravipati only did this because I filed this EEO as the suspicion of her bringing me back immediately and hitting me with the 14 day happening right after I filed, this constitutes retaliation by definition the Agency points out.

<div align="center">Summary on this topic</div>

How? The QM review was supposed to be nonpunitive and Ravipati stated this is a "slap on the wrist." Moreover, on Teams messages her and I were going back and forth in which she states she doesn't know how to get me back to my position directing me to call HR (Alex Morse). Suddenly, when I filed this EEO as a form of retaliation (albeit the retaliation was prematurely filed) and discrimination based on Sex, miraculously, Ravipati found a way to immediately got me back to my position within days; however, it came with a price which was a 14-day suspension and loaded with all kinds of disparaging remarks about me. When Ravipati signed her name on the 14-day proposal which was after I filed this EEO**, at that point this became 100% retaliation under the Protected Activity under the Civil Rights act of 1964, Title VII.**

Continuing the discrimination after I severed a 3 day suspension sentence, made to walk take the walk of shame, slandered my reputation all over the hospital, the mental and physical anguish this put me through for being accused of doing nothing wrong, Leadership continued to retaliate and discriminate against me as explained in emails and my settlement with the Agency when they stripped me of my right to tele work after I served/completed my "sentence. On top of that Agency never told me what I did wrong as far as documenting. See emails of me asking and getting no reply. It was at that moment that I asked to be transferred to another department as a form of

reasonable accommodation. I was not going to sit in a position that put me through Hell and then the leaders that put me through all this could not tell me what I did wrong. I was set up to fail as they could state anything and suspend or fire me for doing the same thing they proclaim I did wrong and me not knowing what that is.

Truth is Agency had no answer to what I did wrong and that's why they never replied to my email, only when I asked for a transfer which I was granted that way the Agency can sweep all this under the rug.

8. I'm not sure what that is referring to. I am guessing that I was supposed to bring this up to Christanah? Is "paragraph 2", Number 2 under Material Facts? If so, Christianah was out of the department at the time for probably 6-8 months and Donnabelle was covering.

10. Okay, and this means what? Please explain if you need me to answer or at least clarify this for the Judge to get what point you're trying to make. I ask that question and not in a condescending way but for reason this statement you make is too vague and insufficiently developed. The record clearly shows evidence throughout, regarding the protocol the RNs and department staff follow via the algorithm entered into evidence, staff emails, the Teams recording which as of now is not part of the record, even though I made every attempt to get it in.

 To your point of a "seamless transition." Whatever is relevant to me as an RN is relevant to Cindy Reyula as an RN as well and every other RN in the department as well as across the Nation within every Community Care Department. Cindy RN, female, Filipino, of Asian Race, had touched that consult three times after I did when DB (female, Asian Race) assigned it to her. Again, this is in the record, in my motion to enter the 7-day letter into evidence which my investigator left out and I mentioned it in the first part of this brief above, therefore no need to go point by point as it would only be redundant. I can add to this the 7 JPRS filed on RNs which deaths were caused on some, others had malignant cancer spreading worse and various other negative consequences in so far as documentation, delay of care goes, in which none of the RNs where put through a chart review, detail, suspension etc etc. In the record the investigator has submitted the plethora (hundreds, no exaggeration) of late consults or as the Agency refers it, "Delay of Care" (SS and either first or last names redacted}. The record shows consult delay of care up to 300 days or more in some cases in which none of the RNs were held accountable. This is probably the weakest argument made as it proves my case completely in terms of Sex and Race and it's all part of the record, in black and white, concrete, not just words or hearsay, and the 10 or so staff members that sent emails to this, that are willing to testify under oath to this is strong. Think about it, why would that many staff members stick up for me or be willing to testify on my behalf if 1: I no longer work in the department, and 2: they have nothing to gain from it. Doesn't make sense that they would put their necks on the line for me. Anyway, shouldn't all those RN's be held to the same standard in so far as a seamless transition? Shouldn't all of them have been detailed, chart review, suspended, gotten lower performance reviews, had been stripped of their nursing duties as well as their ability to work tele?

11. After doing the deep dive into this after talking with, Joy Castelli , of Quality Management (QM) none of this is supposed to be punitive. Then I talked with multiple managers about the JPRS process in which they explained the same thing. QM has a privacy policy so when I tried to find out did QM ask DB or did DB go to them first to give them false information about me by submitting fraudulent duties that are not required of me, and omitting Kelly Heckel who's responsibility it was to schedule the consult and do the duties DB stated I was supposed to do when submitting a ROC, in addition to, omitting Cindy RN from preforming a "seamless transition" when DB assigned her the consult three times after I touched it. Anyway, QM couldn't answer that question of who went to who based on privacy.

But let's just give DB the benefit of the doubt. Let's say QM did ask DB to submit a "report of contact" why did she submit it with deceptive information? DB cannot claim that QM ran the chart under what they thought was appropriate because QM directly told me they would have no way to know what I do as far as job duties, nor would they know that of anyone in whatever dept they work duties are. Joy adds they get that information from the department heads. Therefore, the only way they would have gotten the (deceptive) information that they ran on my chart review would be by DB. And the evidence throughout the record undisputedly depicts that she marbled duties that were not mine under false pretenses to make me look bad. And the outcome of my chart review which made me look bad due to DB's lies and deceit, is the info she submitted to Dr Ravipati which in turn eventually led to Dr Buckley.

Therefore, all leadership above DB was led to make a decision based under false pretenses and deceptive information handed to them by DB. The only problem I have with Buckley was that he fell in lock step with the managers even though I and the Union did our best to explain to him that information was flawed. Now did Buckley come to his conclusion of a 3-day suspension only because he was going off the info given presented to him, or was he just not wanting to go against the managers? That question I can't answer. I do think DB and Ravipati put Buckley in an indefensible position, in which I'm assuming his 3-day suspension was a way to make both sides happy. I'm not sure, I don't know what he was thinking. It would however be interesting to see how often he sides with managers vs low level staff members for purposes of fairness.


**The Report of Contact was deceitful and a form of tampering with evidence.**


As far as the ROC goes, I believe DB initiated it, and sent it to QM based on false deceptive information to make me look like I'm not following protocol. Not even sure this is called a ROC as DB states. See below my discussion with QM.


**My Teams discussion with Joy Castelli of Quality Management**.

[8:36 AM] Kochiu, Azis FHCC Lovell

Joy, quick question, when QM asks for a Report of Contact do you guys ask for it, or is that something that leadership just sends you if leadership asks for a chart review?  or is the ROC the summary that gets sent to the Peer Review Committee for discussion?

[8:38 AM] Castelli, Maria Jessica Joy L. FHCC Lovell

I will have to refer you to Jermaine Williams-privacy officer on what is the use of ROC

[8:38 AM] Castelli, Maria Jessica Joy L. FHCC Lovell

i am not familiar with ROC policies

[8:38 AM] Kochiu, Azis FHCC Lovell

okay thanks

[8:39 AM] Kochiu, Azis FHCC Lovell

does QM ever ask for a report of contact?

[8:44 AM] Castelli, Maria Jessica Joy L. FHCC Lovell

from experience - no

like 1
[8:45 AM] Castelli, Maria Jessica Joy L. FHCC Lovell

typically chart review is only based on what's found in the EHR

[8:46 AM] Kochiu, Azis FHCC Lovell

okay thanks, Joy I appreciate it

The Agency needs to explain what DB is referring to in this statement clearly and directly without an attempt to muddy the issue. DB relayed this information to the VA Attorney, which in my opinion is just another attempt by her to cover up her knowingly and willing entering false information for a chart review, and it goes to her pattern of deceit.   I believe DB is not being truthful with the VA Attorney.

Even if true that QM asked DB to submit a ROC, which seems odd from what QM is stating, again why would DB, enter evidence under false pretenses?  Regardless of who asked who to get the ROC, DB submitted it under false pretenses.  Moreover, it doesn't appear that QM even asks for a ROC.  See evidence in the record.

It seems this was a statement made by DB to the Agency Attorney was intentionally vague and is predicated on the notion to create confusion contrary to the facts of the case.

Per several managers I've spoken to at Lovell a ROC is when a manager asks a staff member to give details on an issue said manager is looking into.

I don't believe DB statement here even has anything to do with QM other than it is the most bizarre way to cause confusion to cover up her cascade of lies.  Only DB knows what her attempt was to strategically make this statement, because when I called QM  asking about this issue, they had no idea what I was even talking about.

**Tampering with evidence a second time.**

DB tampered with evidence when she had Adriene Harris RN submit false information to the Peer Review Committee.  See Affidavit of Adriene Harris and my rebuttal to it in the record.  In the Peer Review Adriene Harris RN stated that the consult was an expedite, when indeed it was not.  An expedited consult means it needs to be started within 48 hours.   Adriene Harris was in the Peer Review Committee and was listening when I stated to the committee this consult was not an expedite.  If I am stating the consult is not an expedite but Adriene is claiming it was in her statement, why did she not speak up and say something?  Why?  Because it is my belief that DB told her to write it up as an expedite, as DB started to realize what she created was getting worse and the truth was starting to come out, she had to justify the reason she ran a false chart review on me and had me detailed under circumstances that she knew that  it was Kelly Heckle's job to schedule the consult and not me.

When the investigator questioned Adriene she stated she didn't mean that it was an expedite but rather that the doctor that entered the consult should have written it as an expedite. If you read the summary Adriene turned into the committee she is stating, "even though the consult was an expedite." That sure doesn't sound like she was trying to state the consult "should have been." Obviously, Adriene is just covering for DB at this point just keep from making waves and be put on DB's bad side.

This would explain why DB reached out to me a week or so before the Peer Review Committee and asked if I was going to show up. According to a Teams message by Joy Castelli, I asked her if I can bring a witness from the department on my behalf to which Joy stated she talked to our Nurse executive, Dr April Shaw, who told her there's no need because she has DB showing up at the meeting. When I participated in the meeting DB was never part of it. Why? Because I brought up the fact that this was not an expedite and she knew that I would call her out and bring up the issue that it was not to which she would have had no answer. I also brought up the issue that it was Kelly Heckle's job to schedule it and Cindy RN never did correct follow up on the consult she touched 3 times after me. DB would have had no answers to any of that in front of the Peer Committee, so she skipped.

DB states in her affidavit that she didn't write the summary but had Adriene write it. I think DB did not want to put her fingerprints on anything else, so she had Adriene Harris write this. Not sure if this is the ROC, DB is referring to, if so, her statement above was a lie that QM asked her to enter a ROC for the chart review. This entire thing is a stretch on DB's behalf, but let's assume what she's saying is true (which I don't believe) why as a leader if you ask someone to submit a summary to the Peer Review committee why would you not read it before it's submitted to be sure it is correct? This was going in front of a Peer Review Committee with heads of the Hospital present, not as though it was some carefree email being sent. Why? Because she knew the summary has been tampered with or she gave Adriene the orders to enter it as an expedite. Whatever happened she as the leader should have read it and corrected it before submitting it.

What we see is a pattern of deceit and lies DB has engaged in.

Quality Management, according to Joy Castelli and the Peer Review Committee Board this incident was **nonpunitive** and confidential and reviews the charts. VHA 5705. VHA directive 1320 appendix B. Doesn't state they investigate.

Ravipati on the other hand after I filed this EEO made a lot of malevolent accusations in her 14-day proposal about me, and brining me back to my position immediately when she initially told me she didn't know how to get me back. For something that was supposed to be nonpunitive she sure made it punitive. **I know that this was done by her only because I filed this EEO as the suspicion of her bringing me back with the 14-day happening right after I filed… one can only come to the conclusion of retaliation. And that constitutes retaliation only this time it happened later in the process after I had already filed this EEO claim, which in essence makes the 14**

**day proposal a retaliation due to filing this EEO claim.** So, if the agency wants to look at it, I file an EEO claiming Sex and retaliation, agency states it can't be retaliation based on this being the first time I filed an EEO. However, **after I filed, Ravipati immediately hits me with a 14 day when this was all supposed to be nonpunitive and this would then be considered retaliation against me for filing this EEO.**

**The fact that Ravipati can get me back immediately after filing the EEO proves they always could bring me back but were slow walking it and it was only after I filed this EEO they retaliate on me in a way that fits the definition of Title VII. Below is my Teams' messages with Ravipati.**

[6/28/2023 2:01 PM] Kochiu, Azis FHCC Lovell

any updates?

[6/28/2023 2:30 PM] Ravipati, Mamata FHCC Lovell

Sorry..no

[6/28/2023 2:31 PM] Kochiu, Azis FHCC Lovell

who is this up to to lift the detail

[6/28/2023 2:31 PM] Ravipati, Mamata FHCC Lovell

i have no idea

[6/28/2023 2:31 PM] Kochiu, Azis FHCC Lovell

Can't you lift it?

[6/28/2023 2:31 PM] Ravipati, Mamata FHCC Lovell
No

[6/28/2023 2:32 PM] Kochiu, Azis FHCC Lovell

yeah but you're higher in the chain of command than donnabelle i don't get it

[6/28/2023 2:34 PM] Kochiu, Azis FHCC Lovell

any reason why I'm being singled out?

Leadership continued to retaliate and discriminate against me as explained in emails and my settlement with the Agency when they stripped me of my right to tele work after I served/completed my "sentence." Just more examples of retaliation by the Agency.

Okay, so if QM wanted the (ROC) why did they only want that of me? Why did they never ask for a ROC with regards to all the other deaths that came through the community care department? QM according to Joy gets notified of every death so they can submit it via a metrix and keep tally. For QM to run chart reviews on every employee(s) in the nation with regards to every death that they look at they'd have a load on their shoulders the size of the National Debt, the Federal Gov't would be bankrupt. There would be so many employees detailed, investigated, and suspended the VA wouldn't be able to operate.

Explain to me, why would QM only ask for a chart review of me and not the other nurse involved in JPRS submitted? This makes no sense at all, unless QM decided to discriminate against me? Something doesn't sound right and that something is that DB created this entire sham and is now trying to find a way out by pointing fingers at everyone as is shown in the record. In addition, Ravipati is party to the crime in which she tried to deflect blame in her affidavit onto HR by indicating that HR didn't recommend Wendy Superable RN be detailed for the suicide of a 35-year-old female veteran who hung herself. Everything I'm stating is part of the record within affidavits.

12. see the record, the consult in question shows that Cindy Reyula had the consult 3 times after I did and the teams recording and algorithm in the record show that it was Kelly Heckle who was supposed to schedule the consult after she was alerted by me and Cindy to schedule the consult. See the emails by department witnesses testifying to this very question of who schedules the appointments, it's also in the record as a transcript of the Teams recording and in algorithm form.

**Applicable laws**

Agency cites from a source the following …" a clear pattern of misuse of EEO process…overburdening the EEO complaint system."  I agree with the Attorney, she makes a valid point; however, I addressed the reprisal argument above and it wasn't an intentional misuse of the EEO system.  It did however rise to reprisal and met the guidelines of retaliation when after I filed, when Ravipati immediately retaliated against me as explained above, which is also part of the record when I rebutted the Agency witnesses' affidavits.   As far as the discrimination based on Sex and Race which fall under the NO FEAR ACT and Title VII there's no denying that occurred and is in no way shape or form a misuse of the EEO system.

The Agency in mentioning some additional points regarding emails dated June 2, 2022… and so on not falling under the jurisdiction of EEOC.  I would need to look back to see what exactly I am referring to but time constraints will not allow me to.  But if I'm not mistaken I think agency is missing the point which is commutatively they add up to a pattern of discrimination and retaliation for speaking up, for bring up issues and dysfunction throughout the department and for being Male, non-Asian Race.  Again, these issues are brought up in my rebuttal to throughout the affidavits.


Agency states complainant seeks to attack the Agency's internal investigation through this EEO claim … or discrimination complaint…" It's hard to understand what the Agency is trying to get at here because the motion is about dismissing the claim of retaliation but then states, "discrimination complaint" These issues were addressed above and throughout the record.  If the Agency is attempting to attack my issues of Sex and Race now and in the future in hopes of a dismissal, my reply is I have 3 issues that meet the Protected Act of VII and they are, retaliation although not as strong as, my issues of discrimination based on sex and race.  There's no denying it and any attempt by the Agency to dismiss particularly those issues of sex and race will be fought till the end.  What's happened has happened and your clients can't unwring that bell.

I would not be objecting to the investigation had it been done in a fair manner.  Had Cindy RN and Kelly PSA been under the exact same investigation with the same intensity as I was, if the 7 JPRS complaints of the RNs were treated similarly, if the entire staff was investigated for the delay of care they are guilty of, if everyone in the Nation that works at the VA was treated exactly the way I was investigated then I'd say okay we're all treated fairly.  But as is seen that's not the case. In addition to having a fair investigation, management shouldn't be soliciting colleagues to state negative remarks about me, management shouldn't submit deceitful information to the Peer Committee or to QM and then blame everyone from Christianah to HR.  for those reasons I am attacking the Agency's fraudulent, lynching of an investigation.

There was a reference made in terms of not liking the outcome or something to that effect. The outcome would be somewhat palatable had the others been treated with the same intensity that I was put through. Meaning Kelly Heckle and Cindy Reyula, then Wendy Superable, and down the line the rest of the department that lacks charting and in violation of leaderships view of "Delay of Care."

**Agency states moving forward with this issue would have a chilling effect.**

How many cases actually get to an EEOC for a hearing? My guess is not as many as the hyperbolic chilling effect statement suggests. However, I could be wrong but most people that initiate an EEO drop it because they don't want to make waves or just bite the bullet and take it, and many are likely not legit claims. An employee has the right to file an EEO if he/she feels the supervisor is initiating an investigation under false pretenses due to discrimination under Protected Activities, No FEAR ACT. What would be a chilling effect is the attempt by the Agency to silence someone of their 1st Amendment right to free speech and petition the government of grievances.

### Odds and Ends

What's happened has happened and I can back up all my points by evidence through emails, Teams recordings, Teams messages, documentation on the consult, documentation entered into evidence via JPRS, via dept staff testimony in writing, daily work list of a plethora of late consults, etc etc etc. The only thing the Agency has in defense is a the thin veneer of words from DB and Ravipati who are trying to shield themselves and are both scrambling because they can't keep their stories straight all while they wrangle and deflect blame on everyone from QM to HR, to Christianah. Ravipati even slid DB into another position temporarily until this case is finished as a way to protect her and shift blame on Christianah. Everything DB and Ravipati are doing is calculated as they are trying to run out the clock in hopes that this case gets dismissed or I drop it. At which point Ravipati will move DB back to her original position when the storm has past. This is a mess DB created and initiated, and Ravipati was just another one of her willing victims that fell for the manipulation, and got implicated herself and because of her ego she got involved and signed her name on a 14 day suspension, all while having little knowledge of my work, the department workflow and all it's intricacies, just in an attempt to virtue signal to DB and retaliate against me for filing this EEO.

I by no means imply what I'm about to say in a disrespectful or in an insensitive or heartless way, as this person that deceased likely had family that loved him and he loved back, he was a son to someone, a veteran, perhaps had I known him I would have even hung out with him and talked Military stories over a few drinks. But the reality of it is the Agency witnesses want to blame me for him dying at the age of 89. Referring I was the Nurse because his first initial of his last name fell under my group. Ravipati states I was the nurse, so it was my responsibility. If they want to play semantics then why wasn't the nurse that had the consult three times after me held accountable, why wasn't the PSA who's duty it was to schedule the consult detailed, why wasn't the requesting doctor that entered the consult on his patient held accountable to the standards I was, why didn't he or his secretary follow up, why wasn't everyone above me in the chain of

command including DB who is an RN and Ravipati who is a medical doctor up the chain of command and every doctor and nurse that has ever saw him in his entire life held accountable.   This can go on and on through infinity.  But what the Agency is doing is using tunnel vision purposely and disregarding all other aspects and variables involved in the veteran's life and care to come after me and only me and expecting that I know everything about the veteran's life for the 89 years that he lived.

Food for thought, when you go to see a doctor, how often does the doctor or nurse schedule your next appointment?  The appointment is made and scheduled by the secretary up front.  Similarly, VISN 12 and National does not want nurses doing the ancillary work of scheduling appointments, that's why Donnabelle's directive was that administrative staff are supposed to follow up in a few days and schedule the appointment.  See affidavits, emails by staff, Teams transcripts, VHA handbook, Teams recording if allowed into evidence. The fact that DB ignored this when she is on recording stating this is perplexing.

Not to mention my team had over 4200 consults we were working on.  The Community Care Department staff does not have direct contact with any of the patients so how could I even attempt to do a physical assessment?  I'm not a doctor, nor am I his primary care physician. My team was short staffed purposely by DB, therefore, does this mean I am/was at the time solely responsible for 4200 assigned consults to me and responsible for all aspects of their care, and if one of them dies it's my fault?  Point to one person on earth that would even be capable of that.

**Conclusion**

The issue of Reprisal should not be dismissed as it was a small fraction of evidence that started as a holistically part of the discrimination based on Protective activity of Sex and Race.  It then met the criteria of retaliation under Title VII when after I initially filed the EEO under retaliation and Sex this issue was supposed to be nonpunitive but was made punitive in retaliation to me filing the EEO by Ravipati signing off on the 14-day suspension and making all sorts of false allegations in her response to it.  The evidence shows throughout the record that the only the only conclusion one can come up with is that this was nothing less than, discrimination based on Sex, discrimination based on race, and Retaliation after I filed this EEO.  I have met 3 of the 5 protected criteria under EEO, Title VII.

**Exhibit 17**

**Investigator's interview of witnesses.**

**Harris**

**Arowora**

**Donnabelle**

**Ravipati**

**Buckley**

**Morse**

**This equal employment opportunity investigative document contains identifiable personal data that is subject to the Privacy Act of 1974, 5 U.S.C. Sec. 552a. Release of such data must be in accordance with the provisions of the Act, as amended. The unauthorized release of this information could subject the releaser to formal disciplinary action and/or criminal penalties, including a fine of up to $5,000.00.**



### DEPARTMENT OF VETERANS AFFAIRS
### Office of Resolution Management, Diversity & Inclusion
### 2255 Enterprise Drive, Suite 5506
### Westchester, IL 60154

### Investigative Report
### In the Matter of the EEO Complaint of Discrimination of:

Azis Kochiu,                                 )
Complainant                                  )
                                             )
                                             )
and                                          )   Case No. 200J-556A-2023-152770
                                             )
Secretary,                                   )
Department of Veterans Affairs               )
810 Vermont Avenue, NW                       )
Washington, DC 20420                         )
                                             )
                                             )
            Agency                           )
Captain James A. Lovell                      )
Federal Health Care Center                   )
3001 Green Bay Road                          )
North Chicago, IL 60064-3049                 )
_____ )

Lisa Wabinga
Contract EEO Investigator
Computer Evidence Specialists, LLC
5315 A1A South
St. Augustine, FL 32080



**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management, Diversity & Inclusion**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

Table of Contents

**1. Formal Complaint**
Formal Complaint                                                      1-1
Investigator Assignment Letter                                       1-2
60-Day Extension                                                     1-3

**2. EEO Counselor's Report**
Counselor's Report                                                   2-1
Notice of Right to File                                              2-2
Notice of Rights and Responsibilities                               2-3
Counseling Documents                                                2-4

**3. Procedural Review**
Notice of Partial Acceptance                                         3-1
Procedural Review Documents                                          3-2

**4. Settlement Agreements**                                         4-1
Reserved

**5. Prior Appellate Activity**                                      5-1
Reserved

**6. Report of Investigation Summary**                               6-1

**7. Exhibits, Evidence**
Affidavit of Complainant                                             7-1
Affidavit Adriene Harris (Complainant Witness)                       7-2
Affidavit of Christianah Arowora (RMO)                               7-3
Affidavit of Donabelle Lorenzo-Villarino (RMO)                       7-4
Affidavit of Mamata Ravipati (RMO)                                   7-5
Affidavit of Robert Buckley (RMO)                                    7-6
Affidavit of Alex Morse (SME)                                        7-7
Complainant's Rebuttal Statement                                     7-8
Complainant's Emails to Management (June 2023)                       7-9
Complainant's Emails to Management (September 2023)                  7-10
Complainant's Emails to Management (August 2023)                     7-11
Complainant's Proficiency Reports (2021-2023)                        7-12
Weingarten Email Notification                                        7-13
Complainant's Reassignment Documentation                             7-14
Evidence File                                                        7-15
Proposal and Decision Notices for Suspension                         7-16
SF-50s for Return to Duty and Suspension                             7-17
VA Handbook 5005/129, Part II, Ch. 3, Professional Standards Board   7-18
Nurses Collective Bargaining Unit Agreement                          7-19
Request for Agency Documents to EEO POC                              7-20
ORMDI Notification to Complainant                                    7-21
Affidavit of Cynthia Reluya (Witness)                                7-22
RMO Lorenzo-Villarino's Emails regarding Complainant's Proficiency
    Input                                                            7-23

COMPLAINT CASE NUMBER:

OMB NO.: 2900-0716
EXPIRATION DATE: DEC 31, 2019
RESPONDENT BURDEN: 30 Min.

**VA** Department of Veterans Affairs

# COMPLAINT OF EMPLOYMENT DISCRIMINATION

*Read the instructions on the reverse side of this form carefully before completing the front of this form.*

| 1. NAME *(Last, first, middle initial) (Please print)* | 3. MAILING ADDRESS | 4a. WORK TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| Azis Kochiu | 1831 Monroe Avenue South Milwaukee, WI 53172 | |
| 2. EMAIL ADDRESS | | 4b. PRIMARY TELEPHONE NUMBER *(Include Area Code)* 414-617-9879 |

| 5. ARE YOU: | 5a. JOB TITLE, SERIES AND GRADE | 7. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED |
|---|---|---|
| [X] A VA EMPLOYEE | RN grade 2 step 2 | Captain James A Lovell Fed Health Center |
| [ ] AN APPLICANT FOR EMPLOYMENT | 5b. SERVICE/SECTION/PRODUCT LINE | |
| [ ] A FORMER VA EMPLOYEE | | |

NOTE: For each employment related matter that you believe was discriminatory you must list the bases *(list one or more of the following)*:
Race *(Specify)*, Color *(Specify)*, Religion *(Specify)*, Sex *(Male or Female)*, National Origin *(Specify)*, Age *(Provide date of birth)*,
Disability *(Specify)*, Genetic Information *(including family medical history)*, and/or Reprisal for participating in the EEO process or opposing unlawful discrimination.

| 8. BASIS | 9. CLAIM(S) *(What employment related claim(s) - personnel action(s), incident(s), or event(s) caused you to file this complaint? Briefly state the specific claim, personnel action and/or event that caused you to file this complaint. Use an additional sheet of paper if necessary. You should not include information that violates the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personal records of other VA employees, etc.)* | 10. DATE OF OCCURRENCE *(Include the most recent date(s))* |
|---|---|---|
| see attached | Please see the attached. | see attached |

11. REMEDIES SOUGHT *(Use an additional sheet of paper if necessary.)*

please see the attached

| 12a. DO YOU HAVE A REPRESENTATIVE? | 12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE | 12c. TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| [ ] YES [X] NO | N/A at this time. | |
| 12b. IF "YES", IS HE OR SHE AN ATTORNEY? | | 12e. EMAIL ADDRESS |
| [ ] YES [X] NO | | |

| 13a. HAVE YOU CONTACTED AN EEO COUNSELOR? | 13b. NAME OF EEO COUNSELOR | 13c. DATE OF INITIAL CONTACT WITH ORM |
|---|---|---|
| [X] YES [ ] NO | Melvin Tolbert and Mechelle Reed | June 2023 |

14. If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in item 10, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. *(Use an additional sheet of paper if necessary.)*

| 15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE? | 15b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED | 16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE? | 16b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED |
|---|---|---|---|
| [ ] YES [X] NO | N/A | [X] YES [ ] NO | N/A |
| 17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? | 17b. IF "YES," PROVIDE THE NAME AND ADDRESS | | |
| [ ] YES [X] NO | N/A | | |

| 18. SIGNATURE OF COMPLAINANT *(Do not print)* | 19. DATE |
|---|---|
| *Azis Kochiu* | 7-24-23 |

VA FORM
MAR 2017 **4939**

SUPERSEDES VA FORM 4939, MAR 2013,
WHICH SHOULD NOT BE USED.

July 21, 2023

Via Email: kochiu106@gmail.com

Azis Kochiu, Aggrieved Party
1831 Monroe Avenue
South Milwaukee, WI 53172

Dear Mr. Kochiu:

I am closing the informal counseling on the matter you presented to this office on June 22, 2023, Case Number 200J-556A-2023-152770.  Your complaint is as follows:

| Bases | Claims and Dates of Occurrence |
|---|---|
| Reprisal<br><br>Sex | **I. Harassment (Non-Sexual)/Hostile Work Environment**<br><br>1. From in or around January 2021 to July 19, 2023, RMO Donnabelle L. Lorenzo-Villarino, Managed Care Clinical Coordinator/Division Officer has harassed and badgered the Aggrieved Party (AP) based of Reprisal and Sex.  The AP contends that the RMO has treated him differently than his Female co-workers.<br><br>2. In 2022, the RMO issued the AP a lower rating of 'Satisfactory' for his annual proficiency report.<br><br>3. From November 8, 2022 - May 2023, the RMO intentionally left the AP's team short staffed.<br><br>4. From November 8, 2022 - May 3, 2023, the RMO assigned the AP a greater workload.<br><br>5. In or around February/March 2023, the RMO subjected the AP to a Weingarten meeting, in the presence of the Union.<br><br>6. On May 8, 2023, the RMO issued the AP a temporary reassignment notice.  The AP was not afforded Union representation.<br><br>7. From May 8, 2023 - July 2023, the RMO removed the AP from patient care, pending a fact-finding investigation (FFI).<br><br>8. From on or around May 8, 2023 - July 2023, the AP was singled out and held to a different standard than other RN's |

|  | when the RMO notified him that he lacks documentation in emails.<br><br>9. In May 2023, the AP became aware that he was being accused of not properly scheduling a deceased patient's consult back in December 2022, even though his Female co-worker(s) was responsible.<br><br>10. On June 15, 2023, the RMO submitted deceptive information to a Peer Review Committee (PRC) when the RMO referred to a prior consult as being "expedited".  During prior Weingarten and FFI emails the RMO did not refer to the consult as "expedited".<br><br>11. During the week of June 19, 2023, the AP became aware that the RMO had been soliciting and coaching staff to submit negative statements against him.<br><br>12. From February 19 - July 19, 2023, the AP has not been issued his annual performance evaluation.<br><br>**II. Reassignment - Directed**<br><br>1. On May 8, 2023, the RMO issued the AP a temporary reassignment notice removing him from patient care.<br><br>**III. Assignment of Duties**<br><br>1. From November 8, 2022 - May 2023, the RMO assigned the AP a greater workload than his Female co-workers.<br><br>**IV. Evaluation/Performance Appraisal/Proficiency**<br><br>1. In 2022, the RMO issued the AP a lower rating of 'Satisfactory' for his annual proficiency report, based on Reprisal.<br><br>2. From February 19 - July 19, 2023, the AP has not been issued his annual performance evaluation, due by February 19, 2023. |
|---|---|

| Alternative Dispute Resolution (ADR) |
|---|
| Declined. |

| Resolution |
|---|
| 1. To be reinstated into his position.<br>2. To be reassigned to another service or department with the same grade and level of pay. |

Upon receipt of this letter please notify me no later than 5 business days whether the above information is incorrect.

I have enclosed a copy of the Notice of Right to File a Discrimination Complaint (including VA Form 4939). At this point, you have two options available to you. To help you make your decision, I have also enclosed a link to the Equal Employment Opportunity Commission's (EEOC) website for an overview of the guidelines on the federal sector EEO complaint process. http://www.eeoc.gov/federal/

Please select one of the options below as your final decision:

**Option 1:**  You can choose to file a formal complaint of discrimination on some or all of the claim(s) listed above.  If you wish to file a formal complaint, please complete, sign, and date the VA Form 4939; returning the form to the address listed on the *Notice of Right to File a Discrimination Complaint.* You are _strongly encouraged_ to  email your VA 4939 formal complaint of discrimination.

**If you decide to file a formal complaint, you have 15 calendar days from receipt of this notice in which to do so.**  Please do not mail the VA Form 4939 to me; your formal complaint must be mailed to the address listed on the first page of the enclosed *Notice of Right to File a Discrimination Complaint* or emailed to ORMMDO4939@va.gov.

Upon receipt of a formal complaint, the Office of Resolution Management, Diversity & Inclusion (ORMDI) will review your complaint and determine if the claim(s)[1]  raised meet(s) EEOC's procedural requirements for continued processing.

If your complaint meets procedural requirements and  is accepted by ORM for investigation, you will be given the opportunity to submit any documentation in support of your allegations of discrimination to the ORM investigator assigned to investigate your complaint, as part of the process for  gathering evidence relevant to the merits of your accepted claim(s). There is no need to provide evidence in support of your claim(s) until notified that your claim(s) is accepted for investigation.

**Option 2**:  You can take no further action, indicating your wish not to pursue the allegations listed above any further.

If you have any questions or need assistance, please call me at 1 (888) 566-3982, Ext. 998569.

---

[1] A claim is the action(s) the Agency has taken or is taking that causes the aggrieved person to believe s/he is the victim of discrimination for which, if proven, there is a remedy under the federal equal employment statues.  It is important to limit your description of the specific claim(s) to one or two sentences.

Sincerely,

*Mechell Reed*

Mechell Reed
EEO Counselor


Enclosure:  Notice of Right to File a Discrimination Complaint
VA Form 4939

## NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT

Aggrieved Person: Azis Kochiu
Case Number: 200J-556A-2023-152770

1. If you are not satisfied with the results of the informal EEO process and believe that you have been subjected to discrimination because of race, color, religion, sex, national origin, age, disability, genetic information, or retaliation, you have the right to file a formal complaint of discrimination. **If you decide to file a formal complaint, you must do so WITHIN FIFTEEN CALENDAR DAYS OF RECEIPT OF THIS NOTICE.**

2. Attached is VA Form 4939, Complaint of Employment Discrimination. If you choose to file a formal complaint at this time, use this form, and carefully read the instructions on the reverse side before completing it. The counselor is available to assist you in filling out this form and to answer any questions you may have about it. If you require assistance, please contact your counselor immediately. **Please note that the <u>15-calendar day</u> time frame will not be extended due to your need to seek my assistance in completing this form.**

3. You may file a complaint in person, by mail, fax, or e-mail with the District Manager at the address below:

   **ORMMDO4939@va.gov**

4. You must identify each claim you are protesting and provide the date on which each occurred. Your complaint must be limited to the claim(s) you discussed with the counselor. Therefore, if there are any claims that you have not discussed with the counselor, you must do so immediately. Regulations require that you provide the Department with an opportunity to resolve each claim informally at EEO counseling.

5. You are entitled to representation at every stage of the complaint process. You may choose anyone as a representative, unless the person occupies a position within VA that would create a conflict of interest. If you do select a representative, you must inform this ORM District Office, in writing, of the representative's name, telephone number, and business address.

6. If you are a member of the bargaining unit, you may have the right to dispute the events discussed with the counselor through the union grievance procedure. Regulations provide that you may file either a grievance <u>or</u> an EEO complaint about the events in dispute, but <u>not both</u>. Should you file both,

whichever you file first (a union grievance or an EEO complaint) will be considered an election to proceed in that forum.

7. If you are complaining about a matter that may be appealed to the Merit Systems Protection Board (MSPB), you may file an EEO complaint <u>or</u> an MSPB appeal, but <u>not</u> <u>both</u>. Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum. If the counselor can be of further assistance to you, please advise.

# COMPLAINT OF EMPLOYMENT DISCRIMINATION INSTRUCTIONS

**Read the following instructions carefully before you complete this form. Please complete all items on the complaint form.**

**GENERAL:** Pursuant to the Equal Employment Opportunity Commission (EEOC) Title 29 Code of Federal Regulations (29 C.F.R.) §1614, VA Form 4939, Complaint of Employment Discrimination, can be used by VA employees, former employees and applicants for employment who file a formal Equal Employment Opportunity (EEO) complaint of discrimination. This regulation prohibits discrimination based on race, color, religion, gender (sex), national origin, age (40 years and over), physical or mental disability, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination.

You can obtain assistance from your EEO Counselor in filling out this form. Your EEO Counselor can also answer any questions you may have about this form. In item 8, you should specify the basis of your complaint: race, color, religion, gender (sex), national origin, age *(date of birth)*, physical or mental disability *(specific information about your disability)*, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination. If you list "Reprisal," please state the nature of the prior EEO activity in which you were engaged, i.e. did you file a prior EEO complaint? Use an additional sheet of paper, if necessary.

It is very important that you be precise as to the dates of all actions or events you are protesting. In addition, the claims listed in item 9, must be limited to those claims discussed with an EEO Counselor *(discussed within 45 calendar days of occurrence of the event, or within 45 calendar days of the effective date, if a personnel action)* or like or related claims. If any of the claims listed in item 9 were discussed with an EEO Counselor, but not within 45 calendar days of their occurrence or of their effective date, you must explain why you waited more than 45 calendar days. If any of the claims listed in item 9 were not discussed with an EEO Counselor, please contact the Office of Resolution Management (ORM), Regional EEO Officer IMMEDIATELY. The requirement that you contact an EEO Counselor about every claim listed in item 9 will not be waived under any circumstances. Failure to do so will only delay the processing of your complaint.

It is your responsibility to keep the (ORM) informed of your current address. If you move, immediately advise the ORM District Office where you filed this complaint of your new address. In addition, you may receive certified and express mail in connection with your complaint. It is your responsibility to claim all certified and express mail. Failure to notify ORM of a change in address or to claim certified and express mail may lead to dismissal of your complaint.

**REPRESENTATION:** You may have a representative of your own choosing at all stages of the processing of your complaint. No EEO Counselor, EEO Investigator or EEO Officer may serve as a representative. (Your representative need not be an attorney, but only an attorney representative may sign the complaint on your behalf.)

**WHEN TO FILE:** Your formal complaint must be filed within 15 calendar days of the date you received the *"Notice of Right to File a Discrimination Complaint"* (NRTF) from your EEO Counselor. If you do not meet this time limit, you must explain why you waited more than 15 calendar days to file. These time limits may be extended under certain circumstances; however, they will NOT be waived and your complaint will NOT be investigated unless you explain your untimeliness and the explanation is acceptable in accordance with EEOC, 29 C.F.R. §1614(c).

**WHERE TO FILE:** The complaint should be filed with the ORM District Office identified in the NRTF. You may submit a copy either by mail, in person, electronically (via e-mail), or by facsimile. Filing instructions are contained in the cover letter attached to the NRTF.

**PRIVACY ACT STATEMENT:** Maintenance and disclosure of VA Form 4939 is made in accordance with the Privacy Act of 1974. Collection of the information on this form is authorized and/or required by the regulations of the EEOC, 29 C.F.R. §1614. All records, from which information is retrieved, by the name or personal identifier of a respondent, are maintained by a Government-wide Systems of Records: EEOC/GOVT-1, Equal Employment Opportunity Complaint Records and Appeal Records. The information collected will be used by ORM to determine whether your complaint is acceptable for investigation and in connection with any subsequent investigation and processing of your complaint. In the course of any investigation, this form may be shown to any individual who may be required by regulations, policies or procedures of the EEOC and/or ORM to provide information in connection with this complaint, including individuals you may have identified as responsible for the acts or events at issue in this complaint. Other disclosures may be: (a) to respond to a request form from a Member of Congress regarding the status of the complaint or appeal; (b) to respond to a court subpoena and/or to refer to a district court in connection with a civil suit; (c) to disclose information to authorized officials or personnel to adjudicate a complaint or appeal; or (d) to disclose information to another Federal agency or to a court or third party in litigation when the Government is party to a suit before the court.

**RESPONDENT BURDEN STATEMENT:** In accordance with the Paperwork Reduction Act of 1995, The Department of Veterans Affairs (VA) may not conduct or sponsor, and the respondent is not required to respond to this collection of information unless it displays a valid OMB Control Number. The valid OMB Control Number for this information collection is 2900-0716. The collection of this information is voluntary. However, the information is necessary to determine if your complaint of employment discrimination is acceptable for further processing in accordance with EEOC, 29 C.F.R. §1614. The time required to complete this information collection is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing the form. Send comments regarding this burden estimate or any other aspects of this collection, including suggestions for reducing this burden, to VA Clearance Officer (005R1B), 810 Vermont Avenue, Washington, DC 20420. SEND COMMENTS ONLY. DO NOT SEND THIS FORM, A COMPLAINT OF EMPLOYMENT DISCRIMINATION, OR REQUEST FOR BENEFITS TO THIS ADDRESS

REVERSE OF VA FORM 4939, MAR 2017

| From: | Kochiu, Azis FHCC Lovell |
|---|---|
| To: | ORMMDO4939 |
| Subject: | EEO filing for Azis Kochiu |
| Date: | Monday, July 24, 2023 3:04:40 PM |
| Attachments: | NORTF Notice (AK 152770) Signed Copy.pdf |
| | Complaint of Employment Discrimination. number 8.docx |
| | Resolution.docx |
| | 45-day EEO.docx |

Greetings,

I am submitting this notice to move to the formal stage of my EEO filing.  You will see the 4939 form filled out and signed.  I attached additional information as I couldn't get them to fit on the form itself.  If we move to the formal stage I have all the evidence backed by facts already completed.

Thank you,
Azis (Ozzie) Kochiu
414-617-9879

| | |
|---|---|
| **From:** | Reed, Mechell A. (ORMDI) (she/her/hers) |
| **To:** | ORMMDO4939 |
| **Subject:** | Documents Received After 4939 Receipt (AK 152770) |
| **Date:** | Tuesday, August 1, 2023 10:04:25 AM |
| **Attachments:** | image001.png |
| | image002.png |

Greetings,

Case#200J-556A-2023-152770



Thank-you.

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, August 1, 2023 10:00 AM
**To:** Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Subject:** RE: ORMDI: Notice of Right To File Formal EEO Complaint and VA Form 4939 (AK) - Please Acknowledge

Mechelle, keep this part for the time being.  I talked to the Union who stated they want to grieve the 2 week suspension.  Apparently, if I go through EEO then I can't go through the union.  So leave this part out please.

Thanks
ozzie

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, August 1, 2023 9:26 AM
**To:** Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Subject:** FW: ORMDI: Notice of Right To File Formal EEO Complaint and VA Form 4939 (AK) - Please Acknowledge

Gm, Mechell.

I was called into the office and was told that they are proposing a two week suspension.  This is no doubt in retaliation to me filing an EEO and came 2 – 3 weeks after you did the formal interview.  Can I have this added to my file as part of the retaliation?

Thanks
Azis Kochiu
414-617-9879

**From:** Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Sent:** Monday, July 24, 2023 9:53 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Fwd: ORMDI: Notice of Right to File Formal EEO Complaint and VA Form 4939 (AK) - Please Acknowledge

Greetings,

Please a copy of the requested information attached.  The timeframe began on the date of the notice.

Thank you.

Get Outlook for iOS

**From:** Reed, Mechell A. (ORMDI) (she/her/hers)
**Sent:** Friday, July 21, 2023 10:21:23 AM
**To:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** ORMDI: Notice of Right to File Formal EEO Complaint and VA Form 4939 (AK) - Please Acknowledge

Greetings,

It was a pleasure to speak with you earlier this week and I've amended the complaint as discussed.

I am providing you with the attached **Notice of Right to File Formal (NORTF)** which includes the **VA Form 4939**.  The aforementioned form outlines your right to continue at the **Formal** stage of the EEO complaint process, if desired.  As we have discussed the **Informal stage** of the EEO complaint process has concluded for you.

Please note the instructions regarding timely filing deadlines, i.e., 15 calendar days and utilizing the **VA Form 4939**, for such action.  The 15 calendar-day timeframe will not be extended due to your request to seek my assistance in completing this form.  The VA Form 4939 is not submitted directly to me for processing.  Please refer to **pages 3 and 5** of the attachment for the submission instructions via email to **ORMMDO4939@va.gov** .

If you elect to continue to the Formal stage, you will receive an acknowledgement of your request and a Counselor's Report within 7 - 10 business days of your request.  Thereafter, you're EEO complaint will be reassigned to a Case Manager as your primary point of contact.  You're EEO complaint will remain in an 'Acceptability Pending' status while being reviewed by the assigned Case Manager.  Within 30 - 60 calendar days you should receive a notice advising you on the decision for your request for investigation.

Any documents that you have submitted during the Informal stage, please consider those as returned to you. If your EEO complaint is accepted for investigation you may submit any evidence in support of your claim to the EEO Investigator, after one is assigned to your case.

Can you please confirm your receipt with a response via email? If you do not respond, it is understood that you have accessed the attachment. If you have any additional questions and/or concerns, please feel free to contact me.

Thank-you,
**Mechell Reed** (she/her/hers)
EEO Counselor
2255 Enterprise Dr., Suite 5506
Office of Resolution Management, Diversity and Inclusion
Westchester, IL 60154
Work Cell: (708) 953-1845
Fax: (708) 236-2898



***NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time. In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically. All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.***

*VA Core Values:* Integrity Commitment Advocacy Respect Excellence
*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service. Please take a moment to* <u>complete a very brief survey</u> *to let us know how my service was today.*

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

| From: | Reed, Mechell A. (ORMDI) (she/her/hers) |
|---|---|
| To: | ORMMDO4939 |
| Cc: | Kochiu, Azis FHCC Lovell |
| Subject: | Documents Received After 4939 Receipt: FW: 2 week proposed suspension to be added to the harassment claim. (AK 152770) |
| Date: | Tuesday, August 1, 2023 12:37:47 PM |
| Attachments: | image001.png |
| | image002.png |
| | azi.pdf |
| | Proposed 14 Day Suspension (AK 152770).pdf |
| | Rescission of Temporary Reassignment (AK 152770).pdf |

Greetings,

Case#200J-556A-2023-152770

Can you please add the below and attached to Mr. Kochiu's case?

Thank-you.

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, August 1, 2023 12:13 PM
**To:** Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Subject:** 2 week proposed suspension to be added to the harassment claim.

Case Manager assigned,

Dr Ravipati who signed this proposal had initially told me this incident would be a slap on the wrist. However, after the EEO was filed and Mechelle interviewed the manager in question, they decided to go from a slap on the wrist to a proposed 2-week suspension. I was never given a verbal at my time in the VA, never a write up or any type of disciplinary action against me. But because I filed an EEO their response couldn't be clearer that they took the nuclear option to intimidate me which is nothing less than retaliation and harassment. It's obvious they are doing this because I filed the EEO.

Section 2 first page shows the proposal.

Please forward this to the case manager.

Azis Kochiu

**From:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Tuesday, August 1, 2023 12:03 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** File

V/R,

# Monica Coleman BSN, RN

**NNOC/NNU Capt James A Lovell FHCC VA Director**
**NNOC/NNU VA Lead National Safety Officer**
**RN Community Care Coordinator**
Office of Community Care Network (CCN)
Captain James A Lovell Federal Health Care Center
3001 Greenbay Road
North Chicago, IL 60064
**Phone: 224-610-8632**
**Fax: 224-610-8638**
**Email:** Monica.Coleman@va.gov

NNU Membership form:
https://www.nationalnursesunited.org/Vamembershipform

**ADO Form**
https://www.nationalnursesunited.org/sites/default/files/nnu/documents/0522_ADO_Electronic_Fo
rm.pdf

See the source image



"I don't know how to change it, but I know if I keep talking about how dirty it is our here, somebody's gonna clean it up" – Tupac Amur Shakur

"We make a living by what we get, we make a life by what we give" – Winston Churchill

"You don't make progress by standing on the sidelines, whimpering and complaining. You make progress by implementing ideas." – Shirley Chisholm



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a),  and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction.  If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management, Diversity & Inclusion**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

October 30, 2023

Computer Evidence Specialists
5315 A1A South
St. Augustine, FL 32080

**SUBJECT: Assignment of Investigation**

1.  You are hereby assigned to investigate the following discrimination complaint starting October 30, 2023:

**Azis Kochiu ▬ Case No. 200J-556A-2023-152770**
**Captain James A. Lovell Federal Health Care Center**

2.  This letter will be your authorization to: (1) investigate the accepted claim(s) in this complaint; (2) require all employees of the Department of Veterans Affairs to cooperate with the investigation; and (3) require employees of the agency having any knowledge of the matter accepted for investigation to furnish testimony without a pledge of confidence.  Pursuant to 29 C.F.R. §1614.108 (c) (2), the Investigator's authority to administer the oath is automatic during the course of this investigation.

Sincerely,

Daniel Spilsbury
OICT Manager

CC:     Complainant
         Robert G. Buckley, Director
         Melvin Tolbert, EEO Program Manager
         Melvin.tolbert@va.gov 224-610-3853 x83853



# LETTER OF AUTHORITY TO INVESTIGATE

Investigator Name: <u>Lisa Wabinga</u>

Investigator Address: <u>Poolville, TX</u>

Subject: Authorization to Investigate
Reference: Veterans Affairs (VA)
EEO Complaint Number: <u>200J-556A-2023-152770</u>
Complainant: <u>Azis Kochiu</u>

<u>Lisa Wabinga</u> ,

<u>11/3/2023</u>

In accordance with the Veterans Affairs (VA) letter to Computer Evidence Specialists, LLC (CES, LLC), dated <u>10/30/2023</u> you are authorized to investigate the above referenced complaint.

Investigations will be conducted in accordance with applicable EEOC directives and other applicable requirements, including 29 CFR 1614.108. The investigator is authorized to investigate all aspects of the complaint of discrimination, to require all employees of the Veterans Affairs having any knowledge of the matter complained of to furnish testimony under oath or affirmation (29 CFR 1614.108(c)(l) and (2)).

Regards,

Jeff Hayden
Project Manager
VA EEO Investigative Services
Contract No.: 36C10X20D0011
Computer Evidence Specialists, LLC (CES, LLC)
(202) 856-5661

| | |
|---|---|
| **From:** | Little, Elvis, Is, Combat, Ready |
| **To:** | Martinez, Patricia (ORMDI) |
| **Subject:** | [EXTERNAL] Re: Formal EEO Complaint Request for Extension A.K. 152770 |
| **Date:** | Thursday, August 24, 2023 12:44:38 PM |
| **Attachments:** | image001.png |

An extension is fine. Take your time.

Ozzie

On Tue, Aug 22, 2023 at 2:02 PM Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov> wrote:

> Good afternoon, Mr. Kochiu,
>
> I am the Case Manager assigned to your formal EEO complaint. Due to a staffing shortage, we are slightly behind in issuing our procedural review letters to complainants. Therefore, we are requesting permission for an extension in the processing of your formal complaint. Within 3 days, please advise me it you do or not agree to a 60-day extension.
>
> I appreciate your understanding. ORMDI is working diligently to issue all our letters as quickly as possible. I anticipate being completed with my procedural review of your formal complaint within the next 2 weeks.
>
> Thank you again!
>
>
> *Patricia Martinez*
>
> **EEO Specialist**
>
> **Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District**
>
> 2255 Enterprise Drive, Suite 5506
>
> Westchester, IL 60154
>
> **C: 708.904.0955**
>
> **F: 708.236.2898**
>
> Helpful Links: OPM| Healthcare | Life Insurance | TSP | FSAFeds | myPay | eOPF | BeneFeds (Dental/Vision) WebTA



**U.S. Department of Veterans Affairs**

Human Resources and Administration
Operations, Security and Preparedness

*Office of Resolution Management, Diversity & Inclusion*

**NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time. In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically. All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.**

*VA Core Values:* **I**ntegrity **C**ommitment **A**dvocacy **R**espect **E**xcellence

*VA Core Characteristics:* **Trustworthy | Accessible | Quality | Innovative | Agile | Integrated**

*Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service. Please take a moment to* complete a very brief survey *to let us know how my service was today.*

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

| | |
|---|---|
| **From:** | Martinez, Patricia (ORMDI) |
| **To:** | kochiu106@gmail.com |
| **Subject:** | Formal EEO Complaint Request for Extension A.K. 152770 |
| **Date:** | Tuesday, August 22, 2023 2:02:00 PM |
| **Attachments:** | image001.png |

Good afternoon, Mr. Kochiu,

I am the Case Manager assigned to your formal EEO complaint. Due to a staffing shortage, we are slightly behind in issuing our procedural review letters to complainants. Therefore, we are requesting permission for an extension in the processing of your formal complaint. Within 3 days, please advise me it you do or not agree to a 60-day extension.

I appreciate your understanding. ORMDI is working diligently to issue all our letters as quickly as possible. I anticipate being completed with my procedural review of your formal complaint within the next 2 weeks.

Thank you again!

*Patricia Martinez*
**EEO Specialist**
**Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District**
**2255 Enterprise Drive, Suite 5506**
**Westchester, IL 60154**
**C: 708.904.0955**
**F: 708.236.2898**
**Helpful Links:** OPM | Healthcare | Life Insurance | TSP | FSAFeds | myPay | eOPF |
BeneFeds (Dental/Vision) WebTA



**U.S. Department of Veterans Affairs**
Human Resources and Administration
Operations, Security and Preparedness
*Office of Resolution Management, Diversity & Inclusion*

**NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time. In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically. All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.**

*VA Core Values:* **I**ntegrity **C**ommitment **A**dvocacy **R**espect **E**xcellence
*VA Core Characteristics:* **Trustworthy | Accessible | Quality | Innovative | Agile | Integrated**

***Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today.***

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

| | |
|---|---|
| **From:** | Microsoft Outlook |
| **To:** | kochiu106@gmail.com |
| **Subject:** | Relayed: Formal EEO Complaint Request for Extension A.K. 152770 |
| **Date:** | Tuesday, August 22, 2023 2:02:10 PM |
| **Attachments:** | Formal EEO Complaint Request for Extension A.K. 152770.msg |

Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:

kochiu106@gmail.com (kochiu106@gmail.com) <mailto:kochiu106@gmail.com>
Subject: Formal EEO Complaint Request for Extension A.K. 152770



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT, DIVERSITY & INCLUSION**
**MID-WEST DISTRICT**

# COUNSELOR REPORT

### CASE NUMBER: 200J-556A-2023-152770
### COUNSELOR NAME: Mechell Reed

| Name of Aggrieved Party: | Mr. Azis Kochiu | | | | | |
|---|---|---|---|---|---|---|
| Home and/or Alternate Address: | 1831 Monroe Avenue, South Milwaukee, WI 53172 | | | | | |
| Home Telephone Number: | (414) 617-9879 | | | | | |
| Cellular/Mobile Number | (414) 617-9879 | | | | | |
| Business Address: | 3001 Green Bay Road, North Chicago, IL 60064 | | | | | |
| Business Telephone Number: | (224) 610-8632 | | | | | |
| Email Address: | kochiu106@gmail.com | | | | | |
| Position Title/Grade: | Registered Nurse, VN-2 | | | | | |
| Employee | X | Former Employee | | Applicant | | Contractor | |
| VHA | X | VBA | | NCA | | Canteen | | Other | |
| Title 5 | | Title 38 | X | Hybrid T38 | | Full-time | X | Part-time | |
| Probationary | | Career | X | Career Conditional | | Temporary | | Term | |
| Name of Facility: | Captain James A. Lovell Federal Health Care Center | | | | | |
| Address of Facility: | 3001 Green Bay Road, North Chicago, IL 60064 | | | | | |
| Facility Telephone Number: | (847) 688-1900 | | | | | |
| Name of Representative: | | | | | Attorney: N/a | |

### NOTIFICATION OF PROCEDURAL RIGHTS

| | | | | |
|---|---|---|---|---|
| Initial Contact: | Telephone: | | Date | 06/22/2023 |
| Initial Interview: | Telephone: | | Date | 06/28/2023 |
| Rights & Responsibilities/Notices: | Email: | 06/30/2023 | Date | 07/01/2023 |
| Notice to Unreachable Aggrieved: | Email: | | Date | |
| Agreed to Waive Anonymity: | YES [X] | NO [ ] | Date | 06/30/2023 |
| Notification to Facility Director | Email: | 07/12/2023 | Date | 07/12/2023 |
| ADR offered by facility [X]  MOU [X]: | YES [X] | NO [ ] | Date: | 06/28/2023 |
| Facility Returned Signed Refusal | YES [ ] | NO [ ] | Date | |
| ADR Agreed to by Aggrieved: | YES [ ] | NO [X] | Date: | 07/01/2023 |
| Settlement (SA): [ ] | Withdrawal (WD): [ ] | | Date: | |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | |
| Notice of Right to File: | Email: | 07/21/2023 | Date: | 07/21/2023 |

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

200J-556A-2023-152770

## RMO INFORMATION

| Responding Management Official(s):<br><br>(Name, Title, Telephone Number) | Donnabelle L. Lorenzo-Villarino (RMO), Managed Care Clinical Coordinator/Division Officer,<br><br>(847) 688-1900, Ext. 88454 |
| --- | --- |

**Claim - 1:** Harassment (Non-Sexual)/Hostile Work Environment
**Incident Date:** 07/19/2023
**Bases:** Reprisal (Opposition), Sex (Male)

|  | Yes (date) | No |  | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
| --- | --- | --- | --- | --- | --- | --- |
| Mixed Case |  | X | MSPB Filed |  | X | |
| Union Grievance Filed |  | X | Is Claim Timely | X | | |
| Administrative Grievance Filed |  |  |  | X | | |
| Have you contacted another EEO Official? |  |  |  | X | | Melvin Tolbert, EEO Manager |

**Brief Description of Claim - 1**

1. From in or around January 2021 to July 19, 2023, RMO Donnabelle L. Lorenzo-Villarino, Managed Care Clinical Coordinator/Division Officer has harassed and badgered the Aggrieved Party (AP) based of Reprisal and Sex. The AP contends that the RMO has treated him differently than his Female co-workers.

2. In 2022, the RMO issued the AP a lower rating of 'Satisfactory' for his annual proficiency report.

3. From November 8, 2022 - May 2023, the RMO intentionally left the AP's team short staffed.

4. From November 8, 2022 - May 3, 2023, the RMO assigned the AP a greater workload.

5. In or around February/March 2023, the RMO subjected the AP to a Weingarten meeting, in the presence of the Union.

6. On May 8, 2023, the RMO issued the AP a temporary reassignment notice. The AP was not afforded Union representation.

7. From May 8, 2023 - July 2023, the RMO removed the AP from patient care, pending a fact-finding investigation (FFI).

8. From on or around May 8, 2023 - July 2023, the AP was singled out and held to a different standard than other RN's when the RMO notified him that he lacks documentation in emails.

9. In May 2023, the AP became aware that he was being accused of not properly scheduling a deceased patient's consult back in December 2022, even though his Female co-worker(s) was responsible.

**Confidential Document**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

200J-556A-2023-152770

10. On June 15, 2023, the RMO submitted deceptive information to a Peer Review Committee (PRC) when the RMO referred to a prior consult as being "expedited". During prior Weingarten and FFI emails the RMO did not refer to the consult as "expedited".

11. During the week of June 19, 2023, the AP became aware that the RMO had been soliciting and coaching staff to submit negative statements against him.

12. From February 19, but as recently as July 19, 2023, the AP has not been issued his annual proficiency report.

The AP contends that the RMO's actions are based on Reprisal, in opposition to him contacting executive leadership regarding workload concerns, etc. According to the AP, he was issued a lower rating around the time he began to voice his concerns regarding staffing and veteran advocacy. The AP contends that the RMO has singled him out in comparison to his Female co-workers. According to the AP two other nurses within the department had similar incidents where patients died, but they were not subjected to any detail, FFI, chart review, etc..

The AP has been harmed with mental and physical suffering, due to the stress and anxiety form the incidents. The AP contends that he has to do the 'walk of shame' and his character has been slandered, due to the detail as he doesn't have an official office.

**Counselor Note:** On June 28, 2023, the AP declined to add the basis of Race, after being asked by this Counselor. On June 28 and July 13, 2023, this Counselor notified the AP to contact the OIG and/or OAWP for claims involving whistleblower reprisal, as another avenue of redress.

**Resolution Sought:**
1. To be reinstated into his position.
2. To be reassigned to another service or department, to a position with the same grade and level of pay.

**Management's Response:**
The Responding Management Official (RMO), Donnabelle L. Lorenzo-Villarino (RMO), Managed Care Clinical Coordinator/Division Officer provided the following statements on July 17 and 19, 2023:

1. At any time from in or around January 2021 - July 11, 2023, did you ever treat ever Mr. Kochiu differently than his Female co-workers? *"No"*

2. At any time from November 8, 2022, to May 3, 2023, did you intentionally leave Mr. Kochiu's team short staffed?

   *"No, I did not. Each team had two clinical nurses per team. Two of the four team had each clinical nurse orientee. One of the four team, women's health only had one full time and a part time clinical nurse. Mr. Kochiu's team had two clinical nurses in the team, a female nurse and himself. It was explained to the whole team that we are currently working to request for another*

**Confidential Document**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

200J-556A-2023-152770

*clinical nurse with the projected goal to have three clinical nurse each team, except for women's health team."*

3. At any time from November 8, 2022, to May 3, 2023, did you ever assign Mr. Kochiu a greater workload than his Female co-workers?

    *"No. Mr. Kochiu's team consist of a female and male nurse who has workload evenly distributed amongst them."*

4. Can you clarify why Mr. Kochiu's was reassigned away from patient care back on May 8, 2023?

    *"Base(d) on the fact finding and human resources recommendation, Mr. Kochiu was reassigned out of patient care."*

5. At any time from 2021 - 2023, were there any other Female RN(s) who had JPRS incidents filed against them where a patient died similar to those against Mr. Kochiu? If so, where the Female RNs subjected to a detail, reassignment, an investigation(s), and/or chart review(s)?

    *"Not that I am aware of."*

6. In June 2023, did you ever coach and/or solicit staff members to submit negative statements against Mr. Kochiu?

    *"No, Mr. Kochiu have already been reassigned to another area in June 2023. Any report of contact requested through the fact finding would be related to an ongoing investigation."*

7. In or around June 2023, did you ever report to the Peer Review Committee that a consult was 'expedited'? In prior fact-finding emails and/or Weingarten meetings did you refer to that same consult as 'expedited'?

    *"No, around June 2023 an FHCC's Risk Manager from Quality Management Department reached out the me regarding a Peer Review Committee invitation to be extended to Mr. Kochiu. Around March 2023, same Risk Manager reached out to me regarding assigning staff or Mr. Kochiu's peer to perform the review. I did not report consult was expedited to the Peer Review Committee nor do I recall referring the same consult as "expedited" in prior fact finding and/or Weingarten meetings."*

8. In 2022, did you issue Mr. Kochiu a rating of 'Satisfactory' for his performance evaluation based on reprisal?

    *"No, his rating of satisfactory was given for the following reason: For FY23 performance which covers 2022, during the absence of Ms. Arowora rated the evaluation for the staff. I had requested Mr. Kochiu, along with other staff who needed their evaluation completed, to provide their self-assessment input. Mr. Kochiu replied to go ahead with his rating without a self-assessment. To my recollection, there was nothing in Mr. Kochiu's performance that would justify a rating above Satisfactory."*

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

9. Have you issued Mr. Kochiu a performance evaluation for the most recent performance period, i.e., due February 2023? If so, what was the rating? If it has not been issued yet is the delay due to Reprisal and/or his Sex?

   *"No, per Mr. Kochiu's direct supervisor, he declined to meet with his supervisor regarding the issuance of his performance evaluation."*

10. Can you please provide a response to Mr. Kochiu's requested resolutions listed below?

    *"No, the requested response for the below resolution are dependent upon future results of the ongoing investigation, which is outside my purview."*

11. Can you clarify who is Mr. Kochiu's direct supervisor is? The date he declined, i.e., *"No, per Mr. Kochiu's direct supervisor, he declined to meet with his supervisor regarding the issuance of his performance evaluation."*

    *"Mr. Kochiu's direct supervisor is Ms. Christianah Arowora. Per Ms. Arowora's initial report to me, she stated the staff refused to attend. I had asked her to forward me a copy of employee declining the meeting, she forwarded me a meeting invite regarding performance evaluation which was scheduled on 6/26/2023 but he did not accept the meeting invite nor attended the meeting invite."*

    *"I also wanted to elaborate on my response to the reason why it has been delayed for most staff, not sure if it should be added. Since Mr. Kochiu's direct supervisor was unexpectedly out on extended leave, it resulted in me taking over some of the roles which includes the performance evaluation, however I did not have access to it at that time. When I received access for performance evaluation for several employees, including Mr. Kochiu, that was when I requested their input and proceeded with their evaluations. "*

12. I received the attached proficiency report for February 28 - February 27, 2023. Were you the rater for this period? Is this the report that was scheduled to be issued to Mr. Kochiu on June 26, 2023?

    *"Yes this is the proficiency I rated Mr. Kochiu on behalf of his direct supervisor since she was on extended leave. On June 26,2023, his direct supervisor, since she has returned, was the one who scheduled to meet with the employee to issue the evaluation where he did not respond nor attend the teams meeting scheduled by the supervisor."*

**Informal Documents Received:**

1. Facility Evidence (Proficiency Report for February 19, 2020 to February 2021), November 13, 2021

2. Facility Evidence (CCNCC - RN Functional Statement), February 2021

3. Facility Evidence (Proficiency Report for February 19, 2021 to February 1, 2022), February 15, 2022

**Confidential Document**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

200J-556A-2023-152770

4. Facility Evidence (Proficiency Report for February 28, 2022 to February 27, 2023), May 4, 2023

5. AP Evidence (Detail Notice), May 8, 2023

6. Facility Evidence (CCNCC - RN Functional Statement), July 2023

7. AP Statement for Untimely Filing, July 13, 2023

| **Claim - 2:** Reassignment - Directed<br>**Incident Date:** 05/08/2023<br>**Bases:** Reprisal (Opposition), Sex (Male) | | | | | | |
|---|---|---|---|---|---|---|
| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely | X | | |
| Administrative Grievance Filed | | | | | X | |
| Have you contacted another EEO Official? | | | | X | | Melvin Tolbert, EEO Manager |

**Brief Description of Claim - 2:**

1. On May 8, 2023, the RMO issued the AP a temporary reassignment notice removing him from patient care.

| **Claim - 3:** Assignment of Duties<br>**Incident Date:** 11/08/2022<br>**Bases:** Reprisal (Opposition), Sex (Male) | | | | | | |
|---|---|---|---|---|---|---|
| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely | X | | |
| Administrative Grievance Filed | | | | | X | |
| Have you contacted another EEO Official? | | | | X | | Melvin Tolbert, EEO Manager |

**Brief Description of Claim - 3:**

1. From November 8, 2022 - May 2023, the RMO assigned the AP a greater workload than his Female co-workers.

| **Claim - 4:** Evaluation/Performance Appraisal/Proficiency<br>**Incident Date:** 07/05/2023<br>**Bases:** Reprisal (Opposition) | | | | | | |
|---|---|---|---|---|---|---|
| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely | X | | |
| Administrative Grievance Filed | | | | | X | |
| Have you contacted another EEO Official? | | | | X | | Melvin Tolbert, EEO Manager |

**Brief Description of Claim - 4:**

**Confidential Document**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

200J-556A-2023-152770

1. In 2022, the RMO issued the AP a lower rating of 'Satisfactory' for his annual proficiency report, based on Reprisal.

2. From February 19, 2023, bit as recently as July 19, 2023, the AP has not been issued his annual proficiency report, due by February 19, 2023.

## SUMMARY OF RESOLUTION EFFORTS

The Aggrieved Party declined the offer to mediate. A resolution could not be reached during the Informal stage.

## FINAL INTERVIEW

During the final interview the results of informal counseling and resolution efforts were discussed with the Aggrieved Party. The Aggrieved Party was informed that the claim listed above was the only claim addressed during the informal EEO counseling. If a formal Complaint of Discrimination is filed, a claim that has not been brought to the attention of an EEO Counselor and is not like or related to a claim that has been brought to the attention of an EEO Counselor is subject to dismissal in accordance to CFR 1614.107 a(2).

The Notice of Right to File a Discrimination Complaint and VA Form 4939 were sent by email on July 21, 2023, and received on July 21, 2023.

Mechell Reed
EEO Counselor                                      Date:07/24/2023

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT, DIVERSITY & INCLUSION
MIDWEST DISTRICT
Westchester, IL

July 21, 2023

Via Email: kochiu106@gmail.com

Azis Kochiu, Aggrieved Party
1831 Monroe Avenue
South Milwaukee, WI 53172

Dear Mr. Kochiu:

I am closing the informal counseling on the matter you presented to this office on June 22, 2023, Case Number 200J-556A-2023-152770.  Your complaint is as follows:

| Bases | Claims and Dates of Occurrence |
|---|---|
| Reprisal<br><br>Sex | **I. Harassment (Non-Sexual)/Hostile Work Environment**<br><br>1. From in or around January 2021 to July 19, 2023, RMO Donnabelle L. Lorenzo-Villarino, Managed Care Clinical Coordinator/Division Officer has harassed and badgered the Aggrieved Party (AP) based of Reprisal and Sex.  The AP contends that the RMO has treated him differently than his Female co-workers.<br><br>2. In 2022, the RMO issued the AP a lower rating of 'Satisfactory' for his annual proficiency report.<br><br>3. From November 8, 2022 - May 2023, the RMO intentionally left the AP's team short staffed.<br><br>4. From November 8, 2022 - May 3, 2023, the RMO assigned the AP a greater workload.<br><br>5. In or around February/March 2023, the RMO subjected the AP to a Weingarten meeting, in the presence of the Union.<br><br>6. On May 8, 2023, the RMO issued the AP a temporary reassignment notice.  The AP was not afforded Union representation.<br><br>7. From May 8, 2023 - July 2023, the RMO removed the AP from patient care, pending a fact-finding investigation (FFI).<br><br>8. From on or around May 8, 2023 - July 2023, the AP was singled out and held to a different standard than other RN's |

|   |   |
|---|---|
|   | when the RMO notified him that he lacks documentation in emails. |
|   | 9. In May 2023, the AP became aware that he was being accused of not properly scheduling a deceased patient's consult back in December 2022, even though his Female co-worker(s) was responsible. |
|   | 10. On June 15, 2023, the RMO submitted deceptive information to a Peer Review Committee (PRC) when the RMO referred to a prior consult as being "expedited". During prior Weingarten and FFI emails the RMO did not refer to the consult as "expedited". |
|   | 11. During the week of June 19, 2023, the AP became aware that the RMO had been soliciting and coaching staff to submit negative statements against him. |
|   | 12. From February 19 - July 19, 2023, the AP has not been issued his annual performance evaluation. |
|   | **II. Reassignment - Directed** |
|   | 1. On May 8, 2023, the RMO issued the AP a temporary reassignment notice removing him from patient care. |
|   | **III. Assignment of Duties** |
|   | 1. From November 8, 2022 - May 2023, the RMO assigned the AP a greater workload than his Female co-workers. |
|   | **IV. Evaluation/Performance Appraisal/Proficiency** |
|   | 1. In 2022, the RMO issued the AP a lower rating of 'Satisfactory' for his annual proficiency report, based on Reprisal. |
|   | 2. From February 19 - July 19, 2023, the AP has not been issued his annual performance evaluation, due by February 19, 2023. |

| **Alternative Dispute Resolution (ADR)** |
|---|
| Declined. |

| **Resolution** |
|---|
| 1. To be reinstated into his position. |
| 2. To be reassigned to another service or department with the same grade and level of pay. |

Page 3
Notice of Right to File a Discrimination Complaint
Name of Aggrieved: Azis Kochiu
Case Number: 200J-556A-2023-152770

Upon receipt of this letter please notify me no later than 5 business days whether the above information is incorrect.

I have enclosed a copy of the Notice of Right to File a Discrimination Complaint (including VA Form 4939). At this point, you have two options available to you. To help you make your decision, I have also enclosed a link to the Equal Employment Opportunity Commission's (EEOC) website for an overview of the guidelines on the federal sector EEO complaint process. http://www.eeoc.gov/federal/

Please select one of the options below as your final decision:

**Option 1:**  You can choose to file a formal complaint of discrimination on some or all of the claim(s) listed above.  If you wish to file a formal complaint, please complete, sign, and date the VA Form 4939; returning the form to the address listed on the *Notice of Right to File a Discrimination Complaint.* You are _strongly encouraged_ to  email your VA 4939 formal complaint of discrimination.

**If you decide to file a formal complaint, you have 15 calendar days from receipt of this notice in which to do so.**  Please do not mail the VA Form 4939 to me; your formal complaint must be mailed to the address listed on the first page of the enclosed *Notice of Right to File a Discrimination Complaint* or emailed to ORMMDO4939@va.gov.

Upon receipt of a formal complaint, the Office of Resolution Management, Diversity & Inclusion (ORMDI) will review your complaint and determine if the claim(s)[1]  raised meet(s) EEOC's procedural requirements for continued processing.

If your complaint meets procedural requirements and  is accepted by ORM for investigation, you will be given the opportunity to submit any documentation in support of your allegations of discrimination to the ORM investigator assigned to investigate your complaint, as part of the process for  gathering evidence relevant to the merits of your accepted claim(s). There is no need to provide evidence in support of your claim(s) until notified that your claim(s) is accepted for investigation.

**Option 2**:  You can take no further action, indicating your wish not to pursue the allegations listed above any further.

If you have any questions or need assistance, please call me at 1 (888) 566-3982, Ext. 998569.

---

[1] A claim is the action(s) the Agency has taken or is taking that causes the aggrieved person to believe s/he is the victim of discrimination for which, if proven, there is a remedy under the federal equal employment statues.  It is important to limit your description of the specific claim(s) to one or two sentences.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) – Revised 4/22/2020

Page 4
Notice of Right to File a Discrimination Complaint
Name of Aggrieved: Azis Kochiu
Case Number: 200J-556A-2023-152770

Sincerely,

*Mechell Reed*

Mechell Reed
EEO Counselor

Enclosure: Notice of Right to File a Discrimination Complaint
VA Form 4939

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) – Revised 4/22/2020



# Office of Resolution Management

*Department of Veterans Affairs*

**NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT**

Aggrieved Person: Azis Kochiu
Case Number: 200J-556A-2023-152770

1. If you are not satisfied with the results of the informal EEO process and believe that you have been subjected to discrimination because of race, color, religion, sex, national origin, age, disability, genetic information, or retaliation, you have the right to file a formal complaint of discrimination. **If you decide to file a formal complaint, you must do so WITHIN FIFTEEN CALENDAR DAYS OF RECEIPT OF THIS NOTICE.**

2. Attached is VA Form 4939, Complaint of Employment Discrimination. If you choose to file a formal complaint at this time, use this form, and carefully read the instructions on the reverse side before completing it. The counselor is available to assist you in filling out this form and to answer any questions you may have about it. If you require assistance, please contact your counselor immediately. **Please note that the <u>15-calendar day</u> time frame will not be extended due to your need to seek my assistance in completing this form.**

3. You may file a complaint in person, by mail, fax, or e-mail with the District Manager at the address below:

   **ORMMDO4939@va.gov**

4. You must identify each claim you are protesting and provide the date on which each occurred. Your complaint must be limited to the claim(s) you discussed with the counselor. Therefore, if there are any claims that you have not discussed with the counselor, you must do so immediately. Regulations require that you provide the Department with an opportunity to resolve each claim informally at EEO counseling.

5. You are entitled to representation at every stage of the complaint process. You may choose anyone as a representative, unless the person occupies a position within VA that would create a conflict of interest. If you do select a representative, you must inform this ORM District Office, in writing, of the representative's name, telephone number, and business address.

6. If you are a member of the bargaining unit, you may have the right to dispute the events discussed with the counselor through the union grievance procedure. Regulations provide that you may file either a grievance <u>or</u> an EEO complaint about the events in dispute, but <u>not both</u>. Should you file both,

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) - 4/22/2020

Page 2.
Notice of Right to File a Discrimination Complaint
Aggrieved Person: Azis Kochiu
Case Number: 200J-556A-2023-152770

whichever you file first (a union grievance or an EEO complaint) will be considered an election to proceed in that forum.

7. If you are complaining about a matter that may be appealed to the Merit Systems Protection Board (MSPB), you may file an EEO complaint <u>or</u> an MSPB appeal, but <u>not</u> <u>both</u>. Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum. If the counselor can be of further assistance to you, please advise.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) – Revised 4/22/2020

COMPLAINT CASE NUMBER:

OMB NO.: 2900-0746
EXPIRATION DATE: DEC 31, 2018
RESPONDENT BURDEN: 30 Min.

## Department of Veterans Affairs — COMPLAINT OF EMPLOYMENT DISCRIMINATION

*Read the instructions on the reverse side of this form carefully before completing the front of this form*

| 1. NAME (Last, first, middle name) (Please print) | 2. MAILING ADDRESS | 4a. WORK TELEPHONE NUMBER (Include Area Code) |
| --- | --- | --- |
| 3. EMAIL ADDRESS | | 4b. PRIMARY TELEPHONE NUMBER (Include Area Code) |

| 5. ARE YOU: | 6. JOB TITLE, SERIES AND GRADE | 7. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED |
| --- | --- | --- |
| ☐ A VA EMPLOYEE | | |
| ☐ AN APPLICANT FOR EMPLOYMENT | 6a. JOB TITLE, SERIES AND GRADE (AT THE TIME) | |
| ☐ FORMERLY A VA EMPLOYEE | | |

NOTE: The each employment related action that you believe was discrimination you must list the bases (list one or more of the following): Race (Specify), Color (Specify), Religion (Specify), Sex (Male or Female), National Origin (Specify), Age (Provide date of birth), Disability (Specify), Genetic Information (including family medical history), and/or Retaliation for participating in the EEO process or opposing unlawful discrimination.

| 8. BASIS | 9. CLAIMS | 10. DATE OF OCCURRENCE (Indicate the most recent date(s)) |
| --- | --- | --- |
| | | |

11. REMEDIES SOUGHT (list or attach remedy sought statement)

| 12a. DO YOU HAVE A REPRESENTATIVE? | 12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE | 12b. TELEPHONE NUMBER (Include Area Code) |
| --- | --- | --- |
| ☐ YES  ☐ NO | | |
| 12. IF YES, IS HE OR SHE AN ATTORNEY? | | 12. EMAIL ADDRESS |
| ☐ YES  ☐ NO | | |
| 13a. HAVE YOU CONTACTED AN EEO COUNSELOR? | 13b. NAME OF EEO COUNSELOR | 13c. DATE OF INITIAL CONTACT WITH ORM |
| ☐ YES  ☐ NO | | |

14. If you contacted an EEO Counselor more than 45 calendar days after the date(s) of Occurrence, there is no, or, if this complaint is filed more than 15 calendar days after receipt of a Notice or Right to File a Discrimination Complaint, you must explain why you were unable to act on EEO counseling or unable to file a complaint. (Use an additional sheet of paper if necessary.)

| 15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE? | 15b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED | 15c. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE? | 15d. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED. |
| --- | --- | --- | --- |
| ☐ YES  ☐ NO | | ☐ YES  ☐ NO | |
| 15. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? | 15. IF "YES," PROVIDE THE NAME AND ADDRESS | | |
| ☐ YES  ☐ NO | | | |

| 16. SIGNATURE OF COMPLAINANT (Complainant) | 16. DATE |
| --- | --- |
| | |

VA FORM **4939**
MAR 2013

SUPERSEDES VA FORM 4939, MAR 2011
WHICH SHOULD NOT BE USED.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) - 4/22/2020

# COMPLAINT OF EMPLOYMENT DISCRIMINATION INSTRUCTIONS
**Read the following instructions carefully before you complete this form. Please complete all items on the complaint form.**

**GENERAL:** Pursuant to the Equal Employment Opportunity Commission (EEOC) Title 29 Code of Federal Regulations (29 C.F.R.) §1614, VA Form 4939, Complaint of Employment Discrimination, can be used by VA employees, former employees and applicants for employment who file a formal Equal Employment Opportunity (EEO) complaint of discrimination. This regulation prohibits discrimination based on race, color, religion, gender (sex), national origin, age (40 years and over), physical or mental disability, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination.

You can obtain assistance from your EEO Counselor in filling out this form. Your EEO Counselor can also answer any questions you may have about this form. In item 8, you should specify the basis of your complaint: race, color, religion, gender (sex), national origin, age *(date of birth)*, physical or mental disability *(specific information about your disability)*, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination. If you list "Reprisal," please state the nature of the prior EEO activity in which you were engaged, i.e. did you file a prior EEO complaint? Use an additional sheet of paper, if necessary.

It is very important that you be precise as to the dates of all actions or events you are protesting. In addition, the claims listed in item 9, must be limited to those claims discussed with an EEO Counselor *(discussed within 45 calendar days of occurrence of the event, or within 45 calendar days of the effective date, if a personnel action)* or like or related claims. If any of the claims listed in item 9 were discussed with an EEO Counselor, but not within 45 calendar days of their occurrence or of their effective date, you must explain why you waited more than 45 calendar days. If any of the claims listed in item 9 were not discussed with an EEO Counselor, please contact the Office of Resolution Management (ORM), Regional EEO Officer IMMEDIATELY. The requirement that you contact an EEO Counselor about every claim listed in item 9 will not be waived under any circumstances. Failure to do so will only delay the processing of your complaint.

It is your responsibility to keep the (ORM) informed of your current address. If you move, immediately advise the ORM District Office where you filed this complaint of your new address. In addition, you may receive certified and express mail in connection with your complaint. It is your responsibility to claim all certified and express mail. Failure to notify ORM of a change in address or to claim certified and express mail may lead to dismissal of your complaint.

**REPRESENTATION:** You may have a representative of your own choosing at all stages of the processing of your complaint. No EEO Counselor, EEO Investigator or EEO Officer may serve as a representative. (Your representative need not be an attorney, but only an attorney representative may sign the complaint on your behalf.)

**WHEN TO FILE:** Your formal complaint must be filed within 15 calendar days of the date you received the *"Notice of Right to File a Discrimination Complaint"* (NRTF) from your EEO Counselor. If you do not meet this time limit, you must explain why you waited more than 15 calendar days to file. These time limits may be extended under certain circumstances; however, they will NOT be waived and your complaint will NOT be investigated unless you explain your untimeliness and the explanation is acceptable in accordance with EEOC, 29 C.F.R. §1614(c).

**WHERE TO FILE:** The complaint should be filed with the ORM District Office identified in the NRTF. You may submit a copy either by mail, in person, electronically (via e-mail), or by facsimile. Filing instructions are contained in the cover letter attached to the NRTF.

**PRIVACY ACT STATEMENT:** Maintenance and disclosure of VA Form 4939 is made in accordance with the Privacy Act of 1974. Collection of the information on this form is authorized and/or required by the regulations of the EEOC, 29 C.F.R. §1614. All records, from which information is retrieved, by the name or personal identifier of a respondent, are maintained by a Government-wide Systems of Records: EEOC/GOVT-1, Equal Employment Opportunity Complaint Records and Appeal Records. The information collected will be used by ORM to determine whether your complaint is acceptable for investigation and in connection with any subsequent investigation and processing of your complaint. In the course of any investigation, this form may be shown to any individual who may be required by regulations, policies or procedures of the EEOC and/or ORM to provide information in connection with this complaint, including individuals you may have identified as responsible for the acts or events at issue in this complaint. Other disclosures may be: (a) to respond to a request form from a Member of Congress regarding the status of the complaint or appeal; (b) to respond to a court subpoena and/or to refer to a district court in connection with a civil suit; (c) to disclose information to authorized officials or personnel to adjudicate a complaint or appeal; or (d) to disclose information to another Federal agency or to a court or third party in litigation when the Government is party to a suit before the court.

**RESPONDENT BURDEN STATEMENT:** In accordance with the Paperwork Reduction Act of 1995, The Department of Veterans Affairs (VA) may not conduct or sponsor, and the respondent is not required to respond to this collection of information unless it displays a valid OMB Control Number. The valid OMB Control Number for this information collection is 2900-0716. The collection of this information is voluntary. However, the information is necessary to determine if your complaint of employment discrimination is acceptable for further processing in accordance with EEOC, 29 C.F.R. §1614. The time required to complete this information collection is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing the form. Send comments regarding this burden estimate or any other aspects of this collection, including suggestions for reducing this burden, to VA Clearance Officer (005R1B), 810 Vermont Avenue, Washington, DC 20420. SEND COMMENTS ONLY. DO NOT SEND THIS FORM, A COMPLAINT OF EMPLOYMENT DISCRIMINATION, OR REQUEST FOR BENEFITS TO THIS ADDRESS

REVERSE OF VA FORM 4939, MAR 2017

**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT, DIVERSITY & INCLUSION
MIDWEST DISTRICT
Westchester, IL 60154

July 11, 2023                                        In Reply Refer To: 08O

Via Email: kochiu106@gmail.com

Azis Kochiu, Aggrieved Party
1831 Monroe Avenue
S. Milwaukee, WI 53172

Dear Mr. Kochiu:

I will serve as the EEO counselor in the matter you reported to the Office of Resolution
Management, Diversity & Inclusion (ORMDI) on June 22, 2023, Case Number 200J-
556A-2023-152770, as follows:

| Bases | Claims | Dates of Occurrence |
|---|---|---|
| Reprisal<br><br>Sex | **I. Harassment (Non-Sexual)/Hostile Work Environment** | |
| | 1. RMO Donnabelle L. Lorenzo-Villarino, Managed Care Clinical Coordinator/Division Officer has harassed and badgered the Aggrieved Party (AP) based of Reprisal and Sex.  The AP contends that the RMO has treated him differently than his Female co-workers. | In or around January 2021 to July 11, 2023 |
| | 2. The RMO issued the AP a lower rating of 'Satisfactory' for his performance evaluation. | 2022 |
| | 3. The RMO has intentional short staffed the AP's team. | November 8, 2022 - May 2023 |
| | 4. The RMO assigned the AP a greater workload. | November 8, 2022 - May 3, 2023 |
| | 5. The RMO subjected the AP to a Weingarten meeting, in the presence of the Union. | In or around February/March 2023 |
| | 6. The RMO issued the AP a temporary reassignment notice. | May 8, 2023 |

|  | The AP was not afforded Union representation. |  |
|---|---|---|
|  | 7. The RMO removed the AP from patient care. The AP was removed from patient care, pending a fact-finding investigation (FFI). | May 8, 2023 to current |
|  | 8. The AP was singled out and held to a different standard than other RN's when the RMO notified him that he lacks documentation in emails. | On or around May 8, 2023 to current |
|  | 9. The AP became aware that he was being accused of not properly scheduling a deceased patient's consult back in December 2022, even though his Female co-worker(s) was responsible. | May 2023 |
|  | 10. The AP became aware that the RMO had been soliciting and coaching staff to submit negative statements against him. | During the week of June 19, 2023 |
|  | 11. The RMO submitted deceptive information to a Peer Review Committee (PRC) when the RMO referred to a prior consult as being "expedited". During prior Weingarten and FFI emails the RMO did not refer to the consult as "expedited". | June 15, 2023 |
|  | 12. The AP has not been issued his annual performance evaluation. | As of July 11, 2023 |
|  | **II. Reassignment - Directed** |  |
|  | 1. The RMO issued the AP a temporary reassignment notice. The AP was removed from patient care, pending a FFI. | May 8, 2023 |
|  | **III. Assignment of Duties** |  |
|  | 1. The RMO assigned the AP a greater workload than his Female co-workers. | November 8, 2022 - May 2023 |

Revised: 4/22/2020

## IV. Evaluation/Performance Appraisal/Proficiency

| | |
|---|---|
| 1. The RMO issued the AP a lower performance evaluation rating of 'Satisfactory', based on reprisal. | 2022 |
| 2. The AP not been issued his annual performance evaluation, due by February 19, 2023. | As of July 11, 2023 |

If this information is incorrect, please advise me within five days of receipt of this letter.

I am enclosing the Notice of Rights and Responsibilities and a document entitled "Role & Responsibilities of the EEO Counselor." Please read these documents carefully, sign where indicated, and return a copy via e-mail to mechell.reed@va.gov.

If you have any questions or need additional information, call me at 1 (888) 566-3982, Ext. 998569.

Sincerely,

*Mechell Reed*

Mechell Reed
EEO Counselor

Case: 1:25-cv-09065 Document #: 1 Filed: 07/29/25 Page 352 of 1155 PageID #:352



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT, DIVERSITY & INCLUSION
MIDWEST DISTRICT
Westchester, IL 60154

June 30, 2023                                    In Reply Refer To: 08O

Via Email: kochiu106@gmail.com

Azis Kochiu, Aggrieved Party
1831 Monroe Avenue
S. Milwaukee, WI 53172

Dear Mr. Kochiu:

I will serve as the EEO counselor in the matter you reported to the Office of Resolution
Management, Diversity & Inclusion (ORMDI) on June 22, 2023, Case Number 200J-
556A-2023-152770, as follows:

| Bases | Claims | Dates of Occurrence |
|-------|--------|---------------------|
| Reprisal<br><br>Sex | **I. Harassment (Non-Sexual)/Hostile Work Environment** | |
| | 1. RMO Donnabelle L. Lorenzo-Villarino, Managed Care Clinical Coordinator/Division Officer has harassed and badgered him based on Reprisal and Sex. The AP contends that the RMO has treated the AP differently than his Female co-workers. | In or around January 2021 to June 28, 2023 |
| | 2. The RMO has intentional short staffed the AP's team. | November 8, 2022 - May 2023 |
| | 3. The RMO assigned the AP a greater workload. | November 8, 2022 - May 3, 2023 |
| | 4. The RMO subjected the AP to a Weingarten meeting, in the presence of the Union. | In or around February/March 2023 |
| | 5. The RMO issued the AP a detail notice. The AP was not afforded Union representation. | On or around May 8, 2023 |
| | 6. The RMO has removed the AP from patient care. | On or around May 8 - to current |

| | | |
|---|---|---|
| | 7. The AP became aware that he was being accused of not properly scheduling a deceased patient's consult back in December 2022, even though his Female co-worker(s) was responsible. | May 2023 |
| | 8. The AP became aware that the RMO had been soliciting and coaching staff to submit negative statements against him. | During the week of June 19, 2023 |
| | **II. Detail (Involuntary)** | |
| | 1. The RMO issued the AP a detail notice.  The AP was removed from patient care, pending a fact-finding investigation. | On or around May 8, 2023 |
| | **III. Assignment of Duties** | |
| | 1. The RMO assigned the AP a greater workload than his Female co-workers. | November 8, 2022 - May 2023 |

If this information is incorrect, please advise me within five days of receipt of this letter.

I am enclosing the Notice of Rights and Responsibilities and a document entitled "Role & Responsibilities of the EEO Counselor."  Please read these documents carefully, sign where indicated, and return a copy via e-mail to mechell.reed@va.gov.

If you have any questions or need additional information, call me at 1 (888) 566-3982, Ext. 998569.

Sincerely,

*Mechell Reed*

**Mechell Reed**
EEO Counselor

Revised: 4/22/2020

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

 **Office of Resolution Management**
*Department of Veterans Affairs*

## NOTICE OF RIGHTS AND RESPONSIBILITIES

Aggrieved Person: Azis Kochiu

Case Number: 200J-556A-2023-152770

Under 29 C.F.R. §1614.105(a) & (a)(1), aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, reprisal or genetic information must consult an EEO counselor prior to filing a complaint in order to try to informally resolve the matter.

An aggrieved person must initiate contact with an EEO counselor within 45 calendar days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 calendar days of the effective date of the action.

If the alleged matter(s) are beyond the 45 calendar day time limit for contacting an EEO counselor, you will be given an opportunity to provide an explanation of your untimely contact to the EEO counselor.

ORM is required to advise you that you have certain rights and responsibilities regarding the EEO matter that you raised. They are:

a. The right to remain anonymous during EEO Counseling. Your name will be divulged to others only upon your authorization for ORM to do so. You should know, however, that it might be very difficult to resolve your complaint informally if you choose to remain anonymous. Please indicate your choice by initialing below:

☐ **I want to remain anonymous**

☐ **I do NOT want to remain anonymous**

b. The right to a representative during the EEO complaint process including during EEO counseling. You may select anyone to represent you, as long as their position with VA would not represent a conflict of interest. **The EEO counselor cannot be your representative.** Please initial next to your selection below:

☐ **I do NOT want a representative at this time.** I understand I may select a representative later (or at any stage of the EEO process).
☐ **I have a representative. My representative is:**

Name:                                   Attorney: ☐ Yes ☐ No
Address:                                Phone: (    )
Email:                                      Fax: (    )

c. The right to have your claim(s) addressed through the agency Alternative Dispute Resolution (ADR) program or EEO counseling, **but not both.** Participation in the ADR program is voluntary on your part and ADR may be entered into in lieu of traditional EEO counseling. If ADR is elected during the pre-complaint process, the counseling period may be extended up to but not more than 90 calendar days. Your agreement to participate in ADR must be in writing. When ADR is elected, the EEO counselor will only gather enough information on your basis (es) and claim(s) to assist the agency in making a procedural determination in the event resolution through ADR is not reached.

The EEO counselor will have no further involvement in the matter until the counselor is advised of the completion of the ADR process or the end of the 90-day counseling period, whichever comes first. At that time, if a resolution is not reached through ADR or the 90-day counseling period has ended, a final interview will be conducted, and you will be issued a Notice of Right to File a Discrimination Complaint.

d. The right to request a reasonable accommodation during the EEO complaint process. Section 501 of the Rehabilitation Act requires agencies to provide reasonable accommodations to qualified applicants and employees with disabilities. To make a request and find your local reasonable accommodation coordinator, visit the Office of Diversity and Inclusion website at: http://www.diversity.va.gov/programs/pwd.aspx

e. Under 29 C.F.R. §1614.301, Relationship to Negotiated Grievance Procedure, if you are employed by an agency subject to 5 U.S.C. 7121(d), and is covered by a bargaining unit agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure, and you wish to file a complaint or a grievance of alleged employment discrimination, you must elect to raise the matter under either Part 1614 OR the negotiated grievance procedure, **but not both**. You may file the grievance before, during or after EEO counseling, but not after you file a formal discrimination complaint through EEO. An election to proceed under a negotiated grievance procedure is indicated by the filing of a timely grievance. Whichever you file first, a formal EEO complaint or a union grievance will be considered an election to proceed in that forum, and it must be presented in writing. At the formal level, any complaint filed after a grievance has been filed on the same matter, shall be dismissed without prejudice to the complainant's right to proceed through the negotiated grievance procedure. The dismissal of such a complaint shall advise the complainant of the obligation to raise discrimination in the grievance process and of the right to appeal the final grievance decision to the Commission. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

f. If you are disputing a matter that can be appealed to the Merit Systems

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

Protection Board (MSPB), you may file an EEO complaint or an MSPB appeal, **but not both**. Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

g.  Within thirty (30) days of your first contact with an EEO counselor, you have the right to receive a written notice terminating counseling and informing you of the right to file a formal complaint (unless the period has been extended by prior written consent). You also have the right, at the conclusion of counseling, to file a formal complaint within **15 calendar days** of receipt of the Notice of Right to File a Discrimination Complaint. When you are represented by an attorney, the Commission's service regulations require that all notices be served on the attorney, with a copy to you. Time frames are computed from the date of receipt by the attorney, not the date of receipt by the aggrieved person.

h.  If you allege age discrimination, you have the right to file a lawsuit in Federal District Court, without filing a formal EEO complaint. A Notice of Intent to Sue must be filed within 180 calendar days of the date of the alleged discriminatory act. However, you must first notify the Equal Employment Opportunity Commission (EEOC), 131 M Street, NE Fourth Floor, Suite 4NWO2F Washington, DC 20507-0100 of your intent to do so, at least thirty (30) calendar days in advance of the filing your Notice of Intent to Sue. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

i.  If you are complaining about sex-based wage discrimination (being paid less than a person of the opposite sex, even though they are doing equal work), you may file a formal EEO complaint, or lawsuit in Federal District Court, pursuant to the Equal Pay Act. In addition to other remedies available through the EEO complaint process, liquidated damages are available for willful violation of the Equal Pay Act. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

j.  If you file a formal EEO complaint and it is accepted, you have the right to request an immediate Final Agency Decision from the Department of Veterans Affairs, or a hearing before an administrative judge of the EEOC after 180 days from the date you file the formal complaint, or after completion of the investigation, whichever comes first. If you request a Final Agency Decision, the request should be addressed to District Manager (08O), Office of Resolution Management, Diversity & Inclusion 2255 Enterprise Drive, Suite 5506, Westchester, IL 60154. If you request an EEOC hearing, the request should be addressed to the EEOC District office under your geographical jurisdiction with a copy to the above-named District Manager. The list of offices can be found at http://www.eeoc.gov/federal/directives/md-110_appendix_n.cfm.

k.  Except for complaints of age discrimination, you have the right to file a lawsuit in Federal District court at any time 180 calendar days after filing a formal complaint

or up to 90 calendar days after receipt of a Final Agency Decision from VA.  You may also appeal a Final Agency Decision to EEOC within 30 calendar days of receipt of the decision.  If you choose to appeal a Final Agency Decision to EEOC, you have the right to file a lawsuit in Federal District Court at any time after 180 calendar days from the filing of such an appeal, or up to 90 calendar days after receiving an appellate decision from EEOC.

l.  If you believe that other individuals, similarly situated to you, have suffered from the same kind of discrimination, you may have the right to file a class action complaint.  A class action complaint must allege that you have been individually harmed by a VA personnel management policy or practice that has similarly harmed numerous other class members.  You must also allege that there are questions of fact that are common to, and typical of, the claims of the class, and that you or your representative will fairly and adequately protect the interests of the class.  EEOC also requires that a class agent be represented by a qualified attorney.
https://www.eeoc.gov/federal/directives/md-110_chapter_8.cfm

m.  You have the responsibility to cooperate with VA during the processing of your complaint.  You must keep the VA informed of your current address; you must claim any mail sent to you, and you must cooperate with any individual assigned to the complaint.  If you eventually file an appeal with EEOC about the complaint, you must serve copies of the appeal papers on VA.

n.  If your complaint involves back pay, you have a duty to mitigate damages by actively seeking and/or retaining employment.  Interim earnings or amounts, which could be earned by a complainant with reasonable diligence, generally must be deducted from back pay.

o.  If you have filed two or more complaints, the agency will consolidate them after appropriate notice to you.  When a complaint has been consolidated with one or more earlier complaints, the agency shall complete its investigation within the earlier of 180 days after the filing of the last complaint or 360 days of the filing of the first complaint.  In addition, the Administrative Judge may consolidate multiple complaints at the EEOC hearing stage.

p.  Finally, you must limit any formal EEO complaint you may file to those matters discussed with ORM, or to like or related matters (that is, matters which are directly related to those matters or which are unmistakably derived from those matters).  Additionally, if you wish to amend a previously filed complaint, only matters that are like or related to the claim(s) in the pending complaint may be added.  To protect your rights, discuss all claims with ORM before you file a formal complaint.

q.  If you reject an agency offer of resolution made pursuant to 29 C.F.R.

§1614.109(c), it may result in the limitation of the Agency's payment of attorney's fees or costs.

r.   Extension of Counseling for Resolution Efforts. When the aggrieved individual and an EEO Counselor engage in resolution efforts, they may decide that they need additional time to reach an agreement. If the aggrieved person consents, the EEO office may extend the counseling period an additional period up to but not exceeding 60 days. See 29 C.F.R. § 1614.105(e). Prior to the end of the 30-day period, the aggrieved person may agree in writing with the agency to postpone the final interview and extend the counseling period for an additional period of no more than 60 days. If the matter has not been resolved before the conclusion of the agreed extension, the notice described in paragraph (g) of this section shall be issued.

s.   Unless you inform us otherwise, all EEO correspondence transmitted by ORM will be sent to you and your designated representative, if applicable, via email. If your representative chooses not to participate in the email receipt of documents, he/she must notify ORM in writing. In instances where documents may be too large to email, ORM will physically mail any such correspondence to your address of record.

If you should file a formal complaint, and it is accepted for investigation, you will receive a copy of the investigative file via encrypted email or via another means approved by the agency. With this election, you will not receive a printed copy of the investigative file unless you notify ORM in writing of your request to receive a printed file.

ORM will use the date you or your attorney, if applicable, received the correspondence via email for purposes of calculating timeliness. Therefore, if the email address to which EEO correspondence is sent is a VA account, you must use the Read Receipt Option in Outlook to provide proof of delivery to ORM. If you or your representative is not using a VA email account to receive EEO correspondence, you must provide ORM with email confirmation immediately upon receipt of documents and notices. For timeliness purposes if read receipt or email confirmation is not provided, it shall be presumed that the parties received the Agency's correspondence within five days after the date it was sent via email.

t.   You may be asked to provide documentation to ORM to support your case.   The Department of Veterans Affairs National Rules of Behavior (§2.hh) state that you "will protect sensitive information from unauthorized disclosure, use, modification, or destruction,…" You are asked to redact any unnecessary personally identifiable information (names, patient records, addresses, phone number, etc..) from any documents that you provide to ORM.  If you believe that the sensitive information in the documents is essential to your case, contact your ORM counselor and

Page - 8 -
Notice of Rights and Responsibilities
Name of Aggrieved Person: Azis Kochiu
Case Number: 200J-556A-2023-152770

advise him/her of your concern BEFORE sending the information.

If you wish to discuss your rights and responsibilities further, or if you have questions or need additional information you may contact me preferably by e-mail, mechell.reed@va.gov or via telephone at 1 (888) 566-3982, Ext. 998569.

_____     _____
Azis Kochiu, Aggrieved Person                            Date


_____     _____
                    Representative, if any                        Date

# Office of Resolution Management

*Department of Veterans Affairs*

**ROLE AND RESPONSIBILITIES OF THE EEO COUNSELOR**

- I am an information gatherer.

- My counseling activities are intentionally informal in order to contribute to a climate within which facts may be given freely and resolutions explored by both parties with minimum tension.

- I talk with the principles in the dispute in a casual and non-intimidating manner.

- As an EEO counselor, my job is to assist the parties of the complaint in their efforts to reach an amicable agreement.

- I am not a representative or an advocate of the aggrieved person. I do not, for example, advise the aggrieved person whether to file a formal complaint.

- I do not offer opinions about the merits of the case, but I do advise on what EEO laws and regulations require to prevail in a case.

- I provide all parties with technical information about how the process works and about their rights and responsibilities during the process.

- I am not management's representative. I am a neutral of the Office of Resolution Management, Diversity & Inclusion (ORMDI).

| VA | Veterans Administration | **PROFICIENCY REPORT** |
|---|---|---|

## SECTION A — INDIVIDUAL REPORTED ON

| 1. NAME (Last, First, Middle)<br><br>KOCHIU, AZIS | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY<br><br>Capt. James Lovell FHCC | 4. FACILITY NO.<br><br>556 |
|---|---|---|---|

| 5. GRADE/STEP<br><br>II/ 1 | 6. POSITION TITLE<br><br>RN/Nurse Care Coordinator | 7. PROBATIONARY REVIEW | | 8. PERIOD COVERED BY REPORT |  |
|---|---|---|---|---|---|

| | | DUE | COMPLETED | FROM<br>2/19/2021 | TO<br>2/1/2022 |
|---|---|---|---|---|---|

| 9. SERVICE<br><br>OCC/Managed Care/PAD | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE<br><br>2/19/2019 |
|---|---|---|

## SECTION B — NARRATIVE EVALUATION BY RATING OFFICIAL

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

Mr. Azis Kochiu did not provide input regarding this proficiency.

PRACTICE:
Mr. Azis Kochiu is currently one of the Clinical Coordinators in the Office of Community Care (OCC) program. In his current role, he is responsible for providing direct staff support in planning, designing, integrating, implementing, modifying, and evaluating the effectiveness of the components of the program. He also served as a liaison to both internal and external providers to ensure a seamless transition to and from the community. Mr. Kochiu works collaboratively with all levels of multi-specialty interdisciplinary healthcare providers, including primary care physicians, pharmacists, social workers, dietitians, behavioral health specialist, outpatient and inpatient departments, ancillary services and community resources. Mr. Kochiu is a strong Advocate for his patients. Mr. Kochiu works diligently to help external providers navigate the complex VHA Health system.

ETHICS:
Mr. Kochiu has the knowledge of eligibility for VA medical care, priorities for care, release of information, Health Information Portability and Accountability Act (HIPAA) Laws, and the Medical Fee Basis programs. Mr. Kochiu adhered to strict guidelines of confidentiality regarding patients, their families, and VA staff. He provided oversight and education with co-workers on the importance of reporting and addressing any issue that went outside the guidelines. He serves as a role model in educating others to make them aware of ethical issues to include unethical practices. Mr. Kochiu ensured the confidentiality of clinical reviews and documented information regarding patients and providers. According to the American Nurses Association (Imperative 8.4), "Nurses must always stress human rights protection with particular attention to preserving the human rights of vulnerable groups, such as the poor, the homeless, the elderly, the mentally ill, prisoners, refugees, women, children, and socially stigmatized groups". And (Imperative 8.2)7 Ethics, human rights, and nursing converge as a formidable instrument for social justice and human rights must be diligently protected and promoted." Mr. Kochiu worked diligently during COVID 19 ensuring every patient had medical attention either through Telehealth, alternative appointment or even finding another provider. This insured veteran's health care was cover to the best ability of the situation at hand.

RESOURCE UTILIZATION:
Mr. Kochiu has thorough knowledge of all basic clinical policies and procedures dealing with outpatient scheduling and other clinical topics. Mr. Kochiu monitors the follow-up to recommendations specific to Community Care. He maintains provider specific statistical data regarding total consult reports and inappropriate consults and ensures all consults are acted on and completed in a timely manner. Mr. Kochiu possess a working knowledge of clinic processes and services to function in/interact with various clinics throughout the hospital. Mr. Kochiu makes independent judgment as required in many situations and care concerns, when there are no written guidelines to cover every situation in the process. As an incumbent RN makes determinations on intent of laws, regulations, and applies guidelines as necessary.
Mr. Kochiu depending on the nature of inquiry, urgency of need for medical attention, or workload, exercised judgment in interpreting guides without deviating from routine procedures.

EDUCATION/CAREER DEVELOPMENT:
Mr. Kochiu works helped as a mentor and preceptor to the new LPN hire into Office of Community Care. Mr. Kochiu always work diligently helping to put the Veterans first. Mr. Kochiu always participates in all the ongoing training for Community Care. He demonstrates technical competency in the use of Tri-west Portal, Health Referral Management system (HSRM), Joint Legacy Viewer (JLV), Referral authorization system for dialysis, Procurement performance management system (PPMS) and Financial Business and Consumer Solutions (FBCS) authorization.

PERFORMANCE:
Mr. Kochiu uses his astute clinical knowledge to valuate practice of self and others using professional standards, relevant statutes, and regulations. Mr. Kochiu takes actions to improve performance. Mr. Kochiu identifies patterns, and trends in the constant changes of OCC processing standard handed down from National office of OCC. Mr. Kochiu evaluates current practice of the program and recommends changes to be implemented. When the key is to get Veterans to be aware of changes to the Office of Community Care, he proposed a solution which is being investigate by Leadership. Mr. Kochiu is working with leadership to identify the issues to modify and improve the program and to facilitate accomplishment of quality management goals and objectives in compliance with laid down Standard of Operation.

COLLEGIALITY:
Mr. Kochiu has heightened awareness of the need for improved patient safety and work with Nurse Manager on consults that needs looked closely at and referred to the ordering provider. Mr. Kochiu supports professionally and aims to achieve a common objective, which is the best patient care possible. Mr. Kochiu uses communication skills to facilitate decision making to improve health care delivery. When a provider entered a consult for a patient outside geographical area and promised patient, they were eligible for the care, he collaborated with her team and leadership to enhance health care delivery. Mr. Kochiu educated patient and family of their eligibility status with the MISSION Act which states that the patient is eligible for community care within the geographical area but does not automatically make them eligible to go out of state for the same care that can be provided. Veteran's understanding was heightened, and customer recovery was done.

COLLABORATION:
Mr. Kochiu collaborates with members of his interdisciplinary team to deliver continuum of care. He led his alpha split team to evaluate the quality of services provided with the medical center, the region and other medical centers as requested. Mr. Kochiu adhered to the policy of Office of Community Care and maintained an on-going communication/collaboration with leadership and providers to ensure that veterans understand and have the option to be a part of their treatment plan regarding their health issues.

QUALITY OF CARE:
Mr. Kochiu implements and maintains the elements of specific Case Management & Utilization Management programs to evaluate the quality of patient care and the appropriateness and timeliness of services provided e.g. Care Assessment Need (CAN) score utilization to differentiate moderate to complex consults. Mr. Kochiu continually goes above and beyond for his patients, making sure customer care is a top priority for Veterans and their families. This is something he practices each in every day of his work.

RESEARCH:
Mr. Kochiu is new to the VA system and to FHCC. Mr. Kochiu collaborates with others within the services to validate and improve nursing practice and patient care delivery. Mr. Kochiu continue to research the new VHA directives as they pertain to managed care. He diligently researches the complex nature of the ever-changing forms and programs. This information is always passed on to the entire team in a seamless effort, making Community Care to operate without disruption with his significant input.

VA FORM **10-2623**

## SECTION C — RATING BY RATING OFFICIAL

INSTRUCTIONS

An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement.

LEGEND
UNSATISFACTORY — Has not met all criteria.
LOW SATISFACTORY — Has met all criteria, but at times performance marginal.
SATISFACTORY — Has met all criteria, at times exceeds expectations.
HIGH SATISFACTORY — Has met all criteria, usually exceeds expectations by a substantial margin.
OUTSTANDING — Has met all criteria, consistently exceeds expectations to an exceptional degree.

11. CATEGORY I — NURSING PRACTICE *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☒ SATISFACTORY   ☐ HIGH SATISFACTORY   ☐ OUTSTANDING

12. Category II — interpersonal relationships *(Words effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☒ SATISFACTORY   ☐ HIGH SATISFACTORY   ☐ OUTSTANDING

## SECTION D — OVERALL EVALUATION

13. OVERALL RATING — *(An objective appraisal of overall competency based on rating in Section C, See DM&S Supplement, MP-5, Part II, Chapter 6, Appendix 6A)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☒ SATISFACTORY   ☐ HIGH SATISFACTORY   ☐ OUTSTANDING

14. ENTRIES ON THIS FORM ARE BASED ON:

NO. OF MONTHS UNDER MY SUPERVISION

12

☒ FREQUENT OR DAILY CONTACT   ☒ FREQUENT OBSERVATIONS OF WORK RESULTS

☐ INFREQUENT CONTACT   ☐ JOINT REVIEWED WITH: _____

☐ INFREQUENT OBSERVATIONS OF WORK RESULTS

16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTED IN WRITING? *(See DM&S Supplement, MP-5, part II, Chapter 6.)*

☐ YES   ☐ NO   ☒ NOT APPLICABLE

| 17a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| CHRISTIANAH AROWORA 400463 Digitally signed by CHRISTIANAH AROWORA 400463 Date: 2022.02.15 11:03:32 -06'00' | Nurse Manager | |

## SECTION E — COMMENTS OF APPROVING OFFICIAL

IF AN DISAGREEMENT WITH RATING, REFER TO DM&S, MP-5, PART II, CHAPTER 6, APPENDIX 6A.

| 18a. SIGNATURE OF APPROVING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| DONNABELLE L LORENZO-VILLARINO 1403592 Digitally signed by DONNABELLE LORENZO-VILLARINO 1403592 Date: 2022.02.15 09:52:41 -06'00' | Managed Care Division Officer | 02/11/2022 |

## SECTION F — RATED EMPLOYEE

| 19a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)* | 19b. DATE |
|---|---|
| | |

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

PROFESSIONAL CAREER DEVELOPMENT PROGRAM — Nurses in centralized positions and nurses with a masters or higher degrees will complete VA Forms 10-5349 and 10-5349a, Recipients of a VA Health Professional Scholarship will complete VA Form 10-5349a until obligated service is completed.

VA FORM **10-2623**

Page 3 of 3

I have been provided with the following VA Form (s):          ☐  10-5349          ☐  10-5349a

VA FORM **10-2623**

| **Department of Veterans Affairs** | | **PROFICIENCY REPORT** | |

## SECTION A - INDIVIDUAL REPORTED ON

| 1. NAME *(Last, First, Middle)* | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY | 4. FACILITY NO. |
|---|---|---|---|
| KOCHIU, AZIS | | Chief of Staff 556 | |

| 5. GRADE/STEP | 6. POSITION TITLE | 7. PROBATIONARY REVIEW | | 8. PERIOD COVERED BY REPORT | |
|---|---|---|---|---|---|
| VN-02 | RN/CASE MGR/CARE, CHIEF OF STAFF | DUE | COMPLETED | FROM 02/28/2022 | TO 02/27/2023 |

| 9. SERVICE | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE |
|---|---|---|
| CHIEF OF STAFF | | |

## SECTION B - NARRATIVE EVALUATION BY RATING OFFICIAL

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

LORENZO-VILLARINO, DONNABELLE  05/04/2023

**Dimension: Practice**

### Practice

Mr. Kochiu applies nursing process to system at the unit.  Mr. Kochiu works collaboratively with patient/providers/outside providers in care coordination.

### Ethics

He collaborated with an interdisciplinary team to include primary care, and specialty care, leadership and with the veteran discuss the course of action to take in order to acquire emergent approval for needed care.

### Resource Utilization

He collaborated with an interdisciplinary team to include primary care, and specialty care, leadership and with the veteran discuss the course of action to take in order to acquire emergent approval

**Dimension: Professional Development**

### Performance

Mr. Kochiu reviews consults assigned to him. He makes sure all pertinent information needed in the consult are present prior to processing and routing to community provider to avoid rejection.

### Education/Career Development

He continues to self-assess knowledge on his current nursing practices and on a monthly basis meet with UBC to discuss new areas of improvement

**Dimension: Collaboration**

### Collegiality

Mr. Kochiu is collaborating with the Unit based council to identify areas of improvement and present to leadership

### Collaboration

Mr. Kochiu is collaborating with the Unit based council to identify areas of improvement and present to leadership

**Dimension: Scientific Inquiry**

### Quality of Care

Working in various avenues in nursing, Mr. Kochiu was able to gain a tremendous amount of knowledge through experience.  He realized, he lack in utilizing evidence based practices in his everyday practice,

### Research

Mr. Kochiu reviews the guidebooks for opportunity to perform the roles of

**Additional Considerations**

Employee did not enter self-assessment.

| INSTRUCTIONS | LEGEND |
|---|---|
| An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement. | <u>UNSATISFACTORY -</u> Has not met all criteria.<br><br><u>LOW SATISFACTORY -</u> Has met all criteria, but at times performance marginal.<br><br><u>SATISFACTORY -</u> Has met all criteria, at times exceeds expectations.<br><br><u>HIGH SATISFACTORY -</u> Has met all criteria, usually exceeds expectations by a substantial margin.<br><br><u>OUTSTANDING -</u> Has met all criteria, consistently exceeds expectations to an exceptional degree. |

**12. CATEGORY I - NURSING PRACTICE** *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☑ SATISFACTORY  ☐ HIGH SATISFACTORY  ☐ OUTSTANDING

**13. CATEGORY II - INTERPERSONAL RELATIONSHIPS** *(Works effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☑ SATISFACTORY  ☐ HIGH SATISFACTORY  ☐ OUTSTANDING

**SECTION D - OVERALL EVALUATION**

**14. OVERALL RATING -** *(An objective appraisal of overall competency based on rating in Section C. See VA Handbook 5013, Part II)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☑ SATISFACTORY  ☐ HIGH SATISFACTORY  ☐ OUTSTANDING

| 15. ENTRIES ON THIS FORM ARE BASED ON: | | NO. OF MONTHS UNDER MY SUPERVISION THIS RATING PERIOD |
|---|---|---|
| ☑ FREQUENT OR DAILY CONTACT<br>☐ INFREQUENT CONTACT<br>☐ INFREQUENT OBSERVATIONS OF WORK RESULTS | ☑ FREQUENT OBSERVATIONS OF WORK RESULTS<br>☐ JOINT REVIEW WITH: | 12 |

**16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTS IN WRITING?** *(See VA Handbook 5013, Part II.)*

☐ YES  ☐ NO  ☑ NOT APPLICABLE

| 17a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| | | |

IF IN DISAGREEMENT WITH RATING, REFER TO VA HANDBOOK 5013, PART II

RAVIPATI, MAMATA  05/04/2023
  Concur

| 18a. SIGNATURE OF APPROVING OFFICIAL | 18b. POSITION | 18c. DATE |
|---|---|---|
| Electronically signed by: Mamata Ravipati MD | ASSOC COS RES & DEV | 05/04/2023 |

| SECTION F- SIGNATURE OF REVIEW BY ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES *(if required.)* | |
|---|---|
| 19a. SIGNATURE OF THE ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES | 19b. DATE |

| SECTION G - RATED EMPLOYEE | |
|---|---|
| 20a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)* | 20b. DATE |

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

| VA Veterans Administration | | **PROFICIENCY REPORT** | | |
|---|---|---|---|---|

**SECTION A — INDIVIDUAL REPORTED ON**

| 1. NAME *(Last, First, Middle)*<br>KOCHIU, AZIS | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY<br>Capt. James A. Lovell FHCC | | 4. FACILITY NO.<br>556 |
|---|---|---|---|---|
| 5. GRADE/STEP<br>I/9 | 6. POSITION TITLE<br>Registered Nurse/ Nurse Care Coordinator | 7. PROBATIONARY REVIEW<br>DUE 2/19/21  COMPLETED | 8. PERIOD COVERED BY REPORT<br>FROM 2/19/20  TO 2/19/21 | |
| 9. SERVICE<br>RESOURCES/PAD/Managed Care/ OCC | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE<br>2/19/19 | | |

**SECTION B — NARRATIVE EVALUATION BY RATING OFFICIAL**

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

**Mr. Azis Kochiu did not provide input regarding this proficiency.**

## I.    PRACTICE DIMENSION

### PRACTICE:

Mr. Azis Kochiu is currently one of the Clinical Coordinators in the Office of Community Care (OCC) program. In his current role, he is responsible for providing direct staff support in planning, designing, integrating, implementing, modifying, and evaluating the effectiveness of the components of the program. He also served as a liaison to both internal and external providers to ensure a seamless transition to and from the community. Mr. Kochiu works collaboratively with all levels of multi-specialty interdisciplinary healthcare providers, including primary care physicians, pharmacists, social workers, dietitians, behavioral health specialist, outpatient and inpatient departments, ancillary services and community resources. Mr. Kochiu is a strong Advocate for his patients. Mr. Kochiu works diligently to help external providers navigate the complex VHA Health system.

### ETHICS:

Mr. Kochiu has the knowledge of eligibility for VA medical care, priorities for care, release of information, Health Information Portability and Accountability Act (HIPAA) Laws, and the Medical Fee Basis programs. Mr. Kochiu adhered to strict guidelines of confidentiality regarding patients, their families, and VA staff. He provided oversight and education with co-workers on the importance of reporting and addressing any issue that went outside the guidelines. She serves as a role model in educating others to make them aware of ethical issues to include unethical practices. Mr. Kochiu ensured the confidentiality of clinical reviews and documented information regarding patients and providers. According to the American Nurses Association (Imperative 8.4), "Nurses must always stress human rights protection with particular attention to preserving the human rights of vulnerable groups, such as the poor, the homeless, the elderly, the mentally ill, prisoners, refugees, women, children, and socially stigmatized groups". And (Imperative 8.2)7 Ethics, human rights, and nursing converge as a formidable instrument for social justice and human rights must be diligently protected and promoted." Mr. Kochiu worked diligently during COVID 19 ensuring every patient had medical attention either through Telehealth, alternative appointment or even finding another provider. This insured veteran's health care was cover to the best ability of the situation at hand.

### RESOURCE UTILIZATION:

Mr. Kochiu has thorough knowledge of all basic clinical policies and procedures dealing with outpatient scheduling and other clinical topics. Mr. Kochiu monitors the follow-up to recommendations specific to Community Care. He maintains provider specific statistical data regarding total consult reports and inappropriate consults and ensures all consults are acted on and completed in a timely manner. Mr. Kochiu possess a working knowledge of clinic processes and services to function in/interact with various clinics throughout the hospital. Mr. Kochiu makes independent judgment as required in many situations and care concerns, when there are no written guidelines to cover every situation in the process. As an incumbent RN makes determinations on intent of laws, regulations, and applies guidelines as necessary.

Mr. Kochiu depending on the nature of inquiry, urgency of need for medical attention, or workload, exercised judgment in interpreting guides without deviating from routine procedures.

VA FORM 10-2623

## II. PROFESSIONAL DEVELOPMENT

**EDUCATION/CAREER DEVELOPMENT:**
Mr. Kochiu works helped as a mentor and preceptor to the new LPN hire into Office of Community Care. Mr. Kochiu always work diligently helping to put the Veterans first. Mr. Kochiu always participates in all the ongoing training for Community Care. He demonstrates technical competency in the use of Tri-west Portal, Health Referral Management system (HSRM), Joint Legacy Viewer (JLV), Referral authorization system for dialysis, Procurement performance management system (PPMS) and Financial Business and Consumer Solutions (FBCS) authorization.

**PERFORMANCE:**
Mr. Kochiu uses his astute clinical knowledge to valuate practice of self and others using professional standards, relevant statutes, and regulations. Mr. Kochiu takes actions to improve performance. Mr. Kochiu identifies patterns, and trends in the constant changes of OCC processing standard handed down from National office of OCC. Mr. Kochiu evaluates current practice of the program and recommends changes to be implemented. When the key is to get Veterans to be aware of changes to the Office of Community Care, he proposed a solution which is being investigate by Leadership. Mr. Kochiu is working with leadership to identify the issues to modify and improve the program and to facilitate accomplishment of quality management goals and objectives in compliance with laid down Standard of Operation.

## III. COLLABORATION
**COLLEGIALITY:**
Mr. Kochiu has heightened awareness of the need for improved patient safety and work with Nurse Manager on consults that needs looked closely at and referred to the ordering provider. Mr. Kochiu supports professionally and aims to achieve a common objective, which is the best patient care possible. Mr. Kochiu uses communication skills to facilitate decision making to improve health care delivery. When a provider entered a consult for a patient outside geographical area and promised patient, they were eligible for the care, he collaborated with her team and leadership to enhance health care delivery. Mr. Kochiu educated patient and family of their eligibility status with the MISSION Act which states that the patient is eligible for community care within the geographical area but does not automatically make them eligible to go out of state for the same care that can be provided. Veteran's understanding was heightened, and customer recovery was done.

**COLLABORATION:**
Mr. Kochiu collaborates with members of his interdisciplinary team to deliver continuum of care. He led his alpha split team to evaluate the quality of services provided with the medical center, the region and other medical centers as requested. Mr. Kochiu adhered to the policy of Office of Community Care and maintained an on-going communication/collaboration with leadership and providers to ensure that veterans understand and have the option to be a part of their treatment plan regarding their health issues.

**SCIENTIFIC INQUIRY**
**QUALITY OF CARE:**
Mr. Kochiu implements and maintains the elements of specific Case Management & Utilization Management programs to evaluate the quality of patient care and the appropriateness and timeliness of services provided e.g. Care Assessment Need (CAN) score utilization to differentiate moderate to complex consults. Mr. Kochiu continually goes above and beyond for his patients, making sure customer care is a top priority for Veterans and their families. This is something he practices each in every day of his work.

**RESEARCH:**
Mr. Kochiu is new to the VA system and to FHCC. Mr. Kochiu collaborates with others within the services to validate and improve nursing practice and patient care delivery. Mr. Kochiu continue to research the new VHA directives as they pertain to managed care. He diligently researches the complex nature of the ever-changing forms and programs. This information is always passed on to the entire team in a seamless effort, making Community Care to operate without disruption with his significant input.

VA FORM 10-2623

## SECTION C — RATING BY RATING OFFICIAL

**INSTRUCTIONS**

An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement.

**LEGEND**

UNSATISFACTORY — Has not met all criteria.
LOW SATISFACTORY — Has met all criteria, but at times performance marginal.
SATISFACTORY — Has met all criteria, at times exceeds expectations.
HIGH SATISFACTORY — Has met all criteria, usually exceeds expectations by a substantial margin.
OUTSTANDING — Has met all criteria, consistently exceeds expectations to an exceptional degree.

11. CATEGORY I — NURSING PRACTICE *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☐ SATISFACTORY  ☒ HIGH SATISFACTORY  ☐ OUTSTANDING

12. Category II — interpersonal relationships *(Works effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☐ SATISFACTORY  ☒ HIGH SATISFACTORY  ☐ OUTSTANDING

## SECTION D — OVERALL EVALUATION

13. OVERALL RATING — *(An objective appraisal of overall competency based on rating in Section C. See DM&S Supplement, MP-5, Part II, Chapter 6, Appendix 6A)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☐ SATISFACTORY  ☒ HIGH SATISFACTORY  ☐ OUTSTANDING

14. ENTRIES ON THIS FORM ARE BASED ON:

☒ FREQUENT OR DAILY CONTACT  ☒ FREQUENT OBSERVATIONS OF WORK RESULTS

☐ INFREQUENT CONTACT  ☐ JOINT REVIEWED WITH: _____

☐ INFREQUENT OBSERVATIONS OF WORK RESULTS

NO. OF MONTHS UNDER MY SUPERVISION

**12**

16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTED IN WRITING? *(See DM&S Supplement, MP-5, part II, Chapter 6)*

☐ YES  ☐ NO  ☐ NOT APPLICABLE

| 17a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| CHRISTIANAH AROWORA 400463  Digitally signed by CHRISTIANAH AROWORA 400463 Date: 2020.12.29 16:11:55 -06'00' | NURSE MANAGER/DIVISION OFFICER OCC | 12/29/20 |

## SECTION E — COMMENTS OF APPROVING OFFICIAL

IF AN DISAGREEMENT WITH RATING, REFER TO DM&S, MP-5, PART II, CHAPTER 6, APPENDIX 6A.

| 18a. SIGNATURE OF APPROVING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| *[signature]* | MANAGED CARE DIVISION OFFICER | 01·08·2021 |

## SECTION F — RATED EMPLOYEE

| 19a. SIGNATURE OF EMPLOYER *(I have seen the approved rating and have had the opportunity to discuss it.)* | 19b. DATE |
|---|---|
| *[signature]* | 1/13/21 |

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

PROFESSIONAL CAREER DEVELOPMENT PROGRAM — Nurses in centralized positions and nurses with a masters or higher degrees will complete VA Forms 10-5349 and 10-5349a. Recipients of a VA Health Professional Scholarship will complete VA Form 10-5349a until obligated service is completed.

VA FORM **10-2623**

Page 4 of 4

I have been provided with the following VA Form (s):     ☐ 10-5349     ☐ 10-5349a

VA FORM **10-2623**

| | |
|---|---|
| **CAPTAIN JAMES A LOVELL** | **CHIEF MEDICAL EXECUTIVE** |
| **FEDERAL HEALTH CARE CENTER** | **DIRECTORATE** |
| **NORTH CHICAGO, ILLINOIS** | **JULY 2023** |

## FUNCTIONAL STATEMENT
### Community Care Network Clinical Coordinator
### Registered Nurse

### 1.      Program General Description

The Community Care Network Clinical Coordinator (CCNCC) Registered Nurse (RN) for Managed Care is assigned to the Chief Medical Executive at the Captain James A. Lovell Federal Health Care Center (FHCC) in North Chicago, Illinois. FHCC is a VA and DoD dually integrated healthcare center providing care services to Veterans, Active-Duty Military Personnel, and their beneficiaries, including outpatient pediatric services. FHCC is a Level 1C interdisciplinary teaching facility with service-lines serving medical, surgical, psychiatric, sterile processing, emergency care, multiple community-based outpatient clinics (CBOC), military branch clinics, and the largest federally run dental program.

The Community Care Network Clinical Coordinator nurse is a professional registered nurse, qualified by education and experience to provide direct staff support to Community Care Network programs in planning, designing, integrating, implementing, modifying, and evaluating the effectiveness of program components and/or services to improve the quality of patient care and the appropriateness and timeliness of services provided. The incumbent serves as the lead of the integrated care team established by the VA Community Care Operating Model. The incumbent will serve as a liaison to both internal and external providers and will be responsible for managing the care and seamless transition of the Veteran to and from the community. He/she possesses intimate knowledge of Community Care Network federal regulations, VHA guidelines, medical review criteria, utilization management processes, clinical documentation requirements, current standards of care, and compliance guidelines. Clinical oversight of the non-VA care approval process is provided by the FHCC Chief of Staff and/or designated appointee. The incumbent supports the FHCC's mission by possessing and exemplifying the Eight Core Competencies of the High-Performance Model.

### 2.      Functions or Scope of Assigned Duties

The Community Care Network Clinical Coordinator Registered Nurse executes position responsibilities that demonstrate leadership, experience, and creative approaches to management of complex client care within the FHCC Office of Community Care program. The Community Care Network Clinical Coordinator Registered Nurse functional role includes organizing and coordinating the clinical components for the authorization of non-VA services in response to individual healthcare needs along the illness and care continuum and in multiple settings. The goals are to center services around the patient, to foster patient self-managed care, and maximize efficient and cost-effective use of health care resources. The incumbent utilizes all avenues of resources

available to provide safe and efficient timely coordination of quality health care and services.

***NOTE: The Registered Nurse Grade is determined by a combination of education attained and meeting the four Dimensions noted below. While there are several criteria listed under each Dimension, the final Grade will also depend upon the scope, depth and breadth of work under each. Attachment (1) is available at the end of this document to provide basic guidance in the overarching requirements to meet criteria at the Nurse I, Nurse II and Nurse III levels as prescribed by the Nurse Professional Standards Board and VA Handbook 5005.***

**Major Duties and Responsibilities**

PRACTICE (Practice, Ethics, Resource Utilization):

A. Supports the Community Care Chief and Nurse Manager to promote quality in clinical practice.
B. Supports Veterans referred for evaluation and coordinates between FHCC providers and community referral physicians; ensures appropriate follow-up consults as required.
C. Coordinates patient appointments and procedural instructions, follow-up and reports test results to appropriate providers, and obtains records and test results from outside facilities.
D. Ensures all consults are acted on within 48 hours and completed within a timely manner.
E. Assigns Community Care consults responsibilities based on patient needs and competencies of staff.
F. Ensures delegated assigned tasks are completed by assigned staff.
G. Utilizes communication skills in accomplishing required activities.
H. Schedules clinic appointments using the Federal Electronic Health Records (FEHR) outlined in Outpatient Scheduling Processes and Procedures (VHA Directive 2006-005).
I. Accurately documents patient findings, assessments, and care provided in FEHR.
J. Effectively collaborates with all levels of the health care team. This includes, but is not limited to clinics, inpatient departments, physicians, nurses, other health care providers such as Pharmacists, Social Workers, Psychologists, Physical Therapists, Dieticians and other outpatient departments, ancillary services, community resources, etc.
K. Ensures instruction to the patient and family are based on identified learning needs. Assesses the family's knowledge base, health status expectations, and the potential for the family member acting as the primary care giver if necessary. Assists with the development of activities and methods to ensure information is articulated and disseminated to staff.
L. Provides tracking and trending of referrals related to authorizations, billing, and clinical outcomes.

M. Assist patients needing assistance with clinical issues in other areas of the Community Care Program such as Authorized Claims, Mill Bill, and Special Programs.

N. Ensures the provider and/or the nurse manager/ immediate supervisor/coordinator are notified of untoward events involving patients and staff.

O. Maintains Automatic Call Distribution (ACD) line protocols to meet required mandate.

P. Assists in medical center activities and preparations for the Joint Commission and other external reviews as they relate to Community Care.

Q. Follows policy for forwarding ethical issues to the Federal Health Care Center (FHCC) Ethics Committee.

R. Ensures all actions and interactions support VHA and Center directives regarding cultural diversity, prevention of sexual harassment and EEO affirmative action programs by executing duties and responsibilities in a professional manner.

S. Ensures all actions and interactions support VHA directives regarding cultural diversity, prevention of sexual harassment, and EEO affirmative action programs by executing duties and responsibilities in a professional manner.

T. Practices in a manner that preserves and protects patient autonomy, dignity, and rights.

PROFESSIONAL DEVELOPMENT (Education, Career Development, Performance):

A. Completes annual nursing mandatory reviews as well as competencies and continuing learning requirements.

B. Serves as a resource to other staff in meeting patient care needs.

C. Incorporates feedback regarding performance and interpersonal skills to enhance own professional development.

D. Improves current knowledge base to evaluate programs or activities.

E. Develops expertise in own area of practice and serves as a resource within own service. Promote the integration of Shared Governance into practice

F. Serve as a preceptor/mentor to new or less experienced staff.

G. Actively participates in professional organizations within the FHCC. Provides guidance, training, and information on Referral Management to providers, nurses, and paraprofessional within FHCC.

H. Plans for personal growth as related to professional goals based on self-assessment, evaluation, and feedback. Assumes responsibility for acquiring knowledge and experience to meet goals. Actively participates in professional organizations.

I. Provides guidance and information on CCN programs to providers and staff at the FHCC. Conducts training for professional and paraprofessional personnel within the department and the FHCC.

COLLABORATION (Collaboration, Collegiality):

A. Role models use of group processes in interdisciplinary care planning and decision making, resulting in improvement and/or resolution of care problems.

B. Establishes collegial relationships with other staff within the facility, the VISN, and the VA.

C. Collaborates with other disciplines and caregivers, using the group process for decision-making in interdisciplinary problem solving for patients in Referral Management. Supports Nursing Service verbally and by example and implements nursing practice consistent with the mission, vision, and values of the James A. Lovell, Federal Health Care Center. Assists others in practicing the same.

D. Promotes, creates, demonstrates, and ensures a culturally diverse workforce in which the values and needs of all individuals are respected.

E. Collaborates with the health care team, community agencies, and other providers within and outside the command to ensure continuity of the patient's care through all health care settings. Promotes effective communication among health care team members, including the patient, family, and significant others. Participates in frequent team meetings. Integrates recommendations of the multidisciplinary team members into a single plan of care.

F. Uses interpersonal communication strategies with individuals, as well as groups of patients/families/significant others and staff that result in the achievement of intended outcomes and other's expressed perception of acceptance/satisfaction. Perceived by other health care workers as approachable when assisting in the achievement of established goals and objectives for improving clinical outcomes. Develops collaborative relationships with other services to facilitate and support quality care.

G. Schedules and coordinates ancillary services required. Ensures consults are completed, results are received, and included in the patient's chart. Initiates coordination efforts to ensure smooth transition and continued healthcare treatment to patients when the military member/beneficiary transfers out of the area.

H. Educates coworkers about the validation or change in practice during monthly unit staff meetings or other formal or informal educational unit-based forum.

I. Participates in data collection to help identify utilization management issues affecting patient care and improve timeliness and access to care.

J. Uses the research knowledge in quality/utilization issues to change group work practices when appropriate.

K. Participates on teams to evaluate the quality of services provided with the medical center, the region and/or other medical centers as requested.

SCIENTIFIC INQUIRY (Quality of Care, Research):

A. Provides leadership in developing and maintaining standards of care which contribute to safe, comprehensive, and quality services to patients receiving services.

B. Evaluates the delivery of care using standards of care/practice, analyzes findings and various reports and recommends changes in practices. Facilitates QI processes at the unit and service level.

C. Uses knowledge of mission, vision, and values to facilitate care and monitors quality improvements for improved outcomes. Describes and utilizes the continuous quality improvement process, roles, and responsibilities.

D. Interprets relevant research and assists in application of findings.

E. Provides input in developing and revising policies, procedures, guidelines, and protocols based on research findings.

F. Participates in Performance Evaluation and Improvement (PE & I) activities by evaluating patient care systems that may include standards, protocols, and documentation for efficiency, safety, and quality. Incorporates evaluative data in the provision of ongoing case management services.

G. Documents patient's progress on clinical pathways/algorithms. Plans care based on patient needs and health care needs, at home and in the health care setting. Utilizes nursing interpretations to alert physicians to significant changes or abnormalities and provide medical information about the patient's condition, medical history and specialized treatment plan or protocol to other professionals.

H. Applies critical thinking and analytical skills to identify barriers for care delivery. Utilizes creativity and innovation and recommends changes that will improve patient care and/or clinic efficiency, or decrease costs associated with care delivery.

I. Serves as a resource to physicians, nurses and other professional personnel at other medical treatment facilities used as referral sources for patients. Shares experience, knowledge and skills.

## 3.    Supervisory Controls

Refer to the service Organizational Chart for the supervisory chain of command and the location of the position. The incumbent is under the supervision of a Nurse Manager or other immediate supervisor who provides the administrative supervision and general instruction, plans and assigns work, assigns time schedules, approves leaves, and completes performance evaluations. Clinical supervision is provided by a registered nurse, physician, or other provider. Incumbent is responsible for being self-directed in the delivery of patient care under moderate to close supervision and instruction by the registered nurse. Nursing practice is reviewed through the PE & I process. The Manager utilizes the data to evaluate overall work performance but generally reviews the employee's work for overall effectiveness in meeting the objectives of the position.

## 4.    Qualification Requirements

The incumbent must be a citizen of the United States; have a full, unrestricted license to practice as a Registered Nurse (RN) from any one of the 50 states or US territories; be a graduate of an ACEN (formerly NLNAC)/CCNE accredited school of Nursing; and meet VA professional and physical requirements as set forth in the Nurse Qualification Standard, VA Handbook 5005/27, Part II, Appendix G6. In addition, the Community Care Network Clinical Coordinator RN preferred qualifications:

a. Have at least a Baccalaureate Degree in Nursing or an Associate Degree/Diploma in Nursing with a Baccalaureate Degree in a related healthcare field;

b. Have at least two (2) years of increasingly complex RN nursing practice;

c. Have/maintain current certification in Basic Life Support (BLS);

d. Be proficient in the written and spoken use of the English Language;

**5.    Age, Development, and Cultural Needs of Patients Requirements**

The primary age of patients treated and cared for range in age from 18 to over 85 years of age.  The position requires the incumbent to possess or develop an understanding of the particular needs of these types of patients. Sensitivity to the special needs of all patients in respect to age, developmental requirements, and culturally related factors must be consistently achieved.

Takes into consideration age-related differences of the various veteran populations served:

A. *Young adulthood (18-40).*  Persons in general have normal physical functions and lifestyles.  Person establishes relationships with significant others and is competent to relate to others.

B. *Middle age (40-65).*  Persons may have physical problems and may have changes in lifestyles because children have left home or change in occupation goals.

C. *Older adulthood (65-75).*  Persons may be adapting to retirement and changing physical abilities. Chronic illness may also develop.

D. *Middle old (75-85).*  Persons may be adapting to decline in speed of movement, reaction time, and sensory abilities. Also, persons may have increasing dependence on others.

E. *Old (85 and over).*  Increasing physical problems may develop.

**6.    Customer Service**

Meets the needs of customers while supporting FHCC mission.  Consistently communicates and treats all customers in a courteous, tactful, and respectful manner. Provides the customer with consistent information according to established policies and procedures. Handles conflict and problems in dealing with the customer constructively and appropriately.

**7.    Computer Security Requirement**

Protects printed and electronic files containing sensitive data in accordance with the provision of the Privacy Act of 1974 and other applicable laws, federal regulations, FHCC/DOD/VA instructions and statutes, and BUMED/VHA policy. Protects the data from unauthorized release of from loss, alterations, or unauthorized deletion.  Follows

applicable regulations and instructions regarding access to computerized files, release of access codes, etc. Reports all known information security incidents or violations to the supervisor and/or the Information Security Officer immediately. Reports all known privacy incidents or violations to the Privacy Officer immediately.

**8.    Green Environment Management System (GEMS)**

Familiarizes self with how their activities impact FHCC's goal to implement sound stewardship practices that are protective of the air, water, land, and other natural and cultural resources.  In accordance with the goals of FHCC GEMS program, seeks to cost-effectively meet or exceed compliance with applicable Federal, State, and Local environmental; public health; and resource protection laws, regulations, and FHCC/VA/DOD requirements.  Seeks to incorporate practices necessary to implement the requirements of Executive Order 13101, "Greening the Government through Waste Prevention, Recycling, and Federal Acquisition".

**9.    Safety**

Environment of Care: Follows Life Safety Management (fire protection) procedures. Reports safety hazards, accident and injuries.  Reviews hazardous materials Material Safety Data Sheets (MSDS)/waste management information.  Follows Emergency Preparedness plan. Follows security policies/procedures.  Complies with federal, state, and local environmental and other requirements preventing pollution, minimizing waste, and conserving cultural and natural resources.

Infection Control: Demonstrates infection control practices for disease prevention (i.e., hand washing, universal precautions/isolation procedures, including TB requirement/precautions and COVID-19).

**10.    Other**

a.  Working Conditions.  To perform in a fully successful manner, the individual must have the physical ability to perform job-related duties which include: light lifting (under 15 pounds); light carrying (under 15 pounds); prolonged sitting up to 2 hours; reaching above shoulder; use of fingers; ability for rapid mental and muscular coordination simultaneously; near vision correctable in one eye to 20/20 and to 20/40 in the other; and hearing (aid permitted).  Administrative duties include word processing, computer keyboard typing, entering and retrieving database information, computer screen viewing, answering/placing telephone calls, filing, note taking. In addition, the following environmental factors apply, working closely with others and working alone. A health examination must be successfully completed prior to this assignment and periodically thereafter as required by the Occupational Health Clinic policy. There will be intermittent exposure to blood and body fluids.

b.  The health care field is a very changing spectrum which requires constant updating of knowledge.  It is therefore important that the incumbent participates in continuing

education that will enhance health care skills and knowledge. Other duties may be assigned in support of the facilities mission.

Digitally signed by APRIL L
L SHAW 957906
APRIL L
SHAW 957906
Date: 2023.07.03
15:22:13 -05'00'

_____
April Shaw, DNP, MSN, RN          Date
ADPCS/Chief Nurse Executive

Human Resource (HR) Informational Codes--
- FLSA: Exempt by Law (Title 38)
- BUS Code: 1335
- Comp Level: 000
- SUPV Code: 0
- Telework: Ad hoc per the discretion and approval of the incumbent's direct supervisor.

_____          _____
Employee Signature                  Date

_____          _____
Supervisor Signature                Date

## *General Dimension/Criteria Guidelines for Nurse I, Nurse II and Nurse III*

| | Criteria | Nurse I/Lev 3 | Nurse II | Nurse III |
|---|---|---|---|---|
| **Nursing Practice** | **PRACTICE** | Proficient use of nursing process; Guides/Directs others who provide care | Demo Leadership; Charge Nurse/Unit Level | Leadership at Service, Service Line, or Medical Center Level; looking for organized processes or systems |
| | **ETHICS** | Identifies ethical practice issues; takes appropriate action. | Serves as resource in identifying ethical issues | Leadership in anticipating risks, resolving ethical issues and dilemmas, analyzing trends, and taking appropriate action |
| | **RESOURCE UTILIZATION** | Delegates care in a safe, efficient, cost-effective manner. Assists clients to identify and secure appropriate services. | Identifies potential problems involving resources or pt. safety and takes action to avert (Team/Unit) | Manages and analyzes resources, evaluates options and takes actions that impact organization outcomes beyond the unit/practice area. |
| **Professional Role** | **EDUCATION/CAREER DEVELOPMENT** | Implements ongoing educational plan to support professional development. | Participates in educational activities to enhance role performance at the unit/team level | Implements educational plan to meet changing needs of program/ service |
| | **PERFORMANCE** | Conducts self-assessment and performance of others; identifies learning needs. | Self-evaluation and evaluation of others | Self-evaluation and evaluation of program or service effectiveness (recommending/implementing changes) |
| **Collaboration** | **COLLEGIALITY** | Provides feedback regarding practice of others to improve client care. | Educates colleagues, preceptor and mentoring roles | Coaches in team building: active involvement in group accomplishments; sharing expertise outside of the facility. |
| | **COLLABORATION** | Refers to, consults with, and makes provision for continuity of care with other health care staff. | Uses group process to identify, analyze, and resolve care problems | Leadership and decision-making role in use of group process for interdisciplinary problem-solving beyond unit/practice setting. |
| **Scientific Inquiry** | **QUALITY OF CARE** | Participates in established quality improvement studies and/or activities. | Participates in QI activities (data collection, analysis, recommendations, etc.) at the Unit level | Initiates/Leads QI activities at the program, service, and/or facility level |
| | **RESEARCH** | Uses a body of research to validate and/or change own professional practice. | Uses research to validate or change Work group/Team practice | Demonstrates leadership in collaboration with others in research activities, across programs/services, to validate & improve practice |

Attachment (1)

CAPTAIN JAMES A LOVELL        RESOURCES
FEDERAL HEALTH CARE CENTER        DIRECTORATE
NORTH CHICAGO, ILLINOIS        FEBRUARY 2021

## FUNCTIONAL STATEMENT
### Community Care Network Clinical Coordinator – Registered Nurse

**1.**      **Program General Description**

The Community Care Network Clinical Coordinator (CCNCC) is a registered professional nurse, qualified by education and experience to provide direct staff support to Community Care Network programs in planning, designing, integrating, implementing, modifying, and evaluating the effectiveness of program components and/or services to improve the quality of patient care and the appropriateness and timeliness of services provided. The CCNCC is aligned within the Resources Directorate, Patient Administration Department, Managed Care Division, Office of Community Care (OCC) Section and serves as the lead of the integrated care team established by the VA Community Care Operating Model. The CCNCC will serve as a liaison to both internal and external providers and will be responsible for managing the care of the Veteran and the seamless transition to and from the community. He/she possesses intimate knowledge of CCN federal regulations, VHA guidelines, medical review criteria, utilization management processes, clinical documentation requirements, current standards of care, and compliance guidelines. Clinical oversight of the non-VA care approval process is provided by the FHCC Chief of Staff and/or designated appointee. The incumbent supports the FHCC's mission by possessing and exemplifying the Eight Core Competencies of the High-Performance Model.

**2.**      **Functions or Scope of Assigned Duties**

The CCNCC executes position responsibilities that demonstrate leadership, experience, and creative approaches to management of complex client care within the FHCC Office of Community Care program. The CCNCC functional role includes organizing and coordinating the clinical components for the authorization of non-VA services in response to individual healthcare needs along the illness and care continuum and in multiple settings. The goals are to center services around the patient, to foster patient self-managed care, and maximize efficient and cost-effective use of health care resources. The CCNCC utilizes all avenues of resources available to provide safe and efficient timely coordination of quality health care and services.

***NOTE: The Registered Nurse Grade is determined by a combination of education attained and meeting the four Dimensions noted below. While there are several criteria listed under each Dimension, the final Grade will also depend upon the scope, depth and breadth of work under each. Attachment (1) is available at the end of this document to provide basic guidance in the overarching requirements to meet criteria at the Nurse I, Nurse II and Nurse III levels as prescribed by the Nurse Professional Standards Board and VA Handbook 5005.***

000071

PROFESSIONAL DEVELOPMENT (Education, Career Development, Performance):

> Plans for personal growth as related to professional goals based on self-assessment, evaluation, and feedback. Assumes responsibility for acquiring knowledge and experience to meet goals. Actively participates in professional organizations. Provides guidance and information on CCN programs to providers and staff at the FHCC. Conducts training for professional and paraprofessional personnel within the department and the FHCC.

COLLABORATION (Collaboration, Collegiality):

a. Collaborates with the health care team, community agencies, and other providers within and outside the command to ensure continuity of the patient's care through all health care settings. Promotes effective communication among health care team members, including the patient, family, and significant others. Participates in frequent team meetings. Integrates recommendations of the multidisciplinary team members into a single plan of care.

b. Uses interpersonal communication strategies with individuals, as well as groups of patients/families/significant others and staff that result in the achievement of intended outcomes and other's expressed perception of acceptance/satisfaction. Perceived by other health care workers as approachable when assisting in the achievement of established goals and objectives for improving clinical outcomes. Develops collaborative relationships with other services to facilitate and support quality care.

c. Schedules and coordinates ancillary services required. Ensures consults are completed, results are received, and included in the patient's chart. Initiates coordination efforts to ensure smooth transition and continued healthcare treatment to patients when the military member/beneficiary transfers out of the area.

d. Educates coworkers about the validation or change in practice during monthly unit staff meetings or other formal or informal educational unit-based forum.

e. Participates in data collection to help identify utilization management issues affecting patient care and improve timeliness and access to care.

f. Uses the research knowledge in quality/ utilization issues to change group work practices when appropriate.

g. Participates on teams to evaluate the quality of services provided with the medical center, the region and/ or other medical centers as requested.

SCIENTIFIC INQUIRY (Quality of Care, Research):

a. Participates in Performance Evaluation and Improvement (PE & I) activities by evaluating patient care systems that may include standards, protocols, and documentation for efficiency, safety, and quality. Incorporates evaluative data in the provision of ongoing case management services.

b. Documents patient's progress on clinical pathways/algorithms. Plans care based on patient needs and health care needs, at home and in the health care

The primary age of patients treated and cared for range in age from 18 to over 85 years of age. The position requires the incumbent to possess or develop an understanding of the particular needs of these types of patients. Sensitivity to the special needs of all patients in respect to age, developmental requirements, and culturally related factors must be consistently achieved.

Takes into consideration age-related differences of the various veteran populations served:

*Young adulthood (18-40).* Persons in general have normal physical functions and lifestyles. Person establishes relationships with significant others and is competent to relate to others.

*Middle age (40-65).* Persons may have physical problems and may have changes in lifestyles because children have left home or change in occupation goals.

*Older adulthood (65-75).* Persons may be adapting to retirement and changing physical abilities. Chronic illness may also develop.

*Middle old (75-85).* Persons may be adapting to decline in speed of movement, reaction time, and sensory abilities. Also, persons may have increasing dependence on others.

*Old (85 and over).* Increasing physical problems may develop.

6. **Customer Service**

Meets the needs of customers while supporting FHCC mission. Consistently communicates and treats all customers in a courteous, tactful, and respectful manner. Provides the customer with consistent information according to established policies and procedures. Handles conflict and problems in dealing with the customer constructively and appropriately.

7. **Computer Security Requirement**

Protects printed and electronic files containing sensitive data in accordance with the provision of the Privacy Act of 1974 and other applicable laws, federal regulations, FHCC/DOD/VA instructions and statutes, and BUMED/VHA policy. Protects the data from unauthorized release of from loss, alterations, or unauthorized deletion. Follows applicable regulations and instructions regarding access to computerized files, release of access codes, etc. Reports all known information security incidents or violations to the supervisor and/or the Information Security Officer immediately. Reports all known privacy incidents or violations to the Privacy Officer immediately.

8. **Green Environment Management System (GEMS)**

Familiarizes self with how their activities impact FHCC's goal to implement sound stewardship practices that are protective of the air, water, land, and other natural and

Human Resource (HR) Informational Codes--
- FLSA: Exempt by Law (Title 38)
- BUS Code: 1335
- Comp Level: 000
- SUPV Code: 0
- Telework: Not Eligible

_____          _____
Employee Signature                         Date

_____          9/23/2021
Supervisor Signature                      /Date/

Page **7** of **8**

000074

CAPTAIN JAMES A LOVELL           FACILITY SUPPORT
FEDERAL HEALTH CARE CENTER      DIRECTORATE
NORTH CHICAGO, ILLINOIS            OCTOBER, 2018

## FUNCTIONAL STATEMENT
### Community Care Network Clinical Coordinator – Registered Nurse

**1.    Program General Description**

The Community Care Network Clinical Coordinator (CCNCC) is a registered professional nurse, qualified by education and experience to provide direct staff support to Community Care Network programs in planning, designing, integrating, implementing, modifying, and evaluating the effectiveness of program components and/or services to improve the quality of patient care and the appropriateness and timeliness of services provided. The CCNCC is aligned within the Facility Support Directorate, Patient Administration Department, Community Care Network (CCN) Section and serves as the lead of the integrated care team established by the VA Community Care Operating Model. The CCNCC will serve as a liaison to both internal and external providers and will be responsible for managing the care of the Veteran and the seamless transition to and from the community. He/she possesses intimate knowledge of CCN federal regulations, VHA guidelines, medical review criteria, utilization management processes, clinical documentation requirements, current standards of care, and compliance guidelines. Clinical oversight of the non-VA care approval process is provided by the FHCC Chief of Staff and/or designated appointee. The incumbent supports the FHCC's mission by possessing and exemplifying the Eight Core Competencies of the High-Performance Model.

**2.    Functions or Scope of Assigned Duties**

The CCNCC executes position responsibilities that demonstrate leadership, experience, and creative approaches to management of complex client care within the FHCC Office of Community Care program. The CCNCC functional role includes organizing and coordinating the clinical components for the authorization of non-VA services in response to individual healthcare needs along the illness and care continuum and in multiple settings. The goals are to center services around the patient, to foster patient self-managed care, and maximize efficient and cost-effective use of health care resources. The CCNCC utilizes all avenues of resources available to provide safe and efficient timely coordination of quality health care and services.

*NOTE: The Registered Nurse Grade is determined by a combination of education attained and meeting the four Dimensions noted below. While there are several criteria listed under each Dimension, the final Grade will also depend upon the scope, depth and breadth of work under each. Attachment (1) is available at the end of this document to provide basic guidance in the overarching requirements to meet criteria at the Nurse I, Nurse II and Nurse III levels as prescribed by the Nurse Professional Standards Board and VA Handbook 5005.*

Page **1** of **8**

**Major Duties and Responsibilities**

PRACTICE (Practice, Ethics, Resource Utilization):

    a. Works with the Community Care Chief and Nurse Manager to promote quality in clinical practice.

    b. Supports the Veterans referred for evaluation and coordinates between the FHCC providers and community referral physicians; ensures appropriate follow-up consults as required.

    c. Coordinates patient appointments and procedural instructions, follow-up and reports test results to the appropriate providers, and obtains records and test results from outside facilities.

    d. Ensures all consults are acted on and completed in a timely manner;

    e. Assigns Community care consults responsibilities based upon patient needs and competencies of staff.

    f. Ensures that delegated tasks as assigned are completed by other staff.

    g. Utilizes communication skills in accomplishing required activities.

    h. Schedules clinic appointments using VISTA in accordance with the business rules outlined in VHA Directive 2006-005, Outpatient Scheduling Processes and Procedures.

    i. Accurately documents in the medical record patient findings, assessments, and care provided.

    j. Effectively collaborates with all levels of the health care team. This includes, but is not limited to clinics, inpatient departments, physicians, nurses, other health care providers such as Pharmacists, Social Workers, Psychologists, Physical Therapists, Dieticians and other outpatient departments, ancillary services, community resources, etc.

    k. Ensures instruction to the patient and the family based on identified learning needs. Assesses the family's knowledge base, health status expectations, and the potential for the family member acting as the primary care giver if necessary. Assists with the development of activities and methods to ensure information is articulated and disseminated to staff.

    l. Provides tracking and trending of referrals related to authorizations, billing, and clinical outcomes.

    m. Attends to patients needing assistance with clinical issues in other areas of the Community Care Program such as Authorized Claims, Mill Bill, and Special Programs.

    n. Ensures the provider and/or the nurse manager/ immediate supervisor/coordinator are notified of untoward events involving patients and staff, either by assigned RN or by self.

    o. Maintains Automatic Call Distribution (ACD) line protocols to meet required mandate.

    p. Assists in medical center activities and preparations for the Joint Commission and other external reviews as they relate to Community Care.

**PROFESSIONAL DEVELOPMENT** (Education, Career Development, Performance):

> Plans for personal growth as related to professional goals based on self-assessment, evaluation, and feedback. Assumes responsibility for acquiring knowledge and experience to meet goals. Actively participates in professional organizations. Provides guidance and information on CCN programs to providers and staff at the FHCC. Conducts training for professional and paraprofessional personnel within the department and the FHCC.

**COLLABORATION** (Collaboration, Collegiality):

a. Collaborates with the health care team, community agencies, and other providers within and outside the command to ensure continuity of the patient's care through all health care settings. Promotes effective communication among health care team members, including the patient, family, and significant others. Participates in frequent team meetings. Integrates recommendations of the multidisciplinary team members into a single plan of care.

b. Uses interpersonal communication strategies with individuals, as well as groups of patients/families/significant others and staff that result in the achievement of intended outcomes and other's expressed perception of acceptance/satisfaction. Perceived by other health care workers as approachable when assisting in the achievement of established goals and objectives for improving clinical outcomes. Develops collaborative relationships with other services to facilitate and support quality care.

c. Schedules and coordinates ancillary services required. Ensures consults are completed, results are received, and included in the patient's chart. Initiates coordination efforts to ensure smooth transition and continued healthcare treatment to patients when the military member/beneficiary transfers out of the area.

d. Educates coworkers about the validation or change in practice during monthly unit staff meetings or other formal or informal educational unit-based forum.

e. Participates in data collection to help identify utilization management issues affecting patient care and improve timeliness and access to care.

f. Uses the research knowledge in quality/ utilization issues to change group work practices when appropriate.

g. Participates on teams to evaluate the quality of services provided with the medical center, the region and/ or other medical centers as requested.

**SCIENTIFIC INQUIRY** (Quality of Care, Research):

a. Participates in Performance Evaluation and Improvement (PE & I) activities by evaluating patient care systems that may include standards, protocols, and documentation for efficiency, safety, and quality. Incorporates evaluative data in the provision of ongoing case management services.

b. Documents patient's progress on clinical pathways/algorithms. Plans care based on patient needs and health care needs, at home and in the health care

setting. Utilizes nursing interpretations to alert physicians to significant changes or abnormalities and provide medical information about the patient's condition, medical history and specialized treatment plan or protocol to other professionals.

   c. Applies critical thinking and analytical skills to identify barriers for care delivery. Utilizes creativity and innovation and recommends changes that will improve patient care and/or clinic efficiency, or decrease costs associated with care delivery.

   d. Serves as a resource to physicians, nurses and other professional personnel at other medical treatment facilities used as referral sources for patients. Shares experience, knowledge and skills.

**3.    Supervisory Controls**

The employee reports to the Community Care Network Supervisor (CCNS). The supervisor provides general information on administrative policies, practices and regulations, which typically is provided during staff meetings. The employee works within the parameter of approved protocols and the departmental policies and procedures. The employee is responsible to independently plan, organize and coordinate work; solve problems, interpret the extent to which protocols may be modified or adapted, interpret policies and regulations and initiate pilot work projects to determine new methodology. The employee apprises the supervisor of controversial or very unusual clinical and administrative situations, and presents recommendations for solving them. Nursing practice is reviewed through the Performance Evaluation and Improvement (PE & I) process. The supervisor utilizes the data to evaluate overall work performance, but generally reviews the employee's work for overall effectiveness in meeting the objectives of the position.

**4.    Qualification Requirements**

The incumbent must be a citizen of the United States; have a full, unrestricted license to practice as a Registered Nurse (RN) from any one of the 50 states or US territories; be a graduate of an ACEN (formerly NLNAC)/CCNE accredited school of Nursing; and meet VA professional and physical requirements as set forth in the Nurse Qualification Standard, VA Handbook 5005/27, Part II, Appendix G6. In addition, the CCNCC must:

   a. Have at least a Baccalaureate Degree in Nursing OR an Associate Degree/Diploma in Nursing WITH a Baccalaureate Degree in a related healthcare field;

   b. Have at least 2 years of increasingly complex RN nursing practice;

   c. Be proficient in the written and spoken use of the English Language;

   d. Have supervisory and management expertise and experience.

## 5. Age, Development, and Cultural Needs of Patients Requirements

The primary age of patients treated and cared for range in age from 18 to over 85 years of age. The position requires the incumbent to possess or develop an understanding of the particular needs of these types of patients. Sensitivity to the special needs of all patients in respect to age, developmental requirements, and culturally related factors must be consistently achieved.

Takes into consideration age-related differences of the various veteran populations served:

*Young adulthood (18-40).* Persons in general have normal physical functions and lifestyles. Person establishes relationships with significant others and is competent to relate to others.

*Middle age (40-65).* Persons may have physical problems and may have changes in lifestyles because children have left home or change in occupation goals.

*Older adulthood (65-75).* Persons may be adapting to retirement and changing physical abilities. Chronic illness may also develop.

*Middle old (75-85).* Persons may be adapting to decline in speed of movement, reaction time, and sensory abilities. Also, persons may have increasing dependence on others.

*Old (85 and over).* Increasing physical problems may develop.

## 6. Customer Service

Meets the needs of customers while supporting FHCC mission. Consistently communicates and treats all customers in a courteous, tactful, and respectful manner. Provides the customer with consistent information according to established policies and procedures. Handles conflict and problems in dealing with the customer constructively and appropriately.

## 7. Computer Security Requirement

Protects printed and electronic files containing sensitive data in accordance with the provision of the Privacy Act of 1974 and other applicable laws, federal regulations, FHCC/DOD/VA instructions and statutes, and BUMED/VHA policy. Protects the data from unauthorized release of from loss, alterations, or unauthorized deletion. Follows applicable regulations and instructions regarding access to computerized files, release of access codes, etc.

## 8. Green Environment Management System (GEMS)

Familiarizes self with how their activities impact FHCC's goal to implement sound stewardship practices that are protective of the air, water, land, and other natural and

cultural resources. In accordance with the goals of FHCC GEMS program, seeks to cost-effectively meet or exceed compliance with applicable Federal, State, and Local environmental; public health; and resource protection laws, regulations, and FHCC/VA/DOD requirements. Seeks to incorporate practices necessary to implement the requirements of Executive Order 13101, "Greening the Government through Waste Prevention, Recycling, and Federal Acquisition".

## 9.     Safety

Environment of Care: Follows Life Safety Management (fire protection) procedures. Reports safety hazards, accident and injuries. Reviews hazardous materials Material Safety Data Sheets (MSDS)/waste management information. Follows Emergency Preparedness plan. Follows security policies/procedures. Complies with federal, state, and local environmental and other requirements preventing pollution, minimizing waste, and conserving cultural and natural resources.

Infection Control: Demonstrates infection control practices for disease prevention (i.e. hand washing, universal precautions/isolation procedures, including TB requirement/precautions).

## 10.     Other

a. Working Conditions. To perform in a fully successful manner, the individual must have the physical ability to perform job-related duties which include: light lifting (under 15 pounds); light carrying (under 15 pounds); prolonged sitting up to 2 hours; reaching above shoulder; use of fingers; ability for rapid mental and muscular coordination simultaneously; near vision correctable in one eye to 20/20 and to 20/40 in the other; and hearing (aid permitted). The individual must also be able to perform the following administrative duties: word processing; computer key board typing, computer screen viewing; answering/placing telephone calls, filing, and note taking. He/she will be exposed to the following Environment Factor: working closely with others. A health examination must be successfully completed prior to this assignment and periodically thereafter as required by the Occupational Health Clinic policy. There will be intermittent exposure to blood and body fluids.

b. The health care field is a very changing spectrum which requires constant updating of knowledge. It is therefore important that the incumbent participates in continuing education that will enhance health care skills and knowledge. Other duties may be assigned in support of the facilities mission.


_Sw Mathews, MSN, MS, MA_                          _Dec 2, 2018_
Dr. Sarah V. Fouse, PhD, MSN, BSN, VHA-CM          Date
Associate Director, Nursing Practice/VA Senior Nurse Executive

Page **6** of **8**

Human Resource (HR) Informational Codes--
- FLSA: Exempt by Law (Title 38)
- BUS Code: 1335
- Comp Level: 000
- SUPV Code: 0
- Telework: Not Eligible

_____     _____
Employee Signature                  Date

_____     _____
Supervisor Signature                Date

Page **7** of **8**

## General Dimension/Criteria Guidelines for Nurse I, Nurse II and Nurse III

| | Criteria | Nurse I/Lev 3 | Nurse II | Nurse III |
|---|---|---|---|---|
| **Nursing Practice** | **PRACTICE** | Proficient use of nursing process; Guides/Directs others who provide care | Demo Leadership; Charge Nurse/Unit Level | Leadership at Service, Service Line, or Medical Center Level; looking for organized processes or systems |
| | **ETHICS** | Identifies ethical practice issues; takes appropriate action. | Serves as resource in identifying ethical issues | Leadership in anticipating risks, resolving ethical issues and dilemmas, analyzing trends, and taking appropriate action |
| | **RESOURCE UTILIZATION** | Delegates care in a safe, efficient, cost-effective manner. Assists clients to identify and secure appropriate services. | Identifies potential problems involving resources or pt. safety and takes action to avert (Team/Unit) | Manages and analyzes resources, evaluates options and takes actions that impact organization outcomes beyond the unit/practice area. |
| **Professional Role** | **EDUCATION/CAREER DEVELOPMENT** | Implements ongoing educational plan to support professional development. | Participates in educational activities to enhance role performance at the unit/team level | Implements educational plan to meet changing needs of program/ service |
| | **PERFORMANCE** | Conducts self-assessment and performance of others; identifies learning needs. | Self-evaluation and evaluation of others | Self-evaluation and evaluation of program or service effectiveness (recommending/implementing changes) |
| **Collaboration** | **COLLEGIALITY** | Provides feedback regarding practice of others to improve client care. | Educates colleagues, preceptor and mentoring roles | Coaches in team building: active involvement in group accomplishments; sharing expertise outside of the facility. |
| | **COLLABORATION** | Refers to, consults with, and makes provision for continuity of care with other health care staff. | Uses group process to identify, analyze, and resolve care problems | Leadership and decision-making role in use of group process for interdisciplinary problem-solving beyond unit/practice setting. |
| **Scientific Inquiry** | **QUALITY OF CARE** | Participates in established quality improvement studies and/or activities. | Participates in QI activities (data collection, analysis, recommendations, etc.) at the Unit level | Initiates/Leads QI activities at the program, service, and/or facility level |
| | **RESEARCH** | Uses a body of research to validate and/or change own professional practice. | Uses research to validate or change Work group/Team practice | Demonstrates leadership in collaboration with others in research activities, across programs/services, to validate & improve practice |

Attachment (1)



**DEPARTMENT OF VETERANS AFFAIRS**
Office of Resolution Management, Diversity & Inclusion
2255 Enterprise Drive, Suite 5506
Westchester, IL 60154

In reply refer to: 08O

September 6, 2023

Via Email: kochu106@gmail.com

Azis Kochiu
1831 Monroe Avenue
South Milwaukee, WI 53172

**SUBJECT: Notice of Partial Acceptance for Your EEO Complaint No. 200J-556A-2023-152770, Filed July 24, 2023, against the Officials at Captain James A. Lovell Federal Health Care Center, North Chicago, IL**

1. On June 22, 2023, you initiated contact with an EEO counselor. Counseling concluded on July 21, 2023, when the *Notice of Right to File a Discrimination Complaint* was emailed to you, which you received on July 21, 2023. On July 24, 2023, you filed a formal complaint of discrimination, VA Form 4939.

2. During informal counseling you stated that in 2022 you received a "Satisfactory" on your Proficiency Report and from November 8, 2022, to May 3, 2023, you were assigned a bigger workload than your co-workers. **Equal Employment Opportunity Commission (EEOC) Regulation 29 C.F.R. §1614.107(a)(2)** requires that complaints of discrimination be brought to the attention of the Equal Employment Opportunity Counselor within forty-five (45) days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action. Your initial contact with the ORMDI office was June 22, 2023, and 45 days back from that date is May 8, 2023. Any independently actionable event occurring on or before May 7, 2023, is untimely. Therefore, the event of being rated Satisfactory on your Proficiency Report in 2022, is **DISMISSED[1] as an independently actionable claim pursuant to EEOC Regulation 29 C.F.R. §1614.107(a)(2)** for failing to comply with the regulatory time limits. This event is, however, determined to be sufficiently related to the overall pattern of harassment and will be included for consideration in the analysis of the harassment claim.

3. Your complaint of discrimination otherwise raises the following claims:

> **Whether complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal when: a) since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed him and management has done nothing to stop it; b) in 2022, he was rated Satisfactory in his Proficiency Report: c) from November 8, 2022, to May 3, 2023, his was assigned a bigger workload than his co-workers; d) on May 8, 2023, he was not allowed Union representation, he was told he was**

---

[1] There is no immediate right to appeal the dismissed portion of the complaint. You will have the right to appeal the partial dismissal once final action is taken by the agency on the remainder of the complaint.

**CONFIDENTIAL DOCUMENT**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Page 2
Notice of Partial Acceptance
Azis Kochiu
200J-556A-2023-152770

**the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022; e) on June 15, 2023, DLV gave deceptive information to a Peer Review Committee: f) on June 19, 2023, he became aware DLV was asking co-workers to submit negative reports of contacts regarding him; and includes the following timely raised independently actionable claims:**

**(1) On May 8, 2023, he was removed from patient care.**

**(2) As of July 19, 2023, he has not been issued his Proficiency Rating that was due in February 2023.**

4. In assessing a hostile environment claim, the totality of the circumstances must be examined, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance and (5) there is a basis for imputing liability to the employer.[2] A hostile environment claim generally requires a showing of a pattern of denigrating conduct that unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment.[3] In determining whether harassment is sufficiently severe or pervasive to create a claim of hostile environment, the harasser's conduct is evaluated from the objective standpoint of a reasonable person. An objectively hostile or abusive work environment is created only when a reasonable person would find it hostile or abusive.

5. We have determined your claim of harassment passes the severe or pervasive requirement for further processing. The above-identified events establish a pattern of conduct that could create a hostile work environment and/or that could interfere with the job performance of a reasonable person. We also believe that management's alleged actions, if proven true, are actions that could reasonably deter an individual from opposing discrimination or participating in the EEO process.

6. As outlined above, **events (1) – (2) in paragraph 3** have been **ACCEPTED** for investigation **as independently actionable claims,** and the **harassment claim, consisting of all events**, is also **ACCEPTED** for investigation.

7. If you believe that the accepted claims are formulated improperly, incomplete, or incorrect, you must notify this office within **seven (7) calendar days** of receipt of this letter, in writing, by email, or fax, stating your disagreement. We will include your statement in the complaint file. If you do not contact this office within **7 calendar days**, we will assume that we correctly stated the claims. **You are *strongly encouraged* to use**

---

[2] See *McCleod v. Social Security Administration*, EEOC Appeal No. 01963810 (August 5, 1999) (citing *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982).
[3] See *Vance C., v. Social Security Administration,* EEOC Appeal No. 2019004877 (September 17, 2020); *Cobb v. Dep't of the Treasury,* EEOC Request No. 05970077 (March 13, 1997).

**CONFIDENTIAL DOCUMENT**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Page 3
Notice of Partial Acceptance
Azis Kochiu
200J-556A-2023-152770

**email to submit your documents to** patricia.martinez2@va.gov**.**

8. We will assign the accepted claims to an impartial Investigator under the supervision of the Office of Resolution Management, Diversity & Inclusion (ORMDI). The Investigator will contact you directly to obtain information or evidence you may wish to offer. The Investigator is only authorized to investigate the claims specified.

9. You have additional rights that are explained fully in the enclosure to this letter.

10. **Failure to keep this office advised of any change of address could dismiss your complaint**. You must also immediately advise this office, in writing, of the name, address, and telephone number of any person you may choose to represent you. If you advise us of legal representation, we will email all subsequent complaint-related correspondence to your representative, with copies to you, unless you advise us, in writing, that that individual no longer represents you.

11. If you have any questions, please contact Patricia Martinez, ORMDI Case Manager, at (708) 904-0955, patricia.martinez2@va.gov. **You are** *strongly encouraged* **to use email to submit your correspondence and/or documents to ORMDI.**

Sincerely,

Charles Kolliker

For Ida O'Neal
District Manager
Midwest District

Enclosure: Complainant's Rights

cc: Robert Buckley, Director, via email: Robert.g.buckley@va.gov
Melvin Tolbert, EEO Program Manager, via email: Melvin.tolbert@va.gov
Stephanie Vickers, EEO Specialist, via email: stephanie.vickers@va.gov

**CONFIDENTIAL DOCUMENT**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

Page 4
Notice of Partial Acceptance
Azis Kochiu
200J-556A-2023-152770

**Complainant's Rights**

The investigation must be completed within **180** calendar days of filing your complaint. You will receive a copy of the investigative file upon completion. You will be advised, in writing, of your right to request a **Final Agency Decision (FAD)** from the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC, or a **hearing** by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

## Requesting a Hearing

To request a hearing, you must meet the following criteria:

- You have received your completed investigative file -**OR**-
- 180 calendar or more days elapsed since you filed your formal complaint (and you have not received your complete investigative file)

Complainants may file a request for a hearing and submit relevant documents through the EEOC's Public Portal. To access the Public Portal, go to https://publicportal.eeoc.gov. To begin, click on the link: "Filing with EEOC" and answer the questions. After you submit your request for a hearing, complainants can then use the Public Portal's "My Cases" feature to view their hearing matters in one convenient location. Complainants can also identify and manage their representative contact information in the Portal. Once identified by a complainant, registered representatives can then upload documentation on their client's behalf.

If a complainant does not want to use the Public Portal, requests for a hearing to the EEOC and supporting documents can still be submitted by using the following methods:

| To request that EEOC appoint an administrative judge to hear your complaint, you must complete EEOC's "Hearing Request Form" and send it to: | You must send a **copy** of your EEOC hearing request to this office: |
|---|---|
| U.S. Equal Employment Opportunity Commission<br>CHICAGO DISTRICT OFFICE<br>John C. Kluczynski Federal Building<br>230 South Dearborn Street, Suite 1866<br>Chicago, Illinois 60604<br>(312) 872-9734<br>(312) 588-1265 (Fax)<br>You can request a hearing at https://publicportal.eeoc.gov. | Department of Veterans Affairs<br>Office of Resolution Management, Diversity & Inclusion<br>2255 Enterprise Drive, Suite 5506<br>Westchester, IL 60154<br>**You are strongly encouraged to use email to submit your hearing request at ORMMWDPostInvestigation@va.gov.** |

You are required to certify to the EEOC administrative judge that you sent a copy of the request for a hearing to the Office of Resolution Management, Diversity & Inclusion at the above address.

## Requesting a Final Agency Decision

To request a FAD, you must have received your completed investigative file.

| To request a FAD, submit the FAD request form, which will be included in your investigation file to: |
|---|
| Department of Veterans Affairs<br>Office of Resolution Management, Diversity & Inclusion<br>2255 Enterprise Drive, Suite 5506<br>Westchester, IL 60154<br>**You are strongly encouraged to use email to submit your appeal request at ORMMWDPostInvestigation@va.gov** |

If you request a FAD, the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC, will render a decision. The FAD will address all claims, and a decision will be made on the merits of your complaint. You may appeal the FAD to EEOC if you are dissatisfied with the decision. OEDCA will provide you with specific information regarding your appeal rights following its final agency decision, including your right to file a civil action in an appropriate United States District Court.

## Requesting Civil Action

If you have not received your copy of the investigative file within 180 calendar days from the date you filed your formal complaint, and you do not wish to have a hearing, you also have the right to file a civil action in an appropriate United States District Court. If you file a civil action, the court may, at its discretion and upon your request, appoint an attorney to represent you in the matter if you do not have or cannot afford one. The court may also authorize the civil action to begin without payment of fees, costs, or other security. Finally, if you decide to file a civil action, you must name the **Secretary of Veterans Affairs** as the defendant.

## Requesting ADR

The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints. Agencies and complainants can realize many advantages from using ADR. ADR offers parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORMDI Case Manager listed in the letter or the ADR Program Manager at workplaceadr@va.gov.

**CONFIDENTIAL DOCUMENT**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.



**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management, Diversity & Inclusion**
**2255 Enterprise Drive Suite 5506**
**Westchester, IL 60154**

In reply refer to: 08O

September 6, 2023

Via Email: Robert.g.buckely@va.gov

Robert G. Buckley
Director (00)
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL  60064-3049

**SUBJECT: Notice of Partial Acceptance for the EEO Complaint of Azis Kochiu, Case No. 200J-556A-2023-152770, Filed July 24, 2023**

1. This is to inform you that Azis Kochiu, employee, filed a complaint of discrimination on July 24, 2023. Enclosed is a copy of the Notice of Partial Acceptance Letter that was sent to complainant.

2. All documents and records, including the Official Personnel Folder related to this complaint, must be maintained at the facility, and made available at the time of the investigation.

3. Advanced preparation for the investigation is to begin as soon as possible. This includes securing all documents (appropriately redacted)[1] identified in the attachment to this letter. We require that the requested information be provided **within ten (10) days** of your receipt of this letter using electronic delivery via email to ORMOICTAdministrativeTeam@va.gov.

If electronic delivery is not possible, the requested information should be mailed to:

**DVA-Office of Resolution Management, Diversity & Inclusion**
**Attn: Colette Hill**
**William S Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh PA 15222**

If any of the requested documents or information does not exist or if your facility does not maintain them, please have an appropriate management official provide a signed and dated statement identifying the information and why it cannot be provided.

4. The protection of the privacy of Veterans, their dependents, and beneficiaries, as well as the privacy of all employees and contractors of VA, and other individuals for whom personal records are created and maintained by Federal law, is a critical requirement. As such, documents you provide us **must be redacted prior to their release to ORMDI** for VA sensitive information[2] and

---

[1] Any patient/veteran information must conform with VA's guidelines/criteria for release of information and have the appropriate documentation to verify authorization to release such information to ORMDI.
[2] VA sensitive information as defined by Public Law 109-461, is all Departmental data on any storage media or in any form or format, which requires protection due to the risk of harm that could result from inadvertent or deliberate disclosure, alteration, or destruction of the information. The term includes information whose improper use or disclosure could adversely affect the ability of an agency to accomplish its mission, proprietary information, records about

**CONFIDENTIAL DOCUMENT**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov

Page 2
Notice of Partial Acceptance
Azis Kochiu
200J-556A-2023-152770

personally identifiable information (PII). Specific examples of information that should be redacted/sanitized before their release to ORMDI include:

a. Social Security numbers.
b. Names of veterans, their dependents and/or beneficiaries.
c. Medical/diagnostic and/or veteran claim information related to specific veterans, their dependents and/or beneficiaries.
d. Dates of birth (the exception to this are for cases that allege age-based discrimination).
e. Complainant's medical information, unless a release of information, signed by complainant, is attached.

5. ORMDI will make two requests for information deemed necessary for inclusion in the investigative file. This letter is considered the first request for information. The Investigator assigned will prepare any additional requests if needed. The investigative file will document the requests, along with your facility's response, or lack thereof. **Failure to submit the requested documents may result in an adverse inference/sanction against the Agency.**

6. The Equal Employment Opportunity Commission (EEOC) encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in this complaint, please contact Patricia Martinez, ORMDI Case Manager, at (708) 904-0955, patricia.martinez2@va.gov.

Sincerely,

Charles Kolliker

For Ida O'Neal
District Manager
Midwest District

Enclosures: Notice of Partial Acceptance Letter
Document List

cc: Melvin Tolbert, EEO Program Manager, via email: Melvin.tolbert@va.gov
Stephanie Vickers, EEO Specialist, via email: stephanie.vickers@va.gov

individuals requiring protection under various confidentiality provisions such as the Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA).
**CONFIDENTIAL DOCUMENT**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

**REQUESTED DOCUMENTS FOR PENDING EEO INVESTIGATIONS**

**COMPLAINANT'S NAME: AZIS KOCHIU**
**CASE NUMBER:** 200J-556A-2023-152770
**DATE FILED: 7/24/2023**

**INSTRUCTIONS:** Please provide documents checked (√) below. This information is due in the ORMDI Field Office within ten (10) days of receipt of request. Documents must be accompanied by a statement from an appropriate official certifying the documents as true and accurate. Statements must be on official stationery, dated, signed and must include the title of the certifying official. The EEO category(s)/bases of this complaint are checked (√) below:

**EEO CATEGORIES (BASES)**

| | | |
|---|---|---|
| RACE | COLOR | AGE (DOB) |
| x SEX | NATIONAL ORIGIN | DISABILITY |
| RELIGION | x REPRISAL | |

**PERFORMANCE RATING**

**[x]** Organizational chart for the organizational unit in which complainant is assigned and in which the action occurred, if the units are different.

**[x]** Statistical breakdown of the organizational unit [1] where the action in question occurred as of the date of the action. Provide name, position (title, series, and grade), and EEO category(s), as checked above, for all employees and supervisors.

**[x]** Written reason why complainant has not been issued his performance evaluation.

---

[1] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if complainant worked for Human Resources Management (HRM) Service/Division/Product Line in the Labor Relations Section, the organizational unit is the Labor Relations Section.

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

000089

**REQUESTED DOCUMENTS FOR PENDING EEO INVESTIGATIONS**

**COMPLAINANT'S NAME: AZIS KOCHIU**
**CASE NUMBER:** 200J-556A-2023-152770
**DATE FILED: 7/24/2023**

**INSTRUCTIONS:** Please provide documents checked (√) below. This information is due in the ORMDI Field Office within ten (10) days of receipt of request. Documents must be accompanied by a statement from an appropriate official certifying the documents as true and accurate. Statements must be on official stationery, dated, signed and must include the title of the certifying official. The EEO category(s)/bases of this complaint are checked (√) below:

**EEO CATEGORIES (BASES)**

| | | |
|---|---|---|
| RACE | COLOR | AGE (DOB) |
| x SEX | NATIONAL ORIGIN | DISABILITY |
| RELIGION | x REPRISAL | |

**MANAGEMENT DIRECTED DETAIL AND HARASSMENT**

[x] Organizational chart for the organizational unit in which complainant was assigned before and after the action in question.

[x] Statistical breakdown of the organizational unit[1] involved in the action in question as of the date of the action. Provide name, position (title, series, and grade), and EEO category(s) as checked above.

[x] Data on management directed details or reassignments within the organizational unit involved in the action in question for the two-year period prior to the action. Provide employee name and EEO category(s), position (title, series, and grade or statement of duties) held before and after the action, date of action, and name, position, and EEO category(s) of the agency official(s) initiating the action.

x[] Request for Personnel Actions SF 52 (both sides) and SF 50 requesting and effecting the action in question.

x[] Documentation, if any, concerning the action in question including notice, response, final decision letters, etc.

---

[1] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if complainant worked for Human Resources Management (HRM) Service/Division in the Labor Relations Section, the organizational unit is the Labor Relations Section.

**Confidential Document**

**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

**[x]** Pertinent regulatory guidelines and local policies and procedures concerning detail or reassignment AND Harassment in effect at the time of the action at issue.

**[x]** Complainant's position description or functional statement before and after the action in question.

**[x]** Copies of complainant's two previous ratings of record, performance appraisals, or proficiency ratings prior to the action in question.

**[x]** Pertinent article(s) of negotiated union agreement, if applicable.

**Confidential Document**
**Privacy Act**: Information associated with EEO complaints is governed by the Privacy Act of 1974 (5 U.S.C. § 552a) and Department of Veterans Affairs (VA) policies. Participants and recipients of EEO complaint information are responsible for protecting information pursuant to Federal Law and VA policies. See www.oprm.va.gov.

| | |
|---|---|
| **From:** | Kochiu, Azis FHCC Lovell |
| **To:** | Martinez, Patricia (ORMDI) |
| **Subject:** | RE: ozzie EEO/Union |
| **Date:** | Wednesday, September 6, 2023 1:56:46 PM |
| **Attachments:** | image001.png |

Let me see if I can retain an attorney, until then let's keep moving forward with the EEO.

Thanks
Ozzie

**From:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>
**Sent:** Wednesday, September 6, 2023 1:01 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: ozzie EEO/Union

You can – you would have to let the EEOC know first. Then after 30 days you can move forward with your suit, and you EEO complaint would be dismissed.

Thanks.

# Patricia Martinez
**EEO Specialist**
**Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District**
**2255 Enterprise Drive, Suite 5506**
**Westchester, IL 60154**
**C:  708.904.0955**
**F:  708.236.2898**
Helpful Links: OPN | Healthcare | Life Insurance | TSP | FSAFeds | myPay | eOPF |
BeneFeds (Dental/Vision) WebTA



U.S. Department of Veterans Affairs
Human Resources and Administration
Operations, Security and Preparedness
Office of Resolution Management, Diversity & Inclusion

***NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time.  In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically.  All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.***

*VA Core Values:* Integrity Commitment Advocacy Respect Excellence
*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today.*

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, September 6, 2023 12:48 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>
**Subject:** RE: ozzie EEO/Union

I can file a Civil Suit? Let me know when I can call you?

ozzie

**From:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>
**Sent:** Wednesday, September 6, 2023 12:37 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: ozzie EEO/Union

No, only a Union Grievance or filing a civil suit would affect your EEO complaint.

Thanks.

Patricia Martinez
**EEO Specialist**
**Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District**
**2255 Enterprise Drive, Suite 5506**
**Westchester, IL 60154**
**C: 708.904.0955**
**F: 708.236.2898**
**Helpful Links:** OPM | Healthcare | Life Insurance | TSP | FSAFeds | myPay | eOPF |
BeneFeds (Dental/Vision) WebTA



**U.S. Department of Veterans Affairs**
Human Resources and Administration
Operations, Security and Preparedness
*Office of Resolution Management, Diversity & Inclusion*

**NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time. In order**

*to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically. All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.*

*VA Core Values:* I*ntegrity* C*ommitment* A*dvocacy* R*espect* E*xcellence*
*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service. Please take a moment to* complete a very brief survey *to let us know how my service was today.*

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, September 6, 2023 10:50 AM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>
**Subject:** FW: ozzie EEO/Union

Hello Patricia, I am currently not at work this week but did talk to the union. They want to fight the suspension through the grievance process. I would like to keep the workflow and all other aspects under the EEO filing.

I do have a question, If I have OIG investigate this situation is that a conflict of interest with my EEO filing?

Thanks
Azis kochiu

**From:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>
**Sent:** Wednesday, September 6, 2023 9:45 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl <Cheryl.Andersen@va.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** RE: ozzie EEO/Union

Mr. Kochiu,

As I explained in an earlier email, you cannot do a Union Grievance and an EEOC complaint on the same issues. Please let me know if you want to add the suspension to your EEO complaint.

Thank you.

Patricia Martinez
**EEO Specialist**
**Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District**
**2255 Enterprise Drive, Suite 5506**
**Westchester, IL 60154**
**C: 708.904.0955**
**F: 708.236.2898**
Helpful Links: OPM | Healthcare | Life Insurance | TSP | FSAFeds | myPay | eOPF |
BeneFeds (Dental/Vision) WebTA



**U.S. Department of Veterans Affairs**
Human Resources and Administration
Operations, Security and Preparedness
*Office of Resolution Management, Diversity & Inclusion*

***NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time. In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically. All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.***

*VA Core Values:* Integrity Commitment Advocacy Respect Excellence
*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today.*

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

---

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Friday, September 1, 2023 3:55 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl <Cheryl.Andersen@va.gov>; Marknielsen@ronjohnson.senate.gove

**Subject:** RE: ozzie EEO/Union

I would like the Union, EEO and all upper leadership to look at these worklists. I've been falsely accused of "delay of care." Everything you see in red is a delay in care, as you can see, **they go past 300 days**. My question to **all leadership** is, are you going to go after all the employees in the department with the **same intensity** as you did and are currently doing to me? You can see the proof that the other employees should be hit with delay in care? Or is this just bully the white guy, non-female, non-Filipino, that speaks up on behalf of the veterans billing issues, who follows Nursing process triage and has bugled to National and VISN many times to let nurses practice within our scope, and not be blocked at every turn. But instead what you have is I followed Donnabelle's new work flow which she set into motion on 11-10-23 and did as I was told but she blamed the nurse for what the administrative staff was directed to do per her directive. Proof was shown to upper leadership via a team's recording of Donnabelle stating in no uncertain terms, nurses process the consults both complex and moderates and admin staff follow up in a few days to schedule the appt. Obviously, upper leadership disregarded that evidence no matter how often I brought it up or they overlooked it. Of course, Donnabelle wasn't going to volunteer that info because it would implicate her and the whole case against me would be frivolous. All leadership had to do was listen to the recording and writing and solidify it by asking what directive the entire OCC dept is working by. The OCC employees would have echoed my sediments.


In addition, is upper leadership going to go after three nurses, two nurses in this dept who happen to be female and one who is male for cancelling a consult and ignoring records in which JPRS were filed? Two of the consults resulted in the death of veterans, the other resulted in a pulmonary nodule that spread to cancer throughout the entire thoracic cavity. How do I know this? Two oncology nurses told me they filed the JPRS on the nurses in the community care dept, and they told me the names of the nurses they filed on. This will be brought out in the further investigations that will take place as nothing happened to any of them.

I've included Nation in this email chain as we have had to have them give the department guidance on procedure and best evidence-based practice to follow by. One of the issues brought up by National was why are nurses scheduling? Why are nurses not working as case managers, nurse liaisons but instead are processing consults? They also mentioned why can't admin staff process consults and do the refdoc? We were also told they want nurses to work at the top of their license rather than do all the ancillary work.

The dept rules change weekly, if not daily? We have two managers that don't get along and don't talk to one another. The dept hears rules from one manager that is different than the other. It's constant chaos. Every employee in the dept is disgruntled, although they may not say it to management in fear of retaliation. We have staff working overtime until 10pm, Saturdays and Sundays, until 4am all without pay and Donnabelle knows this is happening as I told her this is happening which by the way is a labor law violation as well as the tele work agreement violation we all signed, not to mention they are riding a thin line in violation of HIPPA when staff are looking into charts off tour of duty. Yet Donnabelle compares the people that follow the rules as far as workload within tour of duty hours to the people that are violating the tele agreement and labor laws and

comparing what is being done. This issue was also brought up in one of our two Teams building meetings with Dave that we had last summer. IT should look into the charts and see which nurses are in violation of these practices.

There are no rules, the guidebook is not followed, rules change often and management points fingers when things go south. Rather than take the bull by the horns and produce solutions, mngt becomes reactive and goes nuclear rather than act proactively to mitigate problems before they arise.

Example: After talking with Cheryl Anderson over a year ago, the dept decided to work on changing our workflow to what she had mentioned which was based off evidence-based practice and what works. So, we decided as a team to collectively repair the workflow. During one of the meetings, the issue of preferred preferences was brought up in a workflow meeting to which Donnnabelle and another staff member (not me) were going back and forth with what or what not the guidebook states regarding preferred preferences. Mind you we were working on this weekly for months. After the two had their back and forth, the following week Donnabelle never attended any more meeting and essentially abandoned the department and she took the analyst with her. The rest of the dept marched forward and one of the managers and a coworker produced a solution in one day, that the entire dept agreed upon; but, we had to scrap the idea because Donnabelle never approved it and therefore we went back to the old workflow that never worked.

There are no rules to follow in this dept. Everyone documents differently, the admin is told one thing and the RNs are told another.

Serious question, someone in direct leadership and above, please explain to me and the department and National, what rules do we follow?

Do we follow the latest workflow of 11-10-23 where nurses process complex, and moderates and the administration does **ALL** the scheduling or are we going to follow what VISN and National recommend?

I've included you Mark Nielson, for reason can you set me up with a meeting to speak to Senator Johnson?

**In summary**, are all leadership going to go after the other employees in this department as explained above and subject them to **the exact chart review,** with no deviation than the one I was put through, and with **the exact intensity** and discipline as you came after me with?

Ozzie kochiu

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Thursday, August 31, 2023 1:36 PM

**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>; Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Stokes, Gary W. <GStokes@flra.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** RE: ozzie EEO/Union

I would like to add the worst part of this harassment is that Lovell is small and my name and reputation have been slandered throughout the hospital and I cannot get a transfer or even an interview into a new dept because of this.

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Thursday, August 31, 2023 1:29 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>; Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Stokes, Gary W. <GStokes@flra.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** ozzie EEO/Union

Patricia and Melvin,

One of my issues with regards to the EEO currently in motion is the workload I have been receiving. I have asked to be on a fully loaded work group as I have not been on one since I've been in this dept compared to my colleagues; however, now I am back in the department working shorthanded yet again. Today I was given 32 pending consults as well as an email to work on aging consults, this is in addition to all my other work. This is nothing less than a set up to fail as the work should be distributed evenly among the entire staff. With this much work something is bound to be missed no matter how hard someone tries to do everything right and leadership can say if I miss clicking a button or what not that I can be detailed. With this amount of work anyone can make a mistake and I don't want to be sitting in that situation again.

In addition, one of the EEO issues I brough forth was that I was being disciplined on a proposed 2-week suspension, which was an act of retaliation as I was initially told this would be a "slap on the wrist." This 2-week proposal was handed down only after the EEO informal investigation had taken place. Today I was issued a 3-day suspension instead of the 2-week proposed suspension, despite the fact that I followed protocol exactly how Donnabelle stated which she is on recording stating as well as in writing detailing the protocol to follow in no uncertain terms. Furthermore, Donnabelle did not submit my CCP note indicating my documentation. Her responsibility was to do a full and fair investigation that is not one sided biased. But what she did do was submit and obfuscate PSA duties into my chart review to cloud up the issues and circumvent her own directive to the department and used it against me in the chart review. To further compound matters Donnabelle tampered with evidence when allowing the issue of the consult in question be entered to the Peer

Review Committee under the guise of it being an "expedite" when indeed it was not. As well as making the issue of it being a complex vs moderate which wouldn't matter since her directive was RNs do all moderate and complex consults.

But what is most striking is that to this day I wasn't told why I was being investigated or should I say what the exact charge is and therefore, I was put through unnecessary pain and suffering which I continue to endure.

I was not offered a fair, full and proper investigation into this matter. The RN that followed my consult was not disciplined neither was the psa who's responsibility it was to schedule the consult.

At this point I would like to file a grievance with the union as well as have OIG come in and do the full and proper investigation so that I can take this harassment to an arbitration judge.

As far as the EEO goes I would like a full and fair investigation in this matter as well as have the opportunity to speak to and Administrative Judge for the false charges against me and speak on the pain, suffering and PTSD I'm going through.


Azis Kochiu

| | |
|---|---|
| **From:** | Microsoft Outlook |
| **To:** | Buckley, Robert G. FHCC Lovell |
| **Subject:** | Delivered: Notice of Partial Acceptance of EEO Complaint A.K. 152770 |
| **Date:** | Wednesday, September 6, 2023 12:29:04 PM |
| **Attachments:** | Notice of Partial Acceptance of EEO Complaint A.K. 152770.msg |

Your message has been delivered to the following recipients:

Buckley, Robert G. FHCC Lovell (Robert.G.Buckley@va.gov) <mailto:Robert.G.Buckley@va.gov>
Subject: Notice of Partial Acceptance of EEO Complaint A.K. 152770

| | |
|---|---|
| **From:** | Microsoft Outlook |
| **To:** | Vickers, Stephanie A. (she/her/hers) |
| **Subject:** | Delivered: Notice of Partial Acceptance of EEO Complaint A.K. 152770 |
| **Date:** | Wednesday, September 6, 2023 12:29:14 PM |
| **Attachments:** | Notice of Partial Acceptance of EEO Complaint A.K. 152770.msg |

Your message has been delivered to the following recipients:

Vickers, Stephanie A. (she/her/hers) (Stephanie.Vickers@va.gov) <mailto:Stephanie.Vickers@va.gov>

Subject: Notice of Partial Acceptance of EEO Complaint A.K. 152770

**From:** Microsoft Outlook
**To:** Tolbert, Melvin R.
**Subject:** Delivered: Notice of Partial Acceptance of EEO Complaint A.K. 152770
**Date:** Wednesday, September 6, 2023 12:29:04 PM
**Attachments:** Notice of Partial Acceptance of EEO Complaint A.K. 152770.msg

Your message has been delivered to the following recipients:
Tolbert, Melvin R. (Melvin.Tolbert@va.gov) <mailto:Melvin.Tolbert@va.gov>
Subject: Notice of Partial Acceptance of EEO Complaint A.K. 152770

| | |
|---|---|
| **From:** | Microsoft Outlook |
| **To:** | KOCHU106@gmail.com |
| **Subject:** | Relayed: Notice of Partial Acceptance of EEO Complaint A.K. 152770 |
| **Date:** | Wednesday, September 6, 2023 11:52:09 AM |
| **Attachments:** | Notice of Partial Acceptance of EEO Complaint A.K. 152770.msg |

Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:

KOCHU106@gmail.com (KOCHU106@gmail.com) <mailto:KOCHU106@gmail.com>
Subject: Notice of Partial Acceptance of EEO Complaint A.K. 152770

**RESERVED**

**RESERVED**

1

**This equal employment opportunity investigative document contains identifiable personal data that is subject to the Privacy Act of 1974, 5 U.S.C. Sec. 552a. Release of such data must be in accordance with the provisions of the Act, as amended. The unauthorized release of this information could subject the releaser to formal disciplinary action and/or criminal penalties, including a fine of up to $5,000.00.**



### DEPARTMENT OF VETERANS AFFAIRS
**Office of Resolution Management, Diversity & Inclusion**
**William S. Moorhead**
**Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

### Investigative Report
### In the Matter of the EEO Complaint of Discrimination of:

| | | |
|---|---|---|
| Azis Kochiu, | ) | |
| Complainant | ) | |
| | ) | |
| | ) | |
| v. | ) | ORM No. 200J-556A-2023-152770 |
| | ) | |
| Secretary, | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC 20420 | ) | |
| Respondent | ) | |

Agency
Captain James A. Lovell
Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064-3049

Lisa Wabinga
Contract EEO Investigator
Computer Evidence Specialists, LLC
5315 A1A South
St. Augustine, FL 32080

## I. Introduction

Having met all procedural requirements for acceptance, with respect to the issues specified hereafter, this complaint was assigned for investigation on October 30, 2023. An investigation using affidavits and sworn testimony was conducted from November 18, 2023, to January 15, 2024. This report is submitted for the consideration of the Regional EEO Officer on this 2nd day of February, 2024.

## II. Background

Azis Kochiu, herein referred to as "Complainant", contacted an EEO Counselor on June 22, 2023, stating that sex (male) and reprisal were the bases of a non-sexual hostile work environment when management issued him a satisfactory performance rating, intentionally left his team short-staffed; assigned him a greater workload; denied him union representation; reassigned him to another department; removed him from patient care pending a fact-finding investigation; held him to different standards than other nurses; his emails lacked documentation; and he was disciplined for failing to schedule a patient consult which was the responsibility of his female co-worker. Counseling did not result in resolution of the complaint, and on July 24, 2023, he filed a formal complaint of discrimination. The complaint was accepted for investigation on October 30, 2023. (Sections 1, 2, and 3)

## III. Claims and Basis

**Whether Complainant was subjected to a hostile work environment based on sex (male) and reprisal (prior EEO activity) when: a) he was subjected to a hostile working environment and management did nothing to stop it, b) he was rated satisfactory on his proficiency report, c) he was assigned a bigger workload than his co-workers, d) he was not allowed union representation; he was told he was the subject of a fact-finding investigation; he lacks documentation in his emails; he was accused of not properly scheduling a deceased patient's consult, e) his supervisor gave deceptive information to a Peer Review Committee, f) he became aware his supervisor was asking co-workers to submit negative reports of contacts regarding him; and the following timely raised independently actionable claims:**

1) **On May 8, 2023, he was removed from patient care.**

2) **As of July 19, 2023, he has not been issued his Proficiency Rating that was due in February 2023. (Section 3-1)**

**Investigator's Note:** (Events 1 – 2 constitutes a timely raised discrete act and has been accepted as an independently actionable claim. All events were included for consideration in the analysis of the harassment claim.)

3

# IV. Review of Documents

In an email, dated June 2, 2023, Complainant notified RMO Buckley that his department is short staffed and requests additional staff to assist. (7-9)

Emails, between September 1, 2023, and September 20, 2023, Complainant notified management is treating him unfairly because he is a male; he was falsely accused of delay of care; his investigation was unfair; the peer review committee was given false information; and if all employees in the department were going to be treated the same as him for workload delays. (7-10)

In an email, dated August 31, 2023, Complainant requests to be added to a fully staffed work group; he was assigned more work than other staff; he was not afforded a fair investigation and he would like to file a grievance and have OIG conduct another investigation. (7-11)

Complainant signed his "Satisfactory" 2023 Proficiency Report on August 25, 2023. He received a rating of "Satisfactory" in 2022 and "High Satisfactory" in 2021. (7-12)

Email, dated March 24, 2023, RMO Lorenzo-Villarino notifies Complainant to select a date to attend a Weingarten Meeting for delay in patient care delivery and it was his responsibility to obtain union representation. (7-13)

Complainant was issued a Temporary Reassignment Notice on May 8, 2023, pending the outcome of an investigation; and Rescission of Reassignment Notice on August 1, 2023; and a Standard Form (SF) - 50 Notification of Personnel Action, dated October 8, 2023, indicates Complainant was reassigned at his own request. (7-14)

The evidence file indicates a patient expired on February 23, 2023, and RMO Lorenzo-Villarino initiated a Report of Contact on June 7, 2023. The evidence file contains Complainant's appointment SF-50; Douglas Factors; consult of the deceased patient; Weingarten Rights; Fact Finding Investigation of March 29, 2023; audits of patient care charts assigned to Complainant; his timecard; VHA Directive 1232(5) Consult Processes and Procedures; and an excerpt of the Table of Penalties from VA Handbook 5021,16. (7-15)

Complainant was issued a 14-day Proposal Letter on August 1, 2023, for Failure to Follow Policy. A three-day Decision Letter was issued on August 31, 2023, and he was suspended between September 5-7, 2023. (7-16)

SF-50, dated September 5, 2023, indicates Complainant was suspended and returned to duty on September 7, 2023. (7-17)

VA Handbook 5005/129, Part II, Chapter 3, Professional Standards Board dated April 6, 2020, is the policy governing board memberships within the VA.  (7-18)

The Nurses Collective Bargaining Unit Agreement (NNU), dated May 25, 2023, is the negotiated contract between Nurses and the Department of Veterans Affairs. (7-19)

Emails between November 25, 2023, and January 16, 2024, of Investigator's attempts to obtain the document request for the instant complaint.  (7-20)

On January 11, 2024, ORMDI notifies Complainant of investigator's scope of work for conducting EEO investigations.  (7-21)

**Investigator's Note:**  The agency did not provide requested documents prior to the submission of this case. The Investigator will forward to agency upon receipt. (7-20)

Additionally, protected health information regarding deceased patients was provided to the investigator per Complainant's request, which was omitted from the record, due to confidentially.  (7-15, Tab 4)

### V. Summary

**A. Summary**

**Azis Kochiu, Complainant** (sex-male, race-White, EEO activity-Instant Complaint) is a Registered Nurse (RN), Grade II, for the Community Care Living Center, Captain James A. Lovell Federal Health Care Center (FHCC), North Chicago, IL has been employed by the FHCC for five years. His first line supervisor is Christianah Arowora, Registered Nurse Manager, and his second line supervisor is Donnabelle Lorenzo-Villarino, Registered Nurse.  He contends management became aware of his sex upon introduction.

**Investigator's Note:** Complainant added the basis of race for issues b and d, during the investigation.  (7-1, p 32)

Regarding his EEO activity, Complainant filed the instant complaint in July 2023 and contends after he filed his complaint, RMO Lorenzo-Villarino created a hostile work environment and the harassment continued at the same level before and after he filed his EEO case.  (7-1, pp 1-3)

He did not identify previous EEO activity prior to the instant complaint but claims he is a whistleblower when he reported RMO Lorenzo-Villarino for: violating federal labor laws because staff were reviewing patient charts outside their duty hours;

when she denied veterans' medical bills; when she assigned ancillary work to nurses; she objected to the workflow; and when the department was short staffed. After reporting these violations, he was prevented from doing patient care and was reassigned on May 8, 2023. (7-1, pp 3-7; 7-9; 7-10)

**Investigator's Note:** Complainant did not indicate he filed a formal whistleblower complaint with the VA, but he did notify union officials. He alleges RMO Lorenzo-Villarino harasses RMO Christianah Arowora and discriminates against black employees. Since these allegations are outside the scope of this investigation, they will not be addressed in this report.

**Adriene Harris, Complainant Witness** (sex-female), RN, Grade 3, has been an employee with FHCC for six years and in her current position for five years. Her first line supervisor is Christianah Arowora, Nurse Manager, and her second line supervisor is Donnabelle Lorenzo-Villarino, RN Managed Care Department Head. She testifies that she is unaware of the Complainant's EEO activity and denies his sex was a factor in management's actions. (7-2, pp 1-3)

**Christianah Arowora, RMO** (sex-female, race-black), Nurse Manager/ Division Officer, VN 03-11 has been an employee with FHCC for 18 years and in her current position for seven years. Her first- and second-line supervisor is Dr. Mamata Ravipati, Assistant Chief Medical Executive Ambulatory Care. Her first- and second-line supervisors during the instant complaint were Donnabelle Lorenzo-Villarino, Managed Care Department Head and Mr. Steven Kaufman, Patient Administration Department Head. She states she did not supervise the Complainant while she was detailed between December 2021 thru March 2022 nor while she was on leave between November 2022 and June 2023. She was aware he was a male during the interview process in 2019. She affirms she became aware of his EEO activity in June 2023 when he told her of the instant complaint, he filed against RMO Lorenzo-Villarino. She states we was aware of Complainant's race. (7-3, pp 2-3, p 10)

**Donnabelle L. Lorenzo-Villarino, RMO** (sex-Female, race- Asian), Managed Care Clinical Coordinator, Managed Care Department/ Assistant Chief Medical Executive Ambulatory Care, VN-0610-3-4 has been an employee with FHCC for 19 years and in her current position for seven years. Her first line supervisor is Dr. Mamata Ravipati, Assistant Chief Medical Executive Ambulatory Care and her second line supervisor is Dr. Jeffrey Oken, Chief Medical Executive. Her first- and second-line supervisors during the instant complaint were Mr. Steven Kaufman, Patient Administration Department Head and Ms. Yolanda Martinez Assistant Director for Resources/Chief Financial Manager. She was aware by introduction that Complainant is male. She affirms she became aware of his EEO activity when

she received notice of the instant complaint on July 13, 2023.  (7-4, pp 2-3; 7-4, p 16)

**Mamata Ravipati, RMO** (Female), Assistant Chief Medical Executive Ambulatory Care, Provider, GS-15 has been an employee with FHCC for seven years and in her current position for five years. Her first line supervisor is Dr. Jeffrey Oken, Chief Medical Executive and her second line supervisor is Robert Buckley, Director, Lovell FHCC.  She was aware by introduction in 2019 that Complainant is male. She testifies she is unaware of the Complainant's EEO activity, and she was his third line supervisor at the time of this complaint.  She testifies she is unaware of the Complainant's EEO activity and denies his sex was a factor in management's actions.  (7-5, pp 2-3)

**Robert G. Buckley, RMO** (Male), Director, Senior Executive Service (SES) has been an employee with FHCC for seven years and in his current position for five years.  His first line supervisor is Daniel Zomchek, Network Director and his second line supervisor is Rema Nelson, Assistant Undersecretary for Health.  He was aware by introduction that Complainant is male.  He testifies he is unaware of the Complainant's EEO activity and denies his sex was a factor in management's actions.  (7-6, pp 2-3)

**Alex Morse, SME,** (Male), Human Resource Specialist**,** Grade 12, has been an employee at the VHA VISN for 10 years and in his present position for 2 years.  He testifies that he is unaware of the Complainant's EEO activity and denies his sex was a factor in management's actions.  (7-7, pp 1-2)

<u>Investigator's Note</u>:  During his first line supervisor's six-to-eight-month absence, the Complainant identified RMO Lorenzo-Villarino as the supervisor who discriminated against him.

The witnesses testified to the following:

**Whether Complainant was subjected to a hostile work environment based on sex (male) and reprisal (prior EEO activity), as evidence by the following events:**

**Issue a: since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed him and management has done nothing to stop it;**

<u>Investigator's Note:</u>  Complainant provides for issue a, a summarization of all the accepted claims, and his reporting issues to management about the allegations.

**Complainant** testifies in January 2021 he was given a greater workload than the rest of the department.  The work was split by alphabet and even though each

work group had the same number of consults, his workload was heavier because he had less team members and a weak Patient Services Assistant (PSA). In comparison, he was assigned to work 10-12 letters and other employees only had 2-3 letters to work on. Additionally, when staff left the department, he was assigned their work. When he asked RMO Christianah Arowora to assign some of his work to another staff member he was ignored and shortly thereafter he was detailed. In January 2023, when his team was shorthanded, and he was constantly ignored when he complained about the workload, he emailed RMO Buckley for assistance. (7-1, pp 8-9; 7-9)

Complainant asserts the workload was always constant, and he was always being compared to others who had more staff and who worked without pay after hours and during their weekends off. He states he protested to his supervisors in meetings regarding staff who worked outside their duty hours. He offered an example of this where he states, in part, on a September 2023 Teams meeting, "this is the second time I'm going to whistle blow and since this is on recording…" and "the staff are working overtime off tour of duty until 10pm and Saturdays and Sundays without pay, riding the tight rope of HIPPA violations while looking into charts while off tour of duty, and that was in violation of the telework agreement we all signed to work from home." Kindra Perkins, union representative asked RMO Lorenzo-Villarino if Complainant's statement was true to, she replied, "it was brought up to me, but I can't help what people do at home." (7-1, p 9)

**Investigator's Note**: Complainant admits he did not work outside his tour of duty so any compensation issues involving other RN's will not be addressed in this report.

Complainant's position is that RMO Lorenzo-Villarino enjoys watching him suffer each time she ignored his requests for help and hire additional staff. When she solicited employees to speak against him, he ignored it. He states he was told by employees who worked in other departments that she is a very vindictive person and if you are against her, she has been known to fire employees. (7-1, p 10)

**Investigator's Note**: Complainant did not identify any witnesses or what was said when he alleges RMO Lorenzo-Villarino solicited employees to speak against him. He did not identify any witnesses who made the statement that she is a very vindictive person or cite any employees who were terminated by her.

He states after he vocalized the issues of the department's staff shortage to leadership, RMO Lorenzo-Villarino called him into her office and told him he was being detailed. When he confronted her, he stated, "you mean because I followed your rules and now you want to harass and retaliate against me for speaking up to you." He further complained, "I'm not signing this and left her office." He recalls, RMO Lorenzo-Villarino shouted out after him, but he could not remember what she

said, but he did return to her office, took the detail, and proceeded to RMO Ravipati's office.  (7-1, p 10)

Complainant states he asked RMO Ravipati why he was being detailed, to wherein she stated, "it was just a slap on the wrist."  Complainant states he was taken back by her response, and it should not have been a slap on the wrist and RMO Lorenzo-Villarino's actions were harassing and retaliatory because he complained about her.  (7-1, p 10)

Complainant asserts RMO Ravipati's responses to his inquiry of why he was detailed were hazy, but she did disclose 25-30 random charts/consults were selected to undergo a review.    The chart review was conducted by Quality Management (QM) and the only way they could come up with the answers of yes or no to his documentation was that RMO Lorenzo-Villarino told them what to look for.  He adamantly explains she gave misleading information to QM and the errors in the audits were based on the criteria for Program Support Assistants (PSAs) not for registered nurses.  He states he could prove this because on a Team's recording RMO Lorenzo-Villarino gave directives on how the work was to be done.  The guidebook also states nurses coordinate care and delegate administrative work to the PSAs.  (7-1, p 10)

He states RMO Ravipati showed him the errors identified in the audit to which he indicated to her that they were not his errors but was the duty of the PSAs and per RMO Lorenzo-Villarino's directives in the Team recording.  He explains that prior to November 20, 2022, RNs were only doing complex consults and, in the Teams meeting she said nurses were also responsible for processing moderate consults which consisted of calling the veteran, getting preferences, putting labs, x-rays and doctor's notes/documentation, and sending it to the medical facilities outside of the VA.  The basic consults are handled by the PSAs (non-clinical staff).  Once the consults are sent out by the nurses the PSA does the scheduling for all consults.  RMO Lorenzo-Villarino's directives contradicted what Cheryl Anderson put out and the guidebook also states nurses coordinate care and delegate administrative work to the PSAs. (7-1, p 10)

**Investigator's Note:**  Complainant did not identify Cheryl Anderson as being in his direct chain of command or being involved in the action; thus, the investigator deemed it unnecessary to obtain her testimony.

He further testifies he returned to RMO Ravipati's office with PSA Dori Matusz, and she presented an algorithm workflow to RMO Ravipati to differentiate the workflow process between the RNs and the PSAs.  He states she (Dori Matusz) collaborates with his claim.   Complainant states he reiterated to RMO Ravipati that the documentation he was being blamed for was the responsibility of Kelly Heckel, PSA.  Complainant insists QM ran a report with deceptive information, which was then forwarded to RMO Ravipati, and she based her decision on looking at skewed

false information.  RMO Ravipati did not respond and ended the meeting. (7-1, pp 10-11)

**Investigator's Note:** Complainant did not indicate Dori Matusz witnessed any incidents of discrimination or harassment by any management official thus, she was not asked to provide an affidavit regarding Incident a.

Complainant says after he spoke with RMO Ravipati, a few weeks later he was notified a Peer Review was scheduled.  RMO Lorenzo-Villarino asked him if he was going to participate in which he responded, "yes." When he received the letter from the Peer Committee with the date and time of his appearance it indicated the consult was an "expedite" which indicates the consult was to be sent out within 2 days.  The Complainant strongly disagrees that this consultation was an "expedite."  This was based on his review of his past "expedite" consults and because he conferred with other nurses who also agreed with him that it was not an expedite. (7-1, p 11)

Complainant testifies when he attended the Peer Review on June 17, 2023, where he reasoned the consult was not an expedite.  Cindy Reyula, RN followed the consult after him on three separate occasions.  He further testifies that he goes through consults from top to bottom and he follows the rules per RMO Lorenzo-Villarino's directives.  He clarifies in her (RN Reyula) documentation it indicates she did not reach the patient three times and according to the workflow she was supposed to send out a seven-day notice to the veteran to call the Community Care Department or the consult will be cancelled.  She (RN Reyula) did not send any letters to the patient, nor did she call the next of kin until the third attempt.  He testifies he explained to the Peer Committee that it was her job and she missed it three times.  He believes that Cindy was not treated the same in this circumstance because she goes on vacations with RMO Lorenzo-Villarino.  He made the comparison that her actions were no different than if he was on a medical surgical floor and had a patient one time, and the next few weeks another nurse had the patient but failed to follow policy how was it his fault? If she failed to follow policy, how was it his fault?  (7-1, p 11)

Complainant explains after the Peer Review was completed, he believed he would return to his former position and get his life back together. When he asked RMO Ravipati if he could return, she stated, "I don't know".  He avers RMO Lorenzo-Villarino kept him on detail as punishment for speaking out against her and because he stood up for RMO Arowora; so subsequently, he filed the instant complaint.  He argues after he filed his complaint, Michelle Reed, EEO Specialist questioned RMO Lorenzo-Villarino; RMO Ravipati issued him a suspension notice; he provided a response to the proposed discipline and subsequently he was suspended for three days by RMO Buckley, and this serves as the basis for retaliation. (7-1, pp 11-12)

Complainant states his coworkers knew he had a bigger workload and the reasons for his detail. He states they were shocked as to why he was detailed as opposed to Kelly Heckle, PSA. He testifies he complained of harassment and put it in writing to RMO Lorenzo-Villarino, RMO Ravipati, and the Union that he was being harassed because he speaks out against his RMO Lorenzo-Villarino, and he expressed his sentiments to the entire department. (7-1, p 12; 7-9; 7-10; 7-11)

**Investigator's Note**: Documentary evidence: NNU reads, "RN's have a right to their professional opinion. RN's have the right to promptly bring their concern about an unlawful, improper, or conflicting order to the person giving the order. If unable to resolve the issue, RN's have the right to present their concerns up the supervisory chain of command and will follow the direction by their appropriate chain of command. RNs will not be subjected to disciplinary or adverse action for reporting or failing to follow an unlawful, improper, or conflicting order if, after administrative review, the Department determines that the order was unlawful, improper, or conflicting." (7-19, p 15)

**RMO Lorenzo-Villarino** denies harassing Complainant when he requested help during staff shortages. She explains Management continued to provide daily coverage strategy for any staff member who was absent. Management continued to fill vacant positions, and this was communicated to the team. (7-4, p 4)

She denies harassing Complainant when he reported staff were working overtime without compensation. A review of hours worked was performed within the timekeeping system and during a meeting, management reminded staff not to work outside their tour of duty or approved overtime hours. (7-4, p 4)

She denies she directed other staff to make negative statements against Complainant. She indicates on June 24, 2022, Complainant was made aware of a request for Reports of Contacts from other employees. This request was initiated by Steven Kaufman and the Complainant acknowledged the request. (7-4, p 4)

**Investigator's Note:** The Reports of Contact were not received during the investigation, if received, the investigator will forward upon receipt.

She testifies on March 24, 2023, when a request for a fact-finding meeting was issued to Complainant, he notified her that her actions were retaliatory; he would notify her chain of command; and he notified a union official she was retaliating against him because he strongly disagreed with how management administered veterans' billing issues. (7-4, p 4, 7-13, pp 1-9)

**RMO Buckley** claims his contact with Complainant was to listen to his oral reply pertaining to the proposed suspension, and denies any knowledge of the allegations in incident a. He believes RMO Lorenzo-Villarino's behavior towards the Complainant was not based on his sex or EEO activity. (7-6, p 3)

**Issue b:** On unspecified in 2022, he was rated Satisfactory in his Proficiency Report:

**Complainant** believes that RMO Lorenzo-Villarino was responsible for issuing his annual proficiency report in February 2023. He states he did not receive his review until after he came off his detail and had the EEO department bring this up to her as an issue. He states he finally received his rating in September 2023. (7-1, p 13)

Complainant testifies RMO Lorenzo-Villarino gave newly hired Filipino employees who were still in orientation higher ratings because they are the same race as her. These employees had six months of orientation but when he started there was none, or it was sporadic bits and pieces. He further explains he deserved a better review because he was instrumental in collaborating on a better orientation process for new hires. He coached new employees and guided them by sharing information. He believes he was more skilled in terms of knowing his job better than previous years and that he deserved a better review. For example, he received a higher review from RMO Arowora, a year or two before the one RMO Lorenzo-Villarino gave him and she retaliated against him. He believes that since he was in the department longer, he became more proficient in his job. He cites Emelda Escalanti, Ruby Dizon, Adriane Ang, Cindy Reyula, and Ken Dizonas as RNs who are Filipino. (7-1, p 13)

He explains his ratings in the previous two years were higher than "Satisfactory." He says that while the department was in a tailspin, he reached out to RMO Buckley, and he approved overtime and approved staff assistance from other departments. He states he initiated these actions and believed his supervisors should have had the gumption to ask leadership for help. His actions prevented delay of care that indirectly helped the veterans. He states RMO Lorenzo-Villarino lacks the backbone to speak up on behalf of the veterans. He believes his actions constitute the highest rating possible for he was doing her (RMO Lorenzo-Villarin) job. He further cites his outreach to Senator Ronald Johnson's office and the Veteran's House Committee in Washington D.C. demonstrates his effort in resolving patient billing issues. (7-1, pp 13-14)

Complainant explains RMO Lorenzo-Villarino and RMO Arowora gave his review to him upon her (RMO Arowora) return from leave and there was no reason given for the lower rating. He further added he did not know he could appeal the rating for he was too stressed out over what happened to him and all he wanted to do was leave the department. He testifies he emailed RMO Arowora a response as to why he disagreed with the review, but he was not sure if it was considered an appeal, and he never received a response regarding the disagreement he submitted to her. (7-1, p 14; 7-12 p 1)

**Investigator's Note:** Complainant's rating of record was "high satisfactory" in 2021 and "Satisfactory" for 2022 and 2023. VA Form 10-2623 indicates in section 19, "Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or board action folder." Complainant did not submit evidence that he appealed his rating in accordance with VA procedures.

Complainant believes that a lower rating was harassment by RMO Lorenzo-Villarino and her favoritism towards other employees. He states if he applied for other positions in the VA system and is asked for his review this will reflect poorly on him. Since his detail he has not had any interviews in the VA and if he does, he believes he will be denied immediately although he is qualified. The hospital he works in is small and he feels his name has since been slandered. (7-1, pp 14-15)

Complainant states his sex was a factor in this claim because RMO Lorenzo-Villarino was motivated by retaliation for going above her and speaking up regarding this issue. Her actions of perpetuating his detail assignment and suspending him serves as proof. He cites Ruby Dizon and Cindy Reyula as nurses who he believes are treated more favorable than him because they are Female and of Filipino descent. (7-1, pp 15)

Complainant identifies Charlene Miller and Christianah Aurora as nurses who he believes are treated the same as him because they are Black. (7-1, pp 15)

**RMO Arowora** testifies the Complainant's proficiency report period was between February 19, 2021, thru February 19, 2022, and she rated the proficiency reports for her employees and sent it to RMO Lorenzo-Villarino for signature before leaving to VISN 12 for a detail. She explains she issued the Complainant his rating on February 15, 2022; he did not submit a self-assessment and he refused to sign his rating. She states she was advised by HR to write "refuse to sign" on the rating for Complainant was within his rights to do so and Complainant did not challenge his rating until the instant complaint. (7-3, p 4)

She explains that RNs were assigned the same level of work when she was on station and the Program Analyst uses the algorithm method to put the benchmark number of consults together for distribution to all staff. She has always communicated with the Complainant on his performance monthly and based on the algorithm that was why Complainant was rated a "High Satisfactory." She states his rating was lowered by RMO Lorenzo-Villarino when she was on detail. She states when she returned, she was charged by her RMO Lorenzo-Villarino to give proficiency reports to three staff members. She reviewed and signed all the proficiency reports and just handed them to the staff members as instructed by her supervisor. (7-3, pp 4-5)

Ms. Arowora identifies Adriene Harris, RN, and other RNs as comparators on the

same team as the Complainant who received higher ratings on their proficiency reports, and that these ratings were assigned by RMO Lorenzo-Villarino, not her. She cites Title 38, Proficiency Rating as the policy relevant to this matter. (7-3, pp 5-6)

Ms. Arowora states she was not on station at the time she asked to change Complainant's rating, and only communicated by email. However, from her experience with RMO Lorenzo-Villarino, she has filed an EEO complaint for the same reason against her. (7-3, p 10)

**RMO Lorenzo-Villarino** denies she rated the Complainant "Satisfactory" on his Proficiency Report. She testifies she is the reviewing official, and his rating official is RMO Arowora, Nurse Manager. His proficiency report was from February 19, 2021, through February 18, 2022, and to her knowledge he did not submit a self-assessment. (7-4, p 5; 7-12, pp 2-7)

Ms. Lorenzo-Villarino further testifies there was no individual discussion with the reviewing official about a specific rating. There was a discussion to ensure the application of fair and consistent ratings. To her knowledge he did not appeal the rating. (7-4, pp 5-6)

Ms. Lorenzo-Villarino further explains, as the approving official, she did discuss with Ms. Arowora all of her employee's ratings before approving the rating. She recalls, Complainant and Ms. Arowora did not provide any additional information and submitted the same proficiency from the previous year. Thus, without any additional information for the new rating year, she recommended a "Satisfactory." She states if Ms. Arowora deemed an employee as High Satisfactory, she should have provided additional supporting to justify a higher rating. She denies that Complainant's race was a factor in her decision. (7-4, p 17)

**Issue c:** **On unspecified dates from November 8, 2022, to May 3, 2023, his was assigned a bigger workload than his co-workers;**

**Complainant** testifies that the same reasons as in Incident a, and reaffirmed when he asked for assistance with his workload he was ignored. Management gave him no reason why he was working short staffed. When suggested that they rotate the letters, so that he was not the only one with the biggest workload, he received no response. He reaffirmed it was harassment/reprisal for speaking up on his work conditions. (7-1, pp 14-15**)**

Complainant cites all nurses in the department are treated more favorably under similar circumstance except for his coworker RN Harris, and because he speaks out against RMO Lorenzo-Villarino. He states Adriene is treated the same as him because she is a black woman that does not speak up for herself, but she asks him to do so on her behalf. (7-1, pp 16)

**RMO Lorenzo-Villarino** denies she ignored the Complainant when he complained he was assigned a heavier workload than his coworkers. She explains based on feedback from employees in the office, when anyone was absent there would be an alpha split by team rather than individual assignments. Initially there were two registered nurses on each team and two of the teams had an orientee on their team who would eventually merge into the respective team. It was conveyed to the department that a request for an additional registered nurse or a conversion of an administrative position to be converted to a clinical position was in process, which just occurred in January 2024. The alpha split for each team is determined based on historical data not on current data and each team member is expected to process consults within their tour of duty. (7-4, p 7, p 17)

She testifies the procedures were explained during huddles and on Teams meetings with management. On April 6, 2023, an email was sent to the Complainant's team requesting their assistance to train a new detailed nurse manager on clinical consult processing and plans were in place to ensure each team would have three registered nurses per team. Complainant acknowledged this and volunteered to assist in training those who were detailed. (7-4, p 7)

**Investigator's Note:** RMO Lorenzo-Villarino provides relevant emails as attachments. (7-23)

**Issue d: on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022;**

**Complainant** testifies RMO Lorenz-Villarino did not provide a reason as to why she denied him union representation. When the meeting concluded, he contacted Monical Colemen, Union Representative and advised her he was detailed. The union was caught off guard and had no knowledge that he was being reassigned. (7-1, pp 16-17)

**Investigator's Note:** Article 12 of the NNU: Details, Floats and Temporary Assignments reads in part, decisions by management to place RNs on a temporary assignment, detail or float will be based on qualifications and competencies of the RN. Upon request, the Department will explain to NNU the reasons for making the decision. (7-19, p 47)

He testifies the reasons management gave him for the detail was that he writes long and detailed emails and includes various department heads and he excludes these emails in the charts. During the investigation he asked if he should document lengthy notes in the chart as did his former coworker and management's response was "no". He was advised by management to exclude certain private

correspondences in patient charts.  Complainant further states he told RMO Lorenz-Villarino his reassignment was harassment and retaliation because he reported her to Dr. Buckley. (7-1, p 17)

Complainant cites other employees the Community Care department were treated more favorably and were not written up for the same conduct.  He cites he was told by Susan Ryshinski and Thresa Minier, Oncology Department nurses, of two employees in Community Care who did not receive write ups for cancelling a consult and a veteran expired. Another employee did not submit records on time and a veteran went from having a pulmonary nodule that spread cancer throughout his entire thoracic cavity.  In a recent incident, he alleges RMO Lorenz-Villarino showed favoritism when she did not discipline RN Superable, who assigned a suicide patient to PSA Dori Matusz and the veteran committed suicide.  He alleges RN Superable is RMO Lorenzo-Villarino's best friend and is Filipino.   She ignores mistakes made by employees who are female and of her nationality and if you are different than her, she takes the nuclear option**.** (7-1, pp 17-18)

**RMO Lorenzo-Villarino** testifies a notification of patient death which generated a patient safety report, led to Complainant' being detailed pending the fact-finding investigation.   She states based on guidance from Human Resources, she did not offer the Complainant union representation when temporarily reassigning him to another department. The union was notified of the reassignment after the Complainant was informed. (7-4, p 8; 7-14, pp 1-2)

As it pertains to Complainant's comparators located in the Oncology department, she states this department does not fall under her purview; thus, she is unaware of this information. As it pertains to RN Superable, she states to her knowledge this incident occurred in July or August 2023, which is a period she was no longer covering for their direct supervisor.  She however, states however, their direct supervisor did conduct a fact-finding for this incident.  (7-4, pp 17-18)

**Investigator's Note**: Complainant was temporarily reassigned pending the outcome of his investigation.

**Issue e:  on June 15, 2023, DLV gave deceptive information to a Peer Review Committee.**

**Complainant** testifies RMO Lorenzo-Villarino tampered with the evidence as evidenced by her directive which were issued in the Teams meeting.  He states she reported the consult was an expedite when it was not.  She reported he ignored signs and symptoms when he does not see the patients other than names on a computer and social security numbers.  He claims he would have had to see the patient for signs.  She further reported he made the consult moderate rather than complex.  He insists when he ran a can score and called the veteran to base his moderate rating, the patient presented no symptoms.  He asserts it

made no difference if the consult was moderate or complex because according to her new directive, nurses are responsible for both moderate and complex consults, so her accusations were weak. He further insists he was out of the office when the consult was initiated, and it was her responsibility to assign it to another staff member for that is the standard in the department. The fact that the consult was not an expedite alarmed him and the fact that she would say that was shocking and it angered him that she was trying to make him look as if he did something wrong when he did not. (7-1, pp 18-19)

Complainant testifies he did not ask the reason for management's actions because he was disgusted by RMO Lorenzo-Villarino's actions, and she tried to deflect her actions onto him. He testifies he addressed her actions in the
Peer Review Committee and they never asked him about the signs and symptoms or anything else written in her false synopsis. The committee just asked him what his rationale was for categorizing the consult as moderate. (7-1, p 19)

Complainant believes RMO Lorenzo-Villarino's actions were deceptive in that she provided false information. The directives constantly change, and she does not stick to the guidebook. The last change directive was on November 10, 2022, wherein she stated the PSAs do all the scheduling. She would not release the recording for others to hear unless she allowed it. He states, she did not release the Teams recording where she changed the directive. He thinks she did not know how to cover herself when she started a simple lie regarding him being detailed for not documenting emails in a patient chart and falsely giving QM deceptive information to run his chart review audit. Subsequently she falsified the statement of facts to the Peer Committee. (7-1, pp 19-20)

Complainant further states he told RMO Lorenzo-Villarino registered nurses are not performing ancillary work and not working at the top of their license and he believes the guidebook reads RNs do moderate and complex care coordination. National leaders came into the dept to try and assist with the disarray in the department and recommended nurses work as case managers, registered nurse liaisons and care coordinators. (7-1, p 20)

**Complainant Witness Harris** denies RMO Lorenzo-Villarino instructed her to say the consult was an "expedite" nor was she given feedback or direction on what to say during the peer review. When she responded to the question regarding the timeliness of initiating treatment in period of deterioration she stated, "Consult was not requested as an expedite by Resident Piotr P. Rolikowski." Her intent when she answered this question was, "his (Piotr P. Rolikowski) actions of not entering it as an "expedite" could cause a delay in scheduling." (7-2, p 2)

**RMO Lorenzo-Villarino** denies she gave deceptive information to the Peer Review Committee and her responsibility was to assign a RN to Quality Management. She also assisted in relaying messages between Quality

Management, the Complainant, and their peer. She denies his sex and EEO activity was factors in claim e and no action was taken to harass him. (7-4, p 9)

She further testifies that she did not respond to the Complainant's request for a root cause analysis because it is conducted by Maria Jessica Joy Castelli, Quality Management. (7-4, p 9)

**Investigator's Note:** Due to the confidentiality of Peer Reviews, Maria Jessica and Joy Castelli were not asked to provide an affidavit during this investigation. Additionally, the actions that led to the peer review was not the subject of investigation; only the allegation of deceptive information being provided to the Committee, which management denies.

**Issue f: on June 19, 2023, he became aware DLV was asking co-workers to submit negative reports of contacts regarding him;**

**Complainant** cites RMO Lorenzo-Villarino called Monica Coleman, union representative and asked if she could write negative comments about him and would confront her on Teams to tell her he knew she was talking about him. He cites RN Reyula also called him and advised him not to send emails above RMO Lorenzo-Villarino and to be careful because he would get into trouble. (7-1, p 20)

Complainant testifies the incidents of harassment were threatening to him and RMO Lorenzo-Villarino was toying with his livelihood. He states she decided she was the arbiter of whether he was worthy enough to practice as a RN and cites he has more critical care experience than anyone in the department. He states she humiliated him in front of his colleagues and staff around the hospital. It was patently offensive to him to be accused of doing something he did not do, and he had no support. (7-1, p 22)

He strongly disagrees that he violated policy when he followed management's directives. He does not believe RMO Lorenzo-Villarino's directives coincide with the guidebook and he along with the union have challenged her on several occasions. (7-1, p 22)

**RMO Lorenzo-Villarino** denies Complainant's assertion. (7-4, p 18)

**Investigator's Note:** Witness Cynthia Reluya was contacted by the investigator who affirmed she did not have knowledge of this incident; thus, her testimony was not summarized. (7-22)

**Claim 1: On May 8, 2023, he was removed from patient care.**

**Complainant** testifies RMOs' Lorenzo-Villarino and RMO Ravipati provided conflicting reasons for his removal from patient care, and it was finally confirmed

when he received a notice for Failure to Follow Policy and Delay of Care. He insists the Teams recording depicts he followed policy and the delay in care was on PSA Heckel, who failed to schedule the consult within a few days. He cites RN Reyula, failed to send a seven (7) day notice without informing the veteran to call Community Care or the consult would be cancelled on three separate occasions. In addition, Management is culpable because RMO Lorenzo-Villarino issues the worklist daily on what needs to be scheduled or what records need to be uploaded and requested. He further states, Delay of Care should be asked of the Physician who initiated the consult as to why he did not follow up with his patient. He reiterates a system failure does not give management the right to make him a scapegoat when he followed protocol. Removing him from patient care was retaliation because he spoke up disagreed with her. He cites the changes in not documenting emails in patient charts to not documenting PSA duties led to delay of care and was not the procedure. (7-1, pp 22-23)

He testifies his reaction to being removed from patient care caused a flood of emotions from shock to stress, then anger for management did not give sufficient cause for the suspension. Each time he asked for justification for their actions or asked how he failed to follow policy he did not get a response. He requested a transfer to another department to avoid repeating the same policy violation. He believes his transfer was approved so that he would stop asking questions as to what he did wrong. When his telework was suspended he believed it was another form of harassment because he already had an approved telework agreement in place. He further asserts, management did not want to respond to his inquiries because they would implicate themselves and their responses were based on false accusations. (7-1, pp 24)

Complainant states RN Harris, and the entire Community Care department were treated more favorably because they are females, and they were not detailed or suspended when they delayed care to patients. He was treated less favorably because he is a male, and he speaks out against VA practices. (7-1, p 24)

He testifies he was harmed by the allegations in this claim and subjected to emotional distress, punitive damages, and slander throughout the hospital. He states his sex was a factor because female staff violated the same policies, and they were not subject to discipline. He states he is harassed because he advocates for veterans when it comes to billing, and he advocates nurses should be following the guidebook and working at the top of their licenses. He also testified this was his first offense and he has never been counseled or warned about his performance or conduct. (7-1, p 25)

**RMO Lorenzo-Villarino** affirms per guidance from Alex Morse, Human Resource Specialist (HRS), she issued Complainant a temporary reassignment away from patient care during the fact-finding investigation due to the risk to patient safety. This was explained to him at the time he was issued the reassignment notice. His

response to receiving the notice was disappointment; he was unwilling to listen; he refused to sign the notice. Complainant stated he will be reporting the incident to OIG and to RMO Buckley and then he stormed out of the office. (7-4, pp 9-10, 7-15, p 11)

When asked about Complainant's named comparator RN Harris, who Complainant asserts was not detailed or suspended when she delayed care to patients, RMO Lorenzo-Villarino responds that the "community care department is comprised of multiple staff from different backgrounds or gender. Female employees are not treated differently from male employees." (7-4, p 18)

**RMO Ravipati** testifies RMO Lorenzo-Villarino was the management official who issued the Complainant's temporary reassignment based on the recommendation of HR. As it pertains to Complainant's comparator, RN Wendy Superable, she was in fact subjected to a fact-finding, but after a fact-finding investigation and review of 30 consults done by her, there was no evidence to justify her removal from patient care. She denies having a role in this claim and denies Complainant's sex and EEO activity were factors. (7-5, pp 6-7; 7-15, pp 5-9; 7-16, pp 4-5)

**Investigator's Note:** Documentation in regard to Complainant's suspension was provided since it resulted in his removal from patient care. RMO Ravipati was the proposing official in the Complainant's discipline case. The proposal notice charged the Complainant with failure to policy but did not explain how the policy was violated.

**RMO Buckley** condones RMO Lorenzo-Vallarino's' action of removing the Complainant from patient care during the investigation. He firmly recalls she had legitimate reasons to be concerned about patient safety and his ability to perform his patient care responsibilities. During the oral reply, he explained to the Complainant his reasons of why he was removed from patient care, and he recalls the Complainant admitted to him that he failed to take timely action and appropriately follow through on patient care communications and documenting the patient's health record. (7-6, p 4; 7-16 pp 1-3; 7-18)

**Investigator's Note:** Documentation was provided in this claim of Complainant's suspension since it resulted in his removal from patient care. RMO Buckley was the deciding official in the Complainant's discipline case.

He denies the Complainant's sex and EEO activity were factors in claim 1, and he evaluated the merit of the evidence with respect to the charges and carefully considered any information that was provided during the Complainant's oral reply. (7-6, pp 4-5)

He asserts he completed anti-harassment/hostile work environment training annually and confirms the policy is posted in the facility. (7-6, p 6)

**SME Morse** affirms on March 23, 2023, he consulted with RMO Lorenzo-Villarino and advised her there was a delay in care possibly resulting in the death of a patient and management would need to perform a Weingarten meeting to question the Complainant and gather all information surrounding the case, which they did. These actions were warranted based on the VA's table of penalties and because it involved patient care. (7-7, p 2; 7-15, pp 52-61)

**Claim 2: As of July 19, 2023, Complainant has not been issued his Proficiency Rating that was due in February 2023.**

**Complainant** testifies RMO Lorenzo-Villarino wrote his proficiency rating, and it was RMO Aurora who presented the rating to him. He disagrees with the rating and submitted a rebuttal to her. RMO Lorenzo-Villarino did not provide any reason for delaying the rating and he believes the only reason he received it was because he filed the EEO complaint. There was no discussion with management about the rating because RMO Lorenzo-Villarino did not communicate with him after he was detailed. (7-1, pp 25-26)

Complainant testifies he was harmed by the allegations in this claim because a satisfactory rating shows regression from his previous ratings. He states he was instrumental in making positive changes within the department. He further explained that when he interviews for other positions, a lower rating will put him at a disadvantage. (7-1, p 27)

Complainant testifies his sex was a factor in this allegation because when there was a patient death, his female coworkers received raises while he was detailed and suspended on false accusations. He believes his EEO activity was a factor after he filed the instant complaint. Once he filed, management retaliated with a 14-day suspension and prolonged his detail, and this was reprisal. (7-1, p 27)

**RMO Arowora** testifies during her eight-month absence, RMO Lorenzo-Villarino was responsible for issuing proficiency ratings. She cites the following (RN's) were treated the same as the Complainant and did not receive a proficiency rating; Wendy Superable, Cynthia Reluya, Ruby Dizon, and Adriene Harris. Upon her return, she became aware the ratings were rated by RMO Lorenzo-Villarino, but she did not sign them. She was following orders when she was told by her supervisor to sign and issue the ratings. (7-3, pp 6-7)

She denies the Complainant's EEO activity, and his sex were factors in this claim because she was not involved in his rating process. (7-3, p 7)

**Investigator's Note:** The CBA reads in part, Failure of the RN to provide input should not delay the completion of the proficiency report and the Department

recognizes the importance of having proficiencies submitted to the NPSB in a timely basis consistent with VA regulations." (7-19, p 87)

**Harassment Allegation**

**Complainant** testifies he told RMO Lorenzo-Villarino on several occasions that she was harassing him. He told her the day she brought him in the office to issue his detail and because he spoke out against her she was retaliating against him. He reiterated this again during their Weingarten meeting in the presence of union officials and sporadically over the course of a year preceding his detail of May 8, 2023. (7-1, pp 27-28; 7-9; 7-10; 7-11)

**Complainant** reiterated after he filed the instant complaint management proposed disciplinary action against him and prolonged his detail. He believes management should have done a full and fair investigation which included releasing the Teams recording; disciplining PSA Heckel and RN Reyula to include placing them on detail; and questioning the physician who did not follow up with his patient. (7-1, p 28)

**Complainant** testifies union officials represented him during the disciplinary process and said he had a strong case. He states he is owed an apology in the presence of the department, and he should have been returned to his former position immediately. He states his female coworkers were responsible for the same conduct and should have been detailed. He reiterated he was retaliated against as a male nurse because he spoke disagreed with his supervisor. (7-1, p 29)

**Complainant** testifies when he was detailed, he asked management to end the detail. He believes management was influenced by RMO Lorenzo-Villarino knows the rules; she knew she had the power to end his detail; but she kept him on detail out of spite and to punish him. Complainant states no investigation ensued into his allegations of harassment and he reiterated he received medical care for his condition which helped to relieve his stress, anxiety, and anger over his treatment in this complaint. (7-1, pp 29-30)

**Complainant** further testifies his work performance was affected by the allegations in this claim and he felt he was on pins and needles and did not know what they would accuse him of next. He contacted leadership and asked them what he did wrong so as to not make the same mistake and fear of being set up by RMO Lorenzo-Villarino. When leadership did not respond to him, he asked for a transfer and believes they let him transfer to appease him and to sweep the incident under the rug. (7-1, pp 30; 7-14, p 3)

**Complainant** affirms he completed harassment/hostile work environment training in TMS, and he is familiar with the VA policies regarding anti-

harassment/hostile work environment.  He believes the policy is posted in all the break rooms and around the facility. (7-1, p 30)

**Complainant** states to remedy this complaint he is owed an apology.  He is unsure of how he will recoup the lost time with his family; the pain and suffering and PTSD he has endured; or how he is going to rebuild his reputation at the hospital.  (7-1, p 31)

**RMO Christianah Arowora** denies any knowledge of the Complainant's harassment allegations and she was not the person involved in his ratings in the instant complaint.  She affirms the anti-harassment policy is posted in the facility. (7-3, pp 8-9)

**RMO Lorenzo-Villarino** testifies when the Complainant was notified around March 24, 2023 that he would subject to a fact finding, he made statements to the effect,  "this is retaliation," "let me know so I can get the command suite involved," "what patient, this is retaliation, what patient, yep several people told me you would do this," "no you're retaliating," and "any delay in patient care is on leadership not me."  Complainant also notified the National Nurses Union (NNU) asking "can you guys get the issue this is concerning so I can be prepared?". Her response to him was that she could not respond to him while she was on the phone, and she was not sure what his comments were about as this was the process when an issue was identified, a fact finding will be conducted. She was not aware if an investigation was conducted in response to his allegations of harassment because his concerns were elevated to RMO Ravipati.  (7-4, pp 13-14)

She affirms she completed anti-harassment/hostile work environment training June 12, 2023, and the policy is posted in the facility.  (7-4, p 14)

**RMO Mamata Ravipati** testifies on dated September 1, 2023, Complainant notified Melvin Tobert, EEO Program Manager, union officials, and management complaining of harassment after he was issued a disciplinary action.  In his email he states in part, he was falsely accused of "delay of care; " if management was going after other employees with same intensity as they did him; he was being treated differently than female employees; he stood up for  veterans who had billing issues;  he objected to how nurses could not practice within their scope; he followed RMO Lorenzo-Villarino's workflow directions of November 10, 2023 and based on her directions he was blamed for not performing the responsibilities of the administrative staff and management overlooked the evidence where she directed nurses to process both complex and moderate consults and admin staff were to follow up in a few days to schedule the appointments; he questioned if two female and one male nurse were going to be disciplined after JPRS were filed on them; if other employees were going to have their charts reviewed; he demanded leadership explain which rules he should

follow and if Mark Nielson set him up a meeting to speak with Senator Johson. (7-5, pp 7-8; 7-10, pp 1-2)

She was unaware if an investigation was conducted in response to his allegations of harassment because the email was not addressed to her directly. She completed anti-harassment/hostile work environment training on April 24, 2023, and the policy is posted in the facility. (7-5, pp 7-8; 7-10, pp 1-2)

**RMO Robert Buckley** denies the Complainant or anyone on his behalf informed him that his actions constituted a hostile work environment. He affirms he completed anti-harassment/hostile work environment training, and the policy is posted in the facility. (7-6, pp 5-6)

**Complainant Rebuttal**

**Complainant** refutes Witness Harris' testimony does not reflect what was reported in the Peer Review summary. (7-8, pp 2-6)

**Complainant** did not refute RMO Aurora's testimony. (7-8, pp 7-11)

**Complainant** refutes RMO Lorenzo-Villarino's testimony and her conduct and integrity are not believable. (7-8, pp 12-61)

**Complainant** refutes RMO Ravipati's testimony in that she was not truthful in her responses and she condones RMO Lorenzo-Villarino's conduct. (7-8, pp 62-222)

**Complainant** refutes RMO Buckley's testimony, and he never made the statement that (Complainant) "failed to take timely action" during his oral response. RMO Buckley did not indicate how he violated policy, and he did not do his due diligence in making his decision and suspended him without factual evidence. (7-8, pp 223-241)

**Complainant** did not refute the testimony of SME Alex Morse because HR only makes recommendations, the managers make decisions. (7-8, p 242)

The information in this report was obtained from witness testimonies, affidavits and documentation provided by the complainant and/or the Agency.

*Lisa Wabinga*                                            *02/02/2024*
Lisa Wabinga                                                          Date
Contract EEO Investigator
Computer Evidence Specialists, LLC
5315 A1A South
St. Augustine, FL 32080



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Testimony of Azis Kochiu
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | | |
|---|---|---|
| Azis Kochiu | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | Case No. 200J-556A-2023-152770 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC  20420 | ) | |
| _____ | ) | |

I, **Azis Kochiu,** Nurse, Captain James A Lovell, Federal Health Care Center, Chicago, solemnly swear/affirm that the responses and documents I provided in response to the following questions are true and complete to the best of my knowledge and belief.

I understand that the following issue(s) have been accepted for investigation:

**Whether complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal when:**

    a. **since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed him and management has done nothing to stop it;**
    b. **in 2022, he was rated Satisfactory in his Proficiency Report:**
    c. **from November 8, 2022, to May 3, 2023, his was assigned a bigger workload than his co-workers;**
    d. **on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022;**
    e. **on June 15, 2023, DLV gave deceptive information to a Peer Review Committee;**
    f. **on June 19, 2023, he became aware DLV was asking co-workers to submit negative reports of contacts regarding him; and includes the following timely raised independently actionable claims:**

    1. **On May 8, 2023, he was removed from patient care.**

2. **As of July 19, 2023, he has not been issued his Proficiency Rating that was due in February 2023.**

**<u>Complainant</u>:**

1. State your full name (If your mailing address changed since the filing of your Complaint, please provide updated address for the record).

Azis Kochiu
1831 monroe Avenue
South Milwaukee, WI
53172

2. Are you currently a Federal Government Employee? Yes

3. What is your current position title, job series and grade?  610 series, Registered Nurse, Grade 2, step 2

4. During the period in question, what was your position title, job series and grade?

Registered Nurse
Grade 2, step 2

Series 610

5. When did you start this position?

Feb 19, 2019

6. In what (Organization) unit/division do you currently work?

Community Living Center since October 2023 (I've been here for 2 months)
Prior was working in Community Care from 2/2019 to 10/2023

7. Were you serving in this role as of the date(s) of the alleged discrimination? If not, please provide the (Organization) unit/division you were assigned to during the date(s) of the alleged discrimination.

I was working in the Dept of Community Care during the incident.

8. How long have you been employed by the agency?

Just over 4.5 years

9. Who is your first-level supervisor (Provide their name, position title, unit, and division)?

Christianah Aurora, Registered Nurse Manager. She was out on leave for some 6-8 months or so prior to when I was detailed. The day she came back, I was detailed to another department by Donnabelle.

10. Who is your second-level supervisor (Provide their name, position title, unit, and division)?

Donnabelle Lorenzo, Registered Nurse Manager.

11. Are they the same first and second level supervisors you had during the date(s) of the alleged discrimination? If not, please state the changes from then until now.

Yes, however, Christianah was out for 6-8 months and was not there during the incident.

**Sex Allegation**

12. What is your sex? Male

13. How can you be certain that the official(s) you have alleged were responsible for discriminating were aware of your sex?

I work(ed) with Donnabelle since I started the VA in Feb 2019, she knows my gender.

**Reprisal Allegation**

14. Specifically, what was the previous EEO activity in which you were involved that you claim is the basis for the alleged retaliation? (Prior EEO activity includes filing a prior/instant EEO Complaint, testifying as a Witness (Not RMO), assisting another, or participating in a discrimination proceeding; opposing discrimination; requesting a mental/physical or religious accommodation) Please identify the case number(s) and date(s) for your previous EEO activity.

There was no previous case of EEO filed by me. I did however tell Donnabelle (whistleblew) that staff are working on their own time after tour of duty which is 1600 and 1630. Said employees were working until 10 pm, Saturdays and Sundays etc. I stated this is a violation of Federal Labor Laws, violation of our telework agreement we all signed, and HIPPA violation when looking at patient charts off tour. Evidence of this can be backed by the RN's in the dept when during a Team's meeting after I was brought back to the dept when I brought this issue up and the Union Rep, Kindra Perkins, asked if this was true, to which Donnabelle stated, it was brought up to her in the past. Then I (Azis) stated yes that's because i was the one that told you. To which Donnabelle stated, paraphrasing, "I can't help what people do when they are at home." To which I stated this would be easy to prove all you have to do is have IT pull the

records of who is logging on and at what times. Probably a month prior to being detailed.  We were on a Team's call when I told her.

15. If none of the above pertains to you, specify the nature of the prior protected activity that you claim is the basis for the alleged retaliation, identify the parties involved, and provide the date of that activity.

About a year prior to my detail.  I brought up several issues to the one above including:

Donnabelle and the VA denying paying veteran's bills when we (VA) are the ones that sent the vets out because we couldn't take care of them here.  How is that the veteran's fault when they came to us and we sent them out and now they get bills and are sent to collections?  I spoke up on behalf of this issue MANY times in daily huddles.  I went up to the command suite and brought examples to their attention to which our CEO gave directive to Donnabelle to address and fix this issue to which she did not.  And because she did not take action I called her out in daily huddles and email(s) sent above her. (see evidence) Donnabelle did not like me doing this.  I even went so far as to send a proposal to the Veterans House Committee in Washington with my proposal on how to fix the billing issues, it's currently in the review process to see if whether it goes up for a vote or not.  on an off note Donnabelle did try to steal this idea from me but I shut it down immediately when I went to the CEOs administrator and said I brought this to you not Donnabelle. I then got the credit for this to which I'm still fighting for veterans billing issues even though i am no longer in the dept.

I stuck up for Christianah Aurora my direct manager several times in huddles particularly when Christianah was out on leave of absence.  Christianah is the only Black leader in a position of management in the Community Care Dept and Donnabelle bullies her and harrassess her on a daily basis. I sometimes think Christianah was out due to all the badgering she had to endure daily.  Anyway, I would state in huddles that Christianah hired and fought to get for an FTE to get someone (Izzy) to do billing and you (Donnabelle) took her away from Christianah/dept. I asked leadership above Donnabelle to give that billing project the CEO wanted taken care of to Christianah rather than Donnabelle because she can get it done as Donnabelle does not have the wherewithall to take the bull by the horns but Christianah can and would have done it. Everyone in the dept knows that Donnabelle's main objective was to fire Christianah and get her friend Wendy into that position.  When I wouldn't partake in the harassment and stuck up for Christianah I believe this had a lot to do with me being harassed and detailed. I sent an email to the CEO telling him I want to give Christianah a shout out (for being a great leader).  (see evidence)  I'm sure Donnabelle did not like me getting Christianah a shout out to the CEO. In summary on this issue, you can't treat people like that, Christanah is a human being going through some personal health issues.  And I may not see eye to eye with Christanah on many things which i voiced my concerns to her as well, nonetheless, that's not going to stop me from calling out Donnabelle for bulling Christianah.  Me indirectly sticking up for Christianah when i see this as blatant Racism is just another issue that i'm sure Donnabelle didn't like about me.

I constantly made issue that nurses should not be working and doing all the ancillary work because sooner or later veterans are going to slip through the cracks and we will

miss pertinent things that can adversely effect the patients. I would state nurses need to work at the top of their licenses when caring for patients according to the Nurses Practice Act. I mean that's basic everyone knows that one doesn't need a nursing license to understand that. Anyway, Donnabelle, always looked at the Metrix numbers and based work and distributed work off the numbers to which i CONSTANTLY objected and stated as nurses we don't treat the numbers we treat patients and triage care accordingly. The guidebook (VA standard operating procedures, Office of Integrated Veteran Care (IVC) Community Care guidebook) states nurse care coordinate complex and moderate consults meaning we case manage them and the PSAs are suppose to be putting the package together, sending them out and scheduling the veterans. However, Donnabelle has the nurses putting the package together and faxing and for a while we assisted in scheduling consults up until VISN came in at my request (Cheryl Anderson, Office of Integrated Veteran Care, RN) to which Cheryl said they do not want nurses scheduling consults but care coordinating. Another time, National Leadership came in and asked why can't PSAs put the package together and schedule consults, so that nurses can work at the top of their license. Management's response was we don't have enough staff. We don't have enough staff because Donnabelle made the dept top heavy and hired more nurses than PSA's to which me and another employee objected to. The guide book is vague, it changes constantly. Donnabelles, directives change constantly and because she is not following the guidebook the dept is in constant disarray and chaos at best. to sum this issue up I brought this to her attention often in front of staff during huddles to which she did not like me challenging her. I was only suggesting the best evidence based practice. Another time when I brought this up we had a back and forth regarding best practice and after shift huddle she solicited employees in the dept to say or write up negative comments about me. (Monica Coleman was asked and told me Donnabelle asked her to do this) I stated several times we take care of patients, we are not putting lawn mowers torgerther. No matter how hard I fought for nurses to work at the top of their license I was ignored or met with consequences like eventually being detailed and suspended.

i was always outspoken to the injustices i saw in the dept being done to veterans and certain black employees. Example, a vet sent to Vietnam war was diagnosed with agent orange and because the VA filed something wrong, or the community provider didn't file on time the vet was on the hook for the payment. There are many examples of this occurring to our vets and Donnabelle's response was always she will look at it at a case by case basis. I constantly stuck up for the veterans and she did not and I was lower in position so how dare I speak up. Many of our veterans are in collections status and currently there is a class action law suite by the veterans vs the VA. (see evidence)

I asked Donnabelle to direct hire people to help but to no avail she sat on her hands while the department was in a tailspin.

I sent the CEO an email requesting the Active Duty Corpsman to assist our dept to help with some of the ancillary work, i.e. answering phone calls, faxing, making calls, etc to alleviate the RNs to do the critical thinking, which the CEO ended up getting overtime staff to help us. Donnabelle definitely did not like this as I went to the CEO which was

her job to do but yet again she never had the wherewithall to step up her game and ask the CEO, therefore, I did and the dept got overtime approved. (see evidence)

I've brought this issue up so many times that I tried to fix it by creating a billing card around 2021 for the veterans, something similar to what the private sector has. I started to push the issue harder about 4-6 months prior to being detailed. See the attachment I sent to the Command Suite with regards to just one example.

This is another issue I had always brought up repeatedly for years prior to the detail.

About a year prior to me being detailed, I had Cheryl Anderson who is part of the National team come in (on Teams) and have a meeting to discuss VA workflow in the Community Care Department, things she discussed such as, nurses should not be scheduling consults, they need to coordinate care and PSA's should be putting the packages together that they send to the outside providers in addition PSA's, schedule the appointments, receive the medical records and such so that nurses can focus on Case Managing.

After the meeting with Cheryl, I'd say a few weeks or so later, the dept along with Donnabelle were working on restructuring the workflow to coincide with the guidebook and Cheryl's recommendations were to stick to the guidebook as it is predicated on, Evidence Based Practice. In doing so, we collectively as a department worked on this change once a week for about 5-6 weeks until one day during a brainstorming session, Ken Dizon RN and Donnabelle got into a back and forth regarding what the guidebook states on how many providers need to be listed on a consult. The two were essentially arguing to the point that Donnabelle left the meeting and subsequently never showed up to anymore meetings thereafter. When Donnabelle left, she took the department analyst who was part of the workflow process with her. They both stopped attending the workflow changes we were working on. That's when Donnabelle as a manager essentially abandoned the department. Sometime later I called her out on that.

Cheryl again had some people from VISN 12 (these are the folks that look over several VA's in this section of the country, but are under the National people). Again, this was a Teams meeting regarding proper workflow. Once more, even after that meeting our workflow did not change despite National and VISN recommendations which were guidebook driven.

Anyway, Donnabelle no longer was a part of the change so then Christianah (the lower manager) came in and discussed with me, and Ken and Dori who is a PSA, to finish and finalize the workflow to which we finished in one day, what Donnabelle took over a month to try and fix it before abandoning us. The department agreed to move forward with what we finalized; however, Donnabelle never signed off on it and we were back to doing things the way they were always being done, contrary to the guidebook.

On or around Sept 2022, yet again we had some National folks come in by the recommendation of our CEO, Dr Buckley, to look into the problems plaguing the department. These folks stated they want the nurses to work at the top of their licenses.

Please ask Monica Coleman RN as she was keeping track of the details of the department along with the higher ups.

PSA's are administrative staff responsible for the ancillary work. I believe they are called Patient Support Administrative. Sometimes called Administrative Support Assistant. Sort of like CNA's (Certified Nursing Assistants) on the floor that work under the Registered Nurses.

A bunch of times before I was detailed I have Ken Dizon as witness to that. I even sent an email to Dr Buckley and several in the Command Suite, including I believe I CC'd Captain Nelson and Dr Cotter etc, regarding bills and priority hiring to which Dr Buckley gave the greenlight to hire priority. See the email I sent.

See attachment email to Dr Buckley CEO when I requested an active duty corpsman. This was prior to me being detailed.

16. Was/were the management official(s) you name in this complaint involved in your prior EEO/protected activity? If so, explain how each management official was involved and underline the date/time period of his/her/their involvement.

I never filed an EEO prior to this, but if me whistleblowing with regards about labor laws to Donnabelle constitutes protective activity, then yes, I did that perhaps a month or two prior to being detailed and stripped of my nursing privalages which i worked and earned. She acted as if she was the arbiter of my worthiness as a Registered Nurse. She temporarily stripped me of my ability to perform as a nurse just to belittle and harass me for speaking up on the many issues. I was reassigned on May 8, 2023.

17. If the management official(s) you identified in your current complaint were not involved in your prior EEO/protected activity, please explain how and when they became aware of your prior EEO/protected activity and explain how you know this.

Donnabelle on a Teams phone call with me knew I told her about the employees working overtime without pay this was prior to me being detailed and suspended. I told Donnabelle that staff are working overtime with no pay about a month or so before I was suspended on May 8, 2023

18. Other than this EEO complaint, have you filed union-based grievance or an appeal regarding the allegations in this EEO complaint? If so, when did you file the grievance or appeal? If so, what is the status of the grievance/appeal? What was the result? Provide a copy of the appeal and/or grievance and outcome

I didn't file a grievance/appeal with the Union as I was told I cannot do an EEO and Union grievance at the same time.

**You allege you were subjected to a hostile work environment based on sex (Male) and reprisal as evidenced by, but not limited to, several events beginning in January 2021. I will ask you a series of questions about each.**

**Incident a: On unspecified dates since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed you and management has done nothing to stop it.**

19. You allege you were harassed by your supervisor, Donnabelle Lorenzo-Villarino and management did nothing to prevent it. Please provide a few examples with the following details:

   a. On what date(s) did this occur?

It occurred immediately on 1/2021 when I saw the distribution of the workload and kept bringing it up practically daily to make it fair.

On around Jan, 2021 I was given a greater workload then the rest of the dept by virtue of having a smaller group than the others at the same time each group had the same amount of consults.

I was given a greater workload than the rest of the dept. We were split by alphabet and even though each group had roughly the same amount of consults I was given more work by virtue of having less employees. In addition Donnabelle paired me up with one of the weakest PSAs. Moreover, I had 10-12 letters in the alpha split which makes more work when working on, ecats/suicide patients and My Healthyvet (MHV) emails. The other employees only had to look through 2-3 letters to look through, where as I had 10-12. She gave me the bottom of the barrel to create more chaos. I constantly asked for more help stating this is an uneven workload. Then one day, I was asked by our interim manager when Christianah was out that she would assign some of my letters to another staff member that had a smaller workload, however, this never happened. Shortly thereafter I was detailed.

Christianah is my immediate manager, Kelly Heckel, (Female) my coworker on my team who was supposed to schedule the consult in question.

   b. Describe what happened?

I constantly asked for more help as my group was swamped. I was essentially ignored. and for the 6 months since 1/2023 my team worked short handed. I think it's pertinent to mention that even before 1/2023 for years Donnabelle had me work with a smaller group than the others in the dept. For example when someone would leave the dept I had to soak up their letters.

   c. **When** and **where** did it occur?

throughout my time in the department. Harassment takes form in many ways. when you directly give more work to one employee vs the others. when you ask staff to give negative statements about me. when you tell staff I can get in big trouble for going above her as I did when i went to the Command Suite for assistance.

I emailed Dr Buckley and several others CC'd.  See email I sent.

### d.  How often did it occur?

Randomly, but the workload never changed that was constant. Then I would be compared to the others that had more staff and who were working without pay after hours and on weekends to which I blew the whistle.

I never did work outside my duty hours.  I told Donnabelle and Christianah that I will not work off my tour of duty.  I'm not sure if Donnabelle gave the directive to work without pay, but I did tell her it was happening so she knew and can't play ignorant that she never knew.

I told this to Donnabelle about a month prior to me being detailed on May 8, 2023, as stated above that a lot of the staff is working overtime without pay to which she did nothing about it.   This was even brought up in a Teams meeting we had after I came back from being detailed in early September, to which I stated in front of all the RNs that paraphrasing, "this is the second time I'm going to whistleblow and since this is on recording…" and I further stated on Teams that the staff are working overtime off tour of duty until 10pm and Saturdays and Sundays without pay, riding the tight rope of HIPPA violations while looking into charts while off tour of duty, and that was in violation of the Tele work agreement we all signed to work from home.

In that Teams meeting was Kindra Perkins, the Registered Nurse Union Representative. Who asked Donnabelle after I stated that, "is that true?" to which there was a balk, and I stated, "just tell the truth" to which Donnabelle hesitantly stated, "it was brought up to me, but I can't help what people do at home." To which I stated, yes because I was the one that brought that up to you with a stern tone.  I went on to say this is easy to figure out all we have to do is have the IT department look up the records of when our workers are logging into the charts as proof.  That's when Kindra stated she finds this very problematic etc etc etc.

The next day some of the staff RNs Cindy Reyula and Emelda Escalanti were looking for the recording but couldn't find it.  Emelda came up to me at my desk and stated that her and Cindy cannot find the recording of Donnabelle admitting she knew of this.  I had a few other people look for the recording but none of us could find it. Donnabelle, admitted on the Teams meeting in front of the entire RNs in the dept that she knew people were working overtime without pay.  I'm not sure what happened to that recording.  Either Donnabelle never recorded it or she erased it, I'm not sure. Everything is usually recorded when we have Teams meetings.   I asked IT if they can get access to the conversation to which they stated it would have to go through multiple legal steps etc etc.

You can ask any RN in the dept if they remember her admitting she knew of this.  Just be aware a lot of the staff are worried about retaliation if they speak the truth.  I even sent this in an email to the higher ups that Donnabelle admitted to knowing these things. See email.

e.  How did you react?

I kept asking for additional help constantly to no avail. I asked her to direct hire to no avail.  I think she liked watching me suffer.  When she solicited employees to speak against me I essentially ignored it.  I was told by her (supposed friends) that worked with her in other depts they stated she is a very vindictive person and if you go against her she has been known to fire employees.

f.  What response did you make when the incident(s) occurred or afterwards?

I brought up the issues of short staffed to upper leadership.  Donnabelle called me on a Friday and asked me to come into work on i believe it was a Monday as i was working from home full-time. On Monday around 10 am Donnabelle called me into her office and stated I was being detailed.  I was asked, you mean because I followed your rules and now you want to harass and retaliate against me for speaking up to you.  I told her I'm not signing this and left her office, then Donnabelle shouted at me i can't quite remember what she said and I went back to her office took the detail and went straight to her leader, Dr Ravipati.

After I was detailed i kept asking why?  I went above to Dr Ravipati and asked her the reason and she said this was all just "a slap on the wrist."  I was taken back because it shouldn't even be a slap on the wrist and told her this is nothing more than harassment and proceeded to tell her Donnabelle is retaliating because I speak up on the issues I explained above.  I kept asking for the reason I was detailed and I kept getting hazy answers to something about documentation.  I was put under a chart review of random 25-30 consults based on certain criteria.  the Chart review was done by a dept called Quality Management (QM).  The only way Quality management can come up with the answers of yes/no to my documentation is by Donnabelle telling them what to look for in my documentation.  What Donnabelle did was the QM misinformation and had them run a chart review based on the criteria PSAs (Patient Service Administration) where suppose to do not RNs.  Dr. Ravipati showed me the documentation in question that they alleged stated I missed and I responded that everything that indicates I did not document was the duty of the PSA's and that I can prove it by a Team's recording to which Donnabelle gave directive on how we are supposed to be working. Prior to 11/20/22 RN's were only doing complex consults, in the Teams meeting she said nurses were also responsible for processing moderate consults which consisted of calling the veteran, getting preferences, putting the labs, xrays and doctor's notes/ documentation and sent it to the hospital/clinic outside of the VA.  The basic consults were handled by the PSA's (non-clinical staff).  Once the consults are sent out by the nurses the PSA does the scheduling for **ALL** consults.  Her directive contradicted what Cheryl Anderson put out and the guidebook also states nurses coordinate care and delegate admin work to the PSA's.

The following day I went back up to Dr Ravipati's office with our strongest PSA coworker Dori Matusz.  Dori presented an algorithm workflow to what the process

the RNs do and what PSAs do and gave it to Dr Ravipati and Dori stated that all the issues I'm being accused of not documenting is the responsibility of the PSA's and in my case the PSA is Kelly Heckel.  At that point Dr Ravipati didn't want to hear anymore as I imagine she had other work to do.

so up until now you have QM ran a report on deceptive information, which was forwarded to Dr Ravipati as false information.  So now you have Dr Ravipati looking at skewed false information.

When i was detailed about a month into it, I team's messaged Alex after Dr Ravipati told me to reach out to him.  I believe he called me or I called him shortly after the teams message was sent.  I asked Alex where we are with the detail to which he stated it's been done "two weeks ago" and that he wanted to get this off his books. I then reached out to Dr Ravipati to ask her where we are and she couldn't answer as she didn't know.  I stated you're higher than Donnabelle in the chain of command can't you stop this?  she stated no.  as if she wasn't sure what to do. Mind you Dr Ravipati was just assigned to our dept maybe a month prior to this so she likely wasn't sure of policy and how things are done in community care.

A few weeks later I got an email stating there would be a peer review done regarding this incident.  Donnabelle reached out to me via teams or email and asked if i was going to participate and I said YES.  So now Donnabelle knows Im going to be there in front of the committee.  shortly thereafter i received a letter from the Peer Committe with the date and time of my appearance.  in that letter was a synopsis of what allegedly occurred.  In that synopsis it indicated the consult was an "expedite".  An expedite means the consult has to be sent out within 2 days.  Well this consult was not an expedite as I looked back at all my expedites and had several RN's look back as well to which they stated no it's not an expedite.

I believe June 17, 2023 was the peer review.I go to the peer review committe and explain this was not an expedite and added that another RN followed the consult after me 3 separate times her name is Cindy Reyula RN, (another good friend of Donnabelles that goes on vacations with her) and I proceeded to go through the consult from top to bottom.  I followed all the rules per Donnabelle's directive on Teams.  I also stated that Cindy's documentation.indicates she did not reach the patient 3 times and according to the workflow she was supposed to send out a 7-day notice to the vet to call the community care dept or this consult will be cancelled. Cindy did not send any letters out.  She never called next of Kin until her 3rd attempt. I proceeded to tell the peer committee that was her job to do and she missed it 3 times, in addition i added that's no different than if I was on a med surg floor and had a patient one time, and the next few weeks another nurse had the patient but failed to follow policy how is that my fault?  If Cindy (Donnabelle's friend) failed to follow policy how was that my fault?

But let's just step back a bit after the peer review committee was completed I reached out to Dr Ravipati thinking okay this has got to be over by now.  I asked Dr Ravipati if this was done and can i go back to my job.  I didn't get an answer right away then I asked something to the effect (i have this on teams messages) can't

you do something about this again i said you're higher than Donnabelle in the chain of command to which her response was, "i don't know". in other words it was always up to Donnabelle to bring me back. I was told by other managers throughout the facility that it was always up to my manager Donnabelle to bring me back. She purposely kept me detailed as punishment for speaking up and standing up for the lower level boss, Christianah.

At this point I knew i could be detailed for 6 months a year etc because this was all retaliation for speaking up. so i went and talked with Melvin Tolbert our EEO specialist and he explained how the process worked. I told him how the chart review they ran on me was biased and he indicated that, paraphrasing now, if they were going to do a fair chart review then they would need to do all the RNs in the department under the same criteria as mine was ran under to how I compared to theirs. Obviously, I brought this up to Dr Ravipati who ignored it.

That was the time I officially filed an EEO. once I filed an EEO they had Michelle Reed question Donnabelle. Shortly thereafter, I was called back to Dr Ravipati's office to which she had a contract for me to sign that indicated she/donnabelle were proposing a 14 day proposed suspension and in order to reduce this i would need to talk to Dr Buckley our CEO. I said I will not sign that but will talk to Dr Buckley.

So what we have is Dr Ravipati telling me an Dori it was just a slap on the wrist, to me filing an EEO and her and Donnabelle raising it to a 14 day, by virtue of retaliation for filing the EEO.

I was then brought back to work, had a meeting with Dr Buckley and suspended for 3 days.

> g. Did others witness these events? If so, identify the name, title and state what was witnessed.

Everyone in the dept knew I had the bigger workload and they all knew of me being detailed and for reasons above. More importantly, the entire dept was shocked as to why I was being detailed and not Kelly Heckle,PSA.

> h. Are there any notes, physical evidence, or other documentation regarding the incident(s)?

Yes, I have a lot of emails sent and dated (see evidence)

> i. Did you complain about the harassment/hostile work environment? Who did you tell, when, and what did you tell the person?

I told Dr Ravipati, I told the union, I told Donnabelle this is retaliation by her just because I speak up, I told the entire department.

**Incident b:** **On unspecified dates in 2022, you were subjected to a hostile work environment when you were rated Satisfactory in your Proficiency Report.**

20. On what dates did this incident occur?

I never received my review until after I came off of detail and had the EEO dept bring this up as an issue. My review was suppose to be given to my at my annual start date in Feb. I think I finally got my review i want to say in September sometime.

21. Please identify the management official(s) by **name** and **title** who rated you as Satisfactory on your Proficiency Report.

Donnabelle Lorenzo RN Manager

22. Explain why your performance is better than the rating your supervisor gave you. Detail specific events and dates when performance events occurred which demonstrate your better performance.

For starters she gave several Filipino employees (see below) that were new to the dept still on orientation higher marks than mine. By the way Donnabelle is Filipino that's why i make this reference. These employees got 6 months orientation but when I started we had no orientation or very sporadic bits and pieces.

I deserved a better review based on I was instrumental in collaborating on a better orientation process for new hires. I took new employees under my wing and guided them, shared information and so on. I was a better worker in terms of knowing my job better than previous years that I was given a better review. for example, I got a higher review from Christianah a yr or two before the one Donnabelle gave me. That's easy to peg it was just retaliation. If I was in the dept longer I obviously became more proficient in my job. (See evidence my rebuttal to the review)

Emelda Escalanti RN, Ruby Dizon RN, Adriane Ang RN, Cindy Reyula RN, Ken Dizon RN. All RNs all Filipino.

23. What were the ratings you received in the previous two years?

Higher than satisfactory

24. What about your performance is different from/better than last year's performance? Detail specific events and dates when these events occurred, to demonstrate the difference in performance from last year to this year.

While our department was in a tail spin, as explained above i reached out to Dr. Buckley and he got us approved for Overtime where employees from other departments came in to assist. This was done by me not Donnabelle, when she should have had the gumption to ask upper leadership for help. Me doing this prevented a lot of delay of care that indirectly helped the veterans out. Donnabelle lacks the backbone to speak

up on behalf of the veterans we are being paid to serve and the department. This in itself should have given me the highest rating as possible. I was doing her Job.

In conjunction with me keeping in contact with Senator Ron Johnson's office and the Veteran's House Committee in Washington DC with regards to resolving veteran billing issues.

25. Did you ask or were you given a reason for management's actions? If so, explain in detail.

no reason was given, Donnabelle had Christianah give me my review when Christianah came back from leave of abscense. Again I didn't sign the review.

26. Did you appeal your Proficiency Report?

No, I didn't know I could and I was too stressed out from everything that happened to me that the only thing on my mind was getting out of that dept.

a. If so, provide the date you appealed the Satisfactory rating.

Christianah Aurora I sent her a response as to why I disagreed not sure if that's considered an appeal or not.

b. Name of the Management Official you appealed the Proficiency Report to.
c. Did you appeal the Satisfactory rating in writing? *Please provide supporting documentation.*

*I did send my rebuttal to the review to management (see evidence)*

d. If not, explain why you did not appeal the Satisfactory rating.

not sure if I answered this question above?

27. If you appealed the Satisfactory rating:

a. What was Management's response.? *If in writing, please provide a copy.*
b. What date did Management respond?

No response. not sure if my rebuttal was a formal appeal?

28. Please explain how the Satisfactory rating has and/or will negatively impact you.

It was just another form of Donnabelle indirectly harassing me and playing favoritism to certain other employees. If I apply for other positions in the VA system and am asked for my reviews this reflects poorly on me.

Ever since my detail I have not been getting interviews in the system and if I do I'm denied immediately although I'm qualified. The hospital I work in is small and my name has since been slandered throughout.

See attachment.

29. What evidence shows your supervisor was motivated by your sex to give you a rating you didn't deserve?

She was more motivated by retaliation for going above her and speaking up at least on this issue.

Falsely detailing and suspending me is proof enough.

speaking up.

30. Are you aware of any individual, under the same supervision, and under similar circumstances treated better than you under similar circumstances? If yes, identify each individual by:

      i) Name: Ruby Dizon and Cindy Reyula
     ii) Title: Both RNs
    iii) Supervisor: Donnabelle
    iv) Sex: Both Female
     v) Prior EEO activity? (Yes, no or unknown)" prior I believe
    vi) Reason you believe they were treated better than you? they are both female and both are of Filipino descent.

31. Are you aware of any individual, under the same supervision, and under similar circumstances treated the same as you, under similar circumstances? If yes, identify each individual by:

      i) Name: Charlene Miller and Christianah Aurora
     ii) Title: Charlen is a PSA, Christianah RN Manager
    iii) Supervisor: Donnabelle
    iv) Sex (Yes, no or unknown): Femail
     v) Prior EEO activity? (Yes, no or unknown)"prior i believe
    vi) Reason you believe they were treated the same as you? they are both black woman

**Incident c:** **On unspecified dates from November 8, 2022, to May 3, 2023, you were subjected to a hostile work environment when you were assigned a bigger workload than your co-workers.**

32. On what date(s) did this incident occur?

Immediately, see above answer.

33. Describe what happened?

I asked for assistance all to no avail which was purposely done see above notation (see evidence)

34. Did you ask or were you given a reason for management's actions?

Essentially I was ignored

   a) If you disagree with the reason, please explain why.

No reason was given why i was working short staffed. I even asked rotate the letters so im not the only one with the biggest workload.  again all to no avail just another form of harrasment/reprisal for speaking up.

35. Are you aware of any individual, under the same supervision, and under similar circumstances treated better than you under similar circumstances?  If yes, identify each individual by:

   i) Name: All the RNs in the department except for Adrienne Harris who I was teamed up with.
   ii) Title: All RN's
   iii) Supervisor: Donnabelle Lorenzo
   iv) Sex: male and female
   v) Prior EEO activity? (Yes, no or unknown)" yes
   vi) Reason you believe they were treated better than you? because I speak up, Adrianne is a black woman that doesn't speak up but asks me to do so on her behalf.

36. Are you aware of any individual, under the same supervision, and under similar circumstances treated the same as you, under similar circumstances?  If yes, identify each individual by:

   i) Name: Adrienne Harris
   ii) Title: RN
   iii) Supervisor: Donnabelle Lorenzo
   iv) Sex (Yes, no or unknown): female
   v) Prior EEO activity? (Yes, no or unknown)" yes
   vi) Reason you believe they were treated the same as you? I speak up and Donnabelle thinks im upstaging her i suppose, Adrienne is a black woman.  We have a pattern of Donnabelle not liking blacks and me speaking up.

**Incident d: on May 8, 2023, you were subjected to a hostile work environment when you were not allowed Union representation, you were the subject of a fact-finding investigation, that you lacked documentation in your emails, and was**

**accused of not properly scheduling a deceased patient's consult in December 2022.**

37. Please confirm the management official by **name** and **title** who denied your union representation during the fact-finding investigation.

Donnabelle Lorenzo RN Manager

    a. If more than one management official was involved, please identify the name and title of each and describe how each was involved.

n/a

    b. What reason did management provide for denying you union representation.

Gave me no reason, I called the union immediately after and talked with Monica Coleman

    c. Did this investigation lead to a disciplinary action? If so, when? What was the disciplinary action?

    I was immediately detailed without the union's knowledge of this, the union was caught off guard.

38. Did management give you a reason why they were conducting the fact- finding investigation.

    a) If so, what reason were you given?

I write long and detailed emails and include various dept heads and so forth. and was told I don't document my emails in the chart. When I said maybe I should document lengthy in the chart the way "Cherilynn did" a previous employee in the dept that had long documentation. I was told no. we are told not to document certain private correspondences with one another in the patient's charts but on the flip side this was the reason I was initially given for my detail.

    b) Who gave you the reason?

Donnabelle Lorenzo in her office the day of my detail.

    c) Did you disagree with the reason? Why?

Without a doubt I disagreed, I knew that was the weakest excuse on the planet to detail me. I told her this is harassment and retaliation because I speak up and go to the CEO.

    d) Were there other who did the same action as you, but were not subjected to a fact-finding investigation? If so, who (Name and title). Explain what occurred and how you became aware of this information.

YES!!!! I was told by two oncology RN's that they did what is called a JPRS (Joint Patient Safety Reporting System) that two employees in community care dept. one cancelled a consult and a veteran died, the other records were not in on time and the veteran went from having a pulmonary nodule that spread cancer throughout the entire thoracic cavity.

Nothing happened to both these RNs. No chart review, not detail, no suspension

the above info was given to me by Susan Ryshinski and Thresa Minier both Oncology RNs.

Just recently a JPRS was filed by Dori Matusz on Wendy RN, Donnabelle's best friend for not following protocol in which she gave a suicide patient that stated she needed help to a PSA. The chart was flagged suicide mind you and this everyone knows if an RN responsibility. Anyway, Wendy assigned it to a PSA, I think the PSA was still on orientation or just came off of orientation but nonetheless this PSA was new. I believe several days to maybe a week later this female veteran hung herself.

Nothing happended to Wendy as she is Donnabelle's best friend and a Filipino as well.

The pattern we see is favoritism. Donnabelle being Filipino, ignores mistakes made by folks of her nationality who are primarily female, whereas the others she doesn't like she takes the nuclear option on.

**Issue e: on June 15, 2023, you were subjected to a hostile work environment when RMO Donnabelle L. Lorenzo-Villarino gave deceptive information to a Peer Review Committee.**

39. Please confirm DLV was the management official responsible for giving deceptive information to a Peer Review Committee.

(See evidence) this is strong because if one is willing to lie and deceive her entire credibility goes into question. Either she wrote it, but at the very least as a manager she should have seen who she put up to write it. It is her responsibility as the manager to oversee these serious allegations. Why was this never brought up to me when she initially detailed me? why didn't Dr Ravipati mention this when I talked to her? this was slipped in so that Donnabelle can obfiscate from her directives given to the dept because she implicates herself on transcript and on a Teams recording just to make it look bad for me because she couldn't justify the fact that I followed protocol and needed something to hide behind. And by the way I already know what her rebuttal will be on this and many of the issues.

40. Describe what information was provided without disclosing confidential/medical information.

Donnabelle tampered with evidence.

She stated consult was an expedite when it was not.  She stated I ignored signs and symptoms when I don't see the patients other than names on a computer and social security numbers.  I would have had to see the patient for signs. She stated I made this a moderate rather than a complex when I ran a can score and called the veteran to base my moderate rating no symptoms mentioned to me.  and by the way it makes no difference if it is a moderate or a complex because according to her new directive RNs have to do all moderat and complexes so either way her accusations are weak.  (see evidence transcripts or Teams recording)

if this indeed was an expedite, I was gone several days when this consult was placed in addition when i was gone it was her responsibility to assign the expedite to someone else and that's the way we always do it when a fellow employee is absent. But the fact that it was not an expedite is alarming. And the fact that she would say that is shocking.

### 41.  What was your reaction?

I was taken back, shocked, angered that she was trying to make me look bad as if I did something wrong when I did not!

### 42. Did you ask or were you give a reason for management's actions?

I didn't want to ask her; I was disgusted by what she did.  She tried to deflect her actions onto me.  I brought this up to the Peer Committe during the review.  It was the first thing I brought up.  After i opened with this to the committee they never asked me about that or the signs and symptoms or anything else written in the false synopsis but did pivot away from those issues i shot down to wanting to know, what my thinking was in making this a moderate.  and that's all they asked me, my rationale to making it a moderate.

By the way, noteworthy, Donnabelle never showed up to the Peer Review when she found out by Teams messaging me asking if I was going and I said yeah I'm going.  She likely knew I'd bring this up.  She wanted Christianah to show up but Christianah crossed her name off the list of people that would participate as she wasn't in the dept due to her illness.  Above Christianah's crossed out name, I saw Donnabelle initialled that she would be there, however she was not.  That's telling in and of itself.

    a.  If you disagree with the reason, please explain why.

    b.  Why do you believe management was being deceptive? Was this information false?

This information was 100% false.

The directive is constantly changing, she never sticks to the guidebook.  The last changed directive when I was in the department happened on 11-10-22 when she stated the PSA's do all the scheduling.  She will not release this recording to others to hear.   But I have the transcripts and workflow algorithm and can play the recording but no one else can listen to it unless she allows it.

She did this to cover herself and hedge against her Teams recording where she changed the directive.  I sometimes think she fell in a mess and didn't know how to get out not realizing that when she started with a simple lie regarding me being detailed for not documenting my emails in the patient chart to falsely giving QM deceptive information to run my chart review audit, to now falsifying statement of facts to the Peer Committee.

I can't get into her mind and describe her thinking.  Perhaps she thought I wouldn't fight back because in the past I let a lot of things slide, I'm not really sure what she was thinking that led to her cascade of lies.  Maybe she was hoping it would all go away?  Im not really sure.

I'm not sure how to explain her thinking other than in simple terms (please pardon my French here) I think she knew she fell in a pile of shit and somehow wanted to come out smelling like Roses.

43. What policies, procedures, contract provisions, etc. do you believe are relevant to this allegation?

Well Donnabelle has the RN staff doing ancillary work and not working at the top of our license.  I stated these issues many times.  The guide book states I believe RNs do moderate and complex care coordination. The National leaders came into the dept to try and assist with our disarray and stated they want the nurses to work as case managers, Registered Nurse Liaisons, care coordinators.

**Issue f: On June 19, 2023, you were subjected to a hostile work environment when you became aware RMO Donnabelle L. Lorenzo-Villarino was asking co-workers to submit negative reports of contacts regarding him.**

44. Please confirm DLV was the management official responsible for asking co-workers to submit negative reports of contacts. Yes.

45. How did you become aware of this incident? We were in a team huddle and I was asking why Isabelle Cantu was pulled from the department (Isabelle was processing the bills) and why wasn't Cliff doing the work.  Donnabelle called Monica Coleman, union rep and she asked Monica if she could write negative comments about him.  Cindy also called me and also told me not to send emails above Donnabelle and to be careful because I would get in trouble.

46. What was your reaction?  I would mention on Teams to Donnabelle that he knew she was talking about him.

47. Are there any notes, physical evidence, or other documentation regarding the incident(s)?  No physical evidence, these were comments made to me by other staff.

48. Did you ask or were you given a reason for management's actions?  No.

    a)  If you disagree with the reason, please explain why.

49. How did issues **a through f** create a hostile work environment for you?

Detailing me.
Making me work short staffed, hence giving me more work than the other team members suspending me.
soliciting staff to say negative comments about me.
Keeping me detailed longer than I should have.  HR had this completed in less than a month but donnabelle kept me detailed until i filed the EEO to which she retaliated even more. a lower review I work for a small hospital and my name has been slandered due to her actions.

    a.  How were you harmed by these incidents?

Emotional stress I went to see my doctor and now am taking medication, embarrassment, slandered throughout the hospital. The emotional stress was the worst part.  I used vacation time that I otherwise wouldn't have had used just to clear my mind but it was no vacation, I thought about it everyday every minute, it consumed me.  It wasn't until I talked to Melvin Tolbert our EEO manager who I can never pay back for giving me the words of wisdom.

But to add additional salt to the wound, after I filed the EEO they came after me harder.

50. Did these incidents impact your ability to perform your job duties?
    a.  If so, how?

I was so stressed out, I asked to be transferred to another dept.

    b.  Did they impact your salary and or benefits?
    c.  If so, how?

No.  I just had to use a lot of vacation time and lost 3 days pay due to suspension.

    d.  Did they impact your career opportunities?
    e.  If so, how?

Yes.  I have applied for several positions within the hospital for which I qualify for and never get called for even an interview.  I suppose when your detailed the managers want nothing to do with you.

For example, I applied on the Med Surg unit that had an opening.  One of the managers wanted to hire me a few years back.  When an opening came up I went and talked to

the manager of that unit he said to apply. I applied and didn't even get the interview. I'm sure he found out from HR or someone that I was currently detailed and likely wanted nothing to do with me. I don't fault that manager at all.

51. Were these incidents of harassment threatening, humiliating or patently offensive?

I guess you could say threatening due to the fact that this is my livelihood Donnabelle was toying with. I mean she decided she's the arbiter of whether or not im worthy enough to practice as an RN. I have more critical care experience than anyone in that department and by a long shot.

very humiliating in front of my dept colleagues and the staff all around the hospital. word gets around quickly, particularly in a small hospital.

Patently offensive would be an understatement. when you're accused of doing something you didn't do and you feel no one has your back but yourself, i'm not going to lie it's hard. To answer the question, extremely patently offensive.

52. Please cite and provide a copy of any VA policies, rules, etc., which were violated when these events occurred.

I followed Managements directive. However, I don't believe her directive coincides with the guide book. Me, the union, Ken Dizon have arm wrestled with Donnabelle with regards to the guidebook on many occasions. (Ill submit the guide book as evidence) although im not sure how it would apply in this scenario other than nurses not practicing at the top of their licenses.

**Incident 1:** On May 8, 2023, Complainant was removed from patient care.

53. Please confirm the management official(s) by **name** and **title** responsible for removing you from your patient care duties.

Donnabelle Lorenzo RN Manager

54. Describe the circumstances which lead management to remove you from your patient care duties.

I wish I new. Donnabelle and Dr Ravipati changed the reason(s) many times as to why I was removed from patient care. it wasn't until my suspension that stated, "failure to follow policy", "Delay of care." those were the last things I read. (see evidence Teams Recoding that will depict i followed policy and the delay in care was on the PSA, Kelly Heckel who failed to schedule said consult in a few days, and the other nurse Cindy Reyula, who failed to send the 7 day notice out informing the vet to call community care or the consult would be cancelled on 3 separate occasions. In addition, Donnabelle is culpable by way of being the manager and she sends out the worklist daily on what

needs to be touched and scheduled or what records need to be uploaded and requested.) Delay of care should be asked of the doctor that initiated the consult as to why he didn't follow up on his patient. Just because we have a system failure akin to a swiss cheese event doesn't give Donnabelle the right to make me the scapegoat of an entire dept failure when I followed protocol. This shows retaliation for me speaking up.

We went from not documenting emails in patient charts to not documenting PSA duties to delay of care, not following procedure.

They gave me a bunch of other hazy reasons why I was removed from patient care which didn't make sense.

55. What was your reaction?

I went through a flood of emotions from shock, to stress, anger etc. I just want the truth to come out. I have nothing to hide because the simplest thing to remember is the truth. Donnabelle is going to be the one obfiscating and trying to come up with hazy reasons just to cloud the issue and people only do that when they know they're not telling the truth.

56. Did management give you any reason for removing you from your patient care duties?

As stated above, the reasons they gave me made no sense and changed often evertime I would ask, they weren't clear as to what I did wrong. in fact, after i served my suspension I was back working in the dept and I sent an email to the CEO and HR Alex Mores who suspended me and asked them can you tell me specifically what policy i didn't follow just so I don't do it again. I told them I didn't need to get suspended again for not following policy if I didn't know what i did wrong. I got no response from any of them. (see evidence)

That's when I requested to be transferred to another department. I wasn't going to sit there and go through this again not knowing what I did wrong and when I ask upper leadership they don't reply.

So I asked Dr Ravipati for a transfer which she gave me. My guess they made the transfer quick to shut me up from asking what I did wrong.

BTW when I came back to the dept they would not let me telework the way I was prior to my being detailed and suspended. Just another way to harass me by making me come in even though i have the telework agreement in which mngt signed allowing me to telework.

By the way on a side note, about a month into my detail I sent a teams message to Dr Ravipati asking her when I will be coming back to the department to which she told me to talk to Alex Morse the HR representative. I sent a teams message to Alex, then either I called him or he called me I can't quite remember. When we talked on the phone, I asked

Alex when will this end to which he stated, I'm paraphrasing now, "this has been done two weeks ago, It's Donnabelle's decision ..." or something to that effect, he added, "I want to get this off my books..." again something to that effect. I interpreted this as Alex stating this has been done two weeks ago meaning two weeks or so into my detail and he wanted to get this out of the way so he can move on to other things.

I guess this would be easy to prove since I highly doubt Alex would say those things if not true. I'm sure he has a record of dates and times. Therefore, if indeed this was done two weeks or so into my detail, (but we know I was detailed for 3 months) was just Donnabelle's way to diminish me punitively. She can't claim she didn't know she could pull me back sooner because she has been a manager for probably 6-7 years at the VA and knows the rules.

    a. If so, what reasons did management provide.

None went from emails to charting psa duties to delay of care failing to follow policy.

    b. Do you disagree with the reason? If so, please explain why.

100% I disagree. They never gave me a concrete reason for all this. It changed so often and then when I asked for what i'm doing wrong so i won't make the same mistake they ignored my email. They ignored it because they had no reasons and didn't want to implicate themselves by answering. everything was based on lies.

If they want to claim "delay of care" our entire dept would have been detailed. I was preventing delay of care and saving the dept by asking the CEO to get us overtime staff to help out. (see evidence of consults which show delay of care up to 300 days) (see evidence of me emailing CEO asking for dept assistance)

**(If in writing, please provide a copy)**

57. Are you aware of any individual, under the same supervision, and under similar circumstances treated better than you under similar circumstances? If yes, identify each individual by:

        i) Name: Adrianne harris and the entire dept
        ii) Title: RN
        iii) Supervisor: Donnabelle
        iv) Sex: Female
        v) Prior EEO activity? (Yes, no or unknown)" yes
        vi) Reason you believe they were treated better than you? she's a female and I'm a male that speaks up. Also why wasn't the rest of the dept detailed and suspended for delay of care if this is what their landing spot is now? (see evidence of delay of care)

58. Are you aware of any individual, under the same supervision, and under similar circumstances treated the same as you, under similar circumstances? If yes, identify each individual by:

No, I was the only one retaliated against this didn't happen to anyone else ever.

    i)  Name:
   ii)  Title:
  iii)  Supervisor:
   iv)  Sex (Yes, no or unknown):
    v)  Prior EEO activity? (Yes, no or unknown)"
   vi)  Reason you believe they were treated the same as you?

59. How were you harmed by the allegations in this claim?

emotional distress, punitive damages, slander throughout the hospital.

60. Why do you believe that your sex was a factor in these allegations?

Because when the females did the same things, Donnabelle is alleging I did (which i did not do) nothing happened to any of them.

61. Why do you believe your prior EEO activity was a factor in these allegations?

I'm not clear what this is in regard to?  I whistleblew to Donnabelle with regards to overtime stated above.  but i never filed an EEO before this one.

62. Why do you believe this action was taken to harass you?

For all the reasons I previously stated.  I stick up for the veterans when it comes to billing, I speak up that nurses should be following the guidebook and working at the top of their licenses.

63. At any time prior to the issuance of this action were you verbally or formally counseled, warned, or disciplined by your first-line supervisor regarding your performance or for misconduct? If so, when, on how many occasions, and how did you respond? Explain in detail.

Never.  This was the first time this has happened to me that's why it's so hurtful.  To defend yourself against a bunch of lies and no one is listening is a feeling of being violated.

**Incident 2:** **As of July 19, 2023, Complainant has not been issued his Proficiency Rating that was due in February 2023.**

64. Please confirm the management official(s) by **name** and **title** responsible for issuing your Proficiency Rating.

Donnabelle Lorenzo RN Manager

65. Did management give you any reason for delaying your Proficiency Rating?

No reason.  In fact she, Donnabelle who wrote it passed it on to the lower manager Christianah and had her give it to me. I likely would not have gotten my review had I not made it an issue in my initial EEO complaint.

    a.  If so, what reasons did management provide.

None.  Donnabelle never talked to me after she detailed me.

    b.  Do you disagree with the reason?  If so, please explain why.

I added a rebuttal with my disagreement to the review of satisfactory (see evidence) and gave it to Christianah.

66. What policies, procedures, contract provisions, etc. do you believe are relevant to this allegation?

not sure I would have to look at the SOP.

67. Are you aware of any individual, under the same supervision, and under similar circumstances treated better than you under similar circumstances?  If yes, identify each individual by:

      i)  Name: Wendy Superable, RN, Cynthia Reyula RN, Adriane Harris RN,
      ii)  Title: RN's
      iii)  Supervisor: Donnabelle
      iv)  Sex: all females
      v)  Prior EEO activity? (Yes, no or unknown)" unknown
      vi)  Reason you believe they were treated better than you? they are female, I'm a male, I spoke up and in doing so i was retaliated against.

68. Are you aware of any individual, under the same supervision, and under similar circumstances treated the same as you, under similar circumstances?  If yes, identify each individual by:

    No.
      i)  Name:
      ii)  Title:
      iii)  Supervisor:
      iv)  Sex (Yes, no or unknown):
      v)  Prior EEO activity? (Yes, no or unknown)"
      vi)  Reason you believe they were treated the same as you?

69. How were you harmed by the allegations in this claim?

Being rated as satisfactory when previously my direct manager rated me higher show regression which is not the case. I progressed not regressed. I was instrumental in making a lot of positive changes in the dept. I was harmed due to the fact that if I interview for other positions this looks like regression which puts me at a disadvantage.

70. Why do you believe that your sex was a factor in these allegations?

Why? because none of this with regards to the proficiency or detail happened to the females that had veteran's die. As explained previously Wendy's patient committed suicide, Adrienne's patient developed thoracic cancer. They got raises, I was detailed and suspended on false allegations.

71. Why do you believe your prior EEO activity was a factor in these allegations?

after I filed DEFINITLEY. Upper leadership was marbled mouthed as to why i was being detailed, they never gave me a direct answer when i asked numerous times and Dr Ravipati stated this would be a slap on the wrist to which I balked at because it shouldn't have even been that to when I filed the EEO they immediately retaliated with a 14 day suspension and brought me back to my dept after making me sit and wonder how long i would be detailed to bring this to an end when they knew all along they had the power to end it. The EEO filing made them end the detail but at the cost of a 14 day suspension. One would have to be from another galaxy not to see leaderships obvious actions of Reprisal due to me filing. It was disgusting and a very vindictive thing to do to me for filing an EEO that I had probable cause to file.

72. Why do you believe this action was taken to harass you?

Leadership didn't like that I took matters in my own hands and filed an EEO. I finally realized I was the only one in my corner. Me asking upper leadership to resolve this accomplished nothing no matter how much evidence and witnesses i had. It was handed down to me punitively to harass me. it was a way to silence me and not question leaderships decisions. It almost feels as it was a way to prevent me from being a veteran's advocate. I think a lot of times leadership forgets we work for the veterans and the tax payers. A lot of people claim they're for veterans but they're not, they're only in it for the paycheck. I could literally have hundreds of veterans testify on my behalf to the injustices done to them with regards to leaderships delay of care and leadership not paying veteran's bills when none of the bills vets are getting are their fault.


**Harassment Allegation**

73. Did you or anyone acting on your behalf tell the alleged harasser or person that created the hostile work environment that you found his/her behavior unacceptable, unwelcome and/or offensive? If so, provide the following:

a) **Who did you tell? Please list by name and position title.** I told Donnabelle on several occasions that she's harassing me. I told her the day she brought me in the office to detail me this was retaliation and harassment for speaking up.

May 8, 2023, the day I was detailed. I also told Donnabelle several times in phone conversations months prior that I know she is going to retaliate against me for speaking up. I believe I even mentioned this in the Weingarten meeting I had with Donnabelle and a Union Representative Cecilia Sherod. Cecelia told me after the Weingarten meeting that Donnabelle is being punitive.

I also mentioned to Ken Dizon RN that I think Donnabelle is trying or will retaliate against me for speaking up on behalf of the veterans and staff. To which Ken told me he use to be a manager with Donnabelle in a past department and if you get on her bad side she tries to fire people and harass them.

b) **When did you tell them?** Sporadically over the course of a year prior to being detailed on May 8, 2023

c) **What did you tell them?** I told Donnabelle this is harassment and retaliation. to which I made my point when I filed the EEO and they went nuclear on me with the 14 day and brought me back to work.

d) **What was their response?** (If in writing, please provide a copy) Apparently I heard from someone I don't want to mention that Dr Ravipati felt real bad (this was after i filed the EEO) when I claimed retaliation. Apparently, this person told me Dr Ravipati would go to her office and cry and claim her hair is falling out because she felt real bad. If she felt bad that may be true may not be true but she initially told me this was a slap on the wrist then went nuclear and asked for a 14 day suspension. I will not disclose this person's name that told me this i want to keep her out of this. I was also told by Monica Coleman RN in our dept that Dr Ravipati told her she didn't know why Cindy Reyula wasn't detailed for not following up on the consult in question. My anser to that is Dr Ravipati was higher than Donnabelle in the chain of command she could have taken action and detailed Cindy but none of leadership did.they left me hanging until i filed. had i not filed i could have still been detailed today.

e) **What action do you believe management should have taken?**

They should have done a full and fair investigation. Mngt should have presented the Teams recording. They should have told the truth and looked at all the evidence but choose not to. Dr Ravipati and Donnabelle could have detailed Kelly Heckel and Cindy Reyula but they didn't even though they knew they were culpable. They could have questioned the veteran's doctor for not following up on his patient. There was a lot of things they could have done but did not.

74. Did you or did anyone else acting on your behalf bring your concerns regarding the alleged harassment/hostile work environment to the attention of other management officials?  If so, provide the following:

   a) Who did you tell?  Please list by name and position title.
   b) Monica Coleman, RN and Cecilia Sherod RN both Union reps as well as Randa Runge district union leader
   c) When did you tell them?  When I got detailed
   d) What did you tell them?  everything I stated in this affidavit.
   e) What was their response?  (If in writing, please provide a copy) they fought for me said i have a really strong case.  Monica and Randa spoke on my behalf when fighting the 14 day suspension.  Monica has the notations or writings I would imagine.
   f) What action do you believe management should have taken? Please explain.

They should have apologized to me in front of the department in a huddle way in the beginning of this and brought me back to work immediately.

If they indeed wanted to seek the truth they should have done a full and fair investigation of my charts, not tamper with evidence and keep me detailed as punishment when HR had this thing wrapped up in less than a month in addition they could have detailed Kelly and Cindy, the former for delay of care and the latter for failure to follow policy.  but in not doing so shows this was done to me as retaliation for speaking up as a male nurse.

75. Did you ask for the alleged behavior to stop?

During my detail i kept in constant contact with HR and Dr Ravipati to end this.  HR, Alex Morse said this is up to my manager, and Dr Ravipati was new so I don't think she knew what to do.  However, Donnabelle has been a manager for quite some time in several departments. She knows the rules and she knew it was up to her to bring me back but didn't out of spite.  And this is why I believe Dr Ravipati issued a 14 day after my filing to cover for Donnabelle when it was really Donnabelle's decision to bring me back.

The process is the punishment, and Donnabelle knew that and that's why she pushed my detail as far as she could until I filed the EEO after talking with Melvin Tolber EEO counselor at the Hospital.

76. If you did not report the incidents of harassment, why not?

n/a I reported it to Donnabelle herself many times.

77. Was an internal investigation/inquiry conducted into your allegations of harassment/hostile work environment?  If so, who conducted the investigation and when was it conducted?

   No.

78. If an investigation/inquiry was conducted, were you advised of the outcome? If so, when, by whom and what was the outcome? (If in writing, please provide a copy.)

There was a Peer Review Investigation, and I was supposed to get the outcome of that which to today I did not get. I don't think this applies to this question being asked.

79. What, if any, effect did the harassment/hostile work environment have on your physical or emotional well-being?

As stated, I went to the doctor two times and told him about this, he asked me if I wanted to talk to someone about it and I said no I have the union assisting me. I asked him to up my medication zoloft from 50mg to 100mg and get me on clonazepam prn until i get through this which he did. Thankfully, because it helped alleviate a lot of my stress, anxiety and anger with regards to this situation.

80. What, if any, effect did the alleged harassment/hostile work environment have on your work performance?

put me on pins and needles. I wasn't sure what they would accuse me of next. That's why I sent the command suite an email with several people listed on it to tell me specifically what I did wrong so I don't make the same mistake. I didn't want to be set up because Donnabelle could have accused me of something and the punishment could be a lot worse. but when none of the leaders could answer that question i asked to be transferred. Now transfers don't happen that fast, they made an exception for me obviously to appease me and sweep this all under the rug.

81. Have you received training in harassment and/or a hostile work environment, and if so, when and what training did you receive?

Yes, I believe it's done annually through TMS our computer learning center.

82. Are you familiar with the VA's policy on anti-harassment/hostile work environment? Is the policy displayed for employees to view in your work area? If so, where is the policy displayed?

I believe it is posted in all the break rooms and around the facility.

83. Can you provide any witnesses to the events of the accepted claims, who can provide relevant information? If so, please identify by name, title, telephone number and e-mail address. Please state the nature of the information to be provided by each witness.

Yes, the entire department. (see witness list I will provide) although some witnesses will be worried about retaliation.

84. Is there anything you would like to add relevant to the accepted claims which have not been addressed?

I have mountains of evidence via emails and Teams recordings and staff witnesses and can provide any of that upon request.

85. **What remedy do you request to resolve this complaint?**

I'm not sure?

How do you get back the time with family that I was ignoring and edgy with due to the circumstances.

How do you account for pain and suffering I had to endure and continue to as I'm fighting for the truth? All I wanted was the truth nothing more and an apology.

How does one rebuild his reputation at a small facility now that everyone knows I was detailed as if i'm a criminal.  My name and reputation have been slandered.

There's a lot of stages of emotions that you go through when you know you've done nothing wrong.

Now I worry if I'm going to be able to wean off the meds when it's over, particularly the benzodiazepines.

The PTSD this has caused.


This statement is made under penalty of perjury on this _18___day of ___November_____, 2023.

Azis Kochiu
_____
**Azis Kochiu**

[External] - Re: Supplemental Response Required [Due Jan 31, 2024]

Little Elvis Is Combat Ready <kochiu106@gmail.com>

Mon 1/29/2024 10:10 PM

To:Lisa Wabinga <Lisa.Wabinga@ceseeo.com>

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

Please note that when you respond to this email that you are still under oath. Please provide your response below.

**b. in 2022, he was rated Satisfactory in his Proficiency Report.**
**d. on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022.**

For issues b and d you indicated race was a factor. This was not an accepted basis; did you intend to add race?

Yes.

Donnabelle is a female, Filipino of Asian race.

At least half the department is Filipino/Asain race. Every one of the Filipinos that I talked with had gotten higher reviews than I did which means they all got bonuses, and a higher performance review looks better when you interview for jobs within the VA as they at times ask for performance reviews. They do not do any more work than I do, in fact, I was more instrumental than anyone in the department when it comes to troubleshooting department problems. But as the Chinese Proverbial idiom goes, the nail that sticks up the farthest gets hit with the hammer. However, had I been of Asian descent I wouldn't have gotten hammered.

That's why Cindy Reyula RN, female, Filipino, Asian race was never under investigation or detailed when she was issued the same consult I initially worked on, by Donnabelle in which it was Cindy's duty to follow up. Cindy was assigned this consult by Donnabelle three times, and Cindy did not follow through according to the guidebook and Donnabelle's directive and nothing happened to her. Everyone in medicine knows that was Cindy's responsibility. That would be the equivalent of a nurse having a patient one day and then two weeks later another nurse is assigned to the same patient and while the second nurse made a mistake however the first nurse gets blamed. The American Nurses Association, Nurses Practice Act under state/federal laws indicates the nurse at the time cannot pass the buck. Passing the buck means to blame someone else for your own mistake. Now i am not saying Cindy blamed me, but Donnabelle did blame me and no one else. That question of passing the buck is on Nursing Boards, everyone in medicine understands that elementary concept. I got blamed for Cindy female Asian not following through and Kelly Heckel Female not following through per the guidebook and Donnabelle's directive. Nothing happened to either other of them and Cindy got a higher performance review than I did.

Wendy Superable, RN Female, Filipino, Asain race, was issued a JPRS for the death of a patient which would be an automatic detail pending investigation had nothing happen to her. This is one of the most egregious mistakes I have seen happen yet nothing happened to Wendy. And for leadership/Ravipati to play semantics and blame it on HR for not recommending any punishment is the most unbelievable, unconvincing arguments for a leader to make. However, in the same breath, Ravipati states in her affidavit, I'm summarizing, that he is the RN and I should know or have more responsibility or something to that effect. When one is a leader in Medicine you don't blame HR. Discipline is up to clinicians, not HR, when someone in medicine makes a mistake. That's why hospitals have root cause analysis and such. Everyone in health care is aware of this. Leadership willfully failed to take responsibility for a 35 year old female veteran that was asking for inpatient psych for her suicide ideation who shortly thereafter I believe a week or so later hung herself.

Wendy is Filipino of Asian race so she got to skate. No detail, no loss of wage, no suspension, no peer review to my knowledge, and a higher performance review than me.

Look at the workload distributed that was distributed at the time I was in that department. All the Filipinos of Asian race were on fully staffed teams, but I was not which made me have more work by virtue of having less staff for the same amount of work distributed by Donnabelle who is Asian.

I can give example upon example if I wanted to.

I believe with 100% certainty that had I been Filipino of Asian race, not a single thing would have happened to me and I would still be in that department working on a full team.

> If so, please identify your race?
>
> A: My race is white, I am a white male.
>
> When and how did management became aware of your race?
>
> A: Donnabelle and all leadership knew/know I am a white male this has been known by them when I first showed up to work under Donnabelle around February 2019. Dr Ravipati I met sometime after my start date probably within the first six months of my start date she also knows me as a white male non-Asain.
>
> Everything I have stated throughout this entire process whether, in emails, phone calls, briefs, affidavits, rebuttals, in-person communications with my EEO department, all my leaders, and so on has been the truth, nothing but the truth flat cold.
>
> Azis Kochiu  dated 1/29/2024 at 2157

On Mon, Jan 29, 2024 at 8:42 PM Lisa Wabinga <Lisa.Wabinga@ceseeo.com> wrote:
Please note that when you respond to this email that you are still under oath. Please provide your response below.

**b. in 2022, he was rated Satisfactory in his Proficiency Report.**
**d. on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022.**

For issues b and d you indicated race was a factor. This was not an accepted basis; did you intend to add race?

>If so, please identify your race?
>A:

>When and how did management became aware of your race?
>A:

Best,

Lisa Wabinga
Contract EEO Investigator
Computer Evidence Specialists, LLC (CES,LLC)
253.355.0337
lisa.wabinga@ceseeo.com

The information contained in this e-mail and any attachments from Computer Evidence Specialists, LLC may contain confidential and/or proprietary information, and is intended only for the named recipient to whom it was originally addressed. If you are not the intended recipient, any disclosure, distribution, or copying of this e-mail or its attachments is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by return e-mail and permanently delete the e-mail and any attachments.

**[External] - Affidavit Template - Azis Kochiu 11-18-23**

Little Elvis Is Combat… (via Google Docs) <kochiu106@gmail.com>

Sat 11/18/2023 7:59 PM

To:Lisa Wabinga <Lisa.Wabinga@ceseeo.com>

📎 1 attachments (239 KB)

Affidavit Template - Azis Kochiu 11-18-23.pdf;

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

# Little Elvis Is Combat Ready attached a document

Little Elvis Is Combat Ready (kochiu106@gmail.com) has attached the following document:

☐ Affidavit Template - Azis Kochiu 11-18-23

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because kochiu106@gmail.com shared a document with you from Google Docs.

Google



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Testimony of Adriene Harris
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | |
|---|---|
| Azis Kochiu | ) |
| Complainant | ) |
| | ) |
| v. | ) Case No. 200J-556A-2023-152770 |
| | ) |
| Secretary | ) |
| Department of Veterans Affairs | ) |
| 810 Vermont Avenue, NW | ) |
| Washington, DC 20420 | ) |
| _____ | ) |

I, Adriene Harris**,** solemnly swear/affirm that the responses and documents I provided in response to the following questions are true and complete to the best of my knowledge and belief.

***Whether the complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal when:***

**Item a: on June 15, 2023, Donnabelle L. Lorenzo-Villarino gave deceptive information to a Peer Review Committee.**

1. What is your full name? Adriene Harris

2. What is your present position title and series? Registered Nurse BSN-MSN, Community Care Coordinator (Bachelor Science Nursing) (Masters Science Nursing)

3. Please state your grade level. Grade 3 level 12

4. In what (Organization) unit/division do you currently work for? Office of Community Care

5. How long have you worked for this organization? 4years and 10months

6. Please identify your first and second-line supervisors by name and title. Christianah Arowora MSN. MHA. BSN. BS. RN. CCRN-K. CCM. Nurse Manager RN/Registered Nurse

AH          12/27/2023

Are they the same first and second level supervisors you had during the date(s) of the alleged discrimination? If not, please state the changes from then until now. No, **Donnabelle L. Lorenzo-Villarino RN Managed Care Department Head** RN/Registered Nurse **ACME-Ambulatory Care/CME Directorate** is transferring to another position currently.

7. How many years have you worked for the VA Medical Center? 4yrs and 10 months

8. How long have you been in your current position? 4 yrs and 10 months

9. What is your organizational relationship to the Complainant? Co worker

10. Please identify your sex. Female

11. What do you believe Complainant's sex to be? Male

**Item a: on June 15, 2023, Donnabelle L. Lorenzo-Villarino gave deceptive information to a Peer Review Committee.**

12. The Complainant alleges Donnabelle L. Lorenzo-Villarino told you to state that a consult regarding a deceased patient was classified as an "Expedite" to the Peer Review Committee, which he alleges is deceptive. Did this happen as the Complainant described? Were you instructed to give this information? Please explain. (Do not disclose confidential information regarding patient information)

A: Donnabelle L. Lorenzo-Villarino RN Managed Care Department Head RN/Registered Nurse ACME-Ambulatory Care/CME Directorate did not instruct me to say a consult was an expedite to the peer review. I did not get any feedback or direction on what to say. I do not recall stating this consult was an Expedite.

1. In my peer review the question #1 under Issues identified: **Timeliness of initiating treatment in period of deterioration:**

   I stated "Consult not requested as an expedite "(Consult entered by Resident KROLIKOWSKI,PIOTR P an FHCC provider) .

   This was not alerted as an expedite. This statement is stating it was not initiated as an expedite by the provider who entered the consult, which in my opinion could cause a delay in scheduling. That was my intent.

13. Did this action comply with applicable policies and regulations? If so, please identify these policies and regulations?

   A: The action that is implied did not happen

14. Do you have any reason to believe that Complainant's sex and/or prior EEO activity was a factor in management's actions? Explain.

    A: No

15. Do you have anything else to add?

    A: No

This statement is made under penalty of perjury on this __27__ day of

__December__ ____, 2023. (year).

Adriene Harris
Signature

000167



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Testimony of Christianah Arowora
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | | |
|---|---|---|
| Azis Kochiu | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | Case No. 200J-556A-2023-152770 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC  20420 | ) | |
| _____ | ) | |

I, Christianah Arowora**,** solemnly swear/affirm that the responses and documents I provided in response to the following questions are true and complete to the best of my knowledge and belief.

***Whether the complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal when:***

**Whether complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal by Donnabelle Lorenzo-Villarino, since 2021 to include:**

**a.  in 2022, he was rated Satisfactory in his Proficiency Report.**

**1.  As of July 19, 2023, he has not been issued his Proficiency Rating that was due in February 2023.**

1.  What is your full name? –
    **ANSWER:** CHRISTIANAH AROWORA

2.  What is your present position title, pay plan, job series, and pay grade?
    **ANSWER:** NURSE MANAGER/DIVISION OFFICER--- VN 03-11

3.  During the period between January 2021 and June 19, 2023, what was your position title, pay plan, job series, and pay grade?
    **ANSWER:** January 2021---- NURSE MANAGER/DIVISION OFFICER--- VN 02-13; JUNE 2021------ NURSE MANAGER/DIVISION OFFICER--- VN 03-10; JUNE

2023------ NURSE MANAGER/DIVISION OFFICER--- VN 03-11;

4. From approximately what date did you hold that position?
   **ANSWER:** JUNE 2017

5. In what (Organization) unit/division do you currently work?

   **ANSWER:** Captain James A. Lovell FHCC, North Chicago

6. Who is your first-level supervisor (Provide their name, position title, unit, and division)?

**ANSWER:** FORMERLLY (till 12/18/23) --- Ms. Donnabelle Lorenzo-Villarino; Managed Care Department Head/ Pad/ Resources
CURRENTLY---Dr. Mamata Ravipati-- Assistant Chief Medical Executive Ambulatory Care

7. Who is your second-level supervisor (Provide their name, position title, unit, and division)?
**ANSWER:** FORMERLY: Todd Adkins--- Deputy, Patient Administration Department (PAD)—TIL 12/25/22; Steve Kaufman--Head, Patient Administration Department—TILL JANUARY 2023
CURRENTLY---Dr. Mamata Ravipati--- Assistant Chief Medical Executive Ambulatory Care

8. Are they the same first and second level supervisors you had during the date(s) of the alleged discrimination? If not, please state the changes from then until now.
**ANSWER:** No-- FORMERLY: Todd Adkins--- Deputy, Patient Administration Department (PAD)—TIL 12/25/22; Steve Kaufman--Head, Patient Administration Department—TILL JANUARY 2023; CURRENTLY---Dr. Mamata Ravipati--- Assistant Chief Medical Executive Ambulatory Care

9. How long have you worked for this organization? How long have you been in your current position?
   **ANSWER**: I joined VA June 2006—I have been in my current position since June 2017

10. Between the period of January 2021 and June 19, 2023, how many employees did you supervise (directly and indirectly)?
    **ANSWER: Directly--- 23**

11. What is your organizational relationship to the Complainant?
    **ANSWER:** I was his Nurse Manager direct supervisor.

12. How often did you interact with Complainant?

**ANSWER:** I interacted with complaint daily. I did not interact with the complaint from 12/1/2021 to 3/2022 during my detailed assignment to VISN 12 Office. Also did not supervise him from 11/2022 till 6/2023 when I was on medical leave.

13. Please identify your sex.
    **ANSWER:** Female

14. What do you believe Complainant's sex to be?
    **ANSWER:** Male

15. How and when (approximately date) did you become aware of Complainant's sex?
    **ANSWER:** The day interviewed him over the Phone and confirmed when he reported for his tour of duty 2/19/2019

## REPRISAL

16. Were you aware of the Complainant being involved in EEO activity prior to this complaint?  If so, when did you become aware of the Complainant's prior EEO activity?
    **ANSWER**: I got to know about the EEO complaint when I got back from my medical leave June 2023

17. If you were aware of the Complainant's prior EEO activity, how did you become aware?
    **ANSWER:** I was not privy to any EEO complaint before this.  The complainant called me over the phone informed me that he has filed EEO against my direct supervisor Ms. Donnabelle Lorenzo-Villarino.

18. Have you been named by the Complainant as a Responsible Management Official or witness, in a prior EEO Complaint that he filed?  If so, please identify the case number(s) and identify the issue(s) involved in the complaint?
    **ANSWER:**   No, I have never been named as a witness in any prior EEO complaint by the complainant.

19. What was your personal involvement in the prior EEO case(s) filed by the Complainant?
    **ANSWER:** I was not involved with any EEO with the complaint.


***The Complainant alleges that based on sex and reprisal he was subjected to a series of incidents that he believes constitutes a hostile work environment following is a series of questions about each of the incidents raised in the claim.***

**Incident a:** On unspecified dates in 2022, Complainant was rated Satisfactory on his Proficiency Report.

20. Were you responsible for rating the Complainant "Satisfactory" on his Proficiency Report?

    a. If you were not responsible, then please identify the name and title of who was responsible. **ANSWER:** Ms. Donnabelle Lorenzo-Villarino; Managed Care Department Head/ Pad/ Resources

    b. If you were not responsible, did you have a role in this matter? If so, please explain it.
ANSWER: I had rated the proficiency and sent it to my immediate supervisor for signature during warm hand off leaving for VISN 12 detail.

21. What time period did the Proficiency Report cover?
**ANSWER: 2/19/2021—2/19/2022**

22. Did the Complainant submit a self-assessment? If so, did you consider it?
**ANSWER:** The complaint did not submit a self-assessment per attached email evidence.

23. Please explain, in detail, the reason you issued the Complainant a "Satisfactory" Proficiency report.

    **a.** Did you explain this reason to the Complainant?
**ANSWER:** I was charged by my immediate supervisor to give the proficiency to all staff ( 3 of them) when I can back from my detail through an email which is attached. She had reviewed and signed all the proficiency; I just handed it to staff as instructed.

    b. What was the Complainant's response?

**ANSWER:**

24. Did the Complainant advise you that he believed his performance appraisal rating was lower than he deserved? ***If in writing, please provide a copy.***
**ANSWER:**

25. What was your response to the Complainant when he advised you that he believed is rating was lower than he deserved? ***If in writing, please provide a copy.***

**ANSWER:** The proficiency was email to the complaint on 2/15/2022. The complaint reply that he was no going to sign due to a low rating. He has the right to refuse the signing which he did. There was nothing I could do as HR stated I should just write refused to sign and send to HR. which was done. The complaint did not follow-up on this till now.

26. The Complainant alleges he was assigned more work than his coworkers, was this reflected in his proficiency report? If not, please explain why.

**ANSWER:** All RN clinical staff were assigned the same level of work when I was on station. The Program analyst uses the algorithm method to put the benchmark number s of consults together for distribution to all staff.

27. Did you share feedback with the Complainant during the year in the areas you believed needed improvement?

    a. If so, please describe the feedback you provided to the Complainant.
    **ANSWER:** I have always communicated with complaint on how his performance monthly that was why I rated him high Satisfactory, and it was lowered by my immediate supervisor because I was not on station, I was on detail).

28. Was there a reviewing official for the Complainant's performance Proficiency Report? If so, provide the name, title, and email address of the reviewing official.
**ANSWER:** There was none as the complaint did not follow up and the union on the email did not follow-up**.**

29. If there was a reviewing official for the Complainant's Proficiency Rating, did you discuss the Complainant's performance and the rating you believed the Complainant should receive with the reviewing official, before rating the Complainant? If so,

    a. Did the reviewing official agree with the rating you believed the Complainant should receive? Explain the content of your discussion(s) with the reviewing official and provide supporting documentation (notes, etc.) if applicable.
    **ANSWER:** The explanation of the review and communication on this proficiency with my immediate supervisor is attached. The reviewing official is the one who rated the complaint lower.

30. Did the Complainant appeal his Proficiency Rating? If so, He did not.

    a. Provide the specific date he appealed the rating. N/A
    b. Name the Management Official he appealed the rating to. N/A
    c. Did he appeal the appraisal in writing? Please provide supporting documentation. N/A.

31. Did the Proficiency Report rating change after it was appealed? If so,
    a. What did the rating change to?
    b. Please provide the date the rating was changed. ***If in writing, please provide a copy.***

32. Were there any other employees, under your supervision and in the same position and grade as the Complainant, with performance similar to the Complainant's who received a higher rating on his/her Proficiency Report?

    a. Identify each person by name and position title.

**ANSWER:** ███ ████ ████ I do have other RN staff, actually on the same team that was given high Satisfactory by My immediate supervisor during the same period I was out. Staff proficiency attached.

      b. Identify each person's sex.—

**ANSWER:** Female

      c. Why was each person not treated similarly to the Complainant with respect to this matter?

**ANSWER:** I cannot speak to this. I was not the person who rated the complainant and other staff indicated above.

      d. Please explain why each individual was given a higher rating with similar performance.

**ANSWER: N/A**

33. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant with regard to issuing "Satisfactory" Proficiency Report ratings in the past year? If so,

**ANSWER:** Not to my Knowledge.

      a. Identify each person by name and position title.
      b. Identify the sex of each person.


34. What policies are relevant to this matter?

**ANSWER: Title 38—Proficiency Rating**

**Incident 2:** As of July 19, 2023, Complainant has not been issued his Proficiency Rating that was due in February 2023.

35. Were you responsible for issuing the Complainant's proficiency rating?

      a. If you were not responsible, then please identify the name and title of who was responsible.

**ANSWER: I was on medical from November 2022 till June 2023**

      b. If you were not responsible, did you have a role in this matter? If so, please explain it.

**ANSWER:** I did not have a role in the matter. When I came back from medical leave the complaint was already reassigned to another unit pending investigation.

36. Please explain in detail why the Complainant was not issued a Proficiency Rating in February 2023.

**ANSWER:** I was not responsible for proficiency when on leave for 8 months. Ms. Donnabelle Lorenzo-Villarino was responsible to issue the proficiency as she was covering the unit in my absence.

37. Did you explain this reason to the Complainant?

**ANSWER:** The complaint was aware of my absence from work on medical leave.

38. What was the Complainant's response?

**ANSWER:** I do not know.

39. What policies are relevant to this matter?
**ANSWER:** RN Title 38 Proficiency rating

40. Did other employees not receive their Proficiency Rating, in the same position/grade as the Complainant, during the past year, under similar circumstances?
**ANSWER:** If so, -- no because – I was told after a month of coming back from medical leave to sign and give proficiency to staff. The proficiencies were already rated but not signed.

1. ███████ █████ Female—RN care coordinator
2. ███████ █████ Female—RN care coordinator
3. █ ███ █████ Female—RN care coordinator
4. █████████ Female—RN care coordinator
   a. Identify each person by name and position title.
   b. Identify each person's sex.
   c. Why was each person not treated similarly to the Complainant with respect to this matter? I do not know

41. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant who did not receive a Proficiency Rating in the past year?  If so, I do not know

   a. Identify each person by name and position title.
   b. Identify the sex of each person.

42. Was the Complainant's sex a factor in any of the decisions or actions you took?
**ANSWER**: I was not the person involved in this rating or any rating indicated on the complaint.

43. Was the Complainant's EEO activity a factor in any of the decisions or actions you took?
**ANSWER:**  I was not the person involved in this rating or any rating indicated on the complaint.

44. Was this action taken to harass the Complainant?
 **ANSWER:** : I was not the person involved in this rating or any rating indicated on the complaint.

45. What policies are relevant to this matter?
   **ANSWER:** I do not know as I was not involved in the rating , just following orders.

46. Do you have anything else to add?
**ANSWER: Nothing**

**HARASSMENT ALLEGATION**

47. Other than what you may have discussed above, did Complainant (or anyone acting on behalf of Complainant) tell you that your or anyone else's actions constituted harassment and/or a hostile work environment for him? If so, provide the following:

48. **ANSWER:** I was not the person involved in this rating or any rating indicated on the complaint.

    a. When were you told?
    b. Who told you?
    c. What specifically were you told?
    d. What was your response/action? (If in writing, please provide a copy.)

49. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about harassment/hostile work environment? If so, provide the following:

    a. When were you told?
    b. Who told you?
    c. What specifically were you told?
    d. What was your response/action? (If in writing, please provide a copy.)
    **ANSWER: Not to my knowledge**

50. Was an investigation/inquiry conducted into Complainant's allegations of harassment/hostile work environment? If so, by whom and when?
**ANSWER: I do not know**

51. To your knowledge, what was the outcome of the investigation? Please provide a copy of the report.
**ANSWER: I do not know.**

52. Was Complainant informed of the outcome? If yes, how?
**ANSWER:** I was not privy to any of this information.

53. Was any corrective or preventative action necessary? If so, what action was taken?
**ANSWER: I do not know.**

54. If no investigation was conducted, please explain why.
**ANSWER: I do not know.**

55. Have you received training on anti-harassment/hostile work environment while employed by the VA? If so, when?

56. **ANSWER: have received training, however,** I was not the person involved in this rating or any rating indicated on the complaint.

57. Is the agency anti-harassment/hostile work environment policy posted in your facility?
**ANSWER: Yes**

This statement is made under penalty of perjury on this January day of 08, 2024 .

Christianah arowora RN. BSN. MSN. MHA
Christianah Arowora
Signature

[External] - RE: Supplemental Affidavit [Response Required by January 31, 2023]

Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>

Sat 2/3/2024 1:53 PM

To:Lisa Wabinga <Lisa.Wabinga@ceseeo.com>

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

Please note that when you respond to this email that you are still under oath. Please provide your response below.

**b. in 2022, he was rated Satisfactory in his Proficiency Report.**
**d. on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022.**

1. What is your race? Black

2. What do you perceive as Complainant's race? When and how did you become aware? White . I became aware when he was interviewed by me.

As it pertains to **Issue b:** On unspecified in 2022, he was rated Satisfactory in bis Proficiency Report.

1. Do you have any reason to believe that Complainant's sex, prior EEO activity, or race was a factor in how **RMO Lorenzo-Villarino** modified Complainant's rating of high successful to Satisfactory? Explain. I was not on station that time, communicated only by email. However, from my experience with **RMO Lorenzo-Villarino**, I had filed an EEO and another one pending against her for the same reason you are asking me to justify.

V/r

Christianah Arowora MSN. MHA. BSN. BS. RN. CCRN-K. CCM.
Nurse Manager/Division Officer Office of Community Care (OCC)
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Direct: (224) 610-8639 or 68639
Cell phone: 847-456-5050
Email: Christianah.Arowora@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Monday, January 29, 2024 8:47 PM
**To:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Subject:** [EXTERNAL] Supplemental Affidavit [Response Required by January 31, 2023]
**Importance:** High

Please note that when you respond to this email that you are still under oath. Please provide your response below.

**b. in 2022, he was rated Satisfactory in his Proficiency Report.**
**d. on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022.**

1. What is your race?

2. What do you perceive as Complainant's race? When and how did you become aware?

As it pertains to **Issue b:** **On unspecified in 2022, he was rated Satisfactory in his Proficiency Report.**

1. Do you have any reason to believe that Complainant's sex, prior EEO activity, or race was a factor in how **RMO Lorenzo-Villarino** modified Complainant's rating of high successful to Satisfactory? Explain.

Best,

Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

---

The information contained in this e-mail and any attachments from Computer Evidence Specialists, LLC may contain confidential and/or proprietary information, and is intended only for the named recipient to whom it was originally addressed. If you are not the intended recipient, any disclosure, distribution, or copying of this e-mail or its attachments is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by return e-mail and permanently delete the e-mail and any attachments.

## FW: [External] - RE: EEO Affidavit - Response Required

**Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>**

Tue 1/9/2024 9:14 AM

To:Lisa Wabinga <Lisa.Wabinga@ceseeo.com>

📎 6 attachments

VA Form 10-2623 with Dimensions Guide A Kochiu 2022.pdf; VA Form 10-2623 with Dimensions Guide A Kochiu 2022 AZIS KOCHIU 2022 PROFICIENCY.pdf; AZIS KOCHIU PROFICIENCY 2021.pdf; RE RN PROFICIENCY INPUT; VA Form 10-2623 _▮▮▮_ 2022 revised.pdf; Affidavit - RMO Christianah Arowora EEO 1.5.24.pdf;

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

---

Again

V/r

Christianah Arowora MSN. MHA. BSN. BS. RN. CCRN-K. CCM.
Nurse Manager/Division Officer Office of Community Care (OCC)
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Direct: (224) 610-8639 or 68639
Cell phone: 847-456-5050
Email: Christianah.Arowora@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Arowora, Christianah T. FHCC Lovell
**Sent:** Monday, January 8, 2024 9:00 PM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT

Testimony of Donnabelle L. Lorenzo-Villarino
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | | |
|---|---|---|
| Azis Kochiu | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | Case No. 200J-556A-2023-152770 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC 20420 | ) | |
| ———————————————— | ) | |

I, Donnabelle L. Lorenzo-Villarino, solemnly swear/affirm that the responses and documents I provided in response to the following questions are true and complete to the best of my knowledge and belief.

***Whether the complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal when:***

**Whether complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal by Donnabelle Lorenzo-Villarino, since 2021 to include:**

a. **since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed him and management has done nothing to stop it;**
b. **in 2022, he was rated Satisfactory in his Proficiency Report;**
c. **from November 8, 2022, to May 3, 2023, his was assigned a bigger workload than his co-workers;**
d. **on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022;**
e. **on June 15, 2023, DLV gave deceptive information to a Peer Review Committee;**
f. **on June 19, 2023, he became aware DLV was asking co-workers to submit negative reports of contacts regarding him; and includes the following timely raised independently actionable claims:**

---

Affiant's Initials: _____     Date:_____                                    Page 1

1. **On May 8, 2023, he was removed from patient care.**
2. **As of July 19, 2023, he has not been issued his Proficiency Rating that was due in February 2023.**

1. What is your full name?
   a. Donnabelle Lorenzo-Villarino,

2. What is your present position title, pay plan, job series, and pay grade?
   a. Managed Care Clinical Coordinator/Department Head VN-0610-3-4.

3. During the period between January 2021 and June 19, 2023, what was your position title, pay plan, job series, and pay grade?
   a. Managed Care Clinical Coordinator/Department Head VN-0610-3-4.

4. From approximately what date did you hold that position?
   a. Since December 2018 until present.

5. In what (Organization) unit/division do you currently work?
   a. Managed Care Department/Assistant Chief Medical Executive Ambulatory Care at Captain James Lovell Federal Health Care Center (FHCC).

6. Who is your first-level supervisor (Provide their name, position title, unit, and division)?
   a. Dr. Mamata Ravipati, Assistant Chief Medical Executive Ambulatory Care.

7. Who is your second-level supervisor (Provide their name, position title, unit, and division)?
   a. Dr. Jeffrey Oken, Chief Medical Executive.

8. Are they the same first and second level supervisors you had during the date(s) of the alleged discrimination? If not, please state the changes from then until now.
   a. No. Previous first level supervisor was Mr. Steven Kaufman, Patient Administration Department Head. Previous second level supervisor was Ms. Yolanda Martinez Assistant Director for Resources/Chief Financial Manager.

9. How long have you worked for this organization? How long have you been in your current position?
   a. I have worked for Captain James Lovell Federal Health Care Center since August 2016. I have been in my current position since December 2018.

10. Between the period of January 2021 and June 19, 2023, how many employees did you supervise (directly and indirectly)?
    a. I supervise approximately 39 full time employees (FTE).

11. What is your organizational relationship to the Complainant?

a. I was his indirect second level supervisor.

12. How often did you interact with Complainant?
   a. During the alleged period, my interaction with the complainant varies from daily to once a week.

13. Please identify your sex.
   a. Female.

14. What do you believe Complainant's sex to be?
   a. Male.

15. How and when (approximately date) did you become aware of Complainant's sex?
   a. Approximately on February 2019 when the Complainant began his tenure as a full time employee in Managed Care.

**REPRISAL**

16. Were you aware of the Complainant being involved in EEO activity prior to this complaint? If so, when did you become aware of the Complainant's prior EEO activity?
   a. Yes, I was aware. I became aware in July 2023.

17. If you were aware of the Complainant's prior EEO activity, how did you become aware?
   a. On July 13, 2023, an EEO counselor from Office of Resolution Management, Diversity and Inclusion contacted me regarding a required written response to the complainant as the aggrieved party.

18. Have you been named by the Complainant as a Responsible Management Official or witness, in a prior EEO Complaint that he filed? If so, please identify the case number(s) and identify the issue(s) involved in the complaint?
   a. Yes, I was identified as a Responsible Management Official. However, the correspondence from the EEO Counselor did not include a case number. The identified issue in the July 13, 2023, claim was Harassment (Non-Sexual)/Hostile Work Environment, Reassignment – Directed, Assignment of Duties and Evaluation/Performance Appraisal/Proficiency.

19. What was your personal involvement in the prior EEO case(s) filed by the Complainant?
   a. I provided a written response to the questionnaire forwarded to me by the EEO Counselor.

*The Complainant alleges that based on sex and reprisal he was subjected to a series of incidents that he believes constitutes a hostile work environment following is a series of questions about each of the incidents raised in the claim.*

**Incident a: On unspecified dates since January 2021, you harassed the Complainant and management did nothing to stop it.**

20. The Complainant testified he was harassed when he requested help from Management when the department was short staffed. Did this happen as the Complainant described? If so, please explain.
    a. No. When the program experiences turnover and/or staff shortages due to leave usage, all staff members are expected to provide coverage for their absentee member.

21. What action did you take?
    a. Management continued to provide daily coverage strategy for any staff member who was absent. Management has continued to work on backfilling vacant positions and these processes were communicated to the team.

22. If no action was taken, please explain why.
    a. N/A

23. The Complainant testified that he was harassed when he reported staff were working overtime without compensation. Did this happen as the Complainant described? If so, please explain.
    a. No.

24. What action did you take?
    a. When the complainant reported this alleged action, a review of hours worked was performed within the timekeeping system and during one of the huddles, management reminded staff not to work outside their tour of duty or approved overtime hours.

25. If no action was taken, please explain why.
    a. N/A

26. The Complainant testified that you directed other staff to make negative statements against him. Did this happen as the Complainant described? If so, please explain.
    a. No.

27. Did the complainant inform you or anyone else that he felt harassed?
    a. On March 24, 2023, when a request for a fact-finding meeting was issued to the complainant, the accusations of retaliation began.

28. Do you have anything else to add?
    a. Yes. On June 24, 2022, the complainant was made aware of a request of reports of contacts from the staff. This request was initiated by my immediate supervisor Steven Kaufman and the complainant acknowledge the request.

**Incident b: On unspecified dates in 2022, Complainant was rated Satisfactory on his Proficiency Report.**

29. Were you responsible for rating the Complainant "Satisfactory" on his Proficiency Report? No.

      a. If you were not responsible, then please identify the name and title of who was responsible.
          a. Christianah Arowora, Office of Community Care Nurse Manager

      b. If you were not responsible, did you have a role in this matter? If so, please explain it.
          a. I am the reviewing/approving official.

30. What time period did the Proficiency Report cover?
    a. February 19, 2021, through February 18, 2022.

31. Did the Complainant submit a self-assessment?
    a. To my knowledge the complainant did not submit their self-assessment to the rating official.

32. Please explain, in detail, the reason you issued the Complainant a "Satisfactory" Proficiency report.
    a. I am unable to address this question as I am the approving official and not the rating official.

      a. Did you explain this reason to the Complainant?
          a. N/A
      b. What was the Complainant's response?
          a. N/A

33. Did the Complainant advise you that he believed his performance appraisal rating was lower than he deserved? *If in writing, please provide a copy.*
    a. I am unable to address this question as I am the approving official and not the rating official.

34. What was your response to the Complainant when he advised you that he believed is rating was lower than he deserved? *If in writing, please provide a copy.*
    a. I am unable to address this question as I am the approving official and not the rating official.

35. Was there a reviewing official for the Complainant's performance Proficiency Report? If so, provide the name, title, and email address of the reviewing official.
    a. Yes. The reviewing official is Christianah Arowora, Office of Community Care Nurse Manager.

36. If there was a reviewing official for the Complainant's Proficiency Rating, did you discuss the Complainant's performance and the rating you believed the Complainant should receive with the reviewing official, before rating the Complainant? If so,

    a. Did the reviewing official agree with the rating you believed the Complainant should receive? Explain the content of your discussion(s) with the reviewing official and provide supporting documentation (notes, etc.) if applicable.

        a. There was no individual discussion with the reviewing official about a specific rating. There was only a discussion to ensure the application of fair and consistent ratings.

37. Did the Complainant appeal his Proficiency Rating? If so,
    a. Not to my knowledge.

    a. Provide the specific date he appealed the rating.
        a. N/A
    b. Name the Management Official he appealed the rating to.
        a. N/A
    c. Did he appeal the appraisal in writing? Please provide supporting documentation.
        a. N/A

38. Did the Proficiency Report rating change after it was appealed? If so,
    a. Not to my knowledge.
    a. What did the rating change to?
        a. N/A
    b. Please provide the date the rating was changed. ***If in writing, please provide a copy.***
        a. N/A

39. Were there any other employees, under your supervision and in the same position and grade as the Complainant, with performance similar to the Complainant's who received a higher rating on his/her Proficiency Report?
    a. No.

    a. Identify each person by name and position title.
        a. N/A
    b. Identify each person's sex.
        a. N/A
    c. Why was each person not treated similarly to the Complainant with respect to this matter?
        a. N/A

40. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant with regard to issuing

**Incident d:** on May 8, 2023, Complainant was not allowed Union representation, he was the subject of a fact-finding investigation, he lacked documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022.

**Issue e: on June 15, 2023, you gave deceptive information to a Peer Review Committee.**

51. The Complainant alleges you gave deceptive information to a Peer Review Committee on June 25, 2023. Please respond to this allegation.
    a. No. I provided no additional information to the Peer Review Committee. I only assisted Quality Management to assign a peer (Registered Nurse) to review the consult in addition to relaying messages from Quality Management to complainant and to their peer.

52. The Complainant alleges Management did respond when he requested a Root Cause Analysis. Please respond to this allegation.
    a. I was not part of the Root Cause Analysis conducted by Quality Management. The POC for quality management in this incident is Maria Jessica Joy Castelli.

53. What policies are relevant to this matter?
    a. N/A

54. Do you have anything else to add?
    a. Any correspondence related to a Peer Review or Root Cause Analysis was only to assist in relaying information to the team member or complainant.

55. With each of the incidents listed above, was the Complainant's sex a factor in any of the decisions or actions you took?

    a. No.

56. With each of the incidents listed above, was the Complainant's EEO activity a factor in any of the decisions or actions you took?
    a. No.

57. Was this action taken to harass the Complainant?
    a. No.

58. What policies are relevant to this matter?
    a. N/A

59. Do you have anything else to add?
    a. N/A

**Incident 1: On May 8, 2023, the Complainant was removed from patient care.**

60. Were you responsible for removing the Complainant from patient care?
    a. I issued the Complainant a temporary reassignment away from patient care during this investigation as directed by Human Resources.

    a. If you were not responsible, then please identify the name and title of who was responsible.
        a. N/A
    b. If you are not responsible, did you have a role in this matter? If so, please explain it.
        a. N/A

61. Did you receive guidance from anyone in removing the Complainant from patient care? If so,
    a. Yes.

        a. Identify each person by name and position title.
            a. Alex Morse, Human Resources Specialist Employee/Labor Relations.

62. Please explain, in detail, the reason you removed the complaint from patient care.
    a. Since there was a belief in risk to patient safety, it was recommended that the Complainant would be detailed during the investigation.

63. Did you explain this reason to the Complainant?
    a. I tried to provide an explanation to the Complainant at the time of the temporary assignment issuance.

64. What was the Complainant's response?
    a. The complainant was unhappy, unwilling to listen, refused to sign reassignment letter, and stated he will be reporting to OIG and to Dr. Buckley and stormed out of my office.

65. Have you removed any other employee, in the same position/grade as the Complainant, during the past year, under similar circumstances? No
    a. If so,

    a. Identify each person by name and position title.
        a. N/A
    b. Identify each person's sex.
        a. N/A
    c. Why was each person not treated similarly to the Complainant with respect to this matter?
        a. N/A

66. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant who were removed from patient care in the past year? No.
    a. If so,

    a. Identify each person by name and position title.

      a. N/A
  b. Identify the sex of each person.
      a. N/A

67. Was the Complainant's sex a factor in any of the decisions or actions you took?
    a. No.

68. Was the Complainant's EEO activity a factor in any of the decisions or actions you took?
    a. No.

69. Was this action taken to harass the Complainant?
    a. No.

70. What policies are relevant to this matter?
    a. N/A

71. Do you have anything else to add?
    a. Not at this time.

**Incident 2: As of July 19, 2023, Complainant has not been issued his Proficiency Rating that was due in February 2023.**

72. Were you responsible for issuing the Complainant's proficiency rating?
    a. No.

    a. If you were not responsible, then please identify the name and title of who was responsible.
      a. Christianah Arowora, Office of Community Care Nurse Manager

    b. If you were not responsible, did you have a role in this matter? If so, please explain it.
      a. I am the reviewing/approving official.

73. Please explain in detail why the Complainant was not issued a Proficiency Rating in February 2023.
    a. Due to the responsible rating official being on extended leave, I worked with Human Resources to redirect performance reviews of the complainant along with other staff in Office of Community Care to me. On February 21, 2023, several performance appraisals/proficiency ratings were reassigned to me. On February 21, 2023, an email was sent to multiple staff requesting staff to act on their performance appraisal by adding their self-assessment. A follow up email was sent to Complainant on March 21, 2023, to act and provide a response on their appraisal. Complainant replied on March 21, 2023, to "just do it without my input." Complainant was directed to release the performance plan back to supervisor before any action can be taken. On May 5, 2023, I had released employees plan to reviewing/approving official. Mid-May 2023,

Complainant's direct supervisor returned to duty and re-assumed performance appraisals duties and processes.

74. Did you explain this reason to the Complainant?
   a. Yes, it was explained in email.

75. What was the Complainant's response?
   a. Complainant replied on March 21, 2023, to "just do it without my input."

76. What policies are relevant to this matter?
   a. VA Handbook 5005/129.

77. Did other employees not receive their Proficiency Rating, in the same position/grade as the Complainant, during the past year, under similar circumstances? No.
   a. If so,

   a. Identify each person by name and position title.
      1. N/A.
   b. Identify each person's sex.
      1. N/A.
   c. Why was each person not treated similarly to the Complainant with respect to this matter?
      1. N/A.

78. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant who did not receive a Proficiency Rating in the past year? No.
   a. If so,

   a. Identify each person by name and position title.
   b. Identify the sex of each person.

79. Was the Complainant's sex a factor in any of the decisions or actions you took?
   a. No.

80. Was the Complainant's EEO activity a factor in any of the decisions or actions you took?
   a. No.

81. Was this action taken to harass the Complainant?
   a. No.

82. What policies are relevant to this matter?
   a. No.

83. Do you have anything else to add?
   a. Not at this time.

## HARASSMENT ALLEGATION

84. Other than what you may have discussed above, did Complainant (or anyone acting on behalf of Complainant) tell you that your or anyone else's actions constituted harassment and/or a hostile work environment for him? If so, provide the following:

   a. When were you told?
      1. On March 24, 2023, after an email was sent to Complainant about a fact finding.
   b. Who told you?
      1. Complainant
   c. What specifically were you told?
      1. Complainant sent several emails/teams messaging to me stating "this is retaliation," "let me know so I can get the command suite involved," "what patient, this is retaliation, what patient, yep several people told me you would do this," "no you're retaliating," and "any delay in patient care is on leadership not me." Complainant also sent email to NNU asking "can you guys get the issue this is concerning so I can be prepared?"
   d. What was your response/action? (If in writing, please provide a copy.)
      1. I replied to the employee in his teams messages stating as he was also calling me but I was on the phone "I am on the phone. I am not sure regarding your comment as this is part of the process when an issue is identified a fact finding will be conducted."

85. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about harassment/hostile work environment?
   a. No, I am not aware.
      i. If so, provide the following: N/A

   a. When were you told?
      a. N/A
   b. Who told you?
      a. N/A
   c. What specifically were you told?
      a. N/A
   d. What was your response/action? (If in writing, please provide a copy.)
      a. N/A

86. Was an investigation/inquiry conducted into Complainant's allegations of harassment/hostile work environment?
   a. Not that I am aware of.
      i. If so, by whom and when?

---

Affiant's Initials: DLV    Date: 12052023                                    PAGE 13

87. To your knowledge, what was the outcome of the investigation? Please provide a copy of the report.
   a. N/A

88. Was Complainant informed of the outcome? If yes, how?
   a. N/A

89. Was any corrective or preventative action necessary? If so, what action was taken?
   a. N/A

90. If no investigation was conducted, please explain why.
   a. Complainant's concerns were elevated to my supervisor Dr. Ravipati.

91. Have you received training on anti-harassment/hostile work environment while employed by the VA? If so, when?
   a. Yes. My latest completion date was on June 12, 2023. Prior to that I completed training on January 11, 2022.

92. Is the agency anti-harassment/hostile work environment policy posted in your facility?
   a. Yes.

This statement is made under penalty of perjury on this 5th day of December, 2023. (year).

DONNABELLE L LORENZO-VILLARINO 1403592
Digitally signed by DONNABELLE L LORENZO-VILLARINO 1403592
Date: 2024.01.05 14:43:58 -06'00'

Donnabelle L. Lorenzo-Villarino
Signature

**[External] - RE: Supplemental Affidavit [Response Required by January 31, 2024]**

Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>

Tue 1/30/2024 10:21 AM

To: Lisa Wabinga <Lisa.Wabinga@ceseeo.com>

📎 2 attachments (567 KB)

RE_ Recap on meeting 04062023.pdf; RE_ RN PROFICIENCY INPUT AKochiu.pdf;

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

See below in highlight for my response.  Let me know if you have questions.
Thank you.

*Respectfully,*

**Donnabelle Lorenzo-Villarino, RN**
*Referral Coordination Program Manager*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
3001 Green Bay Road North Chicago, IL 60064
Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: donnabelle.lorenzo-villarino@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a),  and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction.  If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Monday, January 29, 2024 8:56 PM
**To:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Subject:** [EXTERNAL] Supplemental Affidavit [Response Required by January 31, 2024]
**Importance:** High

Please note that when you respond to this email that you are still under oath.  Please provide your response below.

1.  What is your race?*[Lorenzo-Villarino, Donnabelle L.]* Asian
2.  What do you perceive as Complainant's race? When and how did you become aware?*[Lorenzo-Villarino, Donnabelle L.]* Caucasian.  Approximately around February 2019 when the complainant began his employment.


**Issue b:** **On unspecified in 2022, he was rated Satisfactory in his Proficiency Report.**

1.  According to Complainant, RMO Arowora rated Complainant as High Satisfactory, but you lowered Complainant's rating to satisfactory, to which RMO Arowora complied. Is this true? If not, explain your account of what occurred. If so, please explain why you lowered Complainant's rating? *[Lorenzo-Villarino, Donnabelle L.]* As the approving official, I discuss with Ms. Arowora all her employee's ratings before approving the rating.  To my recollection, the employee and manager did not provide additional information and submitted the same proficiency from the previous year without additional information for the new rating year.  I recommended to Ms. Arowora that I recommend a SATISFACTORY rating vice HIGH SATISFACTORY.  Ms. Arowora is still the rating official, and I disagreed with her rating.  She then replied noted and rated the complainant as SATISFACTORY.   If she deemed employee as HIGH SATISFACTORY, she should have provided additional supporting documents to justify a higher rating.

2.  According to Complainant his race was a factor in your allegedly changing his high rating to Satisfactory, as all Filipinos received higher ratings.  How do you respond? *[Lorenzo-Villarino, Donnabelle L.]*  No.  I am only the approving official and Ms. Arowora is the rating official.  All ratings by Ms. Arowora were discussed prior to my approval.

**Issue c**: **On unspecified dates from November 8, 2022, to May 3, 2023, he was assigned a bigger workload than his co-workers;**

4.  Please provide a copy of the email sent on April 6, 2023, to CP's team regarding plans being in place to ensure each team would have three registered nurses per team.  Was this issue ever resolved? If so, when? How?  Is CP's team responsible for most consults? If so, explain why. *[Lorenzo-Villarino, Donnabelle L.]* See attached item.  The managing of each team is handled by their direct supervisor and assignments for each team are depending on the staff turnover in the program.  The conversion of one LPN FTEE into an RN FTEE was approved by TFMC and that staff to fill that position just onboarded this week.   Each team members are responsible for consults in their alpha split, but the division is based on a historical data which does not translate as to the daily worklist.


**Issue d:** **on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022;**

5.  According to Complainant, oncology Department nurses in Community Care did not receive write ups for cancelling a consult and a veteran expired, while he was subjected to an fact-finding. How do you respond?

    A:*[Lorenzo-Villarino, Donnabelle L.]*  Oncology department does not fall under my purview.  I am unaware or do not recall of any cancelled oncology consults leading to a veteran expiration.

6.  According to Complainant, another employee did not submit records on time and a veteran went from having a pulmonary nodule that spread cancer throughout his entire thoracic cavity, but not

subjected to a fact-finding. How do you respond?

A:*[Lorenzo-Villarino, Donnabelle L.]* I am unaware or do not recall this scenario, nor was it brought up to my attention.

7. According to Complainant, in a recent incident, he alleges RMO Lorenz-Villarino showed favoritism when she did not discipline RN Superable, who assigned a suicide patient to PSA Dori Matusz and the veteran committed suicide. No fact-finding was conducted. How do you respond?

A:*[Lorenzo-Villarino, Donnabelle L.]* To my knowledge, an incident occurred in July or August of 2023 while I am no longer covering for their direct supervisor. To my knowledge, their direct supervisor did conduct a fact finding for this incident.

8. According to Complainant his race was a factor in this incident. How do you respond?*[Lorenzo-Villarino, Donnabelle L.]* The complainant's race was **not** a factor in this incident.

**Issue f:** on June 19, 2023, he became aware DLV was asking co-workers to submit negative reports of contacts regarding him;

9. According to Complainant, you requested Monica Coleman, union representative, RN Reyula if they could write negative comments about him. Is this true? If not, please explain your account of what occurred.

A:*[Lorenzo-Villarino, Donnabelle L.]* No, it is not true. I have reviewed all communications from myself to Ms. Coleman and Ms. Reluya on the date in question. There is no documentation indicating **any** conversation involving the complainant.

**Claim 1: On May 8, 2023, he was removed from patient care.**

10. According to Complainant, RN Harris, and the entire Community Care department were treated more favorable because they are females; specifically, they were not detailed of suspended when they delayed care to patients. How do you respond?

A:*[Lorenzo-Villarino, Donnabelle L.]* The community care department is comprised of multiple staff from different background or gender. Female employees are not treated differently from male employees.

---

Best,


Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

The information contained in this e-mail and any attachments from Computer Evidence Specialists, LLC may contain confidential and/or proprietary information, and is intended only for the named recipient to whom it was originally addressed. If you are not the intended recipient, any disclosure, distribution, or copying of this e-mail or its attachments is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by return e-mail and permanently delete the e-mail and any attachments.



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Testimony of Mamata Ravipati
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | | |
|---|---|---|
| Azis Kochiu | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | Case No. 200J-556A-2023-152770 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC  20420 | ) | |
| ━━━━━━━━━━━━━━━━━━━ | ) | |

I, Mamata Ravipati**,** solemnly swear/affirm that the responses and documents I provided in response to the following questions are true and complete to the best of my knowledge and belief.

***Whether the complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal when:***

**Complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal by Donnabelle Lorenzo-Villarino, since 2021 to include:**

a. **since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed him and management has done nothing to stop it;**
b. **from November 8, 2022, to May 3, 2023, his was assigned a bigger workload than his co-workers;**
c. **on May 8, 2023, he was not allowed Union representation, he was told he was the subject of a fact-finding investigation, that he lacks documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022;**
d. **on June 15, 2023, DLV gave deceptive information to a Peer Review Committee;**
e. **on June 19, 2023, he became aware DLV was asking co-workers to submit negative reports of contacts regarding him; and includes the following timely raised independently actionable claims:**

1. **On May 8, 2023, he was removed from patient care.**

Affiant's Initials: ___RM_____     Date:_1/10/24_____
Page 1

1. What is your full name?
   Mamata Ravipati
2. What is your present position title, pay plan, job series, and pay grade?
   Assistant Chief Medical Executive Ambulatory Care, Provider pay scale GS15.

3. During the period between January 2021 and June 19, 2023, what was your
   position title, pay plan, job series, and pay grade?
   Assistant Chief Medical Executive Ambulatory Care

4. From approximately what date did you hold that position?
   Since 2017- current
5. In what (Organization) unit/division do you currently work?
   Captain James A.Lovell Federal health Care Center

6. Who is your first-level supervisor (Provide their name, position title, unit, and
   division)?
   Jeffery Oken , Chief Medical Executive.
7. Who is your second-level supervisor (Provide their name, position title, unit, and
   division)?
   Robert Buckley, Director, Lovell FHCC, North Chicago

8. Are they the same first and second level supervisors you had during the date(s)
   of the alleged discrimination? If not, please state the changes from then until
   now. No changes in supervisory roles

9. How long have you worked for this organization? How long have you been in
   your current position?
   Started as Primary care provider on 9/2005, became Assistant Chief Medical
   executive for Ambulatory Care in 2017.
10. Between the period of January 2021 and June 19, 2023, how many employees
    did you supervise (directly and indirectly)?
    <50.
11. What is your organizational relationship to the Complainant?
    Employee in Community care, I am his third line supervisor.
12. How often did you interact with Complainant?
    Once in two-three weeks, as a provider.
13. Please identify your sex.
    Female.
14. What do you believe Complainant's sex to be?
    Male.
15. How and when (approximately date) did you become aware of Complainant's
    sex?

    2019, when employee started in community care and as a primary care provider
    I used to have interactions with him due to patient care.

**REPRISAL**

16. Were you aware of the Complainant being involved in EEO activity prior to this complaint? If so, when did you become aware of the Complainant's prior EEO activity?
    No

17. If you were aware of the Complainant's prior EEO activity, how did you become aware?
    N/A

18. Have you been named by the Complainant as a Responsible Management Official or witness, in a prior EEO Complaint that he filed? If so, please identify the case number(s) and identify the issue(s) involved in the complaint?
    None.

19. What was your personal involvement in the prior EEO case(s) filed by the Complainant?
    N/A

20. To determine your EEO activity, please respond to the following. Have you ever filed your own EEO complaint, been a voluntary witness in someone else's complaint (not including testimony provided as a management official or SME), or ever requested accommodation for a disability or religion? If so, indicate what activity you participated in and when the activity occurred.
    I was interviewed as a witness in 9/21.

***The Complainant alleges that based on sex and reprisal he was subjected to a series of incidents that he believes constitutes a hostile work environment. Following is a series of questions about each of the incidents raised in the claim.***

**<u>Incident a:</u> since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed him and management has done nothing to stop it;**

21. The Complainant testified that he was harassed by **Donnabelle Lorenzo-Villarino** after he reported staff were working overtime without compensation. Please explain in detail what knowledge you have about this incident? **Not aware of the above incident.**

22. According to Complainant he reported that he was being harassed by **Donnabelle Lorenzo-Villarino;** however, management failed to prevent continued harassment. Did Complainant report this incident to you as discriminatory harassment? If so, what did the Complainant report? When?
    Mr.Azis never brought to my attention.

23. Upon becoming aware, what action did you take?
    N/A

24. If no action was taken, please explain why.
    N/A

25. Have you responded to this allegation outside of this EEO Complaint?
    N/A

26. Do you have any reason to believe that **Donnabelle Lorenzo-Villarino's** behavior towards Complainant was based on his sex and/or prior EEO activity? Explain. No, I never witnessed Ms. Lorenzo -Vallarino harassing any of her

employees.

27. According to Complainant your failure to address **Donnabelle Lorenzo-Villarino's** behavior was based on his sex and prior EEO activity. How do you respond?

I am not aware of any issues brought to my attention by the complainant.

**Incident b:** **On unspecified dates from November 8, 2022, to May 3, 2023, the Complainant was assigned a bigger workload than his co-workers.**

28. According to Complainant he was assigned more consults than his co-workers. Is this true? If not, please explain what you believe Complainant could be referring to and/or your account of Complainant's workload as compared to his co-workers.

Office of community care was aligned under my supervision in 3/23, since then he never informed me about any workload issues.

29. The Complainant testified he was ignored when he complained that he was assigned a heavier workload than other staff. Did this happen as the Complainant described? If so, please explain.

**Mr.Azis never brought to my attention about heavier work load.**

30. Did you provide an explanation to the Complainant? If so, what was his response?

N/A

31. If you were not responsible, then please identify the name and title of who was responsible.

Christianah Arowora, Nurse manager for OCC, Donnabelle Lorenzo-Vallarino Nurse manager for Managed care.

32. If you are not responsible, did you have a role in this matter? If so, please explain it.

I am not involved in workload assignments.

33. Did you explain this reason to the Complainant?

N/A

34. What was the Complainant's response?

N/A

35. According to Complainant his sex and prior EEO activity were factors in your decision to assign him a heavier workload. How do you respond?

N/A

**Incident d:** **On May 8, 2023, Complainant was not allowed Union representation, he was the subject of a fact-finding investigation, he lacked documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022.**

36. Please explain in detail the reasons the Complainant was the subject of a fact-finding investigation; where he lacked documentation in his emails and was

accused of not properly scheduling a deceased patient's consult in December 2022.

Office of quality has informed us there is a patient's death in March 2022, which led to patient's safety report. Review of the case showed patient was referred to nephrologist in the community, there was a delay in scheduling the appointment. Patient was admitted into community Hospital with a diagnosis of uremic encephalopathy and eventually patient passed away. Reviews showed gaps in care coordination.

37. Complainant alleges when his chart review was conducted it was based on duties that were the responsibility of the Patient Services Assistant and not Registered Nurses. Is this true? Please explain your account of what occurred.

No, as a RN care coordinator, RN 's has higher responsibility in care coordination.

38. According to the Complainant, Wendy Superable, Nurse was not treated similarly to the Complainant and the subject of a fact-finding investigation following a patient's death. How do you respond?

OCC leadership is working with HR in regards to patients death in a case worked by RN Wendy Superable, work in progress.

32. Have other employees lacked documentation in their emails, in the same position and grade as the Complainant during the past year under similar circumstances, if so,

   a. Identify each person by name and position title. Not aware
   b. Identify each person's sex. – N/A
   c. Why was each person not treated similarly to the Complainant with respect to this matter? N/A.

39. Was Complainant subjected to disciplinary action as a result of the fact-finding investigation? If so, what, when and explain the nature of the charges? Please explain in full detail.
   He has the complaint was subjected to disciplinary action based on thorough chart review of the alleged patient's death, 30 chart reviews has been done by RN external to the department in which multiple gaps were identified. Alleged did not show any responsibility and accountability during one-on-one meeting and in his emails.

40. Did this action comply with applicable policies and regulations? If so, please identify these policies and regulations?
   Complied with VHA table of penalties.

41. Did you and/or the Agency have evidence to support the disciplinary action (if any) made with regard to the Complainant's failure to schedule a deceased patient's consult? If so, what evidence? Please explain in full detail.
   Yes, evidence is processing, comments on the consult, tracking of consult

42. According to Complainant his sex and prior EEO activity were factors in your decision to subject him to a fact-finding investigation. How do you respond? N/A

**Incident 1:** **On May 8, 2023, the Complainant was removed from patient care.**

43. Were you responsible for removing the Complainant from patient care?

If you were not responsible, then please identify the name and title of who was responsible. No, Donnabelle Lorenzo-Villarino issued the temporary re-assignment as per HR's guidance.

If you are not responsible, did you have a role in this matter? If so, please explain it.- No role

44. Did you receive guidance from anyone in removing the Complainant from patient care? If so,

   a. Identify each person by name and position title. HR, Alex Morse ER/LR specialist. -N/A
   b. What guidance did you receive? Did you follow this guidance? – N/A
   c. If not, why not? N/A

45. Please explain, in detail, the reason you removed the complaint from patient care. N/A

46. Did you explain this reason to the Complainant? – n/a

47. What was the Complainant's response? n/a

48. According to the Complainant, Wendy Superable, Nurse was not treated similarly to the Complainant and removed from patient care following the death of a patient? How do you respond? After fact finding and review of 30 consults evidence was presented to HR, HR did not advise OCC leadership to remove RN Wendy Superable from patient care.

49. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant who were removed from patient care in the past year? If so,

   a. Identify each person by name and position title.  Not aware
   b. Identify the sex of each person. n/a

50. According to Complainant his sex a factor in the decision to remove his from patient care. How do you respond? no

51. According to Complainant his prior EEO activity a factor in the decision to

remove his from patient care. How do you respond? No, not aware of any prior EEO activity.

52. Was this action taken to harass the Complainant?
 No
53. What VA policies are relevant to this matter. Please provide for the record.
 Table penalties.
54. Do you have anything else to add?   None


**HARASSMENT ALLEGATION**

55. Other than what you may have discussed above, did Complainant (or anyone acting on behalf of Complainant) tell you that your or anyone else's actions constituted harassment and/or a hostile work environment for him? If so, provide the following:

   a. When were you told? Once complainant was issued disciplinary action, he sent an e-mail to EEO and cc'ed this underwriter.
   b. Who told you? – email sent on 9/1/23
   c. What specifically were you told? See attached E-mail from 9/1/23.
   d. What was your response/action? (If in writing, please provide a copy.) – it was not addressed to me directly.

56. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about harassment/hostile work environment? If so, provide the following:

   a.  When were you told? Thru E-mail to EEO
   b. Who told you? Via email
   c. What specifically were you told? – please attached e-mail from 9/23
   d. What was your response/action? (If in writing, please provide a copy.) it was not addressed directly to the under writer.

57. Was an investigation/inquiry conducted into Complainant's allegations of harassment/hostile work environment? If so, by whom and when? Mr.Azis never brought to my attention about hostile work environment.

58. To your knowledge, what was the outcome of the investigation? Please provide a copy of the report. – n/a

59. Was Complainant informed of the outcome? If yes, how? n/a

60. Was any corrective or preventative action necessary? If so, what action was taken? n/a

61. If no investigation was conducted, please explain why. n/a.

62. Have you received training on anti-harassment/hostile work environment while employed by the VA? If so, when? TMS
Yes, last completed on 4/24/23.

63. Is the agency anti-harassment/hostile work environment policy posted in your facility? Yes.

This statement is made under penalty of perjury on this 10th day of January 2024. (year).

_____MAMATA RAVIPATI _____
Mamata Ravipati
Signature

## [External] - Affidavit of Mamata Ravipati

Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>

Wed 1/10/2024 8:07 AM

To:Lisa Wabinga <Lisa.Wabinga@ceseeo.com>;Tolbert, Melvin R. <Melvin.Tolbert@va.gov>

📎 1 attachments (64 KB)

Affidavit of Mamata Ravipati.docx;

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

---

Good morning, Lisa,
Attached is the signed affidavit.
Thank you for everything.

V/R,
Mamata Ravipati, MD
Assistant Chief Medical Executive Ambulatory Care
Captain James A.Lovell Federal health Care Center
Assistant Professor of Medicine
Rosalind Franklin Univeristy of Science and Medicine
Phone: 224-610-5300.
Fax: 224-610-3863.

CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction.  If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**


Testimony of Dr. Robert G. Buckley
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | |
|---|---|
| Azis Kochiu )<br>Complainant )<br>)<br>v. )<br>)<br>Secretary )<br>Department of Veterans Affairs )<br>810 Vermont Avenue, NW )<br>Washington, DC 20420 )<br>_____ ) | Case No. 200J-556A-2023-152770 |

I, Dr. Robert G. Buckley, solemnly swear/affirm that the responses and documents I provided in response to the following questions are true and complete to the best of my knowledge and belief.


**Whether Complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal by Donnabelle Lorenzo-Villarino, since 2021 to include:**

**a.  since January 2021, Donnabelle Lorenzo-Villarino (DLV), has harassed him and management has done nothing to stop it;**

**1.  On May 8, 2023, he was removed from patient care.**


1.  What is your full name? Robert Grant Buckley

2.  What is your present position title, pay plan, job series, and pay grade? Director, SES Equivalent

3.  During the period between January 2021 and June 19, 2023, what was your position title, pay plan, job series, and pay grade? Director, SES Equivalent

4.  From approximately what date did you hold that position? October 2018

5.  In what (Organization) unit/division do you currently work? Lovell FHCC North Chicago

6. Who is your first-level supervisor (Provide their name, position title, unit, and division)? Daniel Zomchek, Network Director VISN 12

7. Who is your second-level supervisor (Provide their name, position title, unit, and division)? Rema Nelson, Asst Undersecretary for Health

8. Are they the same first and second level supervisors you had during the date(s) of the alleged discrimination? If not, please state the changes from then until now. Yes

9. How long have you worked for this organization? How long have you been in your current position? 7 years. 5 years

10. Between the period of January 2021 and June 19, 2023, how many employees did you supervise (directly and indirectly)? 9

11. What is your organizational relationship to the Complainant? I'm the Director of the facility. He works Community Care.

12. How often did you interact with Complainant? Almost never.

13. Please identify your sex. male

14. What do you believe Complainant's sex to be? male

15. How and when (approximately date) did you become aware of Complainant's sex? I can't recall when I first met him but I assumed he was male.

## REPRISAL

16. Were you aware of the Complainant being involved in EEO activity prior to this complaint? No If so, when did you become aware of the Complainant's prior EEO activity? N/A

17. If you were aware of the Complainant's prior EEO activity, how did you become aware? N/A

18. Have you been named by the Complainant as a Responsible Management Official or witness, in a prior EEO Complaint that he filed? Not that I know of. If so, please identify the case number(s) and identify the issue(s) involved in the complaint? N/A

19. What was your personal involvement in the prior EEO case(s) filed by the Complainant? None that I am aware of.

20. To determine your EEO activity, please respond to the following. Have you ever filed your own EEO complaint, (No) been a voluntary witness in someone else's

complaint (not including testimony provided as a management official or SME), NO or ever requested an accommodation for a disability or religion? NO If so, indicate what activity you participated in and when the activity occurred. N/A

***The Complainant alleges that based on sex and reprisal he was subjected to a series of incidents that he believes constitutes a hostile work environment. Following is a series of questions about each of the incidents raised in the claim.***

Incident a:  On unspecified dates since January 2021, Donnabelle Lorenzo-Villarino harassed the Complainant and management did nothing to stop it.

21. The Complainant testified that he was harassed by **Donnabelle Lorenzo-Villarino** after he reported staff were working overtime without compensation. Please explain in detail what knowledge you have about this incident? I don't recall this issue in particular.

22. According to Complainant he reported that he was being harassed by **Donnabelle Lorenzo-Villarino;** however, management failed to prevent continued harassment. Did Complainant report this incident to you as discriminatory harassment? Not that I recall.  I only heard his oral reply to proposed suspension. If so, what did the Complainant report?  NA When? NA

23. Upon becoming aware, what action did you take?  N/A

24. If no action was taken, please explain why. I only recall his oral reply phase response to proposed discipline.

25. Have you responded to this allegation outside of this EEO Complaint? As above. Only via oral reply.

26. Do you have any reason to believe that **Donnabelle Lorenzo-Villarino's** behavior towards Complainant was based on his sex and/or prior EEO activity? Explain. No

27. According to Complainant your failure to address **Donnabelle Lorenzo-Villarino's** behavior was based on his sex and prior EEO activity. How do you respond? I did no fail to address supervisor's behavior based on sex.  I gave complainant full, unbiased attention during this oral reply phase and encouraged him to use all available means available as due process under law and regulation to include MSPB, Union or EEO.

**Incident 1:** **On May 8, 2023, the Complainant was removed from patient care.**

28. Were you responsible for removing the Complainant from patient care? Not directly.  The supervisor has the authority to remove from patient care pending investigation when he/she has reasonable concern with patient care/safety.

    a. If you were not responsible, then please identify the name and title of who was responsible. Supervisor Ms Lorenzo-Villerino and Dr Mamata Ravipati, her supervisor.
    b. If you are not responsible, did you have a role in this matter? I sustained the proposed discipline.  If so, please explain it.  My recollection is he was removed from patient care because there was reasonable concern with his ability to reliably perform his patient care responsibilities.

29. Did you receive guidance from anyone in removing the Complainant from patient care? No

    a. Identify each person by name and position title.

30. Please explain, in detail, the reason you removed the Complainant from patient care. I did not directly remove him from patient care.  This was done by his work area supervisor pending investigation.

31. Did you explain this reason to the Complainant? During his oral reply, the HR rep and I explained the process and why he was removed from patient care pending resolution of the investigation.

32. What was the Complainant's response to the reason given?  I recall that he admitted during this oral reply that he had failed to take timely action and appropriately follow though on patient care communications and the documentation of these in the health care record.

33. The Complainant alleges he was treated differently because female employees in his department were not disciplined after a patient expired, but that he was. Please respond to this allegation.  I evaluated the merit of the evidence with respect to the charges in this case and carefully considered this and any information he provided during the oral reply phase.

34. Have you removed any other employee, in the same position/grade as the Complainant, during the past year, under similar circumstances?  Not in this position in this particular circumstance.  If so,  N/A

    a. Identify each person by name and position title. n/a
    b. Identify each person's sex.
    c. Why was each person not treated similarly to the Complainant with respect to this matter?

35. According to Complainant his sex a factor in the decisions or actions you took. How do you respond? My decisions were not based on or influenced by his sex.

36. According to Complainant his prior EEO activity was a factor in the decisions or actions you took. How do you respond? My decision was not based on any prior EEO complaint.

37. Was this action taken to harass the Complainant? N/A

What VA policies are relevant to the Complainant's removal from patient care. As noted in the charges and the evidence file - **VHA Handbook 5021 Part 1 Chapter 1; 7b and VHA Handbook 5021 Part 2 Chapter 1; 6 (3)b**

38. Do you have anything else to add?   No

39. Was this action taken to harass the Complainant? No

## **HARASSMENT ALLEGATION**

40. Other than what you may have discussed above, did Complainant (or anyone acting on behalf of Complainant) tell you that your or anyone else's actions constituted harassment and/or a hostile work environment for him? The Complainant did not raise concerns of harassment or hostile work environment to me. If these were concerns of the Complainant, they would likely have been reported to the Complainant's chain of supervision and or the Equal Employment Opportunity Manager for inquiry.

    a. When were you told? n/a
    b. Who told you?
    c. What specifically were you told?
    d. What was your response/action? (If in writing, please provide a copy.)

41. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about harassment/hostile work environment? HWE, no. If so, provide the following:

    a.  When were you told? n/a
    b. Who told you?
    c. What specifically were you told?
    d. What was your response/action? (If in writing, please provide a copy.)

42. Was an investigation/inquiry conducted into Complainant's allegations of harassment/hostile work environment? See 40. No If so, by whom and when? n/a

35. According to Complainant his sex a factor in the decisions or actions you took. How do you respond? My decisions were not based on or influenced by his sex.

36. According to Complainant his prior EEO activity was a factor in the decisions or actions you took. How do you respond? My decision was not based on any prior EEO complaint.

37. Was this action taken to harass the Complainant? N/A

What VA policies are relevant to the Complainant's removal from patient care. As noted in the charges and the evidence file - **VHA Handbook 5021 Part 1 Chapter 1; 7b and VHA Handbook 5021 Part 2 Chapter 1; 6 (3)b**

38. Do you have anything else to add? No

39. Was this action taken to harass the Complainant? No

### HARASSMENT ALLEGATION

40. Other than what you may have discussed above, did Complainant (or anyone acting on behalf of Complainant) tell you that your or anyone else's actions constituted harassment and/or a hostile work environment for him? The Complainant did not raise concerns of harassment or hostile work environment to me. If these were concerns of the Complainant, they would likely have been reported to the Complainant's chain of supervision and or the Equal Employment Opportunity Manager for inquiry.

   a. When were you told? n/a
   b. Who told you?
   c. What specifically were you told?
   d. What was your response/action? (If in writing, please provide a copy.)

41. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about harassment/hostile work environment? HWE, no. If so, provide the following:

   a. When were you told? n/a
   b. Who told you?
   c. What specifically were you told?
   d. What was your response/action? (If in writing, please provide a copy.)

42. Was an investigation/inquiry conducted into Complainant's allegations of harassment/hostile work environment? If so, by whom and when? N/A



43. To your knowledge, what was the outcome of the investigation? Since an allegation of harassment and or hostile work environment did not come to me, I cannot answer this question. Please review with supervisory chain or EEO.

44. Was Complainant informed of the outcome? I have no knowledge regarding an investigation or the outcome, if an investigation was conducted. If yes, how? n/a

45. Was any corrective or preventative action necessary? As above in 44 and 45. If so, what action was taken? n/a

46. If no investigation was conducted, please explain why. See 44 and 45.

47. Have you received training on anti-harassment/hostile work environment while employed by the VA? If so, when? Annual TMS training.

48. Is the agency anti-harassment/hostile work environment policy posted in your facility? Yes

This statement is made under penalty of perjury on this 28ith day December 2023.

_____

Dr. Robert G. Buckley
Signature



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Testimony of Alex Morse
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | | |
|---|---|---|
| Azis Kochiu | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | Case No. 200J-556A-2023-152770 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC 20420 | ) | |
| _____ | ) | |

I, Alex Morse, solemnly swear/affirm that the responses and documents I provided in response to the following questions are true and complete to the best of my knowledge and belief.

***Whether the complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal when:***

**1. On May 8, 2023, he was removed from patient care.**

1. What is your full name?
   a. Alex Morse

2. What is your present position title, pay plan, job series, and pay grade?

   a. Human Resources Specialist(ER/LR) 201 series GS12

3. In what (Organization) unit/division do you currently work for?
   a. VHA VISN 12 HR

4. How long have you worked for this organization?
   a. 10 years.

5. How long have you been in your current position?
   a. 2 years

6. According to the record, you were the Human Resources Specialist that advised

Affiant's Initials: __AM____    Date:__12/21/23_____                    Page 1

management regarding this action? Is this correct? If not, please provide the name of the HR specialist that handled this action (Name and contact information).

A: Yes

7. On what date were you contacted by Management with regard to this action? Who contacted you?

A: 3/23/23. Donnabelle Lorenzo-Villarino

8. What information was provided to you by management and what advice did you give to management regarding this action?

A: That there was a delay in care possibly resulting in the death of a patient. I advised them that they would need to perform a Weingarten meeting to question the employee and gather all the information surrounding the case.

9. Did Management follow the guidance you provided? If not, why not?

A: Yes

10. Was this action consistent with similar action taken within the organization? Was this action warranted based on the circumstances?

A: Yes

11. Did this action comply with applicable policies and regulations? If so, please identify these policies and regulations?

A: Yes, the action complied with the table of penalties due to the patient care involvement.

12. Do you have any reason to believe that Complainant's sex and/or prior EEO activity was a factor in management's actions? Explain.
   a. I do not believe that the complainant's sex played any role in management's decision to take an action. I am not aware of any prior EEO activity.

13. Do you have anything else to add?
   a. I do not have anything else to add.

This statement is made under penalty of perjury on this _21<sup>st</sup>__day of
_December_____, 2023.

ALEX
MORSE
Alex Morse
Signature

Digitally signed by ALEX
MORSE
Date: 2023.12.21
16:03:12 -06'00'

<u>COMPLAINANT'S REBUTTAL STATEMENT</u>

NAME: Azis Kochiu          CASE NUMBER: 200J-556A-2023-152770

I have been provided information regarding the substance of management's articulated reason for its action in this complaint, and: (please initial one)

_____ I DO NOT desire to comment further

_____ I DO desire to comment further as shown on this and/or the following pages:

_____
Signature

___1/8/2024___
Date

000218

# Rebuttal to Adriene Harris's affidavit

**Are they the same first and second level supervisors you had during the date(s) of the alleged discrimination? If not, please state the changes from then until now. No, Donnabelle L. Lorenzo-Villarino RN Managed Care Department Head** RN/Registered Nurse **ACME-Ambulatory Care/CME Directorate** is transferring to another position currently.

I just need to comment on this transfer since it's brought up in this affidavit. This is a calculated move by DB and Dr Ravipati as to protect DB from having to detail her best friend Wendy Superable RN, female, Filipino for negligence in a veteran suicide. Because they detailed me unjustly and I filed the EEO it puts pressure on DB and Ravipati to do the same to Wendy or it makes my point into the discrimination. This way the onus is put on Christianah to do the dirty work, and I know with 100% certainty that DB and Ravipati know that Christianah would never dare do anything to Wendy because of the backlash and punishment they would inflict on Christianah if she even attempted to discipline Wendy as they have done in the past. This way DB can claim it wasn't on her that didn't detail Wendy but rather on Christianah who didn't detail Wendy. DB gets to hedge against my EEO at the same time protect her friend Wendy. It's so obvious what they are doing.

I was on to this as the union rep informed me that Wendy only got a counseling, so I sent an email to Ravipati and up the chain of command that this is what they are planning. And by me sending that email they knew this wouldn't fly so DB and Ravipati couldn't use that strategy and landed on the strategy that HR didn't recommend detailing Wendy. As I point out and as Dr Buckley testified to in his affidavit it is up to the supervisor to issue a detail and remove employees. Now even if DB did make the lateral move to protect herself, it's still on Ravipati to have issued a detail pending investigation but she did not do that. She essentially lied and shifted blame stating HR didn't recommend detailing Wendy but they detailed me under false allegations.

Either HR is guilty of discrimination on me as to all my claims, or DB and Ravipati are guilty. The fact that the VA did this to me puts them liable.

Now let's go back to the lateral move DB made in conjunction with Ravipati. DB makes the lateral move pending outcome of this EEO. After the outcome that they will slide DB right back to her position in leadership overseeing Christanah. As of now Donnabelle's leadership position is opened, and the one that qualifies is Christianah, but DB would never be able to swallow the fact that Christianah would now be her boss. After all the harassment Christianah had to endure by DB, Wendy and some of the other Filipinos in the department this would be the ultimate payback. But to prevent Christianah who is far qualified to do Donnabelle's job than anyone else, Ravipati is detailing another black woman from one of the other hospitals in Chicago to fill this opening temporarily. Even though Chrisitanah (a black woman) has more experience and is more qualified than the person being temporarily detailed into DB

position.  This solves two issues for DB and Ravipati.  1. Chrisitanah can't claim she's not getting the job based on race, and 2. Once this EEO is completed they will send the temporarily detailed person back to her position in Chicago.  Which then again means DB's old position is open to which it is likely Christianah will apply to as will DB.   Ravipati will interview whoever applies which will likely be Christiah and DB, she'll go through all the phony formalities and in the end give the job to DB and proclaim DB did it before and therefore has the experience.  And that is how they make their move.

That is likely one of the reason the VA wants to drop everything and told the Union they will make me whole, this will be off my record, and I'll get my loss of wages paid back under one condition, that I drop this EEO.   The other reason they want this to end is they know they were wrong and what they did to me was discrimination, based on sex, race, reprisal.  My answer to that offer was NO! The EEO is off the table.  No deal that involves me dropping this is on the table.   I tried so hard to explain to Ravipati and leadership the truth through witnesses and evidence to get this to stop, but the more they saw me suffering the more gasoline they poured on me.

A: Donnabelle L. Lorenzo-Villarino RN Managed Care Department Head RN/Registered Nurse
ACME-Ambulatory Care/CME Directorate did not instruct me to say a consult was an expedite to the peer review. I did not get any feedback or direction on what to say. I do not recall stating this consult was an Expedite.

1. In my peer review the question #1 under Issues identified: **Timeliness of initiating treatment in period of deterioration:**
I stated "Consult not requested as an expedite by FHCC provider. Delay in scheduling,"   Federal Health Care Center/FHCC

This is not saying it was an expedite. It is stating it was not initiated as an expedite by the provider which in my opinion could cause a delay in scheduling. That was my intent.

Something doesn't make sense here as to what Adriene is proclaiming in this statement above compared to the summary that was turned into the Peer Committee listed below.

3.      This case involved an 89 y/o male with order placed for community care nephrology consult on 12/08/2022. Order was received on 12/15/2022. On 12/19/2022, referral was processed. Subsequent follow-up for referral was on 01/10/2023. On 02/27/2023, notification was received that patient was admitted in community hospital on 02/23/2023 for acute kidney failure. The initial reviewer identified the aspects of care on inadequately monitoring patient's condition and, lack of recognition of signs and symptoms of deterioration on patient's condition. The initial reviewer cited Community Care Field guidebook chapters 3.2 and 6.3 as reference. The initial reviewer also mentioned that the RN coordinator did not consider the consult as complex by processing and scheduling ASAP even though it was an expedited request.

If Adriene Harris is proclaiming she didn't state this which was submitted to the peer review committee, then who did?

Adrienne's answer was that this was not entered as an expedite by the provider which could result in delay of care.

Adrienne called me up a few weeks back on a Sunday around 6pm because she was stressing and felt awful at what I was going through.  She went on and told me that she filled out a form and indicated on the form that the doctor that entered the consult should have made this an expedite...she further stated that she mentioned Cindy Reyula RN and Kelly Heckel PSA in her written response as well as the MD who entered the consult as all having a hand and responsibility in this matter.

But let's see if what Adriene is stating in her testimony on this affidavit and what she stated to me on the phone are true, then why were those things she stated left out of the summary.  And why is the summary stating this was an expedited request?  I mean, no one else was detailed, no one else was suspended that she claimed she wrote, no one else was blamed or harassed or put through the hell the way that I was put through.

Three scenarios:

1.   Then who turned this in?  it clearly states to the leadership this was an expedite by the verbiage written, one can play semantics and claim this wasn't your intent when you are a highly educated RN with a Masters degree and are getting your point across.  Summary states the " RN coordinator did not consider ... even though it was an expedited request."  It sure doesn't read the way Adrien proclaims in her testimony.  One can easily make the inference that Donnabelle

told Adriene to write this up as an expedite but since Adriene still works under Donnabelle, she may have lied in the above testimony to prevent any retaliation to cover for DB.

2. DB, Dr Ravipati and all VA leadership are the managers who oversees all things, why didn't DB or any of them stop this before it was turned in to the committee? Someone wrote the summary if Adriene's claim above and to me personally is that she didn't write this. It couldn't have been Quality Management that wrote this because QM asked DB to have an employee from the dept to write something up because they are not aware of what we do. DB even testifies to that in her affidavit.

Now, Ravipati was in the peer review committee, so why didn't she speak up when I stated this was not an expedite. She was there and if she knew this was not an expedite why didn't she say something or acknowledge that it wasn't? Or at least investigate it after the review to cross reference whether it was an expedite or not? Maybe she did but didn't want to implicate her friend Donnabelle.

Adriene Harris was also in the Peer Review Committee, why didn't she interject when I made it clear that this was not an expedite? Above she claims it should have been written by the doctor as an expedite, then why didn't she correct this during the Peer Review? Adriene was there and she said nothing which to me indicates she did turn it in claiming it was an expedite; but the question now becomes, did Adriene claim this was an expedite on her own, or was she coached by DB to say it was an expedite.

DB has every motive to tell Adriene that this was an expedite because as I kept fighting for my rights throughout this witch hunt her case was falling apart more and more and this was an attempt for her to justify and make an excuse for detailing me and save face in front of the committee. That was why she never showed up during the Peer Review. I explain this scenario in my rebuttal to DB's affidavit.

Furthermore, no one in The VA leadership took the time to investigate this and to review the documentation submitted to peer committee? That's negligence all the way up to Dr Buckley who should have investigated and at least take what I'm saying into consideration and look into the discrepancies I pointed out prior to suspending me.

3. The only other scenario is if what Adriene is proclaiming in her affidavit testimony is true, then that means someone changed the summary purposely to read as an expedite and turned it in as so. Someone turned it in to Quality Management and that someone would have to be the manager of our department who was the one that kept in touch with QM with regards to my phony chart review, and she was in touch with QM as they asked her to find an RN in the department to write the review and that person was **Donnabelle**.

This claim needs to be seriously investigated into. Because DB tampered with evidence. This is DB motive of operation. She coached Dori M to write a JPRS on Monica Coleman in which Dori told me that. She told Monica to write something negative about me told to me by Monica. I've shown throughout my testimony all her discrepancies and devious acts and deflection.

Some examples of her manipulation and deflection:

She had Luitenant commander Jessica Woody call the police on Lenola Malik and have her escorted off the VA property when DB was arguing with Lenola.

She put Christianah in charge of Wendy's case which still doesn't hold water because it then falls on Ravipati. But she tried.

She had Ravipati write up my proposed 14-day suspension and the remarks Ravipati makes couldn't have been know by her as she was only my leader for two months which means she got the info from DB. But DB kept her fingerprints off that, and her willing victim was Ravipati.

Here she had Adriene enter this as an expedite this way she can protect herself.

DB is a manipulator and knows how to protect herself by having others do her dirty work.

The footprints lead to Donnabelle's door, but she has everyone else's fingerprints on the merchandise.

# Rebuttal of Christianah Aurora

20. Were you responsible for rating the Complainant "Satisfactory" on his Proficiency Report?

   a. If you were not responsible, then please identify the name and title of who was responsible. **ANSWER:** Ms. Donnabelle Lorenzo-Villarino; Managed Care Department Head/ Pad/ Resources

   b. If you were not responsible, did you have a role in this matter? If so, please explain it.
   ANSWER: I had rated the proficiency and sent it to my immediate supervisor for signature during warm hand off leaving for VISN 12 detail.

21. What time period did the Proficiency Report cover?
   **ANSWER: 2/19/2021—2/19/2022**

Christianah's answer is different than from what Donnabelle stated in her testimony in which she states all she does is sign the proficiencies. Christianah states DB rated my proficiency as satisfactory. But she also states that she rated my proficiency and gave it to DB before she went to work at VISN 12.

Affiant's Initials:_CTA_____ Date:_01/20/2024_____ PAGE 4
20. Were you responsible for rating the Complainant "Satisfactory" on his Proficiency Report?
a. If you were not responsible, then please identify the name and title of who was responsible. **ANSWER:** Ms. Donnabelle Lorenzo-Villarino; Managed Care Department Head/ Pad/ Resources
b. If you were not responsible, did you have a role in this matter? If so, please explain it.
ANSWER: I had rated the proficiency and sent it to my immediate supervisor for signature during warm hand off leaving for VISN 12 detail.
21. What time period did the Proficiency Report cover?
**ANSWER: 2/19/2021—2/19/2022**
22. Did the Complainant submit a self-assessment? If so, did you consider it?
**ANSWER:** The complaint did not submit a self-assessment per attached email evidence.
23. Please explain, in detail, the reason you issued the Complainant a "Satisfactory" Proficiency report.
**a.** Did you explain this reason to the Complainant?

**ANSWER:** I was charged by my immediate supervisor to give the proficiency to all staff ( 3 of them) when I can back from my detail through an email which is attached. She had reviewed and signed all the proficiency; I just handed it to staff as instructed.
b. What was the Complainant's response?
**ANSWER:**
24. Did the Complainant advise you that he believed his performance appraisal rating was lower than he deserved? *If in writing, please provide a copy.*
**ANSWER:**
25. What was your response to the Complainant when he advised you that he believed is rating was lower than he deserved? *If in writing, please provide a copy.*
**ANSWER:** The proficiency was email to the complaint on 2/15/2022. The complaint reply that he was no going to sign due to a low rating. He has the right to refuse the signing which he did. There was nothing I could do as HR stated I should just write refused to sign and send to HR. which was done. The complaint did not follow-up on this till now.

So, Christianah had submitted my review to DB after rating it and going to VISN 12 and when she got back from the detail she indicates DB reviewed and signed all the proficiency and that she (Christianah) just handed them to us.

26. The Complainant alleges he was assigned more work than his coworkers, was this reflected in his proficiency report? If not, please explain why. Affiant's Initials:__CTA_____ Date:__01/20/2024_____ PAGE 5
**ANSWER:** All RN clinical staff were assigned the same level of work when I was on station. The Program analyst uses the algorithm method to put the benchmark number s of consults together for distribution to all staff.

That would be true but when one is on a group that is short staffed by virtue of having less workers assisting in the workload that makes my workload heavier. That was designed by Donnabelle to do that to me. Christianah was not there when all this was going on she was out on leave for 8 months. I elaborate on this in my rebuttal to Donnabelle's affidavit and I believe I also make mention of it in Ravipati's as well.

27. Did you share feedback with the Complainant during the year in the areas you believed needed improvement?
a. If so, please describe the feedback you provided to the Complainant.
**ANSWER:** I have always communicated with complaint on how his performance monthly that was why I rated him high Satisfactory, and it was lowered by my immediate supervisor because I was not on station, I was on detail).

Here Chrisitanah testifies to giving me a High Satisfactory prior to leaving for VISN 12, handed it to DB, who lowered my rating to Satisfactory. DB who claimed in her affidavit all

she does is sign the reviews. I doubt that my direct manager, Christianah, would give me High Satisfactory if my work was sub-par.

This same answer is telling. Because during DB and Ravipati's testimony about me especially in Ravipati's statements throughout her 14 day proposed suspension she indicates a lot of negative comments of me, not completing workload, documentation etc etc. Ravipati makes those remarks after only being my leader for two months. How would she know any of that info about me? Wouldn't it be more appropriate for Christianah to answer those questions since she was the one that I had one on one meetings with? Chrisitanah had these meetings with staff all the time so she would know our work performance and that's why she rated me High Satisfactory but DB lowered it.

DB claims throughout her affidavit, all she does is sign the reviews that are given to her; but, Christianah is saying DB lowered my review from what she originally gave me.

**Look if DB is willing to go to lengths and lower my review as Christianah states here in sworn testimony form Christiana's higher rating of me, what would make anyone think that Donnabelle did not tamper with evidence when she submitted the summary of my consult in question as an expedite to the Peer Review Committee? She clearly showed her character as a bully, authoritarian and discrimination because she doesn't like me, especially when my direct supervisor has firsthand evidence of my charting, ability as a nurse and so on.**

**And after 4.5 years in that department I was NEVER NOT ONCE told that my performance or documentation was lacking the way DB and Ravipati claim who makes claims of "gaps in documentation." Absolutely disgusting.**

If Christianah my immediate manager rated me high satisfy, how can DB, Ravipati, and Dr Buckley make those derogatory claims against me when they don't have any knowledge as to what it is I do? What makes them think that when they don't even know my work ethic and Christianah does?

Christianah has no dog in this fight, there is no reason for her to state anything but the facts. **I knew I was being played when DB gave my last two reviews as Satisfactory which was the lowest in the department, but what I didn't know was that she lowered it when Christianah rated me higher!**

32. Were there any other employees, under your supervision and in the same position and grade as the Complainant, with performance similar to the Complainant's who received a higher rating on his/her Proficiency Report?

a. Identify each person by name and position title. Affiant's Initials:__CTA_____ Date:__01/20/2024_____ PAGE 6

**ANSWER:** Ms. Adriene Harris-- I do have other RN staff, actually on the same team that was given high Satisfactory by My immediate supervisor during the same period I was out. Staff proficiency attached.

b. Identify each person's sex.—

**ANSWER:** Female

c. Why was each person not treated similarly to the Complainant with respect to this matter?

**ANSWER:** I cannot speak to this. I was not the person who rated the complainant and other staff indicated above.

d. Please explain why each individual was given a higher rating with similar performance.

**ANSWER: N/A**

33. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant with regard to issuing "Satisfactory" Proficiency Report ratings in the past year? If so,

**ANSWER:** Not to my Knowledge.

Here Christianah states that Adrienne Harris was given a High Satisfactory by DB. DB gave me a satisfactory. Now remember when you look at the cases of JPRS I present as evidence, Adriene has two JPRS filed for delay of care, not getting records and a death. But even though my performance is better than Adriene's and she had the JPRS filed including a death, she was never detailed and got a higher raise than I did. This screams discrimination and should be investigate fully. And to make matters worse DB had Adriene write up the summary into my issue in front of the Peer Commision. I elaborate this throughout DB rebuttal.

36. Please explain in detail why the Complainant was not issued a Proficiency Rating in February 2023.

**ANSWER:** I was not responsible for proficiency when on leave for 8 months. Ms. Donnabelle Lorenzo-Villarino was responsible to issue the proficiency as she was covering the unit in my absence.

Again telling as DB indicated throughout her affidavit all she does is sign the reviews, here Christianah clearly states DB rated my performance and signed it. So here again she lies under sworn testimony throughout her affidavit.

Donnabelle and Ravipati perjured themselves in sworn testimony.

40. Did other employees not receive their Proficiency Rating, in the same position/grade as the Complainant, during the past year, under similar circumstances?
**ANSWER:** If so, -- no because – I was told after a month of coming back from medical leave to sign and give proficiency to staff. The proficiencies were already rated but not signed.
1. Wendy Superable--- Female—RN care coordinator
2. Cynthia Reluya--- Female—RN care coordinator
3. Ruby Dizon--- Female—RN care coordinator
4. Adriene Harris--- Female—RN care coordinator
a. Identify each person by name and position title.
b. Identify each person's sex.
c. Why was each person not treated similarly to the Complainant with respect to this matter? I do not know


This is bizarre because Christianah is stating when she came back the proficiencies were already rated. Donnabelle throughout her sworn testimony states all she does is sign them and doesn't do the ratings. In these 4 RNs listed above DB asked Christianah to sign them after DB rated them. But DB claims she signs them and not rate them. This is inverted to what DB is stating. I imagine both managers sign the reviews.

But what DB is doing is trying to create confusion so that no one can make sense of this and that way she can skate past all her deceptiveness.


I'll be willing to bet one years pay that all four of the nurses listed above got better reviews and ratings than I did. Even though Wendy had a JPRS for a suicide patient, Adriene had two JPRS one of which the patient died due to neglect, and Cindy Reyula who didn't follow protocol on the issue they bring against me.

## Rebuttal to Donnabelle's answers

20. The Complainant testified he was harassed when he requested help from Management when the department was short staffed. Did this happen as the Complainant described?  If so, please explain.
    a. No.  When the program experiences turnover and/or staff shortages due to leave usage, all staff members are expected to provide coverage for their absentee member.

Yes, there was shortage due to turnover; however, the group I was assigned to was short staffed the entire time.  I explain this in detail in my previous brief turned in.

For example, we were divided into 4 groups.

**My group** had 2 RN's and 1 LPN and 1 PSA assigned to 4500 consults.

**Wendy's group** which was an FTE on 1 had roughly 1200 consults and she was supposed to do that all by herself from beginning to end. But DB gave her a fulltime RN and a fulltime PSA.  So this group had 2 RNs and 1 PSA for less than half the consults of any other group.

**Cindy's group** had roughly 4500 consults and she had **3 RNs** and **2 LPN's.**

Although, DB proclaims one of the RNs was in training, the job takes a few weeks to understand and get to processing consults. Informatics or IT can easily look up at the "trainees" and see what they did as far as consults and processing.  Again, the evidence is out there and the trainees were processing consults.  For the 6 months prior to my detail Cindy's group benefitted with the extra RN as well as the extra LPN. And by the way that extra LPN Cindy's group had was, Roger Lohr, who was suppose to be in my group, but DB kept out of my group intentionally.  This was her subtle way of sticking it to me which

constitutes harassment.  It was only around a little before she detailed me that she put Roger in my group.  Now it makes sense.  She planned on detailing me and in doing so my group would only have 1 RN for the 4500 consults so she slid Roger back into my group shortly before my detail.  It was all calculated to harass me before detailing me.

**Ken's Group,** was set up the same way as Cindy's group.  His had roughly 4500 consults divided between 3 RN's and 2 PSA's.


In summary, each group but mine had an extra RN and 1 or 2 extra ancillary staff than my group.  Therefore, by virtue of staff to workload ratio, I had the greater amount of work and responsibility.


Why?  Simple.  Wendy is Filipino and best friends with DB so she had a lot less consults with a lot of extra help.  Cindy is Filipino and good friends with DB so she benefited from the extra help.  Ken is Filipino and his family and DB family are close friends and hang out.  Me as a male non-Filipino wasn't part of the club therefore I was left short staffed. One or two extra staff in a group makes a tremendous amount of difference as far as workload.

21. What action did you take?
    a. Management continued to provide daily coverage strategy for any staff member who was absent.  Management has continued to work on backfilling vacant positions and these processes were communicated to the team.


It doesn't explain why Roger Lohr was hired and assigned to my group but she kept him in Cindy's group up until I was detailed.  When I was detailed she needed to have that group somewhat staffed.  Another

slimy calculated move on DB part when Roger was supposed to be in my group the entire time but only came in when she knew she was shipping me out unjustly.

23. The Complainant testified that he was harassed when he reported staff were working overtime without compensation. Did this happen as the Complainant described? If so, please explain.
    a. No.

Of course, she's going to say no. Why would she admit this especially during a Federal EEO inquiry. Her actions as seen by all her contradictory statements as far as lowering my performance reviews, short staffing me, detailing me under made up circumstances, yelling at me the day she detailed me, ignoring my requests for additional help, ignoring the whistleblower claim I informed her about, etc etc etc all constitutes harassment and discrimination.

24. What action did you take?
    a. When the complainant reported this alleged action, a review of hours worked was performed within the timekeeping system and during one of the huddles, management reminded staff not to work outside their tour of duty or approved overtime hours.

When I blew the whistle on the staff working without pay as she admits in the above answer, I don't remember her mentioning in any huddles for staff to stop. The telework agreement we all signed to work from home indicated that we lose the privilege of working from home if we violate the complaint I made. There is a reason the VA put that clause in as to prevent any labor law violations, HIPPA laws. This should have been immediately addressed as the manager that admits she knew I brought this to her attention. But since it made her numbers look better via the Metrix, DB looked the other way.

Moreover, in Ravipati's 14 day proposed suspension to me one of her answers is that I don't keep up with my workload or something to that effect, which is a spit in my face answer. Ravipati and DB both knew of my whistleblower claims and that I was working short staffed compared to the other groups. And since they knew that and they continued to allow staff to work off hours without pay, rate busting, and that makes them two as guilty as the staff that was violating the labor laws and HIPPA laws. A congressional inquiry into this is warranted. DB and Ravipati are party to the crime for knowing this was happening and yet doing nothing about it. Ravipati's answer with regards to me not keeping up with consults is galling at the very least and only intended to aggressively demean me when her and DB knew I was working short staffed.

25. If no action was taken, please explain why.
   a. N/A

DB stated in an RN meeting as explained in email and on Ravipati's rebuttal the following, "I can't help what people do at home."

Her inaction as a manager violated the Tele agreement, we all signed, violated Labor laws, violated HIPPA laws, all this is grounds to investigate DB and Ravipati.

All the RN's and Kindra Perkins Reginal Union Representative were privy to her admitting she knew this was happening. And she knew I brought it to her attention. And when I brought this to her attention that's when things really started to go down hill for me in that department.

26. The Complainant testified that you directed other staff to make negative statements against him. Did this happen as the Complainant described? If so, please explain.
    a. No.

Again, of course she will not admit this, she's being investigated. Monica Coleman RN, Union Representative told me that DB called her and was calling others in the department soliciting them to write up or say negative comments about me. According to Monica this happened after one of our morning shift huddles. Perhaps the EEO board can ask staff or Monica to testify into this matter.

27. Did the complainant inform you or anyone else that he felt harassed?
    a. On March 24, 2023, when a request for a fact-finding meeting was issued to the complainant, the accusations of retaliation began.

I was telling DB that she has been harassing me way before March 24, 2023. I believe I have even sent her Team's messages indicating this. She was told prior to March 24, 2023 it wasn't too difficult to see I was being harassed by her lowering my reviews, keeping me short staffed and so on.

28. Do you have anything else to add?
    a. Yes. On June 24, 2022, the complainant was made aware of a request of reports of contacts from the staff. This request was initiated by my immediate supervisor Steven Kaufman and the complainant acknowledge the request.

I'm not sure what this is referring to?

**Incident b:** On unspecified dates in 2022, Complainant was rated Satisfactory on his Proficiency Report.

29. Were you responsible for rating the Complainant "Satisfactory" on his Proficiency Report? No.

    a. If you were not responsible, then please identify the name and title of who was responsible.
        a. Christianah Arowora, Office of Community Care Nurse Manager

    b. If you were not responsible, did you have a role in this matter? If so, please explain it.
        a. I am the reviewing/approving official.

Not true, DB is flat cold lying. She gave me my last two reviews and purposely lowered it.

I will interject my direct managers response to this as cross reference. Below are Christianah's answers which I italicized and highlighted in yellow so we know these are questions being asked to Christianh in her affidavit with regard to this matter and not Donnabelle.

*The Complainant alleges that based on sex and reprisal he was subjected to a series of incidents that he believes constitutes a hostile work environment following is a series of questions about each of the incidents raised in the claim.*
*Incident a: On unspecified dates in 2022, Complainant was rated Satisfactory on his Proficiency Report.*

*Affiant's Initials:_CTA_____ Date:_01/20/2024_____ PAGE 4*
*20. Were you responsible for rating the Complainant "Satisfactory" on his Proficiency Report?*
*a. If you were not responsible, then please identify the name and title of who was responsible.* **ANSWER:** *Ms. Donnabelle Lorenzo-Villarino; Managed Care Department Head/ Pad/ Resources*
*b. If you were not responsible, did you have a role in this matter? If so, please explain it.*
*ANSWER: I had rated the proficiency and sent it to my immediate supervisor for signature during warm hand off leaving for VISN 12 detail.*

*23. Please explain, in detail, the reason you issued the Complainant a "Satisfactory" Proficiency report.*

*a. Did you explain this reason to the Complainant?* **ANSWER:** *I was charged by my immediate supervisor to give the proficiency to all staff ( 3 of them) when I can back from my detail through an email which is attached. She had reviewed and signed all the proficiency; I just handed it to staff as instructed.*

*Christianah is indicating DB was the one that rated the performance reviews, signed them and all she did was hand them to the staff.*

*27. Did you share feedback with the Complainant during the year in the areas you believed needed improvement?*
*a. If so, please describe the feedback you provided to the Complainant.*
**ANSWER:** *I have always communicated with complaint on how his performance monthly that was why I rated him high Satisfactory, and it was lowered by my immediate supervisor because I was not on station, I was on detail).*

***Christianah is testifying under Penalty and Perjury in this Federal EEO investigation that she rated me High Satifactory, and it was lowered by her immediate supervisor who is Donnabelle.***

**Back to the questions being asked of Donnabelle below.**

32. Please explain, in detail, the reason you issued the Complainant a "Satisfactory" Proficiency report.
    a. I am unable to address this question as I am the approving official and not the rating official.

**Another lie by Donnabelle. As Christianah my direct manager states in her answers above, she rated me High Satisfactory, and it was Donnabelle that lowered the rating.**

**This is clear bias, clearly makes my point, clearly shows discrimination and retaliation by Donnabelle onto me.**

**If Donnabelle is wiling to lie about this and some of the other instances, why would anyone believe any of her credibility?  It should be automatic, she has been proven to**

have lied under oath. The moment a Jury thinks you're lying, there is a 95% chance the verdict will go against you.

33. Did the Complainant advise you that he believed his performance appraisal rating was lower than he deserved? *If in writing, please provide a copy.*
   a. I am unable to address this question as I am the approving official and not the rating official.

Lie, per Christianah, DB lowered my rating so she is the rating official. The attachment was my reply disagreeing to the rating.



Rebuttle to Yearly
Assmt.pdf

Below is my response to DB's satisfactory rating.


I disagree with the yearly assessment of a "satisfactory" rating for many reasons but will only list the following:

1.I was the one that emailed Dr Buckley and talked to Captain Pyles and Steve Kaufman regarding getting overtime staff to assist OCC either through the Military or otherwise. Dr Buckley responded to me through email with regards to my request. Moreover, this is something leadership should have done, not a low-level RN in the department who processes consults and works other ancillary jobs contrary to what VISN and National are asking of RNs. If not for me we never would have had the 3000 hours of OT so far, and the dept would be sitting dead last in VISN 12.2.There are new staff in this department that had 6 months of training that had gotten bonuses and higher ratings than I did.3.The comment stating, "He realized, he lack in utilizing evidence based practices in his everyday practice," I disagree with that assessment of me. I never said that. I always make sure I'm on top of the latest evidence-based medical practice, as I probably have more critical care experience than any other nurse in this department. Leadership in this department treats the numbers and not the patients which is contrary to EBP. When I fight for nurses to practice at the top of their license which includes our critical thinking and case manage, I'm ignored, and leadership is more concerned about the metrics than triaging patients accordingly. We're not putting lawn mowers together; we're treating human beings; however, the dept is run like an assembly line. The said offensive statement projected towards me stating, "He lacks everyday evidence-based practice" is insulting.

I have a billing proposal sent to the House Veterans Affairs Committee, in Washington DC in line with the subcommittee waiting for vote. I realize I didn't turn in my self-performance eval, but stepping my game up goes straight to my integrity and dedication to the veterans and making the VA a better workplace.
Azis Kochiu

35. Was there a reviewing official for the Complainant's performance Proficiency Report? If so, provide the name, title, and email address of the reviewing official.
  a. Yes. The reviewing official is Christianah Arowora, Office of Community Care Nurse Manager.

Christianah's answer clearly shows DB was the referring official and lowered my rating. Chrisitanah wasn't even on station during my past two reviews but does indicate she gave me high satisfactory and DB lowered it.

This is the game DB plays, she covers her bases by blaming others for her vileness activities. Everything she does is calculated to protect her and deflect her nefarious activities onto her willing victims. She's a manipulator. Just like she got Ravipati to implicate herself in this case when Ravipati was only head of the dept for 2 months, she shifts blame on HR stating they told her to detail me, she is using Christianah as her scapegoat on this issue. Just like her and Ravipati gave DB a lateral move next to Christianah so she is no longer above Christianah (temporarily) so that DB would not be the one to address her friend Wendy's JPRS regarding a veteran that hung herself. This way DB can bypass having to deal with that issue and avoid any discipline to her best friend Wendy. DB would never detail her best friend which would make my point that she is discriminating against me as a male and not Wendy as a female. So she makes the lateral move next to Christianah that way Christianah has to deal with Wendy's JPRS. The caveat is Christianah could never detail Wendy no matter what because, Wendy, DB, Ravipati and all the Filipinos will attack her and make her life miserable to the end of time as they have done to her in the past. It's all calculated by DB and Ravipati in hopes that I drop this EEO case. When that happens, Ravipati will slide DB right back into the head of the department once again. Wendy doesn't get detailed because Christianah won't dare deal with that type of backlash. This way DB is protected from not detailing Wendy and can shift the blame stating it was Christianah that had to deal with Wendy's JPRS and not her; therefore she can proclaim Christianah is Wendy's immediate supervisor it is her responsibility to handle it and this way DB has nothing to do with it and can avoid detailing her friend, or not detailing her friend which would make my case.

And this is why I sent an email suggesting this would happen. The email was sent to Ravipati, HR and others, as soon as I found this out by the Union, to intercept their calculated activity before they have a chance to comment and lie on the affidavit.

But since I called them out in that email, we see that Ravipati and DB cannot use the above excuse as to her lateral move next to Christianah so they both resort to shifting blame on HR stating HR did not advise them to detail Wendy. It was all they had left. Which we know it's up to the manager to hand a punishment not HR.

But what they can't get past is that Ravipati is higher than all of them and it is up to her to detail Wendy and not HR as she/they claim. As Ravipati signed my 14-day proposed suspension she should have treated Wendy with the same intensity that she treated me. Ravipati did not detail Wendy and this is all calculated by the two managers but I called their bluff so all they had left was "HR didn't recommend detailing Wendy."

This bears repeating. Of course, Christianah, would never dare even think of detailing Wendy because if she did then DB, Ravipati and all the Filipinos would harass her as

they have done in the past. Christianah's best bet is to stay clear of DB and Wendy as she will pay the price if she would have detailed her pending investigation. Those two have come after Christianah relentlessly for years and everyone in the department knows that. DB wants Wendy to have Christiana's job and everyone knows it, even Ravipati knows it because she even told Christianah that. I don't think I have seen such blatant racism towards the only black woman in leadership in that department then anywhere as an employee. And because in the past I never went along with DB and Wendy in their attempts to falsely accuse and harass Christianah that was also reason for DB to retaliate against me. If I see someone being bullied, I am not going to stand by and let it happen, I'll say something. Christianah and I may not be friends and go out and have drinks or anything like that but she's a human being, there for a paycheck making a living like the rest of us, people don't deserve to be treated like that, and I won't sit by and watch someone get attacked the way DB, Wendy and the Filipinos attack Christianah. If me intervening goes against the grain so be it.

37. Did the Complainant appeal his Proficiency Rating? If so,
   a. Not to my knowledge.

   a. Provide the specific date he appealed the rating.
      a. N/A
   b. Name the Management Official he appealed the rating to.
      a. N/A
   c. Did he appeal the appraisal in writing? Please provide supporting documentation.
      a. N/A

I did in the above statement, question 33. I'm not sure what the appeals process is and how to go about it. I sent the above rebuttal to my disagreement to the rating.

39. Were there any other employees, under your supervision and in the same position and grade as the Complainant, with performance similar to the Complainant's who received a higher rating on his/her Proficiency Report?
   a. No.

   a. Identify each person by name and position title.
      a. N/A
   b. Identify each person's sex.
      a. N/A
   c. Why was each person not treated similarly to the Complainant with respect to this matter?
      a. N/A

Another lie by DB.

Below is Christianah's response's in italicized and highlighted in yellow.

*32. Were there any other employees, under your supervision and in the same position and grade as the Complainant, with performance similar to the Complainant's who received a higher rating on his/her Proficiency Report?*
*a. Identify each person by name and position title.*

**ANSWER:** *Ms. Adriene Harris-- I do have other RN staff, actually on the same team that was given high Satisfactory by My immediate supervisor during the same period I was out. Staff proficiency attached.*
*b. Identify each person's sex.—*
**ANSWER:** *Female*
*c. Why was each person not treated similarly to the Complainant with respect to this matter?*
**ANSWER:** *I cannot speak to this. I was not the person who rated the complainant and other staff indicated above.*
*d. Please explain why each individual was given a higher rating with similar performance.*
**ANSWER: N/A**

Adrienne Harris got a higher rating than I did even though I am more productive than she is and we are on the same team.  And by the way Adriene Harris had two JPRS filed against her and one of which resulted in a death.  Adriene got no detail pending investigation, no suspension, no harassment etc etc. I will attach those in another section. Yet she got a higher review than I did.  And as Christianah indicates DB was the one that did the ratings.  Very telling with regard to DB's credibility and deflection.

40. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant with regard to issuing

"Satisfactory" Proficiency Report ratings in the past year?
    a. Not to my knowledge.
        If so,

        a. Identify each person by name and position title.
           a. N/A
        b. Identify the sex of each person.
           a. N/A

1. What policies are relevant to this matter?
    a. N/A

Another deflection/lie, as Christianah testified DB was the one that gave the ratings. On mine and Adriene Harris.  See above answer's Christianah states.

**Incident c:** **On unspecified dates from November 8, 2022, to May 3, 2023, the Complainant was assigned a bigger workload than his co-workers.**

42. The Complainant testified he was ignored when he complained that he was assigned a heavier workload than other staff. Did this happen as the Complainant described? If so, please explain.
    a. No. The whole Office of Community Care program was changed to alpha split team rather that alpha split individual assignment as per the staff's feedback due to inconsistent coverage when someone is absent. When the clinical staff were divided into teams, there were initially two Registered Nurses each team. Two of the teams have an orientee on their team who eventually merged into their respective teams. It was also conveyed to the team and to the Complainant, that a request for an additional Registered Nurse or a conversion of an administrative position to be converted to a clinical staff was in the process. The alpha split for each team is determined based on historical data not on current data. Each team member is expected to process consults within their tour of duty.

I brough this up so many times all to no avail. I explained it thoroughly in a brief submitted to my investigator as well as above in question 20.

DB can put whatever kind of spin on it she deems to protect herself but the fact that I had more work than the other groups by virtue of being short staffed doesn't change the facts that I had more work to do. DB did this by design as a way to punish me for speaking up. Again, the people she claims that were orienting were processing consults, IT/informatics can look that up easily. Moreover, Roger Lohr, who was assigned to my team was working under DB's friend Cindy's team all the way up until shortly before I was detailed. All by design to punish and harass me indirectly. Remember harassment comes in subtle forms.

49. Please explain in detail the reasons the Complainant was the subject of a fact-finding investigation; he lacked documentation in his emails and was accused of not properly scheduling a deceased patient's consult in December 2022.
    a. There was notification of patient death which generated a patient safety report. Upon review, patient's cause of death was related to a condition patient was referred to see a specialist. There was a lack of care coordination which resulted in patient being not scheduled for the referred service. Based on care assessment need, patient's care coordination level is determined whether care coordination is handled mostly by a clinical staff of administrative staff. A fact-finding investigation was conducted by management, and a peer review conducted by Quality Management.

That's yet again another deflection. I followed the guidebook as well as Donnabelles directive on 11/10/2022 of which to this day she refuses to let EEO have access to the Team's recoding. Even Melvin Tolbert the VA EEO representative tried to get it and couldn't. I filed a FOIA and was told it would have to be redacted without DB's voice.

But let's dissect this answer before moving on to who's job it was to schedule the appointment.

Her last sentence state, "A fact-finding investigation was conducted by management…"

Below is Ravipati's response to Wendy's detail in which she casts blame toward HR.

*48. According to the Complainant, Wendy Superable, Nurse was not treated similarly to the Complainant and removed from patient care following the death of a patient? How do you respond?*

*After fact finding and review of 30 consults evidence was presented to HR, HR did not advise OCC leadership to remove RN Wendy Superable from patient care*

What you have is that during my investigation Management conducted the fact-finding and detailed me. Conversely when it came to Wendy Ravipati states HR did not advise leadership to remove Wendy. Two contradicting statements by the two leaders. Why would management exclusively take it upon themselves to detail me, but when it comes to Wendy they look the other way and state, well HR did not recommend removing Wendy therefore she was not detailed. What kind of leadership is that? They are the clinicians, NOT HR! They should have taken the initiative to keep things fair and not shift blame on HR for not detailing Wendy. That's got to be one of the most ineffective answers yet! That's medicine 101. It doesn't get anymore rudimentary than that. They both know as clinicians the gravity of what Wendy did warranted an immediate detail pending investigation with the same intensity they came after me with. But as has been proven throughout this entire process through their actions and inactions and the way they obfuscate when answering these questions which constitute not only perjury; but, the bias and discrimination towards me for being a male and treated differently than Wendy as a female Filipino. I explain this in detail on Ravipati's affidavit so no need to repeat the same thing. Just want to make the point it is always up to management to hand down a punishment, HR only guides them. Even if HR recommended no need to remove Wendy, as clinicians and leaders, they were obligated to do so. Yet another thing that warrants a congressional hearing into the corruption of that department in which the taxpayers and veterans should be aware.

There is only two ways to look at this bias.

1.  Either HR is treating me differently as a male than they are Wendy as a female, or,

2.  DB and Ravipati are treating me differently as a male than they are Wendy as a female.

One or the other I was clearly discriminated against. The question becomes who's lying and who's telling the truth? HR or Leadership?

The first part of the answer states a lack of care coordination. I followed the rules and Kelly Heckel was supposed to schedule it. I even called DB and told her my group needs more assistance because Kelly is falling behind. Again DB ignored my request.

The part where she indicates lack of care coordination implicates her. She gave the consult to Cindy Reyula three times, and if there was any lack in care coordination that was on her friend Cindy, female, Filipino. Of course, nothing happened to Cindy or Kelly. According to NPA and medicine the person that's with the patient at the time is sole responsible for what happens and that person was Cindy who had the consult three times after me.

50. Have other employees been the subject of fact-finding investigations, in the same position and grade as the Complainant during the past year under similar circumstances? No.
    a. If so,

    a. Identify each person by name and position title.
        a. N/A
    b. Identify each person's sex.
        a. N/A
    c. Why was each person not treated similarly to the Complainant with respect to this matter?
        a. N/A

This is where I have been waiting so badly to insert the 7 JPRS filed on other staff that DB and Ravipati allege I did, when these JPRS are the ones the two leaders should have focused on.

Below attached are 7 cases to which DB and Ravipati ignored which are under similar circumstances to what they allege I did.


cases.docx

Case 1 – involved Adriene Harris (female) in which delay of care and follow up resulted in a pulmonary nodule that grew.

Case 2 – Ken Dizon (male Filipino) elevated PSA, no follow up of records and patient died.

Case 3 – Monica (female) and Christianah (female) weight loss, mass in pancrease was made a moderate not complex, scheduled 5 months late

Case 4 – Involved Adriene Harris (female) involved a pulmonary consult for a spot on the lung wasn't worked on for until 1 month later, patient died expired sept 22.

Case 5- Ken D (male Filipino)  records were required and weren't gotten until 4 months later after a follow up was requested.

Case 6 – involved Monica (female) and Rhonda (female interm manager)  the consult was administratively closed.  Consult was made a moderate and subsequently closed and there was a delay in scheduling because they had no records.

**Case 7 – Wendy (Female) suicide patient requesting help was made a basic and given to an admin staff orientee to handle it resulting in a 35 year old veteran who hung herself.**

**These are just the JPRS one person gave me, who knows how many more there are?!!**

**Nothing happened to any of them when if you read the consults they clearly show a delay in care, failure to follow up etc. no fact finding, no detail pending investigation, no suspension, no slander, NOTHING!**

**Now for DB and Ravipati to say this has never happened before is a flat cold blatant lie. Yet again, it proves the discrimination towards me for being a male non-Filipino.**

**This case I bring forth has to do with retaliation, sex, and race.  The evidence is so overwhelming.**

**Below I attached an email sent to leadership**



Ozzie's response to
Kaufman regading cor

The attachment above is my responding to leadership that I cannot keep compromising patient care to treat the numbers.

Reasons like the above for speaking up are just some of the reasons DB and Ravipati retaliated against me.

**<u>Issue e</u>: on June 15, 2023, you gave deceptive information to a Peer Review Committee.**

51. The Complainant alleges you gave deceptive information to a Peer Review
    Committee on June 25, 2023.  Please respond to this allegation.
    a. No.  I provided no additional information to the Peer Review Committee.  I
       only assisted Quality Management to assign a peer (Registered Nurse) to
       review the consult in addition to relaying messages from Quality
       Management to complainant and to their peer.

**DB answer yet again, makes no sense.  Below is the summary that was sent to the Peer Review Committee.**

3.     This case involved an 89 y/o male with order placed for community care nephrology consult on 12/08/2022. Order was received on 12/15/2022. On 12/19/2022, referral was processed. Subsequent follow-up for referral was on 01/10/2023. On 02/27/2023, notification was received that patient was admitted in community hospital on 02/23/2023 for acute kidney failure. The initial reviewer identified the aspects of care on inadequately monitoring patient's condition and, lack of recognition of signs and symptoms of deterioration on patient's condition. The initial reviewer cited Community Care Field guidebook chapters 3.2 and 6.3 as reference. The initial reviewer also mentioned that the RN coordinator did not consider the consult as complex by processing and scheduling ASAP even though it was an expedited request.

Adriene Harris called me up personally on my cell phone Sunday January 8th at approximately 6 pm and told me she never wrote that above statement.  She told me she was given a form to fill out to which she did and she stated to me that she included Cindy RN and Kelly Heckel PSA in her response when filling out the form.  She added, she never stated this was an expedite.

Now the response above clearly states in the last sentence "even though it was an expedited request."  So if Adriene Harris states she did not state this was an expedite then why is it written as if it was requested as an expedite?

Either Adriene Harris is lying, or she was told to state that it was an expedite by DB.  Quality Management would not know if this was an expedite as they don't know anything about the ins and outs of our department that's why they asked for someone to review the consult. Therefore, the only one that had access to this was Donnabelle.  No one else was privy to this information.

Moreover, if Adriene Harris did write the above summary (which she stated to me she did not) but let's say even if she did, it was still up to Donnabelle to look into this because as she states in her answer above Quality Management needed her to assist in getting a Registered Nurse to review the consult.

She goes on to answer, "I only assisted Quality Management to assign a peer (Registered Nurse) to review the consult in addition to relaying messages from Quality Management to complainant (me) and their peer.  (meaning peer review committee.)

That indicates Donnabelle had this in her possession and was privy to the information Quality Management was asking for and to relay a copy to me and gave a copy to the Peer Review Committee.  That to me indicates DB was the only one that had this in her Adriene Harris's testimony in her hands.  She's the only one that could have tampered with evidence and changed what Adriene Harris stated.  DB entered this fraudulent information as an expedite and left out Cindy Reyula RN and Kelly Heckel PSA according to Adrien's testimony to me.

Why would DB do that?  Simple, because she had absolutely no reason to do all this to me and she saw her deception into the matter was falling apart and therefore, this was a another Hail Mary attempt to cover herself in front of the Peer Committee and make it look as though I didn't send the consult out soon enough because it was an "expedited request"

Let's just say even if DB proclaims she didn't write this her answer that she relayed the message to me and the peer indicate she had this in her hand and was the only one with the knowledge of the fraudulent summary.  Then why as a manager would you not look

into this to see if it was factual knowledge? Why would you as a manager just randomly submit this information without reading it? That's why her claims that she didn't tamper with evidence is a lie. It was her duty as a manager to make sure everything is correct. She's not an uneducated person, she's well aware enough to proofread a simple paragraph before submitting it to the Peer Review Committee.

Now, the above summary is nothing like Adriene Harris's syntax. She doesn't write the way the summarized paragraph reads. It does however resemble Donnabelle's writing style. Just read that paragraph and read how DB answers questions throughout the affidavit they parallel one another.

What even makes this more suspicious is, DB contacted me through Team's message asking me if I'm going to attend the Peer Review to which I stated, yeah for sure or something that implied definitively I can't quit remember but it is somewhere on Teams. All I remember was my response was given with conviction without hesitation that I was going to be there. At this time, I still did not see the above summary.

Shortly thereafter, I was given a form to sign that I would be attending the Peer Review. On that form I saw that DB inserted Christianah's name to show up as a manager. Where Christianah's name was written I saw that Christianah crossed her name off. She crossed it out because she was out for 8 months and knew nothing of the case and wasn't going to take the blame for anything DB did. Here is another example of DB deflecting so she can state Christianah wrote that summary or something nefarious like that.

A day or two later I got the list sent to me again (I'm not sure if this list came from Quality Management but I assume it did) and on the list where Christianah had crossed her name off, I saw the initials D.B. Donnabelle initialed that she would be there; most likely because Quality Management wanted a manager from the department to show up. However, DB never attended. She never showed up very likely because she knew I was going to be there and shoot her entire case into pieces, which I did.

It wasn't until after Donnabelle reached out to me asking if I was going to be at the Peer Review that I got the summary above. That really bothered me to say the least. I knew exactly what DB was up to at that moment, why she called to see if I was going to be there, and why she inserted Christianah's name in her place.

DB changed the facts to cover her double-dealing into the case which she fraudulently brought up against me, then when she messaged me and found out I was showing up to the hearing knowing that she wrote the summary she then inserted Christianah's name to make it look to me as though Christianah wrote the summary; however, when Christinah stated she wasn't going to be there and crossed her name off the list, DB was likely asked by Quality Management to show up as someone from Community Care Management should be there; however, DB never showed up to the Peer Review because she knew sooner or later Quality Management would give me the summary stated above, which they did, and her knowing that I would speak up frightened her so she played her cards to not show up and hope this goes away somehow.

That signature list can easily be accessed by asking Quality Management.

52. The Complainant alleges Management did respond when he requested a Root Cause Analysis. Please respond to this allegation.
   a. I was not part of the Root Cause Analysis conducted by Quality Management. The POC for quality management in this incident is Maria Jessica Joy Castelli.

I sent an email to upper leadership, DB, Ravipati, Dr Buckley, HR, Union etc. asking why leadership isn't having a Root Cause Analysis into this. If the gravity of what I did was so bad as Buckley stated in his suspension letter to me, then why not a RCA? I mean, what do they have to be afraid of? The truth? A Root Cause Analysis (RCA) is just a team of individuals, doctors, nurses, HR, ancillary team and so on where we all come together and discuss the case to see where the error happened if any so that the hospital can prevent any future occurrences. Sounds reasonable to me. You'd think leadership would push for this after all the accusations they made towards me. I asked them for an RCA as it is even documented in email and not one of them responded, they ignored it. They are the ones that are supposed to spearhead this not wait for Quality Management. Again another deflection by DB, pushing this onto Quality Management.

Again, no one from leadership responded to my request for an RCA. Why? Because they all knew the truth would come out from the recording on 11/10/22, to department witnesses, to the tampering with evidence all which leadership wanted no part of. They just want sweep this under the rug and move on from it and hope that I let this go.

Speaking of wanting me to drop this EEO. I am currently involved in a DAB regarding my suspension that I filed. The DAB is an appeals board that will listen to my side and see if there were any grounds for my punishment. I have about 10 witnesses from the Community Care Department on my behalf and I included Donnabelle on my witness list so that she can be cross examined. The VA attorney has, HR, Buckley, Ravipati and they included Donnabelle as well after I originally wanted her to appear on my witness list. Nonetheless, after our initial hearing, the Union got a call from the VA attorney. The VA proposed that they will drop everything, pay me back the lost wages, make me whole as if this never happened if I am willing to drop this EEO case. Why would they want to drop everything and get this past them if I did everything wrong the way they state?

Answer, is likely because I had them get access to the recording dated 11/10/22 and I told the attorney right there in front of the appeals board why wouldn't you get the tape, why wouldn't you want to hear the truth? I futher stated your client DB and leadership never provided a statement of facts to exactly what I did wrong and then cite somewhere from the guidebook what I did wrong.

It's most likely the VA attorney heard the recoding; new they couldn't back up the allegations and wanted all this to just go away. I told them no deal, the EEO is not negotiable.

Anyway, so I asked for an RCA the moment I was detailed, and I'd still push for an RCA right now. Let's have one, I'm begging them to have one. If they are so certain in their statements of me, then what are they afraid of. Let's have the RCA so that our peers in the hospital can see if something needs to be corrected. They have nothing to lose, I would have everything to lose and am still requesting it be done!!!

**Incident 1:** **On May 8, 2023, the Complainant was removed from patient care.**

60. Were you responsible for removing the Complainant from patient care?
    a. I issued the Complainant a temporary reassignment away from patient care during this investigation as directed by Human Resources.

That's a lie. My phone conversation with Alex HR was that this was management's decision. And management is the one that would have to bring me back from being detailed. In fact, when I called Alex a month into my detail he specifically told me this was all done two weeks ago and said I would have to talk to my manager as it's a management decision.

At that point there was no more talking with DB as she would have kept me detailed for a year if she could so all my correspondences were with Ravipati who told me she did not know how to get me back to my job. So I waited until after my Peer Review Meeting thinking that that's when this nightmare would end but it didn't. After the Peer Review I would randomly reach out to Alex who would tell me it's up to management and not him. When I reached out to Ravipati she stated she didn't know how to get me back and I told Ravipati you're higher in the chain of command than DB can't you do anything about it, because if you leave it up to Donnabelle she'll keep me detailed forever. Ravipati did not answer after I stated that and that was the point where I had no choice but to seek advice from the EEO office at Lovell and talked with Melvin Tolbert. I filed an EEO claim, it was processed, and once the VA was notified that I filed an EEO, Ravipati brought me back immediately. She went from not knowing how to get me back to immediately brining me back, but there was a price I paid for filing. Ravipati retaliated by issuing a 14-day suspension and to add insult to injury made a lot of derogatory statements in the proposed suspension which I had to defend against when I was sent to Dr Buckley's office for this matter.

So, when DB says she was directed by HR that is her way of casting blame on HR and deflecting the truth which is it's always up to management. She is throwing HR under the bus which is par for Donnabelle.

Below is testimony by Alex Morse HR representative from his sworn affidavit.

7. On what date were you contacted by Management with regard to this action? Who contacted you?

   A: 3/23/23. Donnabelle Lorenzo-Villarino

8. What information was provided to you by management and what advice did you give to management regarding this action?

   A: That there was a delay in care possibly resulting in the death of a patient. I advised them that they would need to perform a Weingarten meeting to question the employee and gather all the information surrounding the case.

Donnabelle is throwing HR under the bus and deflecting yet again. You can see from HR's statement above DB approached him and he advised to do a Weingarten and nothing else.

Alex HR does not in any of his testimony throughout his affidavit mention that he directed Donnabelle to give me a temporary assignment away from patient care pending investigation.

The investigator asks a follow up question below to which Alex response at letter a.

activity.

13. Do you have anything else to add?
   a. I do not have anything else to add.

If it was up to Alex HR to detail me then why would he not mention that it was he that pulled me away from patient care?

The truth is it's always up to the manager and HR only guides the managers so that the managers don't put the company at risk.

61. Did you receive guidance from anyone in removing the Complainant from patient care? If so,
   a. Yes.

      a. Identify each person by name and position title.
         a. Alex Morse, Human Resources Specialist Employee/Labor Relations.

Alex does not mention in his affidavit that he gave guidance to remove me from patient care. The only response he had was listed above stating a Weingarten. And he further states he has nothing else to add. Alex only makes mention of the Weingarten and nothing else.

During the Weingarten hearing DB never mentioned what patient, did not look at my documentation on my community care progress note dated 12/19/22 indicating I called the patient when she was accusing me of not charting where I called the veteran. Charted in the CCP note as directed by Christianah my immediate manager. DB only showed certain parts of the consult and was badgering me with a defensive stern tone to her voice to the point that the Union had to step in and calm her down. Cecilia Sherod Union representative stated this was all punitive.

62. Please explain, in detail, the reason you removed the complaint from patient care.
    a. Since there was a belief in risk to patient safety, it was recommended that the Complainant would be detailed during the investigation.

And as we seen nothing happened to Wendy RN after she let a patient hang herself. Or any of the other JPRS I've submitted as evidence.

In fact not only did nothing happen to any of the others like Wendy and the other deaths and delay in care caused by the other Registered Nurses; but they all got raises and performance ratings higher than me! In addition to the entire unit as shown by my attached evidence indicating delay in care. Can you believe that. Case 1, which involved Adriene Harris in which there was delay in care causing a cancerous pulmonary nodule to grow, and Case 4, that I presented regarding Adriene Harris in which she hadn't touched the consult in 1 month and the patient died got a Highly Satisfactory rating by Donnabelle, and I got a Satisfactory rating by Donnabelle as per Chrstianah's testimony in her affidavit.

And to top it off, Adriene with two separate JPRS that got a higher rating and raise than I did was the one Donnabelle had review my consult in this matter to which a fraudulent summary was entered by Donnabelle to save herself at my expense when she realized her lies were unfolding right before our very own eyes. You would have to be at the Smithsonian to see a frame up like this.

Theresa Minier RN cancer coordinator, told me that she filed a JPRS on Dr Ravipati with regards to a cancerous tumor as well, but I never got around to get access to that. Rules for thee not for me according to Ravipati and DB.

The whole thing makes me want to vomit; it's disgusting what they did to me.

63. Did you explain this reason to the Complainant?
    a. I tried to provide an explanation to the Complainant at the time of the temporary assignment issuance.

64. What was the Complainant's response?
    a. The complainant was unhappy, unwilling to listen, refused to sign reassignment letter, and stated he will be reporting to OIG and to Dr. Buckley and stormed out of my office.

I don't know if stormed out of the office is the equivalent of me turning around and walking out but that's up to interpretation. Anyone that's innocent would be upset in these kinds of matters. I came back in the office after Donnabelle screamed at the top of her lungs something that I couldn't quite make out to the effect, I'm paraphrasing now, "you're ignoring me!…" or "you're not going to sign this!" Something to that effect.

I was surprised and shocked when she stated I was going to be detailed for this. As was every single person in the department who thought I was being targeted for speaking up and sending emails out to higher ups, that I would be getting blamed for what they all

know is that it was Kelly Heckel's responsibility to schedule the consult. Kelly was guilty as it was her responsibility to schedule this consult in "a few days after being alerted" per DB directive.  See above transcript, workflow, and staff responses as well as the recording dated 11/10/22 and per VISN and National who stated they do not want nurses scheduling.

Did I say I would call OIG to investigate?  Yes, I sure did and still may have them come in to do a full and fair investigation.

I asked Donnabelle what this was all about and her answer to me was "when you write emails you're not documenting them"  I didn't even understand what that meant?  Since when do we document emails in patient's charts?  I followed up with, should I document like Cherilyn LPN (Cherilyn worked in the department but was ran out as she stated to me, "they sure know how to make someone feel inefficient.") who was thorough on her documentation to which DB said, no that's too much.

From there I took my detail paperwork, did not sign it and walked up to Dr Ravipati's office to get a clearer picture of what this was all about.

65. Have you removed any other employee, in the same position/grade as the Complainant, during the past year, under similar circumstances?  No
   a. If so,

   a. Identify each person by name and position title.
        a. N/A
   b. Identify each person's sex.
        a. N/A
   c. Why was each person not treated similarly to the Complainant with respect to this matter?
        a. N/A

DB indicates no.  Why did she not detail Wendy RN pending investigation for allowing a veteran to hang herself by her negligence.  Why didn't DB detail the 6 other JPRS submitted that she knew about?  Why didn't she detail every single employee in the department for delay of care that go up to and past 300 days from initial consult entry date?  There is so much delay of care and DB's answer is "No"  Those JPRS entered as evidence, including Wendy's JPRS that DB admits she did not remove any other employee, in the same position/grade as complainant just solidified why I was the target of harassment, reprisal, discrimination based on sex and race.

With the evidence I provided and her statement there alone just proved my case.  Let alone all the other things her and Ravipati are inconsistent about throughout their testimony.

66. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant who were removed from patient care in the past year? No.
    a. If so,

    a. Identify each person by name and position title.

What she just stated is by answering "No." is that none the other registered Nurses with JPRS filed against them which caused deaths, delay in care, including Wendy's death by massive negligence were not removed from patient care. But I was. Now is that not discrimination? It sure is. It's so blatant that it's insulting to say otherwise. The facts are clearly presented and by overwhelming evidence I was treated much different than my peers by her admission stating, "No."

67. Was the Complainant's sex a factor in any of the decisions or actions you took?
    a. No.

68. Was the Complainant's EEO activity a factor in any of the decisions or actions you took?
    a. No.

69. Was this action taken to harass the Complainant?
    a. No.

70. What policies are relevant to this matter?
    a. N/A

71. Do you have anything else to add?
    a. Not at this time.

Of course, DB is going to say no to all these. Why would she admit it?

I've proved throughout this affidavit by evidence that my sex played a part in this as compared to the females that actually did commit negligence.

I've shown that this was retaliation to me speaking up, and sending emails, and Ravipati's indicating she couldn't get me back but after I filed the EEO she brought me back and submitted negative, untruthful comments about me in the proposed 14 day suspension.

I've proved this is harassment by this only happening to me and no one else by all the JPRS I've included, as well as harassed by her demeaning tonality during the Weingarten, during phone calls, when she screamed at me the day she detailed me, by short staffing my group ect ect ect.

DB indicates N/A to any policies relevant to this matter. She indicated N/A because she looked the other way when it came to Wendy and the other JPRS filed and all the delay in care the entire department is guilty of. She didn't want to look into the other cases, just mine which was all based on false pretenses.

<u>Incident 2:</u> As of July 19, 2023, Complainant has not been issued his Proficiency Rating that was due in February 2023.

72. Were you responsible for issuing the Complainant's proficiency rating?
    a. No.

    a. If you were not responsible, then please identify the name and title of who was responsible.
        a. Christianah Arowora, Office of Community Care Nurse Manager

    b. If you were not responsible, did you have a role in this matter? If so, please explain it.
        a. I am the reviewing/approving official.

This is a lie. As Christianah clearly states in her testimony on her affidavit below at question 32 of her affidavit.

32. Were there any other employees, under your supervision and in the same position and grade as the Complainant, with performance similar to the Complainant's who received a higher rating on his/her Proficiency Report?

   a. Identify each person by name and position title.

**ANSWER:** Ms. Adriene Harris-- I do have other RN staff, actually on the same team that was given high Satisfactory by My immediate supervisor during the same period I was out. Staff proficiency attached.
b. Identify each person's sex.—
**ANSWER:** Female
c. Why was each person not treated similarly to the Complainant with respect to this matter?
**ANSWER:** I cannot speak to this. I was not the person who rated the complainant and other staff indicated above.
d. Please explain why each individual was given a higher rating with similar performance.

So, we clearly see that Christianah's testimony states she did not rate my proficiency and she states "My immediate supervisor during the same period I was out." Christianah's immediate supervisor is Donnabelle.

Again DB just lies, casts blame on Christianah.

In fact, the previous year when Christianah was detailed to work for VISN 12 she indicates the following below.

27. Did you share feedback with the Complainant during the year in the areas you believed needed improvement?
a. If so, please describe the feedback you provided to the Complainant.
**ANSWER:** I have always communicated with complaint on how his performance monthly that was why I rated him high Satisfactory, and it was lowered by my immediate supervisor because I was not on station, I was on detail).

Christianah, states she rated me at "high Statisfactory… it was lowered by my immediate supervisor…"

How can DB state that she didn't rate me but only signed off on the performance ratings when Christianah in question states Adriene Harris got a High Satisfactory given by Donnabelle and then in question 27 when Christianah did give me High satisfactory, Donnabelle lowered it.  That doesn't coincide with Donnabelle stating all she does is sign the ratings.

**She rated me low last year purposely, and the year before that she lowered my rating from what Christianah gave me.**

73. Please explain in detail why the Complainant was not issued a Proficiency Rating in February 2023.
    a. Due to the responsible rating official being on extended leave, I worked with Human Resources to redirect performance reviews of the complainant along with other staff in Office of Community Care to me.  On February 21, 2023, several performance appraisals/proficiency ratings were reassigned to me.  On February 21, 2023, an email was sent to multiple staff requesting staff to act on their performance appraisal by adding their self-assessment.  A follow up email was sent to Complainant on March 21, 2023, to act and provide a response on their appraisal. Complainant replied on March 21, 2023, to "just do it without my input." Complainant was directed to release the performance plan back to supervisor before any action can be taken.  On May 5, 2023, I had released employees plan to reviewing/approving official.  Mid-May 2023,

Complainant's direct supervisor returned to duty and re-assumed performance appraisals duties and processes.

In this answer Donnabelle is mudding the issue.  First off it is not indicated anywhere that I have to submit an evaluation of myself.  The manager should be aware of the work I do.  Secondly, it would be pointless as I proved whether I submitted a performance review or not DB was going

to give me a satisfactory. I mean, look what Christianah states above. Christianah gave me a higher rating and DB lowered it but claims she only signs the reviews.

DB then indicates when Christianah came back that she re-assumed performance appraisal duties and processes. Here again DB is shifting blame on Christianah.

74. Did you explain this reason to the Complainant?
    a. Yes, it was explained in email.

Christianah was out for 8 months, the rating was done by DB.

78. Have there been other employees, in the same position/grade as the Complainant, treated similarly to the Complainant who did not receive a Proficiency Rating in the past year?  No.
    a. If so,

    a. Identify each person by name and position title.
    b. Identify the sex of each person.

79. Was the Complainant's sex a factor in any of the decisions or actions you took?
    a. No.

80. Was the Complainant's EEO activity a factor in any of the decisions or actions you took?
    a. No.

81. Was this action taken to harass the Complainant?
    a. No.

82. What policies are relevant to this matter?
    a. No.

Question 78 suggests I was treated differently by her answer, "No"

Questions 79 through 81 of course Donnabelle is not going to admit any of this, her actions and inactions presented throughout my briefs and testimony on affidavits speak otherwise.

Question 82 there are policies relevant to this matter with regards to her harassment, discrimination, retaliation, sex and race towards me.

1. Complainant

c. What specifically were you told?

    1. Complainant sent several emails/teams messaging to me stating "this is retaliation," "let me know so I can get the command suite involved," "what patient, this is retaliation, what patient, yep several people told me you would do this," "no you're retaliating," and "any delay in patient care is on leadership not me."  Complainant also sent email to NNU asking "can you guys get the issue this is concerning so I can be prepared?"

Yes, I said the above because this entire case brought against me was fraudulent and based on lies and deception only made to harass me for being vocal on many issues from patient care, to nurses working at the top of their licensures, to veteran billing claims in which veteran's shouldn't be sent to collections for VA mistakes, for me reaching out to upper leadership to approve overtime and get the corpsmen active duty to assist the department because Donnabelle doesn't have the wherewithal to take command and steer this ship while the department is in a full tail spin which is affecting patient care.  She may have felt upstaged so she found revenge to take it out on me with fake claims regarding the consult in question.  Regardless of her feelings what she did to me was infact discrimination based on sex and race as well as retaliation and harassment.

DOWNGRADING NOT
FOLLOW MY NBR OWN
RULES.

## Kochiu, Azis FHCC Lovell

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Monday, September 18, 2023 2:48 PM
**To:** Flood, Nicole L. (VACO); Martinez, Patricia (ORMD); Tolbert, Melvin R.; Ravipati, Mamata
FHCC Lovell; Koehler, Brian F.
**Cc:** Lorenzo-Villarino, Donnabelle L.; Arowora, Christianah T. FHCC Lovell; Buckley, Robert
G. FHCC Lovell; Morse, Alex M.; Coleman, Monica; Perkins, Kindra (NNU); Ruge, Randa
**Subject:** community care, orthopedics 2543186

Brian and Melvin,

Regarding, Turner, M (0046)

On 3-30-23 this consult went from pending to active.

I came across this consult through an email sent to me rather than to the appropriate women's group.

Anyway, this consult was received by leadership on the above date and was made a "basic" contrary to what the admin
screen pulls it up as. In addition there was no clinical triage ran in which leadership assigned it to a psa when it is not a
basic.

Is there any reason why I'm held to a different standard than the manager (who detailed and suspended me), who is an
RN no more and no less than I am?

Ozzie

!"#$%&!'%Ã()Ã*!%!$#'+Ã,))#-$+
.#"%#-'Ã/#&!+Ã,0Ã1(2!33Ã4!5!$#3Ã6!#3%7Ã.#$!Ã.!'%!$
899:Ã;$!!'<#=Ã>(#5Ã?@>  A6Ã.6B.,;@CÃB1ÃD99DE

?(2!&<!$Ã:FCÃF9F8

* !%!$#'ÃG#<=Ã.Ã%

**We have not received confirmation of a scheduled appointment from you or your community provider. Your appointment must be scheduled within 7 calendar days of the issuance of this letter.** B)Ã#'Ã#""(-'%&!'%Ã-+Ã'(%Ã+H7!5I3!5ÃJ-%7-'ÃKÃH#3!'5#$Ã5#$#Hï(Cï3(ï($#'5Ã$!)!$$#3ÃJ-33Ã<! H#'H!33!50Ã

_____

L(I$ÃH(&&I'-%=Ã"$(2-5!$Ã-')($&#%-('MÃ

* , Ã,I%7($-N#%-('MÃï$FEOO9K8P

_____

.("-!+Ã()Ã#=(I$Ã#I%7($-N#%-('Ã#'5ÃH3-'H#3Ã'(%+Ã#7?#2!Ã<!!'Ã)#Cï#5(I$ÃH(&&I'-%=Ã"$(2-5! **Your authorization will not be activated until VA receives confirmation of a scheduled appointment from either you or your community provider.**

* , Ã-+Ã'(%Ã#<3!Ã%(Ã<#HR5#%!!Ã.(&&I'-%=Ã.#$!Ã#I%7($-N#% **If you attend a Community Care appointment before your authorization is activated, you may be responsible for costs associated with that care.**

B)Ã=(IÃ7#2!Ã# SI!+%-('+Ã#<(I%Ã%7!Ã.(&&I'-%=Ã.#$!Ã"$(H!++Ã(IÃH#''(%Ã$!#H7ÃI+Ã#% **224-610-8632**0

A7#'RÃ=(IÃ($Ã=(I$Ã+!$2-H!C
.#"%#-'Ã/#&!+Ã,0Ã1(2!33Ã4!5!$#3!#3%7Ã.#$!Ã.!'%!$Ã.(&&I'-%=Ã#$!Ã$%#

I disagree with the yearly assessment of a "satisfactory" rating for many reasons but will only list the following:

1. I was the one that emailed Dr Buckley and talked to Captain Pyles and Steve Kaufman regarding getting overtime staff to assist OCC either through the Military or otherwise. Dr Buckley responded to me through email with regards to my request. Moreover, this is something leadership should have done, not a low-level RN in the department who processes consults and works other ancillary jobs contrary to what VISN and National are asking of RNs. If not for me we never would have had the 3000 hours of OT so far, and the dept would be sitting dead last in VISN 12.

2. There are new staff in this department that had 6 months of training that had gotten bonuses and higher ratings than I did.

3. The comment stating, "He realized, he lack in utilizing evidence based practices in his everyday practice," I disagree with that assessment of me. I never said that. I always make sure I'm on top of the latest evidence-based medical practice, as I probably have more critical care experience than any other nurse in this department. Leadership in this department treats the numbers and not the patients which is contrary to EBP. When I fight for nurses to practice at the top of their license which includes our critical thinking and case manage, I'm ignored, and leadership is more concerned about the metrics than triaging patients accordingly. We're not putting lawn mowers together; we're treating human beings; however, the dept is run like an assembly line. The said offensive statement projected towards me stating, "He lacks everyday evidence-based practice" is insulting.

I have a billing proposal sent to the House Veterans Affairs Committee, in Washington DC in line with the subcommittee waiting for vote. I realize I didn't turn in my self-performance eval, but stepping my game up goes straight to my integrity and dedication to the veterans and making the VA a better workplace.

Azis Kochiu

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:30 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: Case #1

This next bunch I will add to my afficavit and the memorandum where Ravipatti states this never happened in the dept before

this was a female RN – nothing happened

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 2:59 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Case #1

# Case #1

<u>Preface:</u> 76 yo male; NH resident. Had CT in Sept '21, which led to a PET and then Cardiothoracic evaluation. Fell off after that (No surgery/bx). Repeat CT ordered in Sept '22 (1 year later): lesion grew.

On 9/30/21 pt had CT thorax, which showed stable RUL lung nodule (0.8x1cm) and new subpleural density. On 10/12/21 consults placed for pulmonary outpatient and Community Care (CC)-PET. PET scheduled for 11/2/21 at Froedtert. Pulm appt was 11/30/21, at which time consults were placed for CC-Cardiothoracic and PFTs. Pt saw Cardiothoracic (CTH) surgeon on 1/11/22, but records were not formally requested by CC until 6/23/22 (1st attempt), 7/30/22 (2nd), and finally uploaded on 8/30/22. In the meantime, on 1/27/22 pt's PCP requested CTH records, but PCP's RN instead received GI records. In the actual CTH records, it reads that CTH surgeon needs the disc of the Sept CT scan, presumably in order for them to proceed with a biopsy. (Writer since verified directly with CTH office that they never got the disc and pt never returned to see them and was lost to f/u). On 3/1/22 pt, a NH resident, presented to PCP for routine f/u visit. PCP noted that CTH records were still absent and made note that these were still needed and that NH should obtain them. On 3/10/22 pt presented to pulm for f/u, at which time they also noted absence of CTH records and sought them directly, themselves. Upon receipt they noted that CTH needed the disc, and documented that they called the NH with instruction to obtain it. Pt went back to pulm on 9/1/22, for f/u, at which time it was realized pt STILL had no f/u with CTH surgeon. As <u>one year</u> had elapsed, STAT CT thorax was ordered: RUL

nodules had now grown into 1 lesion: 1.4x1.2cm. NEW consults for CC-cardiothoracic and PET therefore placed.

| | |
|---|---|
| 3/25/21 | **CT thorax:** New subpleural nodule in RUL (0.8 x 1cm) |
| 9/30/21 | **CT thorax:** Stable subpleural nodule in RUL (0.8 x 1cm); New subpleural density in RUL (0.7 x 0.4cm) |
| 10/12/21 | **CT signed off; Consults placed** for pulm outpt and CC-PET. MD called NH and relayed need for f/u with both areas. |
| 10/22/21 | CC RN received PET consult; **PET scheduled** for 11/2/21 @ Froedtert South |
| 11/2/21 | **PET-CT @ Froedtert South** |
| 11/30/21 | **Pulmonary consult** with fellow. **Consults placed** for Cardiothoracic (CTh) and PFTs. |
| 1/4/22 | **CC scheduled CT appt** for 1/11/22 |
| 1/11/22 | **Pt saw CT surgeon** (Dr. Raikar)...note says that they need CT images from the VA |
| 1/27/22 | **PCP requested CT records** |
| 1/28/22 | PCP RN requested records –Rec'd GI records instead—made vague note about "unable to view CTh records" |
| 2/1/22 | **CT RN** requested CT scan from PCP's RN (never sent) |
| 3/1/22 | Pt presented to **PCP for routine f/u** |
| | • Noted that CT records were still absent |
| | • PCP unsure if pt had CTh surgery |
| | • Informed NH to call for records |
| | • Made note for FHCC to obtain records |
| 3/10/22 | Pt presented to **pulm for f/u** |
| | • Noted no records from CTh appt. |
| | • Contacted CTh office for records; fax received. |
| | • Noted that Imaging was needed |
| | • Called NH and instructed to obtain disc. |
| 6/23/22 | CC documents **1st attempt** to obtain records from CTh appt. |
| 7/30/22 | CC documents **2nd attempt** to obtain records from CTh appt. |
| 8/30/22 | **CC uploads CTh records** |
| 9/1/22 | Pt presented to **pulm for f/u** |
| | • Realized that pt still did not have f/u with CTh |
| | • STAT CT ordered. |
| 9/15/22 | **CT thorax:** RUL nodules are now merged as one lesion (1.4 x 1.2cm) |

<u>Summary of elapsed times:</u>

| | |
|---|---|
| CT scan to PET | (33 days) |
| to pulm consult | (28 days) |
| to cardiothoracic appt | (42 days) |
| to 1st request by PCP for records | (16 days) |
| to receipt of records by pulm | (43 days) |

to realization that pt never had 2<sup>nd</sup> CT appt (140 days)

Time for Community Care to request/upload records: **7.5 months**

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:31 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #2

This was a failure to f/u by a female staff employee on one that a male Filipinos sent out

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 3:00 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** case #2

# Case #2

Preface: 73 yo male. PSA steadily increasing since 2010 (4.11 to 12.7, by 2018). PSA 411 (2021), PSA 622 (2022).

On 5/28/21 pt saw PCP for routine visit. Elevated PSA with sx noted; PCP ordered CT CAP and placed consult for CC-Urology. 6/7/21 CT CAP at FHCC showed bone mets-report sent to CC-Urology. Pt had CC-urology appt on 6/9/21. Per conversation with outside clinic, they dx pt with prostate CA and pt's last visit with them was on 9/8/21--they said a CT and bone scan were scheduled for Dec but pt cancelled appts, never returned and there was no f/u. Writer notes that CT CAP was instead performed at FHCC on 7/30/21, with CT lumbar in Aug '21 d/t pt inability to tolerate bone scan. Writer unsure of what transpired at the end of 2021/beginning of 2022 that causes seeming lapse in pt following up with CC urologist. In Feb '22 pt went to the ER with altered mental status and unsteady gait--he was admitted approx 1 month with ESRD/ARF, and thereafter d/ch to NH. Pt eventually returned to FHCC to see PCP on 7/27/22, at which time PCP requested urology records. Note charted 8/11/22 that PCP's RN did request urology records. Unsure if these were ever received, as no notes follow. On 8/3/22 Cancer Care Coordinator (CCC) RN first became aware of pt via autogenerated report from lab, where PSA was elevated at 622. CCC RN reached out directly to Uropartners, where pt went for CC consult, and learned pt never f/u with treatment. Asked for faxed records--received and faxed to PCP's nurse, with Teams message to her that pt never f/u and his PSA is now 622. CCC RN also documented note with PCP sign-off. On 9/8/22 pt was admitted to FHCC with SOB. PSA again drawn: >500. Hem/Onc inpatient consult was placed; Hem-onc fellow Dr. Paduri saw pt and through chart review discovered he was worked up for prostate CA but was never treated. Dr. Paduri asked CCC RN to request records from recent admission - did so and provided records to her. Pt expired 9/28/22 without ever having been treated.

| | |
|---|---|
| 5/28/21 | Saw PCP for routine visit |
| | • Elevated PSA noted; hematuria, bladder lesion |
| | • Ordered CT CAP |
| | • Referred to CC- urology |
| 6/7/21 | CT CAP at FHCC |
| | • Bone mets |
| | • Report sent to CC-urology |

| 6/9/21 | CC-urology appt |
|---|---|

- Bx 6/25/21 (4+3=7); pt diagnosed
- Pt's last visit was 9/8/21
- CT and bone scan scheduled for Dec
- Pt cx appts and never returned

**7/30/21**      CT CAP at FHCC

- Bone mets
- Spinal compression
- Nodal spread

**Aug '21**      CT lumbar at FHCC

- Unable to tolerate bone scan
- Pain management referral

**Feb '22**      Went to ER

- Altered mental status, unsteady gait and falls.
- ICU; ESRD/ARF
- Admitted 1 month, then to NH for rehab

**5/27/22**      Sees Dr. Sias for pre-op physical with

**7/27/22**      Pt sees PCP at FHCC

- PCP requests urology records

**8/11/22**      PCP RN requests CC-urology records

- Never received

**8/3/22**      Cancer Care Coordinator receives PSA list

- Called Uropartners; learned pt never f/u with treatment
- Rec'd records; Faxed to PCP RN
- Documented note; requested PCP sign-off

**9/8/22**      Pt admitted for SOB

- PSA > 500
- Hem/Onc inpatient consult

**Pt EXPIRED 9/28/22**

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
*theresa.minniear@va.gov*



**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 3:03 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Case #3

## Case #3

In this consult, the physician indicated <u>weight loss</u> and clearly listed in the description that a <u>mass in the pancreas</u> was visible on CT. This was categorized as "moderate." Wondering why this wasn't categorized as "complex," with an RN processing?

The evaluation was scheduled for 5 months down the road. One month after this consult was placed (but still before he was scheduled) the pt called the Triage Line with worsening sx, and was advised to go to the ER. I don't see any charting after this, but even this didn't "flag" the urgency of this consult.

Would like to please understand what the acceptable timelines/processes are in community care, so I can help to prevent these lapses.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:32 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #4

Female RN – nothing happened

## Case #4

Pt (now deceased) was a 66 yo chronic smoker.

On 4/14/22 pt had a CT chest, which showed evidence of likely lung cancer in his right middle lobe. This was new since his 2019 imaging. The PCP placed a CC-pulmonary consult, which wasn't "worked on" by CC until 1 month later, at which time an LPN charted that the vet verbalized transportation issues. LPN gave pt numbers to call, with the onus on him to get back to CC. One month later this same LPN returned a call to the pt's daughter, who explained it would be far easier for vet to be seen at FHCC. Almost 3 weeks later, on 6/28, the then manager of CC cancelled the consult and charted a vague note about it being forwarded back to the pulmonary clinic *if needed*. (??) Later this consult was automatically discontinued.

Shortly thereafter the PCP, on 7/1, submitted another pulmonary consult--this time electronic. On 7/5 the pulmonary dept recommended a bronchoscopy with biopsy, which was performed at FHCC on 7/15. The resultant pathology report showed "atypical cells" and was negative for cancer in some samples. It was sent out for an expert opinion. Unclear of pulmonary follow-up.

On 8/10 vet presented to FHCC ER with complaints of abdominal pain, chest burning and shortness of breath. During the evaluation process he had a CT angio to evaluate for pulmonary embolism (PE), which, although negative for PE, again demonstrated likely lung cancer as well as bone metastasis. A CT abdomen-pelvis additionally showed liver lesions which were concerning for cancer, as well as the prostate...the latter which was of concern because pt's PSA was concurrently uptrending. On 8/11 the ER doctor charted that he believed the pt's symptoms were all related to cancer, as likely malignancy was again visible on imaging (lung, liver, adrenal, bone and questionable prostate). He therefore admitted the pt and placed inpatient consults for both pulmonary and oncology.

On 8/11 the oncology fellow MD saw the pt in-house. She requested for his case to be discussed at Tumor Board on 8/15, citing the need for a 2nd pathology review, and to get recommendations on whether or not a liver biopsy was now warranted, to be considered as a secondary site of analysis. Due to questionable prostate cancer with rising PSA, she also placed a urology consult. The 8/15 Tumor Board panel agreed that more tissue was needed for definitive diagnosis and staging, so on 8/19 the hem-onc fellow placed a consult for CC-Invasive radiology for a liver biopsy. Cancer Care Coordinator (CCC) RN was made aware of pt, to track.

In the meantime, on 8/15 a repeat bronchoscopy with biopsy was performed at FHCC. The resultant pathology report was "suspicious for malignancy" in some areas. It was sent out externally to Milwaukee, for additional review.

On 8/16 the urologist saw the pt while admitted. Given the PSA level she did not suspect prostate CA, but decided to wait on a 2nd lung biopsy, to confirm. Pt's f/u with urology was scheduled for 9/9.

On Mon 8/22 CCC RN called pt to f/u on Fri 8/19 order for a liver biopsy. Pt initially declined, citing 2 previous lung biopsies which "showed nothing," in his perception. Pt agreed to speak to the CCC RN while on site the next day, for a 1:1 discussion. CCC RN physically met with the pt and explained rationale and importance for the liver biopsy, citing that his imaging and past biopsies are all concerning, we're just not clear on a definitive diagnosis. Pt agreed to get the liver biopsy, so CCC RN informed CC to proceed with scheduling at CTCA, pt's choice, as it was local. When personally following up with CTCA to check on status, CCC RN eventually learned it was on "hold" for scheduling due to lack of imaging discs. CCC RN alerted CC, and discs were mailed. These took > 1 week to arrive, at which time pt was finally scheduled for a biopsy on 9/8/22.

On 9/8 pt had a liver biopsy at CTCA. The report was finalized on 9/13, and showed "poorly differentiated carcinoma" now suggesting possible pancreaticobiliary origin. CCC RN ordered genomic testing on his tissue specimen, as requested by oncologists, to shed light on origin site and treatment options. Testing through Tempus takes approximately 2 weeks. Note that Tempus testing was not requested of previous lung biopsies, as it was determined that those sample were insufficient for further testing.

On 9/14 pt was admitted to FHCC for weakness and a fall. Repeat CT imaging again showed a lung mass with metastatic sites, including the spine, so oncology was again consulted in-house. On 9/15/22 the hem-onc fellow saw the pt. Plan was for pt to come to the oncology clinic after discharge, to start treatment, as he had since been admitted. It was hoped that his genomic report would be back by then. On request of Tempus, writer secured additional blood sample from pt, while admitted in ICU, so that this (along with the tissue) could help determine histology. This was mailed out Fed-Ex next day.

On 9/20/22 pt had a CT chest which showed pneumonia (possible infection, lung collapse, aspiration and pleural effusions). Pt expired in the ICU on 9/21/22, having never been treated for cancer. Five months had elapsed from when the presumed cancer was first visible on CT.

**Key points:**
- Lack of timely follow-through by CC: Initial pulmonary consult, placed in April, was eventually discontinued. There did not seem to be nursing judgement used, regarding importance of this, as evidenced by charted statements of manager.
- Lack of initiation by VA: As the elderly vet outright verbalized transportation issues—especially with regard to an important pulmonary evaluation for cancer—perhaps it would have been more prudent of the VA to take initiative and call pt with options, rather than placing the onus on the pt to call himself and seek options. Historically some pts can be dismissive and feel burdened if tasks are placed on them. At this time the VA was on "bypass" for onsite pulmonology, due to being short a physician—it took the daughter calling back to see if her father could be seen at the VA, rather than this option being outright offered to the pt, from FHCC, due to urgency of evaluation.
- Unclear pulmonary follow-through: writing unclear of pulmonary follow-through after initial (7/15) bx at FHCC.

- Sending discs: Community Care to be educated to automatically send imaging discs, for a biopsy. In these cases, recommend to overnight discs so precious time is not lost.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
*theresa.minniear@va.gov*



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:32 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: case #5

Female follow up on this  - nothing happened

## Case #5

On 2/4/22 MD entered Community Care (CC) oncology/tumor consult for pt to f/u for testicular cancer (FHCC was on bypass due to solo provider). Consult approved and eventually scheduled for 3/16/22. Records requested by person #1 on 7/2/22, but never received. Records requested by person #2 on 8/10/22, but never received. On 9/20/22 person #3 called outside provider and learned that pt never attended appt, prompting CC Managed Care Director to contact Cancer Care Coordinator (CCC) RN and CC RN on 9/27 to ask that someone f/u with patient. CCC RN responded affirmatively and called pt on 9/27: LM on phone, asking for call back. Pt returned call on 9/28 and expressed desire to attend appt at FHCC. As FHCC oncology is now fully staffed, pt granted permission to be seen at Lovell. CC Managed Care Director therefore forwarded appt back to FHCC Hem/Onc outpatient. Submitting this event because 8 months have elapsed since consult was first placed.

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:41 AM
**To:** lisa.wabinga@ceseeo.com

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:43 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: Absence of records for CC consult that is 1 year old
**Importance:** High

Case 6 here had to do with two females.

One of which who closed the consult is a manager – nothing happened

**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Tuesday, December 12, 2023 9:53 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** FW: Absence of records for CC consult that is 1 year old
**Importance:** High

**Case #6**

Good morning CC Leadership,

Can you kindly provide education on your policy for record request/upload, including the permissible timeframe?
Above pt has a current consult to be seen in the FHCC hem-onc, but Dr. Pant-Purohit lacks outside records from his previous CC consult.
This consult was closed (marked "C") on 3/6/23, without any records uploaded. If I'm reading this correctly, there was only 1 documented attempt made, and 2 additional ones were to follow.
It's now 6 months later, and still there are no records. No more attempts were documented.

```
  COMPLETE/UPDATE          03/06/23 16:44      PAULSON, RHONDA RN    PAULSON, RHONDA RN
ACM-Administratively closed without records
   Administratively complete with records follow-up: Facility community
care staff have received confirmation that the Veteran has attended the
initial visit. One attempt has been made to obtain medical records without
timely response from the community provider. This consult is being
administratively completed. Two additional documented attempts must be
made to obtain the medical records per the guidance in the Office of
Community Care Field Guidebook.
RCT-Referral Coordination Team Member
CUR-CTB User Role: Provider
```

Thank you,

Theresa

**Theresa Minniear, MSN RN OCN**
*Cancer Care Coordinator*
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Building 133, Office 3A-146
*(Ph): 224-610-4089*
*(Fax): 224-610-1030*
theresa.minniear@va.gov



**From:** Kochiu, Azis FHCC Lovell
**Sent:** Tuesday, December 12, 2023 11:45 AM
**To:** lisa.wabinga@ceseeo.com
**Subject:** ozzie - case 7

Case 7

A female Wendy – downgraded and sent an actuve suicide patient who had been asking for inpatient help and the RN who should have taken IMMEDIATE action sent it to have an orientee or just off orientation PSA to process it.  A week later, the 35 year old veteran hung herself.

Nothing happened

V/R,
**Ozzie Kochiu CLC RN Admissions Coordinator**
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law,

**To:** lisa.wabinga@ceseeo.com
**Subject:** FW: ozzie - cc concern

These are the types of reasons I speak up to and have to deal with retaliation.  This is DB motive in doing what she did to me.  I took out the SS #'s and first names.

DB randomly sends the staff consults of overdue by date, not by complexity or triage.  I have been bugling this since the day I stated 4.5 years ago.

She hands us work to make her Metrex look better, rather than letting nurses treat via triage.  It's completely wrong and contrary to medicine.  As you can see I sent this above her and included others in the email.

DB distributes the workload. My response below was with conviction and she doesn't like that which gave her motive to retaliate against me and no one else

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Monday, December 11, 2023 3:20 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** FW: ozzie - cc concern


**From:** Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Sent:** Monday, December 11, 2023 3:14 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** FW: ozzie - cc concern


**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, October 26, 2022 2:55 PM
**To:** Kaufman, Steven R. FHCC Lovell <Steven.Kaufman@va.gov>
**Cc:** Shaw, April L. FHCC Lovell <April.Shaw@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>; Pant-Purohit, Mukta FHCC Lovell <Mukta.Pant-Purohit2@va.gov>; Minniear, Theresa FHCC Lovell <Theresa.Minniear@va.gov>
**Subject:** ozzie - cc concern

Steve,

I have to speak up now.  We were provided a stand down list below to complete by Friday.  I have serious consults which require my attention asap,  extensive ENT surgery to remove cancer mass, several stem cell consults I'm coordinating between Dr Pant, the transplant coordinator, Theresa Minear, and community providers, etc etc etc.  I'm getting tons of emails and phone calls on my personal cell (as that's one of the ways I stay in contact with my critical patients)  Anyway, those consults are being neglected for the following below.  As you can see the below list has  Lab and MRI which are taking priority over the more serious consults.

We are being asked to treat the numbers and not the patients.  I can't keep compromising my complex patients for a numbers game.

Can you allow me to Triage patient care by complexity and  need rather than by numbers as leadership asked us?   This borderlines negligence.

| Patient Name | Patient SSN | Provisional Diagnosis | File Entry Date | Elapsed Days From File Entry Date | Service Nam |
|---|---|---|---|---|---|
| | | Dyspnea, unspecified | | 20 | COMMUNITY CARE-ECHOCARDIOGRAPH |
| | | Anemia, unspecified | | 6 | COMMUNITY CARE-HEMATOLOGY/ONCO |
| | | Chronic Lymphocytic Leukemia of B-Cell Type in Remission | | 20 | COMMUNITY CARE-HEMATOLOGY/ONCO |
| | | Chronic Lymphocytic Leukemia of B-Cell Type not having Achieved Remission | | 12 | COMMUNITY CARE-HEMATOLOGY/ONCO |
| | | Lupus Anticoagulant Syndrome | | 25 | COMMUNITY CARE-HEMATOLOGY/ONCO |
| | | Malignant Neoplasm of Pancreas, unspecified | | 7 | COMMUNITY CARE-HEMATOLOGY/ONCO |
| | | Abnormal Findings on Diagnostic Imaging of other Parts of Digestive Tract | | 104 | COMMUNITY CARE-IN |
| | | Low back pain, unspecified | | 27 | COMMUNITY CARE-IN SCAN |
| | | Neoplasm of Uncertain Behavior of Trachea, Bronchus and Lung | | 4 | COMMUNITY CARE-IN PET |
| | | Personal History of Malignant Neoplasm of Prostate | | 8 | COMMUNITY CARE-IN PET |
| | | Solitary Pulmonary Nodule | | 7 | COMMUNITY CARE-IN PET |
| | | Solitary Pulmonary Nodule | | 5 | COMMUNITY CARE-IN PET |
| | | Solitary Pulmonary Nodule | | 4 | COMMUNITY CARE-IN PET |
| | | Non-St Elevation (Nstemi) Myocardial Infarction | | 8 | COMMUNITY CARE-IN MEDICAL |
| | | End Stage Renal Disease | | 11 | COMMUNITY CARE-IN RADIOLOGY |
| | | Isolated Proteinuria | | 11 | COMMUNITY CARE-IN RADIOLOGY |
| | | Other Kyphosis, Thoracic Region | | 13 | COMMUNITY CARE-IN RADIOLOGY |
| | | Stenosis of other vascular prosthetic devices, implants and grafts, subsequent encounter | | 6 | COMMUNITY CARE-IN RADIOLOGY |

| | | Description | Count | Provider |
|---|---|---|---|---|
| | | Stenosis of other vascular prosthetic devices, implants and grafts, subsequent encounter | 6 | COMMUNITY CARE-I RADIOLOGY |
| | | Diarrhea, unspecified | 6 | COMMUNITY CARE-L |
| | | Encounter for Fertility Testing | 40 | COMMUNITY CARE-L |
| | | Encounter for Preprocedural Laboratory Examination | 6 | COMMUNITY CARE-L |
| | | Encounter for Sterilization | 11 | COMMUNITY CARE-L |
| | | Encounter for Sterilization | 6 | COMMUNITY CARE-L |
| | | Iron Deficiency Anemia, unspecified | 34 | COMMUNITY CARE-L |
| | | Male Infertility, unspecified | 85 | COMMUNITY CARE-L |
| | | Male Infertility, unspecified | 12 | COMMUNITY CARE-L |
| | | Cervicalgia | 22 | COMMUNITY CARE-M |
| | | Cervicalgia | 12 | COMMUNITY CARE-M |
| | | Chest Pain, unspecified | 22 | COMMUNITY CARE-M |
| | | Complete Rotator Cuff Tear or Rupture of left Shoulder, not specified as Traumatic | 21 | COMMUNITY CARE-M |
| | | Foot Drop, unspecified Foot | 19 | COMMUNITY CARE-M |
| | | Low back pain, unspecified | 53 | COMMUNITY CARE-M |
| | | Low back pain, unspecified | 7 | COMMUNITY CARE-M |
| | | Malignant Neoplasm of Axillary Tail of right Female Breast | 32 | COMMUNITY CARE-M |
| | | Neoplasm of Uncertain Behavior of Liver, Gallbladder and Bile Ducts | 21 | COMMUNITY CARE-M |
| | | Other Injury of Muscle, Fascia and Tendon of other Parts of Biceps, left Arm, Initial Encounter | 61 | COMMUNITY CARE-M |
| | | Other low back pain | 22 | COMMUNITY CARE-M |
| | | Pain in right Leg | 14 | COMMUNITY CARE-M |
| | | Pain in right Shoulder | 5 | COMMUNITY CARE-M |
| | | Pain in thoracic spine | 12 | COMMUNITY CARE-M |

Ozzie

I'm following the chain of command that's why I listed all the people in this email thread as well as EEO.

Will there be an RCA into the issue at large that I was detailed and suspended for? There will be a lot of Community Care Staff that would like to speak on that issue. I have asked Donnabelle and mentioned for an RCA to others above through the chain of command to no avail. I believe I should be told the specific reason I was detailed other than "failure to follow policy". What policy exactly? How can I correct anything if I don't know what I did wrong? I'm not asking for an RCA to litigate my suspension and detail, but as nurses and doctors we need to correct any unforeseen errors that can come up.

For example, we had two JPRS filed in the last year one for a death and the other for a pulmonary nodule that was missed and spread throughout the entire thoracic cavity. Just a month ago one of the RNs sent a complex 35-year-old suicide patient to a psa being trained or just out of training in which the veteran hung herself. Suicide is an RN responsibility not a PSA. However, nothing happened to any of them, but we all know what happened to me.

Anyway, I don't need to continue failing to follow policy not knowing which one unless you tell me. I am not giving Donnabelle another reason to target me and harass me down the road as she has been, when I don't know what I did wrong in order to correct said policy.

During last Thursday's in-service Donnabelle was playing semantics and obfuscating with the workflow details she directed on 11-10-22. Obviously, because the entire community care staff knows her directive, she gave on 11-10-22 which is clear as the sky is blue from her own words on recording and on transcript. If she wants to play semantics, we can do that all day long...why was the nurse that followed me not detailed, how about the doctor that entered the consult, how about Donnabelle as a manager that is an RN and should have followed up on said consult, or the PSA she directed to schedule the consult per her directive? Semantics are her way to muddy the waters and try to confuse and hedge against her issue of detailing and suspending me, to cover up her directive as well as when she tampered with evidence to the peer review committee, I brought to CME attention recently. I don't know about you, but if someone lies and tampers with evidence that directly goes to their character in my opinion. So rather than stick to the statement of facts on her directive 11-10-22 that she stated which go far beyond a preponderance of evidence that one would need to be from another galaxy not to see it for what it is.


 I have nothing to hide, I told the truth and will continue with the truth through whatever means I have to go through. Even if it means testifying in front of Congress. If I had done something wrong I would own it and not be fighting this hard for my credibility that has been slandered at Lovell

An RCA will bring to light what happened and if something did happen then it can be corrected so we can collectively as a hospital correct the error. Instead, what I'm seeing is, Mission accomplished, Ozzie suspended, sweep it under the rug and move on. That corrects nothing and doesn't help the veterans at all. That's doing a disservice to the vets.

On a different topic during Thursday's meeting, I brought the issue of staff working overtime without pay. Staff are working until 10pm, Saturdays and Sundays without pay in violation of Federal Labor Laws, violation of the tele work agreement we all signed, and those that are doing it are riding the tight rope of Hippa violations since they are opening patient charts while off tour of duty. Kindra (union rep) asked, Donnabelle if this is true to which  Donnabell surprisingly admitted that she knew this was

brought to her attention in the past. To which I stated yes," that's because I brought it up to you". Obviously, when I brought the issue of workers working without pay to Donnabelle on my second attempt, it just so happened I was detailed shortly thereafter which led to this cascade of ongoing issues.

The rumor mill in Community Care between the past few days by the nurses was why wasn't Thursday's meeting recorded as evidence?

I told the truth, Dr Ravipati but nobody believed me no matter how much direct evidence was presented.


Thank you,

ozzie

OCC

Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

To:Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>;Nelson, Thomas J. CAPT. FHCC Lovell <1160196498@DVAGOV.onmicrosoft.com>;Cotter, William J. FHCC Lovell <William.Cotter@va.gov>

Dr. Buckley and Captain Nelson,

We are sending you this from the Community Care Department as we are in need of your help. The department is currently short-staffed and is in crisis mode at this time. Recently, with several of our clinic's providers being short-staffed for various reasons, the burden has been shifted over to our Community Care Department. The dept continues to arm wrestle between proper triage based on veteran's medical needs versus treating the numbers via metrics VISN wants the dept to follow.

For example, one veteran was on the phone with an RN stating he almost committed suicide due to a lack of follow-up.

Another example is a veteran who paid $14,000 out of pocket due to something that could have been caught if care coordination had been followed up; hence the reason I've included Dr. Cotter in the email. This particular veteran was sent to CTCA and had surgery that was covered by VA; however, he was then sent to a rehab facility to which the accepting facility automatically billed Medicare which left the vet with the copays. In the veteran's defense, the last thing on a patient's mind is a billing concern, particularly when one is in an altered state of consciousness due to being on narcotics for said surgery while at the same time fighting a cancer diagnosis. Dr. Cotter, I'm wondering if we can get a referral for this veteran in which we could backdate the consult to cover his stay at the rehab facility. If so, I can call the facility, have them pay Medicare back, then have them bill Optum. Which leads me to the issue of billing. Can we get someone designated to be assigned exclusively to billing concerns? It was brought to my attention, awhile back, through hearsay, mind you, that Dr. Buckley gave an order in which he wanted the Community Care Dept to resolve the issues with billing. I'm not sure what leadership did with that. Can that order be sent to Christianah to be followed up with if that's true?

In summary, if we were fully staffed, we could avoid these issues.

Therefore, I'm asking you and Captain Nelson if we could get some corpsmen/active duty military to assist the dept until we get back on our feet? We could use their help. In addition, can we get help with priority hiring to fill our vacancies?

Thanks,

Ozzie/Ken

## Rebuttal to Dr Mamata Ravipati's Affidavit

**7. Who is your second-level supervisor (Provide their name, position title, unit, and division)?**
Robert Buckley, Director, Lovell FHCC, North Chicago

Not sure why Ravipati jumped the chain of command and had me go straight to Dr Robert Buckley before Dr Jeffery Oken?

**21. The Complainant testified that he was harassed by Donnabelle Lorenzo-Villarino after he reported staff were working overtime without compensation. Please explain in detail what knowledge you have about this incident?**
**Not aware of the above incident.**
**22. According to Complainant he reported that he was being harassed by Donnabelle Lorenzo-Villarino; however, management failed to prevent continued harassment. Did Complainant report this incident to you as discriminatory harassment? If so, what did the Complainant report? When?**
Mr.Azis never brought to my attention.

I told Dr Ravipati in person the day I was detailed. I went straight to her office and explained this detail and investigation into me was all in retaliation for me Whistleblowing that staff are working past their tour of duty, and for speaking up on veteran's billing issues, as well as the Nursing Process. Tour of Duty is day shift and ends either at 1600 or 1630. A lot of the staff have been working until 10pm, Saturdays and Sundays without pay or approval through overtime. A lot of the staff asked me personally to speak up about this, which I did for a few reasons.

One, it is making some of us that are following the rules look less effective in terms of production to which management throws in the faces of (the ones that follow the rules) that we are not keeping up with others, even though mngt knows almost all the staff are working on their own time without pay.

Secondly, the staff working off tour of duty are in violation of HIPPA by opening up charts off tour of duty, in violation of labor laws, and in violation of the tele work agreement we all signed which states, tele is revoked from anyone working outside their tour of duty.

Not only did I tell Ravipati and Donnabelle these things in person but also through emails I sporadically sent out in which I had several people listed on the email.

I told Dr Ravipati and Donnabelle this can easily be proven just by having informatics look into who touched what consult and at what time.

When I came back from my detail Donnabelle had a Team's meeting with the RN's only, but we had the Union representative with us on teams, Kindra Perkins. During that meeting I said, since this is being recorded I'm going to come right out and say it. That's when I stated this is the third time I'm going to whistleblow about staff working without pay and I went on to explain what I stated above. The union, Kindra Perkins, asked Donnabelle if this was true, to which DB balked, and I stated, just tell the truth, to which DB stated, yes, it was brought up to me. Then I stated yeah because I told you. Then Kindra Perkins went on to say how problematic that was and the seriousness of staff working without pay, etc etc etc. DB's response was, "I can't help what people do at home"

The next day we came to work and several staff members came up to me and stated that it was not on recording and they felt deflated as they wanted DB implicated by admitting she knew they were working without pay.

Now, I'm not sure if the recording was deleted or what, but the staff all thought that the meeting was being recorded.

I mentioned all the above in an email to all the leaders up the chain of command which included DB and Ravipati. So when Ravipati says I never brought it to her attention that is a lie, I did in person and through emails.

26. Do you have any reason to believe that **Donnabelle Lorenzo-Villarino's** behavior towards Complainant was based on his sex and/or prior EEO activity? Explain. No, I never witnessed Ms. Lorenzo -Vallarino harassing any of her employees.

Ravipati is not truthful in this response. Some examples:

DB and the Filipinos have harassed Christianah Aurora (a black woman, and the only black woman in leadership in the dept) repeatedly through their 24/7 Jihad and the entire staff was/is witness to that as it is out in the open. We all know it happened and most people in throughout the hospital know that as well. Ravipati knows this has been happening to Christianah but of course will deny it.

I can explain how she knows this is happening. Because the first day of my detail when I walked out of DB's office, I went straight to Ravipati's office. I mentioned all the ins and outs of why I'm being unfairly detailed and investigated into when I followed all the rules through the guidebook and Donnabelle's directive and so forth. ***But what struck me and is so vivid in my mind was when I was seated across the desk from Dr Ravipati who looked me directly in the eye and slapped her hand on the desk and stated, "this is because of Christianah" and nodded her head. In essence she was implying and trying to blame my detail and the way I was trained in how to chart apparently on Christianah***. She was waiting for me to say yes. I would like to say I was dumbfounded by her deflection, but I wasn't at all because I've seen this type of behavior for the 4.5 years I've been in that department. Now I could have easily stated yes, it was Christianh's fault; and gotten out of this

entirely by blaming it on her, but I don't roll that way, I will only tell the truth. I just starred her in the eye, lazer focused and didn't move and said nothing. That was a slimy move by Ravipati.

The truth is DB and Ravipati are coming after me personally for being the one that sticks up for veteran's rights, veteran's billing issues and for me stating over and over that nurses need to practice at the top of their licenses and not be assigned all the ancillary work, which by the way the guidebook states are PSA duties, in addition to being the most vocal in the department, whistleblowing etc, this is/was their way to shut me up. The proverbial Chinese phrase, the nail that sticks up the highest gets hit with the hammer. They are trying to make an example out of me for speaking up and telling the truth. They know I'm telling the truth and they know they are deceitful and not truthful, but trying to point the finger at Christianah to make it look to me as it is Christianah's fault and not their fault for putting me through all this harassment through this fake detail and suspension, was something I will never forget. I believe 100% had I went along with them and agreed to blame this on Christanah, we wouldn't be sitting here today going through Affidavits and responses and so on. That's why you'll notice all my answers are congruent whereas DB and Ravipati's answers are all finger pointing, deflecting and being evasive. I will never compromise my integrity by "going along" and blaming someone else just to be part of the in group.

It got so bad that, one day DB went to Christianah's office and apparently assaulted her. I guess she was yelling at Christianah and banging on Christianah's desk or something to that effect proclaiming that Christianah is manipulating the numbers? I don't know how that rumor was flying all over the hospital but it was. My understanding is that, Christianah felt so threatened by the assault that she called the police on Donnabelle. At that time we were under the Chain of Command of Todd Adkins who apparently wrote Donnabelle up and told her to stay away from Christianah. This may und like hearsay, but I believe this happened and if you were to look into it, there would be records indicating what happened. The dysfunction in the department is so deep you have two managers that don't talk to each other.

Another incident, Donnabelle had was with Lenola (I don't quite remember her last name) who is a black woman. Anyway it was during Covid and we were all suppose to be wearing masks. Lenola being a bigger girl couldn't wear a mask and needed to use a face shield instead. Apparently, DB got in an argument with Lenola and their was a back and forth. DB left and told Lieutenant Commander, Jessica Woody about the incident, and apparently, one of them called the police on Lenola and had her escorted off the facility grounds. Last I heard after Lenola left the VA she was having an investigation into this matter. Again, the hospital is small and the rumors were going around everywhere. I would be surprised that Ravipati did not know of these things.

Another incident is with Charlene Miller who told me she feels DB is prejudice against black folks and she feels like she is treated differently than other non-blacks in her grade level.

Kay, was an LPN who was working without DB giving her proper training. Anyway, Kay was almost off of her probation I believe she had one day or one week left when DB fired her. Kay is I believe 1st generation from a country in Africa. Now Kay did challenge DB on certain issues to the point that

Kay had to hire an attorney to represent her. Kay fought for her rights, and Kay got fired for doing so.

Now Ken Dizon is a staff employee in Community Care who had worked with Donnabelle both as managers in what is called the Green Houses in the Community Living Center. Ken told me to be careful with Donnabelle because she's vindictive and will come after anyone that challenges her. He indicated that she has fired a lot of people, mainly before they get off their probation. If what he's stating is true, this is an abuse of power. I believe Ken, who knows how many people she's done this to?


28. According to Complainant he was assigned more consults than his co-workers. Is this true? If not, please explain what you believe Complainant could be referring to and/or your account of Complainant's workload as compared to his co-workers.
Office of community care was aligned under my supervision in 3/23, since then he never informed me about any workload issues.
29. The Complainant testified he was ignored when he complained that he was assigned a heavier workload than other staff. Did this happen as the Complainant described? If so, please explain.
**Mr.Azis never brought to my attention about heavier work load.**

Again, Ravipati is not being truthful as I told her this the first day of my detail when I went to see her in her office. I have also sent emails which she is included on stating I have a bigger workload than the others. Groups are all assigned roughly an equal number of consults but when one group like mine is short staffed by virtue of having less workers makes my workload greater than the other groups. By the way none of the Filipinos were shorted staff in terms of their work groups.

I even had Dori Matusz in Ravipati's office with me the second day of my detail to which she explained not only the workflow, but who documents what, and that my assigned workload was heavier than the others and Dori is not even on my team. Either Dori and I are lying, or Ravipati has selective hearing. But I do remember, Ravipati scoffing at us and telling us she didn't have time for that and motioned her hand to the door for us to leave.

One other time I was in Ravipati's office and we were talking and she said she is not stopping the investigation. This implies it's on management to decide on the detail and not HR as she will indicate in her later answers.

All Ravipati had to do was investigate my accusations as far as workload and charting and following guidebook and manager's directive, but she did not. She kept me detailed all the way until I filed an EEO as punishment and harassment for all the aforementioned reasons through out my brief and answers to the affidavits.

**Incident d: On May 8, 2023, Complainant was not allowed Union representation, he was the subject of a fact-finding investigation, he lacked documentation in his emails, and was accused of not properly scheduling a deceased patient's consult in December 2022.**

36. Please explain in detail the reasons the Complainant was the subject of a fact-finding investigation; where he lacked documentation in his emails and was accused of not properly scheduling a deceased patient's consult in December 2022.

Office of quality has informed us there is a patient's death in March 2022, which led to patient's safety report. Review of the case showed patient was referred to nephrologist in the community, there was a delay in scheduling the appointment. Patient was admitted into community Hospital with a diagnosis of uremic encephalopathy and eventually patient passed away. Reviews showed gaps in care coordination.

What gaps is Ravpati referring to?  The question asked her to explain in detail which she clearly does not.  That answer is so evasive because she can't hide from the fact that I did my job exactly as I was told to do, even though I was short staffed etc etc , yet her and DB continued with the detail/harassment/discrimination towards me.

The workflow given to us/the department by Donnabelle is recorded in a Team's meeting dated 11/10/2022.  I followed the workflow exactly how she wanted us to by her directive.

The link below if you can get access to it would be of the upmost importance.  For some reason DB and Ravipati do not want you guys to hear this and I tried my hardest through FOIA requests and so forth all to no avail.  So please get yourself access to the recording and listen to it as DB explains in no uncertain terms how she wants the workflow to go.  The recording is roughly maybe an hour long, but please pay particular attention if you cue it up to 13 minutes where DB explains the process and I asked her to repeat it to which she does.

https://dvagov-my.sharepoint.com/:v:/r/personal/donnabelle_lorenzo-villarino_va_gov/Documents/Recordings/OCC Workflow and Worklist Assignment-20221110_150029-Meeting Recording.mp4?

Please see the workflow algorithm below.  Just click on it and it will indicate what is on the recording but in flowchart format. If for some reason it doesn't load for you, please let me know so I can get you a copy of it.



Copy of OCC
Workflow Flowchart F

Below this is the transcript as to what I am referring to. You would be better off getting the recording as the wording in the transcripts are convoluted and a person not working in the department would not know what DB is referring to, which often happens through translations. For example:  ends is RN's, raft up is REFDOC and so on.

Dizon, Ken FHCC Lovell11:23

I'm so sorry. Just to go back to clarify, did you just say moderates and complex will be RN, is that correct?

**LL**

**Lorenzo-Villarino, Donnabelle L.11:30**

That is correct.

Umm.

**CCP notes** on the moderate and complex. That is what it is and the guidebook moderate our complex. Our work on by our ends. Then you go through the flow. Veteran's preferences have been captured. If not then.

You captured a veteran's preferences, then you work through this workflow. If they have been captured, then you go on to the next one. As far as creating the console.

Are the referral documents and processing them sending them to the providers making sure that when we are creating those ref docs we are sharing them with the team and that share with the team we need to upload that into the CSRM the reason why we wanna upload it to HRM is that it is somebody submitted the refdoc already affects over to the provider somebody else comes behind them and the provider says that they have not received the ref doc. It would be easier if we could just go to you just run.

And download it of the roughed up again rather than creating a new ref top. So make sure that we are once we create those ref doc there's another extra step to just click it and save it to HSRP so that it is available for everybody.

**Once you do that one, the clinical staff, uh alerts their administrative staff.** Once that that has been sent to the provider **administrative staff, you followed through with your process and getting your console scheduled at the same time.** You also follow us through the if the scheduled appointment has been made once it's been sent to the provider.

And so far.

**K**

**Kochiu, Azis FHCC Lovell13:13**

But can you just explain that that last part of it again I?

So.

**LL**

**Lorenzo-Villarino, Donnabelle L.13:17**

Once you, the clinical staff have, for example, Ozzy has submitted the raft up, uploaded it to HS arm, then you **alert your administrative staff that has been sent to PSRM already, even if it's a complex or moderate consult. Administrative staff,** make sure you follow up behind the clinical staff and **call the provider a few days later to make sure if the console has been scheduled.**

**K**

Kochiu, Azis FHCC Lovell13:22

Uh-huh.

OK.



**D**

Dizon, Ken FHCC Lovell13:45

So basically from for moderate complex we're doing from A to like T like meaning we're creating the packet, we're faxing it, gathering the, you know, preferred provider and then admin staff will take.

Over after that, once we sent everything uploaded to HRM, is that correct?

**LL**

Dizon response to workflow.docx

Xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Okay so what you will see is that on this consult I followed exactly what DB directive was. I accepted the consult (which by the way is PSA duties per the guidebook) then I looked through the consult, the veteran did not have much information in the chart from what I remember. I saw he had a preferred provider listed where he wanted to go, I called the veteran to confirm this is where he wanted to go, I proceeded to gather the data needed, uploaded it from REFDOC then into HSRM, faxed the required documents to the preferred provider the veteran wanted, and **alerted Kelly Heckel PSA** who was supposed to schedule the consult. I did everything exactly how DB wanted to per her directive. She even indicated in transcript, on the workflow diagram and on recording this is how the procedure is to be followed.

Kelly Heckel was supposed to schedule the consult but did not. I as an RN don't document on PSA duties as Ravipati eludes to. She's wrong! Just like her as a doctor doesn't document on Nursing duties.

So, what happened was after the consult was sent out I move on to the next consult. During approved overtime DB assigns the workload to staff and assigned Cindy Reyula RN this consult. As you see from my brief and previous answers, Cindy called the veteran to see if he scheduled the appointment. She indicates she did not reach the veteran and when you cannot reach the veteran it is per directive to send a 7 day letter to veteran's address to call us with the appointment or the consult will be cancelled. Cindy RN did not do that the three times she tried to reach the veteran. Cindy RN did however alert Kelly Heckel who yet again did not make any attempt to call and make sure the consult was scheduled. Kelly didn't make the call until after 3 months after first being alerted.

For Ravipati to blame this on me after I followed the exact protocol is deceitful. That is the equivalent of me having a patient on a floor one day, then the next week another nurse is assigned to the same patient but doesn't follow through on patient care but the first nurse that had the patient a week ago gets the blame (in this case me). The ANA (American Nurses Association) NPA (Nurses Practice Act) and Board of Nursing doesn't apply the standard Ravipati is implying. The nursing process/NPA which is a set of state statutes (laws) every state has in which nurses are held accountable to and as far as nursing goes the Federal Government follows the NPA. In this case Cindy Reyula RN neglected to send a 7 day notice three times; per the NPA this was her responsibility since she was the one caring for the patient. Everynurse knows as it is on the NCLEX nursing board exam that you cannot "pass the buck." Meaning if a nurse sees something is wrong they cannot wait for someone else to fix it.

To complicate matters even more, the department is held to a metrix in other words a numbers game. Instead of taking care of patients by triaging per NPA, we are directed by leadership to do the older consults first. So for example if a veteran want's to see a massage therapist and that consult is older than for instance a cardiac cath procedure coming up, leadership directs nurses to work on the massage consult first to make it look good as far as the metrix goes. I was relentless in disagreeing with this and have sent emails and been vocal through the chain of command all the way to VISN 12 and National with this major flaw in leadership directive. That is not how you practice medicine.

Anyway, below is the 7 day letter that Cindy RN was supposed to send out but failed to do so three times.

Department of Veterans Affairs
Captain James A. Lovell Federal Health Care Center
3001 Greenbay Road NORTH CHICAGO, IL 60064
November 12, 2023
Veteran Baby Test
**We have not received confirmation of a scheduled appointment from you or your community**
**provider. Your appointment must be scheduled within 7 calendar days of the issuance of this**
**letter.** If an appointment is not scheduled within 7 calendar days, your consult and referral will be
cancelled.
Your community provider information:
VA Authorization: VA0024990735
Copies of your authorization and clinical notes have been faxed to your community provider. **Your**
**authorization will not be activated until VA receives confirmation of a scheduled appointment**
**from either you or your community provider.**
VA is not able to backdate Community Care authorizations. **If you attend a Community Care**

**appointment before your authorization is activated, you may be responsible for costs**
**associated with that care.**
If you have questions about the Community Care process you can contact us at
224-610-8632.
Thank you for your service,
Captain James A. Lovell Federal Health Care Center Community Care

That letter is another avenue to inform the veteran through mail if we cannot reach the veteran through phone calls. This was not done.

**My question is, why was Cindy RN a Filipino female not held to the NPA standards and detailed and suspended the same way I was?** The answer is because she is Filipino female and close friend with Donnabelle and I am a male of non-Filipino decent.

Why was Kelly Heckel psa not detailed and suspended for ignoring the two alerts one that I sent to her and one that Cindy RN sent to her? Answer because she's a female and I'm male. The delay in scheduling the appointment falls on Cindy RN and Kelly Heckel who DB clearly states in no uncertain terms was suppose to citing DB directive from above.

*Lorenzo-Villarino, Donnabelle L.13:17*
*Once you, the clinical staff have, for example, Ozzy has submitted the raft up, uploaded it to HS arm, then you **alert your administrative staff that has been sent to PSRM already, even if it's a complex or moderate consult**. Administrative staff, make sure you follow up behind the clinical staff and call the provider a few days later to make sure if the console has been scheduled.*

There's the delay of care.  Ravipati is wrong and only justifying her harassment of me.

Below I have a snapshot of DELAY OF CARE with regards to everyone in the department. The names and social securities were redacted. The column that shows elapsed days from entry date is all delay of care.



Delay of care
redacted of SS and na

**Is Ravipati going to treat everyone in the department the same way her and DB came after me? Are they going to put everyone in the dept through a chart review, detail pending investigation, then suspension with the same intensity they came after me for? Or are they going to shift the blame on HR and continue to insist what they did to me is fair and just when they clearly know the amount of DELAY OF CARE throughout the dept. I mean that's the metrix we get daily by DB and leadership.**

**Had I been Filipino none of this would have happened to me. Especially had I been a female Filipino.**

**To solidify that I followed protocol and am on the same page as the rest of the department below are testimony of staff members interpretation of the workflow.**



Charlene - workflow directive.msg

Dori Matusz - workflow directive.ms

Kim Matil - workflow directive.msg

Ken Schengeck - workflow directive.ms

Ken Dizon - workflow directive.ms

Monica Coleman - workflow directive.ms

Roger Lohr - workflow Directive.ms

**If for some reason if any of these emails cannot be opened please reach out to me so that I can send them to you. I didn't want to copy and paste the verbiage as it would take too much space in my replies.**

**37. Complainant alleges when his chart review was conducted it was based on duties that were the responsibility of the Patient Services Assistant and not Registered Nurses. Is this true? Please explain your account of what occurred.**

No, as a RN care coordinator, RN 's has higher responsibility in care coordination.

What does that answer even mean in regard to charting? She doesn't indicate in her answer if my chart review was based on what PSAs are supposed to chart but gives some generic answer that RN's have higher responsibility in care coordination. The question asked was, was my chart review based on PSA duties and she doesn't answer it.

This has been explained above, I followed the rules leadership gave us. I do not document what PSAs are supposed to document that would be falsifying documents had I done so. Just like her as a doctor does not document what RN's are to document. That was a feeble answer and just another deflection.

The fact that they ran a biased chart review on me which included what the PSAs are supposed to chart was purposely done only to make me look bad so they can justify their attacks and harassment on me. For this to hold water DB and Ravipati would have had to run all the RNs under the exact same criteria meaning time frame and complexity of each consult to come to a fair conclusion that I am charting inadequately or differently than any other Registered Nurse in the Department. They never did that, even at my request, as the investigation was fraudulent and biased. Ravipati knows this, she is concealing the truth by not answering a simple question, because as stated above Dori Matusz and I went up to her office and explained this to her before she scoffed and made a contorted face and motioned to the door for us to leave her office.

The flow chart provides evidence otherwise as did the Union when they brought this up to Dr Buckley.

Everyone in leadership knows and knew this but choose to ignore it. Besides we're clinicians at different levels we all know this.

If we follow Ravipati's logic to her answer, then the doctor that initiated the consult has a greater responsibility than I do as I am only a nurse. Did the doctor follow up on his patient? Did the doctor document in the chart his follow up? Why didn't the doctor follow up on his patient that he knows? The nurses in our department only know the veterans by name and social security number we don't see the patients. Why did Nephrology wait a year before seeing the patient? Why is the entire blame on me the RN that touched the consult first and not the doctor, or DB leadership who disseminates the work to staff. Again, why would Cindy RN not be held to the same standard as I was when she had the patient after I did? This logic can even apply to Ravipati as a clinician, why did she not chart anything on the consult. At what point do you stop pointing fingers and hold the system failure accountable but instead come directly after me for personal reasons as explained throughout my rebuttal and past affidavits and emails.

38. According to the Complainant, Wendy Superable, Nurse was not treated similarly to the Complainant and the subject of a fact-finding investigation following a patient's death. How do you respond?

OCC leadership is working with HR in regards to patients death in a case worked by RN Wendy Superable, work in progress.

This is a lie. The case against Wendy Superable RN has been closed, she was only given a counseling, the Union gave me that information. Besides, HR doesn't make the final determination it is the manager and leadership that does. Wendy should have been detailed pending investigation immediately but was not.

The circumstances of the case were a 35-year-old female veteran had a consult placed for inpatient psych and she had called Community Care indicating she needed help and needed inpatient treatment as she was in crisis. Wendy RN made accepted this consult and downgraded it to a basic, and rather than work on it immediately she assigned it to a PSA that was on orientation or had just come off orientation. Anyway, the PSA called the veteran to try and find a facility for her but had no luck. Shortly thereafter Wendy assigned the consult to the PSA, the veteran hung herself. First off this was a complex consult that needed immediate attention and not given to a PSA.

Dori Matusz filed a JPRS into this matter.

I don't know about you, but this seems to be damn serious! Why in the world would Ravipati and DB not suspend Wendy pending investigation? Here Ravipati is pointing indirectly at HR. IT HAS NOTHING TO DO WITH HR! This is a management and leadership call! They are the clinicians not HR! Any provider, or any layperson would know this rudimentary concept. You don't need an advanced literary degree to understand something with this gravity needs a serious intervention immediately so that it doesn't happen again! Or is the VA leadership just trying to cover this up so it doesn't go public? This isn't some 89-year-old dying of old age/renal failure. This was a 35 year old veteran begging for help and the VA let her down! And now leadership is covering up the death by proclaiming they are working with HR. This if failure on leadership at the upmost level. The appropriate thing would have been immediate detail pending investigation. They should have come after Wendy RN, Female, Filipino no different than they did me, with the exact same intensity but did not and now are diverting this on HR. Something like this should be brought up in front of Congress so that leadership in this department can explain to the taxpayers and veteran's why this happened and to the amount of neglect coming out of that department and the coverup into this death. The department

leadership is a hornets nest full of corruption and blaming everyone but themselves for their own failures.

But since Wendy is DB's best friend, female, and Filipino just like DB, this was all swept under the rug. And by the way DB and Ravipati are friends who at times hangout outside of work.

Now you tell me how come Wendy gets special treatment from DB and Ravipati for an offense as egregious as this one but I as a male, non Filipino, that speaks up gets the book thrown at me.

32. Have other employees lacked documentation in their emails, in the same position and grade as the Complainant during the past year under similar circumstances, if so,
a. Identify each person by name and position title. Not aware
b. Identify each person's sex. – N/A
c. Why was each person not treated similarly to the Complainant with respect to this matter? N/A

If Ravipati is quick to make judgments on me prematurely, she should have dug into other RNs charts as well before making disparaging statements about me throughout this affidavit and her proposed 14-day suspension she handed down to me. As she indicates in answer to question 28 in this affidavit the department has only been under her leadership since 3/23.

So, if I get detailed 5/8/2023, then why would Ravipati know and answer all the derogatory negative answers and comments she makes towards me in the 14-day proposed suspension and throughout this affidavit. She was only my leader for 2 months, how would she know that? The only way she can get any false negative information on me is through Donnabelle, who was soliciting staff members to say bad things about me according to Monica Coleman, staff member, union representative as DB solicited Monica to say damaging things about me. And Ravipati is sticking up for her friend DB rather than being impartial in this matter as seen what happened to me verses what happened to Wendy. I think Ravipati signed the 14-day proposed suspension just to virtue signal and show her loyalty to DB but what she did in actuality was implicated herself in this matter by showing discrimination towards me and not others.

That said, if she is able to make statements about me only being my leader for 2 months why can't she do an investigation into the others before alleging that I did anything wrong.

39. Was Complainant subjected to disciplinary action as a result of the fact-finding investigation? If so, what, when and explain the nature of the charges? Please explain in full detail.

He has the complaint was subjected to disciplinary action based on thorough chart review of the alleged patient's death, 30 chart reviews has been done by RN external to the department in which multiple gaps were identified. Alleged did not show any responsibility and accountability during one-on-one meeting and in his email.

That is a powerless answer as the investigator asked her to explain **in full detail**. Ravipati's answer is vague, she doesn't indicate what I did wrong, doesn't explain the nature of the charges as the question asked.

Again, Ravipati addresses a 30 chart review in her answer,  but doesn't indicate in this affidavit what I did wrong within the chart review.  She ducked this question as she did did question number 37 that asked about the chart review.  Her answer in 37 doesn't answer the investigators question with any specifics just as this answer to question 39 doesn't explain in full detail why I was subjected to a disciplinary action.  She wants us to believe because she said it, it must be true, not backing anything up by facts per the VHA guidebook or the workflow directive given on 11/10/2023.  She mentions "multiple gaps" but doesn't indicate **in FULL DETAIL** what those gaps are that she claims were identified.  Answer is Ravipati doesn't indicate which gaps because there are no gaps in my charting.  Again, the question asked is in full detail, and her giving a two-sentence response is hardly a full detail and doesn't explain to anyone the reason I was put through all this distress.  If she was so certain of my mistakes, then present them to the EEO commission in full detail.  If Ravipati has something, present it that way I can rebut it.  But her lack of an answer here and throughout this affidavit makes it hard for anyone to make sense let alone try to rebut phrases she's just throwing out.   She's a doctor for crying out loud, she's intelligent enough to pay attention to detail and should be able to articulate in layman's terms what I did wrong, but she doesn't.

She goes on to say,  "alleged did not show any responsibility and accountability during one-on-one meeting and in his emails."

Is that the barometer I'm supposed to play by with Dr Ravipati?  Am I supposed to walk into her office with my head down and hat in my hand every time she bangs her gong?  I sense the anger in her answer because how dare a low-level RN challenge a doctor's who's opinion of him is biased and wrong.  The egotism in that answer is telling to say the least.  It's disgusting.  How could she know how I'm feeling?

This is the same anger she presented towards me after I filed this EEO.  Ravipati indicated to me that this entire thing is a, "slap on the wrist."  Which by the way I disagreed with.  Why would I accept a slap on the wrist for doing nothing wrong.  Anyway, a slap on the wrist quickly moved to a proposed 14-day suspension the moment DB and the VA got notice that I filed (under my Federal Rights) an EEO into the discrimination into this matter.  Ravipati brought me back immediately after the VA was notified of the EEO filing.  So, this went from a slap on the wrist to

a proposed 14 day suspension.  That is nothing less than retaliation and intimidation because I filed the EEO.

It should be noted that throughout my correspondences with Ravipati she kept insisting she didn't know how to bring me back to my position ever time I asked her.  She told me to call Alex Morse the HR rep. which I did. Alex and I briefly talked through teams and on the phone.   In my conversation with Alex he stated it's not up to him it's up to management to bring me back. Keep in mind this was about a month into my 3-month detail when I called Alex.  Alex further indicated that this case had been done, "two weeks ago" and he wanted to, "get it off his books…"  he reiterated it was up to management and not him.  I told him as I told Ravipati if its up to DB then she will keep me detailed indefinitely, who knows years perhaps.  Again, Ravipati said she didn't know how to bring me back.

But as stated once the EEO was filed and the VA was notified, Ravipati got me back immediately, only she pushed for a suspension and answered questions in her proposal that were disparaging about me after only being my leader for 2 months.  Her ego clouded her judgment and continues to do so.  I'm sure her answering these questions angered her as I get the feeling she feels how dare anyone like the investigator ask her questions.

Again, she was angered at a low-level nurse filing an EEO and she took it personal as if it was directed at her.  Why would she take it so personally and retaliate against me?  I had every right to file as I have been harassed, discriminated against and retaliated for filing.

There was no reason for me to show Ravipati "accountability and responsibility" when I did nothing wrong!!!!

## 40. Did this action comply with applicable policies and regulations? If so, please identify these policies and regulations?
Complied with VHA table of penalties.

Which penalties?  Again, another broad answer without indicating the penalties.  Furthermore, are the penalties she's referring to do they have anything to do with PSA duties that I'm not responsible for?  She needs to indicate what I did wrong, then indicate what the penalties I did wrong from the table which she mentions.

## The Burden is on HER and the VA to show what I did wrong! And they haven't!

## They did not present a statement of facts and cite anything from the guidebook as to what I did wrong! This is a lynching.

41. Did you and/or the Agency have evidence to support the disciplinary action (if any) made with regard to the Complainant's failure to schedule a deceased patient's consult? If so, what evidence? Please explain in full detail.

Yes, evidence is processing, comments on the consult, tracking of consult.

This question was already answered above and throughout this rebuttal. Again, Ravipati does not answer in full detail to what the investigator is asking. She just throws out a one sentence phrase as if she's too good to answer the investigator's question.

I followed the rules as directed and Ravipati refused to listen when I explained them to her with Dori. She knows what the rules and directive is and how the workflow in the dept is run, but is playing ignorant in her answers.

She indicates, processing – I processed the consult according to the guidelines given by leadership indicated in transcripts, on recording, workflow diagram, and by testimony of staff indicating the workflow as described above. Please see the consult in question. What DB left out intentionally during my Weingarten meeting was my community care progress note that indicates I called the veteran on 12/19/2023. I had to fight hard to get this in my hands as her and Ravipati were withholding information from me.



CCP note
12.19.2022.pdf

**Level of Care Coordination**
 **Moderate**
 **Care Coordination was determined from:**
  **Chart Review, Phone call to Veteran/Family/Caregiver**

She indicates, comments on the consult – I documented according to the directive given by DB and all leadership. She doesn't explain what else I would have needed to document.

She indicates, tracking of consult  - after I sent it out as directed, I alerted Kelly Heckel who by the directive as stated above was her duty to schedule the consult. VISN and National made this clear many times. They do not want RN's to be wasting time scheduling consults as that is a PSA's job.

Furthermore, her friend Cindy RN, female, Filipino touched and tracked the consult 3 times after I did. What makes Cindy RN immune to any of the harassment I'm going through?

Why didn't the doctor that entered the consult track his patient and document it on the consult? Is Ravipati going to go after the doctor who knows the patient as well as the entire Nephrology Department who this patient was under, with the same intensity her and DB did to me? Nah they won't because it's much easier to find a low lever nurse and make him the scapegoat of something rather than dig into all the facts and seek the truth.

If Ravipati and all of leadership was serious about this they would have done and RCA (root cause analysis) into this matter. I requested they do this in person and through emails all to no

avail.  An RCA means that we sit in a room with a bunch of staff, doctors, nurses etc etc and discuss the case and find out where the problem is so that it can be corrected so it doesn't happen again.  But there was no RCA done.  Why?  Because an RCA means we present all the evidence and the facts in front of everyone and they knew that I would be in there telling the truth and that would blow their entire case to smithereens.  So they didn't want to do an RCA and will never do one on this out of fear that it will expose Ravipati and DB as lying and negligent in this matter.

I would like to note that once someone documents on a consult that same consult will not show up on the 14-day list as not being touched for 14 days.  As seen by the chart DB gave the consult to Cindy during overtime and Cindy documented on the consult, therefore, that same consult won't show up for 14 days on the list DB sends out daily.  Then DB assigned that consult to Cindy two more times thereafter which Cindy documented on.  Again, after someone documents on the consult it gets lost in the mix and no one sees it for 14 days as staff are working on other consults according to date rather than complexity per leadership to pad the numbers and make their metrix look good.

So I'm not sure who Ravipati is stating didn't follow up on tracking the consult when Cindy RN was working on it after it was assigned to her by DB.  And by the way Ravipati knows this but must paint a broad brush to justify her retaliation and discrimination towards me.

On a side note, I was told by Monica Coleman RN, Union Representative and Cecilia Sherod RN former Union rep that Dr Ravipati felt bad and was telling them she didn't understand why DB never added Cindy RN to this as she is responsible.

Ravipati may have said that but her actions towards me are deceitful, biased, discriminatory, retaliatory.

Please interview Monica Coleman RN and Cecilia Sherod RN as well as Kindra Perkins Reginal Union Rep and Randa Rung head of the Reginal Union, as they were privy to DB statements and Ravipati's statements.

## 42. According to Complainant his sex and prior EEO activity were factors in your decision to subject him to a fact-finding investigation. How do you respond?

N/A

I clearly proved that my gender through sex was clearly a factor in this case.  Look what happened to me as a male and look what happened to Wendy a female.  It couldn't be clearer that I have been discriminated against based on sex 100 percent I now I was. And no matter how Ravipati and DB or the VA want to put a spin on it, I know and believe in my heart this was a factor.

What happened to me and what happened to Wendy they can play semantics with their answers all they want but the truth is I was put through hell and Wendy got away with allowing a 35 year old to hang herself.

What the VA leadership done to me and ignored Wendy's mistake is disgusting and dirty. It's so slimy that I wish there would be a congressional hearing into the corruption and coverup at the VA. I think the veterans and taxpayers are owed an explanation.

**Incident 1: On May 8, 2023, the Complainant was removed from patient care.**
43. Were you responsible for removing the Complainant from patient care?
If you were not responsible, then please identify the name and title of who was responsible.

No, Donnabelle Lorenzo-Villarino issued the temporary re-assignment as per HR's guidance.

This is a deflection to blame HR and keep the truth away from DB and Ravipati. HR, Alex told me on the phone it's all up to management that he had nothing to do with this. As he explained to me, his part was over two weeks after my detail began, but DB and Ravipati kept me detailed all the way until I filed this EEO. I mean this is the federal government that phone call between me and Alex can be easily tracked to prove what he told me.

HR gets the information from the managers. The manager would have had to request HR to get involved. HR doesn't get notified of any JPRS or safety issues unless someone brings it up to them as in this case DB and Ravipati. They are the leaders of course they brought it up to HR. HR may have given direction on what they can do according to guidebook rules to protect the VA, but they seem to want to drag HR into this as if HR told them what to do as managers. Again, another vague answer not fully developed but only meant as a way to cloud the issue and somewhat blame HR for the cascade of discrimination that took place against me.

Truth is the managers DB and Ravipati both initiated this, both discriminated, both retaliated against me for being a male, and did nothing to Wendy for allowing a veteran to hang herself. It couldn't be any more serious than that.

Alex HR has no dog in this fight. If for example Alex was the one to detail me, then why didn't he detail Wendy for the seriousness of her inactions? Or give "guidance" to leadership with regards to Wendy? If that is the case than Alex engaged in discrimination against me. But I don't believe Alex had anything to do with this. This was name dropping to convolute things and muddy the situation to create confusion so the people deciding justice in this matter just throw out the case based on confusion.

Ravipati could have called me back anytime but didn't. She's higher than DB in the chain of command but did nothing and allowed this persecution of me to continue. I even sent her teams messages stating this. Again, statements on record that can be easily produced if needed.

**If you are not responsible, did you have a role in this matter? If so, please explain it.-**

No role

If Ravipati wants to claim she had no role in it, what gives her the latitude to make derogatory comments about me and dictate the proposed 14-day suspension on me? Is this her stab at sarcasm? I mean really? No role?

When I asked Ravipati in her office if this can be stopped because they are making a big mistake, that I did nothing wrong but follow the directive given to me by DB, Ravipati shook her head and said it and will keep it moving forward, referring to the detail. She clearly had a role in this as she is higher in the chain of command than DB. This fools no one. It's a blatant lie she's the boss of course she had a role in this. Her and DB worked in conjunction with one another as friends to discriminate against me for speaking up on several issues and whistleblowing those are facts. You can't claim when you're the boss you had nothing to do with it at the same time dictate the suspension towards me. That doesn't even make sense.

**48. According to the Complainant, Wendy Superable, Nurse was not treated similarly to the Complainant and removed from patient care following the death of a patient? How do you respond?**

After fact finding and review of 30 consults evidence was presented to HR, HR did not advise OCC leadership to remove RN Wendy Superable from patient care

The answer to this is explained in the above rebuttal to the previous question.

Again, HR has nothing to do with telling a manager or advising a managers on how they want to discipline their employees. In this case Ravipati states, " HR did not advise OCC leadership to remove RN Wendy Superable from patient care."

Ravipati's answer can be summed up in two ways:

1.  Then HR discriminated against me in conjunction with DB and Ravipati in detailing me for no reason at all. But on the flip side, HR and management did nothing to Wendy for allowing a 35-year-old veteran to hang herself.

2.  The reality is it's not up to HR to hand down punishments as they are neutral in all matters, or supposed to be. Punishment is handed down by managers. Managers might seek guidance from HR to make sure the rules are followed as to not put the agency in jeopardy or at risk, but they do not hand down or decide what punishment is given to an employee, the managers do that. The manager or in this case leadership is the one to do that but choose not to detail and put Wendy through the same thing they put me through.

    It was up to DB and Ravipati to detail Wendy, and they didn't which proves my case that because I'm a male, non-Filipino I was subject to discrimination; whereas, Wendy who is

a female and is Filipino just like DB is Filipino nothing happened to her. This is textbook discrimination. Case closed.


## 53. What VA policies are relevant to this matter. Please provide for the record.

Table penal

Ravipati doesn't indicate through this entire affidavit or in the 14-day proposed suspension what exactly I did wrong, and she doesn't cite anywhere from the VHA guidebook what violation I'm guilty of.

The table of penalties would apply if leadership presented a clear statement of facts to what I did wrong and then follow up with the guidebook indicating where my violation occurred. But leadership didn't do that, not now and never did from the beginning. They just egotistically took it upon themselves to flex their authority as leaders and randomly jump the gun and moved with this cascade of events without a full and fair investigation. Unless she provides what VHA policies are relevant to this matter as the question asks her, this yet again is an undeveloped response and insufficient answer to the question being asked of her.

Again, nothing happened to Wendy a female. Nothing happened to Kelly Heckel Female responsible for scheduling the consult in question. Nothing happened to the doctor that entered the consult who knows the patient, nothing happened to the Nephrology Department due to patient's renal failure.


When Ravipati speaks of gaps in this affidavit, does she mean gaps in her investigation into seeking the truth or is this just a one sided, three ring circus she's playing? And that is not meant as sarcasm from me, I'm dead serious.


## HARASSMENT ALLEGATION
55. Other than what you may have discussed above, did Complainant (or anyone acting on behalf of Complainant) tell you that your or anyone else's actions constituted harassment and/or a hostile work environment for him? If so, provide the following:

a. When were you told? Once complainant was issued disciplinary action, he sent an e-mail to EEO and cc'ed this underwriter.
b. Who told you? – email sent on 9/1/23
c. What specifically were you told? See attached E-mail from 9/1/23.
d. What was your response/action? (If in writing, please provide a copy.) – it was not addressed to me directly.

My response to letter this particularly letter (d). Ravipati wouldn't respond because she knows she's wrong and knows that her and DB are the ones that did this to me. What the two of them did to me constitutes harassment, discrimination, reprisal. They lied and deflected throughout the entire process, never did a full and fair

investigation, left out details intentionally, ignored my pleas to look into certain things no matter how much I asked just as right now they still won't provide the recording dated 11/10/22 for review by the EEO board which indicates leadership directive, they both kept me detailed and put me under a tremendous amount of stress that I sought my doctor's intervention, they slandered my reputation to the entire Hospital to the point that I cannot even get jobs within the facility. This is a small hospital and I can't go anywhere without someone asking me about this incident.

Nothing is worse than being accused of something you did not do.

## 57. Was an investigation/inquiry conducted into Complainant's allegations of harassment/hostile work environment? If so, by whom and when?

 Mr.Azis never brought to my attention about hostile work environment.

I told Ravipati in person, through team's messages, and in emails that what's happening to me is harassment.

Harassment comes in many forms. Of course, DB isn't going to tell me she's harassing me. Harassment is subtle, for example my group being short staffed intentionally which gave me more work by virtue of having less help. By intentionally lowering my performance rating as indicated by Christianah's testimony in her affidavit when she indicated she rated me highly satisfactory but then states that DB lowered it to satisfactory. By me getting almost half the alphabet assigned to me. I literally was assigned 11-12 letters, which may be the same amount of consults as others but when you work on ECRs and other aspects within the duties of the department it is more work than people only assigned 2 letters. All that is harassment, and it has been happening subtle for at least the last year and a half to two years under DB's leadership.

I literally told these things to Ravipati, but she didn't take it seriously. What Ravipati did do was retaliate the moment I filed the EEO.

## 61. If no investigation was conducted, please explain why.

 n/a

The answer is easy. Because Ravipati won't investigate her friend DB no matter what my claims are. And no one in the VA will investigate Ravipati. She would have to investigate herself that's why you can sense the anger in her answers when the investigator is asking the questions.

I mean I just by reading some of Ravipati's answers to the investigators questions they read to me as if she's being annoyed and defensive as if why an investigator

think she has the right to question her.  How dare anyone question Ravipati's authority as a doctor.  Her answers are such that everyone should be on there knees kissing her hand that's my interpretation of some of her dismissive answers to the investigator.  I have had personal contact with Ravipati and when she shunned me out of her office, as if I was beneath her, that's feel I get from her answers she gave to the investigator.  She had the same demeanor in person and both in this affidavit and in the 14 day proposed suspension she signed off on. It's quite easy to sense.

```
-------------------------------------------------------------------------
MEDICAL RECORD                                               Progress Notes
-------------------------------------------------------------------------
```

NOTE DATED: 12/19/2022 14:35
LOCAL TITLE: COMMUNITY CARE COORDINATION PLAN
STANDARD TITLE: NONVA NOTE
VISIT: 12/19/2022 14:35 COM CARE-NEPHROLOGY
Community Care Coordination Plan
Community Care Consult: Nephrology
              Consult No:
        HSRM Referral #:

Chief Complaint: worsening kidney function

Level of Care Coordination
  Moderate
  Care Coordination was determined from:
   Chart Review, Phone call to Veteran/Family/Caregiver

  Facility Community Care Office Contact
  Care Coordination Point of Contact: Christianah Arowora, OCC Nurse Manager
                Phone Number: 224-610-8632
  Services:
      Basic Care Coordination Services
      Monitoring and coordination of Rehab/PT Services
      Direct communication to referring provider
      Care management, if appropriate

  Plan:
  care coordination


documents faxed to provider

referral
order
general note 212-8-22
Renal 5-25-22
privacy letter
Optum billing address

Referral Number: VA0025145057

FROEDTERT SOUTH MEDICAL GROUP
9555 76TH STREET FLOOR 2
PLEASANT PRIIRIE WI 53158
NPI 1891729950
              ** THIS NOTE CONTINUED ON NEXT PAGE **
-------------------------------------------------------------------------
          CAPTN JAMES LOVELL FED HLT CTR Printed:12/08/2023 11:23
                  Pt Loc: OUTPATIENT                 Vice SF 509
-------------------------------------------------------------------------
```

```
-------------------------------------------------------------------
MEDICAL RECORD                                      Progress Notes
-------------------------------------------------------------------
```

12/19/2022 14:35      ** CONTINUED FROM PREVIOUS PAGE **

TEL 262.577.8300
FAX 262.671.7153
COM----------

  ADDED COMMENT         12/19/22 14:34      KOCHIU,AZIS V      KOCHIU,AZIS V
alerted Kelly

  ADDED COMMENT         12/19/22 14:34      KOCHIU,AZIS V      KOCHIU,AZIS V
awaiting appt details from veteran or community provider
                    Signed by: /es/ AZIS V KOCHIU
                               NURSE
                               12/19/2022 14:36

02/01/2023 16:51      ADDENDUM         STATUS: COMPLETED
Voicemail left to veteran at 1619, requesting him to call Assigned staff
if he already set up an appt. w/ Froedtert South Medical Grp.
Nephrologist.
                    Signed by: /es/ CYNTHIA P RELUYA
                               NURSE COORDINATOR
                               02/01/2023 16:51

02/01/2023 16:51      ADDENDUM         STATUS: COMPLETED
Follow-up call made to provider/vendor to check on status.

Spoke w/ Corrie @ Dr. Wade Milosevic's office w/ Froedtert South Medical
Grp. Nephrology Dept. at 1621 and informed writer that they didn't receive the
referral that was faxed on 12/19/2023, to refax the referral to the same
fax # 262 671 7153, and scheduler will call the patient.
                    Signed by: /es/ CYNTHIA P RELUYA
                               NURSE COORDINATOR
                               02/01/2023 16:51

02/01/2023 16:52      ADDENDUM         STATUS: COMPLETED
RSP-Records faxed/sent to Community Care Provider.
CUR-CTB User Role: RN
COM-Additional Comments:
Referral refaxed to Dr. Rade Milosevic w/ Froedtert South Medical
                    ** THIS NOTE CONTINUED ON NEXT PAGE **
```

```
-------------------------------------------------------------------
               CAPTN JAMES LOVELL FED HLT CTR Printed:12/08/2023 11:23
█████████████████     Pt Loc: OUTPATIENT                Vice SF 509
-------------------------------------------------------------------
```

---

**MEDICAL RECORD**                                    **Progress Notes**

---

12/19/2022 14:35     ** CONTINUED FROM PREVIOUS PAGE **

Grp. Nephrology Dept. at 262 671 7153.

Alert sent to Admin staff to follow up.
                    Signed by: /es/ CYNTHIA P RELUYA
                              NURSE COORDINATOR
                              02/01/2023 16:52

---

CAPTN JAMES LOVELL FED HLT CTR Printed:12/08/2023 11:23
            Pt Loc: OUTPATIENT                    Vice SF 509

---

Dizon, Ken FHCC Lovell
13 minutes 45 seconds13:45
Dizon, Ken FHCC Lovell 13 minutes 45 seconds
So basically from for moderate complex we're doing from A to like T like meaning we're creating the packet, we're faxing it, gathering the, you know, preferred provider and then admin staff will take.
Dizon, Ken FHCC Lovell 14 minutes 1 second
Over after that, once we sent everything uploaded to HRM, is that correct?

Lorenzo-Villarino, Donnabelle L.
14 minutes 5 seconds14:05
Lorenzo-Villarino, Donnabelle L. 14 minutes 5 seconds
That's what the workflow shows, right?

**D**

Dizon, Ken FHCC Lovell
14 minutes 7 seconds14:07
Dizon, Ken FHCC Lovell 14 minutes 7 seconds
OK. I just want to make sure to clarify, I just.

Matusz, Dorinda J. FHCC Lovell
14 minutes 10 seconds14:10
Matusz, Dorinda J. FHCC Lovell 14 minutes 10 seconds
You you guys got a fax it out. You're not just uploading it. You're faxing it as well.

Lorenzo-Villarino, Donnabelle L.
14 minutes 11 seconds14:11
Lorenzo-Villarino, Donnabelle L. 14 minutes 11 seconds
Yeah.

**D**

Dizon, Ken FHCC Lovell
14 minutes 12 seconds14:12
Dizon, Ken FHCC Lovell 14 minutes 12 seconds
Because.

Lorenzo-Villarino, Donnabelle L.
14 minutes 14 seconds14:14
Lorenzo-Villarino, Donnabelle L. 14 minutes 14 seconds
Yes.

**D**

Dizon, Ken FHCC Lovell
14 minutes 14 seconds14:14
Dizon, Ken FHCC Lovell 14 minutes 14 seconds
The the reason I'm clarifying is you know, you know this one delineate from the.

Dizon, Ken FHCC Lovell 14 minutes 21 seconds
You know, from the work flow or workbook. So I just wanna make sure that we want to follow.
Dizon, Ken FHCC Lovell 14 minutes 28 seconds
Yours or the workflow? I just want to make sure that's why I'm clarifying, because even like the identified 3 CCP providers.
Dizon, Ken FHCC Lovell 14 minutes 36 seconds
According to the workflow, I think if the veteran chooses for us to schedule for him, that's when we need to do.
Dizon, Ken FHCC Lovell 14 minutes 44 seconds
Identified 3 providers.

Lorenzo-Villarino, Donnabelle L.
14 minutes 46 seconds14:46
Lorenzo-Villarino, Donnabelle L. 14 minutes 46 seconds
Right. Because that's a question has a community care provider been identified? If it's a no, then you identify if there has been identified by the veteran then you follow through the next process. There's no point of identifying 3 providers, right?
Lorenzo-Villarino, Donnabelle L. 15 minutes
This is a dish.

**D**

Dizon, Ken FHCC Lovell
15 minutes15:00
Dizon, Ken FHCC Lovell 15 minutes
You know, I think.
Dizon, Ken FHCC Lovell 15 minutes 2 seconds
It's different from what it's saying. The workflow so meaning if the veteran resources to schedule their own appointment or or you know schedule their console, we could just say hey, this provider is the closest to you this provider you want to move forward and they can. So we don't have to find 3 providers only if they says I don't know according to workbook workflow whatever it says only if.
Dizon, Ken FHCC Lovell 15 minutes 32 seconds
They choose to the VA to make the point for them. Then you give them 3 providers.
Dizon, Ken FHCC Lovell 15 minutes 38 seconds
I could be wrong, I don't know.

Lorenzo-Villarino, Donnabelle L.
15 minutes 42 seconds15:42
Lorenzo-Villarino, Donnabelle L. 15 minutes 42 seconds
Pull it up and show me. But like I said, I mean this is a simple basic flow from all the.
Lorenzo-Villarino, Donnabelle L. 15 minutes 48 seconds
The from the workflow right? It's either that there have been captured, whether or not they're gonna sell scheduled now. The next question is, is there provider that identified if they don't have a

provider, you identify provider for them, you may be able to identify the first provider and they agree to it, then you go to the next step. If they can't, then you provide them with three, I mean.

Lorenzo-Villarino, Donnabelle L. 16 minutes 10 seconds

Do we need to go into details and how we're going to discuss with patients, how we're gonna?

D



### RE: Ozzie - workflow Directive

**Lohr, Roger W.** <Roger.Lohr@va.gov>

Fri 12/8/2023 1:13 PM

To:Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

After the rn sent the consults to the administrative staff. The administrative were assigned to follow up on all consults

---

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, December 5, 2023 6:37 PM
**To:** Lohr, Roger W. <Roger.Lohr@va.gov>
**Subject:** Ozzie - workflow Directive

Roger,

Can you provide a sentence or two or whatever you think you need in regard to how the directive of the workflow in community care goes. We were given new directive on 11-10-2022 on how the dept flow should be done.

For example, the RN's role as far as processing consults

The LPNs and PSA's roles on what they do after the RN's process the consults.

I attached the algorithm from the 11-10-2022 with the change in directive.

This is all private and will not be shared with anyone in leadership.

Can you please get this back to me at your earliest convenience?

V/R,

Ozzie Kochiu CLC RN Admissions Coordinator
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare

information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

## RE: ozzie - workflow directive

**Matusz, Dorinda J. FHCC Lovell <Dorinda.Matusz@va.gov>**

Wed 12/6/2023 8:10 AM

To:Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

The Rn's approve and accept the consult and then assign to the LPN/PSA if it is a basic.  If the consult is moderate or Complex, the RN process the consults and send to the community provider.  Then the LPN/PSA follows up to get the appointment date/time


V/R
Dori Matusz
Program Support Assistant
Office of Community Care (OCC)
Captain James A. Lovell FHCC
3001 Green Bay Rd, Bldg 9 Rm 205
North Chicago, IL 60064
Ph: (224)610-8632
FX: (224610-8638
Email: Dorinda.matusz@va.gov

---

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, December 5, 2023 6:40 PM
**To:** Matusz, Dorinda J. FHCC Lovell <Dorinda.Matusz@va.gov>
**Subject:** ozzie - workflow directive

Dori,


Can you provide a sentence or two or whatever you think you need in regard to how the directive of the workflow in community care goes.  We were given new directive on 11-10-2022 on how the dept flow should be done.

For example, the RN's role as far as processing consults

The LPNs and PSA's roles on what they do after the RN's process the consults.

I attached the algorithm from the 11-10-2022 with the change in directive.

This is all private and will not be shared with anyone in leadership.

Can you please get this back to me at your earliest convenience?


V/R,
Ozzie Kochiu CLC RN Admissions Coordinator
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147

VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction.  If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

## RE: ozzie - workflow directive

### Grant, Carolyn P. FHCC Lovell <Carolyn.Grant@va.gov>

Wed 12/6/2023 8:39 AM

To:Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

Morning Azis,

I took a look at the workflow, and it looks like what we are doing already, anyway you could point out what the change is, that would be helpful. Unless a veteran requests that I scheduled for them, I usually leave it at that for them to schedule for themselves.

Thanks for giving me the opportunity to give input.

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, December 5, 2023 6:39 PM
**To:** Grant, Carolyn P. FHCC Lovell <Carolyn.Grant@va.gov>
**Subject:** ozzie - workflow directive

Carolyn,

Can you provide a sentence or two or whatever you think you need in regard to how the directive of the workflow in community care goes. We were given new directive on 11-10-2022 on how the dept flow should be done.

For example, the RN's role as far as processing consults

The LPNs and PSA's roles on what they do after the RN's process the consults.

I attached the algorithm from the 11-10-2022 with the change in directive.

This is all private and will not be shared with anyone in leadership.

Can you please get this back to me at your earliest convenience?

V/R,
Ozzie Kochiu CLC RN Admissions Coordinator
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

## RE: ozzie - workflow directive

### Miller, Charlene FHCC Lovell <Charlene.Miller2@va.gov>

Mon 12/11/2023 8:28 AM

To:Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

Good morning,

The workflow in community care is somewhat subjective and convoluted depending on what RN is processing the consult or who the admin staff is receiving the consult from the RN.
Not everyone follows the workflow, the workflow means something different to everyone.  For example:

When the RN receives the consult, taking it from pending to active, this is supposed to occur within 2 days, this rarely happens.
When the RNs perform the admin screening to see which admin staff is supposed to receive the consult, the admin staff is alerted.
Since we have not had the staff for the last 1.5 years, these consults have not been processed promptly and or efficiently for some time, creating a delay in patient care.
There can easily be errors in completing task using this workflow, because of the shortage of staff and the volume of work for the last 1.5 years.
Due to the attrition in OCC not enough time is allotted for the RNs to spend on critical consults, not enough time is allotted for the RNs to provide patient care on each consult and
This has been the behavior for almost the last 2 years.

Thanks

V/R
Charlene Miller, MBA
Patient Service Assistant
Office of Community Care (OCC)
Captain James A Lovell FHCC
North Chicago, IL 60064
Phone: (224)610-8637  X88637
Email: Charlene.miller2@va.gov

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, December 5, 2023 6:40 PM
**To:** Miller, Charlene FHCC Lovell <Charlene.Miller2@va.gov>
**Subject:** ozzie - workflow directive

Charlene,

Can you provide a sentence or two or whatever you think you need in regard to how the directive of the workflow in community care goes.  We were given new directive on 11-10-2022 on how the dept flow should be done.

For example, the RN's role as far as processing consults

The LPNs and PSA's roles on what they do after the RN's process the consults.

I attached the algorithm from the 11-10-2022 with the change in directive.

This is all private and will not be shared with anyone in leadership.

Can you please get this back to me at your earliest convenience?

V/R,
Ozzie Kochiu CLC RN Admissions Coordinator
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

RE: ozzie - workflow directive

Dizon, Ken FHCC Lovell <Ken.Dizon@va.gov>

Wed 12/6/2023 9:33 AM

To:Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

The admin staff is responsible for scheduling the consult after the nurse faxes the documents to the provider.

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, December 6, 2023 9:28 AM
**To:** Dizon, Ken FHCC Lovell <Ken.Dizon@va.gov>
**Subject:** RE: ozzie - workflow directive

Ken, can you explain briefly who's responsibility it is to schedule the consult after the RN's send the faxed documents to the provider? Just want to make it clearer as anyone looking at the algorithm may be confused in following it. Thanks

**From:** Dizon, Ken FHCC Lovell <Ken.Dizon@va.gov>
**Sent:** Wednesday, December 6, 2023 9:18 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: ozzie - workflow directive

Az,
The directive for the nurses was to receive all the consults and process moderate/complex up to a certain point. For example, when processing moderate/complex consults, the nurses are responsible for performing clinical triage, creating CCP notes, capturing preferences, creating the referral packet, sending the referral packet to the com care provider, uploading in HSRM, and finally sending an alert to the admin staff per alpha split. This aforementioned statement can be tracked in the attachment. We are to follow the salmon-colored workflow, and the admin staff takes over the moderate/complex consults from yellow to completion (this starts at "confirm acceptance of referral by community provider").

v/r,
Ken Dizon

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, December 5, 2023 6:32 PM
**To:** Dizon, Ken FHCC Lovell <Ken.Dizon@va.gov>
**Subject:** ozzie - workflow directive

Ken,

Can you provide a sentence or two or whatever you think you need in regard to how the directive of the workflow in community care goes. We were given new directive on 11-10-2022 on how the dept flow should be done.

For example, the RN's role as far as processing consults

The LPNs and PSA's roles on what they do after the RN's process the consults.

I attached the algorithm from the 11-10-2022 with the change in directive.

This is all private and will not be shared with anyone in leadership.

V/R,

*Ozzie Kochiu CLC RN Admissions Coordinator*

Inpatient Geriatric Services

Captain James A. Lovell Federal Health Care Center

3001 Green Bay Road

North Chicago, IL 60064

Hours: Monday-Friday 0700-1530

Office: 1-224-610-3147

VA Cell: 1-224-410-9498

Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction.  If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

## RE: ozzie - workflow directive

### Schingeck, Kenneth R. FHCC Lovell <Kenneth.Schingeck@va.gov>

Wed 12/6/2023 7:49 AM

To:Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

The workflow was once the Rn accepted the consult or sent the consult out the administrative staff were to follow up with the scheduling of the veteran

KEN SCHINGECK
Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Direct:  (224) 610-8761

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, December 6, 2023 7:43 AM
**To:** Schingeck, Kenneth R. FHCC Lovell <Kenneth.Schingeck@va.gov>
**Subject:** RE: ozzie - workflow directive

Just send it back to me through this email thread, thanks Ken

**From:** Schingeck, Kenneth R. FHCC Lovell <Kenneth.Schingeck@va.gov>
**Sent:** Wednesday, December 6, 2023 7:42 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: ozzie - workflow directive

Where do I send this I will be glad to

KEN SCHINGECK
Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Direct:  (224) 610-8761

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, December 5, 2023 6:37 PM
**To:** Schingeck, Kenneth R. FHCC Lovell <Kenneth.Schingeck@va.gov>
**Subject:** ozzie - workflow directive

Ken,

Can you provide a sentence or two or whatever you think you need in regard to how the directive of the workflow in community care goes.  We were given new directive on 11-10-2022 on how the dept flow should be done.

For example, the RN's role as far as processing consults

The LPNs and PSA's roles on what they do after the RN's process the consults.

I attached the algorithm from the 11-10-2022 with the change in directive.

This is all private and will not be shared with anyone in leadership.

Can you please get this back to me at your earliest convenience?


V/R,

*Ozzie Kochiu CLC RN Admissions Coordinator*

Inpatient Geriatric Services

Captain James A. Lovell Federal Health Care Center

3001 Green Bay Road

North Chicago, IL 60064

Hours: Monday-Friday 0700-1530

Office: 1-224-610-3147

VA Cell: 1-224-410-9498

Fax: 1-224-610-2907


Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction.  If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

RE: ozzie - workflow directive

**Martil, Belmo Kim F. FHCC Lovell (he/him/his) <BelmoKim.Martil@va.gov>**
Thu 12/7/2023 12:39 PM
To:Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

Hey,
Sorry just got this email. I have nothing to say good about the workflow nor about the ones running this department. It's all about the title and power. We are always kept in the dark until the last second. No communication.

v/r

*Mr. Kim Martil, LPN*
Nurse Coordinator
Captain James A. Lovell
Federal Health Care Center
Office of Community Care
3001 N. Green Bay Road
North Chicago, IL 60064
Email: BelmoKim.Martil@va.gov
Office: (224) 610-8362

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, December 5, 2023 6:38 PM
**To:** Martil, Belmo Kim F. FHCC Lovell (he/him/his) <BelmoKim.Martil@va.gov>
**Subject:** ozzie - workflow directive

Kim,

Can you provide a sentence or two or whatever you think you need in regard to how the directive of the workflow in community care goes. We were given new directive on 11-10-2022 on how the dept flow should be done.

For example, the RN's role as far as processing consults

The LPNs and PSA's roles on what they do after the RN's process the consults.

I attached the algorithm from the 11-10-2022 with the change in directive.

This is all private and will not be shared with anyone in leadership.

Can you please get this back to me at your earliest convenience?

V/R,
*Ozzie Kochiu CLC RN Admissions Coordinator*
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center

000320

3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**Subject:** Ozzie - workflow directive
**To:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Tuesday, December 5, 2023 6:43:31 PM
**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

**Email:** Monica.Coleman@va.gov
**Community Care ACD Line (224) 610-8632**
North Chicago, IL 60064
3001 Greenbay Road
Captain James A Lovell Federal Health Care Center
**Office of Community Care Network (CCN)**
**RN Community Care Coordinator**
**NNOC/NNU VA Lead National Safety Rep**
**NNOC/NNU VA Capt. James A Lovell Director**

*Monica Coleman BSN, RN*

See the source image

V/R,

Once the referral has been faxed over by the Clincial Staff, an alert is sent to the Admin staff to then ensure the consult has been scheduled with 7 days. The admin staff should be calling the providers office and the veteran to get the consult into scheduled status.

Competed the correct documentation in CPRS (Care Coordination Note)
Fax the referral package over to the provider
expiration date of referral
Document is Consult Toolbox what was sent in the referral package to the community provider and
Complete the referral package ( HSRM and Ref Doc)
Contact the veteran to capture preferences

If the consult is basic, it is sent to the admin staff to process. If the consult is moderate or complex, the RN staff must do the following to process the consult:

The RN reviews the consult at pending status. The RN will complete the Admin screening of the consult and may have to complete the Clinical Triage depending on either the CAN score or clinical judgment. The consult should be received with 2 days of the file entry date.

The process for the workflow as explained on 11/10/23 was as follows:

To:Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
Wed 12/6/2023 4:38 AM

Coleman, Monica <Monica.Coleman@va.gov>

**Re: Ozzie - workflow directive**

000322

Monica,

Can you provide a sentence or two or whatever you think you need in regard to how the directive of the workflow in community care goes. We were given new directive on 11-10-2022 on how the dept flow should be done.

For example, the RN's role as far as processing consults

The LPNs and PSA's roles on what they do after the RN's process the consults.

I attached the algorithm from the 11-10-2022 with the change in directive.

This is all private and will not be shared with anyone in leadership.

Can you please get this back to me at your earliest convenience?

V/R,
Ozzie Kochiu CLC RN Admissions Coordinator
Inpatient Geriatric Services
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Hours: Monday-Friday 0700-1530
Office: 1-224-610-3147
VA Cell: 1-224-410-9498
Fax: 1-224-610-2907

Azis.Kochiu@va.gov



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

| Provisional Diagnosis | Provisional Diagnosis Code | File Entry Date | PID | Elapsed Days From File Entry Date | Service Name |
|---|---|---|---|---|---|
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 4/6/2023 | 4/6/2023 | 148 | COMMUNITY CARE-CARDIOLOGY |
| Chronic Ischemic Heart Disease, unspecified | I25.9 | 2/22/2023 | 4/3/2023 | 191 | COMMUNITY CARE-CARDIOLOGY |
| Thoracic aortic aneurysm, without rupture, unspecified | I71.20 | 3/28/2023 | 4/11/2023 | 157 | COMMUNITY CARE-IMAGING |
| Basal cell carcinoma of skin of scalp and neck | C44.41 | 2/21/2023 | 2/22/2023 | 192 | COMMUNITY CARE-DERMATOLOGY |
| Pain in left Shoulder | M25.512 | 4/4/2023 | 4/4/2023 | 150 | COMMUNITY CARE-OCCUPATIONALTHERAPY |
| Dental Caries, unspecified | K02.9 | 3/17/2023 | 3/17/2023 | 168 | COMMUNITY CARE-DENTAL |
| Pain in right Knee | M25.561 | 4/12/2023 | 4/13/2023 | 142 | COMMUNITY CARE-IMAGING |
| Type 2 Diabetes Mellitus without Complications | E11.9 | 4/17/2023 | 4/17/2023 | 137 | COMMUNITY CARE-ENDOCRINE |
| Other persistent atrial fibrillation | I48.19 | 4/24/2023 | 4/24/2023 | 130 | COMMUNITY CARE-CARDIOLOGY |
| Radiculopathy, Cervical Region | M54.12 | 3/8/2023 | 3/7/2023 | 177 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Malignant Neoplasm of Colon, unspecified | C18.9 | 4/27/2023 | 4/27/2023 | 127 | COMMUNITY CARE-SURGICAL |
| Localized Edema | R60.0 | 4/28/2023 | 4/28/2023 | 126 | COMMUNITY CARE-RADIOLOGY |
| Low back pain, unspecified | M54.50 | 4/11/2023 | 4/12/2023 | 143 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Primary Osteoarthritis, unspecified Hand | M19.049 | 3/17/2023 | 3/17/2023 | 168 | COMMUNITY CARE-ORTHO HAND |

| Diagnosis | Code | Date | Date | | Provider |
|---|---|---|---|---|---|
| Suicidal Ideations | R45.851 | 5/1/2023 | 5/1/2023 | **123** | COMMUNITY CARE-INPATIENT MENTAL HEALTH |
| Adjustment Disorder, unspecified | F43.20 | 4/26/2023 | 4/26/2023 | **128** | COMMUNITY CARE-PSYCHOLOGY |
| Other low back pain | M54.59 | 4/25/2023 | 4/25/2023 | **129** | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Malignant Neoplasm of unspecified part of right Bronchus or Lung | C34.91 | 4/16/2023 | 4/17/2023 | **138** | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Pain in left Elbow | M25.522 | 4/17/2023 | 4/17/2023 | **137** | COMMUNITY CARE-ORTHO HAND |
| Occlusion and Stenosis of unspecified Carotid Artery | I65.29 | 3/15/2023 | 3/15/2023 | **170** | COMMUNITY CARE-SURGICAL |
| Low back pain, unspecified | M54.50 | 4/7/2023 | 4/7/2023 | **147** | COMMUNITY CARE-CHIROPRACTIC |
| Localized Edema | R60.0 | 4/28/2023 | 4/28/2023 | **126** | COMMUNITY CARE-ULTRASOUND |
| Depression, unspecified | F32.A | 4/26/2023 | 4/26/2023 | **128** | COMMUNITY CARE-PSYCHOLOGY |
| Vertebrogenic low back pain | M54.51 | 3/16/2023 | 3/23/2023 | **169** | COMMUNITY CARE-ORTHO SPINE |
| Rash and other Nonspecific Skin Eruption | R21. | 4/4/2023 | 4/4/2023 | **150** | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Migraine, unspecified, not Intractable, without Status Migrainosus | G43.909 | 5/2/2023 | 5/3/2023 | **122** | COMMUNITY CARE-NEUROLOGY |
| Other Periodontal Diseases | K05.5 | 5/4/2023 | 5/4/2023 | **120** | COMMUNITY CARE-DENTAL |
| Unspecified Optic Neuritis | H46.9 | 4/12/2023 | 4/12/2023 | **142** | COMMUNITY CARE-RHEUMATOLOGY/ARTHRITIS |
| Other Chronic Pain | G89.29 | 4/6/2023 | 4/6/2023 | **148** | COMMUNITY CARE-CIH |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | MASSAGE THERAPY |
| Pain in joints of left hand | M25.542 | 3/30/2023 | 3/30/2023 | 155 | COMMUNITY CARE-OCCUPATIONALTHERAPY |
| Carcinoma in situ of other specified sites | D09.8 | 4/24/2023 | 4/24/2023 | 130 | COMMUNITY CARE-HEMATOLOGY/ONCOLOGY |
| Chronic Ischemic Heart Disease, unspecified | I25.9 | 4/4/2023 | 4/4/2023 | 150 | COMMUNITY CARE-CARDIOLOGY |
| Psoriatic Arthritis Mutilans | L40.52 | 4/10/2023 | 4/10/2023 | 144 | COMMUNITY CARE-RHEUMATOLOGY/ARTHRITIS |
| St Elevation (Stemi) Myocardial Infarction involving other sites | I21.29 | 5/7/2023 | 5/8/2023 | 117 | COMMUNITY CARE-EMERGENCY TREATMENT APPROVED |
| Generalized Abdominal Pain | R10.84 | 5/8/2023 | 5/8/2023 | 116 | COMMUNITY CARE-INPATIENT MEDICAL |
| Pain in right ankle and joints of right foot | M25.571 | 4/26/2023 | 5/8/2023 | 128 | COMMUNITY CARE-ORTHO GENERAL |
| Male Erectile Dysfunction, unspecified | N52.9 | 4/20/2023 | 4/20/2023 | 134 | COMMUNITY CARE-UROLOGY |
| Chronic Pain Syndrome | G89.4 | 3/29/2023 | 3/29/2023 | 156 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Heart Transplant Status | Z94.1 | 5/2/2023 | 5/2/2023 | 122 | COMMUNITY CARE-CARDIOLOGY |
| Mixed Incontinence | N39.46 | 5/5/2023 | 5/5/2023 | 119 | COMMUNITY CARE-UROLOGY |
| Squamous cell carcinoma of skin of scalp and neck | C44.42 | 3/16/2023 | 3/16/2023 | 169 | COMMUNITY CARE-DERMATOLOGY |
| Headache, unspecified | R51.9 | 3/15/2023 | 3/24/2023 | 170 | COMMUNITY CARE-NEUROSURGERY |
| Occlusion and Stenosis of right Carotid Artery | I65.21 | 4/19/2023 | 4/19/2023 | 135 | COMMUNITY CARE-NEUROSURGERY |

| Diagnosis | Code | Date 1 | Date 2 | Value | Department |
|---|---|---|---|---|---|
| Unspecified Ptosis of unspecified Eyelid | H02.409 | 4/26/2023 | 4/26/2023 | 128 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Dental Caries, unspecified | K02.9 | 4/25/2023 | 4/25/2023 | 129 | COMMUNITY CARE-DENTAL |
| Other Spondylosis, Thoracic Region | M47.894 | 3/23/2023 | 3/23/2023 | 162 | COMMUNITY CARE-NEUROSURGERY |
| Presbyopia | H52.4 | 4/20/2023 | 5/12/2023 | 134 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Radiculopathy, Lumbar Region | M54.16 | 4/7/2023 | 4/7/2023 | 147 | COMMUNITY CARE-PAIN MANAGEMENT |
| Low back pain, unspecified | M54.50 | 3/28/2023 | 3/28/2023 | 157 | COMMUNITY CARE-CHIROPRACTIC |
| Cervicalgia | M54.2 | 3/31/2023 | 3/31/2023 | 154 | COMMUNITY CARE-CHIROPRACTIC |
| Personal History of Urinary Calculi | Z87.442 | 4/10/2023 | 4/17/2023 | 144 | COMMUNITY CARE-UROLOGY |
| Insomnia, unspecified | G47.00 | 4/18/2023 | 4/18/2023 | 136 | COMMUNITY CARE-NEUROLOGY |
| Malignant Neoplasm of Larynx, unspecified | C32.9 | 3/29/2023 | 4/4/2023 | 156 | COMMUNITY CARE-RADIATIONTHERAPY |
| Generalized Anxiety Disorder | F41.1 | 4/24/2023 | 4/24/2023 | 130 | COMMUNITY CARE-PSYCHOLOGY |
| Other Periodontal Diseases | K05.5 | 3/1/2023 | 3/1/2023 | 184 | COMMUNITY CARE-DENTAL |
| Pain in right Knee | M25.561 | 3/3/2023 | 3/3/2023 | 182 | COMMUNITY CARE-ORTHO JOINTS |
| Low back pain, unspecified | M54.50 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-PHYSICAL THERAPY |
| Combined Forms of Age-Related Cataract, Bilateral | H25.813 | 4/6/2023 | 4/6/2023 | 148 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Hematuria, unspecified | R31.9 | 4/4/2023 | 4/17/2023 | 150 | COMMUNITY CARE-UROLOGY |
| Peripheral Vascular | I73.9 | 4/25/2023 | 4/25/2023 | 129 | COMMUNITY CARE-SURGICAL |

| Disease, Unspecified | | | | | |
|---|---|---|---|---|---|
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-DERMATOLOGY |
| Presbyopia | H52.4 | 4/13/2023 | 4/13/2023 | 141 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Atherosclerosis of other Arteries | I70.8 | 5/11/2023 | 5/11/2023 | 113 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 5/5/2023 | 5/5/2023 | 119 | COMMUNITY CARE-PAIN MANAGEMENT |
| Periodontal Disease, unspecified | K05.6 | 5/10/2023 | 5/10/2023 | 114 | COMMUNITY CARE-DENTAL |
| Presbyopia | H52.4 | 3/9/2023 | 3/9/2023 | 176 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Plantar fascial fibromatosis | M72.2 | 4/20/2023 | 4/20/2023 | 134 | COMMUNITY CARE-RADIOLOGY |
| Pathological Fracture, right Ankle, Initial Encounter for Fracture | M84.471A | 3/17/2023 | 3/17/2023 | 168 | COMMUNITY CARE-ORTHO GENERAL |
| Other specified Types of non-Hodgkin Lymphoma, Intra-Abdominal Lymph Nodes | C85.83 | 5/11/2023 | 5/11/2023 | 113 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Essential (Primary) Hypertension | I10. | 4/12/2023 | 4/12/2023 | 142 | COMMUNITY CARE-CARDIOLOGY |
| Pain in left Shoulder | M25.512 | 4/7/2023 | 4/25/2023 | 147 | COMMUNITY CARE-MRI |
| Other specified peripheral vascular diseases | I73.89 | 4/25/2023 | 4/25/2023 | 129 | COMMUNITY CARE-SURGICAL |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 3/6/2023 | 3/6/2023 | 179 | COMMUNITY CARE-PSYCHOLOGY |
| Aneurysm of Aorta in Diseases | I79.0 | 5/13/2023 | 5/13/2023 | 111 | COMMUNITY CARE-INPATIENT MEDICAL |

| Description | Code | Date | Date | Value | Facility |
|---|---|---|---|---|---|
| classified elsewhere | | | | | |
| Rash and other Nonspecific Skin Eruption | R21. | 4/7/2023 | 4/14/2023 | 147 | COMMUNITY CARE-DERMATOLOGY |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 3/20/2023 | 3/20/2023 | 165 | COMMUNITY CARE-PSYCHIATRY |
| Other Hypertrophic Disorders of the Skin | L91.8 | 4/18/2023 | 4/18/2023 | 136 | COMMUNITY CARE-DERMATOLOGY |
| Regular Astigmatism, unspecified Eye | H52.229 | 4/3/2023 | 4/3/2023 | 151 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Low back pain, unspecified | M54.50 | 4/19/2023 | 4/19/2023 | 135 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 3/28/2023 | 3/28/2023 | 157 | COMMUNITY CARE-NEUROSURGERY |
| Pain in left ankle and joints of left foot | M25.572 | 4/26/2023 | 4/26/2023 | 128 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |
| Cystic Kidney Disease, unspecified | Q61.9 | 3/16/2023 | 3/16/2023 | 169 | COMMUNITY CARE-NEPHROLOGY |
| Pain in unspecified Hip | M25.559 | 4/24/2023 | 5/24/2023 | 130 | COMMUNITY CARE-MRI |
| Paroxysmal atrial fibrillation | I48.0 | 4/18/2023 | 4/25/2023 | 136 | COMMUNITY CARE-CARDIOLOGY |
| Unspecified Atrial Flutter | I48.92 | 5/2/2023 | 5/4/2023 | 122 | COMMUNITY CARE-CARDIOLOGY |
| Major Depressive Disorder, Recurrent, unspecified | F33.9 | 5/16/2023 | 5/16/2023 | 108 | COMMUNITY CARE-INPATIENT MENTAL HEALTH |
| Other specified Abnormal Findings of Blood Chemistry | R79.89 | 5/15/2023 | 5/15/2023 | 109 | COMMUNITY CARE-INPATIENT MEDICAL |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 4/10/2023 | 4/10/2023 | 144 | COMMUNITY CARE-PULMONARY REHAB |
| Vertebrogenic low back pain | M54.51 | 5/10/2023 | 5/12/2023 | 114 | COMMUNITY CARE-ORTHO SPINE |

| Diagnosis | Code | Date 1 | Date 2 | Value | Department |
|---|---|---|---|---|---|
| Spinal stenosis, lumbar region without neurogenic claudication | M48.061 | 4/14/2023 | 4/14/2023 | 140 | COMMUNITY CARE-NEUROSURGERY |
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 5/8/2023 | 5/8/2023 | 116 | COMMUNITY CARE-DERMATOLOGY |
| Acquired Deformity of Nose | M95.0 | 2/24/2023 | 2/24/2023 | 189 | COMMUNITY CARE-ENT |
| Rash and other Nonspecific Skin Eruption | R21. | 4/26/2023 | 4/26/2023 | 128 | COMMUNITY CARE-DERMATOLOGY |
| Pain in right Hip | M25.551 | 5/5/2023 | 5/5/2023 | 119 | COMMUNITY CARE-PAIN MANAGEMENT |
| Dental Caries, unspecified | K02.9 | 4/25/2023 | 4/25/2023 | 129 | COMMUNITY CARE-DENTAL |
| Transient Cerebral Ischemic Attack, unspecified | G45.9 | 5/16/2023 | 5/16/2023 | 108 | COMMUNITY CARE-INPATIENT MEDICAL |
| Acute Respiratory Failure with Hypoxia | J96.01 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-INPATIENT MEDICAL |
| Pain in left Shoulder | M25.512 | 4/12/2023 | 4/12/2023 | 142 | COMMUNITY CARE-MRI |
| Other low back pain | M54.59 | 3/29/2023 | 3/29/2023 | 156 | COMMUNITY CARE-NEUROSURGERY |
| Other Chronic Pain | G89.29 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-PAIN MANAGEMENT |
| Depression, unspecified | F32.A | 5/10/2023 | 5/10/2023 | 114 | COMMUNITY CARE-PSYCHOLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 4/18/2023 | 4/25/2023 | 136 | COMMUNITY CARE-CARDIOLOGY |
| Radiculopathy, Lumbar Region | M54.16 | 4/5/2023 | 4/5/2023 | 149 | COMMUNITY CARE-PAIN MANAGEMENT |
| Vertebrogenic low back pain | M54.51 | 3/13/2023 | 3/20/2023 | 172 | COMMUNITY CARE-CIH ACUPUNCTURE |

| Dental Caries, unspecified | K02.9 | 5/16/2023 | 5/16/2023 | 108 | COMMUNITY CARE-DENTAL |
|---|---|---|---|---|---|
| Pain in right Shoulder | M25.511 | 4/11/2023 | 4/11/2023 | 143 | COMMUNITY CARE-PHYSICAL THERAPY |
| Paroxysmal atrial fibrillation | I48.0 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-CARDIOLOGY |
| Primary Osteoarthritis, right Shoulder | M19.011 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-ORTHO GENERAL |
| Radiculopathy, Lumbar Region | M54.16 | 5/11/2023 | 5/11/2023 | 113 | COMMUNITY CARE-MRI |
| Chronic Obstructive Pulmonary Disease with (Acute) Exacerbation | J44.1 | 5/21/2023 | 5/21/2023 | 103 | COMMUNITY CARE-INPATIENT MEDICAL |
| Splenomegaly, not elsewhere classified | R16.1 | 4/26/2023 | 4/27/2023 | 128 | COMMUNITY CARE-HEMATOLOGY/ONCOLOGY |
| Rash and other Nonspecific Skin Eruption | R21. | 4/24/2023 | 4/28/2023 | 130 | COMMUNITY CARE-DERMATOLOGY |
| Cervicalgia | M54.2 | 4/30/2023 | 5/1/2023 | 124 | COMMUNITY CARE-CHIROPRACTIC |
| Gender Identity Disorder, unspecified | F64.9 | 3/30/2023 | 5/16/2023 | 155 | COMMUNITY CARE-DERMATOLOGY |
| Pain in left Shoulder | M25.512 | 5/11/2023 | 5/11/2023 | 113 | COMMUNITY CARE-PHYSICAL THERAPY |
| Dorsalgia, unspecified | M54.9 | 5/3/2023 | 5/3/2023 | 121 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Malignant neoplasm of prostate | C61. | 5/5/2023 | 5/5/2023 | 119 | COMMUNITY CARE-UROLOGY |
| Hypothyroidism, unspecified | E03.9 | 3/23/2023 | 3/24/2023 | 162 | COMMUNITY CARE-ENDOCRINE |
| Sleep Apnea, unspecified | G47.30 | 4/20/2023 | 4/20/2023 | 134 | COMMUNITY CARE-POLYSOMNOGRAPHY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 5/8/2023 | 5/9/2023 | 116 | COMMUNITY CARE-CARDIAC REHAB |

| | | | | | |
|---|---|---|---|---|---|
| Crohn's Disease, unspecified, without Complications | K50.90 | 4/3/2023 | 4/3/2023 | 151 | COMMUNITY CARE-GASTROENTEROLOGY |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 5/19/2023 | 5/19/2023 | 105 | COMMUNITY CARE-PSYCHIATRY |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-CHIROPRACTIC |
| Unspecified Atrial Fibrillation | I48.91 | 4/10/2023 | 4/10/2023 | 144 | COMMUNITY CARE-CARDIOLOGY |
| Urge Incontinence | N39.41 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-UROLOGY |
| Chronic Combined Systolic (Congestive) and Diastolic (Congestive) Heart Failure | I50.42 | 4/10/2023 | 4/10/2023 | 144 | COMMUNITY CARE-CARDIOLOGY |
| Basal Cell Carcinoma of Skin of other Parts of Face | C44.319 | 5/15/2023 | 11/10/2022 | 109 | COMMUNITY CARE-DERMATOLOGY |
| Pain in unspecified Foot | M79.673 | 5/3/2023 | 5/3/2023 | 121 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |
| Combined Forms of Age-Related Cataract, Bilateral | H25.813 | 3/9/2023 | 3/23/2023 | 176 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Displaced Fracture of Shaft of fifth Metacarpal Bone, left Hand, Initial Encounter for open Fracture | S62.327B | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-ORTHO HAND |
| Atopic Dermatitis, unspecified | L20.9 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-DERMATOLOGY |
| Pneumonia, unspecified organism | J18.9 | 5/23/2023 | 5/23/2023 | 101 | COMMUNITY CARE-INPATIENT MEDICAL |
| Malignant neoplasm of prostate | C61. | 3/22/2023 | 3/22/2023 | 163 | COMMUNITY CARE-UROLOGY |
| Presence of left Artificial Shoulder Joint | Z96.612 | 5/16/2023 | 5/16/2023 | 108 | COMMUNITY CARE-ORTHO SURGICAL |

| | | | | | |
|---|---|---|---|---|---|
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 5/10/2023 | 5/10/2023 | 114 | COMMUNITY CARE-PAIN MANAGEMENT |
| Cervicalgia | M54.2 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-PHYSICAL THERAPY |
| Atherosclerosic heart disease of native coronary artery with refractory angina pectoris | I25.112 | 2/2/2023 | 2/2/2023 | 211 | COMMUNITY CARE-CARDIOLOGY |
| Other Spondylosis with Myelopathy, Lumbar Region | M47.16 | 4/24/2023 | 4/24/2023 | 130 | COMMUNITY CARE-ORTHO SPINE |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 4/3/2023 | 5/23/2023 | 151 | COMMUNITY CARE-PAIN MANAGEMENT |
| Suicidal Ideations | R45.851 | 5/24/2023 | 5/24/2023 | 100 | COMMUNITY CARE-INPATIENT MENTAL HEALTH |
| Radiculopathy, Lumbar Region | M54.16 | 4/25/2023 | 4/25/2023 | 129 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Calculus of Kidney | N20.0 | 4/6/2023 | 4/6/2023 | 148 | COMMUNITY CARE-UROLOGY |
| Benign prostatic hyperplasia with lower urinary tract symptoms | N40.1 | 4/11/2023 | 4/11/2023 | 143 | COMMUNITY CARE-UROLOGY |
| Stenosis of other vascular prosthetic devices, implants and grafts, subsequent encounter | T82.858D | 4/26/2023 | 4/26/2023 | 128 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Chronic Ischemic Heart Disease, unspecified | I25.9 | 3/23/2023 | 3/23/2023 | 162 | COMMUNITY CARE-CARDIOLOGY |
| Pain, unspecified | R52. | 3/27/2023 | 4/20/2023 | 158 | COMMUNITY CARE-PAIN |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | MANAGEMENT |
| Narcolepsy without Cataplexy | G47.419 | 4/21/2023 | 4/21/2023 | **133** | COMMUNITY CARE-PULMONARY SLEEP |
| Low back pain, unspecified | M54.50 | 5/23/2023 | 5/24/2023 | **101** | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other Recurrent Depressive Disorders | F33.8 | 5/1/2023 | 5/22/2023 | **123** | COMMUNITY CARE-PSYCHOLOGY |
| Chest Pain, unspecified | R07.9 | 5/9/2023 | 5/9/2023 | **115** | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 5/22/2023 | 5/22/2023 | **102** | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Chronic Pain Syndrome | G89.4 | 5/3/2023 | 5/3/2023 | **121** | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Chronic Pain Syndrome | G89.4 | 5/4/2023 | 5/5/2023 | **120** | COMMUNITY CARE-CHIROPRACTIC |
| Cervicalgia | M54.2 | 5/4/2023 | 5/5/2023 | **120** | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Abdominal aortic aneurysm, without rupture, unspecified | I71.40 | 5/25/2023 | 5/25/2023 | **99** | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| End Stage Renal Disease | N18.6 | 5/21/2023 | 5/29/2023 | **103** | COMMUNITY CARE-HEMODIALYSIS |
| End Stage Renal Disease | N18.6 | 5/22/2023 | 5/29/2023 | **102** | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| End Stage Renal Disease | N18.6 | 5/23/2023 | 5/29/2023 | **101** | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| End Stage Renal Disease | N18.6 | 5/23/2023 | 5/29/2023 | **101** | COMMUNITY CARE-HEMODIALYSIS |
| Low back pain, unspecified | M54.50 | 5/15/2023 | 5/15/2023 | **109** | COMMUNITY CARE-CHIROPRACTIC |

| | | | | | |
|---|---|---|---|---|---|
| Allergy, unspecified, Sequela | T78.40XS | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Squamous Cell Carcinoma of Skin of other Parts of Face | C44.329 | 5/19/2023 | 5/19/2023 | 105 | COMMUNITY CARE-DERMATOLOGY |
| Pain in left ankle and joints of left foot | M25.572 | 3/31/2023 | 3/31/2023 | 154 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Attention-Deficit Hyperactivity Disorder, unspecified Type | F90.9 | 3/3/2023 | 3/3/2023 | 182 | COMMUNITY CARE-CARDIOLOGY |
| Open Angle with Borderline Findings, low Risk, Bilateral | H40.013 | 3/22/2023 | 3/22/2023 | 163 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Abnormal Electrocardiogram [ECG] [EKG] | R94.31 | 4/18/2023 | 4/18/2023 | 136 | COMMUNITY CARE-CARDIOLOGY |
| Hypertrophic Disorder of the Skin, unspecified | L91.9 | 4/6/2023 | 4/6/2023 | 148 | COMMUNITY CARE-DERMATOLOGY |
| Unspecified Abdominal Pain | R10.9 | 4/10/2023 | 4/10/2023 | 144 | COMMUNITY CARE-GASTROENTEROLOGY |
| Bicipital Tendinitis, right Shoulder | M75.21 | 5/3/2023 | 5/3/2023 | 121 | COMMUNITY CARE-PHYSICAL THERAPY |
| Pneumonia, unspecified organism | J18.9 | 5/30/2023 | 5/30/2023 | 94 | COMMUNITY CARE-INPATIENT MEDICAL |
| Chronic atrial fibrillation, unspecified | I48.20 | 5/22/2023 | 5/30/2023 | 102 | COMMUNITY CARE-CARDIOLOGY |
| Actinic Keratosis | L57.0 | 5/16/2023 | 5/16/2023 | 108 | COMMUNITY CARE-DERMATOLOGY |
| Bradycardia, unspecified | R00.1 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-CARDIOLOGY |
| Malignant Neoplasm of Brain, unspecified | C71.9 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-RADIATIONTHERAPY |
| Peripheral Vascular Disease, Unspecified | I73.9 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-CARDIOLOGY |
| Carcinoma in situ of prostate | D07.5 | 5/31/2023 | 5/31/2023 | 93 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | ONCOLOGY/ TUMOR |
| Other Malformations of Cerebral Vessels | Q28.3 | 5/15/2023 | 5/15/2023 | 109 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 5/22/2023 | 5/24/2023 | 102 | COMMUNITY CARE-MRI |
| Low back pain, unspecified | M54.50 | 5/22/2023 | 5/24/2023 | 102 | COMMUNITY CARE-MRI |
| Peroneal Tendinitis, right Leg | M76.71 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-MRI |
| Nondisplaced Fracture of Coronoid Process of right Ulna, Initial Encounter for closed Fracture | S52.044A | 5/25/2023 | 5/26/2023 | 99 | COMMUNITY CARE-ORTHO HAND |
| Stenosis of other vascular prosthetic devices, implants and grafts, initial encounter | T82.858A | 5/3/2023 | 5/3/2023 | 121 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Alcoholic Hepatitis without Ascites | K70.10 | 5/17/2023 | 5/18/2023 | 107 | COMMUNITY CARE-GASTROENTEROLOGY |
| Stiffness of right Shoulder, not elsewhere classified | M25.611 | 4/27/2023 | 4/27/2023 | 127 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Chronic Pain Syndrome | G89.4 | 1/13/2023 | 1/13/2023 | 231 | COMMUNITY CARE-PSYCHOLOGY |
| Chronic Pain Syndrome | G89.4 | 4/25/2023 | 5/17/2023 | 129 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other Alopecia Areata | L63.8 | 5/12/2023 | 5/12/2023 | 112 | COMMUNITY CARE-DERMATOLOGY |
| Post-Traumatic Stress Disorder, unspecified | F43.10 | 3/30/2023 | 3/30/2023 | 155 | COMMUNITY CARE-PSYCHOLOGY |
| Critical Illness Polyneuropathy | G62.81 | 5/19/2023 | 5/24/2023 | 105 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Melanoma in Situ, unspecified | D03.9 | 5/3/2023 | 5/3/2023 | 121 | COMMUNITY CARE-DERMATOLOGY |

| Diagnosis | Code | Date | Date | Score | Provider |
|---|---|---|---|---|---|
| Rash and other Nonspecific Skin Eruption | R21. | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-DERMATOLOGY |
| Other Seizures | G40.89 | 4/27/2023 | 4/27/2023 | 127 | COMMUNITY CARE-NEUROLOGY |
| Other Allergy Status, other than to Drugs and Biological Substances | Z91.09 | 5/16/2023 | 5/19/2023 | 108 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Pain in unspecified Knee | M25.569 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-PAIN MANAGEMENT |
| Edema of Bilateral Orbit | H05.223 | 4/28/2023 | 5/12/2023 | 126 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Atopic Dermatitis, unspecified | L20.9 | 5/2/2023 | 5/2/2023 | 122 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Squamous Cell Carcinoma of Skin of left lower Limb, including Hip | C44.729 | 4/28/2023 | 5/8/2023 | 126 | COMMUNITY CARE-DERMATOLOGY |
| Other Spondylosis with Myelopathy, Lumbar Region | M47.16 | 5/12/2023 | 5/12/2023 | 112 | COMMUNITY CARE-PAIN MANAGEMENT |
| Psoriasis, unspecified | L40.9 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-DERMATOLOGY |
| Malignant Melanoma of Skin, unspecified | C43.9 | 6/1/2023 | 5/30/2023 | 92 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Pain in left Finger(s) | M79.645 | 4/14/2023 | 4/14/2023 | 140 | COMMUNITY CARE-ORTHO HAND |
| Radiculopathy, Cervical Region | M54.12 | 5/26/2023 | 5/26/2023 | 98 | COMMUNITY CARE-NEUROSURGERY |
| Dyspnea, unspecified | R06.00 | 4/23/2023 | 4/23/2023 | 131 | COMMUNITY CARE-CARDIOLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-CARDIOLOGY |

| | | | | | |
|---|---|---|---|---|---|
| Unspecified Abnormalities of Gait and Mobility | R26.9 | 6/4/2023 | 6/4/2023 | 89 | COMMUNITY CARE-PHYSICAL THERAPY |
| Low back pain, unspecified | M54.50 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-MRI |
| Major Depressive Disorder, Recurrent, Moderate | F33.1 | 4/25/2023 | 4/25/2023 | 129 | COMMUNITY CARE-PSYCHOLOGY |
| Lumbago with Sciatica, unspecified Side | M54.40 | 5/24/2023 | 5/24/2023 | 100 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Cystic Kidney Disease, unspecified | Q61.9 | 4/28/2023 | 5/5/2023 | 126 | COMMUNITY CARE-UROLOGY |
| Basal Cell Carcinoma of Skin of Nose | C44.311 | 5/1/2023 | 5/1/2023 | 123 | COMMUNITY CARE-DERMATOLOGY |
| Pain in right Shoulder | M25.511 | 5/1/2023 | 5/1/2023 | 123 | COMMUNITY CARE-MRI |
| Other Acute Kidney Failure | N17.8 | 5/23/2023 | 5/31/2023 | 101 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Spontaneous Rupture of Flexor Tendons, left upper Arm | M66.322 | 5/12/2023 | 6/2/2023 | 112 | COMMUNITY CARE-OCCUPATIONAL THERAPY |
| Chronic Systolic (Congestive) Heart Failure | I50.22 | 5/2/2023 | 5/4/2023 | 122 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 5/25/2023 | 6/3/2023 | 99 | COMMUNITY CARE-ORTHO SPINE |
| Diabetes Mellitus due to Underlying Condition with unspecified Complications | E08.8 | 6/5/2023 | 6/6/2023 | 88 | COMMUNITY CARE-ENDOCRINE |
| Pain in right Knee | M25.561 | 6/1/2023 | 6/2/2023 | 92 | COMMUNITY CARE-ORTHO JOINTS |
| Heart Failure, unspecified | I50.9 | 4/12/2023 | 4/12/2023 | 142 | COMMUNITY CARE-CARDIOLOGY |
| Major Depressive Disorder, Recurrent, Moderate | F33.1 | 5/2/2023 | 5/2/2023 | 122 | COMMUNITY CARE-PSYCHOLOGY |
| Pain in unspecified Knee | M25.569 | 4/19/2023 | 4/20/2023 | 135 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | ORTHO SPORTS |
| E85.81 | E85.81 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-HEMATOLOGY/ONCOLOGY |
| Trigeminal Neuralgia | G50.0 | 5/1/2023 | 5/1/2023 | 123 | COMMUNITY CARE-NEUROSURGERY |
| Cardiomyopathy, unspecified | I42.9 | 4/19/2023 | 4/19/2023 | 135 | COMMUNITY CARE-CARDIOLOGY |
| Non-St Elevation (Nstemi) Myocardial Infarction | I21.4 | 6/9/2023 | 6/9/2023 | 84 | COMMUNITY CARE-INPATIENT MEDICAL |
| Sleep Apnea, unspecified | G47.30 | 4/26/2023 | 4/26/2023 | 128 | COMMUNITY CARE-PULMONARY |
| Abnormal Electrocardiogram [ECG] [EKG] | R94.31 | 2/6/2023 | 2/8/2023 | 207 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Cardiac Arrhythmia, unspecified | I49.9 | 5/12/2023 | 5/15/2023 | 112 | COMMUNITY CARE-CARDIOLOGY |
| Malignant neoplasm of prostate | C61. | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-IMAGING PET |
| Interstitial lung disease with progressive fibrotic phenotype in diseases classified elsewhere | J84.170 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-PULMONARY |
| Malignant Neoplasm of Tonsil, unspecified | C09.9 | 6/5/2023 | 6/5/2023 | 88 | COMMUNITY CARE-RADIATIONTHERAPY |
| Palmar Fascial Fibromatosis [Dupuytren] | M72.0 | 5/1/2023 | 5/1/2023 | 123 | COMMUNITY CARE-ORTHO HAND |
| Counseling, unspecified | Z71.9 | 2/24/2023 | 2/24/2023 | 189 | COMMUNITY CARE-PSYCHOLOGY |
| Personal History of Colonic Polyps | Z86.010 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-GASTROENTEROLOGY |
| Shortness of Breath | R06.02 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE- |

| Condition | Code | Date 1 | Date 2 | Value | Department |
|---|---|---|---|---|---|
| | | | | | CARDIOLOGY |
| Frequency of Micturition | R35.0 | 6/2/2023 | 6/5/2023 | 91 | COMMUNITY CARE-UROLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 6/8/2023 | 6/9/2023 | 85 | COMMUNITY CARE-CARDIOLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 4/14/2023 | 4/18/2023 | 140 | COMMUNITY CARE-CARDIOLOGY |
| Other Spondylosis with Radiculopathy, Cervical Region | M47.22 | 3/14/2023 | 3/14/2023 | 171 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other Spondylosis with Myelopathy, Lumbar Region | M47.16 | 5/19/2023 | 5/19/2023 | 105 | COMMUNITY CARE-ORTHO SPINE |
| Depression, unspecified | F32.A | 5/31/2023 | 5/31/2023 | 93 | COMMUNITY CARE-PSYCHOLOGY |
| Esophageal Varices without Bleeding | I85.00 | 3/20/2023 | 10/20/2023 | 165 | COMMUNITY CARE-GASTROENTEROLOGY |
| Radiculopathy, Lumbar Region | M54.16 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-PAIN MANAGEMENT |
| Low back pain, unspecified | M54.50 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Parkinson's Disease | G20. | 3/14/2023 | 6/12/2023 | 171 | COMMUNITY CARE-RADIOLOGY |
| Pain in left ankle and joints of left foot | M25.572 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-MRI |
| Spinal Stenosis, Cervical Region | M48.02 | 5/26/2023 | 5/25/2023 | 98 | COMMUNITY CARE-PHYSICAL THERAPY |
| Vertebrogenic low back pain | M54.51 | 6/1/2023 | 6/2/2023 | 92 | COMMUNITY CARE-NEUROSURGERY |
| Cardiac Murmur, unspecified | R01.1 | 6/9/2023 | 6/12/2023 | 84 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | CARDIOLOGY |
| Palpitations | R00.2 | 5/24/2023 | 5/24/2023 | 100 | COMMUNITY CARE-CARDIOLOGY |
| Primary open-angle glaucoma, bilateral, severe stage | H40.1133 | 1/11/2023 | 1/11/2023 | 233 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Attention-Deficit Hyperactivity Disorder, unspecified Type | F90.9 | 6/13/2023 | 6/13/2023 | 80 | COMMUNITY CARE-CARDIOLOGY |
| Encounter for Allergy Testing | Z01.82 | 6/2/2023 | 6/6/2023 | 91 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Cervicalgia | M54.2 | 5/3/2023 | 5/3/2023 | 121 | COMMUNITY CARE-ORTHO SPINE |
| Female Infertility, unspecified | N97.9 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-IVF SC (1334) |
| Abnormal Result of Cardiovascular Function Study, unspecified | R94.30 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-CARDIOLOGY |
| Major Depressive Disorder, single Episode, unspecified | F32.9 | 4/18/2023 | 4/18/2023 | 136 | COMMUNITY CARE-PSYCHOLOGY |
| Pain in left Knee | M25.562 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-ORTHO JOINTS |
| Low back pain, unspecified | M54.50 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Elevated Prostate Specific antigen [psa] | R97.20 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-UROLOGY |
| Pain in right Hand | M79.641 | 5/11/2023 | 5/11/2023 | 113 | COMMUNITY CARE-ORTHO HAND |
| M65.30 | M65.30 | 6/3/2023 | 6/2/2023 | 90 | COMMUNITY CARE-ORTHO HAND |
| Radiculopathy, Lumbar Region | M54.16 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-PAIN MANAGEMENT |
| End Stage Renal Disease | N18.6 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE- |

| | | | | | INVASIVE RADIOLOGY |
|---|---|---|---|---|---|
| Testicular Hypofunction | E29.1 | 1/30/2023 | 1/30/2023 | 214 | COMMUNITY CARE-ENDOCRINE |
| Chronic Pain Syndrome | G89.4 | 3/15/2023 | 3/16/2023 | 170 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Altered Mental Status, unspecified | R41.82 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-INPATIENT MENTAL HEALTH |
| Occlusion and Stenosis of unspecified Carotid Artery | I65.29 | 4/18/2023 | 4/18/2023 | 136 | COMMUNITY CARE-VASCULAR |
| Elevated Prostate Specific antigen [psa] | R97.20 | 6/16/2023 | 6/1/2023 | 77 | COMMUNITY CARE-UROLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Pain in left Shoulder | M25.512 | 6/5/2023 | 6/5/2023 | 88 | COMMUNITY CARE-MRI |
| Radiculopathy, Cervical Region | M54.12 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-MRI |
| Posterior Displaced Type II Dens Fracture, Initial Encounter for closed Fracture | S12.111A | 6/21/2023 | 6/22/2023 | 72 | COMMUNITY CARE-INPATIENT MEDICAL |
| End Stage Renal Disease | N18.6 | 5/12/2023 | 5/12/2023 | 112 | COMMUNITY CARE-HEMODIALYSIS |
| Low back pain, unspecified | M54.50 | 6/22/2023 | 6/23/2023 | 71 | COMMUNITY CARE-ORTHO GENERAL |
| Pain in left Shoulder | M25.512 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-ORTHO GENERAL |
| Unspecified Systolic (Congestive) Heart Failure | I50.20 | 2/28/2023 | 2/28/2023 | 185 | COMMUNITY CARE-CARDIOLOGY |
| Pain in left Knee | M25.562 | 6/13/2023 | 6/15/2023 | 80 | COMMUNITY CARE-ORTHO JOINTS |

| | | | | | |
|---|---|---|---|---|---|
| Bicipital Tendinitis, left Shoulder | M75.22 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-MRI |
| Rash and other Nonspecific Skin Eruption | R21. | 6/5/2023 | 6/7/2023 | 88 | COMMUNITY CARE-DERMATOLOGY |
| Other Periodontal Diseases | K05.5 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-DENTAL |
| Other Periodontal Diseases | K05.5 | 4/17/2023 | 4/17/2023 | 137 | COMMUNITY CARE-DENTAL |
| Type 2 Diabetes Mellitus without Complications | E11.9 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |
| Pain in right Knee | M25.561 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-ORTHO JOINTS |
| Primary Osteoarthritis, right Shoulder | M19.011 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-ORTHO JOINTS |
| Cervicalgia | M54.2 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-PAIN MANAGEMENT |
| Acute and Subacute Hepatic Failure without Coma | K72.00 | 6/25/2023 | 6/25/2023 | 68 | COMMUNITY CARE-INPATIENT MEDICAL |
| Vertebrogenic low back pain | M54.51 | 6/16/2023 | 6/23/2023 | 77 | COMMUNITY CARE-ORTHO SPINE |
| Carpal Tunnel Syndrome, right upper Limb | G56.01 | 6/21/2023 | 6/28/2023 | 72 | COMMUNITY CARE-ORTHO HAND |
| Elevated White Blood Cell Count, unspecified | D72.829 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-HEMATOLOGY/ONCOLOGY |
| Cervical Disc Disorder with Myelopathy, unspecified Cervical Region | M50.00 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-NEUROSURGERY |
| Other Spondylosis with Myelopathy, Lumbar Region | M47.16 | 5/23/2023 | 5/23/2023 | 101 | COMMUNITY CARE-PAIN MANAGEMENT |
| Neoplasm of uncertain behavior of skin | D48.5 | 3/28/2023 | 3/31/2023 | 157 | COMMUNITY CARE-DERMATOLOGY |

| Diagnosis | Code | Date 1 | Date 2 | Value | Provider |
|---|---|---|---|---|---|
| Low back pain, unspecified | M54.50 | 3/28/2023 | 3/28/2023 | 157 | COMMUNITY CARE-ORTHO SPINE |
| Inflamed Seborrheic Keratosis | L82.0 | 6/8/2023 | 6/22/2023 | 85 | COMMUNITY CARE-DERMATOLOGY |
| Other Chronic Pain | G89.29 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-PAIN MANAGEMENT |
| Pain in left Knee | M25.562 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-ORTHO SPORTS |
| Dry Eye Syndrome of Bilateral Lacrimal Glands | H04.123 | 5/23/2023 | 5/23/2023 | 101 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-PULMONARY |
| Spinal stenosis, lumbar region with neurogenic claudication | M48.062 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-ORTHO SPINE |
| Low back pain, unspecified | M54.50 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-ORTHO SPINE |
| Encounter for Follow-up Examination after Completed Treatment for conditions other than Malignant Neoplasm | Z09. | 5/5/2023 | 6/14/2023 | 119 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Malignant Neoplasm of upper Lobe, right Bronchus or Lung | C34.11 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-RADIATIONTHERAPY |
| Pain, unspecified | R52. | 6/9/2023 | 6/9/2023 | 84 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Localized Swelling, Mass and Lump, Trunk | R22.2 | 6/11/2023 | 6/12/2023 | 82 | COMMUNITY CARE-ORTHO SURGICAL |
| Obstructive Sleep Apnea (Adult) (Pediatric) | G47.33 | 5/1/2023 | 5/15/2023 | 123 | COMMUNITY CARE-PULMONARY |
| Other Chronic Pain | G89.29 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-PAIN |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | MANAGEMENT |
| Thoracic aortic aneurysm, without rupture, unspecified | I71.20 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Carcinoma in situ of prostate | D07.5 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-RADIATIONTHERAPY |
| Sacrococcygeal Disorders, not elsewhere classified | M53.3 | 6/13/2023 | 6/13/2023 | 80 | COMMUNITY CARE-PAIN MANAGEMENT |
| Pain in right Shoulder | M25.511 | 5/16/2023 | 5/16/2023 | 108 | COMMUNITY CARE-PHYSICAL THERAPY |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE-PSYCHOLOGY |
| Chronic Ischemic Heart Disease, unspecified | I25.9 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-CARDIOLOGY |
| Bilateral Primary Osteoarthritis of Knee | M17.0 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-ORTHO JOINTS |
| End Stage Renal Disease | N18.6 | 6/14/2023 | 6/28/2023 | 79 | COMMUNITY CARE-HEMODIALYSIS |
| Problem Related to unspecified Psychosocial Circumstances | Z65.9 | 6/21/2023 | 7/21/2023 | 72 | COMMUNITY CARE-PSYCHOLOGY |
| Pain in left Shoulder | M25.512 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-PHYSICAL THERAPY |
| Presbyopia | H52.4 | 5/15/2023 | 5/15/2023 | 109 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Pain in right Shoulder | M25.511 | 5/10/2023 | 5/10/2023 | 114 | COMMUNITY CARE-ORTHO JOINTS |
| Dizziness and Giddiness | R42. | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-ENT |
| Pain in unspecified Foot | M79.673 | 6/23/2023 | 6/28/2023 | 70 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |

| | | | | | |
|---|---|---|---|---|---|
| Chronic atrial fibrillation, unspecified | I48.20 | 6/2/2023 | 6/2/2023 | 91 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 6/29/2023 | 6/29/2023 | 64 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-CARDIAC REHAB |
| Rash and other Nonspecific Skin Eruption | R21. | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-DERMATOLOGY |
| Malignant neoplasm of transverse colon | C18.4 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-IMAGING PET |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-ORTHO SPINE |
| Cardiac Arrhythmia, unspecified | I49.9 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-CARDIOLOGY |
| Radiculopathy, Cervical Region | M54.12 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-PAIN MANAGEMENT |
| Deviated nasal septum | J34.2 | 6/13/2023 | 6/13/2023 | 80 | COMMUNITY CARE-ENT |
| Basal Cell Carcinoma of Skin of other Parts of Face | C44.319 | 5/26/2023 | 5/26/2023 | 98 | COMMUNITY CARE-DERMATOLOGY |
| Obstructive Sleep Apnea (Adult) (Pediatric) | G47.33 | 12/21/2022 | 12/21/2022 | 254 | COMMUNITY CARE-PULMONARY SLEEP |
| Other Chronic Pain | G89.29 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Other Periodontal Diseases | K05.5 | 5/31/2023 | 5/31/2023 | 93 | COMMUNITY CARE-DENTAL |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 5/4/2023 | 5/4/2023 | 120 | COMMUNITY CARE-CARDIAC REHAB |

| Diagnosis | Code | Date 1 | Date 2 | Value | Facility |
|---|---|---|---|---|---|
| Cerebral Infarction, unspecified | I63.9 | 5/22/2023 | 6/12/2023 | 102 | COMMUNITY CARE-CARDIOLOGY |
| Unspecified visual disturbance | H53.9 | 6/28/2023 | 6/28/2023 | 65 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Low back pain, unspecified | M54.50 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-PAIN MANAGEMENT |
| Low back pain, unspecified | M54.50 | 3/23/2023 | 3/23/2023 | 162 | COMMUNITY CARE-ORTHO SPINE |
| Intra-Abdominal and Pelvic Swelling, Mass and Lump, unspecified site | R19.00 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-RADIATIONTHERAPY |
| Cervicalgia | M54.2 | 5/18/2023 | 5/19/2023 | 106 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Chronic Pain Syndrome | G89.4 | 6/16/2023 | 6/20/2023 | 77 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Pseudofolliculitis Barbae | L73.1 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-DERMATOLOGY |
| Pain in left Knee | M25.562 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-MRI |
| End Stage Renal Disease | N18.6 | 6/30/2023 | 7/3/2023 | 63 | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| Other Asthma | J45.998 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Spinal stenosis, lumbar region with neurogenic claudication | M48.062 | 5/23/2023 | 5/23/2023 | 101 | COMMUNITY CARE-MRI |
| Dissection of aortic arch | I71.011 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-CARDIOLOGY |
| Ventricular tachycardia, unspecified | I47.20 | 6/16/2023 | 6/19/2023 | 77 | COMMUNITY CARE-CARDIOLOGY |

| Encounter for other Orthopedic Aftercare | Z47.89 | 6/15/2023 | 6/23/2023 | 78 | COMMUNITY CARE-PHYSICAL THERAPY |
| Opioid use, unspecified, in remission | F11.91 | 6/29/2023 | 7/3/2023 | 64 | COMMUNITY CARE-MH RRTP TREATMENT |
| Rash and other Nonspecific Skin Eruption | R21. | 4/7/2023 | 4/17/2023 | 147 | COMMUNITY CARE-DERMATOLOGY |
| Unilateral Primary Osteoarthritis of first Carpometacarpal Joint, right Hand | M18.11 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-OCCUPATIONALTHERAPY |
| Chronic Pain Syndrome | G89.4 | 5/23/2023 | 5/23/2023 | 101 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Traumatic Subdural Hemorrhage without Loss of Consciousness, Initial Encounter | S06.5X0A | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE-INPATIENT MEDICAL |
| Insomnia, unspecified | G47.00 | 4/28/2023 | 4/28/2023 | 126 | COMMUNITY CARE-PULMONARY SLEEP |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 6/7/2023 | 6/8/2023 | 86 | COMMUNITY CARE-PSYCHOLOGY |
| Cervicalgia | M54.2 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-PAIN MANAGEMENT |
| Low back pain, unspecified | M54.50 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Spinal Stenosis, Cervical Region | M48.02 | 4/27/2023 | 4/27/2023 | 127 | COMMUNITY CARE-NEUROSURGERY |
| Depression, unspecified | F32.A | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-PSYCHOLOGY |
| Chronic rhinitis | J31.0 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-ENT |
| Low back pain, unspecified | M54.50 | 6/16/2023 | 6/20/2023 | 77 | COMMUNITY CARE-CHIROPRACTIC |

| Diagnosis | Code | Date | Date | Value | Provider |
|---|---|---|---|---|---|
| Chronic Pain Syndrome | G89.4 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Multiple myeloma in remission | C90.01 | 5/26/2023 | 5/26/2023 | 98 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Rheumatic aortic stenosis | I06.0 | 4/18/2023 | 4/18/2023 | 136 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Rash and other Nonspecific Skin Eruption | R21. | 2/22/2023 | 2/22/2023 | 191 | COMMUNITY CARE-DERMATOLOGY |
| Other low back pain | M54.59 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-PAIN MANAGEMENT |
| Overactive Bladder | N32.81 | 5/11/2023 | 5/11/2023 | 113 | COMMUNITY CARE-PHYSICAL THERAPY |
| Depression, unspecified | F32.A | 3/17/2023 | 3/17/2023 | 168 | COMMUNITY CARE-PSYCHOLOGY |
| Unspecified Atrial Fibrillation | I48.91 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-CARDIOLOGY |
| Isolated Proteinuria | R80.0 | 6/15/2023 | 6/21/2023 | 78 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Cardiomyopathy, unspecified | I42.9 | 4/27/2023 | 4/27/2023 | 127 | COMMUNITY CARE-CARDIOLOGY |
| Pain in right Shoulder | M25.511 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-ORTHO JOINTS |
| End Stage Renal Disease | N18.6 | 6/15/2023 | 6/16/2023 | 78 | COMMUNITY CARE-HEMODIALYSIS |
| End Stage Renal Disease | N18.6 | 6/21/2023 | 6/22/2023 | 72 | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| Nonrheumatic Aortic (Valve) Stenosis | I35.0 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-CARDIOLOGY |
| Other obsessive-compulsive disorder | F42.8 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-PSYCHOLOGY |
| Unspecified Macular Degeneration | H35.30 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-OPHTHALMOLOGY |

| Condition | Code | Date 1 | Date 2 | Value | Department |
|---|---|---|---|---|---|
| | | | | | DISEASE MGMT |
| Other Retention of Urine | R33.8 | 6/28/2023 | 6/28/2023 | 65 | COMMUNITY CARE-UROLOGY |
| Spinal stenosis, lumbar region with neurogenic claudication | M48.062 | 6/30/2023 | 7/3/2023 | 63 | COMMUNITY CARE-ORTHO SPINE |
| Rosacea, unspecified | L71.9 | 6/27/2023 | 6/30/2023 | 66 | COMMUNITY CARE-DERMATOLOGY |
| Incomplete Rotator Cuff Tear or Rupture of right Shoulder, not specified as Traumatic | M75.111 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-PHYSICAL THERAPY |
| Urge Incontinence | N39.41 | 6/28/2023 | 6/28/2023 | 65 | COMMUNITY CARE-UROLOGY |
| Unspecified Glaucoma | H40.9 | 6/28/2023 | 7/7/2023 | 65 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 6/2/2023 | 6/2/2023 | 91 | COMMUNITY CARE-CARDIOLOGY |
| Tremor, unspecified | R25.1 | 1/30/2023 | 1/30/2023 | 214 | COMMUNITY CARE-NEUROLOGY |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 7/6/2023 | 7/10/2023 | 57 | COMMUNITY CARE-PULMONARY |
| Malignant Neoplasm of unspecified part of right Bronchus or Lung | C34.91 | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE-RADIATIONTHERAPY |
| Anemia, unspecified | D64.9 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-HEMATOLOGY/ONCOLOGY |
| Actinic Keratosis | L57.0 | 4/12/2023 | 4/12/2023 | 142 | COMMUNITY CARE-DERMATOLOGY |
| Low back pain, unspecified | M54.50 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-CHIROPRACTIC |

| Diagnosis | Code | Date 1 | Date 2 | Value | Provider |
|---|---|---|---|---|---|
| End Stage Renal Disease | N18.6 | 5/2/2023 | 7/8/2023 | 122 | COMMUNITY CARE-HEMODIALYSIS |
| End Stage Renal Disease | N18.6 | 7/7/2023 | 7/8/2023 | 56 | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| Basal Cell Carcinoma of Skin of Nose | C44.311 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-DERMATOLOGY |
| Acute and Subacute Hepatic Failure without Coma | K72.00 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-TRANSPLANT SOLID ORGAN |
| Problems in Relationship with Spouse or Partner | Z63.0 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-PSYCHOLOGY |
| Essential (Primary) Hypertension | I10. | 5/24/2023 | 5/24/2023 | 100 | COMMUNITY CARE-CARDIOLOGY |
| Non-St Elevation (Nstemi) Myocardial Infarction | I21.4 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-INPATIENT MEDICAL |
| Elevated Prostate Specific antigen [psa] | R97.20 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-UROLOGY |
| Other Tear of unspecified Meniscus, Current Injury, right Knee, Sequela | S83.203S | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-PHYSICAL THERAPY |
| Rash and other Nonspecific Skin Eruption | R21. | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-DERMATOLOGY |
| Overactive Bladder | N32.81 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-PHYSICAL THERAPY |
| Other Pancytopenia | D61.818 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-INPATIENT MEDICAL |
| Spinal Instabilities, Thoracolumbar Region | M53.2X5 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-MRI |
| Acne, unspecified | L70.9 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-DERMATOLOGY |
| Trigger Finger, right Little Finger | M65.351 | 5/31/2023 | 5/31/2023 | 93 | COMMUNITY CARE-OCCUPATIONALTHERAPY |

| Condition | Code | Date 1 | Date 2 | Value | Facility |
|---|---|---|---|---|---|
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 3/28/2023 | 3/30/2023 | 157 | COMMUNITY CARE-CARDIOLOGY |
| Scotoma involving Central area, unspecified Eye | H53.419 | 5/23/2023 | 5/23/2023 | 101 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Presbyopia | H52.4 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Neoplasm of unspecified Behavior of Brain | D49.6 | 5/23/2023 | 5/23/2023 | 101 | COMMUNITY CARE-NEUROSURGERY |
| Rash and other Nonspecific Skin Eruption | R21. | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-DERMATOLOGY |
| Parkinson's Disease | G20. | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-PHYSICAL THERAPY |
| Dyspnea, unspecified | R06.00 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-CARDIOLOGY |
| Upper Abdominal Pain, unspecified | R10.10 | 6/27/2023 | 7/11/2023 | 66 | COMMUNITY CARE-MRI |
| Presbyopia | H52.4 | 5/18/2023 | 6/2/2023 | 106 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-PSYCHOLOGY |
| Dermatitis, unspecified | L30.9 | 6/29/2023 | 7/7/2023 | 64 | COMMUNITY CARE-DERMATOLOGY |
| Cervicalgia | M54.2 | 6/4/2023 | 6/4/2023 | 89 | COMMUNITY CARE-MRI |
| Cervicalgia | M54.2 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-NEUROSURGERY |
| Pain in unspecified Hip | M25.559 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-MRI |
| Other specified Injuries of Vocal Cord, Initial Encounter | S19.83XA | 3/14/2023 | 3/14/2023 | 171 | COMMUNITY CARE-ENT |

| | | | | | |
|---|---|---|---|---|---|
| Cervicalgia | M54.2 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Other acne | L70.8 | 3/24/2023 | 3/24/2023 | 161 | COMMUNITY CARE-DERMATOLOGY |
| Squamous Cell Carcinoma of Skin of other Parts of Face | C44.329 | 6/2/2023 | 6/2/2023 | 91 | COMMUNITY CARE-DERMATOLOGY |
| Rash and other Nonspecific Skin Eruption | R21. | 5/19/2023 | 5/19/2023 | 105 | COMMUNITY CARE-DERMATOLOGY |
| Low back pain, unspecified | M54.50 | 4/4/2023 | 6/20/2023 | 150 | COMMUNITY CARE-MRI |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-CARDIOLOGY |
| Sleep Disorder, unspecified | G47.9 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-PULMONARY SLEEP |
| Allergy status to unspecified drugs, medicaments and biological substances | Z88.9 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Other Allergy Status, other than to Drugs and Biological Substances | Z91.09 | 6/16/2023 | 6/21/2023 | 77 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Encounter for Screening for Malignant Neoplasm of Skin | Z12.83 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-DERMATOLOGY |
| Radiculopathy, Cervical Region | M54.12 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-MRI |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE-CARDIOLOGY |
| Carpal Tunnel Syndrome, right upper Limb | G56.01 | 6/28/2023 | 6/28/2023 | 65 | COMMUNITY CARE-ORTHO HAND |
| Pain in unspecified Finger(s) | M79.646 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE- |

| | | | | | ORTHO HAND |
|---|---|---|---|---|---|
| Other Cystic Kidney Diseases | Q61.8 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-UROLOGY |
| Pain in right Hip | M25.551 | 7/11/2023 | 7/12/2023 | 52 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Type 2 diabetes mellitus with severe nonproliferative diabetic retinopathy with macular edema, bilateral | E11.3413 | 5/25/2023 | 6/24/2023 | 99 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Abnormal Findings on Diagnostic Imaging of other Parts of Digestive Tract | R93.3 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-GASTROENTEROLOGY EUS |
| Unspecified Kidney Failure | N19. | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-HEMODIALYSIS |
| Radiculopathy, Lumbar Region | M54.16 | 6/8/2023 | 6/15/2023 | 85 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Other low back pain | M54.59 | 5/5/2023 | 5/5/2023 | 119 | COMMUNITY CARE-PSYCHOLOGY |
| Unilateral Primary Osteoarthritis, right Knee | M17.11 | 5/15/2023 | 5/15/2023 | 109 | COMMUNITY CARE-ORTHO JOINTS |
| Chronic rhinitis | J31.0 | 5/16/2023 | 5/16/2023 | 108 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Carcinoma in situ of prostate | D07.5 | 6/21/2023 | 6/22/2023 | 72 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Acute appendicitis with localized peritonitis, without perforation or gangrene | K35.30 | 6/6/2023 | 6/7/2023 | 87 | COMMUNITY CARE-SURGICAL |
| Cervicalgia | M54.2 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-CHIROPRACTIC |
| Other low back pain | M54.59 | 6/30/2023 | 6/30/2023 | 63 | COMMUNITY CARE-PHYSICAL THERAPY |

| | | | | | |
|---|---|---|---|---|---|
| Unspecified Injury of Neck, Initial Encounter | S19.9XXA | 6/30/2023 | 6/30/2023 | 63 | COMMUNITY CARE-NEUROSURGERY |
| Irreversible pulpitis | K04.02 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-DENTAL |
| Streptococcal pharyngitis | J02.0 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-ENT |
| Major Depressive Disorder, Recurrent, Moderate | F33.1 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-PSYCHOLOGY |
| Heart Failure, unspecified | I50.9 | 5/3/2023 | 5/3/2023 | 121 | COMMUNITY CARE-CARDIAC REHAB |
| Chronic Pain Syndrome | G89.4 | 4/19/2023 | 4/19/2023 | 135 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-CARDIOLOGY |
| Achilles Tendinitis, left Leg | M76.62 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |
| Low back pain, unspecified | M54.50 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Neuromuscular Dysfunction of Bladder, unspecified | N31.9 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE-UROLOGY |
| Presbyopia | H52.4 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Pain in unspecified Knee | M25.569 | 6/13/2023 | 6/13/2023 | 80 | COMMUNITY CARE-ORTHO GENERAL |
| Unspecified Systolic (Congestive) Heart Failure | I50.20 | 7/10/2023 | 7/11/2023 | 53 | COMMUNITY CARE-CARDIOLOGY |
| Snoring | R06.83 | 4/4/2023 | 4/4/2023 | 150 | COMMUNITY CARE-PULMONARY SLEEP |
| Polyp of Colon | K63.5 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | GASTROENTEROLOGY |
| Problems in Relationship with Spouse or Partner | Z63.0 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-PSYCHOLOGY |
| Coronary Atherosclerosis is due to Calcified Coronary Lesion | I25.84 | 7/10/2023 | 7/13/2023 | 53 | COMMUNITY CARE-CARDIOLOGY |
| Other low back pain | M54.59 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-PHYSICAL THERAPY |
| Tremor, unspecified | R25.1 | 5/23/2023 | 6/22/2023 | 101 | COMMUNITY CARE-NUCLEAR MEDICINE |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 6/7/2023 | 6/8/2023 | 86 | COMMUNITY CARE-CARDIOLOGY |
| Pulmonary hypertension, unspecified | I27.20 | 6/28/2023 | 6/29/2023 | 65 | COMMUNITY CARE-PULMONARY |
| Low back pain, unspecified | M54.50 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-PAIN MANAGEMENT |
| Hematuria, unspecified | R31.9 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-UROLOGY |
| Other Periradicular Pathology Associated with Previous Endodontic Treatment | M27.59 | 3/28/2023 | 3/28/2023 | 157 | COMMUNITY CARE-DENTAL |
| Chondromalacia, right Knee | M94.261 | 6/28/2023 | 6/28/2023 | 65 | COMMUNITY CARE-MRI |
| Stenosis of other vascular prosthetic devices, implants and grafts, subsequent encounter | T82.858D | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Chest Pain, unspecified | R07.9 | 6/12/2023 | 6/13/2023 | 81 | COMMUNITY CARE-CARDIOLOGY |
| Other low back pain | M54.59 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-PAIN MANAGEMENT |

| | | | | | |
|---|---|---|---|---|---|
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-DERMATOLOGY |
| Neoplasm of uncertain behavior of skin | D48.5 | 5/15/2023 | 5/15/2023 | 109 | COMMUNITY CARE-DERMATOLOGY |
| Secondary Malignant Neoplasm of Brain | C79.31 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-RADIATIONTHERAPY |
| Primary Focal Hyperhidrosis, Soles | L74.513 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-DERMATOLOGY |
| Other specified Problems Related to Psychosocial Circumstances | Z65.8 | 5/19/2023 | 5/25/2023 | 105 | COMMUNITY CARE-PSYCHOLOGY |
| Amyotrophic Lateral Sclerosis | G12.21 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-WOUND CARE |
| Post-Traumatic Stress Disorder, unspecified | F43.10 | 6/7/2023 | 6/22/2023 | 86 | COMMUNITY CARE-PSYCHOLOGY |
| Traumatic Subdural Hemorrhage without Loss of Consciousness, Initial Encounter | S06.5X0A | 7/15/2023 | 7/15/2023 | 48 | COMMUNITY CARE-INPATIENT MEDICAL |
| Chest Pain, unspecified | R07.9 | 7/15/2023 | 7/15/2023 | 48 | COMMUNITY CARE-INPATIENT MEDICAL |
| Other Psychoactive Substance Abuse, Uncomplicated | F19.10 | 6/29/2023 | 7/17/2023 | 64 | COMMUNITY CARE-COMPACT ACT ADDICTION PSYCHIATRY OUTPATIENT |
| Other low back pain | M54.59 | 5/5/2023 | 5/5/2023 | 119 | COMMUNITY CARE-PAIN MANAGEMENT |
| Squamous Cell Carcinoma of Skin of left Ear and External Auricular Canal | C44.229 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-DERMATOLOGY |

| | | | | | |
|---|---|---|---|---|---|
| Complete Rotator Cuff Tear or Rupture of right Shoulder, not specified as Traumatic | M75.121 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-ORTHO SPORTS |
| Palpitations | R00.2 | 2/13/2023 | 2/13/2023 | 200 | COMMUNITY CARE-CARDIOLOGY |
| Presbyopia | H52.4 | 6/21/2023 | 7/7/2023 | 72 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Nonrheumatic Aortic (Valve) Stenosis | I35.0 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-CARDIOLOGY |
| Sleep Apnea, unspecified | G47.30 | 4/10/2023 | 4/10/2023 | 144 | COMMUNITY CARE-PULMONARY |
| Unilateral Post-Traumatic Osteoarthritis, left Knee | M17.32 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-PAIN MANAGEMENT |
| Pain in left Shoulder | M25.512 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-ORTHO JOINTS |
| Drug Induced Acute Dystonia | G24.02 | 3/31/2023 | 3/31/2023 | 154 | COMMUNITY CARE-NEUROLOGY |
| Chronic kidney disease, stage 3b | N18.32 | 3/9/2023 | 3/9/2023 | 176 | COMMUNITY CARE-NEPHROLOGY |
| Chalazion right upper Eyelid | H00.11 | 6/28/2023 | 7/5/2023 | 65 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Pain in left Knee | M25.562 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-PHYSICAL THERAPY |
| Other low back pain | M54.59 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE-PHYSICAL THERAPY |
| Palpitations | R00.2 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-CARDIOLOGY |
| Peripheral Vascular Disease, Unspecified | I73.9 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-VASCULAR |
| Secondary Osteoarthritis, unspecified site | M19.93 | 6/16/2023 | 6/20/2023 | 77 | COMMUNITY CARE-ORTHO HAND |

| | | | | | |
|---|---|---|---|---|---|
| Carcinoma in situ of prostate | D07.5 | 6/30/2023 | 6/30/2023 | 63 | COMMUNITY CARE- UROLOGY |
| Dental Caries, unspecified | K02.9 | 3/23/2023 | 3/23/2023 | 162 | COMMUNITY CARE- DENTAL |
| Actinic Keratosis | L57.0 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE- DERMATOLOGY |
| Pain in left Hand | M79.642 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE- ORTHO HAND |
| Solitary Pulmonary Nodule | R91.1 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE- PULMONARY INTERVENTIONAL |
| Dry Eye Syndrome of Bilateral Lacrimal Glands | H04.123 | 3/17/2023 | 3/17/2023 | 168 | COMMUNITY CARE- OPHTHALMOLOGY DISEASE MGMT |
| Rash and other Nonspecific Skin Eruption | R21. | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE- DERMATOLOGY |
| Radiculopathy, Cervical Region | M54.12 | 5/23/2023 | 5/24/2023 | 101 | COMMUNITY CARE- NEUROSURGERY |
| Palmar Fascial Fibromatosis [Dupuytren] | M72.0 | 4/27/2023 | 7/14/2023 | 127 | COMMUNITY CARE- ORTHO HAND |
| Other Sleep Disorders | G47.8 | 5/4/2023 | 5/4/2023 | 120 | COMMUNITY CARE- PULMONARY SLEEP |
| Dorsalgia, unspecified | M54.9 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Coronary Atherosclerosis due to Lipid Rich Plaque | I25.83 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE- CARDIOLOGY |
| Presbyopia | H52.4 | 6/9/2023 | 6/9/2023 | 84 | COMMUNITY CARE- OPTOMETRY DISEASE MGMT |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE- PSYCHOLOGY |
| Pain in unspecified Hand | M79.643 | 6/29/2023 | 7/18/2023 | 64 | COMMUNITY CARE- EMG |
| Chest Pain, unspecified | R07.9 | 2/21/2023 | 2/21/2023 | 192 | COMMUNITY CARE- CARDIOLOGY |

| Contracture, right Hand | M24.541 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-ORTHO HAND |
|---|---|---|---|---|---|
| Dental Caries, unspecified | K02.9 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-DENTAL |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-CARDIOLOGY |
| Pain in right Hip | M25.551 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Dysphagia, unspecified | R13.10 | 5/19/2023 | 5/19/2023 | 105 | COMMUNITY CARE-ENDOSCOPY |
| Cerebral cysts | G93.0 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-NEUROSURGERY |
| Basal Cell Carcinoma of Skin of unspecified Ear and External Auricular Canal | C44.211 | 7/10/2023 | 7/18/2023 | 53 | COMMUNITY CARE-DERMATOLOGY |
| Male Erectile Dysfunction, unspecified | N52.9 | 3/16/2023 | 3/16/2023 | 169 | COMMUNITY CARE-UROLOGY |
| Unspecified Age-Related Cataract | H25.9 | 5/26/2023 | 5/26/2023 | 98 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Solitary Pulmonary Nodule | R91.1 | 6/30/2023 | 6/30/2023 | 63 | COMMUNITY CARE-PULMONARY |
| Pain in left Hip | M25.552 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-PHYSICAL THERAPY |
| Pain in left Knee | M25.562 | 5/3/2023 | 5/2/2023 | 121 | COMMUNITY CARE-PHYSICAL THERAPY |
| Low back pain, unspecified | M54.50 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-PAIN MANAGEMENT |
| Other Atopic Dermatitis | L20.89 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-DERMATOLOGY |
| Atherosclerotic Heart Disease of | I25.10 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| Native Coronary Artery without Angina Pectoris | | | | | CARDIOLOGY |
| Non-Pressure Chronic Ulcer of unspecified part of left lower Leg Limited to Breakdown of Skin | L97.921 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-LAB |
| Pain in right Shoulder | M25.511 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-MRI |
| Pain in unspecified Foot | M79.673 | 6/5/2023 | 6/7/2023 | 88 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |
| Nondisplaced Fracture of Distal Phalanx of right Thumb, Sequela | S62.524S | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-ORTHO HAND |
| Pelvic and Perineal Pain | R10.2 | 5/17/2023 | 5/17/2023 | | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other Fatigue | R53.83 | 6/30/2023 | 7/19/2023 | 63 | COMMUNITY CARE-CARDIOLOGY |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-PSYCHOLOGY |
| Radiculopathy, Lumbar Region | M54.16 | 6/9/2023 | 6/9/2023 | 84 | COMMUNITY CARE-PAIN MANAGEMENT |
| Neoplasm of uncertain behavior of skin | D48.5 | 6/28/2023 | 7/10/2023 | 65 | COMMUNITY CARE-DERMATOLOGY |
| Burn of unspecified degree of Head, Face, and Neck, unspecified site, Subsequent Encounter | T20.00XD | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-WOUND CARE |
| Post-Traumatic Stress Disorder, unspecified | F43.10 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-PSYCHOLOGY |

| Condition | Code | Date | Date | Value | Provider |
|---|---|---|---|---|---|
| Vertebrogenic low back pain | M54.51 | 5/25/2023 | 5/26/2023 | 99 | COMMUNITY CARE-PAIN MANAGEMENT |
| Low back pain, unspecified | M54.50 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Multiple Myeloma not having Achieved Remission | C90.00 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Hydronephrosis with Ureteral Stricture, not elsewhere classified | N13.1 | 5/10/2023 | 5/10/2023 | 114 | COMMUNITY CARE-UROLOGY |
| Dorsalgia, unspecified | M54.9 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-PHYSICAL THERAPY |
| Depression, unspecified | F32.A | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-INPATIENT MENTAL HEALTH |
| Suicidal Ideations | R45.851 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-INPATIENT MENTAL HEALTH |
| Type 2 diabetes mellitus with proliferative diabetic retinopathy without macular edema, bilateral | E11.3593 | 6/2/2023 | 6/9/2023 | 91 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Low back pain, unspecified | M54.50 | 5/24/2023 | 5/24/2023 | 100 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Pain in right Knee | M25.561 | 5/8/2023 | 5/8/2023 | 116 | COMMUNITY CARE-ORTHO JOINTS |
| Cardiomyopathy, unspecified | I42.9 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-CARDIOLOGY |
| Allergic Rhinitis, unspecified | J30.9 | 6/30/2023 | 6/30/2023 | 63 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Other Chronic Pain | G89.29 | 3/30/2023 | 7/6/2023 | 155 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |

| | | | | | |
|---|---|---|---|---|---|
| Spinal stenosis, lumbar region with neurogenic claudication | M48.062 | 6/21/2023 | 6/26/2023 | 72 | COMMUNITY CARE-MRI |
| Encounter for Adjustment and Management of other part of Cardiac Pacemaker | Z45.018 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Chronic Pain Syndrome | G89.4 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Vertebrogenic low back pain | M54.51 | 6/15/2023 | 6/22/2023 | 78 | COMMUNITY CARE-CHIROPRACTIC |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 6/7/2023 | 6/8/2023 | 86 | COMMUNITY CARE-PSYCHIATRY |
| Other Allergic Rhinitis | J30.89 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Other Spondylosis, Cervical Region | M47.892 | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE-CHIROPRACTIC |
| Ischemic Cardiomyopathy | I25.5 | 5/12/2023 | 5/15/2023 | 112 | COMMUNITY CARE-CARDIAC REHAB |
| Chronic Systolic (Congestive) Heart Failure | I50.22 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-INPATIENT MEDICAL |
| Cyst of kidney, acquired | N28.1 | 6/29/2023 | 6/29/2023 | 64 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Shortness of Breath | R06.02 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-CARDIOLOGY |
| Syncope and collapse | R55. | 3/30/2023 | 4/4/2023 | 155 | COMMUNITY CARE-CARDIOLOGY |
| Radiculopathy, Cervical Region | M54.12 | 5/8/2023 | 5/8/2023 | 116 | COMMUNITY CARE-NEUROSURGERY |
| Allergy, unspecified, Initial Encounter | T78.40XA | 6/26/2023 | 6/27/2023 | 67 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |

| Ischemic Cardiomyopathy | I25.5 | 4/3/2023 | 4/7/2023 | 151 | COMMUNITY CARE-CARDIOLOGY |
|---|---|---|---|---|---|
| Nasal Congestion | R09.81 | 7/11/2023 | 7/18/2023 | 52 | COMMUNITY CARE-ENT |
| Elevated Prostate Specific antigen [psa] | R97.20 | 2/21/2023 | 2/24/2023 | 192 | COMMUNITY CARE-UROLOGY |
| Elevated Prostate Specific antigen [psa] | R97.20 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-UROLOGY |
| Antineutrophilic cytoplasmic antibody [ANCA] vasculitis | I77.82 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-ENT |
| Allergic Contact Dermatitis, unspecified Cause | L23.9 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Dysphagia, unspecified | R13.10 | 6/14/2023 | 6/20/2023 | 79 | COMMUNITY CARE-GASTRENTEROLOGY |
| Pain in unspecified Wrist | M25.539 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-ORTHO HAND |
| Low back pain, unspecified | M54.50 | 5/26/2023 | 5/26/2023 | 98 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Atrioventricular Block, first degree | I44.0 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-CARDIOLOGY |
| Longstanding persistent atrial fibrillation | I48.11 | 7/16/2023 | 7/18/2023 | 47 | COMMUNITY CARE-CARDIOLOGY |
| Basal Cell Carcinoma of Skin of other Parts of Face | C44.319 | 5/30/2023 | 5/30/2023 | 94 | COMMUNITY CARE-DERMATOLOGY |
| Shortness of Breath | R06.02 | 7/5/2023 | 7/7/2023 | 58 | COMMUNITY CARE-CARDIOLOGY |
| Stress Incontinence (Female) (Male) | N39.3 | 4/19/2023 | 4/19/2023 | 135 | COMMUNITY CARE-UROGYNECOLOGY |
| Carcinoma in situ of larynx | D02.0 | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE-ENT |
| Solitary Pulmonary Nodule | R91.1 | 7/14/2023 | 7/17/2023 | 49 | COMMUNITY CARE-PULMONARY |
| Localized Swelling, Mass and | R22.32 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-ULTRASOUND |

000364

| | | | | | |
|---|---|---|---|---|---|
| Lump, left upper Limb | | | | | |
| Essential (Primary) Hypertension | I10. | 7/9/2023 | 7/10/2023 | 54 | COMMUNITY CARE-CARDIOLOGY |
| Spontaneous Rupture of Flexor Tendons, left upper Arm | M66.322 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Acute Diastolic (Congestive) Heart Failure | I50.31 | 4/25/2023 | 4/25/2023 | 129 | COMMUNITY CARE-CARDIOLOGY |
| Benign prostatic hyperplasia with lower urinary tract symptoms | N40.1 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-UROLOGY |
| Mixed conductive and sensorineural hearing loss, unilateral, left ear with restricted hearing on the contralateral side | H90.A32 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-ENT |
| Obstructive Sleep Apnea (Adult) (Pediatric) | G47.33 | 5/28/2023 | 5/30/2023 | 96 | COMMUNITY CARE-PULMONARY SLEEP |
| Varicose veins of right lower extremity with pain | I83.811 | 6/14/2023 | 6/26/2023 | 79 | COMMUNITY CARE-VASCULAR |
| Presbyopia | H52.4 | 7/7/2023 | 7/14/2023 | 56 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Chest Pain, unspecified | R07.9 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-INPATIENT MEDICAL |
| Radiculopathy, Cervical Region | M54.12 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-PAIN MANAGEMENT |
| Cerebral infarction due to unspecified occlusion or stenosis of unspecified carotid artery | I63.239 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-NEUROSURGERY |
| Trigger Finger, unspecified Finger | M65.30 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-ORTHO HAND |

| | | | | | |
|---|---|---|---|---|---|
| Non-St Elevation (Nstemi) Myocardial Infarction | I21.4 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-INPATIENT MEDICAL |
| Other Spondylosis, Cervical Region | M47.892 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Spinal stenosis, lumbar region with neurogenic claudication | M48.062 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-MRI |
| Carcinoma in situ of prostate | D07.5 | 5/29/2023 | 5/30/2023 | 95 | COMMUNITY CARE-GASTROENTEROLOGY |
| Actinic Keratosis | L57.0 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-DERMATOLOGY |
| Radiculopathy, Cervical Region | M54.12 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-PAIN MANAGEMENT |
| Crohn's Disease, unspecified, without Complications | K50.90 | 7/12/2023 | 7/25/2023 | 51 | COMMUNITY CARE-IV INFUSION |
| Cervicalgia | M54.2 | 5/26/2023 | 5/26/2023 | 98 | COMMUNITY CARE-NEUROSURGERY |
| Pain in left Shoulder | M25.512 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-ORTHO JOINTS |
| Cerebral autosomal dominant arteriopathy with subcortical infarcts and leukoencephalopathy | I67.850 | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE-GENETIC COUNSELING |
| Malignant neoplasm of prostate | C61. | 6/30/2023 | 7/14/2023 | 63 | COMMUNITY CARE-NUCLEAR MEDICINE |
| Cerebral aneurysm, nonruptured | I67.1 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Chronic Pain Syndrome | G89.4 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-PAIN MANAGEMENT |
| Calculus of Bile Duct without Cholangitis or Cholecystitis | K80.50 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-INPATIENT MEDICAL |

| Diagnosis | Code | Date | Date | Score | Provider |
|---|---|---|---|---|---|
| without Obstruction | | | | | |
| Fibromyalgia | M79.7 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Unspecified Combined Systolic (Congestive) and Diastolic (Congestive) Heart Failure | I50.40 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-CARDIOLOGY |
| Cervicalgia | M54.2 | 5/30/2023 | 5/30/2023 | 94 | COMMUNITY CARE-CHIROPRACTIC |
| Vitiligo | L80. | 5/30/2023 | 6/5/2023 | 94 | COMMUNITY CARE-DERMATOLOGY |
| Female Infertility, unspecified | N97.9 | 7/3/2023 | 7/21/2023 | 60 | COMMUNITY CARE-INFERTILITY |
| Radiculopathy, Lumbar Region | M54.16 | 6/3/2023 | 6/5/2023 | 90 | COMMUNITY CARE-NEUROSURGERY |
| Frequency of Micturition | R35.0 | 6/23/2023 | 6/29/2023 | 70 | COMMUNITY CARE-UROLOGY |
| Pleural Effusion, not elsewhere classified | J90. | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-PULMONARY |
| Urinary tract infection, site not specified | N39.0 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-UROLOGY |
| Low back pain, unspecified | M54.50 | 5/31/2023 | 5/31/2023 | 93 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-PAIN MANAGEMENT |
| Radiculopathy, Cervical Region | M54.12 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-NEUROSURGERY |
| Unspecified Atrial Fibrillation | I48.91 | 6/2/2023 | 6/2/2023 | 91 | COMMUNITY CARE-CARDIOLOGY |
| Pain in left ankle and joints of left foot | M25.572 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-ORTHO GENERAL |
| Malignant Neoplasm of Esophagus, unspecified | C15.9 | 5/24/2023 | 6/30/2023 | 100 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Other Allergy, Sequela | T78.49XS | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |

| Condition | Code | Date 1 | Date 2 | Value | Provider |
|---|---|---|---|---|---|
| Low back pain, unspecified | M54.50 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Malignant Neoplasm of Esophagus, unspecified | C15.9 | 5/24/2023 | 6/1/2023 | 100 | COMMUNITY CARE-RADIATIONTHERAPY |
| Dysthymic Disorder | F34.1 | 5/24/2023 | 6/7/2023 | 100 | COMMUNITY CARE-PSYCHOLOGY |
| Bradycardia, unspecified | R00.1 | 7/25/2023 | 7/28/2023 | 38 | COMMUNITY CARE-CARDIOLOGY |
| Insomnia, unspecified | G47.00 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-PULMONARY SLEEP |
| Arnold-Chiari Syndrome without Spina Bifida or Hydrocephalus | Q07.00 | 6/15/2023 | 6/16/2023 | 78 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Occlusion and Stenosis of right Carotid Artery | I65.21 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-INPATIENT MEDICAL |
| Nontraumatic Acute Subdural Hemorrhage | I62.01 | 7/28/2023 | 7/31/2023 | 35 | COMMUNITY CARE-INPATIENT MEDICAL |
| Cervicalgia | M54.2 | 6/23/2023 | 6/26/2023 | 70 | COMMUNITY CARE-PAIN MANAGEMENT |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-CARDIOLOGY |
| Other Chronic Pain | G89.29 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-ORTHO HAND |
| Cervicalgia | M54.2 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Headache, unspecified | R51.9 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Pain, unspecified | R52. | 3/21/2023 | 3/21/2023 | 164 | COMMUNITY CARE-ANESTHESI |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | A PAIN MANAGEMENT |
| Encounter for other Orthopedic Aftercare | Z47.89 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Alternating Exotropia | H50.15 | 6/27/2023 | 7/13/2023 | 66 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Carcinoma in situ of prostate | D07.5 | 5/29/2023 | 5/30/2023 | 95 | COMMUNITY CARE-RADIATIONTHERAPY |
| Cervicalgia | M54.2 | 6/5/2023 | 6/5/2023 | 88 | COMMUNITY CARE-CHIROPRACTIC |
| Congenital Pes Planus, unspecified Foot | Q66.50 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-CHIROPRACTIC |
| Dorsalgia, unspecified | M54.9 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-CHIROPRACTIC |
| Carcinoma in situ of prostate | D07.5 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-UROLOGY |
| Dermatitis, unspecified | L30.9 | 6/12/2023 | 6/13/2023 | 81 | COMMUNITY CARE-DERMATOLOGY |
| Dyspnea, unspecified | R06.00 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-CARDIOLOGY |
| Solitary Pulmonary Nodule | R91.1 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-PULMONARY INTERVENTIONAL |
| End Stage Renal Disease | N18.6 | 7/21/2023 | 7/31/2023 | 42 | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| End Stage Renal Disease | N18.6 | 7/21/2023 | 7/31/2023 | 42 | COMMUNITY CARE-HEMODIALYSIS |
| End Stage Renal Disease | N18.6 | 6/13/2023 | 7/24/2023 | 80 | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| Radiculopathy, Lumbar Region | M54.16 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-PAIN MANAGEMENT |
| Atherosclerotic Heart Disease of | I25.10 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| Native Coronary Artery without Angina Pectoris | | | | | CARDIOLOGY |
| Other Chronic Pain | G89.29 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-PAIN MANAGEMENT |
| Acute Pain due to Trauma | G89.11 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-INPATIENT MEDICAL |
| Other specified Cardiac Arrhythmias | I49.8 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-CARDIOLOGY |
| Allergic Rhinitis, unspecified | J30.9 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Chronic Fatigue, unspecified | R53.82 | 3/27/2023 | 3/27/2023 | 158 | COMMUNITY CARE-PULMONARY SLEEP |
| Low back pain, unspecified | M54.50 | 6/2/2023 | 6/2/2023 | 91 | COMMUNITY CARE-NEUROSURGERY |
| Tachycardia, unspecified | R00.0 | 4/24/2023 | 4/26/2023 | 130 | COMMUNITY CARE-CARDIOLOGY |
| Other Malignant Neuroendocrine Tumors | C7A.8 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-SURGICAL |
| Low back pain, unspecified | M54.50 | 7/6/2023 | 7/10/2023 | 57 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Bilateral Primary Osteoarthritis of Knee | M17.0 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-ORTHO JOINTS |
| Pain, unspecified | R52. | 7/25/2023 | 7/26/2023 | 38 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Irritable Bowel Syndrome with Diarrhea | K58.0 | 1/10/2023 | 1/10/2023 | 234 | COMMUNITY CARE-GASTROENTEROLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 6/26/2023 | 6/28/2023 | 67 | COMMUNITY CARE-CARDIOLOGY |
| Sleep Apnea, unspecified | G47.30 | 5/1/2023 | 5/15/2023 | 123 | COMMUNITY CARE-PULMONARY SLEEP |

| Abnormal Electrocardiogram [ECG] [EKG] | R94.31 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-CARDIOLOGY |
|---|---|---|---|---|---|
| Unspecified Atrial Fibrillation | I48.91 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-CARDIOLOGY |
| Carcinoma in Situ of left Bronchus and Lung | D02.22 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-RADIATIONTHERAPY |
| Spinal stenosis, lumbar region without neurogenic claudication | M48.061 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-ORTHO SPINE |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-PSYCHOLOGY |
| Bradycardia, unspecified | R00.1 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-CARDIOLOGY |
| Pain in unspecified Foot | M79.673 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |
| Snoring | R06.83 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-PULMONARY SLEEP |
| Vertebrogenic low back pain | M54.51 | 7/7/2023 | 7/24/2023 | 56 | COMMUNITY CARE-CHIROPRACTIC |
| Vertebrogenic low back pain | M54.51 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-PAIN MANAGEMENT |
| Unspecified Atrial Flutter | I48.92 | 6/5/2023 | 6/5/2023 | 88 | COMMUNITY CARE-CARDIOLOGY |
| Dislocation of left Ankle Joint, Sequela | S93.05XS | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-ORTHO JOINTS |
| Cardiomyopathy, unspecified | I42.9 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-CARDIOLOGY |
| Gastroparesis | K31.84 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE-SURGICAL |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-CHIROPRACTIC |
| Other Spondylosis, | M47.896 | 6/27/2023 | 6/28/2023 | 66 | COMMUNITY CARE-ANESTHESI |

| Diagnosis | Code | Date | Date | Value | Facility |
|---|---|---|---|---|---|
| Lumbar Region | | | | | A PAIN MANAGEMENT |
| Obstructive Sleep Apnea (Adult) (Pediatric) | G47.33 | 1/30/2023 | 1/30/2023 | 214 | COMMUNITY CARE-PULMONARY SLEEP |
| Chondromalacia, right Knee | M94.261 | 6/28/2023 | 6/28/2023 | 65 | COMMUNITY CARE-ORTHO SPORTS |
| Malignant Neoplasm of Overlapping sites of right Female Breast | C50.811 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-PLASTICSURGERY |
| Impacted Teeth | K01.1 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-DENTAL |
| Radiculopathy, Cervical Region | M54.12 | 6/28/2023 | 6/29/2023 | 65 | COMMUNITY CARE-NEUROSURGERY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/12/2023 | 7/14/2023 | 51 | COMMUNITY CARE-CARDIOLOGY |
| Encounter for other Orthopedic Aftercare | Z47.89 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-PHYSICAL THERAPY |
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-DERMATOLOGY |
| Male Infertility, unspecified | N46.9 | 5/26/2023 | 5/26/2023 | 98 | COMMUNITY CARE-INFERTILITY (1332) |
| Peripheral Vascular Disease, Unspecified | I73.9 | 3/17/2023 | 3/17/2023 | 168 | COMMUNITY CARE-SURGICAL |
| Transient Cerebral Ischemic Attack, unspecified | G45.9 | 6/15/2023 | 6/16/2023 | 78 | COMMUNITY CARE-NEUROLOGY |
| Other Spondylosis, Lumbar Region | M47.896 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-MRI |
| Radiculopathy, Cervical Region | M54.12 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-PAIN MANAGEMENT |
| Unspecified Retinal Disorder | H35.9 | 7/28/2023 | 8/4/2023 | 35 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |

| Low back pain, unspecified | M54.50 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
|---|---|---|---|---|---|
| Malignant neoplasm of prostate | C61. | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-UROLOGY |
| Other Chronic Pain | G89.29 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-CHIROPRACTIC |
| Vertebrogenic low back pain | M54.51 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Pain in joints of left hand | M25.542 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-ORTHO HAND |
| Other Microscopic Hematuria | R31.29 | 6/11/2023 | 6/13/2023 | 82 | COMMUNITY CARE-UROLOGY |
| Other low back pain | M54.59 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Malignant Neoplasm of unspecified Kidney, except Renal Pelvis | C64.9 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-RADIATIONTHERAPY |
| Sleep Apnea, unspecified | G47.30 | 6/9/2023 | 6/12/2023 | 84 | COMMUNITY CARE-PULMONARY SLEEP |
| Low back pain, unspecified | M54.50 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-PAIN MANAGEMENT |
| Low back pain, unspecified | M54.50 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other Periodontal Diseases | K05.5 | 1/26/2023 | 1/26/2023 | 218 | COMMUNITY CARE-DENTAL |
| Dry Eye Syndrome of Bilateral Lacrimal Glands | H04.123 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Mixed Incontinence | N39.46 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-PHYSICAL THERAPY |
| Pulmonary hypertension due to lung | I27.23 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-PULMONARY |

| | | | | | |
|---|---|---|---|---|---|
| diseases and hypoxia | | | | | |
| Atherosclerotic Heart Disease of Native Coronary Artery with unspecified Angina Pectoris | I25.119 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-CARDIOLOGY |
| Unspecified Atrial Fibrillation | I48.91 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 7/10/2023 | 7/13/2023 | 53 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Low back pain, unspecified | M54.50 | 7/18/2023 | 7/21/2023 | 45 | COMMUNITY CARE-CHIROPRACTIC |
| Other Sleep Apnea | G47.39 | 4/3/2023 | 4/3/2023 | 151 | COMMUNITY CARE-PULMONARY SLEEP |
| Bradycardia, unspecified | R00.1 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-CARDIOLOGY |
| Acute Kidney Failure, unspecified | N17.9 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-HEMODIALYSIS |
| Acute Kidney Failure, unspecified | N17.9 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| (Idiopathic) Normal Pressure Hydrocephalus | G91.2 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-SURGICAL |
| Other Spondylosis, Lumbar Region | M47.896 | 7/27/2023 | 8/2/2023 | 36 | COMMUNITY CARE-PHYSICAL THERAPY |
| Pain in right Hip | M25.551 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-ORTHO JOINTS |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Low back pain, unspecified | M54.50 | 5/23/2023 | 5/23/2023 | 101 | COMMUNITY CARE-CIH MASSAGE THERAPY |

| | | | | | |
|---|---|---|---|---|---|
| Cervicalgia | M54.2 | 7/6/2023 | 7/6/2023 | 57 | COMMUNIT Y CARE-CHIROPRAC TIC |
| Stenosis of other vascular prosthetic devices, implants and grafts, subsequent encounter | T82.858D | 6/28/2023 | 6/28/2023 | 65 | COMMUNIT Y CARE-INVASIVE RADIOLOGY |
| Trigger Finger, unspecified Finger | M65.30 | 7/10/2023 | 7/11/2023 | 53 | COMMUNIT Y CARE-ORTHO HAND |
| Other Rheumatic Mitral Valve Diseases | I05.8 | 7/6/2023 | 7/6/2023 | 57 | COMMUNIT Y CARE-CARDIOLOG Y |
| Other Spondylosis, Lumbar Region | M47.896 | 6/28/2023 | 7/7/2023 | 65 | COMMUNIT Y CARE-PAIN MANAGEME NT |
| Chronic Pain Syndrome | G89.4 | 7/19/2023 | 7/19/2023 | 44 | COMMUNIT Y CARE-CHIROPRAC TIC |
| Radiculopath y, Lumbar Region | M54.16 | 7/13/2023 | 7/14/2023 | 50 | COMMUNIT Y CARE-PAIN MANAGEME NT |
| Gastro-Esophageal Reflux Disease without Esophagitis | K21.9 | 5/25/2023 | 5/25/2023 | 99 | COMMUNIT Y CARE-GASTROEN TEROLOGY |
| Other Spondylosis, Lumbar Region | M47.896 | 7/11/2023 | 7/11/2023 | 52 | COMMUNIT Y CARE-CIH ACUPUNCT URE |
| End Stage Renal Disease | N18.6 | 3/30/2023 | 6/1/2023 | 155 | COMMUNIT Y CARE-TRANSPLAN T SOLID ORGAN |
| Exudative age-related macular degeneration, left eye, with active choroidal neovasculariz ation | H35.3221 | 6/7/2023 | 6/14/2023 | 86 | COMMUNIT Y CARE-OPHTHALM OLOGY DISEASE MGMT |
| M48.062 | M48.062 | 6/7/2023 | 6/7/2023 | 86 | COMMUNIT Y CARE-PHYSICAL THERAPY |
| Low back pain, unspecified | M54.50 | 7/31/2023 | 7/31/2023 | 32 | COMMUNIT Y CARE-CHIROPRAC TIC |

| | | | | | |
|---|---|---|---|---|---|
| Radiculopathy, Cervical Region | M54.12 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-MRI |
| Encounter for Screening for Malignant Neoplasm of Colon | Z12.11 | 6/22/2023 | 6/28/2023 | 71 | COMMUNITY CARE-GASTROENTEROLOGY |
| Unspecified Abnormalities of Gait and Mobility | R26.9 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-RADIOLOGY |
| Myopia, Bilateral | H52.13 | 7/20/2023 | 7/27/2023 | 43 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-PULMONARY REHAB |
| Deformity of Reconstructed Breast | N65.0 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-PLASTICSURGERY |
| Chest Pain, unspecified | R07.9 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-NEUROSURGERY |
| Encounter for Screening for Malignant Neoplasm of Skin | Z12.83 | 7/17/2023 | 7/24/2023 | 46 | COMMUNITY CARE-DERMATOLOGY |
| Cervicalgia | M54.2 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-NEUROSURGERY |
| Dysphagia, unspecified | R13.10 | 5/11/2023 | 6/2/2023 | 113 | COMMUNITY CARE-GASTROENTEROLOGY |
| Pain in right Hand | M79.641 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-ORTHO HAND |
| Other Chronic Pain | G89.29 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-PHYSICAL THERAPY |
| Chronic Pain Syndrome | G89.4 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Spinal Stenosis, Cervical Region | M48.02 | 6/16/2023 | 6/20/2023 | 77 | COMMUNITY CARE-NEUROSURGERY |
| Cataract in Diseases classified elsewhere | H28. | 12/13/2022 | 12/15/2022 | 262 | COMMUNITY CARE-OPHTHALMOLOGY |

| | | | | | DISEASE MGMT |
|---|---|---|---|---|---|
| Pain in right Hand | M79.641 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-ORTHO HAND |
| Peripheral Vascular Disease, Unspecified | I73.9 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-WOUND CARE |
| Pain in unspecified Knee | M25.569 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-ORTHO GENERAL |
| Low back pain, unspecified | M54.50 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Chronic periodontitis, unspecified | K05.30 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-DENTAL |
| Other low back pain | M54.59 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-CHIROPRACTIC |
| Trigger Finger, unspecified Finger | M65.30 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-ORTHO HAND |
| Calculus of Kidney | N20.0 | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-UROLOGY |
| Zoster with other Complications | B02.8 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-UROLOGY |
| Benign neoplasm of aortic body and other paraganglia | D35.6 | 7/26/2023 | 8/7/2023 | 37 | COMMUNITY CARE-ORTHO HAND |
| Unspecified Atrial Fibrillation | I48.91 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-CARDIOLOGY |
| Trigger Finger, left Middle Finger | M65.332 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-ORTHO HAND |
| Coronary Atherosclerosis is due to Calcified Coronary Lesion | I25.84 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-CARDIOLOGY |
| Non-Pressure Chronic Ulcer of other part of unspecified lower Leg Limited to Breakdown of Skin | L97.801 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-DERMATOLOGY |
| Pain in right Hip | M25.551 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | PHYSICAL THERAPY |
| Depression, unspecified | F32.A | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-PSYCHOLOGY |
| Cervical Disc Disorder with Radiculopathy, unspecified Cervical Region | M50.10 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-PHYSICAL THERAPY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-CARDIOLOGY |
| Pain in left Shoulder | M25.512 | 6/29/2023 | 6/29/2023 | 64 | COMMUNITY CARE-MRI |
| Heart Failure, unspecified | I50.9 | 5/30/2023 | 5/30/2023 | 94 | COMMUNITY CARE-CARDIAC REHAB |
| Hyperlipidemia, unspecified | E78.5 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE-CARDIOLOGY |
| Other Spondylosis with Myelopathy, Cervical Region | M47.12 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-PAIN MANAGEMENT |
| Palpitations | R00.2 | 2/2/2023 | 2/2/2023 | 211 | COMMUNITY CARE-CARDIOLOGY |
| Snoring | R06.83 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-PULMONARY SLEEP |
| Chronic rhinitis | J31.0 | 5/4/2023 | 5/4/2023 | 120 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 5/31/2023 | 5/31/2023 | 93 | COMMUNITY CARE-DERMATOLOGY |
| Rash and other Nonspecific Skin Eruption | R21. | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-DERMATOLOGY |
| Epileptic Seizures Related to External Causes, not Intractable, with Status Epilepticus | G40.501 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-NEUROLOGY |

| | | | | | |
|---|---|---|---|---|---|
| Other Chronic Pain | G89.29 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-PAIN MANAGEMENT |
| Pain in right Shoulder | M25.511 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-ORTHO JOINTS |
| Combined Forms of Age-Related Cataract, Bilateral | H25.813 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Nonrheumatic Mitral Valve Disorder, unspecified | I34.9 | 7/11/2023 | 7/17/2023 | 52 | COMMUNITY CARE-CARDIOLOGY |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-PSYCHOLOGY |
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-DERMATOLOGY |
| Pain in left ankle and joints of left foot | M25.572 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ORTHO GENERAL |
| Chest Pain, unspecified | R07.9 | 7/6/2023 | 7/5/2023 | 57 | COMMUNITY CARE-CARDIOLOGY |
| Cardiomyopathy, unspecified | I42.9 | 6/29/2023 | 6/29/2023 | 64 | COMMUNITY CARE-CARDIOLOGY |
| Migraine with Aura, Intractable, without Status Migrainosus | G43.119 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Memory deficit following other cerebrovascular disease | I69.811 | 7/19/2023 | 7/20/2023 | 44 | COMMUNITY CARE-SPEECH THERAPY |
| Dorsalgia, unspecified | M54.9 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-PHYSICAL THERAPY |
| Unspecified Symptoms and Signs involving the Musculoskeletal System | R29.91 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Acute Kidney Failure, unspecified | N17.9 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-HEMODIALYSIS |
| Acute Kidney Failure, unspecified | N17.9 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-NEPHROLO |

| | | | | | GY DIALYSIS OVERSIGHT |
|---|---|---|---|---|---|
| Pain in right Shoulder | M25.511 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-MRI |
| Other Malignant Neuroendocrine Tumors | C7A.8 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-SURGICAL |
| Dyspnea, unspecified | R06.00 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-PULMONARY |
| Low back pain, unspecified | M54.50 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Bell's Palsy | G51.0 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Trigger Finger, left Ring Finger | M65.342 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-ORTHO HAND |
| Abnormal Electrocardiogram [ECG] [EKG] | R94.31 | 8/9/2023 | 8/11/2023 | 23 | COMMUNITY CARE-CARDIOLOGY |
| Excoriation (skin-picking) disorder | F42.4 | 4/26/2023 | 4/26/2023 | 128 | COMMUNITY CARE-PSYCHOLOGY |
| Sciatica, unspecified Side | M54.30 | 7/5/2023 | 7/5/2023 | 58 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Hypertrophic Disorder of the Skin, unspecified | L91.9 | 4/24/2023 | 4/24/2023 | 130 | COMMUNITY CARE-DERMATOLOGY |
| Chronic Ischemic Heart Disease, unspecified | I25.9 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-CARDIOLOGY |
| Melanocytic Nevi of Trunk | D22.5 | 6/7/2023 | 6/9/2023 | 86 | COMMUNITY CARE-DERMATOLOGY |
| Unspecified Disorder of Binocular Vision | H53.30 | 5/22/2023 | 5/22/2023 | 102 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Nonrheumatic Aortic (Valve) Stenosis | I35.0 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Presence of right Artificial Knee Joint | Z96.651 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-POST-OP |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | PHYSICAL THERAPY |
| Actinic Keratosis | L57.0 | 7/6/2023 | 7/10/2023 | 57 | COMMUNITY CARE-DERMATOLOGY |
| Other low back pain | M54.59 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Low back pain, unspecified | M54.50 | 7/27/2023 | 7/31/2023 | 36 | COMMUNITY CARE-CHIROPRACTIC |
| Multiple Myeloma in Relapse | C90.02 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Pain in unspecified Knee | M25.569 | 7/25/2023 | 7/27/2023 | 38 | COMMUNITY CARE-PHYSICAL THERAPY |
| Testicular Hypofunction | E29.1 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ENDOCRINE |
| Chronic Pain Syndrome | G89.4 | 7/28/2023 | 7/31/2023 | 35 | COMMUNITY CARE-PAIN MANAGEMENT |
| Gout, unspecified | M10.9 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-RHEUMATOLOGY/ARTHRITIS |
| M54.31 | M54.31 | 7/24/2023 | 7/26/2023 | 39 | COMMUNITY CARE-ORTHO SPINE |
| Complete Rotator Cuff Tear or Rupture of right Shoulder, not specified as Traumatic | M75.121 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-OCCUPATIONALTHERAPY |
| Unspecified Atrial Flutter | I48.92 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-CARDIOLOGY |
| Incomplete Rotator Cuff Tear or Rupture of right Shoulder, not specified as Traumatic | M75.111 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Benign Lipomatous Neoplasm of Skin and Subcutaneous Tissue of left Leg | D17.24 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-MRI |

| | | | | | |
|---|---|---|---|---|---|
| Bell's Palsy | G51.0 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-MRI |
| Presence of left Artificial Knee Joint | Z96.652 | 6/14/2023 | 6/14/2023 | 79 | COMMUNITY CARE-PHYSICAL THERAPY |
| Discitis, unspecified, Lumbar Region | M46.46 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-INPATIENT MEDICAL |
| Coronary Atherosclerosis due to Calcified Coronary Lesion | I25.84 | 5/10/2023 | 5/10/2023 | 114 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-ORTHO SPINE |
| Varicose Veins of other specified sites | I86.8 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-SURGICAL |
| Parkinson's Disease | G20. | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Other low back pain | M54.59 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-PHYSICAL THERAPY |
| Sleep Apnea, unspecified | G47.30 | 5/4/2023 | 5/5/2023 | 120 | COMMUNITY CARE-POLYSOMNOGRAPHY |
| Pain in right Knee | M25.561 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-PHYSICAL THERAPY |
| Unspecified Fracture of Shaft of left Fibula, Sequela | S82.402S | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-ORTHO JOINTS |
| Rash and other Nonspecific Skin Eruption | R21. | 7/10/2023 | 7/17/2023 | 53 | COMMUNITY CARE-DERMATOLOGY |
| Cyst of kidney, acquired | N28.1 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Carpal tunnel syndrome, bilateral upper limbs | G56.03 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-CARDIOLOGY |
| Other specified Type of Carcinoma in Situ of right Breast | D05.81 | 2/9/2023 | 2/9/2023 | 204 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Fibromyalgia | M79.7 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-RHEUMATO |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | LOGY/ARTHRITIS |
| Low back pain, unspecified | M54.50 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-PHYSICAL THERAPY |
| Low back pain, unspecified | M54.50 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-CHIROPRACTIC |
| Pain in right Hip | M25.551 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Primary Osteoarthritis, left Shoulder | M19.012 | 7/20/2023 | 7/21/2023 | 43 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Other low back pain | M54.59 | 4/27/2023 | 4/27/2023 | 127 | COMMUNITY CARE-PAIN MANAGEMENT |
| Unspecified Type of Carcinoma in Situ of unspecified Breast | D05.90 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-BREAST CANCER TREATMENT |
| Acute cholecystitis | K81.0 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Basal cell carcinoma of skin of scalp and neck | C44.41 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-DERMATOLOGY |
| Other specified glaucoma | H40.89 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Pain in left Hip | M25.552 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-ORTHO SPORTS |
| Chronic Ischemic Heart Disease, unspecified | I25.9 | 8/13/2023 | 8/13/2023 | 19 | COMMUNITY CARE-CARDIOLOGY |
| Pain in joints of right hand | M25.541 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-ORTHO HAND |
| Encounter for other Orthopedic Aftercare | Z47.89 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Chronic Pain Syndrome | G89.4 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-CHIROPRACTIC |

| | | | | | |
|---|---|---|---|---|---|
| Pain in joints of left hand | M25.542 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-ORTHO HAND |
| Other Chest Pain | R07.89 | 5/16/2023 | 5/15/2023 | 108 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-CHIROPRACTIC |
| Idiopathic urticaria | L50.1 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Type 1 Diabetes Mellitus without Complications | E10.9 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ENDOCRINE |
| Radiculopathy, Cervical Region | M54.12 | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE-MRI |
| Pain in right Shoulder | M25.511 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Pain in left Shoulder | M25.512 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-ORTHO JOINTS |
| Paroxysmal atrial fibrillation | I48.0 | 6/27/2023 | 6/29/2023 | 66 | COMMUNITY CARE-CARDIOLOGY |
| Coronary Atherosclerosis due to Calcified Coronary Lesion | I25.84 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-CARDIOLOGY |
| Pain in left Shoulder | M25.512 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Pain in right Knee | M25.561 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-ORTHO SPORTS |
| Chronic Pain Syndrome | G89.4 | 5/10/2023 | 5/10/2023 | 114 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Pain in left Knee | M25.562 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-ORTHO SPORTS |
| Rash and other Nonspecific Skin Eruption | R21. | 8/1/2023 | 8/7/2023 | 31 | COMMUNITY CARE-DERMATOLOGY |
| Low back pain, unspecified | M54.50 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE- |

| | | | | | PHYSICAL THERAPY |
|---|---|---|---|---|---|
| Other low back pain | M54.59 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-NEUROSURGERY |
| Sciatica, left Side | M54.32 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Retinal Detachment with single Break, right Eye | H33.011 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Atherosclerosis of aorta | I70.0 | 4/26/2023 | 4/26/2023 | 128 | COMMUNITY CARE-VASCULAR |
| Sedative, Hypnotic or Anxiolytic use, unspecified with other Sedative, Hypnotic or Anxiolytic-Induced Disorder | F13.988 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-PSYCHIATRY |
| Carpal tunnel syndrome, bilateral upper limbs | G56.03 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-ORTHO HAND |
| Low back pain, unspecified | M54.50 | 8/3/2023 | 8/8/2023 | 29 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Low back pain, unspecified | M54.50 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Rash and other Nonspecific Skin Eruption | R21. | 7/11/2023 | 7/17/2023 | 52 | COMMUNITY CARE-DERMATOLOGY |
| Malignant neoplasm of liver, not specified as primary or secondary | C22.9 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Cerebral Infarction, unspecified | I63.9 | 8/14/2023 | 8/22/2023 | 18 | COMMUNITY CARE-INPATIENT MEDICAL |
| Encounter for Screening for Respiratory Tuberculosis | Z11.1 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-RADIOLOGY |
| Malignant Neoplasm of Larynx, unspecified | C32.9 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-ENT |

| | | | | | |
|---|---|---|---|---|---|
| Cervicalgia | M54.2 | 7/11/2023 | 7/21/2023 | 52 | COMMUNIT Y CARE-CIH ACUPUNCT URE |
| Chronic periodontitis, unspecified | K05.30 | 8/7/2023 | 8/7/2023 | 25 | COMMUNIT Y CARE-DENTAL |
| Other low back pain | M54.59 | 8/4/2023 | 8/4/2023 | 28 | COMMUNIT Y CARE-ORTHO SPINE |
| Essential (Primary) Hypertension | I10. | 5/15/2023 | 7/4/2023 | 109 | COMMUNIT Y CARE-CARDIOLOG Y |
| Complete Rotator Cuff Tear or Rupture of right Shoulder, not specified as Traumatic | M75.121 | 7/24/2023 | 7/24/2023 | 39 | COMMUNIT Y CARE-POST-OP PHYSICAL THERAPY |
| Malignant Neoplasm of Larynx, unspecified | C32.9 | 8/4/2023 | 8/4/2023 | 28 | COMMUNIT Y CARE-RADIATIONT HERAPY |
| Pain in left Elbow | M25.522 | 5/16/2023 | 5/16/2023 | 108 | COMMUNIT Y CARE-ORTHO HAND |
| Systemic Lupus Erythematos us, unspecified | M32.9 | 7/17/2023 | 7/31/2023 | 46 | COMMUNIT Y CARE-MRI |
| Spinal stenosis, lumbar region without neurogenic claudication | M48.061 | 7/18/2023 | 7/18/2023 | 45 | COMMUNIT Y CARE-PAIN MANAGEME NT |
| Primary Osteoarthritis , left Shoulder | M19.012 | 8/2/2023 | 8/2/2023 | 30 | COMMUNIT Y CARE-PHYSICAL THERAPY |
| Heart Failure, unspecified | I50.9 | 5/17/2023 | 5/17/2023 | 107 | COMMUNIT Y CARE-CARDIOLOG Y |
| Disorders of Diaphragm | J98.6 | 8/1/2023 | 8/1/2023 | 31 | COMMUNIT Y CARE-NEUROLOG Y |
| Atheroscleroti c Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 3/31/2023 | 3/31/2023 | 154 | COMMUNIT Y CARE-CARDIOLOG Y |
| Presence of Prosthetic Heart Valve | Z95.2 | 3/10/2023 | 3/10/2023 | 175 | COMMUNIT Y CARE-CARDIAC REHAB |
| Trigeminal Neuralgia | G50.0 | 8/9/2023 | 8/9/2023 | 23 | COMMUNIT Y CARE- |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | RADIATIONT HERAPY |
| Lateral Epicondylitis, right Elbow | M77.11 | 7/19/2023 | 7/19/2023 | 44 | COMMUNIT Y CARE-ORTHO GENERAL |
| Cervicalgia | M54.2 | 5/4/2023 | 5/4/2023 | 120 | COMMUNIT Y CARE-MRI |
| Actinic Keratosis | L57.0 | 6/6/2023 | 6/13/2023 | 87 | COMMUNIT Y CARE-DERMATOL OGY |
| Rectal Abscess | K61.1 | 8/11/2023 | 8/11/2023 | 21 | COMMUNIT Y CARE-SURGICAL |
| Unspecified Atrial Fibrillation | I48.91 | 8/16/2023 | 8/16/2023 | 16 | COMMUNIT Y CARE-CARDIOLOG Y |
| Other Spondylosis with Radiculopath y, Lumbar Region | M47.26 | 7/17/2023 | 7/17/2023 | 46 | COMMUNIT Y CARE-NEUROSUR GERY |
| Unspecified Atrial Fibrillation | I48.91 | 8/9/2023 | 8/9/2023 | 23 | COMMUNIT Y CARE-CARDIOLOG Y |
| Low back pain, unspecified | M54.50 | 7/31/2023 | 7/31/2023 | 32 | COMMUNIT Y CARE-NEUROSUR GERY |
| Dental Caries, unspecified | K02.9 | 8/14/2023 | 8/14/2023 | 18 | COMMUNIT Y CARE-DENTAL |
| Fracture of unspecified part of Neck of left Femur, Subsequent Encounter for closed Fracture with Routine Healing | S72.002D | 8/9/2023 | 8/9/2023 | 23 | COMMUNIT Y CARE-POST-OP PHYSICAL THERAPY |
| Elevated Prostate Specific antigen [psa] | R97.20 | 7/23/2023 | 7/24/2023 | 40 | COMMUNIT Y CARE-UROLOGY |
| Benign neoplasm of prostate | D29.1 | 8/16/2023 | 8/16/2023 | 16 | COMMUNIT Y CARE-UROLOGY |
| Chronic Pain Syndrome | G89.4 | 8/11/2023 | 8/11/2023 | 21 | COMMUNIT Y CARE-ANESTHESI A PAIN MANAGEME NT |
| AtherScleroti c Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/27/2023 | 7/28/2023 | 36 | COMMUNIT Y CARE-CARDIOLOG Y |

| | | | | | |
|---|---|---|---|---|---|
| Viral Wart, unspecified | B07.9 | 6/29/2023 | 6/29/2023 | 64 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |
| Mild cognitive impairment of uncertain or unknown etiology | G31.84 | 5/11/2023 | 5/25/2023 | 113 | COMMUNITY CARE-NEUROLOGY |
| Squamous Cell Carcinoma of Skin, unspecified | C44.92 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-DERMATOLOGY |
| Low back pain, unspecified | M54.50 | 5/23/2023 | 5/30/2023 | 101 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Rash and other Nonspecific Skin Eruption | R21. | 5/31/2023 | 5/31/2023 | 93 | COMMUNITY CARE-DERMATOLOGY |
| Vertebrogenic low back pain | M54.51 | 8/7/2023 | 8/8/2023 | 25 | COMMUNITY CARE-PAIN MANAGEMENT |
| Cervicalgia | M54.2 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Pain in right Knee | M25.561 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ORTHO SPORTS |
| Personal History of Malignant Neoplasm of Breast | Z85.3 | 6/29/2023 | 6/29/2023 | 64 | COMMUNITY CARE-RADIATIONTHERAPY |
| Pain in right Hip | M25.551 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-ORTHO SPORTS |
| Injury of Peripheral Nerve(s) at Abdomen, lower Back and Pelvis Level, Initial Encounter | S34.6XXA | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other specified Injury of left Quadriceps Muscle, Fascia and Tendon, Subsequent Encounter | S76.192D | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-ORTHO GENERAL |
| Pain in left Shoulder | M25.512 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-ORTHO JOINTS |

| Other Cirrhosis of Liver | K74.69 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-GASTROENTEROLOGY |
| Other specified Joint Disorders, left Hip | M25.852 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Keratoconus, unspecified, Bilateral | H18.603 | 7/24/2023 | 7/25/2023 | 39 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Malignant neoplasm of rectum | C20. | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Low back pain, unspecified | M54.50 | 8/11/2023 | 8/14/2023 | 21 | COMMUNITY CARE-CHIROPRACTIC |
| Radiculopathy, Cervical Region | M54.12 | 7/5/2023 | 7/6/2023 | 58 | COMMUNITY CARE-PAIN MANAGEMENT |
| Other Sleep Apnea | G47.39 | 6/12/2023 | 6/13/2023 | 81 | COMMUNITY CARE-PULMONARY SLEEP |
| Chronic periodontitis, unspecified | K05.30 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-DENTAL |
| Dental Caries, unspecified | K02.9 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-DENTAL |
| Calculus of Kidney | N20.0 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-UROLOGY |
| Presbyopia | H52.4 | 6/30/2023 | 7/7/2023 | 63 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Acute apical periodontitis of pulpal origin | K04.4 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-DENTAL |
| End Stage Renal Disease | N18.6 | 8/18/2023 | 8/19/2023 | 14 | COMMUNITY CARE-PERITONEAL DIALYSIS |
| Unspecified Cataract | H26.9 | 6/23/2023 | 6/30/2023 | 70 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Dissection of aortic arch | I71.011 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-VASCULAR |
| Other Intra-Abdominal and Pelvic Swelling, Mass and Lump | R19.09 | 8/14/2023 | 8/28/2023 | 18 | COMMUNITY CARE-SURGICAL |

| Diagnosis | Code | Date | Date | Value | Provider |
|---|---|---|---|---|---|
| Unspecified Atrial Fibrillation | I48.91 | 12/6/2022 | 12/6/2022 | 269 | COMMUNITY CARE-CARDIOLOGY |
| Coronary Angioplasty Status | Z98.61 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-CARDIAC REHAB |
| Other Spondylosis with Radiculopathy, Lumbosacral Region | M47.27 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other Sleep Disorders | G47.8 | 4/7/2023 | 4/7/2023 | 147 | COMMUNITY CARE-NEUROLOGY |
| Pain in left Wrist | M25.532 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-ORTHO SURGICAL |
| Retinal Detachment with single Break, right Eye | H33.011 | 7/12/2023 | 7/13/2023 | 51 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Rash and other Nonspecific Skin Eruption | R21. | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-DERMATOLOGY |
| Partial Loss of Teeth, unspecified Cause, unspecified Class | K08.409 | 5/5/2023 | 5/5/2023 | 119 | COMMUNITY CARE-DENTAL |
| Other low back pain | M54.59 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-CHIROPRACTIC |
| Dental Caries, unspecified | K02.9 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-DENTAL |
| Bilateral Primary Osteoarthritis of Knee | M17.0 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-PHYSICAL THERAPY |
| Chronic Pain Syndrome | G89.4 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-PAIN MANAGEMENT |
| Other low back pain | M54.59 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Low back pain, unspecified | M54.50 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |

| Trichotillomania | F63.3 | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-PSYCHOLOGY |
|---|---|---|---|---|---|
| Vertebrogenic low back pain | M54.51 | 6/28/2023 | 7/5/2023 | 65 | COMMUNITY CARE-NEUROSURGERY |
| Chronic Kidney Disease, Unspecified | N18.9 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE-NEPHROLOGY |
| Chronic Pain Syndrome | G89.4 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Malignant neoplasm of prostate | C61. | 8/15/2023 | 8/22/2023 | 17 | COMMUNITY CARE-UROLOGY |
| Allergy, unspecified, Initial Encounter | T78.40XA | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Unspecified visual disturbance | H53.9 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Low back pain, unspecified | M54.50 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Dysarthria Following unspecified Cerebrovascular Disease | I69.922 | 8/22/2023 | 8/23/2023 | 10 | COMMUNITY CARE-INPATIENT MEDICAL |
| Encounter for Aftercare Following Liver Transplant | Z48.23 | 8/17/2023 | 8/22/2023 | 15 | COMMUNITY CARE-INPATIENT MEDICAL |
| Pain in unspecified Shoulder | M25.519 | 8/8/2023 | 8/9/2023 | 24 | COMMUNITY CARE-ORTHO SPORTS |
| Primary Osteoarthritis, left Hand | M19.042 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-ORTHO HAND |
| Radiculopathy, Cervical Region | M54.12 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-PAIN MANAGEMENT |
| Multiple myeloma in remission | C90.01 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Primary Osteoarthritis, right Hand | M19.041 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE- |

| | | | | | ORTHO HAND |
|---|---|---|---|---|---|
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-CARDIOLOGY |
| Bradycardia, unspecified | R00.1 | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-CARDIOLOGY |
| Hypertrophy of Tonsils | J35.1 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-ENT |
| Allergy, unspecified, Subsequent Encounter | T78.40XD | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Malignant neoplasm of prostate | C61. | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-IMAGING PET |
| Stenosis of other vascular prosthetic devices, implants and grafts, subsequent encounter | T82.858D | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Nontraumatic Acute Subdural Hemorrhage | I62.01 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-IMAGING |
| Chest Pain, unspecified | R07.9 | 4/20/2023 | 5/11/2023 | 134 | COMMUNITY CARE-CARDIOLOGY |
| Coronary Atherosclerosis is due to Lipid Rich Plaque | I25.83 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-PAIN MANAGEMENT |
| Spinal stenosis, lumbar region with neurogenic claudication | M48.062 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-NEUROSURGERY |
| Chronic rhinitis | J31.0 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Pain in unspecified ankle and joints of unspecified foot | M25.579 | 5/24/2023 | 5/24/2023 | 100 | COMMUNITY CARE-PODIATRY FOOT AND ANKLE |

| | | | | | |
|---|---|---|---|---|---|
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-DERMATOLOGY |
| Unspecified Viral Infection Characterized by Skin and Mucous Membrane Lesions | B09. | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-DERMATOLOGY |
| Pleural Effusion in other conditions classified elsewhere | J91.8 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-PULMONARY |
| Pouchitis | K91.850 | 6/27/2023 | 7/28/2023 | 66 | COMMUNITY CARE-GASTROENTEROLOGY |
| Cardiac Arrhythmia, unspecified | I49.9 | 8/21/2023 | 8/21/2023 | 11 | COMMUNITY CARE-CARDIOLOGY |
| Lumbago with Sciatica, right Side | M54.41 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-CHIROPRACTIC |
| Benign Lipomatous Neoplasm, unspecified | D17.9 | 7/28/2023 | 7/31/2023 | 35 | COMMUNITY CARE-DERMATOLOGY |
| Spinal stenosis, lumbar region with neurogenic claudication | M48.062 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-PAIN MANAGEMENT |
| Rash and other Nonspecific Skin Eruption | R21. | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-DERMATOLOGY |
| Pain in right lower Leg | M79.661 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-ORTHO SPORTS |
| Other Chronic Pain | G89.29 | 6/7/2023 | 6/7/2023 | 86 | COMMUNITY CARE-PAIN MANAGEMENT |
| Pain in right Shoulder | M25.511 | 8/19/2023 | 8/19/2023 | 13 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 8/11/2023 | 8/17/2023 | 21 | COMMUNITY CARE-CHIROPRACTIC |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/8/2023 | 8/11/2023 | 24 | COMMUNITY CARE-CARDIOLOGY |

| | | | | | |
|---|---|---|---|---|---|
| Localized Edema | R60.0 | 8/23/2023 | 8/18/2023 | 9 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Neurofibromatosis, unspecified | Q85.00 | 8/23/2023 | 8/21/2023 | 9 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Pain in right Arm | M79.601 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-ORTHO SURGICAL |
| Syncope and collapse | R55. | 7/12/2023 | 8/12/2023 | 51 | COMMUNITY CARE-NEUROLOGY |
| Radiculopathy, Cervical Region | M54.12 | 7/28/2023 | 8/7/2023 | 35 | COMMUNITY CARE-PAIN MANAGEMENT |
| Pain in right Knee | M25.561 | 7/18/2023 | 7/19/2023 | 45 | COMMUNITY CARE-ORTHO GENERAL |
| Low back pain, unspecified | M54.50 | 7/27/2023 | 8/10/2023 | 36 | COMMUNITY CARE-CHIROPRACTIC |
| Presence of right Artificial Shoulder Joint | Z96.611 | 8/8/2023 | 8/16/2023 | 24 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Radiculopathy, Cervical Region | M54.12 | 7/12/2023 | 7/19/2023 | 51 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Nasal Congestion | R09.81 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Fatty (Change of) Liver, not elsewhere classified | K76.0 | 6/13/2023 | 6/13/2023 | 80 | COMMUNITY CARE-GASTROENTEROLOGY |
| Personal History of Traumatic Brain Injury | Z87.820 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-SPEECH THERAPY |
| Pain in unspecified Shoulder | M25.519 | 8/18/2023 | 8/18/2023 | 14 | COMMUNITY CARE-PHYSICAL THERAPY |
| Neoplasm of Uncertain Behavior of Brain, unspecified | D43.2 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-NEUROSURGERY |
| Other Chronic Pain | G89.29 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-CIH ACUPUNCTURE |

| | | | | | |
|---|---|---|---|---|---|
| Obesity, unspecified | E66.9 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-ENDOCRINE |
| Malignant neoplasm of prostate | C61. | 4/3/2023 | 6/1/2023 | 151 | COMMUNITY CARE-UROLOGY |
| Pain in unspecified Shoulder | M25.519 | 5/23/2023 | 5/24/2023 | 101 | COMMUNITY CARE-ORTHO SPORTS |
| Other Obstructive and Reflux Uropathy | N13.8 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-UROLOGY |
| Change in Bowel Habit | R19.4 | 1/23/2023 | 2/13/2023 | 221 | COMMUNITY CARE-GASTROENTEROLOGY |
| Cerebral Infarction, unspecified | I63.9 | 8/21/2023 | 8/17/2023 | 11 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Carpal Tunnel Syndrome, unspecified upper Limb | G56.00 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ORTHO HAND |
| Sleep Apnea, unspecified | G47.30 | 4/5/2023 | 4/5/2023 | 149 | COMMUNITY CARE-PULMONARY SLEEP |
| Pain in left Hip | M25.552 | 4/24/2023 | 4/24/2023 | 130 | COMMUNITY CARE-ORTHO GENERAL |
| Unspecified Systolic (Congestive) Heart Failure | I50.20 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-CARDIOLOGY |
| Coronary Atherosclerosis due to Calcified Coronary Lesion | I25.84 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-CARDIAC REHAB |
| Neoplasm of Uncertain Behavior of Brain, unspecified | D43.2 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 6/23/2023 | 6/23/2023 | 70 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Pain in left Knee | M25.562 | 8/2/2023 | 8/3/2023 | 30 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Low back pain, unspecified | M54.50 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-CHIROPRACTIC |
| Longstanding persistent atrial fibrillation | I48.11 | 6/28/2023 | 6/28/2023 | 65 | COMMUNITY CARE-CARDIOLOGY |

| Peripheral Tear of Medial Meniscus, Current Injury, right Knee, Subsequent Encounter | S83.221D | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
|---|---|---|---|---|---|
| Medial Epicondylitis, left Elbow | M77.02 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-OCCUPATIONALTHERAPY |
| Type 2 Diabetes Mellitus with unspecified Complications | E11.8 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Pain in unspecified Finger(s) | M79.646 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-ORTHO HAND |
| Pain in unspecified Shoulder | M25.519 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ORTHO JOINTS |
| Presbyopia | H52.4 | 8/18/2023 | 8/22/2023 | 14 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Low back pain, unspecified | M54.50 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Pain, unspecified | R52. | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-NEUROSURGERY |
| Pleural Effusion, not elsewhere classified | J90. | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-INPATIENT MEDICAL |
| Partial Loss of Teeth, unspecified Cause, unspecified Class | K08.409 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-DENTAL |
| Pain in right Shoulder | M25.511 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-ORTHO JOINTS |
| Alcohol Abuse with Intoxication, unspecified | F10.129 | 8/21/2023 | 8/11/2023 | 11 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Cervicalgia | M54.2 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Other Spondylosis, | M47.892 | 5/18/2023 | 7/14/2023 | 106 | COMMUNITY CARE-CIH |

| | | | | | |
|---|---|---|---|---|---|
| Cervical Region | | | | | MASSAGE THERAPY |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 6/29/2023 | 7/5/2023 | 64 | COMMUNITY CARE-MEDICAL |
| Rash and other Nonspecific Skin Eruption | R21. | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-DERMATOLOGY |
| Shortness of Breath | R06.02 | 5/8/2023 | 5/8/2023 | 116 | COMMUNITY CARE-CARDIOLOGY |
| Sensorineural Hearing Loss, Bilateral | H90.3 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-MRI |
| Other low back pain | M54.59 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-CHIROPRACTIC |
| Spinal stenosis, lumbar region without neurogenic claudication | M48.061 | 8/23/2023 | 8/18/2023 | 9 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Intervertebral Disc Disorders with Radiculopathy, Lumbosacral Region | M51.17 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-NEUROSURGERY |
| Unspecified Dislocation of Lens | H27.10 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Other Gender Identity Disorders | F64.8 | 7/25/2023 | 8/8/2023 | 38 | COMMUNITY CARE-DERMATOLOGY |
| Glaucoma Secondary to other Eye Disorders, Bilateral, Indeterminate Stage | H40.53X4 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Bradycardia, unspecified | R00.1 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-CARDIOLOGY |
| Other Spondylosis, Lumbar Region | M47.896 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-CHIROPRACTIC |
| Other specified Type of Carcinoma in Situ of | D05.80 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-BREAST CANCER TREATMENT |

| | | | | | |
|---|---|---|---|---|---|
| unspecified Breast | | | | | |
| Dental Root Caries | K02.7 | 8/7/2023 | 8/7/2023 | 25 | COMMUNIT Y CARE-DENTAL |
| Other low back pain | M54.59 | 8/18/2023 | 8/18/2023 | 14 | COMMUNIT Y CARE-CIH ACUPUNCT URE |
| Low back pain, unspecified | M54.50 | 6/8/2023 | 6/8/2023 | 85 | COMMUNIT Y CARE-CHIROPRAC TIC |
| Low back pain, unspecified | M54.50 | 7/14/2023 | 7/14/2023 | 49 | COMMUNIT Y CARE-ANESTHESI A PAIN MANAGEME NT |
| Allergic Rhinitis, unspecified | J30.9 | 7/5/2023 | 7/5/2023 | 58 | COMMUNIT Y CARE-ALLERGYIM MUNOLOGY |
| Disappearan ce and Death of Family Member | Z63.4 | 7/17/2023 | 7/17/2023 | 46 | COMMUNIT Y CARE-PSYCHOLO GY |
| Low back pain, unspecified | M54.50 | 8/21/2023 | 8/28/2023 | 11 | COMMUNIT Y CARE-CHIROPRAC TIC |
| Other Spondylosis, Lumbar Region | M47.896 | 5/16/2023 | 5/16/2023 | 108 | COMMUNIT Y CARE-CIH ACUPUNCT URE |
| Overactive Bladder | N32.81 | 8/23/2023 | 8/23/2023 | 9 | COMMUNIT Y CARE-UROLOGY |
| Personal History of Malignant Neoplasm, unspecified | Z85.9 | 8/24/2023 | 8/24/2023 | 8 | COMMUNIT Y CARE-RADIATIONT HERAPY |
| Postprocedur al hematoma of a nervous system organ or structure following a nervous system procedure | G97.61 | 8/9/2023 | 8/9/2023 | 23 | COMMUNIT Y CARE-NEUROSUR GERY |
| Other Nonspecific Abnormal Finding of Lung Field | R91.8 | 1/23/2023 | 1/30/2023 | 221 | COMMUNIT Y CARE-PULMONAR Y |
| Dislocation of Proximal Interphalange al Joint of left Ring Finger, Sequela | S63.285S | 7/31/2023 | 7/31/2023 | 32 | COMMUNIT Y CARE-ORTHO HAND |
| Radiculopath y, Cervical Region | M54.12 | 8/2/2023 | 8/2/2023 | 30 | COMMUNIT Y CARE-NEUROSUR GERY |

| | | | | | |
|---|---|---|---|---|---|
| Peripheral Vascular Disease, Unspecified | I73.9 | 8/23/2023 | 8/24/2023 | 9 | COMMUNITY CARE-VASCULAR |
| Nevus, non-neoplastic | I78.1 | 3/3/2023 | 3/3/2023 | 182 | COMMUNITY CARE-DERMATOLOGY |
| Malignant neoplasm of prostate | C61. | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-UROLOGY |
| Partial Loss of Teeth, unspecified Cause, unspecified Class | K08.409 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-DENTAL |
| Spinal stenosis, lumbar region with neurogenic claudication | M48.062 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-PAIN MANAGEMENT |
| Other Chronic Pain | G89.29 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Hematemesis | K92.0 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-ENT |
| Osteoarthritis of Knee, unspecified | M17.9 | 7/20/2023 | 7/21/2023 | 43 | COMMUNITY CARE-RADIOLOGY |
| Presence of right Artificial Knee Joint | Z96.651 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Benign Neoplasm of Pituitary Gland | D35.2 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-NEUROSURGERY |
| Pain in left Wrist | M25.532 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-ORTHO HAND |
| Chalazion left upper Eyelid | H00.14 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/23/2023 | 8/25/2023 | 9 | COMMUNITY CARE-CARDIOLOGY |
| Paralytic Calcification and Ossification of Muscle, right Hand | M61.241 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-ORTHO HAND |
| Chronic Maxillary Sinusitis | J32.0 | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-ENT |

| Chronic periodontitis, unspecified | K05.30 | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-DENTAL |
|---|---|---|---|---|---|
| Pain in unspecified Shoulder | M25.519 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-PHYSICAL THERAPY |
| Elevated Prostate Specific antigen [psa] | R97.20 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-UROLOGY |
| Other Hypersomnia | G47.19 | 4/14/2023 | 4/14/2023 | 140 | COMMUNITY CARE-PULMONARY |
| Other Spondylosis, Lumbar Region | M47.896 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-NEUROSURGERY |
| Personal History of Colonic Polyps | Z86.010 | 5/11/2023 | 5/22/2023 | 113 | COMMUNITY CARE-GASTROENTEROLOGY |
| Allergic Urticaria | L50.0 | 8/9/2023 | 8/10/2023 | 23 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Low back pain, unspecified | M54.50 | 8/21/2023 | 8/24/2023 | 11 | COMMUNITY CARE-ORTHO SPINE |
| Low back pain, unspecified | M54.50 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-PAIN MANAGEMENT |
| Malignant neoplasm of liver, not specified as primary or secondary | C22.9 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Vertebrogenic low back pain | M54.51 | 8/3/2023 | 8/4/2023 | 29 | COMMUNITY CARE-CHIROPRACTIC |
| Unilateral Primary Osteoarthritis, right Knee | M17.11 | 6/2/2023 | 6/2/2023 | 91 | COMMUNITY CARE-ORTHO JOINTS |
| Male Infertility, unspecified | N46.9 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-INFERTILITY EVAL ONLY |
| End Stage Renal Disease | N18.6 | 8/24/2023 | 8/26/2023 | 8 | COMMUNITY CARE-HEMODIALYSIS |
| Low back pain, unspecified | M54.50 | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-CHIROPRACTIC |
| Cardiomyopathy, unspecified | I42.9 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-CARDIOLOGY |
| Secondary Spontaneous | J93.12 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE- |

| Pneumothorax | | | | | PULMONARY |
|---|---|---|---|---|---|
| Other Secondary Neuroendocrine Tumors | C7B.8 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Age-Related Nuclear Cataract, left Eye | H25.12 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Other specified malignant neoplasm of skin of scalp and neck | C44.49 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-SURGICAL |
| Low back pain, unspecified | M54.50 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-PAIN MANAGEMENT |
| Chronic Pain Syndrome | G89.4 | 7/25/2023 | 7/26/2023 | 38 | COMMUNITY CARE-ORTHO SPINE |
| Diffuse Large B-Cell Lymphoma, Lymph Nodes of Axilla and upper Limb | C83.34 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-ONCOLOGY/ TUMOR |
| Post-Traumatic Stress Disorder, unspecified | F43.10 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-PSYCHOLOGY |
| Unspecified Systolic (Congestive) Heart Failure | I50.20 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-CARDIOLOGY |
| Partial Loss of Teeth, unspecified Cause, unspecified Class | K08.409 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-DENTAL |
| Tinea Unguium | B35.1 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-PODIATRY |
| Low back pain, unspecified | M54.50 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Disorders of Diaphragm | J98.6 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-NEUROSURGERY |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-GEC HOSPICE HOME |
| Bilateral Primary Osteoarthritis of Knee | M17.0 | 8/19/2023 | 8/15/2023 | 13 | COMMUNITY CARE-GEC |

| | | | | | SKILLED HOME CARE |
|---|---|---|---|---|---|
| Carcinoma in Situ of right Bronchus and Lung | D02.21 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Difficulty in Walking, not elsewhere classified | R26.2 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-PHYSICAL THERAPY |
| Non-Pressure Chronic Ulcer of other part of left Foot with Fat Layer Exposed | L97.522 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-WOUND CARE |
| Malignant Neoplasm of Pancreas, unspecified | C25.9 | 8/28/2023 | 8/28/2023 | 4 | COMMUNITY CARE-INPATIENT MEDICAL |
| Solitary Pulmonary Nodule | R91.1 | 7/25/2023 | 7/26/2023 | 38 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Vertebrogenic low back pain | M54.51 | 7/10/2023 | 7/12/2023 | 53 | COMMUNITY CARE-PAIN MANAGEMENT |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-CARDIOLOGY |
| Other mechanical complication of implanted penile prosthesis, initial encounter | T83.490A | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-UROLOGY |
| Unilateral Primary Osteoarthritis, left Knee | M17.12 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-PHYSICAL THERAPY |
| Unspecified Abdominal Pain | R10.9 | 6/14/2023 | 7/5/2023 | 79 | COMMUNITY CARE-GASTROENTEROLOGY |
| Unspecified Contact Dermatitis, unspecified Cause | L25.9 | 4/27/2023 | 4/27/2023 | 127 | COMMUNITY CARE-DERMATOLOGY |
| Other Hyperparathyroidism | E21.2 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-ENDOCRINE |
| Low back pain, unspecified | M54.50 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | CHIROPRACTIC |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 8/16/2023 | 8/28/2023 | 16 | COMMUNITY CARE-PSYCHOLOGY |
| Other Chronic Pain | G89.29 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-PAIN MANAGEMENT |
| Unspecified Cataract | H26.9 | 8/7/2023 | 8/11/2023 | 25 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Neoplasm of Uncertain Behavior of Trachea, Bronchus and Lung | D38.1 | 8/25/2023 | 8/25/2023 | 7 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Interstitial Cystitis (Chronic) without Hematuria | N30.10 | 6/27/2023 | 6/28/2023 | 66 | COMMUNITY CARE-UROGYNECOLOGY |
| Upper Abdominal Pain, unspecified | R10.10 | 6/26/2023 | 7/17/2023 | 67 | COMMUNITY CARE-GASTROENTEROLOGY |
| Respiratory Failure, unspecified with Hypoxia | J96.91 | 8/21/2023 | 8/18/2023 | 11 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Acne, unspecified | L70.9 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-DERMATOLOGY |
| Rash and other Nonspecific Skin Eruption | R21. | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-DERMATOLOGY |
| Squamous Cell Carcinoma of Skin of other Parts of Face | C44.329 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-DERMATOLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-CARDIAC REHAB |
| Family History of Malignant Neoplasm of Breast | Z80.3 | 5/12/2023 | 5/12/2023 | 112 | COMMUNITY CARE-GENETIC COUNSELING |
| Radiculopathy, Cervical Region | M54.12 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-ANESTHESIA PAIN |

| | | | | | MANAGEME NT |
|---|---|---|---|---|---|
| Malignant Neoplasm of Liver, Primary, unspecified as to Type | C22.8 | 8/8/2023 | 8/8/2023 | 24 | COMMUNIT Y CARE- INVASIVE RADIOLOGY |
| Age-Related Nuclear Cataract, Bilateral | H25.13 | 8/8/2023 | 8/15/2023 | 24 | COMMUNIT Y CARE- OPHTHALM OLOGY SURGICAL |
| Actinic Keratosis | L57.0 | 6/13/2023 | 6/13/2023 | 80 | COMMUNIT Y CARE- DERMATOL OGY |
| Other Chronic Pain | G89.29 | 8/18/2023 | 8/18/2023 | 14 | COMMUNIT Y CARE-CIH MASSAGE THERAPY |
| Residual hemorrhoidal skin tags | K64.4 | 7/18/2023 | 7/18/2023 | 45 | COMMUNIT Y CARE- DERMATOL OGY |
| Other Chest Pain | R07.89 | 7/20/2023 | 7/20/2023 | 43 | COMMUNIT Y CARE- CARDIOLOG Y |
| Dental Caries, unspecified | K02.9 | 8/17/2023 | 8/17/2023 | 15 | COMMUNIT Y CARE- DENTAL |
| Unilateral Primary Osteoarthritis , right Knee | M17.11 | 8/11/2023 | 8/11/2023 | 21 | COMMUNIT Y CARE- PHYSICAL THERAPY |
| Other Intervertebral Disc Degeneration , Lumbar Region | M51.36 | 8/3/2023 | 8/3/2023 | 29 | COMMUNIT Y CARE- PAIN MANAGEME NT |
| Disorder of the Skin and Subcutaneou s Tissue, unspecified | L98.9 | 8/3/2023 | 8/10/2023 | 29 | COMMUNIT Y CARE- DERMATOL OGY |
| Atheroscleroti c Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/21/2023 | 8/21/2023 | 11 | COMMUNIT Y CARE- CARDIOLOG Y |
| Nonrheumati c Aortic (Valve) Stenosis | I35.0 | 8/24/2023 | 8/25/2023 | 8 | COMMUNIT Y CARE- CARDIOLOG Y |
| Low back pain, unspecified | M54.50 | 7/28/2023 | 7/28/2023 | 35 | COMMUNIT Y CARE- ANESTHESI A PAIN MANAGEME NT |
| Nonrheumati c Aortic | I35.0 | 8/24/2023 | 8/25/2023 | 8 | COMMUNIT Y CARE- CARDIOTHO |

| (Valve) Stenosis | | | | | RACIC SURGERY |
|---|---|---|---|---|---|
| Dental Caries, unspecified | K02.9 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-DENTAL |
| Hypermetropia, Bilateral | H52.03 | 8/2/2023 | 8/4/2023 | 30 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Headache, unspecified | R51.9 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-CHIROPRACTIC |
| Anxiety Disorder, unspecified | F41.9 | 8/15/2023 | 8/16/2023 | 17 | COMMUNITY CARE-PSYCHOLOGY |
| Pain in unspecified Hip | M25.559 | 8/28/2023 | 8/28/2023 | 4 | COMMUNITY CARE-ORTHO JOINTS |
| Bicipital Tendinitis, left Shoulder | M75.22 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-PHYSICAL THERAPY |
| Pain in left Shoulder | M25.512 | 8/5/2023 | 8/5/2023 | 27 | COMMUNITY CARE-OCCUPATIONALTHERAPY |
| Unspecified Contact Dermatitis, unspecified Cause | L25.9 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-DERMATOLOGY |
| Type 2 Diabetes Mellitus with Diabetic Neuropathy, unspecified | E11.40 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-NEUROLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/12/2023 | 8/12/2023 | 20 | COMMUNITY CARE-CARDIOLOGY |
| Allergy, unspecified, Initial Encounter | T78.40XA | 6/13/2023 | 6/13/2023 | 80 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Anorexia | R63.0 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-GEC HOSPICE HOME |
| Type 2 Diabetes Mellitus with unspecified Complications | E11.8 | 8/16/2023 | 8/15/2023 | 16 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Neutropenia, unspecified | D70.9 | 8/18/2023 | 8/18/2023 | 14 | COMMUNITY CARE-GEC |

| | | | | | SKILLED HOME CARE |
|---|---|---|---|---|---|
| Unspecified Atrial Fibrillation | I48.91 | 8/6/2023 | 8/7/2023 | 26 | COMMUNITY CARE-CARDIOLOGY |
| Unspecified Contact Dermatitis, unspecified Cause | L25.9 | 6/2/2023 | 6/2/2023 | 91 | COMMUNITY CARE-DERMATOLOGY |
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-DERMATOLOGY |
| Encounter for Screening for Malignant Neoplasm, site unspecified | Z12.9 | 8/3/2023 | 8/4/2023 | 29 | COMMUNITY CARE-CT THORAX WO CONTRAST |
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-DERMATOLOGY |
| Basal Cell Carcinoma of Skin of Nose | C44.311 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-RADIATIONTHERAPY |
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 7/6/2023 | 7/10/2023 | 57 | COMMUNITY CARE-DERMATOLOGY |
| Unspecified Systolic (Congestive) Heart Failure | I50.20 | 5/29/2023 | 5/30/2023 | 95 | COMMUNITY CARE-CARDIOLOGY |
| Other Peripheral Vertigo, unspecified Ear | H81.399 | 2/14/2023 | 2/14/2023 | 199 | COMMUNITY CARE-NEUROLOGY |
| Lobular Carcinoma in Situ of unspecified Breast | D05.00 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-PLASTICSURGERY |
| Pain in right Hand | M79.641 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-ORTHO HAND |
| Other specified peripheral vascular diseases | I73.89 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-VASCULAR |
| Unspecified Combined Systolic (Congestive) and Diastolic (Congestive) Heart Failure | I50.40 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-CARDIOLOGY |

| Pain in right Shoulder | M25.511 | 8/25/2023 | 8/25/2023 | 7 | COMMUNITY CARE-PHYSICAL THERAPY |
| Pain in left Knee | M25.562 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-ORTHO JOINTS |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-PHYSICAL THERAPY |
| Dental Caries, unspecified | K02.9 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-DENTAL |
| Other Cirrhosis of Liver | K74.69 | 8/17/2023 | 8/18/2023 | 15 | COMMUNITY CARE-GASTROENTEROLOGY |
| Chronic atrial fibrillation, unspecified | I48.20 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-CARDIOLOGY |
| Chest Pain, unspecified | R07.9 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Alcoholic Cirrhosis of Liver without Ascites | K70.30 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-CARDIOLOGY |
| Pain in right Shoulder | M25.511 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Combined Forms of Age-Related Cataract, Bilateral | H25.813 | 8/18/2023 | 8/25/2023 | 14 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Rash and other Nonspecific Skin Eruption | R21. | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-DERMATOLOGY |
| Malignant Neoplasm of unspecified Kidney, except Renal Pelvis | C64.9 | 8/29/2023 | 8/30/2023 | 3 | COMMUNITY CARE-IMAGING CT SCAN |
| Pain in left Shoulder | M25.512 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-ORTHO JOINTS |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-PULMONARY REHAB |
| Radiculopathy, Cervical Region | M54.12 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-NEUROSURGERY |

| | | | | 109 | |
|---|---|---|---|---|---|
| Pelvic and Perineal Pain | R10.2 | 5/15/2023 | 5/30/2023 | | COMMUNITY CARE-PHYSICAL THERAPY |
| Cardiac Arrhythmia, unspecified | I49.9 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-CARDIOLOGY |
| Type 2 Diabetes Mellitus with unspecified Complications | E11.8 | 8/16/2023 | 8/15/2023 | 16 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-POLYSOMNOGRAPHY |
| Unspecified Atrial Fibrillation | I48.91 | 7/13/2023 | 7/14/2023 | 50 | COMMUNITY CARE-CARDIOLOGY |
| Other Benign Mammary Dysplasias of right Breast | N60.81 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-BREAST CANCER TREATMENT SURGICAL OPINION |
| Tributary (branch) retinal vein occlusion, right eye, with macular edema | H34.8310 | 8/27/2023 | 8/28/2023 | 5 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Pain in right Shoulder | M25.511 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-MRI |
| Intervertebral Disc Disorders with Radiculopathy, Lumbar Region | M51.16 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-ORTHO SPINE |
| Pain in unspecified Knee | M25.569 | 8/3/2023 | 8/4/2023 | 29 | COMMUNITY CARE-ORTHO JOINTS |
| Cervicalgia | M54.2 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-CHIROPRACTIC |
| Nondisplaced Fracture of Head of left Radius, Initial Encounter for closed Fracture | S52.125A | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-PHYSICAL THERAPY |
| Other Hypertrophic Disorders of the Skin | L91.8 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-DERMATOLOGY |
| Pain, unspecified | R52. | 7/12/2023 | 7/17/2023 | 51 | COMMUNITY CARE- |

| | | | | | ORTHO HAND |
|---|---|---|---|---|---|
| Vertebrogenic low back pain | M54.51 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-ORTHO SPINE |
| Other Chronic Pain | G89.29 | 8/30/2023 | 8/30/2023 | 2 | COMMUNITY CARE-PAIN MANAGEMENT |
| Chronic Ischemic Heart Disease, unspecified | I25.9 | 6/12/2023 | 6/12/2023 | 81 | COMMUNITY CARE-CARDIOLOGY |
| Sleep Apnea, unspecified | G47.30 | 7/28/2023 | 8/1/2023 | 35 | COMMUNITY CARE-PULMONARY SLEEP |
| Low back pain, unspecified | M54.50 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Pain in right Shoulder | M25.511 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Rash and other Nonspecific Skin Eruption | R21. | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Coronary Atherosclerosis due to Lipid Rich Plaque | I25.83 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-CARDIOLOGY |
| Hesitancy of Micturition | R39.11 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-PHYSICAL THERAPY |
| Pain in left Knee | M25.562 | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-MRI |
| Other Chronic Pain | G89.29 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-CHIROPRACTIC |
| Low back pain, unspecified | M54.50 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Unspecified open Wound, left lower Leg, Initial Encounter | S81.802A | 8/18/2023 | 8/18/2023 | 14 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Radiculopathy, Cervical Region | M54.12 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-NEUROSURGERY |
| Unspecified Atrial Fibrillation | I48.91 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-CARDIOLOGY |

| Essential (Primary) Hypertension | I10. | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-GEC SKILLED HOME CARE |
|---|---|---|---|---|---|
| Type 2 Diabetes Mellitus without Complications | E11.9 | 8/24/2023 | 8/14/2023 | 8 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Periodic Paralysis | G72.3 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-GENETIC COUNSELING |
| Chronic Pain Syndrome | G89.4 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Radiculopathy, Lumbar Region | M54.16 | 8/18/2023 | 8/18/2023 | 14 | COMMUNITY CARE-ORTHO SPINE |
| Low back pain, unspecified | M54.50 | 8/14/2023 | 8/15/2023 | 18 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Anxiety Disorder, unspecified | F41.9 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Other specified Joint Disorders, left Hip | M25.852 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-ORTHO SPORTS |
| Lumbago with Sciatica, unspecified Side | M54.40 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-CHIROPRACTIC |
| Unspecified Atrial Fibrillation | I48.91 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-CARDIOLOGY |
| Dermatitis, unspecified | L30.9 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-DERMATOLOGY |
| Pain in unspecified Shoulder | M25.519 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-PHYSICAL THERAPY |
| Unspecified Systolic (Congestive) Heart Failure | I50.20 | 8/25/2023 | 8/25/2023 | 7 | COMMUNITY CARE-CARDIOLOGY |
| Cervicalgia | M54.2 | 8/25/2023 | 8/25/2023 | 7 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Varicose veins of left lower extremity with pain | I83.812 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-SURGICAL |

| | | | | | |
|---|---|---|---|---|---|
| Bicipital Tendinitis, right Shoulder | M75.21 | 8/9/2023 | 8/16/2023 | 23 | COMMUNITY CARE-PHYSICAL THERAPY |
| Low back pain, unspecified | M54.50 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-CHIROPRACTIC |
| Basal Cell Carcinoma of Skin, unspecified | C44.91 | 8/25/2023 | 8/25/2023 | 7 | COMMUNITY CARE-DERMATOLOGY |
| Unilateral Primary Osteoarthritis, right Knee | M17.11 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-ORTHO JOINTS |
| Conductive Hearing Loss, Bilateral | H90.0 | 7/17/2023 | 8/21/2023 | 46 | COMMUNITY CARE-ENT |
| Unspecified Urinary Incontinence | R32. | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-UROGYNECOLOGY |
| Vertebrogenic low back pain | M54.51 | 6/21/2023 | 6/21/2023 | 72 | COMMUNITY CARE-GENERIC |
| Vertebrogenic low back pain | M54.51 | 6/22/2023 | 6/22/2023 | 71 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Presbyopia | H52.4 | 8/22/2023 | 8/25/2023 | 10 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Isolated Proteinuria | R80.0 | 8/4/2023 | 8/11/2023 | 28 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Low back pain, unspecified | M54.50 | 8/30/2023 | 8/30/2023 | 2 | COMMUNITY CARE-CHIROPRACTIC |
| I71.43 | I71.43 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Low back pain, unspecified | M54.50 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 8/11/2023 | 8/15/2023 | 21 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Angiodysplasia of Stomach and Duodenum with Bleeding | K31.811 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-MRI |
| Basal Cell Carcinoma of Skin of right | C44.212 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| Ear and External Auricular Canal | | | | | DERMATOLOGY |
| Pain in right Hand | M79.641 | 8/29/2023 | 8/29/2023 | 3 | COMMUNITY CARE-ORTHO HAND |
| Other Benign Neoplasm of Skin, unspecified | D23.9 | 7/7/2023 | 7/10/2023 | 56 | COMMUNITY CARE-DERMATOLOGY |
| Other Cirrhosis of Liver | K74.69 | 8/15/2023 | 8/16/2023 | 17 | COMMUNITY CARE-GASTROENTEROLOGY |
| Unspecified Glaucoma | H40.9 | 8/17/2023 | 8/21/2023 | 15 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Low back pain, unspecified | M54.50 | 8/14/2023 | 8/15/2023 | 18 | COMMUNITY CARE-CHIROPRACTIC |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 8/18/2023 | 8/18/2023 | 14 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Abdominal aortic aneurysm, without rupture, unspecified | I71.40 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-VASCULAR |
| Unspecified Urinary Incontinence | R32. | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-UROGYNECOLOGY |
| Atopic Dermatitis, unspecified | L20.9 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Osteophyte, right Foot | M25.774 | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-PHYSICAL THERAPY |
| Diplopia | H53.2 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Squamous Cell Carcinoma of Skin, unspecified | C44.92 | 7/11/2023 | 7/12/2023 | 52 | COMMUNITY CARE-DERMATOLOGY |
| Chronic atrial fibrillation, unspecified | I48.20 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-IMAGING CT SCAN |
| Chronic atrial fibrillation, unspecified | I48.20 | 8/29/2023 | 8/30/2023 | 3 | COMMUNITY CARE-CARDIOLOGY |

| | | | | | |
|---|---|---|---|---|---|
| Pain in right Hip | M25.551 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-ORTHO GENERAL |
| Unspecified Atrial Fibrillation | I48.91 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Basal Cell Carcinoma of Skin of other Parts of Face | C44.319 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-DERMATOLOGY |
| Post-Traumatic Stress Disorder, unspecified | F43.10 | 6/20/2023 | 6/20/2023 | 73 | COMMUNITY CARE-PSYCHIATRY |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 5/17/2023 | 5/17/2023 | 107 | COMMUNITY CARE-PSYCHOLOGY |
| Headache, unspecified | R51.9 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Sleep Apnea, unspecified | G47.30 | 5/2/2023 | 5/2/2023 | 122 | COMMUNITY CARE-POLYSOMNOGRAPHY |
| Change in Bowel Habit | R19.4 | 3/28/2023 | 4/10/2023 | 157 | COMMUNITY CARE-GASTROENTEROLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/31/2023 | 8/31/2023 | 1 | COMMUNITY CARE-CARDIOLOGY |
| Viral Wart, unspecified | B07.9 | 8/9/2023 | 8/10/2023 | 23 | COMMUNITY CARE-DERMATOLOGY |
| Encounter for Screening for Malignant Neoplasm of Colon | Z12.11 | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-GASTROENTEROLOGY |
| Vertebrogenic low back pain | M54.51 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-ORTHO SPINE |
| Pain in right Arm | M79.601 | 8/30/2023 | 8/31/2023 | 2 | COMMUNITY CARE-PAIN MANAGEMENT |
| Nausea with Vomiting, unspecified | R11.2 | 7/14/2023 | 7/17/2023 | 49 | COMMUNITY CARE- |

| | | | | | GASTROEN TEROLOGY |
|---|---|---|---|---|---|
| Other Chronic Pain | G89.29 | 8/4/2023 | 8/7/2023 | 28 | COMMUNIT Y CARE-PAIN MANAGEME NT |
| Unqualified Visual Loss, right Eye, Normal Vision left Eye | H54.61 | 8/23/2023 | 8/22/2023 | 9 | COMMUNIT Y CARE-GEC SKILLED HOME CARE |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/10/2023 | 8/14/2023 | 22 | COMMUNIT Y CARE-CARDIOLOG Y |
| Other Unsatisfactory Restoration of Tooth | K08.59 | 6/5/2023 | 6/5/2023 | 88 | COMMUNIT Y CARE-DENTAL |
| Full Incontinence of Feces | R15.9 | 1/31/2023 | 1/31/2023 | 213 | COMMUNIT Y CARE-PHYSICAL THERAPY |
| Dermatitis, unspecified | L30.9 | 7/14/2023 | 7/14/2023 | 49 | COMMUNIT Y CARE-DERMATOL OGY |
| Chronic Pain Syndrome | G89.4 | 7/13/2023 | 7/13/2023 | 50 | COMMUNIT Y CARE-PAIN MANAGEME NT |
| Transient Cerebral Ischemic Attack, unspecified | G45.9 | 7/25/2023 | 7/28/2023 | 38 | COMMUNIT Y CARE-IMAGING |
| Other Spondylosis with Radiculopathy, Cervical Region | M47.22 | 8/16/2023 | 8/16/2023 | 16 | COMMUNIT Y CARE-NEUROSUR GERY |
| Mixed Incontinence | N39.46 | 5/1/2023 | 5/15/2023 | 123 | COMMUNIT Y CARE-PHYSICAL THERAPY |
| Chronic periodontitis, unspecified | K05.30 | 8/8/2023 | 8/8/2023 | 24 | COMMUNIT Y CARE-DENTAL |
| Cardiac Arrhythmia, unspecified | I49.9 | 8/25/2023 | 8/25/2023 | 7 | COMMUNIT Y CARE-CARDIOLOG Y |
| Injury of Musculocutaneous Nerve, left Arm, Subsequent Encounter | S44.42XD | 8/9/2023 | 8/9/2023 | 23 | COMMUNIT Y CARE-MRI |

| Cardiomyopathy, unspecified | I42.9 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-CARDIOLOGY |
|---|---|---|---|---|---|
| Unspecified dementia, unspecified severity, without behavioral disturbance, psychotic disturbance, mood disturbance, and anxiety | F03.90 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-GEC HOSPICE HOME |
| Other Spondylosis, Lumbar Region | M47.896 | 8/21/2023 | 8/21/2023 | 11 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Aphasia | R47.01 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-NEUROLOGY |
| Pain in left Hip | M25.552 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-ORTHO SPORTS |
| Malignant Neoplasm of Liver, Primary, unspecified as to Type | C22.8 | 8/23/2023 | 8/29/2023 | 9 | COMMUNITY CARE-RADIOLOGY |
| Spinal Stenosis, site unspecified | M48.00 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-MRI |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-CARDIOLOGY |
| Hemangioma unspecified site | D18.00 | 7/27/2023 | 7/31/2023 | 36 | COMMUNITY CARE-MRI |
| Peripheral Vascular Disease, Unspecified | I73.9 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-SURGICAL |
| Low-Tension Glaucoma, Bilateral, Moderate Stage | H40.1232 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Rash and other Nonspecific Skin Eruption | R21. | 8/17/2023 | 8/23/2023 | 15 | COMMUNITY CARE-DERMATOLOGY |

| | | | | | |
|---|---|---|---|---|---|
| Unilateral Primary Osteoarthritis, right Knee | M17.11 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-ORTHO JOINTS |
| Bipolar Disorder, unspecified | F31.9 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Essential (Primary) Hypertension | I10. | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Other Chronic Pain | G89.29 | 6/26/2023 | 7/4/2023 | 67 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Essential (Primary) Hypertension | I10. | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Osteomyelitis, unspecified | M86.9 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Other Nonspecific Abnormal Finding of Lung Field | R91.8 | 8/19/2023 | 8/17/2023 | 13 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Sleep Apnea, unspecified | G47.30 | 7/18/2023 | 7/19/2023 | 45 | COMMUNITY CARE-PULMONARY SLEEP |
| Dysphagia, unspecified | R13.10 | 6/6/2023 | 7/11/2023 | 87 | COMMUNITY CARE-GASTROENTEROLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/30/2023 | 8/30/2023 | 2 | COMMUNITY CARE-CARDIOLOGY |
| Occlusion and stenosis of basilar artery | I65.1 | 6/29/2023 | 6/29/2023 | 64 | COMMUNITY CARE-INVASIVE RADIOLOGY |
| Pain in unspecified Knee | M25.569 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE-PHYSICAL THERAPY |
| Peripheral Vascular Disease, Unspecified | I73.9 | 2/16/2023 | 2/28/2023 | 197 | COMMUNITY CARE-SURGICAL |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 8/25/2023 | 8/25/2023 | 7 | COMMUNITY CARE-GEC HOSPICE HOME |
| Combined Forms of Age-Related | H25.813 | 8/15/2023 | 8/17/2023 | 17 | COMMUNITY CARE-OPHTHALM |

| | | | | | |
|---|---|---|---|---|---|
| Cataract, Bilateral | | | | | OLOGY SURGICAL |
| Keratoconus, Stable, Bilateral | H18.613 | 8/1/2023 | 8/11/2023 | 31 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Palpitations | R00.2 | 7/20/2023 | 7/24/2023 | 43 | COMMUNITY CARE-CARDIOLOGY |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-NEUROSURGERY |
| Low back pain, unspecified | M54.50 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-NEUROSURGERY |
| Other low back pain | M54.59 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-PHYSICAL THERAPY |
| Testicular Hypofunction | E29.1 | 7/14/2023 | 8/9/2023 | 49 | COMMUNITY CARE-IMAGING |
| Anxiety Disorder, unspecified | F41.9 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-PSYCHOLOGY |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Actinic Keratosis | L57.0 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-DERMATOLOGY |
| Carpal tunnel syndrome, bilateral upper limbs | G56.03 | 6/27/2023 | 6/27/2023 | 66 | COMMUNITY CARE-ORTHO HAND |
| Other Chronic Pain | G89.29 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Pain in joints of unspecified hand | M25.549 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ORTHO HAND |
| Chronic rhinitis | J31.0 | 6/20/2023 | 7/19/2023 | 73 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Heart Failure, unspecified | I50.9 | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Subcutaneous Panniculitis-like T-Cell Lymphoma | C86.3 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-ONCOLOGY/ TUMOR |

| Primary Osteoarthritis, unspecified site | M19.91 | 6/9/2023 | 6/9/2023 | 84 | COMMUNITY CARE-ORTHO HAND |
| Radiculopathy, Cervical Region | M54.12 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-PAIN MANAGEMENT |
| Tinea Unguium | B35.1 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-SURGICAL |
| Essential (Primary) Hypertension | I10. | 8/14/2023 | 8/14/2023 | 18 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Crohn's Disease of Both Small and Large Intestine without Complications | K50.80 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-GEC HOME INFUSION THERAPY |
| Permanent atrial fibrillation | I48.21 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-CARDIOLOGY |
| Pain in unspecified Hip | M25.559 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-ORTHO JOINTS |
| Parkinson's Disease | G20. | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-NEUROLOGY |
| Atopic Dermatitis, unspecified | L20.9 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-DERMATOLOGY |
| Acute apical periodontitis of pulpal origin | K04.4 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-DENTAL |
| Corneal transplant failure, right eye | T86.8411 | 7/11/2023 | 7/28/2023 | 52 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Actinic Keratosis | L57.0 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-DERMATOLOGY |
| Alpha-1-Antitrypsin deficiency | E88.01 | 8/25/2023 | 8/25/2023 | 7 | COMMUNITY CARE-GEC HOME INFUSION THERAPY |
| Vertebrogenic low back pain | M54.51 | 8/22/2023 | 8/28/2023 | 10 | COMMUNITY CARE-CHIROPRACTIC |
| Benign prostatic hyperplasia with lower | N40.1 | 7/18/2023 | 7/19/2023 | 45 | COMMUNITY CARE-UROLOGY |

| | | | | | |
|---|---|---|---|---|---|
| urinary tract symptoms | | | | | |
| Nevus, non-neoplastic | I78.1 | 6/30/2023 | 6/30/2023 | 63 | COMMUNITY CARE-DERMATOLOGY |
| Other Bursal Cyst, right Elbow | M71.321 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-ORTHO JOINTS |
| Squamous Cell Carcinoma of Skin, unspecified | C44.92 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-DERMATOLOGY |
| Melanocytic Nevi of Trunk | D22.5 | 7/13/2023 | 7/20/2023 | 50 | COMMUNITY CARE-DERMATOLOGY |
| Psoriasis, unspecified | L40.9 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE-DERMATOLOGY |
| Other specified Phobia | F40.298 | 5/5/2023 | 5/5/2023 | 119 | COMMUNITY CARE-PSYCHOLOGY |
| Hemorrhage of Anus and Rectum | K62.5 | 3/27/2023 | 4/3/2023 | 158 | COMMUNITY CARE-GASTROENTEROLOGY |
| Unspecified Urinary Incontinence | R32. | 7/24/2023 | 7/25/2023 | 39 | COMMUNITY CARE-UROGYNECOLOGY |
| Palpitations | R00.2 | 5/8/2023 | 5/8/2023 | 116 | COMMUNITY CARE-CARDIOLOGY |
| Other Secondary Neuroendocrine Tumors | C7B.8 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-SURGICAL |
| Coronary Atherosclerosis due to Lipid Rich Plaque | I25.83 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-CARDIOLOGY |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 3/17/2023 | 3/17/2023 | 168 | COMMUNITY CARE-PULMONARY REHAB |
| Generalized Abdominal Pain | R10.84 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-GASTROENTEROLOGY |
| Sleep Apnea, unspecified | G47.30 | 4/14/2023 | 4/14/2023 | 140 | COMMUNITY CARE-PULMONARY |
| Dysphagia, unspecified | R13.10 | 5/12/2023 | 6/26/2023 | 112 | COMMUNITY CARE-GASTROENTEROLOGY |
| Hypertrophic Disorder of | L91.9 | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| the Skin, unspecified | | | | | DERMATOL OGY |
| Peripheral Vascular Disease, Unspecified | I73.9 | 6/30/2023 | 7/4/2023 | 63 | COMMUNIT Y CARE-VASCULAR |
| Solitary Pulmonary Nodule | R91.1 | 8/8/2023 | 8/9/2023 | 24 | COMMUNIT Y CARE-INVASIVE RADIOLOGY |
| Basal Cell Carcinoma of Skin of other Parts of Face | C44.319 | 6/27/2023 | 6/27/2023 | 66 | COMMUNIT Y CARE-DERMATOL OGY |
| Conductive hearing loss, unilateral, right ear with restricted hearing on the contralateral side | H90.A11 | 6/13/2023 | 6/20/2023 | 80 | COMMUNIT Y CARE-ENT |
| Chronic Pulmonary Histoplasmos is Capsulati | B39.1 | 4/28/2023 | 4/28/2023 | 126 | COMMUNIT Y CARE-PULMONAR Y |
| Type 2 Diabetes Mellitus without Complication s | E11.9 | 8/23/2023 | 8/22/2023 | 9 | COMMUNIT Y CARE-GEC SKILLED HOME CARE |
| Squamous Cell Carcinoma of Skin of right lower Limb, including Hip | C44.722 | 5/11/2023 | 5/11/2023 | 113 | COMMUNIT Y CARE-DERMATOL OGY |
| Unspecified Atrial Fibrillation | I48.91 | 8/4/2023 | 8/4/2023 | 28 | COMMUNIT Y CARE-CARDIOLOG Y |
| Other Retention of Urine | R33.8 | 8/7/2023 | 8/7/2023 | 25 | COMMUNIT Y CARE-UROLOGY |
| Cyst of kidney, acquired | N28.1 | 7/12/2023 | 7/12/2023 | 51 | COMMUNIT Y CARE-NEPHROLO GY |
| Other Human Herpesvirus Infection | B10.89 | 7/12/2023 | 7/12/2023 | 51 | COMMUNIT Y CARE-DERMATOL OGY |
| Pain in right Knee | M25.561 | 7/26/2023 | 7/26/2023 | 37 | COMMUNIT Y CARE-ORTHO JOINTS |
| Elevated Prostate Specific antigen [psa] | R97.20 | 8/14/2023 | 8/14/2023 | 18 | COMMUNIT Y CARE-MRI |
| Pain in right Shoulder | M25.511 | 7/11/2023 | 7/11/2023 | 52 | COMMUNIT Y CARE-CIH MASSAGE THERAPY |

| | | | | | |
|---|---|---|---|---|---|
| Palmar Fascial Fibromatosis [Dupuytren] | M72.0 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-ORTHO HAND |
| Insomnia, unspecified | G47.00 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-PULMONARY SLEEP |
| Encounter for Screening for Malignant Neoplasm of Skin | Z12.83 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-DERMATOLOGY |
| Unilateral Primary Osteoarthritis, left Hip | M16.12 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-ORTHO JOINTS |
| Malignant Neoplasm of unspecified site of unspecified Female Breast | C50.919 | 11/15/2022 | 11/15/2022 | 290 | COMMUNITY CARE-RADIATIONTHERAPY |
| Unspecified Atrial Flutter | I48.92 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-CARDIOLOGY |
| Juvenile Osteochondrosis of Spine, Lumbar Region | M42.06 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-ORTHO SPINE |
| Basal Cell Carcinoma of Skin, unspecified | C44.91 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-PLASTICSURGERY |
| Spondylosis without Myelopathy or Radiculopathy, Lumbar Region | M47.816 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-PAIN MANAGEMENT |
| Spondylolysis, Lumbar Region | M43.06 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-CIH ACUPUNCTURE |
| Allergic Rhinitis, unspecified | J30.9 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-PULMONARY REHAB |
| Dermatitis, unspecified | L30.9 | 8/1/2023 | 8/8/2023 | 31 | COMMUNITY CARE-DERMATOLOGY |
| Chronic Pain Syndrome | G89.4 | 7/26/2023 | 7/27/2023 | 37 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |

| Other Melanin Hyperpigmentation | L81.4 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-DERMATOLOGY |
|---|---|---|---|---|---|
| Benign Neoplasm of Anus and Anal Canal | D12.9 | 7/28/2023 | 7/31/2023 | 35 | COMMUNITY CARE-SURGICAL |
| Pain in joints of right hand | M25.541 | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-ORTHO HAND |
| Low back pain, unspecified | M54.50 | 8/18/2023 | 8/18/2023 | 14 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Conductive Hearing Loss, Unilateral, left Ear, with Unrestricted Hearing on the Contralateral Side | H90.12 | 6/28/2023 | 6/29/2023 | 65 | COMMUNITY CARE-ENT |
| Obesity, unspecified | E66.9 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-SURGICAL |
| Palpitations | R00.2 | 8/21/2023 | 8/21/2023 | 11 | COMMUNITY CARE-CARDIOLOGY |
| Cervicalgia | M54.2 | 8/14/2023 | 8/16/2023 | 18 | COMMUNITY CARE-PAIN MANAGEMENT |
| Pain in right Wrist | M25.531 | 7/26/2023 | 8/2/2023 | 37 | COMMUNITY CARE-ORTHO HAND |
| Sciatica, unspecified Side | M54.30 | 8/1/2023 | 8/3/2023 | 31 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Sleep Apnea, unspecified | G47.30 | 4/21/2023 | 4/21/2023 | 133 | COMMUNITY CARE-POLYSOMNOGRAPHY |
| Diaphragmatic Hernia without Obstruction or Gangrene | K44.9 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-SURGICAL |
| Encounter for General Adult Medical Examination with Abnormal Findings | Z00.01 | 5/10/2023 | 5/10/2023 | 114 | COMMUNITY CARE-ENDOSCOPY |
| Pain in joints of left hand | M25.542 | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-ORTHO HAND |

| | | | | | |
|---|---|---|---|---|---|
| Cerebral Infarction, unspecified | I63.9 | 8/15/2023 | 8/14/2023 | 17 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Other Reduced Mobility | Z74.09 | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Spinal Stenosis, Lumbosacral Region | M48.07 | 6/16/2023 | 8/8/2023 | 77 | COMMUNITY CARE-ORTHO SPINE |
| Ganglion, right Wrist | M67.431 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-ORTHO HAND |
| Disorder of the Skin and Subcutaneous Tissue, unspecified | L98.9 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-DERMATOLOGY |
| Other Sleep Disorders | G47.8 | 5/12/2023 | 5/12/2023 | 112 | COMMUNITY CARE-PULMONARY SLEEP |
| Chronic atrial fibrillation, unspecified | I48.20 | 6/6/2023 | 6/6/2023 | 87 | COMMUNITY CARE-CARDIOLOGY |
| Other Spondylosis, Cervical Region | M47.892 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Psoriasis, unspecified | L40.9 | 8/7/2023 | 8/8/2023 | 25 | COMMUNITY CARE-DERMATOLOGY |
| Other Idiopathic Peripheral Autonomic Neuropathy | G90.09 | 5/11/2023 | 5/9/2023 | 113 | COMMUNITY CARE-NEUROLOGY |
| Carcinoma in situ of prostate | D07.5 | 8/22/2023 | 9/18/2023 | 10 | COMMUNITY CARE-UROLOGY |
| Acute Diastolic (Congestive) Heart Failure | I50.31 | 8/31/2023 | 8/31/2023 | 1 | COMMUNITY CARE-GEC SKILLED HOME CARE |
| Other Nonspecific Abnormal Finding of Lung Field | R91.8 | 8/1/2023 | 7/31/2023 | 31 | COMMUNITY CARE-PULMONARY |
| Rash and other Nonspecific Skin Eruption | R21. | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-DERMATOLOGY |
| Obesity, unspecified | E66.9 | 6/29/2023 | 6/29/2023 | 64 | COMMUNITY CARE-SURGICAL |
| Presence of other Heart-Valve Replacement | Z95.4 | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-CARDIAC REHAB |

| | | | | | |
|---|---|---|---|---|---|
| Squamous Cell Carcinoma of Skin of left upper Limb, including Shoulder | C44.629 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-DERMATOLOGY |
| Actinic Keratosis | L57.0 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-DERMATOLOGY |
| Chronic atrial fibrillation, unspecified | I48.20 | 5/25/2023 | 5/25/2023 | 99 | COMMUNITY CARE-CARDIOLOGY |
| Contact with and (Suspected) Exposure to other Hazardous, Chiefly Nonmedicinal, Chemicals | Z77.098 | 7/20/2023 | 7/21/2023 | 43 | COMMUNITY CARE-MEDICAL |
| Neoplasm of Uncertain Behavior of Trachea, Bronchus and Lung | D38.1 | 8/29/2023 | 8/29/2023 | 3 | COMMUNITY CARE-PULMONARY |
| Pain in unspecified Knee | M25.569 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-ORTHO JOINTS |
| Snoring | R06.83 | 5/4/2023 | 5/15/2023 | 120 | COMMUNITY CARE-PULMONARY |
| Other Periodontal Diseases | K05.5 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-DENTAL |
| Low back pain, unspecified | M54.50 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-NEUROSURGERY |
| Diarrhea, unspecified | R19.7 | 5/12/2023 | 5/15/2023 | 112 | COMMUNITY CARE-GASTROENTEROLOGY EUS |
| Nonrheumatic Aortic (Valve) Stenosis with Insufficiency | I35.2 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-CARDIOLOGY |
| Rash and other Nonspecific Skin Eruption | R21. | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-DERMATOLOGY |
| Vertebrogenic low back pain | M54.51 | 8/3/2023 | 8/4/2023 | 29 | COMMUNITY CARE-PAIN MANAGEMENT |
| Vasectomy Status | Z98.52 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-UROLOGY |

| Diagnosis | Code | Date 1 | Date 2 | Value | Provider |
|---|---|---|---|---|---|
| Unspecified Atrial Fibrillation | I48.91 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-CARDIOLOGY |
| Pain in left ankle and joints of left foot | M25.572 | 6/27/2023 | 6/28/2023 | 66 | COMMUNITY CARE-RHEUMATOLOGY/ARTHRITIS |
| Snoring | R06.83 | 7/17/2023 | 7/19/2023 | 46 | COMMUNITY CARE-PULMONARY SLEEP |
| Idiopathic Progressive Neuropathy | G60.3 | 7/3/2023 | 7/3/2023 | 60 | COMMUNITY CARE-ORTHO SURGICAL |
| Cellulitis of right Finger | L03.011 | 8/11/2023 | 8/14/2023 | 21 | COMMUNITY CARE-DERMATOLOGY |
| Rash and other Nonspecific Skin Eruption | R21. | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-DERMATOLOGY |
| Unspecified Chronic Bronchitis | J42. | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-PULMONARY |
| Presence of Intraocular Lens | Z96.1 | 8/9/2023 | 8/25/2023 | 23 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Personal History of Colonic Polyps | Z86.010 | 4/17/2023 | 5/17/2023 | 137 | COMMUNITY CARE-GASTROENTEROLOGY |
| Unspecified Urinary Incontinence | R32. | 7/13/2023 | 7/14/2023 | 50 | COMMUNITY CARE-PHYSICAL THERAPY |
| Exudative age-related macular degeneration, right eye, with active choroidal neovascularization | H35.3211 | 8/21/2023 | 8/21/2023 | 11 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Shortness of Breath | R06.02 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-CARDIOLOGY |
| Other Dysphagia | R13.19 | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-GASTROENTEROLOGY |
| Presbyopia | H52.4 | 4/24/2023 | 4/24/2023 | 130 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Stress Incontinence (Female) (Male) | N39.3 | 7/26/2023 | 7/26/2023 | 37 | COMMUNITY CARE-PHYSICAL THERAPY |

| | | | | | |
|---|---|---|---|---|---|
| J30.9 | J30.9 | 7/19/2023 | 7/19/2023 | 44 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Radiculopathy, Lumbar Region | M54.16 | 8/21/2023 | 8/21/2023 | 11 | COMMUNITY CARE-RADIOLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-CARDIAC REHAB |
| Actinic Keratosis | L57.0 | 7/21/2023 | 7/28/2023 | 42 | COMMUNITY CARE-DERMATOLOGY |
| Other low back pain | M54.59 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-ORTHO SPINE |
| Chronic Obstructive Pulmonary Disease, unspecified | J44.9 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-PULMONARY |
| Supraventricular Tachycardia | I47.1 | 8/30/2023 | 8/30/2023 | 2 | COMMUNITY CARE-CARDIOLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/24/2023 | 9/20/2023 | 8 | COMMUNITY CARE-CARDIOLOGY |
| Low back pain, unspecified | M54.50 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Type 2 Diabetes Mellitus with unspecified Diabetic Retinopathy with Macular Edema | E11.311 | 8/17/2023 | 9/28/2023 | 15 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Overactive Bladder | N32.81 | 7/25/2023 | 7/19/2023 | 38 | COMMUNITY CARE-UROLOGY |
| Localized Edema | R60.0 | 5/16/2023 | 5/16/2023 | 108 | COMMUNITY CARE-VASCULAR |
| Rash and other Nonspecific Skin Eruption | R21. | 8/10/2023 | 8/11/2023 | 22 | COMMUNITY CARE-DERMATOLOGY |
| Malignant Neoplasm of Overlapping sites of right | C50.811 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-BREAST CANCER TREATMENT |

| | | | | | |
|---|---|---|---|---|---|
| Female Breast | | | | | |
| Atopic Dermatitis, unspecified | L20.9 | 7/24/2023 | 7/24/2023 | 39 | COMMUNITY CARE- DERMATOLOGY |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 1/20/2023 | 1/20/2023 | 224 | COMMUNITY CARE- CARDIOLOGY |
| Chronic atrial fibrillation, unspecified | I48.20 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE- CARDIOLOGY |
| Melanocytic Nevi of Trunk | D22.5 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE- DERMATOLOGY |
| Allergic Contact Dermatitis, unspecified Cause | L23.9 | 7/20/2023 | 7/27/2023 | 43 | COMMUNITY CARE- DERMATOLOGY |
| Other Intervertebral Disc Degeneration, Lumbar Region | M51.36 | 8/30/2023 | 8/30/2023 | 2 | COMMUNITY CARE- CHIROPRACTIC |
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 8/22/2023 | 8/22/2023 | 10 | COMMUNITY CARE- CARDIOLOGY |
| Basal Cell Carcinoma of Skin of left lower Limb, including Hip | C44.719 | 7/12/2023 | 7/12/2023 | 51 | COMMUNITY CARE- DERMATOLOGY |
| End Stage Renal Disease | N18.6 | 8/29/2023 | 10/1/2023 | 3 | COMMUNITY CARE- HEMODIALYSIS |
| End Stage Renal Disease | N18.6 | 8/29/2023 | 10/1/2023 | 3 | COMMUNITY CARE- HEMODIALYSIS |
| End Stage Renal Disease | N18.6 | 8/29/2023 | 10/1/2023 | 3 | COMMUNITY CARE- NEPHROLOGY DIALYSIS OVERSIGHT |
| End Stage Renal Disease | N18.6 | 8/29/2023 | 10/1/2023 | 3 | COMMUNITY CARE- NEPHROLOGY DIALYSIS OVERSIGHT |

| | | | | | |
|---|---|---|---|---|---|
| End Stage Renal Disease | N18.6 | 8/21/2023 | 10/1/2023 | 11 | COMMUNITY CARE-NEPHROLOGY DIALYSIS OVERSIGHT |
| End Stage Renal Disease | N18.6 | 8/17/2023 | 10/1/2023 | 15 | COMMUNITY CARE-HEMODIALYSIS |
| Multiple Cranial Nerve Palsies in Sarcoidosis | D86.82 | 8/24/2023 | 8/31/2023 | 8 | COMMUNITY CARE-NEUROLOGY |
| Melanocytic Nevi of Trunk | D22.5 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-DERMATOLOGY |
| Allergy, unspecified, Subsequent Encounter | T78.40XD | 5/12/2023 | 5/15/2023 | 112 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Eosinophilic Esophagitis | K20.0 | 8/14/2023 | 11/13/2023 | 18 | COMMUNITY CARE-GASTROENTEROLOGY |
| Unspecified Cataract | H26.9 | 8/4/2023 | 8/8/2023 | 28 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Encounter for other Orthopedic Aftercare | Z47.89 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-POST-OP PHYSICAL THERAPY |
| Dizziness and Giddiness | R42. | 7/21/2023 | 7/31/2023 | 42 | COMMUNITY CARE-NEUROLOGY |
| Palpitations | R00.2 | 5/9/2023 | 5/9/2023 | 115 | COMMUNITY CARE-CARDIOLOGY |
| Sleep Apnea, unspecified | G47.30 | 1/18/2023 | 1/23/2023 | 226 | COMMUNITY CARE-PULMONARY SLEEP |
| Other specified Leukemias, in Remission | C94.81 | 7/19/2023 | 8/1/2023 | 44 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Pain in left Shoulder | M25.512 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-ORTHO SPORTS |
| Chronic atrial fibrillation, unspecified | I48.20 | 7/7/2023 | 7/14/2023 | 56 | COMMUNITY CARE-CARDIOLOGY |
| Unspecified Atrial Fibrillation | I48.91 | 3/31/2023 | 3/31/2023 | 154 | COMMUNITY CARE-CARDIOLOGY |
| Squamous cell carcinoma of skin of scalp and neck | C44.42 | 8/9/2023 | 8/8/2023 | 23 | COMMUNITY CARE-DERMATOLOGY |

| Sick Sinus Syndrome | I49.5 | 7/7/2023 | 7/14/2023 | 56 | COMMUNITY CARE-CARDIOLOGY |
|---|---|---|---|---|---|
| Thyrotoxicosis, unspecified without Thyrotoxic Crisis or Storm | E05.90 | 3/10/2023 | 3/10/2023 | 175 | COMMUNITY CARE-ENDOCRINE |
| Personal History of Colonic Polyps | Z86.010 | 4/14/2023 | 4/14/2023 | 140 | COMMUNITY CARE-GASTROENTEROLOGY |
| Unspecified open-Angle Glaucoma, Severe Stage | H40.10X3 | 8/7/2023 | 8/8/2023 | 25 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Presbyopia | H52.4 | 7/26/2023 | 7/27/2023 | 37 | COMMUNITY CARE-OPTOMETRY ROUTINE EYE EXAM |
| Deposits [Accretions] on Teeth | K03.6 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-DENTAL |
| Scrotal pain | N50.82 | 7/14/2023 | 7/14/2023 | 49 | COMMUNITY CARE-PHYSICAL THERAPY |
| Nontoxic multinodular goiter | E04.2 | 9/12/2022 | 9/12/2022 | 354 | COMMUNITY CARE-ENDOCRINE |
| Other specified Heart Block | I45.5 | 3/9/2023 | 8/11/2023 | 176 | COMMUNITY CARE-CARDIOLOGY |
| Obstructive Sleep Apnea (Adult) (Pediatric) | G47.33 | 4/17/2023 | 6/12/2023 | 137 | COMMUNITY CARE-PULMONARY SLEEP |
| Pain in unspecified Hip | M25.559 | 7/11/2023 | 7/11/2023 | 52 | COMMUNITY CARE-ORTHO GENERAL |
| Spondylolisthesis, Lumbar Region | M43.16 | 8/15/2023 | 8/15/2023 | 17 | COMMUNITY CARE-CHIROPRACTIC |
| Other Idiopathic Peripheral Autonomic Neuropathy | G90.09 | 2/22/2023 | 2/17/2023 | 191 | COMMUNITY CARE-NEUROLOGY |
| Low back pain, unspecified | M54.50 | 8/15/2023 | 10/9/2023 | 17 | COMMUNITY CARE-PHYSICAL THERAPY |
| Neoplasm of Uncertain Behavior of right Kidney | D41.01 | 7/10/2023 | 10/2/2023 | 53 | COMMUNITY CARE-MRI |
| Unspecified visual disturbance | H53.9 | 7/18/2023 | 7/18/2023 | 45 | COMMUNITY CARE-OPHTHALMOLOGY |

| | | | | | DISEASE MGMT |
|---|---|---|---|---|---|
| Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-CARDIOLOGY |
| Combined Forms of Age-Related Cataract, Bilateral | H25.813 | 8/8/2023 | 8/17/2023 | 24 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Unspecified dementia, moderate, without behavioral disturbance, psychotic disturbance, mood disturbance, and anxiety | F03.B0 | 4/6/2023 | 4/6/2023 | 148 | COMMUNITY CARE-NEUROLOGY |
| Hyperlipidemia, unspecified | E78.5 | 6/23/2023 | 6/27/2023 | 70 | COMMUNITY CARE-CARDIOLOGY |
| Unspecified Corneal Scar and Opacity | H17.9 | 10/31/2022 | 11/9/2022 | 305 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Bilateral Primary Osteoarthritis of Knee | M17.0 | 8/9/2023 | 8/9/2023 | 23 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Rash and other Nonspecific Skin Eruption | R21. | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-DERMATOLOGY |
| Coronary Atherosclerosis due to Calcified Coronary Lesion | I25.84 | 6/13/2023 | 6/13/2023 | 80 | COMMUNITY CARE-CARDIOLOGY |
| Post-Traumatic Stress Disorder, unspecified | F43.10 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-PSYCHOLOGY |
| Chronic periodontitis, unspecified | K05.30 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-DENTAL |
| Diarrhea, unspecified | R19.7 | 4/11/2023 | 5/11/2023 | 143 | COMMUNITY CARE-GASTROENTEROLOGY |
| Pain in unspecified Shoulder | M25.519 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-CIH MASSAGE THERAPY |
| Gastro-Esophageal Reflux | K21.9 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE- |

| | | | | | |
|---|---|---|---|---|---|
| Disease without Esophagitis | | | | | GASTROEN TEROLOGY |
| Sensorineura l hearing loss, unilateral, left ear, with restricted hearing on the contralateral side | H90.A22 | 8/11/2023 | 8/11/2023 | 21 | COMMUNIT Y CARE-MRI |
| Malignant neoplasm of pancreatic duct | C25.3 | 7/18/2023 | 7/19/2023 | 45 | COMMUNIT Y CARE-IMAGING CT SCAN |
| Malignant neoplasm of pancreatic duct | C25.3 | 7/11/2023 | 7/12/2023 | 52 | COMMUNIT Y CARE-GASTROEN TEROLOGY |
| Age-Related Osteoporosis without Current Pathological Fracture | M81.0 | 12/7/2022 | 12/7/2022 | 268 | COMMUNIT Y CARE-ENDOCRINE |
| Calculus of Kidney | N20.0 | 7/31/2023 | 7/31/2023 | 32 | COMMUNIT Y CARE-UROLOGY |
| Obstructive Sleep Apnea (Adult) (Pediatric) | G47.33 | 7/28/2023 | 7/28/2023 | 35 | COMMUNIT Y CARE-PULMONAR Y |
| Coronary Atheroscleros is due to Calcified Coronary Lesion | I25.84 | 6/27/2023 | 7/3/2023 | 66 | COMMUNIT Y CARE-CARDIOLOG Y |
| Disorder of the Skin and Subcutaneou s Tissue, unspecified | L98.9 | 7/20/2023 | 7/20/2023 | 43 | COMMUNIT Y CARE-DERMATOL OGY |
| Atheroscleroti c Heart Disease of Native Coronary Artery without Angina Pectoris | I25.10 | 3/31/2023 | 4/14/2023 | 154 | COMMUNIT Y CARE-CARDIOLOG Y |
| Basal Cell Carcinoma of Skin of Lip | C44.01 | 7/31/2023 | 7/31/2023 | 32 | COMMUNIT Y CARE-DERMATOL OGY |
| Encounter for Screening for Malignant Neoplasm of Colon | Z12.11 | 8/9/2023 | 8/9/2023 | 23 | COMMUNIT Y CARE-GASTROEN TEROLOGY |
| Cardiomyopa thy, unspecified | I42.9 | 4/27/2023 | 4/27/2023 | 127 | COMMUNIT Y CARE-CARDIOLOG Y |
| Chronic periodontitis, unspecified | K05.30 | 8/7/2023 | 8/7/2023 | 25 | COMMUNIT Y CARE-DENTAL |

| | | | | | |
|---|---|---|---|---|---|
| Carpal Tunnel Syndrome, left upper Limb | G56.02 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-ORTHO HAND |
| Primary Osteoarthritis, right Hand | M19.041 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-ORTHO HAND |
| Allergic Rhinitis, unspecified | J30.9 | 7/27/2023 | 7/27/2023 | 36 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Residual stage of open-angle glaucoma, bilateral | H40.153 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Unspecified Glaucoma | H40.9 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Personal History of Colonic Polyps | Z86.010 | 4/10/2023 | 10/10/2023 | 144 | COMMUNITY CARE-GASTROENTEROLOGY |
| Family History of Malignant Neoplasm of Breast | Z80.3 | 7/13/2023 | 7/14/2023 | 50 | COMMUNITY CARE-GENETIC COUNSELING |
| Dermatitis, unspecified | L30.9 | 8/18/2023 | 8/25/2023 | 14 | COMMUNITY CARE-DERMATOLOGY |
| Low back pain, unspecified | M54.50 | 8/12/2023 | 8/14/2023 | 20 | COMMUNITY CARE-ORTHO SPINE |
| Unspecified Atrial Fibrillation | I48.91 | 7/7/2023 | 7/7/2023 | 56 | COMMUNITY CARE-CARDIOLOGY |
| Chronic Pain Syndrome | G89.4 | 8/13/2023 | 8/14/2023 | 19 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Other specified glaucoma | H40.89 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-OPHTHALMOLOGY DISEASE MGMT |
| Actinic Keratosis | L57.0 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-DERMATOLOGY |
| Low back pain, unspecified | M54.50 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-PAIN MANAGEMENT |

| Condition | Code | Date 1 | Date 2 | Value | Provider |
|---|---|---|---|---|---|
| Bipolar Disorder, unspecified | F31.9 | 5/2/2023 | 5/2/2023 | 122 | COMMUNITY CARE-PSYCHOLOGY |
| Unspecified Atrial Fibrillation | I48.91 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-CARDIOLOGY |
| Dry Eye Syndrome of Bilateral Lacrimal Glands | H04.123 | 4/11/2023 | 4/11/2023 | 143 | COMMUNITY CARE-OPTOMETRY DISEASE MGMT |
| Other specified Heart Block | I45.5 | 8/1/2023 | 8/1/2023 | 31 | COMMUNITY CARE-CARDIOLOGY |
| Paresthesia of Skin | R20.2 | 12/30/2022 | 12/30/2022 | 245 | COMMUNITY CARE-EMG |
| Atopic Dermatitis, unspecified | L20.9 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Carcinoma in situ of prostate | D07.5 | 4/27/2023 | 4/27/2023 | 127 | COMMUNITY CARE-RADIOLOGY |
| Obstructive Sleep Apnea (Adult) (Pediatric) | G47.33 | 6/5/2023 | 6/5/2023 | 88 | COMMUNITY CARE-POLYSOMNOGRAPHY |
| Cardiac Arrhythmia, unspecified | I49.9 | 8/1/2023 | 8/4/2023 | 31 | COMMUNITY CARE-CARDIOLOGY |
| Abdominal aortic aneurysm, without rupture, unspecified | I71.40 | 5/10/2023 | 4/18/2023 | 114 | COMMUNITY CARE-CARDIOTHORACIC SURGERY |
| Malignant neoplasm of prostate | C61. | 7/25/2023 | 9/4/2023 | 38 | COMMUNITY CARE-MRI |
| Encounter for Screening for Malignant Neoplasm of Cervix | Z12.4 | 4/12/2023 | 4/19/2023 | 142 | COMMUNITY CARE-GYNECOLOGY |
| Malignant neoplasm of prostate | C61. | 6/1/2023 | 6/1/2023 | 92 | COMMUNITY CARE-UROLOGY |
| Paroxysmal atrial fibrillation | I48.0 | 4/4/2023 | 4/4/2023 | 150 | COMMUNITY CARE-CARDIOLOGY |
| Nonrheumatic Aortic (Valve) Stenosis | I35.0 | 8/21/2023 | 8/21/2023 | 11 | COMMUNITY CARE-CARDIOLOGY |
| Neoplasm of Uncertain Behavior of Thyroid Gland | D44.0 | 5/22/2023 | 5/23/2023 | 102 | COMMUNITY CARE-ONCOLOGY/TUMOR |
| Malignant neoplasm of prostate | C61. | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-RADIOLOGY |

| Type 2 Diabetes Mellitus without Complications | E11.9 | 7/18/2023 | 7/19/2023 | 45 | COMMUNITY CARE-ENDOCRINE |
|---|---|---|---|---|---|
| Elevated Prostate Specific antigen [psa] | R97.20 | 8/21/2023 | 8/21/2023 | 11 | COMMUNITY CARE-UROLOGY |
| Acne Keloid | L73.0 | 7/10/2023 | 7/10/2023 | 53 | COMMUNITY CARE-DERMATOLOGY |
| Polyp of Colon | K63.5 | 12/29/2022 | 12/29/2022 | 246 | COMMUNITY CARE-GASTROENTEROLOGY |
| Mixed Conductive and Sensorineural Hearing Loss, Unilateral, right Ear, with Unrestricted Hearing on the Contralateral Side | H90.71 | 7/31/2023 | 7/31/2023 | 32 | COMMUNITY CARE-ENT |
| Dilated Cardiomyopathy | I42.0 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-CARDIOLOGY |
| Vertebrogenic low back pain | M54.51 | 7/21/2023 | 7/21/2023 | 42 | COMMUNITY CARE-ORTHO SPINE |
| Chronic Pain Syndrome | G89.4 | 6/16/2023 | 6/16/2023 | 77 | COMMUNITY CARE-ANESTHESIA PAIN MANAGEMENT |
| Carcinoma in situ of bladder | D09.0 | 5/24/2023 | 5/24/2023 | 100 | COMMUNITY CARE-UROLOGY |
| Chronic Sinusitis, unspecified | J32.9 | 8/8/2023 | 8/8/2023 | 24 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Other specified Joint Disorders, left Hip | M25.852 | 8/11/2023 | 8/11/2023 | 21 | COMMUNITY CARE-ORTHO SPORTS |
| Actinic Keratosis | L57.0 | 7/20/2023 | 7/20/2023 | 43 | COMMUNITY CARE-DERMATOLOGY |
| Cyst of Epididymis | N50.3 | 3/28/2023 | 3/28/2023 | 157 | COMMUNITY CARE-UROLOGY |
| Atherosclerosis of Coronary Artery Bypass | I25.810 | 7/13/2023 | 7/13/2023 | 50 | COMMUNITY CARE-CARDIOLOGY |

| | | | | | |
|---|---|---|---|---|---|
| Graft(s) without Angina Pectoris | | | | | |
| Cardiac Arrhythmia, unspecified | I49.9 | 8/25/2023 | 8/25/2023 | 7 | COMMUNITY CARE-CARDIOLOGY |
| Unspecified Atrial Fibrillation | I48.91 | 6/29/2023 | 4/27/2023 | 64 | COMMUNITY CARE-CARDIOLOGY |
| Multiple Cranial Nerve Palsies in Sarcoidosis | D86.82 | 8/24/2023 | 8/24/2023 | 8 | COMMUNITY CARE-RHEUMATOLOGY/ARTHRITIS |
| Other Spondylosis, Cervical Region | M47.892 | 6/26/2023 | 6/26/2023 | 67 | COMMUNITY CARE-NEUROSURGERY |
| Secondary Parkinsonism, unspecified | G21.9 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-NEUROLOGY |
| Other Sleep Apnea | G47.39 | 3/9/2023 | 3/15/2023 | 176 | COMMUNITY CARE-PULMONARY SLEEP |
| Melanocytic Nevi, unspecified | D22.9 | 8/18/2023 | 8/18/2023 | 14 | COMMUNITY CARE-DERMATOLOGY |
| Allergic Rhinitis, unspecified | J30.9 | 7/21/2023 | 7/24/2023 | 42 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Combined Forms of Age-Related Cataract, right Eye | H25.811 | 5/18/2023 | 6/1/2023 | 106 | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL |
| Stress Incontinence (Female) (Male) | N39.3 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-UROGYNECOLOGY |
| Angiodysplasia of Stomach and Duodenum with Bleeding | K31.811 | 8/23/2023 | 8/23/2023 | 9 | COMMUNITY CARE-GASTROENTEROLOGY |
| Myocarditis, unspecified | I51.4 | 6/8/2023 | 6/8/2023 | 85 | COMMUNITY CARE-CARDIOLOGY |
| Neoplasm of uncertain behavior of skin | D48.5 | 8/4/2023 | 8/4/2023 | 28 | COMMUNITY CARE-DERMATOLOGY |
| Encounter for Screening for Malignant Neoplasm of Colon | Z12.11 | 6/27/2023 | 8/21/2023 | 66 | COMMUNITY CARE-GASTROENTEROLOGY |
| Personal History of Colonic Polyps | Z86.010 | 5/24/2023 | 5/25/2023 | 100 | COMMUNITY CARE-GASTROENTEROLOGY |

| Diagnosis | Code | Date | Date | Value | Facility |
|---|---|---|---|---|---|
| Cervical Disc Disorder with Myelopathy, unspecified Cervical Region | M50.00 | 6/1/2023 | 6/6/2023 | 92 | COMMUNITY CARE-NEUROSURGERY |
| Heart Failure, unspecified | I50.9 | 4/18/2023 | 4/18/2023 | 136 | COMMUNITY CARE-CARDIOLOGY |
| Abnormal Uterine and Vaginal Bleeding, unspecified | N93.9 | 7/25/2023 | 7/25/2023 | 38 | COMMUNITY CARE-GYNECOLOGY |
| Carcinoma in situ of prostate | D07.5 | 8/7/2023 | 8/7/2023 | 25 | COMMUNITY CARE-UROLOGY |
| Hypercalciuria | R82.994 | 8/7/2023 | 8/30/2023 | 25 | COMMUNITY CARE-ENDOCRINE |
| Unspecified Atrial Fibrillation | I48.91 | 8/10/2023 | 8/10/2023 | 22 | COMMUNITY CARE-CARDIOLOGY |
| Carcinoma in situ of prostate | D07.5 | 7/17/2023 | 7/17/2023 | 46 | COMMUNITY CARE-RADIATIONTHERAPY |
| Polyp of Colon | K63.5 | 7/21/2023 | 7/28/2023 | 42 | COMMUNITY CARE-GASTROENTEROLOGY |
| Epilepsy, unspecified, not Intractable, without Status Epilepticus | G40.909 | 7/6/2023 | 7/6/2023 | 57 | COMMUNITY CARE-NEUROLOGY |
| Post-Traumatic Stress Disorder, Chronic | F43.12 | 5/18/2023 | 5/18/2023 | 106 | COMMUNITY CARE-PSYCHOLOGY |
| Allergic Rhinitis, unspecified | J30.9 | 8/2/2023 | 8/2/2023 | 30 | COMMUNITY CARE-ALLERGYIMMUNOLOGY |
| Cardiomyopathy, unspecified | I42.9 | 8/17/2023 | 8/17/2023 | 15 | COMMUNITY CARE-CARDIOLOGY |
| Supraventricular Tachycardia | I47.1 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-CARDIOLOGY |
| Chronic idiopathic constipation | K59.04 | 8/15/2023 | 8/21/2023 | 17 | COMMUNITY CARE-GASTROENTEROLOGY |
| Pain in right Hip | M25.551 | 7/28/2023 | 7/28/2023 | 35 | COMMUNITY CARE-ORTHO SPORTS |
| Tremor, unspecified | R25.1 | 8/16/2023 | 8/16/2023 | 16 | COMMUNITY CARE-NEUROLOGY |

| | | | | | |
|---|---|---|---|---|---|
| Encounter for Screening for Malignant Neoplasm of Colon | Z12.11 | 7/18/2023 | 8/2/2023 | 45 | COMMUNITY CARE-GASTROENTEROLOGY |
| Unspecified Atrial Fibrillation | I48.91 | 6/15/2023 | 6/15/2023 | 78 | COMMUNITY CARE-CARDIOLOGY |
| Gender Identity Disorder, unspecified | F64.9 | 8/1/2023 | 8/25/2023 | 31 | COMMUNITY CARE-ENDOCRINE |
| Separation of muscle (nontraumatic), unspecified site | | 4/14/2023 | 4/14/2023 | 140 | COMMUNITY CARE-PHYSICAL THERAPY |
| Benign Neoplasm of Connective and other Soft Tissue of Head, Face and Neck | D21.0 | 6/16/2023 | 7/7/2023 | 77 | COMMUNITY CARE-SURGICAL |
| orthoepdic aftercare | | 8/3/2023 | 8/3/2023 | 29 | COMMUNITY CARE-OCCUPATIONALTHERAPY |
| Dermatitis, unspecified | L30.9 | 7/20/2023 | 8/11/2023 | 43 | COMMUNITY CARE-DERMATOLOGY |

# Rebuttal Dr Buckley

I think I need to preface this with there seems to be some confusion here.  I never filed an EEO claim prior to this one.  I did talk to EEO and went through the process with regard to this current issue; but, never filed a claim prior to this.  I did, however, whistleblow directly to Donnabelle  prior to me filing this EEO in which staff are working without pay and I futher stated to her this is a violation of labor laws, the tele agreement we all signed and is borderline violation of HIPPA laws as staff are opening up charts while off tour of duty.  I remember exactly what she said, DB sternly stated, "well maybe staff should all come back!" to which I stated, "maybe we should!"  The two of us were in a somewhat disagreement kind of arguing back and forth. This was no secret in the department, as the entire department knew staff were working without pay and that DB knew this was going on but she just looked the other way, because it only benefits her when it comes to her metrics.   I also told Dr Ravipati, in person while I was in her office discussing this current matter when I told her about whistleblow issue stated above of which she did nothing about.  I also sent emails up the chain of command regarding my whistleblowing claims all to no avail.

**Incident 1:** On May 8, 2023, the Complainant was removed from patient care.

28. Were you responsible for removing the Complainant from patient care? Not directly.  The supervisor has the authority to remove from patient care pending investigation when he/she has reasonable concern with patient care/safety.

   a. If you were not responsible, then please identify the name and title of who was responsible. Supervisor Ms Lorenzo-Villerino and Dr Mamata Ravipati, her supervisor.
   b. If you are not responsible, did you have a role in this matter? I sustained the proposed discipline.  If so, please explain it.  My recollection is he was removed from patient care because there was reasonable concern with his ability to reliably perform his patient care responsibilities.

A.  Dr Buckley's, response can be cross referenced with Donnabelle's and Dr Ravipati's response in which DB and Ravipati both state in their affidavits that HR recommended removing me from

000438

my position.  They then indicate when it came to the case against Wendy RN that HR did not recommend removing her pending investigation therefore, they didn't remove Wendy.

**Dr Buckley states, "The supervisor has the authority to remove from patient care pending investigation when he/she has reasonable concern with patient care/safety."**

This is another example of DB and Ravipati deflecting blame towards HR in there affidavits, because they treated me differently than they did Wendy after Wendy's complete neglect in a suicide patient who was pleading for inpatient psych and Wendy disregarded it and downgraded which should have been made a complex consult to a basic and pushed it off onto a PSA in orientation or just off orientation to work on.  This 35-year-old female veteran subsequently hung herself.  Now someone explain to me, for DB and Ravipati to have the "authority" to detail me under false pretenses, but at the same time have the "authority" to detail Wendy but they did not and just let Wendy slide by this incredibly overwhelming negligence on Wendy's part is just clear indication of discrimination towards me.  And for DB and Dr Ravipati deflecting this on to HR throughout their affidavits as if HR is the final arbiter to whether someone is detailed just dodging and are those two throwing HR under the bus.  They are playing the deflect game as everything is calculated with them and they are both guilty and party to allowing or condoning negligence in that department and set a very dangerous precedence that can have dramatic consequences on veteran's care that the importance of this type of leadership decisions warrants  a congressional hearing as to not have this happen again.  This shouldn't be happening to veterans and the tax payers should be privy to this type of information.  Just like they did nothing to assist me when I told Ravipati I'm being harassed, and this is discrimination they just kept moving forward with full force on me but did nothing to Wendy RN Female, Filipino.

I am 100% sure and believe within every cell in my body all the way down to the mitochondria that, had I been Filipino, none of this would have happened to me.

B.  I performed my job just as well, if not better than anyone one in the department within the scope of our 8-hour tour of duty.  In fact, I have the greatest amount of critical care experience and am the strongest nurses in the department when it comes to critical thinking DB can't even come close to me and neither can anyone else in that department. No one in the department can come close to me regarding my persona with veterans, I speak their language.   If leadership wants to compare me to the other staff that I whistleblew when out tour ends at 4 pm but they are working until 10pm, 3 am, Saturdays and Sundays without pay in violation of everything I stated in the above answer, then this was just an excuse to do what they did to me.  Just like when they ran a 30-chart review proclaiming I'm not charting, but what they don't tell you reading this or Dr Buckley was that the review they based my charting on was on charting that are PSA duties in which RNs don't chart on.  Quality Management that ran the chart review on me doesn't know what RN's chart on, the only way they can get that information to enter into a chart review would be from Donnabelle, who purposely gave them false information on what to chart review me on; therefore, QM run my chart review based on what DB told them which was PSAs charting this was done just to make it look like my charting is deficient, which was deceiving.  This is slimy and downright evil and in my opinion DB should not be in any management position as she deceived QM which in turn deceived Ravipati, which led to the deception Dr Buckley got into his hands when he reviewed and interviewed me.  And when I

told Ravipati this, she ignored me.  I even went to her office with Dori Matusz who stated that stated the issues they were claiming I wasn't charting on wasn't true before Ravipati motioned to the door for us to leave her office as if she needed to find a way out of this mess and somehow cover for DB.   The union even stepped in to back me up with regards to the charting again all to no avail.  Furthermore, some of the information DB gave to QM as criteria to run and see if I am charting were criteria that not only RNs do not chart on but even PSAs don't chart on.  For example:  sending letters out after a vet already scheduled the appt.  RNs and PSAs don't send those letters out unless the vet asks for it.  That's what my chart review was up against.

Dr Ravipati ignored all of it and continued to allow this fishing expedition, harassment, discrimination to continue as if it was just a game to them.  As if they enjoyed seeing me suffer and stress out over this to the point I sought out medical advice two times and caused me to be put on medication for the PTSD this has caused.  I think the more clearer I made my points which I had backed by staff and evidence the more Ravipati liked seeing me hurt.  This shows their character and evilness rather than be honest and look at all the evidence in a truthful way, DB fabricated the evidence and Ravipati was compliant with it making her just as guilty, and that makes Ravipati party to the crime against me.

Considering I had a greater workload, followed the rules and the others who had more staff on their teams and worked on their own time isn't nothing close to a fair comparison of my duties.  Now to be fair you would have to compare what the staff did within the scope of tour of duty and compare that with what I did within scope of tour of duty.  Furthermore, run a chart review on all the RNs in the department under the exact same criteria that mine was run, no deviation, meaning time frame consults were pulled, degree of difficulty on consults, then make the comparison and come back to me and the EEO arbiters with the evidence that I am not charting and,  "have the ability to perform my patient care responsibilities."  I am the victim here, I have been discriminated against because I'm male, non-Filipino and because I spoke up, Dr Ravipati took more action against me particularly when she and the VA were notified of my EEO filing.  Ravipati retaliated from telling me this was "a slap on the wrist" which by the way I didn't agree with a slap on the wrist for doing my job as told but rather she tried to intimidate me in hopes to interfere with my EEO by her bogus 14 day proposed suspension and statements she replied to throughout which were just out of spite due to my filing.

Compare my tour of duty with their tour of duty before making insulting accusations to my ability to "…with his ability to reliably to perform his patient care responsibilities."  To the other RN's in the department before being happy and gloat that I'm being put through this process.

30. Please explain, in detail, the reason you removed the Complainant from patient care. I did not directly remove him from patient care.  This was done by his work area supervisor pending investigation.

This answer Buckley gives indicates that it is the supervisors call to remove me from patient care and the onus is not on HR the way Ravipati and DB state in their affidavits with regards to me being detailed and Wendy skating by. In addition, to the contrary it was leaderships that had the responsibility to do the same to the staff in which all the other JPRS I have included as evidence, as well as detail the rest of the department involved in delay of care and documentation. But none of that was done and DB and Ravipati are **blaming their inactions** to detail Wendy and the others with JPRS filed against them on HR in an attempt to hang, Alex Morse (HR Rep) out to dry. Another slimy move by the two leaders.

32. What was the Complainant's response to the reason given? I recall that he admitted during this oral reply that he had failed to take timely action and appropriately follow though on patient care communications and the documentation of these in the health care record.

**That is a complete LIE!!! I never stated I failed to "timely take action." That's not even my verbiage!** I wasn't even there most of the week the consult was placed in addition it never showed up on the metrics list that the analyst or DB send out as our daily workload and what to work on. I believe the consult was placed on a Friday which it did not show up on the list that day, then Saturday and Sunday I don't work, I came back Monday and looked back I couldn't find an assignment list sent to me to work on for that Monday. I even verified this with Adrien Ong  RN in the department to check and see if we were sent a workload on the Monday following the Friday the consult was entered. (Mind you this was when I was detailed.) Adrien Ong stated he couldn't find that we were sent a worklist for that Monday.   Note that we don't always get work assignments daily for whatever reasons.   Sometimes it's a system glitch or the manager may be out of the office etc. But we don't always get them an this could have happened on the Monday.

So since this was placed on a Friday and I'm off the weekend and we don't get a list sent to us on Monday, here's what I clearly know, I took off for my birthday on a Wednesday the 14th that week as well as had a scheduled day off on Friday that week, then Saturday and Sunday I did not work and when I came back on Monday 12/19/22 . I am not sure when I accepted the consult I'm gussing during the week on one of the days I was there which would have been either Tuesday or Thursday. Like I said I had Friday off scheduled and the weekend. My records indicate that on 12/19/22, I called the vet (as noted in my ccp note per direction of my immediate manager), processed consult, faxed it to vets preferred provider, alerted Kelly Heckel in which it was her responsibility to follow up and schedule the consult within a few days.  And I documented everything accordingly to what the directive we were given on process and procedure.  Please listen to the recording 11/10/22 which the VA refuses to release which DB indicates how she wants the workflow to go. Get access to the recording and cue it up to 13 minutes.   So everything was documented, it was not an expedited consult that needed to be sent out within two days, it was a moderate consult, yet with the amount of time I was there that week it was still sent out and documented appropriately.  Kelly Heckel female

PSA, did not due her job in scheduling as DB stated she wants it done.  But as we see she is a female and was not held accountable for her inaction.  If DB wanted this out sooner, she's the one that gives staff the workload daily on what to work on, then why didn't she as the manager assign this to someone else when I was out those days?  And if she wants to continue to play semantics why wasn't the veteran's doctor who entered the consult held accountable in overseeing his patient?  The doctor that entered the consult as well as the Nephrology department know the veteran personally and they were not held accountable.  Why wasn't Cindy Reyula RN held accountable who DB assigned the consult to three times after me and she didn't follow protocol and send the required 7 day notice when you call a veteran and there is no answer.   This was DB's Hail Mary to get me on something which as we see constitutes the definition of discrimination based on sex, race and retaliation.

What I believe I said in the meeting with Buckley, Alex, and my two Union reps who were witnesses there was, if there was something I did wrong I'll take full responsibility.  However, Buckley and no one in leadership below him ever indicated what I did wrong through a concise honest statement of facts that is followed up by indicating where it shows in the guidebook, I didn't follow the rules.

I even sent an email to Buckley and Alex when I was brought back asking them can you please tell me what I did wrong as far as charting so I don't make the same mistake not knowing what I did wrong.  I did not want to go through this nightmare again by not knowing what they are claiming I did wrong.  I got no response from Dr Buckley or Alex or anyone to indicate what I did wrong so that I correct whatever mistake they are speaking of.

When they couldn't respond to my asking for help with for their advice on what I need to correct to avoid whatever error they proclaim I made, that's when I knew I was just being set up for failure.  I immediately emailed Ravipati and asked her if I can be transferred to another department.  It should be noted I was applying to jobs in other areas of the hospital, but no one would hire me due to my being detailed which slandered my name throughout the hospital. I know Med Surg wanted to hire me but when they got word that I was detailed I wasn't even called for an interview, even though I was qualified for the job.   So, Ravipati, reached out to the nurse recruiter and the recruiter reached out to me and the recruiter got me out of Community Care into a different position.  I am sure Ravipati only did this to get me out of the department to stop me from sending emails up the chain of command questioning why I was detailed and put through this.



RE Response follow
up Buckley and Alex e

33. The Complainant alleges he was treated differently because female employees in his department were not disciplined after a patient expired, but that he was. Please respond to this allegation. I evaluated the merit of the evidence with respect to the charges in this case and carefully considered this and any information he provided during the oral reply phase.

Dr Buckley doesn't answer the question being asked. The question is referring to Wendy RN that a JPRS was filed for her enormous negligence in not following up on a critical patient that hung herself after this veteran I'm told called Community Care Office asking for help in getting inpatient therapy. These are crisis situations; you don't blow these things off.

Now Buckley doesn't answer the question being asked. When JPRS are filed, every Monday a team of people sit and discuss them. They are then sent to the Managers of which the employee that had the JPRS filed against them to which the employee's manager handles the situation. HR doesn't know about these JPRS filed unless a manager informs them of it. Now Dr Buckley, being the CEO would know of any JPRS coming in.

What VA policies are relevant to the Complainant's removal from patient care. As noted in the charges and the evidence file - VHA Handbook 5021 Part 1 Chapter 1; 7b and VHA Handbook 5021 Part 2 Chapter 1; 6 (3)b

Buckley cites policies for my removal but never gave me a statement of facts as to what I did wrong and cite the policies in the guidebook to what I did wrong. He made a quick decision without looking to see if the information presented to him were factual or fraudulent.

Summary:

In Buckley's defense he made a decision as he addresses in his suspension statement as to why he gave me a 3 day suspension based on my oral replies and the info presented in the proposed 14 day suspension Ravipati entered. His mistake was not doing his due diligence in researching if indeed the information given to him was factual. He pulled the trigger and suspended me for 3 days without looking at all the factual evidence. Buckley was given false information that was initiated by DB hatred of me which in turn that false information was then sent to Ravipati and that's what Buckley went off when he handed down the suspension.

DB mislead QM initially during the chart review by indicating I was suppose to chart PSA duties, and she went even further and indicate I didn't chat sending scheduled letters out that even PSAs don't send out unless a vet asks for it. The info was gathered by QM and I assume DB gave it to Ravipati, but never told Ravipati that the review was based off false information and not on what RNs document, she also never gave Ravipati the recording dated 11/10/22 or the transcripts or algorithm on her directive to the workflow, so Ravipati went with what DB stated, even though I showed her the evidence of what RNs chart in writing as well as did Dori Matusz when she handed Ravipati the workflow and explained it all to her, before Ravipati motioned us to leave the office. Then DB mislead the Peer Committee in stating the consult was an expedite when it was not and indirectly is deflecting the blame on the person that wrote it, Adriene Harris. And now throughout her and Ravipati's affidavit the two of them shift blame onto HR for detailing me and not Wendy. All that information that wasn't true was given to Dr Buckley when he came to the decision to suspend me.

I get it, Dr Buckley is the CEO of the hospital, he's conducting the ship and he has bigger fish to fry. But it still doesn't change the fact that he made a decision to suspend me based off fraudulent information given to him.

I also believe he knew ahead of time what he was going to give me as a suspension no matter what I said. Since it was a 14-day proposed by Ravipati my guess is Buckley knew before I even stepped in his office, he would make it a 3 day suspension. Had the proposal been let's say 7 days, Buckley would have came back with 1 day. Had the proposed suspension been 2 days, Buckley would have made it an admonishment and so on and so forth. I get the feeling it didn't matter what I said or what proof I presented he knew what my punishment would be before hand.

Ravipati upped the proposal to 14 days only after she found out I filed the EEO.

OCC

## Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>

To:Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>;Nelson, Thomas J. CAPT. FHCC Lovell <1160196498@DVAGOV.onmicrosoft.com>;Cotter, William J. FHCC Lovell <William.Cotter@va.gov>

Dr. Buckley and Captain Nelson,

We are sending you this from the Community Care Department as we are in need of your help. The department is currently short-staffed and is in crisis mode at this time. Recently, with several of our clinic's providers being short-staffed for various reasons, the burden has been shifted over to our Community Care Department. The dept continues to arm wrestle between proper triage based on veteran's medical needs versus treating the numbers via metrics VISN wants the dept to follow.

For example, one veteran was on the phone with an RN stating he almost committed suicide due to a lack of follow-up.

Another example is a veteran who paid $14,000 out of pocket due to something that could have been caught if care coordination had been followed up; hence the reason I've included Dr. Cotter in the email. This particular veteran was sent to CTCA and had surgery that was covered by VA; however, he was then sent to a rehab facility to which the accepting facility automatically billed Medicare which left the vet with the copays. In the veteran's defense, the last thing on a patient's mind is a billing concern, particularly when one is in an altered state of consciousness due to being on narcotics for said surgery while at the same time fighting a cancer diagnosis. Dr. Cotter, I'm wondering if we can get a referral for this veteran in which we could backdate the consult to cover his stay at the rehab facility. If so, I can call the facility, have them pay Medicare back, then have them bill Optum. Which leads me to the issue of billing. Can we get someone designated to be assigned exclusively to billing concerns? It was brought to my attention, awhile back, through hearsay, mind you, that Dr. Buckley gave an order in which he wanted the Community Care Dept to resolve the issues with billing. I'm not sure what leadership did with that. Can that order be sent to Christianah to be followed up with if that's true?

In summary, if we were fully staffed, we could avoid these issues.

Therefore, I'm asking you and Captain Nelson if we could get some corpsmen/active duty military to assist the dept until we get back on our feet? We could use their help. In addition, can we get help with priority hiring to fill our vacancies?

Thanks,

Ozzie/Ken

RE: Response follow up

**Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>**
To:Morse, Alex M. <Alex.Morse@va.gov>
Cc:Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>

Dr Buckley and Alex,


With all due respect, I am humbly asking the following questions. I understand you guys made your decision on the evidence presented to you and that's what you had to go off in making your decision. Please understand, I am not faulting you guys in the least bit.

1. Just wondering, did Donnabelle ever give you guys access to her video recording which depicts her directive to the department in regard to policy/procedure to follow on processing consults and which staff are assigned to which part of the processing and scheduling?

2. Was my CCP note ever entered into evidence which shows I documented that I called the veteran?

On a side note, the issue of preferred preferences was not needed since veteran had a preference to be seen at Froedtert South this has been the ongoing directive to the department staff. Furthermore, we were never told it needed to be documented through the toolbox. Over a year ago there was a back and forth between Ken Dizon and Donnabelle about that exact issue which never got resolved. Now some of us older staff never documented in that section of the toolbox as we were never told it was mandatory and never trained on it. Soon National is requiring that everything be done through the toolbox; however, that has not taken place yet.

3. Lastly, can you please indicate to me specifically what part of policy I did not follow?

   Most of the stuff stating I did not document in the chart review was presented by Donnabelle to obfuscate psa duties and cloud up the issues between RN and PSA documentation as a way to circumvent her own direction to the department which she clearly states on recording and in writing in no uncertain terms. In other words if she had been truthful the recording would have implicated her.

   I just want to make sure if it was something I missed I want to own up to it so I can learn from it.

   By letting me know specifically what policy I failed to follow within the required time frame, resulting in a delay of care, it very likely could be something that I did follow through on but was just overlooked due to lack of evidence presented to you guys, and sadly I have to say it was misleading evidence presented by Donnabelle up the chain of command.

Example: During the peer review committee Donnabelle entered deceptive information. She entered deceptive information in the chart review, to Dr Ravipatie which in turn was sent to you guys. During the Peer Review Committee, Donnabelle tampered with evidence when she allowed a summary either by her or on her behalf to be presented to the Peer Review Committee as if the consult was and an expedite, when indeed it was not and expedite.

She also made issue of the consult being a complex vs moderate when she clearly stated in the recording and in writing that RNs process all complex and moderates and PSAs do all the scheduling. I called the veteran, documented my call in the CCP note per Christianah's directive long ago, he had a preferred provider, the consult was processed and sent to the community and the PSA was alerted to schedule the consult. All within the scope of Donnabelle's directive.

   So, whether it was a complex or moderate didn't matter as the RNs have to do both anyway. And based on this consult being Renal I sent it out in a timely manner and alerted the PSA to schedule, even though I was out most of the week and in addition the consult was not on the daily worklist for several days after being entered by the requesting provider. Furthermore, what is the timeframe in order for the consult to be timely? In the dept we have many consults over 200 and 300 days old which would be considered delay of care.

Would you guys be so kind and please interview the staff both RNs and administrative staff with regards to workflow policy and who does what? What time frames we have, etc etc etc. I think that will make things a lot clearer.

If the above recording and ccp note were not entered into evidence, will you give me the okay to enter it myself?

Thank you,
Please take this into consideration
Azis "ozzie" Kochiu
414-617-9879

I don't really check my work emails as I'm currently serving my sentence this week. If you could correspond through my personal email until next week when I'm back at work that would be appreciated.

Again thank you

Kochiu106@gmail.com


**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Tuesday, August 15, 2023 4:04 PM
**To:** Coleman, Monica <Monica.Coleman@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Good afternoon,
As I stated in my email before, I do not have access to CPRS and do not have the ability to retrieve the information requested. Since this is an item entered on the employee's behalf, the responsibility to obtain the information falls on the employee. Is this not something he is able to pull from the

patient's chart? Maybe HIMS would be the appropriate POC to obtain the information if the employee s not able to.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* HR Quick Card.
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

**From:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Monday, August 14, 2023 3:06 PM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Alex,


Please see Information request. The information provided will be added as evidence.


V/R,


*Monica Coleman BSN, RN*
**NNOC/NNU Capt James A Lovell FHCC VA Director**
**NNOC/NNU VA Lead National Safety Officer**
**RN Community Care Coordinator**
**Office of Community Care Network (CCN)**
Captain James A Lovell Federal Health Care Center
**3001 Greenbay Road**
**North Chicago, IL 60064**
**Phone: 224-610-8632**
**Fax: 224-610-8638**
**Email:** Monica.Coleman@va.gov

NNU Membership form:
https://www.nationalnursesunited.org/vamembershipform

**ADO Form**
https://www.nationalnursesunited.org/sites/default/files/nnu/documents/0522_ADO_Electronic_Form.pdf



"I don't know how to change it, but I know if I keep talking about how dirty it is our here, somebody's gonna clean it up" ~ Tupac Amur Shakur

"We make a living by what we get, we make a life by what we give" ~ Winston Churchill
"You don't make progress by standing on the sidelines, whimpering and complaining. You make progress by implementing ideas." – Shirley Chisholm



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Monday, August 14, 2023 11:21 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

If it is something you would like to add on your behalf, please feel free to submit. I do not have CPRS access.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* HR Quick Card
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Monday, August 14, 2023 10:35 AM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Greetings Alex,

The other day I started processing consults for the first time in over 3 months. After I send the consults, I write a note/summary in what is called a CCP note or (community care progress note) . Anyway, in the template I noticed as I was processing consults that there is a questions and boxes to click asking how my care coordination was determined. Please see the template below.

Are you privy to getting the care coordination progress note on the day I sent the consult? The reason is that I believe that I clicked the box indicating I spoke to the patient.

Monica, can you follow up regarding this? I would like to make this part of the evidence.

Care approved under section 201 of the COMPACT Act with 38 U.S.C 17201J

Chief Complaint: *

Veteran Admitted?
○ Yes
○ No
○ Unknown

Level of Care Coordination
○ Basic (Optional)
○ Moderate

    Care Coordination was determined from:
       *
       ☐ Chart Review
       ☐ Phone call to Veteran/Family/Caregiver
       ☐ Phone call from Veteran/Family/Caregiver

[ Visit Info ]　　　　　　　[ Finish . ]　[ Cancel ]

---

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Friday, August 11, 2023 7:43 AM
**To:** Coleman, Monica <Monica.Coleman@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Good morning,
Thank you for the update, I will reach out to Donnabelle and ask for the link and access.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224–803–6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* HR Quick Card
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

---

**From:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Thursday, August 10, 2023 4:40 PM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** Re: Response follow up

Hello Alex,

Being that the recording is the property of the hospital, we ask that you give permission for its release from Donnabelle who was the "host" of the team's meeting held on 11/10/22 "workflow/work assignment."

V/R,

*Monica Coleman BSN, RN*
**NNOC/NNU VA Capt. James A Lovell Director**
**NNOC/NNU VA Lead National Safety Rep**
**RN Community Care Coordinator**
**Office of Community Care Network (CCN)**
Captain James A Lovell Federal Health Care Center
3001 Greenbay Road

North Chicago, IL 60064
**Community Care ACD Line (224) 610-8632**
**Email**: Monica.Coleman@va.gov

See the source image

---

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Thursday, August 10, 2023 2:12:08 PM
**To:** Coleman, Monica <Monica.Coleman@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Sounds good, thank you very much. Tomorrow is fine.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* HR Quick Card
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

**From:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Thursday, August 10, 2023 2:10 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Morse, Alex M. <Alex.Morse@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** Re: Response follow up

Hi Alex,

Yes we would like for the recording to be submitted. Please give me until EOB tomorrow to submit that. I believe that it needs permission from Donnabelle for it to be released. I am not in front of the computer at the moment to verify.


V/R,

*Monica Coleman BSN, RN*
**NNOC/NNU VA Capt. James A Lovell Director**
**NNOC/NNU VA Lead National Safety Rep**
**RN Community Care Coordinator**
**Office of Community Care Network (CCN)**
Captain James A Lovell Federal Health Care Center
3001 Greenbay Road
North Chicago, IL 60064
**Community Care ACD Line (224) 610-8632**
**Email:** Monica.Coleman@va.gov

---

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Thursday, August 10, 2023 1:59:36 PM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Let me call you after this meeting.

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Thursday, August 10, 2023 1:58 PM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Thank you, I will do that. But I'm not good with computers if you want I can come to your office after this meeting I'm in and maybe you can take it off my teams and put it on yours?

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Thursday, August 10, 2023 1:54 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** Response follow up

Good afternoon,

Yesterday during your response, you played a recording of Donnabelle going over the process. If you would like it to be considered as a part of the evidence you submitted, please reply to this email with a copy of the recording.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* HR Quick Card
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*



ort by | Job Status ⬍ | ⚙ Notifications

**❭ Registered Nurse - Bar Code Medication Administration Coordinator (BCMA-C)**

Reviewing applications

**Veterans Health Administration**
📍 North Chicago, Illinois
🕓 Closed 11/6/2023 • 46 applicants

Application status
You applied on 10/27/2023.
Track this application.

**❭ Registered Nurse (Nurse Educator)**

Reviewing applications

**Veterans Health Administration**
📍 North Chicago, Illinois
🕓 Closed 10/5/2023 • 56 applicants

Application status
You applied on 9/28/2023.
Track this application.

**⊕ Registered Nurse - Emergency Department**

Reviewing applications

**Veterans Health Administration**
📍 North Chicago, Illinois
🕓 Closed 9/6/2023 • 25 applicants

Application status
You applied on 8/30/2023.
Track this application.

**⊕ Registered Nurse - Referral Coordination Initiative (RCI)**

Reviewing applications

**Veterans Health Administration**
📍 North Chicago, Illinois
🕓 Closed 9/1/2023 • 120 applicants

Application status
You applied on 8/18/2023.
Track this application.

**⊕ Registered Nurse (Primary Care - Outpatient Clinic)**

Reviewing applications

Application status



**Registered Nurse - Primary Care Outpatient (Fisher Clinic)**

Reviewing applications

**Veterans Health Administration**
North Chicago, Illinois
Closed 8/16/2023 • 77 applicants

**Application status**
You applied on 8/8/2023.
Track this application.

**Registered Nurse - Community Living Center (CLC)**

Reviewing applications

**Veterans Health Administration**
North Chicago, Illinois
Closed 7/6/2023 • 43 applicants

**Application status**
You applied on 6/22/2023.
Track this application.

**Registered Nurse (RN) - Outpatient Mental Health**

Reviewing applications

**Veterans Health Administration**

**Application status**
You applied on 5/11/2023.



# Welcome Azis!

Your profile is complete and you're able to apply for jobs on USAJOBS.

| **38** APPLICATIONS | **0** SAVED JOBS | **0** SAVED SEARCHES |
|---|---|---|

Active    **Archived**

**Find & filter applications**    ✛

Sort by    Job Status    ⇕

➕ **Registered Nurse (Transition to Practice (TTP) Coordinator)**

➕ **Registered Nurse (Transition to Practice (TTP) Coordinator)**

> Reviewing applications

**Veterans Health Administration**
📍 North Chicago, Illinois
🕒 Closed 9/7/2023 • 27 applicants

**Application status**
You applied on 8/30/2023.
Track this application.

➕ **Registered Nurse (Intensive Care Unit)**

> Reviewing applications

**Veterans Health Administration**
📍 North Chicago, Illinois
🕒 Closed 8/30/2023 • 35 applicants

**Application status**
You applied on 8/30/2023.
Track this application.

➕ **Registered Nurse (Patient Safety Program Manager)**

> Reviewing applications

Veterans Health Administration

**Application status**
You applied on 7/27/2023.

➕ **Assistant Nurse Manager - Community Living Center**

> Job canceled

**Veterans Health Administration**
📍 North Chicago, Illinois
🕒 Closed 9/14/2023 • 21 applicants

**Application status**
You applied on 9/5/2023.
Track this application.

⬇ Export all applications

### ⊕ Registered Nurse (Primary Care - Kenosha CBOC)

Reviewing applications

**Veterans Health Administration**
📍 Kenosha, Wisconsin

🕒 Closed 7/31/2023 · 18 applicants

**Application status**
You applied on 7/25/2023.
Track this application.

### ⊕ Registered Nurse (Med/Surg Intermittent Float Pool)

Reviewing applications

**Veterans Health Administration**
📍 North Chicago, Illinois

🕒 Closed 7/24/2023 · 21 applicants

**Application status**
You applied on 7/12/2023.
Track this application.

### ⊕ Registered Nurse (Medical/Surgical/Telemetry)

Reviewing applications

Veterans Health Administration

**Application status**
You applied on 6/12/2023.

### ⊕ Registered Nurse (RN) - Medicine/Hem-Onc (Inpatient)

Reviewing applications

**Veterans Health Administration**
📍 Milwaukee, Wisconsin

🕒 Closed 6/16/2023 · 5 applicants

**Application status**
You applied on 6/2/2023.
Track this application

### ⊕ Registered Nurse (RN) - Medical Procedures

Reviewing applications

**Veterans Health Administration**
📍 Milwaukee, Wisconsin

🕒 Closed 6/5/2023 · 13 applicants

**Application status**
You applied on 6/2/2023.
Track this application.

### ⊕ Registered Nurse (RN) - Med/Surg

Reviewing applications

**Veterans Health Administration**

**Application status**
You applied on 6/1/2023.



### ➕ Registered Nurse (RN) - Med/Surg

Reviewing applications

**Veterans Health Administration**

📍 Milwaukee, Wisconsin

🕑 Closed 6/2/2023 • 5 applicants

**Application status**

You applied on 6/1/2023.

Track this application.

### ➕ Registered Nurse (RN) -- Home Based Primary Care (HBPC)

Reviewing applications

**Veterans Health Administration**

📍 Milwaukee, Wisconsin

🕑 Closed 6/2/2023 • 6 applicants

**Application status**

You applied on 6/1/2023.

Track this application.

Show more applications

# Rebuttal Alex Morse

7. On what date were you contacted by Management with regard to this action? Who contacted you?

   A: 3/23/23. Donnabelle Lorenzo-Villarino

8. What information was provided to you by management and what advice did you give to management regarding this action?

   A: That there was a delay in care possibly resulting in the death of a patient. I advised them that they would need to perform a Weingarten meeting to question the employee and gather all the information surrounding the case.

Alex's testimony in this affidavit indicate that Management reaches out to him. So when Ravipati and Donnabelle make testimony throughout their affidavits indicating that it's up to HR recommendations to detail Wendy or not.

In the later answer Alex states he "advised them to perform a Weingarten" He is not indicating that he recommended a Weingarten but advised them.

Same with Wendy not being detailed when DB and Ravipati claim HR didn't "recommend", she be detailed pending investigation when they let her off scot-free. HR advises management as to not put the company at risk by making unnecessary errors, HR doesn't tell managers how to do their jobs. As in Wendy's case it was a management decision not an HR decision.

Then why wouldn't HR recommend all the employees in Community Care be detailed pending investigation on all the consults that are in the Delay of Care status or whatever the timeline is?

Why didn't HR recommend the 7 JPRS I submitted be detailed pending investigation?

Because it's always up to management on how to run their staff.

It was just another deflection by DB and Ravipati throughout their sworn testimony because they can't get past why I was discriminated against for being male, race, retaliation and Wendy, female, Filipino had nothing happen to her.

*EXAMPLE OF SPEAKING*
*UP CHAIN OF COMMAND ON*

**Kochiu, Azis FHCC Lovell**

*BEHALF OF VETERANS*

| | |
|---|---|
| From: | Kochiu, Azis FHCC Lovell |
| Sent: | Friday, June 2, 2023 2:43 PM |
| To: | Kochiu, Azis FHCC Lovell |
| Subject: | FW: OCC |

*DR. DOESN'T LIKE*
*THIS*

---

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Thursday, June 2, 2022 11:46 AM
**To:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Nelson, Thomas J. CAPT. FHCC Lovell
<Thomas.Nelson@va.gov>; Cotter, William J. FHCC Lovell <William.Cotter@va.gov>
**Subject:** OCC

Dr. Buckley and Captain Nelson,

We are sending you this from the Community Care Department as we are in need of your help. The department is currently short-staffed and is in crisis mode at this time. Recently, with several of our clinic's providers being short-staffed for various reasons, the burden has been shifted over to our Community Care Department. The dept continues to arm wrestle between proper triage based on veteran's medical needs versus treating the numbers via metrics VISN wants the dept to follow.

For example, one veteran was on the phone with an RN stating he almost committed suicide due to a lack of follow-up.

Another example is a veteran who paid $14,000 out of pocket due to something that could have been caught if care coordination had been followed up; hence the reason I've included Dr. Cotter in the email. This particular veteran was sent to CTCA and had surgery that was covered by VA; however, he was then sent to a rehab facility to which the accepting facility automatically billed Medicare which left the vet with the copays. In the veteran's defense, the last thing on a patient's mind is a billing concern, particularly when one is in an altered state of consciousness due to being on narcotics for said surgery while at the same time fighting a cancer diagnosis. Dr. Cotter, I'm wondering if we can get a referral for this veteran in which we could backdate the consult to cover his stay at the rehab facility. If so, I can call the facility, have them pay Medicare back, then have them bill Optum.

Which leads me to the issue of billing. Can we get someone designated to be assigned exclusively to billing concerns? It was brought to my attention, awhile back, through hearsay, mind you, that Dr. Buckley gave an order in which he wanted the Community Care Dept to resolve the issues with billing. I'm not sure what leadership did with that. Can that order be sent to Christianah to be followed up with if that's true?

In summary, if we were fully staffed, we could avoid these issues.

Therefore, I'm asking you and Captain Nelson if we could get some corpsmen/active duty military to assist the dept until we get back on our feet? We could use their help. In addition, can we get help with priority hiring to fill our vacancies?

Thanks,

Ozzie/Ken

*TYPES OF THINGS I SPEAK UP TO*

## Kochiu, Azis FHCC Lovell

| | |
|---|---|
| **From:** | Kochiu, Azis FHCC Lovell |
| **Sent:** | Friday, September 1, 2023 4:16 PM |
| **To:** | Martinez, Patricia (ORMDI); Tolbert, Melvin R. |
| **Cc:** | Ruge, Randa; Coleman, Monica; Ravipati, Mamata FHCC Lovell; Lorenzo-Villarino, Donnabelle L.; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl; Marknielsen@ronjohnson.senate.gove |
| **Subject:** | RE: ozzie EEO/Union |
| **Attachments:** | Active delay of care.docx; Scheduled delay of care.docx; Todays pendings delay of care.docx |

Sorry for the extra emails but the attached do not have names and ss numbers on them just how many days today's worklist is In the DELAY of Care catagory

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Friday, September 1, 2023 4:14 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl <Cheryl.Andersen@va.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** RE: ozzie EEO/Union

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Friday, September 1, 2023 3:55 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl <Cheryl.Andersen@va.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** RE: ozzie EEO/Union

I would like the Union, EEO and all upper leadership to look at these worklists. I've been falsely accused of "delay of care." Everything you see in red is a delay in care, as you can see, **they go past 300 days.** My question to **all leadership** is, are you going to go after all the employees in the department with the **same intensity** as you did and are currently doing to me? You can see the proof that the other employees should be hit with delay in care? Or is this just bully the white guy, non-female, non-Filipino, that speaks up on behalf of the veterans billing issues, who follows Nursing process triage and has bugled to National and VISN many times to let nurses practice within our scope, and not be blocked at every turn. But instead what you have is I followed Donnabelle's new work flow which she set into motion on 11-10-23 and did as I was told but she blamed the nurse for what the administrative staff was directed to do per her directive. Proof was shown to upper leadership via a team's recording of Donnabelle stating in no uncertain terms, nurses process the consults both complex and moderates and admin staff follow up in a few days to schedule the appt. Obviously, upper leadership disregarded that evidence no matter how often I brought it up or they overlooked it. Of course, Donnabelle wasn't going to volunteer that info because it would implicate her and the whole case against me would be frivolous. All leadership had to do was listen to the recording and writing and solidify it by asking what directive the entire OCC dept is working by. The OCC employees would have echoed my sediments.

**In summary**, are all leadership going to go after the other employees in this department as explained above and subject them to **the exact chart review**, with no deviation than the one I was put through, and with **the exact intensity** and discipline as you came after me with?

Ozzie kochiu

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Wednesday, September 6, 2023 10:41 AM
**To:** Morse, Alex M. <Alex.Morse@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>
**Subject:** RE: Response follow up

Dr Buckley and Alex,

With all due respect, I am humbly asking the following questions. I understand you guys made your decision on the evidence presented to you and that's what you had to go off in making your decision. Please understand, I am not faulting you guys in the least bit.

1. Just wondering, did Donnabelle ever give you guys access to her video recording which depicts her directive to the department in regard to policy/procedure to follow on processing consults and which staff are assigned to which part of the processing and scheduling?

2. Was my CCP note ever entered into evidence which shows I documented that I called the veteran?

On a side note, the issue of preferred preferences was not needed since veteran had a preference to be seen at Froedtert South this has been the ongoing directive to the department staff. Furthermore, we were never told it needed to be documented through the toolbox. Over a year ago there was a back and forth between Ken Dizon and Donnabelle about that exact issue which never got resolved. Now some of us older staff never documented in that section of the toolbox as we were never told it was mandatory and never trained on it. Soon National is requiring that everything be done through the toolbox; however, that has not taken place yet.

3. Lastly, can you please indicate to me specifically what part of policy I did not follow?

Most of the stuff stating I did not document in the chart review was presented by Donnabelle to obfuscate psa duties and cloud up the issues between RN and PSA documentation as a way to circumvent her own direction to the department which she clearly states on recording and in writing in no uncertain terms. In other words if she had been truthful the recording would have implicated her.

I just want to make sure if it was something I missed I want to own up to it so I can learn from it.

By letting me know specifically what policy I failed to follow within the required time frame, resulting in a delay of care, it very likely could be something that I did follow through on but was just overlooked due to lack of evidence presented to you guys, and sadly I have to say it was misleading evidence presented by Donnabelle up the chain of command.

Example: During the peer review committee Donnabelle entered deceptive information. She entered deceptive information in the chart review, to Dr Ravipatie which in turn was sent to you guys. During the Peer Review Committee, Donnabelle tampered with evidence when she allowed a summary either by her or on her behalf to be presented to the Peer Review Committee as if the consult was and an expedite, when indeed it was not and expedite.

She also made issue of the consult being a complex vs moderate when she clearly stated in the recording and in writing that RNs process all complex and moderates and PSAs do all the scheduling. I called the veteran, documented my call in the CCP note per Christianah's directive long ago, he had a preferred provider, the consult was processed and sent to the community and the PSA was alerted to schedule the consult. All within the scope of Donnabelle's directive.

So, whether it was a complex or moderate didn't matter as the RNs have to do both anyway. And based on this consult being Renal I sent it out in a timely manner and alerted the PSA to schedule, even though I was out most of the week and in addition the consult was not on the daily worklist for several days after being entered by the requesting provider. Furthermore, what is the timeframe in order for the consult to be timely? In the dept we have many consults over 200 and 300 days old which would be considered delay of care.

Would you guys be so kind and please interview the staff both RNs and administrative staff with regards to workflow policy and who does what? What time frames we have, etc etc etc. I think that will make things a lot clearer.

If the above recording and ccp note were not entered into evidence, will you give me the okay to enter it myself?

Thank you,
Please take this into consideration
Azis "ozzie" Kochiu
414-617-9879

I don't really check my work emails as I'm currently serving my sentence this week. If you could correspond through my personal email until next week when I'm back at work that would be appreciated.

Again thank you

Kochiu106@gmail.com

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Tuesday, August 15, 2023 4:04 PM
**To:** Coleman, Monica <Monica.Coleman@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Good afternoon,

As I stated in my email before, I do not have access to CPRS and do not have the ability to retrieve the information requested. Since this is an item entered on the employee's behalf, the responsibility to obtain the information falls on the employee. Is this not something he is able to pull from the patient's chart? Maybe HIMS would be the appropriate POC to obtain the information if the employee s not able to.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* HR Quick Card
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

**From:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Monday, August 14, 2023 3:06 PM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Alex,

Please see information request. The information provided will be added as evidence.

V/R,

*Monica Coleman BSN, RN*
**NNOC/NNU Capt James A Lovell FHCC VA Director**
**NNOC/NNU VA Lead National Safety Officer**
**RN Community Care Coordinator**
**Office of Community Care Network (CCN)**
Captain James A Lovell Federal Health Care Center
3001 Greenbay Road
North Chicago, IL 60064
**Phone: 224-610-8632**
**Fax: 224-610-8638**
**Email:** Monica.Coleman@va.gov

NNU Membership form:
https://www.nationalnursesunited.org/vamembershipform

**ADO Form**
https://www.nationalnursesunited.org/sites/default/files/nnu/documents/0522_ADO_Electronic_Form.pdf



**National Nurses United**

"I don't know how to change it, but I know if I keep talking about how dirty it is our here, somebody's gonna clean it up" ~ Tupac Amur Shakur

"We make a living by what we get, we make a life by what we give" ~ Winston Churchill

"You don't make progress by standing on the sidelines, whimpering and complaining. You make progress by implementing ideas." – Shirley Chisholm



**CONFIDENTIALITY NOTICE:** "This document may contain information covered under the Privacy Act. 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Monday, August 14, 2023 11:21 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

If it is something you would like to add on your behalf, please feel free to submit. I do not have CPRS access.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* HR Quick Card
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Monday, August 14, 2023 10:35 AM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Greetings Alex,

The other day I started processing consults for the first time in over 3 months. After I send the consults, I write a note/summary in what is called a CCP note or (community care progress note). Anyway, in the template I noticed as I was processing consults that there is a questions and boxes to click asking how my care coordination was determined. Please see the template below.

Are you privy to getting the care coordination progress note on the day I sent the consult? The reason is that I believe that I clicked the box indicating I spoke to the patient.

Monica, can you follow up regarding this? I would like to make this part of the evidence.

Care approved under section 201 of the COMPACT Act with 38 U.S.C 17201J

Chief Complaint: *

Veteran Admitted?
- ⚪ Yes
- ⚪ No
- ⚪ Unknown

Level of Care Coordination
- ⚪ Basic (Optional)
- ⦿ Moderate

    Care Coordination was determined from:
    *
    - ☐ Chart Review
    - ☐ Phone call to Veteran/Family/Caregiver
    - ☐ Phone call from Veteran/Family/Caregiver

| Visit Info | | Finish . | Cancel |

---

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Friday, August 11, 2023 7:43 AM
**To:** Coleman, Monica <Monica.Coleman@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Good morning,
Thank you for the update, I will reach out to Donnabelle and ask for the link and access.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:  HR Quick Card*
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

---

**From:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Thursday, August 10, 2023 4:40 PM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** Re: Response follow up

Hello Alex,

Being that the recording is the property of the hospital, we ask that you give permission for its release from Donnabelle who was the "host" of the team's meeting held on 11/10/22 "workflow/work assignment."

V/R.

*Monica Coleman BSN. RN.*

**NNOC/NNU VA Capt. James A Lovell Director**
**NNOC/NNU VA Lead National Safety Rep**
**RN Community Care Coordinator**
**Office of Community Care Network (CCN)**
Captain James A Lovell Federal Health Care Center
**3001 Greenbay Road**
**North Chicago, IL 60064**
**Community Care ACD Line (224) 610-8632**
**Email**: Monica.Coleman@va.gov

See the source image

---

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Thursday, August 10, 2023 2:12:08 PM
**To:** Coleman, Monica <Monica.Coleman@va.gov>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Buckley, Robert G. FHCC <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Sounds good, thank you very much. Tomorrow is fine.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN 12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* HR Quick Card
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

---

**From:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Thursday, August 10, 2023 2:10 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Morse, Alex M. <Alex.Morse@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** Re: Response follow up

Hi Alex,

Yes we would like for the recording to be submitted. Please give me until EOB tomorrow to submit that. I believe that it needs permission from Donnabelle for it to be released. I am not in front of the computer at the moment to verify.

V/R,

*Monica Coleman BSN, RN*

**NNOC/NNU VA Capt. James A Lovell Director**
**NNOC/NNU VA Lead National Safety Rep**
**RN Community Care Coordinator**
**Office of Community Care Network (CCN)**
Captain James A Lovell Federal Health Care Center
**3001 Greenbay Road**
**North Chicago, IL 60064**
**Community Care ACD Line (224) 610-8632**
**Email:** Monica.Coleman@va.gov

---

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Thursday, August 10, 2023 1:59:36 PM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Let me call you after this meeting.

---

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Thursday, August 10, 2023 1:58 PM
**To:** Morse, Alex M. <Alex.Morse@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>

**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: Response follow up

Thank you, I will do that.  But I'm not good with computers if you want I can come to your office after this meeting I'm in and maybe you can take it off my teams and put it on yours?

---

**From:** Morse, Alex M. <Alex.Morse@va.gov>
**Sent:** Thursday, August 10, 2023 1:54 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** Response follow up

Good afternoon,
Yesterday during your response, you played a recording of Donnabelle going over the process. If you would like it to be considered as a part of the evidence you submitted, please reply to this email with a copy of the recording.

*Very Respectfully,*

*Alex Morse*

**HR Specialist- Employee/Labor Relations**
**VISN12 Human Resources**
**Phone: 224-803-6312**
*How was your HR service today?*
*Please take a few moments to complete the HR Customer Service Quick Card at this link:* _HR Quick Card_
*Please select VISN 12 and (556) FHCC/Network/VISN 12 HR*

*TYPES OF THINGS I SPEAK UP TO*

**Kochiu, Azis FHCC Lovell**

| | |
|---|---|
| **From:** | Kochiu, Azis FHCC Lovell |
| **Sent:** | Friday, September 1, 2023 4:16 PM |
| **To:** | Martinez, Patricia (ORMDI); Tolbert, Melvin R. |
| **Cc:** | Ruge, Randa; Coleman, Monica; Ravipati, Mamata FHCC Lovell; Lorenzo-Villarino, Donnabelle L.; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl; Marknielsen@ronjohnson.senate.gove |
| **Subject:** | RE: ozzie EEO/Union |
| **Attachments:** | Active delay of care.docx; Scheduled delay of care.docx; Todays pendings delay of care.docx |

Sorry for the extra emails but the attached do not have names and ss numbers on them just how many days today's worklist is in the DELAY of Care catagory

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Friday, September 1, 2023 4:14 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl <Cheryl.Andersen@va.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** RE: ozzie EEO/Union

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Friday, September 1, 2023 3:55 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl <Cheryl.Andersen@va.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** RE: ozzie EEO/Union

I would like the Union, EEO and all upper leadership to look at these worklists. I've been falsely accused of "delay of care." Everything you see in red is a delay in care, as you can see, **they go past 300 days**. My question to **all leadership** is, are you going to go after all the employees in the department with the **same intensity** as you did and are currently doing to me? You can see the proof that the other employees should be hit with delay in care? Or is this just bully the white guy, non-female, non-Filipino, that speaks up on behalf of the veterans billing issues, who follows Nursing process triage and has bugled to National and VISN many times to let nurses practice within our scope, and not be blocked at every turn. But instead what you have is I followed Donnabelle's new work flow which she set into motion on 11-10-23 and did as I was told but she blamed the nurse for what the administrative staff was directed to do per her directive. Proof was shown to upper leadership via a team's recording of Donnabelle stating in no uncertain terms, nurses process the consults both complex and moderates and admin staff follow up in a few days to schedule the appt. Obviously, upper leadership disregarded that evidence no matter how often I brought it up or they overlooked it. Of course, Donnabelle wasn't going to volunteer that info because it would implicate her and the whole case against me would be frivolous. All leadership had to do was listen to the recording and writing and solidify it by asking what directive the entire OCC dept is working by. The OCC employees would have echoed my sediments.

**In summary**, are all leadership going to go after the other employees in this department as explained above and subject them to **the exact chart review**, with no deviation than the one I was put through, and with **the exact intensity** and discipline as you came after me with?

Ozzie kochiu

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Thursday, August 31, 2023 1:36 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>; Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Stokes, Gary W. <GStokes@flra.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** RE: ozzie EEO/Union

I would like to add the worst part of this harassment is that Lovell is small and my name and reputation have been slandered throughout the hospital and I cannot get a transfer or even an interview into a new dept because of this.

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Thursday, August 31, 2023 1:29 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>; Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Stokes, Gary W. <GStokes@flra.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** ozzie EEO/Union

Patricia and Melvin,

One of my issues with regards to the EEO currently in motion is the workload I have been receiving. I have asked to be on a fully loaded work group as I have not been on one since I've been in this dept compared to my colleagues; however, now I am back in the department working shorthanded yet again. Today I was given 32 pending consults as well as an email to work on aging consults, this is in addition to all my other work. This is nothing less than a set up to fail as the work should be distributed evenly among the entire staff. With this much work something is bound to be missed no matter how hard someone tries to do everything right and leadership can say if I miss clicking a button or what not that I can be detailed. With this amount of work anyone can make a mistake and I don't want to be sitting in that situation again.

In addition, one of the EEO issues I brough forth was that I was being disciplined on a proposed 2-week suspension, which was an act of retaliation as I was initially told this would be a "slap on the wrist." This 2-week proposal was handed down only after the EEO informal investigation had taken place. Today I was issued a 3-day suspension instead of the 2-week proposed suspension, despite the fact that I followed protocol exactly how Donnabelle stated which she is on recording stating as well as in writing detailing the protocol to follow in no uncertain terms. Furthermore, Donnabelle did not submit my CCP note indicating my documentation. Her responsibility was to do a full and fair investigation that is not one sided biased. But what she did do was submit and obfuscate PSA duties into my chart review to cloud up the issues and circumvent her own directive to the department and used it against me in the chart review. To further compound matters Donnabelle tampered with evidence when allowing the issue of the consult in question be entered to the Peer Review Committee under the guise of it being an "expedite" when indeed it was

*EXAMPLE OF NOT SPEAKING UP*

**Kochiu, Azis FHCC Lovell**

| | |
|---|---|
| **From:** | Arowora, Christianah T. FHCC Lovell |
| **Sent:** | Thursday, September 14, 2023 12:45 PM |
| **To:** | Kochiu, Azis FHCC Lovell |
| **Subject:** | RE: ECR suicide patient |

Thank you for the information.

V/r

Christianah Arowora MSN. MHA. BSN. BS. RN. CCRN-K. CCM.
Nurse Manager/Division Officer Office of Community Care (OCC)
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Direct: (224) 610-8639 or 88639
Cell phone: 847-456-5050
Email: Christianah.Arowora@va.gov

*GOING ABOVE AND BEYOND FOR PATIENT AND BEING TOLD I CANNOT GET UPPER LEADERSHIP INVOLVED*



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Thursday, September 14, 2023 12:30 PM
**To:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Subject:** RE: ECR suicide patient

I agree with everything you are saying but Donnabelle doesn't work that way, she plays favoritism and discriminates against certain staff members. No matter how often that is brought up to upper leadership they ignore it. Therefore, to protect myself from becoming her victim again, I simply listed everyone through the chain of command, that way I won't get blamed for not doing my job when other leaders can assist in helping a suicide patient as it's everyone's

1



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

---

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Thursday, September 14, 2023 8:25 AM
**To:** Carmona Caravelli, Anita (she/her/hers) <Anita.CarmonaCaravelli@va.gov>; Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>; VHANCH FHCC SPC <FHCCSPC@va.gov>; Lecce, Kristina R. FHCC Lovell <Kristina.Lecce@va.gov>
**Cc:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>
**Subject:** RE: ECR suicide patient

Thanks, Anita, I appreciate it. From this point forward let's keep Dr Buckley off this thread and proceed through Dr Ravipati. I know I tagged him but he's not needed at this time.

ozzie

---

**From:** Carmona Caravelli, Anita (she/her/hers) <Anita.CarmonaCaravelli@va.gov>
**Sent:** Thursday, September 14, 2023 7:29 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>; VHANCH FHCC SPC <FHCCSPC@va.gov>; Lecce, Kristina R. FHCC Lovell <Kristina.Lecce@va.gov>
**Cc:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>
**Subject:** RE: ECR suicide patient

Good morning,
We appreciate your efforts Ozzie. A great example that suicide prevention is everyone's business. There is no clinical indication for a well-being check at this time. The Veteran was hospitalized in a private sector facility – and he had an appointment for follow up in MH, unfortunately – he did not present as scheduled.

This Veteran is well-versed on obtaining emergency services in times of crisis – this is his baseline. Despite the best efforts of VA staff – it is the Veteran's preference not to engage in outpatient treatment.

The Veteran is currently on the REACH VET list at FHCC. A MH Provider will attempt outreach per protocol established.

3

VHANCH FHCC SPC <FHCCSPC@va.gov>; Lecce, Kristina R. FHCC Lovell <Kristina.Lecce@va.gov>
**Cc:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Ravipati, Mamata FHCC Lovell
<Mamata.Ravipati1@va.gov>; Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>
**Subject:** RE: ECR suicide patient

Hello,
I am the Lead Suicide Prevention Coordinator here. I have looked at the Veteran's chart and consulted with my
Teammates. You could try to call his mother to determine whether she has spoken with him, and if she has any safety
concerns of her own. She may be also able to provide an updated address for the Veteran. It looks as though he has a
history of 'no shows' for his appointments, and much of this is his baseline behavior. If you were able to obtain
documents from the outside hospital – perhaps they have a different address or phone number you could try.

You could also try sending him a text if you have a VA cell phone, or communicating through MyHealtheVet...

If these efforts are unfruitful, we have no other options currently. JLV was viewed and he is not hospitalized at any
other VA facility.

Please let us know if we can be of further assistance.

Be well,
Anita

*Anita Carmona Caravelli, LCSW*
Lead Suicide Prevention Coordinator
Captain James A. Lovell FHCC
3001 Green Bay Road
North Chicago, IL 60064
Office: (224) 610-5870
VA Cell: (224) 465-1887
Anita.CarmonaCaravelli@va.gov
Team: FHCCSPC@va.gov

 
New number, same support.
Dial 988 then Press 1

---

**From:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Sent:** Wednesday, September 13, 2023 10:38 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Chapman, Jamie A. (she/her/hers) <Jamie.Chapman@va.gov>;
Marolt, Jacqueline L. FHCC Lovell <Jacqueline.Marolt@va.gov>; Carmona Caravelli, Anita (she/her/hers)
<Anita.CarmonaCaravelli@va.gov>
**Cc:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Ravipati, Mamata FHCC Lovell
<Mamata.Ravipati1@va.gov>; Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>
**Subject:** RE: ECR suicide patient
**Importance:** High

Azis--- Have you heard back from the Ingleside Police or not?

V/r

5

000471

<u>Donnabelle.Lorenzo-Villarino@va.gov></u>; Ravipati, Mamata FHCC Lovell <u>Mamata.Ravipati1@va.gov></u>; Buckley, Robert G. FHCC Lovell <u>Robert.G.Buckley@va.gov></u>
**Subject:** RE: ECR suicide patient

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Wednesday, September 13, 2023 9:07 AM
**To:** Chapman, Jamie A. (she/her/hers) <u>Jamie.Chapman@va.gov></u>; Marolt, Jacqueline L. FHCC Lovell <u>Jacqueline.Marolt@va.gov></u>; Carmona Caravelli, Anita (she/her/hers) <u>Anita.CarmonaCaravelli@va.gov></u>
**Cc:** Arowora, Christianah T. FHCC Lovell <u>Christianah.Arowora@va.gov></u>; Lorenzo-Villarino, Donnabelle L. <u>Donnabelle.Lorenzo-Villarino@va.gov></u>
**Subject:** ECR suicide patient

Jackson 2444 ECR suicide veteran on 8-24-23

```
09/13/2023 ADDENDUM                        STATUS: COMPLETED
Call out to his listed number 224-908-8126 stated, "your call can not be
completed at this time..."


Call out to veteran's emergency contact number 224-433-3360 which states,
"the
person you called has a voice box not set up yet..."


/es/ AZIS V KOCHIU
NURSE
Signed: 09/13/2023 08:46
```

The Northwestern notes in JLV dated Set 13 only indicate labs for the date 8-24-23 stating nothing with regards to suicide ideation.

I've read all the MH notes which indicate none of you listed above have been able to reach veteran.  I also saw a letter mailed to veteran to call you back, has there been any progress on him calling back?

I will send for a wellness check.

ozzie


Northwestern tells me vet was admitted on Aug 23 and discharged on aug 29.

I sent Ingleside Police to do a wellness check right now 847-587-3100.  If they contact vet they will give him my number to call me.

Anyone have any other options?

ozzie

7

**Kochiu, Azis FHCC Lovell**

*DISCRIMINATION*

*REASONS FOR TARGETED*

*REPRISAL*

| | |
|---|---|
| **From:** | Kochiu, Azis FHCC Lovell |
| **Sent:** | Friday, September 15, 2023 1:42 PM |
| **To:** | Martinez, Patricia (ORMDI) |
| **Subject:** | RE: ozzie EEO/Union |

The reason I sent you the message was that I am being treated differently because I'm a Male compared to the Females in this dept. This was one of the issues I brought up initially.

The whistleblower issue I brought up was that I told Donnabelle the manager that staff are working on their own time and not getting paid. They work until 10 pm when work ends at 4 pm, Saturdays and Sundays all without pay. I told Donnabelle this before I was detailed which shows this was another example of retaliation as I was detailed shortly thereafter.

Today on recording we had a meeting with the RNs and Management in which I asked Donnabelle multiple questions. I won't go into them all because they are on recording which I can present at another time. But anyway, I stated this is my 3rd attempt making a whistleblower statement to management. I stated to Donnabelle with regards to the staff working and not getting paid and stated that it's a violation of Federal labor Law, violation of tele work agreement, and violation of HIPPA laws. The union asked Donnabelle if that was true, to which Donnabelle balked and then stated it was brought up to her in the past. Yes, because I brought it up and it was just another way to retaliate against me.

The other issue regarding the suspension will be brought up to the nursing board and OIG. However, the other issues I raised go directly to me being discriminated for my gender and retaliation.

**From:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>
**Sent:** Friday, September 15, 2023 11:23 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: ozzie EEO/Union

Good morning,

The issues you are bring up are not within the jurisdiction of the EEOC. If you feel that management is wrongdoing in anyway, please contact the VA's Office of Inspector General (OIG) or with the VA Office of Accountability and Whistleblower Protection (OAWP), which can be reached at https://www.va.gov/accountability/, or contacted via phone at 202-461-4119, Fax: 202-495-5601 or email at VAAccountabilityTeam@va.gov.

Thank you.

*Patricia Martinez*

**EEO Specialist**
**Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District**
**2255 Enterprise Drive, Suite 5506**
**Westchester, IL 60154**
**C: 708.904.0955**
**F: 708.236.2898**

1

**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: ozzie EEO/Union

Hi Mr. Kochiu,

If you filed an appeal with MSPB, then no.

Thanks.

*Patricia Martinez*

**EEO Specialist**
**Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District**
**2255 Enterprise Drive, Suite 5506**
**Westchester, IL 60154**
**C: 708.904.0955**
**F: 708.236.2898**
Helpful Links: OPM|*Healthcare | Life Insurance | TSP | FSAFeds | myPay | eOPF | BeneFeds
(Dental/Vision) WebTA


**U.S. Department of Veterans Affairs**
Human Resources and Administration
Operations, Security and Preparedness
*Office of Resolution Management, Diversity & Inclusion*

***NOTICE:** ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time. In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically. All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.*

**VA Core Values:** Integrity Commitment Advocacy Respect Excellence
**VA Core Characteristics:** Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service. Please take a moment to* complete a very brief survey *to let us know how my service was today.*

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Friday, September 8, 2023 12:19 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>
**Subject:** RE: ozzie EEO/Union

Patricia,

I don't have the option of filing the suspension via a Union grievance. I have however, filed the suspension to the Appeals Board. Can I keep the suspension portion of the EEO within your dept as well?

3

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Friday, September 1, 2023 3:55 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Marknielsen@ronjohnson.senate.gove; Andersen, Cheryl <Cheryl.Andersen@va.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** RE: ozzie EEO/Union

I would like the Union, EEO and all upper leadership to look at these worklists. I've been falsely accused of "delay of care." Everything you see in red is a delay in care, as you can see, **they go past 300 days**. My question to **all leadership** is, are you going to go after all the employees in the department with the **same intensity** as you did and are currently doing to me? You can see the proof that the other employees should be hit with delay in care? Or is this just bully the white guy, non-female, non-Filipino, that speaks up on behalf of the veterans billing issues, who follows Nursing process triage and has bugled to National and VISN many times to let nurses practice within our scope, and not be blocked at every turn. But instead what you have is I followed Donnabelle's new work flow which she set into motion on 11-10-23 and did as I was told but she blamed the nurse for what the administrative staff was directed to do per her directive. Proof was shown to upper leadership via a team's recording of Donnabelle stating in no uncertain terms, nurses process the consults both complex and moderates and admin staff follow up in a few days to schedule the appt. Obviously, upper leadership disregarded that evidence no matter how often I brought it up or they overlooked it. Of course, Donnabelle wasn't going to volunteer that info because it would implicate her and the whole case against me would be frivolous. All leadership had to do was listen to the recording and writing and solidify it by asking what directive the entire OCC dept is working by. The OCC employees would have echoed my sediments.


In addition, is upper leadership going to go after three nurses, two nurses in this dept who happen to be female and one who is male for cancelling a consult and ignoring records in which JPRS were filed? Two of the consults resulted in the death of veterans, the other resulted in a pulmonary nodule that spread to cancer throughout the entire thoracic cavity. How do I know this? Two oncology nurses told me they filed the JPRS on the nurses in the community care dept, and they told me the names of the nurses they filed on. This will be brought out in the further investigations that will take place as nothing happened to any of them.

I've included Nation in this email chain as we have had to have them give the department guidance on procedure and best evidence-based practice to follow by. One of the issues brought up by National was why are nurses scheduling? Why are nurses not working as case managers, nurse liaisons but instead are processing consults? They also mentioned why can't admin staff process consults and do the refdoc? We were also told they want nurses to work at the top of their license rather than do all the ancillary work.

The dept rules change weekly, if not daily? We have two managers that don't get along and don't talk to one another. The dept hears rules from one manager that is different than the other. It's constant chaos. Every employee in the dept is disgruntled, although they may not say it to management in fear of retaliation. We have staff working overtime until 10pm, Saturdays and Sundays, until 4am all without pay and Donnabelle knows this is happening as I told her this is happening which by the way is a labor law violation as well as the tele work agreement violation we all signed, not to mention they are riding a thin line in violation of HIPPA when staff are looking into charts off tour of duty. Yet Donnabelle compares the people that follow the rules as far as workload within tour of duty hours to the people that are violating the tele agreement and labor laws and comparing what is being done. This issue was also brought up in one of our two Teams building meetings with Dave that we had last summer. IT should look into the charts and see which nurses are in violation of these practices.

5

*DONNABELLO NOT*
*FOLLOW WE MGR OWN*
*RULES.*

## Kochiu, Azis FHCC Lovell

| | |
|---|---|
| **From:** | Kochiu, Azis FHCC Lovell |
| **Sent:** | Monday, September 18, 2023 2:48 PM |
| **To:** | Flood, Nicole L. (VACO); Martinez, Patricia (ORMDI); Tolbert, Melvin R.; Ravipati, Mamata FHCC Lovell; Koehler, Brian F. |
| **Cc:** | Lorenzo-Villarino, Donnabelle L.; Arowora, Christianah T.  FHCC Lovell; Buckley, Robert G. FHCC Lovell; Morse, Alex M.; Coleman, Monica; Perkins, Kindra (NNU); Ruge, Randa |
| **Subject:** | community care, orthopedics 2543186 |

Brian and Melvin,

Regarding,  Turner, M (0046)

On 3-30-23 this consult went from pending to active.

I came across this consult through an email sent to me rather than to the appropriate women's group.

Anyway, this consult was received by leadership on the above date and was made a "basic" contrary to what the admin screen pulls it up as.  In addition there was no clinical triage ran in which leadership assigned it to a psa when it is not a basic.

Is there any reason why I'm held to a different standard than the manager (who detailed and suspended me),  who is an RN no more and no less than I am?

Ozzie

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Monday, September 18, 2023 12:15 PM
**To:** Coleman, Monica <Monica.Coleman@va.gov>
**Cc:** Perkins, Kindra (NNU) <kperkins@nationalnursesunited.org>
**Subject:** RE: 72/80 Action Day

Kindra and Monica,

Kindra, with regards to the nurses meeting on 9-15-23 someone said they were recording it but it was not recorded. Kindra, you are witness to me telling Donnabelle that I made 3 whistleblower attempts two of which were directly to her and one to Dave in teams building last summer with regards to the staff working overtime until 10pm, Saturdays and Sundays and not getting paid. You then asked Donnabelle if that was true and she balked for a moment then stated it was brought up to her and I said yes it was me that told you. Then she indicated she can't stop what people do with their computers at home... etc etc etc.

I need you and others in the meeting per EEO case managers request when the investigator asks for the evidence.

ozzie

**From:** Coleman, Monica <Monica.Coleman@va.gov>
**Sent:** Tuesday, September 5, 2023 9:16 AM
**To:** FHCC Lovell NNU <FHCCLovellNNU@va.gov>
**Cc:** Perkins, Kindra (NNU) <kperkins@nationalnursesunited.org>
**Subject:** 72/80 Action Day

National Nurses Organizing Committee and National Nurses United

# *Union Nurses of North Chicago, VA:*

Nationwide, NNOC/NNU nurses have been fighting tirelessly for the VA Governance Board to vote for *72/80, Nationwide, NOW* by adopting the REBOOT Task Force 72/80 plan.

- **In early September, the VA Governance Board will be taking up 72/80 again, and this time may vote to adopt the plan, or to dismiss the voices of VA nurses across the**

**country.**

Nurses at the North Chicago VA know that when only a few of us speak up, nurses get nothing. But when we're united and take a stance, we can make the largest single healthcare system in the US, the VA, do what's right for nurses and patients alike. That's why VA nurses and NPs of NNOC/NNU are calling for a National Day of Action for 72/80. VA nurses across the country are standing up and demanding with one powerful voice: "WHAT DO WE WANT? 72/80! WHEN DO WE WANT IT? NOW!!!"

*Join your fellow VA nurses across the country in the efforts to get 72/80. How can you participate?*

*1. Attend the Action on September 7, 2023 10a-1p*

- **When:** Thursday, 9/7/23, from 10am-1pm Central Time

- **Where:** Corner of Buckley and Lewis Main

- **What:** Nurses wear red and peacefully demonstrate for 72/80 while on your break or your off-day

*Email Union Nurse Director, Monica Coleman at monica.coleman@VA.gov or NNU Labor Rep, Kindra Perkins at kperkins@calnurses,org to RSVP for the event*

*2. Send a message to the VA Governance Board directly with the NNOC/NNU digital postcard, and encourage your coworkers, friends, and family to send one too! Click to Here send a digital postcard!*

Remember: you have every legal right to speak up, protest, and fight for what you know is right, and if management or anybody tells you otherwise, NNOC/NNU has your back all the way. We all know that management, and even some coworkers, like to spread misinformation, rumors, or scare-tactics to try to keep nurses from speaking up. So even if you hear things like "management will do something to anyone who participates in your Union's action" or "oh I heard that there actually isn't an action happening", don't panic, always verify information with Monica Coleman as well as other certified Nurse Reps and keep standing Union Strong. At the end of the day, the strongest message to send to any nay-sayers is showing up with as many nurses as possible and standing firm for what's right.

## *For 72/80, RNs/NPs Won't Back Down!*



National Nurses United | nationalnursesunited.org
8455 Colesville Rd, Suite 1100 | Silver Spring, MD 20910
You can manage your email subscriptions here

GX
REPRISAL
Sent up the

**Kochiu, Azis FHCC Lovell**

**From:** [illegible]
**Sent:** [illegible]
**To:** [illegible]
**Cc:** [illegible]
**Subject:** [illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

**Kochiu, Azis FHCC Lovell**

*[handwritten annotations: BY REPRISAL ASKING FOR CLARIFICATION / SENT UP THE CHAIN OF COMMAND]*

| | |
|---|---|
| **From:** | Kochiu, Azis FHCC Lovell |
| **Sent:** | Wednesday, September 20, 2023 9:53 AM |
| **To:** | Ravipati, Mamata FHCC Lovell; Flood, Nicole L. (VACO); Martinez, Patricia (ORMDI); Tolbert, Melvin R.; Koehler, Brian F. |
| **Cc:** | Lorenzo-Villarino, Donnabelle L.; Arowora, Christianah T. FHCC Lovell; Buckley, Robert G. FHCC Lovell; Morse, Alex M.; Coleman, Monica; Perkins, Kindra (NNU); Ruge, Randa |
| **Subject:** | RE: community care, orthopedics 2543186 |

I'm following the chain of command that's why I listed all the people in this email thread as well as EEO.

Will there be an RCA into the issue at large that I was detailed and suspended for? There will be a lot of Community Care Staff that would like to speak on that issue. I have asked Donnabelle and mentioned for an RCA to others above through the chain of command to no avail. I believe I should be told the specific reason I was detailed other than "failure to follow policy". What policy exactly? How can I correct anything if I don't know what I did wrong? I'm not asking for an RCA to litigate my suspension and detail, but as nurses and doctors we need to correct any unforeseen errors that can come up.

For example, we had two JPRS filed in the last year one for a death and the other for a pulmonary nodule that was missed and spread throughout the entire thoracic cavity. Just a month ago one of the RNs sent a complex 35-year-old suicide patient to a psa being trained or just out of training in which the veteran hung herself. Suicide is an RN responsibility not a PSA. However, nothing happened to any of them, but we all know what happened to me.

Anyway, I don't need to continue failing to follow policy not knowing which one unless you tell me. I am not giving Donnabelle another reason to target me and harass me down the road as she has been, when I don't know what I did wrong in order to correct said policy.

During last Thursday's in-service Donnabelle was playing semantics and obfuscating with the workflow details she directed on 11-10-22. Obviously, because the entire community care staff knows her directive, she gave on 11-10-22 which is clear as the sky is blue from her own words on recording and on transcript. If she wants to play semantics, we can do that all day long...why was the nurse that followed me not detailed, how about the doctor that entered the consult, how about Donnabelle as a manager that is an RN and should have followed up on said consult, or the PSA she directed to schedule the consult per her directive? Semantics are her way to muddy the waters and try to confuse and hedge against her issue of detailing and suspending me, to cover up her directive as well as when she tampered with evidence to the peer review committee, I brought to CME attention recently. I don't know about you, but if someone lies and tampers with evidence that directly goes to their character in my opinion. So rather than stick to the statement of facts on her directive 11-10-22 that she stated which go far beyond a preponderance of evidence that one would need to be from another galaxy not to see it for what it is.

I have nothing to hide, I told the truth and will continue with the truth through whatever means I have to go through. Even if it means testifying in front of Congress. If I had done something wrong I would own it and not be fighting this hard for my credibility that has been slandered at Lovell

An RCA will bring to light what happened and if something did happen then it can be corrected so we can collectively as a hospital correct the error. Instead, what I'm seeing is, Mission accomplished, Ozzie suspended, sweep it under the rug and move on. That corrects nothing and doesn't help the veterans at all. That's doing a disservice to the vets.

On a different topic during Thursday's meeting, I brought the issue of staff working overtime without pay. Staff are working until 10pm, Saturdays and Sundays without pay in violation of Federal Labor Laws, violation of the tele work agreement we all signed, and those that are doing it are riding the tight rope of Hippa violations since they are opening patient charts while off tour of duty. Kindra (union rep) asked, Donnabelle if this is true to which Donnabell surprisingly admitted that she knew this was brought to her attention in the past. To which I stated yes," that's because I brought it up to you". Obviously, when I brought the issue of workers working without pay to Donnabelle on my second attempt, it just so happened I was detailed shortly thereafter which led to this cascade of ongoing issues.

The rumor mill in Community Care between the past few days by the nurses was why wasn't Thursday's meeting recorded as evidence?

I told the truth, Dr Ravipati but nobody believed me no matter how much direct evidence was presented and what witnesses I had.

Thank you,

ozzie

---

**From:** Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>
**Sent:** Wednesday, September 20, 2023 8:37 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Flood, Nicole L. (VACO) <Nicole.Flood@va.gov>; Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>; Koehler, Brian F. <Brian.Koehler@va.gov>
**Cc:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>; Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Morse, Alex M. <Alex.Morse@va.gov>; Coleman, Monica <Monica.Coleman@va.gov>; Perkins, Kindra (NNU) <kperkins@nationalnursesunited.org>; Ruge, Randa <RRuge@nationalnursesunited.org>
**Subject:** RE: community care, orthopedics 2543186

Good morning,

Thank you for bringing it our attention, the issue that was brought forth will be looked into.

V/R,
Mamata Ravipati, MD
Assistant Chief Medical Executive Ambulatory Care
Captain James A.Lovell Federal health Care Center
Assistant Professor of Medicine
Rosalind Franklin Univeristy of Science and Medicine
Phone: 224-610-5300.
Fax: 224-610-3863.

CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Thursday, August 31, 2023 1:29 PM
**To:** Martinez, Patricia (ORMDI) <Patricia.Martinez2@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>; Reed, Mechell A. (ORMDI) (she/her/hers) <Mechell.Reed@va.gov>
**Cc:** Ruge, Randa <RRuge@nationalnursesunited.org>; Coleman, Monica <Monica.Coleman@va.gov>; Ravipati, Mamata FHCC Lovell <Mamata.Ravipati1@va.gov>; Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>; Stokes, Gary W. <GStokes@flra.gov>; Marknielsen@ronjohnson.senate.gove
**Subject:** ozzie EEO/Union

Patricia and Melvin,

One of my issues with regards to the EEO currently in motion is the workload I have been receiving. I have asked to be on a fully loaded work group as I have not been on one since I've been in this dept compared to my colleagues; however, now I am back in the department working shorthanded yet again. Today I was given 32 pending consults as well as an email to work on aging consults, this is in addition to all my other work. This is nothing less than a set up to fail as the work should be distributed evenly among the entire staff. With this much work something is bound to be missed no matter how hard someone tries to do everything right and leadership can say if I miss clicking a button or what not that I can be detailed. With this amount of work anyone can make a mistake and I don't want to be sitting in that situation again.

In addition, one of the EEO issues I brough forth was that I was being disciplined on a proposed 2-week suspension, which was an act of retaliation as I was initially told this would be a "slap on the wrist." This 2-week proposal was handed down only after the EEO informal investigation had taken place. Today I was issued a 3-day suspension instead of the 2-week proposed suspension, despite the fact that I followed protocol exactly how Donnabelle stated which she is on recording stating as well as in writing detailing the protocol to follow in no uncertain terms. Furthermore, Donnabelle did not submit my CCP note indicating my documentation. Her responsibility was to do a full and fair investigation that is not one sided biased. But what she did do was submit and obfuscate PSA duties into my chart review to cloud up the issues and circumvent her own directive to the department and used it against me in the chart review. To further compound matters Donnabelle tampered with evidence when allowing the issue of the consult in question be entered to the Peer Review Committee under the guise of it being an "expedite" when indeed it was not. As well as making the issue of it being a complex vs moderate which wouldn't matter since her directive was RNs do all moderate and complex consults.

But what is most striking is that to this day I wasn't told why I was being investigated or should I say what the exact charge is and therefore, I was put through unnecessary pain and suffering which I continue to endure.

I was not offered a fair, full and proper investigation into this matter. The RN that followed my consult was not disciplined neither was the psa who's responsibility it was to schedule the consult.

At this point I would like to file a grievance with the union as well as have OIG come in and do the full and proper investigation so that I can take this harassment to an arbitration judge.

As far as the EEO goes I would like a full and fair investigation in this matter as well as have the opportunity to speak to and Administrative Judge for the false charges against me and speak on the pain, suffering and PTSD I'm going through.


Azis Kochiu

I disagree with the yearly assessment of a "satisfactory" rating for many reasons but will only list the following:

1. I was the one that emailed Dr Buckley and talked to Captain Pyles and Steve Kaufman regarding getting overtime staff to assist OCC either through the Military or otherwise. Dr Buckley responded to me through email with regards to my request. Moreover, this is something leadership should have done, not a low-level RN in the department who processes consults and works other ancillary jobs contrary to what VISN and National are asking of RNs. If not for me we never would have had the 3000 hours of OT so far, and the dept would be sitting dead last in VISN 12.

2. There are new staff in this department that had 6 months of training that had gotten bonuses and higher ratings than I did.

3. The comment stating, "He realized, he lack in utilizing evidence based practices in his everyday practice," I disagree with that assessment of me. I never said that. I always make sure I'm on top of the latest evidence-based medical practice, as I probably have more critical care experience than any other nurse in this department. Leadership in this department treats the numbers and not the patients which is contrary to EBP. When I fight for nurses to practice at the top of their license which includes our critical thinking and case manage, I'm ignored, and leadership is more concerned about the metrics than triaging patients accordingly. We're not putting lawn mowers together; we're treating human beings; however, the dept is run like an assembly line. The said offensive statement projected towards me stating, "He lacks everyday evidence-based practice" is insulting.

I have a billing proposal sent to the House Veterans Affairs Committee, in Washington DC in line with the subcommittee waiting for vote. I realize I didn't turn in my self-performance eval, but stepping my game up goes straight to my integrity and dedication to the veterans and making the VA a better workplace.

Azis Kochiu

**Department of Veterans Affairs**

# PROFICIENCY REPORT

## SECTION A - INDIVIDUAL REPORTED ON

| 1. NAME (Last, First, Middle) | | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY | 4. FACILITY NO. |
|---|---|---|---|---|
| KOCHIU, AZIS | | | Chief of Staff 556 | |

| 5. GRADE/STEP | 6. POSITION TITLE | 7. PROBATIONARY REVIEW | | 8. PERIOD COVERED BY REPORT | |
|---|---|---|---|---|---|
| VN-02 | RN/CASE MGR/CARE, CHIEF OF STAFF | DUE | COMPLETED | FROM 02/28/2022 | TO 02/27/2023 |

| 9. SERVICE | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE |
|---|---|---|
| CHIEF OF STAFF | | |

## SECTION B - NARRATIVE EVALUATION BY RATING OFFICIAL

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

LORENZO-VILLARINO, DONNABELLE  05/04/2023

**Dimension: Practice**

### Practice

Mr. Kochiu applies nursing process to system at the unit.  Mr. Kochiu works collaboratively with patient/providers/outside providers in care coordination.

### Ethics

He collaborated with an interdisciplinary team to include primary care, and specialty care, leadership and with the veteran discuss the course of action to take in order to acquire emergent approval for needed care.

### Resource Utilization

He collaborated with an interdisciplinary team to include primary care, and specialty care, leadership and with the veteran discuss the course of action to take in order to acquire emergent approval

**Dimension: Professional Development**

### Performance

Mr. Kochiu reviews consults assigned to him. He makes sure all pertinent information needed in the consult are present prior to processing and routing to community provider to avoid rejection.

### Education/Career Development

He continues to self-assess knowledge on his current nursing practices and on a monthly basis meet with UBC to discuss new areas of improvement

**Dimension: Collaboration**

### Collegiality

Mr. Kochiu is collaborating with the Unit based council to identify areas of improvement and present to leadership

### Collaboration

Mr. Kochiu is collaborating with the Unit based council to identify areas of improvement and present to leadership

**Dimension: Scientific Inquiry**

### Quality of Care

Working in various avenues in nursing, Mr. Kochiu was able to gain a tremendous amount of knowledge through experience.  He realized, he lack in utilizing evidence based practices in his everyday practice,

### Research

Mr. Kochiu reviews the guidebooks and looks for opportunity to improve the process.

**Additional Considerations**

Employee did not enter self-assessment.

**SECTION C - RATING BY RATING OFFICIAL**

| INSTRUCTIONS | LEGEND |
|---|---|
| An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement. | <u>UNSATISFACTORY -</u> Has not met all criteria.<br><br><u>LOW SATISFACTORY -</u> Has met all criteria, but at times performance marginal.<br><br><u>SATISFACTORY -</u> Has met all criteria, at times exceeds expectations.<br><br><u>HIGH SATISFACTORY -</u> Has met all criteria, usually exceeds expectations by a substantial margin.<br><br><u>OUTSTANDING -</u> Has met all criteria, consistently exceeds expectations to an exceptional degree. |

**12. CATEGORY I - NURSING PRACTICE** *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☑ SATISFACTORY   ☐ HIGH SATISFACTORY   ☐ OUTSTANDING

**13. CATEGORY II - INTERPERSONAL RELATIONSHIPS** *(Works effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☑ SATISFACTORY   ☐ HIGH SATISFACTORY   ☐ OUTSTANDING

**SECTION D - OVERALL EVALUATION**

**14. OVERALL RATING –** *(An objective appraisal of overall competency based on rating in Section C. See VA Handbook 5013, Part II)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☑ SATISFACTORY   ☐ HIGH SATISFACTORY   ☐ OUTSTANDING

**15. ENTRIES ON THIS FORM ARE BASED ON:**

☑ FREQUENT OR DAILY CONTACT          ☑ FREQUENT OBSERVATIONS OF WORK RESULTS
☐ INFREQUENT CONTACT                       ☐ JOINT REVIEW WITH:
☐ INFREQUENT OBSERVATIONS OF WORK RESULTS

**NO. OF MONTHS UNDER MY SUPERVISION THIS RATING PERIOD**

12

**16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTS IN WRITING?** *(See VA Handbook 5013, Part II.)*

☐ YES          ☐ NO          ☑ NOT APPLICABLE

| 17a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| Electronically signed by: Christianah Arowora | RN/CASE MGR/CARE, CHIEF OF STAFF | 08/25/2023 |

IF IN DISAGREEMENT WITH RATING, REFER TO VA HANDBOOK 5013, PART II

RAVIPATI, MAMATA  05/04/2023

  Concur

| 18a. SIGNATURE OF APPROVING OFFICIAL | 18b. POSITION | 18c. DATE |
|---|---|---|
| Electronically signed by: Mamata Ravipati MD | ASSOC COS RES & DEV | 05/04/2023 |

| SECTION F- SIGNATURE OF REVIEW BY ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES *(if required.)* | |
|---|---|
| 19a. SIGNATURE OF THE ASSOCIATE DIRECTOR FOR PATIENT CARE SERVICES | 19b. DATE |

| SECTION G - RATED EMPLOYEE | |
|---|---|
| 20a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)* | 20b. DATE |
| Electronically signed by: azis kochiu | 08/25/2023 |

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

**From:** Kochiu, Azis FHCC Lovell
**To:** Lorenzo-Villarino, Donnabelle L.
**Subject:** RE: ePerformance
**Date:** Tuesday, March 21, 2023 11:25:43 AM
**Attachments:** image001.png
image002.png

Just do it without my input.

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Tuesday, March 21, 2023 11:22 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: ePerformance

It's a tool for both employees and supervisors – once actioned to employees for example to provide input – it is up to the employees to provide the input and send that back to supervisor for rating.

Respectfully,

**Donnabelle Lorenzo-Villarino, RN**
Managed Care Department Head
ACME-Ambulatory Care/CME Directorate
X68454

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Tuesday, March 21, 2023 11:17 AM
**To:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Subject:** RE: ePerformance

I thought it wasn't mandatory for employees to do it

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Tuesday, March 21, 2023 11:16 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: ePerformance

I have not received a response in regards to your appraisal. Please take action in eperformance.

Respectfully,

**Donnabelle Lorenzo-Villarino, RN**
Managed Care Department Head
ACME-Ambulatory Care/CME Directorate
X68454

**From:** Lorenzo-Villarino, Donnabelle L.
**Sent:** Tuesday, February 21, 2023 3:58 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** ePerformance

Good afternoon,

Please take action on your performance appraisal plan by COB 2/27/2023.

000488

| KOCHIU, AZIS | 2623 | 40% | Annual | Employee - Create Self-assessment | 12/29/2022 | KOCHIU, AZIS | ➡ |

*Respectfully,*

**Donnabelle Lorenzo-Villarino, RN**
*Managed Care Clinical Coordinator/Division Officer*
*Patient Administration Department/Resources Directorate*
*Captain James A. Lovell Federal Health Care Center*
3001 Green Bay Road North Chicago, IL 60064
Work: 1-847-688-1900 x88454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: <u>donnabelle.lorenzo-villarino@va.gov</u>



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Rediscolsure without additional patient consent, or as permitted by law, is prohibited. Unauthorized rediscolsure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

## SECTION C — RATING BY RATING OFFICIAL

| INSTRUCTIONS | LEGEND |
|---|---|
| An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement. | UNSATISFACTORY — Has not met all criteria. LOW SATISFACTORY — Has met all criteria, but at times performance marginal. SATISFACTORY — Has met all criteria, at times exceeds expectations. HIGH SATISFACTORY — Has met all criteria, usually exceeds expectations by a substantial margin. OUTSTANDING — Has met all criteria, consistently exceeds expectations to an exceptional degree. |

11. CATEGORY I — NURSING PRACTICE *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☒ SATISFACTORY  ☐ HIGH SATISFACTORY  ☐ OUTSTANDING

12. Category II — interpersonal relationships *(Words effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☒ SATISFACTORY  ☐ HIGH SATISFACTORY  ☐ OUTSTANDING

## SECTION D — OVERALL EVALUATION

13. OVERALL RATING — *(An objective appraisal of overall competency based on rating in Section C, See DM&S Supplement, MP-5, Part II, Chapter 6, Appendix 6A)*

☐ UNSATISFACTORY  ☐ LOW SATISFACTORY  ☒ SATISFACTORY  ☐ HIGH SATISFACTORY  ☐ OUTSTANDING

14. ENTRIES ON THIS FORM ARE BASED ON:

☒ FREQUENT OR DAILY CONTACT  ☒ FREQUENT OBSERVATIONS OF WORK RESULTS

☐ INFREQUENT CONTACT  ☐ JOINT REVIEWED WITH: _____

☐ INFREQUENT OBSERVATIONS OF WORK RESULTS

NO. OF MONTHS UNDER MY SUPERVISION

12

16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTED IN WRITING? *(See DM&S Supplement, MP-5, part II. Chapter 6.)*

☐ YES  ☐ NO  ☒ NOT APPLICABLE

17a. SIGNATURE OF RATING OFFICIAL
CHRISTIANAH AROWORA
400463
Digitally signed by CHRISTIANAH AROWORA 400463
Date: 2022.02.15 11:03:32 -06'00'

17b. POSITION
Nurse Manager

17c. DATE

## SECTION E — COMMENTS OF APPROVING OFFICIAL

IF AN DISAGREEMENT WITH RATING, REFER TO DM&S, MP-5, PART II, CHAPTER 6, APPENDIX 6A.

18. SIGNATURE OF APPROVING OFFICIAL
DONNABELLE L LORENZO-VILLARINO 1403592
Digitally signed by DONNABELLE LORENZO-VILLARINO 1403592
Date: 2022.02.15 09:52:41 -06'00'

17b. POSITION
Managed Care Division Officer

17c. DATE
02/11/2022

## SECTION F — RATED EMPLOYEE

19a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)*

19b. DATE

NOTE: Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

PROFESSIONAL CAREER DEVELOPMENT PROGRAM — Nurses in centralized positions and nurses with a masters or higher degrees will complete VA Forms 10-5349 and 10-5349a, Recipients of a VA Health Professional Scholarship will complete VA Form 10-5349a until obligated service is completed.

VA FORM **10-2623**

| | Veterans Administration | **PROFICIENCY REPORT** |
|---|---|---|

## SECTION A — INDIVIDUAL REPORTED ON

| 1. NAME *(Last, First, Middle)* KOCHIU, AZIS | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY Capt. James Lovell FHCC | 4. FACILITY NO. 556 |
|---|---|---|---|

| 5. GRADE/STEP II/ 1 | 6. POSITION TITLE RN/Nurse Care Coordinator | 7. PROBATIONARY REVIEW | | 8. PERIOD COVERED BY REPORT |
|---|---|---|---|---|

| 7. PROBATIONARY REVIEW DUE | COMPLETED | 8. PERIOD COVERED BY REPORT FROM 2/19/2021 | TO 2/1/2022 |
|---|---|---|---|

| 9. SERVICE OCC/Managed Care/PAD | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE 2/19/2019 |
|---|---|---|

## SECTION B — NARRATIVE EVALUATION BY RATING OFFICIAL

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

Mr. Azis Kochiu did not provide input regarding this proficiency.

PRACTICE:
Mr. Azis Kochiu is currently one of the Clinical Coordinators in the Office of Community Care (OCC) program. In his current role, he is responsible for providing direct staff support in planning, designing, integrating, implementing, modifying, and evaluating the effectiveness of the components of the program. He also served as a liaison to both internal and external providers to ensure a seamless transition to and from the community. Mr. Kochiu works collaboratively with all levels of multi-specialty interdisciplinary healthcare providers, including primary care physicians, pharmacists, social workers, dietitians, behavioral health specialist, outpatient and inpatient departments, ancillary services and community resources. Mr. Kochiu is a strong Advocate for his patients. Mr. Kochiu works diligently to help external providers navigate the complex VHA Health system.

ETHICS:
Mr. Kochiu has the knowledge of eligibility for VA medical care, priorities for care, release of information, Health Information Portability and Accountability Act (HIPAA) Laws, and the Medical Fee Basis programs. Mr. Kochiu adhered to strict guidelines of confidentiality regarding patients, their families, and VA staff. He provided oversight and education with co-workers on the importance of reporting and addressing any issue that went outside the guidelines. He serves as a role model in educating others to make them aware of ethical issues to include unethical practices. Mr. Kochiu ensured the confidentiality of clinical reviews and documented information regarding patients and providers. According to the American Nurses Association (Imperative 8.4), "Nurses must always stress human rights protection with particular attention to preserving the human rights of vulnerable groups, such as the poor, the homeless, the elderly, the mentally ill, prisoners, refugees, women, children, and socially stigmatized groups". And (Imperative 8.2)7 Ethics, human rights, and nursing converge as a formidable instrument for social justice and human rights must be diligently protected and promoted." Mr. Kochiu worked diligently during COVID 19 ensuring every patient had medical attention either through Telehealth, alternative appointment or even finding another provider. This insured veteran's health care was cover to the best ability of the situation at hand.

RESOURCE UTILIZATION:
Mr. Kochiu has thorough knowledge of all basic clinical policies and procedures dealing with outpatient scheduling and other clinical topics. Mr. Kochiu monitors the follow-up to recommendations specific to Community Care. He maintains provider specific statistical data regarding total consult reports and inappropriate consults and ensures all consults are acted on and completed in a timely manner. Mr. Kochiu possess a working knowledge of clinic processes and services to function in/interact with various clinics throughout the hospital. Mr. Kochiu makes independent judgment as required in many situations and care concerns, when there are no written guidelines to cover every situation in the process. As an incumbent RN makes determinations on intent of laws, regulations, and applies guidelines as necessary.
Mr. Kochiu depending on the nature of inquiry, urgency of need for medical attention, or workload, exercised judgment in interpreting guides without deviating from routine procedures.

EDUCATION/CAREER DEVELOPMENT:
Mr. Kochiu works helped as a mentor and preceptor to the new LPN hire into Office of Community Care. Mr. Kochiu always work diligently helping to put the Veterans first. Mr. Kochiu always participates in all the ongoing training for Community Care. He demonstrates technical competency in the use of Tri-west Portal, Health Referral Management system (HSRM), Joint Legacy Viewer (JLV), Referral authorization system for dialysis, Procurement performance management system (PPMS) and Financial Business and Consumer Solutions (FBCS) authorization.

PERFORMANCE:
Mr. Kochiu uses his astute clinical knowledge to valuate practice of self and others using professional standards, relevant statutes, and regulations. Mr. Kochiu takes actions to improve performance. Mr. Kochiu identifies patterns, and trends in the constant changes of OCC processing standard handed down from National office of OCC. Mr. Kochiu evaluates current practice of the program and recommends changes to be implemented. When the key is to get Veterans to be aware of changes to the Office of Community Care, he proposed a solution which is being investigate by Leadership. Mr. Kochiu is working with leadership to identify the issues to modify and improve the program and to facilitate accomplishment of quality management goals and objectives in compliance with laid down Standard of Operation.

COLLEGIALITY:
Mr. Kochiu has heightened awareness of the need for improved patient safety and work with Nurse Manager on consults that needs looked closely at and referred to the ordering provider. Mr. Kochiu supports professionally and aims to achieve a common objective, which is the best patient care possible. Mr. Kochiu uses communication skills to facilitate decision making to improve health care delivery. When a provider entered a consult for a patient outside geographical area and promised patient, they were eligible for the care, he collaborated with her team and leadership to enhance health care delivery. Mr. Kochiu educated patient and family of their eligibility status with the MISSION Act which states that the patient is eligible for community care within the geographical area but does not automatically make them eligible to go out of state for the same care that can be provided. Veteran's understanding was heightened, and customer recovery was done.

COLLABORATION:
Mr. Kochiu collaborates with members of his interdisciplinary team to deliver continuum of care. He led his alpha split team to evaluate the quality of services provided with the medical center, the region and other medical centers as requested. Mr. Kochiu adhered to the policy of Office of Community Care and maintained an on-going communication/collaboration with leadership and providers to ensure that veterans understand and have the option to be a part of their treatment plan regarding their health issues.

QUALITY OF CARE:
Mr. Kochiu implements and maintains the elements of specific Case Management & Utilization Management programs to evaluate the quality of patient care and the appropriateness and timeliness of services provided e.g. Care Assessment Need (CAN) score utilization to differentiate moderate to complex consults. Mr. Kochiu continually goes above and beyond for his patients, making sure customer care is a top priority for Veterans and their families. This is something he practices each in every day of his work.

RESEARCH:
Mr. Kochiu is new to the VA system and to FHCC. Mr. Kochiu collaborates with others within the services to validate and improve nursing practice and patient care delivery. Mr. Kochiu continue to research the new VHA directives as they pertain to managed care. He diligently researches the complex nature of the ever-changing forms and programs. This information is always passed on to the entire team in a seamless effort, making Community Care to operate without disruption with his significant input.

VA FORM **10-2623**

Page 3 of 3

I have been provided with the following VA Form (s):  ☐ 10-5349    ☐ 10-5349a

VA FORM **10-2623**

| VA | Veterans Administration | PROFICIENCY REPORT | | |
|---|---|---|---|---|

**SECTION A — INDIVIDUAL REPORTED ON**

| 1. NAME *(Last, First, Middle)*<br>KOCHIU, AZIS | 2. SOCIAL SECURITY NUMBER | 3. NAME AND LOCATION OF FACILITY<br>Capt. James A. Lovell FHCC | | 4. FACILITY NO.<br>556 |
|---|---|---|---|---|
| 5. GRADE/STEP<br>I/9 | 6. POSITION TITLE<br>Registered Nurse/ Nurse Care Coordinator | 7. PROBATIONARY REVIEW | 8. PERIOD COVERED BY REPORT | |

| | | DUE<br>2/19/21 | COMPLETED | FROM<br>2/19/20 | TO<br>2/19/21 |
|---|---|---|---|---|---|

| 9. SERVICE<br>RESOURCES/PAD/Managed Care/<br>OCC | 10. DATE OF BIRTH | 11. SERVICE COMPUTATION DATE<br>2/19/19 |
|---|---|---|

**SECTION B — NARRATIVE EVALUATION BY RATING OFFICIAL**

INSTRUCTIONS: Document how the nurse meets the criteria stated in the VA Nurse Qualification Standards and appropriate functional statement, other significant professional contributions, and areas needing improvement. (The narrative evaluation should be limited to the space provided except in unusual circumstances.)

**Mr. Azis Kochiu did not provide input regarding this proficiency.**

### I.    PRACTICE DIMENSION

**PRACTICE:**

Mr. Azis Kochiu is currently one of the Clinical Coordinators in the Office of Community Care (OCC) program. In his current role, he is responsible for providing direct staff support in planning, designing, integrating, implementing, modifying, and evaluating the effectiveness of the components of the program. He also served as a liaison to both internal and external providers to ensure a seamless transition to and from the community. Mr. Kochiu works collaboratively with all levels of multi-specialty interdisciplinary healthcare providers, including primary care physicians, pharmacists, social workers, dietitians, behavioral health specialist, outpatient and inpatient departments, ancillary services and community resources. Mr. Kochiu is a strong Advocate for his patients. Mr. Kochiu works diligently to help external providers navigate the complex VHA Health system.

**ETHICS:**

Mr. Kochiu has the knowledge of eligibility for VA medical care, priorities for care, release of information, Health Information Portability and Accountability Act (HIPAA) Laws, and the Medical Fee Basis programs. Mr. Kochiu adhered to strict guidelines of confidentiality regarding patients, their families, and VA staff. He provided oversight and education with co-workers on the importance of reporting and addressing any issue that went outside the guidelines. She serves as a role model in educating others to make them aware of ethical issues to include unethical practices. Mr. Kochiu ensured the confidentiality of clinical reviews and documented information regarding patients and providers. According to the American Nurses Association (Imperative 8.4), "Nurses must always stress human rights protection with particular attention to preserving the human rights of vulnerable groups, such as the poor, the homeless, the elderly, the mentally ill, prisoners, refugees, women, children, and socially stigmatized groups". And (Imperative 8.2)7 Ethics, human rights, and nursing converge as a formidable instrument for social justice and human rights must be diligently protected and promoted." Mr. Kochiu worked diligently during COVID 19 ensuring every patient had medical attention either through Telehealth, alternative appointment or even finding another provider. This insured veteran's health care was cover to the best ability of the situation at hand.

**RESOURCE UTILIZATION:**

Mr. Kochiu has thorough knowledge of all basic clinical policies and procedures dealing with outpatient scheduling and other clinical topics. Mr. Kochiu monitors the follow-up to recommendations specific to Community Care. He maintains provider specific statistical data regarding total consult reports and inappropriate consults and ensures all consults are acted on and completed in a timely manner. Mr. Kochiu possess a working knowledge of clinic processes and services to function in/interact with various clinics throughout the hospital. Mr. Kochiu makes independent judgment as required in many situations and care concerns, when there are no written guidelines to cover every situation in the process. As an incumbent RN makes determinations on intent of laws, regulations, and applies guidelines as necessary.
Mr. Kochiu depending on the nature of inquiry, urgency of need for medical attention, or workload, exercised judgment in interpreting guides without deviating from routine procedures.

VA FORM 10-2623

## II. PROFESSIONAL DEVELOPMENT

**EDUCATION/CAREER DEVELOPMENT:**
Mr. Kochiu works helped as a mentor and preceptor to the new LPN hire into Office of Community Care. Mr. Kochiu always work diligently helping to put the Veterans first. Mr. Kochiu always participates in all the ongoing training for Community Care. He demonstrates technical competency in the use of Tri-west Portal, Health Referral Management system (HSRM), Joint Legacy Viewer (JLV), Referral authorization system for dialysis, Procurement performance management system (PPMS) and Financial Business and Consumer Solutions (FBCS) authorization.

**PERFORMANCE:**
Mr. Kochiu uses his astute clinical knowledge to valuate practice of self and others using professional standards, relevant statutes, and regulations. Mr. Kochiu takes actions to improve performance. Mr. Kochiu identifies patterns, and trends in the constant changes of OCC processing standard handed down from National office of OCC. Mr. Kochiu evaluates current practice of the program and recommends changes to be implemented. When the key is to get Veterans to be aware of changes to the Office of Community Care, he proposed a solution which is being investigate by Leadership. Mr. Kochiu is working with leadership to identify the issues to modify and improve the program and to facilitate accomplishment of quality management goals and objectives in compliance with laid down Standard of Operation.

## III. COLLABORATION
**COLLEGIALITY:**
Mr. Kochiu has heightened awareness of the need for improved patient safety and work with Nurse Manager on consults that needs looked closely at and referred to the ordering provider. Mr. Kochiu supports professionally and aims to achieve a common objective, which is the best patient care possible. Mr. Kochiu uses communication skills to facilitate decision making to improve health care delivery. When a provider entered a consult for a patient outside geographical area and promised patient, they were eligible for the care, he collaborated with her team and leadership to enhance health care delivery. Mr. Kochiu educated patient and family of their eligibility status with the MISSION Act which states that the patient is eligible for community care within the geographical area but does not automatically make them eligible to go out of state for the same care that can be provided. Veteran's understanding was heightened, and customer recovery was done.

**COLLABORATION:**
Mr. Kochiu collaborates with members of his interdisciplinary team to deliver continuum of care. He led his alpha split team to evaluate the quality of services provided with the medical center, the region and other medical centers as requested. Mr. Kochiu adhered to the policy of Office of Community Care and maintained an on-going communication/collaboration with leadership and providers to ensure that veterans understand and have the option to be a part of their treatment plan regarding their health issues.

**SCIENTIFIC INQUIRY**
**QUALITY OF CARE:**
Mr. Kochiu implements and maintains the elements of specific Case Management & Utilization Management programs to evaluate the quality of patient care and the appropriateness and timeliness of services provided e.g. Care Assessment Need (CAN) score utilization to differentiate moderate to complex consults. Mr. Kochiu continually goes above and beyond for his patients, making sure customer care is a top priority for Veterans and their families. This is something he practices each in every day of his work.

**RESEARCH:**
Mr. Kochiu is new to the VA system and to FHCC. Mr. Kochiu collaborates with others within the services to validate and improve nursing practice and patient care delivery. Mr. Kochiu continue to research the new VHA directives as they pertain to managed care. He diligently researches the complex nature of the ever-changing forms and programs. This information is always passed on to the entire team in a seamless effort, making Community Care to operate without disruption with his significant input.

VA FORM 10-2623

## SECTION C — RATING BY RATING OFFICIAL

| INSTRUCTIONS | LEGEND |
|---|---|
| An adjective rating will be assigned for each category. The adjective ratings will reflect and summarize how the nurse meets the criteria stated in the Nurse VA Qualification Standard and appropriate functional statement. | UNSATISFACTORY — Has not met all criteria.<br>LOW SATISFACTORY — Has met all criteria, but at times performance marginal.<br>SATISFACTORY — Has met all criteria, at times exceeds expectations.<br>HIGH SATISFACTORY — Has met all criteria, usually exceeds expectations by a substantial margin.<br>OUTSTANDING — Has met all criteria, consistently exceeds expectations to an exceptional degree. |

**11. CATEGORY I — NURSING PRACTICE** *(Demonstrates a level of professional nursing practice appropriate to grade and functional statement.)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☐ SATISFACTORY   ☒ HIGH SATISFACTORY   ☐ OUTSTANDING

**12. Category II — interpersonal relationships** *(Works effectively with individuals and groups at the level appropriate to grade and functional statement.)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☒ SATISFACTORY   ☒ HIGH SATISFACTORY   ☐ OUTSTANDING

## SECTION D — OVERALL EVALUATION

**13. OVERALL RATING** — *(An objective appraisal of overall competency based on rating in Section C, See DM&S Supplement, MP-5, Part II, Chapter 6, Appendix 6A)*

☐ UNSATISFACTORY   ☐ LOW SATISFACTORY   ☐ SATISFACTORY   ☒ HIGH SATISFACTORY   ☐ OUTSTANDING

**14. ENTRIES ON THIS FORM ARE BASED ON:**

☒ FREQUENT OR DAILY CONTACT   ☒ FREQUENT OBSERVATIONS OF WORK RESULTS

☐ INFREQUENT CONTACT   ☐ JOINT REVIEWED WITH: _____

☐ INFREQUENT OBSERVATIONS OF WORK RESULTS

**NO. OF MONTHS UNDER MY SUPERVISION:** 12

**16. FOR FULL-TIME PERMANENT NURSES RECEIVING A LOW SATISFACTORY OR UNSATISFACTORY RATING, HAS THE REQUIREMENT BEEN MET FOR ADVANCE COUNSELING DOCUMENTED IN WRITING?** *(See DM&S Supplement, MP-5, part II, Chapter 6)*

☐ YES   ☐ NO   ☐ NOT APPLICABLE

| 16a. SIGNATURE OF RATING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| CHRISTIANAH AROWORA 400463 — Digitally signed by CHRISTIANAH AROWORA 400463 Date: 2020.12.29 16:11:55 -06'00' | NURSE MANAGER/DIVISION OFFICER OCC | 12/29/20 |

## SECTION E — COMMENTS OF APPROVING OFFICIAL

IF AN DISAGREEMENT WITH RATING, REFER TO DM&S, PART II, CHAPTER 6, APPENDIX 6A.

| 18a. SIGNATURE OF APPROVING OFFICIAL | 17b. POSITION | 17c. DATE |
|---|---|---|
| *[signature]* | MANAGER CARD DIVISION OFFICER | 01.08.2021 |

## SECTION F — RATED EMPLOYEE

| 19a. SIGNATURE OF EMPLOYEE *(I have seen the approved rating and have had the opportunity to discuss it.)* | 19b. DATE |
|---|---|
| *[signature]* | 1/13/21 |

**NOTE:** Concise comments concerning your rating may be submitted in writing to your supervisor and will be filed in your Official Personnel Folder and/or Board Action Folder.

**PROFESSIONAL CAREER DEVELOPMENT PROGRAM** — Nurses in centralized positions and nurses with a masters or higher degrees will complete VA Forms 10-5349 and 10-5349a. Recipients of a VA Health Professional Scholarship will complete VA Form 10-5349a until obligated service is completed.

VA FORM **10-2623**

Page 4 of 4

I have been provided with the following VA Form (s):   ☐ 10-5349   ☐ 10-5349a

VA FORM 10-2623

RE: Fact Finding

**Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>**

Fri 3/24/2023 11:54 AM

To:Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>

This is retaliation


**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Friday, March 24, 2023 11:51 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Fact Finding

Good morning,

As discussed this morning, a JPSR was submitted related to delay in patient care delivery.

Below are the dates and times I am available next week for the Weingarten meeting.
The meeting will take place in my office, Building 9 Room 214.

Should you wish to have union representation, it is your responsibility to provide the below
dates and times to the union when checking their availability.

Please selects one of the following dates and times:
- Wednesday, March 29th, 1500
- Thursday, March 30th, 1500
- Friday, March 31st, 1000

**Please responds by Monday, March 27, 2023 no later than 1500.**


*Respectfully,*

**Donnabelle Lorenzo-Villarino, RN**
*Managed Care Department Head*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
*3001 Green Bay Road North Chicago, IL 60064*

000497

Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: donnabelle.lorenzo-villarino@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Rediscosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**RE: Fact Finding**

**Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>**

Fri 3/24/2023 11:54 AM

To:Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>

You have to tell me what this is for

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Friday, March 24, 2023 11:51 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Fact Finding

Good morning,

As discussed this morning, a JPSR was submitted related to delay in patient care delivery.

Below are the dates and times I am available next week for the Weingarten meeting. The meeting will take place in my office, Building 9 Room 214.

Should you wish to have union representation, it is your responsibility to provide the below dates and times to the union when checking their availability.

Please selects one of the following dates and times:
- Wednesday, March 29th, 1500
- Thursday, March 30th, 1500
- Friday, March 31st, 1000

**Please responds by Monday, March 27, 2023 no later than 1500.**

*Respectfully,*

*Donnabelle Lorenzo-Villarino, RN*
*Managed Care Department Head*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
*3001 Green Bay Road North Chicago, IL 60064*

000499

Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: donnabelle.lorenzo-villarino@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**RE: Fact Finding**

**Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>**

Fri 3/24/2023 12:04 PM

To:Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
Cc:Coleman, Monica <Monica.Coleman@va.gov>;Sherrod, Cecilia A. FHCC Lovell <Cecilia.Sherrod@va.gov>;Ruge, Randa <RRuge@nationalnursesunited.org>

Hello union,

My manager will not let me know what patient this is concerning. Can one of you find out so I can look into the matter. It feels like retaliation for me speaking up to the billing issues.

ozzie

---

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Friday, March 24, 2023 11:55 AM
**To:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Subject:** RE: Fact Finding

This is retaliation

---

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Friday, March 24, 2023 11:51 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Fact Finding

Good morning,

As discussed this morning, a JPSR was submitted related to delay in patient care delivery.

Below are the dates and times I am available next week for the Weingarten meeting. The meeting will take place in my office, Building 9 Room 214.

Should you wish to have union representation, it is your responsibility to provide the below dates and times to the union when checking their availability.

Please selects one of the following dates and times:
- Wednesday, March 29th, 1500

- Thursday, March 30th, 1500
- Friday, March 31st, 1000

**Please responds by Monday, March 27, 2023 no later than 1500.**

*Respectfully,*

**Donnabelle Lorenzo-Villarino, RN**
*Managed Care Department Head*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
3001 Green Bay Road North Chicago, IL 60064
Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: donnabelle.lorenzo-villarino@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."



**RE: Fact Finding**

**Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>**

Fri 3/24/2023 11:56 AM

To:Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>

Let me know so I can get the command suite involved

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Friday, March 24, 2023 11:51 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** Fact Finding

Good morning,

As discussed this morning, a JPSR was submitted related to delay in patient care delivery.

Below are the dates and times I am available next week for the Weingarten meeting. The meeting will take place in my office, Building 9 Room 214.

Should you wish to have union representation, it is your responsibility to provide the below dates and times to the union when checking their availability.

Please selects one of the following dates and times:
- Wednesday, March 29th, 1500
- Thursday, March 30th, 1500
- Friday, March 31st, 1000

**Please responds by Monday, March 27, 2023 no later than 1500.**

*Respectfully,*

*Donnabelle Lorenzo-Villarino, RN*
*Managed Care Department Head*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
3001 Green Bay Road North Chicago, IL 60064

000504

Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: donnabelle.lorenzo-villarino@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."



**DEPARTMENT OF VETERANS AFFAIRS**
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Rd
North Chicago, IL 60064

08 May 2023

Azis Kochiu
Community Care/Managed Care/ACME
Captain James A. Lovell Federal Health Care Center
3001 North Green Bay Rd
North Chicago, Illinois 60064

Re: Temporary Reassignment

1. Due to an investigation being conducted, you are temporarily reassigned, effective immediately. You are to report to Allen Vintola, Business Manager in building 133, room BA 117-A and/or Amy Clayton, Supervisory Administrative Officer in building 133, room 116 A for assignment of duties pending completion of the investigation. You temporary location will be on building 133 room 118.

2. I am issuing this temporary reassignment to facilitate an orderly inquiry and investigation of these allegations.

3. The primary functions of this assignment will include (but not limited to) answering phones, taking messages, running errands, JPI, action plans and other administrative duties outside patient care. You will be given training, if necessary, to aid the completion of your assignments. Your scheduled tour of duty will not be changed.

4. This order will remain in effect until such time as I, or a higher authority, cancels it.

5. If you have any questions or concerns, please contact me at 224-610-1900 x64227.

_____          05 · 08 · 2023
Donnabelle Lorenzo-Villarino                Date
Managed Care Department Head

I acknowledge receipt of this letter:

*REFUSED TO SIGN*                          05 · 08 · 2023
_____          _____
Azis Kochiu                               Date



**DEPARTMENT OF VETERANS AFFAIRS**
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Rd
North Chicago, IL 60064

August 01, 2023

Azis Kochiu
Nurse
Community Care
Captain James A. Lovell Federal Health Care Center
3001 North Green Bay Rd
North Chicago, Illinois 60064

Re:  Rescission of Temporary Reassignment

1.  The temporary reassignment that you received on May 08, 2023, is rescinded.

2. Effective immediately, you will report to BLD9/Room 206. You are expected to perform your job duties as Nurse. You will go back to your original tour of duty, 08:00am to 04:30pm. You will report to Christianah Arowora.

3. If you have any questions or concerns please contact me at 224-610-2013

MAMATA
RAVIPATI
<small>Digitally signed by MAMATA
RAVIPATI
Date: 2023.08.01 07:52:33
-05'00'</small>

_____          _____
Mamata Ravipati, MD                                           Date
Assistant Chief Medical Executive Ambulatory Care

I acknowledge receipt of this letter:

_____          _____
Azis Kochiu                                                          Date

Mr. Kochiu refused to sign the forms

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| KOCHIU, AZIS VELIKO | ▮▮▮ | ▮▮▮ | 10/08/2023 |

### FIRST ACTION | ### SECOND ACTION

| 5–A. Code | 5–B. Nature of Action | 6–A. Code | 6–B. Nature of Action |
|---|---|---|---|
| 721 | REASSIGNMENT | | |

| 5–C. Code | 5–D. Legal Authority | 6–C. Code | 6–D. Legal Authority |
|---|---|---|---|
| V8V | 38 USC CHAP 74 | | |

| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |
|---|---|---|---|
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| NURSE<br>PD: 000000<br>POSITION: 91471159 | NURSE<br>PD: 000000<br>POSITION: 91512663 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VN | 0610 | II | 02 | ▮▮ | PA | VN | 0610 | II | 02 | ▮▮ | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| VETERANS HEALTH ADMINISTRATION<br>CHIEF OF STAFF<br><br><br>NORTH CHICAGO IL USA | VETERANS HEALTH ADMINISTRATION<br>NURSING, GEC<br><br><br>NORTH CHICAGO IL USA |

### EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|
| 1 | 1 – None  3 – 10-Point/Disability  5 – 10-Point/Other<br>2 – 5-Point  4 – 10-Point/Compensable  6 – 10-Point/Compensable/30% | 1  0 – none  2 – Conditional<br>1 – Permanent  3 – Indefinite | | YES  X  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0  BASIC ONLY | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| KF  FERS FRAE AND FICA (FULL) | 02/19/2019 | F  FULL TIME | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2  1 – Competitive Service  3 – SES General<br>2 – Excepted Service  4 – SES Career Reserved | E  E – Exempt<br>N – Nonexempt | 7207-2492 | 1335 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 17-6290-097 | NORTH CHICAGO   IL |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| 556 | | | | |

**45. Remarks**
AT EMPLOYEE'S REQUEST, MANAGEMENT APPROVED
CHANGE IN ASSIGNMENT.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| VETERANS HEALTH ADMINISTRATION | ELECTRONICALLY SIGNED BY: |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | MATTHEW ZIRBES |
|---|---|---|---|
| VATA | 1577 | 10/23/2023 | HUMAN RESOURCES OFFICER (ACTING) |

**Exhibit 18**

**Investigator's entered the following:**

**Deceptive chart review**

**VHA SOP**

**Emails**

**Table of Contents**
Azis Kochiu, Nurse

| Location | Date | Document Description | Source |
|----------|------|---------------------|--------|
| Tab 1 | 02/26/23 | SF50 | eOPF |
| Tab 2 | 06/13/23 | Aggravating and Mitigating Factors | Mamata Ravipati, MD, Assistant Chief Medical Executive |
| Tab 3 | 03/23/23 | Supervisor ROC | Donnabelle Lorenzo-Villarino, Nurse Manager |
| Tab 4 | 12/08/22 | Patient Chart | Donnabelle Lorenzo-Villarino, Nurse Manager |
| Tab 5 | 03/29/23 | Weingarten Meeting | Donnabelle Lorenzo-Villarino, Nurse Manager |
| Tab 6 | 4/27/23 | Community Care Chart Audit | Donnabelle Lorenzo-Villarino, Nurse Manager |
| Tab 7 | 12/04/22 | VATAS Timecard | VATAS |
| Tab 8 | 08/24/16 | VHA Directive 1232 | Veterans Health Administration |
| Tab 9 | 07/19/13 | Table of Penalties | VA Handbook 5021 |

1

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| **KOCHIU, AZIS VELIKO** | ▇▇▇▇▇▇ | ▇▇▇▇▇▇ | 02/19/2019 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code **170** | 5-B. Nature of Action **EXC APPT** | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code **V8V** | 5-D. Legal Authority **38 USC 7401(1)** | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | NURSE<br>PD: 000000<br>POSITION: 91471159 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | VN | 0610 | I/03 | 09 | ▇▇▇ | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | ▇▇▇▇ | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | VETERANS HEALTH ADMINISTRATION<br>MANAGED CARE<br><br>NORTH CHICAGO IL USA |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1   1 – None   3 – 10-Point/Disability   5 – 10-Point/Other<br>     2 – 5-Point   4 – 10-Point/Compensable   6 – 10-Point/Compensable/30% | I   0 – None   2 – Conditional<br>    1 – Permanent   3 – Indefinite | | YES   X NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   BASIC ONLY | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| KF   FERS FRAE AND FICA (FULL) | 02/19/2019 | F   FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2   1 – Competitive Service   3 – SES General<br>     2 – Excepted Service   4 – SES Career Reserved | E   E – Exempt<br>    N – Nonexempt | 7412-2284 | 1335 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 17-6290-097 | NORTH CHICAGO IL |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| 556 | | | | |

45. Remarks

SELECTED FROM 20181031-CAYE-001 DATED 10/31/2018
APPOINTMENT AFFIDAVIT EXECUTED 2/19/19
SPECIAL RATE TABLE ND83.
BOARD ACTION APPROVED 2/9/19
SUBJECT TO COMPLETION OF 2 YEAR PROBATIONARY PERIOD COMMENCING 2/19/19
CONTINUED EMPLOYMENT IN THIS POSITION IS CONDITIONED UPON FAVORABLE ADJUDICATION OF APPLICABLE BACKGROUND
INVESTIGATION OR NATIONAL AGENCY CHECK WITH WRITTEN INQUIRIES (ANACI).
SPECIAL RATE UNDER 38 U.S.C. 7455.
YOU MUST ELECT YOUR HEALTH BENEFITS ENROLLMENT WITHIN 60 DAYS AFTER THE EFFECTIVE DATE OF THIS ACTION.
FROZEN SERVICE: NONE.
CREDITABLE MILITARY SERVICE: NONE.
PREVIOUS RETIREMENT COVERAGE: NEVER COVERED
EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS, FERS-RAE, OR FERS-FRAE.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF VETERANS AFFAIRS - VETERANS HEALTH ADMI. | ELECTRONICALLY SIGNED BY:<br>STUART SOUDERS<br>HUMAN RESOURCES OFFICER |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| VATA | 1577 | 02/19/2019 | |

5 Part 50-316     2 - OPF Copy - Long-Term Record - **DO NOT DESTROY**     Editions Prior to 7/91 Are Not Usable After 6/30/93<br>NSN 7540-01-333-6238

2

# **Memorandum**

**DEPARTMENT OF VETERANS AFFAIRS**

Date: July 5, 2023

From: Assistant Chief Medical Executive For Ambulatory Care

Subject: Title 38 Mitigating and Aggravating Factors re: Full-Time RN

To: Azis Kochiu

The following is an analysis of the Aggravating and Mitigating Factors, per Handbook 5021, *Employee/Management Relations*, Part II, Appendix A.

1. The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities. Facts to be considered may include:

    A. Was the offense intentional or a result of negligence?

    RESPONSE: Result of negligence.

    B. Was the offense important, meaningful, or considerable?

    RESPONSE: Important.

    C. Did the offense result in serious injury or death?

    RESPONSE: Death.

    D. Was the offense repeated?

    RESPONSE: No.

2. The employee's job level and type of employment. Facts to be considered may include:

    A. Does the employee have frequent contact with patients or the public?

    RESPONSE: Yes

    B. Is the employee a supervisor or manager?

    RESPONSE: No

    C. How prominent is the employee's position? What makes it a prominent position?

**FT T-38 Aggravating & Mitigating Factors**
Employee: employee name

RESPONSE: Prominent as he is one of the clinical leads in their assigned team.

3. The employee's past disciplinary record.

RESPONSE: None

4. The employee's work record. Facts to be considered may include:

   A. What is the employee's length of VA service, length of overall total federal service (including military), and length of service in the position/role currently occupied?

      RESPONSE: Enter on Duty Date:          February 19, 2019
                Service Comp Date:          February 19, 2019
                Service in RN role since:   February 19, 2019

   B. What was the employee's performance on the job before the offense?

      RESPONSE:

| RATING PERIOD | RATING |
|---|---|
| 02/19/2021 – 02/19/2022 | Satisfactory |
| 02/19/2022 – 02/19/2023 | Satisfactory |

   C. What is the employee's performance on the job since the offense?

      RESPONSE: Once employee was aware of the fact finding, performance was satisfactory with improvement in documentation

   D. Is the employee dependable?

      RESPONSE: 1. Employee is dependable with attendance.
                2. Employee not dependable with workload, consult management process, and resistance to supervision/feedback.

5. Management's confidence in the employee's ability to successfully perform and behave in the future. Facts to be considered may include:

   A. Did the offense involve a breach of integrity or character flaw that significantly impacts management's confidence?

      RESPONSE: Yes, prior to offense employee was not receptive to peer feedback of following up with care coordination to his assigned patients.

   B. Can the employee's supervisor rely on the employee to successfully perform in the future?

2

RESPONSE:  Undetermined.

C. Can the employee's supervisor rely on the employee to refrain from misconduct in the future?

RESPONSE:  Undetermined.

6. Consistency of the penalty. Facts to be considered may include:

A. Using the Table of Penalties as a guideline only, is the penalty within the range for similar offenses as outlined in the Table?

RESPONSE:  Yes

B. What penalty was imposed on other employee(s), for the same or similar offenses, in the same organizational work unit doing similar work?

RESPONSE:  N/A

7. The impact of the offense upon the reputation of the agency. Facts to be considered may include:

A. What is the notoriety or the potential notoriety of the offense outside the VA, *e.g.,* media, Congress?

RESPONSE:  Potential for notoriety of the offense may include media and/or Congress.

B. How and to what extent does the offense violate the agency's core values?

RESPONSE:

Integrity – Offense impacts integrity by lowering Veteran's confidence for the agency.
Commitment – Offense shows he is not committed to providing optimal patient care delivery.

Respect – Offense shows lack of dignity and respect with failing to follow through with timely care coordination.

Excellence – Offense shows he is not accountable for actions nor willing to admit mistakes and in correcting them.

C. Has the offense impacted the veterans' or public's trust in the agency?

RESPONSE:  Not that I am aware of.

3

**FT T-38 Aggravating & Mitigating Factors**
**Employee:  employee name**

8. The degree to which the employee either knew or should have known that the conduct in question was improper or that the standard of care was not met. Facts to be considered may include:

   A. Are there any laws, regulations, directives or agency policies addressing the offense?

   RESPONSE:  Yes.

   B. Was the employee trained or informed about the laws, regulations, directives or agency policies addressing the offense?

   RESPONSE:   Yes.

   C. Would a reasonable person know that the offense was wrong without any special training?

   RESPONSE:  Yes.

   D. Is it contrary to commonly accepted clinical practices?

   RESPONSE:  Yes.

9. The potential for the employee's rehabilitation. Facts to be considered may include:

   A. Has the employee accepted responsibility for the offense?

   RESPONSE:  No.

   B. Has the employee shown remorse for the offense?

   RESPONSE:  No.

   C. Has the employee taken any action to give the agency a reasonable belief that the offense will not recur?

   RESPONSE:   Employee was reassigned, unable to assess to make a determination.

   D. Is there training or assistance available to prevent recurrence?

   RESPONSE:  Yes.

10. Any mitigating circumstances surrounding the offense. Facts to be considered may include:

   A. Were there any unusual job tensions, personality problems, harassment, or other workplace stressors in the employee's work unit?

4

**FT T-38 Aggravating & Mitigating Factors**
Employee:  employee name

RESPONSE:  No.

B.  Was the employee provoked by others?

RESPONSE:  No

C.  Was management made aware of any workplace stressors or provocations? If yes, what was management's response?

RESPONSE: Employee with other staff brought to leadership's attention, increase of workload. Management response to staff regarding to process as many consults as they can during the tour of duty, also voluntary overtime was offered to Internal and External staff.

11. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future. Facts to be considered may include: Whether other sanctions were considered before determining that this penalty was appropriate?

RESPONSE:  No alternative sanctions proposed.


I have considered the above Mitigating and Aggravating factors in making my decision, including his ability to apply critical thinking skills, therefore I propose Azis Kochiu to be suspended for two weeks.


**MAMATA RAVIPATI** Digitally signed by MAMATA RAVIPATI
Date: 2023.07.05 10:18:38 -05'00'

_____          7/5/2023_____
                                                                              DATE
Assistant Chief Medical Executive For Ambulatory Care

5

3

| **Department of Veterans Affairs** | **REPORT OF CONTACT** |
|---|---|

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE<br>CAPTAIN JAMES LOVELL FHCC | IDENTIFICATION NOS. (C,XC, SS, XSS, V, K, etc.) |
|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
| PERSON CONTACTED<br>Donnabelle Lorenzo-Villarino | TYPE OF CONTACT *(check one)*<br>☐ PERSONAL   ☐ TELEPHONE |
| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED<br>*(Include Area Code)* |
| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)*<br>☐ PERSONAL   ☐ TELEPHONE |
| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO<br>CONTACTED YOU *(Include area code)* |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

During  weekly review of deceased patient list on the FHCC Pyramid Data Dashboard, a patient expired, requiring care delivery review. Received email from quality management related to a JPSR of patient expired after admitted for acute kidney failure requiring review of events leading to death as patient. Fact finding conducted and followed up with staff whether patient received community care for nephrology.

| DIVISION OR SECTION<br>Managed Care | EXECUTED BY *(Signature and title)*<br>DONNABELLE L LORENZO-VILLARINO 1403592   Digitally signed by DONNABELLE L LORENZO-VILLARINO 1403592<br>Date: 2023.06.05 09:38:36 -05'00' |
|---|---|

000519

| | |
|---|---|
| **From:** | Lorenzo-Villarino, Donnabelle L. |
| **To:** | Ravipati, Mamata FHCC Lovell; Paulson, Rhonda FHCC Lovell |
| **Subject:** | DECEASED VETERAN |
| **Date:** | Thursday, March 23, 2023 10:13:00 AM |
| **Attachments:** | image001.png |

Morning,

Reviewing Deceased patient list on the FHCC Dashboard, I came across patient that needs review.

███████████ was admitted on 2/23/2023 Aurora medical Center ER for acute kidney failure and expired on 2/25/2023.
Consult for COM CARE NEPHROLOGY entered on 12/8/2022 still in ACTIVE - having OCC PSA check with community provider if patient was actually seen prior to ER admission. No follow up from assigned coordinator - only from OT staff trying to verify if appt was attended.

```
ADDED COMMENT          12/19/22 14:33    KOCHIU,AZIS V      KOCHIU,AZIS V
PRQ-Provider requires records to review prior to scheduling.
DU-Documents uploaded to HSRM.
RSP-Records faxed/sent to Community Care Provider.
CUR-CTB User Role: RN
COM-Additional Comments:
documents faxed to provider

referral
order
general note 212-8-22
Renal 5-25-22
privacy letter
Optum billing address

Referral Number: VA0025145057

FROEDTERT SOUTH MEDICAL GROUP
9555 76TH STREET FLOOR 2
PLEASANT PRIIRIE WI 53158
NPI 1891729950
TEL 262.577.8300
FAX 262.671.7153
COM----------


ADDED COMMENT          12/19/22 14:34    KOCHIU,AZIS V      KOCHIU,AZIS V
alerted Kelly

ADDED COMMENT          12/19/22 14:34    KOCHIU,AZIS V      KOCHIU,AZIS V
awaiting appt details from veteran or community provider

ADDED COMMENT          01/10/23 17:50    RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Voicemail left to veteran at 1746  requesting a call back re: if he has an
appt. set up already w/ Froedtert Nephrologist.
COM----------


ADDED COMMENT          02/01/23 16:41    RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Voicemail left to veteran at 1619, requesting him to call Assigned staff
if he already set up an appt. w/ Froedtert South Medical Grp.
Nephrologist.
COM----------


ADDED COMMENT          02/01/23 16:46    RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
CUR-CTB User Role: RN
COM-Additional Comments:
Follow-up call made to provider/vendor to check on status.

Spoke w/ Corrie @ Dr. Wade Milosevic's office w/  Froedtert South Medical
Grp.
Nephrology Dept. at 1621 and informed writer that they didn't receive the
referral that was faxed on 12/19/2023, to refax the referral to the same
fax # 262 671 7153, and scheduler will call the patient.
COM----------
```

```
ADDED COMMENT        02/01/23 16:49     RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
RSP-Records faxed/sent to Community Care Provider.
CUR-CTB User Role: RN
COM-Additional Comments:
Referral refaxed to Dr. Rade Milosevic w/ Froedtert South Medical
Grp. Nephrology Dept. at 262 671 7153.

Alert sent to Admin staff to follow up.
COM----------
```

```
ADDED COMMENT        03/01/23 17:45     RELUYA,CYNTHIA P    RELUYA,CYNTHIA P
CV2-COVID-19 Priority 2: Schedule after clinical review
CUR-CTB User Role: RN
COM-Additional Comments:
Follow-up call made to provider/vendor to check on status.

Contacted Dr. Wade Milosevic's office w/ Froedtert South Medical
Grp. Nephrology Dept. at 1731 but office is closed already.
COM----------
```

*Respectfully,*

**Donnabelle Lorenzo-Villarino, RN**
*Managed Care Department Head*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
3001 Green Bay Road North Chicago, IL 60064
Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: donnabelle.lorenzo-villarino@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

4

5

# WEINGARTEN RIGHTS FORM

Weingarten Rights are mandated by law, and materialized from an actual case (National Labo r Relations Board vs. J. Weingarten, Inc.) decide d by the U.S. Supreme Court in 1975. T he rights announced by the Court are as follows:

***Employees have the right to request that a representative be present at any investigatory meeting when the employee reasonably believes that disciplinary action might result from the investigation.***

## PROCESS

1. The employee may request a representative prior to the meeting or at anytime during the meeting.

2. If the meeting is delayed or interrupted at the employee's request for a representative, then the m eeting and subsequent questions should end and one of the following decisions must be reached:

   • Re-schedule the meeting to allow a representative to attend. A reasonable time period should be allowed.

   • Move forward with the investigation and tak e appropriate action without information from the employee.

   • Inform the employee that he/she has a choice to either voluntarily give up his/her rights to a representative and meet, or the meeting may or may not be re-scheduled and the employee's information not considered in the investigation.

## REPRESENTATIVE'S ROLE

1. A representative, if requested, must be given the opportunity to meet with the employee prior to the meeting.

2. During the meeting, a representative may ask for clarification of questions, but may not tell the employee what to say.

3. Employee/Representative may request to consult in private during this meeting.

## INVOKEMENT OF WEINGARTEN RIGHTS

[x] I choose to invoke my Weingarten Rights and request that a representative be present at the investigatory meeting.

[ ] I do not request to invoke my Weingarten Rights.

## ACKNOWLEDGEMENT OF RECEIPT OF YOUR WEINGARTEN RIGHTS

I, _Azis Kochiu_____, have had full opportunity to read and consider the contents of this form, and I understand that, by signing this form, I am confirming the receipt of my Weingarten Rights, as described in this form.

Signature _Azis Kochiu_____     Date: _____

**YOU ARE ENTITLED TO A COPY OF THIS FORM AFTER YOU SIGN IT.**



**Captain James A. Lovell**                **Memorandum**
**Federal Health Care Center**

March 29, 2023

Azis Kochiu, RN
Office of Community Care, Managed Care, ACME
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Rd. North Chicago, IL 60064

**SUBJ**:  Weingarten Question OCC delayed in patient care

1.  Please state you name, job title and duties.
    a.  Azis, Kochiu, RN, Community Care – care coordinator

2.  What is your tour of duty?
    a.  0800-1630

3.  Can you explain the process of care coordination according to the OCC FGB?
    a.   According to VISN, National and guidebook, nurses are doing care coordinate
        not processing, not the admin stuff.  We are doing a lot of the processing.  We are
        doing admin work pressed up on the metrics not doing our work as nurses care
        coordinating.

4.  What entails care coordination?
    a.  Basically, case management, calling Veterans, asking their concerns.  What we
        are doing is superficial to care coordinating.

5.  Can you elaborate on superficial care coordinating?
    a.  I don't want to incriminate myself.  Am I on trial.  Care coordinating is case
        management.

6.  On December 15, 2022, you initiate a community care referral for patient ▮▮▮▮ what is
    the expectation for accepting community care consults, how many days?
    a.  I cannot recall.  I have to see the consult.  The standard change to 2 days.  You
        guys said we do it – it changed from CME doing it.  I don't remember when that
        happened.

7.  Patient was referred for a community care nephrology with diagnosis of chronic kidney
    disease stage 3 unspecified and determined to have an uptrend of labs.  Patient's case was
    determined that care coordination level was moderate, what is your role in moderate
    consults?
    a.  I process, sends them out, based on Cheryl Anderson national, Angelia
        Montgomery VISN.  PSA admins are supposed to do.  We are stuck with

overwhelming responsibilities, stuck to the metrics. Moderates used to be done by LPNs.

8. Did you provide appropriate level of care coordination based on level of care coordination from the Screening Triage Tool including serving as primary POC for all Veteran/Provider questions relating to care coordination and follow up?
    a. I always do in every patient. 100%. Every patient.

9. Did you communicate with the patient education information, care needs related to episode of care, community care process, etc.? If so, identify where in the consult that task has been completed.
    a. This consult. Whatever I documented there. I probably likely called the patient. Nephrology got sent to nephrologist and sent to Kelly. This is back when you made the nurses do moderate and complex and switch the entirety of this. This in fact could probably be a basic.

10. Prior to forwarding documents to community provider Froedert South Medical Group, did you contact the patient? If so, when and show where in the consult contact was made.
    a. I call every patient/provider let them know referral is there.

11. Where is that in the consult?
    a. Shows where I sent out to the provider. I see that I alerted Kelly.

12. Where in the consult shows you contacted the patient?
    a. Maybe I did not put it there. Have IT look into the phone calls I made. Maybe I didn't put it in there. I didn't click the button. It doesn't give us the option. I am not sure I documented everything.

13. How did you determine that patient was to be referred to Froedert South Medical Group?
    a. I had to have called the guy. Look at where he is living, I don't know where he is.

14. Did you direct patient's care to Froedert and forward their medical information without discussing with the patient related to their care?
    a. Never, they all know I do that. Unless it is something a follow up. Consult was sent, referral was sent, make appointment.

Thank you for your time. If you have any additional information that you would like to add, please do not hesitate to bring it to my attention. This is for the record.

*Azis Kochiu*

## 1. Summary

| | |
|---|---|
| Meeting title | Fact Finding |
| Attended | 3 |
| Start time | 3/29/23, 2:56:18 PM |
| End time | 3/29/23, 3:33:20 PM |
| Meeting duration | 37m 3s |
| Average attendance time | 33m 25s |

## 2. Participants

| Name | First join | Last leave | In-meeting duration | Email | Participant ID (UPN) | Role |
|---|---|---|---|---|---|---|
| Sherrod, Cecilia A. FHCC Lovell | 3/29/23, 2:57:42 PM | 3/29/23, 3:33:20 PM | 35m 38s | Cecilia.Sherrod@va.gov | Cecilia.Sherrod@va.gov | Presenter |
| Kochiu, Azis FHCC Lovell | 3/29/23, 2:57:44 PM | 3/29/23, 3:33:20 PM | 35m 36s | Azis.Kochiu@va.gov | Azis.Kochiu@va.gov | Presenter |
| Lorenzo-Villarino, Donnabelle L. | 3/29/23, 2:58:06 PM | 3/29/23, 3:27:06 PM | 29m | Donnabelle.Lorenzo-Villarino@va.gov | Donnabelle.Lorenzo-Villarino@va.gov | Organizer |

## 3. In-Meeting Activities

| Name | Join time | Leave time | Duration | Email | Role |
|---|---|---|---|---|---|
| Sherrod, Cecilia A. FHCC Lovell | 3/29/23, 2:57:42 PM | 3/29/23, 3:33:20 PM | 35m 38s | Cecilia.Sherrod@va.gov | Presenter |
| Kochiu, Azis FHCC Lovell | 3/29/23, 2:57:44 PM | 3/29/23, 3:33:20 PM | 35m 36s | Azis.Kochiu@va.gov | Presenter |
| Lorenzo-Villarino, Donnabelle L. | 3/29/23, 2:58:06 PM | 3/29/23, 3:27:06 PM | 29m | Donnabelle.Lorenzo-Villarino@va.gov | Organizer |

6

**VA** Department of Veterans Affairs | **REPORT OF CONTACT**

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C,XC, SS, XSS, V, K, etc.) |
|---|---|
| CAPTAIN JAMES LOVELL FHCC | |

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| ███████████ | |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|
| | |

| PERSON CONTACTED | TYPE OF CONTACT *(check one)* |
|---|---|
| Donnabelle Lorenzo-Villarino | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED *(Include Area Code)* |
|---|---|
| CAPTAIN JAMES LOVELL FHCC | |

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)* |
|---|---|
| | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|
| | |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

An external administrative audit of random patient charts were conducted for patients assigned to Mr. Kochui.

30 random charts were reviewed to determine potential delay of care issues.

30% of the charts reviewed showed consults were not processed within 48 hours contributing to the delay in patient care.

46.6% of the charts reviewed showed consult lack in capturing Veteran's preference which can contribute to the delay in patient care delivery.

86.6% of the charts reviewed did not have any documentation of contact attempts made to Veteran which can contribute to patient care delivery.

96.6% of the charts reviewed did not have any documentation that Veteran was provided a copy of their authorization for care which can contribute to the delay in patient care delivery.

66% of the charts reviewed showed no supporting documentation that Veteran's were informed of their scheduled appointment which can contribute to patient care delivery.

Administrative review performed showed lack of care coordination from assigned care coordinator which can contribute to the delay in patient care delivery.

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)* |
|---|---|
| Managed Care | DONNABELLE L LORENZO-VILLARINO 1403592   Digitally signed by DONNABELLE L LORENZO-VILLARINO 1403592  Date: 2023.06.29 15:29:05 -05'00' |

| Type of issues | N/D | Comments |
|---|---|---|
| Delay of Care | 9/30 | There were 30% of the chart being reviewed that were not compliant with consult processing within 48 hours |
| Delay of Care | 14/30 | 46.6%of the chart reviewed did not show documentation in the consult toolbox that veteran's preference and modality options were captured |
| Delay of Care | 4/30 | There were 86.6% of the chart being reviewed that were not in compliance with documenting contact attempts in the consult toolbox |
| Delay of Care | 1/30 | There were 96.6 % of the chart being reviewed with no supporting documentation in consult toolbox that letters were mailed out to the veterans with their  their authorized number with the approved in-network community provider info/description of authorized care/The time period the veterans were  authorized to receive care. |
| Delay of Care | 20/30 | 66 % of the chart reviewed showed no supporting documentation in the consult toolbox that the veterans were informed of the scheduled appointment |
| Process Issues | 11/27 | 40 % of the chart reviewed showed that the referring providers failed to acknowledge receipt of records from community |

ADVERSE EFFECTS NEEDING MORE MEDICAL REVIEW

| |
|---|
| ████████ referral for Oncology for Dr. Najeeb Mohideen DX; Elevated PSA |
| PSA trending up and last one was July  7/13/2022 - There was no notification made to patient for critical labs of PSA 15.9- Pt dx with prostate cancer afterwards |
| There's delay in getting records from providers ≥ 37 days |
| It took about  about 3 weeks before the FHCC PCP acknowledge the scanned record |

| Community Care Process Consult AUDIT | Veteran 1 | Veteran 2 | Veteran 3 | Veteran 4 | Veteran 5 | Veteran 6 |
|---|---|---|---|---|---|---|
| Referral date | Date of referral: 11/7/2022 | Date of referral: 12/30/22 | Date of referral: 10/19/2022 | 10/11/2022 | 10/26/2022 | 3/14/2023 |
| Name of Staff that receive the consult | CR | AK | AK | Ruby Dixon | AK | AK |
| Yes/No | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO |
| COMMUNITY CARE REFERRAL TYPE | RADIOLOGY PET SCAN | COMMUNITY CARE-ONCOLOGY/TUMOR | COMMUNITY CARE-PULMONARY | COMMUNITY CARE-UROGYNECOLOGY | COMMUNITY CARE-ONCOLOGY/TUMOR | COMMUNITY CARE-DERMATOLOGY |
| Admin Screening Care Coordination | MODERATE | MODERATE | MODERATE | BASIC | MODERATE | COMPLEX |
| Was consult referral reviewed and received within 48 hours from entry? | YES | YES | YES | YES | YES | YES |
| Was there evidence of contact attempts made to the veteran by the Care Coordinators and documentation is captured in consult toolbox ? RNS- for Moderate /complex or urgent & LPN PSA for basic consult | YES | NO | NO | YES | NO | NO |
| Was the patient preferences and modality options captured in consult toolbox? ( both must be addressed in consult toolbox) | YES | NO | NO | YES | NO | NO |
| Was there an administrative screening performed and captured in the consult toolbox ? | YES | YES | YES | YES | YES | YES |
| If applicable, was clinical triage performed and captured in consult toolbox ? Note: ( Basic consult does not need clinical triage) | YES | YES | YES | | YES | YES |
| If Yes) clinical triage, is there a community care coordination plan note inplaced in consult toolbox | YES | YES | YES | | YES | YES |
| Was the appointment scheduled and Authorizations is created and approved within 21 days of receipt of consult ? | YES | YES | YES | YES | YES | YES |
| Did the veterans receive a letter with: an authorized number/The approved in-network community provider info/description of authorized care/The time period the veteran is authorized to receive care. This should be documented in appointment tracking in consult toolbox. | NO | NO | NO | NO | NO | NO |
| Was the veteran informed of scheduled appointment & captured in consult toolbox under appointment tracking ? | NO | NO | NO | NO | NO | YES |
| At the scheduled date, did the veterans attend their community care appointment? | YES | YES | YES | YES | YES | YES |
| Did the Referring Provider acknowledge receipt of records from the community | YES | YES | YES | NO | YES | YES |

| Veteran 7 | Veteran 8 | Veteran 9 | Veteran 10 | Veteran 11 | Veteran 12 | Veteran 13 | Veteran 14 | Veteran 15 |
|---|---|---|---|---|---|---|---|---|
| 12/7/2022 | 1/12/2023 | 1/25/2023 | 12/28/2022 | 10/20/2022 | 11/8/2022 | 11/22/2022 | 3/15/2023 | 12/6/2022 |
| CR/AK | AK | AK | AK | RD | WS | AK | AK | MC |
| YES/NO | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO |
| COMMUNITY CARE-INPATIENT MENTAL HEALTH | COMMUNITY CARE-CARDIOLOGY | COMMUNITY CARE-OPHTHALMOLOGY SURGICAL | COMMUNITY CARE-PULMONARY | COMMUNITY CARE-NEUROLOGY | COMMUNITY CARE-ONCOLOGY/TUMOR | COMMUNITY CARE-IMAGING CT SCAN | COMMUNITY CARE-IMAGING PET | COMMUNITY CARE-NEUROSURGERY |
| COMPLEX/CHRONIC | MODERATE | MODERATE | MODERATE | MODERATE | BASIC | BASIC | MODERATE | MODERATE |
| YES | NO | YES | YES | YES | YES | NO | YES | YES |
| NO | NO | NO | NO | NO | NO | NO | NO | NO |
| NO | NO | YES | NO | YES | YES | YES | NO | YES |
| YES | YES | YES | YES | YES | YES | YES | YES | YES |
| YES | YES | YES | YES | YES | | | YES | YES |
| YES | YES | YES | YES | YES | | | YES | YES |
| YES | YES | YES | YES | YES | YES | | YES | YES |
| NO | NO | NO | NO | NO | NO | NO | NO | NO |
| NO | NO | YES | YES | NO | NO | NO | NO | YES |
| YES | YES | PENDING | YES | YES | YES | YES | YES | YES |
| NO | NO | PENDING | YES | YES | NO | YES | YES | NO |

| | Veteran 16 | Veteran 17 | Veteran 18 | Veteran 19 | Veteran 20 | Veteran 21 | Veteran 22 | Veteran 23 |
|---|---|---|---|---|---|---|---|---|
| Date | 12/5/2022 | 11/18/2022 | 10/12/2022 | 12/1/2022 | 2/7/2023 | 1/18/2023 | 3/3/2023 | 1/5/2023 |
| Code | AK | KD | AK/KD/RBM | AK/EE/KS/Kelly | MC/DM | RD/AK | AK | AK |
| | YES/NO | YES/NO | YES/NO | Yes/No | Yes/No | Yes/No | Yes/No | Yes/No |
| Type | COMMUNITY CARE-DERMATOLOGY | COMMUNITY CARE-HEMODIALYSIS | COMMUNITY CARE-CARDIOLOGY | COMMUNITY CARE-DERMATOLOGY | COMMUNITY CARE-ORTHO HAND | COMMUNITY CARE-RADIOLOGY | COMMUNITY CARE-CARDIOLOGY | COMMUNITY CARE-CARDIOLOGY |
| Complexity | BASIC | BASIC | BASIC | COMPLEX/CHRONIC | BASIC | BASIC | MODERATE | COMPLEX/CHRONIC |
| | NO | NO | NO | NO | YES | YES | YES | YES |
| | NO | NO | NO | NO | NO | NO | NO | NO |
| | YES | YES | YES | YES | YES | NO | NO | NO |
| | YES | NO | YES | YES | YES | YES | YES | YES |
| | | | | YES | | | YES | YES |
| | | | | YES | | | YES | YES |
| | YES | YES | NO | NO | YES | | YES | YES |
| | NO | NO | NO | NO | NO | NO | NO | NO |
| | NO | NO | YES | NO | NO | NO | NO | YES |
| | YES | YES | YES | YES | YES | YES | Pending | YES |
| | YES | NO | YES | NO | YES | YES | Pending | NO |

000533

| | Veteran 24 | Veteran 25 | Veteran 26 | Veteran 27 | Veteran 28 | Veteran 29 | Veteran 30 |
|---|---|---|---|---|---|---|---|
| | 11/7/2022 | 10/2/2022 | 10/19/2022 | 2/10/2023 | 3/6/2023 | 11/15/2022 | 11/17/2022 |
| | MC/RD | AK | AK | AK | AK | AK | AK |
| | Yes/No | Yes/No | Yes/No | Yes/No | Yes/No | Yes/No | Yes/No |
| | COMMUNITY CARE-DERMATOLOGY | COMMUNITY CARE-ALLERGY/IMMUNOLOGY | COMMUNITY CARE-ORTHO JOINTS | COMMUNITY CARE-UROLOGY | COMMUNITY CARE-UROLOGY | COMMUNITY CARE-NEUROSURGERY | COMMUNITY CARE-ORTHO GENERAL |
| | MODERATE | BASIC | BASIC | BASIC | Complex/Chronic | BASIC | MODERATE |
| | NO | YES | YES | NO | YES | NO | YES |
| | YES | NO | YES | NO | NO | NO | NO |
| | YES | NO | YES | YES | NO | YES | NO |
| | YES | YES | YES | YES | YES | YES | YES |
| | YES | | | | YES | | YES |
| | YES | | | | YES | | YES |
| | YES | YES | YES | YES | YES | YES | YES |
| | NO | NO | YES | NO | NO | NO | NO |
| | NO | YES | YES | YES | YES | NO | YES |
| | YES | YES | YES | YES | YES | YES | Pending |
| | NO | NO | YES | YES | YES | NO | Pending |

7

Timesheet Summary

**Timesheet Summary**

**Employee:** KOCHIU, AZIS V
**Pay Period:** 25 – 2022 : Dec 04, 2022-Dec 17, 2022

**TL Unit:** 556-__-211
**Timesheet Type:** Regular
**Status:** Sent

Stored Snapshot

## Timesheet

| Day | Start | Stop | Meal / Sleep | Hours | Night Diff | Hours Code | Env/Haz/Other Code | Shift Code |
|---|---|---|---|---|---|---|---|---|
| Week 1 Sun 12/04 | | | | | | | | |
| Week 1 Mon 12/05 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | RG - Regular (Graded) | TW - Telework Regular | 0 - Graded |
| Week 1 Tue 12/06 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | RG - Regular (Graded) | TW - Telework Regular | 0 - Graded |
| Week 1 Wed 12/07 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | RG - Regular (Graded) | TW - Telework Regular | 0 - Graded |
| Week 1 Thu 12/08 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | RG - Regular (Graded) | TW - Telework Regular | 0 - Graded |
| Week 1 Fri 12/09 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | RG - Regular (Graded) | TW - Telework Regular | 0 - Graded |
| Week 1 Sat 12/10 | | | | | | | | |
| Week 2 Sun 12/11 | | | | | | | | |
| Week 2 Mon 12/12 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | RG - Regular (Graded) | TW - Telework Regular | 0 - Graded |
| Week 2 Tue 12/13 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | RG - Regular (Graded) | TW - Telework Regular | 0 - Graded |
| Week 2 Wed 12/14 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | LA - Annual | None | 0 - Graded |
| Week 2 Thu 12/15 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | RG - Regular (Graded) | TW - Telework Regular | 0 - Graded |
| Week 2 Fri 12/16 | 8:00am | 4:30pm | 0:30 | 8:00 | 0:00 | LA - Annual | None | 0 - Graded |
| Week 2 Sat 12/17 | | | | | | | | |
| | | Week 1 Total | | 40:00 | 0:00 | | | |
| | | Week 2 Total | | 40:00 | 0:00 | | | |
| | | Pay Period Total | | 80:00 | 0:00 | | | |

Schedule

| Su 12/04 | M 12/05 | T 12/06 | W 12/07 | Th 12/08 | F 12/09 | Sa 12/10 | Su 12/11 | M 12/12 | T 12/13 | W 12/14 | Th 12/15 | F 12/16 | Sa 12/17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8:00a-4:30p | 8:00a-4:30p | 8:00a-4:30p | 8:00a-4:30p | 8:00a-4:30p | | | 8:00a-4:30p | 8:00a-4:30p | 8:00a-4:30p | 8:00a-4:30p | 8:00a-4:30p | |
| | 8 | 8 | 8 | 8 | 8 | | | 8 | 8 | 8 | 8 | 8 | |

**Work Schedule:** F - Full-time    **AWS Code:** 0 - Not On AWS    **User Type:** B - Title 38    **US Code Indicator:** L - Title 38    **Premium Pay Indicator:** None    **Schedule:** Permanent

## Totals

| Week One: | 40:00 |
| Week Two: | 40:00 |
| Total Hours: | 80:00 |
| Night Diff: | 0:00 |
| On Call: | 0:00 |

| Hours Code | Amount |
|---|---|
| RG - Regular (Graded) | 64:00 |
| LA - Annual | 16:00 |

## Remarks

| Date | Daily Remarks | | Pay Period Remarks |
|---|---|---|---|
| | | | |

## Leave Requests

| Date | Times | Hours | Transaction | Status | Approver | Submitter Remarks | Approver Comments |
|---|---|---|---|---|---|---|---|
| Wed 12/14 | 8:00am 4:30pm | 8:00 | LA - Annual | Approved | DONNABELLE,LORENZO-VILLARINO | | |
| Fri 12/16 | 8:00am 4:30pm | 8:00 | LA - Annual | Approved | DONNABELLE,LORENZO-VILLARINO | | |

## Premium Pay Requests

| Date | Times | Hours | Transaction | Status | Approver | Justification | Approver Comments |
|---|---|---|---|---|---|---|---|
| No premium pay requests found for this pay period | | | | | | | |

## Leave Data

| Leave Type | Forward | Adj Forward | Accrued | Used | Adjustments | Expired | Capped | Balance | EOY Balance | Use or Lose |
|---|---|---|---|---|---|---|---|---|---|---|
| Annual Leave | 335:15 | 335:15 | 8:00 | 16:00 | 0:00 | 0:00 | 0:00 | 327 :15 | 335:15 | 0:00 |
| Sick Leave | 40:30 | 40:30 | 4:00 | 0:00 | 0:00 | 0:00 | 0:00 | 44:30 | 48:30 | 0:00 |
| Time Off Award | 4:00 | 4:00 | 0:00 | 0:00 | 0:00 | 0:00 | 0:00 | 4:00 | 4:00 | 0:00 |
| Other Leave | 72:00 | 72:00 | 0:00 | 0:00 | 0:00 | 0:00 | 0:00 | 72:00 | 0:00 | 0:00 |

## Timesheet Profile

| | |
|---|---|
| Status Change Type: None | Holiday Flag: T |
| Status Change Day: None | Holiday OT Flag: T |
| Work Schedule: F - Full-time | Hours > 8-Day Flag: |
| Duty Hours: 80 | Military Leave Flag: T |
| Pay Plan: VN - Nurses (38USC7404), PA's and EFDA's (38USC4107) | Night Differential Flag: F |
| Graded/Ungraded: Graded | Non Pay Annual Leave Flag: F |
| Pay Basis: PA - Per Annum | On Call Flag: T |
| Fee Basis Rate: | Overtime Flag: T |
| Pieceworker Percentage: | Recess Periods Flag: F |

000536

| | | | |
|---|---|---|---|
| Premium Pay Indicator: None | | Regular Scheduled Flag: T | |
| Recess Appointment Date: | | Saturday Premium Flag: T | |
| User Type: B - Title 38 | | Scheduled Callback OT Flag: T | |
| Pay Plan Indicator: None | | Sick Leave Flag: T | |
| AWS Code: 0 - Not On AWS | | Sleep time Flag: F | |
| FLSA Indicator: E - Exempt | | Standby Flag: F | |
| Temporary Position Code: None | | Sunday Flag: T | |
| T&A Status: A - Active | | Telework Eligible Flag: F | |
| US Code Indicator: L - Title 38 | | Tour Differential Flag: T | |
| Type Appointment: 5 - Excepted without time limit except no career and dental residents | | Accession Date: 02/19/2019 | |
| Employee Status: A - Active | | Separation Date: | |
| Employee Status Indicator: A - Active | | Temporary Appointment NTE: | |
| OCC Series-title-assignment: 0610-50-M2 - Nurse | | Service Computation Date: 02/19/2019 | |
| Annual Leave Flag: T | | Leave Category Override: Eight hours per pay period | |
| Authorized Absence Flag: T | | Leave Ceiling IDC: 1 – 30 days (regular) | |
| AWOL/Susp/LWOP/Furlough Flag: T | | Leave Ceiling Override: 685:00 | |
| CompTime/Credit Hrs Earn/Use Flag: T | | Station: 556 - 556 NORTH CHICAGO IL LAKE | |
| Comp Time for Travel Flag: T | | Duty Station: __ - NORTH CHICAGO, IL, LAKE | |
| Continuation of Pay Flag: T | | TL Unit: 556__211 | |
| Environmental Differential Flag: F | | Cost Center: 7412 | |
| Hazardous Duty Flag: F | | Org Code: 2322 | |

**Activity Log**

| Action | Date | Name | Message |
|---|---|---|---|
| Timesheet Processed | 12/17/2022 03:02 AM GMT | SYSTEM | |
| Timesheet Certified | 12/16/2022 02:54 PM GMT | LORENZO-VILLARINO, DONNABELLE L | |
| Timesheet PreProcessed | 12/16/2022 02:54 PM GMT | SYSTEM | |
| Validated By Timekeeper | 12/15/2022 04:39 PM GMT | OLSON, CLIFFORD R | |
| Timesheet Saved | 12/15/2022 04:39 PM GMT | OLSON, CLIFFORD R | |
| Timesheet Saved | 12/14/2022 03:04 PM GMT | SYSTEM | |

I certify that the schedule, time worked, and leave taken as recorded on this form is true and correct to the best of my knowledge.

Print    Cancel

000537

8

AMENDED
December 5, 2022

**Department of Veterans Affairs**　　　　　　　　VHA DIRECTIVE 1232(5)
**Veterans Health Administration**　　　　　　　　　　**Transmittal Sheet**
**Washington, DC 20420**　　　　　　　　　　　　　　**August 24, 2016**

## CONSULT PROCESSES AND PROCEDURES

**1. REASON FOR ISSUE:** This Veterans Health Administration (VHA) directive provides policy for consult scheduling processes and procedures. *NOTE: "Consult" is the term used in the Veterans Information Systems and Technology Architecture (VistA) and Computerized Patient Record System (CPRS) platforms. "Referral" is the term used in the Cerner platform for outpatient-based consults. For the purposes of this directive, the use of the term "consult" is meant to also include "referral" and be applied across the various platforms.*

**2. SUMMARY OF MAJOR CHANGES:**

　　a. Amendment dated December 5, 2022:

　　(1) Incorporates new responsibilities for the Consult Sending Service and Consult Receiving Service to comply with processes on the use of consults for established patients in medical specialty and surgical specialty care areas, physical medicine and rehabilitation services and mental health, set forth in VHA Consult Use for Established Patients in Medical Specialty and Surgical Specialty Care Areas Standard Operating Procedure (SOP); VHA Consult Use for Established Patients in Physical Medicine and Rehabilitation Services SOP; and VHA Consult Use for Established Patients in Mental Health SOP available on the following SharePoint site: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. *NOTE: This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

　　(2) Incorporates a reference under the VA medical facility Consult Management Steering Committee to the VHA Consult Business Rules and Uses of the Consult Package SOP, which had formerly been included as Appendix B and is now available on the following SharePoint site: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. *NOTE: This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

　　(3) Deletes responsibilities for the Executive Director, Office of Compliance and Business Integrity (CBI), Veterans Integrated Service Network (VISN) CBI Officer and VA medical facility CBI Officer for consistency with CBI policy.

　　b. Amendment dated December 14, 2021:

　　(1) Requires compliance to the Consult Timeliness Standard Operating Procedures

**August 23, 2016**                                                    **VHA DIRECTIVE 1232(5)**

(SOP), provides the link to the SOP and updates language in this directive accordingly, available on the following SharePoint site:
https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

(2) Rescinds Appendix C: "Minimum Scheduling Effort Required for Outpatient Appointments" and updates all relevant references to the Minimum Scheduling Effort SOP, available on the following SharePoint site:
https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

(3) Requires a change from the use of Discontinue to Cancel by consult receiving clinicians. The Discontinue option will remain available in the software but will not be used other than noted exceptions. Consults that are cancelled beyond 90 calendar days will be auto discontinued using the mandatory Computerized Patient Record System (CPRS) Patch GMRC*3*113.

c. Amendment dated April 5, 2021, updates all website links in the directive to the most up-to-date versions and removes General Business Rules Uses of the Consult Package regarding Community Care Consults to instead reference the Office of Integrated Veteran Care (IVC) Community Care Field Guidebook for additional information.

d. Amendment dated June 28, 2019, adds and/or clarifies:

(1) Updates the policy statement, changing consults Pending status no more than 7 calendar days to 2 business days to align with the Deputy Under Secretary for Health for Operations and Management Memo dated June 5, 2017;

(2) Responsibilities for Facility Chief of Staff, paragraph 5.h.; and

(3) Responsibilities for Consult Receiving Services, paragraph 5.l.

(4) The addition of Appendix C, Minimal Scheduling Efforts for Outpatient Appointments.

e. This revised VHA directive provides updates to policies, responsibilities, and definitions for consult processes and procedures. Consult business rules were developed to outline consult set up and usage. Consult processes have been standardized and oversight responsibilities defined. Policy is provided regarding disposition of consults, entry of clinically indicated date, and changes to permitted urgency statuses. All non-mental health consults may be cancelled without provider review after one no show or cancellation, or failure to respond to minimal scheduling efforts in all services as specified in this directive. Low risk consults may be cancelled

**T-2**

**August 23, 2016**                                              **VHA DIRECTIVE 1232(5)**

without rescheduling attempts.

**3. RELATED ISSUES:** H.R. 3230 – Veterans Access, Choice and Accountability Act of 2014; VHA Directive 1231(3), Outpatient Clinic Practice Management, dated October 18, 2019; VHA Directive 1230, Outpatient Scheduling Management, dated June 1, 2022; and VHA Directive 2007-033, Telephone Service for Clinical Care, dated October 11, 2007.

**4. RESPONSIBLE OFFICE:** The Assistant Under Secretary for Health for Integrated Veteran Care (16) is responsible for the contents of this directive. Questions relating to this directive may be referred to the Assistant Under Secretary for Health for Integrated Veteran Care via government email at VHA16IVCAction@va.gov.

**5. RESCISSIONS:** VHA Directive 2008-056, dated September 16, 2008, is rescinded.

**6. RECERTIFICATION:** This VHA directive is scheduled for recertification on or before the last working day of August 2021. This directive will continue to serve as national VHA policy until it is recertified or rescinded.


/s/ David J. Shulkin, M.D.
Under Secretary for Health

***NOTE:*** *Amendments to this directive and all active Deputy Under Secretary for Health Operations and Management (10N) memoranda are considered policy and will remain in effect until this directive is recertified. Applicable 10N/USH memoranda are located on the Office of Veterans Access to Care (OVAC) SharePoint site at the following link:* https://dvagov.sharepoint.com/sites/vhaovac/SitePages/Policy.aspx. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

***NOTE:*** *All references herein to VA and VHA documents incorporate by reference subsequent VA and VHA documents on the same or similar subject matter.*

**DISTRIBUTION:** Emailed to the VHA Publications Distribution List on 08/24/2016.

**August 23, 2016**                                    **VHA DIRECTIVE 1232(5)**

## CONTENTS

## CONSULT PROCESSES AND PROCEDURES

1. PURPOSE ............................................................................................... 1

2. BACKGROUND ...................................................................................... 1

3. DEFINITIONS ........................................................................................ 1

4. POLICY .................................................................................................. 5

5. RESPONSIBILITIES .............................................................................. 6

6. REFERENCES ..................................................................................... 13

APPENDIX A
RECOMMENDED CONTENT FOR CARE COORDINATION AGREEMENTS ............ A-1

**August 23, 2016**  AMENDED
December 5, 2022  **VHA DIRECTIVE 1232(5)**

## CONSULT PROCESSES AND PROCEDURES

### 1. PURPOSE

This Veterans Health Administration (VHA) directive establishes policy for consult management. All national or local policies are superseded to the extent that they conflict with this directive and will not be followed. VHA's use of the electronic consult package includes traditional clinical consult, administrative communication, Community Care coordination (including purchased care in the community and Department of Defense care), clinical procedures (diagnostic equipment vendor reports), prosthetics and future care. **AUTHORITY:** 38 U.S.C. 7301(b).

### 2. BACKGROUND

The Computerized Patient Record System (CPRS) electronic consult software was not uniformly implemented in the past. This led to inconsistent implementation and management of consults. In order to improve the management of clinical consult processes, VHA is standardizing certain aspects of electronic consult. These standards aim to improve transparency and timeliness of consult completion while preserving the freedom to use the consult package for administrative uses, prosthetics, and other purposes.

### 3. DEFINITIONS

a. **Administrative Consult.** An Administrative Consult is a consult document in CPRS used as one-way communication on behalf of a patient to make a clinical request to transfer care or communicate an order or series of orders. Administrative consult orders include requests to schedule where clinical review is not required but should not be used to request scheduling of clinical care. VA medical facilities may or may not have administrative consults. Use of the consult package for such administrative requests is optional.

b. **Care Coordination Agreements**. A Care Coordination Agreement is an agreement or understanding between two or more services within or between facilities, one of which sends work to the other(s), defining the workflow rules. This is a written document that is developed based on discussion and consensus between the involved services and facilities. The Care Coordination Agreement is signed by service chiefs from the involved services. **NOTE:** *See appendix A for recommended content for Care Coordination Agreements. This definition does not refer to facility integration across systems or between VA and Community Care providers.*

c. **Clinical Consult.** A Clinical Consult is a consult document in CPRS used as two-way communication on behalf of a patient consisting of a physician or provider (sender) request seeking opinion, advice, or expertise regarding evaluation or management of a specific problem answered by a physician or other health care provider (receiver). The CPRS consult package must be used for all clinical consults.

d. **Clinically Indicated Date.** The Clinically Indicated Date (CID), previously referred

**1**

to as the earliest appropriate date, is the date care is deemed clinically appropriate by the VA sending provider. CID is entered into Consult Request in the field labelled clinically indicated date. The CID determination is made based upon the needs of the patient and should be at the soonest appropriate date.

e. **Clinical Procedures Package with Vendor Interface.** A request for a clinical service when the response includes a computer-generated report that flows from diagnostic equipment (vendor) to the CPRS consult package. VA medical facilities may consider these clinical or administrative depending on whether the consult includes one way or two-way communication. The CPRS consult package may be used for clinical procedures with a vendor interface.

f. **Community Care.** Community Care includes community care consults and Department of Defense (DoD) Care.

g. **Consult.** A Consult is a request for clinical services on behalf of a patient. In VHA, consult requests are made through an electronic document in CPRS communicating service requests and/or results.

h. **Consult Status Definitions.** The receiving service must receive the consult to update the status of pending as soon as possible and no later than 2 business days of the request receipt. Merely adding a comment without changing the status from pending is not acceptable.

(1) **Active (a).** This status occurs when a consult is "Received", and efforts are underway to fulfill a consult. A consult may also revert to "Active" in other scenarios such as when an appointment is cancelled or no-showed.

(2) **Pending (p).** This status designates requests that have been sent, but not yet acted on by the receiving service.

(3) **Scheduled (s).** This indicates that an appointment has been made and linked to the consult request. Scheduled status automatically sends an alert to the sending provider. The consult status should not be manually changed to "Scheduled" in the consult package but should be linked to appointments so that the consult status changes when the appointment status is changed.

(4) **Partial Result (pr).** This status designates partial but not complete resolution of the consult request.

(5) **Complete (c).** This status designates Completion of the requested service.

(6) **Administrative Complete.** This function may be used by administrative or clinical staff to complete a consult without a consult titled progress note. This function must be used with extreme care in order to avoid compromising care. This status triggers an alert to the sending provider.

(7) **Forward.** This action is selected by the receiving service when the decision is

**August 23, 2016** **VHA DIRECTIVE 1232(5)**

made to Forward the consult to another service. This is not used to Forward to a specific provider. Forwarding clinical procedure consults to Community Care Coordination is not allowed. An alert is sent to the sending provider.

(8) **Add Comments.** This function is used to enable and document communication including instructions to the scheduling clerk. Adding comments may trigger an alert to the sending provider depending on consult notification setup.

(9) **Significant Findings.** This function allows a sender or a receiver to flag a consult as containing vital or specific information for special attention. This triggers an alert to the sending or receiving provider.

(10) **Discontinue (dc).** The Discontinue (dc) action should no longer be used by consult receiving clinicians or staff responsible for consult management when the consult is no longer needed. Cancelled consults will change to a discontinued status according to the number of days that are set in Veterans Health Information Systems and Technology Architecture (VistA) parameters in a Cancelled status and will therefore no longer be able to be resubmitted.

(11) **Cancel/Deny (x).** The Cancel/Deny action may be used by the appropriate staff responsible for consult management. Cancel/Deny should be used in all instances when the consult is no longer needed and replaces the Discontinue action.

(12) **Edit/Resubmit.** This action is used by the sending provider to resubmit a cancelled (denied) consult after appropriate modification. An alert is sent to the receiving service.

i. **Earliest Appropriate Date.** The Earliest Appropriate Date (EAD) is the former name of the Clinically Indicated Date (CID) field in the consult template.

j. **E-Consult.** The E-Consult clinical consult is provided by a clinician who provides diagnostic and medical management of a specific patient in response to a request seeking opinion, advice, or expertise. Utilizing information provided in the consult request and/or review of the patient's electronic medical record, the consultant provides a documented response that addresses the request without a face-to-face visit. Sending services may request E-Consult; however, receiving consults may choose whether to order a face-to-face appointment. The receiving service may also decide to complete a face-to-face consult as an E-Consult, if appropriate. E-Consults should be promoted to the extent possible because they often allow the consult question to be answered more quickly. It is highly recommended that E-consults are used to provide further recommendations, instead of cancelling a consult if a work-up is incomplete. In the instance when an e-consult cannot be used, the clinical service should follow the appropriate process to obtain the necessary work-up, which may include cancelling the consult using the appropriate CTB cancellation reason. For further details on E-Consults, refer to the E-Consults Guidebook at the following link: https://dvagov.sharepoint.com/sites/vhaovac/cpm/Shared%20Documents/Forms/AllItem s.aspx?id=%2Fsites%2Fvhaovac%2Fcpm%2FShared%20Documents%2FGuidebooks

**August 23, 2016** **VHA DIRECTIVE 1232(5)**

%2FE%2DConsult%20Guide%20Book%20V%203%2E0%2Epdf&parent=%2Fsites%2F vhaovac%2Fcpm%2FShared%20Documents%2FGuidebooks. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

k. **Future Care Consults.** Future Care consults are requests where the Patient Indicated Date (PID) is beyond 90 calendar days from the File Entry Date and the expectation is that care will be delivered beyond 90 calendar days. Future Care naming conventions for consult titles which include the words Future Care, no longer need to be used. Requests for care in the future should now be indicated by consult referring clinicians by entering a PID for a future date. For further details on future care consults, see the VHA Consult Business Rules and Uses of the Consult Package SOP, available on the following SharePoint site: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

l. **Low Risk Clinics.** For the purposes of consult processes, VHA has defined low risk clinics nationally to include physical therapy, occupational therapy, kinesiotherapy, acupuncture, smoking clinic, MOVE clinic, massage therapy, chiropractic care and erectile dysfunction clinic. A full list of low risk clinics can be found in the Minimum Scheduling Effort SOP, located at: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. Facilities may cease efforts to reschedule appointments and cancel the consult without provider review after one no show or one patient cancellation in these clinics. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

m. **Community Care Consult.** The Community Care consult must be set up in CPRS and performed as outlined in the Office of Integrated Veteran Care (IVC) Community Care Field Guidebook: https://dvagov.sharepoint.com/sites/VHAOCC/CNM/CI/OCCFGB/SitePages/FGB.aspx. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

n. **Urgency Status.** The Urgency status is used by the sending provider to communicate a timeframe when the consult should be addressed. The only two acceptable urgencies are Routine and Stat:

(1) **Routine.** The Routine consult indicates the patient should be seen in accordance with the clinically indicated date.

(2) **Stat.** The Stat consults will be defined as an "immediate" need. The sender of a

**4**

**August 23, 2016**                                           **VHA DIRECTIVE 1232(5)**

stat consult is required to:

(a) Contact the intended receiver of the consult request to discuss the patients' situation.

(b) Enter "Today" in the clinically indicated date/earliest appropriate date field of the consult.

(c) Enter "Stat" in the urgency field of the consult.

(d) Before the patient leaves the clinic either schedules an appointment or documents when the patient will be seen.

(e) A stat consult must be completed within 2 business days of FED. Refer to the Consult Timeliness SOP: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

o. **Veterans Health Information Systems and Technology Architecture Option Group Update of Consult and Procedure Requests.** The Veterans Health Information Systems and Technology Architecture (VistA) Option Group Update of consult and procedure requests is a VistA menu option that allows the status of multiple consults be updated simultaneously. This process should generally be avoided because of the risk to closing the consult before the needed care. Any use of group closure should be used with strict oversight.

## 4. POLICY

a. It is VHA policy to ensure timely and clinically appropriate care to all Veterans by standardizing and managing consult processes. The sending provider determines the CID, which is the date care is deemed clinically appropriate. The CID determination is made based upon the needs of the patient and should be at the soonest appropriate date care is needed. The CID should not be used to indicate the latest appropriate date. The CID may not be changed by the receiving service due to lack of availability of appointments. The date may only be changed if it was entered in error, (e.g., a future care consult with a CID of today). The date must either be manually entered into the consult order or generated through an order menu that includes the CID. The CID should be entered into the scheduling package when the appointment is made.

b. The consult/referral status must change within 2 business days of the File Entry Date (FED). The consult should be received, so that the status, at least changes from Pending to Active within that 2-business day timeframe but may also be Scheduled, Forwarded, Cancelled or Completed within that timeframe. (Exceptions include E-Consults, Prosthetics and Pathology.)

c. All non-mental health consults can be cancelled without provider review after a

5

**August 23, 2016**                                   **VHA DIRECTIVE 1232(5)**

single no show or patient cancellation. Low risk consults do not require rescheduling attempts prior to discontinuation after one no show or one patient cancellation.

## 5. RESPONSIBILITIES

a. **Under Secretary for Health.** The Under Secretary for Health has the overall responsibility for consults in VHA.

b. **Assistant Under Secretary for Health for Operations.** The Assistant Under Secretary for Health for Operations is responsible for:

(1) Communicating the contents of this directive to each of the VISNs.

(2) Assisting VISN Directors to resolve implementation and compliance challenges in all VA medical facilities within that VISN.

(3) Providing oversight of VISNs to ensure compliance with this directive and its effectiveness.

c. **Assistant Under Secretary for Health for Integrated Veteran Care.** The Assistant Under Secretary for Health for Integrated Veteran Care is responsible for consult policy and process education, improvement, and oversight. In addition, the Office of Integrated Veteran Care (IVC) is responsible for establishing the national approved list of low-risk clinics and publishing it in the Minimum Scheduling Effort SOP, located at:
https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. *NOTE: This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

d. **Veterans Integrated Service Network Director.** The Veterans Integrated Service Network (VISN) Director is responsible for VISN oversight of policy implementation and performance management within the VISN including:

(1) Overall responsibility to regularly review and apply corrective measures to address VISN data on consult quality outcomes.

(2) Implementation of standardized processes for consult management and reporting across the VISN.

(3) Assigning a VISN level point of contact to be responsible for coordination within the VISN and to serve as a liaison at the national level.

e. **VA Medical Facility Director.** The VA medical facility Director is responsible for:

(1) Oversight of the facility consult policy, processes, and outcomes.

(2) Regular monitoring and improvement of facility consult performance and results.

**August 23, 2016**                                                   **VHA DIRECTIVE 1232(5)**

This review should occur monthly and more frequently if outcomes are not being met.

(3) Allocating sufficient resources to enable management of consults and timely delivery of care.

(4) Ensuring all new Licensed Independent Practitioners complete consult training in the VA Talent Management System (TMS).

(5) Ensuring new residents complete consult management training. Recommend the use of abbreviated resident consult training materials posted at the following link: https://dvagov.sharepoint.com/sites/vhagroup-practice-manager-pilot/SitePages/AL-CL-Training.aspx. Resident Training can be found at the link below: https://dvagov.sharepoint.com/sites/vhaconsults/Shared%20Documents/Forms/AllItems.aspx?id=%2Fsites%2Fvhaconsults%2FShared%20Documents%2FTraining%2FHPT%2DResident%2DConsultTraining%2Epdf&parent=%2Fsites%2Fvhaconsults%2FShared%20Documents%2FTraining. ***NOTE:*** *These are internal VA websites that are not available to the public and are accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

(6) Ensuring that consults are cancelled appropriately.

(7) Defining in local policy a process for managing the urgency of consults. The only two acceptable urgencies are Routine and Stat (see definition for urgency statuses).

(8) Ensuring specific consult set up rules, stop code alignment, and naming conventions are followed.

(9) Ensuring schedulers link a consult request to the appointment.

(10) Ensuring adherence to national timeliness and completion requirements as outlined in the Consult Timeliness SOP: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

(11) Ensuring Community Care is utilized in accordance with regulatory authority and guidance from the Office of Integrated Veteran Care.

(12) Following Community Care VA Medical Care Coordination procedures including utilizing standardized community care consult templates, as appropriate.

(13) Ensuring that the local Office of Information and Technology (OI&T) or Clinical Informatics staff set the patch GMRC*3*113 Cancelled to Discontinue Consults to Active as outlined in the CPRS: Consult Request/Tracking Technical Guide (GMRC) available at https://www.va.gov/vdl/application.asp?appid=62. This patch contains a routine that runs overnight, changing cancelled status consults to discontinued

**7**

**August 23, 2016**                                        **VHA DIRECTIVE 1232(5)**

according to the period of time specified in the parameter. This option must be set to run by selecting "Yes" by OI&T or Clinical Informatics, or personnel with access to the VistA Option: GMRC CX TO DC PARAMETER EDIT. The patch setting should be determined by the VA medical facility Consult Steering Committee at least 31 days and no more than 91 days from the date of cancellation. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

   f. **Facility Chief of Staff.** The Facility Chief of Staff is responsible for:

   (1) Regularly reviewing and improving facility consult performance and outcomes.

   (2) Ensuring the use of the VistA Consult Package for clinical consults.

   (3) Ensuring that the facility complies with the designation of low-risk clinics approved by the Assistant Under Secretary for Health for Integrated Veteran Care. ***NOTE:*** *Facilities may not designate individual clinics as low risk.*

   (4) Ensuring appropriate no show follow-up. See the Minimum Scheduling Effort SOP for additional information, located at: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

   (a) Consults in low-risk clinics may be cancelled without provider review after a single no-show or patient cancellation without rescheduling attempts. See the Minimum Scheduling Effort SOP for additional information, located at: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

   (b) The following process is recommended: consults identified as lower risk state that the consult will be cancelled after a single no show; the appointment letter contains instructions if the patient cannot keep an appointment and that the appointment will be cancelled after a single no-show; the no-show letter informs the patient that the consult was cancelled and instructs them to contact their provider if they want the consult to be reinstated; notifications must be set to mandatory. See the Minimum Scheduling Effort SOP for additional information, located at: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

   (5) Timely review and application of corrective measures as needed to address consult quality outcomes.

**8**

**August 23, 2016**                                      **VHA DIRECTIVE 1232(5)**

(6) Oversight and facilitation of effective relationships between services using Care Coordination Agreements.

g. **Service and Department Clinical Leaders.** Each Service and Department Clinical Leader is responsible for ensuring:

(1) Adherence to any consult related national program office guidance.

(2) Regular review and improvement of Service or Departmental performance gaps.

(3) Consults are submitted in accordance with the provider's credentials, privileges and scope of practice.

(4) Managing patients effectively through the use of Care Coordination Agreements. Care Coordination Agreements must be established and utilized with a goal of optimizing referral relationships, establishing clear processes, and reducing the need for inspection and rework. Consult templates in CPRS are used to assist in the operationalization of Care Coordination Agreements and enhance the effectiveness of referrals.

(5) Identifying, requesting, and managing resources needed to comply with consult performance measures.

(6) Creating, managing, and improving access through local Care Coordination Agreements.

h. **Facility Consult Management Steering Committee.** Each facility must perform the following functions. These functions are assigned to individuals in this Directive. The following list identifies suggested functions of a facility Consult Management Steering Committee or an equivalent local functional committee.

(1) Ensuring the use of the VistA Consult Package for clinical consults.

(2) Assisting the VA medical facility Director and Chief of Staff in the oversight, management, implementation, and improvement of the facility consult process to include all consult services.

(3) Facilitating coordination between VHA Directive 1230, Outpatient Scheduling Management, SOPs, and any other documents, policies, or agreements that impact consult management processes.

(4) Ensuring specific consult set up rules, stop code alignment, and naming conventions are followed in accordance with the VHA Consult Business Rules and Uses of the Consult Package SOP available on the following SharePoint site: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. ***NOTE:*** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

**9**

**August 23, 2016**                                      **VHA DIRECTIVE 1232(5)**

(5) Defining in local policy a process for managing the urgency of consults. The only two acceptable urgencies are Routine and Stat (see definition for urgency status).

(6) Facilitating alignment of consults with Care Coordination Agreements. Care Coordination Agreements must be established and utilized with a goal of optimizing referral relationships, establishing clear processes, and reducing the need for inspection and rework. Consult templates in CPRS are used to assist in the operationalization of Care Coordination Agreements and enhance the effectiveness of referrals.

(**7**) Including Committee members that are in clinical, administrative, and technical roles.

(8) Meeting regularly.

(9) Working collaboratively with national level consult work groups and performance improvement efforts.

i. **Consult Sending Service.** The Consult Sending Service is responsible for:

(1) Adhering to Care Coordination Agreements including completion of appropriate and timely pre-work.

(2) Documenting contact with the receiving service for any Stat consults.

(3) Assuring patients understand and are willing to keep any consult appointments that are scheduled.

(4) Completing the consult order, including manual entry of the CID for all consults to be completed by the Sending Provider.

(5) Ensuring Future Care Consults have a CID that is greater than 90 calendar days from the date the consult is entered.

(6) Reviewing the status of ordered consults to make sure that the patient receives timely care.

(**7**) Complying with the guidance on the use of consults for established patients in medical specialty and surgical specialty care areas, physical medicine and rehabilitation services and mental health. Refer to the VHA Consult Use for Established Patients in Medical Specialty and Surgical Specialty Care Area SOP, VHA Consult Use for Established Patients in Physical Medicine and Rehabilitation Services SOP and VHA Consult Use for Established Patients in Mental Health SOP: available at https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. ***NOTE***: *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

(8) Reviewing and acting on the results of completed consults for clinical services.

**10**

**August 23, 2016**                                           **VHA DIRECTIVE 1232(5)**

(9) Reviewing discontinued or cancelled consults to determine if additional clinical measures are necessary.

j. **Consult Receiving Service.** The Consult Receiving Service is responsible for ensuring:

(1) Adherence to the relevant Care Coordination Agreements.

(2) Timely review and response to consult requests.

(3) Consults are answered as E-Consults where appropriate and possible, including when prerequisite tests or treatments have not been provided.

(4) Completion of E-Consults within 3 business days of FED. Refer to the Consult Timeliness SOP: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

(5) Implementation of the "minimum scheduling effort" for non-responding patients. See the Minimum Scheduling Effort SOP for additional information, located at: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy, and paste the link directly into a Chrome browser.*

(6) Ensuring the Forward status is selected by the receiving service only when the decision is made to forward the consult to another service. This is not used to forward to a specific provider. Forwarding consults to community care is not allowed. An alert is sent to the sending provider.

(7) Complying with the guidance for referrals within teams and completion of initial consults as outlined in the VHA Consult Use for Established Patients in Mental Health SOP. Refer to the VHA Consult Use for Established Patients in Mental Health SOP: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

(8) Implementation of the process of cancelling a consult without provider review if the patient does not respond to the minimum scheduling effort or no shows or cancels one or more times. See the Minimum Scheduling Effort SOP for additional information, located at: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

**August 23, 2016**  **VHA DIRECTIVE 1232(5)**

Cancelled consults should always document the reason for cancellation and can always be re-ordered or copied to a new order if appropriate. The Consult Resolution notification pathway must be set to mandatory so that a notification will be sent.

(9) Consults may be cancelled by administrative staff without provider review under the following conditions:

(a) Failed mandated scheduling effort.

(b) Provider documented instructions to cancel consult.

(c) Appointment not warranted by Veteran.

(d) Care is no longer needed.

(e) Duplicate request.

(f) Eligibility requirements not met.

(g) Entered/Requested in error.

(h) Established pt, follow up appointment scheduled and/or RTC order entered.

(i) Veteran deceased or incapacitated.

(j) Does not meet criteria (explanation required).

(k) Incomplete work-up (explanation required).

(l) Incorrect service (explanation requested).

(m) Recommend alternative to consult (explanation required).

(n) Other (explanation required).

(10) Ensuring reasons for status changes including next steps needed for timely resolution of consult are documented.

(11) A review of patients who failed to present for the scheduled visit and timely initiation of efforts to reschedule or cancel the consult according to the minimum scheduling effort described above. See the Minimum Scheduling Effort SOP for additional information, located at: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.aspx. *NOTE: This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser*.

(12) The answer to the consult question is attached to the consult requests in the CPRS consult package. This enables the requestor to be alerted to the report's

**August 23, 2016**                                          **VHA DIRECTIVE 1232(5)**

availability and ensures that the results are available and easily identifiable.

(13) Consult notes are linked properly with the consult request.

(14) If consult questions are not completed by a progress note, the results are attached to the consult request by other means such as pasting them into the administrative complete dialogue.

(15) Compliance with requirement for consult reviews, as specified by Health Information Management Service (HIMS), the Joint Commission, and any National audits.

(16) Ensuring that staff responsible for consult management appropriately Cancel, rather than Discontinue, all consults that are not needed and only in accordance with reasons as outlined in the CTB.

(17) Ensuring appropriate use of all VHA approved consult management software and technology to include third- party software, such as Consult Toolbox (CTB) or other VA approved third-party software.

## 6. REFERENCES

a. VHA Directive 1230, Outpatient Scheduling Management, dated June 1, 2022. https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

b. Consult Timeliness SOP: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

c. Minimum Scheduling Effort SOP: https://dvagov.sharepoint.com/sites/vhaovac/cpm/SitePages/AccessPolicyResources.as px. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

d. E-Consult Guidebook: https://dvagov.sharepoint.com/sites/vhaovac/cpm/Shared%20Documents/Forms/AllItem s.aspx?id=%2Fsites%2Fvhaovac%2Fcpm%2FShared%20Documents%2FGuidebooks %2FE%2DConsult%20Guide%20Book%20V%203%2E0%2Epdf&parent=%2Fsites%2F vhaovac%2Fcpm%2FShared%20Documents%2FGuidebooks. **NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

**August 23, 2016**                                         **VHA DIRECTIVE 1232(5)**

    e. IVC Community Care Field Guidebook:
https://dvagov.sharepoint.com/sites/VHAOCC/CNM/CI/OCCFGB/SitePages/FGB.aspx.
**NOTE:** *This is an internal VA website that is not available to the public and is accessible by Chrome if using a web browser (do not use Microsoft Edge). If the link to a VA website does not work, copy and paste the link directly into a Chrome browser.*

August 23, 2016

**VHA DIRECTIVE 1232(5)**
**APPENDIX A**

### RECOMMENDED CONTENT FOR CARE COORDINATION AGREEMENTS

**1.** The Care Coordination Agreement is a written agreement made between any two or more parties, where one party sends work to the other, outlining the workflow rules. The agreements may exist within or between facilities. They are developed by consensus; signed by service chiefs from involved services; reviewed or updated as changes are needed, at a minimum annually; and audited.

**2.** The Care Coordination Agreement is available for reference by posting on the facility or Veterans Integrated Service Network (VISN) Web site, as appropriate.

**3.** The Care Coordination Agreement must contain, at a minimum, the following elements:

a. The services covered by the agreement are listed and defined in order to clarify which topics are selected to be covered by the Care Coordination Agreement.

b. The timeframe expected for response from the consultant is established.

c. Judicious and appropriate history, physical, and diagnostic information from the sending provider is provided in order to put the consultant in a position to be able to make a patient care decision on the initial visit.

d. Criteria for discharge from specialty care are stated. It is the expectation that patients will be discharged from the specialty clinic once consult and any needed procedure and follow-up are completed. If ongoing care is co-managed by both the sender and consultant, responsibilities must be clarified.

e. The method for communicating recommendations and treatment plan back to the referring clinician is delineated in order to simplify, standardize, and clarify communication.

f. The agreement has a review and renewal date. **NOTE:** *An annual timeframe is recommended.*

**4.** Additional valuable elements may include:

a. Concurrence signatures by the involved service chiefs, as well as the Chief of Staff (or the Chiefs of Staff and VISN Chief Medical Office in the event the request is for an Inter-facility Consult (IFC)).

b. Definition of a method for accessing consultants outside of the formal consult process, so questions may be asked, or advice given, potentially avoiding the need for formal consult.

c. Definition of a method for immediate access to the consulting service for clinical

**A-1**

**August 23, 2016**

**VHA DIRECTIVE 1232(5)**
**APPENDIX A**

issues that need urgent or emergent attention.

d. A description of how primary care and specialty care evaluate and monitor the Care Coordination Agreement, including identification of data sources.

(1) Adherence to agreements is monitored by measuring the sender responsibilities of sending the right work (right requests) (see paragraph 3.a. of this appendix) packaged the right way (correct pre-work is included) (see paragraph 3.c. of this appendix).

(2) The receiver responsibilities are measured by auditing adherence to agreed-upon timeliness response standards (see paragraph 3.b. of this appendix).

e. CPRS consult referral templates.

**A-2**

9

**VA HANDBOOK 5021/15**                                    **JULY 19, 2013**
**PART II**
**APPENDIX A**

### TABLE OF PENALTIES FOR TITLE 5 AND TITLE 38 EMPLOYEES

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum to Maximum | Minimum to Maximum | Minimum to Maximum |
| **Attendance** | | | |
| 1. Unexcused tardiness. | Admonishment Reprimand | Reprimand 7 days | 7 days Removal |
| 2. Unexcused or unauthorized absence. | Admonishment Reprimand | Reprimand 14 days | 14 days Removal |
| 3. Leaving job to which assigned or VA premises, during working hours, without proper permission. | Admonishment Reprimand | Reprimand 7 days | 14 days Removal |
| 4. Obtaining or requesting leave under false pretense, or falsifying attendance record for self or another employee. | Reprimand Removal | 14 days Removal | Removal |
| **Safety and Health** | | | |
| 5. Smoking in unauthorized places or carrying of matches in explosive areas. | Admonishment Reprimand | Reprimand 14 days | 14 days Removal |
| 6. Failure to report personal injury or accident. | Admonishment Reprimand | Reprimand 14 days | 14 days Removal |
| 7. Failure to observe precaution for personal safety, posted rules, signs, written or oral safety instructions; failure to use protective clothing or equipment; or carry flammable materials into a hazardous area. | Admonishment 14 days | Reprimand Removal | 14 days Removal |
| 8. Violating traffic regulations, reckless driving, or improper operation of a motor vehicle while on VA premises or in a duty status. | Admonishment 14 days | Reprimand Removal | 14 days Removal |
| 9. Endangering the safety of or causing injury to anyone on VA premises. | Admonishment Removal | 14 days Removal | Removal |
| 10. Abuse of patients or beneficiaries. | Reprimand Removal | 14 days Removal | Removal |

**II-A-2**

OCTOBER 10, 2014

VA HANDBOOK 5021/16
PART II
APPENDIX A

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum to Maximum | Minimum to Maximum | Minimum to Maximum |
| **Information and Security** | | | |
| 11. Failure to safeguard confidential matter or access to such. | Admonishment Removal | Reprimand Removal | 14 days Removal |
| 12. [Offenses related to falsification: | [ ] | [ ] | [ ] |
| a.] Intentional falsification, misstatement, or concealment of material fact; | [Reprimand Removal | [14 days Removal | [Removal |
| [b. W]illfully forging or falsifying official Government documents; | Reprimand Removal | 14 days Removal | Removal |
| [c. Willfully submitting or directing others to submit false data concerning wait times for health care or quality measures related to health care; or | Reprimand Removal | 14 days Removal | Removal |
| d. R]efusal to cooperate in an investigative proceeding. | Reprimand Removal] | 14 days Removal] | Removal] |
| 13. Except as specifically authorized, disclosing or using direct or indirect information obtained as a result of employment in VA, which is of a confidential nature or which represents a matter of trust; or any other information so obtained of such character that its disclosure or use would be contrary to the best interests of the Government, VA, or the Veterans being served by it. | Reprimand Removal | Removal | |
| 14. Violation of the Privacy Act, HIPAA or other laws, regulations and/or policy pertaining to information disclosure. | Reprimand Removal | 14 days Removal | Removal |
| **General Misconduct** | | | |
| 15. Loafing, willful idleness, or waste of time. | Admonishment Reprimand | Reprimand 14 days | 14 days Removal |
| 16. Careless or negligent workmanship resulting in waste or delay. | Admonishment Reprimand | Reprimand 14 days | 14 days Removal |

II-A-3

**OCTOBER 10, 2014**

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum to Maximum | Minimum to Maximum | Minimum to Maximum |
| 17. Sleeping on duty. | | | |
| a. Where safety of patients, beneficiaries, members, employees or property is not endangered. | Admonishment Reprimand | Reprimand 14 days | 14 days Removal |
| b. Where safety of patients, beneficiaries, members, employees, or property may be endangered. | 7 days Removal | Removal | |
| 18. Deliberate failure or unreasonable delay in carrying out instructions. | Admonishment Reprimand | 7 days 14 days | 14 days Removal |
| 19. Deliberate refusal to carry out any proper order from a supervisor having responsibility for the work of the employee; willful resistance to same. | Reprimand Removal | 14 days Removal | Removal |

**II-A-3a**

**VA HANDBOOK 5021/15**                                                   **JULY 19, 2013**
**PART II**
**APPENDIX A**

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum to Maximum | Minimum to Maximum | Minimum to Maximum |
| **General Misconduct** | | | |
| 20. Making false or unfounded statements, which are slanderous or defamatory, about other employees or officials. | Reprimand Removal | 14 days Removal | Removal |
| 21. Disrespectful, insulting, abusive, insolent, or obscene language or conduct to or about supervisors, other employees, patients, or visitors. | Reprimand Removal | 14 days Removal | Removal |
| 22. Fighting, threatening, attempting or inflicting bodily injury to another; engaging in dangerous horseplay. **NOTE:** *Penalty depends on such factors as provocation, extent of any injuries, and whether actions were defensive or offensive in nature.* | Reprimand Removal | 14 days Removal | Removal |
| **Alcohol and Drug Related** | | | |
| 23. Offenses related to intoxicants.  a.  Alcohol-related: | | | |
| (1) Unauthorized possession of alcoholic beverages while on VA premises. | Reprimand 7 days | 14 days Removal | Removal |
| (2) Unauthorized use of alcoholic beverages while on VA premises. | Reprimand 14 days | 14 days Removal | Removal |
| (3) Reporting to or being on duty while under the influence of alcohol. | Reprimand Removal | 14 days Removal | Removal |
| (4) Sale or transfer of an alcoholic beverage while on VA premises or in a duty status, or while any person involved is in a duty status. | 14 days Removal | Removal | |

**II-A-4**

**AUGUST 3, 2017**

**VA HANDBOOK 5021/24**
**PART II**
**APPENDIX A**

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum to Maximum | Minimum to Maximum | Minimum to Maximum |
| **Alcohol and Drug Related** | | | |
| b. Drug-related: | | | |
| (1) Possession of an illegal drug or unauthorized possession of a controlled substance while on VA premises. | 7 days Removal | 14 days Removal | Removal |
| (2) Unauthorized use of an illegal drug or controlled substance while on VA premises. | 14 days Removal | Removal | |
| (3) Reporting to or being on duty while under the influence of an illegal drug or unauthorized controlled substance. | 14 days Removal | Removal | |
| (4) Sale or transfer of an illegal drug or controlled substance while on VA premises or in a duty status, or while any person involved is in a duty status. | 14 days Removal | Removal | |
| (5) Refusal to take drug test. | Removal | | |
| [(6) Unauthorized possession or diversion of a VA controlled substance for sale, transfer, or use. | Removal] | | |
| **NOTE:** *For offenses relating to VA's Drug-Free Workplace Program, see VA Directive and Handbook 5383.* | | | |
| **Outside Activities / Financial Interest** | | | |
| 24. Indebtedness; lack of good faith in paying just financial obligations. | Admonishment | Admonishment Reprimand | Reprimand Removal |

**II-A-5**

Case: 1:25-cv-09065 Document #: 1 Filed: 07/29/25 Page 876 of 1155 PageID #:876

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum | Minimum to Maximum | Minimum to Maximum |
| 25. Participation in any type of outside activities, of relationships with contractors, lenders, builders, or others engaged in business with VA, or relationships with those seeking contracts, which would be contrary to the best interests of VA and the Veterans it serves. **NOTE:** *Penalty action will be determined on the basis of whether the activities, or relationships, might result in a conflict between the private interest of the employee and his/her duty and obligation to VA, or tend to create in the minds of others a suspicion of prejudice or favoritism that would be of embarrassment to VA.* | Admonishment Removal | 14 days Removal | Removal |

| NATURE OF OFFENSE | 1ST OFFENSE Minimum to Maximum | 2ND OFFENSE Minimum to Maximum | 3RD OFFENSE Minimum to Maximum |
|---|---|---|---|
| **Outside Activities / Financial Interest** | | | |
| 26. Gambling, unlawful betting, or the promotion thereof, on VA premises. | Reprimand 14 days | 14 days Removal | Removal |
| 27. Participating in a strike, work stoppage, sick-out, slowdown, or other job action. | Reprimand Removal | Removal | |
| 28. Borrowing from, or lending money to, any beneficiary or claimant of VA; or borrowing from, or lending money to, another VA employee (or non-VA employee) for the purpose of monetary gain while on duty or on VA property. | Reprimand Removal | Removal | |
| 29. Soliciting contributions for, or otherwise promoting, on premises occupied by VA, of any type of campaign which has not had appropriate VA endorsement. | Reprimand Removal | 14 days Removal | Removal |
| 30. Selling tickets, stocks, articles, or commodities or services on VA premises that has not had appropriate VA endorsement. | Reprimand Removal | 14 days Removal | Removal |
| 31. Accepting gifts or gratuities (whether in the form of goods, money, services, purchases at discount, entertainment, or similar favors) from claimants or beneficiaries of VA, or individuals or firms doing business with or having contractual relations with VA. | Reprimand Removal | Removal | |
| 32. Owning any interest in, or receiving any wages, salary dividends, profits, gratuities, or services from any educational institution operated for profit in which an eligible Veteran, or person, is pursuing a course of education or training under 38 U.S.C. 34 and 35, where it is determined that detriment will result to the United States or to eligible Veterans, or persons, by reason or such interest or connection. | Removal | | |

**JULY 19, 2013**

**VA HANDBOOK 5021/15**
**PART II**
**APPENDIX A**

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum/ Maximum | Minimum/ Maximum | Minimum/ Maximum |
| **Use of Government Property** | | | |
| 33. Loss of, damage to, or unauthorized use of Government property: | | | |
| a. Through carelessness or negligence | Admonishment 14 days | 14 days Removal | Removal |
| b. Through maliciousness or intent | Reprimand Removal | 14 days Removal | Removal |
| 34. Actual or attempted removal of Government property or other property from VA premises. | Reprimand Removal | 14 days Removal | Removal |
| **Discrimination / EEO / Protected Activity** | | | |
| 35. Sexual harassment. | Reprimand Removal | 7 days Removal | 14 days Removal |
| 36. Discrimination based on race, color, sex, religion, national origin, age, marital status, political affiliation, or disability. | Reprimand Removal | 7 days Removal | 14 days Removal |
| 37. Interference with an employee's exercise of, or reprisal against an employee for exercising, a right to grieve, appeal or file a complaint through established procedures. | Reprimand Removal | 7 days Removal | Removal |
| 38. Reprisal against an employee for providing information to an Office of Inspector General (or equivalent) or Office of Special Counsel, or to an EEO investigator, or for testifying in an official proceeding. | 14 days Removal | Removal | |
| 39. Reprisal against an employee for exercising a right provided under 5 U.S.C. 71 (Federal Labor Management Relations Statute). | Reprimand Removal | 7 days Removal | 14 days Removal |
| 40. Violation of an employee's constitutional rights (i.e., freedom of speech, association, religion). | Reprimand Removal | 7 days Removal | 14 days Removal |

**II-A-7**

VA HANDBOOK 5021/15                                              JULY 19, 2013
PART II
APPENDIX A

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum/ Maximum | Minimum/ Maximum | Minimum/ Maximum |
| **Offenses Prescribed in Statute** | | | |
| 41. Failure to adhere to the rules governing the use of Government charge cards (purchase, travel, or fleet) and convenience checks. | Admonishment Removal | 7 days Removal | 14 days Removal |
| 42. Prohibited personnel practice (5 U.S.C. 2302). | Reprimand Removal | 14 days Removal | Removal |
| 43. Willfully using or authorizing the use of Government passenger motor vehicle or aircraft for other than official purposes (31 U.S.C. 1349(b)). | 30 days Removal | Removal | |
| 44. Finding by MSPB of refusal to comply with MSPB order or of violation of statute causing issuance of Special Counsel complaint ((5 U.S.C. 1204(a)(2) and 1212(a)).  **NOTE:** *Penalty may need to be coordinated with Office of Special Counsel.* | Reprimand Removal | 7 days Removal | 14 days Removal |
| 45. Prohibited Political Activity:  a. Violation of prohibition against the solicitation of political contributions (5 U.S.C. 7323).  b. Violation of prohibition against influencing elections (5 U.S.C. 7324).  **NOTE:** *Actions based on Hatch Act violations will be initiated by the Office of Special Counsel.* | Removal   30 days Removal | Removal | |
| 46. Soliciting contributions for a gift for a superior; making a donation as a gift to a superior; accepting a gift from an employee receiving less pay (5 U.S.C. 7351). | Reprimand Removal | 14 days Removal | Removal |
| 47. Directing, expecting, or rendering services not covered by appropriations (5 U.S.C. 3103). | Removal | | |
| 48. Failure to deposit into the Treasury money accruing from lapsed salaries or from unused appropriations for salaries (5 U.S.C. 5501). | Removal | | |

II-A-8

Case: 1:25-cv-09065 Document #: 1 Filed: 07/29/25 Page 880 of 1155 PageID #:880

| NATURE OF OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | Minimum/ Maximum | Minimum/ Maximum | Minimum/ Maximum |
| **Offenses Prescribed in Statute** | | | |
| 49. Action against national security (5 U.S.C. 7532). | 30 days Removal | Removal | |
| 50. Mutilating or destroying a public record (18 U.S.C. 2071). | Removal | | |

]



DEPARTMENT OF VETERANS AFFAIRS
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Rd
North Chicago, IL 60064

August 01, 2023

Azis Kochiu
Nurse
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Rd
North Chicago, IL 60064

SUBJ: Proposed 14-day suspension Under the Authority of 38 U.S.C. Ch. 74

**1.** I am proposing to 14-day suspension you from employment with VA under the authority of 38 U.S.C. Ch. 74 based on the following reason:

**Charge: Failure to Follow Policy**

**Specification:** On December 15, 2022, you initiated a consult for a Veteran. You failed to complete the consult within the required timeframe which resulted in a delay in care.

**2. AGGRAVATING FACTORS:** I proposed that you be suspended for 14 days and have considered that you have no prior discipline on file. Your failure to follow policy is unacceptable and will not be tolerated. These factors will be considered by the Deciding Official in determining the appropriate level of discipline, if one or more of the above reasons are sustained. You may reply orally or in writing, or both orally and in writing, with respect to these factors, and you may submit supporting evidence, including affidavits. In this regard, you may make a statement expressing your views as to the consideration to be given such factors in determining proper action.

**3. RIGHT TO REPLY:** In accordance with 38 U.S.C. § 7462, which was modified by Public Law 115-41, Section 208 on June 23, 2017, the time period for you to respond to this notice of proposed 14-day suspension is 7 business days from receipt of this notice. Business days are defined as Monday through Friday, in Washington D.C., excluding Federal holidays. If you chose to reply, you may do so orally, or in writing, or both orally and in writing, and you may submit affidavits and other documentary evidence in support of your reply, showing why the charge is unfounded and any other reasons the proposed action should not be effected. If you elect to submit a written reply, it must be submitted through supervisory channels to Director, Dr. Robert G. Buckley, and received no later than 11:59 p.m. 7 business days from receipt of this notice. If you wish to present an oral reply to the Deciding Official, it is your responsibility to contact Michelle Vidanes-Bartolome, Secretary to the Director at (224) 610-3002 as soon as possible (typically no later than the 3rd business day after receipt of the proposed action) to make an appointment with him/her in sufficient time

to ensure the meeting is convened prior to the expiration of the statutory deadline of 7 business days in which to reply to a proposed action.

4. **RIGHT TO REPRESENTATION**: You may be represented by an attorney or other representative of your choice at all stages of this matter, up to and including the issuance of the decision. Any representative must be designated in writing.

5. **RIGHT TO REVIEW MATERIAL**: The evidence on which this notice of proposed action is enclosed. You will be given up to eight (8) hours to review this material. Arrangements for the use of official time, or requests for additional time, should be made with me.

6. **FREEDOM TO PRESENT DEFENSE:** Be assured that you and your representative have freedom from restraint, interference, coercion, discrimination, or reprisal in discussing, preparing, and presenting a defense.

7. **DECISION**: The final decision to effect the action proposed has not been made. The Director, Dr. Robert G. Buckley, who will make the final decision, will give full and impartial consideration to your reply(ies), if submitted, and all evidence of record. You will be given a written decision within 15 business days of the date you receive the notice of proposed action. If an action is effected, the applicable grievance or appeal rights will be included in the decision letter.

8. **DUTY STATUS**: You will be retained in a pay and duty status during the period of advance notice.

9. If you have any questions or do not understand the above reasons why your 14-day suspension is proposed, contact me, or Alex Morse, Human Resource Specialist at alex.morse@va.gov or 224-803-6312.

**MAMATA RAVIPATI**
Digitally signed by
MAMATA RAVIPATI
Date: 2023.08.01
07:54:10 -05'00'

Mamata Ravipati, MD

Assistant Chief Medical Executive Ambulatory Care

*Mr. Kochiu refused to sign the forms*

I acknowledge that I have received a copy of the above proposal memo and evidence folder:

_____      _____
Azis Kochui                                                    Date



**DEPARTMENT OF VETERANS AFFAIRS**
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Rd
North Chicago, IL 60064

August 31, 2023

Azis Kochiu
Nurse
Captain James A. Lovell Federal Health Care Center
North Chicago, IL 60064

SUBJ: Suspension Under the Authority of 38 U.S.C. Ch. 74

1. In connection with the letter of August 1, 2023, in which you were given advance notice of your proposed 14 day suspension, a decision has been made to suspend you for 3 days from employment with VA under the authority of 38 U.S.C. Ch. 74, effective September 5, 2023 to September 7, 2023, based on the following reason:

   **Charge: Failure to Follow Policy**

   **Specification:** On December 15, 2022, you initiated a consult for a Veteran. You failed to complete the consult within the required timeframe which resulted in a delay in care.

2. In reaching this decision, your oral and written replies were carefully considered along with all the evidence developed.

3. This decision also takes into consideration the aggravating factors cited in your notice of proposed suspension. These factors were considered in determining the appropriate level of discipline. I have also considered other factors including your years of service, your past work record, the seriousness of the offense with which you have been charged, and whether there are any mitigating or extenuating circumstances which would justify mitigation of the proposed penalty. I have concluded that the sustained charge against you is of such gravity that mitigation of the proposed penalty is not warranted, and that the penalty of suspension is appropriate and within the range of reasonableness.

4. You will be retained in a pay and duty status until the effective date of your 3 day suspension.

5. Disciplinary Appeals Board: Since the reason for the action as stated in the notice of proposed discharge involves a question of professional conduct or competence, you have the right to appeal this decision to the Disciplinary Appeals Board (DAB) and to request a formal hearing before the Board. Your request for a formal hearing must be submitted in writing in conjunction with your appeal. In accordance with 38 U.S.C. § 7462, which was modified by Public Law 115-41, Section 208 on June 23, 2017, the appeal must be filed with the Under Secretary for Health so as to be received no later than 7 business days after your receipt of this decision. Please fax your appeal to (202) 495-5200 or scan the appeal as a .pdf document and email it to vaco051cacgohrm@va.gov.

If you prefer to mail your appeal, it must be sent to the following address with an annotation on the outside of the envelope that the material is time sensitive:

Office of the Chief Human Capital Officer
Employee Relations and Performance Management Service (051)
810 Vermont Ave., N.W.
Washington, DC 20420

If you have any questions regarding how to submit your appeal, or if you would like to confirm that your appeal was received, you may contact the Office of the Chief Human Capital Officer (051) via telephone at (202) 461-5983

6. Office of Special Counsel (OSC): If you elect to request corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 U.S.C. § 2302(b) (prohibited personnel practices). This can include, but is not limited to, claims of reprisal for whistleblowing and/or engaging in protected activity. If you are making a covered claim of retaliation for engaging in one or more protected activities, or for making protected disclosures and OSC terminates its investigation and/or has not timely notified you it will seek corrective action, you may have the right to file an individual right of action (IRA) appeal to the MSPB. Such an appeal will be limited to an adjudication of whether you proved your protected activity or disclosure was a contributing factor in the effected action (5 U.S.C. § 1214; 5 U.S.C. § 1221)..

7. Equal Employment Opportunity Commission (EEOC): If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age or disability, you may file a complaint of discrimination or raise the issue of discrimination in a grievance under the negotiated grievance procedure as described above, when the negotiated grievance procedure allows a complaint of discrimination to be raised in connection with a grievance. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-566-3982. Such a complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

8. Whichever option you may choose to pursue regarding this action (a request for a Disciplinary Appeals Board, corrective action to OSC, or a discrimination complaint), shall be considered an election by you to proceed under that appeal process. However, you may concurrently file a corrective action to OSC and a discrimination complaint.

9. A copy of VA Handbook 5021, Part V, Chapter 1 and Human Resources Management Letter No. 05-21-02 are enclosed to provide you with necessary

information regarding an appeal to the Disciplinary Appeals Board. Please note that the timeframe for appealing to a DAB as noted in VA Handbook 5021, Part V, is superseded by the applicable Human Resources Management Letter. A further explanation of your appeal rights may be obtained by consulting Alex Morse, Human Resource Specialist at alex.morse@va.gov or 224-803-6312.

**Buckley, Robert G.** Digitally signed by Buckley, Robert G.
Date: 2023.08.31 11:59:37 -05'00'

Robert G. Buckley, MD, MPH, FACEP

Medical Center Director

I acknowledge that I have received a copy of the above decision memo and copy of VA Handbook 5021, Part IV, Chapter 3.

_____    8/31/23
Azis Kochiu                    Date

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| KOCHIU, AZIS V | ▉ | ▉ | 09/07/2023 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| **5-A. Code** 292 | **5-B. Nature of Action** RTD | **6-A. Code** | **6-B. Nature of Action** |
| **5-C. Code** CGM | **5-D. Legal Authority** 5 U.S.C. 552A(E)(5). ACCU RACY OF PERSONNEL ACT | **6-C. Code** | **6-D. Legal Authority** |
| **5-E. Code** | **5-F. Legal Authority** | **6-E. Code** | **6-F. Legal Authority** |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | NURSE PD: 000000 POSITION: 91471159 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | VN | 0610 | II | 02 | ▉ | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | VETERANS HEALTH ADMINISTRATION CHIEF OF STAFF<br><br>NORTH CHICAGO IL USA |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 – None     3 – 10-Point/Disability     5 – 10-Point/Other | 0 – None     2 – Conditional | | YES  X   NO |

**29. Pay Rate Determinant** 0

**33. Part-Time Hours Per Biweekly Pay Period**

**37. Bargaining Unit Status** I335

| 40. Agency Data 556 | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks

| 46. Employing Department or Agency VETERANS HEALTH ADMINISTRATION | 50. Signature/Authentication and Title of Approving Official ELECTRONICALLY SIGNED BY: |
|---|---|
| **47. Agency Code** VATA | **48. Personnel Office ID** 1577 | **49. Approval Date** 09/08/2023 | **MATTHEW ZIRBES**<br>**HUMAN RESOURCES OFFICER (ACTING)** |

5-Part 50-316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

000575

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name *(Last, First, Middle)* KOCHIU, AZIS V | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date 09/05/2023 |
|---|---|---|---|---|---|

**FIRST ACTION**

| 5-A. Code 450 | 5-B. Nature of Action SUSPENSION NTE    09/07/2023 |
|---|---|
| 5-C. Code VAC | 5-D. Legal Authority 5 U.S.C. 7502,  SUSPEN- SION FOR 14 DAYS OR LESS |
| 5-E. Code | 5-F. Legal Authority |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| 6-C. Code | 6-D. Legal Authority |
| 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number NURSE PD: 000000 POSITION: 91471159 | 15. TO: Position Title and Number |
|---|---|

| 8. Pay Plan VN | 9. Occ. Code 0610 | 10. Grade or Level II | 11. Step or Rate 02 | 12. Total Salary | 13. Pay Basis PA | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12A. Basic Pay | | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | 20A. Basic Pay | | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | |

| 14. Name and Location of Position's Organization VETERANS HEALTH ADMINISTRATION CHIEF OF STAFF NORTH CHICAGO IL USA | 22. Name and Location of Position's Organization |
|---|---|

**EMPLOYEE DATA**

| 23. Veterans Preference 1 | 24. Tenure 1 | 25. Agency Use | 26. Veterans Pref for RIF YES   X NO |
|---|---|---|---|
| 1 - None          3 - 10-Point/Disability     5 - 10-Point/Other 2 - 5-Point      4 - 10-Point/Compensable    6 - 10-Point/Compensable/30% | 0 - None     2 - Conditional 1 - Permanent 3 - Indefinite | | |

| 27. FEGLI C0    BASIC ONLY | 28. Annuitant Indicator 9    NOT APPLICABLE | 29. Pay Rate Determinant 0 |
|---|---|---|

| 30. Retirement Plan KF    FERS FRAE AND FICA (FULL) | 31. Service Comp. Date (Leave) 02/19/2019 | 32. Work Schedule F    FULL TIME | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied 2 | 35. FLSA Category E | 36. Appropriation Code 7409-2000 | 37. Bargaining Unit Status 1335 |
|---|---|---|---|
| 1 - Competitive Service    3 - SES General 2 - Excepted Service    4 - SES Career | E - Exempt N - Nonexempt | | |

| 38. Duty Station Code 17-6290-097 | 39. Duty Station *(City - County - State or Overseas Location)* NORTH CHICAGO    IL |
|---|---|

| 40. AGENCY DATA 556 | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks

FEGLI COVERAGE CONTINUES UNTIL YOUR TIME IN NONPAY STATUS TOTALS 12 MONTHS. CONTACT YOUR SERVICING HUMAN RESOURCES OFFICE OR SEE THE FEGLI HANDBOOK AT HTTP://WWW.OPM.GOV/INSURE FOR DETAILED INFORMATION.

SERVICE CREDIT FOR RETIREMENT, REDUCTION-IN-FORCE, AND LEAVE ACCRUAL PURPOSES CONTINUES FOR UP TO A MAXIMUM OF 6 MONTHS IN NONPAY STATUS PER CALENDAR YEAR.

REASON FOR SUSPENSION: FAILURE TO FOLLOW POLICY .

IF YOU ENTER A LEAVE WITHOUT PAY STATUS OR ANY OTHER TYPE OF NONPAY STATUS OR YOUR PAY IS INSUFFICIENT TO COVER YOUR FEHB PREMIUM, THEN YOU MUST ELECT TO EITHER: (1) TERMINATE YOUR ENROLLMENT IN FEHB, OR (2) CONTINUE IT FOR UP TO 365 DAYS AND AGREE TO PAY THE PREMIUM OR INCUR A DEBT. IF YOU DO NOT ELECT TO TERMINATE OR CONTINUE YOUR ENROLLMENT, IT AUTOMATICALLY TERMINATES AT THE END OF THE LAST PAY PERIOD IN WHICH YOU PAID PREMIUMS. CONTACT YOUR SERVICING HUMAN RESOURCES OFFICE OR SEE FEHB HANDBOOK AT HTTP://WWW.OPM.GOV/INSURE FOR DETAILED INFORMATION.

| 46. Employing Department or Agency VETERANS HEALTH ADMINISTRATION | 50. Signature/Authentication and Title of Approving Official ELECTRONICALLY SIGNED BY: MATTHEW ZIRBES HUMAN RESOURCES OFFICER (ACTING) |
|---|---|
| 47. Agency Code VATA | 48. Personnel Office ID 1577 | 49. Approval Date 09/07/2023 | |

5-Part

**2 - OPF Copy - Long-Term Record -- DO NOT DESTROY**

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6236

## SECTION C.  PROFESSIONAL STANDARDS BOARDS

**1.  ESTABLISHMENT**

a.  Professional Standards Boards (PSBs) act for, are responsible to, and are agents of the Under Secretary for Health for occupations listed in 38 U.S.C. 7401(1), [(with the exception of those occupations under 38 USC 7401(3); See Section F of this part)] and part time or intermittent registered nurses (RNs) in the following matters.

[ ]

(1)  **Podiatrists, Optometrists, Chiropractors, RNs, Nurse Anesthetists, PAs and EFDAs.**  In matters concerning appointments, advancements, and probationary reviews for these occupations, PSBs will determine eligibility and recommend the appropriate grade and step for appointment, recommend candidates for advancement, and conduct probationary reviews, when applicable**.**  This includes part time or intermittent (including temporary service) for RNs appointed under 38 U.S.C. 7405(a)(1) since May 5, 2010.

(2)  **Physicians and Dentists.**  In matters concerning appointments and probationary reviews, PSBs will determine eligibility for appointment and conduct probationary reviews.  See VA Handbook 5007, Part IX, Physician and Dentist Pay regarding the role and responsibilities of compensation panels in determining physician and dentist pay for appointments.

b.  Members of boards serve in a dual capacity.  They deal with matters in which they must divest themselves of their identity with the particular facility at which they are employed and must become representatives of and primarily concerned with the needs and problems of the entire VHA.

c.  VHA management officials are responsible for ensuring the effective functioning of boards under their jurisdiction.

**2.  APPROVING AUTHORITIES FOR BOARD MEMBERSHIP.**  The following officials may approve or terminate board membership.  A second Chair or Co-Chair may be appointed to a Board when the approving authority determines it is necessary and appropriate to do so.  (For composition of boards, see paragraph 5.)

a.  **National Boards.**  The Under Secretary for Health, or designee, may approve or terminate membership on National boards, including appointment of the board Chair.

b.  **Regional Boards.**  The Under Secretary for Health, or designee, may approve or terminate membership on Regional boards, including appointment of the board Chair.

c.  **VISN Boards.**  Except as provided in paragraph 3a, the Network Director will establish VISN boards.  The Network Director or designee may approve or terminate membership on VISN boards, including appointment of the board Chair.

d. **Facility Boards.** The facility Director may approve or terminate membership on facility boards, including appointment of the board Chair. The appropriate service chief or equivalent position will nominate board members and recommend a board Chair.

e. **Termination of Board Membership.** Appointments to the board under paragraphs 2a through 2d above may be terminated whenever an individual's performance, conduct, or position is incompatible with board membership. Examples include receipt of performance rating of below the fully successful level (or equivalent), breach of confidentiality, failure to attend meetings or to complete assignments in a timely manner, expiration of term as Board member, and election or appointment as a union official.

3. **BOARD MEMBERSHIP**

a. Persons selected to serve on boards will be chosen from the most capable, experienced and responsible personnel. Board members must be at a grade and level that is equal to or higher than that of the candidate being considered. Board membership should also be sufficiently broad to cover the range of practice within an occupation and where possible include all grades and levels within an occupation.

b. Recommending officials will not serve on boards considering their recommendations. Employees will not serve on boards for which they serve as the approving official.

c. Boards may be composed of three or five voting members who were appointed under 38 U.S.C. chapters 73 or 74. However, when necessary, the Under Secretary for Health or designee may appoint other qualified individuals to National boards. One of the members will be appointed as Chairperson of the board. Board membership will also include a Secretary, who may or may not be one of the voting members. The role of the Secretary is to record, prepare and submit notes of the Board proceedings and relevant discussion to the PSB Chair. The Secretary is also responsible for completing page two of VA Form 10-2543 and obtaining Board members' signatures. The signatures of the board members and the approving official may be original, facsimile, or digital.

d. The Human Resources Management Officer or designee will serve as technical advisor on all board actions. Attendance at Board meetings by the Human Resources technical advisor is required.

e. Upon initial and all subsequent appointments to a Board, whether a facility, VISN, or national Board, all appointees, including the Chair, members, and the Secretary, must take the Professional Standards Board training.

4. **COMPOSITION OF BOARDS.** Whenever possible, PSBs will be composed of three or five employees from the same occupation as the individual being considered. When three or five members from the same occupation are not available, appropriately qualified individuals from other occupations may be appointed, provided the board is composed of a majority of the

employees from the occupation involved (see note below). When the appropriate minimum number of employees in the occupation is not available or the number of employees is too small to provide for an independent review, an alternate board must be used.

5. **BOARD FUNCTIONS.** The primary functions of boards are to:

   a. Review and act on employment applications and determine whether the applicant meets the requirements set forth in VA qualification standards. Sound professional and administrative judgment will be exercised in reviewing applications to ensure that VA obtains the best qualified personnel.

   b. Review completely an individual's qualifications for advancement by an examination of the personnel folder, proficiency reports or performance appraisals, supervisory evaluations, and other pertinent records; and to make recommendations based on their findings.

   c. Conduct probationary reviews for individuals appointed under 38 U.S.C. 7401(1), or as part time or intermittent RNs under 38 U.S.C. 7405(a)(1).

   d. Execute VA Form 10-2543, Board Action.

   e. National boards make recommendations to the Under Secretary for Health or designee on appointments and advancements, and on probationary reviews of individuals appointed under 38 U.S.C. 7401(1), or as part time or intermittent RNs under 38 U.S.C. 7405(a)(1), which require approval in Central Office. This includes recommendations on requests for promotion reconsideration by registered nurses.

6. **EXCEPTIONS.** The Under Secretary for Health or designee may establish procedures for appointing employees without action by a Professional Standards Board in instances such as:

   a. Temporary appointment under 38 U.S.C. 7405 pending processing by a Professional Standards Board for an appointment under 38 U.S.C. 7401(1).

   b. Temporary appointment of part time or intermittent RNs pending processing by a Professional Standards Board for a probationary appointment as a part time or intermittent RN under 38 U.S.C 7405(a)(1)(A). As of May 5, 2010, the time spent under the temporary appointment and prior to Professional Standards Board review for a part time or intermittent RN is creditable towards the completion of the probationary period.

   c. Conversion of an employee appointed under 38 U.S.C. 7401(1) to an appointment under 38 U.S.C. 7405(a)(1), 7405(a)(2) or 7306.

   d. Conversion of an employee from an appointment under 38 U.S.C. 7405(a)(1)(A) or 7306 to an appointment under 38 U.S.C. 7401(1) provided the employee had previously completed a probationary period under 38 U.S.C. 7401(1) or 7306 in the same occupation and has had continuous service under 38 U.S.C., chapter 73 or 74 since acquiring such status.

7. **APPROVING OFFICIAL'S DECISIONS.** The approving official's decision is final. This does not preclude employees from requesting promotion reconsideration under the provisions of part III, chapter 4, Sections A or B (whichever is appropriate), of this handbook.

8. **ORGANIZATIONAL STRUCTURE OF BOARDS.**

   a. **National Boards.**  National boards are established to act on appointments, advancements, and probationary reviews for Central Office employees, Regional and VISN PSB members, and for VISN and facility employees where those boards do not exist.  National boards also act on promotion reconsideration requests submitted under part III, chapter 4, sections A and B, of this handbook.

      (1)  The National Physician and Dentist Professional Standards Boards also act on appointments and probationary reviews.

      (2)  The National Nurse PSB acts on all promotion reconsideration requests from registered nurses and licensed practical/vocational nurses, all appointments, advancements, probationary reviews, and reassignments involving Nurse Executive and Nurse V positions.

      (3)  The National Research Board will consider all appointments and advancements for research employees in accordance with VHA Handbook 1200.03.

      (4)  Other National Boards may be constituted as needed by the Under Secretary for Health.

   b. **Regional Boards.**  Whenever necessary, the Under Secretary for Health, or designee, may designate a Regional Board to serve one or more VISNs for designated occupations.

   c. **VISN Boards.**  For employees assigned at the VISN level, VISN boards shall consider appointments, advancements, probationary reviews, and reassignments where there are additional basic qualification requirements for the new assignment.  For nurses and hybrids, see below.

      (1)  **Nurses.**  A VISN NPSB shall consider the appointment, advancement, and reassignment (where there are additional basic qualification requirements for the new assignment) for Nurse IV.  The appropriate VISN NPSB is identified in appendix II-H5.

   d. **Facility Boards.**  Facility boards will be established to act on all appointments and advancements and as delineated in Appendix II-O, this part.  For employees occupying positions identified in 38 U.S.C. 7401(1) and for part time or intermittent registered nurses under 38 U.S.C 7405(a)(1), facility PSBs will conduct probationary reviews.  For physicians and dentists, PSBs will determine eligibility for appointment and conduct probationary reviews when applicable.

SECTION E.  GENERAL APPOINTMENT PROVISIONS UNDER 38 U.S.C. CHAPTER 74

**1.  APPOINTMENT PROCESSING REQUIREMENTS**

a.  **Applications Received by Facilities.**  Applications received by facilities will be referred promptly to Human Resources Management Service.  The Human Resources Management Officer will review applications for compliance with administrative and regulatory requirements. Candidates who fail to meet these requirements and thus fail to qualify for appointment will be notified by the Human Resources Management Officer.  Applications from selectees who meet [VA] requirements for appointment [under 38 U.S.C 7401(1)] will be referred to the appropriate Professional Standards Board (PSB) [for necessary action as follows:

NOTE: See Section F of this part for those occupations under 38 U.S.C. 7401(3)):]

(1) **Selection and Appointment Action**

(a) The PSB will evaluate qualifications and recommend a grade level and step based on VA qualification standard requirements.  Except for physicians, dentists, and podiatrists the board will also recommend a rate of pay with due consideration being given to prior service and professional achievement.  (See VA Directive and Handbook 5007, Part II, Pay Administration.)  The board will complete the VA Form 10-2543, Board Action, and forward all documents through the approving authority to the Human Resources Management Officer, who will affect the appointment action.  For actions, which require the approval of the Under Secretary for Health or designee, the facility board will enter its recommendations on VA Form 10-2543, and forward all documents through channels for approval.  On approval, the originals will be returned to the facility or VISN as appropriate.

(b) For physician service chiefs and comparable positions, see appendix II-H1.

(c) For podiatrists, see appendix II-H3.

(d) For optometrists, see appendix II-H4.

(e) For chiefs of nurse anesthesiology sections, see appendix II-H6.

(f) For physician assistants (PAs) at Chief Grade, see appendix II-H7.

(g) For chiefs of pharmacy service (all grades), clinical pharmacy/pharmacy specialists, and program specialists at Grades GS-13 and above, see appendix II-H8.

(h) For occupational and physical therapists as section chief, see appendix II-H9.

(i) For registered nurses at grades IV and V, see appendices II-H5.

(j) For Dentists and EFDAs, see appendix II-H2.

(k) For doctors of chiropractic, see appendix II-H10.

NOTE:  See section B, paragraph 11 of this chapter for provisions relating to Deans Committee recommendations.  See M-3 for selection of Medical Investigators and Clinical Investigators appointed under this authority.

(2) **Action When No Facility Vacancy Exists.**  When a facility receives an application and no appropriate vacancy exists at that facility, and the applicant wishes employment elsewhere, the HRM Officer will advise the applicant to consult the VHA vacancy database www.vacareers.com for the location of current vacancies.  At the applicant's request, the application will be referred for employment consideration to the VA facility of the applicant's choice which has a suitable vacancy.

b. **Applications Received by Central Office.**  If the applicant is to be considered for facility assignment, the application will be referred to the facility of the applicant's choice and processed as provided in subparagraph (1).  If the applicant is to be considered for Central Office assignment, an interview may be conducted in Central Office or at a VA facility determined to be more convenient.  The appropriate National Central Office PSB will consider the applicant's professional qualifications, enter its recommendations on VA Form 10-2543, and forward all forms to the appropriate approving authority.  The Central Office Human Resources Service (05HR3) in Central Office will take the necessary appointment action.

c. **Applicants Not Recommended for Appointment.**  When an applicant is not recommended for appointment, the standards board shall record its findings on VA Form 10-2543, Board Action, and send them to the approving official.  After approval of the Board Action, the applicant will be notified in a letter over the signature of the Facility Chief of Staff or appropriate approving authority that the individual's appointment has not been recommended.  The letter will briefly state the basis for the action.  The letter should be reviewed by the Human Resources Management Officer for adherence to technical requirements.

2. **APPOINTMENT ABOVE THE MINIMUM FOR SUPERIOR QUALIFICATIONS**

a. Full-time, part-time, or intermittent podiatrists, optometrists, chiropractors, nurses, nurse anesthetists, PAs and EFDAs, who meet the qualification requirements for appointment, may have their initial rate of pay fixed at a step above the minimum of the appropriate grade in recognition of superior qualifications, experience, and/or achievement exceeding the expected standards for the grade.  The initial rate of pay may be set at any step rate within the grade (See VA Directive and Handbook 5007, Part II, Pay Administration.)

NOTE:  Physicians and dentists are not eligible for appointment above the minimum rate of the grade.  The step rate for a physician or dentist is determined by the number of total years of service the individual has worked in the VHA as reflected by his/her VA service date.  However, superior qualifications for physicians and dentists can be addressed through the use of market pay.  See part IX of VA Handbook 5007.

b.  Individuals appointed under authority of 38 U.S.C. 7401(3), or under authority of 38 U.S.C. 7405 to occupations identified in section 7401(3), may be appointed above the minimum step of the grade under provision of VA Directive and Handbook 5007.  This includes Hybrid Title 38 occupations.  The step rate for occupations under 38 USC 7401(3) cannot be based on the number of years of experience alone.  The specific criteria for steps above the minimum rate in VA Handbook 5007 Part II, Chapter 3, Paragraph 3b must be justified.

c.  Appointment at a step rate above the minimum shall be based on conclusive evidence of superior qualifications which equates to the step rate assigned.  Qualifications used to meet minimum grade level requirements in the qualification standard will not be used to also justify appointment at a step rate above the minimum of the grade.  Determinations as to whether an individual should be appointed at a step rate above the minimum will be made fairly, consistently, and according to Agency criteria.  The following are examples of appropriate criteria:

(1)  Significant and distinguished contribution in some phase of the appropriate occupation as evidenced by difficult and original research, writing and publications in professional media of stature, or special recognition in teaching or professional practice.

(2)  Special competence in the occupation as evidenced by service with professionally recognized committees, groups or responsible offices in professional societies above the local level, or consultative services within the occupation.  The competence attained must be supported by achievement of renown on a regional or wider basis.

(3)  Educational preparation that clearly exceeds requirements for the grade, expertise in specialized treatment modalities, outstanding competence as a clinical practitioner, or significant contributions concerning some aspect of the occupation.

(4)  Eligibility for certification or certification by an American Specialty Board.

(5)  Certification by the appropriate national certifying body to formally recognize a level of excellence based on demonstrated superior performance in clinical practice, assessment of knowledge, and colleague endorsement.

(6)  Other appropriate evidence of professional stature.

NOTE:  Prior to recommending approval or approving actions based on certification, Professional Standards Boards will verify the possession of such recognition by the individual.

d.  **Processing.**  The approval of step rates above the minimum is subject to the following requirements:

(1)  **Nurses.**  The facility Director (or Nurse Executive if so delegated), on recommendation, justification, and documentation by the appropriate PSB, may approve the appointment of nurses at any step above the minimum of the grade.

(2)  **Nurse Anesthetists.**  The facility Director, on recommendation, justification, and documentation by the facility PSB, may approve the appointment of nurse anesthetists to any step above the minimum of the grade.  Nurse anesthetists appointed on or after May 4,

1993, may not be appointed at a step rate above the minimum for the grade based on certification by the Council on Certification of Nurse Anesthetists.  Certification is a condition of employment and may not be used as a basis for appointment above the minimum step of the grade on initial appointment or reappointment.

(3) **PAs.**  The facility Director, on recommendation, justification, and documentation by the facility PSB, may approve the appointment of PAs to any step above the minimum of Chief grade or below.

## SECTION F.  APPOINTMENTS UNDER 38 U.S.C. 7401

1. **GENERAL.**  The primary consideration, prior to making selections and appointments under this authority, is to evaluate qualifications and personal characteristics as they relate to what is essential to successful performance of assigned responsibilities.  Prior to effecting appointments under this authority, Professional Standards Boards and/or Human Resources for 38 USC 7401(3) occupations), [whichever is applicable], and selecting officials are required to determine that the candidate's professional qualifications, physical and mental capacity, emotional stability, and any other pertinent qualifying factors, warrant a permanent appointment.  The use of this appointment authority should essentially provide tenure for the employee and ensure the continuation of quality service for VHA.  (See section G for procedures concerning full time temporary, part time, intermittent or fee basis appointments under 38 U.S.C. 7405.)

2. **APPOINTMENTS UNDER 38 U.S.C. 7401(1).**  Only full-time permanent appointments of physicians, dentists, podiatrists, optometrists, chiropractors, nurses, nurse anesthetists, PAs, and EFDAs are made under authority of section 7401(1).  These appointments are subject to a two-year probationary period requirement as specified in 38 U.S.C. 7403(b)(1).  See Sections A and G of this chapter for probationary period requirements for individuals appointed as part time or intermittent registered nurses under 38 U.S.C. 7405(a)(1).

3. **APPOINTMENTS UNDER 38 U.S.C. 7401(3).**  Only full-time permanent appointments of hybrid title 38 employees are made under authority of section 7401(3).  These appointments are subject to title 5 probationary period requirements (see chapter 2, section A, paragraph 9, this part).

   a. The Supervisor at the appropriate level will obtain an approval to fill a vacant position in accordance with local procedures.  Once approval is obtained the service will initiate recruitment action and contact the servicing Human Resources Office (HRO).

   b. Before recruitment is initiated, Human Resources will work in collaboration with the Supervisor to determine the eligibility and qualifications requirements that pertain to the assignment and grade level for the position to be filled in accordance with the qualification standards found in VA Handbook 5005, Part II Appendices found in appendix "G".   If the supervisor is not a subject matter expert in the profession, the supervisor must consult with the profession's subject matter expert throughout the recruitment and onboarding process for the vacant position.

   c. Human Resources will determine eligibility and qualifications in accordance with standards found in VA Handbook 5005, Part II found in Appendix "G", document the determination as instructed by VHA national policy office and recommend the appropriate grade to the selecting official for appointments, promotions, reassignments and change to lower grades.  The qualification determination for each applicant must be documented by HR completing a separate VHA qualification form for each of the applicants.

   d. Human Resources will notify candidates who fail to meet the requirements and fail to qualify for appointment.

   e. Processing requests for promotions, reassignments and change to lower grades in compliance with VA Handbook 5005, Part III, Chapter 4, paragraph 9.

TABLE of CONTENTS

Page Number

PREAMBLE ................................................................................................. 1

GENERAL PROVISIONS:
Article 1:    Recognition and Coverage .................................................... 2
Article 2:    Governing Laws and Regulations.......................................... 4
Article 3:    Collaboration and Labor-Management Forums ................... 5
Article 4:    Labor-Management Relations Training................................. 6
Article 5:    National VA Labor-Management Relations (LMR)-NNU Meeting ..................... 8

RN PROVISIONS:
Article 6:    RN Rights............................................................................. 9
Article 7:    Advanced Practice Registered Nurses (APRN ...................17
Article 8:    Seniority...............................................................................19
Article 9:    Work Unit .............................................................................20
Article 10:   Holidays ...............................................................................21
Article 11:   Leave and Absences............................................................24
Article 12:   Details, Floats, and Temporary Assignments .....................47
Article 13:   Work Schedules...................................................................50
Article 14:   Overtime (OT) and Compensatory Time (CT.......................55
Article 15:   Work Assignments and Objection to Work Assignment ......60
Article 16:   Staffing.................................................................................62
Article 17:   Job Sharing..........................................................................64
Article 18:   Alternative Workplace Arrangements (Telework ................66
Article 19:   Contract RNs........................................................................71
Article 20:   Uniforms, Appearance and Professional Identification........72
Article 21:   Vacancy Announcements.....................................................75
Article 22:   Professional Development and Education ...........................78
Article 23:   Nurse Professional Standards Boards (NPSB .....................83
Article 24:   Nurse Qualification Standards (NQS) and Proficiency Reporting ...................86
Article 25:   Recognition and Awards .....................................................89
Article 26:   Safety, Health and Environment..........................................91
Article 27:   Workplace Violence Prevention......................................... 107
Article 28:   Investigations .................................................................... 110
Article 29:   Surveillance and Monitoring .............................................. 112
Article 30:   Non-Disciplinary, Disciplinary and Major Adverse Actions ............................. 115
Article 31:   Alternative Dispute Resolution (ADR................................ 124
Article 32:   Equal Employment Opportunity......................................... 125
Article 33:   Reasonable Accommodations for RNs with Disabilities .... 127
Article 34:   Workers' Compensation .................................................... 131
Article 35:   Special Physical Examination (commonly known as Fitness for Duty) and Physical Standards Board ........................ 136
Article 36:   Dependent Care.................................................................. 138
Article 37:   Appointment Authority Changes......................................... 140
Article 38:   Official Records and Protection of Identifiable Information ........................... 141
Article 39:   Outsourcing......................................................................... 144
Article 40:   Drug Testing ....................................................................... 146
Article 41:   Employee Assistance Program .......................................... 148

Article 42:  Organizational Performance Improvement ....................................................... 150
Article 43:  Research........................................................................................................... 151

UNION PROVISIONS:
Article 44:  Union Rights and Representation..................................................................... 153
Article 45:  Facilities and Services for Union Use ............................................................. 158
Article 46:  Official Time ................................................................................................... 163
Article 47:  Grievance Procedure...................................................................................... 171
Article 48:  Arbitration ...................................................................................................... 177
Article 49:  Dues Deduction............................................................................................. 181
Article 50:  Mid-Term Bargaining ..................................................................................... 185
Article 51:  Local Supplemental Contracts, Memoranda of
             Understanding and Agreements........................................................................ 191
Article 52:  Nurse Locality Pay Survey ............................................................................ 193
Article 53:  NNU Representation on Committees ............................................................. 194
Article 54:  Affiliations/Joint Ventures ............................................................................. 195
Article 55:  Change in Ownership or Merger of a VA Facility ........................................... 196
Article 56:  Restructuring, Consolidating, Integrating or Closing VA Facilities or Units ..... 197
Article 57:  Contract Training, Duration and Distribution.................................................. 200

## **PREAMBLE**

A. This National Master Contract is made between the Department of Veterans Affairs (VA) and National Nurses Organizing Committee, National Nurses United. For purposes of this Contract, the Department of Veterans Affairs will be referred to as VA or the Department, and the National Nurses Organizing Committee, National Nurses United will be referred to as NNOC/NNU-VA or the Union.

B. The Department and NNOC/NNU-VA agree a constructive and cooperative working relationship between labor and management is essential in achieving the VA's mission and to ensure a quality work environment and work life. NNOC/NNU-VA and the Department recognize their relationship must be built on a solid foundation of cooperation, collaboration, trust, mutual respect, understanding, and sharing in the responsibility for organizational success. On issues that carry an obligation to bargain under the Federal Service Labor Management Relations Statute (the Statute), the parties agree that discussion will occur at the earliest opportunity.

C. The parties acknowledge that the Registered Nurse (RN) is critical to delivering safe patient care. RNs base actions and decisions on sound professional judgment, Scope and Standards of Professional Nursing Practice and Evidence Based Practice.

D. This contract will support a quality working environment for the recruitment and retention of RNs. Therefore, the parties agree to work together in collaboration and through this contract to identify opportunities for improvement, enhance productivity, and deliver the best quality of service to our nation's Veterans and their families. The parties agree that the RN is an advocate for patient safety. Patient safety is an integral part of the RN role.

## Article 1: Recognition and Coverage

### Section 1

California Nurses Association, National Nurses Organizing Committee, National Nurses United, AFL-CIO (Union or NNOC NNU-VA) is recognized as the sole and exclusive representative for all RNs, in units, hereinafter referred to as local units, consolidated and certified by the Federal Labor Relations Authority (FLRA) in case No. WA-RP-16- 0046, dated September 29, 2016, and any subsequent certifications or amendments. Employees subsequently added to the consolidated unit certification are automatically covered by the Master Contract.

### Section 2: NNU Role

As the sole and exclusive representative, NNOC NNU-VA at the national and local unit level is entitled to act for and to negotiate contracts covering all RNs in the bargaining unit. NNOC NNU-VA is responsible for representing the contractual interests of all RNs in the bargaining unit, regardless of membership status.

### Section 3: Registered Nurse Representation

A. The Department recognizes NNOC NNU-VA as the exclusive representative of all RNs in the bargaining unit; NNOC NNU-VA has the right to speak for and to bargain on behalf of the RNs it represents.

B. The NNOC NNU-VA will be given reasonable advance notice as to provide sufficient notification for a representative to be present at any formal discussions with bargaining unit employees concerning matters affecting personnel policies, practices or working conditions. In situations where the Department knows far in advance of the formal discussion, it should not delay in providing notice to NNOC NNU-VA of the meeting. The intent is not to delay time-sensitive discussions or to prevent a sufficient opportunity for a Union representative to attend the meeting.

C. The Department agrees that by participating in such discussions, the parties do not waive their rights under the Statute to request formal bargaining as appropriate consistent with the Mid-Term Bargaining Article.

### Section 4: Bargaining Unit Eligibility

A. Prior to taking an existing bargaining unit position out of the unit, the Department will discuss the unit status with NNU. Subsequent to such discussions, if the Department takes the position out of the unit, NNU will be notified in writing. Such notice will include the basis for the removal.

2

B.  The Department will provide NNU, each quarter, a copy of basic employment information regarding Bargaining unit RNs from the HRSmart system or other existing automated database. To the extent reasonably available, the basic employment information will include, by facility, the following: RN name, employee ID, department ID code, work schedule (e.g., full time, part time, intermittent), grade, step and total salary, T&L codes and tour of duty. This information will be provided in electronic (Excel) format to the union at the national level for local dissemination.

### Section 5: NNU Representatives

Union officials/representatives are defined as elected officers or RN representatives who are designated by NNU. NNU at the appropriate level will provide the Department with an updated list of the names, titles, room numbers and telephone numbers of all officials annually and when changes occur. Only representatives on this list are authorized to represent NNU. This list can be updated at any time, electronically or in writing, as changes occur.

## ARTICLE 2: GOVERNING LAWS AND REGULATIONS

**_____: Relationship to Laws and Regulations**

A.  In the administration of all matters covered by this Contract, applicable Federal Statutes and their implementing regulations shall govern management officials and RNs. They will also be governed by Government-wide regulations in existence upon the approval date of this Contract.

B.  Under 38 USC 7422, collective bargaining by RNs appointed under Title 38, including RNs, may not "cover, or have any applicability to, any matter or question concerning or arising out of (1) professional conduct or competence, (2) peer review, or (3) the establishment, determination, or adjustment of RN compensation under this title."" ... The term 'professional conduct or competence' means any of the following:
(1) Direct patient care,
(2) Clinical competence."
By law, these areas are excluded from collective bargaining, including any grievance procedure under this Contract. NNU and the Department intend that all articles in this Contract should be interpreted consistent with such statutory provisions, regardless of whether or not 38 USC 7422 is specifically cited in the article.

C.  NNU and the Department agree that 38 USC 7422 shall govern each and every article and section of this Contract as described in Section 1B above.

## Section 2: Relationship to Department Policy

A.  Where any Department or VHA policy expressly conflicts with this Contract, this Contract shall govern. Portions of Department or VHA policy, including Directives/Handbooks, which do not conflict with this Contract will remain in force.

B.  All local and national VA policies, including, but not limited to, standard operating procedures, guidelines which affect personnel policies, practices or working conditions of RNs will not be added, eliminated or modified without bargaining as appropriate consistent with Article 51 – Mid-term Bargaining when such a duty to bargain is triggered by the Federal Service Labor-Management Relations Statute (the Statute).

C.  Nothing in this provision is intended to waive the NNU's right to demand to bargain, consistent with Article 51 – Mid-term Bargaining or to satisfy the Department's obligation to bargain upon demand, over any change(s) in working conditions when such a duty to bargain is triggered by the Statute.

## ARTICLE 3: COLLABORATION AND LABOR-MANAGEMENT FORUMS

### Section 1: Purpose

A. The Department and NNOC, NNU-VA are encouraged to support collaborative relationships that will renew their efforts in improving service to Veterans and providing a positive work environment for RNs.

B. Collaborative activities may eliminate the need for formal bargaining but is not a waiver of bargaining rights of either party under law or government-wide regulation.

### Section 2: Principles

NNOC, NNU-VA and the Department encourage open communication that facilitates collaborative recommendations, cooperation, and mutual respect.

### Section 3: Pre-Decisional Involvement

Collaboration can lead to a functional and effective labor-management relationship. This includes discussion with NNOC, NNU-VA of potential changes in the workplace and the accomplishment of work by RNs, prior to the change being effectuated. Collaboration may enhance the decision-making process by providing the opportunity for NNOC, NNU-VA and the Department to discuss proposed changes, identify potential problems, exchange ideas and explore solutions. To the extent practicable, the Department will bring forth issues at the earliest possible time during collaborative discussions in order to minimize the time spent in, or the need for, formal negotiations.

## ARTICLE 4: LABOR-MANAGEMENT RELATIONS TRAINING

**Section 1: Joint Labor-Management Relations Training**

A. The parties agree that joint Labor-Management Relations (LMR) training is of mutual benefit when it covers appropriate areas such as contract administration, joint master contract training, interest-based bargaining, and other labor-management relations issues.

B. Bargaining unit RNs attending joint LMR training will be on official time. Apart from trainers, such official time will not count towards an official time allocation. The NNU representatives conducting joint LMR training will be on official time subject to applicable allocations. Joint LMR training may, as appropriate, count towards any annual training requirement that the Department may establish.

C. Joint national LMR training will be provided by mutual agreement of the parties. This training does not preclude separate training by either party.

D. Joint local LMR training will be provided by mutual agreement of the local parties. If approved, the nature, amount, and scheduling of the joint LMR training will be resolved locally. This training does not preclude separate training by either party.

E. Any training documents and media will be prepared jointly and published by the Department.

**Section 2: NNU Sponsored Labor-Management Relations Training**

A. NNU and the Department agree that NNU sponsored LMR training is of mutual benefit when it covers appropriate areas such as contract administration and interest-based bargaining. NNU sponsored training will be clearly identified as such. The intent of NNU sponsored training is to enable and empower local Union representatives to carry out their permitted representative functions and to train staff RNs on labor-management relations.

B. Subject to advance Department approval, official time allocated from the Official Time Article of this Contract can be used for appropriate union sponsored training, including travel time conducted during duty hours.

C. Bargaining unit RNs may request to attend NNU sponsored LMR training, subject to advance approval by the Department. If approved, attendance will be on official time. As appropriate, such training may count towards any annual training requirement that the Department may establish. If the request is not approved, NNU will be provided the reason for the decision, upon request.

D. NNU will notify the appropriate Department supervisors as soon as possible, but at least four weeks prior to the desired training date of the individuals selected for, or desiring to attend, NNU sponsored training. Additionally:

   1. For national NNU sponsored LMR training, VACO LMR will be given reasonable advance notice of the training along with a specific agenda.

   2. For local NNU sponsored LMR training, the appropriate Department official of the local health care system will be given reasonable advance notice of the training along with a specific agenda.

E. Training that relates to internal union business will not be conducted or attended on official time.

## Section 3: Third-Party Sponsored Training

Third-party sponsored training may be considered an appropriate use of official time.

## ARTICLE 5: NATIONAL LABOR-MANAGEMENT RELATIONS (LMR) – NNU MEETING

A. There shall be an annual one day joint face-to-face National VA Labor Management Relations – NNU meeting. The location of the meeting will be in Washington DC, unless mutually agreed otherwise. NNU and the Department may mutually agree to extend the meeting beyond one day. NNU and the Department will exchange agenda items no later than six weeks in advance, unless mutually agreed otherwise. NNU and the Department will jointly determine whether additional meetings via current telecommunications technology are necessary.

B. The Department will authorize official time (if otherwise in a duty status), for eight NNU representatives. The Department will pay travel and per diem for four of the eight NNU representatives. NNU will provide to VA Central Office management the names of the NNU designated representatives no later than six weeks in advance of the meeting, so that official time may be authorized. The amount and use of official time for the national meeting will be subject to the allocations established in the Official Time article of this Contract.

C. Upon request of NNU, a representative from the Office of Nursing Services (ONS) may attend the National VA Labor Management Relations - NNU meeting to address specific agenda items.

D. On an as needed basis, the parties may schedule meetings via current telecommunications technology to address time sensitive issues with NNU and either ONS or LMR.

## Article 6: RN Rights

 **Section 1:** **General Rights**

A. RNs are integral members of the health care team. In an atmosphere of mutual respect, all RNs shall be treated fairly, equitably and without discrimination, including but not limited to, their political affiliation, union activity, race, color, religion, national origin, gender, sexual orientation, marital status, age, or non-disqualifying disabling conditions. RNs will also be afforded proper regard for and protection of their privacy and constitutional rights. It is therefore agreed that the Department will establish working conditions that will be conducive to enhancing and improving RN morale and efficiency.

B. RNs have the right and responsibility to self-monitor their performance. Should a RN identify an issue/concern, the RN will notify the appropriate supervisor or service chief of the issue identified. RNs have the right to expect the Department to correct validated systems issues. The Department shall provide the education or skills training required by the Department to address other validated issues/concerns. Additionally, should the RN's official duties change or be altered, the Agency will provide the required education or skills training required as a result of those changes or alterations. The Department will foster an atmosphere of safety by encouraging RNs to identify systems issues without fear of reprisal.

C. RNs have the right to have all communications, including but not limited to, instructions and assignments given in a clear, reasonable and constructive manner. Such communications will be provided in an atmosphere that will avoid embarrassment or ridicule.

D. Information sharing between/from Department representatives, including but not limited to, electronic mail messages (email) regarding conduct or performance deficiencies and an employee's leave status, will not be distributed to or shared with other employees who do not have a need to know.

E. If a RN is to be served with a warrant or subpoena, the Department will take steps to ensure that it will be done in private without the knowledge of other employees to the extent it is within the Department's control. A Department representative will escort the RN to the VA Police Department or Human Resources as appropriate.

F. Consistent with the Non-Disciplinary, Disciplinary and Major Adverse Actions Article of this Contract, disciplinary and adverse actions will be impartial, taken with due process, not based on gossip or unsubstantiated rumors, and timely, based on the circumstances and complexity of each case.

9

G. RNs have the right to work in an environment free from inappropriate behavior such as intimidation, coercion, harassment, bullying behavior, non-verbal threatening gestures or reprisal and no RN will be used as an example to threaten other RNs.

H. RNs are encouraged to give suggestions and ideas to make the Department a better workplace and employer of choice. These suggestions and ideas will be given due consideration and feedback will be provided by the Department.

I. RN participation in surveys will be voluntary, unless NNOC NNU-VA and the Department agree to require participation. RNs will be assured that their responses will be confidential and their anonymity will be protected, unless NNOC NNU-VA and the Department agree otherwise.

J. The RNs shall be advised of the subject, location and time of all meetings with the Department. The RN will be advised of their right to NNU representation at the same time, if applicable.

## Section 2:  Rights to NNU Membership

Each RN in the bargaining unit will have the right to join NNU, engage in any statutory rights or rights under this Contract, including but not limited to, submitting an Assignment Despite Objection (ADO), filing a grievance or other complaint, asking for Union representation, participating in the Union, consulting with the Union and acting as a designated representative without fear of penalty or reprisal.  This right shall extend to participation in all NNU activities including service as officers or representatives.

## Section 3:  Rights to NNU Representation

A. The Department recognizes a RN's rights to assistance and representation by NNU, and the right to meet and confer with NNU representatives in private during duty time, consistent with law and with this Contract. If the RN or the Union official request to meet and confer regarding representational issues, the Department will endeavor to allow the RN to be released within the work shift in which the request is being made. A RN must have supervisory permission prior to leaving the work unit unless the RN is on break or meal period.

B. The right to meet with a NNU official to discuss representational and other issues includes the right to meet in a nearby non-work area, including but not limited to, available break rooms, conference rooms, and unused patient rooms where privacy is assured.

C. If the RN cannot be released immediately upon request to meet with a NNU representative, the RN will be released within a reasonable timeframe (generally no later than the day following the request) to schedule and meet with a NNU representative on duty time.  If such release is not made or not possible,

appropriate relief from grievance time frames will be afforded. The Department may track the amount of time RNs use while on duty to meet and confer with Union representatives.

D. When the RN chooses to meet with the Union on scheduled meal or break times, supervisor permission is not required.

E. After New Employee Orientation, RNs may request a copy of the Contract by contacting NNU/NNOC or the local Human Resources office.

## Section 4: Weingarten Rights

A. The Department agrees to inform all RNs annually of their right to NNU representation under 5 USC 7114 (a)(2)(B), commonly known as the Weingarten Right. Specifically, the Weingarten right provides the following: in any examination of a RN by the Department (or any agency acting as an agent of the Department) in connection with an investigation, the RN has a right to NNU representation if he/she reasonably believes that the examination may result in disciplinary action, and NNU representation is requested by the RN.

B. At the beginning of any actual examination of a RN in which Weingarten applies, the Department agrees to provide notice to the RN of his/her right to have an NNU representative present during the examination.

C. The Department will not dissuade a RN on the need for, or from requesting Union representation.

D. If the RN requests NNU representation, the Department may delay or reschedule the meeting if necessary, in order to give NNU an opportunity to be present. The unavailability of a union representative will not unduly delay the meeting. NNOC NNU-VA recognizes that the RN has the right to waive or refuse NNOC NNU-VA representation.

E. A RN may rescind the waiver to NNU representation and invoke this right at any time during the process.

## Section 5: Counseling

A. Both verbal and written counselings shall be reasonable, fair, and used constructively to encourage a RN's improvement in areas of conduct and performance. A counseling, either verbal or written, does not constitute a disciplinary action. The Department is not required to counsel verbally prior to issuing a written counseling to a RN.

B. Conduct or performance deficiencies will be discussed with a RN in private.

11

C. The Department official, at their own determination, may invite a NNU representative to attend a counseling session.

D. In general, meetings to deliver a counseling do not require the RN to have representation. However, if the supervisor requires additional Department representatives to deliver the counseling the RN may request a union representative be present, subject to the determination of the Department Official.

E. After a counseling session, if the RN is dissatisfied and wishes to pursue a grievance, the RN may proceed to either Step 1 or to Step 2 of the grievance procedure.

F. Verbal Counseling:

1. When it is determined that verbal counseling is necessary, the counseling will be accomplished during a private meeting with the concerned RN.

2. Verbal counselings will be reasonable, fair and used constructively to encourage the RN's improvement in areas of conduct and performance.

3. If a written confirmation or record of the verbal counseling is made by the Department, the RN will be provided a copy as soon as possible. It will be annotated on the confirmation notice to the RN that the counseling is verbal.

4. A verbal counseling does not constitute a disciplinary action or entitle the RN to representational rights.  However, if the counseling turns into a Weingarten meeting (i.e., where a Department official questions a RN and the RN reasonably believes that the questions may lead to his/her discipline as described in Section 4 of this Article) then the RN is entitled to NNU representation upon request. At any point during the counseling session where a RN has the right to local NNU representation, the RN shall be advised of that right immediately.

G. Written Counseling:

1. Written counseling will be reasonable, fair, and used constructively to encourage the RN's improvement in areas of conduct and performance. When it is determined that written counseling is necessary, the counseling will be accomplished during a private meeting. Two copies of the written counseling will be given to the RN.

2. Consistent with the Non-Disciplinary, Disciplinary and Major Adverse Actions Article of this Contract, written counselings for non-probationary employees may only be kept or used to support other personnel actions for up to six

months unless additional, related misconduct occurs, and then it may be retained up to one year.

3. A written counseling does not constitute a disciplinary action or entitle the RN to representational rights. However, if the counseling turns into a Weingarten meeting (i.e., where a Department official questions a RN and the RN reasonably believes that the questions may lead to his/her discipline as described in Section 4 of this Article) then the RN is entitled to union representation upon request. At any point during the counseling session where a RN has the right to local NNU representation, the RN shall be advised of that right immediately.

4. In the case of probationary RNs, written counselings may be kept up to the time a decision is made regarding whether or not the RN will continue beyond the probationary period, unless the employee initiates litigation to contest a probationary termination decision. Thereafter, all written counselings must be removed.

## Section 6: Use of Recording Devices

A. No recording device, electronic or otherwise, shall be used to make a record of any conversation between a RN and Department official without mutual consent except for Administrative Investigations, Inspector General investigations, Office of Resolution Management (ORM)/Equal Employment Opportunity (EEO), investigations or law enforcement investigations.

B. In the instance that the Department makes a recording of a statement given by a RN during an administrative investigation (including fact findings and AIBs), the electronic recording will be transcribed. When a recording is made, the RN will be given the opportunity to review the transcript for accuracy, and may make corrections as needed. Upon request, the RN will be provided a copy of the transcript, as well as a copy of the RN's corrections, if applicable.

C. RNs who are given a proposal for discipline based on recorded statements given to Department officials must be provided with the final complete written transcript of all of the statements at the time the proposal letter is issued.

## Section 7: First Amendment Rights

RNs have the right to present their views to Congress, the Executive Branch, or any other authorities and to otherwise exercise their First Amendment rights, consistent with applicable laws, without fear of penalty or reprisal.

## Section 8: Access to Documentation

13

Upon proper request, RNs have a right to be made aware of and receive copies of any information, including anecdotal notes, specific to them maintained under their name, social security number, and/or any recognizable personal identifier, pursuant to the Privacy Act of 1974, 5 USC Section 552a(d)(1). The Department will promptly provide the documents, based on their availability and will not unduly delay providing of the documents. The Department agrees to follow the requirements for creating and/or maintaining systems of records consistent with law and government-wide regulation.

## Section 9; Personal Rights

A. RNs will have the right to direct and fully pursue their private lives, personal welfare, and personal beliefs without interference, coercion, retribution, or discrimination by the Department, so long as such activities do not conflict with job responsibilities.

B. The Department will make every reasonable effort to provide for secure storage of personal belongings.

C. Upon request, the Department will instruct RNs on how to file a claim for reimbursement under 31 USC 3721 and related regulations and will make forms available in case of loss if some personal item is damaged, irretrievably lost, or destroyed.

## Section 10: Dignity and Self-Respect in Working Conditions

RNs, individually and collectively, have the right to expect and to pursue conditions of employment that promote and sustain human dignity and self-respect. Therefore, they will be treated with dignity and respect in the performance of their duties by all those they encounter. It is the RN's right to expect zero tolerance for violence in the workplace whether from other employees, patients or the public.

## Section 11: RN Right to Privacy

A. RNs may store personal papers and effects in their office, desk, file cabinet, or lockers. Personal papers and effects stored in Department areas are subject to warrantless search or seizure if the Department has reasonable grounds for suspecting the RN is engaged in work-related misconduct or the search is necessary for a non-investigative work-related purpose.

B. Additionally, consistent with the Article on Surveillance and Monitoring of this Contract, search of a RN's person and personal items owned by the RN, such as handbags, briefcases, backpacks, or other like material, may be permitted only on the basis of reasonable suspicion based on specific, objective evidence and/or reasonable inferences drawn from the evidence of work-related misconduct or criminal activity.

**Section 12:  Whistle-Blower Protection**

Consistent with the Federal Whistleblower Protection Act, 5 USC 2302 (b)(8), RNs will be protected against reprisal for the disclosure of information not prohibited by law, rule, regulation or Executive Order, that the RN reasonably believes evidences a violation of law, rule or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.  "Public" includes patients and RNs to the extent permitted by law.

**Section 13:  Unlawful Improper or Conflicting Orders**

A. RNs practice with and are required to have a valid State License.  The RN is required to practice within the scope of applicable State Nurse Practice Acts, VA Regulations and Applicable Laws.

B. RNs have a right to their professional opinion. RNs have the right to promptly bring their concern about an unlawful, improper or conflicting order to the person giving the order. If unable to resolve the issue, RNs have the right to present their concerns up the supervisory chain of command and will follow the direction by their appropriate chain of command. RNs retain the right to initiate an ADO.

C. RNs will not be subjected to disciplinary or adverse action for reporting or failing to follow an unlawful, improper or conflicting order if, after administrative review, the Department determines that the order was unlawful, improper or conflicting.

**Section 14:  Group Meetings**

A. When the Department conducts group meetings with RNs and the topics include personnel policies, practices, or working conditions, NNU will be notified in advance and given the opportunity to be present.

B. RNs may request group meetings with the Department and NNU representatives to discuss workplace issues. The Department will schedule the meeting in coordination with NNU. The Department agrees that by participating in such meetings NNU does not waive its right to request formal bargaining consistent with the Statute.

C. RNs may raise workplace concerns to the Department and/or NNU. RNs can request a meeting with NNU to discuss RN representational issues but only the Department can allow RNs to have a meeting on work time, and determine the number of RNs to be released and the time of the release. Other than meetings conducted in space reserved for NNU, NNU may request meeting space, subject to the Department's approval which will be based on local availability and as not to disrupt patient care. Subject to Department approval, RNs will be allowed to attend a meeting with other RNs and NNU, and/or Department representatives to

15

discuss these concerns while on duty. These meetings may be staggered or several meetings scheduled to allow all interested staff to attend.

## ARTICLE 7: ADVANCED PRACTICE REGISTERED NURSES (APRN)

### Section 1: General

A. The entire Master Contract shall apply to all Advanced Practice Registered Nurses.

B. The Department and NNU agree that Advanced Practice Registered Nurses (APRN) definitions are contained in VA Policy, VA regulations (eg 38 CFR 17.415) and state licensure laws. APRNs are covered by this Contract, applicable government-wide rules and regulations, and applicable VA Handbook and Directives. The term Advanced Practice Registered Nurse refers to nurses with nationally recognized graduate educational preparation and certification, usually as either a clinical nurse specialist (CNS), or nurse practitioner (NP), but can also refer to nurse anesthetists, and nurse midwives. , etc. These nurses provide advanced clinical care to achieve optimal patient outcomes. Assignment of duties and scope of work is consistent with 38 USC 7422 and VA Regulations including, but not limited to, VHA Handbook 1100.19 and VA Handbook 5005.

C. The Department and NNU recognize that APRNs are valuable and contributing members of the healthcare team, who may manage a caseload of patients independently or in a collaborating role. APRNs, as either team members or in a collaborative environment, will have adequate support to manage their work assignments, including completion of view alerts. When a APRN performs officially ordered or approved hours of work in excess of the APRN's basic work requirement, the APRN may request compensatory time or be paid overtime, consistent with all VA regulations and handbooks related to pay.

### Section 2: APRN Collaboration

The Department and NNU recognize that the ability of physicians and APRNs to work together as a unified team is important to patient care. When making collaborative placements, the Department is encouraged to consider interpersonal relationships.

### Section 3: Continuing Educational Opportunities

A. The Department recognizes the value of continuing educational activities to enhance the professional competency of APRNs. Upon request, APRNs may be granted Authorized Absence (AA) in order to participate in continuing education conferences relevant to their area of practice. The Department will fully consider requests for AA or Leave Without Pay (LWOP) and, where appropriate, funding for APRNs to attend such conferences. APRNs will follow the local process for requesting funding and AA.

B.  Since professional development is critical to maintaining the performance of the APRN, support for continuing education and training will be in accordance with the Professional Development and Education Article.

## ARTICLE 8: SENIORITY

### Section 1: Seniority Definition

A. Unless otherwise defined below, NNOC NNU-VA adopts for their bargaining unit RNs that the general seniority definition will be defined as entrance on duty date (EOD) as a Title 38 RN for/at the local facility. Only periods of service for/at the local facility as a RN will be used to compute and establish seniority. If there is more than one RN with the same date, the RNs of that date will be ranked alphabetically.

B. Current VA policy, which is not part of this negotiated Contract, will govern the determination for seniority for reduction in force (RIF) procedures.

C. In the event of a merger, a department initiated realignment of facilities or an involuntary transfer of RN(s) the seniority of the affected RN(s) will remain intact.

### Section 2: Seniority Rosters

A. The local NNOC NNU-VA will be provided quarterly seniority rosters to each local unit by Time and Leave (T&L).

B. These rosters will also be provided, maintained and accessible to all RNs on each nursing unit or work area. In the event that NNOC NNU-VA believes a RN's seniority date is improperly identified in this report, NNOC NNU-VA is responsible to identify the error upon their receipt of the quarterly report or when NNOC NNU-VA first becomes aware of the error.

## ARTICLE 9:  WORK UNIT

A.  A work unit is defined as bargaining unit RNs in a physical area or clinical function if a physical area is not applicable.

B.  This definition will be utilized when dealing with issues that impact working conditions including, but not limited to, overtime assignments, annual leave solicitation, details and floats.

C.  Subject to the limitations of 38 U.S.C. 7422, NNU will be involved in changes regarding work units.

## ARTICLE 10: HOLIDAYS

**Section 1: General**

A. NNU and the Department agree that it is the responsibility of the Department to provide for the safety of patients and their families as well as for the safety of the staff assigned. As such, it is a management right to assign work and approve or change schedules, including schedules created from procedures in this Article, to meet direct patient care needs and ensure RN safety, consistent with 38 USC 7422.

B. Upon the request of either party, scheduling days off for holidays is subject to local bargaining. If there is no request to bargain locally, the process will be as follows in the remainder of this Article.

**Section 2: Designated Federal Holidays**

RNs covered by this Contract will be entitled to the benefit of the holiday provisions set forth in applicable statutes and regulations. The ten recurring Federal holidays currently established are:

A.      New Year's Day - January 1st

B.      Martin Luther King Day - the 3rd Monday in January

C.      President's Day - the 3rd Monday in February

D.      Memorial Day - the last Monday in May

E.      Juneteenth - June 19th

F.      Independence Day - July 4th

G.      Labor Day - the first Monday in September

H.      Columbus Day - the second Monday in October

I.      Veteran's Day - November 11th

J.      Thanksgiving Day - the fourth Thursday in November

K.      Christmas Day - December 25th

**Section 3: Other Holidays**

A. Other holidays may occur based on regional, ethnic, religious or other considerations and traditions. RNs are not entitled by law to these other holidays.

B. Other holidays, though not considered an entitlement, may be requested as days off or annual leave. When a RN routinely observes a bona fide religious, ethnic or other consideration or tradition, the RN may register a request in writing to his/her supervisor or manager stating their preference for observing such a holiday. Requests should be submitted as far in advance as possible, but no later than one week before the posting date of the work schedule on which the holiday appears. Subject to staffing requirements, direct patient care needs, and this Contract regarding leave and absences, requests of this nature will be accommodated by the Department whenever possible.

## Section 4: Federal Holiday Scheduling

A. The Department will use a separate holiday calendar or a combined holiday and annual leave planning calendar, which will be posted no later than September 1st of each year.

B. Scheduling time off for Federal holidays will be done in accordance with the procedures outlined below.

C. Peer negotiation will be used for scheduling holidays. Peer negotiation is defined as RNs first discussing holiday preferences among themselves to determine holiday selection in lieu of the Department making the determination. The outcome reached through peer negotiation is subject to supervisory approval.

D. Process for Holiday Coverage

1. The RN solicitation for requests for holidays off or to work a holiday during the next leave year beginning with pay period one through pay period twenty-six will be posted on each work unit by September 1st. RNs should indicate their holiday preferences, by September 30th. RNs will use this time period to discuss or work out any peer negotiated agreements.

2. The Department will approve or disapprove all timely submitted requests before considering requests that failed to meet the deadline.

3. The finalized holiday schedules for the following leave year will be approved and posted by November 15th of the current year.

4. Where there are more requests for a specific holiday than can be supported by the staffing plan, the following priorities will be applied:

Priority 1 - Peer negotiated arrangement

Priority 2 - RNs that did not have that holiday off in the preceding year

Priority 3 - Determined by seniority once management makes a determination as to qualified staff

5. If there are additional opportunities identified for holidays off, the Department will maximize the number of RNs off. If the Department posts open slots on the holiday schedule, the Department will promptly consider RN requests, determine whom to approve based on the above process beginning with those previously denied, and post the approved RN requests for those holiday periods. These requests will not be arbitrarily denied.

6. When there are more RNs wanting to work the holiday than are required, the determination will be based on seniority (most senior) once management makes a determination as to qualified staff.

7. The Department will make efforts to minimize impact on reassigned RN(s) with previously approved holiday requests. The affected RN(s) will keep their previously approved holiday request, unless the supervisor determines after considering alternative staffing methods, there is no other qualified RN to perform the assignment. RNs hired or transferred in after the submission of holiday preferences will have their requests considered fairly and equitably after the application of the above process.

8. When the RN has approved annual leave where the time period includes a holiday, the holiday will be approved. The holiday within the leave period will be considered the RN's first priority request.

## ARTICLE 11:  LEAVE AND ABSENCES

### Section 1:  General Leave Provisions

A. NNU and the Department agree that it is the responsibility of the Department to provide for the safety of patients and their families as well as for the safety of the staff assigned. As such, it is a management right to assign work and approve or change schedules, including schedules created from procedures in this Article, to meet direct patient care needs and ensure RN safety, consistent with 38 USC 7422.

B. Leave for Title 38 RNs is governed by VA Directive and Handbook 5011, Part III, Chapter 3, laws, government-wide regulations, and this Contract.

C. RNs are responsible for planning and managing their leave. RNs recognize that planned leave should be requested as far in advance as possible in order to increase the likelihood of approval and facilitate the scheduling of other RNs' leave.

D. All leave charges will be in minimum increments of one-quarter hour.

E. No arbitrary or capricious restraints will be established to restrict when leave may be requested or approved. The Department's leave program shall be applied fairly and uniformly, consistent with VA regulations.

F. The proper care and treatment of patients shall be the primary consideration in granting leave. The Department will give due regard to the welfare and preferences of individual RNs.

G. RNs will not be denied leave or adversely affected in any employment decision based solely on their leave balances.

H. Leave will be denied only for appropriate reasons and not as a form of discipline. No approved leave or approved absence will be a basis for disciplinary action except when management establishes that the RN submitted knowingly false documents or knowingly misrepresented the facts when requesting the leave.

I. For clearly compassionate and appropriate reasons, the Department may increase the stated limits applicable to all forms of leave in accordance with applicable government-wide regulation and law.

J. Documents required to support RN absences for leave purposes are highly sensitive. The Department will ensure that records are secure, confidential, and all information divulged will be to those who have a need to know.

K. Upon request of either local party, the portions of this Article concerning the process for yearly annual leave solicitation are subject to local negotiation upon the effective date of the Contract.

**Section 2;** **Annual Leave**

A. Use of Annual Leave:

1. The taking of annual leave is a right of the RN, subject to the right of Management to determine and approve when leave may be taken.

2. RNs may request to schedule annual leave and, subject to direct patient care needs and approval by the appropriate official, are entitled to use the entire 208 hours of annual leave they earn each year.

3. RNs are encouraged to take a minimum of two consecutive weeks of annual leave per year.

4. The Department may advance up to 208 hours of annual leave to a RN as provided in Handbook 5011, Part III, Chapter 3, Paragraph 6.f.(2).

B. Accrual and Carry Over:

1. In accordance with VA Handbook 5011 Part III Chapter 3, full-time RNs accrue annual leave at the rate of eight hours per each full biweekly pay period.  Part-time RNs accrue annual leave at the rate of one hour per ten hours in pay status.

2. If a full-time RN elects not to use all accrued leave:

    a. Annual leave accumulates to a maximum carry over leave balance of 685 hours at the end of each leave year.

    b. Generally, part-time RNs may not carry over more than 240 hours of annual leave at the end of each leave year.

3. Accumulated annual leave exceeding the applicable limit is considered "use or lose" leave, meaning any unused balance over the maximum will be forfeited at the end of the leave year unless the annual leave was properly scheduled in advance and canceled by the Department for business reasons.

a. RNs in "use or lose" status are encouraged to schedule sufficient leave (at least 26 days) during the year to avoid the possibility of loss. The restoration of any leave lost under this provision is described in VA Handbook 5011, Part III, Chapter 3, Paragraph 6(f)(1)(d).

b. The RN is encouraged to consider donating excess annual leave to another Federal employee in need of donated leave to cover illness or injury.

4. Between August 15th and August 31st of each year, the Department will notify RNs of the following:

a. A full-time RN can carry no more than 685 hours and a part-time RN can carry no more than 240 hours of annual leave;

b. RNs should request to use any amount of annual leave accrued and that will be earned during the rest of the leave year that is over the maximum carryover;

c. RNs who are in "use or lose" status should plan to schedule five weeks of annual leave during the planning period for the next calendar year;

d. Failure to use excess annual leave may result in forfeiture of any amount exceeding the maximum carryover amount;

e. Each RN may access their leave information by logging on to https://mypay.dfas.mil/mypay.aspx and accessing a current Leave and Earnings Statement (LES). Within the leave block on the LES, RNs will see a current leave balance and any amount of "use or lose" leave (if applicable) for that leave year.

5. The notification requirement of Section 4 above cannot change the Department's requirements regarding the carry over or restoration of annual leave.

C. Planned Annual Leave:

1. The Department determines how many RNs may take annual leave during any given week and reserves the right to determine qualified staff mix and appropriate staff workload distribution and assignments for patient care.

2. During initial leave planning, the Department will make sufficient weeks available to ensure that RNs can take five weeks, or twenty-six days of leave annually. In the unusual circumstance where there are not sufficient weeks available, the Department will immediately notify NNU and meet to discuss the matter.

3. All RNs in a work unit will submit leave requests with other RNs for that work unit.

4. The RNs may use an annual leave planning calendar provided by the Department to assist in working out differences with their peers during the request period. This annual leave planning calendar will not be a substitute for placing the annual leave request in the Electronic Time and Attendance system.

5. The Department will post the annual leave planning calendar containing the following information by September 1 each year:

    a. The maximum number of RNs who can be off duty on annual leave at any given time as determined by the Department;

    b. A list of each week, by date, in the leave year.

6. RNs will submit requests for annual leave during the planning period between September 1st and September 30th for the next leave year beginning with pay period one through pay period twenty-six.

7. RNs can request AL in week or day increments. Single day requests will not pose negative effects on the weeks of leave available.

8. RNs fill in the annual leave planning calendar according to the following process:

    a. The RN will submit leave requests to the leave approving supervisor and, under ordinary circumstances, will post the same leave requests on the AL planning calendar. If the RN is unable to post the submitted leave request on the AL planning calendar due to geographical unavailability (such as telework, CBOC or other off-site location) or to extended leave, the supervisor will, at the request of the RN, post requests on the RN's behalf.

    b. There is no limit to the number of weeks of leave a RN may request. However, in the first planning period, the manager will not approve more than 5 weeks of annual leave per RN.

    c. The RN can request extra weeks during the 2nd request period (Oct 15-31).

    d. Once approved for annual leave based on using a seniority benefit, the RN may not swap annual leave weeks or days with another RN.

27

e. Where there are more RN requests for specific annual leave in a work unit than can be supported, the following priorities will be applied:

    i. Priority 1 - Peer negotiated arrangement.

    ii. Priority 2- RN that did not have that annual leave time off in the preceding year.

    iii. Priority 3 - Determined by seniority.

9. The Department will approve or disapprove all timely submitted requests before considering requests that failed to meet the deadline.

10. The Department will notify the RN by no later than October 15th of approved or disapproved annual leave and post the approved annual leave calendar on the unit.

11. The posted annual leave calendar will contain the following information:

a. The maximum number of RNs who can be off duty on annual leave at any given time as determined by the Department;

b. A list of each week, by date, in the leave year;

c. The name(s) of the RN(s) who have been approved for annual leave will be annotated next to the corresponding week and will be updated as changes occur;

d. Any open weeks which will be updated as changes occur.

e. The Department will not remove or block any open weeks that were not taken by the RNs after the bidding periods.

12. If a RN is notified by October 15th that any portion of his/her annual leave request(s) has been disapproved, he/she may submit another request for the open weeks no later than October 31st. These requests will be approved or disapproved by November 15th and posted on the annual leave calendar. The calendar will be posted in the unit. Upon request, the finalized approved annual leave calendar will be provided to the union.

13. RNs will place all approved and disapproved annual leave requests from planning period in the ETA system by December 1st. The Department will approve/disapprove all the planning period requests by December 15th.

14. The Department will update the posted approved annual leave calendar as annual leave requests are approved and as RNs are no longer employed in

the work area.  Upon request, changes in the annual leave calendar will be provided to the local Union on a monthly basis.

15. The Department will post open slots on the Annual Leave Calendar when they become available through transfer, resignations, etc. The following process will be followed:

    a.  Those RNs who were previously denied will annotate this information on the leave request and will be given first option for the open slot(s);

    b.  RNs who did not have off the preceding year time slot will annotate this information on the leave request and will be given the next option;

    c.  Determined by seniority

    d.  When this process is complete the Department will post the approved RN requests for those annual leave periods.

16. RNs who have been previously approved for annual leave, but do not have enough annual leave or compensatory time available to cover their absence when the leave period arrives, will not be able to take annual leave. The RN may request Leave Without Pay which is subject to approval by the Department and is not an entitlement.

D.  Unplanned Annual Leave or Compensatory Time Requests:

1.  Unplanned (incidental) annual leave or compensatory time requests are those not requested during the planning period.

2.  When an unplanned need arises, the RN must contact their supervisor or designee with leave approving authority to request the leave. The RN may verbally request annual leave or compensatory time not in excess of three days. The RN will enter the leave into the ETA prior to taking the leave, unless not practicable, in which case the RN will enter the leave request into the ETA system no more than two days after returning to duty. The RN will be informed whether the leave is approved or disapproved at the time of the request.

3.  Request(s) for unplanned leave in excess of three days will be made into the ETA system unless not practicable.  If not done prior to use, the request will be placed in the ETA no less than two days after returning to duty.

4.  There will always be someone available who is authorized to receive and act upon the leave request.

5.  The RN must have annual leave or compensatory time for this request to be approved.

6.  When an annual leave request is approved, compensatory time may be substituted for annual leave. A RN does not have to have a zero annual leave balance in order to use compensatory time earned, nor does a RN have to use compensatory time earned before using annual leave.

7.  For more information on earning and use of Compensatory Time see Article 14 Overtime and Compensatory Time.

E.  Days Off In Conjunction With Annual Leave:

1.  Normally, a RN will have weekends off before, during, and after a week(s) of annual leave unless the RN requests other days off in conjunction with annual leave.

2.  RNs who work weekends and/or compressed tours of duty may not routinely get the traditional weekend (Saturday and Sunday) off. RNs who request annual leave for an entire workweek will be entitled to two days off prior to the start of the week of annual leave and two days off at the end of the week of annual leave. For example, RNs on compressed tours, such as four 10-hour shifts, are entitled to two days off prior to the annual leave, four days of annual leave, their normal off day, and two additional days off for their weekend.

3.  When a RN requests annual leave in conjunction with their normally scheduled days off, if the annual leave is approved the Department will make every effort to not change those days off. If days off are changed the Department will notify the RN prior to posting the schedule to ascertain whether the RN still desires to use the requested annual leave.

4.  NNU and the Department agree annual leave scheduling may alter weekend rotation. All efforts will be made to minimize changes to the weekend rotation.

F.  Transfer/Reassignment of RNs:

1.  The Department will make every effort to allow voluntarily transferred/reassigned RNs to keep their previously approved leave.

2.  If the RN did not request the transfer or reassignment, the affected RN will keep their previously approved annual leave request(s), unless the supervisor determines after considering alternative staffing methods, there is no other qualified RN to perform the assignment.

G.  Cancellation of Leave by the Department:

1. In an unusual or emergent situation, previously approved annual leave may be canceled and the RN directed to return to duty. Generally, the authority to cancel leave will not be exercised unless there is an urgent unforeseen circumstance and it is feasible for the RN to return to duty.

2. The following process will be used to select the RN(s) whose leave will be canceled:

   a. Volunteers will be solicited first, then;

   b. Peer negotiation, then;

   c. If no resolution, the least senior qualified RN will be selected.

3. Upon request, a RN will be provided a written reason why the annual leave was canceled.

## Section 3: Sick Leave

A. Accrual of Sick Leave:

1. Full-time RNs accrue sick leave at the rate of four hours per pay period. Part-time RNs accrue sick leave at the rate of one hour for each twenty hours in a pay status.

2. Consistent with VA Handbook 5011, Part 3, Chapter 3, Paragraph 6.f.(2), sick leave, not to exceed 360 hours, may be advanced to full-time RNs at any time. However, sick leave shall not be advanced to RNs on time limited appointments in an amount in excess of that amount which could accrue during the remainder of the current appointment. Consistent with VA Handbook 5011, Part 3, Chapter 3, Paragraph 6.f.(3), part-time RNs may be advanced sick leave based upon their appointment.

B. Annual leave and leave without pay requests are not considered the same as sick leave requests, as the criteria for granting such requests is different. However, the RN may request annual leave or leave without pay instead of sick leave for an absence for which sick leave would otherwise be appropriate, subject to approval by the Department.

C. In cases in which a RN has a sick leave balance and places a valid sick leave request, the Department will not deny a request to substitute compensatory time earned for sick leave.

31

D. In an effort to minimize leave usage, the Department will attempt to accommodate RNs who request a change in work schedule in advance to meet medical and dental appointments.

E. Use of Sick Leave

1. Sick leave is the RN's earned benefit and will be granted to the RN for appropriate absences.

2. Sick leave may be used when RNs:

   a. Receive medical, dental, or an optical examination or treatment;

   b. Are incapacitated for the performance of duties by physical or mental illness, injury, pregnancy, or childbirth;

   c. Are required to give care and attendance to an immediate family member who is afflicted with a contagious disease and/or would jeopardize the health of others by being present on duty after exposure to a contagious disease;

   d. Must be absent from duty for purposes related to the adoption of a child, including appointments with adoption agencies, social workers, and attorneys; court proceedings; required travel; and any other activities necessary to allow the adoption to proceed.

   e. Use of Sick Leave for Family Care or Bereavement

F. Use of Sick Leave for General Family Care or Bereavement Purposes

1. Sick Leave for General Family Care or Bereavement purposes is set out in VA Handbook 5011, Part 3, Chapter 3.

2. Family member means an individual with any of the following relationships to the employee:

   a. Spouse and parents thereof;

   b. Sons and daughters and spouses thereof;

   c. Parents and spouses thereof;

   d. Brothers and sisters and spouses thereof;

   e. Grandparents and grandchildren and spouses thereof;

32

      f.   Domestic partner and parents thereof, including domestic partners of any individual in paragraphs (b) through (e) of this definition; and

      g.   Any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship.

3.   Leave for Family Care and Bereavement Purposes

      a.   A RN may be granted or advanced sick leave to care for a family member, to make arrangements and attend the funeral of a family member, and arrange for adoption.

      b.   Full-time employees may take up to thirteen days of sick leave in a leave year.

      c.   Part-time employees may take up to the amount of sick leave they would accrue in a leave year.

4.   Sick Leave under this paragraph does not count toward a RN's entitlement under the Family and Medical Leave Act unless the employee notifies the leave approving official in advance of intent to substitute sick leave for leave without pay taken under the Family and Medical Leave Act.

5.   A RN who has already used twelve weeks of sick leave in accordance with paragraph 3 (below) is not entitled to use the thirteen days of Sick Leave for General Care and Bereavement referenced in this paragraph.

H.  Sick Leave to Care for a Family Member With a Serious Health Condition

1.   Full-time RNs may take up to a total of twelve administrative workweeks (480 hours) of sick leave in a leave year to care for a family member with a serious health condition, as defined in the Family and Medical Leave Act.

2.   If a RN has previously used any portion of the thirteen days of Sick Leave for General Family Care and Bereavement Purposes in a leave year, that amount must be subtracted from the twelve workweek entitlement.

3.   Use of sick leave to care for a family member with a serious health condition does not preclude a RN from applying for and benefiting from the entitlements of the Family and Medical Leave Act.

4.   For additional information, see VA Handbook 5011, Part 3, Chapter 3, Section 5(i), Sick Leave for General Family Care and Bereavement Purposes.

I.   RNs are not required to reveal the nature of the illness as a condition for approval of sick leave.

J.  It is the responsibility of the RN who is incapacitated for duty to notify the immediate supervisor or designee (or to have any responsible person make the notification for the RN) at the work site as soon as possible but no later than two hours after the RN is scheduled to report for duty unless mitigating circumstances exist. The Department will assure a designated number is established for the supervisor or designee to receive such notifications; the RN's obligation is to complete one phone call, to either the established number or to an alternate number the RN was notified to use. In the unlikely event that the RN does not speak with a supervisor and leaves a voicemail message, the RN may be called back by a Department representative regarding the sick leave message.

K.  The Department will ensure that there will always be someone available who is authorized to receive and act upon the leave request.

L.  A RN who expects to be absent more than one day will inform the supervisor or designee of the expected date of return. If the RN is unable to return to duty on the expected date, the supervisor or designee will be notified as soon as the RN is aware that he/she will be unable to report for duty. Daily reports will not be required.

M.  All requests for sick leave must be entered into the ETA system and should be entered within two days after RN's return the day the RN returns to duty unless the leave was requested in advance.

N.  For absences in excess of three consecutive workdays, the Department may require a medical certificate or other administratively acceptable evidence. Where a health care provider is not available or where the RN's illness does not require a health care provider, self-certification in writing may be provided by the RN. If the medical certificate does not provide sufficient information to warrant approval of the sick leave, a RN may be required to furnish additional evidence.

O.  Medical certificates or other evidence of illness which may be required will be submitted within 15 days after the RN's return to duty. If, due to circumstances beyond the control of the RN, he or she is unable to provide the documentation within 15 calendar days, the RN must provide the evidence or medical certification no later than 30 calendar days after returning to work. A RN who does not provide the required evidence within 30 calendar days is not entitled to sick leave.

P.  Sick Leave Certification:

1.  Frequency or amount of sick leave used, or leave for which acceptable medical documentation has been provided, will not be the sole factor(s) for

34

determining sick leave abuse. Approved unplanned annual leave and compensatory time will not be used to determine sick leave abuse.

2. Prior to placing a RN on sick leave certification, the Department may discuss with the RN their sick leave usage.

3. When the Department deems it necessary to place a RN on a sick leave certification, an in person meeting will be held to explain the basis for the certification and the process.

4. In cases that indicate excessive absence where there appears to be an abuse of the sick leave privilege, medical certificates may be required for any period of absence provided the RN has been informed in advance, in writing, that such a requirement has been established for that RN.

5. Failure to provide the required medical certification, may be grounds for disapproval of sick leave.

6. The RN may request that his/her sick leave usage be reviewed every three months. If it is determined that a medical certificate is no longer warranted for sick leave of three consecutive workdays or less, the RN shall be notified in writing.

7. Sick leave certification will normally be for a six-month duration. At the end of the six-month period, the sick leave usage will be reviewed and the certification letter will be removed, should the Department determine that the RN's leave usage so warrants.

## Section 4: Leave for Childbirth, Paternity Reasons, and Adoption

A. Leave related to maternity or paternity reasons may consist of sick leave, annual leave, compensatory time, or leave without pay, as applicable. RNs who have worked for the Department for a minimum of 12 months may also be eligible to receive leave under the Family and Medical Leave Act (FMLA). The Department may grant additional leave if the situation warrants.

B. The circumstances of a RN's case will be considered in determining a RN's capacity for duty as a result of pregnancy. RNs seeking a change in assignment or work schedule are responsible for providing medical documentation confirming the pregnancy and any required job restrictions or modifications. The Department will make every effort to provide a temporary modification in assignment, as needed, for RNs as a result of pregnancy. A RN will not be adversely impacted for making such a request.

C. NNU and the Department agree that unexpected absences may be required to attend the delivery of a family member's child birth. A family member is defined as an individual related by blood or affinity that the RN regards as family. The Department will make every effort to grant this leave to RNs to attend the child birth.

D. The Department may provide designated parking for pregnant RNs.

**Section 5:  Family and Medical Leave**

A. The Family and Medical Leave Act (http://www.opm.gov/oca/fmla/fmla96.pdf) (FMLA) allows eligible RNs to be granted up to 12 weeks of unpaid leave during any 12-month period for one or more of the following reasons:

  1. Maternity and Paternity Leave:

      a. Birth of a son or daughter and the care of such son or daughter; and,

      b. Placement of a son or daughter for adoption or foster care.

The Department is encouraged to approve additional leave as circumstances warrant.

  2. Other Family Medical Leave:

      a. The care of a family member of the RN with a serious health condition. Family member is defined as:

        i. Spouse;

        ii. Children under 18 or over 18 and incapable of self-care because of a mental or physical disability, consistent with the Americans with Disabilities Act, including adopted children;

        iii. Parents.

      b. A serious health condition of the RN that makes the RN unable to perform the functions of the position of such RN.

A RN on approved FMLA, on the effective date of this contract, will be allowed to complete the FMLA leave year under the terms of the previous contract. Subsequent FMLA requests will be subject to the terms of the current contract.

B. A RN does not qualify for FMLA benefits until the RN has worked for a minimum of 12 months for the Department.

36

1. If FMLA leave is foreseeable based on an expected birth, placement for adoption or foster care, or planned medical treatment, the RN shall provide notice of his/her intention to take FMLA leave not less than 30 calendar days before the date the leave is to begin.

2. If FMLA leave is foreseeable but the date of birth or placement or planned medical treatment requires leave to begin within 30 calendar days, the RN shall provide such notice as is practicable.

3. If the need for FMLA leave is not foreseeable (e.g., a medical emergency or the unexpected availability of a child for adoption or foster care, etc.) and the RN cannot provide 30 calendar days notice of his/her need for leave, the RN shall provide notice within a reasonable period of time. In circumstances where the RN is incapable of requesting the FMLA leave, a family member or other responsible party may make the request and the request will be timely reviewed for approval.

4. The RN may request extensions of the above time limits. The Department will give serious consideration to this request and should grant it when good cause is shown.

5. The Department may require the RN to submit certification from a health care provider to substantiate that the leave is due to the serious health condition of the RN or the RN's immediate family member. Failure to submit certification from a health care provider may result in a delay in the start of the FMLA leave or the failure to approve requested FMLA leave until the appropriate medical certification is provided.

C. A RN who has received approval for unpaid leave under the FMLA may elect to substitute accrued annual leave, accrued compensatory time, donated leave, or accrued sick leave to which they are otherwise entitled for all or any part of the approved weeks of unpaid leave. Sick leave shall not be substituted in situations where sick leave would normally not be allowed by law.

D. The Department will provide RNs with access to information on the FMLA, including local contact information for the individual or department responsible for processing applications, on appointment and annually. The RN will only be required to submit paperwork to one department designated by the hospital to administer and approve FMLA applications.

E. The start date of FLMA will be the consistent with FMLA law and regulations.

**Section 6: Additional Maternity and Paternity Leave**

A. Once an employee's entitlement under Section 5A1(a) above has been exhausted, bargaining unit employees who have completed at least 12 months of service are entitled to an additional four weeks of leave without pay during any twelve-month period for the following reasons:
1. Birth of a son or daughter and the care of such son or daughter; and,

2. Placement of a son or daughter for adoption or foster care.

B. Leave requested and provided under this section will be consistent with maternity and paternity leave provided under FMLA.

C. A RN who has received approval for unpaid leave under this section may elect to substitute accrued annual leave, accrued compensatory time, donated leave, or accrued sick leave to which they are otherwise entitled for all or any part of the approved weeks of unpaid leave. Sick leave shall not be substituted in situations where sick leave would normally not be allowed by law.

**Section 7: Entry of Leave into the Electronic Time and Attendance System (ETA)**

A. All requests for leave outside the planning period should be entered into the ETA by the RN for approval. Leave will be approved or disapproved within five days and/or prior to the start of the requested leave date, whichever comes first. Exceptions are when a RN has already filled out a paper request, if applicable, such as an OPM Form 71.

B. Bargaining Unit RNs do not have authority to approve any leave, time cards, overtime, or compensatory time requests.

C. All requests for sick leave must be entered into ETA within two workdays after the RN's return to duty unless the leave was requested in advance.

D. All requests for leave will be entered and approved in advance whenever practicable.

**Section 8: Miscellaneous Absences**

A. Consistent with VA Handbook 5011, Part 111, Chapter 3, Paragraph 9, an unavoidable or necessary absence from duty and tardiness of less than 1 hour may be excused when the reasons for the absence appear to be adequate to the leave approving official. This is not appropriate for instances of repeated tardiness.

B. With proper documentation and with management approval:

1. Excused absence is permitted up to four hours for donating blood to a recognized facility-sponsored or endorsed blood program;

2. Leave is permitted for RNs to participate as living bone marrow, tissue, or organ donors, including time for donor screening, the medical procedure and recovery. This type of leave is generally limited to seven workdays per year for bone marrow donation and thirty workdays per year for organ donation; and

3. Other reasons consistent with VA policy may be authorized, including participation in emergency/disaster preparedness and civil defense activities, attending professional educational events, and participation in VA-supported programs whether offered by the Department or a third party. These activities will be on duty time or leave time, as appropriate.

C. RNs may be excused to attend educational lectures, seminars, courses of instruction, etc., in the Department in-service training programs and to participate in other training as defined in 5 USC 4104. While absent from the usual worksite for such activity, the RN is considered to be on official duty during normal work hours.

D. The Department may excuse NNU representatives without charge to leave for training sponsored by labor organizations or the Department where the training will be a benefit to both the Department and NNU within the meaning of 5 USC 7131 and VA Handbook 5011, Part III, Chapter 2, paragraph 12(i), as made applicable to RNs by VA Handbook 5011, Part III, Chapter 3, paragraph 9(o). Normally attendance at labor organization conventions is considered internal Union business unless there is clear and unequivocal information to the contrary. Requests to attend must be made as official time requests for training of a Union representative and should be submitted by the RN in writing together with information supplied by the Union setting forth the content of the training, its duration, a statement of how training is related to the RN's performance of VA duties and a statement that the training is required. In addition, the RN's request should be submitted sufficiently in advance so that the Department can review the matter and make a decision. For National events, the approval requests and necessary paperwork for approval is submitted to VA Central Office. Once approved the Department will disseminate the approval to those who need to know. For additional information regarding excused absences for official time for Union representatives, please see Article 4 - Labor-Management Relations Training and Article 47 - Official Time.

**Section 9:  Military Leave**

A.  Military leave will be granted consistent with Federal law, government-wide rules and regulations.

B.  In accordance with VA Handbook 5011, Part III, Chapter 3, paragraph 9, full-time RNs whose appointments are not limited to one year, who are members of the National Guard or the Armed Forces Reserves, are entitled to fifteen calendar days of military leave in a fiscal year for active duty or active duty for training. RNs that do not use the entire 15 days can carry any unused military leave (not to exceed 15 days) over to the next fiscal year. Military leave balances may never exceed 30 days in any 1 calendar year. Military leave is pro-rated for part-time career RNs.

C.  Regular military leave is charged in increments of one hour and does not include non-workdays falling within the period of absence of military duty. The Department will not arbitrarily deny a RN's request for military leave.

D.  The Department will take into consideration the schedules of RNs who work off tours and will arrange schedules to allow such RNs to have scheduled days off immediately preceding and following the required military leave consistent with Section 2.

E.  The Department will charge military leave on an hourly basis and will allow military leave to be taken intermittently, a day at a time, or all at one time.  At the RN's request, the Department may charge the RN's absence to perform service to annual leave or available compensatory time balance, but not sick leave. Sufficient certification by the proper Department of Defense entity is required to grant military leave.

F.  RNs who are called to active duty in support of the Overseas Contingencies Operations (OCO) (Formerly the Global War on Terrorism) are entitled to five days of excused absence upon their return from active duty. A RN may be granted five days of excused absence only after the RN returns from at least 42 consecutive days of active military service in connection with the continuing OCO. For multiple deployments, the Department may not grant more than five days of excused absence in a twelve month period.

**Section 10:  Leave Without Pay**

A.  Leave without pay is a temporary non-pay status and absence from duty.

B. Leave without pay may be requested in the same manner and for the same purposes as annual leave and sick leave.

C. Requests for leave without pay will be given serious, bona fide consideration. The leave without pay program will be administered fairly and uniformly. Upon request, the reason for denying the leave request will be provided to the RN.

D. Approval of leave without pay is a matter of administrative discretion. A RN cannot demand that leave without pay be granted as a matter of right except in the following cases:

   1. Disabled veterans who are entitled to leave without pay if necessary for medical treatment;

   2. Reservists and members of the National Guard who are entitled to leave without pay if necessary to perform military training duties;

   3. A RN has suffered an incapacitating job related injury or illness and is waiting adjudication of a claim for RN compensation by the Office of Worker's Compensation Program;

   4. A RN makes a request under the FMLA and meets the criteria for that program.

E. Upon written request from the appropriate Union office, a RN may leave without pay to engage in Union activities. Such requests will be referred to the appropriate Department official approved. Such RNs shall continue to accrue benefits in accordance with applicable OPM regulations. Leave without pay for this purpose is limited to one year but may be extended or renewed upon proper application.

F. Upon return to duty after a period 30 days or more of leave without pay, RNs can usually expect to return to their former position. However, it may become necessary in the interest of the service to reassign them to other positions during their absence or upon their return.

G. RNs may request leave without pay for educational purposes.

## Section 11: Hazardous Weather/Emergency Conditions

A. The Department and the NNU Local at each facility will jointly plan any new procedures or revisions for hazardous weather/emergency conditions. These procedures will be communicated to the RNs annually and as changes are made.

41

B. The local NNU Director or designee shall be informed by the appropriate Department official at the time the facility declares hazardous weather/emergency conditions. The most expedient method for such notification will be used, including but not limited to, phone or email. The Local NNU Director is responsible for keeping the local facility informed as to who will receive the notification, the method for communication, and phone number/email address to be reached.

C. When hazardous conditions exist, including but not limited to, extreme weather conditions, serious interruptions in public transportation, earthquake and disasters such as flood, fire or other natural phenomena, the Department will determine whether all or part of the facility should be closed or remain open. If the Department decides to close all or part of the facility during periods the facility would otherwise be open, the Department will notify RNs whether liberal leave or authorized absence will be authorized. RNs who are prevented from reporting to work due to the closure of all or part of the facility should be granted authorized absence in accordance with OPM guidance and/or government-wide regulations.

D. In the event of extreme hazardous conditions above, RNs are expected to report to work and must make all reasonable efforts to get to work. However, in the rare instance where certain RNs who provide critical services make every reasonable effort to get to work and are unable to do so, the Director or designee may approve excused absence without charge to leave

E. RNs may be granted a two-hour grace period (authorized absence) during periods of inclement weather or government declared emergencies as needed to travel to and from work safely.

F. Facilities under emergency conditions will provide services, including but not limited to, meals, sleeping accommodations and essential items for performing their official duties (a clean uniform, etc.) for RNs who are required to remain on duty.

G. RNs who are to report to duty prior to their scheduled tour or if the Department determines RNs are unable to leave the facility at the end of their shift RNs will be compensated in accordance with VA regulations, law and/or government-wide regulations.

H. Assignments made during hazardous/emergency situations will consider RNs physical abilities. Limited duty or disability restrictions of any RN will be adhered to by the Department during hazardous/emergency situations.

I.  Consistent with VA policy, the VA Incentive Awards Program may be utilized for recognizing dedication and commitment by RNs during emergency/hazardous weather conditions.

J.  In accordance with government-wide regulations, the Department will fully implement the provisions of any approved program designed to provide inter-agency leave donation for RNs affected by natural disasters.

### Section 12:  Absent Without Leave

Absent without leave is an unauthorized absence from duty.  The RN receives no pay for such absence. Absent without leave is a payroll classification, and is not a disciplinary action in and of itself but may serve as the basis for disciplinary action.

### Section 13:  Court Leave

A.  Court leave is permitted for RNs called to jury duty, in accordance with applicable laws and regulations.  Court leave is also permitted when RNs are called to be witnesses or to be deposed in any legal matter to which the United States, the District of Columbia, or a state or local government is a party, regardless of which party requests the presence of the RN.

B.  Even though no compensation is received for serving on jury duty in a federal court, RNs may keep expense money received for mileage, parking or required overnight stay. Money received for performing jury duty in state or local courts is indicated on the pay voucher or the check as either "fees for services rendered" or "expense money". "Expense money" may be retained by the RN, "fees for services rendered" must be submitted to the appropriate financial office.

C.  It is agreed that days off and or schedules will not be changed to avoid granting absence for court or court-related services.

D.  In accordance with VA Handbook 5011, employees who are granted court leave and are excused or released by the court for any day or substantial portion of a day are expected to return to their regular VA duties, except when:

   1.  Only a small portion of the workday would be involved and thus no appreciable amount of VA service would be rendered; or

   2.  The distance from the court to the place of duty is such that this would be an unreasonable requirement; or

3. The regular tour of duty occurs at night. For example, RNs whose tour occurs between 1800-0600 and who serve a full day or a substantial portion of the day of court duty, will not be expected to report for the next tour of duty if that tour occurs within 24 hours of their release from court duty.

## Section 14: Registration and Voting

Subject to direct patient care needs, the Department agrees that when the voting polls are not open at least three hours before or after the RN's regular hours of work, RNs will be granted an amount of excused leave to vote, or to register to vote, which will permit them to report to work three hours after the polls open or leave work three hours before the polls close, whichever requires a lesser amount of time. If unable to be released at the beginning or end of the work day, the Department, to the extent possible, will make other arrangements to allow the RN a reasonable amount of time during the work day to vote or register to vote. Under unusual circumstances, RNs may be excused up to the full day.

## Section 15: Unavoidable Delay While On Government Business

When a RN is unable to return to his/her duty station through no fault of the RN while on authorized government business, the RN will notify their supervisor as soon as possible and obtain appropriate instructions. In such instances, the RN will be paid overtime unless compensatory time is requested in writing, for any time beyond normal duty hours that they are determined to be performing official duties. If the RN is unable to return to his/her duty station and must stay overnight at some other location, per diem expenses will be paid when appropriate.

## Section 16: Accommodation for Religious Observances

A. A RN whose personal religious beliefs require abstention from work during certain periods of time may request to work compensatory or overtime to compensate for time lost by meeting those religious requirements.

B. To the extent that such modifications in work schedules do not interfere with the VA's mission, the Department shall in each instance afford the RN the opportunity to work compensatory time earned and shall in each instance grant compensatory time used to a RN requesting such time off for religious observances when the RN's personal religious beliefs require that RN abstain from work during certain periods of the workday or workweek.

C. For the purpose stated in Paragraph B of this Section, the RN may work such compensatory time earned before or after the granting of compensatory time used. Advanced compensatory time used should be repaid with the appropriate

44

000631

amount of compensatory time earned within a reasonable amount of time. Compensatory overtime shall be credited on an hour by hour basis or authorized fractions thereof. Appropriate records will be kept of compensatory overtime earned and used.

## Section 17: Advanced Annual/Sick Leave

A. A RN may be advanced all annual leave that will accrue up to the end of the leave year. However, advanced annual leave may not be granted to a temporary RN beyond the date set for the expiration of the RNs temporary appointment. Upon separation, RNs must repay the balance of any remaining advanced annual leave; however, a RN may request a waiver in writing.

B. Advanced sick leave may be combined with annual leave, compensatory time or leave without pay when necessary to cover one continuous period of absence.

C. The application for advanced leave will be processed and approved or disapproved promptly. Upon request, the RN will be provided the name of the Department official to whom they should submit their request.

D. Advanced leave may be approved in accordance with the RN's type of appointment. The RN will not be required to utilize any annual leave prior to utilizing the advanced sick leave.

E. Denials of requests for advanced leave will be conveyed in writing to the RN promptly and will contain an explanation of the reasons for the denial.

F. The Department agrees to notify RNs of the ability to request advanced leave annually and individually to RNs as the need arises.

## Section 18: Voluntary Leave Transfer Program

A. RNs are entitled to donate and receive leave for medical needs consistent with VA and government-wide regulations.

B. The Leave Transfer Program allows a RN to transfer annual leave to an approved leave recipient (excluding the RN's supervisor) up to one-half of the amount of annual leave the RN will accrue during the leave year.

C. The minimum amount of annual leave that may be transferred to and from a Title 5 or Title 38 RN who is charged leave in hours is four.

D. The Department will assist RNs in preparing, the application for leave donation and the solicitation memorandum. The solicitation memorandum identifies the recipient of the donated leave. The Department will advise RNs of how and where to receive such assistance.

E. The application for the Voluntary Leave Transfer Program will be processed and approved or disapproved promptly. Upon request, the RN will be provided the name of the Department official to whom they should submit their request.

F. When a RN receives donated leave, it may be used only for the medical need for which it was donated.

G. NNU may work with the Department to determine whether donated annual leave is needed by its RNs in disaster situations and can quickly facilitate the transfer of donated annual leave among administrations.

H. Forms for donating and receiving annual leave under the inter/intra-agency Emergency Leave Transfer Program can be accessed on OPM's web site at http://www.opm.gov/oca/leave/html/ELTP.asp

## ARTICLE 12:  DETAILS, FLOATS AND TEMPORARY ASSIGNMENTS

### Section 1:  General

A. The Department and NNU recognize the importance of properly orienting RNs to their functions and work environment, and to protect the health, safety, and welfare of RNs to practice within that RN's scope of practice. The Department and NNU recognize quality patient care is the guiding principle in assigning RN staff. To that end, the Department may temporarily assign, detail or float an RN to ensure adequate coverage. VA Directives, Handbooks, and this Contract will govern the details, floats and temporary assignments of RNs.

B. Decisions by management to place RNs on a temporary assignment, detail or float will be based on qualifications and competencies of the RN. Upon request, the Department will explain to NNU the reasons for making the decision.

C. Temporary assignments, details and floats shall not be used as harassment or reprisal.

D. Even though management has the right to make work assignments, the Department will explore supplemental staffing alternatives (for example, unscheduled hours, alternate schedules, intermittent RN staff, etc.) before detailing, floating or temporarily assigning RNs away from their work unit to avoid disruption in care, to allow continuity of assignments, and to address RNs' work-life issues.

### Section 2: Definitions

A. A detail is the temporary assignment of a RN to a different set of duties for a specified period of time. For the purposes of this Contract, a detail is treated the same as a temporary assignment. There is no formal position change; officially, RNs continue to hold the position from which they were detailed and keep the same status and pay. The exception is if a RN is detailed into a nurse manager position that exceeds more than 30 days.

B. A float is a short term assignment of a RN from the assigned nursing work unit to meet the nursing care needs on another work unit for all or part of a single tour of duty of 12 hours or less.

### Section 3; Orientation and Training

A. Consistent with the Professional Development and Education Article, Section 4, the Department will provide orientation for all RNs upon detail or float to a different position/location or area. As needed, this orientation will include clinical requirements and competencies specific to the area of assignment.

B. Orientation for floats will minimally contain a review of the physical location, emergency procedures, and evacuation plan to ensure safe patient care.

### Section 4: Temporary Assignments and Details

A. When a RN position is vacant or a temporary need exists, the Department may detail a RN to that position. Generally, details will be 30 days, extended in 30 day increments and not to exceed 1 year. The detail may be terminated prior to the expiration date. The Department may approve extensions of the detail beyond one year when circumstances warrant.

B. The Department will provide written notice to the affected RN(s) and NNU containing the specifics of all temporary assignments or details in excess of seven days, including, but not limited to the reason for the detail, location, duration, duties, supervisor, work assignment and tour of duty, as soon as practicable. NNU will be given the opportunity to discuss this assignment or detail. The Department will ensure that RNs possess the nursing skills required to provide safe and competent care in the specific area the RN will be temporarily assigned or detailed.

C. If the RN believes that he/she does not possess the nursing skills required to provide safe and competent care in the specific area to which the RN is temporarily assigned or detailed, the RN will immediately report these concerns to the supervisor. The RN may complete an Assignment Despite Objection (ADO) form without reprisal and provide a copy to the supervisor and to NNU. The supervisor and RN will discuss the matter, the supervisor will consider the concerns raised by the RN and make a decision regarding the assignment.

D. The Department will seek qualified volunteers for the temporary assignment or detail from the unit /area. If there are more qualified RN volunteers than needed, the Department shall select the most senior RN.

E. A unit based rotation list based on reverse seniority will be used to determine which individual RN will be detailed when there are no volunteers. If there are no volunteers, the department shall select the least senior RN (from the seniority list) of those previously determined by management to be qualified.

F. For temporary assignment or details outside of the RN's current work location, the RN shall be reimbursed mileage over their normal daily commute.

G. The Department will make effort to minimize impact on the affected RN(s) including, but not limited to tour of duty and work hours, work schedules, and current differentials. The affected RN(s) will keep their previously approved leave, unless the supervisor determines after considering alternative staffing methods, there is no other qualified RN to perform the assignment.

H. The Department will work with NNU to avoid placing a NNU representative on a temporary assignment or detail that would negatively impact or prevent them from performing their representational functions.

## Section 5: Floats

A. A unit-based rotation list based on reverse seniority will be used to determine which individual RN is required to float when there are no volunteers.

B. Once a RN has floated for a period of 15 minutes or more, the RN's name will go to the bottom of the rotational list regardless of whether the RN volunteered for the float.

C. If floating is required, the Department will first solicit volunteers determined to be qualified by management. If the number of volunteers exceeds the number required to float, the most senior qualified RN will be selected.

D. If there are no volunteers, the Department will select the RN who is at the top of the unit-based rotation list for the assignment.

E. RNs on orientation will not have their names on the unit-based rotation list and will not be floated until orientation is completed.

## ARTICLE 13: WORK SCHEDULES

**Section 1: General**

A. All sections are subject to the limitations set forth in 38 USC 7422.

B. The provision of quality, safe patient care is essential to the accomplishment of the Department's mission. Accomplishment of that mission requires a highly motivated and skilled professional RN workforce as well as appropriate staffing levels and staff mix. Nothing in this Article is intended to permit collective bargaining over staffing, including but not limited to staffing levels, qualifications, staff selection, levels and/or staff mix in a given patient care setting.

C. In keeping with the Department's stated goal to become an employer of choice, the Department recognizes that scheduling is a work life issue and must be addressed to the extent permitted by Law.

D. The Department will endeavor to minimize involuntary overtime. Involuntary overtime will not be used for routine scheduling unless all of the conditions set forth in 38 USC 7459(c) are met. Please refer to Section 4 of the Overtime and Compensatory Time Article for more complete information.

E. Any VA Directives or Handbooks referenced in this Article are provided for informational purposes.

F. Nothing in this Article is intended to waive NNU's right to demand to bargain or the Department's obligations to give notice and bargain when an obligation to do so is triggered by the Statute.

G. The Department shall encourage and support RNs having meaningful input into their schedules, for example through the use of wish lists or preferences, self-scheduling, peer negotiated scheduling, or similar methods as determined by the Department. If the proposed schedule meets staffing needs as determined by the Department, requests for days off/on should be honored.

**Section 2: Work Schedules**

A. Work schedules for RNs will be planned on a fair basis giving consideration to the competencies of the RNs and the staff mix required to meet patient care needs.

B. Schedules will be posted in a designated and accessible area for periods of a minimum of four weeks at a time, and shall be signed by the appropriate Department Official and posted in final form not later than four weeks prior to the first work date on the schedule. Upon request, NNU will be provided copies of schedules.

C. Should it become necessary for the Department to post the work schedules in less than the prescribed time frame above, the NNU local will be notified with a specific explanation of the unusual cause of delay and the date the work schedule will be posted.  This can be done via email to an appropriate local NNU representative.

D. Subject to direct patient care needs, the Department:

1. will not change work schedules once posted except by request or by mutual prior consent of all affected individual RNs;

2. will ordinarily grant each RN two weekends off in a four week period unless otherwise requested off in writing by the RN;

3. will ordinarily schedule the RN for two consecutive days off each pay period if an RN works every weekend;

4. will make every practical effort to avoid scheduling nurses to work more than five consecutive days unless requested in writing by the RN;

5. will give RNs at least 11 hours of non-duty time between scheduled tours of duty. Exceptions may be made at the written request of the RN;

6. will not schedule RNs to rotate between more than two tours of duty during each posted schedule, except by the RN's written request;

7. will grant individual RN requests for specific tours of duty or time-off on an equitable basis.  An explanation, in writing (when possible through the electronic time and leave system), will be provided for denials of requests;

8. will avoid rotating RNs on permanent off tours to other tours unless requested by the RN;

51

9. will allow the RN to elect to take leave or flex the next tour when involuntary overtime occurs and the RN is scheduled to work so as to allow at least 11 hours off between tours. The proper arrangements and approval for the next tour starting time or leave will be obtained from the appropriate Department official.

E. Full-time RNs may request to reduce their status to part-time. Part time RNs may request to increase their status to full-time. The Department will seriously consider such requests and will respond promptly and in writing.

## Section 3: Tour Rotation

A. A RN who normally works a preferred tour may request to rotate to an alternate tour of their choice. The Department will endeavor to approve the request, provided:

1. The RN's performance and dependability are satisfactory;

2. Requests do not exceed available openings on alternate tours; and,

3. The Department has determined that the competencies and skills of the RN are commensurate with the assignment.

B. RNs may request a preferred tour and/or tour rotation, including RNs working 12 hour tours or other alternative work schedules.

C. All tour and weekend rotations will be done on an equitable basis among qualified RNs as determined by the Department.

D. The Department will consider the requests of RNs for preferred tours by seniority. Seniority is defined in the Seniority Article.

E. RNs may request evening or night tours of duty as primary assignments. The Department will endeavor to create and fill permanent evening and night positions for RNs to minimize tour rotation.

F. RNs that are moved from a permanent tour of duty will be given first opportunity to return to the tour when a position becomes available unless the RN was moved for cause by the Department.

## Section 4: Alternative Work Schedules (AWS)

A. Subject to direct patient care needs, the Department will endeavor to offer RNs Alternative Work Schedules. Examples may include Baylor Plans, part-time or

partial tour scheduling, job sharing, compressed tours, flexible scheduling, 72/80 scheduling, and other innovative scheduling options. See VA Handbook 5011, Part II, Chapter 3.

B. NNU local units may submit recommendations on other systems of scheduling work time or AWS, including but not limited to: self-scheduling or peer-negotiated scheduling, length of trial period, 12 hour rotational scheduling and pattern schedule for consideration by the Department.

C. RNs on AWS must be scheduled and work consistent with 38 USC 7456(a).

## Section 5: Break and Meal Periods

A. Safety for the RN and for the patients being of paramount importance, the Department will provide the RN with a 15 minute rest break on duty time for every 4 hours of duty, where direct patient care needs permit. This is separate and distinct from any meal period not on duty time.

B. Breaks and meal periods will normally be assigned at the beginning of the shift.

C. The Department will provide a meal period not on duty time or the RN will be appropriately compensated consistent with law, rule and regulation for this work.

D. RNs that are unable to take their scheduled meal periods will notify their supervisor promptly. The appropriate Department official will determine if relief is available.

E. RNs unable to take their scheduled breaks should notify their supervisor as soon as possible. The appropriate Department official will endeavor to provide the RN a break before the end of the RN's scheduled tour. RNs will note this on the appropriate document, such as the 24 hour report.

## Section 6: Errors in Time Keeping

A. Whenever a Department error results in the failure of a RN to receive full salary payment on time, the Department will take immediate action to promptly pay the RN. The Department will make every effort to make full payment as soon as possible. Under ordinary circumstances, when a shortfall may be resolved through special pay, the Department shall submit all appropriate documentation for payment to the Defense Finance and Accounting Service (DFAS) within five business days of verification of the payroll error. For shortfalls that may not be resolved through special pay, the Department will take immediate action.

B. Timekeeping errors, once identified, will be addressed immediately.

53

**Section 7: On-Call Duty**

A. Pursuant to 38 USC 7453(h) and VA Handbook 5007, Part V, Ch. 5 Paragraph 1, a RN who is officially scheduled to be on-call outside the regular duty hours of the RN will receive pay for each hour of on-call duty, except for such time as the RN may be called back to perform overtime work.

B. Pursuant to 38 USC 7453(e) and VA Handbook 5007, Part V, Ch. 2, Paragraph 2, which is not a part of this negotiated agreement, when called back to perform overtime work, the RN will receive overtime pay for a minimum of two hours for each incident.

C. A RN will be available for prompt response to perform service when scheduled on-call duty.

D. On-call pay will be suspended during the period of actual overtime duty. When released from overtime duty the RN will return to the remaining scheduled on-call duty, if any, and receive on-call pay accordingly.

E. In the event of incapacitation for availability during the period for which scheduled to be on-call, such unavailability shall be reported promptly. A RN who is relieved from scheduled on-call duty as a result of incapacitation thereof will not receive on-call pay during the period from which relieved.

F. The RNs who are on-call and are called back to duty may request to take leave or flex the next tour (where flexible tours currently exist) they are scheduled to work if they are called back to duty. Subject to direct patient care needs, the Department will give consideration to this request (e.g. adjusting the next regularly scheduled tour, leave request) following on-call duty so as to allow adequate rest between work periods.

G. Subject to law, rule, and regulation, the Department will provide communication devices to RNs who are on-call.

H. Once the Department has determined the qualified RNs, on-call scheduling will be assigned in an equitable manner amongst these RNs in the work unit.

I. Except for rare and unusual circumstances, RNs who work 16 continuous hours of direct patient care in a 24 hour period will be relieved of further call and work duty to allow for adequate rest, subject to direct patient care needs.

J. When it can be demonstrated that on-call duty will not assure availability of employees for essential patient care needs, standby duty may be authorized as an exception to on-call duty. The Department's authorization of standby duty and standby premium pay will be pursuant to VA Handbook 5007, Part V, Chapter 5.

## ARTICLE 14: OVERTIME (OT) AND COMPENSATORY TIME (CT)

### Section 1: General

A. Overtime pay for RNs is governed by 38 USC 7453(e), 7456A and 7459, and subject to 38 USC 7422. Overtime and compensatory time are governed by Directives and Handbooks 5007, Part V, Chapter II and 5011, Part II, Chapter 3. Any language in sections 1 and 2 of this Article that reference Title 38 law or VA regulations is being provided for informational purposes only.

B. If a RN performs officially ordered or approved hours of work in excess of the RN's basic work requirement, the RN may request compensatory time or be paid overtime. These hours of work will include both direct and non-direct care, such as VA education, mandatory in-services, committee meetings or staff meetings.

C. When a RN works overtime, such overtime will be earned in increments of 15 minutes. RNs will be paid differential and premium pay in addition to the overtime compensation.

D. The Department shall make reasonable effort to give the RN as much notice as possible when overtime is needed.

E. RNs who work overtime will be allowed to make calls at no cost to them to make necessary arrangements. This shall include, but is not limited to, dependent care arrangements and updates, medical appointments, classes and self-improvement commitments.

F. A RN's decision to volunteer for overtime or compensatory time or refrain from volunteering for overtime or compensatory time will not be used as a basis for discrimination or preferential treatment and no RN will be coerced into working for compensatory time instead of overtime.

G. RNs who are called back to work for overtime are entitled to a minimum of two hours overtime pay. This also applies when the RN is scheduled to work OT on a regularly scheduled day off.

H. RNs whose request for relief for a meal period is denied shall be paid OT unless CT is requested in writing.

I. Overtime is payable for service performed in excess of 40 hours in an administrative workweek, or in excess of 8 consecutive hours, whichever is greater, at a rate of one and one-half times the RN's basic hourly rate of pay. For a full-time RN on a compressed work schedule, overtime is payable for hours of work in excess of the basic work requirement. For a part-time RN on a compressed work schedule, overtime is payable for hours of work in excess of the basic work requirement (but must be in excess of 8 consecutive hours) or for a week (but must be in excess of 40 hours).

## Section 2: Compensatory Time

A. Requests for compensatory time off in lieu of overtime pay must be made and directed to an official authorized to approve overtime work. Pursuant to 38 USC 7453(e)(3), compensatory time off in lieu of pay for service performed under the provisions of this subsection shall not be permitted, except as voluntarily requested in writing by the RN in question.

B. RNs are encouraged to include the date(s) and time(s) for which they would like to use the CT in the same written request in an effort to reduce the risk of a RN losing earned CT. Requests to use CT earned will be made and approved in the same manner as requests for other types of leave.

C. Compensatory time off should be taken as soon as possible after it is earned. When the RN is unable to use earned CT within 26 pay periods due to the exigencies of the service, the CT will be paid to the RN at the OT rate. If CT is not taken within this period because of personal reasons not due to the exigencies of the service, the right to compensatory time off or overtime pay for the duty is lost.

D. The supervisor cannot select the date(s) and time(s) that the RN will use the earned CT.

E. Generally, the supervisor will approve or disapprove the CT request within five days. The supervisor will continue to consider and may grant previously disapproved CT requests up until the pay period prior to the requested date. If later approval can be granted, the RN will reenter the request in the Electronic Time and Attendance system.

## Section 3: Voluntary Overtime Procedures

A. RNs may voluntarily place their names on rosters that will be used when overtime opportunities become available.

56

B. Assignment of voluntary overtime will be as follows:

1. The Department reserves the right to determine qualified staff to be solicited for voluntary overtime.

2. A volunteer roster will be maintained on each unit. The roster will include the names of the RNs desiring to perform OT work. The unit roster will be set up by seniority beginning with the most senior RN. The names of new RNs assigned to the unit will be added by seniority. As RNs work voluntary OT, the date will be entered on the roster.

3. Volunteers to work OT will first be solicited from those RNs on duty from the unit to which they are assigned. If there are more volunteers than OT opportunities, the roster will be used. The RN(s) whose last date of voluntary OT work is most distant from the current date will be selected to work.

4. If there are no volunteers from the unit's roster, the overtime opportunity will be offered to other on-duty qualified RNs.

5. If no on-duty RNs volunteer to work OT, the off-duty RNs on the unit's volunteer roster will be contacted.

6. If there are no off-duty volunteers from the unit's roster, the overtime opportunity will be offered to other off-duty qualified RNs.

## Section 4: Involuntary Overtime Procedures

A. Involuntary overtime is governed by 38 USC 7459 and applicable Department regulations. The language below is taken from 38 USC 7459 and is being provided for informational purposes only:

**(a) Limitation.** Except as provided in subsection (c), the Secretary may not require nursing staff to work more than 40 hours (or 24 hours if such staff is covered under section 7456 of this title [38 USCS § 7456]) in an administrative work week or more than eight consecutive hours (or 12 hours if such staff is covered under section 7456 or 7456A of this title [38 USCS § 7456 or 7456A]).

**(b) Voluntary overtime.**

**(1)** Nursing staff may on a voluntary basis elect to work hours otherwise prohibited by subsection (a).

**(2)** The refusal of nursing staff to work hours prohibited by subsection (a) shall not be grounds—

**(A)** to discriminate (within the meaning of section 704(a) of the Civil Rights Act of 1964 (42 U.S.C. 2000e-3(a))) against the staff;

**(B)** to dismiss or discharge the staff; or

**(C)** for any other adverse personnel action against the staff.

**(c) Overtime under emergency circumstances.**

**(1)** Subject to paragraph (2), the Secretary may require nursing staff to work hours otherwise prohibited by subsection (a) if—

**(A)** the work is a consequence of an emergency that could not have been reasonably anticipated;

**(B)** the emergency is non-recurring and is not caused by or aggravated by the inattention of the Secretary or lack of reasonable contingency planning by the Secretary;

**(C)** the Secretary has exhausted all good faith, reasonable attempts to obtain voluntary workers;

**(D)** the nurse staff have critical skills and expertise that are required for the work; and

**(E)** the work involves work for which the standard of care for a patient assignment requires continuity of care through completion of a case, treatment, or procedure.

**(2)** Nursing staff may not be required to work hours under this subsection after the requirement for a direct role by the staff in responding to medical needs resulting from the emergency ends.

B. The Department reserves the right to determine qualified staff for involuntary overtime.

C. An involuntary OT roster will be maintained on each unit. The unit roster will initially be set up by entry on duty date as a Title 38 RN for/at the local facility, beginning with the least senior RN. The names of new RNs assigned to the unit will be added to the top of the roster. As RNs work involuntary OT, the date will be entered on the roster.

D. Involuntary OT will be assigned using the unit's involuntary OT roster. When there is a need for involuntary OT, the RNs on duty for the unit of need will be assigned by roster. The RN(s) whose last date of involuntary OT work is most distant from the current date will be selected to work.

58

E. Any increment of pay (quarter hour or more) will serve as the RN's turn at involuntary overtime.

F. RNs may have legitimate reasons in which they may be unable to work OT, such as illness, extreme fatigue, unique dependent care issues, etc. However, the Department reserves the right to mandate overtime consistent with Federal law and VA regulations. If the Department determines not to mandate the overtime due to the RN's request, the RN will be mandated to work the next period of involuntary OT, even if the previously established selection process would not require them to work the OT. NNU and the Department will work together to resolve issues of possible abuse.

+

## ARTICLE 15: WORK ASSIGNMENTS AND OBJECTION TO WORK ASSIGNMENTS

### Section 1: General

A. NNU and the Department agree that it is the responsibility of the Department to provide for the safety of patients and their families as well as for the safety of the staff assigned. As such, it is a management right to assign work to meet the needs of patients and ensure RN safety, consistent with 38 USC 7422.

B. The Department recognizes the importance of RNs' input regarding safe patient care. RNs will not be subjected to intimidation or reprisal for providing input regarding safe patient care, questioning an assignment or completing a written objection.

C. The Department and NNU agree that staffing requirements determined through the VA's staffing methodology support and maintain a standardized approach to ensure adequate nursing personnel across the VA.

D. Every RN employed by the Department is required to hold a current full and unrestricted license as a Registered Nurse in a State, Territory, or Commonwealth (e.g., Puerto Rico) of the U.S. or in the District of Columbia as a condition of employment.

E. The Department and NNU are jointly committed to ensuring that RNs:

1. Are prepared to provide safe nursing care within their skills and competencies and

2. Receive a comprehensive hand-off report of the patient's condition and the work expected of them during the tour of duty, including time for providing and/or receiving this information.

F. The Department is committed to ensuring that appropriate staffing levels and staff mix are available to provide professional nursing care. Upon NNU request, the Department will provide reports which include variances and discuss with NNU the variances of staffing.

**Section 2: Work Assignments and Objections to Work Assignments**

A. It is the RN's responsibility to notify the Department at the time when in the RN's professional judgment the assignment has become unsafe for patients or staff. This can be at any point during the work shift.

B. Each facility will utilize and communicate to RNs a clear chain of responsibility to assess/reassess the appropriateness of work assignments for RNs.

C. When a RN believes a work assignment would place a patient, the RN, or another staff member in an unsafe situation, the RN will immediately verbally notify the supervisor or other appropriate Department official if the supervisor is not available. The supervisor or other appropriate Department official will then discuss and assess the situation and determine whether or not the assignment should be carried out. If the supervisor or Department official determines the assignment should be carried out, the RN will complete the assignment.

D. A RN who wishes to express concern about a work assignment or believes the work assignment was unsafe must submit written documentation, such as the NNU Assignment Despite Objection (ADO) form (see Appendix), email or other written memo to the appropriate supervisor. This can be submitted at any time during the assignment or after completion. The RN is free to make suggestions or recommendations for resolution of concerns. The Department will give full consideration to any concerns or suggestions raised by the RN.

E. RNs will forward copies of completed NNU ADO forms, email or other written memo to the Nursing Supervisor on duty, Nurse Manager and NNU.

F. Any objection to work assignments including completion of the NNU ADO form, email or other written memo will not be considered by either party as punitive but as a communication tool to improve working conditions and patient care.

G. The appropriate Department official will immediately address the situation documented in the NNU ADO form, email or other written memo. The Department will respond to the RN and take action as warranted. If the Department makes a written response a copy will be provided to the RN and NNU.

H. At the request of NNU, the Nurse Executive or designee will meet with NNU to discuss objections to work assignments. The Department will give full consideration to any concerns raised.

I. NNU may educate all RNs on the use of the ADO process.

**Section 3: Committee Attendance**

61

Subject to direct patient care needs, the Department will make reasonable efforts to release RNs to attend assigned committee meetings.

## ARTICLE 16: STAFFING

### Section 1: General

A. This Article is subject to 38 USC 7422. It is not intended to require union involvement in day-to-day staffing decisions or formal bargaining over matters excluded from bargaining under 38 USC 7422(b) or 5 USC Ch. 71.

B. The Department will notify the Chair NNU-VA and the affected NNU Director when the Department changes its staffing plan and provide NNU a written copy of the changes in a timely manner. At any time NNU may provide, and the Department will consider, input at the facility or national level, as appropriate regarding changes in staffing.

C. It is the responsibility of the Department to provide safe, appropriate, high-quality health care to Veterans.

D. The Department recognizes that staffing can affect the types and amounts of duties required of a RN and may potentially impact upon the RN's licensure. Subject to law, rule, and regulation, a RN has the right to function within their scope of practice.

E. The Department recognizes that the safety of patients is impacted by staffing and the Department strives to reduce care related errors and injuries while increasing positive patient/RN satisfaction. The Department also recognizes that there is a need for adequate levels of ancillary personnel to assist RN's to provide safe patient care and assure patient/RN satisfaction.

### Section 2: Staffing Methodology Information

A. Local NNU Directors will be given copies of the current staffing methodology in place upon the completion of this Contract. Additionally, upon request, the local NNU Director will be provided the staffing plans for all patient care areas. This information, if available, will include but is not limited to, the name of each unit, the care delivery model utilized on the unit, and the projected staffing needed to safely provide care by tour, including any changes needed for the week-end patterns and how the staffing level and skill mix was derived.

B. The NNU Local Director (or designee), any NNU representative on the facility Staffing Methodology Panel and any RN on the Unit Based Expert Panels will be provided the same training as the other panel members.

C. NNU will appoint one RN to serve on the Facility Expert Panel in a representational capacity on official time.

D. NNU may recommend a RN for the Unit Based Expert Panel to the Nurse Executive. NNU's recommendation must be from the nursing staff on the nursing work unit for each Unit Based Expert Panel. If the Department accepts the NNU recommendation for the Unit Based Expert Panel, the recommended RN is not on official time and must act as a peer on the Unit Based Expert Panel, not as a NNU representative.

E. If the Department does not approve the summary work of the Unit Based Expert Panel, the Unit Based Expert Panel will be notified if they need additional clarification and additional information will be requested, consistent with Department policy.

F. The NNU representative on the Facility Expert Panel will have access to the same information as all other members of the Panel to examine the staffing requirements used in the facility staffing methodology plan. This information can be shared with local NNU officials, including any follow-up action plan, but shall not be disseminated beyond officials with a need to know.

## ARTICLE 17: JOB SHARING

 **Section 1: General**

A. Job sharing is a form of part-time employment in which the tours of duty of two RNs are arranged in such a way as to cover a single full-time position.

B. Job sharing can provide the Department and RNs with considerable work scheduling flexibility.

**Section 2: Procedures**

A. The Department determines whether RNs can job share, what hour or tours can be worked, and what potential patient care and clinical competence concerns exist with respect to the potential job sharing. The Department agrees that entry into job sharing is strictly voluntary, initiated by the RNs, and without coercion by the Department. Job sharing can be considered when traditional part-time employment is not practical or feasible.

B. The Department shall give bona fide consideration to RNs' requests regarding part-time job sharing employment, including requests for reassignment from a non job sharing arrangement to a job sharing arrangement and from a job sharing arrangement to a non job sharing arrangement, consistent with the Department's resources and mission requirements. RNs working under similar functional statements, or in the same clinical settings, may request the opportunity to enter a job sharing arrangement. RNs must qualify for the position for which they are applying.

C. RNs interested in job sharing will submit a written proposal to the immediate supervisor. The job sharers are expected to seek the Department's assistance and approval in drawing up the job sharing plan so that the work will be properly divided. RNs will receive a written response from the Department within a reasonable amount of time from the date of submission of their written proposal informing them of acceptance or rejection of their job sharing proposal or if the Department requires additional time for review or information from the job sharers before making a decision. If rejected, the reasons will be stated in

64

writing. The RNs may revise their written proposal to accommodate the reasons given for rejection and resubmit it for reconsideration.

D.  Although the RNs share the duties of a full-time position, job sharers are considered to be individual part-time RNs for all personnel and employment purposes.

E.  A variety of different work scheduling arrangements can be used as long as each job sharer works the hours as indicated in their signed job sharing agreement. For example:

    1.  Split days (one RN works mornings, and the other afternoons);

    2.  Alternate days (one RN works Monday and the other Tuesday, etc.);

    3.  Split weeks (one RN works Monday through noon Wednesday and the other works noon Wednesday through Friday; although most job sharers split the hours of a full-time position in half, this is not a requirement);

    4.  The work schedules of job sharers may overlap (one job share may work from 10 a.m. to 2 p.m. every day and the other from noon to 4 p.m.). This arrangement can provide the Department with extra coverage during heavy workload periods. A certain amount of overlap may also be desirable to enable job sharers to attend staff meetings or provide hand-off communication.

F.  The employment of a RN in a part-time position shall not be a basis for exclusion from participation in job sharing.

G.  Each RN entering into a job sharing arrangement shall be given a written explanation of his/her work schedule and an explanation of the impact of conversion to part-time on his/her rights and benefits. The job sharing agreement shall incorporate the understanding that in the event one of the job sharing RNs leave and the Department concludes that the needs of the position requires full-time staffing, the Department shall make a reasonable effort to assist the remaining RN in finding another partner. The remaining RN will be given a reasonable amount of time, normally 30 days to find another RN job sharer.

H.  The decision to end a job sharing arrangement is at the Department's discretion. When drafting the job sharing arrangement, it should include what can be done if one partner is unable to maintain the arrangement.

## Article 18: Alternative Workplace Arrangements (Telework)

### Section 1: General

A. Telework refers to a work flexibility arrangement under which a RN performs the duties and responsibilities of such RN's position, and other authorized activities, from an approved worksite other than the location from which the RN would otherwise work. Telework within the Department must be administered in accordance with The Telework Enhancement Act of 2010 (Public Law 111-292), which is aimed at increasing telework in the Federal Government, and VA Handbook 5011.

B. Telework may benefit the Department and RNs by providing an alternative work situation, which may improve services to Veterans, improve productivity, help with recruitment and retention, and improve the quality of life of RNs. The primary intent of the program is to support the mission of the Department in an alternative work setting.

C. Telework must not be used as an alternative to, or in lieu of, dependent care.

D. Flexi-place, telecommuting, work-at-home, and telework all refer to paid employment away from the traditional office. The terms are synonymous and may be used interchangeably.

E. A community based telecenter is an office, typically in a space owned or leased through General Services Administration (GSA), and/or other Federal Government facility, which may be shared by multiple agencies, or a satellite office of a single agency where a RN works one or more days in the workweek.

F. Home-based/work-at-home telework means allowing RNs to use information technology and communication packages to work one or more days in the workweek at the RN's place of residence.

G. Mobile/virtual office means a location or environment, which may include customer sites, hotels, cars, or at home, etc., where a RN performs work through the use of portable information technology and communication packages.

66

H. Official duty station means the official duty station for a RN's position of record as indicated on the most recent notification of personnel action.

## Section 2: Telework Guidelines

A. Department officials are responsible for determining whether a position is suitable for telework, notifying newly hired RNs of position suitability for telework, and deciding whether a RN is eligible for telework. 38 USC 7422 applies to telework.

B. Consistent with law and VA policy, certain RNs are not eligible for telework. This includes:

   1. A RN who has been officially disciplined for absence without approved leave for more than five days in any calendar year;

   2. A RN who has been officially disciplined for violations of subpart G of the Standards of Ethical Conduct for Employees of the Executive Branch for viewing, downloading, or exchanging pornography, including child pornography, on a Federal Government computer or while performing official Federal Government duties; and

   3. RNs with a performance rating less than successful or equivalent.

C. RN participation in a telework arrangement is voluntary. RNs who volunteer and those who do not volunteer for telework will be treated equitably.

D. Prior to teleworking, RNs must complete all required VA forms, including a Telework Request/Agreement form currently found in VA Handbook 5011, Part II, Chapter 4.

E. Telework agreements must be completed with each RN participant. The agreement must include, but is not limited to;

   1. A preamble statement of voluntary participation;

   2. The identity of the signatories, duty station and alternative worksite;

   3. A description of the work schedule and tour of duty;

   4. A description of required equipment/supplies an explanation of the responsible provider;

   5. The parameters of work assignments to be performed as well as performance criteria. Teleworkers and non-teleworkers will be treated the same for purposes of performance criteria; and,

6. The provisions describing requirements for leave, overtime, liability, work area (for work at home only), worksite inspection, alternative worksite costs, injury compensation, cancellation, privacy obligations, standards of conduct, and paragraph on appropriate disciplinary or adverse action.

F. Telework may be used as a reasonable accommodation for employees with qualifying disabilities under the Americans with Disabilities Act, 42 USC 12101.

G. To the extent that there is not a 38 USC 7422 issue involved in modifying or terminating a telework arrangement that affects RNs, that change is a grievable issue.

H. The Department should notify the RN of any modification or termination of the telework arrangement. This notice should be given as soon as practicable, but normally at least two weeks in advance. A RN may terminate his/her telework arrangement at any time. However, the RN must provide at least two weeks advance notice to the Department.

I. There will be no change in telework arrangements based solely on a change in supervision.

J. Department officials are responsible for assisting the RN with completion of the User's Remote Computing Security Agreement. The agreement is available in the "VA Remote Access Guidelines". Department officials will assist the RN in coordinating the request for remote access through the Information Security Officer. The RN is responsible for working with the Department official to complete the required forms.

K. Appropriate Department officials may conduct safety inspections, as required, during normal working hours, to ensure proper maintenance of any Government-owned property and conformance with safety standards. The safety inspection will be limited to ingress, egress and the telework area. The RN will be provided advance notice of any safety inspection.

L. Full-time, part-time, and temporary RNs may request a telework arrangement. Each arrangement for telework is to be considered individually.

M. The Department is encouraged to provide training to facilitate the use of telework.

N. If appropriate, the opportunity for RNs to voluntarily use their own personally owned equipment will be explored to decrease the cost of the telework program. To the extent possible, security inspections of personally owned equipment will be strictly limited to sections of the equipment used for telework.

O. Periodic work reviews between Department officials and the RN are encouraged.

P. The RN's time and attendance will be recorded as performing official duties at the official duty station or alternative worksite, as applicable. To verify attendance at the alternative worksite, Department officials may periodically contact the RN and/or permit RN self-certification. To help ensure that RNs on telework arrangements work as scheduled, Department officials should focus on the completion of work products, as applicable.

Q. Based on work requirements, the Department may arrange telework schedules to allow RNs to work on a telework arrangement one day per pay period, one day per week, or as often as five days per week. Department officials may also approve alternative work schedules for RNs on telework arrangements when doing so is consistent with work requirements. Consistent with VA Handbook 5011, Department may change telework schedules, including an alternative work schedule which is part of the RN's telework agreement, normally with a two week notice to the RN.

R. With regard to emergency situations that may impact official duty stations and/or alternative duty stations, the following rules apply:

1. A telecommuting RN will sometimes, but not always, be affected by an emergency requiring his/her official duty station to close. When both the official duty station and the alternative duty station are affected by a widespread emergency, the Department should grant the telecommuting RN excused absence as appropriate.

2. When an emergency affects only the alternative duty station for a major portion of the workday, the Department can require the telecommuting RN to report to his/her official duty station, approve annual leave or leave without pay, or authorize an excused absence.

3. The telework site may be unaffected by emergencies that lead to closings and dismissals at the official duty station. If work can proceed at the alternative duty station, then the RN may not be excused from duty just because other employees elsewhere have been dismissed or excused from reporting.

S. When the Department determines exigent circumstances exist (for example, a RN's sudden illness precluding work at the official duty station), the Department may institute an ad hoc telework arrangement without completion of required documentation. Ad hoc arrangements should only be instituted to assist RNs and management in unforeseeable and unavoidable emergency circumstances, and to ensure improvement of services to Veterans, increase productivity, recruit and retain RNs, and improve their quality of life. After effecting an ad hoc arrangement, a telework agreement should be completed at the earliest possible opportunity. Ad hoc telework can also be done on an occasional, episodic or

short-term basis. These situations include, but are not limited to; specific projects, reports or short-term assignments. Such situations may occur throughout the year or be a one-time event.

T.  Expenses and Equipment

1.  The Department may issue and/or pay for equipment, software, equipment maintenance, and repair based on the availability of funds and equipment. The decision to purchase or provide Government issued equipment is discretionary on the part of the Department.

2.  When needed, the Department may pay expenses associated with working at home such as: pens, paper, printer cartridges, printer, phone charges (long-distance and other); and the cost of computers, fax machines, computer software, modems, and equipment maintenance and repair.

3.  The RN will incur the cost of utilities associated with working at home.

U.  When acting within their official capacity, RNs on telework arrangements are covered under the Federal Tort Claims Act and the Federal Employees Compensation Act. RNs are required to submit reports of OCWP injury/illness consistent with facility policy.

## ARTICLE 19: CONTRACT RNs

**Section 1: General**

A. This Article is subject to 38 U.S.C. § 7422. It is not intended to require Union involvement in day-to-day staffing decisions or formal bargaining over matters excluded from bargaining under 38 U.S.C. § 7422(b) or 5 U.S.C. Chapter 71. When the use of Contract RNs causes a change in working conditions of bargaining unit RNs, which triggers a duty to bargain under the Statute, the Department will bargain as appropriate.

B. It is the responsibility of the Department to provide safe, appropriate, high-quality health care to Veterans, and well-qualified, dedicated and properly oriented RNs are important in fulfilling the Department's mission. The Department is authorized to use Contract RNs to meet mission needs.

C. When the Department determines the need to establish a contract for RNs, NNU will be notified.

**ARTICLE 20: UNIFORMS, APPEARANCE AND PROFESSIONAL IDENTIFICATION**

 Section 1: Uniforms & Appearance

A. When a duty to bargain is triggered under the Statute by any changes to the uniform and appearance policy, the Department will negotiate with NNU at the appropriate level.

B. If there is an existing local Department policy that provides a different number of uniforms than provided in this Article, those amounts will not be changed.

C. If there is a question as to whether a RN is adhering to the uniform and appearance policy, a Department official will make a determination. If the RN disagrees, they may seek NNU representation. The Department will discuss the matter with the NNU representative, upon request.

D. In various work settings at each facility, uniform requirements may vary based on the clinical environment (i.e. psychiatry, home health, etc.). The requirements are determined by local facility policy.

E. RNs will remain in compliance with safety and infection control guidelines in order to maintain a safe work environment for patients and staff.

F. When the Department requires a RN to change into a uniform after the RN arrives onsite, the RN will be provided up to 10 minutes at the beginning and end of a tour for the RN to change clothes. In addition, RNs will be allowed a reasonable amount of time to change clothes when their clothing becomes soiled.

G. Each RN will present a clean, well-kept, and professional appearance.

   1. Work uniforms, whether provided by the RN or by the Department, will be appropriate and safe for the work environment.

   2. Footwear should be appropriate and safe for the patient care environment and in compliance with infection control policies and safety requirements.

   3. When the Department does not provide uniforms, RNs will be provided with a uniform allowance in accordance with VHA Handbook 1850.04.

4. When the Department issues uniforms, the Department will be responsible for their maintenance.

5. RNs who normally work in non-uniform work areas will be temporarily provided a suitable uniform when placed on a float or detail to an area where a uniform is required. If the RN is temporarily reassigned to an area that requires uniforms, the Department will coordinate a uniform allowance or provide uniforms, as appropriate, for the duration of the temporary assignment.

H. If it is determined by the Department that a RN is in violation of the uniform and appearance policy, a temporary suitable uniform may be loaned to the RN instead of sending him/her home to change clothes. Failure to follow the uniform and appearance policy may lead to discipline.

I. RNs who are issued uniforms by the Department will be provided with uniforms of proper size and fit for the RN.

J. RNs who are issued uniforms will be issued a suitable number to allow for laundry turnaround, normally five complete sets of uniforms. If scrub jackets are required by the Department, RNs will be issued a suitable number to allow for laundry turnaround, normally two scrub jackets. These numbers may vary for RNs who do not work full-time.

K. RNs who do not normally wear uniforms but work in a clinical setting will be issued, upon request, a suitable number of lab coats to allow for laundry turnaround, normally four lab coats. This number may vary for RNs who do not work full-time.

L. When available at the facility, a RN will be loaned an available uniform when his/her uniform is soiled during his/her tour of duty. This loan will be obtained by the appropriate Department official or by the RN with supervisory permission and will be returned within three working days.

M. At local facilities where NNU scrub tops and/or nurse uniforms with the NNU insignia have been permitted in the past, the parties may continue this practice. At facilities where such a practice does not exist, the parties may discuss the option to use NNU scrub tops and/or uniforms that solely identify NNU affiliation. In either instance, the scrub top and/or nurse uniform must meet the local uniform and appearance policy.

## Section 2: Professional Identification

A. Name badges or identification cards must be worn according to Department policy.

B. Personal Identification Verification (PIV) cards or equivalent must be worn. The RN or Nurse Practitioner designation will be on all PIV cards.

C. RNs who have been issued a PIV card but occasionally forget to bring it to work may be issued a temporary badge after presenting appropriate picture identification, such as a driver's license. A RN who fails to bring his/her PIV card to work for three or more consecutive days may be required to obtain a replacement PIV card. RNs will not be charged for the temporary badge or replacement PIV card unless a VA policy is developed and the Department has met any statutory duty to bargain.

D. RNs will be provided appropriate PIV applicant training on duty time.

E. Procedure for providing RNs controlled access to secured areas will be determined locally.

F. Currently, the Department does not use the VA PIV card as a time card. The Department will bargain any changes for the use of a PIV card for recording a RN's time and attendance when a duty to bargain is triggered under the Statute.

G. When name badges or identification cards are worn around the neck on cords, lanyards or badge holder devices, those devices will have a safety breakaway feature so that the RN is at no risk for choking should the device be pulled accidentally or intentionally in the workplace.

## ARTICLE 21: VACANCY ANNOUNCEMENTS

**Section 1: General Provisions**

A. A vacancy is defined as an opening for a position within the bargaining unit presently unfilled including newly created positions, whether temporary or permanent, as well as positions currently filled but anticipated to be open in the future.

B. The Department retains the right to decide whether to fill a position, to determine qualifications for positions to be filled, to determine the area of consideration, and to make judgments as to RN qualifications.

C. 38 U.S.C. Chapter 74, provides the Secretary of Veterans Affairs with authority to hire personnel listed in 38 U.S.C. §7401(1) directly, without regard to civil service hiring requirements. The Department may fill registered nurse positions without posting vacancy announcements. If the Department elects to post a vacancy announcement, it may simultaneously post such positions internally and externally.

D. When the Department elects to post a vacancy announcement, it will be posted for a minimum of 10 calendar days. However, when management determines that there is evidence of a critical staffing shortage or a lack of qualified internal candidates, the Department will post the position prior to the expiration date of the announcement and will notify the NNU Local.

E. The parties may bargain locally on procedures to consider internal applicants for vacant positions.

**Section 2: Vacancy Announcement**

The notice of a job vacancy should contain the following information:

A. Position title

B. Unit or service or department of assignment

C. Description, role, function and qualifications

75

D. Educational and experience requirements

E. Tours of duty, if specific

F. Anticipated date the vacancy will exist, if in the future

G. Nature of position-permanent/temporary, full-time or part-time, float or relief

H. The closing date of the announcement

I. The individual or office to which the application package should be submitted

## Section 3: Vacancy Procedures

A. The Department will accept and consider NNU comments on posted vacancy announcements.

B. NNU may make recommendations for criteria to be used for all newly created bargaining unit RN positions. The Department will provide draft position announcements for the newly created bargaining unit positions to NNU which may submit comments within 48 hours of receipt.

C. Vacancy announcements may be advertised simultaneously internally and externally, and will contain the same qualifications. The Department is encouraged to give internal RNs first consideration when filling bargaining unit positions.

D. RNs will have an opportunity to apply for a posted vacancy. Applicants that are interviewed for a job vacancy will be asked the same questions related to the job and past experiences as indicated in the vacancy announcement. This provision does not limit the department's right to ask additional questions based upon the responses of the applicant. The RN will apply for positions as indicated in the announcement.

E. When selecting from an internal certificate, and the Department determines that two or more RNs are equally qualified and competent for a position, the most senior RN will be selected.

F. Shadowing consists of up to a four-hour observation period during which the RN will shadow/observe another RN on the unit for which he/she has been selected. This will allow the RN selectee to make an informed decision regarding the new position prior to acceptance. When requested by a RN, he/she may be allowed to shadow. This experience will be arranged by the supervisors of the affected areas.

76

G.  All bargaining unit applicants will be notified of the selection or non-selection in writing. All non-selected bargaining unit applicants will be given the opportunity to discuss with the selecting official (or designee) how he/she can improve his/her chances for selection in the future. NNU will be notified of the selection when a bargaining unit selectee has accepted a bargaining unit position.

H.  When a vacancy is filled internally, effort will be made to make the transfer within 60 days of the decision. If the RN cannot be moved within 60 days, the Department will provide a firm move day with the expectation that the move will occur in the next 30 days. The intent is to move the RN as soon as possible.

I.  If available, NNU local units will receive reports of transfers, gains, losses and name changes as the report is generated with the expectation that it will be done at least monthly.

J.  The Department will inform NNU in advance of new RNs entering onto duty for orientation.

77

## ARTICLE 22: PROFESSIONAL DEVELOPMENT AND EDUCATION

### Section 1: General

A. The provisions of this Article are intended to be consistent with 38 USC 7422.

B. Nursing professional development is the lifelong process of active participation by RNs in learning activities that assist in developing and maintaining their continuing competence, enhancing their professional practice, and supporting achievement of their career goals. The Department and NNU agree on the following principles:

1. Lifelong learning is essential to maintain and increase competence in nursing practice.

2. Continuing nursing competence is essential to the provision of safe, quality nursing care.

3. The public expects continued professional competence throughout the RN's career.

4. Professional nursing competency is definable, measurable, and quantifiable.

5. A variety of educational options to meet the diverse needs of the professional RN may include, but are not limited to: academic education, specialty and nursing certifications, experiential learning, consultation, teaching others, professional reading, distance learning, research, and self-directed educational activities.

6. Educational programs and offerings will reflect changes and advances in nursing practice, health care delivery systems and technology, and consumer demographics.

C. It is agreed that it is the responsibility of the Department to improve clinical efficiency through the professional growth and development of RNs. Toward that end, the Department agrees to provide appropriate orientation, training programs, staff development and continuing and academic education programs for RNs.

D. The Department acknowledges the role of the RN in preparing, leading and delivering educational programs to enhance patient care and maintain professional credentials. To support this end, Department supervisors will work with RNs to allow for a reasonable amount of on-duty time for RNs providing training to allow for preparation of in-services and other educational programs.

E. The Department recognizes the RN's need to access the Internet and other resources for clinical and other job responsibilities. In addition, RNs will have access to the Internet for nursing practice, related research and career development.

F. The Department will provide local resources that support career development and education, including but not limited to: access to each facility's general and medical library resources and educational programs for using technology-based learning. Access to the resources not located on the unit will be with the permission of the supervisor if the RN is on duty. Department supervisors will work with RNs to allow for such opportunities. The Department agrees to keep RNs informed of training and reimbursement opportunities.

G. The Department will strive to offer in-service education on all tours. If in-service education is not available on all tours, the Department will endeavor to offer accommodations as applicable for attendance.

H. Should the Department offer Educational Programs for RNs via computer or other technology for which an RN requires assistance, the Department shall provide such assistance.

I. Each October the Department will announce education programs which will enhance career development and potential academic growth. The October announcement time may be adjusted locally based upon changes in programming. Should the Department fail to provide the information, NNU will provide the Department with one reminder message and the Department will immediately provide the information. Information regarding new or changed educational programs will be distributed as soon as practicable.

J. It is the personal and professional responsibility of each RN to maintain his/her licensure requirements.

## Section 2: Continuing Education and Training

A. Definitions:

1. Academic education consists of courses taken for undergraduate or graduate credit in an institution of higher learning, whether via traditional or distance learning, that may lead to a degree or a certification upon completion.

79

2. Continuing education refers to systematic professional learning experiences designed to augment the knowledge, skills, and aptitudes of RNs and therefore enhance contributions to quality healthcare and their pursuit of professional career goals.

3. Staff development is a directed process that promotes professional practice and continuing competence through assessment of needs, program planning and evaluation.

B. Mandated training and training to meet local requirements specific to a position will be provided to all RNs.

1. In addition to mandatory education topics, the Department will provide in-service education and opportunities for professional continuing education consistent with budgetary constraints. RNs will be encouraged and permitted to attend such offerings on a fair and impartial basis (i.e., consistent with merit factors required by applicable law, rule or regulation). The Department supervisors will work with RNs to allow for such opportunities.

2. All bargaining unit RNs can request funding for training and the Department will strive to allow maximum training opportunities.

C. Mandated training will be on duty time and the Department will pay all costs.

D. The Department will encourage RNs to further their academic education. Managers are encouraged to work with the RN to develop options, such as flexible work schedules, that will accommodate the RN's academic needs.

E. Upon request, RNs may be authorized to participate in workshops and attend educational programs. The Department will fully consider such requests to participate. These activities may be on duty time or leave time where appropriate. Where appropriate, per diem expenses, travel and fees for RNs to attend educational courses, lectures, seminars, courses of instructions, etc. may be approved. RNs will follow the local process for requesting participation.

F. Educational announcements (both internal and external) will be distributed to all RNs manually or electronically generally two months in advance, or as soon as practicable, and shall include subject, time, date, location, amount of credit (time) if offered, and cost (if any).

G. The Department will maintain a record of training.

H. RNs may access programs presented by the Department. Copies of reference materials including, but not limited to: the VA Formulary, Medical Dictionary, Pharmacy Reference, policy and procedure manuals, shall be available on each work location, either electronically or in hard copy.

I. The NNU will have representation on appropriate local education-related committees impacting bargaining unit RNs. Additionally, NNU will be invited to participate in related national committees, as appropriate.

## Section 3: Competencies

A. In accordance with VA policy, RN competence will be assessed and validated during the orientation process. This orientation will specifically address aspects of performance in accordance with the RN's functional statement.

B. The Department will ensure ongoing assessment of RN knowledge, skills and abilities, necessary to assure continued competence in the workplace.

C. The Department will support and encourage continuing education and training required to allow RNs to practice nursing competently. Such support may include, but is not limited to the following:

1. Involving practicing staff nurses and NNU in identification and development of facility-wide and unit-based RN competency needs.

2. Soliciting input from practicing staff RNs and NNU into ongoing evaluation/updating of staff RN competencies.

3. Ensuring that RN competencies are within the scope of applicable State Nurse Practice Acts, VA regulations and laws.

4. Ensuring that RNs are familiarized, trained and have supervised practice with demonstration/return demonstration on all new equipment used by the Department. If the RN is not competent with an assigned task, using certain equipment, or other technology that is introduced, he/she will be afforded a reasonable amount of time for review and training as determined by the Department.

5. Ensuring that competencies are clearly written and clearly communicated to all affected RNs, and document the RN's completion of competencies.

D. Upon request, the Department will provide a copy of current, facility-wide and unit based competencies to the local NNOC NNU bargaining unit.

## Section 4: Orientation

A. The Department will provide orientation for all new RNs upon their entrance on duty and upon reassignment to a different position/location or area. As needed, this orientation will include clinical requirements and competencies specific to the area of assignment.

B. The Department should use experienced RNs as preceptors and mentoring concepts as a component during RN orientation. It is expected that the RN will work closely with the preceptor and when possible management will assign the orienting RN to work the same schedule as the preceptor. NNU and the Department agree that continuity during orientation is of upmost importance to ensure a competent, independent and well qualified nursing workforce to ensure the highest quality of patient care.

C. RN expertise develops from novice to expert through stages based on experience. (For informational purposes only see Appendix B) NNU and the Department recognize the importance of a quality orientation and that RNs have varying backgrounds and levels of experience requiring a specialized orientation process. The orientation period will be individualized in length and scope based on the RN's needs in collaboration with the RN, the RN preceptor and the Nurse Manager. Orientation is finished when the orientation checklist is completed.

## Section 5: Career Development Program

A. The Department encourages RNs' efforts in enhancing and developing their professional careers, and will provide a career development program consistent with budget capabilities. For those RNs interested in career development a Personal Development Plan (PDP) or its equivalent should be developed in conjunction with their supervisor/preceptor.

B. Participation will be voluntary and non-participation will not adversely impact the RN's proficiency rating.

## Article 23: Nurse Professional Standards Boards (NPSB)

### Section 1: General

A. The subject of Nurse Professional Standards Boards (NPSBs) is a subject excluded from collective bargaining pursuant to 38 USC 7422. Procedures for NPSBs are presently governed by VA Handbook 5005 and VA Handbook 5021. Those procedures may in the future be governed by other handbook provisions, publications or policies. VA Handbook 5005 can be found at Handbook 5005 link and VA Handbook 5021 can be found at VA Handbooks 5005/5021.

B. The VA Nurse Qualification Standards (NQS) define the performance, experience and education requirements for a RN to be appointed, advanced, and promoted within the VA. The performance of RNs will be evaluated using the NQS. This process is presently governed by VA Handbook 5005 Part II Appendix G-6 but may in the future be governed by other handbook provisions, publications or policies.

C. NNU and the Department agree that the provisions of this Article refer to recommendations for promotions, disciplinary board actions or retention. These recommendations are to be made equitably and in a consistent manner. The NPSB is normally only a recommending body. NPSB recommendations are provided to the appropriate Executive Level approving official.

D. The NPSB represents a peer review body, which compares each RN's performance, education and experience against professional standards and guidelines.

### Section 2: Nurse Professional Standards Boards

A. Membership of the NPSB should be reviewed on an annual basis. NNU may recommend bargaining unit RNs for appointment to the NPSB. Such appointments are made without regard to bargaining unit membership or other affiliations. RNs appointed to the NPSB must divest themselves of their identity with the particular facility at which they are employed, and their labor union, and must become the agents of the VA Under Secretary for Health.

B. The Department will publish the membership of the NPSB to include the dates of appointment, the term of the appointment and the projected schedule of board meetings on an annual basis and provide a copy to the local NNU. The Department should publish this information on their local websites. The membership of the NPSB will be provided to the RNs annually and as changes are made.

C. The function and composition of local NPSBs will be in accordance with VA policy, which sets the criteria and procedures by which RN members of the NPSB are recommended by the Nurse Executive and appointed by the Medical Center Director.

D. Training to RNs on the role and responsibilities of the NPSB will be provided by the Department upon their appointment and annually. RNs may submit suggestions to the Department as to the content and frequency of such training. The Department will provide additional education and/or training on the NPSB as changes or updates occur. http://vaww1.va.gov/nursing/npsb_rsrc.asp

E. Additional training on the NPSB may be provided by NNU. The Department will consider RN requests for authorized absence to attend these educational sessions. The Department may request additional information regarding the content of the training such as agenda to be presented if not previously provided.

F. When a RN files an appeal before a Title 38 Disciplinary Appeals Board (DAB), the RN is entitled to designate a personal representative of their choice, who may be from NNU. The NNU representative must protect the confidentiality of any information to which they have access in connection with the DAB hearing. A representative in a DAB hearing may speak, clarify, ask questions, and present the interests of the RN for whom they represent. However, the representative may not unnecessarily interfere with or delay the proceeding.

G. When a RN is the subject of a Summary Review Board (SRB), the RN is entitled to a representative of their choice, provided the choice would not create a conflict of interest. The NNU representative must protect the confidentiality of any information to which they have access in connection with the SRB proceeding. A summary review is not an adversarial procedure and the representative's role is limited to assisting the employee in exercising the right to reply orally and/or in writing to the reasons for the review. Only Board members are entitled to be present when an individual is being interviewed, except that an employee's representative may be present while the employee is being interviewed. The representative may not unnecessarily interfere with or delay the proceeding.

H.  The Department will notify each RN of the recommendations of NPSB action in writing.  The notice will include reconsideration and/or appeals processes, if appropriate.  Supervisors must advise employees of any decision not to promote them, of the reason(s) for the decision, and of their right to request reconsideration. The right to reconsideration does not extend to promotions to Nurse IV and Nurse V, which are based on complexity of assignment, nor does it extend to temporary promotions.  The employee must discuss his or her dissatisfaction with their immediate supervisor prior to submitting a request for reconsideration. (See VA HB 5005, Part III, Chapter 4, p. 52.For promotions and advancement to a Higher Level With the Grade to Nurse III and Below, if consideration of a registered nurse promotion or advancement to a higher level within the grade by the Under Secretary for Health or designee is requested, the Human Resources Management Officer will take necessary steps to ensure that the Nurse Executive [is] aware of the case and of the recommendation(s) of the appropriate Nurse Professional Standards Boards. See VA HB 5005, Part III, Chapter 4, p.52.

I.  The Department retains the discretion to determine when RN boarding will take place. Generally, RNs Grade I and II will be boarded annually at their anniversary date and RNs Grade III will have a onetime review for scope and complexity for promotional consideration to Nurse IV.

J.  The Department should use the notification letters as provided by the Office of Nursing Services (ONS) website to communicate board actions. If the board does not recommend promotion, the notification letter will include the specific elements not met, the reconsideration and/or appeals processes, the projected date of the RN's next scheduled boarding. Anytime the boarding date is extended beyond one year an explanation will be provided in writing.

K.  The board chair will not share any board information regarding the recommendation until the approving official signs off on the board action.

**ARTICLE 24: NURSE QUALIFICATION STANDARDS (NQS) AND PROFICIENCY REPORTING**

**Section 1: General**

This Article is subject to the provisions of 38 USC 7422. The information in this Article is subject to the policies and procedures outlined in VA Handbook 5005, Part II and VA Handbook 5013, Part II (http://vaww1.va.gov/ohrm/HRLibrary/Dir-Policy.htm). Additional Nurse Qualification Standards and proficiency information is found at the Office of Nursing Services website: http://www.va.gov/nursing/.

**Section 2: Nurse Qualification Standards (NQS)**

A. The VA Nurse Qualification Standards define the performance, experience and education requirements for a RN to be appointed, advanced, and promoted. The performance of RNs will be evaluated utilizing the NQS.

B. Each RN will be oriented and provided a copy of the NQS upon appointment and subsequently upon request.

**Section 3: Proficiency Reporting**

A. There will be a continuous learning environment for RNs in preparing for and writing proficiency content related to the NQS and professional requirements for performance.

B. All newly-appointed RNs will be educated in the proficiency requirements to include processes and procedures for providing input into the evaluation process. This initial training will be face-to-face. Annual training on NQS and proficiencies will be provided. Additional ongoing education for all RNs is available on the Office of Nursing Services website (ONS).

C. Upon appointment, advancement, promotion and upon request, each RN will be provided a copy of performance requirements, such as competency checklists and functional statements for the position they occupy. All RNs will receive

86

updated copies of promotion and special advancement criteria when changes are made.

D. Each RN will be notified 90 days prior to the due date of the proficiency. RNs have the right to provide input into their proficiency for the rating official's consideration and incorporation where appropriate. The Department will provide copies of the NQS for their grade and career path for use as a reference. If the RN requires additional training prior to completion of the evaluation, a request will be made to the rater or the approving official. Input into the evaluation should be completed and provided to the rater no less than 45 days before the proficiency is due. Failure of the RN to provide input should not delay the completion of the proficiency report.

E. Each RN has the responsibility to participate in the development of their professional goals.

F. The Department and NNU agree that in order to accomplish the mission of the Department, every effort will be made to provide timely proficiency reports to ensure professional growth and/or resolve performance problems.

G. The Department will follow its policy concerning the timeliness or and procedures for notification to RNs and completion of RN proficiencies. The Department recognizes the importance of having proficiencies completed by supervisors trained in the Department's proficiency rating system.

H. The Department recognizes the importance of having proficiencies submitted to the NPSB in a timely basis consistent with VA regulations.

I. All RNs will have in-person discussions with their rater by the proficiency due date, so that clear understanding of the areas of accomplishment, professional growth opportunities and goals are discussed. Constructive feedback will be provided to clearly explain the overall rating and performance expectations.

J. Upon completion of the discussion and review of the written evaluation the RN will have the opportunity to sign the evaluation. Signing the report indicates the RN has seen the report and had an opportunity for discussion. RNs who disagree with the proficiency may provide concise comments in writing to their supervisor to be filed in the eOPF. The RN may decline signing the proficiency report and if so the rater will indicate such on the proficiency report and forward to HR.

K. Delay of a proficiency report will follow the guidance outlined in the Department policy. If a RN's proficiency is delayed and the RN is later advanced or promoted, the Department will make the individual whole back to the date the change would

have taken effect, including back pay and corrected date of promotion. This section is not intended to allow for arbitration or other third party review other than that referred to above.

L. Upon the request of NNU, the Department will provide a list of all bargaining unit RNs' delayed proficiencies. The report will contain the RN's name, the RN's proficiency due date and number of late proficiencies for that facility.

M. Subject to the limitations of 38 U.S.C. 7422 and unless otherwise provided by VA Handbook 5013, Part II, or successor handbook provision or policy, non-probationary RNs who demonstrate areas of less than satisfactory performance will be given written counseling which includes direction for improvement. Each non-probationary RN will be given an opportunity to improve, normally 60 to 90 days prior to the proficiency due date. Counseling and follow up to improve the less than satisfactory performance will be completed according to the guidance in VA Handbook 5013, Part II.

## ARTICLE 25: RECOGNITION AND AWARDS

### Section 1: General

A. RNs who make noteworthy contributions in support of organizational goals and objectives should be considered for recognition consistent with local policy and VA Directive and Handbook 5017 or successor.

B. Definitions:

1. Awards refer to the entire range of rewards available to recognize a RN under the VA Employee Recognition and Awards Program, including cash, non-monetary, honorary, and time-off awards.

2. Cash awards are monetary awards. This type of award may include one-time awards like Special Contribution Awards, Suggestion Awards, On-The-Spot Awards, gift certificates and savings bonds. Special Advancement for Achievement or Performance are awards that may result in an increase to base pay.

3. Non-monetary awards refer to non-cash awards such as certificates and plaques.

4. Honorary awards refer to recognition at a special event, or one of the several types of named awards such as the Secretary's Hands and Heart Award. This category may also include recognition plaques for service awards.

5. Time-off awards are blocks of time-off awarded to RNs without charge to leave. The minimum time-off award is four hours. The maximum amount of time-off that may be granted to any RN during a (12) month period is (80) hours, with no more than (40) hours being granted to a RN for a special contribution.

### Section 2: Awards Process

A. NNU, the Department, RNs, and other employees all have important roles in identifying RNs who may be deserving of recognition and awards. NNU and RNs may provide recommendations concerning awards and recognition to be considered by the Department.

B. RNs will be encouraged to submit suggestions and to assist in the development and testing of ideas. RNs may request supervisory assistance so that the suggestion is sufficiently described for successful evaluation.

C. NNU and the Department are encouraged to develop awards and recognition programs through local collaborative processes.

D. RNs may be granted a one time cash award at the conclusion of the performance rating cycle each year based on their rating of record. These awards are not subject to review and approval by the Nurse Professional Standards Board (NPSB).

E. NNU may designate a member on the facility awards committee. The committee will review award submissions and make recommendations to the Medical Center Director (MCD). The MCD retains sole authority to decide on awards within his/her jurisdiction.

F. Awards will be processed in a timely and expeditious manner, generally within thirty 30 days, after they have been approved by the appropriate Department official(s).

G. Special Advancements for Achievement, Special Advancements for Performance, and Exemplary Job Performance are part of the awards program for RNs.

## ARTICLE 26: SAFETY, HEALTH, AND ENVIRONMENT

**Section 1: General Duty Clause**

A. A safe and healthy work environment is highly valued by the Department and RNs. All Department officials and RNs must adhere to high standards of safety, health, and the environment. The Department will investigate and abate workplace hazards and/or provide engineering and administrative controls, material substitution, training and personal protective equipment to reduce RN exposures to recognized safe levels.

B. The Department is responsible for conducting routine health and safety inspections at all VA facilities and coordinating with the property owners of leased facilities to perform such inspections.

   1. NNU will be afforded the opportunity to be an active participant in all health and safety inspections.

   2. The Department is responsible for timely investigating and correcting, as needed, all issues found on health and safety inspections at VA facilities.

   3. For leased facilities, the Department will work with the owner of the leased facilities to ensure that unsafe or unhealthy working conditions are addressed and/or corrected in a timely manner.

   4. If the Department cannot timely correct unsafe working conditions, the Department will take steps to ensure RN safety, which may include assigning RNs to alternative work areas.

C. When a RN determines that he/she has an unsafe or hazardous condition in the work environment, he/she will immediately report the danger to the appropriate Department official. When the Department receives a report of a potentially dangerous or unhealthful condition affecting RNs, the Department shall notify NNU of the alleged dangerous or unhealthful condition. The Department will promptly initiate appropriate corrective action when an unsafe or potentially hazardous condition is reported.

D. In the case of imminent danger situations, RNs shall make reports by the most expeditious means available. The term "imminent danger" means any condition(s) or practice(s) in any workplace which are such that a danger exists which would reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through normal procedures (29 CFR 1960.2(u)). The RN has a right to decline to perform his/her assigned tasks because of a reasonable belief that, under the circumstances, the task poses an imminent risk of death or serious bodily harm coupled with a reasonable belief that there is insufficient time to effectively seek redress through normal hazard reporting and abatement procedures. However, in these instances, the RN must report the situation to his/her supervisor or another supervisor who is immediately available.

E. When NNU identifies or receives a complaint by a RN of a potentially unsafe or unhealthful working condition, NNU will report the complaint as soon as possible to the appropriate Department official. Additionally, NNU has the right to review and/or look into a RN complaint of potential and/or actual unsafe or unhealthful working conditions and assist the RN in filing a report or initiating a report on the RN's behalf to the appropriate Department official or authority.

F. While awaiting an inspection and the completion of any repairs resulting from the inspection, the Department may require that the RN perform alternative tasks for which the RN is qualified.

G. A NNU representative will be given the opportunity to be present during the inspection by the safety and/or health personnel representative. The Department shall investigate all instances where the safety or health personnel have failed to notify NNU of inspections or failed to provide an opportunity for NNU to be present during inspections. The Department shall provide the NNU Local with a written explanation stating the reason(s) for such failure and any corrective actions taken.

H. If the Department safety or health personnel representative decides a condition does not pose an imminent danger, the instruction to return to work shall be in writing and contain a statement with an explanation as to why the area is deemed to be safe and free of danger. Refusal to perform an assignment after the safety or health personnel representative has deemed it to be safe may result in disciplinary action.

I. When the Department receives a report that a dangerous, unhealthful or potentially dangerous or unhealthful condition is present at a particular work site, the Department shall notify the facility safety committee and the local NNU-NNOC Safety mailgroup of the alleged dangerous or unhealthful condition. The

parties will cooperate to create the local NNOC-NNU Safety mailgroup within thirty days of the effective date of this Master Contract. In the interim, the Department will notify the facility safety committee, the Local NNOC-NNU Director and the local NNOC-NNU Health and Safety Representative.

J. Each Department facility will maintain conditions of safety, health and sanitation in accordance with all applicable laws, regulations and directives. The Department will provide risk assessments and determine the appropriate engineering and administrative controls and guidelines. Upon request, NNU will be provided with a copy of the risk assessment, including but not limited to action plans or interventions.

K. All health and safety equipment that is determined necessary by the Department for a particular job will be furnished by the Department. RNs may be assigned alternative tasks until the necessary equipment is provided.

L. RNs and NNOC,NNU have the responsibility to promptly bring their health and safety concerns to management. If NNOC, NNU or a RN has concerns with the health and safety equipment provided, the parties will discuss the concerns and endeavor to resolve them. The intent is not to interfere with the day to day operations of the medical center.

M. If a workplace illness or injury necessitates removal of the RN from their normal work environment pending a final decision by Office of Workers' Compensation Programs (OWCP), a reasonable effort will be made to place that RN in another work environment which makes use of the RN's professional knowledge, skills, and abilities. In accordance with the Details, Floats and Temporary Assignments Article, if a RN is detailed or temporarily reassigned for more than seven days, NNU will be notified.

N. Minutes, policies, manuals etc., from Health and Safety committee(s) and sub-committee(s) will be made available to NNU through their member/representative and one alternate. If available electronically, the union member/representative and one alternate will have access to SharePoint, databases and Dashboards related to the committee(s).

## Section 2: NNU Involvement

A. NNU, recognizing the importance of safety, health and environment to the well-being and working conditions of RNs, will appoint National Safety Representatives from among its membership. The Department will notify three individuals identified by NNU on national safety issues. The Department will

solicit at least one NNU nomination for appropriate national level safety/health/environment initiatives.

B. A NNU National Safety Representative and one local NNU safety representative from each NNU facility will attend one safety training class per year, either Basic Safety, Intermediate Safety or another VA approved national safety conference at the Department's expense. This includes tuition, travel and per diem, as appropriate. Additionally, NNU may request funding for additional events, which the Department will consider subsidizing based on available travel funds and overall benefit.

C. Consistent with Department policy, each local facility will develop and/or maintain safety policies and procedures to be observed by all RNs. NNU representatives make valuable contributions when participating in the development of safety and health policies and procedures. The Department will solicit NNU participants in/on taskforces and committees related to this field. NNU retains the right to comment on policies and procedures proposed by the Department and to negotiate where a duty to bargain is triggered under the Statute.

D. NNU will be represented on the local safety and Environment of Care standing committee(s) in each Department facility, as permitted by Department policy. NNU will be offered representation on all other safety-related committees affecting bargaining unit RNs, both locally and nationally. The NNU representative will have the right to submit agenda items, request evaluation of hazards and represent a NNU member at the RN's request. The NNU representative on these committees will be permitted use of telephones, conference call and videoconferencing facilities when required in support of committee business.

E. The NNU local safety representative or designee will be afforded the opportunity to participate in health or safety related inspections impacting RNs. NNU reserves the right to jointly submit its own findings or observations for inclusion in the inspection report. Sufficient notice will be provided when management has advance notice or scheduling authority. NNU has the right to submit findings, recommendations and observations to investigators and management, with the understanding that they may or may not be included in the final report or abatement plan if based on unsupported content, as determined by the Department. If an inspection leads to implementation of an abatement plan, NNU will participate in Occupational Safety and Health Administration/Environment of Care committee oversight of such plan.

## Section 3: Training

In accordance with Department policy, each facility will provide RNs with safety training annually. All RNs will be provided training and/or retraining, as appropriate, on procedures and equipment, recognized best safety practices and manufacturer recommendations, including training and education as needed, based on new conditions related to infectious diseases. RNs are responsible for reporting operational and equipment status to supervisors and ensuring safe and proper use of equipment.

### Section 4: Ergonomics and Safe Patient Handling

A. It is the responsibility of the Department to maintain an effective ergonomics program or similar program in order to help control occupationally related cumulative trauma and/or musculoskeletal disorders consistent with VHA Directive 2010-032.

B. NNU has the right to identify potential ergonomic workplace hazards and request evaluation of a designated workplace and/or workplace equipment.

C. Safe Patient Handling (SPH):

1. Consistent with VHA Directive 2010-032, it is the responsibility of the Department to maintain a SPH program that protects both RNs and patients.

2. Any lifting equipment should take into account operational and RN needs, physical environment, hazard assessment and injury analysis. In addition, NNU may provide input into the selection and evaluation of patient transfer equipment.

3. Each Department workplace will conduct an ergonomic assessment of its patient transfer program to ensure that it has appropriate staffing, equipment and training. Lifting team programs augment the use of assistive lifting devices and may be considered, where appropriate. Single person lifts in patient care areas will be discouraged. Upon request, NNU will be provided a copy of the ergonomic evaluation.

4. The patient Fall Risk Assessment will be conducted and communicated to affected staff according to established Department policy.

D. New construction and renovation will take into account the need for SPH and moving equipment.

E. Consistent with VHA Directive 2010-032, oversight for the Department's SPH program is the responsibility of each local facility's health and safety committee. This includes:

1. Ensuring utilization by the Department of SPH expertise when developing renovation plans, facility projects, and new construction that involve introduction or installation of patient handling equipment; and,

2. Ensuring that appropriate patient handling (lifting) equipment is installed during new construction and renovation construction projects in unit and clinical areas where patient handling occurs.

F. An effective safety program should include the following from the Department:

1. Completion of a detailed ergonomic evaluation during the design requirements planning process to determine necessary patient lifting equipment and to provide such to NNU upon request;

2. Installation of ceiling-mounted or overhead lift systems, where necessary and feasible; and,

3. Provision of adequate and accessible storage space for portable or floor-based and other patient handling equipment.

G. The Department normally provides members of the local facility's health and safety committee with employee injury and illness summary reports (OSHA 508 report). Upon request, the Department will provide this report to NNU. NNU has the right to look into and review injuries of bargaining unit RNs, provide recommendations, and track these injuries by unit, area, and facility consistent with law or government-wide regulation.

H. NNU and end-user RNs are encouraged to provide recommendations and feedback on equipment for purchase and currently in use for SPH.

## Section 5: Latex Allergy

A. Latex sensitivity constitutes a health risk to patients and RNs, therefore lowering the latex exposure risk is beneficial to patients, visitors and RNs. Latex-related health problems may be minimized by reduction of exposure, appropriate work practices, training and education of staff, monitoring symptoms and substituting non-latex products when appropriate and available.

B. Each Department facility will provide non-latex or powder-free low latex content products to the extent their usage is appropriate. The Department will strive to reduce the use of latex products and protect at-risk patients and RNs wherever feasible.

96

C. If severity of the latex allergy necessitates removal of the RN from his/her normal work environment, the RN will be offered another assignment in accordance with applicable regulations. NNU notification regarding reassignments will be consistent with the Details, Floats and Temporary Assignments Article.

**Section 6: Occupational Health Program**

A. Occupational Health is governed by VA Handbook 5019 and the subject of 38 USC 7422. Each Department facility will provide Occupational Health services.

　1. When feasible, RNs are responsible for notifying their supervisor of their intent to seek medical treatment in the Occupational Health Unit. When this is not feasible, the RN may report directly to the Occupational Health Unit authorized to render emergency care.

　　a. The RN may obtain emergency diagnosis and initial treatment for injuries or illness that becomes necessary during working hours and that are within the competency of the professional staff and facilities of the Occupational Health Unit. During non-administrative hours, the RN may report directly to Urgent/Emergent Care Departments, where available.

　　b. In cases where the necessary emergency treatment is outside the competency and resources or scope of practice of the health service staff and facilities, conveyance of the RN to his/her physician or suitable community medical facility may be provided at the request of or on behalf of the RN.

　　c. The Department needs to ensure that a determination is made as to whether or not the RN is to be billed for the VA health care received. The RN will be notified as soon as feasible after the billing decision is made.

　2. All medical examinations, tests and/or immunizations deemed essential and authorized/mandated by VA regulations will be provided.

　3. The Occupational Health program is not a substitute for the RN's personal physician. However, if a RN suffers a minor illness or injury, which interferes with their ability to perform their duties, treatment may be provided to relieve their discomfort and enable the RN to remain at work. In an emergency, appropriate care to stabilize and transport the RN will be rendered.

　4. Preventative services, including health education programs and specific disease screening examinations, may be offered when appropriate.

B. Documentation of any examinations or screenings will be kept in the RN's Employee Medical File (EMF) and will be considered confidential. In accordance with OSHA regulations, and appropriate statutes, RNs may request in writing, to view and/or receive copies of the contents of their EMF, and may submit a release of information request to provide the EMF to their personal physician. The EMF is a VA system of records with disclosure governed by the Privacy Act. RN medical records maintained by the Department must be separately and distinctly secured from any other medical records. OWCP files will be maintained consistent with Department of Labor regulations.

C. If a RN believes that he/she contracted a contagious, work related illness that may adversely impact patients or other employees, he/she shall notify their supervisor. Additionally, he/she may subsequently report to the Occupational Health Unit and has the right to file a claim for a work related illness. A determination on the RN's claim can only be made by OWCP.

D. When a RN needs medical treatment while at work, the Department's first concern is to act in a prompt and responsible fashion.

E. The Department agrees to maintain Automated External Defibrillators (AED) at each VHA facility and work unit. RNs will also have reasonable access to first aid supplies, either on the work unit or at the Occupational Health Unit.

## Section 7: Exposure Prevention and Management

A. The Department will implement programs addressing blood borne pathogens, high risk exposure situations, hazardous material safety data, radiation exposure and tuberculosis (TB) in accordance with OSHA, Nuclear Regulatory Commission regulations and other applicable Federal and VA Directives.

B. Personal Protective Equipment

1. All personal protective equipment that is determined necessary by the Department for a particular job will be furnished by the Department.

C. Needlesticks/Other Exposures

1. Each Department location will establish a system to continuously evaluate the sharps causing injuries in their facilities; sharps which have not yet been replaced with safer devices; new and existing commercially available engineered devices; and a system for introducing, testing and accepting or rejecting those devices.

2. NNU and bargaining unit RNs will provide input in the selection, evaluation and review of current and new needlestick devices.

3. The Department will use safety devices on all sharps and needles for the protection of the RN consistent with law and government-wide regulation.

4. Every RN is required to report promptly to his/her immediate supervisor either verbally or in writing, in accordance with current regulations:

   a. All needlestick/sharps accidents occurring on the job;

   b. All illnesses that may have been contracted as a result of the performance of their duty or exposure to the same.

5. In accordance with Department regulations, each Department facility shall provide appropriate medical supervision and treatment, both preventative and curative, in the event any RN is exposed to any illness or injury in the performance of his/her duty.

6. Universal Precautions must be observed in accordance with Department policy.

7. The VHA facility will provide an exposure management program for occupational exposure to blood-borne pathogens in accordance with law and regulation and current Centers for Disease Control (CDC) Guidelines.

8. Post-exposure evaluation and follow-up will be conducted in accordance with applicable OSHA standards in 29 CFR 1910.1030(f)(3). The Department shall provide relief as soon as possible to ensure timely treatment.

9. Following a report of an exposure incident, the Department will make immediately available to the exposed RN, a confidential medical evaluation and follow-up in accordance with 29 CFR 1910.1030(f)(3).

10. In the event of a needlestick or other possible exposure, the Department will not deny or delay any indicated medical treatment merely because the patient involved in the needlestick or exposure refuses to be tested or the patient has not tested positive.

D. High Risk Exposure Situations

1. The RN exposed to a patient(s) with an undiagnosed communicable disease will be notified by the appropriate Department official, as soon as the

diagnosis is established on a laboratory or clinical basis. A RN who feels he/she has had exposure to a potential transmitter of a communicable disease shall, as soon as possible, notify the supervisor.

2. RNs who are immunosuppressed, have clinical conditions including, but not limited to pregnancy, breastfeeding, and chemotherapy, should discuss their work responsibilities and environment with the appropriate Department official and medical provider. RNs with documented special needs will be addressed on an individual basis, as appropriate.

3. RN assignments may incur a hazard or high risk exposure, including but not limited to, administering chemotherapy, experimental drug therapies or treatments, and exposure to communicable diseases. The Department will take appropriate steps to protect RNs who deliver such medical care.

E. Radiation Exposure

1. RNs working with radiation will be issued and required to wear approved personal protective equipment (PPE) and exposure monitoring devices when the management official responsible for radiation safety determines that such devices and equipment are needed. Results of monitoring badges will be provided to the RN when exposures are out of range or upon the RN's request.

2. RNs who are, or may be, pregnant and are concerned about exposure should immediately report this to their supervisor, who will request that exposure be evaluated by management officials responsible for radiation safety to determine whether the RN should be placed on a limited exposure protocol.

F. Tuberculosis

1. RN training, surveillance, and treatment will occur as stated in VA policy in VA Handbook 5019, Part IV, Section 2 and current CDC guidelines and will be at no cost to the RN.

2. Provisions for reading TB skin tests during non-administrative hours will be made by the Department and communicated to all RNs subject to testing at the time of the annual TB skin test.

3. The appropriate Department official shall take medical and public health steps to ensure adequate disposition of active cases of TB and to protect other VA employees and patients.

4. Testing of RNs for exposure or potential exposure to TB will be done consistent with current CDC guidelines and VA policy.

5. RNs will be fit-tested for respirators for respiratory isolation for TB exposure and treatment.

G. Pandemic Events

1. In the event of a declared pandemic event or serious public health threat, the appropriate Department official shall take action to address the event, which may include immunization of RNs and family members and the use of appropriate PPE. The Department may incorporate guidance from the Government Pandemic Plan website, the Center for Disease Control, or other appropriate sources.

H. Hazard Communication

1. Pursuant to OSHA Hazard Communication Standard (29 CFR 1910.1200), Material Safety Data Sheets (MSDS) for all hazards, including cleaning materials, medications, and therapeutic agents utilized in the work environment, will be readily accessible in each work area, electronically and/or printed form.

2. The Department has the responsibility to ensure that the hazards of all chemicals used in the performance of RN duties are communicated to RNs. This may include hazard communication education programs and training.

3. RNs will be trained annually, as appropriate, on the handling and disposal of each hazardous chemical.

4. If the Department is made aware that a RN may be or has been affected by a hazardous chemical, the Department will immediately notify the RN.

## Section 8: Security

A. Work Environment

1. Each Department facility will provide:

a. Security for all RNs on each tour of duty, in the work environment, in common use areas and in areas for parking and approaches to the workplace on Department- owned property. The Department will address the issue of security when leasing space utilized by RNs;

    b. Facilities for those RNs, both male and female, who are required by the Department to change in and out of uniform; and,

    c. A safe place to eat on all tours and at all Community Based Outpatient Clinics (CBOCs) and facilities.

  2. The Department will make reasonable efforts to provide secure space for placement of purses and wallets in a designated area.

B. Parking

  1. All Department grounds and parking areas including CBOCs and any building where RNs ingress and egress to their worksite will be well-lighted, whenever possible.

  2. Upon request, the Department will provide escorts, when available, for RNs to cars on site and to any offsite parking locations.

  3. The Department will ensure that pedestrian crosswalks from parking areas on VA property are clearly marked.

  4. Provisions for parking for RNs is an area for local negotiations.

## Section 9: Patient Safety Incident Reports

RNs may voluntarily submit patient safety incident reports and may do so confidentially and without retaliation. The intent of these reports is to encourage anyone who witnesses or experiences an error or close call involving a patient to report it, so that systems improvements can be identified and VHA becomes the safest system for health care.

## Section 10: Mold

A. It is the responsibility of the Department to make the workplace free of mold, to inspect and monitor as necessary, and to take appropriate action to contain and remove mold from any RN work environment.

B. The Department will notify NNU and affected RNs of any mold found in any RN work environments.

C. Upon request, NNU Health and Safety Representatives will be given a copy of all tests monitoring mold levels.

D. Mold abatement plans may include the discontinuance of work or the shifting of the RNs work location. Notice of such abatement action will be provided to NNU in a timely manner.

## Section 11: Asbestos

A. It is the responsibility of the Department to address the discovery of airborne asbestos in the workplace, to inspect, monitor as necessary and take appropriate action.

B. The Department will notify NNU and affected RNs of any asbestos found in any RN work environments.

C. The Department will notify NNU prior to initiating asbestos removal or containment projects.

D. Upon request, NNU will be given a copy of all tests monitoring asbestos levels and any abatement plans.

## Section 12: Ergonomic Work Station Design & Work Units

A. The Department acknowledges that there are certain ergonomic and environmental factors that can contribute to the health and comfort of RNs. These factors involve the proper design of work stations and the education of managers, supervisors, and RNs about the ergonomic job design and organizational solutions to design.

B. The Department agrees that RNs should be provided information about ergonomic hazards and how to prevent ergonomically-related injuries. This information could be provided by OSHA Safety and Health Guidelines and other available literature. The Department agrees to provide, to the maximum extent possible, workstations and equipment (including but not limited to chairs, tables, workstations, portable workstations, Bar Code Medication Administration carts, lighting, keyboards, screens, scanners, accessory equipment, and printers) that meet ergonomic design criteria. RNs will be given training on the use of equipment provided, as appropriate.

C. The Department will strive to meet the ergonomic needs of RNs on the work unit. A RN may request an ergonomic assessment which will identify the RN's needs and the available modifications. Upon request, the Department will meet with the RN and his/her NNU representative to discuss the assessment and how to proceed.

D. Lighting

1. The Department will endeavor to place computer monitors in work locations to avoid unnecessary glare and allow the use of anti-glare screens, as needed.

2. The Department will provide lighting that is adequate/appropriate for the work setting.

E. Keyboard and Screen

1. Keyboards should be placed on a level and stable surface for normal keying function and be adjustable vertically and horizontally to fit the RN's height. The keyboard and screens will be able to move out of the way for patient care duties and allow line of sight to the patient while charting.

2. Keyboards, in combination with their supporting surface, chairs, carts and other furniture shall permit RNs to adopt and maintain neutral wrist positions.

3. Screens should be easily adjustable for brightness and field of vision of the RN.

4. RNs engaged in continuous computer and/or keyboard use are encouraged to engage in other work duties on a periodic basis (e.g. hourly) to avoid unnecessary eye or wrist strain.

F. Printers

The Department will endeavor to place printers in a manner so that RNs do not have to excessively bend, stoop, or reach to remove printed materials.

## Section 13: Emergency Preparedness

A. The Department shall have an emergency preparedness plan. This plan will publish the chain of command, which will identify a member of the Department who will be physically present for RN direction during all scheduled work hours in each installation. The plan will also cover RN procedures in the event of snow and/or blizzard, fire, earthquake, bomb threat, tornado, flood, hurricane, weapons of mass destruction, or similar locally or nationally declared emergencies. The Department will conduct evacuation drills, normally conducted on a quarterly basis.

B. The Department will provide NNOC, NNU with copies of such plans within thirty days of execution of this contract and as changes occur.

## Section 14: Smoking Cessation Program

A. The Department and NNU are committed to making smoking cessation programs available to each and every RN who wishes to participate in them.

B. The Department will provide nicotine patches or other appropriate medications, in addition to counseling, at no cost to the RN pursuant to VHA Directive 2010-041, Smoking Cessation Benefit for VHA Employees: No-Cost Provision of Nicotine Replacement Therapy.

C. RNs who wish to stop smoking, but who are unable to successfully complete a smoking cessation program, or who have quit smoking but are experiencing related difficulties, may seek additional assistance through Employee Assistance Program (EAP). RN participation in assistance or cessation programs is strictly voluntary.

## Section 15: Wellness Program

A. NNU and the Department agree that recognizing, minimizing, and coping with stress are essential parts of RNs' wellness. Local facilities should consider making stress reduction a part of their wellness program, which can include training and education on stress reduction.

B. RNs who feel they are experiencing harmful levels of job-related stress may contact EAP.

C. At any local facility where a wellness committee or subcommittee exists or is subsequently established, NNU may serve as a member on such committee.

D. The Department and NNU support wellness and initiatives that focus on various activities, which may include: physical activity, weight management, smoking cessation, stress management, healthy lifestyle classes, and nutrition.

E. VHA facilities have the option to allow RNs access to exercise facilities when it does not conflict with patient use.

## Section 16: Use of Insecticides/Chemicals

105

A. The Department is responsible for the safe use of insecticides and chemicals in and around RN work areas. This may include the use of paint, carpet glue, HVAC cleaning agents, and similar construction or maintenance chemicals.

B. Whenever such chemicals are used in the work environment, NNU and RNs will receive advance notice.

C. If a RN has special health care needs which may be affected by the use of certain insecticides and/or chemicals, the RN should immediately notify their supervisor and the Department will work with the RN to address their health needs.

## ARTICLE 27: WORKPLACE VIOLENCE PREVENTION

**Section 1: General**

A. The Department is responsible for maintaining an Occupational Safety and Health (OSH) program. This includes:

   1. Providing safe and healthful work environments for all RNs;

   2. Complying with OSH requirements contained in Federal laws, regulations, executive orders, and VA policies;

   3. Prohibiting reprisals against RNs who exercise their rights under the VA OSH program.

B. VA Directive 7700, VHA Directive 7701, and VHA Handbook 7701.01 or successor document, establishes the Department's workplace violence prevention policy.

C. For informational purposes only, workplace violence such as threats of violence, assault, physical or emotional injury, lateral violence, and non-physical violence such as workplace bullying may include any incidents in which an individual is threatened, verbally or physically assaulted, harassed, injured, or killed.

**Section 2: Workplace Violence Prevention**

A. Workplace violence is an occupational and security issue as well as a potential criminal issue and is not tolerable in the Department.

B. When a RN has been physically assaulted in the workplace and has reported the assault, the Department will take appropriate action to prevent future physical assaults by the perpetrator.

C. The Department will develop, implement and maintain workplace violence and abuse policies. Where not currently in existence, the Department will:

   1. Develop and implement policies and procedures for the awareness and prevention of violence or potential violence and reporting of same including but not limited to; training, environmental design, and emergency response based on the local hazard analysis and the Occupational Safety and Health Administration (OSHA) Guidelines.

107

2. Develop training for RNs on the appropriate process for reporting and documenting workplace violence. This process will minimally include notification of the immediate supervisor, Risk Management, VA Police and NNU. The Department will take action to stop all workplace violence immediately.

3. Provide risk assessments and recommend the appropriate engineering and administrative controls and guidelines to local management. NNU may request to be included in a facility's risk assessment team. This request will be approved unless NNU is a subject of the complaint. Upon completion of the assessment, NNU can request a copy of the team report.

4. Provide periodic training programs on violence assessment, prevention and verbal de-escalation, and reaction to violence for all RNs.

5. Take immediate action to investigate when a RN reports bullying, harassing, and any other negative behavior that violates a RN's right to a safe work environment to the Department.

6. Report any injury or illness to the appropriate agencies and provide the affected RN(s) with medical and psychological services, consistent with Federal law, rule, and government-wide regulation.

7. Assure that all RNs have the right to police protection and enforcement of federal court orders. In cases where there is a non-federal court order of protection, the RN will bring such court order to the VA police to support the RN in this endeavor and throughout the police/court process.

8. Assure that all incidents of workplace violence will be reported to the appropriate facility committee for review and appropriate intervention.

D. NNU will have a designated member on committees or programs associated with workplace violence prevention. Participation in such committees or programs will be on official time.

E. RNs are required to notify VA Police and Security of any suspicion of weapons on Department property.

F. All Department grounds and parking areas including CBOC and any building where RNs work will be well-lighted whenever possible. Upon request, the Department will provide escorts, when available, for RNs to cars on site and to any offsite parking locations.

G. Subject to law, rule, and regulation, the Department will provide communication devices to RNs whose job duties require work outside of the facility.

H. Upon request, affected RNs will be provided with copies of any documents relating to any incident of workplace violence whether the RN is the victim or a witness of the incident, subject to law, rule, and regulation.

**Section 3: RNs Who Have Experienced Workplace Violence**

A. Consistent with Article 27, Safety, Health and Environment, Section 1(D), a RN has a right to decline to perform his/her assigned tasks due to a reasonable belief of imminent danger that could result in death or serious physical harm.

## ARTICLE 28: INVESTIGATIONS

### Section 1: General

A. The term investigation in this section covers routine fact findings and preliminary inquiries by supervisors and other Department officials. The Department has the authority to conduct a formal investigation consistent with VA Directive 0700 and VA Handbook 0700 and Section 2 of this Article.

B. Consistent with the RN Rights Article, Section 4 and pursuant to 5 USC 7114(a)(2)(b) (Weingarten), in any examination of a RN by the Department (or any agency acting as an agent of the Department) in connection with an investigation, the RN has a right to NNU representation if he/she reasonably believes that the examination may result in disciplinary action and NNU representation is requested by the RN.

C. Consistent with the RN Rights Article, Section 4, at the beginning of any actual examination of a RN in connection with any investigation, the Department agrees to provide notice to the RN of his/her right to have an NNU representative present during the examination, if the RN so requests.

D. If the RN requests NNU representation, the Department may delay or reschedule the meeting, if necessary, in order to give NNU an opportunity to be present.

### Section 2: Formal Investigations

A. The process and procedure for conducting a formal investigation, known as Administrative Investigation Boards (AIB) (also known as Administrative Board of Investigation (ABI) and Administrative Investigations (AI)), is established under VA Directive 0700 and VA Handbook 0700.

B. Formal investigations do not include quality assurance documents or information protected by 38 USC 5705, such as those listed in VHA Directive 2008-077; investigations into complaints of discrimination conducted by the Office of Resolution Management pursuant to the regulations of the EEOC; investigations conducted by personnel of the Office of the Inspector General or the Office of the Medical Inspector; investigations by VA police officers conducted pursuant to VA Directive 0730 and VA Handbook 0730; or tort claims investigations conducted by, or under guidance from, the Office of the General Counsel.

110

C. The Department will give consideration to scheduling a RN's AIB testimony during the RN's tour of duty or temporarily changing the RN's tour of duty. If this is not possible, the RN will be properly compensated for his/her time on duty while participating in an AIB.

D. It is the responsibility of the Department to ensure that employees performing an AIB are sufficiently trained.

E. The Department will inform NNU, in advance, if a RN is the subject of an AIB.

F. Upon request, a RN has the right to NNU representation during his/her AIB testimony. If a RN is the subject of an AIB, he/she will be informed of the right to local NNU representation prior to the questioning of the RN.

G. If the RN is the subject of the investigation, they may request and receive a written copy of the Charge Letter of the AIB.

H. Upon request, a copy of the RN's testimony will be provided to the RN and/or the RN's representative.

I. Once the AIB is certified as complete, the Department will provide written notice to the subject of the AIB or any RN who provided testimony that the investigation is complete. If NNU represents the subject of the investigation or any RN witnesses, it will also be provided with written notification that the AIB is complete. Upon request, if the union represents the subject of the investigation, it will be furnished with a complete copy of the AIB report, including exhibits and attachments referenced therein. If the RN who is a subject of the investigation is not represented by the union, upon request, the RN will be furnished with a complete copy of the AIB report, including exhibits and attachments referenced therein. Release of the Report is subject to Freedom of Information Act (FOIA), the Privacy Act and laws and regulations pertaining to confidentiality of medical records. For specific information regarding limitations on provision of records, see VA Handbook 0700, Chapter 4, Section B(5).

J. Consistent with VA Handbook 0700, a RN will be given a written notice of witness obligations, protections and Privacy Act matters prior to the start of the investigation.

K. The NNU representative in attendance at an AIB is entitled to take an "active role," which generally includes clarifying questions asked of the RN, assisting the RN in producing relevant information, and consulting with the RN. However, the NNU representative may not disrupt or delay the AIB, and may not answer for the RN.

## ARTICLE 29: SURVEILLANCE AND MONITORING

**Section 1; General Provisions**

A. This Article applies to computer monitoring (including but not limited to keystroke monitoring, email access monitoring, and browser history retrieval), and individual or workplace monitoring (including but not limited to video or audio monitoring, covert surveillance, proximity cards, or other devices or technology attached to or directed at the person, including the ID badge, clothing, or uniform of a RN, or at particular areas where RNs work).

B. The Department's right to determine its internal security practices under 5 USC 7106(a)(1) includes the right to determine the policies and practices that are part of its plan to secure or safeguard it's personnel, physical property, and operations against internal and external risks. Surveillance of work areas is conducted for safety and security reasons.

C. The use of covert cameras to achieve internal security objectives is a right reserved to the Department. If the Department uses covert or hidden surveillance during an investigation, and a proposed disciplinary/adverse action results, the RN will be given upon request and at no cost, two copies of the evidence file including any surveillance media utilized to support the charge(s).

D. There will be no monitoring of RNs in rest rooms, locker rooms, staff lounges, or other areas where a RN would have a reasonable expectation of privacy unless the Department has a reasonable suspicion of work-related misconduct. In such cases, monitoring will be narrowly tailored to the extent feasible to capture the suspected misconduct.

E. Department authorized employees involved in monitoring and surveillance will ensure the proper handling and release of protected information gathered in any monitoring or surveillance activities. Additionally, the Department will use such information only for legitimate Department purposes.

F. No provision of this Article precludes the routine security monitoring by the Police Department of hallways, corridors, and entrances in and to the Medical Center.

**Section 2: Computer/Individual/Workplace Monitoring and Surveillance**

A. When the Department monitors government information resources, it will do so consistent with VA policy, including but not limited to VA Handbook and Directive

6500 or successor document. Department officials with a need to know may access electronic communications.

B. This Article shall not preclude the introduction of valid information, incidentally obtained through computer, individual and workplace monitoring to support appropriate disciplinary action.

C. NNU representatives will be authorized access to and provided any data obtained through computer or workplace monitoring that is reasonably available and necessary to represent bargaining unit RNs pursuant to 5 USC 7114(b)(4).

D. Where a duty to bargain is triggered under the Statute, NNU will be notified in advance of any new or changed monitoring or surveillance programs and be given the opportunity to bargain as appropriate.

E. Data collected from current or future systems including, but not limited to: call centers, patient call systems, patient bed monitoring systems, hand wash monitors, nurse location monitors, nurse communication system, or Bar Code Medication Administration (BCMA) systems has a main purpose of improving patient care and identifying systems issues. This data may be used to support appropriate disciplinary action consistent with the Discipline Article.

F. A search of a RN's person and personal items owned by the RN, such as handbags, briefcases, backpacks, or other like material, may be permitted only on the basis of reasonable suspicion based on specific, objective evidence and/or reasonable inferences drawn from the evidence of work-related misconduct or criminal activity.

G. RNs who are the subject of a search for misconduct-related reasons will be afforded their Weingarten rights, specifically the right to Union representation. The Department will take steps to protect the RN's privacy and avoid any undue embarrassment during the search.

H. If the RN requests Union representation, the search will be postponed until a Union representative can be present. However, when VA Police and Security need to perform an immediate search in order to secure or prevent tampering with evidence, the right to representation will not prevent the Department from proceeding.

I. RNs will not suffer loss of pay or leave or be disciplined for not reporting to work on time due to delays attributed to nonrecurring security inspections.

J. Monitoring, surveillance, and/or searches of NNU's office, workplace, lockers, etc., may be permitted only based on specific, objective evidence of workplace misconduct and/or reasonable inferences of evidence of criminal activity. If NNU's office, workplace, lockers, etc., is subject to a criminal search, a Union

official will be present. However, when VA Police and Security need to perform an immediate search in order to secure evidence or prevent tampering with evidence, the Department may proceed if a Union official is not immediately available.

K. In an effort to protect the right of the RN to meet with their NNU representative in private, the entrances or exits to the NNU office(s) will not be monitored, except for reasonable suspicion of criminal activity.

**Section 3: Call Centers**

A. The primary purpose of monitoring call center conversations is to ensure complete and accurate information is courteously provided to the customer, to retrieve performance data, and to determine training requirements.

B. The Department is not currently using call center monitoring for timekeeping purposes. The Department will notify NNU and meet all statutory bargaining obligations prior to changing this practice.

C. The Department will notify the RN when monitoring data has been collected for the purpose of evaluating performance. If the monitoring data is actually used for evaluating performance, the RN and NNU, upon written request, will receive a copy of the data.

## ARTICLE 30: NON-DISCIPLINARY, DISCIPLINARY AND MAJOR ADVERSE ACTIONS

NNU and the Department recognize that under 38 USC 7422, collective bargaining concerning employees appointed under Title 38, including RNs, may not "cover, or have any applicability to, any matter or question concerning or arising out of (1) professional conduct or competence, (2) peer review, or (3) the establishment, determination, or adjustment of RN compensation under this title." "Professional conduct or competence" means "direct patient care and/or clinical competence." NNU and the Department also recognize that disciplinary and major adverse actions taken against RNs relating to professional conduct or competence are excluded from bargaining, including any grievance procedure under this contract, pursuant to 38 USC 7422. Nothing set forth in this Article will limit or infringe upon any such 38 USC 7422 exclusion, nor shall any RN be prevented from exercising any rights to appeal disciplinary or adverse actions to appropriate bodies, including but not limited to the Disciplinary Appeals Board and the VA Administrative Grievance Process.

### Section 1: General

A. NNU and the Department recognize that the public interest requires the maintenance of high standards of conduct which will promote quality patient care. NNU and the Department agree that no bargaining unit RNs will be subject to disciplinary or major adverse action except for just cause. The parties further agree to the principle of progressive discipline, which is designed to correct and improve RN conduct rather than impose punishment. Disciplinary or major adverse actions will be taken when other supervisory techniques, including but not limited to, coaching, mentoring and education, have failed to correct a given problem, or would be inappropriate. This is not intended to infringe upon management's right to discipline as appropriate.

B. Disciplinary and major adverse actions will be taken for such cause as will promote the efficiency of the service. The Department bears the burden of proving by a preponderance of evidence the charges that form the basis for the action.

C. The provisions of this Article are intended to be consistent with applicable laws, regulations and policy.

D. Disciplinary and major adverse actions will be impartial, taken with due process, and timely based on the circumstances and complexity of each case. Actions will not be based on gossip or unsubstantiated rumors. When an incident occurs which may result in a potential disciplinary or major adverse action, inquiry will be made into the incident as soon as practicable to obtain the facts and determine what action, if any, to initiate. If action is initiated, it will be taken as soon as practicable.

E. After determining the facts of the case, the deciding official should consider any extenuating or mitigating circumstances and/or contributing factors surrounding the offense, including but not limited to, the RN's past work record, awards and recognitions, whether the offense was intentional, technical, or inadvertent and potential for the RN's performance improvement. Actions taken should be consistent with penalties for like offenses, with due consideration of any extenuating circumstances.

F. Officials involved in taking a disciplinary or major adverse action against a RN must observe the prohibitions against improper "ex parte" communications. Department officials may communicate with each other during the decision-making process; however, it is improper for an interested party (e.g., supervisor, proposing official), to pressure the deciding official into making a particular decision. Such communications may support reversal of the action upon appeal.

## Section 2: Definitions

For informational purposes only, the following definitions in VA Handbook 5021 are provided:

A. A disciplinary action is defined as an adverse action, other than a major adverse action, which includes admonishment and/or reprimand based on conduct or performance.

B. A major adverse action is a suspension (including indefinite suspension), transfer, reduction in grade, reduction in basic pay, or discharge taken against a RN for misconduct or performance.

C. "Professional conduct or competence" is a question that involves direct patient care and/or clinical competence. Clinical competence includes issues of professional judgment.

## Section 3: Removal of Disciplinary Actions

A. Admonishments and reprimands may be removed from a RN's Merged Record Personnel Folder and/or electronic Official Personnel Folder (eOPF) after a six-month period if the purpose of the discipline has been served. If a RN requests removal of such actions within the above time frames, the Department may comply with such request. A grievance may not be filed based on a supervisor's decision not to remove the action earlier than the time frames set forth above.

B. An admonishment will be removed from a RN's eOPF after two years and a reprimand will be removed after three years. However, in cases of patient abuse, an admonishment or reprimand may be retained in the RN's eOPF indefinitely.

116

C. Management should consider the recency of any past disciplinary actions that form part of the basis for the proposed action. Consideration should be given to the use of any actions which are more than three years old, even if they have remained in the personnel folder. They should be examined closely to ensure their relevance to the proposed action before they are used to support such action.

## Section 4: Non-Disciplinary Actions

Performance Improvement Plans (PIPs), remedial training, and administrative reassignments are not considered to be disciplinary actions but may be used to support disciplinary or major adverse actions. A written counseling for conduct or performance may only be kept or used to support other personnel actions for up to six months. If used to support disciplinary action, written counselings will be retained in the evidence file as consistent with General Records Schedules.

## Section 5: Processing Proposed Disciplinary Actions and Major Adverse Actions

A. Disciplinary Actions

1. In general, meetings to merely deliver a letter of proposed action or final decision for discipline do not require the RN to have NNU representation. However if the supervisor requires additional Department representatives to deliver the notice or letter the RN will be entitled to NNU representation. In addition, if there is to be any discussion or if any discussion begins management will immediately stop the meeting and notify the RN of their right to NNU representation.

2. Timeframes

   a. The Department shall propose in writing to a full-time RN any disciplinary action prior to issuance. The aggregate period for written notice, employee reply and final decision shall not exceed 15 business days for a full time RN. The notice will state specific reasons for the proposed action. The full-time RN shall be given the opportunity to use up to eight hours of duty time to review the evidence used to support the proposed action and prepare the reply. Additional time may be granted on a case-by-case basis. If the full-time RN requests additional official time beyond what was originally approved, the request may be honored if it is reasonable. The full-time RN will be given two copies of the proposed action and the full-time RN may furnish one copy to NNU.

   b. The Department shall propose in writing to a part-time RN any disciplinary action prior to issuance. A part-time RN against whom an admonishment or reprimand is proposed is entitled to 14 days advance written notice, except when the crime provision has been invoked. The notice will state

specific reasons for the proposed action. The part-time RN shall be given the opportunity to use up to eight hours of duty time to review the evidence used to support the proposed action and prepare the reply. Additional time may be granted on a case-by-case basis. If the part-time RN requests additional official time beyond what was originally approved, the request may be honored if it is reasonable. The part-time RN will be given two copies of the proposed action and the part-time RN may furnish one copy to NNU.

3. When a RN requests to use allotted duty time for review of evidence and preparation of defense for a proposed disciplinary action, the Department will make every effort to promptly release the RN early in the timeline process. The RN will not generally be denied release, in order to comply with the limited timelines for the employee's response and completion of the process. Data/Information requests to support the response to the charges will be processed as expeditiously as possible so as to not impede the RNs response.

4. If a proposed disciplinary action is contemplated, the evidence file must be assembled and two hard copies and an electronic copy will be provided to the RN at the time the proposed notice is issued. The file must contain the evidence upon which the notice of proposed action is based, and which supports the charges in that notice. Evidence will be developed impartially and an effort will be made to resolve any conflicting statements. Material which cannot be disclosed to the RN or to NNU may not be used to support a disciplinary action. If a proposed disciplinary action is based on evidence obtained by an Administrative Investigation Board (AIB), the evidence file will include all AIB evidence related to the proposed charge(s), both aggravating and mitigating, the AIB report, and the transcripts of related witness statements.  If the materials to be provided include information protected by HIPAA or the Privacy Act, such information shall be redacted only to the extent required by law. The parties acknowledge that disciplinary actions involving questions of professional conduct or competence are excluded from bargaining pursuant to 38 USC 7422 and nothing contained herein limits that exclusion.

5. Additional evidence acquired after the issuance of a notice of proposed action may be added without necessitating reissuance of the notice except when the additional evidence forms the basis for initiating new reasons for proposing the action, or it is determined that a different action should be proposed. Two copies of any material added to the evidence file must also be provided.

6. RN Response Period

   a. The full-time RN and/or NNU may respond orally and/or in writing as soon as practical but no later than 7 business days from issuance of the

proposed action notice. The response may include written statements of the persons having relevant information and/or other appropriate evidence. To the extent practicable, the employee's response will be mutually scheduled with the full-time RN and/or NNOC NNU.

b. The part-time RN and/or NNU may respond orally and/or in writing as soon as practical but no later than 10 calendar days from receipt of the proposed action notice. The response may include written statements of the persons having relevant information and/or other appropriate evidence. If the Department official is not able to hear the oral reply within the 10 calendar day period, this period will automatically be extended until the Department official is available to meet. To the extent practicable, the employee's response will be mutually scheduled with the part-time RN and/or NNOC NNU.

7. For Part-time RNs, extensions for replying to proposed admonishments and reprimands may be granted based on individual circumstances. This time frame may be extended by mutual agreement in writing prior to the expiration of the time frame.

8. In responding to a proposed admonishment or reprimand, the RN may request NNU representation.

B. Major Adverse Actions

1. In general, meetings to merely deliver a letter of proposed action or final decision for major adverse action do not require the RN to have NNU representation. However if the supervisor requires additional Department representatives to deliver the notice or letter the RN will be entitled to NNU representation. In addition, if there is to be any discussion or if any discussion begins management will immediately stop the meeting and notify the RN of their right to NNU representation.

2. Time Frames

a. The Department shall propose in writing to a full-time RN any major adverse action prior to issuance. The aggregate period for written notice, employee reply and final decision shall not exceed 15 business days for a full time RN. The notice will state specific reasons for the proposed action. The full-time RN shall be given the opportunity to use up to eight hours of duty time to review the evidence used to support the proposed action and prepare the reply. Additional time may be granted on a case-by-case basis. If the full-time RN requests additional official time beyond what was originally approved, the request may be honored if it is reasonable. The full-time RN will be given two copies of the proposed action and the full-time RN may furnish one copy to NNU.

119

b. The Department shall propose in writing to a part-time RN any major adverse action prior to issuance. A part-time RN against whom an any major adverse action is proposed is entitled to 14 days advance written notice, except when the crime provision has been invoked. The notice will state specific reasons for the proposed action. The part-time RN shall be given the opportunity to use up to eight hours of duty time to review the evidence used to support the proposed action and prepare the reply. Additional time may be granted on a case-by-case basis. If the part-time RN requests additional official time beyond what was originally approved, the request may be honored if it is reasonable. The part-time RN will be given two copies of the proposed action and the part-time RN may furnish one copy to NNU.

3. When a RN requests to use allotted duty time for review of evidence and preparation of defense for a proposed disciplinary action, the Department will make every effort to promptly release the RN early in the timeline process. The RN will not generally be denied release, in order to comply with the limited timelines for the employee's response and completion of the process. Data/Information requests to support the response to the charges will be processed as expeditiously as possible so as to not impede the RNs response.

4. If a proposed major adverse action is contemplated, the evidence file must be assembled and two hard copies and an electronic copy will be provided to the RN at the time the proposed notice is issued. The file must contain the evidence upon which the notice of proposed action is based, and which supports the charges in that notice. Evidence will be developed impartially and an effort will be made to resolve any conflicting statements. Material which cannot be disclosed to the RN or to NNU may not be used to support a disciplinary action. If a proposed disciplinary action is based on evidence obtained by an Administrative Investigation Board (AIB), the evidence file will include all AIB evidence related to the proposed charge(s), both aggravating and mitigating, the AIB report, and the transcripts of related witness statements. If the materials to be provided include information protected by HIPAA or the Privacy Act, such information shall be redacted only to the extent required by law. The parties acknowledge that disciplinary actions involving questions of professional conduct or competence are excluded from bargaining pursuant to 38 USC 7422 and nothing contained herein limits that exclusion.

5. Additional evidence acquired after the issuance of a notice of proposed action may be added without necessitating reissuance of the notice except when the additional evidence forms the basis for initiating new reasons for proposing the action, or it is determined that a different action should be proposed. Two copies of any material added to the evidence file must also be provided.

6. RN Response Period

    a. The full-time RN and/or NNU may respond orally and/or in writing as soon as practical but no later than 7 business days from issuance of the proposed action notice. The response may include written statements of the persons having relevant information and/or other appropriate evidence. To the extent practicable, the employee's response will be mutually scheduled with the full-time RN and/or NNOC NNU.

    b. The part-time RN and/or NNU may respond orally and/or in writing as soon as practical but no later than 10 calendar days from receipt of the proposed action notice. The response may include written statements of the persons having relevant information and/or other appropriate evidence. If the Department official is not able to hear the oral reply within the 10 calendar day period, this period will automatically be extended until the Department official is available to meet. To the extent practicable, the employee's response will be mutually scheduled with the part-time RN and/or NNOC NNU.

7. Part-time RNs, extensions for replying to proposed major adverse actions may be granted based on individual circumstances. This time frame may be extended by mutual agreement in writing prior to the expiration of the time frame.

8. In responding to a proposed major adverse action, the RN may request NNU representation.

## Section 6: Final Written Decision of Disciplinary and Major Adverse Actions

A. Decision Dates

1. For full time RNs, the Department official will issue a written decision as early as practicable, but no later than 15 business days after issuance of the proposed action.

2. For part-time RNs, The Department official will issue a written decision as early as practicable, but no later than 21 days after receipt of any part-time RN response, or 21 days from when the response was due if no response was made.

B. The written decision will contain the following information:

1. A statement of whether any of the charges sustained arose out of a question of professional conduct or competence;

2. A statement that consideration has been given to all evidence developed, including the RN's reply or replies. If the RN replies both orally and in writing, both must be mentioned;

3. A statement of the deciding official's determination regarding which charges, if any, in the advance notice were sustained, and which charges, if any were not sustained;

4. If a record of prior disciplinary actions was cited in the advance notice, the decision will indicate how the past record, as cited in the advance notice, was taken into consideration in determining the proper action; and,

5. A statement concerning the RN's rights to file a grievance or appeal, and the time limit within which it must be filed. In addition, a statement advising the RN that a further explanation of the RN's appeal rights may be obtained by consulting the local HR office or NNU. A copy of the Disciplinary Appeals Board (DAB) policy and appeal process will be given to the RN if a DAB is applicable.

C. For Part-time RNs, if the action imposed is a major adverse action, the effective date will be at least 30 days after the date of the proposed action.

D. Effective Dates

    a. For full–time RNs, if the action is a suspension, the inclusive dates of the suspension will be stated.

    b. For part–time RNs, the appropriate Department official will issue the written decision on a major adverse action at least five days prior to the effective date of the action. If the action is a suspension, the inclusive dates of the suspension will be stated.

E. The RN will be given two copies of the final written decision and the RN may furnish one copy to NNU.

F. The final written decision will advise the RN how long the disciplinary action will be maintained in their eOPF. Upon the RN's request, the Department will schedule a meeting with the RN to discuss the decision. If the RN elects to have a NNU representative present, the RN will be given a reasonable amount of time to secure a representative.

## Section 7: Investigations

A. The Department will investigate an incident or situation as soon as practicable to determine whether or not discipline is warranted.

B. In an investigation, reasonable efforts will be made to reconcile conflicting statements. In all cases, the information obtained will be documented.

C. During the advance notice period of a proposed action, it may be necessary to remove the RN from the worksite. In those instances where it is determined that the RN's continued presence at work during the advance notice period might pose a threat to the RN or others, result in loss of or damage to Government property, or otherwise jeopardize legitimate Government interests, the following alternatives can be considered.

D. Such alternatives include, but are not limited to, reassignment or detailing the RN to other duties to eliminate concerns arising out of the proposed action. In such instances, the Department will take into consideration the impact of the resulting assignment to the RN as well as the relationship between the temporary assignment and their previous work assignment.

E. A preliminary inquiry is used to cover informal day to day inquiry by the supervisor. Ordinarily, a preliminary inquiry will be made by the appropriate line supervisor. A further formal investigation under VA Handbook 0700 may be warranted depending on the nature and seriousness of the incident. In either instance, the RN is entitled to union representation.

## ARTICLE 31: ALTERNATIVE DISPUTE RESOLUTION (ADR)

A. The Department and NNU acknowledge that the use of ADR problem solving methods, which seek early informal resolution of disputes, helps to foster a good labor/management relationship. ADR will only be used by mutual agreement.

B. The use, nature and implementation of the ADR program is encouraged by NNU and the Department where appropriate and will be determined at the appropriate level.

C. ADR resolutions shall not set precedent unless mutually agreed to by NNU and the Department. Resolutions under ADR cannot conflict with or supersede collective bargaining agreements.

D. The Department recognizes that NNU is a vital component to development, implementation and assessment of an overall effective VA ADR Program and is encouraged to participate in this endeavor. All local ADR programs shall be jointly designed and implemented in good faith with NNU and include the use of mutually agreed upon neutral third parties. Any ADR program will be designed to resolve conflicts and disputes in a more timely, less costly and less adversarial manner than litigation or administrative adjudication. RN participation in the ADR process must be voluntary.

E. Mediators and facilitators shall be adequately trained. Training for bargaining unit facilitators for the Department's ADR program will be coordinated and/or provided at the local level and such training costs will be paid by the Department. NNU will be involved in the selection of bargaining unit RNs to be trained as mediators and facilitators.

F. NNU and the Department will have the right to participate in all stages of the ADR process. Disputes settled by ADR are final when a settlement is written, signed and reviewed by NNU to ensure that the settlement is not in conflict with the contract. Once a bargaining unit RN elects to use the ADR process, NNU has a right to participate. This right is in addition to the RN's right to Union representation.

G. It is agreed by all parties that the ADR process is confidential and should not be shared with anyone without a need to know. All settlement agreements are binding on NNU and the Department.

H. ADR methods may be used prior to or during a grievance/arbitration or statutory appeal. In the use of ADR processes, contractual time frames will be stayed by mutual agreement.

## ARTICLE 32: EQUAL EMPLOYMENT OPPORTUNITY

### Section 1: General

A. The Department and NNU affirm their commitment to the policy of providing equal employment opportunities to all RNs and to prohibit discrimination because of race, color, religion, sex (including sexual harassment, gender identity, transgender status, sexual orientation, and pregnancy), national origin, age (40 or older), genetic information, marital status, parental status, political affiliation, or disability. Retaliation based on prior Equal Employment Opportunity (EEO) activity is prohibited. RNs' EEO rights are not set or altered by any provision of this Article.

B. The Department's EEO Program promotes equal employment opportunity and diversity in every aspect of the Department's personnel policy and practice in accordance with applicable law and government-wide rules and regulations.

C. The Department agrees to provide RNs with electronic access to information describing the discrimination complaints procedures.

D. The Department agrees to post the telephone number of the Office of Resolution Management (ORM), local EEO representative and VISN EEO representative, if any, on appropriate bulletin boards, electronically and online.

E. NNU may designate a representative for membership on any local EEO Advisory Council/Committee.

F. For information regarding the reasonable accommodation process, see Article 34, Reasonable Accommodations for RNs with Disabilities.

### Section 2: Equal Employment Opportunity Program

The Department's EEO Program shall be administered to promote equal employment opportunity in every aspect of the Department's personnel policy and practice. The program shall be administered in accordance with applicable law and government-wide rules and regulations, including but not limited to Title VII of the Civil Rights Act of 1964, as amended; the Age Discrimination in Employment Act of 1967, as amended, the Rehabilitation Act of 1973, as amended; the Equal Pay Act of 1963, the Lilly Ledbetter Fair Pay Act of 2009, and the Genetic Information Nondiscrimination Act of 2008.

### Section 3: Complaints

A. Any RN who wishes to file or has filed an EEO complaint will not be subjected to coercion, interference, dissuasion, and/or retaliation of any kind.

125

B. RNs will pursue their complaints through established Department procedures.

C. If the RN elects to file a complaint, he/she must choose to file the complaint under either the negotiated grievance procedure, a prohibited personnel practice charge, or the statutory EEO process, but only one avenue of redress may be selected. If there is an established ADR procedure, and ADR is elected during the pre-complaint processing period, the EEO counseling period may be extended in accordance with 29 CFR 1614.105.

D. The RN may elect to use an existing ADR process; however, the RN's rights to pursue an EEO complaint are not waived during the ADR process. At the same time, the RN's responsibilities to comply with all requirements of the EEO process (e.g., time limits and points of contact) must be followed. In the event that ADR is terminated for any reason, the RN may continue to pursue an informal resolution of the matter with the EEO counselor, or may request a Notice of Final Interview from the EEO Counselor. Guidance on the requirements of discrimination complaint appeals will be available in the appropriate administrative office.

## Section 4: Reports

A. At the National level, the Department will provide the NNU with a copy of the National Affirmative Employment Plan and any other reports submitted to the Equal Employment Opportunity Commission (EEOC), including statistical data, as these reports are generated.

B. Upon request by the local NNU each facility or installation preparing an Affirmative Employment Plan, and any other EEO-related reports, will provide a copy of the same, including statistical data, to the appropriate local NNU representative.

C. When the EEO Advisory Committee makes EEO related materials available electronically, NNOC NNU, through their member/representative and one alternate, will be provided access to the record keeping system.

## Section 5: Special Emphasis Programs/EEO Advisory Committees

The Department will request nominations from the local NNU and the local NNU unit may submit names, for consideration by the Department to serve as Special Emphasis Program Coordinators.

## Article 33: Reasonable Accommodations for RNs with Disabilities

### Section 1: General

A. In accordance with Section 501 of the Rehabilitation Act of 1973, as amended, government-wide rules and regulations and VA policy, including but not limited to VA Handbook 5975.1, the Department is committed to affirmative action for the employment, placement, and advancement of qualified RNs with disabilities.

B. The Department shall provide reasonable accommodations to qualified individuals with disabilities to allow them to fully participate in the application process, perform essential job functions, and enjoy equal benefits and privileges of employment, in accordance with all applicable laws, regulations, and VA policies, unless to do so would cause undue hardship to the Department.

C. RNs may request NNU assistance and/or representation at any time during the reasonable accommodation process.

D. When a duty to bargain is triggered by the Statute after the Department approves reasonable accommodation to a RN, the Department will bargain appropriate arrangements and procedures.

### Section 2: Definitions

A. Individual with a disability: a person who has a physical or mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded as having such impairment.

B. Qualified individual with a disability: an individual with functional limitation who, with or without reasonable accommodation, can perform the essential functions of the position without being a direct threat to the health or safety of the individual or others. A "qualified individual with a disability" must satisfy the requisite skill, experience, education, and other job-related requirements of employment for the position the individual holds or desires.

C. Reasonable accommodation: a change in the work environment or in work processes that enables a qualified individual with a disability to enjoy equal employment opportunities. The accommodation must be effective in meeting the needs of the individual by addressing the barrier created by the functional limitations.

D. Undue hardship: the significant difficulty or expense incurred or anticipated, should the organization provide a particular accommodation. The following criteria are used to determine undue hardship:

1. Nature and cost of the accommodation;

2. Overall size of the organizational unit with respect to the number of employees, facilities, and size of the budget;

3. Type of operation, including composition and structure of the workforce; and,

4. The impact of the accommodation on the operation of the organization, including the impact on the ability of other employees to perform their duties and the impact on the organization's ability to conduct business.

E. Additional definitions regarding the reasonable accommodation process can be found in VA Handbook 5975.1, Paragraph 4.

### Section 3: Reasonable Accommodation Guidance

A. Consistent with VA policy, the Department shall process a RN's request for reasonable accommodation and provide accommodations as soon as possible, normally within 30 calendar days from the date the request was received. The parties recognize that individual accommodations will be determined on a case-by-case basis, taking into consideration the RN's specific disability, the RN's suggestions for reasonable accommodations, existing limitations, the work environment, any threat to the health and safety of any employee, and undue hardship imposed on the operation of the Department's program.

B. Reasonable accommodation for a non-probationary RN may include reassignment to a funded vacant position for which he/she is otherwise qualified, consistent with EEO and VA regulations. Reassignment will be considered only if there are no other accommodations available that will enable the RN to perform the essential functions of his/ her current job.

C. The Department recognizes that job restructuring may constitute a reasonable accommodation such as reallocating or redistributing marginal job functions that a RN is unable to perform because of a disability or altering when and/or how an essential or marginal function is performed. The parties recognize, however, that the Department has no duty to eliminate or reallocate the essential functions of a position as a reasonable accommodation.

D. The parties agree that in many cases, changes in the work environment and other accommodations enable RNs with disabilities to more effectively perform their job duties. An active interaction and discussion between the RN, NNU (if requested by the RN) and the Department offers the best opportunity to reach agreement on a reasonable accommodation to meet the RN's needs, even if the accommodation is not the specific request. Alterations and accommodations may include, but are not limited to, the following:

1. Rearranging files or shelves;

2. Widening access areas;

3. Maintaining hazard-free pathways;

4. Raising or lowering equipment;

5. Moving equipment controls from one side to the other, or modifying them for hand or foot operations;

6. Installing special holding devices on desks, benches, chairs or machines;

7. Providing qualified interpreters for the hearing impaired; and,

8. With respect to the modernized systems environment, examples of accommodations may include:

   a. The surface that holds the terminal will be adjusted to a level suitable to the RN's needs;

   b. The keyboard will have "light touch," guards, and other adaptive devices that will be considered;

   c. Visually impaired RNs will be permitted to label "home" keys;

   d. Operational and training materials will be available in Braille;

   e. Lap trays will be considered;

   f. Computer based voice-output systems or computer screen enlargers or other appropriate devices will be provided for visually impaired RNs;

   g. Hardware and software will be configured to accommodate color blindness (blinking cursor, highlighting);

   h. Printer switches will be available in "light touch" and located in an easily accessible location;

   i. Sight adaptive devices for medication administration; and,

   j. Adaptive devices for medication carts

E. RNs may be provided assistive devices if the Department determines that the use of the equipment is necessary to perform official duties. Such equipment

does not cover personal items which the employee would be expected to provide such as hearing aids or eye glasses.

F.  The Department facilities shall be accessible to RNs with disabilities.

G.  The Department will be liberal in granting leave to accommodate the disabling condition of RNs. For example:

    1.  Leave without pay may be granted for illness or disability; and,

    2.  Sick leave can be appropriately used by a RN with a disability (who uses prosthetic devices, wheel chairs, crutches, guide dog, or other similar type devices) for equipment repair or guide dog training or medical treatment.

H.  The Department will provide training to RNs with disabilities on the same basis as to other RNs consistent with the Professional Development and Education Article of this Contract. Once an RN is selected for training, the Department will provide reasonable accommodations to the RN to attend and complete the training. It is the intent of the Department to provide on-the-job training opportunities to qualified RNs with a disability on the same basis as other RNs consistent with operational needs.

I.  For the purpose of continuing to provide reasonable accommodations for hearing-impaired RNs, the Department agrees to provide interpreter services, auxiliary aids or assistive technologies, as appropriate, for those RNs who seek Union assistance and/or representation for their individual concerns. To the extent possible, interpreter services should be arranged in advance unless the RN wants to retain confidentiality.

J.  To provide RNs with disabilities an equal opportunity to perform official business travel, certain additional travel expenses necessarily incurred to reasonably accommodate the RNs disability may be reimbursed consistent with the Federal Travel Regulations.

K.  RNs with disabilities may, where appropriate as a reasonable accommodation, utilize work-at-home accommodations, flexi-place work setting or Telework.

## ARTICLE 34: WORKERS' COMPENSATION

### Section 1: General

A. A RN's entitlement to benefits under the Federal Employee Compensation Act (FECA) as administered by the Department of Labor (DOL) depends on his/her meeting the criteria set by Federal statutes and regulations, including 5 USC 8101, et seq. and 20 CFR Parts 1-25. This Article is intended to provide RNs with a general overview of the FECA processes. However, RNs' rights to workers' compensation benefits are not set or altered in any way by any provision of this Article.

B. In accordance with the FECA, when a RN suffers or alleges a work related illness or injury, the appropriate Department official will inform the RN of the following:

   1. The right to file for workers' compensation benefits;

   2. The types of benefits available;

   3. The procedure for filing claims;

   4. The option to use compensation benefits, if approved, in lieu of sick or annual leave; and,

   5. The option to use continuation of pay (COP) for traumatic injuries in lieu of sick or annual leave.

C. The DOL's Office of Workers' Compensation (OWCP) is responsible for decisions on workers' compensation claims. The Department is responsible for completing and forwarding OWCP forms and related documentation in accordance with DOL regulations.

   1. RNs with pending workers' compensation claims are encouraged to discuss their questions about the timely filing of their claim with the local facility employee responsible for processing of OWCP claims. The Department will discuss any such concerns with the RN.

   2. After this discussion, if the RN has unresolved concerns regarding the Department's failure to forward any claim forms or related paperwork to OWCP, the RN may request, in writing, a written response to their outstanding concerns, which the Department will provide in a timely manner.

D. NNU will have access to the ASISTS program for tracking injuries at all facilities. Upon request, the Department will notify NNU of the number of RNs and their location on light duty in a work unit due to an on-the-job injury.

E. The Department will maintain a responsible OWCP program in accordance with DOL implementing regulations and other applicable laws, rules, and regulations.

**Section 2:** **FECA Definitions Provided for Informational Purposes Only**

A. Traumatic injury is defined as a wound or other condition of the body caused by external force, including stress or strain. The injury must be identifiable by time and place of occurrence and member of the body affected and must be caused by a specific event or incident or series of events or incidents within a single workday or tour of duty. A traumatic injury also includes damage to or destruction of prosthetic devices or appliances.

B. Occupational Disease/Illness is defined as a condition produced in the work environment over a period longer than a single workday or tour of duty. It may result from systemic infection, repeated stress or strain, exposure to toxins, poisons, or fumes, or other continuing conditions of work.

C. Form CA-1 is the appropriate form for reporting a traumatic injury.

D. Form CA-2 is the appropriate form for reporting an occupational disease or illness.

E. Form CA-16 authorizes an injured RN to obtain examination and/or treatment from a physician for an on-the-job injury.

F. Form CA-17 Duty Status Report is used to report the duty status of the RN, including when placed in a limited duty status, etc.

G. Form CA-20 is the Medical Report Form.

**Section 3: Procedure for Filing Claims for Workers' Compensation**

A. As soon as/if possible after experiencing a job related injury or illness, the RN should contact his/her supervisor and provide hand-off communication to another RN.

B. The Department shall, at the time the injury is reported, assure that the RN is provided the proper forms and assist the RN in filling them out. The Department shall provide the RN with copies and forms as needed.

C. The appropriate sections of the forms CA-1 (Traumatic Injury) or CA-2 (Occupational Disease) should be filled out by the RN electronically and given to the supervisor as soon as possible, but not later than 30 calendar days from the date of the occurrence. If the RN is incapacitated, this action may be taken by someone acting on his/her behalf in accordance with existing regulations. An

132

alternate means of notification of rights and filing will be provided when electronic submission is not possible or electronic information is not available.

D. The Department agrees to post a notice in centralized areas where RNs gather, advising RNs of the appropriate office location for filing workers' compensation claims. This notice will include office telephone numbers for obtaining information and assistance relevant to workers' compensation claims. The Department agrees to provide access to information on FECA procedures available through electronic means. Additional specific information on FECA benefits is available at http://www.dol.gov/owcp/dfec/.

E. The Department will not request a RN to release their medical records and/or personally identifiable information except to the extent required to process the RN's claim. This release will be specific to the injury/illness claimed. The RN will be informed of and afforded the opportunity to discuss the release of records with NNU prior to submitting the release.

F. When the RN has elected NNU representation in writing, the Department will give that NNU representative notice within a reasonable time frame of when a RN's claim has been approved or denied.

G. A RN has the initial right to select a provider or physician of his/her choice to provide necessary treatment. Whenever possible, the RN will be provided a CA-16 (Authorization for Examination and/or Treatment) or successor document within four hours. When it is not possible, the Department will authorize medical treatment by telephone and send the completed form to the provider or physician within 48 hours.

H. The DOL provides the online medical provider search tool. Upon request, the Department will assist the RN in accessing and using the list. The Department cannot assist the RN in selecting a provider or physician. The fact that a provider or physician is listed in no way constitutes the Department's endorsement of the provider or physician or their services.

I. The responsible Department official should complete the Department's portion of the CA-17 or successor document by describing the physical requirements of the RN's job and noting the availability of any light or limited duty. The provider or physician uses this information in determining what, if any, work restrictions are needed. The RN must use this form each and every time they visit the provider or physician. The form is returned to the supervisor after completed by the provider or physician. The responsible Department official may send the form to the provider or physician at reasonable intervals (but not more often than once per week) to monitor the RN's medical status and ability to return to light or full duty.

**Section 4: Placement of Workers' Compensation Claimants and Light Duty**

133

A. The Department has no obligation to provide permanent light duty assignments or to create positions reserved for RNs who need temporary light duty assignments. However, the Department will make a reasonable effort to grant a requested light duty assignment. The Department will determine whether a RN can be provided light duty assignments consistent with the RN's qualifications and medical limitations as well as the patient care needs of the Department. When the Department approves a light duty assignment it will be of limited duration, not permanent in nature and provided to the RN in writing.

B. RNs who are determined by the DOL not able to perform his/her assigned duties will be offered another available position in accordance with applicable law and regulations.

C. If the DOL, OWCP determines that a RN who was previously deemed disabled has recovered and is medically able to be reemployed, the Department will endeavor to offer placement in accordance with applicable law and regulations.

D. The Department, upon receipt of indication by the RN of a desire to accept or pursue a retirement option for which he/she is eligible, will provide information and assist the RN with the application process with a goal of expediting the retirement application.

## Section 5: OWCP Rights for RNs

A. The Department may contact the attending provider or physician only in writing and only to clarify or obtain additional information about the RN's duty status or medical progress.

B. Consistent with DOL regulations, time lost on the date of injury should be changed to administrative leave. The period to be charged to COP begins with the first day or shift of disability or medical treatment after the date of injury, provided that the absence began within 45 days after the injury. A RN's regular pay may continue for up to 45 calendar days of wage loss due to disability and/or medical treatment after a traumatic injury. A RN is entitled to receive COP when he/she is absent from work due to disability or medical treatment. After entitlement to COP ends, the RN may apply for compensation or use leave.

C. Pending the approval of the compensation claim for traumatic injury by OWCP, the RN may elect to use annual leave (AL), compensatory time (CT), sick leave (SL) or leave without pay (LWOP). The RN has the right to complete a CA-7 and submit it to the DOL for consideration of wage loss compensation.

D. Consistent with DOL regulations, entitlement to COP is not available to RNs who file an occupational disease claim.

E.  The Department will not place a RN in absent without leave (AWOL) status for absences directly related to an approved OWCP claim. However, the RN is still required to follow proper leave procedures.

F.  The Department will not place a RN on leave restriction or sick leave certification for absences directly related to an approved OWCP claim.

G.  When a RN is disabled (incapacitated for duty) on the job and files a claim with the OWCP, LWOP may be granted in accordance with VA Handbook 5011 Part III, Chapter 3, Paragraph 10.

## ARTICLE 35: SPECIAL PHYSICAL EXAMINATION (COMMONLY KNOWN AS FITNESS FOR DUTY) AND PHYSICAL STANDARDS BOARD

### Section 1: General

A. The Department and NNU recognize that 38 USC 7422 prohibits negotiation, grievances, and any other form of collective bargaining over issues of professional conduct or competence and direct patient care, including RNs' physical or mental fitness for duty. Nothing set forth in this Article will limit or infringe upon any such 38 USC 7422 exclusion.

B. In accordance with VA Handbook 5019, the Department may direct a RN to undergo a special physical examination (fitness for duty) to resolve questions of physical or mental ability to perform the duties of a RN position. An examination may also be necessary to determine physical and mental fitness to resume duty after illness.

C. In the event that the Department objectively determines that a RN is physically or mentally incapable of performing their duties, the RN shall be entitled to meet with the recommending medical official to discuss grounds for such action, and to provide any oral and written evidence before a recommendation is made. In any such meeting, the RN is entitled to representation. The RN may elect that their representative be an NNU representative.

D. No RN will be determined physically or mentally incapable of performing duties satisfactorily without benefit of a Physical Standards Board deliberation unless the RN is being evaluated for medical disability retirement.

E. All matters relating to Special Physical Examinations and Physical Standards Board proceedings and recommendations will be confidential, and related documents will be secured in accordance with applicable VA regulations and this Contract.

### Section 2: Notice of Examination

A. In unusual circumstances, e.g., when an immediate determination must be made as to a RN's mental or physical fitness to remain on duty, the RN will be given verbal notice as to the grounds for such an examination.  The RN will have a right to a representative. The RN may elect that their representative be a NNU representative.

B. Otherwise, at least a 14-day advance written notice of a special physical examination shall be given to the RN. The notice will include:

1. Reason for examination;

2. Date, time and location of examination (including travel information, if appropriate);

3. A citation to any specific VA policies, Handbooks, Directives, etc., pertaining to the examination procedure;

4. Right to submit physical examination results or other medical evidence obtained at the individual's own expense for consideration by the VA Occupational Health Care Provider and/or, if appropriate, a Physical Standards Board; and

5. Right to NNU representation during all phases of the process.

## Section 3: Status Pending Examination Outcome

In the event that the Department determines that a RN must be reassigned pending the outcome of the special physical examination, NNU will be notified. In the event the Department determines a RN must be removed from duty pending the outcome of a special physical/mental exam, the RN may be given Authorized Absence (AA) until a decision is made.

## Section 4: Decision and Appeal

A. If a decision is made that would remove any RN from his/her position or duties for physical or mental inability to perform, the RN shall be entitled to use the appropriate appeals procedure under existing title 38 regulations. A copy of the relevant VA Directives/Handbooks, policies, etc., pertaining to the appeals procedure will be given to the RN.

B. If the Board determines a RN to be physically and/or mentally incapable of performing the duties of the assignment and the nature of the physical condition is one that may be corrected by remedial treatment, the Department may grant sick leave and annual leave, or leave without pay may be granted as appropriate.

## ARTICLE 36: DEPENDENT CARE

### Section 1: General

A. NNU and the Department recognize that RNs may have special dependent care needs during working hours. For the purposes of this Article, the definition of dependents includes any individual related by blood or affinity whose close association with the RN is the equivalent of a family relationship who routinely relies on the RN for economic, medical, social or emotional support.

B. NNU and the Department recognize the need for RNs to secure appropriate dependent care arrangements.

### Section 2: Dependent Care Activities

A. The Department will provide information on its human resources website on such things as dependent care, parenting information, dependent care resources, referral information, workshops, and government-wide initiatives such as long-term care insurance, flexible spending accounts for dependent care needs, and counseling available through the Employee Assistance Program. Should its human resources website as described herein no longer remain accessible, the Department agrees to meet and bargain with NNU for the purpose of making such information available to RNs when a duty to bargain is triggered by the Statute.

B. The Department supports the finding of creative solutions to meet RN dependent care needs.

C. In accordance with applicable public laws, rules and regulations, the Department agrees to pay legally permissible expenses for VA employed dependent care employees for training, conferences, or other meetings deemed necessary, relevant, and connected to the provision of dependent care services should the Department provide dependent care services at any facility.

### Section 3: Dependent Care Committees

If a decision is made to establish a dependent care facility, a local committee will be established. A NNU representative, on official time, will be a member of any such committee.

### Section 4: RN Related Dependent Care Needs

A. The Department recognizes that requiring additional hours of duty can cause issues with dependent care. When the Department requires additional hours of duty that cause issues with dependent care, it is agreed that the appropriate

Department official should allow the RN time to make alternate dependent care arrangements and grant unplanned leave requests brought about by unexpected changes in dependent care arrangements, consistent with 38 USC 7422 and the Leave and Absences Article of this Contract. Requests will not be unreasonably denied.

B.  The Department will consider the use of employment options such as: part-time employment, job sharing, leave, flexi-time, compressed tours, etc., to assist RNs with dependent care needs.

C.  The Department recognizes that on occasion RNs may need to make reasonable, brief contact with dependent care providers, family members and/or dependents during duty hours as long as it does not interfere with patient care delivery.

### **Section 5: Facilities**

If a dependent care facility is established, it will be governed by appropriate laws and regulations.

### **Section 6: Miscellaneous**

NNU will be kept informed of local dependent care initiatives.

## ARTICLE 37: Appointment Authority Changes

A.  Prior to granting a RN's request for a change in appointment authority (including but not limited to conversion from temporary to permanent, full-time to part-time, part-time to full-time, per diem, intermittent or from Title 38 to Title 5), an explanation of the change in rights and benefits will be provided verbally, as well as in writing, to the RN by the Department. Presenting this information verbally allows the RN to ask questions and gain clarification. The RN will sign a document acknowledging his/her receipt of this explanation.

B.  When the appointment authority of a RN is changed, an official personnel action will be processed in a timely manner.

### ARTICLE 38: Official Records & Protection of Identifiable Information

#### Section 1: Official Records and Files

A. No personnel record may be collected, maintained, or retained except in accordance with law, government-wide rules and regulations, VA regulations, this Contract and any Local Contract.

B. All Electronic Official Personnel Folders (eOPF) are confidential. Occupational Health Recording Systems (OHRS) (employee health medical records) are confidential and protected by the Health Insurance Portability and Accountability Act (HIPAA). Both will be known, viewed, or disclosed by/to officials only with a legitimate need to know for the performance of their duties or as otherwise required by law. The RN will be notified within a reasonable amount of time after any episode of failure to provide for security of the records.

C. All eOPFs, medical and other records with personally identifiable information (PII) will be maintained in a secure location.

D. RNs will be annually advised of the purpose and intended use of the eOPF or any other file specific to them maintained under their name, social security number and/or any recognizable personal identifier, and its location.

#### Section 2: Access to Records

A. RN's right of access and/or review of records containing PII will be granted in accordance with all Federal laws including FOIA, Privacy Act, and HIPAA as well as VHA Handbook 1650.1. During normal duty hours, a RN and/or his/her representative(s) designated in writing will have the right to examine records personally identified to the RN (Including but not limited to: eOPF, EEO, evidence files, appeal and grievance records, employee medical folders). The Department will allow a RN and/or his/her representative access to such records requested within a reasonable period of time. If the records are not maintained at the local facility, the Department will initiate action to obtain the records and make them available to the RN or designated representative within three working days.

B. Consistent with VHA Handbook 1650.1, a person of the RN's own choosing may accompany the RN to review a record. A written statement is required from the individual authorizing discussion of the record in the accompanying person's presence (VA Form 07-5571). A Department official must be present at all times during any personal review of a record to ensure the integrity of the record.

C. The RN, or his/her designated representative(s) in writing, may receive, at no cost, two copies of personally identified records. Additional copies will be

provided, however, there may be a charge in accordance with the Department fee schedules in effect at the time of the request.

### Section 3: Clarification or Rebuttal of Information in Official Records

A. Every RN has the right to prepare and enter a concise statement of disagreement with, rebuttal to, or clarification of, any document filed in the eOPF and the proficiency folder. All requests for amendment of such records will be processed under the provisions of Title 38, CFR Part I, and VA Handbook 6300.4

B. Nothing in this section shall negate the RN's right to grieve matters covered by the grievance procedure.

### Section 4: Outdated Records

A. All eOPFs will be purged and information disposed of in accordance with the appropriate records control schedule.

B. Upon request, the Department will work with a RN and his/her representative to explain the records retention timeframes and, if necessary, assist the RN in reviewing his/her eOPF to ensure any outdated records are purged.

C. If any outdated or unauthorized material is accidentally left in a file, it may not be used to support any personnel action detrimental to the RN.

### Section 5: Supervisory Notes

A. Department officials at any level will not keep files specific to individual RNs maintained under their name, social security number, and/or any recognizable personal identifier not approved by the Department as an official system of records.

B. If a Department official creates a supervisory note regarding a RN, the RN will be given a copy within a reasonable time after it is written. If there has been a delay in providing a copy and it is used to support an action against the RN, the delay must be considered by the Department before a decision is made. Exceptions may be made if showing the note to the RN may impair the Department's ability to conduct an investigation or may impose a safety or security issue.

### Section 6: Uses and Misuses of RN Social Security Numbers and Identification

A. The Department shall maintain the confidentiality of the RN's social security number in accordance with Executive Order 9397, the Privacy Act, and all applicable legal requirements.

B. Consistent with Executive Order 9397 and the Privacy Act, lists or documents requiring the use of the social security number and/or birth date will be kept confidential and disclosed only on a job-related need-to-know basis or as required by law.

C. RNs will not be identified by their full or partial social security number on any publicly available lists, including but not limited to educational offering sign-in sheets.

D. Consistent with the Privacy Act, HIPAA and to the extent technologically feasible, RN health records accessible via the computer or paper will have the social security number and birth date data protected.

E. Should an RN have any problems related to identity theft, the Department will cooperate with any related investigation and/or prosecution. Should the Department find that the offender in such a case is a Department RN, it will refer the offender for criminal prosecution and/or administrative action as appropriate.

## ARTICLE 39: OUTSOURCING

### Section 1: General

This Article is subject to law, rule and regulation, including the Federal Acquisition Regulation.

### Section 2: Consultation

The Department will notify and seek NNU input when it considers outsourcing RN work. NNU may provide and the Department will consider NNU input at the appropriate level when considering whether to outsource any work performed by RNs or to outsource work that will require RNs to perform additional duties. Upon request, the Department will provide NNU with the solicitation numbers for actual, published requests for solicitation. The requests for solicitation may be accessed through www.fbo.gov.

### Section 3: Site Visits and Notification

A. The Department will notify NNU if a site visit, either physical or virtual, is going to be conducted for potential bidders seeking to contract for work performed by RNs in a work location. A NNU representative may attend any such site visit/meeting. NNU will be given notice and an opportunity to bargain when the duty to bargain is triggered under the Statute.

B. Upon request, NNU will be provided a copy of a contract outsourcing work performed by RNs. Any release of a copy of a contract is subject to the requirements of the Freedom of Information Act, including appropriate redaction of proprietary/confidential information.

### Section 4: Placement

When RNs are adversely affected by a decision to outsource, the Department will endeavor to find available positions for affected RNs. This effort will include, but is not limited to:

A. Establishing a Reemployment Priority List and a placement program;

B. Giving special selection priority for available positions to which the RN applies;

C. Paying reasonable costs for training and, when appropriate, relocation that contributes to placement; and,

D. Providing career transition assistance which may include: office space, telephones, copy and fax machines, computers, and job placements specialists in the effort to obtain other employment.

144

**Section 5: NNU Representation**

A. Official time is appropriate for NNU representatives when conferring with affected RNs regarding the outsourcing impact.

145

# ARTICLE 40: DRUG TESTING

## Section 1: General

A. Bargaining unit RNs are subject to mandatory drug testing according to applicable government-wide Federal regulations and VA Handbook 5383 or successor which is referenced for informational purposes only.

B. RNs are entitled to NNU representation throughout the entire process including actual drug testing. However, the right to representation cannot delay or prevent any testing requirements of applicable federal regulations and any applicable VA policies, both local and national.

C. In the event of a positive test result, the RN will be given two copies of the test results. The RN may furnish one copy to NNU for use if a RN requests NNU representation with regard to any proposed disciplinary action or major adverse action that is based, in whole or in part, on the results of a drug test. For negative test results, the RN may request a copy of the test result which will be provided in a timely manner so long as the facility received a copy of the test result.

## Section 2: Collection of Independent Samples Authorized

A. A RN required to submit to a mandatory drug test will, upon request, be permitted to provide an additional sample (the independent sample) for testing by an independent HHS-certified laboratory at the RN's expense. The Department will provide an additional container for the independent sample, which will be collected from and packaged by the RN in the presence of a Department representative at approximately the same time as the samples collected by the Department.

B. Once collected and packaged, the RN shall be responsible to deliver the independent sample to a HHS-certified laboratory for testing, and to document the sample's chain of custody. For the purposes of this paragraph, it shall be sufficient for the RN to package the independent sample for delivery by a commercial messenger service to the chosen laboratory in the presence of a Department observer. The RN shall be responsible for the costs of delivery and testing of the independent sample.

C. The RN shall be permitted, but not required, to submit the results of an independent sample collected and tested under this Section to the relevant Medical Review Officer for his/her consideration in certifying results.

D. In making any personnel decision based on a RN's drug test, the Department shall not draw a negative inference if the RN provided an additional sample for

146

independent testing, nor whether the RN submitted the results of such an independent test to the Medical Review Officer.

## ARTICLE 41: EMPLOYEE ASSISTANCE PROGRAM

**Section 1: Program Purpose**

A. The Department agrees to make the Employee Assistance Program (EAP) available to RNs with personal issues. Examples of issues for which EAP may be appropriate include but are not limited to: emotional and mental distress, family discord, marital counseling, substance abuse, financial stressors. This list is not meant to be all encompassing, as other issues may be covered.

B. Information on the EAP will be available electronically and posted on bulletin boards. Updates and changes on the EAP will be distributed as changes are made. Information on the EAP will also be made available after catastrophic events affecting RNs.

C. The EAP is subject to Federal law and government-wide regulations, including 42 USC 290 aa et seq., 5 USC 7361 et seq., Executive Order 12564.

D. RNs are encouraged to consult the Office of Personnel Management's website Employee Assistance Programs (opm.gov) OPM EAP Fact Sheet, for further information about the scope of assistance available through EAP and the rules and regulations pertinent to the program.

**Section 2: Record of Participation**

A. The Department will ensure that no RN will have their job security or promotion opportunities jeopardized as a direct result of initiating a request for counseling or referral assistance. This may not apply if there are related existing or pending disciplinary or major adverse actions.

B. The Department will ensure the confidentiality of all RN records consistent with current public laws and Office of Personnel Management regulations and preserve the records in accordance with applicable laws and regulations.

C. Without an RN's specific written authorization, a supervisor may not obtain information about the substance of an RN's involvement with a counseling program. Information obtained without the RN's written authorization from such counseling programs may not serve as the basis for disciplinary or adverse actions consistent with applicable law and regulation.

**Section 3: Voluntary Participation and RN Responsibility**

Although the existence and functions of counseling and referral programs will be publicized to RNs, no RN will be required to participate or be penalized for merely declining referral to such programs.

148

**Section 4: Disciplinary Action**

The EAP is not intended to shield the RN from disciplinary or a major adverse action. Depending on the circumstances, it may be appropriate to offer assistance to a RN to help correct a performance and/or conduct problem as an alternative to discipline/major adverse action. However, EAP may be offered to a RN at the same time that a disciplinary or major adverse action is proposed.

**Section 5: Excused Absence**

RNs undergoing counseling under the EAP may be excused without charge to leave for a brief period of time of less than one hour for each counseling session up to a maximum of eight total hours. The use of this excused absence is subject to supervisory approval.

**Section 6: Leave Associated with EAP**

It is the policy of the Department to grant leave (e.g., sick, annual, or Leave Without Pay (LWOP)) for the purpose of treatment or rehabilitation for RNs under the EAP as would be granted for RNs with any other health problem.

**Section 7: EAP Related Assignment Requests**

RNs undergoing rehabilitation that will not permit them to function temporarily in their assigned position, may request temporary assignment to another position including, but not limited to other departments, record reviews, post-op telephone calls and the possibility for telework if appropriate and consistent with the Department's telework policy. The request will be considered and approved by the supervisor consistent with valid operational needs, the individual RN's qualifications and rehabilitation needs.

## ARTICLE 42: Organizational Performance Improvement

**Section 1: General Commitment**

The Department and NNU recognize the importance of a strong commitment to a comprehensive organizational Performance Improvement (PI) program in the success in meeting the mission of the VA. The Department's PI program is governed in part by prevailing accreditation standards and VA Handbooks and Directives. The program emphasizes quality service to the Veteran, which is the cornerstone of the relationship between the Department and RNs.

**Section 2: Committee Representation**

A. Both parties agree that the commitment of the Department, NNU and RNs at every level is critical for success of the PI program.

B. NNU will appoint a representative as a full member on the facility-level PI program committee(s) and other appropriate PI program committees, either local or national, currently in existence, newly developed or its successor.

C. Minutes, policies, manuals etc., from these committee(s) will be made available to NNU through their member/representative and one alternate. If available electronically, the union member/representative and one alternate will have access to SharePoint, databases and Dashboards related to the committee(s).

D. NNU bargaining unit RNs and representatives will receive training appropriate to their PI committee, task or responsibility.

## ARTICLE 43: Research

**Section 1: General**

A. The Department and NNU mutually agree that research is for the advancement of patient care and/or nursing science.

B. It is recognized that participation in research development, gathering data, data analysis/recommendations, or research utilization can enhance the RN's role/career development. The Department will encourage and support participation by RNs in VA-approved research projects, approved by the Institutional Review Board and/or Health Services Research and Development. However, this Article is subject to the provisions of 38 USC 7422.

**Section 2: Procedures**

A. When the Department enters into any research project that affects RNs working conditions, NNU will be given notice as soon as practicable and an opportunity to bargain when the duty to bargain is triggered under the Statute.

B. When a research project results in an innovation, changes in documentation, or in technology that impacts RNs throughout the system, NNU will be given notice as soon as practicable and an opportunity to bargain when the duty to bargain is triggered under the Statute.

C. RNs will be encouraged to develop their research knowledge and abilities. The Department, to the extent practical, will provide, either in person or electronically:

   1. Access to information on available training/educational programs that would enhance the RNs research knowledge;

   2. Access to information on available VA grants and research programs that may relate to their area of research interest; and,

   3. Notice of the grant opportunities once the local facility is informed.

D. RNs' participation in research projects and surveys related to the research projects is voluntary and without fear of reprisal. Participation in research projects, including surveys related to the research project, is governed by law, government-wide regulations and Department policy, including but not limited to VA Handbook 1058.01.

E. Data analysis and recommendations from any local patient care/nurse-related research that affects working conditions will be provided to the NNU, upon request.

F.  RNs who apply for time-limited research positions will be advised of the limitations and potential consequences to employment before they accept the position in accordance with the Appointment Authority Changes Article of this Contract. RNs on time-limited appointments may apply for permanent positions any time prior to the expiration of his/her appointment and will be considered as internal candidates for posted facility RN vacancies consistent with the Vacancy Announcements Article of this Contact.

## ARTICLE 44: Union Rights and Representation

### Section 1: NNU Rights

A. In all matters relating to personnel policies, practices, and other conditions of employment, NNU and the Department will abide by 5 USC Chapter 71, 38 USC 7422 and this Contract.

B. The Department recognizes NNU as the exclusive representative of bargaining unit RNs. NNU and the Department recognize that a collaborative relationship between NNU and the Department is essential so that the organization works more efficiently and effectively and better serve Veterans' needs, RNs, NNU representatives and the Department.

C. For matters relating to personnel policies, practices, other conditions of employment, grievances, contract enforcement, etc., the Department and NNU shall meet at mutually agreeable times, dates, and places that are reasonable and convenient. This does not apply to regular recurring committee or task force meetings on which NNU has a seat. These meetings should also be held on dates at times and places that are reasonably convenient.

D. The Department will not restrain, coerce, discriminate against, or interfere with any NNU representatives/officials, or RN(s) in the exercise of their contractual or statutory rights.

E. In accordance with 5 USC 7116(a)(3), the Department will not sponsor, control, or otherwise assist any labor organization other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to other labor organizations having equivalent status.

### Section 2: NNU Representation

A. NNOC NNU will be provided with reasonable advance notice and be given the opportunity to be present and to participate at any formal discussion between one or more representatives of the Department and one or more RNs in the bargaining unit or their representatives concerning any grievance, personnel policy or practice, or other general condition of employment.

B. NNU will also be allowed to be present and represent a RN at any examination of a RN in the unit by a representative of the Department in connection with any investigation if the RN reasonably believes that the examination may result in disciplinary/adverse action against the RN and the RN requests representation. Consistent with 5 USC 7114(a)(2)(B), NNU will be allowed to be present and represent a RN at any examination of a RN in the unit by a representative of the

Department in connection with an investigation if the RN reasonably believes that the examination may result in disciplinary/adverse action against the RN and the RN requests representation.

### Section 3: Notification of Changes in Conditions of Employment

A. Consistent with the Mid-Term Bargaining Article of this Contract, the Department will forward a notification of all proposed changes for which there is a statutory bargaining obligation to the appropriate Union official. The Department will forward, along with the notice, all relevant information relied upon to propose the change(s) in conditions of employment, for the purpose of NNU exercising its full rights to bargain (for example if applicable to the situation, affected RN(s), floor plans, any studies done, etc.). All notifications shall be in writing or by electronic means to the appropriate NNU official. Participation in committees and other such groups does not constitute official notice to the union nor meet the obligations of this Article unless the parties agree otherwise.

B. In accordance with Executive Order 13522, the Department will allow NNU to have pre-decisional involvement in all workplace matters to the fullest extent practicable without regard to whether those matters are negotiable subjects of bargaining in order to decrease the time spent in formal bargaining.

C. NNU has the right to request a briefing and/or bargain in accordance with the Mid-Term Bargaining Article. Such briefings will be provided by Department appropriate officials who have expert knowledge of the subject at hand as determined by the Department.

D. The Department agrees not to conduct formal discussions (meetings) regarding grievances or changes to any personnel policy or practice or other general condition of employment with RNs without giving NNU reasonable advance notice and an opportunity to attend.

E. In an effort to be proactive, NNU may propose changes regarding conditions of employment or resolution of problems affecting the working conditions of the bargaining unit. The Department will meet its statutory obligation to bargain over NNU proposed changes.

F. Upon request, NNU will be given a list of bargaining unit RNs. At the national level the report will be by facility and at the local level this list will include the time and leave unit of the RN.

G. A report of gains and losses of RNs, will be provided to NNU upon request.

### Section 4: Information

A.  In accordance with 5 USC 7114 (b)(4), the Department agrees to provide NNU upon request, and to the extent not prohibited by law, with data that is normally maintained in the regular course of business, reasonably available, and necessary for full and proper discussion, understanding and negotiation of subjects within the scope of collective bargaining and which does not constitute guidance, advice, counsel, or training provided for management officials or supervisors, relating to collective bargaining.

B.  Information will be provided within a reasonable period of time at no cost to NNU.

C.  In the event the request is denied, the written denial will identify the reason and title of the person denying the information.

D.  If the Department determines that the information or data requested is not reasonably available in accordance with 5 USC 7114(b)(4), NNU will be notified as soon as practicable.

E.  The Department agrees that if they have a concern regarding information or data request(s) they will promptly contact NNU to discuss and resolve the issues.

### Section 5: Notification of NNU and Department Officials

A.  At the appropriate level, NNU will provide the Department with an annual updated list of the names, titles, room numbers and telephone numbers of all officials.

B.  The Department agrees to disseminate the list to all bargaining unit RNs within 30 days after its receipt. Further, the Department agrees to provide all new RN hires with a copy of the list when they enter on duty. This does not preclude NNU from providing RNs with the same information.

### Section 6: NNU-RN Communication

A.  The Department will not alter or censor the content of any direct communications between NNU and RNs. However, VA facilities will not be available for posting or distribution by RNs of libelous or defamatory material directed at VA or NNU officials or programs.

B.  NNU has the right to distribute brochures and literature for use by the RNs.

### Section 7: Surveys and Questionnaires

A.  Prior to collecting information from bargaining unit RNs through surveys and questionnaires regarding conditions of employment, the Department will give notification to NNU before distribution of the survey. Notification will generally include, but is not limited to, a copy of the survey, dates to be administered,

notice of confidentiality and voluntary participation to the RN, purpose and use of the data obtained, and how NNU may obtain a copy of the results. Notification will be at the national level for national surveys and at the local level for local surveys. To the extent practicable, NNU will be notified when questionnaires and surveys from other agencies are distributed by the Department. Nothing in this section precludes NNU from the right to bargain over conditions of employment under the Statute.

B. Participation in surveys will be voluntary, unless NNU and the Department agree to require participation. RNs will be assured that their responses will be confidential and their anonymity protected, unless NNU and the Department agree otherwise.

C. RNs shall be afforded reasonable duty time and will be relieved from required duties to complete surveys and questionnaires.

D. The results of surveys and questionnaires regarding conditions of employment will be shared with NNU. If a third party conducts a survey and the results are distributed to the Department, the results will be shared with NNU and the bargaining unit.

## Section 8: New RN Orientation

A. When there are new RNs, NNU will be afforded the opportunity to make a 60 minute presentation during RN orientation. When NNU meets with new RNs during non-duty time, the Department will not be present. Current VA RNs who are newly appointed to a NNOC NNU-VA bargaining unit position will be afforded the opportunity to attend the 60 minute presentation from a Union representative.

B. The Department will provide NNU with notice of the date, time, and place of the orientation and a list of new RNs including projected work location. The scheduled starting time of the NNU presentation will be coordinated with the local NNU. Any NNU official(s) making the presentation will be allowed official time to make the presentation, if otherwise in a duty status.

C. If a RN misses the scheduled NNU presentation/orientation, NNU will be responsible for coordinating with the Department to provide the RN with the information.

D. NNU officers and/or representatives may introduce themselves to new RNs, including but not limited to, in break rooms, unused patient rooms, nursing stations and the cafeteria.

## Section 9: Voluntary Programs

The Department and NNU agree that RN participation in the Combined Federal Campaign, blood donor drives, bond campaigns and other worthy projects will be on a voluntary basis. This does not preclude publicizing such projects and encouraging RNs to contribute and/or participate.

### Section 10; RN Exit Interviews

The NNU local will be on the clearance check list in use at each facility for bargaining unit RNs who are leaving employment at the facility.

### Section 11; Access to NNU Office

If the Department authorizes any person access to the Union office for any reason (other than cleaning and safety inspection), including a Department official, the local NNU Director will be notified in writing of the reason for the access immediately or as soon as practical thereafter. If a NNU official is on station and available, he/she will be contacted and arrangements made to accompany the person authorized to access the NNU office. If a NNU official is not available, a responsible Department official or an officer from the Police Department will escort the authorized person into the NNU office and stand by until the reason for the access is completed.

157

## ARTICLE 45: FACILITIES AND SERVICES FOR UNION USE

 **Section 1; Space & Office Equipment**

A. The Department recognizes the value of a constructive labor-management relationship and the need for the local NNU to have use of office space. Where space is not presently being provided, it will be provided upon request. The Department agrees to furnish office space to NNU appropriate for carrying out its representational duties in locations easily accessible to RNs and private citizens and of size, furnishings, and decor commensurate with other administrative offices within the facility. Office space shall be sufficiently private to ensure confidentiality to the maximum extent possible. The office(s) shall be of sufficient size for necessary storage of confidential materials.

B. The Department will provide standard office equipment at no cost to NNU. Where current office equipment, space, etc., exceed the minimum listed below there will be no reduction. The parties agree that the use of such equipment is for representational activities consistent with 5 USC Chapter 71 (the Statute). As new technology becomes available, the updates shall be made available to NNU consistent with other administrative offices. Nothing in this Article precludes the local union from requesting additional space and office equipment. The request will not unreasonably be denied.

C. The following is minimum standard office equipment:

   1. One locking file cabinet

   2. One ergonomic desk with ergonomic office chair and adjustable key board tray/table for each office

   3. Two ergonomic visitor chairs

   4. One fax machine, with separate fax line

   5. One scanner or 3-in-1 color printer, scanner, copier similar to what is currently in use in the facility

   6. One telephone line with long-distance capabilities, speaker capabilities, caller ID and voicemail similar to what is currently in use in the facility. Each additional workstation provided will have a separate telephone line with long-distance capabilities, speaker capabilities and voice mail.

   7. One up-to-date computer for each workstation provided, with standard up-to-date computer software similar to Word, Excel, PowerPoint, etc. that is available at the local facility, as well as VA network access and electronic

storage necessary for representational duties, including email, VA Intranet (for VA employees) and Internet

8. One photocopier in the NNU office equal to other administrative offices and access to high-volume production equipment, if available in the facility

9. One laser printer (color)

10. One Blackberry for the NNU Chair, up to eight National NNU Officers, and each local NNU Director if requested

11. One laptop with wireless Internet capabilities and access for the NNU-VA Chair. This includes mobile docking station in lieu of a desktop computer if requested. NNU officers will be granted temporary use of a VA laptop with wireless Internet from the local facility on request and subject to local availability

12. One thumb drive or mobile data storage device encrypted for VA use similar to what is currently in use in the facility

13. One bookcase, one wall clock and one literature rack

14. Ability to schedule conference rooms and access to conference space subject to local availability

15. One office multi-purpose cross cutter paper shredder or access to VA secure shredder bins if used at that facility

D. The following conditions will apply to the use of space and equipment:

1. Such use will not damage the space and equipment in question more than normal wear and tear.

2. The space and equipment will be subject to the facility's sanitation and safety inspection program. NNU will coordinate with Facilities Management or equivalent service for access to the office space for cleaning and safety inspection as needed. NNU offices will be on the facility painting and carpet replacement schedules or as needed.

3. If the space and/or equipment are required for immediate needs of the facility, the Department will give NNU a reasonable advance notice (normally 90 days) and bargain with NNU over alternative arrangements.

4. All VA computer equipment use will adhere to established policies/procedures governing computer security and ethics.

5. At the facility where the NNU Chair is located, a separate office with the equipment noted above in Section 1C will be provided. The other national NNU representatives will be given shareable space in the local NNU office, including a separate desk, chair, telephone line, computer, and locking file cabinet. Where feasible, such shareable space will be at least 120 square feet. The officers of NNU may request conference space in accordance with local procedures.

## Section 2: Services

A. The services listed in this section are considered to be minimum levels. Where in local facilities more have been negotiated those will not be reduced without negotiation.

B. The following services shall be provided to each local:

1. VA inter-office mail access and a mail stop code

2. Conference rooms made available at no cost when requested in advance, subject to availability

3. Facility audio/visual equipment made available at no cost, subject to availability

4. VANTS access and web/teleconferencing conferencing access similar to what is currently in use in the facility

5. If the facility utilizes reserved parking spaces for supervisory employees, the local facility will work with the local NNU to provide one parking space, in a clearly marked location, reserved for the use of the NNU Local. This request will not be unreasonably denied. The location will be based on patient care requirements and the current availability of such reserved locations. The local parties will discuss the possibility of additional reserved parking spaces.

6. Signage for local NNU offices

7. Inclusion of NNU offices and NNU officers in all directories, as requested

8. Panic alarms will be available in the NNU offices

9. NNU, upon request, will be included on all local mail and distribution groups where bargaining unit RNs are assigned

C. The Department will provide at no cost to NNU routine office supplies.

D. NNU local Directors and National NNU Officers will be integrated into each facility's security, safety and sanitation plan. NNU offices will be secured according to the medical center's key plan.

E. Local NNU officials may use the facility telephone service and government long-distance service for handling representational duties and conducting labor-management relations. NNU will use government long-distance service in a reasonable, prudent, and cost-conscious manner. Additionally, such telephone service, including VANTS, will only be used for representational matters including communications with the Department.

F. At each facility, division and CBOC where there are RNs covered by this Contract, the NNU will be provided at least one locked bulletin board and space on common-use bulletin board(s) on patient care areas where they exist. Additional bulletin boards and locations may be requested locally. The material posted must be clearly identified as that of NNU and must follow related VA regulations regarding bulletin board postings.

G. NNU may use the internal mail/messenger system for regular representational communications consistent with the Statute. NNU shall have use of VA metered mail limited to representational matters consistent with postal regulations. It is agreed that the use of metered mail for mass mailings is inappropriate under this section.

H. The Department will create local and national mail group(s) and drives for NNU upon request. NNU will provide the Department at least one designated NNU official for mail group coordinator privileges for this group(s). NNU will be responsible for populating and maintaining the mail group. It is understood that electronic mail network access will be used for official labor-management communications within the NNU bargaining unit. The parties agree that the use of the electronic mail system will adhere to established policies/procedures governing computer security and ethics.

I. When travel to another location within the jurisdiction of a NNU local is necessary for representational activities consistent with the provisions of this Contract, and the transportation is otherwise being provided to the location for official business, NNU will be allowed access to the transportation on a space-available basis. When travel is approved and a NNU representative uses a privately owned vehicle, travel reimbursement will be pursuant to applicable travel regulations.

J. The Department agrees to provide to RNs a link to the NNU-VA Contract, MOUs, national grievances, and National NNU Officers on the LMR website (http://www.va.gov/lmr/). Additional information regarding NNU-VA is located at the NNU website (NNU - VA). If a local facility maintains an HR website, the parties will discuss the inclusion of NNU information on that website.

161

**Section 3: Information and Reference Services**

A. The Department will give NNU local and national representatives electronic access to pertinent sections of the United States Code, Code of Federal Regulations, VA Directives and Handbooks and other relevant publications.

B. If the local library has copies of video or audio programs or similar communications vehicles, the local NNU and individual RNs may check them out for viewing, utilizing existing equipment available for that purpose. If education credit is offered for viewing and evaluating such programs, the Department will extend education credit to RNs who verify attendance and submit the required documentation.

**Section 4: Access**

A. When NNU officials and NNU staff visit other facilities for the purpose of representation activity, they will notify the Chief of Human Resources or designee prior to their visit. They will be provided identification as specified in local policy.

B. NNU staff will have access to Union offices and non-work areas of VA facilities.

C. In facilities without designated space for meals or break periods, the Department agrees to cooperate with local NNU officials, upon notice and request, to identify appropriate locations where RNs can spend these non-work periods.

D. The Department will provide space for the purpose of distributing NNU literature. The space will be as agreed upon locally. Distribution of literature on official time will be permitted for representational purposes consistent with the Statute.

E. The Department agrees to provide adequate facilities, with proper advance notice and written request, for membership drives at locations that will provide access to RNs during break and lunch periods. Detailed arrangements will be made at the local level. At a minimum, NNU will be given the use of facilities at least equal to that provided to other organizations/vendors or Department sponsored functions. Membership drives are internal union business and are not an appropriate use of official or duty time.

## ARTICLE 46: OFFICIAL TIME

### Section 1: Purpose

A. NNU and the Department recognize that good communication is essential for positive constructive relationships. Good communications facilitate and encourage amicable settlement of disputes between RNs and the Department involving conditions of employment.

1. RNs are vital members of a facility's health care team. As such, all RNs must be able to perform in their RN position and to meet the competencies for that RN position.

2. Unless specified in this Article, no NNU representative can function as a full-time union representative and no representative can use more than 80% of any official time during the fiscal year. It is the goal that all RNs work at least 20% of their regularly scheduled work time. These amounts will be prorated for the period between the effective date of the Contract and the end of that fiscal year.

3. It is recommended that NNU representatives spread out their use of official time hours over the course of the fiscal year. NNU representatives will work out official time usage with their supervisors to accommodate both union representational activities and Department assigned duties. The parties recognize that a mutually agreed upon schedule is the recommended method for scheduling official time. Scheduling of RN duties for the end of the fiscal year should be avoided unless it is best for the local facility.

B. No NNU representative shall use official or duty time to conduct internal union business.

### Section 2: NNU-VA National Officials

A. The Department shall grant a total of 3 FTEE (6240 hours per year) of Official Time to NNU for allocation to their National Officials to conduct national duties. The Chair NNU-VA and one National NNOC/NNU official may serve in a 100% official time capacity. NNU may determine the remaining allocations but such allocations are subject to the limitations described in Section 1 above.

B. The Department will grant a total of 50% (1040 hours) official time for NNU national safety representative(s). This time / hours will be allocated by the NNU Chair and can be split among multiple representatives. The time may be used at any point in the fiscal year but does not carry over to the next fiscal year.

C. NNU, at the national level, will have an additional 1500 hours of official time to designate to RNs for pre-decisional involvement and management created committees including National Partnership Council (NPC). This time will be allocated by the Chair-NNU by submitting a written request to VACO LMR, if the request did not come from LMR. The additional 1500 hours is on a yearly basis, at the beginning of the fiscal year, and does not carry over from year to year.

1. VACO LMR will be advised of the pre-decisional involvement or management created committee related to the request. Requests will not be arbitrarily denied but the total time used by the NNU representative may not exceed the allocations in this Article. Once approved, VACO LMR will advise the local facility of the NNU representative being approved for official time. The NNU representative will work with their supervisor to coordinate the release. If release is not possible at the time requested, a mutually agreeable time will be established in a timely manner.

2. Upon request, VACO LMR will provide to the Chair-NNU the balance of hours.

A. Any national officer or designated national representative will coordinate a suitable arrangement with local management for the scheduling of their national official time.

B. Official Time Support:

1. When a local elected official is also a national official and is therefore occasionally unavailable to perform local NNU representational functions, it is expected that another local official may be needed to perform such local functions of the unavailable NNU official.

2. Where it is necessary for a local elected official who is also a national official to delegate a portion of his or her local official time to an alternate:

   a. The alternate will be released to perform representational duties when adequate notice has been given (normally four weeks), direct patient care needs permitting. Emergency request(s) for delegation of time will be fully considered. Upon request, the reason for the denial will be communicated to NNU in writing.

   b. The alternate may need to delegate part or all of his/her local official time to another local official consistent with this Article.

   c. The alternate to whom the official time is delegated must also be delegated full authority to act and make decisions in the absence of the national official and fulfill the duties for which the official time was originally allocated.

164

      d.  The process for the delegation of national official time will be coordinated with the appropriate Department official at the local level.

## <u>Section 3:</u> Local NNU Officials

A.  Official time for Local NNU bargaining units will be as follows:

    1.  Local official allocations will be consistent with Section 1 above.

    2.  Each NNU Local is entitled to official time according to the number of RNs in the bargaining unit as follows:

       Under 200 BUE .65 FTEE
       200-399 BUE .75 FTEE
       400-599 BUE 1.10 FTEE
       600-799 BUE 1.45 FTEE
       800-1000 BUE 1.80 FTEE
       After 1000, for every additional 100 FTEE, that local would receive an increase of 0.1 FTEE (i.e. 1050 BUE would be at 1.80 FTEE and 1100 BUE would be 1.90 FTEE)

    3.  If a local unit is losing official time under these calculations, the reduction will occur over a step-down period as follows: during the first full fiscal year of the Contract no reduction will occur; during the second full fiscal year, the reduction will be at 50% of the loss, and during the third full fiscal year and following years, the official time allocation will be consistent with the amounts above.

    4.  The number of bargaining unit RNs represented by that Local Unit as of September 1st of each year will be used to determine the size of the bargaining unit. For the purposes of this section a year is defined as a fiscal year. The time allocated for the first year will be prorated based on the date of execution of this agreement. If this official time is not used, it does not carry over to the following fiscal year.

    5.  Annually, no later than September 7th, the Department will forward a report of the bargaining unit size by facility to the Chair NNU and a unit report to the local Director.

    6.  Consistent with Section 1, local official time under this section may be distributed by NNU to as many representatives as they wish but the total allocation may not exceed the above amount. The local NNU Director will supply this information to the local facility no later than October 1.

B. Unless specified in this Article, official time shall be granted in amounts specified by this Article for the purposes of all representational activities, including but not limited to:

1. Communicating about matters covered under this Contract, with RNs, NNU union officials, and Department officials, including pre-decisional involvement and labor-management forums;

2. Preparing and investigating grievances, interviewing witnesses, preparing for arbitration, and meeting with NNU representatives in connection with representational activity;

3. Preparing to represent an employee in a statutory appeal process, including but not limited to, replies to the courts and/or administrative agencies such as FMCS, FSIP, and/or FLRA;

4. Preparing to and participation in mid-term negotiations;

5. Preparing to participate in a FLRA investigation or hearing as a representative of the NNU;

6. Formal discussions;

7. Grievance meetings;

8. Arbitration hearings;

9. Oral and written replies to disciplinary and major adverse actions;

10. Travel associated with a representational activity;

11. Training hours in addition to the hours below.

C. Exceptions to the Local Official Time Allocations:

1. Consistent with the Statute and this Contract, designated NNU representatives will be granted reasonable and necessary time to carry out the following functions:

   a. Term agreement bargaining in accordance with 5 USC 7131(a) and this agreement; and,

   b. Negotiating a Local Supplemental Contract

2. NNU Members will receive official time for providing contract training to the local units consistent with requirements outlined in the Contract Training,

166

Duration and Distribution Article. This official time will not be counted against any official time allocations in this Article.

3. Official time will be granted to attend facility and VISN level labor-management forums consistent with the Collaboration and Labor-Management Forums Article of this Contract. This official time will be in addition to the amounts granted in this Article.

4. For purposes of labor management training consistent with the Labor-Management Relations Training Article of this Contract, each NNU Local is entitled to additional official time according to the number of RNs in the bargaining unit as follows:

   a. Under 250 RNs – 80 hours per fiscal year

   b. 250 - 500 RNs – 160 hours per fiscal year

   c. 501 or more RNs - 280 hours per fiscal year

   The number of bargaining unit RNs represented by that Local as of September 1st of each year will be used to determine the size of the bargaining unit. For the purposes of this section a year is defined as a fiscal year. These amounts will be prorated for the period between the effective date of the Contract and the end of that fiscal year. If this training time is not used, it does not carry over and may not be used for the representational activities described above. This time is for all associated training hours including travel to and from the training location (if travel is appropriate).

5. The Department and NNU are responsible for managing and scheduling the use of allocated official time effectively. When there is a genuine need for additional official time, the Department may grant, upon request, additional official time for participation in committees and other requested management meetings/assignments. When granted, the parties will work out the amount of time actually needed and the union will demonstrate the amount of time necessary. The Department will track such requests, and when granted, the amount of official time used. This section is not intended to avoid using official time allocated in this Article.

## Section 4: Official Time Usage

A. The parties recognize that a mutually agreed upon schedule is the recommended method for scheduling official time. Although official time allocated in Section 3A can be used in a regularly scheduled fashion or as needed (i.e. bank time), the parties recognize that establishment of bank time will best serve to cover

representational needs during the year. The use of fixed scheduling with no bank time does not address the unplanned or unexpected representational needs.

B. NNU Representatives and local management may choose to schedule usage of official time on some regular basis, provided that the scheduling does not conflict with the terms of this Contract. NNU representatives will work out official time usage with their supervisors to accommodate both NNU representational activities and Department assigned RN duties.

C. If official time is not scheduled on a regular basis, NNU representatives are required to request and arrange official time with the appropriate Department officials in advance for their usage of official time. This usage will be recorded. If a valid operational need of the Department would not permit the NNU representative to use the official time when requested, another occasion will be determined, keeping in mind the interests of NNU and RNs as well as the needs of the Department. No undue delay should result from these efforts nor will either party be compromised in the exercise of their rights by such efforts. If scheduled and cancelled, the official time can be returned to the bank or NNU may make arrangements to transfer the official time and have a different representative perform the function.

1. When bank official time is requested, the supervisor will be advised of the general purpose of the request, how the NNU representative may be contacted and the estimated time of return. Requests will not be arbitrarily denied.

2. Prior to canceling prescheduled official time, the Department will make reasonable efforts to provide coverage so as not to necessitate the need to cancel the official time. If it is necessary to cancel official time, the Department will provide a written explanation to NNU, upon request. If cancelled, the parties will work to timely reschedule cancelled official time and unused official time will be returned to the available bank allocation.

3. The NNU representative will notify the appropriate Department official when he/she returns to duty.

4. If the NNU representative will be delayed beyond the estimated time, he/she will notify the immediate supervisor to request additional needed time, which will not be arbitrarily denied. If granted, the supervisor will also be notified of the time of return.

D. Additional specifics regarding local arrangements of official time may be negotiated locally. This includes but is not limited to scheduling of fixed official time, release to perform official time duties, the specific process and/or form for requesting and tracking official time, and the transfer of official time.

E. Consistent with the RN Rights Article and the Facilities and Services for Union Use Article of this Contract, NNU representatives may visit work areas as part of their representational duties consistent with the Statute and this Contract. Patient privacy must be respected at all times and the representative will not cause any disruption to the work area.

F. Leave usage, such as sick and annual leave, should not count against official time allocations.

## Section 5: Travel

A. Official time is appropriate for travel when representational duties or scheduled meetings are required at another location.

B. NNU officials on Department approved travel are entitled to travel and per diem when appropriate, consistent with the Federal Travel Regulations.

## Section 6: Performance Evaluation

The use of official time, in accordance with this Contract, will not adversely affect an RN's proficiency report.

## Section 7: Return to Staff RN Duty of Union Officials

A. Reassignment and/or return to a RN position will be consistent with 38 USC 7422.

B. This section covers NNU representatives previously serving in a 100% official time capacity who are returning to a RN position. The RN can request to return to the same or similar position of responsibility that he/she previously occupied as a RN. The Department will make reasonable efforts to return the RN to a same or similar position, based upon the skills of the RN and valid operational needs of the Department. If no position is requested, the Department will place the RN in a position based upon the skills of the RN and the needs of the Department.

C. Additionally, the RN can request to return to the same tour of duty that the RN served in. When requested, the Department will make reasonable efforts to return the RN to the same tour of duty, based on valid operational needs of the Department. If no tour of duty is requested, the Department will place the RN in a position based upon the skills of the RN and the needs of the Department.

D. The Department will provide orientation, education and/or training consistent with the Professional Development and Education Article of this Contract.

E. Issues arising from this section may be addressed by the Chair NNU-VA by discussion with VACO LMR.

F.  The NNU Official has the same right of any RN to apply and be selected for other position(s) for which they are qualified, consistent with this Contract.

## ARTICLE 47: GRIEVANCE PROCEDURE

**Section 1: Definitions**

A. A grievance under 5 USC 7103(a)(9) means any complaint by a RN concerning any matter relating to the employment of the RN; by NNU concerning any matter relating to employment of a RN; or by an RN, NNU or the Department concerning the effect or interpretation, or a claim of breach of this Contract; or any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment.

B. This Article shall not govern a grievance concerning:

1. Exclusions listed in 5 USC 7121(c):

   a. Any claimed violation of subchapter III of Chapter 73 of Title 5 (relating to prohibited political activities);

   b. Retirement, life insurance, or health insurance;

   c. A suspension or removal under 5 USC 7532;

   d. Any examination, certification, or appointment.

2. The rating of the proficiency

3. Decisions of the Nurse Professional Standards Board (including reconsiderations)

4. Notices of proposed actions

5. Separation of RNs on probationary and/or time-limited appointments

6. Any disciplinary or major adverse action involving professional conduct or competence

7. Any matter or question concerning or arising out of 38 USC 7422

**Section 2: Election of Grievance Procedure**

A. As dissatisfactions and disagreements arise occasionally among people in any work situation, the filing of a grievance shall not be construed as reflecting unfavorably on a RN's good standing, performance, loyalty, or desirability to the VA. The mere filing of a grievance will not reflect negatively on the Department or NNU.

B. As provided for in 5 USC 7121 and 38 USC 7461, the following actions may be filed either under an applicable statutory procedure (i.e., the agency grievance procedure, unfair labor practice (ULP) or EEO procedures) or the negotiated grievance procedure on the same issue, but not both:

1. Disciplinary actions that do not involve professional conduct or competence (38 USC 7461(b)(2)), major adverse actions that do not involve professional conduct or competence (38 USC 7463), and other grievances, and/or

2. Discrimination (5 USC 2302(b)(1)).

C. Nothing in this Contract shall constitute a waiver of any further appeal or review rights permissible under 5 USC Chapter 71.

D. RNs shall be deemed to have exercised the option referred to in this section when they timely initiate an action under the applicable statutory procedure or file a timely grievance in writing under the negotiated grievance procedure, whichever event occurs first. Discussions between a RN and an EEO Counselor at the informal stage would not preclude a RN from opting to select the negotiated grievance procedure if the grievance is otherwise timely. For purposes of an EEO action, the time limit for filing a grievance should be extended in writing if the additional time may help facilitate the resolution of the RN's complaint or contribute to a full and complete investigation of the facts.

## Section 3: Jurisdiction

A. If either party considers a grievance nongrievable or nonarbitrable, the original grievance will be considered amended to include this issue. The two issues will be adjudicated separately. When the Secretary has determined an issue to be exempt from the grievance procedure under 38 USC 7422, an arbitrator has no jurisdiction over that issue. When a request for a 7422 decision has been made, the arbitration will be stayed pending the issuance of the decision.

B. This provision is for informational purposes only and is excluded from collective bargaining. If Department managers and management staff believe that a matter may be excluded from collective bargaining or the grievance procedure under 38 USC 7422 because the matter covers, or has any applicability to, any matter or question concerning or arising out of (1) professional conduct or competence, (2) peer review, or (3) the establishment, determination, or adjustment of RN compensation, they may explain and discuss their rationale with NNU and provide information as appropriate. Only the Secretary, or designee, has the authority to decide whether an issue is excluded from collective bargaining or the grievance procedure under 38 USC 7422. Consistent with VA Handbook 5023, and any revisions thereto, if the Department submits a request to the Secretary to have a matter excluded from collective bargaining or the grievance procedure,

NNU should be afforded the opportunity to formally submit NNU's written position on the matter.

## Section 4: Representation

A. The only representative a RN may have under this negotiated grievance procedure is a NNU representative approved in writing by NNU. A RN may pursue a grievance under the negotiated procedure without NNU representation, but NNU may elect to attend each grievance step. NNU will be provided notice when any grievance under the negotiated grievance procedure is filed, as well as given notice of each meeting when a RN chooses not to be represented.

B. Reasonable time during work hours will be allowed for RNs to discuss, prepare for, and present grievances, including attendance at meetings with management officials concerning the grievances.

## Section 5: Informal Resolutions

A. Most grievances arise from misunderstandings or disputes which can be settled promptly and satisfactorily on an informal basis, if the RN, NNU and the Department agree.

B. The parties may use alternative dispute resolution to settle grievances.

C. The parties agree that grievances will be settled at the lowest possible level. RNs are encouraged to informally discuss issues of concern to them with NNU and/or their supervisors at any time.

D. RNs and/or NNU may request to talk with supervisors and other appropriate Department officials about items of concern without filing a formal grievance if they choose.

## Section 6: Grievance Procedure

A. Any grievance must state, in detail, the basis for the grievance, including the specific contract provision, policy, handbook, directive or law, etc., allegedly violated by that action and the corrective action desired.

B. When information is requested by NNU to assist in processing the grievance, the Department will provide information consistent with 5 USC 7114(b)(4) and to the extent not prohibited by law.

C. When a RN or NNU file a local grievance, the following steps will be followed:

**Step 1**: The RN and/or NNU shall present the grievance to the immediate or acting supervisor in writing within 30 calendar days of the date that the RN or

NNU became aware or should have become aware of the act or occurrence or anytime if the act or occurrence is of a continuing nature. Situations caused by actions which were taken or occurred on one specific date are not considered continuing violations despite any continuing effects they may have. The supervisor or designee will meet with the RN and/or NNU, upon request, to attempt to resolve the grievance and fully understand the nature of the grievance. A written answer will be provided within 14 calendar days of receipt of the grievance. If the Department fails to respond within 14 days, NNU may advance the grievance to the next step.

**Step 2**: If the grievance is not satisfactorily resolved at Step 1, it must be presented to the Associate Director for Patient Care Services (ADPCS), i.e., Chief Nurse Executive (CNE), or designee in writing, within 15 calendar days of the Step 1 supervisor's decision. The ADPCS, i.e., CNE, or designee will meet with the RN and/or NNU, upon request, to attempt to resolve the grievance and fully understand the nature of the grievance. A written answer will be provided within 10 calendar days of receipt of the grievance. If the Department fails to respond within 10 days, NNU may advance the grievance to the next step.

**Step 3**: If the grievance is not satisfactorily resolved at Step 2, the RN or NNU shall submit the grievance to the Director, or designee, in writing, within 15 calendar days of receipt of the Step 2 decision. The Director or designee will meet with the RN and/or NNU, to attempt to resolve the grievance and fully understand the nature of the grievance. A written answer will be provided within 10 calendar days of receipt of the grievance. If the Department fails to respond within 10 days, NNU may advance the grievance to the next step.

**Step 4**: If the grievance is not satisfactorily resolved in Step 3, the grievance may be referred to arbitration.

## Section 7: Matters Related to the Grievance Procedure

A. At any step of the negotiated grievance procedure, when any management deciding official designates someone to act on his/her behalf, that designee will have the complete authority to render a decision at that step and will render the decision. The designee will never be someone who decided the issue at any previous step.

B. The grievance may be resolved at any step in the procedure.

C. Grievances should normally be resolved at the lowest level possible. However, a grievance may be more appropriately initiated at the second or third step of the procedure when:

1. Disciplinary action is taken by a Service Chief or higher level;

2. The supervisor at the lower level clearly has no authority to resolve the issue;

3. NNU grieves an action of a management official other than a Step 1 supervisor; or

4. The Department files a grievance against NNU.

D. When a grievance is initiated at a higher step, the time limits of Step 1 will apply.

E. Department-initiated grievances at the local level shall be filed with the NNU local union Director or designee and shall constitute Step 3 of the negotiated grievance procedure. Such grievance must be filed within 30 calendar days of the act or occurrence or when the Department became aware of, or should have become aware of, the act of occurrence. The time limits for the meeting and response will be 14 calendar days.

## Section 8: Time Extensions

Time limits at any step of the grievance procedure may be extended by mutual agreement in writing prior to the expiration of the time limit. Requests for an extension of time will not be unreasonably denied by either party.

## Section 9: Multiple Grievances

Multiple grievances over the same issue may be initiated as either a group grievance or as single grievances at any time during the time limits of Step 1. Grievances may be combined and decided as a single grievance at the later steps of the grievance procedure by mutual consent.

## Section 10: Failure to Respond

A. Should the moving party fail to comply with the time limits in this Article, unless an extension has been granted, at any step set forth in this Contract, the grievance is dismissed.

B. Should the responding party fail to comply with the time limits in this Article, unless an extension has been granted, the grievance may be advanced to the next step.

## Section 11: National-Level Grievances

A. A national-level grievance is a grievance that affects two or more facilities or is a matter that the facility Director does not have the authority to resolve.

B. Grievances between the Department and NNU at the national level shall be filed by the aggrieved party as follows:

175

1. Within 45 calendar days of the act or occurrence or within 45 days of the date the party became aware of or should have become aware of the act or occurrence or at any time if the act or occurrence is continuing, the aggrieved party may file a written grievance with the other party. Situations caused by actions which were taken or occurred on one specific date are not considered continuing violations despite any continuing effects they may have.

2. Upon receipt of a grievance, the parties will meet (in person, telephonic, or by other remote teleconference) and communicate with each other in an attempt to resolve the grievance. A final written decision, including any position on grievability or arbitrability, must be rendered by the respondent within 45 days of receipt of the grievance. If a decision is not issued in 45 days or if the grieving party is dissatisfied with the decision, the grieving party may proceed to arbitration. The time limits may be extended by mutual agreement in writing prior to the expiration of the time limit.

176

## ARTICLE 48: ARBITRATION

**Section 1; General**

A. Only NNU or the Department may refer to arbitration any grievance that remains not satisfactorily resolved after the final step under the procedures of the Grievance Procedure Article.

B. Questions of arbitrability or grievability which cannot be resolved by NNU and the Department shall be referred to arbitration for decision. The arbitration process shall be bifurcated where either party asserts that the issue(s) is non-arbitrable or non-grievable.

C. Official notices as required by this article may be by email or other formal written communication. This is not meant to inhibit verbal communication in an effort to resolve the issues.

**Section 2: Notice to Invoke Arbitration**

A notice to invoke arbitration shall be made in writing to the opposite party within 30 calendar days after receipt of the written decision rendered in the final step of the grievance procedure. Failure of the moving party to invoke arbitration within 30 calendar days will constitute termination of the grievance unless the parties mutually agree to allow the grievance to continue.

**Section 3: Arbitration Procedure**

A. Within 10 calendar days from the date of the notice to invoke arbitration, the moving party will request the Federal Mediation and Conciliation Service (FMCS) to provide a list of seven impartial persons to act as an Arbitrator. A copy may be requested by the other party if timeliness is in question. Failure of the moving party to request a panel from the FMCS will constitute termination of the grievance unless the parties mutually agree to allow the grievance to continue.

1. By mutual agreement NNU and the Department may agree to use an Arbitrator outside of the FMCS list.

2. If using the FMCS list, NNU and the Department will meet within 10 calendar days after receipt of such list to select an Arbitrator (this may be done by telephone). Failure of the moving party to agree to meet within this time frame will constitute termination of the grievance unless the parties mutually agree to allow the grievance to continue. Should the other party fail to meet within 10 days, the moving party may unilaterally select an Arbitrator. On the agreed upon date, the parties will alternatively strike one potential Arbitrator's name from the list of seven and repeat this procedure until one name remains. The

remaining person will be the duly selected Arbitrator. The parties will choose lots to determine who strikes the first name.

3. Following the selection, the moving party will, within seven calendar days, notify the FMCS of the name of the Arbitrator selected. A copy of the notification will be served on the other party. Failure of the moving party to notify the FMCS within seven calendar days will constitute termination of the grievance unless the parties mutually agree to allow the grievance to continue.

4. When the selected Arbitrator notifies NNU and the Department of his/her availability to conduct the hearing, NNU and the Department will confer within seven calendar days or at a mutually agreeable date, to reach agreement on the hearing date. The Arbitrator will be promptly notified of the date.

5. The arbitration hearing date must be scheduled (but not necessarily held) within 90 days from the date the Arbitrator was selected or the grievance will be considered terminated. An exception to this time period will be made by mutual consent to extend the timeframes. Additionally, an exception will be made for inability on the part of the Arbitrator to provide a hearing date. Should the Department refuse to participate in scheduling the arbitration within the 90 day period, NNU may unilaterally schedule the arbitration hearing date. If a mutually agreeable date is not readily available for the selected Arbitrator, NNU and the Department may elect to use another Arbitrator.

6. Prior to the arbitration date, the parties will attempt to prepare a joint statement of the issue(s). If no agreement is reached, each party will submit its own statement of the issues, at least seven calendar days prior to the arbitration date for the Arbitrator's consideration. In case of disagreement, the Arbitrator will determine the final statement of the issues.

7. If either party considers a grievance nongrievable or nonarbitrable, the original grievance will be considered amended to include this issue. Grievability or arbitrability will be adjudicated by the Arbitrator prior to the arbitration hearing. A final decision on grievability or arbitrability will be rendered by the Arbitrator at least fifteen calendar days prior to the scheduled arbitration date. The Arbitrator may schedule pre-hearing conferences, require written submissions from the parties, or take other actions necessary to reach a complete understanding of the parties' claims of nongrievability or nonarbitrability. The Arbitrator may not schedule in person face-to-face meetings to resolve a claim of nongrievability or nonarbitrability.

B. The procedures used to conduct an arbitration hearing shall be determined by the Arbitrator. All witnesses necessary for testifying at the arbitration will be on duty time if otherwise in a duty status. With at least six weeks advance notice

from NNU, the Department will arrange necessary witnesses' schedules and place them on duty during the arbitration hearing whenever practical. Participating witnesses will be allowed a reasonable amount of official time to prepare for arbitration and to participate in the arbitration hearing.

C. The Arbitrator's fees and expenses, including the panel request fees, and transcript fees shall be borne equally by NNU and the Department. The parties will share equally the costs of the use of a court reporter. If the Department requests a transcript the Department will pay the cost of preparing and copying the arbitration transcript. If the Union requests a transcript the Union will pay the cost of preparing and copying the arbitration transcript. Upon mutual cancellation of the arbitration (i.e., settlement), NNU and the Department shall bear equally any cancellation fee. If one party cancels the arbitration and a cancellation fee is required, that party will be responsible for the total fees for the Arbitrator.

D. For single station local grievances, the site normally will be the facility where the grievance exists. At the local's request, another site may be designated upon mutual agreement. If another site is used based on the local's request, the local will pay the cost of the site. For national grievances normally the hearing will be held in Washington, D.C. unless NNU and the Department mutually agree to another site.

E. The Arbitrator's decision shall be final and binding. However, either party may file an exception to the Arbitrator's award in accordance with applicable law and regulations. The Arbitrator will be requested to render a decision within 45 days. Any dispute over the interpretation of an Arbitrator's award shall be returned to the Arbitrator for settlement, including remanded awards. The Arbitrator shall have no authority to alter, amend, add to or subtract from the contract. The Arbitrator shall be bound by and must comply with all terms of the contract.

F. The Arbitrator has full authority to award appropriate remedies, including reasonable legal fees and costs to the extent authorized by applicable statutory and regulatory authorities.

G. Nothing shall prevent the use of the Arbitrator for mediation if mutually agreed upon by NNU and the Department.

H. Visitors and observers will be allowed to attend and observe arbitration proceedings if mutually agreed upon by NNU and the Department and the Arbitrator.

I. NNU and the Department will pay 100 percent for the fees, travel, per diem and expenses for their representatives.

J. NNU and the Department will furnish names of any witnesses and representatives, their installation and work location, if not located at the hearing

site, to the other party at least 10 workdays in advance of the arbitration. If witnesses are added to the list after the 10 day deadline, the other party will be informed in writing immediately. When witnesses are outside a 200-mile radius, NNU and the Department will attempt to obtain testimony without requiring witness travel.

## Article 49: Dues Deduction

### Section 1: Eligibility

A. Any bargaining unit RN may have dues deducted through payroll deductions. Such deductions will be discontinued when the RN leaves the unit of recognition, ceases to be a member in good standing of NNU, or submits a timely revocation form under the procedures of this Article.

B. RNs that are placed in training assignments in the bargaining unit of 90 days or less shall remain as members of the unit of recognition and eligible for dues deduction.

### Section 2: NNU Responsibilities

A. NNU agrees to inform the Department, in writing, of the following:

1. The dues amount(s) or changes in the dues amounts;

2. The names of the NNU officials responsible for certifying each RN's authorization form, the amount of dues to be withheld, and changes in allotments; and,

3. The name and address of the payee to whom the remittance should be made.

B. NNU agrees to promptly forward completed and certified form(s) to the appropriate Department office via facsimile or other secure appropriate manner, such as encrypted email.

C. The local NNU Director or designee will notify the Department immediately of issues regarding dues deduction.

### Section 3: Department Responsibilities

A. It is the responsibility of the Department to:

1. Complete the processing of voluntary allotments of dues in accordance with this Article and in amounts certified by NNU within two weeks of receipt of a properly certified authorization form;

2. Withhold RN dues on a bi-weekly basis;

3. Transmit copies of the remittance list via email to the NNU national office and one other location as specified by NNU, at the end of each pay period.

4. Transmit copies of the bi-monthly anniversary report via email to each NNU local and the NNU national office at the end of each pay period. The anniversary report will be an Excel document and will include: RN name, pay period, station, duty station, city, code, option, employee ID, dues amounts, T&L Unit, work schedule (full-time/part-time), separation date and anniversary date.

B. Electronic transfer of funds will be authorized for the transmittal of NNU dues.

### Section 4: Procedures for Withholding

A. Bargaining unit members wishing to have his/her dues withheld by payroll deduction will submit his/her completed SF-1187s or the NNU Dues Deduction Form to NNU designated officials. A NNU official will certify the form and include the amount of dues to be withheld.

B. The certified SF-1187 or the NNU Dues Deduction Form will be forwarded to the appropriate VA office for processing. Dues withholding will become effective at the beginning of the next pay period if received in the appropriate VA office at least three workdays prior to the beginning of that pay period.

C. Questions concerning whether an RN is in the unit of recognition and eligible for payroll deduction of NNU dues will be resolved through consultations between the Human Resource Manager or designee and local NNU officials and/or through a unit clarification petition. In the event a clarification of unit petition is filed, the RN's dues will be withheld pending a decision on the petition.

### Section 5: Changes in Dues Amount

A. At any time there is a change in dues structure, the designated national NNU official will send a memorandum to the appropriate Department official noting the amount of the change.

B. The new amount will be deducted starting the first pay period following receipt by the Fiscal Officer unless a later date is specified.

C. The memorandum must be signed by one of the national NNU officials designated to certify dues withholding amounts.

### Section 6: Revocation

A. Consistent with 5 USC 7115(a), RNs may revoke his/her dues withholding only once a year, on the anniversary date of his/her original allotment, by submitting a timely SF-1188. The SF-1188 is available on the VA web site.

B. NNU will inform RNs that:

1. Dues withholding may be revoked by submitting a SF-1188 to the Department within a 21 calendar day period prior to the anniversary date of the RN's signature as indicated on the SF-1187.

2. If a request for revocation is not submitted within the timeframe cited above, the authorization will continue for additional one year periods on each anniversary of the date a SF-1187 was signed.

3. In order for the SF-1188 to be timely, it must be submitted to the Department between the anniversary date of the effective date of the dues withholding and 21 calendar days prior to the anniversary date.

C. Upon request from a RN, the Department will process SF-1188s in accordance with the terms and conditions specified on SF-1187s and this Article. The Department will return SF-1188s or equivalent if not timely filed. The Department will forward to the designated NNU representative(s) copies of processed SF-1188s received directly from RNs.

## Section 7: Continuation of Dues

A. When a RN has dues temporarily stopped, or is detailed/temporarily promoted out of the bargaining unit, NNU dues withholding will restart automatically when the RN returns to the bargaining unit, with reinstatement of the RN's original anniversary date.

B. Anytime Department officials request the Fiscal Office in writing to discontinue a RN's dues withholdings because the RN has left the unit of recognition (i.e., promotion and reassignment), a copy of such request shall be provided to NNU. Where a dispute arises over whether or not the person has left the unit and eligible for payroll deduction of NNU questions will be resolved through consultations between the Human Resource Manager or designee and local NNU officials and/or through a unit clarification petition. In the event a clarification of unit petition is filed, the RN's dues will be withheld pending a decision on the petition.

## Section 8: Costs

All payroll deductions and transmittals will be made at no cost to NNU.

## Section 9: New Position Determination

If any RN who is on dues deduction is selected for a new, non-supervisory position and NNU and the Department do not agree on whether a position is in the bargaining unit, the RN will remain on dues deduction until the matter is resolved.

## ARTICLE 50: MID-TERM BARGAINING

### Section 1; General

A. The purpose of this Article is to establish a complete and orderly process and ground rules to govern mid-term negotiations at the National, Intermediate and Local levels.

B. When the Union demands to bargain as a result of Department initiated changes in working conditions of bargaining unit employees that triggers a duty to bargain under the Statute, the Department will bargain as appropriate at the level defined by this Article.

C. The level at which bargaining occurs will be determined by the organizational level where the change is being proposed.

   1. If the change is proposed at the National level the change will be negotiated with NNOC/NNU-VA at the national level.

   2. If the change is proposed at the intermediate (VISN) level, notice will be given to the designated NNOC/NNU-VA National representatives.

   3. If the change is proposed at the local level the change will be negotiated at the local level.

   4. At each level described above, the Union will designate two representatives who will receive all notices as outlined in this Agreement. The designation(s) will include the name, business address, email address, and all VA phone numbers, including cell phone numbers issued by the Department.

D. Recognizing that the NNOC/NNU-VA Master Contract cannot cover all subjects, it is understood that mid-term agreements may include substantive bargaining on all subjects not covered in the NNOC/NNU-VA Master Contract.

### Section 2: National Bargaining and Ground Rules

A. The Department will forward a notification of all proposed changes for which there is a statutory bargaining obligation to the Chair NNOC/NNU-VA and a second designated national representative, along with copies of all relevant documents to explain the change. Service will be done electronically. The date of receipt for electronic notices will be three business days following the date the electronic notice was sent.

B. Once the notice has been delivered pursuant to Section 2A, the following time limits will apply:

1. NNOC/NNU-VA shall have 15 calendar days from the date of receipt of a notification described in Section 2A above to request a briefing and 30 calendar days from the date of receipt of the notification described in Section 2A above to request bargaining. If NNOC/NNU-VA has not requested bargaining within this time frame, the Department may implement the proposed change. This does not preclude the parties from discussion post-implementation.

2. The Department will have seven calendar days from the briefing request described in Section 2B1 above to arrange the briefing, subject to the availability of appropriate officials needed to provide/receive the briefing or consultation.

3. NNOC/NNU-VA will have 30 days from the receipt of the notice of proposed change or briefing if one was provided to forward a complete set of written proposals to the designated Department official authorized to negotiate. The proposals will address the substance or impact of the change as appropriate and will not address unconnected matters unrelated to the proposed change.

4. Upon receipt of the written proposals, the parties will begin negotiations within 30 calendar days.

   a. If NNOC/NNU-VA has not submitted written proposals within the time frame in Section 2B3, the Department may implement the proposed change. This does not preclude the parties from discussion post-implementation.

   b. Within this 30 day period, the parties will initially attempt to reach agreement by negotiating by telephone or other virtual technology (for example V-Tel or Live Meeting). Telephone negotiations will normally be for up to two (2) hours per call, commencing at a mutually agreeable time and continuing for no more than two (2) calls unless mutually agreed upon by the NNOC/NNU-VA and VA. If NNOC/NNU-VA and VA are unable to reach agreement through this effort, negotiations will proceed face-to-face. Such bargaining will ordinarily take place in the Washington, DC area unless otherwise mutually agreed upon. Upon request the Department will provide access to the appropriate equipment to enable the designated NNOC/NNU-VA representatives to participate in the negotiations.

5. Face-to-face bargaining at the national level will not usually exceed five working days. The five workday period is to include necessary travel, preparation, and actual bargaining. This time period may include mediation. The parties will bargain in good faith to reach agreement as expeditiously as possible. The parties may agree to reasonable extensions of time for complex issues provided that the total time does not cause an unreasonable delay or

unreasonably impede the Department from making the change(s) in a timely manner.

    6.  Extensions or reductions of any time periods will be by mutual agreement.

C. Each party may have up to six negotiators for telephone negotiations and up to six negotiators for face-to-face negotiations. The number of negotiators may, by mutual agreement, be increased or decreased based on the complexities and/or number of issues to be negotiated. The parties will exchange the names of the bargaining team members for the specific issue(s) to be discussed prior to the beginning of bargaining. This does not preclude the attendance of experts by mutual consent of the parties.

D. For face-to-face negotiations, travel and per diem will be paid for four NNOC/NNU bargaining team members by the Department, pursuant to the Federal Travel Regulations. The number of NNOC/NNU bargaining team members for whom travel and per diem will be paid may be changed by mutual agreement. Normally, the Department will furnish VA space and equipment for these negotiations.

E. Face-to-face bargaining sessions will be for eight and a half hour days at mutually agreeable times, which will include a break for lunch. However, the parties, by mutual agreement, may extend or shorten such bargaining sessions as necessary. The parties may agree to utilize Alternate Dispute Resolution mechanisms.

F. No official electronic recording or verbatim transcripts will be made during the negotiations. However, each party may make and keep its own notes and records. The notes may be taken on a non-voice activated electronic device unless required by disability of a team member.

G. Either party requesting a caucus will leave the bargaining room to caucus in a room provided by the Department. There is no limit on the number of caucuses which may be held but each party will make every effort to restrict the number and length of caucuses.

H. Cell phones and other electronic devices will be placed on vibrate mode.

I. The Chief negotiator for each party will initial each clause as tentatively agreed. There is no agreement until all proposals have been initialed or withdrawn.

J. These ground rules do not preclude the development and use of more specific ground rules by mutual agreement and as needed by circumstances and complexity of the issues.

K. The Department retains the right to modify, withdraw, or add to any interests, concerns, or proposals they may have discussed or exchanged earlier related to the proposed change.

L. National memorandums of understanding will be available electronically. The Department will electronically distribute copies of all MOUs to each local facility and local NNOC/NNU-VA.

M. The Parties agree that when any changes in statutory law that conflict with this Contract occur, the Department will notify the Union in writing. The Parties will meet within 30 calendar days after notice was provided to negotiate over the appropriate arrangements and procedures regarding changes that impact the Contract.

## Section 3: Intermediate Level Bargaining and Ground Rules

Bargaining at the intermediate level will follow the procedures outlined in Section 2. The location for face-to-face negotiations will be mutually determined. The parties will make reasonable efforts to use bargaining team members from the geographic area of concern. Unless changed by mutual agreement, no more than four NNOC/NNU-VA negotiators will be utilized. The Department will pay for travel for up to three NNOC/NNU-VA negotiators.

## Section 4: Local Level Bargaining and Ground Rules

A. The Department will forward a notification of all proposed changes for which there is a statutory bargaining obligation to the NNOC/NNU-VA Local Director and a second designated local representative, (could include NNOC NNU Labor Representative) along with copies of all relevant documents to explain the change. Service will be done electronically. The date of receipt for electronic notices will be three business days following the date the electronic notice was sent.

B. Once notice is given to the NNOC/NNU-VA representatives pursuant to Section 4A, the local may either request a briefing or demand to bargain.

   1. If NNOC/NNU-VA chooses to request a briefing, it must do so within fifteen days of the receipt of the notice.

      a. The Department will have seven calendar days from the briefing request to arrange the briefing, subject to the availability of appropriate officials needed to provide/receive the briefing or consultation.

      b. After the briefing, NNOC/NNU-VA will have ten days to demand to bargain and submit proposals to the Department.

      c. Once proposals are received by the Department, the bargaining will begin within seven days.

      d. Face-to-face bargaining will not usually exceed five working days. The five workday period is to include necessary travel, preparation, and actual bargaining. This time period may include mediation. The parties will bargain in good faith to reach agreement as expeditiously as possible.

      e. The parties may agree to reasonable extensions of any of the above time frames provided that the total time does not cause an unreasonable delay or unreasonably impede the Department from making the change(s) in a timely manner.

      f. If NNOC/NNU-VA has not requested bargaining within this time frame, the Department may implement the proposed change. This does not preclude the parties from discussion post-implementation. Every effort will be made by NNU to request the briefing and bargaining in the earliest time frame.

2. If NNOC/NNU-VA chooses to demand to bargain without requesting a briefing, they must submit a demand to bargain and a complete set of proposals within thirty calendar days.

      a. Once proposals are received by the Department, the bargaining will begin within seven days.

      b. Face-to-face bargaining will not usually exceed five working days. The five workday period is to include necessary travel, preparation, and actual bargaining. This time period may include mediation. The parties will bargain in good faith to reach agreement as expeditiously as possible.

      c. The parties may agree to reasonable extensions of any of the above time frames provided that the total time does not cause an unreasonable delay or unreasonably impede the Department from making the change(s) in a timely manner.

      d. If NNOC/NNU-VA has not requested bargaining within this time frame, the Department may implement the proposed change. This does not preclude the parties from discussion post-implementation. Every effort will be made by NNOC/NNU-VA to request the briefing and bargaining in the earliest time frame.

C. Each party may have up to four negotiators. The number of negotiators may by mutual agreement be increased or decreased based on the complexities and/or number of issues to be negotiated. The parties will exchange the names of the bargaining team members for the specific issue(s) to be discussed prior to the

beginning of bargaining. This does not preclude the attendance of experts by mutual consent of the parties.

D. The Department will furnish VA space and equipment for these negotiations.

E. Face-to-face bargaining sessions will be for eight and a half hour days at mutually agreeable times, which will include a break for lunch. However, the parties, by mutual agreement, may extend or shorten such bargaining sessions as necessary. The parties may agree to utilize Alternate Dispute Resolution mechanisms.

F. No official electronic recording or verbatim transcripts will be made during the negotiations. However, each party may make and keep its own notes and records. The notes may be taken on a non-voice activated electronic device unless required by disability of a team member.

G. Either party requesting a caucus will leave the bargaining room to caucus in a room provided by the Department. There is no limit on the number of caucuses which may be held but each party will make every effort to restrict the number and length of caucuses.

H. Cell phones and other electronic devices will be placed on vibrate mode.

I. The Chief negotiator for each party will initial each clause as tentatively agreed. There is no agreement until all proposals have been initialed or withdrawn.

J. These ground rules do not preclude the development and use of more specific ground rules by mutual agreement and as needed by circumstances and complexity of the issues.

K. NNOC/NNU-VA and the Department retain the right to modify, withdraw, or add to any interests, concerns, or proposals they may have discussed or exchanged earlier related to the proposed change.

L. Local memorandums of understanding will be available electronically.

## ARTICLE 51: LOCAL SUPPLEMENTAL CONTRACTS, MEMORANDA OF UNDERSTANDING AND AGREEMENTS

1. Local supplemental agreements (LSAs) in existence prior to the effective date of the successor agreement to the 2012 Master Agreement (the "Contract") will terminate upon the effective date of the Contract, except as provided in Section 2 below.

2. Should a party wish to have any LSA in existence prior to the Contract continue in existence then such request shall be made by providing a copy of that LSA to VHA WMC 106A (VHA106AWMCHRM@va.gov) and NNOC/NNU, along with their request, within 60 days from date this Contract becomes effective. The parties will then attempt to negotiate a successor agreement. Should a successor agreement not be reached within seven (7) months from the end of the initial 60-day period, then the parties shall submit all outstanding agreements in dispute to the FMCS for mediation within 30 days of the end of the 7-month negotiation period. The parties must engage in a minimum of one mediation session, after which either party may declare impasse. Should the parties reach impasse during mediation, then the mediator shall issue any mediator report/supposals. The impasse shall then be submitted to FSIP for resolution. To the extent the LSA does not conflict with the Contract or violate any existing law, rule or regulation, the LSA will remain in effect until the parties have reached an agreement or the FSIP has made a decision.

3. Local MOUs that were previously bargained based on the 2012 Master Agreement will remain in effect to the extent that their terms are not in conflict with the Contract or in violation of existing law, rule or regulation.

4. All other local MOUs in existence prior to the Contract will terminate upon the effective date of the Contract, except as provided in Section 5.

5. Should a party wish to have any local MOU in existence prior to the Contract continue in existence then such request shall be made by providing a copy of that MOU to VHA WMC 106A (VHA106AWMCHRM@va.gov) and NNOC/NNU, along with their request, within 90 days from date this Contract becomes effective. The parties will then attempt to negotiate a successor agreement. Should a successor agreement not be reached within nine (9) months from the end of the initial 90-day period, then the parties shall submit all outstanding agreements in dispute to the FMCS for mediation within 30 days of the end of the 9-month negotiation period. The parties must engage in a minimum of one mediation session, after which either party may declare impasse. Should the parties reach impasse during mediation, then the mediator shall issue any mediator report/supposals. The impasse shall then be submitted to FSIP for resolution. To the extent the MOU does not conflict with the Contract or violate any existing law, rule or regulation, the MOU will remain in effect until the parties have reached an agreement or the FSIP has made a decision.

6. National MOUs will continue in effect to the extent that the terms of the MOUs are not in conflict with this Contract.

7. For the purposes of this Article, a term is in conflict with the Contract if it would: (a) alter the terms of the Contract or (b) interfere with or impair its implementation.

8. Any party taking the position that a provision of a LSA or MOU conflicts with the Contract or violates existing law, rule or regulation must identify in writing the basis of its position as expeditiously as practicable following the request that the LSA or MOU continue in existence.

9. The local Parties will not negotiate a new LSA during the duration of this Contract.

## ARTICLE 52: NURSE LOCALITY PAY SURVEY

A. VA policy prescribes both valid mechanisms for the collection of survey data and the order in which types of available survey data are applied to increase existing rates or establish new rates of pay for nurse schedules. A facility may utilize a local contractor provided survey, a national third party salary survey, or if salary survey data is not readily available, the facility may perform a Department conducted Nurse Locality Pay Survey, with survey team members appointed by the Medical Center Director (MCD).

B. Should the MCD appoint a team to conduct a Nurse Locality Pay Survey, NNU will be notified and may recommend names for inclusion as team members. RN pay scales are determined by the Department and are not subject to collective bargaining and/or the negotiated grievance procedure. This does not preclude NNU from providing information and recommendations for RN pay scales. Upon request, NNU will be provided a copy of the data used to determine RN pay scales.

C. If national data is used, the Department will discuss with NNU the data used in its review and provide a copy, upon request.

D. NNU may recommend certain establishments within the geographic survey area to be contacted for Department conducted surveys.

E. NNU shall have the right, if it believes circumstances in the geographical area warrant, to submit a request to the MCD to have a locality pay survey conducted. The MCD will give full consideration to this request prior to making his/her final determination. If a survey is not conducted, the MCD or designee will provide a written explanation of his/her decision, upon request.

F. VHA Handbook 5007, Part X, Locality Pay System, Chapter 1, General Provisions, 5(b) addresses the review of pay-setting and/or survey decisions and states:

[OCHCO, Compensation and Classification Service] (055) officials will review pay-setting and/or survey decisions at least annually to determine if action by the Under Secretary for Health is warranted. Such reviews will normally be conducted coincident with the annual reporting requirement in paragraph 6 of this chapter but may take place at other times as requested by the Under Secretary for Health.

## ARTICLE 53: NNU REPRESENTATION ON COMMITTEES

A. It is understood that this Article does not extend to matters involving professional conduct or competence, peer review, or the establishment, determination, or adjustment of RN compensation.

B. Participation on committees may eliminate the need for formal bargaining but is not a waiver of bargaining rights of either party. NNU representatives serving on committees will be on official time consistent with the Official Time Article of this Contract.

C. NNU may request to be represented on Department committees, initiatives and task force groups which impact working conditions of NNU bargaining unit RNs at the local, intermediate and national levels.

D. Consistent with Section A above, if a local committee directly impacts nursing care delivery (i.e. Nurse/Pharmacy and Nurse/SPD), NNU may request representation which will not be unreasonably denied.

E. Nothing in this Article is intended to alter current NNU participation and membership on committees, initiatives and task force groups.

F. Upon determining that NNU participation is appropriate, the Department will invite a NNU representative to attend meetings that involve external stakeholders for matters that impact working conditions of RNs.

G. No later than 90 days after the effective date of this Contract, the Department will provide to the local NNU a list of any known committees that impact working conditions of RNs. Subsequently, the Department will inform NNU when new committees which impact working conditions of NNU bargaining unit RNs are formed.

H. Minutes, policies, manuals etc., from these committees will be made available to NNOC NNU through their member/representative and one alternate. If available electronically, the union member/representative and one alternate will have access to SharePoint, databases and Dashboards related to the committees. No PHI or PII will be shared under this section.

## ARTICLE 54: AFFILIATIONS/JOINT VENTURES

### Section 1:

The Department will honor NNU's rights as the exclusive representative regardless of any relationship between the Department and any affiliated body, agency, department, assignee or contractor.

### Section 2:

The Department agrees that officials of an affiliate/joint venture acting in a supervisory capacity over bargaining unit RNs shall be bound by applicable law, regulations, and the terms of this Contract and any applicable supplemental contracts in his/her supervisory relationships with bargaining unit RNs.

## ARTICLE 55: CHANGE IN OWNERSHIP OR MERGER OF A VA FACILITY

**Section 1:**

Before the sale, transfer of ownership or merger of any VA facility or part thereof in which NNU represents RNs, the Department will give NNU written notice as far in advance as possible prior to the transaction. The term merger includes both a merger of a VA facility with a non-VA entity as well as a merger with another VA facility. The Department will bargain as appropriate if the sale, transfer of ownership or merger triggers a duty to bargain under the Statute.

**Section 2:**

Upon sale, transfer of ownership or merger of a VA facility or part thereof, the Department will remain neutral in any action before the FLRA seeking to continue NNU's certification as the exclusive representative, if the unit would otherwise be considered an appropriate unit under the law.

## ARTICLE 56: RESTRUCTURING, CONSOLIDATING, INTEGRATING OR CLOSING VA FACILITIES OR UNITS

 Section 1: General

A. The Department may consider restructuring, consolidating, integrating, share(ing) agreements or closing facilities/units.

B. In the event that restructuring, consolidating, integrating or closing facilities/units is contemplated or proposed, NNU at the appropriate level(s) will be notified. To the extent practicable, the Department will notify NNU at the earliest possible time to allow for discussions.

C. Notification of the closing or opening of a VHA facility shall be given to the NNU National Office as far in advance as possible prior to the transition.

D. Where a duty to bargain is triggered by the Statute, the Department will bargain with NNU at the appropriate level, to the extent required by law, regarding restructuring, consolidating, integrating, or closing facilities/units.

E. Conferring with affected RNs regarding restructuring, consolidating, integrating, or closing facilities/units is an appropriate use of official time.

 Section 2: Reduction in Force (RIF)/Staff Adjustment Planning and Implementation

A. In the event that a staff adjustment is necessary in conjunction with a decision to restructure, consolidate, integrate or close any facility/unit, the Department will provide reasonable notice (normally 60 days) to NNOC-NNU and to all RNs affected. In all cases, RNs will be given a minimum of 30 days advance notice. Once notice has been given, NNOC-NNU will be given a list of affected RNs. The notice will include the reason for the RIF/Staff Adjustment, anticipated scope of impact, time frames, and information concerning the availability of placement and other types of assistance.

B. Functional statements must be used in determining Competitive Levels (CL) during the implementation of a RIF/Staff Adjustment, but do not form the sole basis for establishing CL. The functional statement must contain all pertinent information (i.e. principle duties, responsibilities and supervisory relationships) related to the position to ensure accurate job related documentation.

C. Upon request, NNOC NNU will be provided with current specific functional statements for all RNs affected by the staff adjustment.

197

D. Prior to the issuance of management's written notice to affected RNs, the Department will give NNOC NNU the opportunity to review, comment, and discuss its concerns related to competitive levels of the affected RN(s). NNOC NNU will have 10 business days to complete its review and provide comments. Extensions of this time may be made by mutual agreement. Management will be available for discussion during this review period.

E. In the event of a RIF/Staff Adjustment affecting RNs, the Department will act in accordance with law, government-wide rules or regulations and/or VA policy.

F. If a RIF/Staff Adjustment is required, a written plan will be developed and provided to NNU.

G. RNs who are reassigned due to a RIF/Staff Adjustment will receive appropriate training/orientation to the new work location/unit to which they are assigned consistent with the Professional Development and Education Article.

## Section 3: Work Location Movements (No Loss of RNs)

A. When a work location/unit is moved to another area within the facility without a change in the work location/unit mission or staffing, the Department will meet with NNU and the RNs who would be affected by the move to discuss the impact.

B. Identification of RNs affected will be made to the NNU local prior to notification of the individual RNs. RNs will normally be given at least 30 days advance notice when a work location/unit is going to be closed and the RNs are reassigned. Impact and implementation will be locally negotiated when the obligation to bargain is triggered by the Statute.

## Section 4: Realignment of Positions

A. When the Department determines a need to realign positions secondary to changes in function or closing of a work location/unit, NNU will be notified, normally at least 60 days in advance. Where a duty to bargain is triggered by the Statute, the Department will bargain with NNU at the appropriate level, to the extent required by law.

B. The Department has the responsibility to develop plans and procedures to accommodate the realignment of RNs and provide this plan to the union. A RN will be notified, normally at least 30 days in advance, that his/her position is going to be realigned. NNU will be given the opportunity to comment and discuss its concerns regarding RN realignment.

C. RNs who are realigned will receive appropriate training/orientation to the new work location/unit to which they are assigned consistent with the Professional Development and Education Article.

D. If the Department decides to reestablish positions that were previously realigned, an affected RN may make a request to return to the work location/unit. The Department will give serious consideration to the request. When practical, procedures outlined in the Details, Floats and Temporary Assignment Article and the Seniority Article will be considered if these procedures do not conflict with any law, government-wide rule or regulations, or VA policy.

000786

## ARTICLE 57: CONTRACT TRAINING, DURATION AND DISTRIBUTION

### Section 1: Contract Duration

A. Effective Date

1. This Contract is effective upon execution as agreed by the parties in their Settlement Agreement dated July 19, 2021.

2. This Contract remains in effect for a period of three years.

3. This Contract will automatically renew itself for one year intervals, unless either party serves notice of its desire to amend or modify the Contract. The notice must be given no less than 60 days but no more than 120 days prior to the expiration date. If such notice is given and negotiations are not completed by the expiration date the Contract will be extended until the changes are negotiated and approved.

B. Mid-term Reopener

1. This Contract is subject to reopening by mutual consent of the parties. When new or revised laws or regulations of appropriate authority require changes to provisions of this Contract, those provisions may be reopened. Before reopening, the party wishing to reopen will submit to the other party an agenda stating the reasons for reopening and the changes that are desired.

2. The parties agree to meet to negotiate within 30 calendar days or as mutually agreed after proposals on the amendments or modifications are received from the moving party.

C. Federal Mediation and Conciliation Service

The parties will give notice to the other party and the Federal Mediation and Conciliation Service (FMCS) of the desire to amend, modify or terminate this Contract in accordance with the rules of the FMCS.

### Section 2: Distribution of Contract

A. The VA will provide electronic access to the Master Contract to all RNs on duty as of the effective date of this Contract. Upon request, the Department will provide a hard copy of the Master Contract to a requesting employee. Alternatively, the Local may provide a hard copy to the requesting employee.

B. The Department will initially provide NNU National with 250 copies of the Master Contract and each NNU Local with 50 copies.

C. This Contract will be available in PDF format on the Department website within 60 days of implementation. This copy shall be accessible via VACO LMR website at http://www.va.gov/lmr/ and on the intranet homepage for each NNOC NNU-VA facility.

### Section 3: Contract Training

A. NNU is responsible for training its representatives and staff RNs, while the Department is responsible for training its representatives

B. The Department will:

    a. Provide adequate meeting space with projection and video viewing capabilities for the training
    b. Provide access to use live meeting, v-tel or similar video conferencing access to the allow use of expanded remote meeting capabilities
    c. Provide technical support for the training i.e., providing portable compatible lap top, microphones, CD slot access, video-taping, etc.
    d. Assure scheduling, release and support for RNs to attend the training on duty time.

C. NNOC NNU-VA representatives presenting the local training will be on official time that will not count against the local allotment as provided for in the Official Time Article

For the Department of Veterans Affairs

Denis McDonough
Secretary
Department of Veterans Affairs

Lyndsey Miller
Chief Negotiator, VA

Jeffrey L. Whiting
Member

James Zeveski
Member, VHA

Randy Spahos
Member, VHA

Michelle R. Mountfort
Member, VHA

Date: May 25, 2023

For NNOC/NNU

Irma Westmoreland, RN
NNOC/NNU Chair
Chief Negotiator

Mildred Manning-Joy, RN
Negotiating Team

Ray Fletcher, RN
Negotiating Team

Scott Springstead, RN
Negotiating Team

Jonathan Weitz
Chief Negotiator

John Stead-Mendez
VA Division Director

Bonnie Castillo, RN
Executive Director

000789

RE: [External] - RE: Document Request AS-152770 (4th Request)

Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>

Tue 1/16/2024 8:32 AM

To:Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
Cc:Jeff Hayden <jeff.hayden@cesnb.com>

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

Good morning Lisa,

I am working through all that was submitted for this case, can I have until COB tomorrow 1/17 to submit the documents?

Thank you.

Stephanie Vickers
EEO Specialist
Captain James A. Lovell Federal Healthcare Center
3001 Green Bay Rd
North Chicago,IL 60064
Phone:- (224)610-3853
Fax:- (224)610- 3004


**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Friday, December 22, 2023 8:05 AM
**To:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Cc:** Jeff Hayden <jeff.hayden@cesnb.com>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** [EXTERNAL] Re: [External] - RE: Document Request AS-152770 (4th Request)

Greetings Stephanie - how are we coming along on the document request? I still have not received any documents for this case. I am available at 253-355-0337 if you need any additional information.


Best,


Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

RE: [External] - RE: Document Request AS-152770 - Final Request

Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>

Tue 1/16/2024 8:00 AM

To:Lisa Wabinga <Lisa.Wabinga@ceseeo.com>

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

Good morning,

Please see below

Steve Kaufman- Steven Kaufman@va.gov
Yolanda Martinez- Yolanda.Martinez2@va.gov

Thank you.

Stephanie Vickers
EEO Specialist
Captain James A. Lovell Federal Healthcare Center
3001 Green Bay Rd
North Chicago,IL 60064
Phone:- (224)610-3853
Fax:- (224)610- 3004

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Wednesday, January 3, 2024 9:31 PM
**To:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Cc:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** [EXTERNAL] Re: [External] - RE: Document Request AS-152770 - Final Request
**Importance:** High

Thank you - can I get the email addresses for Steven Kaufman and Yolanda Martinez?  Thank you

Best,


Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

**From:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Sent:** Wednesday, January 3, 2024 7:16 AM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** RE: [External] - RE: Document Request AS-152770 - Final Request

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

Good morning Lisa,

Apologies on the delay as I have been out of office since December 21st, upon my return to the office next week, I will provide all requested documents then.

Thank you and have a great week.

Stephanie Vickers
EEO Specialist
Captain James A. Lovell Federal Healthcare Center
3001 Green Bay Rd
North Chicago, IL 60064
Phone:- (224)610-3853
Fax:- (224)610- 3004

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Tuesday, January 2, 2024 6:43 PM
**To:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** [EXTERNAL] Re: [External] - RE: Document Request AS-152770 - Final Request
**Importance:** High

Greetings Stephanie/Melvin:

Please note that I will need to have these documents NLT than January 5, 2024.

Best,

Lisa Wabinga
Contract EEO Investigator
Computer Evidence Specialists, LLC (CES,LLC)
253.355.0337

lisa.wabinga@ceseeo.com

lisa.wabinga@ceseeo.com

---

**From:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Sent:** Friday, December 15, 2023 8:03 AM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Jeff Hayden <jeff.hayden@cesnb.com>; Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** RE: [External] - RE: Document Request AS-152770 (3rd Request)

| CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor. |
| --- |

Good morning,

As a followup to our conversation, the RMO is wanting the timeframe being requested so she can gather the documents.

Thank you.

Stephanie Vickers
EEO Specialist
Captain James A. Lovell Federal Healthcare Center
3001 Green Bay Rd
North Chicago,IL 60064
Phone:- (224)610-3853
Fax:- (224)610- 3004

---

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Monday, December 11, 2023 9:44 AM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>; Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Cc:** Jeff Hayden <jeff.hayden@cesnb.com>
**Subject:** [EXTERNAL] Re: [External] - RE: Document Request AS-152770 (3rd Request)

Good morning all -

I am following up on the document request regarding Mr. Azis.  I will need the discipline file this week so that I can prepare the affidavits for the RMO's.

Thank you kindly.


Best,


Lisa Wabinga

Contract EEO Investigator

Melvin Tolbert, Ph.D.
*EEO Program Manager*
*Harassment Prevention Coordinator (HPC)*
*ADR Coordinator*
*Diversity Officer*

Captain James A. Lovell
Federal Health Care Center
(Command Suite)
3001 Green Bay Road
North Chicago, IL  60064

Phone:  224.610.3853
Melvin.tolbert@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Re-disclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Monday, December 4, 2023 12:04 PM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** [EXTERNAL] Re: Document Request AS-152770 (2d Request)

Greetings Melvin - Following up on this document request.  Thank you!

Best,

Lisa Wabinga

Contract EEO Investigator

253.355.0337

lisa.wabinga@ceseeo.com

---

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Wednesday, December 6, 2023 2:16 PM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Subject:** Re: [External] - RE: Document Request AS-152770 (2d Request)

I am really in need of the discipline file - if you can make this a priority that would be great .
Thank you!

Best,

Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

---

**From:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Sent:** Monday, December 4, 2023 12:34 PM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Subject:** [External] - RE: Document Request AS-152770 (2d Request)

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you
recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

Good afternoon Lisa,

I have asked Stephanie to assist in providing you the requested information.  Sorry for the delay.  Please include
Stephanie on all communication to ensure we provide you what is requested as quickly as possible.

Thanks,
Melvin

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

---

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Wednesday, December 6, 2023 2:16 PM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Subject:** Re: [External] - RE: Document Request AS-152770 (2d Request)

I am really in need of the discipline file - if you can make this a priority that would be great .
Thank you!


Best,


Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

---

**From:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Sent:** Monday, December 4, 2023 12:34 PM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>
**Subject:** [External] - RE: Document Request AS-152770 (2d Request)

| CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor. |
| --- |

Good afternoon Lisa,

I have asked Stephanie to assist in providing you the requested information.  Sorry for the delay.  Please include
Stephanie on all communication to ensure we provide you what is requested as quickly as possible.

[External] - RE: Document Request AS-152770 (2d Request)

**Tolbert, Melvin R. <Melvin.Tolbert@va.gov>**

Mon 12/4/2023 12:34 PM

To:Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
Cc:Vickers, Stephanie A. (she/her/hers) <Stephanie.Vickers@va.gov>

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. When in doubt, forward this to your supervisor.

Good afternoon Lisa,

I have asked Stephanie to assist in providing you the requested information.  Sorry for the delay.  Please include Stephanie on all communication to ensure we provide you what is requested as quickly as possible.

Thanks,
Melvin

## Melvin Tolbert, Ph.D.
*EEO Program Manager*
*Harassment Prevention Coordinator (HPC)*
*ADR Coordinator*
*Diversity Officer*

Captain James A. Lovell
Federal Health Care Center
(Command Suite)
3001 Green Bay Road
North Chicago, IL  60064

Phone:  224.610.3853
Melvin.tolbert@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Re-disclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Monday, December 4, 2023 12:04 PM

Thanks,
Melvin

## Melvin Tolbert, Ph.D.
*EEO Program Manager*
*Harassment Prevention Coordinator (HPC)*
*ADR Coordinator*
*Diversity Officer*

Captain James A. Lovell
Federal Health Care Center
(Command Suite)
3001 Green Bay Road
North Chicago, IL  60064

Phone:  224.610.3853
Melvin.tolbert@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Re-disclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Monday, December 4, 2023 12:04 PM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** [EXTERNAL] Re: Document Request AS-152770 (2d Request)

Greetings Melvin - Following up on this document request.  Thank you!


Best,


Lisa Wabinga

**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** [EXTERNAL] Re: Document Request AS-152770 (2d Request)

Greetings Melvin - Following up on this document request.  Thank you!



Best,


Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com



**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Saturday, November 25, 2023 5:07 PM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** Document Request AS-152770

Greetings Melvin -

I haven't done investigation in a while - is there a secure portal which we can send secure emails to VA employees?

Here is the document request for this case.  If peer reviews are confidential and cannot be released, please give a brief explanation.

Contact Information for:  Donnabelle Lorenzo-Villarino **(DLV)** ,  Christianah Aurora **(CA)** and Dr. Ravipati to include, Dr. Buckley:

Full name, Position Title, Series, Grade, Work Unit, work phone number and email addresses.

Organizational chart of DLV's work unit and her chain of command.

List of all employees who are supervised by DLV by sex, name, position titles, series and grade.

**Reprisal Allegation:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of working overtime without compensation.

000799

2. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of the VA denying veteran's bills.

3. VA policy on assignment of work.

4. VA Bargaining unit agreement excerpt on assignment of work.

- 

**Incident a:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of the distribution of his workload.

2. Documentation to include emails, team meetings, meeting minutes and SF-50s when Complainant was detailed to another department.

3. Documentation to include emails, team meetings, meeting minutes and SF-50s when Complainant was suspended.

**Incident b:**

1. Complainant's proficiency reports for 2021, 2022, and 2023.

2. VA policy on proficiency reports and excerpt from the CBA.

**Incident d:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant was denied union representation on May 8, 2023.

2. Documentation to include emails, team meetings, and meeting minutes when Complainant attended a fact finding meeting.

3. VA policy on discipline and reassignments. Bargaining unit agreement excerpt on union representation during meetings and excerpt on discipline and reasignments.

**Incident e:**

1. Complainant's peer review committee report.

2. VA Bargaining unit agreement excerpt on peer reviews.

3. VA policy on Peer Reviews.

**Incident 1:**

1. Documentation to include emails, team meetings, meeting minutes and SF-50s when Complainant was removed from his patient cared duties on May 8, 2023.

2. Complainant's telework agreement and telework policy.

3. VA Bargaining unit agreement excerpt on telework.

**Harassment Allegation:**

1. VA EEO and harassment policies

2. Training records for Complainants and RMO EEO training dates

If not mentioned above:

**<u>Discipline:</u>**

3. Provide data (a list/spreadsheet/summary sheet) on disciplinary and adverse actions within the organization(s) subordinate to RMO Donnabelle L. Lorenzo-Villa for the two-year period prior to March 2023.  Specifically provide:
   - Name, position title, pay plan, series, grade and sex of each employee who had a disciplinary or adverse action taken against them.
   - Employee's offense
   - The penalty imposed
   - The date of the action.
   - Name, position title, pay plan, series, grade and sex, of the proposing and deciding officials.
   - If reprisal and/or retaliation is alleged, indicate which employees and management officials have had **prior EEO activity** with "yes" or "no" on data list/spreadsheet/summary sheet.

4. Documentation of counseling conducted with Complainant for similar issues addressed in the disciplinary/adverse action during the two-year period prior to July 19, 2023.

5. Provide notice of **proposed disciplinary/adverse action (relevant to the claim[s] at issue)** and all supporting documentation (all material relied upon in making decision to propose the action). Annotate:
   - Name, position title, pay plan, series, grade and sex of RMO Donnabelle L. Lorenzo-Villarino and/or the proposing and deciding official.
   - Name, position title, pay plan, series, grade and sex, and of all witnesses to each event who contributed to the disciplinary or adverse action.

6. Complainant's written **reply to the proposed disciplinary/adverse action**; or if an oral reply was made, provide any memoranda documenting the oral reply.  If no reply was submitted, indicate this in response.

7. Decision **notice effecting the disciplinary/adverse action (relevant to the claim[s] at issue).**  Annotate name, position title, pay plan, series, and grade and

8. Notification of Personnel Action(s), SF 50(s), **affecting the disciplinary/adverse action at issue.**

9. Grievance or appeal correspondence **regarding the disciplinary/adverse action at issue, if** any filed.  If no grievance or appeal filed, indicate this in response to this request.

10. Provide <u>excerpts</u> from the pertinent agency and local guidelines/regulations concerning disciplinary and adverse actions in effect after the Weingarten meeting in February 2023. (Include the title/cover page to identify source document.  Include index. Include relevant excerpt.  Do not provide the entire guideline/regulation unless requested.)

11. If Complainant is a bargaining unit employee (BUE), provide the applicable/pertinent <u>excerpts</u> from the article(s) of the negotiated union agreement regarding disciplinary and adverse actions.  If Complainant is not a BUE, indicate in response. (Include title/cover page to identify source document.  Include index.  Insert relevant excerpt.  Do not provide the entire negotiated agreement unless requested.)

12. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who handled or who can provide information about the disciplinary/adverse action at issue.

**Reassignment:**

12. If not already provided, include organization chart(s) for work unit(s) of Complainant after the management directed detail/reassignment.

13. Provide data (a list/spreadsheet/summary sheet) on management-directed details or reassignments within the organization(s) subordinate to RMO Donnabelle L. Lorenzo-Villarino for the two- year period prior to May 8, 2023.   Specifically provide:
    ○ Name, title, series, grade and sex of employees detailed or reassigned involuntarily.
    ○ Employee's position title, pay plan, series, grade, sex and organization segment, or statement of duties and organization assignment, before and after the involuntary detail or reassignment.
    ○ Nature of and effective date of the involuntary detail or reassignment.
    ○ Reason for the involuntary detail or reassignment.
    ○ Name, position title, pay plan, series, and grade, and sex, of the agency official(s) taking the action.
    ○ If reprisal and/or retaliation is alleged, indicate which employees had **prior EEO** activity with "yes" or "no" on data list/spreadsheet/summary sheet.

14. If not already provided, Complainant's position description or statement of duties before and after the involuntary detail or reassignment.

15. Documentation, if any, concerning the involuntary detail or reassignment, to include the advance notice, supporting documentation, Complainant's response, management's final decision letter, etc.

16. Request for Personnel Action, SF 52 (both sides), requesting the involuntary detail or reassignment.

17. Notification of Personnel Action, SF 50, effecting the involuntary detail or reassignment, if any. If none filed, indicate this in response to this request.

18. Grievance or appeal correspondence regarding Complainant's involuntary detail or reassignment.  If no grievance or appeal is filed, indicate this in response to this request.

19. Provide excerpts from the pertinent agency and local guidelines/regulations concerning involuntary details and reassignments in effect May 8, 2023. (Include the title/cover page to identify source document.  Include index. Include relevant excerpt. Do not provide the entire guideline/regulation unless requested.)

20. If Complainant is a bargaining unit employee (BUE), provide the applicable/pertinent excerpts from the article(s) of the negotiated union agreement regarding involuntary details and reassignments.  If Complainant is not a BUE, indicate in response. (Include title/cover page to identify source document.  Include index.  Include relevant excerpt.  Do not provide the entire negotiated agreement unless requested.)

21. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who advised management on the involuntary detail or reassignment of Complainant, or who can provide information about the action.

22. Provide the applicable/pertinent excerpt(s) from the article(s) of negotiated union agreement, if applicable. (Include cover page to identify source document. Do not provide the entire negotiated agreement unless requested.)

23. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who handled the action at issue or who can

# Computer Evidence Specialists, LLC (CES,LLC)

## 253.355.0337

## lisa.wabinga@ceseeo.com

---

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Saturday, November 25, 2023 5:07 PM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** Document Request AS-152770

Greetings Melvin -

I haven't done investigation in a while - is there a secure portal which we can send secure emails to VA employees?

Here is the document request for this case.  If peer reviews are confidential and cannot be released, please give a brief explanation.

Contact Information for:  Donnabelle Lorenzo-Villarino **(DLV)** ,  Christianah Aurora **(CA**) and Dr. Ravipati to include, Dr. Buckley:

Full name, Position Title, Series, Grade, Work Unit, work phone number and email addresses.

Organizational chart of DLV's work unit and her chain of command.

List of all employees who are supervised by DLV by sex, name, position titles, series and grade.

**Reprisal Allegation:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of working overtime without compensation.
2. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of the VA denying veteran's bills.
3. VA policy on assignment of work.
4. VA Bargaining unit agreement excerpt on assignment of work.
 -

**Incident a:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of the distribution of his workload.
2. Documentation to include emails, team meetings,  meeting minutes and SF-50s when Complainant was detailed to another department.
3. Documentation to include emails, team meetings,  meeting minutes and SF-50s when Complainant was suspended.

**Incident b:**

1. Complainant's proficiency reports for 2021, 2022, and 2023.

2. VA policy on proficiency reports and excerpt from the CBA.

**Incident d:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant was denied union representation on May 8, 2023.
2. Documentation to include emails, team meetings, and meeting minutes when Complainant attended a fact finding meeting.
3. VA policy on discipline and reasignments.  Bargaining unit agreement excerpt on union representation during meetings and excerpt on discipline and reasignments.

**Incident e:**
1. Complainant's peer review committee report.
2. VA Bargaining unit agreement excerpt on peer reviews.
3. VA policy on Peer Reviews.

**Incident 1:**
1. Documentation to include emails, team meetings,  meeting minutes and SF-50s when Complainant was removed from his patient cared duties on May 8, 2023.
2. Complainant's telework agreement and telework policy.
3. VA Bargaining unit agreement excerpt on telework.

**Harassment Allegation:**

1. VA EEO and harassment policies
2. Training records for Complainants and RMO EEO training dates

If not mentioned above:

**<u>Discipline:</u>**

3. Provide data (a list/spreadsheet/summary sheet) on disciplinary and adverse actions within the organization(s) subordinate to RMO Donnabelle L. Lorenzo-Villa for the two-year period prior to March 2023.  Specifically provide:

   - Name, position title, pay plan, series, grade and sex of each employee who had a disciplinary or adverse action taken against them.
   - Employee's offense
   - The penalty imposed
   - The date of the action.
   - Name, position title, pay plan, series, grade and sex, of the proposing and deciding officials.
   - If reprisal and/or retaliation is alleged, indicate which employees and management officials have had **prior EEO activity** with "yes" or "no" on data list/spreadsheet/summary sheet.

4. Documentation of counseling conducted with Complainant for similar issues addressed in the disciplinary/adverse action during the two-year period prior to July 19, 2023.
5. Provide notice of **proposed disciplinary/adverse action (relevant to the claim[s] at issue)** and all supporting documentation (all material relied upon in making decision to propose the action). Annotate:

   - Name, position title, pay plan, series, grade and sex of RMO Donnabelle L. Lorenzo-Villarino and/or the proposing and deciding official.
   - Name, position title, pay plan, series, grade and sex, and of all witnesses to each event who contributed to the disciplinary or adverse action.

6. Complainant's written **reply to the proposed disciplinary/adverse action**; or if an oral reply was made, provide any memoranda documenting the oral reply. If no reply was submitted, indicate this in response.

7. Decision **notice effecting the disciplinary/adverse action (relevant to the claim[s] at issue).** Annotate name, position title, pay plan, series, and grade and

8. Notification of Personnel Action(s), SF 50(s), **affecting the disciplinary/adverse action at issue.**

9. Grievance or appeal correspondence **regarding the disciplinary/adverse action at issue, if** any filed. If no grievance or appeal filed, indicate this in response to this request.

10. Provide <u>excerpts</u> from the pertinent agency and local guidelines/regulations concerning disciplinary and adverse actions in effect after the Weingarten meeting in February 2023. (Include the title/cover page to identify source document. Include index. Include relevant excerpt. Do not provide the entire guideline/regulation unless requested.)

11. If Complainant is a bargaining unit employee (BUE), provide the applicable/pertinent <u>excerpts</u> from the article(s) of the negotiated union agreement regarding disciplinary and adverse actions. If Complainant is not a BUE, indicate in response. (Include title/cover page to identify source document. Include index. Insert relevant excerpt. Do not provide the entire negotiated agreement unless requested.)

12. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who handled or who can provide information about the disciplinary/adverse action at issue.

## Reassignment:

12. If not already provided, include organization chart(s) for work unit(s) of Complainant after the management directed detail/reassignment.

13. Provide data (a list/spreadsheet/summary sheet) on management-directed details or reassignments within the organization(s) subordinate to RMO Donnabelle L. Lorenzo-Villarino for the two- year period prior to May 8, 2023. Specifically provide:

    o Name, title, series, grade and sex of employees detailed or reassigned involuntarily.
    o Employee's position title, pay plan, series, grade, sex and organization segment, or statement of duties and organization assignment, before and after the involuntary detail or reassignment.
    o Nature of and effective date of the involuntary detail or reassignment.
    o Reason for the involuntary detail or reassignment.
    o Name, position title, pay plan, series, and grade, and sex, of the agency official(s) taking the action.
    o If reprisal and/or retaliation is alleged, indicate which employees had **prior EEO** activity with "yes" or "no" on data list/spreadsheet/summary sheet.

14. If not already provided, Complainant's position description or statement of duties before and after the involuntary detail or reassignment.

15. Documentation, if any, concerning the involuntary detail or reassignment, to include the advance notice, supporting documentation, Complainant's response, management's final decision letter, etc.

16. Request for Personnel Action, SF 52 (both sides), requesting the involuntary detail or reassignment.

17. Notification of Personnel Action, SF 50, effecting the involuntary detail or reassignment, if any. If none filed, indicate this in response to this request.

18. Grievance or appeal correspondence regarding Complainant's involuntary detail or reassignment. If no grievance or appeal is filed, indicate this in response to this request.

19. Provide <u>excerpts</u> from the pertinent agency and local guidelines/regulations concerning involuntary details and reassignments in effect May 8, 2023. (Include the title/cover page to

identify source document.  Include index. Include relevant excerpt. Do not provide the entire guideline/regulation unless requested.)

20. If Complainant is a bargaining unit employee (BUE), provide the applicable/pertinent excerpts from the article(s) of the negotiated union agreement regarding involuntary details and reassignments.  If Complainant is not a BUE, indicate in response. (Include title/cover page to identify source document.  Include index.  Include relevant excerpt.  Do not provide the entire negotiated agreement unless requested.)

21. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who advised management on the involuntary detail or reassignment of Complainant, or who can provide information about the action.

22. Provide the applicable/pertinent excerpt(s) from the article(s) of negotiated union agreement, if applicable. (Include cover page to identify source document. Do not provide the entire negotiated agreement unless requested.)

23. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who handled the action at issue or who can provide information about the action.

Thank you Kindly.


Best,


Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

---

**From:** Roger Morrison <roger.morrison@cesnb.com>
**Sent:** Friday, November 3, 2023 5:06 PM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Cc:** kochiu106@gmail.com <kochiu106@gmail.com>; Buckley, Robert G. FHCC Lovell <Robert.G.Buckley@va.gov>; Jeff Hayden <jeff.hayden@cesnb.com>; Maureen Huff <maureen.huff@cesnb.com>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Subject:** CES EEO Investigator assignment for case 152770 RE: [External] - FW: DO NOT REPLY - Official Correspondence – 152770


Mr. Tolbert,

Computer Evidence Specialists, LLC (CES) has assigned EEO investigator Lisa Wabinga to case 152770. Ms. Wabinga is copied here and will coordinate her investigation with you.

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

---

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Saturday, November 25, 2023 5:07 PM
**To:** Tolbert, Melvin R. <Melvin.Tolbert@va.gov>
**Subject:** Document Request AS-152770

Greetings Melvin -

I haven't done investigation in a while - is there a secure portal which we can send secure emails to VA employees?

Here is the document request for this case.  If peer reviews are confidential and cannot be released, please give a brief explanation.

Contact Information for:  Donnabelle Lorenzo-Villarino **(DLV)** ,  Christianah Aurora **(CA)** and Dr. Ravipati to include, Dr. Buckley:

Full name, Position Title, Series, Grade, Work Unit, work phone number and email addresses.

Organizational chart of DLV's work unit and her chain of command.

List of all employees who are supervised by DLV by sex, name, position titles, series and grade.

**Reprisal Allegation:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of working overtime without compensation.
2. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of the VA denying veteran's bills.
3. VA policy on assignment of work.
4. VA Bargaining unit agreement excerpt on assignment of work.
   -

**Incident a:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant complained of the distribution of his workload.
2. Documentation to include emails, team meetings,  meeting minutes and SF-50s when Complainant was detailed to another department.
3. Documentation to include emails, team meetings,  meeting minutes and SF-50s when Complainant was suspended.

**Incident b:**

1. Complainant's proficiency reports for 2021, 2022, and 2023.
2. VA policy on proficiency reports and excerpt from the CBA.

**Incident d:**

1. Documentation to include emails, team meetings, and meeting minutes when Complainant was denied union representation on May 8, 2023.
2. Documentation to include emails, team meetings, and meeting minutes when Complainant attended a fact finding meeting.
3. VA policy on discipline and reassignments.  Bargaining unit agreement excerpt on union representation during meetings and excerpt on discipline and reassignments.

**Incident e:**
1. Complainant's peer review committee report.
2. VA Bargaining unit agreement excerpt on peer reviews.
3. VA policy on Peer Reviews.

**Incident 1:**
1. Documentation to include emails, team meetings,  meeting minutes and SF-50s when Complainant was removed from his patient cared duties on May 8, 2023.
2. Complainant's telework agreement and telework policy.
3. VA Bargaining unit agreement excerpt on telework.

**Harassment Allegation:**

1. VA EEO and harassment policies
2. Training records for Complainants and RMO EEO training dates

If not mentioned above:

**Discipline:**

3. Provide data (a list/spreadsheet/summary sheet) on disciplinary and adverse actions within the organization(s) subordinate to RMO Donnabelle L. Lorenzo-Villa for the two-year period prior to March 2023.  Specifically provide:
    - Name, position title, pay plan, series, grade and sex of each employee who had a disciplinary or adverse action taken against them.
    - Employee's offense
    - The penalty imposed
    - The date of the action.
    - Name, position title, pay plan, series, grade and sex, of the proposing and deciding officials.
    - If reprisal and/or retaliation is alleged, indicate which employees and management officials have had **prior EEO activity** with "yes" or "no" on data list/spreadsheet/summary sheet.
4. Documentation of counseling conducted with Complainant for similar issues addressed in the disciplinary/adverse action during the two-year period prior to July 19, 2023.
5. Provide notice of **proposed disciplinary/adverse action (relevant to the claim[s] at issue)** and all supporting documentation (all material relied upon in making decision to propose the action). Annotate:
    - Name, position title, pay plan, series, grade and sex of RMO Donnabelle L. Lorenzo-Villarino and/or the proposing and deciding official.
    - Name, position title, pay plan, series, grade and sex, and of all witnesses to each event who contributed to the disciplinary or adverse action.

6. Complainant's written **reply to the proposed disciplinary/adverse action**; or if an oral reply was made, provide any memoranda documenting the oral reply. If no reply was submitted, indicate this in response.

7. Decision **notice effecting the disciplinary/adverse action (relevant to the claim[s] at issue).** Annotate name, position title, pay plan, series, and grade and

8. Notification of Personnel Action(s), SF 50(s), **affecting the disciplinary/adverse action at issue.**

9. Grievance or appeal correspondence **regarding the disciplinary/adverse action at issue, if** any filed. If no grievance or appeal filed, indicate this in response to this request.

10. Provide <u>excerpts</u> from the pertinent agency and local guidelines/regulations concerning disciplinary and adverse actions in effect after the Weingarten meeting in February 2023. (Include the title/cover page to identify source document. Include index. Include relevant excerpt. Do not provide the entire guideline/regulation unless requested.)

11. If Complainant is a bargaining unit employee (BUE), provide the applicable/pertinent <u>excerpts</u> from the article(s) of the negotiated union agreement regarding disciplinary and adverse actions. If Complainant is not a BUE, indicate in response. (Include title/cover page to identify source document. Include index. Insert relevant excerpt. Do not provide the entire negotiated agreement unless requested.)

12. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who handled or who can provide information about the disciplinary/adverse action at issue.

**Reassignment:**

12. If not already provided, include organization chart(s) for work unit(s) of Complainant after the management directed detail/reassignment.

13. Provide data (a list/spreadsheet/summary sheet) on management-directed details or reassignments within the organization(s) subordinate to RMO Donnabelle L. Lorenzo-Villarino for the two- year period prior to May 8, 2023. Specifically provide:
   - Name, title, series, grade and sex of employees detailed or reassigned involuntarily.
   - Employee's position title, pay plan, series, grade, sex and organization segment, or statement of duties and organization assignment, before and after the involuntary detail or reassignment.
   - Nature of and effective date of the involuntary detail or reassignment.
   - Reason for the involuntary detail or reassignment.
   - Name, position title, pay plan, series, and grade, and sex, of the agency official(s) taking the action.
   - If reprisal and/or retaliation is alleged, indicate which employees had **prior EEO** activity with "yes" or "no" on data list/spreadsheet/summary sheet.

14. If not already provided, Complainant's position description or statement of duties before and after the involuntary detail or reassignment.

15. Documentation, if any, concerning the involuntary detail or reassignment, to include the advance notice, supporting documentation, Complainant's response, management's final decision letter, etc.

16. Request for Personnel Action, SF 52 (both sides), requesting the involuntary detail or reassignment.

17. Notification of Personnel Action, SF 50, effecting the involuntary detail or reassignment, if any. If none filed, indicate this in response to this request.

18. Grievance or appeal correspondence regarding Complainant's involuntary detail or reassignment. If no grievance or appeal is filed, indicate this in response to this request.

19. Provide <u>excerpts</u> from the pertinent agency and local guidelines/regulations concerning involuntary details and reassignments in effect May 8, 2023. (Include the title/cover page to identify source document. Include index. Include relevant excerpt. Do not provide the entire guideline/regulation unless requested.)

20. If Complainant is a bargaining unit employee (BUE), provide the applicable/pertinent <u>excerpts</u> from the article(s) of the negotiated union agreement regarding involuntary details and reassignments. If Complainant is not a BUE, indicate in response. (Include title/cover page to identify source document. Include index. Include relevant excerpt. Do not provide the entire negotiated agreement unless requested.)

21. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who advised management on the involuntary detail or reassignment of Complainant, or who can provide information about the action.

22. Provide the applicable/pertinent <u>excerpt(s)</u> from the article(s) of negotiated union agreement, if applicable. (Include cover page to identify source document. Do not provide the entire negotiated agreement unless requested.)

23. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who handled the action at issue or who can provide information about the action.

Thank you Kindly.

Best,

Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

<u>lisa.wabinga@ceseeo.com</u>

---

**From:** Roger Morrison <<u>roger.morrison@cesnb.com</u>>
**Sent:** Friday, November 3, 2023 5:06 PM
**To:** Tolbert, Melvin R. <<u>Melvin.Tolbert@va.gov</u>>
**Cc:** <u>kochiu106@gmail.com</u> <<u>kochiu106@gmail.com</u>>; Buckley, Robert G. FHCC Lovell <<u>Robert.G.Buckley@va.gov</u>>; Jeff Hayden <<u>jeff.hayden@cesnb.com</u>>; Maureen Huff <<u>maureen.huff@cesnb.com</u>>; Lisa Wabinga <<u>Lisa.Wabinga@ceseeo.com</u>>
**Subject:** CES EEO Investigator assignment for case 152770 RE: [External] - FW: DO NOT REPLY - Official Correspondence – 152770

Mr. Tolbert,

Computer Evidence Specialists, LLC (CES) has assigned EEO investigator Lisa Wabinga to case 152770. Ms. Wabinga is copied here and will coordinate her investigation with you.

Here is the investigators contact information:

**Reprisal Allegation:**

VA policy on assignment of work.
VA Bargaining unit agreement excerpt on assignment of work.


**Incident b:**

Complainant's proficiency reports for 2021, 2022, and 2023.
VA policy on proficiency reports and excerpt from the CBA.

**Incident e:**
VA Bargaining unit agreement excerpt on peer reviews.
VA policy on Peer Reviews.

**Incident 1:**
Complainant's telework agreement and telework policy.
VA Bargaining unit agreement excerpt on telework.

**Harassment Allegation:**

VA EEO and harassment policies
Training records for Complainants and RMO EEO training dates


**<u>Discipline:</u>**

3. Provide data (a list/spreadsheet/summary sheet) on disciplinary and adverse actions within the organization(s) subordinate to RMO Charles Buckley for the two-year period prior to March 2023. Specifically provide:
    - Name, position title, pay plan, series, grade and sex of each employee who had a disciplinary or adverse action taken against them.
    - Employee's offense
    - The penalty imposed
    - The date of the action.
    - Name, position title, pay plan, series, grade and sex, of the proposing and deciding officials.
    - If reprisal and/or retaliation is alleged, indicate which employees and management officials have had **prior EEO activity** with "yes" or "no" on data list/spreadsheet/summary sheet.
4. Documentation of counseling conducted with Complainant for similar issues addressed in the disciplinary/adverse action during the two-year period prior to July 19, 2023.
5. Copies of any grievances filed on any of the claims in a-e and Events 1 and 2.


**Reassignment:**

12. If not already provided, include organization chart(s) for work unit(s) of Complainant after the management directed detail/reassignment.
13. Provide data (a list/spreadsheet/summary sheet) on management-directed details or reassignments within the organization(s) subordinate to RMO Donnabelle L. Lorenzo-Villarino for the two- year period prior to May 8, 2023. Specifically provide:
    - Name, title, series, grade and sex of employees detailed or reassigned involuntarily.
    - Employee's position title, pay plan, series, grade, sex and organization segment, or statement of duties and organization assignment, before and after the involuntary detail or reassignment.

- Nature of and effective date of the involuntary detail or reassignment.
- Reason for the involuntary detail or reassignment.
- Name, position title, pay plan, series, and grade, and sex, of the agency official(s) taking the action.
- If reprisal and/or retaliation is alleged, indicate which employees had **prior EEO** activity with "yes" or "no" on data list/spreadsheet/summary sheet.

14. If not already provided, Complainant's position description or statement of duties before and after the involuntary detail or reassignment.
15. Documentation, if any, concerning the involuntary detail or reassignment, to include the advance notice, supporting documentation, Complainant's response, management's final decision letter, etc.
16. Request for Personnel Action, SF 52 (both sides), requesting the involuntary detail or reassignment.
17. Notification of Personnel Action, SF 50, effecting the involuntary detail or reassignment, if any. If none filed, indicate this in response to this request.
18. Grievance or appeal correspondence regarding Complainant's involuntary detail or reassignment. If no grievance or appeal is filed, indicate this in response to this request.
19. Provide excerpts from the pertinent agency and local guidelines/regulations concerning involuntary details and reassignments in effect May 8, 2023. (Include the title/cover page to identify source document. Include index. Include relevant excerpt. Do not provide the entire guideline/regulation unless requested.)
20. If Complainant is a bargaining unit employee (BUE), provide the applicable/pertinent excerpts from the article(s) of the negotiated union agreement regarding involuntary details and reassignments. If Complainant is not a BUE, indicate in response. (Include title/cover page to identify source document. Include index. Include relevant excerpt. Do not provide the entire negotiated agreement unless requested.)
21. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who advised management on the involuntary detail or reassignment of Complainant, or who can provide information about the action.
22. Provide the applicable/pertinent excerpt(s) from the article(s) of negotiated union agreement, if applicable. (Include cover page to identify source document. Do not provide the entire negotiated agreement unless requested.)
23. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who handled the action at issue or who can provide information about the action.

Thank you Kindly.


Best,


Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

Wollmann, Rena (ORMDI)

| | |
|---|---|
| From: | Spilsbury, Daniel (ORMDI) |
| Sent: | Thursday, January 11, 2024 11:36 AM |
| To: | Wollmann, Rena (ORMDI) |
| Subject: | FW: [EXTERNAL] Re: Affidavit of Christiana Arowora |

For submission into the record.

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Thursday, January 11, 2024 11:06 AM
**To:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>; Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Cc:** Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <lisa.wabinga@ceseeo.com>
**Subject:** RE: [EXTERNAL] Re: Affidavit of Christiana Arowora

Okay, I guess all I can do is submit my rebuttal and all the information I have at this time and hope ORMDI asks for more information because I'm not sure I can explain/articulate in verbiage on paper the facts of the case and the process we follow in the Community Care Department as the dept is run as chaos at best. You'd need a highly sophisticated psychologist to decipher the human behavior in that department.

I mean you got managers calling the police on other managers in the dept. Managers calling the police on staff etc etc etc. Trying to explain in words on paper the disfunction and all the changes that take place in that department is the equivalent of trying to explain the existential crisis in life.

Anyway, thanks for taking the time to explain this to me, Dan. Likewise, thankyou Lisa for your effort into investigating this matter. I truly do appreciate all you've done.

All I can say is I'll do my best

-ozzie

**From:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Sent:** Thursday, January 11, 2024 7:47 AM
**To:** Little Elvis Is Combat Ready <kochiu106@gmail.com>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <lisa.wabinga@ceseeo.com>
**Subject:** RE: [EXTERNAL] Re: Affidavit of Christiana Arowora

Good Morning,

By regulation, the Investigator is required to investigate the accepted claims of discrimination. The investigator controls the investigation and gathers relevant information about the accepted claims. It is up to the Investigator to make determinations on the relevancy as well as the information gathered from the witnesses. While a Complainant may make suggestions, the Investigator's role in the process is to gather the information that they believe is relevant to the complaint. Once an investigation is completed it is reviewed by ORMDI. If ORMDI determines that additional information is needed or relevant information is missing from the record, ORMDI will return the investigation for follow up.

Sincerely,

Daniel Spilsbury

**From:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Sent:** Wednesday, January 10, 2024 8:27 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <lisa.wabinga@ceseeo.com>
**Subject:** [EXTERNAL] Re: Affidavit of Christiana Arowora

I would also like to know if Dr Mamet Ravipati will be investigated? She handed the proposed 14 day suspension and entered all kinds of statements in her proposal that she knows nothing about. our department was only under her chain of command for a short period of time, maybe two months.

How would she know the answers she entered on the proposed suspension if I wasn't under her leadership for at least 4 plus years of me being in that department.

Ravipati made a lot of accusations in her answers about me, which Dr Buckley stated clearly he took into consideration what was written in the 14 day suspension Ravipati proposed when coming to the final decision.

I want the investigator to ask Ravipati how she came up with those answers if she wasn't my boss. I want the investigator to ask Ravipati why she initially told me this was a "slap on the wrist" but why after I filled my EEO, she retaliated by issuing a propose a 14 day suspension. Why in teams messages when I was asking her to come back she said she didn't know how but quickly figured out how after I filed the EEO but it came with a punishment of 14 days and a bunch of derogatory anders about my work ethic and performance. I want her to answer a lot of questions,

I want the investigator to ask when my leadership ran a chart review of my records why they claimed I did not chart PSA duties when nurses do not chart the PSA duties. That was used against me when Dr Buckley claims his suspension was based off my charting.

Why are so many questions not being investigated into?

Why wasn't the question asked of Human Resources who told me that the investigation was completed 3 to 4 weeks into my 3 month detail but yet leaders t continued to keep me detailed 2 months after and only brought me back after I filed the EEO. I'm sure all this is documented in writing by HR.

If I can't get these questions to be asked I would like another investigator assigned to me that will ask these basic questions.

These are pertinent questions and I want to see leadership explain their rationale for the answers so I can then provide proof to all the obfuscation ahold faced lies.

I can corroborate all these answers if the investigator asked staff members the protocol as far as charting, how often it changes, who does what as far as job duties etc etc.

Why am I not getting these things investigated into?

Again if I can't get these questions investigated into I would like another investigator assigned to pick up the missing pieces.

Sent from my iPhone

On Jan 10, 2024, at 6:48 PM, Little Elvis Is Combat Ready <kochiu106@gmail.com> wrote:

This is the link

https://dvagov-my.sharepoint.com/:v:/r/personal/donnabelle_lorenzo-villarino_va_gov/Documents/Recordings/OCC Workflow and Worklist Assignment-20221110_150029-Meeting Recording.mp4?

Sent from my iPhone

On Jan 10, 2024, at 3:26 PM, Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov> wrote:

So, for example, if I had a link to the recording inserted into my brief, that would not be acceptable? Otherwise, are you saying I could go to an administrative Judge and ask/explain why this is principal to my case?

**From:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Sent:** Wednesday, January 10, 2024 3:21 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Good Afternoon,

The agency cannot accept evidence that cannot be placed into the record. If you with to provide the transcription of the recording to the contract investigator, you can highlight or denote the portion of the transcript that you believe is relevant so that the decision maker can focus on what you have provided and have outlined. If you request a Hearing before EEOC, the first phase of that process is Discovery. Discovery allows for additional information to be added to the record. During that process you can make the request directly to the Administrative Judge and explain why you believe listening to the recording is paramount.

Sincerely,

Daniel Spilsbury

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, January 10, 2024 3:43 PM
**To:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

The recording is about an hour long, but the only part I need is at 13 minutes in the recording so I would likely just need a few minutes before and a minute after or so. We'd be looking at less than 5 minutes no more than 10. I do have the transcripts to the recording, but they won't have the same effect as actually listening to the manager give the direction. This is one of the key components to my case.

The other issue I had was making an addendum to the EEO filing to include all leadership within the Community Care Department as they were privy to the information from Donnabelle but were new to the department and made judgment calls on my character and work ethic without knowing me which was tainted prior when they signed off on my discipline, namely Dr Ravipati. In addition, after reading the affidavits sent to me and learning from staff members in the dept I want to add **Race** to my EEO filing and not just **retaliation and sex.**

-ozzie


**From:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Sent:** Wednesday, January 10, 2024 2:23 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Good Afternoon,

The issue with the Teams recording is the size of the recording. EEOC has a size limitation on investigation files and an audio recording would be too large to transmit on their server; however, the recording can be transcribed and the transcription added into the record.

Sincerely,

Daniel Spilsbury


**Daniel R. Spilsbury (he, him, his)**

ORMDI Investigations and Contracting Team Manager

DVA Office of Resolution Management & Diversity Inclusion

William S. Moorhead Federal Building

1000 Liberty Avenue, Suite 1801

Pittsburgh PA 15222

(412) 482-5205

Facsimile: (202) 495-6031

<image001.png>
*A Core Values: Integrity Commitment Advocacy Respect Excellence*
*VA Core Characteristics: Trustworthy | Accessible | Quality | Innovative | Agile | Integrated*

*Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today.* Click Here

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, January 10, 2024 2:45 PM
**To:** Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>; Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Thanks,

I sent you a separate email but we can stay on this thread for transparency

**From:** Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>
**Sent:** Wednesday, January 10, 2024 1:44 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>; Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Good Afternoon,

I'm adding my supervisor Dan Spilsbury to this email.

Sincerely,
Rena M. Wollmann

**Rena M. Wollmann**
COR-Investigations
ORMDI Investigation and Contracting Team (OICT)
1000 Liberty Avenue, Room 1801
Pittsburgh, PA 15222
Phone: (412) 482-5211
Fax: (202) 495-6031

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, January 10, 2024 2:34 PM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Lisa,

Well, I just got a call from records department here at the Lovell VA and they won't give me the Team's Recording under a FIOA request without it being redacted which won't help me. And since you won't get the recording and told me you won't talk to me for whatever reason I'm not sure, I have included the above in this email to assist in getting the recording as well as enter an addendum to my EEO filing.

**Dan and Rena** can you contact me at 414-617-9879 regarding my concern to get a Team's recording submitted into EEO evidence as well as make an addendum to my EEO filing? Currently, I feel like if I ask for certain things to prove my case through the truth and the need for certain people to be interviewed I am being ignored in this process.

Thanks
Ozzie

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Wednesday, January 10, 2024 12:05 PM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Don't worry about the CCP note dated 12/19/2022 I got it. I'm still working on getting the Team's recording because I want to enter the link into my rebuttal for the EEO staff that are reviewing as evidence.

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Wednesday, January 10, 2024 7:56 AM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Received and thank you, Lisa.

-Ozzie

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Tuesday, January 9, 2024 8:28 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** [EXTERNAL] Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Pease see attached.

Best,

Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

The information contained in this e-mail and any attachments from Computer Evidence Specialists, LLC may contain confidential and/or proprietary information, and is intended only for the named recipient to whom it was originally addressed. If you are not the intended recipient, any disclosure, distribution, or copying of this e-mail or its attachments is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by return e-mail and permanently delete the e-mail and any attachments.

## Wollmann, Rena (ORMDI)

| | |
|---|---|
| From: | Spilsbury, Daniel (ORMDI) |
| Sent: | Thursday, January 11, 2024 11:36 AM |
| To: | Wollmann, Rena (ORMDI) |
| Subject: | FW: [EXTERNAL] Re: Affidavit of Christiana Arowora |

For submission into the record.

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Thursday, January 11, 2024 11:06 AM
**To:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>; Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Cc:** Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <lisa.wabinga@ceseeo.com>
**Subject:** RE: [EXTERNAL] Re: Affidavit of Christiana Arowora

Okay, I guess all I can do is submit my rebuttal and all the information I have at this time and hope ORMDI asks for more information because I'm not sure I can explain/articulate in verbiage on paper the facts of the case and the process we follow in the Community Care Department as the dept is run as chaos at best. You'd need a highly sophisticated psychologist to decipher the human behavior in that department.

I mean you got managers calling the police on other managers in the dept. Managers calling the police on staff etc etc etc. Trying to explain in words on paper the disfunction and all the changes that take place in that department is the equivalent of trying to explain the existential crisis in life.

Anyway, thanks for taking the time to explain this to me, Dan. Likewise, thankyou Lisa for your effort into investigating this matter. I truly do appreciate all you've done.

All I can say is I'll do my best

-ozzie

**From:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Sent:** Thursday, January 11, 2024 7:47 AM
**To:** Little Elvis Is Combat Ready <kochiu106@gmail.com>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <lisa.wabinga@ceseeo.com>
**Subject:** RE: [EXTERNAL] Re: Affidavit of Christiana Arowora

Good Morning,

By regulation, the Investigator is required to investigate the accepted claims of discrimination. The investigator controls the investigation and gathers relevant information about the accepted claims. It is up to the Investigator to make determinations on the relevancy as well as the information gathered from the witnesses. While a Complainant may make suggestions, the Investigator's role in the process is to gather the information that they believe is relevant to the complaint. Once an investigation is completed it is reviewed by ORMDI. If ORMDI determines that additional information is needed or relevant information is missing from the record, ORMDI will return the investigation for follow up.

Sincerely,

Daniel Spilsbury

**From:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Sent:** Wednesday, January 10, 2024 8:27 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <lisa.wabinga@ceseeo.com>
**Subject:** [EXTERNAL] Re: Affidavit of Christiana Arowora

I would also like to know if Dr Mamet Ravipati will be investigated? She handed the proposed 14 day suspension and entered all kinds of statements in her proposal that she knows nothing about. our department was only under her chain of command for a short period of time, maybe two months.

How would she know the answers she entered on the proposed suspension if I wasn't under her leadership for at least 4 plus years of me being in that department.

Ravipati made a lot of accusations in her answers about me, which Dr Buckley stated clearly he took into consideration what was written in the 14 day suspension Ravipati proposed when coming to the final decision.

I want the investigator to ask Ravipati how she came up with those answers if she wasn't my boss. I want the investigator to ask Ravipati why she initially told me this was a "slap on the wrist" but why after I filled my EEO, she retaliated by issuing a propose a 14 day suspension. Why in teams messages when I was asking her to come back she said she didn't know how but quickly figured out how after I filed the EEO but it came with a punishment of 14 days and a bunch of derogatory anders about my work ethic and performance. I want her to answer a lot of questions,

I want the investigator to ask when my leadership ran a chart review of my records why they claimed I did not chart PSA duties when nurses do not chart the PSA duties. That was used against me when Dr Buckley claims his suspension was based off my charting.

Why are so many questions not being investigated into?

Why wasn't the question asked of Human Resources who told me that the investigation was completed 3 to 4 weeks into my 3 month detail but yet leaders t continued to keep me detailed 2 months after and only brought me back after I filed the EEO. I'm sure all this is documented in writing by HR.

If I can't get these questions to be asked I would like another investigator assigned to me that will ask these basic questions.

These are pertinent questions and I want to see leadership explain their rationale for the answers so I can then provide proof to all the obfuscation ahold faced lies.

I can corroborate all these answers if the investigator asked staff members the protocol as far as charting, how often it changes, who does what as far as job duties etc etc.

Why am I not getting these things investigated into?

Again if I can't get these questions investigated into I would like another investigator assigned to pick up the missing pieces.

Sent from my iPhone


On Jan 10, 2024, at 6:48 PM, Little Elvis Is Combat Ready <kochiu106@gmail.com> wrote:


This is the link

https://dvagov-my.sharepoint.com/:v:/r/personal/donnabelle_lorenzo-villarino_va_gov/Documents/Recordings/OCC Workflow and Worklist Assignment-20221110_150029-Meeting Recording.mp4?

Sent from my iPhone


On Jan 10, 2024, at 3:26 PM, Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov> wrote:


So, for example, if I had a link to the recording inserted into my brief, that would not be acceptable?  Otherwise, are you saying I could go to an administrative Judge and ask/explain why this is principal to my case?

**From:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Sent:** Wednesday, January 10, 2024 3:21 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Good Afternoon,

The agency cannot accept evidence that cannot be placed into the record.   If you with to provide the transcription of the recording to the contract investigator, you can highlight or denote the portion of the transcript that you believe is relevant so that the decision maker can focus on what you have provided and have outlined.   If you request a Hearing before EEOC, the first phase of that process is Discovery.   Discovery allows for additional information to be added to the record.  During that process you can make the request directly to the Administrative Judge and explain why you believe listening to the recording is paramount.

Sincerely,

Daniel Spilsbury

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, January 10, 2024 3:43 PM
**To:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

The recording is about an hour long, but the only part I need is at 13 minutes in the recording so I would likely just need a few minutes before and a minute after or so. We'd be looking at less than 5 minutes no more than 10. I do have the transcripts to the recording, but they won't have the same effect as actually listening to the manager give the direction. This is one of the key components to my case.

The other issue I had was making an addendum to the EEO filing to include all leadership within the Community Care Department as they were privy to the information from Donnabelle but were new to the department and made judgment calls on my character and work ethic without knowing me which was tainted prior when they signed off on my discipline, namely Dr Ravipati. In addition, after reading the affidavits sent to me and learning from staff members in the dept I want to add **Race** to my EEO filing and not just **retaliation and sex.**

-ozzie


**From:** Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Sent:** Wednesday, January 10, 2024 2:23 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Good Afternoon,

The issue with the Teams recording is the size of the recording. EEOC has a size limitation on investigation files and an audio recording would be too large to transmit on their server; however, the recording can be transcribed and the transcription added into the record.

Sincerely,

Daniel Spilsbury


**Daniel R. Spilsbury (he, him, his)**

ORMDI Investigations and Contracting Team Manager

DVA Office of Resolution Management & Diversity Inclusion

William S. Moorhead Federal Building

1000 Liberty Avenue, Suite 1801

Pittsburgh PA 15222

(412) 482-5205

Facsimile: (202) 495-6031

<image001.png>
*A Core Values: Integrity Commitment Advocacy Respect Excellence*
*VA Core Characteristics: Trustworthy | Accessible | Quality | Innovative | Agile | Integrated*

*Thank you for contacting the Office of Resolution Management, Diversity & Inclusion. Our goal is to provide you with exceptional customer service.  Please take a moment to complete a very brief survey to let us know how my service was today.* Click Here

*NOTE:  If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law.  If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, January 10, 2024 2:45 PM
**To:** Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>; Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Thanks,

I sent you a separate email but we can stay on this thread for transparency

**From:** Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>
**Sent:** Wednesday, January 10, 2024 1:44 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>; Spilsbury, Daniel (ORMDI) <Daniel.Spilsbury@va.gov>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Good Afternoon,

I'm adding my supervisor Dan Spilsbury to this email.

Sincerely,
Rena M. Wollmann

**Rena M. Wollmann**
COR-Investigations
ORMDI Investigation and Contracting Team (OICT)
1000 Liberty Avenue, Room 1801
Pittsburgh, PA 15222
Phone: (412) 482-5211
Fax: (202) 495-6031

**From:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Sent:** Wednesday, January 10, 2024 2:34 PM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>; and <dan.spilsbury@va.gov>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>; Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Wollmann, Rena (ORMDI) <Rena.Wollmann@va.gov>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Lisa,

Well, I just got a call from records department here at the Lovell VA and they won't give me the Team's Recording under a FIOA request without it being redacted which won't help me. And since you won't get the recording and told me you won't talk to me for whatever reason I'm not sure, I have included the above in this email to assist in getting the recording as well as enter an addendum to my EEO filing.

**Dan and Rena** can you contact me at 414-617-9879 regarding my concern to get a Team's recording submitted into EEO evidence as well as make an addendum to my EEO filing? Currently, I feel like if I ask for certain things to prove my case through the truth and the need for certain people to be interviewed I am being ignored in this process.

Thanks
Ozzie

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Wednesday, January 10, 2024 12:05 PM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Don't worry about the CCP note dated 12/19/2022 I got it. I'm still working on getting the Team's recording because I want to enter the link into my rebuttal for the EEO staff that are reviewing as evidence.

**From:** Kochiu, Azis FHCC Lovell
**Sent:** Wednesday, January 10, 2024 7:56 AM
**To:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Cc:** Little Elvis Is Combat Ready <kochiu106@gmail.com>
**Subject:** RE: Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Received and thank you, Lisa.

-Ozzie

**From:** Lisa Wabinga <Lisa.Wabinga@ceseeo.com>
**Sent:** Tuesday, January 9, 2024 8:28 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** [EXTERNAL] Affidavit of Christiana Arowora
**Sensitivity:** Confidential

Pease see attached.

Best,

Lisa Wabinga

Contract EEO Investigator

Computer Evidence Specialists, LLC (CES,LLC)

253.355.0337

lisa.wabinga@ceseeo.com

The information contained in this e-mail and any attachments from Computer Evidence Specialists, LLC may contain confidential and/or proprietary information, and is intended only for the named recipient to whom it was originally addressed. If you are not the intended recipient, any disclosure, distribution, or copying of this e-mail or its attachments is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by return e-mail and permanently delete the e-mail and any attachments.



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Testimony of Cynthia Reluya
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | | |
|---|---|---|
| Azis Kochiu | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | Case No. 200J-556A-2023-152770 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC  20420 | ) | |
| _____ | ) | |

I, Cynthia Reluya**,** solemnly swear/affirm that the responses and documents I provided in response to the following questions are true and complete to the best of my knowledge and belief.

***Whether the complainant was subjected to a hostile work environment based on Sex (Male) and Reprisal when:***

**Item f: on June 19, 2023, he became aware DLV was asking co-workers to submit negative reports of contacts regarding him.**

1. What is your full name? Cynthia Reluya

2. What is your present position title and series? Nurse Care Coordinator

3. Please state your grade level. Nurse 3 step 9

4. In what (Organization) unit/division do you currently work for? Office of Community Care

5. How long have you worked for this organization? Four years and 9 months

6. Please identify your first and second-line supervisors by name and title.
   1.Christianah Arowora, OCC Nurse Manager; 2. Donnabelle Lorenzo-Villarino, Division Head Officer

---

Affiant's Initials:  ___CPR_____    Date:___1/31/2024_____                    Page 1

7. Are they the same first and second level supervisors you had during the date(s) of the alleged discrimination? If not, please state the changes from then until now.
Yes

8. How many years have you worked for the VA Medical Center? Four years and 9 months

9. How long have you been in your current position? Four years and 9 months

10. What is your organizational relationship to the Complainant? He was my colleague.

11. Please identify your sex. Female

12. What do you believe Complainant's sex to be? Male

**In regard to issue f: on June 19, 2023, CP became aware DLV was asking co-workers to submit negative reports of contacts regarding him;**

13. Did RMO Donnabelle L. Lorenzo-Villarino contact you to submit negative reports regarding him?

   A: No

14. If so, when?

   A: Not applicable

15. What did she ask you to report?  Please explain. (Do not disclose confidential information regarding patient information)

   A: Not applicable

16. Did you submit the report?  If so, who did you report it to?

   A: Not applicable

17. Please describe the details which led to this action.

   A: Not applicable

18. Did this action comply with applicable policies and regulations? If so, please

identify these policies and regulations?

A: Not applicable

19. Do you have any reason to believe that the Complainant's or prior EEO activity was a factor in management's actions? Explain.

A: Not applicable

20. Do you have anything else to add?

A: None

This statement is made under penalty of perjury on this __31__ day of ___January_____, 2024. (year).

_____
CYNTHIA RELUYA  Digitally signed by CYNTHIA RELUYA
                Date 2024.01.31 12:41:10 -10'00'

Cynthia Reluya
Signature

.

**From:** Arowora, Christianah T. FHCC Lovell
**To:** Lorenzo-Villarino, Donnabelle L.
**Subject:** RE: RN PROFICIENCY INPUT
**Date:** Friday, February 11, 2022 3:51:35 PM
**Attachments:** image001.png
image002.png

Got it Noted. Thank you.

V/r



Christianah Arowora MSN, MHA, BSN, BS, RN, CCRN-K, CCM.
VISN 12 Acting Women's Health Community Care Clinical Coordinator.
VISN 12 VA Great Lakes Health Care System.
Healthcare Corporate Tower
11301 W. Cermak Rd. STE 810
Westchester, IL 60154
VA Cell phone: 847-456-5050
Email: Christianah.Arowora@va.gov

CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Friday, February 11, 2022 3:50 PM
**To:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Subject:** RE: RN PROFICIENCY INPUT

I requested input again from employee but was only provided with same info from last year. No new input from employee or manager therefore I would disagree with a HIGH SATISFACTORY rating. I

```
would rate SATISFACTORY.  Please sign as rating official and
issue to the employee upon your return.  Thank you.

Respectfully,

Donnabelle Lorenzo-Villarino, RN
Managed Care Clinical Coordinator/Division Officer
Patient Administration Department/Resources Directorate
X88454
Fax # 224-610-3821
```

**From:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Sent:** Wednesday, January 26, 2022 4:59 PM
**To:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Subject:** RE: RN PROFICIENCY INPUT
**Importance:** High


Good afternoon Donnabelle,

I do not have any added information. I will rate this employee as indicated below.


CATEGORY I – NURSING PRACTICE ---HIGH SATISFACTORY
Category II – interpersonal relationships----HIGH SATISFACTORY
OVERALL RATING------- HIGH SATISFACTORY
ENTRIES ON THIS FORM ARE BASED ON:
FREQUENT OR DAILY CONTACT and FREQUENT OBSERVATIONS OF WORK RESULTS


Thank you.



V/r

Christianah Arowora MSN. MHA. BSN. BS. RN. CCRN-K. CCM.
VISN 12 Acting Women's Health Community Care Clinical Coordinator.
VISN 12 VA Great Lakes Health Care System.
Four Westbrook Corporate Tower
11301 W. Cermak Rd. STE 810
Westchester, IL 60154
VA Cell phone: 847-456-5050
Email: Christianah.Arowora@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Wednesday, January 26, 2022 12:40 PM
**To:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Subject:** RE: RN PROFICIENCY INPUT

```
He did not provide any input, there is no attachment.

Respectfully,

Donnabelle Lorenzo-Villarino, RN
Managed Care Clinical Coordinator/Division Officer
Patient Administration Department/Resources Directorate
X88454
Fax # 224-610-3821
```

**From:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Sent:** Wednesday, January 26, 2022 12:24 PM
**To:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Subject:** RE: RN PROFICIENCY INPUT
**Importance:** High

There is no attachment to this email for rating.

V/r

Christianah Arowora MSN. MHA. BSN. BS. RN. CCRN-K. CCM.
VISN 12 Acting Women's Health Community Care Clinical Coordinator.
VISN 12 VA Great Lakes Health Care System.
Four Westbrook Corporate Tower
11301 W. Cermak Rd. STE 810
Westchester, IL 60154
VA Cell phone: 847-456-5050
Email: Christianah.Arowora@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Wednesday, January 26, 2022 11:39 AM
**To:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Subject:** FW: RN PROFICIENCY INPUT

Please advise how you would rate this employee and if you have additional info to add – employee did not provide any input. Thank you.

Respectfully,

**Donnabelle Lorenzo-Villarino, RN**
Managed Care Clinical Coordinator/Division Officer
Patient Administration Department/Resources Directorate
X88454
Fax # 224-610-3821

**From:** Lorenzo-Villarino, Donnabelle L.
**Sent:** Monday, December 13, 2021 12:04 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Subject:** RE: RN PROFICIENCY INPUT

Good Morning,

To date there has not been any input submitted on your proficiency. Please advise whether or not you will be providing me your input. Thank you.

Respectfully,

**Donnabelle Lorenzo-Villarino, RN**
Managed Care Clinical Coordinator/Division Officer
Patient Administration Department/Resources Directorate
X88454
Fax # 224-610-3821

**From:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Sent:** Friday, November 12, 2021 4:09 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Subject:** RN PROFICIENCY INPUT
**Importance:** High

Good afternoon Azis,

Please send your FY 2022 input for your proficiency due COB 12/10/2021.

Thank you.

V/r

Christianah Arowora MSN. MHA. BSN. BS. RN. CCRN-K. CCM.
Nurse Manager/Division Officer Office of Community Care (OCC)
Captain James A. Lovell Federal Health Care Center
3001 Green Bay Road
North Chicago, IL 60064
Direct: (224) 610-8639 or 88639
Cell phone: 847-456-5050
Email: Christianah.Arowora@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or

failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**From:** Fareji, Megan M. FHCC Lovell <Megan.Fareji@va.gov>
**Sent:** Friday, November 12, 2021 2:43 PM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>
**Cc:** Arowora, Christianah T. FHCC Lovell <Christianah.Arowora@va.gov>
**Subject:** Annual Nurse Proficiency Due 12/21/2021

Hello,

Your annual proficiency for rating period (2/19/2021 – 2/19/2022) is due to the Office of the Nurse Executives by 12/21/2021.

Nursing proficiency document should be completed and sent to your manager **90 days before the grade entry date** to allow for corrections and approval signatures.

Once all signatures are obtained, please forward the completed Proficiency to the e-mail group **"FHCC Lovell Nurse Proficiency"** for review.

The Office of the nurse Executive will then Upload for HR and NPSB review.

If you have not completed the process for this year, please complete it as soon as possible.

Your supervisor / rater has been included on this e-mail. **If your supervisor has changed or the person listed is incorrect,** please respond to this e-mail with the correct information.

The form that needs to be completed is found in Nursing Resources > Professional Development > NPSB Information > Proficiency Form, or by following the link below:

Please click on the **Edit Document** button on the top right of the page, select **Edit in Desktop App**, then save the completed document in your **(U) drive** before you send it to your manager.

Nurse Proficiency Form



If you are in a supervisory position on an ECF and looking for promotion to Nurse III, please

000835

submit a memo writing to the performance standards as an addendum to your ECF. Submit this with a copy of your most recent ECF.

If you have any questions regarding your proficiency, performance standards, or on the rating process, please contact your supervisor. (If your direct supervisor is not a RN or NP, please reach out to the ACN for your department for proficiency writing guidance.)

You can find additional resources at the Office of Nursing Services website:
http://vaww.va.gov/nursing/qualificationstandards.asp#path

Finally, please take this opportunity to notify me if there have been any changes in your education level (i.e. received advanced degree). *If you have received an advanced degree but it has not been verified by credentialing, the board will be unable to take it into account when considering you for promotion.

If your completed proficiency was forwarded to the manager, please follow up with them as to the status.

*Megan Farej*
Secretary
Office of the Nurse Executives
NPSB Administrative Support
Captain James A. Lovell FHCC
(224)610-4999

| From: | Kochiu, Azis FHCC Lovell |
|---|---|
| To: | Lorenzo-Villarino, Donnabelle L.; Matusz, Dorinda J. FHCC Lovell |
| Cc: | Paulson, Rhonda FHCC Lovell; Harris, Adriene O. FHCC Lovell |
| Subject: | RE: Recap on meeting |
| Date: | Thursday, April 6, 2023 2:08:31 PM |
| Attachments: | image001.png |

Yeah that would be great, Ill come in on Monday.

Thanks
ozzie

**From:** Lorenzo-Villarino, Donnabelle L. <Donnabelle.Lorenzo-Villarino@va.gov>
**Sent:** Thursday, April 6, 2023 9:48 AM
**To:** Kochiu, Azis FHCC Lovell <Azis.Kochiu@va.gov>; Matusz, Dorinda J. FHCC Lovell
<Dorinda.Matusz@va.gov>
**Cc:** Paulson, Rhonda FHCC Lovell <Rhonda.Paulson@va.gov>; Harris, Adriene O. FHCC Lovell
<Adriene.Harris2@va.gov>
**Subject:** Recap on meeting

Good morning,

Just to recap on our recent teams meeting. Thank you for the
information. We acknowledge and understand your concerns from
your perspective. Please know we take your concern seriously
and will resolve this matter accordingly. *As per our previous
conversation, I am currently working to convert one LPN FTEE
into an RN FTEE so each team will have 3 RNs. As discussed,
the plan is to have nurse manager assist with the workload in
the interim. As you are aware Rhonda, acting Nurse Manager is
making every effort to learn as much as she can with consult
processing so she can assist your team. She is planning to
shadow other RNs to review their current process. If your team
can assist with her orientation to expedite the process, we
would appreciate the help. If you or Adrienne can be on
station Monday and Tuesday, so she can observe with the goal to
have her assist your team as soon as she can. Please work with
Rhonda.* Should you have further questions or concerns, please
do not hesitate to contact me. Thank you.


*Respectfully*

**Donnabelle Lorenzo-Villarino, RN**
*Managed Care Department Head*
*ACME-Ambulatory Care/CME Directorate*
*Captain James A. Lovell Federal Health Care Center*
3001 Green Bay Road North Chicago, IL 60064
Work: 1-847-688-1900 x68454 Cell: 1-847-331-4571
Fax: 1-224-610-8638 Email: donnabelle.lorenzo-villarino@va.gov



CONFIDENTIALITY NOTICE: "This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent, or as permitted by law, is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made."

**Exhibit 19**

**Affidavit of Monica Coleman.**

Monica states in her final answer that Donnabelle uses race when disciplining staff.

This witness as well as the 10 plus witnesses entered into evidence will testify to this as well.

Kochiu and Monica have already testified to it, now I will solidify this by my witnesses.



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Testimony of Monica Coleman
in the Matter of the EEO Complaint of Discrimination filed by Azis Kochiu

| | |
|---|---|
| Azis Kochiu ) | |
| Complainant ) | |
| ) | |
| v. ) | Case No. 200J-556A-2023-152770 |
| ) | |
| Secretary ) | |
| Department of Veterans Affairs ) | |
| 810 Vermont Avenue, NW ) | |
| Washington, DC  20420 ) | |
| _____ _____) | |

I, Monica Coleman**,** solemnly swear/affirm that the responses and documents I
provided in response to the following questions are true and complete to the best of
my knowledge and belief.

***Whether the complainant was subjected to a hostile work environment based
on Sex (Male) and Reprisal when:***

**Item f: on June 19, 2023, he became aware DLV was asking co-workers to
submit negative reports of contacts regarding him.**

1. What is your full name? Monica Necole Coleman

2. What is your present position title and series? RN Care Coordinator

3. Please state your grade level. Nurse I step 7

4. In what (Organization) unit/division do you currently work for? Captain James A
   Lovell in the Office of Community Care

5. How long have you worked for this organization? Feb. 2016

6. Please identify your first and second-line supervisors by name and title. First Line
   Supervisor Christianah Arowora RN.. Current second line supervisor Dr. Mamata
   Ravipati MD

7. Are they the same first and second level supervisors you had during the date(s)
   of the alleged discrimination? If not, please state the changes from then until

now. My second line supervisor has changed since the alleged discrimination. The previous second line supervisor was Donnabelle Lorenzo-Villarino RN

8. How many years have you worked for the VA Medical Center? Feb 2016

9. How long have you been in your current position? Started 11/2021

10. What is your organizational relationship to the Complainant? Co-worker

11. Please identify your sex. Female

12. What do you believe Complainant's sex to be? Male

**In regard to issue f: on June 19, 2023, CP became aware DLV was asking co-workers to submit negative reports of contacts regarding him;**

13. Did RMO Donnabelle L. Lorenzo-Villarino contact you to submit negative reports regarding him?

   A: Yes

14. If so, when?

   A: I have no exact date, but it was the same day for which Mr. Azis Kochiu did not agree with the changes for which Donnabelle Lorenzo-Villarino was proposing. I do know that it was before May 8,2023 maybe a few months prior as Ms. Christianah Arowora was still out of the office at the time. The conversation was either about billing or workload.

15. What did she ask you to report? Please explain. (Do not disclose confidential information regarding patient information)

   A: She asked me to write up a report of contact stating that Mr. Azis Kochiu was disrespectful.

16. Did you submit the report? If so, who did you report it to?

   A: I did not submit a report

17. Please describe the details which led to this action.

   A: We had a huddle for which Donnabelle Lorenzo-Villarino was the acting direct supervisor. Azis Kochiu expressed concern regarding the topic of billing or

workload and Donnabelle Lorenzo-Villarino was attempting to suppress his concerns. Azis Kochiu was bringing attention to a process that was could have been harmful to the department's success.

18. Did this action comply with applicable policies and regulations? If so, please identify these policies and regulations?

A: No. A supervisor should not be requesting an employee to place a Report of Contact against another employee if it did not directly affect said employee. If Donnabelle Lorenzo-Villarino felt disrespected, she should have placed her own report of contact. This is not the first incident for which an employee disagrees with her. She had never requested any report of contact to be done on anyone else in the department.

19. Do you have any reason to believe that the Complainant's or prior EEO activity was a factor in management's actions? Explain.

A. Anytime that an employee does not agree with Donnabelle Lorenzo-Villarin, she targets that individual. I have been a victim of her target as well.

20. Do you have anything else to add?

A: Donnabelle Lorenzo-Villarino has her favorites in the department. The individuals that don't speak up or that are of her race, she brings no negative actions against. For example, there was another case similar to Azis Kochi for which the other employee received a lesser discipline action.

This statement is made under penalty of perjury on this _1st___day of ___February_____, 2024. (year).

MONICA COLEMAN  <small>Digitally signed by MONICA COLEMAN Date: 2024.02.01 10:49:56 -06'00'</small>
_____
Monica Coleman
Signature

**Exhibit 20**

**This is a recent email that was sent to the Hospital asking for staff help in the Community Care Department.  Why is it significant?  Because I was charged with, "Delay of Care", despite following the correct protocol given to the department by Donnabelle the manager.  And yet even today the entire department is in, "Delay of Care" status and not one person has been detailed, suspended, humiliated, slandered, or had a false chart review done to them.  Contrary to what happened to Kochiu.**

| From: | Knapp, Monica A. FHCC Lovell |
|---|---|
| To: | FHCC Lovell All RN"s |
| Cc: | Dietrich, Leigh A.; Maldonado, Vanessa FHCC Lovell; Shaw, April L. FHCC Lovell; Ravipati, Mamata FHCC Lovell; Morse, Alex M. (VISN 12 HR); King, Courtney L.; Spillner, Cathy FHCC Lovell |
| Subject: | **SHORT FUSED** RN Volunteers Needed for OCC Detail - RESPOND NLT THURSDAY 7/24/25 @ 0730 |
| Date: | Tuesday, July 22, 2025 5:22:07 PM |
| Importance: | High |

All RNs,

Office of Community Care (OCC) is seeking interested volunteers for a 120 day detail to OCC. This detail will assist in reducing the referral backlog and mitigate critical staffing shortfalls. You will report directly to the OCC Nurse Manager, Christianah Arowora. There will be no changes in your pay status. There is no formal position change and you will continue to hold your permanent position and will return to it upon the completion of the detail. Tour of duty is Monday-Friday (not negotiable) from 0730-1600 (some flexibility may be negotiated, including those with compressed tours).

This is unfortunately a short fused request. *If you are interested in this detail*, please reply to me **with your supervisor's approval for consideration NLT 0730 on Thursday, 7/24/25.**

Thank you!

Very Respectfully,

**Monica Knapp, RN, MSN**
**Chief Nurse, Managed Care**
CAPT James. A. Lovell, Federal Health Care Center
Monica.knapp@va.gov
Office: 224-610-1141